**No. 26-6906**

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

STANFORD DAILY PUBLISHING CORPORATION, ET AL.,
*Plaintiffs-Appellees*,

v.

MARCO RUBIO, ET AL.,
*Defendants-Appellants*.

On Appeal from a Judgment Issued by the U.S. District Court for the Northern District of California (Civil Action No. 5:25-cv-06618-NW)

# DEFENDANTS-APPELLANTS' OPENING BRIEF

JONATHAN D. GUYNN
Acting Assistant Attorney General
Civil Division

DREW C. ENSIGN
Deputy Assistant Attorney General

THOMAS S. VASELIOU
Senior Counsel to
the Assistant Attorney General
Civil Division

AUGUST E. FLENTJE
Deputy Director
Office of Immigration Litigation

SAMUEL P. GO
Assistant Director

JAMES A. HURLEY
Trial Attorney
Office of Immigration Litigation
U.S. Department of Justice
Civil Division
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044
T: (202) 305-1889
F: (202) 305-2509
james.hurley@usdoj.gov

JAIME DURR
DOMINIC WEISS
Trial Attorneys

November 20, 2026

*Attorneys for Defendants-Appellants*

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT ............ xiii

INTRODUCTION ............ 1

STATEMENT OF JURISDICTION ............ 4

STATEMENTS OF THE ISSUES ............ 4

STATEMENT OF THE CASE ............ 5

I. Legal Background ............ 5

II. Factual Background ............ 9

A. The United States responds to an increase in antisemitic violence and national-security threats. ............ 9

B. Related Case in *American Associations of University Professors v. Rubio*, No. 1:25-cv-10685 (D. Mass) ............ 11

III. Proceedings Below ............ 12

A. Verified Amended Complaint ............ 12

B. Memorandum of Decision and Judgment ............ 14

SUMMARY OF ARGUMENT ............ 15

STANDARD OF REVIEW ............ 19

ARGUMENT ............ 19

I. Both Plaintiffs lack standing. ............ 19

A. Jane Doe lacks standing. ............ 20

1. There is no credible threat of enforcement against Doe. ............ 21

2. Doe has not established an intention to engage in conduct arguably covered by the Provisions. .......... 25

B. Stanford Daily lacks standing. .......... 26

1. Stanford Daily lacks associational standing. .......... 26

2. Stanford Daily lacks organizational standing. .......... 30

II. Jurisdiction is barred by the INA. .......... 32

A. 8 U.S.C. §1252(a)(5), (b)(9) and §1201(i) .......... 32

B. 8 U.S.C. §1252(g) .......... 35

III. The Deportation and Revocation Provisions do not violate the First Amendment. .......... 38

A. Plaintiffs failed to meet their facial-challenge burden. .......... 39

B. The Provisions do not facially violate the First Amendment. .......... 51

1. Aliens are entitled to weak First Amendment protections. .......... 51

2. The Provisions do not violate aliens' First Amendment rights. .......... 62

C. Even if normal scrutiny standards applied, the Provisions survive any standard of review. .......... 65

IV. The Deportation and Revocation Provisions are not unconstitutionally vague. .......... 69

A. The Provisions do not regulate primary conduct or define the lawfulness of speech. .......... 69

B. The Provisions provide sufficient notice and

standards. ..... 72

CONCLUSION ..... 75

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

*AAUP v. Rubio*,
802 F.Supp.3d 120 (D. Mass. 2025) ........................................ 11, 24, 32

*Adams v. Howerton*,
673 F.2d 1036 (9th Cir. 1982) ........................................................ 64

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
591 U.S. 430 (2020) ....................................................................... 42

*Alexander v. S.C. State Conf. of the NAACP*,
602 U.S. 1 (2024) ........................................................................... 19

*Am. Legal Found. v. FCC*,
808 F.2d 84 (D.C. Cir. 1987) .......................................................... 28

*Arizona All. for Retired Americans v. Mayes*,
186 F.4th 622 (9th Cir. 2026) ......................................... 21, 30, 31

*Beram v. City of Sedona*,
--- F.4th ----, 2025 WL 5380289, (9th Cir. 2026) ............................... 21

*Blum v. Holder*,
744 F.3d 790 (1st Cir. 2014) ........................................................... 22

*Bluman v. FEC*,
800 F.Supp.2d 281 (D.D.C. 2011) ........................................ 54, 57, 58

*Bouarfa v. Mayorkas*,
604 U.S. 6 (2024) ..................................................................... 73, 74

*Brecht v. Abrahamson*,
507 U.S. 619 (1993) ....................................................................... 58

*Bucklew v. Precythe*,
587 U.S. 119 (2019) ....................................................................... 48

*Carlson v. Landon*,
342 U.S. 524 (1952) ........................................................................ 60

*Carman v. Yellen*,
112 F.4th 386 (6th Cir. 2024) ........................................................ 69

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ........................................................ 21, 23, 24

*Connection Distrib. Co. v. Holder*,
557 F.3d 321 (6th Cir. 2009) .......................................................... 43

*Crawford-Hall v. United States*,
2018 WL 5816117 (C.D. Cal. May 31, 2018) ..................................... 72

*D.C. v. Heller*,
554 U.S. 570 (2008) ........................................................................ 52

*Dayton Area Chamber of Com. v. Kennedy*,
147 F.4th 626 (6th Cir. 2025) ........................................................ 29

*Demore v. Hyung Joon Kim*,
538 U.S. 510 (2003) ........................................................................ 54

*Dep't of State v. Muñoz*,
602 U.S. 899 (2024) ........................................................ 38, 62, 63

*E.F.L. v. Prim*,
986 F.3d 959 (7th Cir. 2021) .......................................................... 36

*Elgharib v. Napolitano*,
600 F.3d 597 (6th Cir. 2010) .......................................................... 37

*Elrod v. Burns*,
427 U.S. 347 (1976) ........................................................................ 55

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012) ........ 72

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ........ 23, 30

*Fitzgerald Reno, Inc. v. DOT*,
60 F. App'x 53 (9th Cir. 2003) ........ 29

*Fleck & Assocs. v. City of Phoenix*,
471 F.3d 1100 (9th Cir. 2006) ........ 27

*Foley v. Connelie*,
435 U.S. 291 (1978) ........ 56

*Free Speech Coal. v. U.S. Att'y Gen.*,
974 F.3d 408 (3d Cir. 2020) ........ 29

*Gettman v. DEA*,
290 F.3d 430 (D.C. Cir. 2002) ........ 28

*Gonzales v. Carhart*,
550 U.S. 124 (2007) ........ 48

*Gonzalez v. Dep't of State*,
174 F.4th 683 (9th Cir. 2026) ........ 18, 41, 73

*Graham v. Richardson*,
403 U.S. 365 (1971) ........ 59

*Harisiades v. Shaughnessy*,
342 U.S. 580 (1952) ........ 18, 55, 64, 67

*Hoffman v. Bailey*,
996 F.Supp.2d 477 (E.D. La. 2014) ........ 42

*Holder v. Humanitarian L. Project*,
561 U.S. 1 (2010) ........ 65, 67

*Humphries v. Various Fed. USINS Emps.*,
164 F.3d 936 (5th Cir. 1999) .................... 37

*Hunt v. Washington State Apple Advert. Comm'n*,
432 U.S. 333 (1977) .................... 26, 27

*Hunter v. Dep't of Educ.*,
115 F.4th 955 (9th Cir. 2024) .................... 65

*In re Nat'l Sec. Letter*,
33 F.4th 1058 (9th Cir. 2022) .................... 65, 66, 68

*J.E.F.M. v. Lynch*,
837 F.3d 1026 (9th Cir. 2016) .................... 33

*Jimenez-Angeles v. Ashcroft*,
291 F.3d 594 (9th Cir. 2002) .................... 36

*John Doe No. 1 v. Reed*,
561 U.S. 186 (2010) .................... 47

*Khalil v. United States*,
164 F.4th 259 (3d Cir. 2026) .................... 23, 33, 35

*Kleindienst v. Mandel*,
408 U.S. 753 (1972) .................... 38, 62, 64

*Kumar v. Koester*,
131 F.4th 746 (9th Cir. 2025) .................... 20

*Kwong Hai Chew v. Colding*,
344 U.S. 590 (1953) .................... 41, 58

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .................................................................... 31

*Mathews v. Diaz*,
426 U.S. 67 (1976) ...................................................................... 62

*Moody v. NetChoice*,
603 U.S. 707 (2024) ........................................................ 39,42, 45, 50

*Murthy v. Missouri*,
603 U.S. 43 (2024) ............................................................... 23, 25

*NetChoice v. Att'y Gen., Georgia*,
--- F.4th ----, 2026 WL 3079563 (11th Cir. Oct. 15, 2026) ............ 42, 43

*NetChoice v. Bonta*,
152 F.4th 1002 (9th Cir. 2025) . 17, 20, 27, 39, 40, 43, 44, 45, 46, 48, 64

*NetChoice v. Bonta*,
170 F.4th 744 (9th Cir. 2026) ........................................... 39, 40, 43

*Nishimura Ekiu v. United States*,
142 U.S. 651 (1892) .................................................................... 59

*Nyeholt v. Sec'y of Veterans Affs.*,
298 F.3d 1350 (Fed. Cir. 2002) .................................................... 70

*Or. Advocacy Ctr. v. Mink*,
322 F.3d 1101 (9th Cir. 2003) ...................................................... 27

*Palestine Info. Off. v. Shultz*,
853 F.2d 932, 944 (D.C. Cir. 1988) ............................................... 72

*Peace Ranch v. Bonta*,
93 F.4th 482 (9th Cir. 2024) ......................................................... 24

*Pub. Emps. for Env't Resp. v. Zeldin*,
174 F.4th 183 (D.C. Cir. 2026) ..................................................... 28

*Qatanani v. United States*,
144 F.4th 485 (3d Cir. 2025) .......................................... 54, 59, 61, 64, 67

*R.A.V. v. City of St. Paul*,
505 U.S. 377 (1992) .......................................................................... 49, 50

*Reno v. AADC*,
525 U.S. 471 (1999) .......................................................................... 35, 36

*AADC v. Reno*,
70 F.3d 1045 (9th Cir. 1995) ........................................................................ 56

*Satanic Temple v. Labrador*,
149 F.4th 1047 (9th Cir. 2025) .................................................................. 29

*Speech First v. Killeen*,
968 F.3d 628 (7th Cir. 2020) ............................................................. 20, 25

*Students for Fair Admissions v. Harvard Coll.*,
600 U.S. 181 (2023) .......................................................................................... 26

*Susan B. Anthony List v.* Driehaus,
573 U.S. 149 (2014) ............................................................................. 19, 20, 25

*Terrace v. Thompson*,
263 U.S. 197 (1923) .......................................................................................... 56

*Thomas v. Anchorage Equal Rts. Comm'n*,
220 F.3d 1134 (9th Cir. 2000) ...................................................................... 22

*Trump v. Hawaii*,
585 U.S. 667 (2018) .......................................................................................... 60

*Turner v. Williams*,
194 U.S. 279 (1904) ............................................................................. 18, 55, 60

*Twitter v. Garland*,
61 F.4th 686 (9th Cir. 2023) ............................................ 18, 65, 66, 68

*United States v. Curtiss-Wright Export Corp.*,
299 U.S. 304 (1936) ............................................................................ 68

*United States v. Escobar-Temal*,
161 F.4th 969 (6th Cir. 2025) ............................................... 52, 53, 54

*United States v. Hansen*,
599 U.S. 762 (2023) ............................................................. 43, 44, 47

*United States v. Matchett*,
837 F.3d 1118 (11th Cir. 2016) ......................................................... 70

*United States v. Singh*,
979 F.3d 697 (9th Cir. 2020) ............................................................. 53

*Viasat, Inc. v. FCC*,
47 F.4th 769 (D.C. Cir. 2022) ........................................................... 28

*VIP Products v. United States*,
185 F.4th 919 (9th Cir. 2026) ........................................................... 19

*W. Virginia v. B.P.J.*,
609 U.S. 958 (2026) ............................................................................ 48

*Warth v. Seldin*,
422 U.S. 490 (1975) ............................................................................ 30

*Wayte v. United States*,
470 U.S. 598 (1985) ............................................................................ 56

*Williams v. Johnson*,
2011 WL 4101505 (E.D. Va.) ............................................................. 71

