**No. 26-6906**

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

**STANFORD PUBLISHING CORPORATION, *et al.*,**

*Plaintiffs-Appellees,*

**v.**

**MARCO RUBIO, *et al.*,**

*Defendants-Appellants.*

**Appeal from a Judgment Issued by the U.S. District Court for the Northern District of California (Civil Action No. 5:25-cv-06618-NW)**

# DEFENDANTS-APPELLANTS' EXCERPTS OF RECORD VOLUME 4 of 15

**JONATHAN D. GUYNN**
**Acting Assistant Attorney General**
**Civil Division**

**DREW C. ENSIGN**
**Deputy Assistant Attorney General**

**AUGUST E. FLENTJE**
**Special Counsel for Immigration Litigation**

**SAMUEL P. GO**
**Assistant Director**

**JAMES A. HURLEY**
**Trial Attorney**
**Office of Immigration Litigation**
**U.S. Department of Justice Civil Division**
**P.O. Box 878, Ben Franklin Station**
**Washington, D.C. 20044**
**T: (202) 305-1889**
**F: (202) 305-2509**
**james.hurley@usdoj.gov**

**JAIME DURR**
**DOMINIC WEISS**
**Trial Attorneys**

**Date: November 20, 2026**

**Attorneys for Respondent**

you, and also it could be that the police might be, um, not so friendly. You know there are examples in many different contexts in this country where we've had issues, where there were clashes. And I think that, um, I feel it's reasonable to fear that if something were to happen, that I would be more vulnerable than other people, than you, for example.
Q. You indicated you that attended a protest relating to DOGE? D-O-G-E. I don't know how you pronounce it.
A. Yeah, the one that was, um, about Elon Musk and the cuts. So, yeah, I, um -- under different circumstances I would have liked to attend it.
Q. And you didn't attend it because you feared that the government was going to identify you and pick you out of a crowd?
A. Exactly what I said before. It's not that I was worried that they would sort of look for me specifically, but I was -- I didn't know whether these were going to be peaceful protests, I don't know what was going to happen, and I was worried that if something was going to happen, I would be in a particularly vulnerable situation.
Q. Have you -- how many protests have you attended in your lifetime, could you give an estimate?
A. Um, I don't know, maybe -- I don't know, maybe 30,

40 protests.
Q. 30 or 40?
A. Yes.
Q. Have you ever been arrested at a protest?
A. No.
Q. Have you ever been detained or questioned at a protest?
A. No.
Q. And still thought that that could happen?
A. I mean most of those were not in the U.S. I mean I was -- for 25 years I was living in the UK, in London, and most -- I might have attended some protests in Germany while I was still in school. But most of the protests I attended were in the UK. But even if I had attended all these protests in the U.S., I mean it's different now precisely because of the -- what I mentioned, the threats to get rid of pro-Hamas students and faculty and, um, the detainment and deportation of pro-Palestinian students. So that's definitely a shift.
Q. You indicated that people from Camera had accused you of associating with pro-Hamas causes. Has anybody from the U.S. government ever accused you of that?
A. Not that I'm aware of. No.
Q. Okay. And with respect to this article that you indicated that you are refrained from writing. Your

opinion is that this article would have been viewed by the government as a reason to deport you?
A. To be perfectly honest, I don't trust the government to make a distinction between a critique of Israel and pro-Palestinian positions and the support for Hamas. I haven't seen evidence of that distinction.
Q. Did I hear you correctly yesterday when you indicated that this article that you were thinking of writing you intended to be somewhat critical of Hamas?
A. Yes, critical of Hamas and critical of the Israel government both. I don't believe that you have to do one or the other.
Q. Of course.
THE COURT: Forgive the interruption. I want to go back to how you answered the earlier question.
THE WITNESS: Yes.
THE COURT: Do I understand you to say that you don't understand the United States government to make a distinction between criticism of the State of Israel and its conduct in Gaza, and with respect to Palestinians, and activities that are pro-Hamas?
THE WITNESS: Yes, correct.
THE COURT: I understand that's what you think?
THE WITNESS: Yes.
Q. And your opinion, or your belief, your professed

belief, is that if you wrote an article that was critical of Hamas, that might expose you to the heightened risk of deportation?
A. Correct. But not because of my criticism of Hamas, because of my -- but also the criticism of the Israeli government. And because I'm already, um, due to my previous role as Director, and, um, it's not just Camera, I mean it's one person who has an entire blog dedicated to write about the Center of Middle East Studies and has mentioned me. So overall it's wider than just one organization.
Q. Those organizations that you indicate --
A. Yes.
Q. -- were, um, alleging that you were tied to Hamas or supportive of Hamas in any respect, those weren't government organizations, were they?
A. No.
Q. Okay. And with respect to those, um -- those criticisms, have you heard -- have you had any communication from the United States government, or its agents, regarding any of those publications -- well any of those allegations?
A. Um, I don't know whether I can speak about this, but there has been an HHS Title VI investigation of Brown and, um, some of this came up.

Q. Without going into details because --
A. Yeah, I don't think I should talk about it.
Q. -- there's concern about possibly intruding upon other litigation, um, apart from that belief, is there anything else that would lead you to believe that the government has associated -- the U.S. government has associated you with pro-Hamas activity?
A. No.
Q. Now you indicated that you had traveled overseas in 2025?
A. Yes, correct.
Q. Can you help me remember when you left to travel overseas?
A. Yeah, so, um, I traveled -- first of all, in December 2024, I traveled to, um, spend the break with my, um, family, with my daughter, and, um, I saw my mother in Germany, and my partner, and I was in the UK and then in Germany. And I came back early -- no, I also spent a week in Berlin. And I came back early, um, because Brown University asked everyone who was not a U.S. citizen to come back prior to the inauguration, um, there was a worry that there would be -- that there would be issues at the airport. So I came back. I think it was the 18th of January. I don't know exactly, but sometime, um, just a couple of days before the

inauguration, which was on the 20th, I think.

And then I, um, had -- I traveled on the 8th of March. It was my mother's birthday and my mother was not well, she's in a care home, and my father passed way and I'm the only daughter, so I went and I arrived on the 9th of March, and I arrived to the news of the arrest of Mahmoud Khalil.

And at that point, as I said yesterday, I mean I -- I was quite nervous, but I decided that I had to see my mother, and I did. And I did go on to Switzerland to give my talk and I didn't go home on the holiday. And I came back a couple of weeks after I traveled -- I mean after I left the country.

Q. Was your return to the United States in approximately April of 2020?

A. No, no, it was like two weeks later. So it must have been on the 8th or whatever was two weeks later. So it was before the end of March. I know it was before the arrest of Rumeysa Ozturk, because I remember after I arrived a few days later, I heard about the arrest and then I saw the pictures. So, um --

Q. So you've traveled to the United States twice since the Trump administration -- strike that.

You've traveled outside the United States twice since the Trump administration was voted in, correct?

A. Correct.
Q. Now when you -- and your concern that you've articulated with respect to your fears about being deported --
A. Yes.
Q. -- those are concerns you had, um, since even prior to Trump's election, correct?
A. No.
MR. BIALE: Objection. Sorry I'll drop it.
A. Not those concerns. I mean generally when I came early, it wasn't my concern, it was that the University asked everyone, all students, all faculty, who are not citizens, no matter whether they have spoken out on Palestinian or not to come back before the inauguration. So I was just following, you know, what Brown wanted. It wasn't that I was worried coming in.
It is true that in March when I returned from my travel to see my mother and give the talk -- or give a couple of talks in Switzerland, that, um, I was scared. I mean by that time, as I said, I left on the 8th and arrived on the 9th, and I think Mahmoud Khali was arrested on the 8th.
Q. And by that time your views, expressed through your work and the, um, CMES, those were well-known in your opinion?

A. What do you mean by "well-known."
Q. You indicated you were the Director of the CMES prior to that point in time?
A. Yes.
Q. And then the allegations about, um, you supporting Hamas had manifested publicly prior to that trip to Switzerland?
A. I mean I don't know what you mean by "manifested publicly." I have never been at the forefront, the first avante-garde in terms of pro-Palestinian speech or activism, okay? So I didn't think that I would be like one of the first people. But I also saw that things are moving in a certain direction and eventually it would be my turn, given my role and what is out there. And so if someone was going to do some research, as I was answering, or if my name were mentioned, then, yes. But I didn't think it would be like first-row.
Q. Where did you fly into after your trip to Switzerland, what airport in the United States?
A. I always fly into Boston.
Q. To Boston, Logan?
A. Uh-huh.
Q. And when you arrived at Boston, Logan, were you detained by ICE?
A. No.

Q. Were you, um -- were you questioned by anybody at CBP regarding your prior scholarship?
A. No.
Q. Were you questioned in any way about your prior work or the issue of Palestine?
A. No.
Q. Now you're aware that sometimes people who come into the United States are pulled aside for additional questioning, you're aware of that, correct?
A. Yes.
Q. And were you -- sometimes they call that "secondary." Do you understand that term?
A. Yes.
Q. Were you called into "secondary" for questioning?
A. No.
Q. You weren't. In fact at no point in time, upon your return from your Switzerland trip, were you ever, by any representative of the United States, questioned about the prior work or your, um, the allegations regarding your connection to Palestine, isn't that right?
A. Yeah, that's right. But as I said, I'm not frontline. So me being able to enter in March doesn't mean that I would be able to enter in November or December. I mean I -- yeah.
Q. You believe that eventually the government would

come for you?
A. Well I hope not. I mean that's why I'm here.
Q. Okay. And that belief was -- I believe you indicated yesterday, informed in part by your upbringing, is that a fair characterization?
A. Which belief?
Q. The belief that you were a potential target for deportation?
A. No, it has nothing to do with my upbringing in Germany.
Q. Okay. Yesterday, and perhaps I misheard.
Yesterday you indicated that you were sensitive to issues regarding immigration because you grew up in Germany. Did I misremember that?
A. Yes. Yes, that is, um -- what I was trying to say is that, um, I, growing up in Germany, I became sensitive to ideas around silence and complicity, because of the history of Nazi Germany and the holocaust, and you know the majority of -- well many many many Germans, the majority of Germans, just stayed silent or pretended that they didn't know, or they didn't speak up, and in my mind that is complicity and contributed to the holocaust. So that's what I said in terms of it shaped my, um, you know my awareness.
Q. Okay. And you did not grow up in the 1940s in

Germany, did you?
A. No, I did not grow up in the 1940s. (Laughs.) But I grew up in the '60s and '70s and '80s where, um, education, beyond history classes, was very much focused on making sure that that history is never going to happen again. And at the same time I -- as I was enjoying the privilege of living in a democratic country that was trying to come to terms with its past, I also saw how my relatives in Iraq were living under the Bathe regime, the dictatorship, how my relatives were scared to even speak on the phone. My, um, one of my uncles was executed by Saddam Hussein. So I saw what a dictatorship should be like. I feel that I have to use my privilege, as someone who is educated and grew up in Germany, to fight for democracy, freedom of speech, academic freedom, that's where my background comes in.
Q. Your -- your family's experience in Iraq, that you just described, did that in any way inform your concern that you might be deported from the United States?
A. Um, no.
(Pause.)
MR. KANELLIS: We tender the witness.
THE COURT: Anything else?
MR. BIALE: No redirect.
THE COURT: You may step down. Thank you.

Call your next witness.

MR. BIALE: The plaintiffs call Mike Mathis.

THE COURT: He may be called.

(MICHAEL J. MATHIS, sworn.)

THE CLERK: State your full name, spelling your last name, please.

THE WITNESS: Mr. Michael J. Mathis. My last name M-A-T-H-I-S.

MR. WANG: Good morning, your Honor. I'm Xiangnong Wang for the plaintiffs.

*****************

MICHAEL J. MATHIS

*****************

DIRECT EXAMINATION BY MR. WANG:

Q. Mr. Mathis, good morning, thank you for joining us today.

Where do you live, Mr. Mathis?

A. I live in --

THE COURT: Just the city and town.

A. Somerville, Massachusetts.

Q. And how long have you lived there?

A. I moved in June 2019.

Q. And do you have a security system installed at your

Case: 26-6906, 11/20/2026, DktEntry: 16.5, Page 14 of 300



home in Somerville?
A. Yes, I do.
Q. And who installed the system?
A. It's a mixture between the previous owner of my unit and me.
Q. Okay. And when did you install the system that you had had a part in installing?
A. I installed it roughly, um, in 2020.
Q. Could you please briefly describe the security Camera system?
A. Yes. There are two security cameras facing the rear of the house. Two security cameras facing the front of the house. And two in the interior.
Q. And is one of the cameras facing the front of the house, does that show the street or sidewalk in front of your house?
A. Yes, it does.
Q. And is that one of the cameras that you yourself installed?
A. Yes, it is.
Q. Does your security system record continuously or does it record by motion?
A. It does both, I have a continuous stream and a motion stream.
Q. And does your system add a date and timestamp to the

Case: 26-0906, 11/20/2026, DktEntry: 16.5, Page 15 of 300



videos that it records?
A. Yes, it does.
Q. Do you have footage from your security camera system from March 25th, 2025 at around 5:00 p.m.?
A. Yes, I do.
Q. And why do you remember that date and time specifically?
A. Because there was a large police presence outside my house after that time. I went to look at the security cameras. I saw something notable. So I saved it off.
Q. And have you reviewed this footage again?
A. Yes, I have.
Q. Can you describe what the video footage you're talking about shows?
A. Yes. I see two cars parked in front of my house and a group of masked people getting out of the car, approaching a young woman, and moving her into the car, and later driving away.
Q. And to your knowledge was your system functioning properly at the time?
A. Yes, I believe it was.
Q. Did you take any steps to preserve this video that you're talking about today?
A. Yes, I saved it off to the side.
Q. And why did you do that?

A. Oftentimes the secured camera footage will lapse and it will be deleted and I thought that this was notable so I should save it off to the side.
Q. Did you share this video that you're talking about with anyone else?
A. Yes, I shared it with, um, various news outlets, I shared it with my Congresswoman's office, Anna Preston, and I shared it with the plaintiffs here.
THE COURT: I didn't catch the last bit?
MR. WANG: "And the plaintiffs here."
THE COURT: Oh, yes.
Q. Just to confirm that last part, you did share it with counsel in this case?
A. Yes.
Q. That's great.
I'm now going to show you what's been premarked as Exhibit B, and that's Bates stamps AUP 01823-1.
A. (Looks.)
Q. Do you recognize what this is?
A. Yes, I do.
Q. And what do you recognize it to be?
A. This is the front of my house.
Q. Yes, there you go.
A. (On screen.)
Q. And how do you recognize this to be the front of

your house?
A. That's my driveway and it's the corner of Electric Ave. and Mason Street.
MR. WANG: So with the Court's permission, I'd like to play a couple of minutes of this video.
THE COURT: Well he's authenticated it, it seems to me, and you want to offer it?
MR. WANG: Yes, I would like to offer Exhibit B.
THE COURT: Any objection?
MR. KANELLIS: No, your Honor, but I don't see any need to play it --
THE COURT: I don't see any need -- again in the interests of time.
Unless, um --
MR. WANG: No further questions.
THE COURT: Very well.
So B is admitted in evidence as Exhibit 225, in evidence.
Any questions for this witness, Mr. Kanellis?
(Exhibit 225, marked.)
MR. KANELLIS: Just one question, your Honor.

CROSS-EXAMINATION BY MR. KANELLIS:
Q. Did you personally observe the conduct outside your home separate and apart from what's on the video?

A. I did not see what was on the video, but I saw the police presence soon after, and that's when I went outside.
Q. Okay. Did you -- did you see it and hear it or did you hear it -- I'm sorry, see it?
A. Are we talking about what's on the video?
Q. No, the police presence outside.
A. Yes, I saw it out my window.
Q. You saw it out your window. Did you hear -- was there any sound associated with what you --
A. There was a police officer on my front steps talking to my upstairs neighbor and I heard that.
Q. Okay. Did you hear the specific conversation at all?
A. No, I didn't.
Q. Okay. Other than the police officer speaking to a neighbor on your front steps, did you hear anything else?
A. No, I did not.
MR. KANELLIS: No more questions, your Honor.
THE COURT: Nothing further for this witness?
MR. WANG: Nothing further.
THE COURT: Thank you. You may step down.
225 is in evidence.
Call your next witness.

MR. BIALE: Your Honor, the plaintiffs call Bernhard Nickel.

THE COURT: He may be called.

(Witness takes stand.)

(BERNHARD NICKEL, sworn.)

THE CLERK: Please state your full name and spell your last name for the record.

THE WITNESS: It's Bernhard Nickel, and the last name is spelled N-I-C-K-E-L.

MR. BIALE: May I proceed, your Honor?

THE COURT: You may.

**************

BERHARD NICKEL

**************

DIRECT EXAMINATION BY MR. BIALE:

Q. Good morning, Professor Nickel.
A. Good morning.
Q. So where do you work?
A. At Harvard University.
Q. And what's your position at Harvard University?
A. I'm a Professor of Philosophy.
Q. And is that your title?
A. Yes.

Q. Have you recently held any other titles or positions at Harvard?
A. Yes, I've been Chair of the Philosophy Department for the last 3 years. My term ended at the end of June.
Q. Um, so where were you born?
A. In Germany.
Q. And, um, of what country are you a citizen?
A. Germany.
Q. How long have you lived in the United States?
A. About 30 years now.
Q. And what's your immigration status here?
A. I have a green card.
Q. Approximately when did you get your green card?
A. About 20 years ago.
Q. Now, are you familiar with a, um, the following term, the "Ideological Deportation Policy"?
A. Yes, I am.
Q. What do you understand that term to mean?
A. Well it's a deportation policy insofar as it's a policy in either removing or getting people to remove themselves from the United States, um, noncitizens, that is, and it's ideological insofar as it seems to be targeted specifically at people who have a certain ideological profile, specifically people who have spoken up or are politically engaged in pro-Palestinian causes.

Q. Do you believe that the Ideological Deportation Policy, as you have just described it, is a policy of the current Presidential administration?
A. Yes.
Q. In broad strokes, um, Professor Nickel, how has the Ideological Deportation Policy affected you personally?
A. Well I've stopped going to protests, I've stopped signing on to public letters, and I've cancelled international travel.
Q. Okay. I'm going to ask you about the specifics of some of those, but let me go back, if you don't mind, to, um, when you moved from Germany to the United States. What prompted that move?
A. So I came to the United States to attend college, I went to college at Cornell, in Ithica, New York, in Upstate New York, and, um, it had been a dream of mine to come to the U.S. for a very long time. I felt an affinity for the United States for almost as long as I can remember. I grew up in Germany. I was born in '75. I'm of the generation that, um, felt deeply grateful for what America did during World War II. And more specifically in my case, I grew up next to an American Air Force hospital, and so I was exposed to American pop culture a lot, watched American TV, listened to American radio, played basketball with the American service

members and the kids who went to high school there. And America was always deeply attractive to me, it held the promise of being a place where history isn't quite destiny, where you can be very different things than perhaps your own history or your country's history would have set you up to be. And that was deeply attractive to me at the time.

Q. And when you came to Cornell University, did you, um -- did America live up to your expectations?

A. Yes. (Laughs.)

Q. Okay. What did you plan to study at Cornell?

A. I came in planning to be an Economy major.

Q. Okay. That's economics?

A. Yes, Economics.

Q. Did you end up majoring in economics?

A. I did not.

Q. Why not? What happened?

A. I took a course in economics. (Laughter.) But more seriously, one of the things I was very attractive of coming to school in America, as opposed to staying in Germany, is at the American college level one gets a very broad education, one doesn't just sign up for a single major and basically start a MMA program. And, um, so I was exposed to many different areas of study, including history and philosophy. And not only did

economics not attract me, other fields did.
Q. And did you end up majoring in one of those fields?
A. Not officially, officially I was at Cornell, I was called a "cult scholar," which was designing your own major, but I ended up focusing most of my studies in philosophy.
Q. And after you graduated from Cornell University, what did you do immediately after college?
A. I took a gap year and I lived in Southern California, um, in San Diego, volunteering for Habitat For Humanity.
Q. And I take it you built houses for Habitat For Humanity during that year?
A. That's right.
Q. And then after that gap year, what did you do?
A. I matriculated at MIT, at the Massachusetts Institute of Technology, in their PhD program in Philosophy.
Q. Okay. And, um, did you complete the PhD program in philosophy at MIT?
A. I did.
Q. And did you write a dissertation?
A. I did.
Q. And after you, um, completed your PhD, what did you do next?

A. First, um, I worked as an Adjunct Professor at Tufts University for a year. I did that because a couple of weeks before I had to finish my PhD, my daughter was born, and it made sense to me, and given where my wife was career-wise, for me to take a year, basically a gap year, and be a stay-at-home dad.
Q. And then after your position as an Adjunct at Tufts, did you obtain a full-time position at a university?
A. I did, I obtained a tenure-track position at Harvard.
Q. Okay. And what year was that?
A. 2006.
Q. Okay. And you've been at Harvard ever since then?
A. That is correct.
Q. And I take it you were able to get tenure?
A. I did.
Q. Tell us, Professor Nickel, about your scholarly, um, writing?
A. So my areas of specialization are in the philosophy of language and linguistics, and very broadly speaking I'm very interested in the way that, using the tools of linguistics and understanding language, to illuminate much broader concerns about human nature, about communications, how we're going to make sense of the world, and my case study was the focus of my work. It

concerns what I called the "language of stereotypes," generalizations about the natural and social world that you might call the "Rule of Thumb," like ravens are black, tigers have stripes, lions have manes, Germans don't have a sense of humor. (Laughter.) And those generalizations aren't purely statistical generalizations, it doesn't seem, for one thing they mean very different things. Most ravens are black, but it's certainly not true that most lions have manes.

But more importantly, if I think about the kinds of generalizations about national groups, about racial groups, ethnic groups, genders, very often those come in clusters. So along with the nonhumorous aspect of being German, there's the idea of being detail-oriented, which is why you get precision German engineering. There's an idea of being good at planning, but perhaps not very creative, and perhaps also aggressive, which is perhaps part of the explanation as to why Germany started a couple of world wars in the previous century. Not that these explanations are any good, but the idea that seems reliable is that there's something like a nature that explains various other features, and I'm interested in understanding what those claims really amount to.

Q. So if you'll permit me, and this may be dumbing it down way too much, but essentially you study the

structure of language and you look at how that informs us about broader issues, including issues of history and politics, is that fair?
A. Yes.
Q. Okay. What courses have you taught at Harvard?
A. So I've taught a broad range of courses. Almost immediately after coming to Harvard I took over one of the main introductory courses, which is a course named "First-year students, to introduce them to the field." I've taught just about every year that I've been on staff, except for those years I was on sabbatical. I've also taught survey courses in my own area of specialization, the philosophy of language. I've recently started teaching an introductory logic course. And then I've taught smaller seminars on far more specialized topics.
Q. Do any of your courses or, for that matter, any of your scholarly writings touch on issues related to the Israeli/Palestinian conflict?
A. No.
Q. Separate and apart from your work as a scholar and your work as a teacher, have you be politically active since you came to the United States?
A. To some extent, yes.
Q. Tell us about what you've done?

A. Well in the more distant past, I've gone to some protests, especially as America started to wrestle much more with its history as it concerns race and also structural issues around gender, and so I took my daughter to some Pink Hat protests. I also went to some Black Lives matter protests in Boston. And more recently, I was more politically active signing on to public letters having to do with political issues, and also, um, going to some more protests.
Q. And so you mentioned public letters that you've signed more recently. Did any of those letters have to do with the Israeli/Palestinian conflict?
A. Yes.
Q. Okay. Before we get more deeply into that, let me just ask you, are you a member of any organizations?
A. Yes.
Q. What organization?
A. I'm a member of the AAUP, and the Harvard Chapter. I'm also a member of the American Philosophical Association.
Q. And when did you join AAUP?
A. Right around the time that the Harvard Chapter was founded, so I believe it's been about a year now.
Q. Okay. So the Harvard Chapter of AAUP is relatively new?

A. Yes.

Q. And you joined, fair to say, right around the time it started?

A. About then, yes.

Q. Why did you decide to join the AAUP Harvard Chapter?

A. Um, over the past couple of years, you know over the past 2 years, 2 1/2 years, questions of faculty governance have become very important at Harvard. Harvard is one of the very few schools that doesn't have a faculty Senate. And the AAUP, as an Association of University Professors, is one way for faculty to organize in order to make their voices heard in a more concerted way.

Q. Okay. I want to get now into some of the letters that you talked about that you signed.

MR. BIALE: Mr. Kumar, can you pull up Exhibit 83 in evidence.

(On screen.)

Q. And, Professor Nickel, could you take a look at the, um, first page of that document.

A. (Looks.) Yeah.

Q. Okay. And what's the date of the letter?

A. July 1, 2019.

Q. Okay. And it looks like, um, it has some authors at the top. But in addition to those individuals, did you

also sign this letter?
A. I did.
Q. Okay. Tell us generally what this letter is about?
A. It is about a strategy of historiography concerning the holocaust. And, um --
Q. I'm sorry?
A. Is it possible to scroll to another page?
Q. Yes.
MR. BIALE: Mr. Kumar, if you could go down.
(Scrolls.)
THE COURT: Let us know where we should stop.
THE WITNESS: Yes, that's good. Thank you.
(On screen.)
A. So there's -- okay. So the policy that's under discussion is "Unequivocally Rejecting Efforts to Create Analogies Between the Holocaust and Other Events, Whether Historical or Contemporary," and the letter demands that this, um, not be followed -- or asks that this not be followed.
Q. And why did you sign a letter advocating, um, that a policy of not making analogies between the holocaust and other events be followed?
A. So in Germany there certainly was a very strong historiographical tradition that, um, treated World War II, and the Nazi regime, the Third Reich, and the

holocaust, as sue generis, a "thing unto itself," something that cannot be understood, perhaps with the ordinary tools of historiography. And I certainly understand why that might seem appropriate insofar as, um, the horror of the holocaust are almost incomprehensible. At the same time I think this also led to not thinking about the times before and after the Third Reich, the things that led up to it, and its effects.

And so for somebody like me, who grew up in Germany in the '70s and '80s, it is often very difficult to understand the longer-term effects of World War II, of the Nazi seizure, of power and its maintenance of power, because I knew that there were the Nuremberg trials, the very top echelon of the Nazi hierarchy was eliminated. Of course Hitler didn't make it to the trials. But so much of the underlying structure was still there. And I think it's important that we understand, or at least that it's a possible avenue of understanding, that we think of, even something as horrific as the holocaust, as something that was brought about by people in all walks of life.

In fact, right around the time that I came to Cornell in the mid '90s, um, an American historian, Daniel Jonna Goldhagan had published a book, "Hitler's

Growing Executioners," in which he documented, quite extensively the way that ordinary Germans were part of the Nazi machinery, and he was celebrated in Germany, not because he made Germans feel good about themselves, anything but, but I think because it allowed many Germans to begin to wrestle with their past, because many of us have parents, grandparents in my case, who were members of the party.

Q. Let me just ask you. You've mentioned a term "historiography," just to make sure that we're all on the same page. Would you explain what that means?

A. Oh, the way that I use it, I just mean approaches to how to pursue historical inquiry and how to write history.

Q. And, um, you talked about sort of a broader understanding of the forces that brought about the holocaust and the lingering effects in Germany. And can you just explain to us how, um, those concerns apply to this idea of analogizing the holocaust to other events?

A. Well the holocaust, as a major event, was the effect of many people working more or less in concert, making lots of decisions, and I think it's one form of analogy to ask where does something like that -- where else does something like that happen? I think that's a form of analogy that, given the statements here, would

be, um, forbidden.

THE COURT: That would be --

THE WITNESS: Forbidden.

THE COURT: Forbidden.

Q. And in your view that's a form of analogy that should be permitted?

A. Yes.

Q. Did you have any concerns, um, when you signed on to this letter, about how it could affect your employment in the philosophy department at Harvard?

A. No.

Q. Did you have any concerns, when you signed onto this letter, about how it could affect your immigration status in the United States?

A. No.

Q. Let me show you another document. This is Exhibit 84 in evidence.

A. (Looks.)

Q. And I'm happy to show you additional pages of it, if that would be helpful. Just let us know.

A. (Reads.) Okay.

Q. What's this document?

A. It's a Harvard faculty statement in support of Palestinian liberation.

Q. And did you sign onto this document?

A. I did.
Q. Why did you sign onto this document? I'm sorry, before we get there, can you just tell the date of this document.
A. Yes, it's dated May 20th, 2021.
Q. Okay. And now tell us why you decided to sign on to this statement and generally what the, um, what the gist of the statement was?
A. (Reads.) Would you mind scrolling down just a little bit. (Scrolls.) Thank you.
The demand, at the end of the statement, is an end to U.S. support for Israel's apartheid regime and the condemnation of state aggression.
Q. Okay. And why did you decide to align yourself with this particular statement?
A. I've become aware of, um, the conditions in Gaza and, um, I became aware that the conditions are horrifying, and it seemed important to try to support and, um, mark this fact, and express my support for people who are living under these horrifying conditions.
Q. And did you, um -- and was this letter, um, released publicly?
A. Yes.
Q. And were the signatories publicly identified?
A. Yes, I believe so.

Q. Did you have any concerns, when you signed this letter, that public identification of your name with this message could lead to, um, problems with your employer?
A. No.
Q. Did you have any concerns, when you signed this letter, that your name being associated with it could lead to problems with your immigration status?
A. No.
Q. Okay. I want to just talk to you briefly and then I guess I will show you one more letter. I want to just talk about the attack of October 7th, 2023, um, and ask you about, um -- and the subsequent Israel military campaign in Gaza. I'm going to ask about your personal reaction to those events and what the reaction was like on the Harvard campus?
THE COURT: Well that's something of a compound question. Let's break it down. First, your reaction -- but the questions are appropriate.
First, your reaction to the events of October 7th?
A. So the, um, the attack by Hamas, um, horrified me, just it -- it's just viscerally, it's almost incomprehensible the brutality of the attacks.
Q. And how about the, um, subsequent Israeli military campaign that was a response to the attack?

Case: 26-6906, 11/20/2026, DktEntry: 16.5, Page 35 of 300



A. Well I was also deeply saddened and also horrified by all this blood and casualties that the campaign caused.

Q. And now -- and I appreciate the Court's objection to my question, now you can talk about the reaction on the Harvard campus to those events?

A. I think it probably makes sense to start with a statement released by several student groups shortly after the Hamas attack, holding Israel alone responsible for the events, for the attack.

MR. KANELLIS: Your Honor, I apologize for the interruption, but an objection to the extent this calls for hearsay. He's quoting a letter by --

THE COURT: He is. I'm not clear -- I have a more fundamental concern. I've allowed all this on the issue of bias, because people's motivations are at issue here. Why -- in my subsequent events really, why do we need this testimony here? How does it help us in the issues in this case?

MR. BIALE: Understood, your Honor. Let me cut to the chase.

Q. Did there come a time, Professor Nickel, that there was an encampment on Harvard's campus?

A. Yes.

Q. Okay. And what was that encampment about?

A. It was, um, an encampment that, um, asked for, um, and demanded Harvard's divestment from Israel and condemnation of the military campaign.
Q. Did you attend the encampment at any point?
A. Yes.
Q. Approximately how many times did you attend the encampment?
A. I guess around 10.
Q. And just so we can get a timeframe, do you remember around what time period this was?
A. I believe it was, um, starting about 5 or 6 weeks before the end of the spring semester of 2025, and it lasted, I believe, for about 4 -- 4 weeks or so.
Q. And just to make sure, you said 2025. Was this the spring semester -- you mean the semester that just ended or are we talking about the spring of 2024?
A. Um --
Q. In other words, was this a year ago or was this in the last couple of months?
A. Oh, no, I'm sorry, you're right. It's 2024.
Q. Thank you.
A. Yes, of course.
Q. Why did you go to the encampment approximately 10 times, as you testified?
A. For a couple of reasons. At first I went because,

um, I knew some of the students at the encampment, they had been students in my classes, um, and some of them were philosophy majors. And then later on, when the university began to start disciplinary proceedings against some of the students, I met with students there, because as part of the disciplinary process at Harvard, students that are brought before the administrative board are entitled to a faculty advisor, and I served as the faculty advisor for a couple of the students.

Q. And did you, um, other than going to visit your particular students, did you wish to express sympathy or support for any of the positions that the protesters were talking at the encampment?

A. Yes. I mean it was a -- a somewhat complicated thing, because on the one hand, to the extent that the protesters were drawing attention to the continuing, um, terrible human toll that the war took, um, I thought that was very important, and I supported that. On the other hand, my own attitudes towards thinking about the university specifically, the best thing, as a means of bringing about broader political change in the world, um, I mean I don't find that all that compelling. And so that part of it, um, I probably wasn't deeply in support of.

Q. Did you see anything at the encampment or hear about

anything that occurred there that you, um, would deem to be antisemitic?
A. Yeah, unfortunately.
Q. What was that?
A. Um, I saw a large-scale caricature of what looked to me like our then interim President Garber, um, with, I believe, the Devil's horns and a Devil's tail. And that's just a very, from now on, antisemitic trope.
Q. And I think you sort of alluded to this in your answer, but did you approve of that, um, the use of that image in the students' protest?
A. No.
Q. Okay. Now, um, when you, um, went to the encampment, did you have any concerns that your presence there would cause you problems with your employer, Harvard University?
A. No.
Q. Did you have any concerns that your presence there would, um, create problems for your immigration status?
A. No.
Q. I want to turn your attention to, um, the election in 2024.
So after President Trump was elected, did you send --
THE COURT: I interrupt only because I'm going to

take a recess at quarter to 11:00. Do you want to take it now and then pick up half an hour out?

MR. BIALE: I think that makes sense, your Honor, I have a little bit more with the witness.