*Williams-Yulee v. Fla. Bar*,
575 U.S. 433 (2015) ...................................................... 65, 66, 67, 68

*Wolford v. Lopez*,
609 U.S. 185 (2026) .......... 53

*Woodhull Freedom Foundation v. United States*,
72 F.4th 1286 (D.C. Cir. 2023) .......... 74

*Woodruff v. Dep't of Lab.*, , Off. of Workers Comp. Program,
954 F.2d 634 (11th Cir. 1992) .......... 70

*Yifan Shen v. Comm'r*,
158 F.4th 1227 (11th Cir. 2025) .......... 58

**STATUTES**

8 U.S.C. §1101(a)(47)(B) .......... 9

8 U.S.C. §1182 .......... 5

8 U.S.C. §1182(a)(3)(B) .......... 68

8 U.S.C. §1182(a)(3)(c)(i) .......... 66

8 U.S.C. §1182(a)(3)(C)(iii) .......... 1, 5, 6, 41, 44, 63, 70, 71, 73

8 U.S.C. §1201 .......... 5, 32

8 U.S.C. §1201(i) .......... 1, 2, 3, 4, 6, 7, 16, 32, 33, 35, 49, 70, 74

8 U.S.C. § 1227 .......... 5

8 U.S.C. §1227(a) .......... 8

8 U.S.C. §1227(a)(1)(B) .......... 6, 7, 73

8 U.S.C. §1227(a)(4)(A)(i) .......... 68

8 U.S.C. §1227(a)(4)(A)(ii) .......... 68

8 U.S.C. §1227(a)(4)(B) .......... 68

8 U.S.C. §1227(a)(4)(C) .......... 33

8 U.S.C. §1227(a)(4)(C)(i) .......... 1, 2, 5, 6, 41, 44, 49, 50, 66, 68, 70, 73

8 U.S.C. §1227(a)(4)(C)(ii) .......... 6

8 U.S.C. §1229 .......... 8

8 U.S.C. §1229a .......... 8

8 U.S.C. §1229a(a)(1) .......... 8

8 U.S.C. §1229a(c)(1)(A) .......... 8

8 U.S.C. §1252(a)(5) .......... 3, 4, 16, 32, 33

8 U.S.C. §1252(b)(9) .......... 3, 4, 16, 32, 33

8 U.S.C. §1252(g) .......... 3, 4, 16, 32, 33

18 U.S.C. §611 .......... 57

28 U.S.C. §1291 .......... 4

28 U.S.C. §1331 .......... 4

**<u>REGULATIONS</u>**

8 C.F.R. §1003.1 .......... 9

8 C.F.R. §1003.13 .......... 8

## STATEMENT REGARDING ORAL ARGUMENT

Defendants-Appellants respectfully request oral argument. This Court has already granted Defendants' unopposed motion to expedite this appeal and stated that "[t]he case will be placed on the next available calendar upon the completion of briefing." Doc. 6.1.

# INTRODUCTION

Plaintiffs, Jane Doe and Stanford Daily, challenge longstanding provisions of the Immigration and Nationality Act ("INA")—the Deportation Provision (8 U.S.C. §§1227(a)(4)(C)(i), 1182(a)(3)(C)(iii)) and the Revocation Provision (8 U.S.C. §§1201(i), 1227(a)(1)(B))—claiming they facially violate the First Amendment's free-speech guarantee and the Fifth Amendment's vagueness doctrine. Everyone agrees Plaintiffs' challenges are facial, but Plaintiffs believe their "facial challenge" can be narrowed to the Provisions' application to "protected speech." The district court somehow agreed and entered a follow-the-law declaratory judgment, declaring that the Provisions violate the First and Fifth Amendment "with respect to enforcement based on protected speech." 1-ER-0092.

If that sounds circular and absurd, that is because it is. There is no such thing as a facial challenge to provisions that are directed at conduct—not speech—"as to their application to protected speech." That question-begging, facial-challenge-but-somehow-only-as-to-particular-applications framing is as novel as it is uncognizable. And because Plaintiffs impermissibly limited their facial-challenge analysis and record

development, Plaintiffs never even tried to carry their burden to establish facial invalidity. That alone dooms their claims.

But even if one performs a facial-challenge analysis, Plaintiffs' claims still clearly fail. The Provisions cover a wide swath of conduct, and those clearly constitutional applications easily outweigh any purported unconstitutional ones.

Instead, the district court, using its nonsensical framing, concluded that the Provisions are facially content-based and viewpoint-discriminatory and applied strict scrutiny. That is deeply wrong.

The Provisions are not facially content-based or viewpoint-discriminatory. The Provisions are directed at conduct, not speech. Nowhere does the Revocation Provision or the main Deportation Provision even mention speech. 8 U.S.C. §§1201(i), 1227(a)(4)(C)(i). The Provisions thus do not facially trigger First Amendment scrutiny.

Regardless, the normal scrutiny levels do not apply to aliens' First Amendment rights. Text, history, and precedent all show that aliens' First Amendment rights are weaker than U.S. citizens. Indeed, the Supreme Court has already held that the First Amendment does not prohibit the United States from deporting aliens for their political beliefs

and associations. At most, Plaintiffs' First Amendment claims are reviewed under the highly deferential facially legitimate and bona fide reason standard. Plaintiffs cannot show the Provisions facially violate that highly deferential standard.

In any event, the Provisions satisfy any standard of review, including strict scrutiny. Contra the district court, the Provisions are narrowly tailored to serve the government's compelling U.S. foreign policy interest, including in national security and in preventing potentially serious foreign-policy consequences.

The Deportation and Revocation Provisions are also not unconstitutionally vague. The Provisions do not regulate primary conduct, so they are not subject to vagueness scrutiny. Nor do the Provisions fail to give sufficient notice or provide sufficiently clear standards.

This Court need not reach any of these issues, however, because the district court lacked jurisdiction. First, neither Plaintiff established standing, and for substantially the same reasons, Plaintiffs' claims are not ripe. Second, the district court's jurisdiction is barred by 8 U.S.C. §1252(a)(5), (b)(9), and (g) and 8 U.S.C. §1201(i). Congress specifically withdrew jurisdiction to review decisions and actions to place aliens in

removal proceedings and channeled those claims into removal proceedings reviewable in the courts of appeals. *Id.* §1252(a)(5), (b)(9), (g). Because Congress directed that Plaintiffs' claims be channeled into removal proceedings and no removal proceedings have been identified, the district court lacked jurisdiction. And because §1201 bars judicial review of revocation decisions outside removal proceedings, the district court lacked jurisdiction over Plaintiffs' Revocation Provision claim.

This Court should reverse.

## STATEMENT OF JURISDICTION

Plaintiffs invoked jurisdiction under 28 U.S.C. §1331, and the First and Fifth Amendments to the Constitution, which Defendants dispute.

The district court entered the Memorandum of Decision and Judgment under Rule 52(a) on August 28, 2026. 1-ER-0002-92. This Court has jurisdiction under 28 U.S.C. §1291. Defendants filed a timely notice of appeal on October 14, 2026. 15-ER-4114; *see* Fed. R. App. P. 4(a)(1)(B).

## STATEMENTS OF THE ISSUES

1. Whether Plaintiffs lack standing.

2. Whether 8 U.S.C. §1252(a)(5), (b)(9), and (g) and 8 U.S.C. §1201(i) divested the district court of jurisdiction over Plaintiffs' claims.

3. Whether the Deportation and Revocation Provisions facially violate the First Amendment.

4. Whether the Deportation and Revocation Provisions are unconstitutionally vague.

## STATEMENT OF THE CASE

### I. Legal Background

There are numerous immigration enforcement pathways under the INA. These paths can involve distinct statutory provisions and different agencies and government actors, including officials from the State Department and the Department of Homeland Security ("DHS"). Plaintiffs challenge only portions of 8 U.S.C. §§1227, 1182, and 1201. Still, Plaintiffs' challenges directly implicate two distinct pathways. And the United States has significant flexibility and discretion over which path to use (or even to use another path not at issue here).

The first path involves 8 U.S.C. §1227(a)(4)(C)(i) and §1182(a)(3)(C)(iii) (collectively, "Deportation Provision"). The Deportation Provision applies to all types of aliens—*e.g.*, illegal, lawful permanent residents ("LPRs"), temporary visitors, and visa holders.

Under §1227(a)(4)(C)(i), an alien "whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is deportable." But there is a narrow exception to that general grant of authority. Under 8 U.S.C. §1182(a)(3)(C)(iii), as incorporated by 8 U.S.C. §1227(a)(4)(C)(ii):

> An alien … shall not be [deportable] because of the alien's past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States, unless the Secretary of State personally determines that the alien's [presence] would compromise a compelling United States foreign policy interest.

The exception applies, among other things, to "past, current, or expected" speech that occurred anywhere in the world if that same speech "would be lawful within the United States." *Id.*

The second path involves 8 U.S.C. §1201(i) and §1227(a)(1)(B) (collectively, "Revocation Provision"). The Revocation Provision applies to aliens with visas, but there are a wide range of visas, generally categorized as "immigrant" and "nonimmigrant" visas. *See* Directory of Visa Categories, Dep't of State, https://travel.state.gov/content/travel/en/us-visas/visa-information-resources/all-visa-categories.html. These visas are

generally temporary and time limited. Examples include F-1 visas for students, H-2A visas for temporary agricultural workers, B-2 visas for tourists, B-1 visas for business visitors, and H-1B visas for temporary workers in specialty occupations.

Under §1201(i), the Secretary of State has broad discretionary authority to revoke visas:

> After the issuance of a visa or other documentation to any alien, the consular officer or the Secretary of State may at any time, in his discretion, revoke such visa or other documentation.... There shall be no means of judicial review ... of a revocation under this subsection, except in the context of a removal proceeding if such revocation provides the sole ground for removal under [8 U.S.C §1227(a)(1)(B)].

Once a visa is revoked under §1201(i), the alien is deportable. 8 U.S.C. §1227(a)(1)(B). And the Revocation Provision makes clear that "[t]here shall be no means of judicial review ... of a revocation" of a visa under §1201(i), "except in the context of a removal proceeding if such revocation provides the sole ground for removal ...." *Id.* §1201(i).

Unlike the Deportation Provision, the Revocation Provision does not contain an exception for revocation of visas based on speech that "would be lawful within the United States."

Again, there are numerous other ways for an alien to be deemed deportable that do not involve the State Department. For example, DHS itself can initiate removal proceedings for an alien (including those with a visa) without going through the Secretary of State. *See, e.g.*, 8 U.S.C. §1227(a). The INA does not mandate an order or sequence that charges of removal have to be brought or that certain charges be brought.

In any event, under the above two paths, the State Department does not unilaterally act to remove aliens. Such proceedings also involve DHS. Under the INA, removal proceedings generally provide the exclusive means for determining whether an alien is both removable and eligible for any relief or protection from removal. 8 U.S.C. §1229a. Section 1229, entitled "[i]nitiation of removal proceedings," explains that an alien must be given written notice of the initiation of removal proceedings through a charging document, which may include a "Notice to Appear." 8 U.S.C. §1229; 8 C.F.R. §1003.13. To start removal proceedings, DHS files the notice with the immigration court. *Id.* §1003.14(a). For this process, DHS has discretion and flexibility on whether, when, and on what grounds to initiate such proceedings.

Removal proceedings are conducted before an immigration judge ("IJ"), who decides "whether an alien is removable from the United States." 8 U.S.C. §1229a(a)(1), (c)(1)(A). An alien can appeal an IJ's decision to the Board of Immigration Appeals ("BIA"). 8 C.F.R. §1003.1. An alien's order of removal does not become final until the BIA affirms the order or the time permitted to appeal runs. 8 U.S.C. §1101(a)(47)(B).

## II. Factual Background

### A. The United States responds to an increase in antisemitic violence and national-security threats.

On October 7, 2023, Hamas and other Palestinian terrorist groups launched a coordinated attack in southern Israel murdering thousands of innocent individuals, leading Israel to launch a counterattack and ground invasion of Gaza. 3-ER-0387. Planned and spontaneous protests erupted across the country, including at American universities, calling for, among other things, a ceasefire, increased humanitarian aid to Palestinians, and university divestment of financial portfolios from Israel. 3-ER-0387-88. Some of the individuals on campus engaged in disruptions, occupations of school buildings, harassment of Jewish students, and even violence. Others on and off campus voiced their views on the

conflict through social media, in news interviews, and in other forums. 3-ER-0388.