THE COURT: I'm not crowding you, it's just you said "turning to another point in time," that's why I interrupted. It's your call.

MR. BIALE: I think it's a good time to take a break, your Honor.

THE COURT: We'll take the morning recess. We'll start at 10 minutes after 11:00.

We'll recess.

THE CLERK: All rise.

(Recess, 10:40 a.m.)

C E R T I F I C A T E

I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do hereby certify that the forgoing transcript of the record is a true and accurate transcription of my stenographic notes, before Judge William G. Young, on Tuesday, July 8, 2025, to the best of my skill and ability.

/s/ Richard H. Romanow 07-8-25
________________________
RICHARD H. ROMANOW  Date

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

No. 1:25-cv-10685-WGY
Volume 2, Pages 75 - 148

AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
Plaintiffs

vs.

MARCO RUBIO, in his official capacity as
Secretary of State, et al,
Defendants

********

BENCH TRIAL DAY 2

BEFORE THE HONORABLE WILLIAM G. YOUNG
UNITED STATES DISTRICT JUDGE

United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
July 8, 2025

********

Court Reporter: Kelly Mortellite, RPR, RMR, CRR
Official Court Reporter
United States District Court
One Courthouse Way
Boston, Massachusetts 02210
mortellite@gmail.com

A P P E A R A N C E S

RAMYA KRISHNAN
ALEX ABDO
Knight First Amendment Institute at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
ramya.krishnan@knightcolumbia.org
and
COURTNEY GANS
NOAM BIALE
ALEXANDRA CONLON
Sher Tremonte LLP
90 Broad Street, 23rd Floor
New York, NY 10004
(212) 540-0675
cgans@shertremonte.com
For Plaintiffs

ETHAN B. KANTER
WILLIAM KANELLIS
VICTORIA M. SANTORA
JESSICA A. STROKUS
DOJ-Civ
P.O. 878
Ben Franklin Station
Washington, DC 20044
(202) 616-9123
ethan.kanter@usdoj.gov
and
SHAWNA YEN
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, MA 02210
shawna.yen@usdoj.gov
(617) 748-3100
For Defendants

Case: 26-6906, 11/20/2026, DktEntry: 16.5, Page 43 of 300


INDEX


| WITNESS | PAGE |
|---|---|
| BERNHARD NICKEL | |
| Direct Examination By Mr. Biale (continued) | 78 |
| Cross-Examination By Mr. Kanellis | 93 |
| Redirect Examination By Mr. Biale | 116 |
| SARA JOHNSON | |
| Direct Examination By Mr. Abdo | 121 |
| NADIA ABU EL-HAJ | |
| Direct Examination By Ms. Conlon | 131 |


E X H I B I T S


| Exhibit No. | Received |
|---|---|
| 226 | 125 |
| 227 | 129 |

P R O C E E D I N G S

(Resumed, 11:12 a.m.)

THE COURT: Mr. Biale, you may continue.

MR. BIALE: Thank you, Your Honor.

BY MR. BIALE:

Q. Professor Nickel, when we left off at the break I was about to ask you about the November 2024 election of President Trump. You recall that event?

A. Yes.

Q. Let me ask you, without getting into your personal views, at the time you were chair of the philosophy department, right?

A. That's correct.

Q. And so as a faculty member and university administrator, what was your reaction to the election?

A. Well, especially in my role as chair, I think it's part of my job to help the community and help hold the community together, create community as much as possible. So I, as part of that, I would at times send out emails to the community at large to talk about things that concerned all of us.

Q. And when you say "the community," what are you referring to?

A. I mean, my colleagues in the department, the graduate students in the department and our undergraduate majors.

Q. Okay. So you mentioned that you sent out emails. Do you recall if you sent out one of these emails to the department or

to the department community, I'll say, around the time of the election, shortly after the election?
A. Yes, I did.
MR. BIALE: Okay. Mr. Kumar, if you could pull up Exhibit 77 in evidence.
Q. Professor Nickel, take a moment to look at that document on the screen.
Is this the email that you sent to the philosophy department community shortly after the 2024 election?
A. Yes.
Q. Okay.
THE COURT: Say again the exhibit number, excuse me?
MR. BIALE: Sure, Your Honor. It's Exhibit 77.
THE COURT: Thank you.
Q. Now, if I can direct your attention -- let me just, just focusing quickly on the date, when was it sent?
A. November 7 of 2024.
Q. Okay. And we won't get into it what day of the week that was, but you see at the beginning it says, "In the wake of Tuesday's election." So fair to say this was sent shortly after the election?
A. Yes.
Q. Okay. I want to direct your attention to the second paragraph, and you say there, "I take the campaign's rhetoric about, among other things, deportations and using the resources

of the state to go after political opponents both seriously and literally." What did you mean by that?

A. Well, during the campaign there were statements by both Candidate Trump and others in the campaign, including Vice President Vance, arguing that -- Vice President Vance, for instance, said that the universities are the enemy, and Candidate Trump at various points suggested that if he were elected he would use the powers of the state to prosecute his enemies, his political opponents.

Q. When you say "political opponents," in that context, who are you talking about?

A. You know, unfortunately a very broad range of people, but they certainly included people who might have been politically active, especially in pro-Palestinian causes, in large part because in many of the statements he made concerning the campus protests that had preceded the election, the protesters seemed to be characterized as antisemitic quite broadly and pretty much universally.

And to the extent that antisemitism is a very good ground for bringing the powers of the state to bear, it seemed that that was a case where a lot of students potentially might be threatened.

Q. And when you said "deportations," is it that issue specifically that you had in mind, student pro-Palestinian protesters?

A. It's certainly one of them I had in mind. I'm not sure if that's the only one.
Q. And then in the next sentence you said, "I'm also keenly aware of the chilling effects on freedom of expression."
Just tell us a little bit about what you were thinking of when you wrote that.
A. So I think as an international student one is particularly vulnerable. When I came to America, I came here on an F-1 student visa before I got my green card. And even me who was coming usually from Europe, whenever I had to go through immigration, it was a moment of deep anxiety because I felt very much at the mercy of a bureaucracy that may or may not -- that I may or may not have protections from.
So I felt it especially to the extent that international students would be the targets of some of these activities, I could easily imagine them wanting to keep a very low profile and not speak up in favor of not just pro-Palestinian causes, certainly those as well but others as well that might run afoul of the administration.
Q. Okay. Mr. Kumar, you can take that down.
I asked you at the beginning of your testimony about the ideological deportation policy. In your view, has the Trump administration since being inaugurated put that policy into effect?
A. Yes.

Q. What have you seen or heard about that makes you believe that the administration has done that?

A. Certainly the arrests of Mr. Khalil and Ms. Ozturk, along with broader statements that were covered in the press to the effect that protest is not something that is welcomed, certainly not all forms of protest. And so there are the statements and then there are the arrests.

Q. So I want to ask you about each of those. Just first focusing on the statements, is there a specific statement that you have in mind or a specific government official that you have in mind who made a statement, if you remember?

A. No. At this point I don't remember.

Q. Okay. Let me ask you then about the arrest of Mr. Khalil. How did you hear about that?

A. In the media. I read it in the newspaper.

Q. What did you read?

A. That he was arrested, apparently very close to his -- I don't recall if it was in his home or close to his home. And that this was in the presence of his, I believe, at the time pregnant wife.

Q. And what about that incident that you learned at that time led you to believe that this was a manifestation of the ideological deportation policy?

A. Nothing in the coverage of this case indicated that he had done anything other than exercising his political speech. He

was very active. He was, as far as I could tell, one of the leaders of some of the campus protests at Columbia, but that was the extent of it.

Q. Okay. And did you read at the time about what Mr. Khalil's immigration status was in the country?

MR. KANELLIS: Objection, Your Honor. We're getting into a lot of hearsay.

THE COURT: Again, that's not for the truth but what he came to understand was his status and then this individual himself. So I'll allow it but not for the truth.

So what did you come to think his immigration status was?

THE WITNESS: I believed that he had a green card.

Q. Okay. Based on what you heard about Mr. Khalil, his arrest, his prior activities and his immigration status, how did learning about all that make you feel?

A. It scared me because I didn't think that those kinds of -- yeah, I didn't think that those kinds of arrests would happen in America, but they did.

Q. And other than how it made you feel about America generally, did it affect you personally in any way?

A. I mean, that, although I think this became much more sharp, this came much more sharply into focus a little while later when Ms. Ozturk was arrested in the way that she was.

So I told you earlier that I came to America because I

have something like an affinity, and I hadn't planned to be an immigrant. I thought I'd come here for four years, maybe six, maybe do a master's and then go back to Germany.

Of course that didn't happen. I ended up going to college, finding my career here and meeting my wife, having a kid. And I did that in part because I actually love this country. And it's the kind of love that other immigrants who have been in the situation where they could just affirmatively choose to move here had.

And throughout all the ups and downs and all the different parts of my life and certainly all of the different ways that America came to wrestle with itself and think about the ways it could try to create a more perfect union, that love never changed.

And as my fear of political reprisal grew, I just don't feel that way about the country in quite the same way. That's depressing and it's destabilizing.

Q. So let me ask you, you said that that sort of came into sharper relief with Ms. Ozturk's arrest. How did you hear about that incident?

A. Also in the media.

Q. Okay. And just tell us what you remember hearing.

A. So first I just read accounts in the newspapers saying that she was picked up in broad daylight off the street. And what I remember is that the only thing that she had done which

could have anything to do with the arrest was publishing a piece in the Tufts student newspaper.
Q. And you mentioned that she was picked up on the street. Do you recall seeing a video of that incident?
A. I did.
Q. Approximately when did you see that video?
A. Probably like two or three days after it happened. I read accounts of what was in the video. And I didn't really want to see it. I thought it would be really disturbing. But then after a while I thought it's important that I see it, and so I did see it.
MR. BIALE: So let me ask you, Mr. Kumar, to pull up Exhibit 225. And Your Honor, we're not going to play the whole video. I just want to play a couple of seconds of it so the witness can see it.
THE COURT: You may.
MR. BIALE: Mr. Kumar, if you can take us to 2 minutes and 30 seconds and play maybe five seconds of the video.
(Video played.)
MR. BIALE: Okay. Thank you, you can pause it.
Q. Professor Nickel, is this the video that you saw that you were just talking about?
A. Yes.
Q. Okay. By the way, you mentioned Mr. Khalil's arrest. Do you recall ever seeing a video of that arrest?

A. No.
Q. Okay. Now, after you learned about these two incidents and saw the video of Ms. Ozturk's arrest, did you start to think about how you might change your behavior?
A. Yes.
Q. Okay. And we covered that a little bit, but if you can just tell us again, what were the specific things you did?
A. So for me, the arrest of Ms. Ozturk was the turning point. That was the moment that I actually just decided on a blanket policy that I would keep my head down completely. I would not go to protests. I would not write, I would not sign on to public letters, and any other potential forms of publicity I would just avoid.
Q. And did you attend any protests between Mr. Khalil's arrest and Ms. Ozturk's arrest?
A. I did.
Q. Tell us about that protest.
A. There was one on the grounds of Harvard University in the yard. I believe it was organized by the AAUP in support of Mr. Khalil. And I was -- I had begun to be somewhat scared because of the arrest, but I decided I could still go to the protest. I wouldn't be in the front row, and I have to admit I was glad that I wasn't in the picture that was published in the Harvard student newspaper when that protest was covered.
Q. Why were you glad that you were not in the picture that

was published in the student newspaper?
A. I didn't want to draw attention to myself.
Q. Why not?
A. Well, I thought that if I drew attention to myself, I might potentially be the target of something. Specifically I had been hoping to do some international travel and go to Europe a couple of times earlier this year, well, once earlier this year and once right around now. And I was worried about potentially being detained at the border.
There had been stories about people being detained at the border and then moved to a detention center in Louisiana or being turned away and being sent back to Germany. And I was worried about those possibilities.
Q. Let me ask you about the planned travel. So you said there was one that you planned to take earlier this year and one that you would have gone on around now.
Tell us about the first trip. Where did you plan to go and what was the purpose of your travel?
A. I planned to go back to Germany pretty close to where I grew up because I wanted to see my half brother, and I wanted to take my daughter to see him. He's about ten years older than me, and earlier this year he was diagnosed with terminal cancer. Right now he probably has about nine or ten months to go. And the trip in May would have been a chance for me to see him and for my daughter to spend some time with him.

He's at this point the only family I have left. I'm an only child. Both of my parents are gone. I don't really have connections with my extended family. And so this was important for me and would have been important for my daughter.

MR. BIALE: Mr. Kumar, can you show us what's in evidence as Exhibit 170.

Q. Professor Nickel, can you take a look at this exhibit?
A. Okay.
Q. I'm not going to ask you to -- it's in German. I'm not going to ask you to translate it, but can you just tell us the date and tell us what this email is.
A. So the date is March 11 of this year, and it's an email that I sent to my brother. And there's some chitchat, but the basic point was to say that my daughter's summer plans had become more fixed and so I would be available to travel -- we would both be available to travel between the middle of May and the middle of June, from the 15th of May to the 15th of June.
Q. So this was March 11, so this was I guess a couple of days after Mr. Khalil was arrested; is that right?
A. Yeah.
Q. But before Ms. Ozturk was arrested?
A. That's right.
Q. And so after Ms. Ozturk was arrested, did you change your plan?
A. Yes.

Q. Tell us what happened.
A. Well, I decided not to go and see him. And instead my daughter and I still took a trip here in the U.S. Just because it was nice to spend some time with her after both of our semesters were over, but we very consciously took a domestic trip.
Q. And I take it you were not able to see your brother on that domestic trip, right?
A. That is correct.
Q. And let me ask you then about the trip that you planned to be on now. What was the purpose of that trip and where were you going to go?
A. I was planning on going to Edinburgh in the U.K. for an academic conference. And depending on exactly how my plans shaped up, I had planned to see some other people who work in the same area as I do, same discipline area I mean.
Q. Was that a conference you were invited to?
A. As a participant, yeah. It's put on by several fairly close friends of mine.
Q. Have you previously, I'm talking now before March of 2025, previously attended conferences, academic conferences outside of the United States?
A. Yes.
Q. Approximately how many?
A. Well --

Case: 26-6906, 11/20/2026, DktEntry: 16.5, Page 56 of 300


Q. That may be an unfair question.
Is that something that you used to do frequently?
A. Fairly frequently, yes, certainly once COVID ended.
Q. Okay. And this trip to Edinburgh for the academic conference, did you go on that trip?
A. No.
Q. Why not?
A. Because I was worried about international travel, and specifically I was worried about potentially being detained at the border when I tried to re-enter.
MR. BIALE: Okay. Now, if I can just have a moment, Your Honor.
Q. I want to go back now -- Mr. Kumar, you can take that down -- to, you said that after the arrest of Ms. Ozturk you decided as a blanket policy not to sign on to any more public statements, right?
A. That's correct.
Q. Were you still chair of the philosophy department at that time?
A. I was.
Q. And did you still engage in your practice of at times sending emails to the department community?
A. Yes.
Q. Did you consider that to be making a public statement?
A. No.

Q. Why not?
A. It's an email. So usually I sent these emails, and they're emailed to a very specifically defined group of people, the faculty, graduate students and undergrads in the department.
Q. And in some of those emails, if you recall, did you say anything that was critical of the Trump administration and its policies?
A. Yes.
Q. Why did you feel comfortable doing so in that medium?
A. I wouldn't quite say that I felt comfortable. I did feel like I had to do it. I think it was -- I thought it was important to do it. And I chose to do it because I thought that these are emails that are not public but are aimed at a very specific community, within which we all know each other fairly well.
Q. And if you recall, was an excerpt from one of those emails at some point printed in The Harvard Crimson, the student newspaper?
A. Yes, it was.
MR. BIALE: Mr. Kumar, if you can pull up Exhibit 81.
THE COURT: 81?
MR. BIALE: 81, 8-1.
Q. This is -- I apologize for the big advertisement for the D. E. Shaw Group, but this is an internet printout of the

article. Mr. Kumar, if you can just go down to page 2 and if you can enlarge the second paragraph.

So this is quoting something you said. It says, "Philosophy Chair Bernhard Nickel wrote to his department."

Is this quotation from one of the emails that you sent, private emails, to the philosophy department community?

A. Yes.

Q. When you sent that email, did you anticipate or intend -- strike that.

When you sent the email, did you intend that your words would be publicized more broadly?

A. No.

MR. BIALE: Okay. You can pull that down.

Q. So Professor Nickel, you've testified about some of the concrete ways in which the ideological deportation policy has affected your plans and your activities, and you testified about how it's affected your feelings about this country.

Is there any other way that it's affected you that you think is important for this court to understand?

A. I mean, I can share with you because of my role as chair but also my job as just a faculty member, I've spoken to students, students who at some points were also worried about this, this policy. And there's just there's a fair amount of fear among our student body, to the extent that I feel for them. I suppose that's a way that it's affected me. And I

don't want to make it about myself.
Q. I understand. Well, to ask you one more question about yourself. Why have you decided to come testify as a witness in this trial?
A. You know, anybody can sign on to an open letter. Anybody can go to a protest. My sense was that, in this trial, somebody in my quite specific situation, somebody who is a senior scholar with a secure position at Harvard and who was not a citizen and who felt the effects of the policy, I don't know that there are that many people who could have done this. So I thought this is something that's worth it.
And frankly, I told you how my feelings have changed. This is still, this is where I live, and I want this to be a country and a nation of laws, not of men. And so I believe in these kinds of processes and procedures. And this is me doing my part.
MR. BIALE: Thank you. No further questions.
THE COURT: Mr. Kanellis, do you wish to question?
MR. KANELLIS: Yes, sir.
THE COURT: You may.
CROSS-EXAMINATION BY MR. KANELLIS:
Q. Professor Nickel, good to see you again.
A. Hi.
Q. I'd like to ask a couple of questions about your membership in AAUP. You indicated that you joined AAUP about a

Case: 26-6906, 11/20/2026, DktEntry: 16.5, Page 60 of 300


year ago?
A. I think that's about right.
Q. Roughly. And do you have a leadership position within the AAUP?
A. I do not.
Q. Okay. And you mentioned a protest that you attended on behalf of AAUP this year, correct?
A. I believe it was organized by AAUP. I think it was on behalf of Mr. Khalil.
Q. And with respect to other meetings of AAUP, beyond that protest, have you attended any of those?
A. Yes.
Q. How many?
A. So these are meetings, like chapter meetings, as opposed to public protests. Probably two or three.
Q. Two or three in the last year?
A. Yeah.
Q. And outside of attending the public protest and those AAUP chapter meetings, have you done anything else on behalf of AAUP?
A. I think I may have when I first -- when AAUP, when the Harvard chapter was first founded, I may have mentioned to my colleagues that the chapter is now founded and that they could consider joining.
Q. Okay. Other than that, have you done anything else

related to AAUP other than what you've described?
A. No.
Q. Let's talk about your scholarship for a little bit. You've been here in the United States, did you say, for 30 years?
A. Just about. I came here in the fall of 1996.
Q. Okay. And you've been a green card holder for 20 years? Did I hear that correctly?
A. About that, yes.
Q. Okay. In the 30 years, just to be clear, you've never taught a course relating to the subject of Palestine, have you?
A. That is correct.
Q. In the 30 years you've been here you've never taught a subject relating to the topic of Israel, have you?
A. That is correct.
Q. With respect to seminars or other teaching opportunities you've had, have you led a seminar or engaged in any other teachings relating to the subject of Palestine or Israel?
A. No.
Q. You did, you have written letters, though, correct?
A. I've signed on to letters.
Q. Signed on to letters, and we've discussed a few of those. And we talked about a few letters that you had written regarding the Holocaust Memorial Museum?
A. You're saying I wrote the letter?

Q. That's fair. Strike that. Let me correct that.

You've signed on to letters relating to -- public letters that could be interpreted as relating to Palestine. Fair statement?

A. Yes.

MR. KANELLIS: Okay. Can you pull up, whoever is handling the exhibits, Exhibit 83?

Your Honor, may I approach the witness?

THE COURT: You may.

MR. KANELLIS: Actually, if you're able to pull it up. I can shortcut this, Your Honor, and bring it up. This will be very brief.

THE COURT: Yes. We should help each other.

Q. You referenced this briefly in your direct examination. This is a letter you wrote in 2019, correct?

A. No, I did not write this letter.

Q. This is a letter you signed on to in roughly 2019, correct?

A. Yes.

Q. Okay. When signing on to that letter, that reflected to some degree your agreement with at least some of the statements in the letter. Fair statement?

A. Yes.

MR. KANELLIS: Okay. Can we go to the -- can we actually flip through the pages. This may go quicker, Your

Honor, if I just give the witness the document so he can --

THE COURT: However you --

MR. KANELLIS: May I approach?

THE COURT: You may.

Q. Professor Nickel, please just take a moment and review that document just to make sure it's what you remember it to be.

Have you had an opportunity to review that?

A. Yes.

Q. Can you go to the last page, please. And can you describe -- the last page reflects the number of signers to the letter. Do you see that?

A. At least on my printout there aren't any numbers. I'm willing to be instructed on this.

Q. I'm sorry. Go to the penultimate page. Okay. There aren't numbers.

How many pages are in this entire document; can you count them?

A. 23 pages of signatories.

Q. And is it fair to say that the majority of those pages are filled up with the names of signers of that document?

A. Yes.

Q. Would you estimate that the number of signers of that document is over 100 people?

A. Yes.

MR. KANELLIS: Okay. Your Honor, may I approach the witness?

THE COURT: You may.

Q. Now, Professor Nickel, is it your opinion that your signature on this document relating to an open letter to the director of the U.S. Holocaust Memorial Museum was one of the factors that caused you concern after the Trump administration took over in November of 2024?

MR. BIALE: Objection.

THE COURT: No. Overruled. He may have it.

A. Not at the time.

Q. Not at the time. How about after the fact, and I'll ask that question just to be clear. After the fact, now that the Trump administration has come into power, do you believe that your signature on this letter could be a cause for the Trump administration to target you for purportedly pro-Palestinian views?

A. Yes.

Q. Okay. And so there are hundreds of signatures on this document, and your testimony is you believe that you will be singled out for potential deportation because of your signature on this letter?

A. That is not my testimony.

Q. Okay. Well, do you believe that there is a heightened risk that, because you signed this letter, that the Trump

Case 5:25-cv-05618-NW Document 82-2 Filed 03/27/26 Page 99 of 148



administration would target you for deportation?
A. That I do believe.
Q. And your signature on this letter was one of hundreds?
A. Yeah.
THE COURT: Okay. And your signature on this letter was?
MR. KANELLIS: Exhibit 83.
THE COURT: No. I didn't hear the last part of your question. "And your signature on this is letter was."
MR. KANELLIS: Thank you, Your Honor.
Q. It was one of hundreds of signatures on this document?
THE COURT: Thank you.
Q. Correct?
A. Yes.
Q. You also signed what has been entered into evidence as Exhibit 84. It's a Harvard faculty statement in support of Palestinian liberation.
Do you remember your testimony regarding that letter?
A. Yes.
Q. Okay. I have a quick question for you.
MR. KANELLIS: But, Your Honor, may I approach?
THE COURT: You may. While he's doing that, 83 is an example of your view of historiography relative to the Holocaust, 83?
THE WITNESS: Mm-hmm.

THE COURT: It's better if you say yes or no.
THE WITNESS: Yes. Sorry, yes.
BY MR. KANELLIS:
Q. And with respect to -- is that Exhibit 84?
A. Yes.
Q. Okay. With respect to be Exhibit 84, can you just flip through there and tell the court how many people signed that letter?
MR. BIALE: Sorry, Your Honor. Can we just have him pull it up.
THE COURT: I have copies of these and I'm looking at it.
MR. BIALE: I know, but I don't have a copy so I just want to make sure it's on the screen once we're talking about it.
THE COURT: Well, I can answer this question. This has 66, so the document speaks for itself. Go ahead.
Q. There are 66 signatories on the letter, correct?
A. That's correct.
MR. KANELLIS: May I approach, Your Honor?
THE COURT: That at least is what it says. Go ahead.
Q. Same question about this letter, Exhibit 84. Do you believe, now believe that your signature along with 65 other individuals on this letter written in 2021 would lead to the Trump administration deporting you?

A. Do I believe that this signature by itself would cause the administration to deport me?
Q. Yes.
A. Categorically? I believe that it creates a risk. That it would definitely happen? No.
Q. It creates a risk that it would definitely happen?
A. No. It creates a risk, yes. That it would definitely happen, no. I do not believe that it will definitely happen.
MR. KANELLIS: Okay. Could can we pull up Exhibit 77, please.
Q. This is an exhibit you saw -- do you see your screen. This is an exhibit that you wrote on -- an exhibit -- this is an email you wrote on November 7, 2024, correct?
A. Yes.
Q. This was immediately after the Trump administration was elected into office, correct?
A. Yes.
Q. Okay. And immediately after the Trump administration was elected, you were issuing cautions to students relating to the potential adverse effects of the Trump administration, correct?
MR. BIALE: Objection.
THE COURT: I beg your pardon?
MR. BIALE: Objection.
THE COURT: He may press the question in that form.
Can you answer the question?

A. I don't know that I'd treat this as a caution.
Q. Setting aside what's written in this letter, were you writing statements to students at Harvard after the Trump administration was elected that expressed your anxiety about the potential effects on students of the Trump election?
A. To some students, yes.
Q. To some students, all right.
MR. KANELLIS: Your Honor, may I approach?
THE COURT: You may.
MR. KANELLIS: Let the record reflect -- one moment, Your Honor.
Your Honor, we're checking to make sure this hasn't already been admitted. Otherwise I'll lay a foundation.
Q. Can you take a look at that, sir.
MR. KANELLIS: Your Honor, I have not provided you a copy. I think that would help. Sorry about that. Let the record reflect the witness has been handed an exhibit I marked for identification as HB, and I believe it's in --
MR. BIALE: We're just going to confirm it's in evidence. We believe it's in evidence as Exhibit 78.
THE COURT: I have it. It is Exhibit 78 in evidence.
MR. KANELLIS: My apologies for the confusion on my behalf, Your Honor.
THE COURT: No problem. Go ahead.
Q. Mr. Nickel, this is a letter or email you wrote on

Case: 26-6906, 11/20/2026, DktEntry: 16.5, Page 69 of 300


February 13, 2025, correct?
A. Yes.
Q. And you're touching upon, among other things, on the impact of the inauguration of the new administration. Fair statement?
A. I'm sorry. Did you ask me if it's the impact of the inauguration itself?
Q. I'll put another question. If you look at the second paragraph, you're discussing attacks on our institutions. Do you see that?
A. Yes.
Q. And what do you mean by "attacks on our institutions"?
A. So specifically -- well, I have to admit I'm not sure whether I meant higher education specifically or also things like the legal system more generally.
Q. All right. Fair enough.
If you go to the To line at the top of the page, do you see it says "Fill grad-list."
A. Yes.
Q. Was that an internet group that was set up at Harvard to communicate with members of certain communities at Harvard?
A. It's a mailing list that was up that includes all and only the graduate students in the philosophy department.
Q. With respect to that list, how many people were on that list; do you remember?

A. I would think about 45.
Q. 45 people. And anywhere on this document do you indicate that you don't want this document shared with other people?
A. No.
Q. So you understood when you wrote this email that it was possible that people may share this document here with third parties. Fair statement?
A. Yes.
Q. And this document is critical, would you say, of the Trump administration?
A. Yes.
MR. KANELLIS: Let's go to -- and I appreciate you doing this -- can we go to Exhibit 171, please. The type here is very small.
MR. BIALE: You can zoom.
MR. KANELLIS: If you want to zoom in, that may help.
Q. Do you recognize this document, Mr. Nickel, Professor Nickel?
A. Yes.
Q. And what is the purpose of this email that's sent by you?
A. Yes. It's an email that I forwarded to the faculty members in my department informing them of information that's made available by the Harvard International Office.
Q. Okay. And it's --
A. Actually, I'm sorry. It was actually, the thing that I

forwarded was written by our graduate school, but most of the resources point to the HIO, the Harvard International Office.
Q. And this was written on March 31, 2025, correct?
A. That is correct.
Q. And why did you send this email to the faculty members of your department?
A. Because, unfortunately, during the semester, the past semester, spring of 2025, information wasn't widely shared between different elements of our administration, and so the graduate school might sometimes send things just to the chair of the department, just to the director of graduate studies, even though the information would be very helpful to any faculty member who advised graduate students, for instance.
So the purpose of this email was to forward some of the information that I received to make sure that faculty members in my department had access to the information as well.
Q. And when you wrote this, you intended that they distributed it to their students, the recipients of these emails -- the recipients of these emails; is that right?
A. I did not intend for them to forward the email to the students. I intended for them to make use of the resources that were in the email that I forwarded.
MR. KANELLIS: Can we pull up Exhibit 172, please.
Let the record reflect the witness is being shown Exhibit 172, it's in evidence, from Bernhard Nickel, Subject:

Additional Conversation on April 2, 2025.
Q. Do you see, did you have an opportunity to review this document, sir?
A. I did.
Q. And what's the purpose of this document that you sent on April 2, 2025?
A. It's an invitation to the current graduate students but also prospective graduate students. So this was written at a time when students who had been offered admission to our Ph.D. program were on campus for a campus visit to determine if Harvard would be a good fit for them.
And during that time, I invited both the current grads and the prospective grads who were on campus to attend a conversation that I would facilitate but where they would be able to ask me questions but also talk to each other.
Q. Did you end up having such a conversation you've just described?
A. I did.
Q. You did. And when was that?
A. At the time that I indicated in the email, so whenever the following Thursday, I guess that would be April 3, at 5:00 p.m.
Q. Did you instruct any of the recipients of this email not to share this email --
A. No.
Q. -- with third parties?

A. I did not.
Q. So you knew it was a possibility that this email also could be shared with the public, correct?
A. You know, it's a possibility that any email that I write could be shared.
Q. Thank you.
And that email is warning of threats of the Trump administration, correct?
A. I don't think that it's a warning. It's a chance to discuss attacks and threats, yes.
MR. KANELLIS: Apologize for doing this. Can we confirm that this has not been admitted? Our paralegal is printing documents, so we have to rely on this. I just want to make sure.
While, we're waiting for that confirmation, may I approach, Your Honor, to facilitate things?
THE COURT: You may.
MR. KANELLIS: Professor Nickel, let the record reflect, is being handed what has been marked as for identification as HC, and we will confirm whether this has been admitted into evidence in just a moment.
MR. BIALE: Your Honor, I'm being told by my expert team here that it's in evidence as Exhibit 79.
THE COURT: Exhibit 79.
MR. KANELLIS: Yes, sir. So the document you're

reading --

THE COURT: HC is in evidence, Exhibit 79.

BY MR. KANELLIS:

Q. Professor Nickel, have you had an opportunity to review this document?

A. Yes.

Q. And this document discusses that you are facing serious threats as a community. That's in the second paragraph, correct?

A. That is correct.

Q. And this document was written to whom; what groups are identified in the To and CC lines?

A. So in the To lines, it is the graduate students in the philosophy department and our undergraduate majors at Harvard, they're called concentrators, which is the list is called "conc" for concentrators. The CC is the list of faculty members of the department.

Q. About how many recipients are on all of these lists combined, if you can estimate it?

A. Maybe about 200.

Q. 200 recipients of this email?

A. Yes.

Q. And this email warns -- strike that.

And this email is very critical of the Trump administration. Fair statement?

A. It's critical of the administration, yes.
Q. So all of these emails that we've discussed were written after the Trump administration took office in 2025, correct?
A. Yes, I believe so. I'm sorry, you've shown me several emails. I had to think about it for a while.
Q. You discussed how, after the attacks of October 7 in 2023, you were horrified by the Hamas attacks?
A. Yes.
Q. And did you publicize in any respect the fact that you were troubled by the Hamas attacks?
A. Publicize?
Q. Did you make public your views that you were troubled by the Hamas attacks?
A. In the media?
Q. In any respect.
A. I sent emails to the philosophy department.
Q. Okay. Now, you also indicated that there was an encampment on Harvard campus in 2024 that you attended. Do you remember that?
A. Yes, I remember.
Q. Did you publicly announce your attendance at this?
A. No.
Q. Okay, you kept that private.
And to your knowledge, was anyone from the federal government monitoring that encampment?

A. To my knowledge, no.
Q. Okay. You wanted to show your sympathy and support for protesters, right?
A. Yes.
Q. Okay. And with respect to that sympathy and support for protesters, did you publicize that? Did you make that sympathy public?
A. I believe that I signed on to some public letters that could be construed as making -- as expressing that kind of sympathy and support.
Q. And is it your concern that your signature on those public letters would cause the Trump administration to target you for deportation?
A. Yes, it's among the causes.
Q. You indicated that in response to the arrests of Mr. Khalil and Ms. Ozturk, it scared you. Is that a fair summary of your reaction to that, those arrests?
A. Yes.
Q. Now, just to be clear, you didn't work for the United States Government; you've never worked for the United States Government, right?
A. That is correct.
Q. And so you are unable to say with certainty that the arrests were for a reason other than the political speech of those individuals. Fair statement?

MR. BIALE: Objection.

THE COURT: If he understands that. In other words, here is how I understand it, which I think is a proper question.

So far as you know, and you formed the opinion that the arrest of these two individuals named were for their expression of political beliefs. That's what you thought; is that right?

THE WITNESS: Yes, that's right.

THE COURT: And that was your question?

MR. KANELLIS: Yes.

THE COURT: You go ahead, feel free.

MR. KANELLIS: Thank you, sir.