Upon taking office, President Trump issued two executive orders to address antisemitism and national security. Executive Order 14188 responds to "an unprecedented wave of vile anti-Semitic discrimination, vandalism, and violence[,] … especially in our schools," that arose from the Israeli-Hamas conflict. 90 FR 8847, §1 (Jan. 29, 2025). It directs agencies to use "all available and appropriate legal tools, to prosecute, remove, or otherwise hold to account the perpetrators of unlawful anti-Semitic harassment and violence." *Id.* §2.

Executive Order 14161 declares the United States's policy to "protect its citizens from aliens who intend to commit terrorist attacks, threaten our national security, espouse hateful ideology, or otherwise exploit the immigration laws for malevolent purposes." 90 FR 8451, §1(a) (Jan. 20, 2025). It seeks to ensure aliens "do not advocate for, aid, or support designated foreign terrorists and other threats to our national security." *Id.* §1(b).

Both EOs require their implementation to be consistent with applicable law. EO 14161, §4(b); EO 14188, §4(b).

### B. Related Case in *American Associations of University Professors v. Rubio*, No. 1:25-cv-10685 (D. Mass.)

In March 2025, two organizations sued in the District of Massachusetts alleging that in implementing EOs 14161 and 14188, DHS and the State Department were carrying out an "ideological-deportation policy," which they described as a "large-scale" policy of "arrest[ing], detain[ing], and deport[ing]" noncitizen students and faculty engaged in "pro-Palestinian protests" and related "expression and association." *AAUP v. Rubio*, 802 F.Supp.3d 120 (D. Mass. 2025).

The Massachusetts district court held a bench trial, taking testimony from several witnesses for both parties. 3-ER-0465; 13-ER-3536. The government's witnesses testified about the processes for evaluating and referring individuals for immigration enforcement actions, and for making removability and visa-revocation determinations.

In its decision, the Massachusetts district court concluded that "[t]here was no ideological deportation policy [and that i]t was never the Secretaries' immediate intention to deport all pro-Palestinian non-citizens." *AAUP*, 802 F.Supp.3d at 172-73. The court, however, determined that there was a government enforcement initiative constituting final agency action based on the government witnesses' testimony that the

government had engaged in a "discrete enforcement initiative." *Id.* at 191.

The government has appealed the decision, which is pending in the First Circuit. *AAUP v. Rubio*, Nos. 26-1141, -1195 (1st Cir.).

## III. Proceedings Below

### A. Verified Amended Complaint

On August 6, 2025, pseudonymous Plaintiff Jane Doe and the Stanford Daily Publishing Corporation ("Stanford Daily") filed a complaint in the Northern District of California seeking declaratory and injunctive relief.[1] 15-ER-4078-113. Plaintiffs later filed a Verified Amended Complaint. 13-ER-3620; 14-ER-3716. Plaintiffs brought facial challenges to the Deportation Provision and the Revocation Provision, claiming that the Provisions facially violate the First and Fifth Amendment.

Stanford Daily operates and publishes *The Stanford Daily*, a student-run newspaper at Stanford University. It covers relevant campus activities but also defends and advocates certain positions beyond campus. 3-ER-0458. Before suing, Stanford Daily started advocating against

[1] A second pseudonymous Plaintiff John Doe filed a stipulated dismissal of his case on July 27, 2026. 3-ER-0376-77.

the government's use of the Deportation and Revocation Provisions, alleging the government is using the Provisions to "punish legally present citizens." 14-ER-3687. Stanford Daily alleges that because of the government's threats to enforce the Deportation and Revocation Provisions, its "members" are, among other things, self-censoring. 14-ER-3690.

Plaintiff Jane Doe ("Doe") is an alien lawfully present in the United States on an F-1 student visa. 3-ER-0379. Doe has no relationship with Stanford Daily and has never been a student at Stanford University, 3-ER-0379, but was a member of the pro-Palestinian student group at her university, 3-ER-0384. Doe published pro-Palestinian/anti-Israel commentary online and publicly criticized American foreign policy, particularly its relationship with Israel. 3-ER-0381. Doe appeared in a profile on the Canary Mission website, which publishes the personal information of students, professors, and organizations it deems "anti-Israel." 3-ER-0384. In March 2025, Doe read news articles about the attempted deportation of aliens related to the Israeli-Palestinian conflict. 3-ER-385; 14-ER-3695. Per Doe, Doe refrained from publishing and voicing her opinions regarding Palestine and Israel and deleted a social-media account to guard against retaliation for past expression. 3-ER-0385-86.

### B. Memorandum of Decision and Judgment

After a bench trial, the district court issued a decision granting Plaintiffs declaratory relief but denying injunctive relief. 1-ER-0002-92. The district court first concluded that Plaintiffs established standing. 1-ER-0064. Though the district court failed to address Defendants' arguments that Stanford Daily lacks standing, the district court concluded that Doe satisfied her burden of showing a credible threat of enforcement based on enforcement of the INA against other aliens. 1-ER-0060-61.

On the merits, the district court concluded that the Provisions "facially" violate the First and Fifth Amendments with respect to "protected speech." 1-ER-0092. To reach that result, the court determined that Plaintiffs could properly narrow their facial challenge to the Provisions' application to "protected speech" only and that the Supreme Court's ordinary limits for facial challenges did not apply. 1-ER-0071. The court then concluded "noncitizens are afforded First and Fifth Amendment rights to the same extent as citizens." 1-ER-0069. As to the First Amendment, the court concluded that the Provisions triggered and failed strict scrutiny. 1-ER-0071, 0086. As to the Fifth Amendment, the court concluded that the Provisions were unconstitutionally vague because they

provided the Secretary of State too much discretion based on "incomprehensible standard[s]." 1-ER-0080.

The district court entered a follow-the-law declaratory judgment, declaring that the Deportation and Revocation Provisions "violate[] the First Amendment" and "the Fifth Amendment with respect to enforcement based on protected speech." 1-ER-0092.

## SUMMARY OF ARGUMENT

The district court concluded that the Deportation and Revocation Provisions of the INA "facially" violate the First and Fifth Amendment "with respect to enforcement based on protected speech." 1-ER-0092. This Court should reverse.

The district court lacked jurisdiction to adjudicate Plaintiffs' claims for two independent reasons.

First, neither Plaintiff established standing. Jane Doe lacks standing at least because she failed to establish a credible threat of enforcement. And Stanford Daily lacks associational and organizational standing. It is not a membership association and in any event, failed to adequately identify a member with standing for substantially the same reasons as Doe. And Stanford Daily lacks organizational standing because

it does not assert its own rights and did not establish that the Provisions directly interfered with its core business activities.

Second, jurisdiction is barred by 8 U.S.C. §1252(a)(5), (b)(9), and (g) and 8 U.S.C. §1201(i). Federal courts have limited jurisdiction, and Congress specifically withdrew jurisdiction to review decisions and actions, or legal or factual questions arising from such decisions and actions, to place aliens in removal proceedings. *Id.* §1252(b)(9), (g). Instead, it channeled those claims into removal proceedings reviewable in the courts of appeals. *Id.* §1252(a)(5).

Plaintiffs' claims rest on the premise that Plaintiffs or their members reasonably fear being placed in removal proceedings. But Congress directed that both types of claims be channeled into removal proceedings. Otherwise, it would set up a race to the courthouse where aliens can get pre-enforcement review of their claims as long as they file before immigration proceedings are commenced. This they cannot do. Regardless, §1201 bars judicial review of visa-revocation decisions outside removal proceedings, so the district court lacked jurisdiction over Plaintiffs' Revocation Provision claims.

On the merits, the district court's analysis fares no better. Though it is undisputed that Plaintiffs bring facial challenges, the district court concluded that none of the strictures on facial challenges applied because the district court could view the challenge as limited to "protected speech." If that sounds circular, that is because it is. And neither the district court nor Plaintiffs could identify a case allowing this unprecedented "facial" challenge.

Under the correct facial-challenge standard, Plaintiffs' First Amendment claim easily fails. Plaintiffs utterly failed to present adequate analysis and record development to enable a court to perform the facial-challenge analysis, even though it was Plaintiffs' burden. That dooms their claim. *See, e.g.*, *NetChoice v. Bonta*, 152 F.4th 1002, 1013 (9th Cir. 2025). Even if Plaintiffs had tried, they would have failed. The Provisions are directed at conduct—not speech. Indeed, application against unprotected conduct is their primary use. Because the Provisions cover a broad swath of conduct, those concededly constitutional applications dwarf the allegedly unconstitutional ones.

But even under the district court's bizarre framing, the court got it wrong. As to the First Amendment: Because the Provisions are directed

at conduct rather than speech, they do not facially trigger the First Amendment. Regardless, the Supreme Court has long found it permissible to deport aliens based on certain associations or expression. *See Harisiades v. Shaughnessy*, 342 U.S. 580, 592 (1952); *Turner v. Williams*, 194 U.S. 279, 292 (1904). Given that aliens have no or at least have weakened First Amendment rights in the removal context, the district court grievously erred by applying strict scrutiny.

But even if strict scrutiny applied, the Provisions pass muster because they are sufficiently tailored to serve the government's compelling interest in foreign policy and national security. Courts, including this Court, have numerous times concluded that national-security statutes surmount strict scrutiny. *See, e.g.*, *Twitter v. Garland*, 61 F.4th 686 (9th Cir. 2023).

As to the Fifth Amendment: Neither the Deportation Provision nor the Revocation Provision is unconstitutionally vague. Both provisions do not regulate primary conduct and thus are not subject to void-for-vagueness challenges. In any event, both Provisions provide sufficient notice. The Deportation Provisions provides obvious and meaningful limiting principles that are materially similar to other standards this Court has

upheld against vagueness challenges. *See, e.g.*, *Gonzalez v. Dep't of State*, 174 F.4th 683, 697 (9th Cir. 2026). The Revocation Provision also provides adequate notice and standards. It is clear in the discretion it provides to the Secretary of State to revoke visas. Though the Provision is broad, breadth does not equal vagueness.

This Court should reverse.

## STANDARD OF REVIEW

This Court reviews the district court's "legal conclusions following a bench trial *de novo* and findings of fact for clear error." *VIP Prods. v. United States*, 185 F.4th 919, 926 (9th Cir. 2026). But "[i]f a trial court bases its findings upon a mistaken impression of applicable legal principles, the reviewing court is not bound by the clearly erroneous standard." *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 18 (2024) (cleaned up).

## ARGUMENT

### I. Both Plaintiffs lack standing.

Plaintiffs "'bear[] the burden of establishing standing.'" *Susan B. Anthony List v. Driehaus* ("*SBA List*"), 573 U.S. 149, 158 (2014). Here, Plaintiffs must establish standing "'with the manner and degree of

evidence required at'" trial. *Id.* (cleaned up); *see* 1-ER-0003-92 (opinion after a "bench trial"). Neither Plaintiff has met their burden to establish standing. And for substantially the same reasons, Plaintiffs' claims are not ripe. *See NetChoice*, 152 F.4th at 1019 (standing and ripeness overlap in pre-enforcement First Amendment context).

### A. Jane Doe lacks standing.

To establish standing, Doe must show an injury in fact fairly traceable to the Provisions and likely redressable by a judicial ruling. *SBA List*, 573 U.S. at 157-58. It is undisputed that Doe has not actually faced *any* enforcement, let alone under the challenged Provisions. So Doe's standing necessarily depends on the future enforcement of the Provisions. Thus, Doe must show that she has "'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Id.* at 159.[2] She failed to do so.

---

[2] To the extent that Doe is relying on self-censorship to establish standing, that theory entirely overlaps with the credible-threat-of-enforcement analysis. "[S]elf-censorship is only an injury in fact where [the plaintiffs] demonstrate an actual and well-founded fear that the law will be enforced against them." *Kumar v. Koester*, 131 F.4th 746, 753 (9th Cir. 2025) (cleaned up); *see Speech First v. Killeen*, 968 F.3d 628, 638-39 & n.1

### 1. There is no credible threat of enforcement against Doe.

To determine whether there is a credible threat of enforcement, the Court considers "any past enforcement of the challenged statute and the potential for future enforcement." *Arizona Alliance for Retired Americans v. Mayes*, 186 F.4th 622, 637 (9th Cir. 2026) (en banc). Mere "allegations of possible future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (cleaned up). Doe has failed to establish a credible threat of enforcement.