BY MR. KANELLIS:

Q. You indicated that you watched a video, correct?

A. Yes.

Q. And the video was of the arrest of Ms. Ozturk?

A. That is correct.

Q. Okay. Had you ever seen anyone arrested before?

A. Have I seen -- no.

Q. Okay. Do you have any basis for an opinion that the arrest of Ms. Ozturk, based upon your observation, was contrary to law enforcement practices in the federal government?

MR. BIALE: Objection.

THE COURT: Sustained on this foundation. We may get

into those practices, but his opinion neither adds nor detracts anything because I don't know what are the practices.

Q. Do you have any basis for an understanding of what federal law enforcement practices are with respect to arrests?

A. No.

Q. You indicated that you attended a protest in the yard that was sponsored by AAUP. Do you remember that testimony?

A. I do, I do.

Q. By "the yard," what is the yard?

A. It's part of the grounds of Harvard College.

Q. Okay. And that was a public protest, correct?

A. That is correct.

Q. Was that the only protest that was sponsored by AAUP to your knowledge?

MR. BIALE: Objection. If we can get a more specific timeframe.

THE COURT: I think that's fair, but he may press the question.

MR. KANELLIS: Certainly. I can fix it, Your Honor. Not a problem.

Q. In the last year, are you aware of any other protests other than this one that were sponsored by AAUP at Harvard?

A. I don't recall.

Q. You don't know of any?

A. I don't recall.

Q. So the only protest that you're aware of that was sponsored by AAUP was done this year in 2025, correct?

MR. BIALE: Objection.

THE COURT: No. He can have it.

A. The only one that I recall.

Q. And that was after the Trump administration was already in power, correct?

A. That is correct.

Q. And you attended that public protest, didn't you?

A. I did.

Q. And you were aware that other people could see you attending that protest; isn't that right?

A. Yes.

Q. I'd like to talk about, you said you had feelings in reaction to what you interpret as the ideological deportation policy. And I want to ask you about how you felt. Did you have anxiety?

THE COURT: I guess I don't understand. They explored this, and of course you may. You're saying when he had what he conceived of as that policy in mind, did he have anxiety. Is that your question?

MR. KANELLIS: Yes, sir.

THE COURT: And you may answer it.

A. Yes.

Q. You had anxiety. You're a philosophy professor, correct?

A. Yes.
Q. Okay. And you know what Kierkegaard said about anxiety, right?
A. Actually, I don't.
Q. You don't?
A. I'm not that kind of philosopher.
Q. Angst ist der Schwindel der Freiheit. Anxiety is the dizziness --
THE COURT: Perhaps more to the point, I don't know what --
MR. KANELLIS: I'll say it in English.
THE COURT: But I'm open to be instructed.
MR. KANELLIS: I can ask, it's very easy, Your Honor.
Q. Angst ist der Schwindel der Freiheit. That means anxiety is the dizziness of freedom. Did I translate that correctly?
A. I don't even speak Danish, you know. So to the extent that's a German translation of Danish and into English, close enough.
Q. Close enough. Thank you.
Your German is obviously better than mine. Let me ask you, do you disagree with that sentiment?
MR. BIALE: Objection.
THE COURT: No. I'm going to let him have it.
MR. BIALE: Okay.
THE COURT: Do you agree?

THE WITNESS: I don't even know what that means.
BY MR. KANELLIS:
Q. Fair enough. In the 30 years that you've been in the United States, have you ever been contacted by the federal government about political views that you've expressed?
A. No.
Q. And in the 30 years that you've been in the United States, has anyone at the federal government expressed to you that they have been monitoring political speech that you've engaged in?
A. No.
Q. Since November of 2025, have you received any communication in any form from anyone in the government regarding your political participation?
A. I'm sorry, did you say November of '25?
Q. Since November of 2024, thank you. I'll re-ask.
Since November of 2024, have you received any communication from anyone in the government relating to political speech that you've engaged in?
A. No.
Q. And since November of 2025, have you received any indication or suggestion that the government has been monitoring your political speech?
A. I'm sorry, I think you asked me about November '25 again.
Q. I should fix that, shouldn't I?
Since November of 2024, have you received any indication

or communication that the government has been monitoring your political speech?

MR. BIALE: Objection. Compound question.

THE COURT: Not really. Overruled. You may answer.

A. No.

MR. KANELLIS: We tender the witness.

THE COURT: Anything further?

MR. BIALE: Brief redirect.

THE COURT: You may.

REDIRECT EXAMINATION BY MR. BIALE:

Q. Professor Nickel, you were asked a number of questions on cross-examination about how your feelings and actions had changed since -- I believe the question was since the Trump administration came to power.

To be clear, what is the event that you discussed on your direct testimony that you said is the most critical that's changed your behavior and feelings?

A. It's the arrest of Ms. Ozturk.

Q. And when did that occur, approximately?

A. I believe it was the end of March.

Q. Now, and as to that, you were also asked about a protest that you attended on Harvard Yard that was organized by AAUP?

A. That is correct.

Q. Did that occur prior to the arrest of Ms. Ozturk?

A. Yes.

Q. Now, you were shown a number of emails that you sent to graduate students in the philosophy department, right?
A. Yes.
Q. And to your fellow faculty members in the philosophy department?
A. Yes.
Q. How many faculty members are there in the philosophy department?
A. About 25.
Q. And do you know them all personally?
A. Yes.
Q. Do you know all the graduate students personally?
A. Yes.
Q. Did you intend for those emails that you sent to those groups to be shared with third parties, as the question was put to you?
A. No, I did not.
Q. Did you anticipate that any of those people who you know who you sent those emails to would share them with third parties?
A. No.
Q. Let's bring up Exhibit 171. You were asked about this document. And Mr. Kumar, if you can just pull up the part that the witness wrote.
So you were shown this document and asked some questions

about this email, right? And I think you testified that you wanted to pass along information for resources such as the legal representation clinic and know your rights resources for faculty who are here on visas or green cards?
A. Yes.
Q. Why did you think it was important for faculty who were here on visas and green cards to be in touch with the legal representation clinic and to know their rights?
A. Because I thought that some of them might be targeted by the administration.
Q. And some of them might be targeted for what?
A. For their political speech, including potentially their pro-Palestine speech.
Q. Now, you were asked questions about any communications that you have received personally from the government regarding -- well, sorry, withdrawn.
You were asked questions about any communications you received from the government. Do you remember that?
A. Yes.
Q. Are you aware of any communications that Harvard University has received from the government?
A. Yes.
Q. Okay. Are you aware that -- well, let me show you what's in evidence as Exhibit 216.
THE COURT: Wait a minute here now. This is redirect,

and I don't think he's opened up any -- there is this investigation and this back and forth between Harvard and the administration, but I don't think that's been opened up.

MR. BIALE: Your Honor, let me ask it this way.

Q. You were shown some emails that you sent to the philosophy department that referenced specific threats to Harvard. Do you remember that?

A. Yes.

Q. Okay. And did you feel more vulnerable as a noncitizen who had spoken out about pro-Palestine issues who was also a professor at Harvard?

MR. KANELLIS: Objection, leading, Your Honor.

THE COURT: Sustained on that ground. How did that make you feel? Look, it's not a game, but following the rules, he's correct. So he sets up the situation. You're a long-time green card holder, lawful permanent resident to the United States. You're also a professor at Harvard. The situation between Harvard and the administration I think is an expansion beyond what anyone's asked you. We're not going there on redirect.

Having that in mind, how do the two events, the two situations make you feel?

THE WITNESS: I'm sorry. The reason I took a moment is because this is very serious, and there was a moment of laughter --

Case: 26-6906, 11/20/2026, DktEntry: 16.5, Page 86 of 300


THE COURT: And his question --
A. -- and so I wanted to just go back and --
THE COURT: -- posited two situations. You occupy both, tenured faculty member at Harvard, green card holder.
THE WITNESS: Yes.
THE COURT: But I think it's an appropriate question, if you can answer it.
THE WITNESS: Yes. I felt, as a green card holder, I felt more exposed than simply in my role as not just faculty member but also department chair of a department.
Q. And how about specifically in your role in having those titles at Harvard University?
A. I certainly felt like -- I felt very exposed, and it made me very worried about, for instance, engaging in international travel.
Q. Okay. And you've testified to this, but just tell us why.
A. Because I was concerned that between being department chair and also having been politically active in the ways that I have, I might be identified at the border and either detained or sent back.
MR. BIALE: If I can just have a moment to confer with co-counsel.
THE COURT: Of course you may.
MR. BIALE: No further questions.
THE COURT: Nothing further for this witness?

MR. KANELLIS: No, Your Honor.
THE COURT: You may step down. Thank you. Call your next witness.
MR. ABDO: Good morning, Your Honor. Alex Abdo for the plaintiffs. The plaintiffs call Sara Johnson to the stand.
SARA JOHNSON, Sworn
COURTROOM CLERK: Can you please state your full name and spell it for the record.
THE WITNESS: Sara Johnson. S-a-r-a, J-o-h-n-s-o-n.
COURTROOM CLERK: Thank you. You may be seated.
DIRECT EXAMINATION BY MR. ABDO:
Q. Good afternoon, Professor Johnson. Can you tell us your name for the record.
A. Sara Johnson.
Q. And what do you do, Professor Johnson?
A. I am a professor in the Eliot-Pearson Department of Child Study and Human Development at Tufts University.
THE COURT: Where do you work at?
THE WITNESS: Tufts.
THE COURT: Tufts, thank you.
BY MR. ABDO:
Q. How long have you had that position at Tufts university?
A. Since August 2016.
Q. Are you familiar with someone named Rumeysa Ozturk?
A. Yes, I am.

Q. Who is she?
A. She's one of my doctoral students.
Q. How long has she been your student?
A. She's been my student since January 2023.
Q. Have you known her since then?
A. I've actually known her since September of 2020, which is when she started as a student in our doctoral program.
Q. Is Rumeysa Ozturk your student the same Ms. Ozturk who has been in the news recently?
A. Yes.
Q. And what has she been in the news for?
A. She has been in the news for being detained in Louisiana.
Q. Have you seen any videos of her detention?
A. Yes, I have seen the video.

MR. ABDO: Mr. Kumar, if you could pull up --

THE COURT: Well, "the video," the one we have in evidence here is of her apprehension by ICE.

THE WITNESS: Yes.

THE COURT: Is that the video?

THE WITNESS: That is the video, yes, Your Honor.

MR. KANELLIS: Your Honor, just one quick question, a question about relevancy. I'm not sure why this witness watching a video is relevant to this proceeding.

THE COURT: No one said that it was. I just want to be clear what she's seen. All right. We'll see what questions

Mr. Abdo asks.

MR. ABDO: Mr. Kumar, if you wouldn't mind pulling up Exhibit 225. And Your Honor, with your indulgence, I'd like to show the witness about 10 to 15 seconds of the video as the foundation for her testimony.

THE COURT: And what's the relevance of it?

MR. ABDO: The relevance is her identification of Ms. Ozturk in the video. The government has refused --

THE COURT: It's not disputed.

MR. ABDO: The government has refused to stipulate to that, is my understanding, Your Honor.

THE COURT: If they dispute it, I take that as essentially undisputed. Let's go on.

MR. KANELLIS: Your Honor, we can stipulate.

THE COURT: There, there. Trials have a purpose. So stipulated.

MR. ABDO: Thank you, Your Honor.

THE COURT: It is Ms. Ozturk on the video. Now that that is taken care of, go ahead.

MR. ABDO: Thank you, Your Honor.

Q. Professor Johnson, are you generally familiar with the public writings of the students you advise?

A. Yes, I am.

Q. And why is that?

A. Public writings are one component of the skills that our

doctoral students are required to develop during the program.
Q. And are you generally familiar with Ms. Ozturk's public writings in particular?
A. Yes.
Q. Are you familiar with any op-eds she's written?
A. I'm familiar with one op-ed that she wrote in The Tufts Daily.
MR. KANELLIS: Your Honor, I have to object because I think we're now intruding into the specific facts of matters that may be litigated in District Court.
THE COURT: They may be, but overruled. I've said I'm making no rulings on any of these things. I didn't say I wasn't going to take evidence. I am. Go ahead, go ahead, Mr. Abdo.
MR. ABDO: Thank you, Your Honor.
Q. When did you become aware of Ms. Ozturk's op-ed in The Tufts Daily?
A. In March of 2024.
Q. Do you remember how you became aware of it?
A. I saw it in The Tufts Daily.
Q. Did you look at it at the time?
A. Yes.
Q. I'm going to show you, Professor Johnson, what's been marked as Exhibit AG for identification. Do you recognize this exhibit?

A. I do.
Q. What do you recognize it to be?
A. It looks like the op-ed that Rumeysa was a co-author on that I saw in The Tufts Daily.
MR. ABDO: Your Honor, we would offer into evidence Ms. Ozturk's op-ed from the Tufts Daily.
MR. KANELLIS: Classic hearsay.
THE COURT: He's not offering it for the truth. He's offering it for the fact of its existence, isn't that correct?
MR. ABDO: That's correct, Your Honor.
THE COURT: Overruled. It may be admitted. It will be exhibit -- so what are we up to now? 226, in evidence.
(Exhibit 226 admitted into evidence.)
Q. Professor Johnson, did you ever discuss this op-ed with Ms. Ozturk?
A. I did.
Q. And when was that?
A. That was in March 2025.
Q. Without yet going into what she told you or what you spoke to her about during that conversation, can you tell us the circumstances of that conversation?
A. The circumstances of that conversation were when she came to my office for our weekly advising meeting and appeared very upset.
Q. Can you explain what you mean by, "She appeared very

upset"?
A. She had -- her eyes were red. Her face was puffy. She was clearly trying to hold back tears with a fistful of Kleenex.
Q. And what did she say to you at that time?
A. I said --
MR. KANELLIS: Objection, calls for hearsay.
THE COURT: Yes, it does.
MR. ABDO: Your Honor, it's not offered for the truth of the matter.
THE COURT: Why is what she said at that time relevant?
MR. ABDO: It will be relevant to the effect on the witness, Your Honor, for a foundation for what she did next.
MR. KANELLIS: That turns upon the statement itself.
THE COURT: It does indeed. As a result of that conversation, what did you do?
THE WITNESS: I asked her to come into my office and asked her whether she was okay, and she said no. And then I asked her if she wanted to talk about it.
THE COURT: I'll let that stand.
MR. ABDO: Thank you, Your Honor.
Q. Professor Johnson, did Ms. Ozturk explain to you why she was upset?
A. Yes. She came, it took --

MR. KANELLIS: Objection, Your Honor.

THE COURT: He's objecting. You know, how do you think you can get that in?

MR. ABDO: Your Honor, this should come in under 803.2 as an excited utterance. I think Ms. Ozturk was clearly in a state of distress at the moment.

MR. KANELLIS: Your Honor, an excited --

THE COURT: Wait a minute. When I need argument, I'll take the time for it. Sustained.

MR. KANELLIS: Thank you.

THE COURT: No thanks is necessary. Go ahead.

BY MR. ABDO:

Q. Professor Johnson, did you come to learn during this conversation with Ms. Ozturk of any basis for why she might be upset?

THE COURT: Well, you know, I have to follow the rules of evidence here, and now he is objecting to this. I haven't got a basis for getting into the substance of this conversation. I mean you no disrespect at all, but this has got them on their feet, so I have to play my bit part here. Go ahead.

MR. ABDO: Understood, understood.

THE COURT: Go ahead.

BY MR. ABDO:

Q. Professor Johnson, as a result of this conversation, what

did you do?

A. As a result of this conversation I looked on the website Canary Mission for Rumeysa's profile.

Q. And did you read the profile that you saw?

A. I did.

Q. Were you previously familiar with the Canary Mission website?

A. No, I was not.

Q. Did you come to an understanding of what the website was when you reviewed it?

A. My understanding is that the website is where the organization posts profiles of individuals who they believe have engaged in antisemitic activity.

Q. Do you recall what you saw when you reviewed Ms. Ozturk's profile on the website?

MR. KANELLIS: Objection, hearsay.

MR. ABDO: It's not offered for the truth of the matter, Your Honor, just to demonstrate its existence.

THE COURT: Well, am I going to see it?

MR. ABDO: Yes, Your Honor.

THE COURT: Well, then let's get to it.

MR. ABDO: Great.

Mr. Kumar, if you wouldn't mind pulling up, as you have, Exhibit CZ for identification.

Q. Professor Johnson, do you recognize this exhibit?

A. I do.
Q. What do you recognize it to be?
A. This is the profile of Rumeysa on the Canary Mission website.
Q. And if you wouldn't mind taking a moment to review it. Does it reflect a true and --
THE COURT: Are you going to offer it?
MR. ABDO: Momentarily, Your Honor, yes.
Q. -- true and correct copy of what you saw when you reviewed it shortly after or during your conversation with Ms. Ozturk?
A. Yes.
MR. ABDO: Your Honor, we would offer this into evidence, not for the truth of the matter.
MR. KANELLIS: Objection, to the extent the contents are admitted. We have no objection to --
THE COURT: He's offering it not for the truth but for the fact of its existence, which I do deem relevant, so as limited, CZ is admitted, Exhibit 227, as limited.
(Exhibit 227 admitted into evidence.)
MR. ABDO: Thank you. No further questions, Your Honor. Thank you.
THE COURT: Thank you. Any questions for this witness?
MR. KANELLIS: No, Your Honor.
THE COURT: You may step down and thank you.

Call your next witness.

MR. BIALE: Your Honor, this is the remote witness, so it will just take a moment.

THE COURT: I understand and that's fine.

While you're doing that, just to save time, because there is something I was going to do at 2:00, but you keep setting up. Actually, counsel, it's you that reminded me to do this now. You made a request about documents that I might turn over to you. I have a packet of documents, which I'm not going to turn over to you, but I'm going to give copies which I've made to the government. And while we're only going to take a brief recess tomorrow, if you have any particular objection to these documents, I will hear you during the recess tomorrow. I have final arguments in another case at 2:00 this afternoon. If we're ready, let's go on.

MS. CONLON: To be clear, Your Honor, you meant if the government has objections to the court --

THE COURT: You're not asked to do anything. I'm giving them, really I'm giving them every chance. I'm letting them look at what, if I overrule the objections, I will then hand to you at about 10:45, 11:00 tomorrow.

MS. CONLON: Okay. Great. Then I will go to the podium.

THE COURT: Yes, if we're ready. Alexandra Conlon for the plaintiffs.

I did just see our witness a second ago. Okay. Ms. Abu El-Haj, are you there? I think if you speak we may then see you on the screen.

THE WITNESS: I am, I'm trying to start the video. There we go.

MS. CONLON: Are you able to see us, just before you're sworn? Are you able to see the courtroom and to see the judge?

THE WITNESS: Yes, I am.

THE COURT: Let's swear the witness.

NADIA ABU EL-HAJ, sworn

(Witness testifying via teleconference.)

COURTROOM CLERK: Can you please state your name and spell your last name for the record.

THE WITNESS: Nadia Abu El-Haj, A-b-u, E-l, apostrophe, H-a-j.

DIRECT EXAMINATION BY MS. CONLON:

Q. Okay. Ms. Abu El-Haj, can you hear us clearly on the Zoom link?
A. Yes, I can.
Q. And you can see everybody as best you can tell?
A. Yeah, yes.
Q. I know you can't see my face, but you can hear my voice; is that right?
A. Yes.

Q. Okay. So please tell us where you work.
A. I am a professor at Barnard College and Columbia University.
Q. Okay. And you are a professor of what subject?
A. I am a professor of anthropology, and I am the co-director of the Center for Palestine Studies.
Q. Staying for a moment with your background, what kind of anthropology do you teach?
A. I am a sociocultural anthropologist, and I work regionally on the Middle East, specifically on Israel and Palestine, although I've also written a book on the U.S.
Q. And approximately when did you begin working as an anthropologist on Israel and Palestine?
A. The late 1980s, when I was in a Ph.D. program.
Q. Did you do a dissertation on Israel and Palestine?
A. Yes, I did.
Q. And what in particular was that about?
A. The dissertation looked at the practice of archeology, both Biblical archeology and Israeli archeology, in terms of transforming the land of Palestine into the land of Israel and then the consequences for Israeli nationalist ideology.
Q. Now, you mentioned in addition to your work as a professor that you are a co-director of the Center for Middle East Studies -- or Center for Palestine Studies, rather.
Can you tell us about the Center, please?

A. Yes. The Center was founded I think about 12 years ago by a group of faculty. I was involved from the beginning. We wanted to create a space where we could both foster a more serious sort of discussions and scholarship in Palestinian studies. It is a -- it's a center that is not a teaching center at the university. So we run programs. We have a postdoctoral fellowship. We run some public programs as well as workshops, which are sort of more closed spaces where students and professors get together and discuss the people's work.
Q. You said that the center is not a teaching center; is that right? What does that mean?
A. Well, it means that we do not -- we do not -- we do not offer classes. At Columbia only institutes offer classes, not centers.
Q. But the center puts on programming for students; is that right?
A. Yes, yes.
Q. Now, what in particular do you do for the Center for Palestine Studies?
A. I'm the co-director.
Q. So what does that mean your work entails?
A. It entails overseeing the programming with my co-director and the administrative director. I can't remember the exact title. It means vetting the postdoctoral applications for our

postdoctoral fellowships, and it means working with other faculty who want to -- who propose events to us that we host and fund.
Q. Are there any faculty affiliated with the Center, other than you?
A. Yes, there are.
Q. About how many people?
A. I'd say maybe 15 to 18. Could be more. I haven't looked in a while, honestly.
Q. Do they all teach in the area or research in the area of Middle East studies?
A. No. Actually, some do and some do not.
Q. And are they all at Columbia?
A. Almost everyone is at Columbia. We have over the years had a few people like poets or unaffiliated scholars who have been affiliated with us. But for the most part it is Columbia faculty and Barnard faculty.
Q. Now, you're testifying remotely. Where are you in this moment testifying from?
A. I'm in Beirut, Lebanon.
Q. And are you a full-time resident of Lebanon?
A. No.
Q. Were you born in Lebanon?
A. I was not. I was born in New York.
Q. So it's fair to say you're a United States citizen?

A. Yes, I am.
Q. Are you in Beirut for work right now?
A. I'm in Beirut for a combination of personal and work reasons.
Q. And what is the work you're doing in Beirut?
A. I am affiliated with the German Orient Institute. I'm a visiting fellow there, and I'm just writing some essays on the war in Gaza.
Q. Now, I want to turn to AAUP. Are you familiar with the American Association of University Professors?
A. Yes, I am.
Q. How are you familiar with AAUP?
A. Well, I've known about AAUP for decades, and I joined about a year and a half ago when the chapter at Columbia, which isn't that old, really expanded a year and a half ago as part of faculty attempt to push back against the administration, the Columbia administration. Sorry.
Q. You anticipated exactly what I was going to ask. What made you personally decide to join the AAUP at that time?
A. It felt both like the university administration was cracking down on issues that are central to the AAUP, such as academic freedom and faculty governance, and it was also because there had been Congressional hearings in December of 2023. And then we knew that the Columbia president was going to be testifying as well.

It also felt like there was increasing pressure from Congress on the administration to crack down on faculty governance and academic freedom. So it felt like the best way to counter the administration as a collective faculty.

Q. Do you pay dues to AAUP?

A. I do.

Q. Are you familiar with the Middle Eastern Studies Association?

A. Yes.

Q. I'm going to call it MESA. Are you a member of MESA?

A. I am.

Q. And how long have you been a member?

A. So this round, it's going on two years. I've been a member off and on for, you know, through my career.

Q. What is your understanding of what MESA does, what its purpose is?

A. Well, MESA is the sort of major -- is the major and most important organization of Middle East scholars both in the U.S. and beyond. It brings together faculty. I mean, there's an annual meeting which is its biggest event, which is an important event for faculty, who get to know each other and meet each other and participate in intellectual conversations, but also quite centrally for graduate students who are just entering the field, and that's where they initially present their work and also begin to get to know members of the field,

including fellow graduate students and, quite importantly, established faculty members as well.

Q. Have you attended MESA's annual meeting before?

A. I have.

Q. And do you have an understanding of the purpose of MESA apart from the sort of networking? And if you don't, that's fine.

A. Well, I mean, it's not just a networking thing. It's a place where -- I mean, it's really, it's an intellectual hub for people who work on the Middle East as well.

Q. Now, when you say "an intellectual hub for work on the Middle East," I am silly asking, but I just want to confirm that relates to scholarship related to Israel and Palestine?

A. Yes, absolutely.

Q. Based on your experience as a member of MESA, are you aware of whether -- well, withdrawn.

How would you describe MESA's membership generally in terms of where the other members are from?

MR. KANELLIS: Objection, Your Honor. Relevancy. This is a U.S. citizen.

THE COURT: Yes, well, she is. I'm not -- why is that relevant?

MS. CONLON: Well, Your Honor, MESA is the plaintiff. This is a witness. So we're trying to establish that MESA's membership, who we represent, include both citizens and

noncitizens and the extent to which they have both been chilled as a result of the policy that we challenge.

THE COURT: All right. I understood really from the motion to dismiss that MESA had both citizen and noncitizen members indeed. I understood that the other plaintiff associations in the different universities have both citizen and noncitizen members. This court reaches the standing of the noncitizen members, not further. But I'm going to sustain that objection, and I'll give you some brief time with this witness. Go ahead.

BY MS. CONLON:

Q. Do you engage, Ms. Abu El-Haj, with noncitizen members in MESA in your work with MESA?

A. I do. I mean, when I've participated in the -- for example, the conference I was at in the fall of 2023, I was on a panel with noncitizen members.

Q. And to your understanding -- withdrawn.

Can you describe generally whether, are the other members of MESA, for example, only from U.S. universities, or are you aware of members from international universities?

A. I am aware of members from international universities, yes.

Q. Now, just a moment. Turning back for a moment to the Center For Palestine Studies, you described programming and events that the Center puts on generally. Did there come a

time this year where the Center's approach to its work changed?
A. Yes.
Q. And around when did that happen?
A. It happened around mid March after Mahmoud Khalil's arrest.
Q. Did it only begin to happen in March?
A. We were aware of the rhetoric coming out of the newly inaugurated Trump administration that was threatening to deport student activists who were protesting on behalf of Palestine and against the war in Gaza. But we did not -- so that was in the background, but we weren't sure what was going to happen with that, and it was sort of on our radar, but it didn't affect what we did until after first Ranjani Srinivasan -- I think that's her last name -- who was a graduate student in the graduate school of architecture at Columbia went into hiding because she was fleeing an ICE detention -- or ICE was trying to detain her, and then the following day Mahmoud Khalil's arrest, and then things changed.
Q. You mentioned a student who had gone into hiding. Can you say their name again for the record?
A. Ranjani Srinivasan I think is her last name. I do not know her.
MR. KANELLIS: Objection, Your Honor. Now we are going beyond the five individuals --
THE COURT: We may. That was the discovery order.

She may inquire.

BY MS. CONLON:

Q. And what was your understanding as to why Ranjani Srinivasan went into hiding at the time?

A. ICE agents knocked on the door of her apartment in a Columbia graduate student housing building. She was not home at the time. Her roommate told her --

MR. KANELLIS: Objection, foundation.

THE COURT: It's not timely, but I'll entertain it at this time. It was all hearsay, but we'll let the first part stand.

Go ahead, Ms. Conlon.

MS. CONLON: Your Honor, this is for the effect on the listener. We anticipate that Ms. Abu El-Haj will testify about the effect of these ICE actions on campus on the noncitizen students she teaches, noncitizen colleagues --

THE COURT: Well, then get to it.

MS. CONLON: We are trying to do so expeditiously, Your Honor.

THE COURT: I'm not troubled with the timing because I've set my time limits. When they're up, they're up. And I want you to try your case. But as I've tried to follow, I have to follow the rules of evidence.

Now, you can get in effects on a relevant community. So I -- well, I don't give advisory opinions, but then let's

Case: 26-0906, 11/20/2026, DktEntry: 16.5, (107 of 300)


get to it.

MS. CONLON: Your Honor, I apologize for interrupting. Just to be clear, I want to make clear to this court that it's our understanding and view that the relevant community is not only the noncitizens but also, as Your Honor may recall, we have advanced a theory of standing for citizens who have been prevented from affiliating with and hearing from noncitizens, and so that is important --

THE COURT: You have.

MS. CONLON: Yes.

THE COURT: And respectfully, I have rejected it, saying that's a step too far. And I'm not taking -- they don't have standing. Citizens don't have standing. I could be in error, and I've been known to be in error, but the record is clear, and I'm not spending trial time on matters as to which I've got to make rulings and findings. So let's go to noncitizens' concerns about these events. She's in a position to know.

MS. CONLON: Your Honor, just to close the loop on this, it was our understanding from your order that we were permitted to advance this theory through the testimony of one or two people and that Your Honor had not foreclosed this theory of standing, though Your Honor had found that we had sufficiently alleged standing on another basis, so we are doing as we suggested that we ought to do and that we understood the

court was open to us doing, and this is the only person through which we are trying to do that, just to be transparent about the effort here.

THE COURT: I always appreciate transparency, but I've now made my ruling. If I have ruled erroneously, a higher court can correct me.

Now, let's find out if she has anything to say about the feelings of noncitizens who would have standing to personally be concerned about actions of these official defendants and those who work for them.

BY MS. CONLON:

Q. Okay. Ms. Abu El-Haj, we were just speaking about Ms. Srinivasan. You mentioned that things changed as well after Mahmoud Khalil's arrest, so I want to turn to that.

Are you personally familiar with Mr. Khalil?

A. Yes, I am.

Q. And how do you know him?

A. I know him as, I got to know him as a participant in the student activist movement, particularly in the academic year '23-'24 and because he emerged as a leader within that movement. And, yeah, I just got to know him in that capacity.

Q. When you say the student activist movement in '23 or '24, you are referring to the student activist movement regarding the rights of Palestinians; is that correct?

A. Correct.

Q. And you said he emerged as a leader. What do you mean by that? What did you observe of him?

A. He was someone -- I mean, a leader not in an organizational sense. He is a graduate student, so he is somewhat older than many of the students who participated, and he really was someone a lot of the undergraduates, I think, particularly the Palestinian undergraduates, turned to and relied on for emotional support.

He also was one of the handful of people who were willing to be public and make statements, talk to the press without being masked. And he was one -- he was the key negotiator between the administration, Columbia administration and the students during the encampment.

Q. Turning to the statements you mentioned, are you familiar with any of the public statements he made about the protests at Columbia?

A. Yes. I mean, I can't quote them verbatim, but yes.

Q. Did you see him speak publicly?

A. I saw him give a few -- I mean, I saw him when he was being interviewed by the press a few times during the encampment.

Q. And you also mentioned his role as a negotiator with the school. What was it that he was negotiating?

A. He was negotiating a peaceful end to the encampment. He was trying to reach, to find an agreement that would bring the

students and the administration close enough together that the students would voluntarily leave the encampment before the university called the police in for the second time.

Q. You've mentioned the encampment. Did you observe the encampment yourself in person at any point?

A. Yes. I spent a lot of time there while it was ongoing.

Q. Did you have an opportunity to observe Mr. Khalil in person at any encampment or protest at Columbia?

A. Yes.

Q. Now, what did you see about his conduct on campus when you observed him?

A. I found him very, very thoughtful, very calm and really, you know, politically savvy in many ways. He was certainly not an agitating presence in any way. He was never arrested. He never broke any rules. I mean, he never committed any crimes or was accused of any crimes. And I found him a really thoughtful person who was quite mature for someone who was his age, which at the time was 29.

Q. And did you have an understanding of his citizenship status?

A. I knew he was not a citizen. I'm not sure, I don't recall if I knew he had green card status at least last spring.

Q. Now, you said that his arrest changed things. What did you observe about how Mr. Khalil's arrest affected first the students that you teach and interact with at Columbia?

A. I mean, students were really terrified. Mahmoud had been out front, again, he never masked up, even after other students did. And I want to be clear, students were masking up because they were being doxed really badly initially and then now increasingly because they're worried about being identified by the federal government.

But he never did because he never thought he was at risk. He never said anything violent or promoted violence. And he really understood himself, and the other students did too, that his speech would be protected because he had a green card. He was --

MR. KANELLIS: Objection.

A. -- not a U.S. citizen, but he had a green card.

MR. KANELLIS: Objection, foundation, hearsay.

THE COURT: I will strike so much -- that's not for the truth. And further, I will strike her statement because and what follows as to why they were afraid, but I will let stand the business about they were already masking up and they, in her words, were terrified. I'll let that stand. Go ahead, Ms. Conlon.

BY MS. CONLON:

Q. You used the word "doxed." What does doxed mean to you?

A. Students were, their private phone numbers and addresses were listed online. They were threatened. I had one student, non-U.S. citizen who had a note slipped under her door that

said "We know where you live. Sleep with one eye open." Some were accused of being antisemitic and pro-Hamas supporters and the blow-back was often a lot of threatening emails and sometimes, you know, more than that.

MR. KANELLIS: Objection, Your Honor. Again foundation.

THE COURT: Well, it wasn't timely. I'm going to let it stand.

Q. Did you have direct conversations with any noncitizen students after Mr. Khalil was arrested?

A. Yes, I did.

Q. Is that how you learned about what you've testified to just now with respect to their fears?

A. Yes.

Q. Did noncitizen students convey fears apart from being doxed after Mr. Khalil's arrest by ICE?

A. Yes.

Q. What other fears did they convey to you?

A. Fears of being detained.

Q. Detained by who?

A. By ICE.

THE COURT: All right. It's 1:00. I have a meeting, and so we'll stop at this time. We'll start promptly at 9:00 a.m.

Professor, I apologize for the time differences, but I

appreciate your testimony, and we will resume at 9:00 a.m. tomorrow morning.

Total elapsed time out of the four and a half days available to each side, the plaintiffs have used up one day, one hour, five minutes. The defense has used up two hours, 25 minutes. Tomorrow we will stop at noon. We'll recess.