***Past Enforcement.*** Past history of enforcement strongly cuts against standing. Doe was not subject to past enforcement despite past statements that are materially similar to Doe's desired future expression. 3-ER-0379.

Instead, Doe points to enforcement against other aliens. But "a history of enforcement is evidence of a credible threat only when it is against parties similarly situated to the plaintiff." *Beram v. City of Sedona*, --- F.4th ----, 2025 WL 5380289, at *7 (9th Cir. 2026) (cleaned up). Here, the

---

(7th Cir. 2020) (any "chilling effect" on plaintiff's speech must be "objectively reasonable").

enforcement actions Doe points to are materially different from the ones she claims to fear. The enforcement Doe identifies did not involve solely pure political speech as a basis for removal. Rather, they "were the result of the individuals' conduct at protests or other information discovered about them from the resulting investigations, not their mere participation in or presence at public protests or pure political speech." 13-ER-3602. These past instances of enforcement not only are rare but also differ from Doe's past conduct or desired conduct in critical respects, so Doe cannot rely on them to establish her own standing. *See Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1141 (9th Cir. 2000) (distinguishing past acts of enforcement as too different to establish plaintiffs' standing); *Blum v. Holder*, 744 F.3d 790, 799 (1st Cir. 2014) (no standing in a chill case where enforcement "has been rare and has addressed actions taken that are different from those plaintiffs propose to undertake").

***Future Enforcement.*** Doe failed to establish the potential for future enforcement based solely on her past or future desired speech. Doe hinges her standing on the allegation that the government is taking

ongoing immigration enforcement actions based solely on pure political speech, especially related to protesting Israel. 13-ER-3577.

But Defendants have already shown that the government months ago "completed its review of the 5,000-plus campus-protester names referred to it," with "less than 1% of campus-protest leads … result[ing] in nonimmigrant visa revocations"—none of which included Doe, despite her prior speech. 5-ER-1163-64; 6-ER-1402-04, 1417-23, 1455-58. Thus, "without proof of an ongoing pressure campaign, it is entirely speculative" that Doe will be targeted for enforcement. *Murthy v. Missouri*, 603 U.S. 43, 69 (2024).

The Provisions' structure further undermines that there is a credible threat. Enforcement based on the desired speech is highly speculative. After all, enforcement is highly discretionary in either pathway, and use of the Provisions generally can result in two separate paths to deportation. *Supra* 5-9. The "highly attenuated chain of possibilities" underscores that injury is anything but "certainly impending." *Clapper*, 568 U.S. at 410; *see FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 383 (2024) ("The causation requirement also rules out attenuated links ….").

Especially here: Doe offered nothing to show that such future, hypothetical action would be based on speech rather than general noncompliance with visa terms or some other unrelated basis for removal. *See, e.g.*, 13-ER-3566. And even if Doe showed that certain government actors might pursue enforcement action based on "protected speech," Doe offered no concrete evidence that such action would be approved, especially when so few campus protester leads (less than 1%) were even forwarded for *potential* enforcement action, 5-ER-1163; 6-ER-1402-04, 1417-23, 1455-58; *see Clapper*, 568 U.S. at 413 (expressing reluctance to find standing where it "require[s] guesswork as to how independent decisionmakers will exercise their judgment"). Doe's fears thus boil down to "a subjective chill based on speculation about potential governmental action" and falls far short of the required "concrete evidence to substantiate [Doe's] fears." *Id.* at 420 (cleaned up).

*AAUP* backs this up. There, the Massachusetts district court concluded that there "was no ideological deportation policy" and that "[i]t was never the Secretaries' immediate intention to deport all pro-Palestinian non-citizens." 802 F.Supp.3d at 172.

In sum, Doe failed to establish a credible threat of enforcement. This alone is fatal.

**2. Doe has not established an intention to engage in conduct arguably covered by the Provisions.**

Plaintiffs also had to show "'an intention to engage in a course of conduct arguably affected with a constitutional interest'" and "'proscribed by [the Provisions].'" *SBA List*, 573 U.S. at 159 (cleaned up). That means Doe, at a minimum, must identify "specific statements [she] intend[s] to make in [the] future." *Id.* at 161; *see Murthy*, 603 U.S. at 67 n.7 ("*plaintiffs* bear the burden to establish standing by setting forth 'specific facts'"); *Killeen*, 968 F.3d at 640 ("Speech First has failed to identify in the record specific statements any students wish to make that the University's policies have chilled.").

But Doe merely provided abstract topics Doe wishes to speak on and claimed she wanted to engage in "protected speech." 3-ER-0379-86. That crucially differs from other cases finding standing for pre-enforcement challenges based on much more concrete speech. *See, e.g.*, *SBA List*, 573 U.S. at 161 (plaintiffs "pleaded specific statements they intend to make in future election cycles").

### B. Stanford Daily lacks standing.

The district court failed to address Defendants' argument that Stanford Daily lacked standing. 1-ER-0054-64. Stanford Daily lacks both associational and organizational standing.[3]

#### 1. Stanford Daily lacks associational standing.

To establish associational standing, an organization must show that "'its members would otherwise have standing to sue in their own right,'" "'the interests it seeks to protect are germane to the organization's purpose,'" and "'neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Students for Fair Admissions v. Harvard Coll.* ("*SFFA*"), 600 U.S. 181, 199 (2023) (quoting *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). Stanford Daily cannot establish the first two requirements.[4]

---

[3] Below, Plaintiffs contended that Stanford Daily has "corporate standing." 13-ER-3551-53. But that is not a separate ground for standing. There is no meaningful difference between corporate standing and associational (or organizational) standing. *Id.* So Stanford Daily lacks "corporate standing" for the same reasons.

[4] To the extent Stanford Daily tries to claim that its challenges are as-applied or "hybrid" rather than purely facial, Stanford Daily flunks the third requirement of associational standing. That requirement is not satisfied if "the claim asserted [or] the relief requested requires the participation of individual members." *Hunt*, 432 U.S. at 343. As-applied challenges, and materially similar challenges, fail that requirement. *See, e.g.*,

**a.** Stanford Daily failed to identify a member that would otherwise have standing.

***First,*** Stanford Daily is not an association and lacks members, so it cannot identify a member with standing. "Associational standing is reserved for organizations that express the collective views and protect the collective interests of their members." *Fleck & Assocs. v. City of Phoenix*, 471 F.3d 1100, 1106 (9th Cir. 2006) (cleaned up). Stanford must show "'indicia of membership.'" *Or. Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1111 (9th Cir. 2003).

Stanford Daily is not an "association" of "members" in the relevant sense. It is not an advocacy organization. It is a general-purpose student-run newspaper. The newspaper alleges that its mission is "to serve the Stanford community with relevant, unbiased journalism and provid[e] its editorial, tech and business staffs with unparalleled educational opportunities." 13-ER-3636. That is not a membership association. *Cf. Viasat v. FCC*, 47 F.4th 769, 781 (D.C. Cir. 2022) ("[I]t is not enough for putative

---

*Free Speech Coal. v. U.S. Att'y Gen.,* 974 F.3d 408, 422 (3d Cir. 2020) (as-applied free speech); *NetChoice*, 152 F.4th at 1013-14 (same).

members simply to read a group's publications, subscribe to its e-mail list, or follow its Facebook page.").

Stanford Daily claims that it has "members," namely "editorial members or business members," who each have different responsibilities. 13-ER-3637. Those are not members, but de facto employees. And Stanford Daily "cannot claim their employees as 'members'" for associational-standing purposes. *Pub. Emps. for Env't Resp. v. Zeldin*, 174 F.4th 183, 193 (D.C. Cir. 2026).

Plaintiffs have not identified a single instance of a newspaper successfully asserting associational standing, let alone under the proper standard. To the contrary, the D.C. Circuit, for example, has rejected associational standing for a magazine because its relationship with employees, contributors, and its "readers and subscribers" did not make the magazine a membership association. *Gettman v. DEA*, 290 F.3d 430, 435 (D.C. Cir. 2002); *see Am. Legal Found. v. FCC*, 808 F.2d 84, 90 (D.C. Cir. 1987) (rejecting that a "media watchdog" group was a membership association).

***Second,*** Stanford Daily does not identify, through competent evidence, any individual with sufficient details. *See Satanic Temple v.*

*Labrador*, 149 F.4th 1047, 1050 (9th Cir. 2025). Regardless, Stanford Daily, at best, identifies individuals like Doe, but for the reasons explained above, Doe (or others materially similar to Doe) lack standing. *Supra* I.A.

**b.** Stanford Daily also cannot show germaneness. Stanford Daily has no special focus on foreign policy or immigration; it is a general-purpose newspaper with an admittedly "vast" scope. 3-ER-0414-15; 13-ER-3638 (describing other activities). Thus, Stanford Daily is not the type of organization that can establish associational standing here. *See*, *e.g.*, *Fleck*, 471 F.3d at 1106 (privacy interests of "members" of men's social club not germane to club's profit-seeking mission); *Fitzgerald Reno v. DOT*, 60 F.App'x 53, 53 (9th Cir. 2003) ("TTAX has no standing because it is a taxpayer organization whose purported environmental interests are not germane to its members.").

Indeed, "there is little reason to believe that [Stanford Daily] has any particular knowledge or experience in the subject matter of the lawsuit." *Dayton Area Chamber of Com. v. Kennedy*, 147 F.4th 626, 633 (6th Cir. 2025). Its interests are simply "too remote" to challenge the hypothetical enforcement of the Provisions. *Id.* To conclude otherwise would

mean that there is no "limiting principle" preventing any newspaper from challenging all sorts of statutes or actions that implicate something the newspaper writes on. *See id.* at 634 (finding no germaneness when there was no such "limiting principle"). That cannot be right.

### 2. Stanford Daily lacks organizational standing.

Stanford Daily does not meaningfully contend that *its* First Amendment rights are violated. Instead, Stanford Daily seeks to assert the First Amendment rights of others, *i.e.*, third parties. But Article III requires a plaintiff to "assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). Plaintiffs have never meaningfully tried to displace that usual rule. This alone is fatal.

But Stanford Daily cannot establish organizational standing regardless. The "standing inquiry is the same for individuals and for organizations." *Mayes*, 186 F.4th at 630. That is, "organizations must satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals." *Hippocratic Medicine*, 602 U.S. at 393-94. Organizational standing is reserved for "unusual case[s]" and should not be "extend[ed]." *Id.* at 396. And here, standing is particularly difficult to

establish because Stanford Daily is not the direct object of the Provisions. *See, e.g.*, *id.* at 383.

Stanford Daily has not shown a cognizable injury in fact. The Provisions have not "directly affected and interfered with [Stanford Daily's] core business activities." *Id.* at 395. Instead, Stanford Daily expresses "[g]eneral objections" or "abstract opposition" to the alleged enforcement of the Provisions, which does not constitute a cognizable injury. *Mayes*, 186 F.4th at 632. The Provisions do not require Stanford Daily to do, or refrain from doing, anything.

To the extent Stanford Daily claims other injury, it failed to quantify or substantiate them and its "fear cannot support standing because it lacks record support and is highly speculative." *Id.* at 634 (cleaned up). For example, any alleged "interference" has been the result of third parties making their own independent decisions—none of whom would have standing in their own right, as explained above. *See, e.g.*, 3-ER-0418; *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). Thus, Stanford Daily's alleged injury is not fairly traceable to the Provisions.

*AAUP* is instructive. There, the district court determined that the lead plaintiff group lacked organizational standing. 802 F.Supp.3d. at

180. As that court explained, the "harms" that AAUP tried to rely on—"deterred and diminished noncitizen participation in AAUP events and diverted resources from more typical core advocacy issues such as 'adjunctification' to dealing with immigration law"—were insufficient for an organization to demonstrate standing in its own right. *Id.* So too here.

## II. Jurisdiction is barred by the INA.

The district court also lacked jurisdiction to hear Plaintiffs' claims under 8 U.S.C. §1252(a)(5), (b)(9), and (g), and 8 U.S.C. §1201 bars Plaintiffs' Revocation Provision claims. Those provisions limit district courts' jurisdiction to hear challenges to decisions and actions to place aliens in removal proceedings, and channel review of such claims through the petition-for-review process, with ultimate review in a federal court of appeals. Because Plaintiffs' challenge turns on potential decisions to place aliens in removal proceedings, the district court lacked jurisdiction.