(Adjourned, 12:58 p.m.)

Case: 26-0906, 11/20/2026, DktEntry: 16.5, Page 114 of 300


CERTIFICATE OF OFFICIAL REPORTER

I, Kelly Mortellite, Registered Professional Reporter, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing transcript is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter to the best of my skill and ability.

Dated this 8th day of July, 2025.

/s/ Kelly Mortellite

_______________________________

Kelly Mortellite, RPR, RMR, CRR

Official Court Reporter

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

No. 1:25-cv-10685-WGY
Volume 1, Pages 1 - 76

AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
Plaintiffs

vs.

MARCO RUBIO, in his official capacity as
Secretary of State, et al,
Defendants

********

BENCH TRIAL DAY 3

BEFORE THE HONORABLE WILLIAM G. YOUNG
UNITED STATES DISTRICT JUDGE

United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
July 9, 2025

********

Court Reporter: Kelly Mortellite, RPR, RMR, CRR
Official Court Reporter
United States District Court
One Courthouse Way
Boston, Massachusetts 02210
mortellite@gmail.com

A P P E A R A N C E S

RAMYA KRISHNAN
XIANGNONG WANG
Knight First Amendment Institute at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
Carrie.decell@knightcolumbia.org
and
COURTNEY GANS
NOAM BIALE
ALEXANDRA CONLON
Sher Tremonte LLP
90 Broad Street, 23rd Floor
New York, NY 10004
(212) 540-0675
Cgans@shertremonte.com
For Plaintiffs

ETHAN B. KANTER
WILLIAM KANELLIS
VICTORIA M. SANTORA
JESSICA A. STROKUS
DOJ-Civ
P.O. 878
Ben Franklin Station
Washington, DC 20044
(202) 616-9123
Ethan.kanter@usdoj.gov
and
SHAWNA YEN
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, MA 02210
Shawna.yen@usdoj.gov
(617) 748-3100
For Defendants

Case: 26-6906, 11/20/2026, DktEntry: 16.5, Page 117 of 300


INDEX


| WITNESS | PAGE |
|---|---|
| ABU EL-HAJ | |
| Direct Examination By Mr. Wang (continued) | 5 |
| Cross-Examination By Mr. Kanellis | 36 |
| PETER HATCH | |
| Direct Examination By Ms. Conlon | 42 |

E X H I B I T S

| Exhibit No. | Received |
|---|---|
| 228 | 16 |
| 229 | 32 |
| 230 | 33 |
| 231 | 34 |

P R O C E E D I N G S

(Begins, 9:04 a.m.)

THE COURT: Have we got the witness on the video? But before we do, forgive me, I should say that I've allowed internet access to these proceedings. It's appropriate therefore to say that if you are accessing these proceedings on the internet, the rules of court remain in full force and effect, which means there's no taping, streaming, rebroadcasts, screenshots or other transcription of these proceedings, and it 09:04 is important that you keep your microphone muted. If you do not and interrupt the proceedings, we will turn you off.

Now, with that stated, counsel, are we ready to continue?

MR. WANG: Your Honor, one brief preliminary matter before we recall Ms. Abu El-Haj. Due to witness scheduling, we reached out to the government yesterday to see if they would be okay with me continuing the questioning of the witness in lieu of my colleague, Ms. Conlon. They consented on the understanding that we would extend them the same courtesy, and 09:05 if you are amenable to it --

THE COURT: I am.

MR. WANG: Great. Thank you.

THE COURT: But state your name again.

MR. WANG: Yes. That's Xiangnong Wang for the plaintiffs, Your Honor.

THE COURT: Yes, Mr. Wang. Forgive me, but there's a large number of you all.

MR. WANG: Absolutely, understood.

THE COURT: I see the witness, and if the clerk could remind the witness that she remains under oath.

COURTROOM CLERK: I remind you that you remain under oath. Do you understand?

THE WITNESS: Yes, I do.

THE COURT: Thank you, Professor. Mr. Wang, you may
09:05 continue.

DIRECT EXAMINATION BY MR. WANG:

Q. Good morning, or perhaps afternoon, Professor Abu El-Haj. Thank you again for joining us today.

So yesterday you began to talk about Mahmoud Khalil, and you mentioned that you heard Mr. Khalil speak on a number of occasions; is that correct?

A. Yes, that's correct.

Q. To the best of your recollection, where have you heard him speak?

09:06 A. I've heard him speak, he gave -- I've heard him speak to the press, press conferences, some at the encampment and one, definitely one after the raid of Hamilton Hall when the encampment was shut down.

Q. And the encampment you're speaking of, just to be clear, is the encampment at Columbia University between 2023 and 2024;

is that correct?
A. Correct, in April 2024.
Q. Have you heard Mr. Khalil speak publicly about Israel and Palestine?
A. Yes.
Q. What do you believe is Mr. Khalil's general message in his speech about Israel and Palestine?
MR. KANELLIS: Objection. Calls for speculation.
THE COURT: Why, even if not offered for the truth, 09:07 why is it relevant?
MR. WANG: Well, I'm asking the witness to, from her personal knowledge of speaking with Mr. Khalil --
THE COURT: No, no. I'm following.
MR. WANG: Right. Just about --
THE COURT: If the speech itself is relevant, I understand. But she's already said about his maturity and about his negotiating skills, and based upon the record, as I understand it, he has made statements that are -- I must choose my words with care -- pro-Palestinian.
09:08 I don't know that anyone -- I don't know how we're going to get at relevant evidence here. That's my problem with the question. Because if they say he's speaking to recruit recruits for Hamas, a terrorist organization, but I have no evidence that he ever did that. And so her hearing him talk on some other occasion about something else, it doesn't help me.

MR. WANG: Understood, Your Honor.
THE COURT: Very well. Then ask another question.
MR. WANG: Understood, understood.
THE COURT: Sustained.
Q. Have you ever heard Mr. Khalil espouse violence?
A. No.
Q. Have you ever seen Mr. Khalil engage in violence?
A. No, I have not.
Q. Have you heard him threaten another student?
09:09 A. No.
Q. Have you heard him threaten anyone else?
A. I have not, no.
Q. Have you ever seen Mr. Khalil harass another student?
A. No.
Q. Have you seen Mr. Khalil engage in antisemitic behavior?
A. I have not.
Q. All right. I want to take you back to the day of Mr. Khalil's arrest.
THE COURT: Excuse me. And let me ask, Professor, 09:09 because definitions are important here, when you answered that you've never seen him engaged in antisemitic behavior, can you define, how do you use the term "antisemitic behavior," if you can tell me.
THE WITNESS: Yes. So I understand antisemitic behavior and speech to be speech and behavior that targets

individuals on the basis of their Jewish identity. Mahmoud Khalil's speech was always speech about the Israeli state, the critical speech about the Israeli state, about its conduct in Gaza, which you referred to -- the genocide in Gaza and sometimes he refers to it as the atrocities and about the inequality that the Zionist Project as a political ideology and as the governing institutions of the Israeli state, the inequality that that produces, both the disenfranchisement that has produced for Palestinians who were forced out or in the 09:10 occupied territories and the inequality that it produces for citizens of the state who are Palestinian. So it never was reference to a non-state project.

THE COURT: One other term you use that it will be helpful if you define it for me, you said he spoke about the Zionist Project. What does that mean, in your mind?

THE WITNESS: Well, the Zionist Project was, is, the project to have -- is the project of a Jewish state. In other words in the structure of law -- sorry?

THE COURT: I shouldn't interrupt, having asked the 09:11 question and you're right ready to answer it. I want to let the lawyers ask the questions, and I think you've answered mine. I understood what you mean by Zionist Project. They can inquire if they wish. Go ahead, Mr. Wang.

MR. WANG: Thank you very much, Your Honor.

BY MR. WANG:

Q. So I want to take you back to the day of Mr. Khalil's arrest. When did you first learn of his arrest?
A. I don't remember precisely, but I either learned late at night the Saturday night, if I recall correctly, that he was arrested or first thing in the morning.
Q. And you how did you hear of his arrest?
A. Various students and faculty members reached out. Yeah, that's how I heard.
Q. And what do you remember about how Columbia University's 09:12 campus felt to you in the days immediately following Mr. Khalil's arrest?
A. Well, I wasn't -- well, actually I was on campus that Sunday. But there was -- it was, I would say the feeling was both shock -- people were quite shocked that he was detained, especially when it became clear on top of everything else that he's a green card holder, and a sort of anxiety and panic about what might happen next.
Q. So Professor Abu El-Haj, you testified yesterday that things changed after Mr. Khalil's arrest. Do you believe that 09:13 Mr. Khalil's arrest had an impact on the campus speech environment at Columbia?
A. Absolutely.
Q. And what impact do you believe it had?
A. A lot of students who reached out to me were panicked that they -- students who had been publicly critical of the Israeli

state and the genocide in Gaza reached out to me, people who participated in the demonstrations feeling like they could be very vulnerable to ICE detention.

I do want to say that included students, Palestinian students who are U.S. citizens but not natural born citizens because that was a rhetoric also coming out of Washington. I also definitely have faculty friends who felt like they needed to withdraw a bit from -- withdraw from public speech out of fear of the possibility of their deportation.

09:14 Q. And did you observe a change in the student protests at Columbia following Mr. Khalil's arrest?

A. I definitely know that many of the Palestinian and Muslim students withdrew while they were trying to catch their breath and figure out what might happened next. There was a demonstration that was -- actually, it wasn't a demonstration. There was a sit-in, I don't know, a week maybe, I don't remember exactly when, after Mahmoud's detention. And it was organized by JVP, Jewish Voice for Peace and attended really I actually think exclusively by Jewish members of the community 09:14 because they, as someone articulated it to me, they felt like they were the least likely to be --

MR. KANELLIS: Objection, Your Honor. This is hearsay.

THE COURT: I'll stop it there, but what she's testified to may stand.

MR. WANG: Thank you, Your Honor.
Q. I want to ask you about another individual now. Are you familiar with Mohsen Mahdawi?
A. Yes, I am.
Q. And how do you know Mr. Mahdawi?
A. I got to know him in the previous academic year, '23-'24, as part of the Palestinian student groups and political movement.
Q. And to your knowledge did Mr. Mahdawi have a role in the 09:15 student protests at Columbia from 2023 to 2024 that you mentioned yesterday?
A. He did. He was definitely one of the more vocal public voices about the student movements, particularly in the first five or six months. He was another person who spoke out publicly without ever masking up.
I personally did not see him at the encampment, so I'm not sure he was there, but he was definitely at many of the activities before that.
Q. And what was his role in these campus protests?
09:16 A. He often -- well, first of all, he was a head of the Palestinian -- there's a Palestinian student group called, I think Dawb -- I can't even remember. And he was the president of that, if I recall correctly. And basically he was often a person who spoke at the demonstrations and rallies.
Q. Have you heard Mr. Mahdawi speak publicly about Israel and

Palestine?
A. Yes, I have.
Q. And do you, in your mind is there something distinctive about the viewpoints that Mr. Mahdawi presented when speaking about Israel and Palestine?
MR. KANELLIS: Objection, Your Honor.
THE COURT: Well, I'm going to receive the answer since it's jury-waived, subject to your objection and a motion to strike. You may answer, Professor.
09:17 A. Yeah. In some ways there is something distinctive about him. He really speaks in the language of restorative justice. And he speaks in the language of sort of liberty, a very American language of liberty and democracy. He really sees himself as influenced by Martin Luther King and the nature of a nonviolent resistance and restorative justice. That's his language.
MR. KANELLIS: Your Honor, move to strike.
THE COURT: Move to strike? The motion to strike is denied. I'm asking accepting that that's what she heard of 09:17 him, heard or what she got from what he said. Go ahead.
MR. WANG: Thank you, Your Honor.
Q. Did you ever recall seeing Mr. Mahdawi speak on Columbia's campus?
A. Yes, I did, I do.
Q. How many times do you remember him speaking on Columbia's

campus?
A. I don't know. I mean, probably four or five times maybe.
Q. Are there any events at Columbia in which he spoke that you remember specifically?
A. I remember him speaking at what was organized as a vigil, I would say it was November sometime, 2023.
Q. So I'm going to show you a video that's been pre-marked as Exhibit DJ for identification purposes. Sorry, DJ1, I'm sorry.
MR. WANG: Mr. Kumar, would you please pull up that
09:18 video.
A. Okay. I am really sorry, but I seem to be -- oh, I found it. Never mind. Okay. Sorry. I found it.
Q. Professor Abu El-Haj, do you see the --
A. I see a document, yeah.
Q. -- the screen?
A. Okay, yes.
MR. WANG: Do we have that up here in court?
THE WITNESS: Yes, I see it.
MR. WANG: Your Honor, would you be amenable to us
09:19 playing just a few seconds of this video clip?
THE COURT: Well, I haven't heard any objection, so go ahead.
MR. KANELLIS: Well, I'm just going to object, Your Honor, to relevancy, unless she's going to lay -- if she's going to authenticate this. If she took the video, that's one

thing. Otherwise, relevancy.

THE COURT: Well, it's not necessary that she have taken it, so we can all stand a few seconds. The time counts against them. Go ahead.

MR. WANG: Thank you, Your Honor.

(Video played.)

THE COURT: You move to strike it.

MR. KANELLIS: Yes, Your Honor. It's not relevant.

THE COURT: No, I don't think it's relevant. You're
09:20 right to say it, but I'll let it stand.

MR. WANG: Thank you, and can we have -- thank you very much, Ms. Belmont.

Q. Do you recognize what the video clip you just watched depicts?

A. It is a video of the -- sorry, I've lost you -- of the vigil that I mentioned before.

THE COURT: And who is speaking, ma'am, if you know of your own knowledge?

THE WITNESS: That is Mohsen Mahdawi.

09:20 THE COURT: Thank you.

Q. Just for the record, you were in attendance at the event that was depicted; is that correct?

A. I was sitting in the background with some faculty members, watching the event.

Q. And to the best of your knowledge, is the video an

accurate representation of the event where Mr. Mahdawi spoke?

A. Yes.

MR. WANG: Your Honor, we offer Exhibit DJ1.

THE COURT: Why is this relevant?

MR. WANG: Your Honor, it's relevant to show Mr. Mahdawi's protected speech.

THE COURT: Well, I think that actually I have some question about whether it's protected speech in the sense that in one connotation of the cry "From the river to the sea" is in
09:21 fact a call for genocide. I don't adopt that or reject it, but there's that possibility. Your point is that you've now authenticated that this is speech anyway --

MR. WANG: That's correct.

THE COURT: -- by what has been characterized as a target subject. Why is that relevant here? That's one snippet of speech. How long is the whole video?

MR. WANG: The whole video I think goes on for another maybe couple of minutes. One minute 20 seconds. Thank you.

THE COURT: So what's the relevance?

09:22 MR. WANG: So the relevance, Your Honor, is that it is an example of speech that Mr. Mahdawi, one of the targeted individuals, has engaged in, and part of plaintiffs' argument is that the policy -- that the government has engaged in a retaliatory policy that may involve showing that our targeted individuals engaged in protected speech, again, understanding

that the protected part of that is a legal inquiry, but we believe that --

THE COURT: I'm not saying that it's not entirely protected speech because he was using the subjunctive phrase and was asserting that so-called "they" ignore as he went on atrocities I take it in Gaza.

MR. WANG: Mm-hmm.

THE COURT: So that would seem to be just an example of political speech.

09:23 MR. WANG: You're correct, Your Honor, except that the government has cited Mr. Mahdawi's participation in protests as part of Secretary Rubio's determination.

THE COURT: Yes. Well, I don't -- actually, I think it would be best to have a full record here, so I'm going to overrule it. DJ for identification?

MR. WANG: Yes, DJ1. I believe the next exhibit number is Exhibit 228.

THE COURT: I think it is. DJ1 is admitted.

(Exhibit 228 admitted into evidence.)

09:24 THE COURT: Now, understand, you're touching on something that is going to recur in this case, and I've said throughout there's a statute here passed by the Congress of the United States. You people don't challenge that statute, and indeed I have doubts whether you have standing to challenge that statute. But you don't challenge it.

So long as the Secretary of State is following the law as the Congress has passed it, I don't see what I have to say about that, but a complete record is essential.

MR. KANELLIS: Your Honor, may I, for clarification?

THE COURT: You may.

MR. KANELLIS: So I just want to preserve our objections. This is hearsay.

THE COURT: It is. I acknowledge it.

MR. KANELLIS: And it's not relevant.

09:25 THE COURT: Well, they're not offering it for the truth. They're offering it for the fact that he spoke, and a competent witness has testified that it is his speech. So, no, I don't think it's hearsay.

MR. KANELLIS: For that purpose, Your Honor, then we -- if it's just -- if it's not for his statements but actually for the fact he spoke, we don't with a problem.

THE COURT: Well, he spoke and it's for, it's an example of his speech.

MR. KANELLIS: Sure. That's not a problem. Just not
09:26 for the substance.

THE COURT: But I don't -- that's the line I don't understand. It is for the substance.

MR. KANELLIS: No, it's not --

THE COURT: Suppose in the course of presiding I utter a racial slur. I'm not quoting from something, but I utter a

racial slur. Well, that fact of that speech, which is utterly inappropriate from a judicial officer, would be relevant, one imagines, in certain circumstances.

Here is one of the alleged target individuals speaking. He's speaking on a subject of both political interest and arguably a call for antisemitic violence, arguably. I take no position. It seems to me that's relevant.

MR. KANELLIS: No. That's fine, Your Honor. By "substance," I meant the statements that were made therein for

09:27 the truth. That's what I was referring to.

THE COURT: Oh, that somehow -- I understand.

MR. KANELLIS: Thank you, Your Honor.

THE COURT: We're arguing over how many angels dance on the head of a pin. I do not accept this as evidence of atrocities by anyone in Gaza. Go ahead.

MR. WANG: Your Honor, just two brief clarifications on the colloquy we just had.

THE COURT: I try my best and now we have qualifications or clarifications on the clarifications. Go

09:27 ahead.

MR. WANG: I'm sorry, Your Honor.

THE COURT: Don't apologize.

MR. WANG: I just wanted to briefly mention that, to be clear, we do challenge the statute that you were just referring to --

THE COURT: Oh, you do?

MR. WANG: -- in the complaint as a technical matter and, you know, as applied --

THE COURT: On constitutional grounds?

MR. WANG: That's right, Your Honor.

THE COURT: Do you think, since you're clarifying things, let me clarify, because I think you have a very high hurdle here, and it's this: When I read the complaint -- and I've read it recognizing this was an issue to begin with, I
09:28 don't see how your clients who are the people chilled here but who have not come within the ambit of that, you haven't challenged -- you haven't -- I don't know that you have standing to challenge the constitutionality of that statute. And if you think you do, that's something that I really need briefing on.

I've solicited it from the government, and I pause to clarify that I solicit it from you. If you challenge it, fine. I don't know that your clients have standing to challenge it, as the statute has never been used against any of them.
09:29 Mahdawi does, Khalil does, Ozturk does. But this court, and I'll be very clear, is not going to express any opinion. I don't instruct other judges or advise other judges. I handle the case before me. I respect other judges, but you've got to brief that.

MR. WANG: Of course, Your Honor.

THE COURT: I seem to remember Ms. Krishnan in her opening saying you didn't challenge the statute. But if you do, you've got to convince me you have standing to do that. And the fact that you got past a motion to dismiss doesn't establish it.

Go ahead, Mr. Wang. You don't need any clarification on that, Mr. Kanellis. Go ahead.

MR. WANG: Understood, Your Honor, and we'd be happy to address that in the brief.

09:30 THE COURT: I'm eager for it.

MR. WANG: And one final point on the video that was just played, you know, as I mentioned before, it does extend longer, and so now that it is in evidence, I would invite Your Honor to view the whole thing. Thank you.

THE COURT: That's my duty now that it's in evidence.

MR. WANG: Absolutely.

THE COURT: You can be sure that I will, but on my own time, not yours. Go ahead.

MR. WANG: Of course. Thank you, Your Honor.

09:30 BY MR. WANG:

Q. So returning to the event that we were just speaking about that you authenticated in the video, can you describe this event?

A. So it was organized primarily as a vigil with an art installation. It started out, in my memory -- this was a long

time ago and there have been many events -- it probably lasted about an hour and a half. I think a lot of the first half hour or 40 minutes was either silent or people were singing, and then there were some speeches, included Mohsen's, I don't really remember who else spoke, but I didn't know a lot of the students. I wouldn't necessarily know.

Q. And is there any reason why this event stuck in your mind?

A. I mean, it stuck in my mind for one thing because towards the very end of the event, I think it was towards the end, 09:31 somebody who approached from behind where the security, Columbia security was standing and started yelling some antisemitic thing, I don't remember what. And the students immediately shut this person down and Mohsen himself actually walked over to him and asked him to leave, et cetera, and then made a statement about antisemitism.

Q. Thank you. So I am going to show you now what's been pre-marked as Exhibit D1. And Your Honor, if I may approach, I can provide you a paper copy.

THE COURT: Of course you may.

09:32 MR. WANG: Sorry, DI.

THE COURT: This is DI?

MR. WANG: Yes. Do you need a paper copy, Your Honor?

THE COURT: Do I need a paper copy? Apparently I do not. So go ahead.

MR. WANG: Thank you.

BY MR. WANG:
Q. Do you recognize what -- sorry. Professor Abu El-Haj, do you see the document I'm referring to that's been pre-marked as DI?
A. Yeah, I do.
Q. Do you recognize what this is?
A. I mean, it's an article in The Columbia Spectator, which is Columbia's daily newspaper.
Q. And can --
09:33 A. And it -- go ahead.
Q. Can you please take a moment to review the article.
A. Yeah. Okay.
Q. Is the event this article describes the same event that you just discussed?
A. Yes.
Q. And how do you know it's referring to the same event?
A. Both because I remember aspects of the description, but also that panel that's at the top of artwork or whatever was only at that event.
09:34 MR. WANG: Thank you. Your Honor, we offer Exhibit DI.
MR. KANELLIS: Hearsay, not relevant.
THE COURT: It is, it is.
MR. WANG: Your Honor, we're offering it just to corroborate Professor Abu El-Haj's account.

THE COURT: Of course you are. That means substantively. It's hearsay. Sustained.

MR. WANG: Thank you, Your Honor.

MR. WANG:

Q. So moving on, have you ever seen Mr. Mahdawi engage in violence?

A. No.

Q. Have you heard him threaten another student?

A. No.

09:34 Q. Have you heard him threaten anyone else?

A. No, I've never heard him threaten anyone.

Q. Have you ever seen Mr. Mahdawi harass another student?

A. I have not.

Q. And based on the articulation of antisemitic behavior that you gave before, have you seen Mr. Mahdawi engage in antisemitic behavior?

A. No. And like Mahmoud Khalil, he often speaks out against antisemitism.

Q. Did you speak with Mr. Mahdawi in the days after Mahmoud

09:35 Khalil was arrested?

A. I did, yes.

Q. And did Mr. Mahdawi tell you how he was feeling at the time?

A. Yes. He was very --

MR. KANELLIS: Objection. Calls for hearsay.

THE COURT: No. Well, it does, but I'll limit it to what's admissible under 803. What did he say?

THE WITNESS: He said that he was worried that he was going to be the next target, and he asked me to convince the Columbia University president to move him from his Columbia housing that was off campus to inside the gates because at that point the university was requiring a judicial warrant for ICE agents to enter the gates of Columbia, and the properties outside were less secure.

09:36 MR. KANELLIS: Objection to the first, not to the second.

THE COURT: Just a moment, just a moment.

MR. KANELLIS: Sorry. Objection to the second, not the first.

THE COURT: So much of the answer as follows "because," I strike. The rest of it may stand. That's his then present state of mind and an expression of intentions as to the future. Go ahead.

MR. WANG: Thank you, Your Honor.

09:36 BY MR. WANG:

Q. Did you see, did you observe Mr. Mahdawi change his behavior in any way after Mr. Khalil was arrested?

A. Yes. He stayed in his apartment. He did not leave the apartment. People brought him food, et cetera.

Q. And how do you know that?

A. He told me.
Q. And --
MR. KANELLIS: Objection. Move to strike, hearsay.
THE COURT: Yeah, it is. Sustained. I'll strike that out -- well, I will not include it in the record. All right.
MR. WANG: Thank you, Your Honor.
Q. During the period that you just described, did he tell you how he was feeling at the time?
THE COURT: Haven't you just asked that? Now it's during the period?
09:37
MR. WANG: That's correct.
THE COURT: All right.
A. Well, he was very anxious.
THE COURT: Did you talk --
A. Yes.
THE COURT: I'm sorry, I spoke over you.
THE WITNESS: Sorry.
THE COURT: It was my fault. I heard you say he was anxious.
09:37 THE WITNESS: Yes.
THE COURT: Thank you.
THE WITNESS: And I did speak with him further.
THE COURT: And thank you for that.
BY MR. WANG:
Q. Did you perceive Mr. Mahdawi's arrest as having an effect

on the speech environment at Columbia?
A. I think it really just kept, it just escalated a sense of anxiety and panic at Columbia, including I think the feeling that Columbia was really kind of ground zero of the attacks on universities at that point.
Q. And did you continue to hear from noncitizens after Mr. Mahdawi's arrest?
A. I did, yes.
Q. Sorry. Just for the record, was Mr. Mahdawi arrested?
09:38 A. Yes, he was arrested when he went to his citizenship interview in Vermont three weeks I think after Mahmoud's arrest or about therein.
Q. Thank you. So I just want to move on to another topic now.
Yesterday you mentioned that some students were terrified about being doxed, and you described what you believe "doxed" means.
Why do you think students were so afraid of being doxed at that time?
09:38 MR. KANELLIS: Objection, foundation.
THE COURT: Sustained. She can't testify to what's in someone else's mind.
Q. Based on your -- yesterday you mentioned that you had conversations with noncitizen students who expressed concerns about being doxed. What were some of the concerns that they

expressed to you?

MR. KANELLIS: Same objection. Calls for hearsay.

THE COURT: We'll see. You may tell us. What did such students say to you about the doxing?

THE WITNESS: Well, so let me start with Mohsen. He specifically said that his name, like Mahmoud's name, had been tweeted at Secretary Rubio with a photo of his presence at a sit-in at Barnard College a few days before he was arrested with the tag, "he should be deported," or something like that.

09:39 Mohsen was, then subsequently his name was also tweeted -- this is what he told me -- at Rubio and maybe the White House, I don't recall, with the same, him being added to the list that a couple -- well, one organization in particular was creating.

And I think there was -- so that was -- that's the most specific I can tell you, but that was generally what students were saying to me. They were worried that their photo and names would be tweeted at the administration, and in their understanding, that was a key or that is what helped get

09:40 Mahmoud arrested.

MR. KANELLIS: Okay. Your Honor, move to strike.

THE COURT: I will strike it all but for when she says "They were worried that they would be tweeted," et cetera. The rest of it is stricken as hearsay. Go ahead, Mr. Wang.

MR. WANG: Thank you, Your Honor.

BY MR. WANG:
Q. Are you familiar with the organization Betar U.S.?
A. Yes, I am.
Q. And what to your understanding is Betar U.S.'s purpose?
A. So Betar U.S. sees itself, or defines itself -- not sees itself -- as in the tradition of the Betar youth movement, which started in the pre-state period in Palestine and was led by Jabotinsky, who was the leader of the more right wing faction of Zionism that was at the very beginning committed to 09:41 expelling Arabs, I mean explicitly committed.
I don't know what their -- I mean, I'll reword it a bit. I know what they say that they are doing. They see themselves as defenders of the Israeli state and in particular even its right wing iteration, the Netanyahu government.
They have been very explicit that they are creating lists of noncitizens in the U.S. or who they think are noncitizens, I don't know, they often -- I don't know how they know -- and calling for their deportation.
They have also, if I'm recalling correctly and I think I 09:42 am, sent a list of American anti-Zionist Jews to the Israeli government and asked, these are the list of people you should not let in. They have also shown up at events and passed out or given a speaker a plastic pager, which is an explicit threat because it refers to the pagers that were exploded by Israeli intelligence in Lebanon that killed, I don't remember, but a

lot of people, over a thousand people and wounded more than that in my memory.

MR. KANELLIS: Objection. Move to strike --

A. That's what they do.

MR. KANELLIS: Objection. Move to strike the entirety of that prior statement as hearsay.

THE COURT: Well, there was no objection until she got to the interesting point about pagers. That, I will strike.

MR. KANELLIS: No, Your Honor. I was letting her

09:43 finish her answer, but she said "they say."

THE COURT: Indeed.

MR. KANELLIS: I was being polite and letting her finish before I interjected.

THE COURT: That's my ruling. Go ahead, Mr. Wang.

BY MR. WANG:

Q. Professor, you mentioned earlier that it is your belief that Betar has provided names to the current administration. What is the basis of that belief?

A. Their Twitter account or X account. They state that in

09:43 their account.

MR. KANELLIS: Objection. Move to strike.

THE COURT: Well, I mean, that's stating her basis for making the statement. I'm going to let that stand, but it confirms your objection, Mr. Gonzalez, that the basis of her knowledge is third-party declarations, not admissions,

certainly not admissions by the government, then I can't see any other basis for attributing it to the government. So I'll let the answer stand, but I don't really see what this adds, unless somehow the government is making use of this information.

MR. WANG: Sorry, Your Honor. Was that directed at me or --

THE COURT: No. I was just talking. I'm looking at you, but just talking.

09:44 MR. WANG: Thank you, Your Honor.

BY MR. WANG:

Q. Okay. Just a few more questions, Professor Abu El-Haj.
Are you familiar with a website called Canary Mission?

A. I am, yes.

Q. And when did you first learn about Canary Mission?

A. I don't really recall because it's been around for a long time. I would say maybe 15 years ago, maybe a little longer, but it's not an accurate estimate.

Q. And what do you understand --

09:45 A. It's not --

Q. Excuse me. Have you seen the Canary Mission website?

A. I have.

Q. Is there a profile page on Canary Mission about you?

A. Yes.

Q. Have you visited it?

A. Yes.
Q. And what generally does it say about you?
MR. KANELLIS: Objection.
THE COURT: At this point he objects. I sustain it. If there's such a website, if it has data that's relevant, that's the data, not the hearsay.
MR. WANG: Understood, Your Honor.
Q. Are there profiles of other people on Canary Mission who you personally know?
09:46 A. Many, many.
Q. Do you know if Mahmoud Khalil has a Canary Mission profile?
A. Yes.
Q. And have you visited this profile?
A. I have.
Q. When did you visit it?
A. I think around the time when he was arrested -- detained by ICE.
Q. And do you know if Mohsen Mahdawi has a Canary Mission
09:46 profile?
A. Yeah.
Q. And have you visited his profile?
A. Yeah, I think around the same time.
Q. When did you visit it?
A. Around the time of the detentions. I don't remember

precisely.
Q. Okay. Just a couple more questions, Professor.
Professor, I'm going to show you -- sorry, let me find my exhibit list. Thank you. I'm going to show you what has been premarked as Exhibit CC.
Professor, do you have that in front of you?
A. Yeah.
Q. What do you recognize this to be? Sorry. Do you recognize it?
09:47 A. I do.
Q. And what do you recognize it to be?
A. I mean, it's on the Canary -- I don't know if it's their home page or whatever, but it's the Canary Mission's explication of their own mission, as it says.
Q. And have you visited this website before?
A. Yes, I have.
MR. WANG: We offer Exhibit CC.
MR. KANELLIS: Objection, hearsay.
MR. WANG: Not for the truth, Your Honor.
09:48 MR. KANELLIS: And relevancy.
THE COURT: Since it's not for the truth, it is relevant. CC will be admitted as limited, 229 in evidence.
(Exhibit 229 admitted into evidence.)
Q. Next I will show you Exhibit CY, what has been marked as Exhibit CY. Do you recognize what this is?

A. Yes. It's a photo of Mohsen Mahdawi on the Canary Mission website.

Q. And have you visited that web page before?

A. Yes, but briefly, not in a sustained manner.

MR. WANG: Your Honor, we offer Exhibit CY.

MR. KANELLIS: Objection. It's hearsay and it's not relevant. She's already testified she visited the website. It adds no value.

THE COURT: Not for the truth but for the fact of it 09:49 being there. I need to be sure, Professor, you saw this entry on this website, you?

THE WITNESS: Yeah. I occasionally check out their website, who is on and what they're saying.

THE COURT: Well, but I'm looking at a specific here. It starts with a photo, and it's got a red arrow towards someone speaking. You've looked at this entry?

THE WITNESS: Yeah.

THE COURT: Is that your testimony?

THE WITNESS: Yes, I have, yes.

09:50 THE COURT: Overruled. CY is admitted. Exhibit 230 in evidence.

(Exhibit 230 admitted into evidence.)

MR. KANELLIS: Pardon me, Your Honor.

THE COURT: Limited.

MR. KANELLIS: Limited, thank you.

BY MR. WANG:
Q. And one more. I'm going to show you what has been pre-marked as Exhibit DA.
A. Yeah.
Q. Do you recognize this exhibit?
A. Yes, I do.
Q. And what is it?
A. It's the Canary Mission entry on Mahmoud Khalil.
Q. And have you seen this web page?
09:50 A. Yes, I have.
MR. WANG: Your Honor, we offer Exhibit DA.
THE COURT: Same.
MR. WANG: For the same reason.
THE COURT: Same limitation, DA, with the same limitation, is admitted, Exhibit 231.
(Exhibit 231 admitted into evidence.)
MR. WANG: All right. Thank you, Your Honor.
Q. Just a couple last questions.
Are you familiar with the term "ideological deportation
09:51 policy"?
A. I am familiar with it through the framing of this case.
Q. And what do you understand that term to mean in your mind?
A. So in my mind it refers to -- it refers to the fact that the government is committed to deporting noncitizens who hold beliefs that they do not agree with.