### A. 8 U.S.C. §1252(a)(5), (b)(9) and §1201(i)

In the INA, Congress provided a comprehensive and exclusive remedial scheme over challenges to decisions, actions, and proceedings related to the removal of aliens, that channels all such challenges through the immigration courts and subsequent review into the courts of appeals.

*See* 8 U.S.C. §1252(a)(5), (b)(9), (g); *id.* §1201(i). Section 1252(b)(9) directs that judicial review "of all questions of law and fact … arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section." *Id.* §1252(b)(9). Congress has further provided that a petition for review in the courts of appeals "shall be the sole and exclusive means for judicial review of an order of removal." *Id.* §1252(a)(5). "Taken together, §1252(a)(5) and §1252(b)(9) mean that *any* issue—whether legal or factual—arising from *any* removal-related activity can be reviewed *only* through the [petition-for-review] process." *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1031 (9th Cir. 2016). And §1201(i) provides that "[t]here shall be no means of judicial review … of a revocation under this subsection, except in the context of a removal proceeding if such revocation provides the sole ground for removal."

*Khalil v. U.S. President*, 164 F.4th 259 (3d Cir. 2026), is illustrative. There, the Secretary of State issued a determination under the foreign-policy provision at 8 U.S.C. §1227(a)(4)(C), and DHS charged Khalil with removability for that reason and because he made a willful misrepresentation. *Id.* at 266-67. Before the completion of removal proceedings,

Khalil filed a habeas petition arguing, among other things, that he was placed in proceedings in retaliation for his pro-Palestinian and anti-Israeli speech. *Id.* at 276. The Third Circuit held that, regardless of any chill, Khalil had to wait until he filed a petition for review of a final removal order to obtain judicial review of his constitutional claims. *Id.* at 273, 279. And Khalil is now pursuing such review. *Khalil v. Blanche*, No. 26-60344 (5th Cir.).

Neither Doe nor any "member" of Stanford Daily has shown that the government has taken any action to remove them. Plaintiffs instead seek to bring the same collateral challenge that Khalil brought and lost. It would be paradoxical to require Khalil to bring his constitutional claims in removal proceedings, while permitting someone against whom no proceedings have been brought to challenge imagined future enforcement actions based on his or her removal. And it would be doubly bizarre to allow an organization—without even a credibly threatened member—to bring such a challenge.

Plaintiffs' claims are the types of issues that must be raised in removal proceedings and then channeled to the courts of appeals. If Doe or a "member" of Stanford Daily is placed in a proceeding, that person can

challenge it on First Amendment grounds in those proceedings. *See Khalil*, 164 F.4th at 280; *Reno v. AADC*, 525 U.S. 471, 496 n.2 (1999) (Ginsburg, J., concurring in part and in the judgment) (describing this mechanism). But they cannot short-circuit this process and circumvent Congress's comprehensive judicial-review scheme by bringing a preemptive and premature claim in district court before the government acts.

Finally, §1201(i) bars district-court jurisdiction to hear Plaintiffs' Revocation Provision claims. That provision makes clear that there is no "judicial review" of a visa revocation under §1201(i), "except in the context of a removal proceeding." As this case does not involve a removal proceeding for Doe or Stanford Daily's "members" with visas, the district court lacked jurisdiction to review Plaintiffs' Revocation Provision claims.

**B. 8 U.S.C. §1252(g)**

Section 1252(g) also barred the district court's jurisdiction to hear Plaintiffs' claims. It provides that "notwithstanding any other provision of law (statutory or nonstatutory)," "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to [1] commence proceedings,

[2] adjudicate cases, or [3] execute removal orders against any alien," except through a petition for review from a final order of removal. Courts "cannot entertain challenges to the enumerated executive branch decisions or actions" outside a petition for review. *E.F.L. v. Prim*, 986 F.3d 959, 964 (7th Cir. 2021).

Section 1252(g) was "directed against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion" and "similar discretionary determinations." *AADC*, 525 U.S. at 485 & n.9. Through §1252(g) and other provisions of the INA, Congress aimed to prevent removal proceedings from becoming "fragment[ed], and hence prolong[ed]." *Id.* at 487. To achieve these ends, §1252(g) prohibits district courts from adjudicating any challenge related to the commencement of removal proceedings—not only whether to commence proceedings, but also when to commence a proceeding. *Jimenez-Angeles v. Ashcroft*, 291 F.3d 594, 599 (9th Cir. 2002).

The Supreme Court's decision in *AADC* confirms as much. There, a group of aliens—members of the Popular Front for the Liberation of Palestine—sued challenging their deportations. 525 U.S. at 473-75. The aliens claimed they were targeted for their beliefs and expression. *Id.* at

474. They alleged that being deported "because of their affiliation with a politically unpopular group" was unlawful, in violation of the First and Fifth Amendments. *Id.* at 471-72. The Supreme Court held that such a suit was jurisdictionally barred. The Court reasoned that the "decision to 'commence proceedings'" against an alien (or a group of aliens) fit exactly within §1252(g)'s text—in fact, a "challenge" to such an action was "precisely" what Congress had "in mind" when enacting that provision. *Id.* at 487. Such a challenge to one's removal (whether on constitutional grounds, or any other) must be channeled into a petition for review. *See Elgharib v. Napolitano*, 600 F.3d 597, 599, 600-03 (6th Cir. 2010); *Humphries v. Various Fed. USINS Emps.*, 164 F.3d 936, 945 (5th Cir. 1999). This dooms Doe's claims.

*AADC* also dooms Stanford Daily's claims. If aliens *themselves* cannot bring this sort of suit against the government "for allegedly targeting them for deportation because of their affiliation with a politically unpopular group," *AADC*, 525 U.S. at 472, then third parties cannot bring such a collateral suit. Otherwise, the INA's jurisdictional bars would be meaningless.

## III. The Deportation and Revocation Provisions do not violate the First Amendment.

The district court concluded that the Provisions facially violate the First Amendment to the extent they applied to "protected speech." 1-ER-0071. That conclusion is obviously wrong.

The Provisions do not facially violate the First Amendment. The normal facial-challenge strictures apply here, and Plaintiffs never tried to meet that demanding standard. That alone is fatal. Regardless, aliens do not have the same First Amendment rights as citizens. Given that the First Amendment does not apply to aliens in full, heightened scrutiny does not apply; instead, the "facially legitimate and bona fide reason" standard, at most, applies. *See Dep't of State v. Muñoz*, 602 U.S. 899, 908 (2024); *Kleindienst v. Mandel*, 408 U.S. 753, 770 (1972). And under that highly deferential standard, the Provisions are not facially unconstitutional.

But even if the normal analysis applied, the district court still got it wrong. The Provisions are directed at conduct rather than speech, so they do not facially trigger First Amendment scrutiny. And even if the Provisions were subject to strict scrutiny, they would pass muster.

### A. Plaintiffs failed to meet their facial-challenge burden.

Everyone agrees that Plaintiffs raise a facial challenge to the Provisions. That choice "comes at a cost." *Moody v. NetChoice*, 603 U.S. 707, 723 (2024). "Even in the First Amendment context, facial challenges are disfavored" and "hard to win." *Id.* at 723, 744.

"Establishing a facial challenge entails two steps." *NetChoice*, 152 F.4th at 1020. First, "a court must consider how a statute works in '*all* of its applications.'" *Id.* "What activities, by what actors, do the laws prohibit or otherwise regulate?" *Moody*, 603 U.S. at 724. Second, the court must determine "which of the laws' applications violate the First Amendment" and "measure them against the rest." *Id.* at 725. If the plaintiff establishes that "the ratio of unconstitutional applications is 'lopsided,'" the statute is facially unconstitutional. *NetChoice*, 152 F.4th at 1020. Plaintiffs must carry their burden "as to each challenged provision." *NetChoice v. Bonta*, 170 F.4th 744, 754-55 (9th Cir. 2026).

Plaintiffs do not even try to meet the proper facial-challenge standard, which is alone fatal. Even if Plaintiffs did try, they still would not come close to meeting their demanding burden. And Plaintiffs' and the district court's attempts to skirt this heavy burden fail.

**1.** Plaintiffs failed to enable a court to perform a proper facial-challenge analysis, which dooms Plaintiffs' challenge. *See, e.g.*, *NetChoice*, 152 F.4th at 1021. Indeed, there are numerous shortcomings to Plaintiffs' First Amendment analysis. Even though facial challenges must occur "as to each challenged provision," *NetChoice*, 170 F.4th at 754, Plaintiffs treated the Deportation and Revocation Provisions together, *see, e.g.*, 13-ER-3655 ("The Deportation Provision violates the First Amendment for the reasons stated [regarding the Revocation Provision]."). Even though "facial challengers bear heavy factual burdens" and "the court needs information not only about the law's scope, but also about the facts that determine the law's constitutionality in each of its applications," *NetChoice*, 152 F.4th at 1020, Plaintiffs did not sketch out the full universe of speech and speakers covered by the Provisions, let alone address the potential nuances between that broad universe of speech and speakers. Rather than perform the proper facial-challenge analysis, Plaintiffs focused solely on "protected speech" spoken in the United States by certain aliens. In other words, Plaintiffs only focused on a narrow amorphous subset of covered individuals and speech.

Plaintiffs' shortcomings prevent this Court from doing a proper facial-challenge analysis. For example, the analysis for the Deportation Provision and Revocation Provision may be relevantly different. The Provisions' text materially differs. The Revocation Provision nowhere mentions speech and is clearly directed at conduct. The main Deportation Provision, 8 U.S.C. §1227(a)(4)(C)(i), also does not mention speech and is clearly directed at conduct, though the exception to that general authority does, *id.* §1182(a)(3)(C)(iii).

The Provisions' scopes also materially differ. For example, the Revocation Provision applies only to aliens with visas, while the Deportation Provision applies to all types of aliens, including illegal aliens, visa holders, and LPRs. Each type of alien covered by each Provision may affect the First Amendment analysis. *Cf., e.g.*, *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 n.5 (1953) (suggesting that there might be an "ascending scale of rights as [the alien] increases his identity with our society"); *Gonzalez*, 174 F.4th at 691 (suggesting "constitutional status changes" when an alien "begins to develop the ties that go with permanent residence"); *Hoffman v. Bailey*, 996 F.Supp.2d 477, 488 (E.D. La. 2014) ("Defendant, a nonresident alien, is not entitled to First Amendment protections of the

United States Constitution"); *infra* III.B.1.b (discussing rights of aliens). And the Provisions appear to cover speech not only uttered in the United States but also spoken outside the United States. That, too, may affect the First Amendment analysis. *Cf., e.g.*, *Agency for Int'l Dev. v. All. for Open Soc'y Int'l* ("*AOSI*"), 591 U.S. 430, 433 (2020) ("[F]oreign citizens outside U.S. territory do not possess rights under the U. S. Constitution."). And even within each Provision, there may be key differences, depending on the speaker, the speech, and whether only speech is at issue.

Nowhere does Plaintiffs engage with any of these potential nuances, even though they had the burden to do so. By failing to address all these different applications, Plaintiffs impermissibly try to "confine[] the[] battle" to "certain [subset of] applications." *Moody*, 603 U.S. at 724.

Plaintiffs' shortcomings are fatal. "To discharge its facial-challenge burden," Plaintiffs "must provide the reviewing court with the data—either hard facts or, at the very least, sufficient briefing—necessary to conduct the [facial-challenge] analysis." *NetChoice v. Att'y Gen., Georgia*, --- F.4th ----, 2026 WL 3079563, at *7 (11th Cir.); *accord, e.g.*, *NetChoice*, 170

F.4th at 755. Because Plaintiffs did not, Plaintiffs' First Amendment claims fail at the outset.

**2.** In any event, Plaintiffs' First Amendment claim, under the proper facial-challenge standard, is easy to resolve in favor of Defendants without diving into the complexities of aliens' constitutional rights. In assessing overbreadth, "unchallenged applications of a statute must be assumed constitutional for purposes of a facial challenge." *NetChoice*, 152 F.4th at 1022. And the Court "may assume for the sake of argument that certain applications of the law would be unconstitutional but still reject a facial challenge." *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 342 (6th Cir. 2009) (en banc).

***Revocation Provision.*** The Revocation Provision nowhere mentions speech and applies to all sorts of conduct. Plaintiffs point to little (if any) instances where the Provision was used against pure domestic speech. *See United States v. Hansen*, 599 U.S. 762, 770 (2023) ("To justify facial invalidation, a law's unconstitutional applications must be realistic, not fanciful, and their number must be substantially disproportionate to the statute's lawful sweep.").