Q. And do you believe that Mahmoud Khalil's arrest, detention and attempted deportation are part of this ideological deportation policy?
A. Yes, I do.
Q. And why do you hold that belief?
A. Well, Senator Rubio said that the grounds of his arrest is some obscure, I think, law, that allows the Secretary of State presumably to deport someone who poses a risk or undermines U.S. foreign policy. And Rubio said that Mahmoud Khalil is 09:52 promoting antisemitism and that contradicts the U.S. foreign policy goal of fighting antisemitism worldwide.
Q. Do you believe that Mahmoud Mahdawi's arrest, detention and attempted deportation are part of this ideological deportation policy?
A. Yes, I do.
Q. And why do you hold that belief?
A. Because he was arrested under the same statute and for the same reasons on the allegation that he is promoting antisemitism which undermines an important foreign policy goal 09:53 of the U.S., which is fighting antisemitism globally.
Q. And final question, Professor. What do you perceive has been the effect of this policy, including the actions taken against the two individuals you just mentioned, on the community of Palestinian students at Columbia?
A. It has been terrifying for Palestinian students at

Columbia, especially those who do not hold U.S. citizenship. But as I said earlier, even students who are naturalized citizens are nervous.

MR. WANG: No further questions, Your Honor.

THE COURT: Mr. Kanellis, do you wish to examine this witness?

MR. KANELLIS: Yes, Your Honor. May I remain seated while I question?

THE COURT: You may, absolutely.

09:53 MR. KANELLIS: Thank you.

CROSS-EXAMINATION BY MR. KANELLIS:

Q. Professor, you are a U.S. citizen, correct?

A. I am.

Q. You've always been a U.S. citizen?

A. Yes. I was born in New York.

Q. Born in New York. And so this ideological deportation policy you've described does not relate to your fear of deportation, correct?

A. Correct.

09:54 Q. You indicated that after the arrest of Mr. Khalil, I believe you said there was a change in student protests, didn't you?

A. Yes.

Q. And those student protests are the ones that you're familiar with on the campus of Columbia University, correct?

A. Correct.
Q. And those protests, your involvement in those protests relates to your role with the Center for Palestine Studies at Columbia, correct?
A. No. I was not involved in the protests, and the Center for Palestine Studies does not work with student groups.
Q. Okay. Thank you for the clarification. You said the effects of the policy were terrifying, this ideological deportation policy?
09:55 A. Yes --
Q. But in fact --
A. -- for many people.
Q. But in fact, protests continued at Columbia after the arrest of Mr. Khalil, didn't they?
A. Yes. However, the students, many -- I don't -- the Palestinian students I know, certainly the ones without U.S. citizenship but including a few that have U.S. citizenship, stopped participating. And at least one person I know who does not hold U.S. citizenship went out and tried to -- what do you 09:55 call it -- erase her social media presence.
Q. Okay. And that's based upon what the student told you, correct?
A. Yes.
Q. And that's not based upon anything you personally observed; you didn't watch that student delete her social media

account, did you?
A. No, I did not.
Q. And the protests, after the arrest of Mr. Khalil, continued at Columbia University and were very well attended, weren't they?
A. I -- as far as I know, there were three protests. Two of them were organized by JVP and quite small. The third one was larger.
Q. The third one was huge in --
09:56 A. And the students I know about which I am speaking did not attend those protests.
Q. Okay. But --
A. The third protest -- any of them.
Q. One of the protests was huge in your opinion, wasn't it?
A. Yes, but I don't know who took part. Were they all U.S. citizens?
Q. Okay. Do you know who took part in the protests that were smaller in size?
A. I know -- sorry.
09:56 Q. Did you interview the students who were there to determine their nationality?
A. I did not.
Q. Okay. And in fact, you don't know who did or who did not attend the protests as far as their nationality or citizenship, do you?

A. No, but I do know that there are international students who explicitly said to me that they were not going to attend the protests or be public going forward.

MR. KANELLIS: Okay. I'll move to strike, Your Honor, on the basis of hearsay.

THE COURT: I will strike her last answer on that ground.

Q. Not only were there huge protests, but there were press conferences protesting the arrest of Mr. Khalil after his

09:57 arrest, isn't that right?

A. I participated in press conferences, but I don't recall any by students.

Q. And in the press conference you participated in, you made a speech criticizing the U.S. Government for the arrest of Mr. Khalil, didn't you?

A. I did. I'm a U.S. citizen.

Q. And you said, in that press conference, you said, "Mahmoud's story is in short the Palestinian story, par excellence." You said that, didn't you?

09:58 A. I did.

Q. And you said, "But let us be clear, Mahmoud has been detained for his political speech." You said that, too, didn't you?

A. Yes.

Q. You said, "It is the political speech that some of our

colleagues and students and many agitators outside the university do not like." You also said that in your speech at this public protest, didn't you?
A. Yes.
Q. "It is political speech that they have tried to shut down by slandering Palestinians and pro-Palestinian protesters as antisemites and even as providing material support for terrorists with absolutely no evidence to back it up."
You also said that, didn't you?
09:59 A. I did.
Q. And when you said that, you were standing before a series of microphones from many news organizations, weren't you?
A. Yes, but I'm a U.S. citizen.
Q. Fox News was there, right?
A. Yes.
Q. AP was there?
A. Yes, but again, I'm a U.S. citizen. I'm not scared of deportation.
Q. ABC was there, correct?
09:59 A. I honestly do not remember everyone who was there. I remember there was a lot of press there.
Q. A lot of press there. And this press conference was given in the middle of New York City, right?
A. Correct.
Q. On Columbia's campus?

A. No, it was not on Columbia's campus. It was -- well, I don't know if that's Columbia's campus. It was up at 125th Street on a plaza in front of, I think it was a Columbia arts building, but I honestly do not know if that is considered legally Columbia's campus.

Q. The press conference was given at the Lenfest Center For Arts at Columbia University --

A. But we were not inside, we were not inside the building.

Q. Ah, I see. You were outside. So in that respect you
10:00 question whether or not it was at Columbia University?

A. Look, I generally just don't know whether legally that public space is owned by Columbia University. That's all I'm saying.

Q. New York has over eight million residents, doesn't it?

MR. WANG: Objection.

THE COURT: I don't know that she is a demographer.

MR. KANELLIS: She can tell me if she knows.

THE COURT: I'll allow it.

A. That sounds right.

10:00 THE COURT: All right. We'll let that stand.

Q. Okay. And you knew that by giving this press conference, in making these statements critical of the United States and the policy regarding Palestine and the arrest of Mr. Khalil, that this could be heard by a great number of people; isn't that right?

A. Yes.
MR. KANELLIS: No more questions.
A. And I repeat, I'm a U.S. citizen.
THE COURT: Nothing further for this witness, Mr. Wang?
MR. WANG: Nothing further from us.
THE COURT: We thank you, Professor. All right. Call your next witness.
MR. BIALE: Your Honor, this is Noam Biale for the plaintiffs. Plaintiffs call Peter Hatch.
10:01
THE COURT: He may be called.
PETER HATCH, Sworn
COURTROOM CLERK: Can you please state your full name and spell your last name for the record.
THE WITNESS: Peter John Hatch, H-a-t-c-h.
COURTROOM CLERK: Thank you. You may be seated.
DIRECT EXAMINATION BY MS. CONLON:
Q. Good morning. Is there a way for me to adjust the volume on this? Okay. Good morning, Mr. Hatch.
10:03
A. Good morning.
Q. My name is Alex Conlon. Thank you for being here.
So just to situate us all, Mr. Hatch, you work for the United States Government?
A. Yes, I do.
Q. Okay. You work in the Department of Homeland Security?

A. Yes, for the component called Immigration and Customs Enforcement.
Q. ICE?
A. Yes.
Q. And specifically, within ICE, you work for the Office of Intelligence; is that right?
A. I work for a subcomponent of ICE called Homeland Security Investigations, and within Homeland Security Investigations, I'm the assistant director for the Office of Intelligence.
10:03 Q. Okay. Now, you and I of course didn't get to prepare together because you are here with the defendants, so I want to give you a sense of what we're going to cover today for you and the court.
In early March you were given the names of student protesters for the Office of Intelligence to produce analysis -- reports of analysis on; is that correct?
A. Yes.
MS. STROKUS: Objection, Your Honor, leading and foundation.
10:04 MS. CONLON: Your Honor, this is an adverse witness and under Rule 611 --
THE COURT: Please, I'm familiar with the rules of evidence. What's your response to that?
MS. STROKUS: Your Honor, Mr. Hatch is a federal government employee.

THE COURT: He is.

MS. STROKUS: And he is prepared to testify honestly and truthfully here today.

THE COURT: Well, that's the presumption, and I certainly respect him, as I do all witnesses. She may lead him. I'm familiar with leading, and of course it bears on the weight to be given to the answers, but she may proceed in that fashion.

MS. CONLON: Okay.

10:04 BY MS. CONLON:

Q. Many of the names of the student protesters provided to you for the Office of Intelligence to produce reports of analysis on came from the website Canary Mission, correct?

A. It's true many of the names, even most of the names came from that website, but we were getting names and leads from many different sources.

Q. The reports of analysis on the student protesters, you had the chance to review, or read, rather, many of them, right?

A. I have read several but not all of the reports of analysis

10:05 coming out of that effort.

Q. And the reports of analysis on the student protesters that you've read, you have seen ones that mention Israel, correct?

A. Yes. They've mentioned several of the nations involved in the Middle East conflict.

Q. You've seen reports of analysis that mention Palestine,

correct?

A. Yes.

Q. You've seen reports of analysis that mention pro-Palestinian protests, correct?

A. I've seen reports of analysis that mention Palestine and issues related to Palestine.

Q. You've specifically seen reports of analysis that mention pro-Palestinian protests, correct?

THE COURT: Well, I guess now she's framing it, so I 10:06 guess the way I hear her, she wants to have you say, when you read reports, did the phrase "pro-Palestinian" -- what was her third word -- "pro-Palestinian activities" or the like, did you receive reports that had those phrases in it?

THE WITNESS: I don't think the reports of analysis mentioned that phrase as you've described it. I think the reports of analysis mentioned students involved in protests or personnel involved in protests. I don't know if a report of analysis specifically said, mentioned pro-Palestine protests, you know, those words. I just don't remember.

10:07 THE COURT: All right. How about pro-Hamas?

THE WITNESS: I do remember reports of analysis that mentioned Hamas, but it isn't the analyst's job to make the determination whether something is pro or con. They would just make the determination that a Hamas leader was, for example, mentioned in the protest or there was some sort of activity or

statement made in support of Hamas or related to Hamas. But the analyst would not make the decision of or classify it as this is pro-Hamas activity, this is pro-Palestine activity. They just don't make those determinations.

Q. So I want to make sure we get off on sort of the right foot here, and if I'm misunderstanding something that you've said in your deposition, you can tell me.

But we spoke to you in a deposition maybe a week ago; is that right?

10:08 A. That's correct.

Q. In that deposition -- and for the government's benefit, I'm looking at page 233, lines six to eight.

You were asked this question and you gave this answer.

Question: Do you recall seeing any reports of analysis that mention pro-Palestinian protests?

Answer: Yes.

MS. STROKUS: Objection, Your Honor, improper impeachment. Can she please show the witness the testimony to which she's referring?

10:08 THE COURT: Under Queen Charlotte's case, that's appropriate.

MS. CONLON: I'm happy to show the witness.

THE COURT: Yes, let's do it.

MS. CONLON: We're queueing it up. While we queue it up --

THE COURT: Government counsel, I just want to call people by names, and again, your name, I'm sorry?

MS. STROKUS: Yes, Your Honor. I'm Jessica Strokus on behalf of defendants.

THE COURT: Thank you, Ms. Strokus.

BY MS. CONLON:

Q. So Mr. Hatch, this deposition took place June 25, right?
A. Yes.
Q. And you had government counsel there with you?
10:09 A. Yes.
Q. And of course you were under oath in the deposition?
A. Yes.
Q. And at the outset of that deposition you were instructed that if a question was unclear, you could ask for clarification, right?
A. Yes.
Q. And in fact, many times you did ask for clarification, right?
A. Yes.
10:09 Q. Okay. So turning your attention now to the section that you see here on the screen, and this again is page 233, starting at line six, you see where it says, Question: "Do you recall seeing any report of analysis that mentions pro-Palestinian protests?"
Answer: "Yes."

Do you see that there?

A. I do, but that's not what it says.

Q. I'm sorry, that's not what it says?

A. I'm looking at line -- the question above that was, "Do you recall seeing any report of analysis that refers to pro-Palestinian protests."

Q. You then asked that the question be rephrased, right? Do you see that on line four?

A. Yes.

10:10 Q. And then the question was asked -- and I hate to repeat it, but it says, "Do you recall seeing any report of analysis that mentions pro-Palestinian protests?"

That is the question that was put to you, and the response you gave was, "Yes." Isn't that right?

A. "Do you recall seeing any report of" -- yes.

MS. CONLON: Okay. You can take it down.

Q. Now, the reports of analysis about the student protesters, you said that you only reviewed several of them, correct?

A. That's correct.

10:11 Q. When you say "several," can you give us a sense of how many that means?

A. For this particular effort, I probably reviewed a couple of dozen, maybe a dozen, maybe 20.

THE COURT: When you say "this particular effort," to what do you refer?

THE WITNESS: I review probably almost a thousand, maybe up to a thousand ROAs in total during a year, and we do, the Office of Intelligence does approximately 25,000 to 30,000 ROAs a year.

THE COURT: But my question was, you're able to say this particular effort, you reviewed about 20. What do you mean by "this particular effort"? What was the mission or the effort that we're talking about?

THE WITNESS: When we were looking at the protests. 10:12 So personnel from -- individuals from the lists of people who were involved in protests.

THE COURT: Protests at Columbia or other places as well?

THE WITNESS: Other places as well.

THE COURT: Thank you. Just so I understand, college protests or --

THE WITNESS: Student, student protests and personnel who was participating in those protests.

THE COURT: Thank you.

10:12 BY MS. CONLON:

Q. When you say "personnel participating in the student protests," does that extend to faculty?

A. It extends to everyone other than -- yes, and all others who are involved who may not have been associated with the university at all.

Q. You said a moment ago that the Office of Analysis -- or Intelligence, rather, produces upwards of 25,000 reports of analysis on all kinds of subjects in a given year, right?

A. That's correct.

Q. And you said that you review a small slice of that in a given year, maybe a thousand. Did I understand you right?

A. That's about right.

Q. And you said that in this line of effort, which was compiling reports of analysis on student protesters, that you 10:13 recall reviewing several dozen; is that correct?

MS. STROKUS: Objection, Your Honor. It misstates his testimony.

THE COURT: That's not exactly what he said.

MS. CONLON: I'm seeking -- I'm sorry.

THE COURT: But I understand, and let me try.

MS. CONLON: Okay.

THE COURT: So with respect to student protests, you recall reviewing about 20?

THE WITNESS: That's correct.

10:13 THE COURT: All right. Now go from there.

MS. CONLON: Okay.

BY MS. CONLON:

Q. So again, I just want to make sure I'm understanding you and we're on the same page.

When you say "dozens," a couple dozen, you mean

approximately 100, isn't that right?
A. No. We said about -- I've reviewed about 20 of those.
Q. Okay.
A. I don't recall the exact number. Like I said, I review a lot of ROAs, so I'm estimating here.
Q. Okay. I'm going to ask -- I'm going to ask that we put the transcript back up. And can we please go first to page 83. So first -- and we're going to have to do this in a few parts, but Mr. Hatch, I want to direct your attention to lines 13 to 10:14 16 so that you're clear on the context for what I'm going to show you next here.
In line 13 you're asked, "Do you recall whether any of these reports of analysis on student protesters mentioned the terms 'Israel' or 'Palestine,'" to which you said yes, which you've also said today. And now moving ahead to page 84, lines 10 to 12, when you were asked about those reports, the question was, "And when you say dozens, what's a ballpark figure?" And in line 12 the answer you gave was, "Approximately, 100."
So you testified that you know that approximately 100 of 10:15 the reports of analysis on student protesters mentioned the terms "Israel" or "Palestine," isn't that right?
MS. STROKUS: Objection, Your Honor. It's unclear from the what's on the screen right now what the original question was.
THE COURT: If it's clear to the witness -- if it's

clear to the witness, it's sufficiently clear. Do you understand the question?

THE WITNESS: Can you show me page 83?

MS. CONLON: Of course. And for ease -- sorry, the lines --

MS. STROKUS: You honor, we ask that the witness be provided a paper copy so we don't have to keep flipping back and forth.

THE COURT: Do you have one? Do you have one?

10:16 MS. STROKUS: No, Your Honor.

THE COURT: I was thinking that it might be helpful if I had one, but we live in the real world.

MS. CONLON: We may have extra copies. Can I take a moment to look?

THE COURT: Well, of course you may.

In the hierarchy of getting at the truth, among us, if you have a copy, let's give it to the witness.

MS. CONLON: If the court happens to have the pretrial brief exhibits here, the court then does have a full copy, and

10:17 we have a copy we could give the witness as well.

THE COURT: Give that to the witness.

MS. CONLON: It's Exhibit 2 to the pretrial brief.

THE COURT: Thank you, and I do.

MS. CONLON: May I approach to give the witness the binder?

THE COURT: You may.
Q. So Mr. Hatch, when you have a chance to look at pages 83 and 84, that's where I've been directing your attention, just let me know.
A. Yes.
Q. Okay.
THE COURT: It isn't Exhibit 2 in mine, but don't slow down.
MS. CONLON: Okay. I apologize. We're going to get
10:18 clarification on that, Your Honor, but I won't stop, as you say.
Q. So Mr. Hatch, in the deposition you testified that approximately 100 of the reports of analysis on student protesters mentioned the terms "Israel" or "Palestine," correct?
A. Yes, I did.
Q. Okay. When you testified earlier a moment ago that you reviewed only maybe 20 or more of these reports of analysis, you were talking about the same reports that you mentioned in
10:18 the deposition, right?
A. Yes, I was.
Q. Okay.
THE COURT: It's Exhibit 6, but go right ahead.
MS. CONLON: Okay.
Q. And just to be clear, the 100 or so reports of analysis

that mentioned the terms "Israel" or "Palestine" was a subset of the total reports of analysis on student protesters generated in this line of effort, correct?
A. Yes, I believe it was a subset.
Q. In other words, there were more than 100 reports of analysis generated about student protesters, right?
A. Slightly more, yes.
Q. How many more?
A. There were less than 200.
10:19 Q. More than 100, less than 200?
A. Yes.
Q. Okay. So I want to back up for a moment to -- so at a high level, so you understand, those are the topics I want to get into, but I want to get back for a moment to your work.
So you told us that you work in HSI, which is part of ICE, and ICE works to, among other things, dismantle transnational criminal organizations, right?
A. Yes, HSI's mission is to dismantle transnational criminal organizations.
10:20 Q. As in, ICE's mission is broader, but HSI's work is focused on dismantling transnational criminal organizations; is that correct?
A. That is correct.
Q. HSI, where you work, identifies and investigates people suspected of breaking criminal laws, right?

A. We don't investigate. We only analyze.
Q. You analyze, okay. You research and analyze?
A. Yes. We're talking about the Office of Intelligence.
Q. Yes. And let's talk about that. So you are the assistant director of the Office of Intelligence, right?
A. Yes, I am.
Q. And you have worked in law enforcement overall for more than 35 years, correct?
A. Yes, I have.
10:21 Q. You joined the Department of Homeland Security in 2019?
A. I became an HSI employee in 2019. Before that I was an officer in the Coast Guard.
Q. And when you joined in 2019, you moved into the senior role that you are in now, right?
A. I did.
Q. It may be obvious to others from your title, but so that I'm clear, you are senior-most office -- official in the Office of Intelligence; is that right?
A. I am.
10:21 Q. And you report directly to senior leadership of the umbrella that is also Homeland Security Investigations?
A. Yes, I report to the deputy.
Q. The deputy is Derek Gordon?
A. That is correct.
Q. You oversee more than a thousand investigative analysts?

A. Approximately a thousand.
Q. Now, the Office of Intelligence focuses on criminal networks, criminal conspiracies, those engaged in criminal conduct, right?
A. That is correct.
Q. Its work is divided into different types of crimes or program areas like child exploitation or human trafficking?
A. Yes.
Q. Okay. So you said earlier that the Office of Intelligence
10:22 doesn't do investigation. It does research and analysis.
A. Yes. We are, investigative analysts are not law enforcement officers. They do not have arrest powers. They don't have investigative powers.
Q. Okay. And the Office of Intelligence supports investigations, though it does not do them itself, through factfinding, right?
A. Yes, we -- yes, we do.
Q. And those facts get memorialized in a report called a report of analysis?
10:23 A. Yes, the report of analysis is the way the investigative analyst documents their work.
Q. So I want to talk about what reports of analysis ordinarily contain, and I will be direct with you and tell you I have never seen one. They have been withheld as privileged in this case. So if I ask you a question and it doesn't make

sense or it's off-base, please tell me.
A report of analysis can focus on a particular person?
A. Yes, they can focus on individuals, yes.
Q. For our purposes, I'll call an individual that's the subject of a report "the subject," just so I don't have to keep repeating it.
The report can have a great deal of factual information about the subject, right?
A. The report should have a lot of factual information about
10:24 the subject and only factual information.
Q. And the factual information they should have are facts that could be relevant to a suspected violation of a criminal law; is that right?
A. Violations of primarily criminal law but violations of law, and for HSI's mission, violations of immigration and customs law, which is our specialty.
Q. And when you say "immigration and customs law," are you referring to the Immigration and Nationality Act?
A. Title 8 for immigration.
10:24 Q. Okay. The reports of analysis on a subject include, among other things, the person's immigration history?
A. Yes, that would be part of it.
Q. The history of their activity in the United States?
MS. STROKUS: Objection, Your Honor. This line of questioning is teetering on the law enforcement privilege.

What goes into the report of analysis --
THE COURT: I haven't heard it yet.
MS. STROKUS: Your Honor, what goes into a report of analysis has been withheld as privilege.
THE COURT: It may have, but ultimately that's the court's decision. She may have the question.
BY MS. CONLON:
Q. A report of analysis may contain history of the subject's activity in the United States, right?
10:25 A. It would contain things like their criminal activity, perhaps employment, travel. But without getting into -- I want to keep it in general terms because people know -- if criminals learn what we write in a report of analysis, then they can make adjustments.
THE COURT: Actually, you've touched on the line I'm trying to draw. As I view the law enforcement privilege, and you're a person who works in this area, so I want you to tell me if you think a question trenches on it.
Nothing here should mess up or impair your office's or 10:26 any knowledge you have of government operations' ability to enforce the laws and protect the nation generally.
Having said that, we're engaged in a search for truth here about certain things that have happened or haven't happened and are in factual dispute. So it's not wrong for her to start this way because documents have been withheld. But if

you think -- I'll be satisfied with the 30,000-foot view if I can understand what you were doing, and then we may drill down on things that have happened which may bear on what I've got to sort out here. Do you understand my instructions?

THE WITNESS: Yes, Your Honor.

THE COURT: And so feel free to use them. I'm not at all disrespectful of counsel. You should listen to your counsel, but that's the line I'm following. Go ahead.

MS. CONLON: Your Honor.

10:27 MS. STROKUS: Your Honor, may I be heard?

THE COURT: Yes.

MS. STROKUS: These questions and the line of questioning that already began and we are anticipating go straight to methods, indicators, techniques that are privileged under the law enforcement privilege and that will have wide-ranging impacts on criminal and immigration investigation.

THE COURT: I'm not clear why you've withheld, if such documents exist, why you've withheld them with respect to the specific targets because that's in the past.

10:28 MS. STROKUS: Yes, Your Honor, it is in the past. What I'm saying here is we're talking about reports of analysis generally and what goes into them.

THE COURT: So we are. So I'd be interested to see the reports of analysis about any of the people that were denominated targets here. She says you withheld that. I'd be

interested in seeing that. Maybe we can save a lot of time.

MS. STROKUS: Yes, Your Honor, I believe those were submitted to you in camera and withheld from plaintiffs' counsel as law enforcement privilege.

THE COURT: I understand.

MS. CONLON: If I may assist. The court redirected yesterday the government to submit a log indicating the basis for its withholding of a certain packet of materials you provided to them --

10:29 THE COURT: I read the materials.

MS. CONLON: They submitted a log that I think makes reference, the one that was just filed last night I think refers to, from what I can tell, at least two reports of analysis on targeted noncitizens, so I know at least the court has those, but of course not what else.

MS. STROKUS: Yes, Your Honor. You were provided the individual for the five allegedly targeted individuals in this case in camera.

THE COURT: Okay. We'll address that in 15 minutes, 10:29 or maybe we should address it now, have him step down, and we'll see where we go. Would you prefer to do it that way?

MS. CONLON: I understand the witness has limited time, and I want to be to respectful of it.

THE COURT: Yes, I do, too. So let's go ahead and get him on his way.

BY MS. CONLON:
Q. Okay. So Mr. Hatch, without revealing any techniques of law enforcement, a report of analysis includes only factual information; is that right?
A. That is correct.
Q. It does not include, for example, a summary of anyone's opinion about the facts, correct?
A. No, it should not include any opinions at all.
Q. And a report of analysis in describing factual material
10:30 may append the underlying source materials to it for someone else to review, correct?
A. Yes, as part of our procedure, is to make sure that it's repeatable and you can find out why certain things were included or what the source material was for something being included.
Q. I want to talk about how ordinarily the Office of Intelligence gets tasked in the ordinary course as opposed to in this line of effort with creating these reports of analysis. And a report of analysis can be generated by the Office of
10:31 Intelligence in response to a request from a law enforcement partner, correct?
A. Yes. In fact, most of the time it's a special agent who is asking the investigative analyst for help in finding more information out about an individual.
Q. A special agent who, for example, is already investigating

someone and seeking help from the Office of Intelligence to gather information?

A. That's one of the ways, yes.

Q. And that is most often the way, correct?

A. That is most often the way. But it's not the only way.

Q. The agents who make such requests of the Office of Intelligence can be situated outside of the Office of Intelligence and in other parts of HSI, right?

A. Yes, the domestic offices, the programs, even leadership.

10:31 Q. Requests for reports of analysis can also come from outside of HSI and outside of the Department of Homeland Security, correct?

A. As long as it goes through HSI leadership and I get my tasking from HSI leadership, we can be asked to look into any individual.

Q. Now, I want to talk about what ordinarily happens when the Office of Intelligence receives such a request. The office gets the request from an agent, and when the report of analysis is created, it goes back to the agent who asked for it,

10:32 correct?

A. In most cases, yes, but not in every case. It could be provided to a related program. And again, we're only talking right now about what we receive from a special agent, but we do get tips and leads before an investigation that needs some background information or needs some information to be gathered

before it's given to the investigator to determine whether or not to continue an investigation or to start an investigation.
Q. And when you say the Office of Intelligence gets tips or leads, so something outside of an agent in HSI asking for help, do you mean tips and leads like outside of the government, like civilians?
A. It includes civilians. We have a tip line that civilians can call and provide information.
Q. Can civilians also provide information through the
10:33 agency's social media channels, for example, by tweeting at the Department of Homeland Security?
A. I suppose they could. I have never seen an instance of that.
Q. So you're aware only of tips through a tip line and not any other means; is that right?
A. Tips through the tip line or some other connection point with HSI. Sometimes tips are left in emails or sent to emails or sometimes to other public-facing phone numbers or email boxes, not to an individual but to a box.
10:34 Q. Now, ordinarily, after a report of analysis is generated, and for clarity, that's done at the level of an analyst in the Office of Intelligence; is that right?
A. What's your question? Can you repeat that?
THE COURT: She hasn't asked it yet.
Q. Reports of analysis are created not by you but by

investigative analysts in the Office of Intelligence, right?
A. Yes, the analysts write the ROAs. I have not written ROAs.
Q. Not ever probably?
A. Right.
Q. Okay. Once the ROA is drafted by an investigative -- or by an analyst, the ROA -- and I apologize for the record. That's what I'm abbreviating, report of analysis.
THE COURT: I am following.
10:35 Q. The ROA does not have to go through any formal sign-off procedure within the Office of Intelligence before it can leave the office and be given to whoever requested it, correct?
A. Yes. They do not go through me, if that's what you're asking. I do not have approval process where I sign off on every ROA.
Q. Right, because there's like 25,000 of them in a year?
A. Correct.
Q. Okay. And you have a deputy, correct?
A. I have one deputy.
10:35 Q. Mr. Etter, Bradley Etter?
A. That's correct.
Q. He also doesn't have to sign off on ROAs before they go outside of the Office of Intelligence, right?
A. No. The relationship is the analyst works with the agent, and that's a partnership that we try to encourage.

Q. In other words, we're talking about direct collaboration between the analyst in the Office of Intelligence and the agent who asked for the office's help?

A. That's correct.

THE COURT: This may all be relevant, but how much more do you think you have for this witness?

MS. CONLON: In general or on this topic?

THE COURT: No, in general.

MS. CONLON: I have a great deal more.

10:36 THE COURT: And you want to get him out of here today?

MS. CONLON: I do. I understand that he has a lot on his plate.

THE COURT: He may very well. They may have questions for him. All right. You go ahead. I guess I'm thinking, though he's being perfectly responsive to your questions as far as I can see, it might be helpful to get to this case.

MS. CONLON: I'm almost there, I promise.

BY MS. CONLON:

Q. So in the ordinary course, sticking with your regular
10:36 process, not the student protester process for a moment, after the Office of Intelligence gives the report of analysis to the party who requested it, that is often the end of the Office of Intelligence's involvement in that case, correct?

A. Yes. Oftentimes we don't hear back from the agent on any results of the investigation.

Q. Now, you've been in your role for six years, approximately?

A. Since 2019.

Q. For your first five and a half years in your role, you were never involved in the investigation of a foreign student engaged in political protest, correct?

A. I was never asked -- again, I don't do investigations.

Q. Sorry.

A. So I was never -- I don't recall any instance where I was 10:37 asked to review protest activity.

Q. Now, prior to 2025, to the best of your knowledge, you also weren't involved in cases involving lawful permanent residence for potential action by the State Department, correct?

A. No. We -- I don't recall any actions where we provided information to the State Department, but we were -- that is, that referral to the State Department is one of the statutes in Title 8, and we've been investigating or we've been analyzing Title 8 offenses since I've been there.

10:38 Q. So just to bring you back to the question, you had seen reports of analysis on visa holders that went to the State Department prior to 2025 but not reports of analysis on green card holders, lawful permanent residents that went to the State Department before 2025, correct?

A. That I don't recall because I thought your question was

related to the protesters. So if you're asking me, I don't recall any instances of LPRs being referred to the State Department because of protest activity. I don't know the answer if we referred to any LPRs -- "we" being HSI referred any LPRs for other types of activity, I just don't -- I'm not sure I would remember those.
Q. You don't think you'd recall whether you reviewed reports that went to the State Department about lawful permanent residents before?
10:39 A. Yes. It's not something I would, as the assistant director, that I would be involved in in the normal course of business. It wouldn't really rise to my level as an issue.
Q. Do you recall ever seeing see a referral of a student protester for a visa revocation before 2025?
A. I don't recall that.
Q. Now, President Trump was inaugurated in January, right, of this year?
A. Yes.
Q. January 20. Is that a yes, if you know?
10:40 A. Yes.
Q. And shortly after he took office, he issued several executive orders that relate to the work of the Department of Homeland Security, correct?
A. Yes.
Q. You read, for your work, executive orders that relate to

the work of HSI, correct?
A. Yes, the ones that I can find and interpret, yes.
Q. Okay. And one of the orders that has affected the work of HSI this year is Executive Order 14161, which is titled Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats. Is that right?
A. Yes, but if you're going to ask me questions about it, can I have it, can I read it?
Q. Of course.
10:40 MS. CONLON: Your Honor, you look like you were going to say something. Should I continue?
THE COURT: No. I didn't understand your question. But go ahead and ask your question. He understood it, and I think I do. He's familiar with that executive order, but if you're going to question him --
MS. CONLON: He wants to see it.
THE COURT: -- we better look at it.
Q. Okay. So we have put a document that has been marked as Exhibit 70, which is in evidence, in front of you. Do you see
10:41 it on the screen there?
A. Yes, I do.
Q. Do you recognize that as Executive Order 14161?
A. Yes.
Q. And you can see it was issued January 20, 2025?
A. I can see that.

Q. Okay. You've seen this before, right?
A. I have seen it.
Q. Now, part of this executive order relates to HSI's work, correct?
A. It does.
Q. The part that most directly relates to HSI's work I think appears in Section 2, little (a), little number (4), so if you would direct your attention there. We may be able to make it bigger, maybe.
10:42 A. I can read it.
Q. Great. That part of the executive order calls for the vetting and screening to the maximum degree possible all aliens who intend to be admitted, enter or are already inside of the United States, particularly those aliens coming from regions or nations with identified security risks; is that right?
A. Screening and vetting is part of HSI's mission.
Q. That is exactly what I wanted to ask you.
Screening includes looking, from HSI's perspective, at an individual to see if there is any derogatory information about
10:42 that person, right?
A. Yes, that's also almost quoted directly from my deposition.
Q. I'm glad that you also remember it.
OI, Office of Intelligence screens a particular person and then writes a report of analysis with any derogatory

information if they find it, right?
A. Yes. And we are one of the agencies that does screening and vetting. There are an umbrella of agencies or cluster of agencies that do this in coordination.
Q. Including and pursuant to this executive order, right?
A. That's correct.
Q. President Trump has issued other executive orders that also affect your work this year, right?
A. Yes.
10:43 Q. Are you familiar with Executive Order 14188, which regards combatting antisemitism?
A. I am, but as you recall from the deposition, that was the first time I had read that executive order.
Q. So that's not one you had read closely?
A. No.
Q. Okay. Then I will not ask you to read it now.
So turning to early March of this year, after this executive order that we just looked at, Exhibit 70 --
THE COURT: Now we're turning? Just a matter of case
10:44 management here.
MS. CONLON: Sure.
THE COURT: I said we'd take a brief recess, at which time I would hear the government, who is asking me to reconsider on a subset of documents which I'm familiar with which don't include but now they point out these ROAs at least

as to what we've denominated target individuals here.