Plaintiffs also only challenge applications of the Revocation Provision to "protected speech" uttered in the United States by an alien in the United States with a visa (as opposed to aliens with visas outside the United States, speech outside the United States, or conduct). Because Plaintiffs only challenge that narrow application, all these "unchallenged applications [are] assumed constitutional." *NetChoice*, 152 F.4th at 1022. Those constitutional applications dwarf the alleged unconstitutional applications. Plaintiffs thus failed to show the Revocation Provision facially violates the First Amendment.

***Deportation Provision.*** Plaintiffs' challenge to the Deportation Provision fares no better. 8 U.S.C. §1227(a)(4)(C)(i) covers a host of conduct-based reasons. 8 U.S.C. §1182(a)(3)(C)(iii) mentions "statements [that] would be lawful within the United States" if "the Secretary of State personally determines that the alien's [presence] would compromise a compelling United States foreign policy interest." But that provision is just one aspect of the broader foreign-policy-based authority covering a range of conduct, rendering its use in a particular instance far more "fanciful" than "realistic." *Hansen*, 599 U.S. at 770.

Here, Plaintiffs appear to only challenge pure "protected speech" occurring in the United States for a certain type of alien. But the Deportation Provision covers far more, including non-expressive conduct, speech occurring outside the United States, non-constitutionally protected speech even for U.S. citizens, and speech by illegal aliens, among other types of aliens. Again, the Court must assume these unchallenged applications are "constitutional for purposes of a facial challenge." *NetChoice*, 152 F.4th at 1022. Given the amount of clearly constitutional applications of the Deportation Provision, Plaintiffs plainly failed to satisfy their burden to show that the allegedly unconstitutional applications "substantially outweigh" the constitutional ones. *Moody*, 603 U.S. at 724.

**3.** Plaintiffs try to dodge this demanding standard in two ways, but both are meritless.

***First*****,** Plaintiffs characterize their facial challenge as a "hybrid" challenge. *E.g.*, 2-ER-0119. According to Plaintiffs and the district court, Plaintiffs' challenge is to the Provisions' application to "protected speech" only. 2-ER-0162; 2-ER-0182. Not so.

To start, Plaintiffs' challenge is not a proper "hybrid" challenge, even if there is such a thing as a "hybrid" facial challenge. Plaintiffs and

the district court posit that the Provisions must be unconstitutional as applied only in the circumstances where they would be unconstitutional, *i.e.*, when they are "protected." Indeed, this is exactly how the district court defines "protected speech": "speech that is legally protected under the First Amendment." 1-ER-0060 n.341. At trial, the district court itself recognized that the very reasoning it eventually endorsed "feels circular," and it is. 2-ER-0172. Neither the Supreme Court nor any other court of appeals has sanctioned such a circular theory.

Just the opposite, in fact. The Supreme Court has rejected that parties and the courts can treat facial-challenge claims "more like as-applied claims." *Moody*, 603 U.S. at 724. For a facial challenge, neither the parties nor the court may focus on a "certain [subset of] applications" and "confine[] the[] battle to that terrain." *Id.* And this Court has made clear that "a facial challenge is not merely an as-applied challenge extended to cover non-parties." *NetChoice*, 152 F.4th at 1013. A plaintiff "cannot focus on a law's effect[s]" on Plaintiffs only or "even limit the inquiry" to those similarly situated to Plaintiffs. *Id.* at 1020. Yet Plaintiffs and the district court violated all these ground rules.

Rather than follow *Moody* and Ninth Circuit precedent, the district court misread *John Doe No. 1 v. Reed*, 561 U.S. 186 (2010). Even if *Reed* survives *Moody*, that case does not support Plaintiffs' or the district court's circular inquiry. In *Reed*, the Supreme Court addressed a claim challenging a state public records act's application to referendum petitions. *Id.* at 191-94. That challenge was still "'facial'" because it was "not limited to plaintiffs' particular case, but challenges application of the law more broadly to all referendum petitions." *Id.* But the challenge did not presuppose that it was only as to "speech," let alone "protected speech." *See id.* at 195-201 (deciding whether referendum petitions are protected speech, deciding the appropriate scrutiny level, and determining that the law was not facially unconstitutional). And the distinct category of the statute's application challenged by the plaintiffs was "realistic, not fanciful," *Hansen*, 599 U.S. at 770, as someone did seek to obtain the at-issue referendum petitions through the challenged statute, *see Reed*, 561 U.S. at 191-94.

Even if *Reed* survives *Moody*, *Reed* does not relieve Plaintiffs of their usual facial-challenge burden. *Reed* does not support circular claims based on "protected speech." If *Reed* were read otherwise, it would upend

the distinction between facial and as-applied challenges by allowing litigants to nonsensically narrow claims for a facial challenge to only what triggers First Amendment scrutiny (or the particular level of First Amendment scrutiny that benefits the plaintiffs). It would be difficult to imagine how a plaintiff could not turn all facial challenges into ones that trigger heightened scrutiny through mere "pleading games"—something that the Supreme Court has rejected. *Bucklew v. Precythe*, 587 U.S. 119, 139 (2019); *cf. W. Virginia v. B.P.J.*, 609 U.S. 958, 986 (2026) (rejecting a plaintiff's attempt to raise "a backdoor argument for strict scrutiny").

Facial challenges are supposed to be "disfavored," "hard to win," the "exception," not "casually employed," and "a last resort." *E.g.*, *NetChoice*, 152 F.4th at 1019-20; *Connection Distrib.*, 557 F.3d at 336, 341. By contrast, "as-applied challenges" are supposed to be "the basic building blocks of constitutional adjudication." *Gonzales v. Carhart*, 550 U.S. 124, 168 (2007) (cleaned up). Plaintiffs' and the district court's theory makes facial challenges preferable to as-applied challenges and is thus irreconcilable with these principles. Their theory must be rejected.

***Second,*** the district court concluded that overbreadth analysis was unnecessary because the Provisions are facially content-based or

viewpoint-discriminatory. But as explained below, the normal scrutiny levels do not apply here. *See infra* III.B.2. Regardless, the district court is incorrect that the Provisions are *facially* content-based or viewpoint-discriminatory.

The Revocation Provision is not facially content-based or viewpoint-discriminatory. Section 1201(i) gives the Secretary of State broad discretion to revoke visas "at any time." 8 U.S.C. §1201(i). Nowhere does §1201(i) mention speech or make any distinctions based on the content or viewpoint of speech. The Revocation Provision is thus "directed not against speech but against conduct," *R.A.V. v. City of St. Paul*, 505 U.S. 377, 389 (1992), so it does not facially trigger the First Amendment. And regardless, because the Provision does not limit the Secretary's visa revocation discretion based on a particular standard, it is obviously not facially content-based or viewpoint-discriminatory, even if it were directed at speech.

The Deportation Provision is not facially content-based or viewpoint-discriminatory either. The Secretary of State's authority to mark an alien deportable is 8 U.S.C. §1227(a)(4)(C)(i). Under that provision, an alien "whose presence or activities in the United States the Secretary of

State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is deportable." Nowhere does §1227(a)(4)(C)(i) mention speech, let alone target speech based on content or viewpoint. Indeed, like the Revocation Provision, §1227(a)(4)(C)(i) is "directed not against speech but against conduct." *R.A.V.*, 505 U.S. at 389.

Finally, as explained below, the proper standard for reviewing aliens' First Amendment rights in the deportation context is the highly deferential facially legitimate and bona fide standard. *Infra* III.B.2. Plaintiffs cannot show that the Provisions in a substantial amount of their applications would violate that deferential standard, so their facial challenge necessarily fails.[5]

[5] Though the standard is inherently satisfied here based on the premises of the suit, the standard is best employed in as-applied challenges, further underscoring that facial challenges in this context are categorically improper. *Cf. Moody*, 603 U.S. at 745 (Barrett, J., concurring) ("[D]ealing with a broad swath of varied platforms and functions in a facial challenge strikes me as a daunting, if not impossible, task.").

### B. The Provisions do not facially violate the First Amendment.

As explained, the Provisions are directed at conduct, not speech, and thus do not facially trigger First Amendment scrutiny. *Supra* III.A.1. But even if they did, the Provisions do not violate the First Amendment. As a general matter, all aliens are entitled to weaker First Amendment protections compared to U.S. citizens. And whatever First Amendment rights aliens have, those rights are particularly circumscribed in the removal context. So the normal speech-restriction rules do not apply here.

The First Amendment does not prohibit the government from revoking an alien's privilege to be present in the United States based on their political activity, as long as the government satisfies the highly deferential facially legitimate and bona fide standard. Plaintiffs failed to show that the Provisions will violate that deferential standard in a substantial amount of their applications.

#### 1. Aliens are entitled to weak First Amendment protections.

The district court concluded that "noncitizens are afforded First … Amendment rights to the same extent as citizens." 1-ER-0069. That is a remarkable conclusion—remarkably wrong. Aliens' rights under the First Amendment are not coextensive with those of citizens. And an

alien's First Amendment rights are nonexistent or significantly circumscribed when it comes to removal. Text, history, structure, and precedent all point in the same direction: aliens enjoy, at most, limited First Amendment protections that are not violated by the Provisions, and strict scrutiny does not apply here.

**a. Text, History, and Tradition**

Start with the text. The First Amendment states: "Congress shall make no law … abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I. By referring to "*the* freedom of speech," the Constitution codifies a "preexisting right." *See, e.g.*, *D.C. v. Heller*, 554 U.S. 570, 592 (2008) ("[T]he Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right.").

The use of "the people" later in the Amendment further supports that the First Amendment's scope has more limited application beyond citizens. *See, e.g.*, *United States v. Escobar-Temal*, 161 F.4th 969, 998 (6th Cir. 2025) (Thapar, J., concurring) ("[T]he use of 'the people' in the First Amendment's text likely meant that those rights were restricted to 'citizens,' while the Amendments that used general terms, like 'person,' were

not."). First Amendment rights are presumptively limited to citizens—not aliens. *See, e.g.*, *Heller*, 554 U.S. at 595 (referring to the First Amendment "right of citizens to speak"); *Escobar-Temal*, 161 F.4th at 997 (Thapar, J., concurring). At the very least, First Amendment rights are limited to those who are members of the United States's political community, and most aliens, if not all, are not such members. *Cf. Wolford v. Lopez*, 609 U.S. 185, 195-96 (2026) (defining "the people" as "all members of the political community"); *United States v. Singh*, 979 F.3d 697, 724 (9th Cir. 2020) ("Nonimmigrant aliens, like those unlawfully present, are neither citizens nor members of the political community.").

History backs this up. For example, "President John Adams contemplated applying the Alien and Sedition Acts to imprison William Duane, the editor-in-chief of a newspaper issuing an 'uninterrupted stream of slander' about the Adams Administration. Instead of asserting the First Amendment directly, Duane claimed—perhaps falsely—to be an American citizen." *Escobar-Temal*, 161 F.4th at 998 (Thapar, J., concurring). "The application of the Alien and Sedition Acts to resident foreigners suggests that the founders did not understand the First Amendment to extend to aliens, much less illegally present ones." *Id.* At a

minimum, text and history support that aliens have weaker First Amendment rights than citizens.

So does tradition. "In the exercise of its broad power over naturalization and immigration," Congress and States "regularly make[] rules that would be unacceptable if applied to citizens." *Demore v. Kim*, 538 U.S. 510, 521 (2003) (cleaned up). The government has barred aliens from, among other things, voting, serving as jurors, and working as police, probation officers, and public-school teachers. *See, e.g.*, *Bluman v. FEC*, 800 F.Supp.2d 281, 287 (D.D.C. 2011). And "there is no long standing post-enactment practice … recognizing all aliens within our borders possess First Amendment rights." *Qatanani v. U.S. Att'y Gen.*, 144 F.4th 485, 517 (3d Cir. 2025) (Matey, J., dissenting). This strongly supports that aliens have weaker First Amendment rights than citizens.

**b. Precedent**

What text, history, and tradition establish, precedent confirms. Over a century of precedent shows that aliens do not have the same First Amendment rights as citizens. "The Supreme Court has consistently found that noncitizens may assert speech protections in more limited circumstances than American citizens." *Escobar-Temal*, 161 F.4th at 998

(Thapar, J., concurring) (collecting cases). The Supreme Court has held that the government may deport aliens based on their membership or association with certain political parties or because of advocacy of certain political positions. *See Harisiades*, 342 U.S. at 592; *Turner*, 194 U.S. at 293. The Supreme Court has also made clear that "an alien unlawfully in this country has no constitutional right to assert selective enforcement as a defense against his deportation." *AADC*, 525 U.S. at 488.