I appreciate what you're doing. I'm prepared to go on or stop and have argument. You're not part of it. It doesn't count against anyone's time. How do you wish to proceed, Ms. Conlon?

MS. CONLON: I'd like to keep going if that's okay?

THE COURT: It is okay, as long as I can pay full attention. We will take a recess out of necessity. Go ahead.

MS. CONLON: Okay. Did Your Honor want to recess now?

10:45 THE COURT: No. Do you want to keep going?

MS. CONLON: I do, if that's okay.

THE COURT: We will.

MS. CONLON: Okay, great.

BY MS. CONLON:

Q. So in early March of this year you attended a briefing on student protests, correct?

A. I did.

Q. This briefing on student protests in March included your boss, Derek Gordon?

10:45 A. Yes, my boss, Derek Gordon, the chief of operations, William Walker, a number of other people, but the senior -- many of the senior leadership of HSI.

Q. So you mentioned that the briefing on student protests in March included William Walker, we've said Derek Gordon. Do you recall whether Robert Hammer was there?

A. I think so.

Q. And Mr. Hammer is the deputy executive associate director of Homeland Security Investigations or rather he was just before Mr. Gordon took over; is that right?

A. He was at the time, yes.

Q. Okay. I see. So the meeting occurred when Mr. Hammer was still incumbent in that seat and then Mr. Gordon took over?

A. That's correct.

Q. The meeting also included Roy Stanley, the chief of the 10:46 analysis division for the Office of Intelligence; is that right?

A. I believe he was there and he is the unit chief for the analysis division within Office of Intelligence.

Q. Do you recall who else from senior leadership was there, or is that the group?

A. I don't -- I don't remember who else was there.

Q. Okay. Now, in this meeting, the meeting was convened by HSI's leadership, correct?

A. Yes.

10:47 Q. And the meeting was held as part of HSI's effort to implement Executive Order 14161, correct?

A. I do not characterize it that way because, as I recall from the discussions, I don't think that was the topic of the meeting. The meeting was to talk about protest activity or student protesters who may be in violation of U.S. law.

Q. So it's your understanding that the meeting was about an effort to gather information on student protesters, but you don't understand it to have been --

THE COURT: Let's not beat around the bush. I'm interested in this meeting. You're the witness. Not how she characterizes things. What were the instructions or the like from the briefing?

MS. STROKUS: Objection, Your Honor.

THE COURT: Overruled.

10:48 MS. STROKUS: Objection, Your Honor, deliberative process privilege.

THE COURT: They weren't deliberating. They were being briefed. When you're briefed, you're told what's going to happen. Were you deliberating?

THE WITNESS: We weren't briefing. We were discussing.

THE COURT: I stand corrected. It was referred to as a briefing.

So you were discussing and you have characterized the

10:48 discussion as student protesters who may have broken the law?

THE WITNESS: Yes, sir.

THE COURT: Okay. And having been corrected and I appreciate your persistence, I sustain the objection.

And now I'll ask this. So as a result of that meeting, what instructions, if any, were adopted? And again,

I'm going to explain the line I'm drawing because I have some trust that you're following the line.

When you're kicking stuff around, the rest of us aren't entitled to know that, just as I kick stuff around with my law clerks. Once I've decided what we're going to do, well, then in the judicial end I have to write it all out and that's all above it. In your executive end, whatever is decided that bears on this case and student protesters, we're entitled to know that, and I need to know it.

10:49 Do you have that in mind?

THE WITNESS: Yes, Your Honor.

THE COURT: So recognizing that's the line, what came out of it?

THE WITNESS: To look at the protesters, to develop reports of analysis on the protesters, specifically looking for violations of U.S. laws, including and specific to immigration and customs laws.

THE COURT: Can you be any more specific as to the immigrations and customs laws that you were looking for were?

10:50 THE WITNESS: Thinking in general terms, it was anything that may relate to national security or public safety issues, things like were any of the protesters violent or inciting violence? I think that's a clear obvious one. Were any of them supporting terrorist organizations? Were any of them involved in obstruction or unlawful activity in the

protest?

THE COURT: What do you mean by "obstruction"?

THE WITNESS: Like blocking normal citizens from going about their business.

THE COURT: Okay. Thank you.

THE WITNESS: And that we would use the normal report of analysis process and our normal trade craft for this.

THE COURT: Proceed, Ms. Conlon.

MS. CONLON: Okay. Thanks.

10:51 BY MS. CONLON:

Q. So you characterized it as a meeting, not a briefing; is that right?

A. I characterized it as a discussion.

Q. You would call it a discussion?

A. Yes.

Q. The discussion was led by HSI leadership?

A. I think only HSI was in the room.

Q. So by default.

THE COURT: We're going to --

10:51 MS. CONLON: Sorry.

THE COURT: I'm not the only one who needs a break here. The court reporters need to switch. So what we're going to do is we're going to take a break until 11:00. That's the break. If you want to leave some time to have argument about issues that are to be discussed, fine. Otherwise you can run

Case: 26-6906, 11/20/2026, DktEntry: 16.5, Page 190 of 300



until 12:00, and I'm stopping and we will take this matter up tomorrow without any further argument. And hopefully we can get him on his way.

MS. STROKUS: Your Honor, we were told by plaintiffs that Mr. Hatch would be going first today. He made his travel arrangements to testify today. I understand that we are going into tomorrow. May I request that we do, after the break, arguments on the issues that are percolating so that Mr. Hatch is able to rearrange his travel schedule?

10:52 THE COURT: In other words, you'd like to cause him to rearrange his travel schedule so that we get that taken care of, argument about -- you call it the issues percolating -- the issues about the documents I said could be turned over but I wanted to give you a chance to argue. That's how you'd like to do it?

MS. STROKUS: Your Honor, just based on the outline that Ms. Conlon started in the beginning, it does not sound like direct will be completed today.

THE COURT: So long as he's going to be here tomorrow,
10:53 I'm fine with that. She's nodding her head. But for now, five-minute break for all of us. I will hear you at 11:00, no more than ten minutes of argument. That's not an invitation to take ten minutes. And when that's resolved, you may resume the stand, and we'll have the pleasure of your company tomorrow probably. We'll recess. (Recess, 10:53 a.m.)

CERTIFICATE OF OFFICIAL REPORTER

I, Kelly Mortellite, Registered Professional Reporter, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing transcript is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter to the best of my skill and ability.

Dated this 9th day of July, 2025.

/s/ Kelly Mortellite

________________________________

Kelly Mortellite, RPR, RMR, CRR

Official Court Reporter

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS (Boston)

No. 1:25-cv-10685-WGY
Volume 2, Page 78 to 121

AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
Plaintiffs

vs.

MARCO RUBIO, in his official capacity as Secretary of State, et al,
Defendants

*********

For Bench Trial Before:
Judge William G. Young

United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
Wednesday, July 9, 2025

********

REPORTER: RICHARD H. ROMANOW, RPR
Official Court Reporter
United States District Court
One Courthouse Way, Room 5510, Boston, MA 02210
rhr3tubas@aol.com

A P P E A R A N C E S

RAMYA KRISHNAN, ESQ.
CAROLINE DeCELL, ESQ.
ALEXANDER ABDO, ESQ.
SCOTT B. WILKENS, ESQ.
ALEXANDRA CONLON, ESQ.
Knight First Amendment Institute at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
E-mail: Ramya.krishnan@knightcolumbia.org
and
COURTNEY GANS, ESQ.
NOAM BIALE, ESQ.
Sher Tremonte LLP
90 Broad Street, 23rd Floor
New York, NY 10004
(212) 540-0675
Email: Cgans@shertremonte.com
For Plaintiffs

ETHAN B. KANTER, ESQ.
WILLIAM KANELLIS, ESQ.
VICTORIA M. SANTORA, ESQ.
JESSICA STROKUS, ESQ.
DOJ-Civ
P.O. 878
Ben Franklin Station
Washington, DC 20044
(202) 616-9123
Email: Ethan.kanter@usdoj.gov
and
SHAWNA YEN, ESQ.
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, MA 02210
Email: Shawna.yen@usdoj.gov
For Defendants

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| PETER HATCH (Continued.) | | | | |
| By Ms. Conlon | 12 | | | |
| By Ms. Strokus | | | | |

E X H I B I T S

(None marked.)

P R O C E E D I N G S

(Resumed, 11:00 a.m.)

THE COURT: All right. We'll start with this issue which Ms. Strokus characterizes as a "percolating issue."

But, Mr. Kanellis --

MR. KANTER: Mr. Kanter, your Honor.

THE COURT: Mr. Kanter. I'm sorry. And I have read your briefs, and I am appreciative about them, and in at least one respect I do reconsider my order. And let me say I appreciate the careful way you have, um, suggested redactions in the subset of materials. And you're absolutely right in at least two respects. There's no reason to disclose e-mails or cell phones, you can redact those.

I guess I do want to say one other thing. I don't understand why you're objecting so vigorously to this subset? And I'll tell you why.

What I get from this -- the whole exercise is trying to persuade me, is this shows officers of the government -- some are attorneys, actually seeking to follow the law, to bring the conduct of enforcement agents and the like, in accordance with the law. And it reveals the process that they went through to follow the law. That's what I get about it. And that's really

what drew my interest. There's a larger group of material, but that's what drew my interest to this subset. I'll say no more.

Why shouldn't I, um, subject to the protective order that it's used, "Just for the purposes of this litigation. It's not to be spread around. We'll see if any of it gets in evidence." I'll hear you.

MR. KANTER: Thank you, your Honor.

I will start with one clarification in light of the examination that is, um, we're in the middle of, and that was the reference to the so-called "ROAs," "Reports Of Analysis," and Ms. Conlon can correct me, I thought I heard, um, her to say that some of the ROAs are in the subset. They are not.

MS. CONLON: And I stood up to say exactly that. I wanted to indicate to the Court that I think I made a mistake.

THE COURT: Okay, so we're not talking about that.

MR. KANTER: I just want to --

THE COURT: Go ahead, as to the materials I have here.

MR. KANTER: To begin with and that I think as the -- and that three of the documents in the subset -- this is the thing. There were two in-camera submissions. The third, we explained the confusion

there, which had to do with merely, you know -- the first in-camera submission was redacted and we provided it to the plaintiffs, it's been the subject of the plaintiffs' motion to compel, which your Honor decided in the government's favor, denying the plaintiffs' motion to compel.

So the point regarding the subset that I wanted to make was that the first document in the subset and the last two were part of what was litigated in that motion to compel. That's the only sort of point of clarification. Because, um, the documents in the subset straddled the two submissions.

THE COURT: Understood. All right. I don't want to take up your time.

MR. KANTER: Yes.

THE COURT: But let me say this. On this issue, and indeed throughout the litigation I've made it clear, that I'm not impugning in any way the good faith of counsel for the defense, or of the plaintiffs. All right? Trials are living things. Now -- it's one thing in the run-up to a trial, you're ruling on discovery motions, but now it's put to me. I am the factfinder here. I take that with extraordinary seriousness.

And so now -- though in a jury-waived case I'm perfectly able to look at something and say -- for

instance, I've adhered to the enhanced Visa scrutiny. I think "Well that's national security, put that out," we're dealing with people who at one time we invited in and we gave them Visas, green cards, and the like, and that's what I'm looking at. And that's the class, if I think of it as a class, the class of people who these lawyers represent.

So putting that to one side, I look at the rest of it, some of it's interesting to me. And I'm not judging anything, I'm simply telling you why it's interesting to me.

MR. KANTER: Your Honor, I take your point --

THE COURT: So you tell me why I should put it aside and not have it part of the record.

MR. KANTER: Exactly. I will offer this up. That it is a difficult calculus that often the law enforcement, um, officers and investigators, and so forth, are confronted with.

THE COURT: Except where's the government if I reveal any of it?

MR. KANTER: We represent the defendant agencies.

THE COURT: Correct.

MR. KANTER: And those agencies reviewed these documents carefully, at multiple levels, and it's -- it's a question. As your Honor pointed out, there are

instances in which the government may choose to -- not with waiving a privilege, but nevertheless turn something over. And in the case we have decided that certain materials will only be shown attorneys' eyes only. That is an ongoing discussion and consideration.

But I take the point your Honor is making, which is we're saying this goes to the matters at issue in the factfinding of the Court. And you're asking why is it that the government would stand on its privileges with respect to some of that information? I take that point. I will take it back to the agencies. And -- but, you know, we, um, we want to represent the agencies, extend the privileges that are theirs to assert. And, um --

THE COURT: All right, here's what we're going to do. Now -- you go ahead and do that, but -- and I'll take responsibility.

By 5:00 this afternoon, redact -- if I've missed any, all cell phone numbers, all e-mail addresses, and otherwise turn it over. Subject to a complete call-back if the agency -- because the question is am I going to have it as part of the record or not? It's attorneys' eyes only, it's used for the purposes of this litigation. That's the order. Let's call the witness back and we'll run till 12:00.

MR. KANTER: I take the order, I'm not challenging

it --

THE COURT: Feel free in the appropriate way.

MR. KANTER: A point of information, which is we have redacted and we've shown the Court our redactions with respect to what you just referenced. Already it is before your Honor. And secondly, to the extent that your Honor is proposing to turn over material that is outside those redactions, we would request a stay of the ruling so the Solicitor General can decide whether or not to seek mandates. But I don't understand your Honor to be turning over material that we have redacted.

THE COURT: Wait a minute. Wait a minute. I just -- I just -- yes, and I've made --

MR. KANTER: We provided redactions.

THE COURT: I know you have, and I've sustained so much of them as, um -- excuse me. I've sustained so much of them as excised cell phone and e-mail addresses. You're going to have to do it again, because as to the rest of it, I overrule it. Now you make a motion to stay --

MR. KANTER: I make a motion to stay.

THE COURT: Of course, which is your right. I allow the motion until 9:00 tomorrow morning. You will then turn it over unless there is a stay from some court of competent jurisdiction. I have the obligation to try

this case and there's exigencies in moving through the case. That's the order of the Court.

All right.

MR. WILKENS: Your Honor, may I be briefly heard for the plaintiffs? Scott Wilkens.

THE COURT: Well I don't think you'll be part of it, but, Mr. Wilkens, we've got a witness coming in, but it's always a pleasure for you to fill the time.

(Pause.)

MR. WILKENS: I will sit down, your Honor. Thank you.

THE COURT: Well there's no need, I spoke seriously.

Yes, Mr. Biale?

MR. BIALE: Your Honor, briefly there's another issue.

We have a lawyer who went down to New York for the deposition that was --

THE COURT: Oh, I know. That's right.

You know I'm troubled by this nonproduction of witnesses. I sense some gamesmanship here. Having said that, I'm not going to compel his attendance. It bears on the Court's assessment of these witnesses when he's called upon to testify. Believe me, it bears on it that he was not produced against this background.

I have urged cooperation in significant respects, though I don't challenge anyone's good faith, there has not been cooperation. I need to get through the trial. The parties are benefitted if I get through the trial. Now let's get the witness in here.

(Pause.)

THE COURT: Where'd he go?

MS. SANTORA: Your Honor, Victoria Santora for the defendants. If I may? We were not able to respond to the motion to compel, but I do just want to note that as plaintiffs --

THE COURT: You just won it?

MS. SANTORA: So I did -- just to the extent that you said that you will consider the witness's conduct in not appearing at trial, I do want to note that it was a logistical issue more on the part of the attorneys than on the witness.

THE COURT: Then it could be worked out rather than having to make motions. You know we have days. We have a weekend here.

MS. SANTORA: I agree, your Honor. And we are willing to cooperate with opposing counsel.

THE COURT: I expect it. And that's helpful. Thank you, Ms. Santora.

What happened to -- usually when we have a jury

and we have sequestered witnesses and they don't come when you call them, I tell stories about the courtroom to the jury.

MS. CONLON: We'll hear your stories, your Honor.

THE COURT: No, here he is.

(Mr. Hatch, the witness, enters courtroom.)

THE COURT: And, Ms. Conlon, you may continue.

MS. CONLON: Thank you, your Honor.

DIRECT EXAMINATION BY MS. CONLON: (Continued.)

Q. Okay, Mr. Hatch, before the break you were describing for the Court, um, the instructions that you received at the March meeting with HSA leadership concerning student protestors. One of the things you said was that you were directed, um, to review and analyze whether any of the student protestors had, for example, supported terrorist organizations.

Did anybody specify Hamas in particular in the meeting?

A. I don't --

MS. STROKUS: Objection, your Honor, to the extent it calls for the deliberative process in the discussions in the meeting.

THE COURT: Oh, actually, Ms. Strokus, you're right, you must ask were any of the directions relative

to Hamas?

MS. CONLON: Yes, I will rephrase it.

THE COURT: (To the witness.) Do you see the line? Not the discussions, but the directions about what you were going to do.

Did anyone mention that you were, among other things, going to take a look at Hamas or pro-Hamas activity?

THE WITNESS: Um, yes, we -- the -- supporting Hamas would be, um, relative to a violation of law. So it would be standard practice for an analyst to that anyway. However, um, my direction to the team, um, was to look for, um -- as an example, to look for Hamas, any statements in support of Hamas, or any activities.

THE COURT: And a question for me.

Hamas was a designated terrorist organization well before January 20th of this year, correct?

THE WITNESS: Yes, your Honor, that's correct.

THE COURT: All right.

Go ahead, Ms. Conlon.

MS. CONLON: Thank you.

Q. You were just talking about the directions that you gave to others, but I want to bring it back to the directions you received from HSI leadership before we discuss what you may have directed others to do. So

sticking with what you were directed to do as a result of this meeting.

Were you specifically directed to look at whether student protesters supported Hamas as opposed to just all foreign terrorist organizations, was there any specific direction concerning Hamas?

A. I don't recall receiving any specific direction to me to look at Hamas.

Q. You don't recall anything in the meeting about student protestors resulting in a direction to review whether the student protestors expressed support for Hamas?

MS. STROKUS: Objection, your Honor, deliberative process privilege. He's asking about --

THE COURT: Please. Please. I'm not a fan of speaking objections. It's sufficient, and I think it is your right, to say "Objection, deliberative process privilege." That calls into mind what we're talking about. If I need argument, I'll ask for it.

This is directions. It's limited to directions.

And do you understand the question?

THE WITNESS: Yes, but I think, um, counsel rephrased the question from one to the other.

THE COURT: Go ahead.

A. So I do not recall receiving any specific direction

from my supervisors to, um, focus directly and solely on Hamas.
Q. Do you recall receiving any direction to focus on any particular foreign terrorist organization?
A. I recall receiving direction to focus on violations of the U.S. law. I don't -- I don't recall any instruction to me specifically to Hamas.
Q. Well earlier when you were answering the Court's questions about the instructions you received, you give certain examples of the kind of things that the Office of Intelligence was supposed to be on the lookout for. And your examples, as I recall, included inciting violence, supporting terrorist organizations, etc.
But it's true that the direction was actually broader, it was to look for any potential violations of Title VIII, correct?
A. Yes, any violations of U.S. law.
Q. Including Title VIII?
A. Our organization specializes in immigration and customs law.
Q. And the examples you were giving were examples that might be particularly relevant to the review of a student protester's conduct, is that correct?
A. Yes. You're asking me to speculate and those are the ones that would be -- those are the ones that I can

think of that would be relevant right now.
Q. Well you are an authority here, so I'm happy to have your understanding of it.
Now when you say "supporting terrorist organizations," in this context, were you given any direction about what "supporting" means here for the work of the Office of Intelligence?
A. I was not.
THE COURT: From something you said earlier, I got the sense, but let's see if I heard it right. And thereafter you carried out that mission, but you carried it out in your usual way?
THE WITNESS: Yes, sir.
Q. What kind of evidence does the Office of Intelligence look for as indicative potentially that a noncitizen supports a foreign terrorist organization? Can you -- I'm trying to understand what you mean when you say "supporting a terrorist organization"?
MS. STROKUS: Objection, your Honor.
THE COURT: Yeah, sustained.
Q. What does "supporting a terrorist organization" mean when you say it?
A. (Pause.) Again the analyst looks for indicators, does not make the judgment on whether the activity actually supports or doesn't support terrorism. So we

look for activities, um, such as, um, support for a terrorist -- statements in support of a terrorist leader, um, everything from that to material support, which would be providing money to a terrorist organization or making, um, donations to an organization that's affiliated with a terrorist organization. But I really don't want to say any more detail than that.

THE COURT: And that's perfectly acceptable to the Court. Let me give you this example.

If you find out that a person was saying, um, statements like this, "Hamas is right, what Hamas is doing is right for the situation, or for the Middle East, or just right." And I'll stop there.

How does that fit or doesn't it?

THE WITNESS: Yes. In that example, the analyst would be, um, within policy to include that statement, because again the analyst is just collecting the facts.

THE COURT: Right.

THE WITNESS: If the person actually didn't say that or someone alleged they say that and the analyst found out that they didn't say that, then they would write the facts and not the allegations. So it's just factfinding.

If they, um, made a statement in support of the Yankees, the analyst wouldn't put it in there because

it's not related to a national security or public safety issue. Although in the case of the Yankees, it might be.

Q. Are you a Nationals' fan?

A. I'm a Red Sox fan.

Q. Oh, then you're in the right place.

So the Court gave you an example of a statement that say, for example, "Hamas is right," that could be relevant to, um, an analyst's compiling of a report of analysis about a student protester.

Could a statement like "Free Palestinian" be similarly relevant?

A. Again all of these are on a case-by-case basis. But it could be, depending on the circumstances of that individual. But as long as that statement was factual and we could corroborate that it was made by the individual under the circumstances described.

Q. And just to understand the flip side of it. Could a statement condemning the actions or the existence of Israel still be relevant to a report of an analyst in the same way?

A. Again, it depends on the circumstances of the individual. It depends on the individual circumstances. But the analyst would -- as long as that statement is factual, the analyst would not be against policy in

including that in the Report Of Analysis. And it isn't the, um, the presence or existence of a Report of Analysis does not presume guilt or innocence, it's just factfinding.

Q. Okay. So it's fair to say the analyst's job is to include whatever facts could be relevant to a determination that a person, um, act contrary to U.S. law and that could include the person's speech, correct?

A. That's correct. It includes all kinds of activities.

Q. Now, um, this -- back to the March meeting -- we'll move on from it momentarily, but back to this March meeting where you received this guidance to produce these reports.

A team was formed to carry out that line of effort, correct?

A. I don't believe the team was formed during that meeting, I think the team was formed after that meeting, maybe a week after, several days after. I don't know the exact timeframe.

Q. And for our ease of reference here, that team's nickname was the Tiger Team?

A. It was called the "Tiger Team," yes.

Q. And the Tiger Team included senior officials carrying out this line of effort?

A. The Tiger Team consisted of not senior officials, it consisted of analysts, an agent, um, and led by the unit chief you mentioned earlier, Roy Stanley. He was not the unit chief at the time -- he was not the division chief at the time, he was the unit chief.
Q. Were you part of the Tiger Team?
A. No, I was not part of the Tiger Team.
Q. Who, um, briefed you on the progress of the Tiger Team?
A. Um, the unit chief, often through my deputy Brad Edder, was the one briefing me on the activities, or the progress of the Tiger Team.
Q. Now the Tiger Team, which was formed shortly after this March, um, meeting had rolling discussions over the following days about its work, right?
A. I believe they had daily discussions.
Q. "Daily," you said?
A. Within the team, you're asking me about discussions within the team?
Q. Actually, um, now understanding you're not a part of the team, I'm interested in your contact with the team.
So how often did you speak with the team?
A. I did not speak with the team as a group, I spoke with the team leader maybe once a day on all issues, not just, um, the team's issues, and specifically with the

team, um, I mean over the last -- over -- maybe initially once a day. But after weeks, when the team was home, maybe every other day, um, three times a week maybe.

Q. And the team itself, so far as you knew, did its work on a daily basis, right?

A. Yes.

Q. When you had discussions with senior leadership about the work of the Tiger Team, those discussions included the people you mentioned earlier, Derrick Gordon, Robert Handler, William Walker, Roy Stanley, is that right?

A. Yes.

Q. Okay. So I want to talk about the Tiger Team's process for this line of effort.

The Tiger Team was -- well, withdrawn.

At the March meeting, I understand that a procedure to expedite this work was set up, and I'm thinking of what you said in your deposition, in particular that the Office of Intelligence would do the factfinding, the National Security Division of Homeland Security Investigations would compile the information in a letter to the State Department, and the State Department would make the decision on what action to take.

Is that a fair summary of the process that emerged as a result of this meeting?
A. Yes, that's a fair summary of the three steps.
Q. Okay. Now you have said, a couple of times, that Reports Of Analysis that the Office of Intelligence created did not have a recommendation of actions to take, right?
A. That's correct.
Q. The recommendations for any actions to take it overlaid when the Report Of Analysis goes from the Office of Intelligence to the National Security Division, correct?
A. The National Security Division is the first step in the decision-making process on making judgments or assessments of the facts collected in the ROA.
Q. And it's your understanding that the National Security Division conveys its views of the next appropriate step in a letter that the National Security Division sends to the State Department, correct?
MS. STROKUS: Objection, your Honor, this calls for speculation. He does not work in the National Security --
THE COURT: Well we'll see if he knows, whether he worked there or not.
Is that correct?

THE WITNESS: That is the description of the process. How the mechanics worked and how it was conveyed to the State Department? I don't know the details of that.
Q. Well we talked in your deposition, right, about how the National Security Division would send a letter to the Department of State called a "DHS referral." Do you remember that?
A. Yes, only because you showed me -- I did not know it was even called a "DHS referral." I just knew it as the National Security Division's letter.
Q. Okay. So from your perspective, the way it works is, you, your Office of Intelligence gives the report to the National Security Division, and that division, which is led by Andre Watson, gives a letter, we'll call it the "DHS letter," to, um, the State Department?
A. That's how I understand it.
Q. Okay. Now the first instance of a recommendation being made by anyone in the chain of decision-makers occurs in that step that the National Security Division takes, correct?
A. Yes, that's not made in the Office of Intelligence.
Q. And I mention this, but just for clarity.
The head of the National Security Division is Andre Watson, is that right?

A. That's correct.
Q. And he is the person who sends the letters that come from the Office of Intelligence -- or I'm sorry, withdrawn, and strike that.
He's the person who sends the letter from the Department of Homeland Security to the Department of State conveying both the ROA produced by the Office of Intelligence and the letter from the Department of Homeland Security, correct?
A. He's the one who signs the letter? I do not know how it gets sent.
Q. Yes, a good distinction. He's the signer. We don't know who the sender is.
Okay. So you understood and understand that this three-step process is intended for the State Department to be able to make a determination, one way or the other, about whether a person's Visa, in the case of a Visa holder, should be revoked, correct?
A. No.
Q. Okay, tell me what's wrong with that?
A. I think that's -- that may -- the State Department can use the ROA and the information we collect in whatever way they need to to make decisions related to the State Department. I think Visa revocations is one way they may use it. But it may not be the only way.

Q. Okay. Are you talking right now about how it generally works or how it worked in this 3-step process on student protesters?
A. It's my understanding that this way would include -- what I just said would include both of your scenarios.
Q. All right. And to be clear, what you're saying is that it would be up to the State Department to determine what the appropriate action was to take?
A. That's correct.
Q. And that could include you understood and understand a Visa revocation, right?
A. It could include a Visa revocation.
Q. And it could include a determination that a lawful permanent resident is removable, correct?
A. It could anything under their authorities and I believe in that case -- the example you just mentioned is one of their authorities.
Q. Now this process was -- the 3-step process was developed in conjunction with, um, Mr. Watson, who again is the head of the National Security Division, right?
A. Yes, but I don't -- this process could have existed. It's not a complicated process of factfinding, a letter to the authoritative decision-maker. So, um, this could have been used -- like I said, Title VIII's been around since the 1950s. This process would have been possible,

um, would have been acceptable at any time since Title VIII.

Q. It may have been. But you've been in your job for 6 years, and until the Tiger Team was formed and this meeting occurred, you had never seen the process work this way, is that right?

A. That's right, since 2019, I had never seen it used.

Q. And it is, as you say, a simple and sort of expedient process, just three steps, but to you it was new, correct?

A. Yes, for me it was new.

Q. Now when the State Department did act on these referrals, that information traveled back to DHS, correct?

MS. STROKUS: Objection, your Honor, calls for speculation?

THE COURT: Well I don't know that he knows, but we'll see.

If you know the answer, you may give it.

A. I don't know the process for how it got back to, um -- I don't know the steps it took or the pathway it took to get back to HSI.

THE COURT: That's his answer.

Q. In this case, you were in Tiger Team discussions, consistent with this process, where you understood that

the Tiger Team received updates on whether the State Department had acted on its referrals, correct?

A. Yes, I believe that through National Security Division representatives, um, I believe the team knew if there was an action taken.

Q. An action like an arrest?

A. Yes.

Q. An action like detention?

A. Yes.

Q. Now you said earlier --

A. It did not go through me.

Q. Right.

A. So I'm making a, um, a speculation just from what I saw. But I did not dictate the process or have usability of how the mechanics worked.

Q. When you say it's speculation, but it's also from what you saw, referring to what you saw, you mean the meetings that you heard, whether or not you led them, correct?

A. Well I would hear back potentially from the unit chief or Brad Edder, my deputy, that there had been an action taken.

Q. Well it is not required that the State Department let the Department of Homeland Security know that it's taking an action on a referral, right?

MS. STROKUS: Objection, calls for speculation.
THE COURT: Sustained. Sustained.
Q. In your experience, you often do not learn whether or not the State Department has acted on a referral that HSI has sent, correct?
A. Me personally? No.
Q. And it's your understanding that HSI often is not informed of what happens to a referral that it sends to the State Department, right?
A. You ask me? I'm only speaking for the Office of Intell. HSI? You'd have to ask -- that's the operational part, the investigative part, the law enforcement part of the agency, not the intelligence part. So I don't have visibility in how or when or under what circumstances they would or would not be notified.
Q. And when you say "HSI," the operations part is separate from the Office of Intelligence, are you referring to Mr. Watson of the National Security Division?
A. The National Security Division. The other divisions I mentioned in my deposition, all, um, none of them report to me, um, they all report to the same deputy that I do. So, no, I don't have any authority over them. I don't have, um -- I'm not required to have

visibility of their actions.
Q. Just a moment. (Pause.)
It is your understanding that HSI leadership has had ongoing conversations with State Department employees about the student protesters, correct?
A. It is my understanding that, um, HSI -- members of HSI have had conversations with the Sate Department. I don't know if I'm qualified to make the determination if they're ongoing or at what frequency.
Q. Okay. So this three-step simple process, um, required HSI to reallocate some of its personnel, right?
A. It required me to reallocate some of my analysts, um, because of the workload.
Q. People were moved from the Counterterrorism Intelligence Unit to work on this effort, correct?
A. From the Counterintelligence Unit, the Counterterrorism Intelligence Unit, from the Cyber Intelligence Unit, from the Global Trade Intelligence Unit, from all different parts of HSI intelligence.
Q. And that was, as you say, because of the workload?
A. That's correct.
Q. Now, um, I want to talk about that workload and what it resulted in.
Here hours of labor were generated in response to lists of names of student protesters, right?

A. Yes, but we were working off a number of sources, including lists.
Q. Now you saw a number of sources, but the lists were communicated to you through Derrick Gordon, correct?
A. They were communicated to the leadership, including through the people we mentioned before.
Q. None of the student protester names came to you from any source other than HSI leadership, correct?
A. They always came through, um, HSI, um, yes, leadership positions. We did not get -- I did not get any lists sent to me directly from anyone outside the agency.
Q. These names were given to you. Were they given to you in a written form or verbally?
A. Again, um -- I think most of them were -- I don't know how they were --
Q. If you don't recall --
A. I don't recall how.
Q. Okay.
A. And again, they usually did not go through me either, they went to my deputy or to the team leader.
Q. The names went from Mr. Gordon either to you or to your deputy or the leader of the Tiger Team, is that right?
A. That's correct.

Q. And actually, I understand just now, and I can understand why, you don't recall how the names were transmitted to you. I'd like to see if we can refresh your recollection. So just give me one moment to see if I can find something that might be useful. (Pause.)

Okay, I'd like to show you -- or actually we don't even need to use the screen, because you have a binder. Could you just look for me at Page 88 of the transcript, and would you review just Lines 15 to 22. And when you've had a moment to do that, just let me know that you've done that, and then I'd like to ask you a question.

MS. STROKUS: Your Honor, can I request that we do actually use the screen as well here for the government's counsels' purpose?

THE COURT: You don't have it? Yes, that may be done if it can be done. But you may press on, Ms. Conlon.

MS. CONLON: I can press on. Okay, we'll start putting it up.

(On screen.)

Q. Okay. Does looking at Page 88 refresh your recollection at all as to whether you received any names and requests to generate reports from Mr. Gordon in writing or orally?