Take, for example, *Turner*. There, the Court found that the Alien Immigration Act of March 1903, which provided for the exclusion of anarchists based solely on political or philosophical viewpoint, did not violate the First Amendment. 194 U.S. at 294. The Court recognized that Congress had the "power to shut out any alien" and that doing so did not in itself "abridge the freedom of speech." *Id.* at 292. This is in contrast with the First Amendment rights of citizens, which permit the expression of political opinions. *See Elrod v. Burns*, 427 U.S. 347 (1976).

Similarly, in *Harisiades*, the Court upheld the Alien Registration Act, which empowered the government to remove Communist aliens. 342 U.S. at 580. Though the Court noted that Communist Party membership likely constituted "ambiguous speech," the Court concluded that because

of Congress's "admonition to aliens" not to engage in such speech, deportation could occur. *Id.* at 592-93. Again, such a restriction on speech would likely not have been permissible if applied to citizens.

The Supreme Court has never countenanced that all aliens have similar First Amendment to citizens—let alone regarding removal. To the contrary, when this Court held that the First Amendment applied fully in the deportation setting, the Supreme Court swiftly corrected its error. *See AADC v. Reno*, 70 F.3d 1045, 1056 (9th Cir. 1995), *vacated*, *AADC*, 525 U.S. 471. Specifically, the Supreme Court held that aliens cannot assert selective-enforcement claims grounded in the First Amendment as a defense against deportation. *AADC*, 525 U.S. at 488. By contrast, citizens may generally bring First Amendment claims alleging selective enforcement. *E.g.*, *Wayte v. United States*, 470 U.S. 598 (1985).

The Supreme Court has also long held that aliens' rights, privileges, and duties critically differ from those of citizens. *See, e.g.*, *Terrace v. Thompson*, 263 U.S. 197, 218 (1923). They cannot be drafted or serve on a jury. *Id.* at 219; *Foley v. Connelie*, 435 U.S. 291, 296 (1978). As a result, they lack some of the benefits of citizenship. They cannot vote or run for federal office. *Terrace*, 263 U.S. at 218; 18 U.S.C. §611. And the

government "may bar foreign citizens from … working as police or probation officers, or working as public school teachers." *Bluman*, 800 F.Supp.2d at 287. Aliens thus lack the same duties as citizens, so they are not entitled to the same rights or privileges.

That aliens lack the same First Amendment rights as citizens make sense. Weaker First Amendment rights are a natural corollary of a weaker connection to the country and an inability to participate in America's democratic institutions. The First Amendment's core is political speech relevant to the democratic process, yet aliens's participation in the political process is significantly limited (if not virtually nonexistent). *See, e.g.*, *Arizona Right to Life Pol. Action Comm. v. Bayless*, 320 F.3d 1002, 1008 (9th Cir. 2003) ("[P]olitical speech … is at the heart of our democratic process and 'operates at the core of the First Amendment.'"). This is particularly apparent for aliens temporarily in the country like Doe and Stanford Daily's "members," who "by definition have only a short-term interest in the national community." *Bluman*, 800 F.Supp.2d at 291.

Take Doe, for example. Doe is in the country consistent with her F-1 student visa, so she can only be legally present for the time it takes to

complete her degree program—or less if she were found to violate applicable law. This limited interest in the country corresponds with more limited constitutional protections. *See id.* at 291; *cf., e.g.*, *Shen v. Comm'r*, 158 F.4th 1227, 1255 (11th Cir. 2025).

The district court disagreed, concluding that *all* aliens have identical First Amendment rights as U.S. citizens. The court cited *Kwong Hai Chew* for the proposition that "[t]he First Amendment acknowledges no 'distinction between citizens and resident aliens,'" but the court fundamentally misread *Kwong Hai Chew*. 1-ER-0066 (quoting 344 U.S. at 596 n.5). For one, the district court's ruling applies to more than just LPRs, which *Kwong Hai Chew* did not involve. For another, *Kwong Hai Chew* confronted a Fifth Amendment question—where the Amendment uses "person" rather than "the people"—and noted only in passing that aliens have First Amendment "privileges." 344 U.S. at 596 n.5. The Court did not conclude—nor did it have any reason to conclude—that the First Amendment protects aliens in the same way as citizens. That dicta is not binding. *See, e.g.*, *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993) (an issue not "squarely addressed" is not binding precedent). "[Supreme Court] dicta," at most, suggests that LPRs "can potentially invoke the

First Amendment in some criminal prosecutions." *Qatanani*, 144 F.4th at 516-17 (Matey, J., dissenting).

The district court also ignored the Supreme Court's *AADC* decision, which concluded that "an alien unlawfully in this country has no constitutional right to assert selective enforcement as a defense against his deportation." 525 U.S. at 488. Instead, the district court heavily relied on this Court's decision that the Supreme Court *reversed*. 1-ER-0067-68. That patent error turned vertical stare decisis upside down.

### c. Constitutional Structure

Aliens have no right to enter or remain in the United States. "[A]n alien within our Nation as a matter of administrative grace has no right to remain." *Qatanani*, 144 F.4th at 521 (Matey, J., dissenting). And Congress has substantial power to dictate not only who may enter the country but the activities they may engage in while they remain. *See Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892). As the Supreme Court has explained: "The National Government has broad constitutional powers in determining what aliens shall be admitted to the United States, the period they may remain, [and the] regulation of their conduct before naturalization." *Graham v. Richardson*, 403 U.S. 365, 377 (1971)

(citations omitted). That is especially true when it comes to decisions that implicate national security and significant foreign-policy matters. *See, e.g.*, *Trump v. Hawaii*, 585 U.S. 667, 702 (2018).

Further, it is well-settled that aliens may be denied entrance for expressing certain opinions. *See Turner*, 194 U.S. 279. So if Doe, for example, had expressed earlier the opinions she now claims to be self-censoring, her entry likely would have been denied. *See* 1-ER-0022. That Doe is present in the United States on a temporary visa does not grant Doe greater First Amendment protections than at entry—let alone the same First Amendment rights as citizens.

Contra the district court, there is no brick wall separating those who have already entered the country from those seeking entry. Even when an individual has entered, the conditions of her admission persist. *See Carlson v. Landon*, 342 U.S. 524, 534 (1952). The Provisions all existed long before Doe and Stanford Daily's "members" ever entered the United States and were conditions on her entry into the United States. Because Doe (and Stanford Daily's "members") could have been denied entry for the beliefs she now professes and the Provisions existed before their entry into the United States, the expression of those same beliefs

should not be protected against the Provisions solely because she is within the borders of the country.

*       *       *

The upshot of text, history, and precedent is that aliens lack First Amendment free-speech rights against removal. *See Qatanani*, 144 F.4th at 521 (Matey, J., dissenting) ("Even if Qatanani were afforded First Amendment protection as an unauthorized alien (or even an LPR), denial (or recission) of an immigration privilege, to which he has no right or entitlement, is not a punitive or adverse action that could trigger First Amendment restrictions."). "[I]mmigration determinations, without more, cannot serve as adverse actions against an alien, making appeals to First Amendment limitations inapposite." *Id.* at 522. At most, all aliens have weakened First Amendment rights compared to citizens and the strength of protection might vary depending on the type of alien and his connection to the United States, with illegal aliens on one side and LPRs on the other. Given that the inquiry could be fact-intensive, facial challenges are entirely improper in this context. *See supra* III.B.1.b. At a minimum, the normal speech restriction rules do not apply here.

### 2. The Provisions do not violate aliens' First Amendment rights.

Given that the First Amendment does not apply to aliens in full, an alien's First Amendment claim regarding his presence in the United States should at most be reviewed under the highly deferential "facially legitimate and bona fide" standard—*i.e.*, solely whether the legal justification proffered by the agency is facially valid, without further inquiry into the justifications behind the government's actions. *See Mandel*, 408 U.S. at 766; *Muñoz*, 602 U.S. at 908.

Under the facially legitimate and bona fide standard, the court looks to the legal justification proffered by the agency and, if facially valid, "the inquiry is at an end." *Id.*; *see Mathews v. Diaz*, 426 U.S. 67, 81 n.17 (1976) (Congress has plenary authority over immigration matters, which are "so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." (cleaned up)).

That forgiving standard is doubly difficult for Plaintiffs to overcome on a *facial* challenge. Here, Plaintiffs cannot show that every application or a substantial number of applications of the Provisions will violate that standard. Although there is no challenged discretionary action in this

case, any exercise of discretion under the Deportation Provision, by its nature, must satisfy this standard. Specifically, the Deportation Provision only gives the Secretary the power to act when he determines that there is a compelling foreign-policy justification for doing so. 8 U.S.C. §1182(a)(3)(C)(iii). Thus, to act, he must have a legitimate motivation. As the district court correctly noted, "[i]t's a very significant and serious interest that the government would have" when acting under the Provisions. 2-ER-0208. When the Secretary does so, his conduct does not violate the First Amendment protections of aliens under the facially legitimate and bona fide standard.

Likewise for the Revocation Provision. Those actions generally involve discretionary foreign-policy determinations to address significant and serious governmental interests. So actions under the Revocation Provision will generally always satisfy the facially legitimate and bona fide standard.

The district court thus erroneously concluded that strict scrutiny was the correct test to apply. 1-ER-0071. Indeed, as the Supreme Court has explained, applying strict scrutiny to "the field of immigration, an area unsuited to rigorous judicial oversight," "would be remarkable."

*Muñoz*, 602 U.S. at 911. Instead, a less demanding standard is appropriate, and Plaintiffs cannot establish that the Provisions will violate that standard in a substantial number of the Provisions' applications.

Even if somewhat stronger First Amendment protections apply to Doe (or Stanford Daily's "members") because of her physical presence in the United States, such protections still would not prevent removal for expressing certain beliefs. Again, even resident aliens may be deported for belonging to groups advocating for violence. *See Harisiades*, 342 U.S. 580. And Doe is not an LPR. Because "the Court has upheld the broad power of Congress to determine immigration policy in the face of challenges based upon the [F]irst [A]mendment," the kind of expression Doe (or Stanford Daily's "members") wishes to engage in simply is not protected by the Constitution for purposes of deportation. *Adams v. Howerton*, 673 F.2d 1036, 1041 (9th Cir. 1982) (citing *Mandel*, 408 U.S. at 765-67). Removal "cannot serve as adverse actions against an alien, making appeals to First Amendment limitations inapposite." *Qatanani*, 144 F.4th at 522 (Matey, J., dissenting).

### C. Even if normal scrutiny standards applied, the Provisions survive any standard of review.

Regardless, the Provisions would satisfy any standard of review, including strict scrutiny. *Cf. Hunter v. Dep't of Educ.*, 115 F.4th 955, 968 (9th Cir. 2024) ("Because the exemption would survive the more demanding intermediate scrutiny standard, we need not decide which standard applies.").

To satisfy strict scrutiny, the law must be narrowly tailored to achieve a compelling governmental interest. *In re Nat'l Sec. Letter*, 33 F.4th 1058, 1070 (9th Cir. 2022). Strict scrutiny is not "fatal in fact." *Id.* at 1073. This Court and the Supreme Court have upheld national-security and foreign-affairs statutory provisions against strict scrutiny numerous times, including when the provisions involve immigration. *See, e.g.*, *Holder v. Humanitarian L. Project*, 561 U.S. 1, 25-39 (2010) (national security and foreign affairs); *Williams-Yulee v. Fla. Bar*, 575 U.S. 433 (2015) (campaign finance for judges); *Twitter*, 61 F.4th at 698-702 (national security); *Nat'l Sec. Letter*, 33 F.4th at 1072 (national security and foreign affairs).