A. Yes, in my deposition I said verbal, but when you asked me about it now, I was thinking about the Canary list, which was over 5,000 names, and I don't think we got them verbally.
Q. I will turn to that in a moment.
THE COURT: Wait, I'm now not understanding. The what list, um, over 5000 names?
THE WITNESS: The Canary Mission list.
THE COURT: Oh, the Canary Mission list had over 5,000 names. So it didn't make any sense when you said you got that verbally. You mean someone said, "Here is a list that the Canary Mission has put together?
THE WITNESS: Yes.
THE COURT: I just want to understand.
THE WITNESS: Yes, sir. And actually, um, I need to correct myself, because, um, when I was answering the question I was thinking of the Canary Mission list, which is thousands of names, and I was thinking we would not have gotten that verbally. But actually we, um, the direction was to look at the website and that was a verbal direction, so. I'm trying to recall a conversation from a long time ago.
THE COURT: And I'm equally trying to understand. So here's what I understand.
Because the Canary Mission had a website, you were

directed to take a look at this website for leads?

THE WITNESS: That's correct, yes, sir.

THE COURT: All right.

Q. Okay. The direction to look at the Canary Mission website for its list was given to you in the March meeting that was discussed or was it given to you at another time?

A. I don't recall when it was given to us.

Q. And do you recall who gave you the direction?

A. I don't remember who mentioned it.

Q. Do you recall in what setting you received the direction, like a briefing, a meeting?

A. I don't know.

Q. Okay. But your understanding is that the Office of Intelligence should generate Reports Of Analysis on the names of persons on the Canary Mission's website lists, is that correct?

A. That we should look at the individuals named in the Canary Mission website and, um, in that process, when we look at an individual and do research on an individual, it is our process to do an ROA when we have relevant information and activities.

THE COURT: So that's over 5,000 people, is that right?

THE WITNESS: Yes, sir.

THE COURT: Yeah. Okay.

THE WITNESS: Which shows why we needed a Tiger Team. A normal division, a normal unit or section or group of analysts, um, operating in our normal organizational construct couldn't handle that workload.

THE COURT: Yes. Thank you.

Q. And was there a particular timeframe in which the Tiger Team needed to try to get through this very long list?

A. We are an organization or an agency that, um, in a world where, um, taking months to do things is not acceptable. So, yeah, it -- we were not -- I was not going to be allowed to say we've got 5 -- well you know a small number of analysts on this, it's going to take them 6 months to get through 5,000 names. I was not given a deadline. But I knew from how we were organized and how we worked that we needed to work through this expeditiously.

Q. What is your understanding of why the Canary Missions list was the list to use for this project?

A. It was one -- it was a list that made accusations or, um, asserted a lot of information like, um, these protesters are involved in violent activities, are condoning or supporting violence, possibly even terrorist organizations, and that list was, I think,

visible to -- or known to a lot of people. And because we're one of the agencies that is responsible for investigating this type of activity, as it relates to immigration and customs offenses, it seemed natural that we would get the list and have to review it.

Q. And when you say "get the list," um, is it your understanding Canary Mission provided the list to someone in the government?

A. I don't -- I don't know how we, um, got the notification. I don't know who notified us that this website exists. But I can say that Canary Mission is not part of the U.S. government. It is not information that we would take as an authoritative source or -- and we did not work with the individuals who created the website. I don't know who creates the website. We don't have a relationship with the creators of the website.

Q. You had never, prior to 2025, been asked to specifically review people identified on the Canary Mission website, right?

A. I did not know the Canary Mission website existed until I think after March, March or later of this year.

Q. But you have since then seen the Canary website?

A. I have looked at the Canary Mission website once.

Q. What was the occasion that led you to look at it?

A. I was curious, because I had heard of it.
Q. Do you recall approximately how long ago that was?
A. Maybe March, April.
Q. Do you have an understanding of what Canary Mission does, like, as an organization, what it is?
A. No, I don't have any details on what, um -- only in what type of information was presented on the website.
Q. And in broad strokes, do you understand that Canary Mission identifies people who allegedly promote hatred of the United States, Israel, and the Jewish people?
MS. STROKUS: Objection.
THE COURT: Well on this foundation, I'm going to sustain that. He's told us what he knows about it.
Q. So it's fair to say that what you know about it comes from what's on this website?
A. Yes, that's correct.
Q. Okay. Do you have an understanding of how Canary Mission identifies the people on its website?
MS. STROKUS: Objection, your Honor.
THE COURT: Well I'm going to let him answer that yes or no.
Do you have an understanding?
THE WITNESS: No.
THE COURT: That may stand.
Q. Do you have any understanding of what process they

use or don't to verify the information they put on the website?

MS. STROKUS: Objection, your Honor.

THE COURT: Well you know she's objecting vigorously and there's no foundation for this. He answered no to the last question. He looked at the website once. An understanding? I suppose he might have an understanding if there was some statement from some other person or a source. But this isn't discovery.

MS. CONLON: No, your Honor, I don't want to touch on anything that could be deliberative, but I want to better understand this witness's understanding of the work that he was doing.

THE COURT: I have it.

MS. CONLON: Okay.

THE COURT: Again, this isn't a game, you're trying to persuade the factfinder here. And here's what I'm getting from this witness.

That, um, they got the -- I shouldn't even say "got the list," somebody had access to this website. Somebody, a superior, said, "Look here, check these people out." Well that's not precisely what he said, but the transcript will govern. And he got on it. And that because there's a reference to Canary Mission, he

went and looked at it once and saw whatever he saw. And he's careful to point out, "They're not us." His looking at it told him that they make accusations. And I will tell you, it's significant to me that he said, "We approached it with an independent view," not simply accepting accusations that they got. Now it's not a discovery deposition. I think we've gotten his knowledge. But I'll ask this question.

Have I accurately characterized your testimony? Because I didn't use your words exactly and I was just saying this is what I'm hearing.

Have I accurately characterized it?

THE WITNESS: Yes, your Honor.

THE COURT: All right. I think that's what he knows.

MS. CONLON: And, your Honor, if that's all he knows, that's all he knows. But we heard about a list of 5,000 people on the website. And I appreciate this isn't discovery, but it's news to us that that is how it worked.

THE COURT: Well it's news to me, and I find it very interesting. But I'm telling you what I got from it. And now we've gotten it, so let's move on.

Q. So, Mr. Hatch, um, understanding that you have not spent time looking at the website, have you seen Reports

of Analysis that were generated in response to the directive to look at the Canary Mission website?

A. We, um -- the analysts wrote ROAs on personnel or individuals who are named in the website.

Q. To your knowledge, did the analysts include, in their ROAs, the allegations from the Canary Mission website as relevant -- as information that could be relevant to a potential violation of Title VIII?

MS. STROKUS: Objection, your Honor.

THE COURT: Sustained. The best evidence are the ROAs.

MS. CONLON: And, your Honor, it's ironic because I don't have them and I wish I did.

THE COURT: I understand.

MS. CONLON: But I can't offer them to you.

THE COURT: And we will see about that. Because they would seem, at least with respect to the target individuals, to be relevant. Perhaps they should have been prepared. I've made a ruling now with respect to a subset of documents. It's clarified that I don't have them. I'm wondering about that.

Go ahead.

MS. CONLON: Okay. I'm sorry, I'm getting a correction from somebody. (Talks to co-counsel.) Yes. Okay.

Case: 26-0906, 11/20/2026, DktEntry: 16.5, Page 231 of 300



It is our understanding that the Court did receive all 5 of the Reports of Analysis on the targeted individuals in a production -- a document production to the Court on June 11th, that is, um --

(To co-counsel.) I think that's correct?

THE COURT: Well I'll look at what I have, physically.

MS. CONLON: Okay. And for the Court's ease of reference, we understand that to be Docket 131, that docket entry.

THE COURT: Thank you.

MS. CONLON: Okay.

Q. Now, um, you said that the project was to look at this list from Canary Mission. Did the list of student protesters -- it included information of student protesters identified through other means apart from simply Canary Mission?

MS. STROKUS: Objection, your Honor, a mischaracterization of testimony.

THE COURT: Well let me ask this question.

She started out saying how much -- how many ROAs did you look at, and you used the word the "student protester effort," and as you started, I didn't know what you were talking about.

Do we now understand that's the Tiger Team's work

after you got this list? Well I shouldn't even say "got this list," after the list was provided on the website?

THE WITNESS: Yes, your Honor. But the Canary Mission wasn't the only, um, group of students. It was most of it.

THE COURT: Yes.

THE WITNESS: But it wasn't the only way that we received, um, information on protesters. And also there were duplicates, we received information about the same protester from multiple sources. But Canary Mission was the most inclusive of that.

THE COURT: Do you recall other sources? Without revealing investigatory matters.

THE WITNESS: There was another website that does the same thing. I don't remember the name of it. Um, and --

THE COURT: If I suggested "Betar"?

THE WITNESS: That sounds right, sir.

THE COURT: Okay. Go ahead.

THE WITNESS: And then we would get individual names or we could even get a list from a police department if any protesters were arrested. We could get that.

So the list, um, came in from all different directions. The team -- the source of the information

was not necessarily relevant to the analyst, because the analysts were doing factfinding, and the analysts were not reporting, um, that, um -- where the name came from, because They're independent from that. Nor would they -- it's not our standard practice, it's not within policy for us to report other people's uncorroborated allegations or assertions. Everything, like I said before, needs to be collaborated.

THE COURT: So these sources though that you've now identified, as far as my notes, they came down from Mr. Jordan, is that right?

THE WITNESS: Mr. Gordon.

THE COURT: Mr. Gordon. They all come down from him. But of course you're looking at them. And you can see if a police department -- for instance, if it arrested someone at a protest, whether it fit within the scope of what the Tiger Team was doing?

THE WITNESS: Yes, sir.

THE COURT: All right. I think that it's noon. I am -- and I apologize for this, the time is not counted against you, but we'll start promptly at 9:00 a.m. tomorrow morning.

The total elapsed time for the plaintiffs is 2 days, 15 minutes. For the defense, 2 hours, 30 minutes.

We'll recess till 9:00 a.m. tomorrow morning.

We'll recess.

THE CLERK: All rise.

(Adjourned, 12:00 p.m.)

C E R T I F I C A T E

I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do hereby certify that the forgoing transcript of the record is a true and accurate transcription of my stenographic notes, before Judge William G. Young, on Wednesday, July 9, 2025, to the best of my skill and ability.

/s/ Richard H. Romanow 07-9-25
__________________________
RICHARD H. ROMANOW  Date

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS (Boston)

No. 1:25-cv-10685-WGY
Volume 1, Page 1 to 71

AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
Plaintiffs

vs.

MARCO RUBIO, in his official capacity as
Secretary of State, et al,
Defendants

*********

For Bench Trial Before:
Judge William G. Young

United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
Thursday, July 10, 2025

********

REPORTER: RICHARD H. ROMANOW, RPR
Official Court Reporter
United States District Court
One Courthouse Way, Room 5510, Boston, MA 02210
rhr3tubas@aol.com

A P P E A R A N C E S

RAMYA KRISHNAN, ESQ.
CAROLINE DeCELL, ESQ.
ALEXANDER ABDO, ESQ.
SCOTT B. WILKENS, ESQ.
ALEXANDRA CONLON, ESQ.
Knight First Amendment Institute at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
E-mail: Ramya.krishnan@knightcolumbia.org
and
COURTNEY GANS, ESQ.
NOAM BIALE, ESQ.
Sher Tremonte LLP
90 Broad Street, 23rd Floor
New York, NY 10004
(212) 540-0675
Email: Cgans@shertremonte.com
For Plaintiffs

ETHAN B. KANTER, ESQ.
WILLIAM KANELLIS, ESQ.
VICTORIA M. SANTORA, ESQ.
JESSICA STROKUS, ESQ.
DOJ-Civ
P.O. 878
Ben Franklin Station
Washington, DC 20044
(202) 616-9123
Email: Ethan.kanter@usdoj.gov
and
SHAWNA YEN, ESQ.
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, MA 02210
Email: Shawna.yen@usdoj.gov
For Defendants

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| PETER HATCH (Continued.) | | | | |
| By Ms. Conlon | 10 | | | |
| By Ms. Santora | | | | |

E X H I B I T S

EXHIBIT 232................................ 29
EXHIBIT 233................................ 47
EXHIBIT 234................................ 53
EXHIBIT 235................................ 60
EXHIBIT 236................................ 66

P R O C E E D I N G S

(Begins, 9:00 a.m.)

THE COURT: Let me simply repeat, as I have allowed internet access in these proceedings, that if you are accessing these proceedings by the internet, the rules of court remain in full force and effect, that means there is no taping, streaming, rebroadcast, screen shots, or other transcription of these proceedings.

It is very important that you keep your microphone muted, and if you do not keep it muted, I will have to cut you off from access.

Now there's before the Court, and I've reviewed it, the defendants' motion to clarify the July 9 bench ruling. There's no reason to clarify. This is an attempt to cabin in the Court's ruling. The transcript makes clear it applies to all the documents that were furnished, and I stand on that ruling.

Now, again the question, Mr. Kanter, you've complied with the Court's order?

MR. KANTER: Yes, your Honor.

THE COURT: Thank you.

MR. KANTER: All the documents that have been furnished to the government in the subset have been turned over to the plaintiffs before the deadline.

THE COURT: And that was the Court's order. I'm

satisfied with that.

I have also, because it was a matter of issue yesterday, reviewed the documents that I have and I have ROAs for certain of the so-called "targets" here, and the Watson letters, as soon as I can make copies, they'll be turned over to you.

All right.

MR. BIALE: Your Honor, I just wanted to confirm what Mr. Kanter said, and we received a traunch of 18 pages of document. I don't know -- just putting that on the record so that --

THE COURT: Well you may have. You know I really have no reason to, um, impugn anyone's good faith and I'm not starting to.

MR. BIALE: Neither do I.

THE COURT: Please recall the witness.

MS. CONLON: Your Honor, I'm sorry, but before we begin, is there any possibility we could have -- the ROAs are the documents this witness is familiar with, helps oversee the preparation of, and knows about. If there's any chance I can have them before I question him? I don't need a break, if I could have them so I can --

THE COURT: I'm doing the best I can.

MS. CONLON: Thank you.

THE COURT: As soon as we copy them, you will have them.

MS. CONLON: I'm trying to suggest that even if it's in the course of the examination, I would take them if I could, so I can discuss them with him.

THE COURT: And you understand the Court's procedure.

MS. CONLON: Yes.

THE COURT: When I have them, and I have looked at what I intend to give you, I have a good --

Yes, Mr. Hatch, come on up.

MS. CONLON: Thank you.

MR. KANTER: Your Honor, I have one question for the Court.

THE COURT: Yes, while the witness is returning.

MR. KANTER: And this is for the purpose of, um, the consideration by the government to file a mandamus petition.

THE COURT: Yes.

MR. KANTER: And I want to be accurate in the scope of that petition. Because your Honor indicated that it's an order related to the subset that I have turned over and complied with. The most -- what I would like to clarify --

THE COURT: The order did, yes, and I'm satisfied

with your compliance with the order.

MR. KANTER: What my question pertains to is an in-camera submission on June 11th that has documents that are not included in that subset.

THE COURT: Yes.

MR. KANTER: And which, if your Honor has ordered that the privileges covering those other documents have been waived, the government will likely be seeking mandamus to overturn that order.

THE COURT: I have made myself clear on the record, and I think I am only reiterating because the record will govern.

I have said that as to the mass of documents that the government has voluntarily submitted to it, evidently to further its case, I have determined that those documents relating to any changes in Visa applications, because they implicate national security, are privileged. I am treating them as in-camera, which I mean the only eyes on those documents are my eyes. And as to the remaining documents, I have overruled the assertions of privilege. I have ordered the production of certain of them. It seems to me the government has complied.

MR. KANTER: We have, your Honor.

THE COURT: I'm now, um, going to -- and they come

out of what's Exhibits B through K. But you'll have to give me a moment to look it over. They are the ROAs and the Watson letters and such attachments to particular ROAs that existed.

MR. KANTER: Has your Honor --

THE COURT: That does not exhaust the total documents that I have. And as to those I've said -- I think I can reiterate --

MR. KANTER: You said Friday noon was to assert LEP on those documents.

THE COURT: That's correct.

MR. KANTER: Thank you, your Honor.

THE COURT: I said I was in a quandary, and I'm trying properly to manage the case. And that is what I'm trying to do.

MR. KANTER: As to the document over which --

THE COURT: Wait.

MR. KANTER: -- over which --

THE COURT: Wait a minute. Wait a minute.

MR. KANTER: Yes.

THE COURT: I want to start taking testimony, because time counts. All right? We can talk about it this afternoon.

Where is Mr. Hatch?

MS. CONLON: Mr. Hatch was in the hallway. He is

being retrieved.

THE COURT: Well -- but I want to use the time, Mr. Kanter.

MR. KANTER: Yes, I was asking specifically about the indication of the Presidential communications privilege with respect to a report sent by the Agencies to President Trump, as requested in his executive order. The government invoked the Presidential communications privilege. Your Honor held that --

THE COURT: I ordered the documents turned over to me. And as to that -- as to that, I, um, I think I am premature to say I overrule that. You've now identified that. As to that, it's under advisement.

Does that answer your question?

MR. KANTER: Yes.

THE COURT: And as to that, um -- actually I appreciate your correcting me because I accurately restated what earlier I had done. I am again reading these materials, working with them, and reflecting. And as to the document that you just made reference, it's under advisement. I have not overruled the privilege. Nor have I sustained it.

MR. KANTER: At the risk of --

THE COURT: No, the witness is here.

MR. KANTER: Okay, thank you, your Honor.

(Mr. Hatch takes the stand.)

THE COURT: And would you remind the witness.

THE CLERK: Sir, you remain under oath. Do you understand?

THE WITNESS: I do.

MR. BIALE: And, Ms. Conlon, you may continue.

DIRECT EXAMINATION BY MS. CONLON: (Continued.)

Q. Good morning, Mr. Hatch, how are you?

A. Good morning.

Q. Now, um, we talked a bit yesterday about a list of names that you understand came from Canary Mission. I have some further questions about that.

Canary mission doesn't limit the names on its website to immigrants. The list you received, was that only for noncitizens?

A. The list had, um, U.S. citizens on it, um, as well as noncitizens.

Q. And that list of 5,000 names, which included any number of citizens and noncitizens, that wasn't limited to people who, um, were students, correct?

A. Correct, I believe it had faculty, um, and others.

Q. And when you talk about others --

THE COURT: At the end of your -- and "others"?

THE WITNESS: Yes, people that weren't faculty,

Case: 26-6906, 11/20/2026, DktEntry: 16.5, Page 246 of 300



weren't students.
Q. For example, the list also included medical professionals, which is another category of people that the Canary Mission catalogs information about, correct?
A. I don't recall any -- any information about medical personnel.
Q. Do you recall information about other kinds of professionals who are neither faculty nor students?
A. No details on it, just that they were present.
Q. The list, um, itself, includes, as does the Canary Mission website, people who are thought to have a variety of attitudes, right?
A. I don't understand the question?
Q. For example, Canary Mission's website is not limited to and does not purport to reflect people who have only pro-Hamas views?
A. I don't know -- I only looked at the website once. So you're asking me to comment on what the website does, and I don't have those answers.
Q. Well I'm less interested in the website, I'm interested in the list.
So the list, which came from the Canary Mission website, as you understand it, it's fair to say it was not, um, culled, before it came to you, to remove people who might not be relevant to your work, is that right?

A. As I understand it, the list was just names of people, um, who are in protests.
Q. When you received the list, if you recall, it was a list someone had created of names as opposed to just a direction to go check out this website?
A. As I understand it, it was a direction to check out the website, and the team went through the website and generated the list.
Q. I see. So when you say a list of over 5,000 names, you're just doing your best to estimate the total number of people who are cataloged on the website, is that right?
A. That were listed on the website, that's correct.
Q. I see. It may be more than 5,000 names, for example?
A. It may be.
Q. Now you said -- you testified that the list -- I asked you why -- why start with this Canary Mission website population of people as opposed to something else for this project? And you said that the list made accusations, included protesters who were accused of having been involved in violent activities or condoning or supporting violence. But I understand you now to have just said, in fact, the effort was just to look at everyone on the list. And you would agree that not

everyone on the Canary Mission website, who was looked at, had been accused of engaging in violence, terrorism, or stuff like that?

A. Yes, I didn't say the website made accusations against every single person on the list. I don't know that. But in general the website was making some accusations. However the list that we looked at was to, um, look at the protesters, again, as I said before, not based on the allegations, but based on what we could find for information relative to violations of U.S. law.

Q. Now just so I'm clear, it was not your understanding that the list included only people alleged to have violated U.S. laws, just that the list was a starting point for the Office of Intelligence to discern whether there was information to support that?

A. Yes, that's what I just said.

Q. Okay. And I guess sitting here you've said that you looked at the website only once, so you're not in a position to speak about the kind of information that the Canary Mission website contained about these people, is that right?

A. Not in any kind of detail.

Q. Okay. The people who actually worked at the Canary Mission website to do this work, those were the investigative analysts?

A. Yes.
Q. Do you recall any direction or limitation given to those analysts about who to focus on among this large pool of people?
A. Um, the direction was to go through everyone we got a lead on, which would have contained the entire list.
Q. Now the list is a living thing, their website is frequently updated. Is that a direction that you received, was it only to look at who was there at a given point in time, or was it time-limited?
A. I don't know. I would suspect -- as they were going through the list, I would suspect that -- I would guess that the analyst would -- or I would say that the analyst would go through everyone on the list, and if there were additions, they would look at additions as well.
Q. A moment ago you used the --
THE COURT: Just let me interrupt, because she's focusing on this Canary Mission, and properly so to her point of view.
But as I recall your testimony, you were clear yesterday that that was not the only source of leads to which this Tiger Team devoted its time, is that correct?
THE WITNESS: Yes, your Honor.
THE COURT: Now I have notes and I have that in

mind. And I wouldn't -- I didn't mean that as criticism, I just want to be clear in my own mind.

But at least 5,000, give or take, you understood, came through this Canary Mission?

THE WITNESS: Yes, your Honor.

THE COURT: Thank you.

(Pause.)

Q. Now I appreciate the Court's clarification and I do want to move, in a moment, to the other sources of leads. But before we do, um, I understand that at least 75 percent of the leads that the Tiger Team looked at came from the Canary Mission website, is that correct?

A. Yes, most of the names came from Canary Mission.

Q. And whether or not you've spent time reviewing the website, you understand that the Canary Mission only purports or sets out to identify people with hatred at or negative views of Israel, correct?

A. I don't know the intention of --

MS. SANTORA: Objection.

THE COURT: Yeah, it's sustained.

MS. CONLON: Sorry.

THE COURT: I don't -- I don't think he knows that.

MS. CONLON: May I inquire as to his knowledge?

THE COURT: You may inquire.

Q. Okay. So understanding you haven't spent time studying the website, you have an understanding of what the Canary Mission organization purports to do, right?
A. No, I don't.
Q. You have no idea whether the Canary Mission purports to identify people with negative views towards countries other than Israel and the United States?
A. I have -- that's not the question you asked me. I have seen that they have done that. I do not know the intentions. I don't know the purpose, the stated intent of the website. I don't know any of the people behind the website. As I said before, the website is not associated with us or the U.S. government. So you're asking me to comment on their intentions and their purpose. I don't know their -- I don't know their intentions or their goals.
Q. Now I understand you can't speak to the people who organize it or what their personal intentions are, but you're given a list as a starting point for research and analysis. You have some understanding of what that list purported to contain of the population of people it's supposed to include. And you have an understanding that it was including people other than those who hold negative views of the United States, Israel, or Jewish people?

A. I don't -- I saw indications of that, but to -- they may have had other intentions that I don't know about, so I can't say truthfully that I know that that's the purpose.

THE COURT: No, no, as I understood her question, her question was, you have some familiarity with the list as it was generated, and I understood her to be asking, um, as you looked at that list, to the extent you did, were there -- not asking about the credibility of accusations or anything, but accusations of conduct other than hostility to the United States, to the State of Israel, or to Jewish people, other people on the list who have other hostilities or concerns?

THE WITNESS: I don't -- I don't know if there were others. I do know, um, what I recall is, um, that there were allegations of, um, anti-U.S., anti-Israel, um, pro-Palestine, pro-Hamas. There may have been other things on there.

THE COURT: Thank you.

Q. And as far as you -- sorry. Strike that.

All you recall about the general views of this group is what you've just described, is that correct?

A. That's correct.

THE COURT: By "this group," you mean the list?

MS. CONLON: Yes. Thank you for the

clarification. Yes, the list.
THE COURT: All right.
Q. Now the list, in terms of the bases proffered that the Office of Intelligence researched, the bases for the claim that any of these people held the views that you described, many of those bases were the people's public speech, correct?
A. Um, more to the bases was from social media or -- yeah, social media.
Q. In other words, something a person might post on their social media website indicating, for example, their support of Palestine, right?
A. That could be one example.
Q. Others on the list were characterized as anti-Israel for supporting boycott, divestment, and sanctions, against the State of Israel, correct?
A. By, um --
Q. Canary Mission.
A. I believe Canary Mission, those are among the allegations that the Canary Mission made.
Q. The allegations included those academics who supported boycotts of Israeli academics, correct?
A. I believe so, but I'm not 100 percent sure about, um, what those comments were. Again, I didn't have the details.

Q. The allegations included people who had spoken critically about Israel's actions in Gaza, correct?
A. Yes, I believe those were, um -- were some of the allegations, or allegations of that general type.
MS. CONLON: Just a moment.
(Pause.)
Q. Okay. Now, um, the Court clarified that Canary Mission was not the only source of names, another source of names that came up briefly yesterday was "Betar U.S.", correct?
A. That's correct.
Q. So "Betar U.S." you described as similar to Canary Mission, right?
A. I had heard it was similar to Canary Mission. I did not look and have not ever seen that website. I don't know any details about that website.
Q. Um, without speaking about its website, you understand that Betar U.S., like Canary Mission, purports to identify people who hold anti-Israel views, correct?
A. No, I don't know anything about that website. I didn't even know it was called "Betar U.S." I just heard "Betar."
Q. Okay. So how are you aware that any of the names came from Betar?

A. One of the, um, I believe the supervisor of the, um, of the team, um, mentioned that list and said that, um, the names looked to be the same as Canary Mission.
Q. In other words, a supervisor identified that certain of the people were -- had been, um, cataloged on each website, both Betar U.S. and Canary Mission, is that correct?
A. Could you repeat the question. I couldn't really hear you.
Q. Yes. And I'll just wait one second until -- okay, we're good.
A supervisor indicated to you that some of the names on the Canary Mission website also appeared on Betar's U.S.'s website, is that correct?
A. On Betar's website, yes.
Q. And are you familiar with Betar's deport list?
A. As I said, I don't have -- I didn't see any list from Betar myself. I had not checked that website. I do not know any details about Betar.
Q. Now back for a moment to Canary Mission.
You said that Canary Mission is itself just a source of names for the research and analysis that the Office of Intelligence was going to do, right?
A. It was a list of names of people -- of protesters.
Q. Right. And you testified that the Office of

Intelligence vetted and corroborated claims in the Canary Mission website profiles of these students, right?

A. The Office of Intelligence did Reports of Analysis and looked at, um, the people on the list. We did not corroborate all the information that was in it. I wouldn't use that term to generalize what we did.

Q. When you say that you looked at the allegations -- and you testified very clearly to the Court yesterday that the Office's research and analysis is independent of, not reliant upon what Canary Mission claims, right?

A. That's correct.

Q. So, for example, if Canary Mission included a description of an academic's research, the Office of Intelligence would endeavor to determine whether the person had in fact done the research as described by Canary Mission, right?

A. Yes, we would not take any leads, information, as fact.

Q. If a person was described on Canary Mission as having written a news article, the Office of Intelligence would endeavor to confirm whether or not the person had in fact written the article, right?

A. As I said, we check all the information. We don't take any leads, information, as fact.

Q. Are you finished?
A. Yes.
Q. Okay. Now in the case of a person alleged by Canary Mission to have written an article that was antisemitic, if that's the allegation, the Office of Intelligence wouldn't make its own determination that the article is antisemitic, because that's a conclusion, the Office of Intelligence would just look at the facts, did they write this article? Is that correct?
A. That's correct. We don't do deliberations. We don't present opinions. We don't make assessments.
Q. So the Office of Intelligence --
THE COURT: Ms. Conlon, I'm talking notes and we'll have the complete transcript, but much of this examination is hypothetical when here we're interested in particular people. I mean I have no problem with the sweep, what types of people, we can look at all of them, or the procedures generally, he's talked about that. But now you're getting into matters that I would think maybe we could talk about this case?
MS. CONLON: Yes, your Honor, and my team is looking at the actual ROAs and --
THE COURT: I understand, and if that's why you're doing it --
MS. CONLON: I'm hoping to return to that, but I

myself have not seen them.

THE COURT: Understood. Understood.

MS. CONLON: Okay. We'll go back in a moment once I've gotten to look at it.

THE COURT: Understand that at some stage my duty is going to be to make findings of fact and generalized statements about procedure unless their relevance isn't going to help me much.

MS. CONLON: I appreciate that, your Honor.

THE COURT: All right.

Go ahead.

MS. CONLON: And I am going to, on the fly, attempt to do my very best to get into the actual facts of these ROAs.

THE COURT: Yes. Go ahead.

Q. Okay. So -- and in sum, what we learn from this, the Office of Intelligence, as you've said, is not a decision-maker about whether a person actually violated a law, but in the role of gathering information that could be relevant to someone else's determination that a person violated U.S. law, is that a fair summary?

A. Can you say that again, please?

Q. Yeah. The Office of Intelligence is not in a position of deciding whether a person's speech or conduct violated any U.S. law, but instead it's just,

um, tasked with gathering information that could help a later decision-maker make that determination, is that fair to say?
A. The Office of Intelligence is not the decision-maker, it doesn't make the decisions, um, and as I just said, collects the facts.
Q. And lastly, on Reports of Analysis.
Reports of Analysis include everything that the Office of Intelligence identified that could be relevant to a determination that a person violated a United States law, correct?
A. That's what was strived to put into the -- that's the purpose of the ROA.
Q. Okay.
MS. CONLON: Let's please put Exhibit B -- well hold on, just a moment, your Honor. I apologize. I just need one second.
(Pause.)
Q. Okay.
MS. CONLON: Your Honor, if we could please put the exhibit that your Honor just gave us, which I believe is identified as Court Exhibit B --
THE COURT: Well, no, that's how it's on the materials I have, but if you have an exhibit, you might as well identify it by, um --

Case: 26-6906, 11/20/2026, DktEntry: 16.5, Page 260 of 300



MS. CONLON: Something. Okay.
THE COURT: -- by the date or something.
MS. CONLON: Okay.
MR. KANTER: Your Honor?
THE COURT: Yes.
MR. KANTER: There is a matter about the exhibits that counsel has, um, just referred to. Those exhibits contain law-enforcement privileged information that the government is --
THE COURT: Well I've overruled that.
MR. KANTER: -- that the government is going to log, by Friday at noon, as the Court gave us the opportunity to do and, um --
THE COURT: Well that's not a ground for delay. I'm sorry. I did give you that time.
MR. KANTER: We waived it on June 11th, your Honor, and we brought it to the Court's attention --
THE COURT: I've made my ruling. She may use the document.
MS. CONLON: I am holding here an exhibit that was provided to the Court, which I will mark for identification -- and I need a letter. What letter again? EK. Marked for identification as EK.
THE COURT: Fine.
MS. CONLON: And I have only one copy, so I will

have to provide my one copy to the witness, I think, unless the government has an electronic copy that we could have the Court and the witness --

THE COURT: No, we'll work off papers, and I have a copy, so I'll look over his shoulder, and I'll know what he's looking at, and we can go from there.

(Pause.)

(Puts document on screen.)

MR. KANELLIS: Whoa, whoa, whoa, take it down.

MS. CONLON: I need a way of showing it. Okay, we can take it off the public one, but I need to show the witness and I have one copy to work with.

THE COURT: Just a moment. Have in mind that I'm presiding here.

MR. KANELLIS: Yes, your Honor, I just --

THE COURT: All right? And no one just shouts out orders to anybody in this court. I try not to. And you won't.

MR. KANELLIS: Understood, your Honor.

THE COURT: Very well.

The document is for identification. It is not admitted and therefore it is not for the public. The Clerk can take care of that. And the document may be shown to the witness.

MS. CONLON: Is there a way for me to put this so

only he sees it?

THE COURT: Yes, the Clerk can do that. But for identification.

MS. CONLON: Yeah.

(On witness screen only.)

Q. Okay. Here, I'm showing you, the witness, a document, and I'm endeavoring to have it be that you can see the whole thing. Yes, there you go.

(On witness screen.)

THE COURT: May I help you?

THE WITNESS: Sir, may I have moment to review the entire thing?

THE COURT: Yes. There's no magic to it being clipped together, so feel free to unclip it.

THE WITNESS: Yes. Sure.

(Pause.)

MS. CONLON: When you've had a moment to review it, just let me know. I'm not going to show anyone, I just want to ask you a question about it next.

A. (Looks.)

MS. SANTORA: Your Honor, we were under the impression that these documents were provided to plaintiffs' counsel, attorneys'-eyes only, in which case I don't think it's appropriate for the witness to be looking at it.

THE COURT: I'm going to allow her to use it with the witness.

A. (Looks.)

THE COURT: Mr. Hatch, I'm simply -- feel free to look at anything, but the way I have them clipped together, they may pertain to individuals other than Ms. Ozturk, because I clipped the documents all together. But I think she wants to ask you about Ms. Ozturk and a report -- yeah, why don't you stop there.

MS. CONLON: Yes. Okay.

Q. Mr. Hatch, having reviewed this document, do you recognize what it is?

A. It is a subject profile of, um, Ms. Ozturk.

Q. And when you say "subject profile," that means the HSI subject profile?

A. It's the Report of Analysis.

Q. They are the same thing, the HSI profile and a Report of Analysis?

A. A subject profile is a Report of Analysis.

Q. I see. Is this a fair and accurate copy of the subject profile that the Office of Intelligence created concerning Rumeysa Ozturk?