***Compelling Interest.*** The Provisions safeguard two of the government's most compelling interests: protecting national security and

preventing potentially serious foreign-policy consequences. *See Twitter*, 61 F.4th at 698 ("[N]o governmental interest is more compelling than the security of the Nation."); *Nat'l Sec. Letter*, 33 F.4th at 1072 ("[N]ational security is a compelling government interest."). The Deportation Provision authorizes the Secretary to act "because of the alien's past, current, or expected beliefs" only to when he "has reasonable ground to believe [the alien's presence or activities] would have potentially serious adverse foreign policy consequences for the United States" and determines the alien's presence would "compromise a compelling United States foreign policy interest." 8 U.S.C. §§1182(a)(3)(c)(i), 1227(a)(4)(c)(i). Although the Revocation Provision does not contain equivalent language, its use is still in the interest of national security. It was undisputed before the district court that the Secretary's position is to revoke visas only from those "aligned with organizations that seek to do damage in this country, … and advocate for policies that are in direct contradiction of our national interest." 3-ER-0392. The Provisions thus serve a compelling interest.

***Tailoring.*** The Provisions are also narrowly tailored. Narrow tailoring does not mean "perfect[]" tailoring. *Williams-Yulee*, 575 U.S. at 454. A restriction on speech is narrowly tailored when it covers only "a

narrow slice of speech" and when there are no less restrictive means available. *Id.* at 452.

Crucially, here, neither provision actually targets speech. By their terms, the Provisions only delegate authority. *Supra* III.A.1. Both allow the Secretary to consider, among myriad other factors, what an alien has said to make a determination on whether that individual should remain in the country. *Id.* The Provisions' purpose is not to eliminate speech, but to use it as a form of evidence. *Id.* An alien is free to say whatever she wants without punishment. *Cf. Harisiades*, 342 U.S. at 594 ("[N]or is … deportation a punishment; it is simply a refusal by the Government to harbor persons whom it does not want."); *Qatanani*, 144 F.4th at 521-22 (Matey, J., dissenting). But if what an alien says reveals that she is a threat to national security, she may be deported.

There are no less restrictive means available to the government. An alien's statements about her beliefs can be direct evidence that she presents a danger. The flexibility inherent in the Provisions is also necessary to respond to the uncertain and rapidly changing nature of foreign affairs and national security. *See Holder*, 561 U.S. at 34; *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936). Because the

Provisions do not target speech and are necessary to enable the government to protect national security, they are narrowly tailored.

The district court disagreed, pointing to other provisions in the INA authorizing removal based on proscribable speech or conduct. 1-ER-0077 (citing 8 U.S.C. §§1182(a)(3)(B), 1227(a)(4)(A)(i)-(ii), 1227(a)(4)(B), 1227(a)(4)(C)(i)). But "the First Amendment does not confine [the government] to addressing evils in their most acute form." *Williams-Yulee*, 575 U.S. at 454. Further, an alternative must "'be at least as effective in achieving the legitimate purpose that the statute was enacted to serve.'" *Twitter*, 61 F.4th at 698. The district court's alternatives would be less effective than the Provisions. And "[t]he government is entitled [to] deference when it comes to factual judgments bearing on national security," including what means are necessary to address the government's compelling interest. *Twitter*, 61 F.4th at 698. The Court should not displace Congress's "relatively nuanced approach" in this complex field of national security and foreign affairs. *NetChoice*, 152 F.4th at 1018; *see Nat'l Sec. Letter*, 33 F.4th at 1073, 1075 ("[A] reviewing court should decline to wade into the swamp of calibrating the individual mechanisms of a

restriction" and "decline the [plaintiff's] invitation to quibble with the particular ranges selected by Congress." (cleaned up)).

## IV. The Deportation and Revocation Provisions are not unconstitutionally vague.

The district court concluded that the Deportation and Revocation Provisions were unconstitutionally vague with respect to "protected speech." 1-ER-0084, 0088. That conclusion suffers from many of the same facial-challenge issues as Plaintiffs' First Amendment claims.[6] But in any event, the district court's vagueness conclusion fails for two reasons. First, because the Provisions do not regulate primary conduct or define the lawfulness of speech, they are not subject to vagueness scrutiny. Second, the Provisions provide sufficient notice and clarity.

### A. The Provisions do not regulate primary conduct or define the lawfulness of speech.

The vagueness doctrine applies only to laws that regulate primary conduct or define the lawfulness of speech. *See Nyeholt v. Sec'y of Veterans Affs.*, 298 F.3d 1350, 1356 (Fed. Cir. 2002). The Supreme Court "has

---

[6] Even more problems in fact. Defendants are unaware of any case applying a "hybrid" facial claim for the Fifth Amendment's vagueness doctrine. And "Plaintiffs have not pointed … to a case when a preenforcement-facial-vagueness challenge was ripe." *Carman v. Yellen*, 112 F.4th 386, 402 (6th Cir. 2024).

steadfastly applied the void-for-vagueness doctrine only to statutes or regulations that purport to define the *lawfulness* of conduct or speech," *id.* (collecting cases); *see United States v. Matchett*, 837 F.3d 1118, 1122 (11th Cir. 2016) (Pryor, J., and Carnes, J., dissental) (collecting cases). So courts have consistently rejected vagueness challenges to laws that do not regulate primary conduct. *See Nyeholt*, 298 F.3d at 1351, 1355-57; *Woodruff v. DOL*, 954 F.2d 634, 642 (11th Cir. 1992).

The Deportation and Revocation Provisions neither regulate primary conduct nor define the lawfulness of speech. The Revocation Provision simply delegates authority to the Secretary of State to revoke visas "in his discretion" and "at any time." 8 U.S.C. §1201(i).

The Deportation Provision delegates authority to the Secretary to render an alien deportable because his "presence or activities" "would compromise a compelling United States foreign policy interest." *Id.* §§1182(a)(3)(C)(iii), 1227(a)(4)(C)(i). Though the alien's "activities" are relevant to the Secretary's determination, the Provision itself does not purport to control the alien's conduct or make it unlawful. Instead, if an alien wants to engage in actions that support that their continued presence in the United States will harm important U.S. foreign-policy

interests, he must leave the United States. In fact, the statute applies only to conduct that "would be lawful within the United States." *Id.* §1182(a)(3)(C)(iii). That delegation is not a regulation of primary conduct.

Indeed, the Deportation Provision is materially similar to the parole provisions that *Williams v. Johnson*, 2011 WL 4101505 (E.D. Va.), concluded were not susceptible to a vagueness challenge. *Id.* at *4. Those statutes granted the Board authority to grant parole, but provided that:

> No person shall be released on parole by the Board until a thorough investigation has been made into the prisoner's history, physical and mental condition and character and his conduct, employment and attitude while in prison. The Board shall also determine that his release on parole will not be incompatible with the interests of society or of the prisoner.

*Id.* The court determined that because the statutes did not regulate conduct but merely prescribed the general process and criteria for granting parole in Virginia, they were not subject to vagueness scrutiny. *Id.* at *5.

The same is true here. While the Deportation Provision references an alien's activities, it does not regulate those activities. Instead, it merely makes the referenced activities relevant to the discretionary authority delegated to the Secretary of State to determine eligibility for deportability. Likewise for the Revocation Provision. Thus, neither provision is subject to vagueness scrutiny.

### B. The Provisions provide sufficient notice and standards.

A statute is void for vagueness only if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited" or "is so standardless that it authorizes or encourages seriously discriminatory enforcement." *FCC v. Fox Television Stations*, 567 U.S. 239, 253 (2012) (cleaned up). "The standard for showing constitutional vagueness is high in the civil context." *Crawford-Hall v. United States*, 2018 WL 5816117, at *5 (C.D. Cal.). "[P]erfect clarity and precise guidance have never been required even of regulations" that implicate "expressive activity." *Holder*, 561 U.S. at 19 (cleaned up). That is especially true here given that "the special exigencies of foreign policy require Congress to draft statutes that provide a standard far more general than that which has always been considered requisite with regard to domestic affairs." *Palestine Info. Off. v. Shultz*, 853 F.2d 932, 944 (D.C. Cir. 1988) (cleaned up).

Plaintiffs' vagueness claims fail at the outset. "[A] plaintiff whose speech is clearly proscribed cannot raise a successful vagueness claim." *Holder*, 561 U.S. at 20 (cleaned up). Under Plaintiffs' view, their desired speech is clearly covered by the Provisions. So their claims fail. Regardless, the Provisions provide sufficient notice and standards.

***Deportation Provision.*** The Deportation Provision is, on its face, sufficiently clear. Under 8 U.S.C. §1227(a)(4)(C)(i), an alien "whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is deportable." The Deportation Provision provides further notice, making clear that an alien is deportable "because of the alien's past, current, or expected beliefs … [that] would be lawful within the United States" if "the Secretary of State personally determines that the alien's [presence] would compromise a compelling United States foreign policy interest." 8 U.S.C. §1182(a)(3)(C)(iii). These limitations are neither standardless nor invite arbitrary enforcement. Rather, they provide a meaningful "limiting principle" materially similar to other standards in the immigration context that this Court has upheld against vagueness challenges before. *See Gonzalez*, 174 F.4th at 697 ("know, or have reasonable ground to believe that an applicant seeks to enter the United States to engage in unlawful activity" (cleaned up)).

***Revocation Provision.*** The Revocation Provision also provides sufficient clarity. The Provision is clear on its face, and Congress permitted the opportunity to challenge visa revocations only after the fact and

under limited circumstances where the revocation is the sole basis for removal proceedings, which none of the Plaintiffs allege apply to them. *See* 8 U.S.C. §1227(a)(1)(B); *id.* §1201(i). Moreover, the fact that Congress used broad language to preclude review of visa revocations—as it most surely may do—does not mean the statute is impermissibly vague. *See Bouarfa v. Mayorkas*, 604 U.S. 6, 19 (2024) (interpreting another visa-revocation statute, 8 U.S.C. §1155, with similar language).

In concluding otherwise, the district court improperly conflated vagueness and breadth. A law is not vague just because its terms are broad or expansive. *See, e.g.*, *Woodhull Freedom Foundation v. United States*, 72 F.4th 1286, 1304 (D.C. Cir. 2023) ("breadth" of law "does not make it vague").

The district court also all but ignored that the government engaged meaningfully with the general public, issuing statements from senior officials explaining the government's approach to the Provisions. *See, e.g.*, EO 14161, 90 FR 8451; EO 14188, 90 FR 8847; 1-ER-00024; 14-ER-3676-77, 3746. In fact, by Plaintiffs' own admissions through the allegations in their Complaint, they were plainly aware. *See, e.g.*, 14-ER-3690 ("Many Stanford Daily members … *have personally read and are aware* of the

government's statements and enforcement actions referenced in this Complaint"). These statements along with other documents communicated how foreign-policy determinations would be applied and reaffirms that there is sufficient notice and clarity.

## CONCLUSION

The Court should reverse the district court's judgment.

Respectfully submitted,

JONATHAN D. GUYNN
Acting Assistant Attorney General
Civil Division

DREW C. ENSIGN
Deputy Assistant Attorney General

THOMAS S. VASELIOU
Senior Counsel to
the Assistant Attorney General
Civil Division

AUGUST F. FLENTJE
Deputy Director

SAMUEL P. GO
Assistant Director

/s/ *James A. Hurley*
JAMES A. HURLEY
Trial Attorney
Office of Immigration Litigation
U.S. Department of Justice
Civil Division
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044
T: (202) 305-1889
F: (202) 305-2509
james.hurley@usdoj.gov

JAIME DURR
DOMINIC WEISS
Trial Attorneys

Dated: November 20, 2026 *Attorneys for Defendants-Appellants*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 13,950 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010, Times New Roman, 14-point type.

/s/ *James A. Hurley*
JAMES A. HURLEY
Trial Attorney
Office of Immigration Litigation
U.S. Department of Justice, Civil Division
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044
T: (202) 305-1889
F: (202) 305-2509
james.hurley@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on November 20, 2026. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *James A. Hurley*
JAMES A. HURLEY
Trial Attorney
Office of Immigration Litigation
U.S. Department of Justice, Civil Division
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044
T: (202) 305-1889
F: (202) 305-2509
james.hurley@usdoj.gov

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 26-6906

I am the attorney or self-represented party.

**This brief contains** 13,950 **words,** including ___ words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- (●) complies with the word limit of Cir. R. 32-1.
- ( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- ( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- ( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- ( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - [ ] it is a joint brief submitted by separately represented parties.
  - [ ] a party or parties are filing a single brief in response to multiple briefs.
  - [ ] a party or parties are filing a single brief in response to a longer joint brief.
- ( ) complies with the length limit designated by court order dated ___.
- ( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ James A. Hurley **Date** 11/20/2026

*(use "s/[typed name]" to sign electronically-filed documents)*