A. It appears to be.

Q. Okay.

MS. CONLON: I am offering what was EK for evidence as Exhibit 232.

THE COURT: And I just want to be clear, the documents you looked at -- we've both been looking at together, down to Exhibit I, the page that says "Exhibit I," are those pages, is that how they appeared in the, um, report? Does the question make sense? Is that -- there's attachments, for instance. And were those attachments part of that report?

THE WITNESS: I don't -- I don't remember, um, this report specifically, but it would be within policy to include these other attachments.

THE COURT: And, um, as you look at the document, that's the type of material that would, in the ordinary course, be attached to such a report?

THE WITNESS: Yes, that's correct, sir.

THE COURT: All right.

EK is -- with the pages he's identified, may be admitted as Exhibit 232. The defendants' rights are saved.

(Exhibit 232, marked.)

MS. CONLON: And if the Court would permit me to publish it, while we speak about it, so the government and everybody has it. As well as I'm covering, to be clear, personal identifying information that is on it in

terms of Social Security number or anything else.

MS. SANTORA: Your Honor, we object to the showing of the document publicly.

THE COURT: Overruled. It's a public trial. I've admitted it in evidence.

MS. SANTORA: This document, I believe, is confidential pursuant to the terms of the protective order and --

THE COURT: Well, but the protective order is between you and them. I preside. Now they may use it as evidence. The public is entitled to know what I'm going to base my findings on. And it may be used. And if I were to base them on anything else, um -- let me give you an example here, because this troubles me.

I agreed with Mr. Kanter that I may have spoken too quickly in overruling a Presidential privilege. But if that's so, why was the document given to me, the judge who must make the findings of fact? One can only infer from the submission of the document to me that it, one, was relevant, two, it was authentic, and three, somehow it was intended to persuade me of something.

Now if the privilege is upheld as to that document, then I'll be clear as to what I'm going to do, I'm going to set it aside, it won't have any bearing on this case at all.

Now you say that's so here. I disagree. I've made my rulings. I express no opinion on any of this, but I'm going to look at it. As other documents as to which I have overruled the privilege.

MS. SANTORA: Your Honor, if I may? We did submit this document, um, in-camera at your invitation to us to submit it.

THE COURT: Yes, and I've ruled for the law-enforcement privilege, which you have significantly interpreted overbroadly, and I have rejected that.

MS. SANTORA: I just want to reiterate what Mr. Kanter said, that it is our position that this document is law-enforcement privileged and we do intend to submit a privilege log for it on Monday.

THE COURT: I understand that. I understand that and we're going forward. I've said your rights are saved.

Go ahead.

Q. Now, Mr. Hatch, this is Exhibit 232 on the screen. I have put Post Its over things like Social Security numbers that I'm not planning to ask you about. I'd like to turn your attention to the top left corner where it says "Analysis Findings."

Here the first sentence indicates that Ms. Ozturk, who is a Visa holder, is, quote, "A co-author of an

Op-Ed calling for divestment from Israel and associates with Tufts Students for Justice in Palestinian, which was suspended for cause for student intifada," end quote.

What is the reason that her Op-Ed, which calls for divestment from Israel, is mentioned in the analysis findings?

A. Again it's a fact that she wrote the Op-Ed, and the lead was for Ms. Ozturk, so the analyst, um, was presenting information on her. Again I did not write this ROA. I only read it one time. So I didn't -- I did not approve -- I'm not an approver of ROAs. So, um, all I can comment on is policies and procedures --

Q. Are you --

A. -- in general terms.

Q. I'm sorry, I didn't mean to interrupt you. Are you finished?

A. I finished.

Q. You say you're not an approver for ROAs, but you did read this one. And is it true that this one, as part of a sort of development of the three-step process we discussed yesterday, wherein certain ROAs were reviewed by senior HSI leadership before they were actually referred to the State Department for action, isn't that right?

A. That process, as I described it yesterday, was already in place, and we read the ROAs -- the review is a connotation that, um, that -- it connotates to me an approval.

THE COURT: Um, I just need to follow up here.

Do you recall that in the -- in the ordinary course of doing your business, this particular ROA, you've read that, before we gathered in the midst of this lawsuit, is that true?

THE WITNESS: I have read this.

THE COURT: You read it back in the ordinary course?

THE WITNESS: Yes.

THE COURT: So why did this one come to your attention?

THE WITNESS: Because of this process, um, I would see the ROAs in the, um -- within the process at times. I didn't see all of them. What I saw was a few of them, um, especially at first. And, um, and it looks like this one was written in March.

So, um, at that time I wanted to -- I actually wanted to make sure that the process was working, that the analysts were providing information, and that the analysts were doing what was, um -- what we wanted them to do.

Q. Now -- I'm sorry. The Court.
THE COURT: And so you read it, and in accordance with your view of the processes of your office, you thought that this followed the processes of your office?
THE WITNESS: Yes, I thought this was within policy for us.
THE COURT: Yeah. And so you sent it on to Mr. Watson?
THE WITNESS: No, I did not send it on to anybody. Again, I was not, um --
THE COURT: Well somebody sent it on?
THE WITNESS: Somebody sent it on, yes.
THE COURT: So I don't want to put any words in your mouth.
So after you reviewed it, what did you do, if anything?
THE WITNESS: Um, allowed it to go through the process. I didn't stop the process because of this ROA, I think that's a better way to characterize it.
THE COURT: All right. So if we analogized it to the papers that pass across my desk, there are many thing that I look at and put in an out-box which signifies to the appropriate person that this is okay, take the next step, whatever that may be. Is that a proper characterization of what you did?

THE WITNESS: Um, it's closer but, um, that implies that you made a decision that there was, um -- there was an in-box and an out-box. The only situation I would be in would be to say, "No." "Stop." "Hold." If I don't say anything, then it goes through the process.

THE COURT: I follow.

THE WITNESS: So only a negative action from me maybe is the best way to describe it.

THE COURT: And so it would be fair, in this case, to say you took no negative action?

THE WITNESS: I took no negative action, sir.

THE COURT: Thank you.

Ms. Colon, go ahead.

Q. Thank you, um, and that clarification is helpful, but I'm still stuck on one thing, which maybe you can help me with.

In the ordinary process -- not the special three-step process, but the ordinary process, ROAs were not normally reviewed by you and other senior HSI leaders before they were released into the State Department, correct?

A. That is correct. But we do read -- it is not correct to say that, um, we don't read ROAs, or, um, that, um, we don't discuss ROAs in other processes. But

in none of those processes are we, um, approving ROAs. I just would not characterize it as an "approval process" like they're trying to -- like you seem to be connoting.
Q. I understand that there are circumstances under which you, or other senior HSI leaders, have at one time or the other read an ROA before it went outside, but it's correct, that as a matter of course, that is not something you do?
A. We don't, um -- we don't typically, um, review or read all ROAs done by personnel, so.
Q. Mr. Hatch, not all ROAs. Isn't it true that as a matter of course you do not read ROAs before they go outside the Office of Intelligence?
A. Yes, that is true, that I don't read ROAs normally before they're sent to an agent or sent to, um, a program.
Q. But for this review, the three-step process that the Tiger Team was engaged in, you and other senior officials in HSI reviewed some of the ROAs, including this one, right?
A. We read some of the ROAs, yes.
Q. And it wasn't just you that read them, it was Derrick Gordon, correct?
A. Um, yes.

Case: 26-6906, 11/20/2026, DktEntry: 16.5, Page 272 of 300



Q. William Walker?
A. Yes.
Q. Robert Hammer?
A. Yes.
Q. Roy Stanley?
A. He was the team lead.
Q. And I understand there was an additional layer of review, and tell me if this is part of the normal process or not, wherein the ROAs were informally sent to a Special Agent in the National Security Division, then back to the Office of Intelligence, reviewed by you and senior leadership, and then formally referred back to the National Security Division, and only in this process, isn't that correct?
A. The Special Agent was part of the team, so it wasn't sent -- the Special Agent was working with the analyst.
Q. So the office that was to receive the report, in this instance, also participated in developing the report, is that correct?
A. They helped supervise the team.
Q. Apart from -- moving away for a moment from this sort of extra layers of review, the process, when you participated in discussions about these particular ROAs in this new process with other HSI senior leaders, the kinds of considerations you made, or were supposed to

make, were has there been a violation of the law or was there information relevant to a violation of the law, correct?
A. That is the instruction given to the analyst.
Q. But that wasn't just the instruction for the analyst, that's what you, and the senior HSI leaders, sought to do when you sat together and looked at certain of these ROAs before referring them to the National Security Division, correct?
A. That was our intent to, um, to focus on violations of law.
Q. And you had specific discussions with other HSI senior leaders about ROAs on the student protesters produced in this effort before they were sent to the National Security Division for a formal referral, correct?
A. Yes, we did.
Q. Discussions of the activities that were cited in the Reports of Analysis that you all reviewed, correct?
A. Yes, we were discussing the ROAs.
Q. And to be clear, it's not ordinarily the case that the National Security Division, which receives a Report of Analysis from the Office of Intelligence, is involved in the developing of that report, overseeing of that report, it ordinarily just relies on the report and

sends it to NSD, correct?
A. It is common for analysts and agents to work together, but the analyst does write the ROA.
Q. Now here you specifically recall reviewing Ms. Ozturk's ROA, right?
A. I have read this ROA twice, once today and once back in March.
Q. And when you read it back in March, that was in a meeting with other senior HSI leaders, right?
A. Yes, it was.
Q. Now turning to the actual ROA.
I asked you, and I'll ask again, because I don't think I understood the answer, what possible violation of U.S. law is the fact that Ms. Ozturk co-authored an Op-Ed about divestment from Israel relevant to?
A. Again, the analyst who wrote this, um, was given the task of, um, of producing information or finding information, um, relative, um, to the protest. And so getting -- again, getting the facts on this person and whether they may be related to the law is the emphasis. But getting the facts on the person and what this person did builds the -- builds the understanding of the individual.
Q. So the analyst would include the facts I'm seeing here as part of their effort to gather information

relevant to the student's participation in protests, is that correct?

A. The -- the student's participation in protests, his contacts of what the individual did or did not do, and whether or not they were in any position to, um, conduct some activity.

Q. So to -- one second. (Pause.)

So you looked at this ROA. You saw that in the analysis findings the only activities cited about Ms. Ozturk's involvement in protests are, one, that she co-authored an Op-Ed calling for a divestment from Israel, and, two, that she associates with Tufts Students for Justice in Palestine. What made you think that here there was any indication that Ms. Ozturk had potentially violated a United States law?

A. I did not make that determination. That was not my job as the Assistant Director of the Office of Intelligence, was to supervise the analyst. I was not making the decision on determinations.

Q. I appreciate that you're not deciding that she did in fact violate the law or deciding that her Visa should be revoked, but the Office of Intelligence collects the facts that are relied upon by all the leader decision-makers to determine whether a violation of law has occurred. And so I'm asking you, as a person who

runs that office, when you look at the ROA in front of you, what do you see here that is, um, to you, potentially indicative of a violation of U.S. law?

A. I don't make those determinations. I'm not a Special Agent. I'm not an attorney. I don't work for the State Department.

THE COURT: That's his answer. Move on.

MS. CONLON: Yes.

Q. Now this ROA itself has a few additional pages. I'm going to, um, not -- I'm not going to remove the Post Its because I want to protect Ms. Ozturk's personal identifying information, but it's fair to say, because you can see the version in front of you that doesn't have any Post Its on it, that nothing in the part that I've covered is relevant to the law-office findings of an allegation of violating U.S. law, right? The parts that are covered have her Social Security number --

MS. SANTORA: Objection, lack of foundation.

THE COURT: No, he's looking at it. The document speaks for itself. So he can see it. And without characterizing what's there, counsel.

The parts that she covered in examining you, and you see the whole document, none of that has any relevance to the investigation beyond identifying a particular person, so we're clear who we're talking

about, is that right?
THE WITNESS: Yes, sir, there is information in the ROA that is for context, for understanding the individual, um, it includes details that, um, have biographical, and don't point to a violation of the law, but provide context for understanding that individual.
Q. And the same is true for the next page, which I'm putting here, which has Ms. Ozturk's travel history, right, that's part of the effort that LI makes to document biographical information about a person that might be relevant, right?
A. That's correct.
Q. Now I'd like to turn to the next page. This page here. (On screen.) It says "Social media and open sources." And the only social media listed here is a Canary Mission profile of Ms. Ozturk stating her participation in anti-Israel activism in March of 2024, is that correct?
A. It does.
Q. And the entire Canary Mission profile for Ms. Ozturk was included as an attachment to the Report of Analysis, correct?
A. It appears so.
Q. The other thing that was included as an attachment was an article that Ms. Ozturk wrote for the "Tufts

Daily," correct?
A. (Looks.) It does.
Q. That is, as I understand it, the Op-Ed referenced by the Canary Mission profile. So I'm going to put this here. (Moves on screen.) Sorry. Here we go.
Do you see where it says -- hang on. Sorry. I'm missing a page.
(Pause.)
MS. CONLON: Hold on.
Q. I'm going to go back actually to the actual Canary Mission profile. (On screen.) Okay, got it. Okay, I'm being told that you can't see it on this printout here, but the Op-Ed is linked in a drop-down on the Canary Mission website. And then I actually have the Op-Ed here. So I'm going to turn your attention to that.
This Op-Ed is the Op-Ed that was written by Ms. Ozturk, correct, cited by Canary Mission?
A. It appears to be.
Q. No, that's the wrong one. Dear Lord, I'm sorry. Doing this on the fly is proving to be a little tough. Okay, here we go.
THE COURT: I'm not sure what this adds?
MS. CONLON: I'm sorry?
THE COURT: I'm satisfied -- the government provided this. I'm satisfied that this is authentic.

And I asked him a question about what pages went along with the facing page, and he said that it appears that the other pages go along with that facing page.

What are we adding?

MS. CONLON: Well, your Honor, in candor the government wouldn't even stipulate that Ms. Ozturk wrote this Op-Ed, so I just want the record to be clear.

THE COURT: The case is being tried to me.

MS. CONLON: Okay. If the Court accepts that, then we can move on.

THE COURT: No one accepts it, I accept that it exists, and that this appears to be the authentic and complete -- I -- the complete ROA.

So far as you know, it's the complete ROA, is that right?

THE WITNESS: That's right.

MS. CONLON: Thank you.

THE COURT: It's always a question whether as factfinder I believe him, and I'm not permitted to say yet. We'll see the whole sweep of the exhibits. But I understand the testimony.

MS. CONLON: Okay.

Q. So it's fair to say that this ROA on Ms. Ozturk includes no allegations about her protest activity apart from what's on the face of it, in other words you're not

aware of anything missing, any other basis for the HSI to think that she had additional involvement, is that correct?

A. I believe this is what the analyst could find related to Ms. Ozturk.

Q. Okay. All right.

MS. CONLON: Thanks. And you can take that down.

(Pause.)

THE COURT: Are we done with the questions as to Ms. Ozturk?

MS. CONLON: As to Ms. Ozturk, yes.

THE COURT: Then maybe he can give me back those pages.

MS. CONLON: Yes. Sorry.

Q. Now I'd like to turn your attention to another document, and the Court, I believe, has a copy. And I'm sorry to deprive the Court of what may be its only copy, but I would ask that the witness be given the pages concerning Mahmoud Khalil.

THE COURT: Let me do that.

(Pause.)

MS. SANTORA: Your Honor, for the record we would like to preserve our objection with respect to the --

THE COURT: Oh, I think that's fair, you have a continuing objection as to each of the documents I have

provided this morning, on all the grounds you've articulated both in writing and, um, orally, not only today, but in the course of this proceeding.

MS. SANTORA: Thank you, your Honor.

Q. Have you had a chance to skim the document that is -- oh, he doesn't have it yet. Sorry.

(Judge gives documents to witness.)

THE COURT: Now that's the government's, um, not you, but start on the next page. No, no, keep going.

May I have the page before that?

(Hands to judge.)

THE COURT: Okay. For ease of the government following, I'm giving him the pages that were denominated of what was submitted as Exhibit E. They were proceeded by Exhibit D, which appears to be the Andre Watson letter.

Go ahead.

MS. CONLON: Thank you, your Honor.

Q. Okay. Mr. Hatch, do you recognize what I'm going to, for the record, premark as EO, the document in front of you?

A. It is the subject profile from Mr. Khalil.

Q. Does it appear to you to be a true and accurate copy of the subject profile that the Office of Intelligence prepared on Mr. Khalil?

A. It appears to be.
Q. Does it appear to you to be a complete profile of Mr. Khalil?
A. Again I only in read this one once. It appears to be, but I'm not -- I'd have to see our document.
MS. CONLON: At this time I would ask to move into evidence what's been premarked as EO, as Exhibit 233.
THE COURT: I understand the government to object. I think the foundation is sufficient. Overruled. It's Exhibit 233 in evidence.
(Exhibit 233, marked.)
Q. Now I'm going to show you the first page, and again here I've put Post Its over the personal identifying information that I don't intend to ask you about. The top of the report says "Analysis Findings."
Is that meant to capture everything that follows or does that refer only to the two bullets that appears right underneath the header?
A. The two bullets underneath the header.
Q. Okay so the findings for Mr. Khalil relay that he became a lawful permanent resident, correct?
A. Can you -- can you ask your -- the previous question again?
Q. The findings for Mr. Khalil indicate that he is a lawful permanent resident, correct?

A. No, I'm --
THE WITNESS: Sorry, your Honor, I'm confused. Can you start over? Please ask the question one more time, I wasn't -- you didn't have my full attention. I was looking at the document.
THE COURT: Her more general question was, the portion above the picture is the total findings of the examiner including in the report as to Mr. Khalil, the factual findings as to Mr. Khalil, that's how I took her question, is that right?
THE WITNESS: Not exactly. That paragraph, the analysis findings paragraph, is kind of what, um, those two bullets are, um, kind of a way for a person to read and get key details quickly. The entire document is the research and analysis, the totality of the research and analysis. It provides a partial summary so that the reader can get an understanding very quickly of what we're talking about and what the situation is.
Q. It's like the "headlines" basically?
A. Basically, yes.
Q. Okay. Now the categories that are covered are under the headline of "Biographical Information" and other such categories. I want to move to what is the third page of Exhibit 233, the category here is "News Articles." Now you don't have the benefit of having the

actual articles in front of you, and neither do I, so I'm not going to ask you what they say. However you are an expert in the Report of Analysis process.

Can you explain why these articles would be relevant to a Report of Analysis about Mr. Khalil?

A. Again, providing context for the -- for the individual who was in the lead -- who was the subject of the lead, um, it appears the analyst was, um, trying to get an understanding of his activities.

Q. Now you said it helps to provide context. The third bullet here actually is Mr. Khalil's Canary Mission profile, is that right? Do you see where it says "canarymission.org/individual/mamoud_khalil"?

A. It does appear that that's from Canary Mission, a source of Canary Mission, or --

Q. The italicized language that appears in this page, these are excerpts from articles that the analyst has highlighted as particularly relevant, is that correct?

A. It appears to be that the analyst highlighted where "Khalil" was mentioned.

Q. In other words, your understanding about -- at least how it ordinarily works, is that an analyst pulls out the relevant portions of sources that it is including as those sources relate to the person that the report is about?

A. Yes.
Q. I'm going to turn to -- and just so we're clear on this, the sources here, so we have an article from the "Wall Street Journal," the "Guardian," Canary Mission, and at the bottom we see "The New York Post"?
A. I see "The New York Post."
Q. Okay. And I'm going to put the next page in front of you and give you a second to -- oh, you have it in front of you already, to just take a look. This last bullet at the top of the next page I think is a continuation -- but tell me if I'm looking at it incorrectly, of what was from "The New York Post" article. Is that a fair understanding of it?
A. It appears to be. (On screen.)
Q. And here you see where it says that Mr. Khalil told the "Columbia Daily Spectrum," reading from the top, that he didn't participate in protests because he was worried about losing his Student Visa status that lets him be in the U.S.
What is the relevance of that to the context here?
A. Again, it's just a news article on him.
Q. You agree that the only articles we're seeing about Ms. Ozturk or Mr. Khalil are ones that relate to protests of Israel and Palestine and not any other topic, right?

Case: 26-6906, 11/20/2026, DktEntry: 16.5, Page 286 of 300



A. That's correct.
Q. Um, okay. Just a moment. (Pause.) Okay. I'm going to -- and I guess lastly, you can see here the last category appears to be social media. There is an Instagram posting of a news clip -- that is an ordinary thing, I take it, to include in a Report of Analysis, an Instagram post, for example?
A. It could be.
Q. It could be. Okay. I'm going to move to another profile because I think the profile --
THE COURT: Well since we're working off paper copies, if he could give me that back. (Hands to judge.)
And the next one is who?
(Pause.)
Q. Okay.
MS. CONLON: If the Court could please give -- and thank you for your help, Mr. Hatch the document -- the pages concerning Badar Khan Suri.
THE COURT: All right.
(Hands to witness.)
(Pause.)
Q. And when you've had a chance to -- oh, you don't have it yet. Sorry.
(Pause.)

THE COURT: These are the documents, um, tabbed Exhibit K in the government's submission to the Court, so we're clear. The first page is not the file itself.
Q. I'm just going to give you a moment to look at that.
A. (Reads.)
Q. So you're reviewing right now what I'd like to have marked as -- EN for identification.
THE COURT: It may be so marked.
Q. Do you recognize this document?
A. It appears to be the ROA for Mr. Suri.
Q. Does this appear to be a true and accurate copy of the ROA for Mr. Suri, so far as you can tell?
A. It appears to be, so far as I can tell, not being familiar with this ROA, only having read it once.
Q. But you recall reading it, um, at some point before today, correct?
A. Yes.
Q. And you read it in the same context in which you read Ms. Ozturk's and Mr. Khalil's, which is to say in a meeting with senior HSI leadership, correct?
A. I do not recall where I read this one.
Q. Okay. And it appears to you, as you page through, to be the complete Report of Analysis from Mr. Suri, is that correct?
A. It looks like it.

MS. CONLON: We offer what has been premarked as Exhibit EN for identification as Exhibit 234 into evidence.

THE COURT: The government objects and its rights are saved, but the objection is overruled. It may be admitted, EN is admitted, Exhibit 234 in this proceeding.

(Exhibit 234, marked.)

MS. CONLON: Now I'm going to put this up in a second, I'm just covering any biographical, sensitive information, so I apologize. Just a moment.

(Pause.)

Q. Okay. So this page here, Page 1, for Mr. Suri --

MS. SANTORA: Your Honor, I'm so sorry to interrupt, but I don't think the government has that document, um, in the packet that was handed to us. He said it was Exhibit K, our packet stops at Exhibit I.

THE COURT: The law clerks may -- confer with her, um, with Ms. Conlon.

(Pause.)

THE COURT: Ms. Santora, also confer with Ms. Belmont, the Clerk, because you should have everything that she has, in the exactly the same form.

(Confers.)

Q. So just to confirm for the record, the government

does have it?

THE COURT: Well now they do.

MS. CONLON: Thank you.

Q. So this ROA for Mr. Suri has more information in the analysis binder than the others we've looked at, right?

A. It does.

Q. It cites here that Mr. Suri is married to a person who is the daughter of a person who is or was a senior Hamas figure in Gaza, is that right?

A. It appears to say that.

Q. And it says that Mr. Suri, according to open source reporting, spreads Hamas propaganda and promotes antisemitism on social media, right?

THE COURT: Well it's in evidence now, it speaks for itself. I can speak and read.

MS. CONLON: I want to ask him about that.

THE COURT: Then why don't you ask him about that.

Q. Where it says "open source reporting," that means there has been reporting in sources online that the government identified?

A. Yes, that's usually what "open source" means.

Q. I'm wondering if it's a term of art or if I'm misunderstanding something. So just to confirm, "open source reporting" means sources online have reported these claims about Mr. Suri, correct?

A. "Open source" usually means press reporting.
Q. Press reporting. Okay.
So turning to the press reporting here, which I think starts on Page 4.
A. (Looks.)
Q. There is -- just making sure you can see it. Okay.
Page 4, there's a Twitter posting included here, by someone else, not Mr. Suri, another person, Anna Stanley, with claims about Mr. Suri. Is that an example of "open source reporting"?
A. (Looks.) It could be.
Q. In other words, social media, in Reports of Analysis, doesn't have to be limited to the subject's social media, it can include things about the subject on social media, correct?
A. It can, yes.
Q. And in this instance the open source reporting about Mr. Suri from social media includes something by someone who isn't him, correct?
A. That's correct.
Q. Now -- just a moment.
A. One correction. One addition to that.
Q. Yes.
A. I'll note that the analyst properly included where the post came from, who posted it, um, and it looks like

it factually represented what was posted and the details.

Q. Yes. In other words, the analyst didn't suggest this is what the analyst thinks, the analyst made clear this is what somebody else has said?

A. That's correct. And the analyst did not say that that's what the government thinks or did not recommend anything from that, just put the fact that there was an article or a post and this is what it said and this is who it is said by.

Q. Yes, and that is the only sort of job as the ROA, that is what it's supposed to do?

A. That's correct.

Q. Now in the next page of this, at the top, um, here, it says "Khan Suri appears to post pro-Palestinian content." That is not an excerpt from social media, that is a characterization by the analyst about the nature of Mr. Suri's online postings, correct?

A. Again, you'd have to ask the analyst. I don't know -- again it says "It appears to post pro-Palestinian content." So, yes -- and it looks to be that that was written by the analyst, from the context of this report.

Q. That's all I wanted to confirm. I appreciate that you don't know what the content is. But just to be

clear, like if it were an excerpt, it would be in italics with a quotation mark. This text here, below the Instagram link, is actually something written coming from the analyst, not an excerpt or quotation from someone else?
A. It looks like it.
Q. And the -- what's listed as social media includes things other than, um -- you know includes things other than posts on like social media websites. So it includes things here, for example, about his work profile in the Georgetown website.
Is that, in the ordinary course, something that gets included?
A. Yes. We're collecting information about -- or reporting information about the individual, to understand the, um -- the, um, details about the individual.
Q. And on the next page, in addition to exploring -- the page before, that we just looked at, had descriptions about his research, and here on the next page there's a description of the course he's teaching from some website "Corsical."
So in a Report of Analysis, it's relevant, on a faculty member, what course they teach?
A. Again, we also put what car he drives or where he

lives. It provides information to understand the individual and what that individual does.

Q. Well just a moment, and I don't want to quivel, but there's nothing in here about, for example, what car he drives, right? I mean you don't know, from looking at this, if this man has a driver's license or drives a car, right?

A. As an example, I put car information and residence and other types of information in the ROA.

Q. But there's nothing in here about his hobbies, right?

A. I don't see anything like that.

Q. There's nothing in here about how he spends his time on the weekends, right?

A. There doesn't appear to be.

Q. Because this is only collect information pertinent potentially to a violation of law, right?

A. That's correct.

Q. And in this instance, for a professor, what was potentially pertinent were articles about his scholarship, his course posting at his university, and things that other people wrote about him on the internet, right?

A. This is what the analyst could find.

Q. And this is all they could find?

A. I would assume so.
Q. Okay.
MS. CONLON: I would ask that the Court please provide Mr. Hatch with the pages concerning Mohsen Kadar Mahdawi, and we're done speaking about Mr. Suri.
THE COURT: And then what?
MS. CONLON: I'm done with Mr. Suri's pages, so I was suggesting maybe they be returned to the Court.
THE COURT: Yes, and Mr. Hatch will do that while I'm finding Mr. Mahdawi.
MS. CONLON: Yes, Mr. Mahdawi.
(Pause.)
THE COURT: And so we're clear, I'm giving the witness the pages that the government has denominated Exhibit G in the submission to the Court.
And if you'll return what you've got. Yes, thank you. (Witness returns pages.)
Q. Okay. When you've had a moment to take a look, just let me know.
A. (Looks.) Okay.
Q. Now I'm showing you what I'd like premarked as EN for the record.
Do you recognize this document?
A. It appears to be the Report of Analysis on Mr. Mahdawi.

Q. Does it appear to be a true, accurate, and complete copy of that document as far as you can tell?
A. As far as I can tell, it appears to be.
Q. Okay.
MS. CONLON: I would like to offer this into evidence as Exhibit 235.
THE COURT: The government objects. It's rights are saved. The objection is overruled. The document may be admitted, Exhibit 235 in evidence.
(Exhibit 235, marked.)
Q. Okay. I'm showing you this first page. Here, again, we have the highlights and the analysis findings, which in this instance seem only biographical.
And a question for you. Is that typically the case?
A. That the analysis findings only include biographical information?
Q. We've seen kind of a mix as we look through these, and in some instances there's some indication of why the person is being examined and in some it's just here's when they came, here's their status, and I'm wondering if there's any sort of rhyme or reason into what goes into that section of the report?
A. It's just a summarization of the information they found. I don't know the answer to that.

Q. Okay. Fair enough.

Turning to -- and, Mr. Mahdawi, sorry, before we go on, he's a lawful permanent resident, as you see at the top.

I take it there's no difference in the type of Report of Analysis prepared whether the person is a Visa holder or a lawful permanent resident, is that correct?

A. We don't have Reports of Analysis categories based on those types of considerations.

Q. Okay. The process is the same?

A. Yes.

Q. Okay. Now I'm going to direct your attention to the third page, and I'm going to skip Page 2, which has lots of identifying information, but the third page does not, it has -- this is the section on social and open sources.

And my first question is this. Drawing your attention to the bullet on the left where it says, "has the Twitter X post." It includes the post claiming that Mr. Mahdawi is pro-Hamas based on an appearance he had on "60 Minutes."

You'd agree with me that there's nothing in the report indicating the analyst reviewed his appearance on "60 Minutes" to determine whether the Twitter post characterized his appearance accurately, right?

A. I --

THE COURT: I didn't understand the question.

MS. CONLON: Sorry, I'm going to break it into multiple parts just so we can all be on the same page.

Q. So first what we have here on the left is a Twitter post by someone else accusing Mr. Mahdawi of being pro-Hamas based on remarks he's alleged to have made on "60 Minutes," correct?

A. Yes, it appears to be.

Q. There is nothing in the Report of Analysis indicating that the analyst reviewed his appearance on "60 minutes" to determine whether what this person on Twitter said about him was correct, do you agree with that?

A. I don't see anything about the -- I don't know if the analyst reviewed "60 Minutes" or not.

Q. And is it, in the ordinary course, is that -- I'm trying to understand sort of the extent or the depth of the look that's given by the analyst.

Is it enough for the report if the analyst just indicates "Here is what someone else has accused this person of?" Is that --

THE COURT: Enough for what?

MS. CONLON: For the purpose of following the policies and guidance about making an ROA. Like is that

Case: 26-6906, 11/20/2026, DktEntry: 16.5, Page 298 of 300



all that's expected?
A. Just on the circumstances you've given me, and in that scenario, I would have expected the analyst to have reviewed the "60 Minutes" report. However, as long as the analyst properly cites this was what it was, it was a statement made by a person about a video they had seen related to the individual, it's not a judgment call from the analyst, it's what they found.
Q. I understand that, that the analyst is not superimposing their characterization of it, they're just reporting what someone else says. But I'm concerned that the only information that's used later by decision-makers is what's in the Report of Analysis --
THE COURT: With all respect, Ms. Conlon, your concerns are not dispositive.
MS. CONLON: Sure. I'm sorry. I'm just trying to explain my question. But I can just be more direct.
Q. At least in this instance for Mr. Mahdawi, there's no indication on the face of this report that anybody reviewed any of the underlying materials that are being characterized by other people on social media, isn't that correct?
A. I don't know if you can make that characterization. I can't look at this and say the analyst -- that they may have looked at the "60 Minutes" report and, um,

found something or found nothing. They -- I can't make the judgment that you assert.

Q. If a person had looked, an analyst had looked at the "60 Minutes" report, wouldn't you expect them to include, in the report, whether or not that is what happened, whether or not the allegation was true?

A. I would have expected that. But again, if I'm looking at this, um, the ROA, and like you said assessing the -- whether or not the analyst followed policy, I see here that the analyst properly, um, wrote "sourced the material," and showed whoever reads it that this is just a claim somebody made about reading the report. So you could take this report and say, "Okay, the next step is to read the -- to actually look at the '60 Minutes' report," or again that's the other side of this on how the ROA is used. I'm assessing the ROA as to whether or not it's within policy, did the analyst do their job.

Q. So from your perspective -- or withdrawn.

It's not the Office of Intelligence's responsibility to take what you have identified as a potential useful next step, that's not the Office of Intelligence's responsibility, is that correct?

A. In a scenario like this, I or one of the supervisors could have asked the analyst, "Did you look at the '60

Minutes' report?" And I don't know if that happened. I don't recall if that happened. But that's the -- yeah.

Q. You don't recall -- you did review this one, but just to be clear, you don't recall whether you received any information not contained within this report about Mr. Mahdawi, correct?

A. I don't remember -- I don't -- I know that I read the report. I don't recall any actions taken from this report.

Q. Okay.

MS. CONLON: One second.

(Pause.)

MS. CONLON: Okay. And I think we can hand back to the Court the paperwork on Mr. Mahdawi, and I have one more Report of Analysis that I'd like to show you. If the Court would please provide Mr. Hatch with the Report of Analysis on Yunseo Chung.

(Pause.)

THE COURT: And I've given Mr. Hatch the documents that appear, and the government's designation, when submitted to the Court, as Exhibit C.

MS. CONLON: And I'm going to ask that the document be premarked as Exhibit EO for identification.

THE COURT: It may be so marked.

(Pause.)