**No. 26-6906**

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

**STANFORD PUBLISHING CORPORATION, *et al.*,**

*Plaintiffs-Appellees,*

**v.**

**MARCO RUBIO, *et al.*,**

*Defendants-Appellants.*

**Appeal from a Judgment Issued by the U.S. District Court for the Northern District of California (Civil Action No. 5:25-cv-06618-NW)**

# DEFENDANTS-APPELLANTS' EXCERPTS OF RECORD VOLUME 5 of 15

**JONATHAN D. GUYNN**
**Acting Assistant Attorney General**
**Civil Division**

**DREW C. ENSIGN**
**Deputy Assistant Attorney General**

**AUGUST E. FLENTJE**
**Special Counsel for Immigration Litigation**

**SAMUEL P. GO**
**Assistant Director**

**JAMES A. HURLEY**
**Trial Attorney**
**Office of Immigration Litigation**
**U.S. Department of Justice Civil Division**
**P.O. Box 878, Ben Franklin Station**
**Washington, D.C. 20044**
**T: (202) 305-1889**
**F: (202) 305-2509**
**james.hurley@usdoj.gov**

**JAIME DURR**
**DOMINIC WEISS**
**Trial Attorneys**

**Date: November 20, 2026**

**Attorneys for Respondent**

Q. Do you recognize this document?
A. It appears to be the Report of Analysis for Ms. Chung.
Q. And does it appear to you to be a true, accurate, and complete copy of the Report of Analysis on Ms. Chung?
A. It appears to be. Again, the same comments as before. I think I read this one once.
MS. CONLON: Your Honor, I'd like to offer what was premarked as Exhibit EN -- EO rather, into evidence as Exhibit 237.
THE COURT: The government objects under its continuing objection to these, and its rights are saved, but overruled. The document may be admitted and marked Exhibit 236 in evidence.
(Exhibit 236, marked.)
Q. Now I'm going to show that you this exhibit, so you know what we're looking at.
A. (Looks.)
Q. This is a Report of Analysis on Ms. Chung, who is a legal permanent resident, and that is all that's in the headline of her report, right?
A. The report says she's a legal permanent resident.
Q. Okay. Now I want to turn to the substance of it in terms of the information about her activity. (On

screen.)

Here there are two news articles on this page and there are some notes from the analyst about the news articles above the excerpts about the article -- from the article. So turning your attention to the first one from the New York post.

Am I correct that the text that appears below the link where it says -- it describes her as being part of the protest, that is text that was put there by the analyst, and what appears below it is a quote from the article, is that right?

A. That's what it appears to be.

Q. And then again, on the next bullet, the same thing, right? This text here, the nonitalicized text under the link, that's the analyst's input, correct?

A. It appears to be from the analyst.

Q. Okay. And I don't want to put the first page -- I don't want to take the Post Its off this first page, so I'm just -- but I do need to look at it, so I need to direct your attention back to the first page.

There's a section on the first page that says "Criminal History," right?

A. Yes.

Q. And it lists three charges that were apparently related, it would seem, to the protest, is that correct?

A. I don't -- I don't know if I can make that judgment. I see the charges.

Q. The charges have the date -- there's a parenthetical after them that says "March 2025," that would be something that the analyst inputted, is that right?

A. Yes, that would be.

Q. And there's a description of the charges, but no indication of their status, is that correct?

A. That's correct.

Q. In other words, we can tell from this report that she was accused of disorderly conduct, trespass, and obstructing governmental administration, in the second degree, and that those charges were made in the New York County Criminal Court, is that correct?

A. That's what it says.

Q. But you couldn't discern, from looking at this, whether those charges were dismissed, is that right?

A. I cannot.

Q. If the charges had been dismissed or were later dismissed, does the ROA get updated to reflect that or once the ROA's made and goes out the door, that's the end of it?

A. It is our policy for ROAs to be updated.

Q. Okay. And this ROA, the published date at the bottom, that is the date that it was created, March 6th.

If it had been updated, would there be a second date on it?
A. There usually would be.
Q. It would appear -- would you see only one date, the most recent, or do you see ordinarily the original publication date and then a date of the revision or amendment?
A. It could be both.
Q. Okay.
MS. CONLON: One second.
(Pause.)
Q. Now, um, the five -- and you can put that aside, I don't expect to ask you more that requires you to look at the documents. I hope not to.
The five reports -- oh, sorry, your Honor, I think he's --
THE COURT: Yes. I'm sorry.
Q. The five reports that we've looked at, um, they are -- are they representative of the reports that you saw produced by the Tiger Team on the protestors as part of this effort that began in March?
A. Representative in what way?
Q. Um, is there anything special about --
THE COURT: I understand that question, and it occurred to me.

Are these typical reports?

THE WITNESS: They're typical subject profiles.

THE COURT: Okay.

Q. And is there anything different about these five subject profiles that you recall from the other subject profiles that you saw produced by the Tiger Team?

A. No, not substantially.

THE COURT: Much more for this witness, Ms. Conlon?

MS. CONLON: A bit more, your Honor, but not much. But more than 5 minutes.

THE COURT: Would you like to take the recess?

MS. CONLON: Yes, if your Honor wouldn't mind. Yes, please.

THE COURT: We'll take the recess for one half hour until 11:15.

We'll stand in recess.

THE CLERK: All rise.

(Recess, 10:45 a.m.)

C E R T I F I C A T E

I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do hereby certify that the forgoing transcript of the record is a true and accurate transcription of my stenographic notes, before Judge William G. Young, on Thursday, July 10, 2025, to the best of my skill and ability.

/s/ Richard H. Romanow 07-10-25
________________________
RICHARD H. ROMANOW  Date

Case: 26-6906, 11/20/2026, DktEntry: 16.6, Page 8 of 300



UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

No. 1:25-cv-10685-WGY
Volume 2, Pages 72 - 132

AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
Plaintiffs

vs.

MARCO RUBIO, in his official capacity as
Secretary of State, et al,
Defendants

********

BENCH TRIAL DAY 4

BEFORE THE HONORABLE WILLIAM G. YOUNG
UNITED STATES DISTRICT JUDGE

United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
July 10, 2025

********

Court Reporter: Kelly Mortellite, RPR, RMR, CRR
Official Court Reporter
United States District Court
One Courthouse Way
Boston, Massachusetts 02210
mortellite@gmail.com

Case: 26-6906, 11/20/2026, DktEntry: 16.6, Page 9 of 300


A P P E A R A N C E S

RAMYA KRISHNAN
XIANGNONG WANG
Knight First Amendment Institute at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
Carrie.decell@knightcolumbia.org
and
COURTNEY GANS
NOAM BIALE
ALEXANDRA CONLON
Sher Tremonte LLP
90 Broad Street, 23rd Floor
New York, NY 10004
(212) 540-0675
Cgans@shertremonte.com
For Plaintiffs

ETHAN B. KANTER
WILLIAM KANELLIS
VICTORIA M. SANTORA
JESSICA A. STROKUS
DOJ-Civ
P.O. 878
Ben Franklin Station
Washington, DC 20044
(202) 616-9123
Ethan.kanter@usdoj.gov
and
SHAWNA YEN
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, MA 02210
Shawna.yen@usdoj.gov
(617) 748-3100
For Defendants

Case: 26-6906, 11/20/2026, DktEntry: 16.6, Page 10 of 300


INDEX


| WITNESS | PAGE |
|---|---|
| PETER HATCH | |
| Direct Examination By Ms. Conlon (continued) | 75 |
| Cross-Examination By Ms. Santora | 90 |
| Redirect Examination By Ms. Conlon | 107 |
| AMY GREER | |
| Direct Examination By Mr. Biale | 113 |
| Cross-Examination By Mr. Kanellis | 125 |

E X H I B I T S

| Exhibit No. | Received |
|---|---|
| 237 | 124 |

P R O C E E D I N G S

(Resumed, 11:19 a.m.)

THE COURT: The witness may resume the stand.

MS. CONLON: Ms. Conlon, you may continue.

BY MS. CONLON:

Q. So we've spoken quite a bit about Canary Mission, that source of names, and the court alluded earlier with you to the fact that names came from elsewhere. I just want to turn to the "elsewhere" part of that for a moment.

11:19 You had previously testified that the names came through Derek Gordon, correct?

A. Yes, they came through ICE leadership, HSI leadership.

Q. And they came on multiple occasions, right? It wasn't one delivery?

A. Right, there were multiple.

Q. And certain -- well, you'll tell me if it's for all or some, but in certain instances you received more than just the name of a person to look at, right?

A. We would get the name, occasionally we would get what

11:19 protest they were alleged to have attended, maybe where they were a student, some basic information. The lead usually contained some basic information.

Q. When you say "the lead," you mean like the verbal information Mr. Gordon gave you about the person?

A. Yes.

Q. And when you say that in certain instances Mr. Gordon gave you the name of a student and which protest they had attended, you mean like the date and place and time of a particular protest, correct?
A. I believe so.
Q. And he didn't just give you their name and the protest they went to and the school they went to but also their suspected nationality, correct?
A. No. I don't -- again, these are -- as I said before in my deposition, the leads didn't go through me. Most of the leads went to the team lead or through my deputy.
But as I recall, when hearing the information, I don't know if I could say that they -- I don't know the details of each lead other than they usually had a name, they definitely had a name, that they were a protester and then it may have included what school they were from. I don't recall hearing anything about nationality.
Q. Mr. Hatch, I'm going to be referring to the transcript of your deposition. For the benefit of the court and the government, I'm thinking about pages 213 to 214 of Mr. Hatch's deposition, and I want to make sure you have a copy.
Actually, can we put it up on the screen because it's just one page. 213. We just need a moment. I just want you to be able to see it.
I'm going to draw your attention to the bottom half of the

page, and you can let me know if it refreshes your recollection because I'm assuming that you simply forgot.

Line 16, you were asked: "Do analysts get anything more than the name of a student protester when they're asked to research that individual?"

Answer: "Yes."

"What information besides the name do they get?"

We're going to start -- Ms. Safavi objected. Starting at line 24, Answer: "As I recall, they could get what protest 11:22 they were at," and then continuing on to the next page, which may take us technically a moment.

A. Is it possible I can see the whole page? That's better. I can read this.

Q. Okay. "They could get the suspected nationality." Do you see that there?

A. Yes, they could get it. I don't recall but it's possible the nationality could have been part of the lead. I just don't recall it.

Q. So to the best of your recollection -- you can take that 11:23 down.

To the best of your recollection having reviewed your deposition testimony, they could get the student name, where they were a student, the protests they attended and their suspected nationality, among other things; is that right?

A. They could get it, yes.

Q. Now, Mr. Gordon would convey that information to them separate from the directive to look at the Canary Mission website. That was a separate source of information; is that correct?
A. Yes, we had multiple sources of information. Canary Mission was not the only one.
Q. And about the quarter of the people identified came through alternate sources other than Canary Mission, right?
A. I guess up to.
11:23
Q. I'm sorry?
A. Up to a quarter.
Q. Up to a quarter?
A. I don't know the exact numbers of the leads we got. Sorry.
Q. Sorry, no.
You testified a bit in your deposition about the process, to the extent to which the process involves the front office, which I assume is the front office of HSI, in terms of identifying leads. And I want to ask you about that.
11:24
The leads, the list of leads usually goes through the front office, the leadership of HSI, isn't that correct?
A. Could you show the deposition?
Q. Sure. Do you not recall? Because we don't ordinarily just show people their depositions unless they don't remember. If you don't remember, we can if you want to.

THE COURT: He's asked and that's your answer, you're not going to show it to him.

MS. CONLON: I mean, I just -- you're right, not unless you don't recall.

THE COURT: It's not whether I'm right. This is your case to try, but that strikes me that when a witness asks -- well, it's your case to try. Show it to him or not.

A. You referenced the deposition, so I'd like to see the deposition.

11:25 Q. Sure. Can we please turn to page 177 of the deposition transcript. Actually, I guess it's page 178. I apologize. Page 178, please.

If you look at lines one through five, you indicated that -- you made a clarification about the list you received. You testified that, "They usually go through the front office, so the leadership of HSI, but they come from Office of Border Czar, Office of the Secretary."

Do you see that there?

A. I see that.

11:25 Q. So we can take that down.

So when you say, "They go through the front office," that means who exactly?

A. So the front office are the people we mentioned before. It could go through Mr. Gordon, Mr. Hammer. Again, that's the HSI top leadership.

Q. And when you say, "They go through the leadership of HSI, but they come from the Office of the Border Czar," you're speaking of the Office of the Border Czar, which is housed, as I understand it, outside of the Department of Homeland Security, right?

A. So when I said that, I was giving you possible examples of where the leads came from. I don't -- as I had said earlier, I don't know exactly, because I'm not familiar with that process and I was not privy to that, I don't know how they got the -- I 11:26 don't know how HSI got the leads. I don't know how it was sent to them, and I don't know who sent it to them. And at that point I was speculating who it came from.

I think I mentioned they came from possibly the Border Czar, possibly DHS, possibly other partners, even the public. So those leads can come from all directions.

Q. So I hear you saying you don't know for certain where the particular student protester names given to the tiger team came from but that the regular process -- and I'm literally reading your words here, "The clarification would be those lists 11:27 usually go through the front office so the leadership of HSI but they come from Office of Border Czar, Office of the Secretary." That is the ordinary process, correct?

A. No, it is not. The ordinary process for leads or the ordinary process for the protesters?

Q. The ordinary process for lists. You said, "Lists usually

go through the front office, so the leadership of HSI, but they come from Office of Border Czar, Office of the Secretary."
A. The leads go through -- in this case, the leads went through the front office and could have come from those locations.
As I said before, for example, with the Canary Mission list, I don't know how that was presented to us. I don't know who sent that, notified us of the website. I don't know of any leads, any particular leads coming from any place outside of HSI. I can't tell you where each lead came from.
11:28
Q. So I am clear here, when you made a reference in your deposition in response to a question about the leads to the Office of the Border Czar, you were referring to the Border Czar who is appointed by the President outside of the Department of Homeland Security; is that correct?
A. When I said "Border Czar," I was referring to the Border Czar.
Q. The Border Czar being Tom Homan. We can talk about him by name, right?
11:28
A. That's correct.
Q. Tom Homan was -- withdrawn. Tom Homan does not work for DHS, right?
A. I think -- I don't know who the Border Czar works for, if he works for DHS --
Q. He's not part of HSI's leadership; is that fair to say?

A. He's not part of HSI leadership.
Q. When you said that ordinarily -- or I'm not sure what you're saying about it now, but when you said in your deposition that, "Lists go through the front office but come from the Office of Border Czar or Office of the Secretary," "Office of the Secretary" was a reference to the Secretary of Homeland Security, correct?
A. Yes. And what I meant was their offices. So obviously the Secretary of Homeland Security is not sending us leads personally.
Q. The executive office?
A. Yes, her office, her staff, as well as Border Czar. And for clarification, as I said before in the deposition and now, I don't know where each particular lead came from. I don't know where each particular list came from. So I can't say for certain, but I was giving you general where they may have come from. I could not cite, for example, a specific lead that came from any particular source if you were to ask me.
Q. Yeah, I understand that you don't know the specific origin of these leads. I'm asking you how it normally works since you don't know the specifics of this source of leads. So that's what I wanted to clarify.
A. To answer your question on how it normally works is I get the lead from the chain of command. That's the normal process. How the chain of command gets it is something beyond my

visibility.
Q. Okay. Well, just to be very clear, the question you were asked was about how leadership gets it, and the answer you gave was that the lists go through the front office. Was that untrue? Is that incorrect?
A. The list goes through the front office -- in this case, the lists and leads were coming from the front office, the HSI front office.
Q. And literally in your deposition you said, quote, "But
11:31 they come from Office of Border Czar, Office of the Secretary." Was that incorrect?
A. They could come from --
Q. That isn't what you said. Do you want to see it?
MS. SANTORA: Objection.
THE COURT: The objection is sustained. I've looked at the deposition. He said what he said. You've read it. It's part of the record. He's given his testimony here today. Let's move on.
Q. Okay. We can move on to -- I only have a few questions
11:31 remaining.
So we spoke about the ROAs for five particular people, and you looked at them with me. You've mentioned that there were approximately 200, as best you know, ROAs generated by the tiger team, right?
A. Approximately, yes. I don't recall the numbers. I was

not keeping stats of what I read.
Q. I understand. Now, most of the ROAs, so far as you know, mentioned Israel or Palestine, correct?
A. Yes, as you saw the way they were mentioned in the five we reviewed earlier.
Q. In other words, whether a person -- references to what the person had said concerning Israel or Palestine?
A. Could be.
Q. Many of them mentioned specifically the war in Gaza, 11:32 right?
A. I don't know.
Q. Do you recall seeing any that mentioned the war in Gaza?
A. I recall, yes.
Q. Is that a yes?
A. Yes. Some mentioned Gaza, I believe.
Q. Some mentioned pro-Palestinian protests, right?
A. I think so.
Q. More than just the one we saw today, correct?
A. Yes, I think so.
11:32 Q. Some used the term "pro-Hamas," correct?
A. I believe so.
Q. Some, like the ones we saw today, mentioned a student protester's public writing, correct?
A. If you mean a post as public writing, then yes.
Q. I don't only mean a post. Articles in newspapers, for

example?
A. That's possible as well.
Q. To be clear, I'm not asking you to just summarize what you and I looked at in those five, but I'm asking the broader body of ones --
A. I understand.
Q. Okay. Some mentioned a student protester's social media, right?
A. That's correct.
11:33 Q. Some of the ROAs mentioned public statements by protesters, not from social media, not from, say, an article, right?
A. Yes, some mentioned public statements.
Q. Some mentioned a student protester's chants at a student protest, right?
A. I believe some did.
THE COURT: Some of them mentioned criminal activity.
THE WITNESS: Yes, sir.
Q. Well, the question is about the ones we haven't seen, so I
11:33 guess the question for you, to build on what Your Honor has asked, Mr. Hatch, approximately how many of them mentioned criminal activity?
A. I don't recall those numbers.
Q. Today we looked at five, only one of which made a reference to a person having been arrested. Is that a

representative sample?
A. I think there were two with.
Q. I'm sorry?
A. I think that I read two today -- two of those five had criminal activity. One had the ones you mentioned about the New York cases, but another had an LSD possession charge.
Q. I am talking about recent criminal activity at a protest. You're talking about something else. I understand the distinction, so let me be clear.
11:34 Of the population of reports of analysis that you reviewed, approximately how many included allegations of recent criminal conduct in connection with a protest?
A. I don't know.
Q. Did any of the reports of analysis you reviewed mention that a person had been convicted of a crime?
A. I don't remember.
Q. Hmm. Some of the ROAs that you reviewed, not just the ones in this courtroom, specifically mentioned a protester's membership in a student group, right?
11:35 A. That's possible.
Q. That's possible or that is what you recall?
A. I believe there were some.
Q. Some specifically mentioned a student's membership in the group Students For Justice in Palestine, right?
A. I think that was one.

Q. Some specifically mentioned a student protester's statements or views on Israel, correct?
A. I believe so.
Q. Fair to say that the vast majority of the ROAs you reviewed said nothing about criminal activity whatsoever?
A. I don't know.
Q. You don't know whether the vast majority --
A. I don't recall the details of those ROAs.
Q. Now, this whole effort, tiger team effort, began sometime in March, right?
A. I believe so, yes.
Q. And it was responsive to two executive orders issued by the President, one of which we've spent some time discussing, and those would be Executive Order 14161 and 14188, correct?
A. As I said before, the tiger team was formed because of the large number of individuals in the lists. The tiger team was formed to look at protesters.
Q. Okay. And the reason that you were looking at protesters was because of the executive orders, correct?
A. The reason I was looking at protesters is because I was directed to from HSI leadership. Whether or not they did it in response to the executive orders was not something I was privy to.
Do the protesters' activities relate to an executive order? Possibly. I guess it could be characterized that way.

But you're asking me if I characterized it that way, and I did not.

Q. Well, Mr. Hatch, I really don't want to have to go back to your deposition transcript, but I will if you don't recall saying this.

You've previously testified that Mr. Gordon gave you guidance or instructions about the executive orders to produce reports of analysis on student protesters. You linked those things, isn't that correct?

11:37 A. I think it's fair to say that yes, but that's not my -- I did link those things, but my direction to the team was not execute the executive order. My direction to the team was look at protesters.

Q. I don't want to argue with you. I'm not asking about your direction to your team. I'm asking about what you received, the directions you got. And the directions you got were to create these reports of analysis on student protesters as part of HSI's response to Executive Orders 14161 and 14188, isn't that right?

11:38 A. I don't know if -- I'm just trying to answer the question as best I can, Your Honor. I don't characterize it that way. I know that the executive orders, I know one of those executive orders existed. As I said in my deposition, that was the first time I had read one of them. So the context of everything we were doing is obviously from the executive orders, but in this

particular effort, my direction to the team and as I received it, my characterization of it is we were looking at protesters.
Q. Can we please put page 149 of the deposition transcript on the screen. Please take a look.
Line 11, Question: "Well, you -- you agreed -- you answered in the affirmative to whether you have received guidance or instructions about the executive orders and you named as one person who has provided that guidance, Mr. Gordon. My question is what was that guidance?"
11:39 Ms. Safavi objects. You answered, "Produce reports of analysis on individuals involved in protests as it relates to Title 8."
That's what you said, right?
A. Yes, I think that's what I just said a minute ago. The job was to produce reports of analysis on individuals involved in protests as it relates to Title 8 and violations of law.
Q. I'm not sure why you're so resistant to answer this here.
THE COURT: Don't characterize the witness's answers. I'm listening.
11:40 MS. CONLON: Okay. We can take down the transcript.
Q. Now, these protests that we're talking about, the student protests, they began in October of 2023, right?
A. Yes, I believe so.
Q. Okay. This urgent effort by HSI to identify these student protesters didn't start in 2023 when the protests began. It

started after these executive orders in the spring of 2025, right?

A. It started in the spring of 2025.

MS. CONLON: Okay. Nothing further.

THE COURT: Ms. Santora, do you wish to examine this witness?

MS. SANTORA: Yes, I do, Your Honor.

CROSS-EXAMINATION BY MS. SANTORA:

Q. Good morning. I want to ask you a few questions.

11:41 During your direct testimony yesterday you testified about your role with the Office of Intelligence, correct?

A. Yes, I did.

Q. And you are the highest-ranking official in the Office of Intelligence?

A. I am.

Q. And are you responsible as leadership in the Office of Intelligence for providing guidance to your analysts?

A. Yes, I do.

Q. Are you responsible for providing training to your

11:41 analysts?

A. Yes, training, policy, procedures, equipment and allocation of analysts.

Q. So would it be fair to say that if there were changes to policies and procedures in your office, you would know about those?

A. Yes, if they related to the analysts, yes.
Q. And you would provide training to your analysts on those?
A. That's correct.
Q. Would it be possible for a new policy or procedure to exist in your office without you knowing about it?
A. In my office, no.
Q. And since the beginning of 2025, have there been any changes to the policies and procedures in your office?
A. No. We've been doing our analysis the same way since I started in 2019, 2020, and developed the way we do analysis. We haven't changed the way we do subject profiles at any time in say -- during that time we've always done subject profiles this way. We conduct our analysis the same way. And for that matter, we've been looking at the same violations of law during that time as well.
Q. So you haven't changed the content of your reports of analysis?
A. We have not.
Q. So it's always included biographical information?
A. It has.
Q. Information about criminal activity?
A. Yes.
Q. Information about potential violations of law, including Title 8?
A. Yes.

Q. And I just mentioned reports of analysis. Can you, for the benefit of everyone, define what is a report of analysis?
A. It's the way the analyst documents their work product, and it is specifically designed for analyzing criminals, criminal networks, criminal conspiracies, and subject profile is just one ROA type that we use.
Q. You mentioned that your office receives leads or tips that can generate the creation of a report of analysis, correct?
A. That's correct.
11:43 Q. And from where does the Office of Intelligence receive tips or leads?
A. In general terms, beyond the scope of a protest, we receive them from all different kinds of directions. They can come from an agent's contacts. They can come from interagency partners. They can even come from the tip line, which is a public-facing mechanism for the public to provide tips. They even can be mailed to the office, hard copies.
Q. And with respect to the protesters, did your office receive leads in a different way?
11:44 A. I think we were getting the leads from all directions. I don't know in particular where we were getting the leads from.
Q. Okay. When your office receives a lead, generally speaking, what does it do with it?
A. Usually it's provided to an analyst to do exactly what you saw with these ROAs, to look for information, as I said before,

that's a violation, potential violation of law, with our specialty being immigration and customs laws. But it's also, as we're building that, it's also to get the context of the individual, which is why the biographical information and the car information like I mentioned is in there.

Q. And is a lead ever insufficient for your office to do anything with it?

A. Yes. There are times when a lead just has incomplete information, a nonspecific name, no identifying information to help us identify or narrow down who it was.

11:45

Q. And in that case what does your office do?

A. We would just file the lead. We'd move on.

THE COURT: Well, that question interests me. I've had cases where someone's identified as LNU or FNU LNU, first name unknown, last name unknown, and I wondered what we're talking about in my case. And your answer jogged that memory.

When you don't have enough to do anything, do you report that in any way, or you just don't do anything because you haven't got enough to work on?

11:46

THE WITNESS: It's mostly the latter, sir.

THE COURT: The latter, all right. Ms. Santora, go ahead.

Q. Assuming that there's sufficient information in the lead, what does -- I guess I'll ask this. Does your office do -- you said you would create a report of analysis; is that correct?

A. That's correct.
Q. And in creating that report of analysis, you testified earlier that you do independent research?
A. Yes.
Q. So you look into the information in the lead and independently confirm?
A. Try to, yes.
Q. And that's the information that goes into the report of analysis?
11:46 A. Yes.
Q. So to be clear, the report of analysis is a fact-based document?
A. Yes, we try, as you saw with those, we try to just report the facts or what the analyst finds and properly source it so anyone reading it knows where this that came from.
Q. Does a report of analysis make any recommendations?
A. It does not.
Q. Does it include any opinions?
A. Does not.
11:47 Q. Does it make any referrals?
A. No.
Q. Or any judgments?
A. No.
Q. How do you know that reports of analysis don't include those things I just referred to, recommendations, opinions,

referrals and judgments?
A. It's in our policy.
Q. You spoke during your direct examination about a tiger team, correct?
A. That's correct.
Q. Generally speaking, what is a tiger team?
A. A tiger team is a term of art we use for an ad hoc, temporary standup of analysts or a combination of analysts that get assigned to a project, usually when it's a large workload,
11:47 and we use it when we have to bring analysts in from other parts so a specific group or section doesn't have the capacity to handle, so we'll bring in others to help.
And it's a way of differentiating between whether someone's doing their normal job or whether they're doing this additional duty or whether they have been reassigned to this duty.
THE COURT: So tiger team, you've had Tiger Teams more than once on different subjects?
THE WITNESS: Yes, Your Honor. We've used a tiger
11:48 team maybe half a dozen times since I've been at HSI for all different types of things. It's just a term of art.
THE COURT: Thank you.
BY MS. SANTORA:
Q. So why is the term tiger team used, if you know?
A. I think, I mean we got it from business, military I think

uses the term as a way to focus analysts. I didn't make up the term tiger team. If I go back to my Coast Guard days, we would set up a tiger team to fix an engine problem when you needed an electrician or mechanic. It's kind of always been in existence.

Q. So you've heard the term back to your Coast Guard days?
A. I have, yes.
Q. So it's a term that's used in government jargon?
A. Yes, and I believe in business, too.
11:49 Q. And it sounds a bit intimidating. Is it meant to intimidate?

MS. CONLON: Objection.

THE COURT: Sustained. He said it's a term of art.

Q. Is it meant to intimidate?

MS. CONLON: Objection.

THE COURT: Why don't you ask him whether he means it to intimidate.

Q. Do you mean it to intimidate?
A. No, not at all. It's an internal term.

11:49 THE COURT: The sense I get, so we're clear on what I'm hearing, is you mobilize a Tiger Team because you need to do the work assigned, correct?

THE WITNESS: Yes, Your Honor.

THE COURT: And calling it a tiger team conveys to me some sense of urgency and importance in that work.

THE WITNESS: Yes, sir.
THE COURT: Is that right?
THE WITNESS: That's correct. And we're analysts, so we're nerds. We're the nerds. We're a law enforcement and we're analysts. We're nerds. We're not ferocious.
THE COURT: It's not like painting decals on fighter planes.
THE WITNESS: No, sir.
THE COURT: Go ahead.
11:50 BY MS. SANTORA:
Q. I want to talk to you about the tiger team that was created in March of 2025. What topic was that Tiger Team created to address?
A. That was protesters and we had gotten a lot of leads.
Q. Were you asked specifically or was that tiger team asked specifically to look into student protesters?
A. All protesters.
Q. All protesters, okay.
And ultimately how many people did the tiger team look
11:51 into?
A. Over 5,000, more than 5,000. I don't know the exact number.
Q. And in looking into those people, did the Office of Intelligence analyze any differently than it normally does?
A. A little bit. Normally we do an ROA on everybody, no

matter what. And that's why you'll see the variation as we saw from the five today where one was two pages and one was longer.

But in this instance, because we had so many names, I told the analysts if you don't find anything beyond the biographic information -- we were looking at violations of law and as it relates to protests. So some of the names, for example, were said to be at a protest, but we never found that they were at a protest. We never found anything. We didn't find any conduct. We didn't find anything related to the individual. So it would 11:52 have been a one-page ROA. And so I told the team for the sake of expediency to get through this long list to just not do the ROAs on those individuals.

Q. Okay. You talked about the fact that you received information from Canary Mission with respect to these lists, correct?

A. Yes.

Q. To be clear, does your office work with Canary Mission?

A. No. Like I said before, we have no association with Canary Mission. Canary Mission is not associated with HSI at 11:52 all. I don't know who posts on that website. I don't know who runs that website. I don't know anybody in that organization. I don't have any connection with anybody in that organization.

Q. Does the office treat Canary Mission information differently than it treats other information?

A. We treat it just like any other lead.

Q. Was the office asked to look at Canary Mission information differently than other information?
A. No, we were not asked to look at it differently. We were not asked to change the ROA process or our process of criminal analysis.
Q. Would it be relevant to a report of analysis that someone had been charged with a crime but not convicted?
A. As long as the charge was factual, it could be included in the ROA, so yes.
11:53 THE COURT: I don't understand a charge that wasn't factual.
THE WITNESS: I guess you're right. A charge would be included in that section you saw, the criminal history.
BY MS. SANTORA:
Q. And how would that be relevant to the analysis, a charge that was not a conviction?
THE COURT: That's pretty hypothetical. I don't know what to do with that. This is a law enforcement operation or part of a law enforcement operation. Of course you include
11:54 charges because you might want to -- or someone, some enforcer might want to follow up on that. I just don't understand.
MS. SANTORA: Okay. We'll move on. Thank you, Your Honor.
THE COURT: All right.
MS. SANTORA: Preserving the government's objection to

these documents being entered into evidence based on privilege, in case our objection is ultimately overruled -- the overruling objection is upheld, I do want to ask questions about the documents that opposing counsel --

THE COURT: You don't waive the objection properly preserved by exercising your opportunity during the trial to ask about such documents.

MS. SANTORA: Thank you, Your Honor.

I want to ask you about a document you looked at

11:55 earlier. I believe it was, it was in the packet we received. It was Exhibit K related to Mr. Mahdawi. I don't know what letter it's been marked.

MS. CONLON: It was marked as a number, and it's 235.

MS. SANTORA: 235, okay. Are you able to show the witness?

THE COURT: I'm an equal opportunity helper.

MS. SANTORA: Thank you, Your Honor.

THE COURT: Here's the documents that have now been marked, and thank you, Ms. Conlon, Exhibit 235 in evidence.

11:55 BY MS. SANTORA:

Q. Do you see subject profile for Mohsen Mahdawi?

THE COURT:

A. I'm looking at the one for Suri.

THE COURT: You said K.

MS. SANTORA: Sorry. That was K. I don't know what

letter this was.

THE COURT: You want Mahdawi?

MS. SANTORA: Mahdawi, yes.

THE COURT: All right. In the packet as it was delivered to the court, it's Exhibit E. And so our record is complete, someone will help me, Exhibit E has become --

MS. CONLON: 235.

THE WITNESS: Are you going to ask me about --

THE COURT: Since I have now become a document custodian. Go ahead.

11:56

BY MS. SANTORA:

Q. I believe when you were being questioned earlier --

THE WITNESS: Sir, this is Khalil.

THE COURT: It is, and that's my mistake. I'm not much of a document custodian. Yes.

MS. SANTORA: I can give the witness my copy --

THE COURT: No. I have it right here. Now I've got the right one. Having nothing to do with this exhibit, but it reminds me, the government has made an ex-parte submission, properly. The court has reviewed it, and pertaining to one of these exhibits, and that's something potentially should be redacted or withdrawn. I want to know precisely what it is with the brackets as you've done it in time for our conference at 3:00. You can hand it up to the clerk so I know what we're talking about. Go ahead.

11:57

11:58

11:59

BY MS. SANTORA:
Q. Mr. Hatch, you are looking at the subject profile now of Mohsen Mahdawi, correct?
A. Yes, I am.
Q. And do you remember when opposing counsel was questioning you and they said that in this report of analysis it included only biographical information, correct?
A. Yes.
Q. And do you see the last bullet under Analysis and Findings?
A. Yes, I do.
Q. That relates to possession of various drugs, correct?
A. It does.
Q. Would you describe that as biographical information?
MS. CONLON: Objection, Your Honor.
THE COURT: No. She may have that question in that form.
A. I don't know.
Q. Would you describe the drug charges as biographical information?
MS. CONLON: Objection. It doesn't even say "charges."
Q. Would you describe that bullet relating to this individual being in possession of drugs as biographical information?
A. I'd more likely say it was criminal history.

Q. Thank you.

And that bullet appears in the analysis and findings section, correct?

A. It did, it also appears in criminal history.

Q. Okay. Thank you. I want to ask you about another one of the documents opposing counsel asked you about. These are the documents related to Rumeysa Ozturk.

THE COURT: In the packet of documents given to the court, these appear as Exhibit C. And they are now in evidence as what? Ms. Conlon.

MS. CONLON: Sorry. Ms. Ozturk, 232.

THE COURT: 232.

THE WITNESS: Do you want this one back, sir?

THE COURT: Yes.

THE WITNESS: Okay.

BY MS. SANTORA:

Q. Opposing counsel asked you earlier about the first bullet under analysis and findings, and they mentioned the coauthoring of an op-ed. Do you remember that exchange?

A. Yes.

Q. And if you look at the rest of that bullet, it says that she wrote the op-ed with Tufts Students for Justice in Palestine, which was suspended for calls for Student Intifada.

Would that part of the bullet factor into the office's analysis?

A. Yes, I mean it is part of it.
Q. Moving on, I would like to ask you, I want to ask you some questions about the executive orders that you referenced in your testimony.
A. Okay.
Q. How did your office respond to Executive Order 14161 and Executive Order 14188, if at all?
A. Can you give me the titles? I don't know them by the numbers.
12:02
Q. Executive Order 14161 is protecting -- I'm sorry, I don't have the title in front of me. 14188 has to do with antisemitism. You mentioned that you had not seen that executive order until your deposition, correct?
A. That's correct.
Q. So we can put that to one aside. With respect to the other executive order that you --
A. Okay. I'm familiar with that.
Q. -- yesterday and today, how did your office respond to that executive order?
12:03
A. I recall when I read that executive order, I saw that just about everything related to that executive order and us were things we were already doing. They all related to existing Title 8 issues. So it did not task my office with doing anything different.
Q. And so your office didn't change the way it analyzed

information in response to the executive orders?
A. No. And especially in that executive order, it didn't change anything. It all related to Title 8. It emphasized things in Title 8, but nothing was new to us.
Q. So the executive order essentially directed your office to follow Title 8?
A. That's how I interpreted it for the most part.
Q. And your office does follow Title 8?
A. We have been since I've been there and, I mean, since HSI
12:04 has existed.
Q. And how long has HSI existed?
A. HSI, and in its previous form, Customs' Office of Investigations, has been around since the 1950s, and I believe Title 8 has been since the 1950s.
Q. I want to go back for a second to the ROAs about the protesters. You said that your office looked into 5,000 leads related to that, correct?
A. Over 5,000, yes.
Q. And because of the bulk of work in that particular
12:04 situation, ROAs were not created in every circumstance, correct?
A. That's correct.
Q. Do you know in what percentage of cases ROAs were created?
A. I don't know the exact numbers, but I would estimate, I think I said 200, so less than -- I'm not good at public math.

Less than 5 percent.
Q. Less than 5 percent. And so 95 percent did not result in the creation of an ROA?
A. That would seem to be true.
Q. What happened with those 95 percent of the 5,000 cases?
A. If we didn't do an ROA, we just moved on to the next person on the list or the next lead. We didn't do anything with them.
Q. Okay. So in 95 percent of those 5,000 cases regarding
12:05 protesters, your office did nothing?
A. We moved on to the next lead, yes.
MS. SANTORA: Thank you.
THE COURT: Ms. Conlon, anything further?
MS. CONLON: Yes, Your Honor.
THE COURT: You may.
MS. CONLON: Is it okay with Your Honor if I examine from here?
THE COURT: Of course it is. So you all understand, I understand that by passing the bar, you have the right to be
12:06 within the bar enclosure denominated by the rug in deeper blue. It's not an instruction that you have to stay on that rug, but I learned you could move around in the bar enclosure as a lawyer. Go ahead, Ms. Conlon.

MS. CONLON: Okay.

REDIRECT EXAMINATION BY MS. CONLON:

Q. So you were just asked about the percentage of ROAs that were generated as a result of this line of effort, and you have estimated -- and don't worry, this won't be an equation. But you've estimated about 5 percent; is that right?
A. Yes.
Q. And your estimate is based on the notion knowing that there were over 5,000 names at least on Canary Mission, and you saw maybe 200 reports; is that right?
12:06
A. As I recall, yes, I think that's what I said.
Q. Now, you have said before you didn't look at all the reports generated by the tiger team, right?
A. That's correct.
Q. You happened to have seen about 200, correct?
A. Somewhere in there. I don't know the exact numbers.
Q. Right?
A. I'm giving you an estimate. That's all I'm doing.
Q. No, no. I appreciate that you have seen 5 percent of -- if we're sticking with percentages, I appreciate that what you
12:07
can tell us is that you've seen 200 and you know that at least more than 5,000 people were looked at. But I understood you to be saying earlier you can't tell us how many ROAs were actually created. Am I mistaken?
A. I'm estimating that somewhere under 200 or around 200 ROAs

were produced. In my testimony I believe I said, as you mentioned earlier, dozens, I had read -- you asked me how many I had read. I said dozens. And then you brought up my deposition and said, "You said here 100," and I had said earlier 20.

So I would estimate I've read between 20 and 100, but I know the team produced more, and I'm estimating they produced less than 200 in total.

Q. And what is that based on? What is your estimate of what
12:08 the team produced, I mean, based on?

A. Just my recollection of the effort described to me by the team lead. I'm giving you my best estimate.

Q. I appreciate that. Fair to say you don't actually recall the total number that were created by the tiger team?

A. I do not recall the total number.

Q. Fair to say you are in a position to speak about the total number as an estimate only that you personally reviewed?

A. That's correct.

Q. Now, that 5,000-person list which resulted in -- for many
12:08 folks resulted in no ROAs, one of the reasons it resulted in no ROAs for so many people is because that list included a lot of U.S. citizens, right?

A. That's correct.

Q. And it's not within the purview of the Office of Intelligence to write reports of analysis about U.S. citizens,

correct?
A. We absolutely are.
Q. Oh, you wrote them about U.S. citizens?
A. HSI intelligence is authorized to write ROAs about U.S. persons. That's the question you asked me, right?
Q. Yes, that is the question I'm asking.
A. Now, are you asking me if any of the protesters that were U.S. citizens had ROAs written on them?
Q. Well, I guess that's a good question.
12:09 A. I don't know. I don't recall, I don't recall reading an ROA on a U.S. person.
Q. Now, the circumstance in which you could write an ROA about a U.S. person, that would not be for a violation of Title 8 immigration offense, right, for example, being out of status or any number of things?
A. We are authorized to write ROAs on U.S. persons for any violation of U.S. law, potential violation of U.S. law, suspicion of violating U.S. law, information related to violations of U.S. law, as I've said before.
12:10 Q. Sorry. So going back to the question I think you tried to ask if I was asking just a moment ago, the tiger team did not, to your knowledge, create ROAs on U.S. citizen protesters; is that correct?
A. I don't recall reading any ROAs on U.S. citizen protesters.

Q. And you did not understand the project at hand to be one that included looking at U.S. citizen student protesters, correct?
A. I didn't interpret the focus to be U.S. persons.
Q. Now, you've said that ROAs were only generated for some small number out of the overall group. And one reason that could happen is if you couldn't sufficiently identify a person; is that correct?
A. That's correct. That's one reason.
12:11 Q. Another reason that could happen was if you couldn't confirm that a student had actually attended a protest; is that right?
A. That's correct, that's one reason. It's a possible reason, yes.
Q. In other words, the student protester initiative of the tiger team was meant really to capture people who protested, is that correct, who had attended protests?
A. I would not use the word "capture."
Q. Well, we can pick a different word.
12:11 THE COURT: Focus on is the sense of her question. Do you accept that?
A. That was the focus, yes.
Q. So if no protest, no ROA; is that right?
A. Yeah. If we found no activity, we would move on to the next one.

Q. I'm a little confused because "activity" -- I'm asking specifically about protest activity. If you did not find evidence of protest activity, the person did not receive an ROA; is that correct?
A. That is correct.
Q. Now, the ROAs were not limited to persons who attended protests who had potentially committed a criminal offense, correct?
A. When we start out with the leads, we don't know what we
12:12 have to begin with, so we look, as you saw in the ROAs, we focus on the individual.
Q. And ROAs were generated for students who attended protests who were not suspected of having committed a crime, isn't that right?
A. That is correct, yes.
MS. CONLON: Just a moment.
Q. You said that you weren't directed to look at the Canary Mission list any differently from how you look at other information. Did I hear that correctly?
12:12 A. The Canary Mission list, it was one source of leads we get. We were not directed to look at Canary Mission any differently than we would another lead on a protester.
Q. You didn't receive a directive to look at any other collection of people from any other single source in the way that you did for the Canary Mission website, correct?

12:14

12:15

A. I think it's fair to say that Canary Mission was unique.
Q. It was unique because it was the focal point of this effort, wasn't it?
A. It was unique because it was a large amount of leads, large amount of information on protesters.
MS. CONLON: Just a moment.
Q. I think you testified earlier, but tell me if I'm wrong, that you as the director of the office are familiar with training given to analysts about how to do these reports of analysis, right?
THE COURT: This is redirect. That's beyond the scope.
MS. CONLON: Your Honor, I'm sorry, I thought that just came up in the government's questioning.
THE COURT: I didn't.
MS. CONLON: You didn't hear that?
THE COURT: That may not be the same.
MS. CONLON: Can I have just one second to see? I'm sorry.
I think that's it. Thank you so much. Thank you for your time.
THE COURT: Nothing more, Ms. Santora?
You may step down. Thank you. This witness is excused. Call your next witness.
MR. BIALE: Thank you, Your Honor. Noam Biale for the

Case: 26-6906, 11/20/2026, DktEntry: 16.6, Page 49 of 300


plaintiffs. Plaintiffs call Amy Grier.

THE COURT: She may be called.

AMY GREER, Sworn

COURTROOM CLERK: Can you please state your name and spell your last name for the record.

THE WITNESS: Sure. My name is Amy Greer, G-r-e-e-r.

MR. BIALE: May I proceed, Your Honor?

THE COURT: You may.

DIRECT EXAMINATION BY MR. BIALE:

12:16 Q. Good afternoon, Ms. Greer.

A. Good afternoon.

Q. Where do you work?

A. At Dratel & Lewis as an associate attorney.

Q. And what is Dratel & Louis?

A. It is a small criminal defense firm.

Q. Where is it based?

A. In Manhattan.

Q. And how long have you been a licensed attorney?

A. Since September 18, 2020.

12:16 Q. Okay. Good memory for the date.

A. It was the day RGB died.

Q. I see.

A. It was not a celebratory day.

Q. I see. And you're admitted to the New York bar?

A. Yes.

Q. Any other states?
A. Actually that 2020 date I was admitted to the State Bar of Alaska. And since then I've been admitted to the District of New Jersey, the District of New York, and the District of the District of Columbia.
Q. Do you know an individual by the name of Mahmoud Khalil?
A. Yes.
Q. How do you know him?
A. He is my client.
12:17 Q. When did you begin representing Mr. Khalil?
A. In or around November of 2024.
Q. And since you began representing him in November of 2024, have you met with Mr. Khalil in person?
A. I have.
Q. Approximately how many times?
A. Approximately two to three times.
Q. In addition to the two to three times you met with Mr. Khalil in person, have you ever met with him in a videoconference or on FaceTime or something like that?
12:18 A. Yes. I have met with him numerous times by videoconference, Signal, et cetera.
Q. You said "numerous times." Can you estimate for us how many times you met with Mr. Khalil by videoconference?
A. Sure. Between November and March, probably weekly, so however that adds up to. And then after his detention, I met

with him nearly daily by videoconference.
Q. Okay. So fair to say you've met with Mr. Khalil, at least by videoconference, dozens, maybe even over 100 times?
A. Yes.
Q. Are you familiar with Mr. Khalil's wife?
A. Yes.
Q. What is her name?
A. Dr. Noor Abdalla.
Q. And have you met Dr. Abdalla in person?
12:18 A. Yes.
Q. Approximately how many times?
A. Probably five or six times.
Q. Have you also met with Dr. Abdalla on videoconference?
A. Yes, numerous times.
Q. Numerous. Can you give us a ballpark estimate?
A. I was one of the primary contacts for Dr. Abdalla throughout the course of this case. So it's hard to estimate, but probably a few times a week, so at least dozens, if not more.
12:19 Q. And just so we're clear, when you say "this case," you're referring --
A. Sorry. The habeas and immigration case post-detention.
THE COURT: Case in which you represent him as his attorney?
THE WITNESS: One of them, yes, sir.

Case: 26-6906, 11/20/2026, DktEntry: 16.3, Page 52 of 300


MR. BIALE: Thank you.
Q. Are you familiar with Dr. Abdalla's voice?
A. Yes.
Q. Okay. Have you ever been to the building where Mr. Khalil and Dr. Abdalla live?
A. Yes.
Q. Approximately how many times have you been there?
A. Approximately twice.
Q. Are you familiar with the lobby of that building?
12:19
A. Yes.
Q. Okay. I'd like to direct your attention to March 8, 2025. What do you recall happened that day?
A. In the evening of March 8, 2025, I received a phone call from Mahmoud.
Q. Okay. Do you remember approximately what time?
A. I remember exactly what time. It was 8:26 p.m.
Q. And without telling me what -- when you say "Mahmoud," we're talking about Mr. Khalil?
A. Sorry. Mr. Khalil, yes.
12:20
Q. Without telling me what Mr. Khalil told you in that phone call, can you tell us about anything that he did in that phone call?
A. I am not sure if he handed the phone to the agent from immigration or if the agent took the phone, but the phone was given to one of the agents.

Q. And when you say, "one of the agents," can you clarify what you mean?
A. Sure. Mr. Khalil called me because agents had entered, and I know this because I spoke with the agent on the telephone, and so that agent introduced himself to me over the telephone.
Q. Okay. And did the agent identify what agency he was from?
A. He said he was from Department of Homeland Security, HSI.
Q. Okay. And you understood based on the way the phone call went that this agent was physically present with Mr. Khalil at the time?
12:21
A. Yes.
Q. Now, were you physically present with Mr. Khalil and with this agent at the time?
A. No.
Q. Okay. Could you hear anything in the background of the phone call?
A. With Mr. Khalil?
Q. Yes.
12:21
A. I could hear him speaking, Mr. Khalil speaking, and I was obviously hearing the agent speaking to me. And then I heard other voices, ambient voices in the background.
Q. Okay. And then what happened next after you received this phone call?
A. Well, I spoke to the agent and he hung up on me.

12:22

12:23

Q. Okay. And what happened after that?
A. Well, I freaked out a little, to be completely candid, and I called the partners at my law firm. And then while I was on the phone with one of them, I received another phone call.
Q. And who was the second phone call -- who did the second phone call come from?
A. The second phone call came from Dr. Noor Abdalla.
Q. And Dr. Abdalla call you from her phone or from somebody else's phone?
A. She called me from Mr. Khalil's phone.
Q. Okay. And approximately when did Dr. Abdalla call you from Mr. Khalil's phone?
A. It was at 8:34, so eight minutes later.
Q. And when Dr. Abdalla called you, were you able to hear her voice over the phone?
A. Yes.
Q. Did you hear any other sounds over the phone?
A. Yes. I could hear Mahmoud, or Mr. Khalil, speaking in the background, and I heard other ambient male voices.
Q. Okay. I'd like to show you what's been marked for identification as Exhibit A1.
Mr. Kumar, if you can pull that up and just pause on the first frame.
Do you see that in front of you, Ms. Greer?
A. Yes.

Q. Just looking at the image in the middle, do you see the location?
A. On the bottom left there, or do you mean the actual --
THE COURT: No. Do you recognize the location?
A. Yes, I do.
MR. BIALE: Thank you, Your Honor.
Q. Where do you recognize that -- what do you recognize that location to be?
A. That is the lobby of Mr. Khalil and Dr. Abdalla's apartment building.
12:24
Q. And how do you recognize that location to be the lobby of their apartment building?
A. Because I've been there and because I actually noticed the tiling on the floor when I visited, it's kind of an odd linoleum tile.
MR. BIALE: Okay. Mr. Kumar, I'd like you to play -- and I'm hoping that we have sound -- play the video to 7 seconds.
THE COURT: Well, you're calling her to authenticate this video?
12:24
MR. BIALE: Yes, Your Honor.
THE COURT: And what do you -- let me ask this preliminary question. What do you understand this to be? Yes, what do you think this is, this video?
THE WITNESS: From what I know of this video, this is

the video of when Mahmoud, Mr. Khalil, was arrested.

THE COURT: And how did you come to know that?

THE WITNESS: I know that because I received it from Dr. Abdalla on the evening that Mr. Khalil was arrested.

THE COURT: All right. And who do you think took it?

THE WITNESS: Dr. Abdalla.

THE COURT: Thank you. All right. Mr. Kanellis.

MR. KANELLIS: I'll reserve my objection, Your Honor.

THE COURT: Reserved, okay. You may proceed.

12:25 MR. BIALE: Could you play it to seven seconds, Mr. Kumar, and with sound.

(Video played.)

BY MR. BIALE:

Q. Okay. You just heard some voices on that video, and you heard at the end it sounded like a woman's voice say, "He's not resisting."

A. Mm-hmm.

Q. Do you recognize that person's voice?

A. Yes.

12:25 Q. Who is that?

A. Dr. Abdalla.

MR. BIALE: Now, Mr. Kumar, if you can play a few more seconds to ten seconds.

(Video played.)

MR. BIALE: Stop.

Q. Now I'm going to ask you, who do you recognize in the video?
A. The person facing the camera is Mr. Khalil.
MR. BIALE: Okay. And now, with the court's indulgence, I'll ask to play another 20 seconds of the video, if we can do that.
THE COURT: Proceed.
(Video played.)
Q. Okay. You just heard some additional parts of the video, 12:26 and you heard Dr. Abdalla say "Hi Amy."
A. Mm-hmm.
Q. Do you know who she is referring to?
A. Yes.
Q. Who is she referring to?
A. Me.
Q. And how do you know that?
A. Because I was on the phone with her. I answered the telephone when she called.
Q. Okay. Can you just tell us about what you remember about 12:27 that conversation.
A. Sure. I was on the phone with Dr. Abdalla and one of the partners at my law firm, and together we were advising Dr. Abdalla, I was saying to her --
MR. KANELLIS: Objection, Your Honor. Two bases.
THE COURT: I'll hear you.

Case: 26-6906, 11/20/2026, DktEntry: 16.6, Page 58 of 300


MR. KANELLIS: First is, if she's going to discuss these communications, she may be waiving her privilege. Second, calls for hearsay.

THE COURT: Well, the first is, I suppose she knows that, and she may make her own determinations.

The second is, what she says is hardly -- well, I'm not so sure it's even hearsay. If she was advising her, it's not for the truth. That's the advice, act in this way. Any response from Mr. Khalil's wife I would think under the circumstances is an excited utterance.

So subject to your motion to strike, you may answer the question. What did you say and -- did the partner speak, before we go any further?

THE WITNESS: We were both speaking, but I was primarily the one speaking.

THE COURT: And what's the name of the partner?

THE WITNESS: Lindsay Lewis.

THE COURT: All right. And tell us what each person said as best you can recall.

THE WITNESS: Okay. When we first got on the phone, we were attempting to calm Dr. Abdalla down. "It's going to be okay. Can you stay with us? Let's talk through this." And that was both Lindsay and myself, Ms. Lewis and myself. I was asking Dr. Abdalla, "How many people do you see? What's happening now? Can you ask them where they're taking him? Can

you ask them if they will show you a warrant? Will one of them identify themselves to you? Can you get a name? Again, where are they taking him?"

And I honestly do not recall, because this was obviously a rapidly unfolding situation, whether it was myself or Lindsay who asked if we could speak with one of the agents again and to see if Dr. Abdalla could hand one of them the phone.

MR. BIALE: Okay. So Your Honor, at this time I would play the rest of the video, given what you've heard about Ms. Greer's memory of what was said on that phone call, but I don't want to take up the time if the court would be prepared to receive the video in evidence now.

12:29

THE COURT: Well, I have this problem, but perhaps Mr. Kanellis wouldn't object on this ground. That's not the original video because the visages of the agents are obscured. Someone has done that. If he has no problem with that, I am prepared to receive the video as a video of whatever it records. So we'll ask him.

12:30

MR. KANELLIS: Your Honor, obscuring the faces is not the issue. The issue is it hasn't been properly authenticated. If Ms. Abdalla wants to come and lay the foundation, no issue with that.

THE COURT: I think it's been adequately identified, and that objection is overruled, and A1 is admitted as an

exhibit, now it will be Exhibit 237. 237. But I'll review it, so we need not play it.

(Exhibit 237 admitted into evidence.)

MR. BIALE: That's fine, Your Honor.

BY MR. BIALE:

Q. Let me just ask so the court understands because it's a good point. The court pointed out that the faces are obscured in the video. And I think you testified before that you received the video from Dr. Abdalla shortly after it was taken; 12:31 is that right?

A. Yes, approximately two hours later.

Q. In the version that you received from Dr. Abdalla, were the agents' faces obscured?

A. No.

Q. Okay. How did, if you know, how did the faces of the agents come to be obscured in the video?

A. We, as a legal team, knew that there has been a respectful protocol when videos are shown publicly to blur out the faces of other people besides, you know, the person agreeing to make 12:32 the video public. So as a team, we decided to blur out the video -- excuse me, blur out the faces. And I was privy to part of those conversations, and then one of the legal team members undertook that, the blurring.

Q. Just to be clear, that was to protect the identities of the agents who were involved in the arrest, right?

A. Right, to protect the identities of any person who appeared in the video who was not Mahmoud.
Q. Okay. Now, you've seen this version of the video before? And by "this version," I mean the exhibit that was just admitted into court.
A. The Associated Press version, yes, I have seen it.
Q. And you have also seen the version that Dr. Abdalla sent you two hours after this incident?
A. Correct.
12:32 Q. Other than the obscured faces of agents, is there any difference between those two videos, or are they identical?
A. They appear identical to me, yes.
MR. BIALE: No further questions.
THE COURT: Mr. Kanellis.
MR. KANELLIS: Very short, Your Honor.
CROSS-EXAMINATION BY MR. KANELLIS:
Q. Ms. Greer, is it?
A. Yes.
Q. Let's keep that video up. Have you had -- you are a criminal defense attorney?
12:33
A. Yes, sir.
Q. And you represent criminal clients who have been accused of breaking the law. Fair statement?
A. I represent people who have been accused of breaking the law.

Q. And have a few of your clients ever been arrested?
A. Sure.
Q. And when they were arrested, have a few of your clients ever been handcuffed?
A. Yes.
MR. BIALE: Objection. Your Honor.
THE COURT: No. Overruled, overruled. This is certainly something that is appropriate. I don't know how far we'll go, but he may proceed with it.
12:33 MR. KANELLIS: I've made that point, Your Honor. I'm going to move on to another one.
THE COURT: All right.
MR. KANELLIS:
Q. Do you remember in the video that hanging from the chests of the two -- and we can play it back if you need your memory refreshed, but hanging from the chests of the two agents were identification badges, correct?
A. I recall seeing at least one.
Q. At least one?
12:34 A. Yeah, I mean, just from memory.
Q. From memory. Do you want, we can play the video back.
THE COURT: It's in evidence. I'm going to have to look at it.
Q. All right. So there was no -- no one was concealing the fact that these were law enforcement officers, right?

A. No.

MR. KANELLIS: Okay. No more questions, Your Honor.

THE COURT: Nothing further for this witness, Mr. Biale?

MR. BIALE: No, Your Honor.

THE COURT: You may step down. So call your next witness.

MR. BIALE: Your Honor, at this time plaintiffs have called all our witnesses who we have not previously identified as being called out of order, and so, except with respect to those witnesses, plaintiffs rest.

12:34

THE COURT: All right. And who is left, just so we know?

MR. BIALE: Sure. Sorry. One second.

So here is what it includes. So we have Jeff Reger, who is scheduled to testify on Monday. He's the executive director of MESA.

On Tuesday, the government is going to be calling the agents who were involved in four of the relevant arrests, and we have agreed with the government that, because both sides wanted to call those witnesses, we have agreed that the cross-examinations could go beyond the scope of the direct so that we don't have to call them separately.

12:35

And then on Friday, we will have Veena Dubal, who is the head of --

Case: 26-6906, 11/20/2026, DktEntry: 16.6, Page 64 of 300


THE COURT: Friday of this week?

MR. BIALE: No. Friday of next week. I'm sorry, would you like to know the whole schedule? I was just telling you plaintiffs' witnesses.

THE COURT: No, no. Keep going.

MR. BIALE: So Friday of next week we will have plaintiffs' additional witnesses. These are the ones who are out of the country this week. Veena Dubal, who is the general counsel of AAUP, and Cinzia Arruzza, who is a professor at 12:36 Boston University.

THE COURT: All that's fine.

MR. BIALE: And we may -- sorry, just to be complete, we may call one very brief summary witness to talk about evidence that's already been admitted or will be admitted, but that's still to be determined.

THE COURT: All right. So the government may call a witness.

MR. KANELLIS: Your Honor, we have operated under the understanding it was going to last -- our first witness would 12:36 be available tomorrow.

THE COURT: Fine. We'll charge you with the time, but that's fine. Well, actually, we'll charge you with the time, but we'll stop the clock now. There were matters that I was going to see you on at 3:00, once I've handled the proceeding I have on for 3:00. I'm happy to handle it now.

Where I'd like to start, if anyone could help me, and I'm looking to the government, is the ex-parte submission in the red folder, I want to see what document, to what document does that relate. And in that document -- you don't have to reveal it to them, but in that document to what words or sentence, if you can point it out. It doesn't have to be done -- oh, Ms. Santora is ready to do it.

MS. SANTORA: I was going to confer with our agent.

THE COURT: You go right ahead.

12:37 MR. BIALE: Your Honor, sorry. Before we get there, I of course forgot about one witness. We have also indicated to the government that we wished to call Stuart Wilson, who is a government official. We have served a trial subpoena for him on the government. The government so far has not accepted service of that subpoena but has told me that he will be available to come to testify either next Monday or next Friday.

MR. KANELLIS: That's not accurate.

MR. BIALE: Which part of it is not accurate?

MS. SANTORA: I can explain. I think I know what you're talking about. 12:38 So we had indicated based on -- or I had indicated, and I'm sorry if this was confusing, that based on the trial schedule as the parties had currently set, it seemed like the only days where there would be available trial time is Monday and Friday. And I had tried to indicate that we were inquiring with our witness as to his availability on those

days, not that he was available.
MR. BIALE: That's fine.
MR. KANELLIS: I apologize for multiple people speaking, Your Honor. One point of clarification, we have I think cooperated very well with respect to sharing time and figuring out how to fill out these two weeks. Mr. Wilson was not identified on their witness list. We had no idea --
THE COURT: Well, I deal with cases in controversy. So far I don't have controversy. Assuming we can get him and
12:39 fit him in, that's fine.
All right. Have we got the document we're concerned about or the portion of it?
MS. SANTORA: Yes. Let us just confer for one minute. I want to make sure we have the accurate information, Your Honor.
THE COURT: Well, we've got a whole team here. What was the matter, the housekeeping or other matter that we were going to have to talk about at 3:00? Let's talk about it.
MR. KANELLIS: Your Honor, I would ask that we do that
12:39 at sidebar. It contains sensitive information.
THE COURT: Sidebar on the record I will do it.
MR. KANELLIS: Yes, sir.
THE COURT: Very well.
(Sealed sidebar excised from transcript.)
THE COURT: One minute while I total up the time.

MR. BIALE: Your Honor, can I ask one clarifying question?

THE COURT: Of course.

MR. BIALE: This relates to what we were just discussing, but the question can be asked on the public record.

THE COURT: Yes.

MR. BIALE: With respect to the ROAs that were admitted into evidence today, other than the particular one that we just handed back --

12:46 THE COURT: That we're dealing with.

MR. BIALE: I just want to get clarification. Are those part of the public record?

THE COURT: They are not.

MR. BIALE: Those are sealed?

THE COURT: They're sealed. But all -- for instance, though I take it the last video has been on TV and the like, all the exhibits in this case are for the court. This court's protocol is not to share those during the trial or until the court is done with its decision.

12:47 The court in its decision will make reference to those things upon which the court has relied. I've always taken the position that those things, unless classified, and I've dealt with cases that had classified data, are then public so the decision may be thoroughly reviewed by obviously higher courts but anyone who wants to analyze the court's reasoning.

Case: 26-6906, 11/20/2026, DktEntry: 16.6, Page 68 of 300


Now, there are various protective orders into which the attorneys have voluntarily entered, and those continue, and you are all subject to those.

MR. BIALE: Thank you for that helpful clarification, Your Honor.

THE COURT: Total elapsed time for the plaintiffs is two days, two hours, 45 minutes. Defense, three hours, 15 minutes. We'll resume tomorrow promptly at 9:00 a.m. Thank you.

(Recess, 12:47 p.m.)

* * * * *

CERTIFICATE OF OFFICIAL REPORTER

I, Kelly Mortellite, Registered Professional Reporter, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing transcript is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter to the best of my skill and ability.

Dated this 10th day of July, 2025.

/s/ Kelly Mortellite

_______________________________

Kelly Mortellite, RPR, RMR, CRR
Official Court Reporter

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

No. 1:25-cv-10685-WGY
Volume 1, Pages 1 - 65

AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
Plaintiffs

vs.

MARCO RUBIO, in his official capacity as
Secretary of State, et al,
Defendants

********

BENCH TRIAL DAY 5

BEFORE THE HONORABLE WILLIAM G. YOUNG
UNITED STATES DISTRICT JUDGE

United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
July 11, 2025

********

Court Reporter: Kelly Mortellite, RPR, RMR, CRR
Official Court Reporter
United States District Court
One Courthouse Way
Boston, Massachusetts 02210
mortellite@gmail.com

Case: 26-6906, 11/20/2026, DktEntry: 16.6, Page 70 of 300


A P P E A R A N C E S

RAMYA KRISHNAN
SCOTT WILKENS
Knight First Amendment Institute at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
Carrie.decell@knightcolumbia.org
and
COURTNEY GANS
NOAM BIALE
ALEXANDRA CONLON
Sher Tremonte LLP
90 Broad Street, 23rd Floor
New York, NY 10004
(212) 540-0675
Cgans@shertremonte.com
For Plaintiffs

ETHAN B. KANTER
WILLIAM KANELLIS
VICTORIA M. SANTORA
JESSICA A. STROKUS
DOJ-Civ
P.O. 878
Ben Franklin Station
Washington, DC 20044
(202) 616-9123
Ethan.kanter@usdoj.gov
and
SHAWNA YEN
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, MA 02210
Shawna.yen@usdoj.gov
(617) 748-3100
For Defendants

Case: 26-6906, 11/20/2026, DktEntry: 16.6, (71 of 300)


INDEX


| WITNESS | PAGE |
| --- | --- |
| MAUREEN SMITH | |
| Direct Examination By Ms. Strokus | 8 |
| Cross-Examination By Mr. Wilkens | 20 |


E X H I B I T S

None

P R O C E E D I N G S

(Begins, 9:02 a.m.)

THE COURT: Let me say, as I have each day I've authorized Internet access to these proceedings and, therefore, if you are accessing these proceedings via the Internet, have in mind that the rules of court remain in full force and effect. That means there's no taping, streaming, rebroadcasts or screenshots or other transcription of these proceedings. You must keep your microphone muted at all times. If you do not, I shall cut you off from access.

With that said, the government may call its first witness.

MR. BIALE: Can we just briefly raise, before the government calls --

THE COURT: Well, I see some things that perhaps need attending to. I plan to do it during the break this morning. I'd like to take evidence.

MR. BIALE: That's fine, Your Honor. I just want to say I think timing will work out fine. We need to address it and get clarity before the second witness testifies, but it's fine to --

THE COURT: Well, before the second witness, very well.

MR. BIALE: Thank you, Your Honor.

THE COURT: Call the first witness, Ms. Santora.

MS. SANTORA: The government calls Maureen Smith. Ms. Smith is testifying remotely, and I do understand she is having some trouble logging in, so it might take a second for her to get logged in.

THE COURT: Well, all right, and that's fine. And I don't know if she can hear me, but I apologize for not starting early with her, but I appreciate her presence.

And since we're waiting, but as soon as she's ready, do you have someone to signal when she's ready?

MS. SANTORA: Yes. I think if we could just pull up the Zoom link, we should see if she's been able to log in. We have an attorney with her who will be questioning her.

THE COURT: Very well. Then we can talk about other matters in the interim is what I'm saying.

So, two matters that I think need addressing and I was going to address during the break. First of all, with respect to Exhibit A, and I see Mr. Kanter here, the document as to which the government has asserted the Presidential communications privilege. I have that matter under advisement.

MR. KANTER: Yes.

THE COURT: In view now of the coordinate proceedings in the Court of Appeals, I state that document is not going to be used, disclosed, at all until the court, if ever, until the court has concluded its analysis of the government's assertion of that privilege.

Case: 26-6906, 11/20/2026, DktEntry: 16.6, Page 74 of 300



Yes, I have looked at it in order to make that determination, and I am considering it. But you understand that's as far as it's going in these proceedings, unless I were otherwise to order, and I will make the order just as soon as I can. If I decide that the privilege applies, as I understand the governing law, I should return the document physically, and I will, to government counsel, and it's certainly not part of the record and that's an end of it.

MR. KANTER: And if Your Honor decides that the privilege does not apply, the result would be --

THE COURT: Well, look, I think since the matter is in limbo, I'm going to be very cautious what I say, but I'll say this.

MR. KANTER: It's still under advisement.

THE COURT: It looks to me like the document is, as to these proceedings, of very peripheral relevance. So let's say that I decide that the privilege does not apply. I note it is to be construed narrowly, but let's say I decide it's not to apply. I don't have any present intention of making any disclosure of it, but I may consider it part of the record.

Does that answer your question?

MR. KANTER: Thank you, Your Honor.

THE COURT: Yeah. All right. The second thing is about these witnesses and service and the like. And I had hoped all this could be worked out. But let me -- and I'm not

Case: 26-6906, 11/20/2026, DktEntry: 16.3, Page 75 of 300


going to entertain argument on this. Let me tell you two lines that I'm following.

One, we're not going to be adding witnesses to this case and so we're limited to the witnesses disclosed in the pretrial order.

Two, the government isn't going to put on, given the fact that the weekend is coming up and witnesses, we're going to have to go through next week and Wednesday we're not going to sit, the government is not going to put on a witness now without making that witness available for deposition if they want, the plaintiffs want to take the deposition.

All right. Are we ready with Ms. Smith?

COURTROOM CLERK: Yes, she's on the Zoom.

THE COURT: Let's go.

MR. BIALE: Your Honor --

THE COURT: Let's go with Ms. Smith.

MR. BIALE: Yes, Your Honor.

THE COURT: We'll take a break and I'll hear you.

MR. BIALE: I'll raise it then.

THE COURT: Do I understand, Ms. Santora, that we're going to have an on camera lawyer interrogate her?

MS. SANTORA: Yes, I think you can see her on camera now.

THE COURT: I can. All right. Let's start by swearing the witness.

MAUREEN SMITH, Sworn

COURTROOM CLERK: Can you please state your full name and spell your last name for the record.

THE WITNESS: Maureen Amanda Smith.

THE COURT: Thank you. You don't have to keep your hand up.

THE WITNESS: Okay.

THE COURT: And counsel is with you, if she could introduce herself.

MS. STROKUS: Good morning, Your Honor. Jessica Strokus on behalf of defendants. And Your Honor, I have one request. As we are appearing via Zoom, may I remain seated during examination and objections on cross-examination?

THE COURT: Of course you may. Of course you may.

MS. STROKUS: Thank you, Your Honor.

THE COURT: Let me say this, Ms. Smith. I know it would have been more convenient to you if I started early. All I can say is I have plenty to do, and I appreciate you starting at our usual time. Very well. Ms. Gursky, you may inquire.

DIRECT EXAMINATION BY MS. STROKUS:

Q. Good morning, Ms. Smith.

Where do you currently work?

A. I work at the U.S. Department of State.

Q. And how long have you been employed with the State Department?

A. I have been employed since September of 1999.
Q. What was your first position with the State Department?
A. My first position with the State Department was at the United States Consulate General in Guadalajara, Mexico.
Q. And can you please briefly walk us through the duty stations and positions that you've held.
A. Yes. After that I went back to D.C. and I had an orientation class for foreign service generalists. Then I was given language training in Portuguese. I went to Recif, Brazil where I was the sole consular officer and deputy principal officer.
After Recif I went to Merida, Mexico as an entry level officer and after that Santo Domingo, Dominican Republic as the immigrant visa unit chief; after that back to Merida, Mexico as the consular section chief and deputy principal officer; then to Mexico City as American citizen services chief; then back to D.C. for French and Haitian Creole language training. I went to Port-au-Prince for two years as deputy consul general. Then after that I went to Guadalajara, Mexico as the nonimmigrant visa unit chief, and after that to Kingston, Jamaica as deputy consul general, which is where I am now.
Q. Ms. Smith, have you had a change in your employment since February of this year?
A. Yes. As of the beginning of February of this year, I went to Washington, D.C. on long-term temporary duty, TDY, until

now. And I'm in Kingston, packing up to report to a one-year position up in D.C.

So thank you for indulging me in doing the testimony from here virtually, everyone there in the court.

Q. And what was your temporary duty station that's now going to be your permanent station for the next year?

A. I am a senior adviser in the Bureau of Consular Affairs front office.

Q. And are there any roles at the Bureau of Consular Affairs immediately superior to your role?

A. Yes. My direct supervisor is Mr. John Armstrong, the senior bureau official for consular affairs.

Q. Ms. Smith, are you familiar with how decisions at the State Department have historically been made?

A. Yes, I am familiar with how decisions are made historically.

Q. And has the State Department's policy evolved in the time that you've been employed?

A. Yes, it has evolved.

Q. Has the State Department created an exhibit that would assist you in presenting your testimony today?

A. Yes.

MS. STROKUS: Your Honor, I'd like to mark --

MR. WILKENS: Objection.

THE COURT: Wait a minute. Well, she's leading, but

it's background. I'll let that stand.

MS. STROKUS: Your Honor, I'd like to mark for identification Exhibit HM.

THE COURT: Have I got this?

MS. STROKUS: I believe you do, Your Honor.

THE COURT: HM for identification.

BY MS. STROKUS:

Q. And Ms. Smith, are you familiar with this exhibit?

A. Yes, I am familiar with it.

Q. Will it help present the evidence to which you are testifying and assist in comprehension today?

A. Yes, it will assist.

MS. STROKUS: Your Honor, pursuant to 107(a) and 611, I move Exhibit HM into evidence.

MR. WILKENS: Objection. Your Honor, I'd like to voir dire about the how the exhibit was prepared because it hasn't been established.

THE COURT: Forgive me, but I'll ask you to state your name.

MR. WILKENS: Scott Wilkens, Your Honor, for the plaintiffs.

THE COURT: Mr. Wilkens, you're of course welcome, but no voir dire. I don't understand what the relevance of this is and Ms. Gursky, tell me why you think this is relevant.

MR. WILKENS: Your Honor, we don't have a copy.

THE COURT: Well, the government will provide you one forthwith. I have one. But Ms. Gurksy, tell me why this is relevant.

MS. STROKUS: Your Honor, I'm Ms. Strokus, just to clarify.

THE COURT: Ms. Strokus, yes. And you must forgive me. I recognize you. I just hadn't got your name down yet. Forgive me that. Ms. Strokus. And you've gotten a trip now as part of this case. Tell me why it's relevant.

MS. STROKUS: Your Honor, plaintiffs have alleged a new policy which they have termed an ideological deportation policy that they assert that the State Department and the Department of Homeland Security are employing.

THE COURT: I understand that.

MS. STROKUS: This witness is going to testify that the State Department's policies and practices, the way it implements law and regulation have been in place for, in some instances, up to 70 years. And the purpose of this exhibit is to aid, to assist her in presenting her testimony based on her knowledge and aid in the court's comprehension, simply because of the large volume of years to cover for what is currently being implemented today.

THE COURT: But this goes way back before she was employed there, so she doesn't have personal knowledge, for instance, of what was going on in 2004, and certainly she

Case: 26-6906, 11/20/2026, DktEntry: 16.6, Page 81 of 300


doesn't have -- though I can take judicial notice of the Immigration Act of 1924, and she doesn't have personal knowledge of the visa security measures in 1941.

I can take judicial notice of the events, the World Trade Center bombing, September 11 terrorist attacks, one imagines they changed their policies.

MS. STROKUS: Your Honor --

THE COURT: Let's proceed this way. You go ahead and ask her your questions. I understand that central to this case is an alleged policy, and the government denies that there's any such policy. But it's pretty clear the government has procedures, and I'm interested to know what she has to say about those procedures. Let's proceed that way.

I've looked at this. It's hardly conclusive on anything, but I'll defer ruling. So go ahead and ask your questions.

MS. STROKUS: Your Honor, just to clarify, Ms. Smith did just testify that she joined the State Department in 1999. And if I could make a brief offer of proof for all of the testimony that would come before --

THE COURT: No. I stand corrected as to when she joined, and I'm appreciative of that, but I don't need an offer of proof at this time. Go ahead, ask questions.

MS. STROKUS: Thank you, Your Honor.

BY MS. STROKUS:

Q. Ms. Smith, when with did the State Department's visa issuance policy originate?

THE COURT: Which policy? Excuse me, I didn't hear the type of policy.

MS. STROKUS: Visa issuance policy.

THE COURT: Again, forgive me. Say it again.

MS. STROKUS: Sure. My question, Your Honor, was when did today's -- when did the State Department's visa issuance policy originate.

MR. WILKENS: Objection.

THE COURT: Overruled. You may answer.

A. Thank you, Your Honor.

With the Immigration Act of 1924.

Q. And Ms. Smith, what did that Immigration Act of 1924 do?

MR. WILKENS: Objection.

A. It laid out some basic --

THE COURT: I'm going to sustain that. I can look at the Act. We're back in 1924. That's over a century ago. Let's come to this case.

MS. STROKUS: Yes, Your Honor. Certainly, Your Honor.

BY MS. STROKUS:

Q. So skipping over some questions that I intended to ask Ms. Smith, Ms. Smith, after World War II, what was the next major development in immigration law?

MR. WILKENS: Objection.

THE COURT: No. Overruled. She may tell us.
A. After World War II, the major milestone was the Immigration and Nationality Act in 1952 which laid out rules and regulations on visas and established ineligibilities and what DHS would call inadmissiblities, as well as rules around visa revocation.
Q. And is the INA still the governing law today?
A. Yes, it is still the governing law.
MR. WILKENS: Objection.
THE COURT: Well, overruled. I'm the judge of the law, but I'm going to let that stand. Go ahead. That's the act that's in effect today. Go ahead. Go ahead, counsel.
MS. STROKUS: Yes.
BY MS. STROKUS:
Q. Have there been any amendments that have been relevant to the State Department visa security policy in the years following 1952?
A. Yes. One in particular stands out in my mind that came into effect right before I started with the State Department, which was in 1996, which established the ineligibilities for illegal presence 212(a)(9)(i) and 212(a)(9)(ii).
Q. And you started at the State Department when again?
A. In September of 1999, and I got to my first post in November of 1999.
Q. What was the next major event that impacted the State

Department's visa security policy?
A. If I may back up just a little bit because something that impacted the State Department was in 1993, the first World Trade Center bombing when it --
MR. WILKENS: Objection.
THE COURT: What's the ground of the objection?
MR. WILKENS: I mean, she testified that she joined the department in 1999. Now she's going to back to before she joined, Your Honor.
THE COURT: Yes, but she has training and the like. To tell you the truth, so far I haven't heard anything that is particularly relevant, but I'd like to move on. If she doesn't get to something relevant pretty soon, I'll issue a direction. But this is all background and perhaps it's helpful.
Go ahead. After the World Trade Center bombing, what happened so far as you know?
THE WITNESS: Yes, Your Honor.
A. So after the first World Trade Center terrorist bombing, there was a push within Consular Affairs for some system automation as well as limited biometric collection. And if we fast forward, I started in '99, then the September 11, 2001 terrorist attacks happened. And that was a major wake-up call for the State Department for Consular Affairs and for the whole U.S. Government in terms of our failure to properly vet visa applicants, since at least a couple of them were in the U.S. on

Case: 26-6906, 11/20/2026, DktEntry: 16.6, (85 of 300)


student visas. At least one had attended flight school in the United States.

So in the immediate years following the September 11 terrorist attacks, there were several laws that came into effect and major changes in the Bureau of Consular Affairs in terms of full biometric collection. And, for example, the INS became DHS with all of its different components, HSI, ICE, also consular officers having access to entry and departure data for all aliens.

Another major shift was that before 9/11 foreigners could transit the U.S. without a visa. And starting in 2002, foreigners needed to obtain a visa in order to even switch planes in the United States.

Also the visa security program was created, which is where HSI has agents co-located in consular sections abroad that conduct additional vetting on visa applicants. And also in the few years following 9/11 it was mandated that U.S. Government agencies needed to share in a very fulsome way derogatory information on visa applicants. And also there was sharing of biometric data especially between DHS and Consular Affairs.

Q. Ms. Smith, was there anything specific to student visa applicants that occurred following 9/11?

A. Yes. Specific to student visa applicants the SEVIS system was created, also referred to as SEVP, Student and Exchange Visitor Program. And that was literally a database that was

created by ICE to track students from the moment that they are issued their I-20 or DS-2019 form in order to apply for a visa abroad. And it tracks when they report to class in the United States. If they were to flunk out of school, their status would change.

ICE certifies designated school officials at every school that is accredited to issue the I-20 or DS-2019, and the DSO, as they're called, is supposed to update in SEVIS, in the SEVP any and all student movements, including if someone is, for example, adversely terminated at the school.

Q. Ms. Smith, all of these changes and evolutions that you've mentioned after the September 11 terrorist attacks, are they still being implemented today by the State Department?

A. Yes, they are still in effect today.

Q. After the implementation and all of this evolution in response to the September 11 terrorist attacks, was there anything else that occurred that created additional evolution in the State Department's visa security policy?

A. So for example, in 2013, there was the Boston Marathon bombing that was carried out by a naturalized U.S. citizen and a legal permanent resident. And that brought to the forefront once again for Consular Affairs the need to properly vet all applicants because of serious national and public security concerns.

The next big event was in 2015, the San Bernardino

shooting that was carried out by a Pakistani national who obtained a K-1 fiance visa in order to enter the U.S. to marry a U.S. citizen. And he had posted on his social media, I think it was the day before or the day of the shooting, he had posted what he was going to do. And then a review of social media revealed afterwards that he had pro-ISIS postings on his social media. So this was when the Bureau of Consular Affairs first started to take a really hard look at how to vet social media.
Q. And for how long has the State Department required visa applicants to provide social media handles for the purpose of visa vetting?
A. So to mention that in 2016, so about a year after the San Bernardino shootings, FDNS, the Forensic Document National Security director within USCIS started social media vetting of certain subsets of applicants.
And in the State Department, in, it was 2019 or 2020, started to require that all visa applicants, whether nonimmigrant or immigrant visa applicants, were obliged to report their social media handles on their DS-160 or DS-260 electronic application forms.
Q. And Ms. Smith, following after, say, 2020, has there been additional development in the State Department's visa security policy?
A. Yes. There have been further developments in terms of interagency and biometric checks. Also there have been some

innovations, for example, for a while there was a predictive analytic software that was run as a pilot at some posts on visa applicants based on their biographic and other information. Sort of a first foray into an AI type system on visa applicants.

And another is a focus on data-driven decisions and metrics. So everything on refusal rates, productivity, there have been different innovations over the years since around 2019, 2020, leading up until today and continuing.

Q. Ms. Smith, is the State Department, to your knowledge, continuing to implement the same statutes and regulations today as it has since the passage of the Immigration and Nationality Act in 1952?

A. Yes. The State Department and specifically Consular Affairs continues to uphold everything that is in the INA.

MS. STROKUS: Your Honor, I have nothing further for this witness and tender the witness to the court.

THE COURT: Yes. Thank you.

Mr. Wilkens, do you wish to inquire of this witness?

MR. WILKENS: Yes, I do, Your Honor.

THE COURT: You may.

CROSS-EXAMINATION BY MR. WILKENS:

Q. Ms. Smith, you've talked about, I think you called them everything from sort of major changes to changes over the years to innovations.

Case: 26-6906, 11/20/2026, DktEntry: 16.6, Page 89 of 300


And am I correct that when those types of changes have happened, the Department of State and in particular the Bureau of Consular Affairs has regularly issued policy guidance to all posts on how those changes should be implemented?

A. Yes, that is correct. One way that the State Department or Consular Affairs issues guidance to the field is via cables, yes.

Q. And while we're on that topic, in addition to cables, how else does the Department provide policy guidance to visa officers around the world and in Washington?

A. Another way that the State Department provides guidance is via FAM updates, the Foreign Affairs Manual, 9 FAM in particular, which is everything about how consular officers need to apply the INA abroad, sort of operational instructions.

Another way besides cables and FAM updates, sometimes emails are released until a cable can get fully cleared because any cable that is released from the State Department has numerous layers of clearances both within Consular Affairs as well as throughout the State Department building, many different offices.

And another way that guidance is released to the field is, depending on the topic, Consular Affairs may hold a webinar in order to give information and receive questions from the field.

Q. And in addition to taking account of the various types of changes that you spoke about earlier, this type of policy

guidance is also issued to implement executive orders no matter what the Presidential administration, correct?

MS. STROKUS: Objection, Your Honor.

THE COURT: What's the ground?

MS. STROKUS: Scope of her prior testimony.

THE COURT: Overruled. He may have it. Is that the practice?

THE WITNESS: Counsel, can you please repeat the question? I want to make sure I understand.

THE COURT: Yes. His question is, does like policy guidance get issued to consular offices when it's necessary to implement a President's executive orders.

THE WITNESS: Thank you, Your Honor.

The Consular Affairs would release cables or webinar or hold webinars if an executive order is relevant to visa work or let's say U.S. passport adjudications. So it really depends on the topic. We don't hold a webinar or release a cable based on every executive order. It really depends on what the topic of the executive order is.

Q. And under this administration, isn't it correct that the bureau has issued policy guidance with respect to executive orders issued by the President?

MS. STROKUS: Objection, Your Honor.

THE COURT: I'm not getting into how they've changed the visa applications, if at all and on what basis. In my

mind, all of those things implicate national security, and that's the line I'm following. So that question I'm sustaining on that ground.

Q. So I will come back to a related area in a moment. Let me just step back for a second about your position, Ms. Smith, which you talked about earlier as special adviser. You've been in that role since February, right?

A. That is correct, I've been in that role since February.

Q. And that is the first role that you've had sort of in the head office, the front office in Washington, D.C. since you joined the Department in 1999, correct?

A. Yes, that is correct. That's the first role I've had in the Consular Affairs front office since I joined.

Q. You've, so to speak, been in the field up until taking that role; is that fair?

A. Yes, that's correct. Other than language training, I've been in the field.

Q. Okay. And so would it be fair to say that you've been on the receiving end of the policy guidance we've talked about under various cables that are sent or the Foreign Affairs Manual, the emails that you mentioned that are sent prior to some cables being issued; is that right?

A. Yes, I've been on the receiving end of guidance from D.C.

Q. And in your current role since February, you've been on the, let's say the generating end, the creation end of the

policy guidance that goes out to consular posts around the world and to the visa office in D.C., correct?

MS. STROKUS: Objection, Your Honor.

THE COURT: No. He may have that. Is that a proper characterization, ma'am?

THE WITNESS: I guess what I'd do is I'd caveat it a little bit, because I am one of many people within the Bureau of Consular Affairs who are attempting to faithfully carry out what the President is releasing via executive orders.

BY MR. WILKENS:

Q. And would it be fair to say that one of the principal responsibilities of your role is to help implement President Trump's executive orders, and in particular, let me refer to a couple of them in particular, Executive Active order 14161, which is titled Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats, and Executive Order 14188, titled, Additional Measures to Combat Antisemitism; is that right?

MS. STROKUS: Objection, Your Honor, scope.

THE COURT: No. Overruled. He may have it.

A. Yes, that is correct. As part of my job in D.C. is to help the Bureau of Consular Affairs implement executive orders out of the White House, including the EOs that you mentioned, EO 14161 and the EO on antisemitism.

Q. And in your role as special adviser since February, you

have in fact undertaken a number of tasks to implement those two executive orders, isn't that right?

MS. STROKUS: Objection, Your Honor, scope.

THE COURT: Overruled.

A. Can you please ask the question again? I think it's two questions. So would you mind separating the questions, please.

THE COURT: Follow that direction.

MR. WILKENS: I'm trying to remember the question, Your Honor.

THE COURT: I'll break it down. He asked about two executive orders. So since you've had this duty in February, have you worked on the executive order relative to measures to combat terrorism and the like, the first one he mentioned?

THE WITNESS: Yes, Your Honor. So EO 14161, I have been a member of the team to help implement that executive order, which basically directed the State Department to find ways to better vet visa applicants abroad. And so it was left to the State Department and specifically the Bureau of Consular Affairs to envision and implement what that entailed, what that means.

THE COURT: And his second question was, the executive order dealing with antisemitism.

THE WITNESS: Yes, Your Honor. Although I've been less involved with that executive order specifically, I have had some dealings with it but not as much as EO 14161.

Case: 26-6906, 11/20/2026, DktEntry: 16.6, Page 94 of 300


BY MR. WILKENS:
Q. Turning you specifically to the antisemitism EO, what guidance are you aware of that has been issued to visa officers, to consular officers to implement the antisemitism EO?
MS. STROKUS: Objection, Your Honor, scope.
THE COURT: Sustained. But this is not on scope. We're not getting into the vetting of visa applicants.
MR. WILKENS: Your Honor, let me mark an exhibit to sort of make it clear that some of this material is before the court and has been marked as exhibits that deals with this question.
THE COURT: Maybe it is. So we'll have to work out from there, but that's the line I'm following.
MR. WILKENS: Yes.
Could we pull up Exhibit 64, please. Terrorists.
THE COURT: I have it.
THE WITNESS: I'm viewing it as well.
THE COURT: Thank you.
BY MR. WILKENS:
Q. Ms. Smith, please take a moment to look at that, if you need to.
MS. STROKUS: Your Honor, I'm going to object to the introduction of this exhibit to this witness.
THE COURT: Wait a minute. It's a little too late.

This document is in evidence under the pretrial order. So we've got a document in evidence, it's redacted, and I'm not changing that.

MS. STROKUS: I understand, Your Honor. My objection is under Rule 611(b), the scope of cross-examination.

THE COURT: Well, that's within the court -- I see, it's scope. And I overrule the objection. But yes, maybe -- well, no, she's adverse. He may inquire. The matter is within my discretion. He may inquire, but I'm not getting into changes in practice for vetting visa applicants. But hope springs eternal, Mr. Wilkens, so go ahead.

MR. WILKENS: Yes.

BY MR. WILKENS:

Q. And have you seen this cable before, Ms. Smith?

A. Yes, I have seen this cable before.

Q. And is this cable one of the types of policy guidance that's been issued to implement the executive orders we spoke about a moment ago, including the antisemitism executive order?

MS. STROKUS: Objection, Your Honor.

THE COURT: Overruled.

A. Yes, this is one example of how executive orders are implemented.

Q. Okay. And just with respect to cables more generally but including this cable, am I correct that cables don't just apply to visa officers located in diplomatic posts around the world

but also can provide policy guidance to the visa officers working here in D.C., isn't that correct? Well --

THE WITNESS: Were you going to say something, Your Honor.

THE COURT: No.

THE WITNESS: Sorry.

MR. WILKENS: Sorry. That was me. Let me withdraw that.

THE COURT: Withdrawn.

BY MR. WILKENS:

Q. I'll ask you, so the cables -- yeah. This cable applies not just to visa applicants who are applying for visas through posts abroad but also applies to visa holders who are present in the United States, isn't that right?

A. So the question is whether the cable guidance would apply to visa holders in the United States as well?

Q. Yes.

A. I think it's a little bit of a broad question to try and answer because if a student has been admitted to the United States, they are admitted by Customs and Border Protection, S, Ms and Js are categories that are submitted, duration of status. And so there's certain aspects of their presence here that are -- well, actually, most aspects of their presence in the United States are sort of governed by the Department of Homeland Security and not the State Department.

Q. The State Department, though, is the agency with the statutory authority to revoke visas, correct?
A. That is correct, the State Department has the authority to revoke visas.
Q. And that includes student visas, correct?
A. That is correct, that includes student visas that the State Department has the authority to revoke.
Q. And could I ask you to turn to paragraph 11 of this cable, which is on page five of six?
A. Yes. Could I have a moment to read it, please.
Okay.
Q. Okay. So with respect to paragraph 11, does that make it clear that the cable, the guidance provided by this cable is applicable not just to students applying for visas from abroad at consular posts but also the students in the United States and the possibility that the State Department will revoke their visas?
MS. STROKUS: Objection.
THE COURT: Well, the document speaks for itself. The objection is overruled. No. The objection is sustained. The document speaks for itself. That's what it says.
MR. WILKENS: Okay, Your Honor.
BY MR. WILKENS:
Q. Just to be clear, the questions that I will be asking with respect to policy guidance, I intend to ask those questions

about policy guidance with regard to visa holders in the U.S., not visa applicants abroad who are applying through U.S. diplomatic posts. I just want to be clear about that, that that's what I want to focus on.

So am I correct that in the bureau in which you are a senior adviser that there is a visa office that handles the revocation of visas for students who are already in the United States, student visa holders?

A. Yes, that is correct, there is the visa office in D.C. that would handle the revocation of visas there; yes, that is correct.

Q. And we spoke a moment ago about different types of guidance, policy guidance that is provided by the Department of State and the bureau, which you mentioned, for example, includes the Foreign Affairs Manual, cables, emails in advance of cables being issued and webinars.

And do those types of guidance -- don't those types of guidance also apply to visa officers in Washington who are working on visa revocations?

MS. STROKUS: Objection.

THE COURT: Overruled.

A. So I think what you're asking is whether the same standards would apply abroad or domestically in the United States on whether there are grounds to revoke a visa.

So there are certainly rules as it does briefly mention in

paragraph 11 of the cable in Exhibit 64, there is brief mention of that. And so for example, it mentions how in driving under the influence, a consular officer abroad is able to revoke a visa, even if the person is in the United States. But most times it needs to be the visa office in the U.S. that would perform the prudential revocation.

Q. And could you just briefly explain what the term "prudential revocation" means for the court.

A. Yes, a prudential revocation is when a visa is revoked but it actually does not take effect until the person departs the United States.

Q. Okay. And I just want to just back up for one second just to be clear. So the types of guidance we talked about, the Foreign Affairs Manual, cables, emails, webinars, all of that, those types of policy guidance with regard to the two EOs we spoke about apply to students, student visa holders, the revocation of student visas for students who are already present in the United States, correct?

MS. STROKUS: Objection.

THE COURT: No. Overruled.

A. A consular officer, whether they're abroad or in the United States, would need to look at the totality of the circumstances of an applicant's situation, would need to look at all facts their case, any and all criminal history, any aspect of the applicant in order to determine if there are

grounds for revocation or prudential revocation.
Q. And I want to focus on the question of where the guidance that the consular officer, particularly located in D.C., is relying on.
And what I'm asking is, they also rely on the various types of policy guidance that you mentioned, which includes the Foreign Affairs Manual, cables, emails, webinars, isn't that correct?
A. Yes, an officer in D.C. would also rely on the Foreign Affairs Manual, cables, webinars. We are all held to the same standard.
Q. And I think you mentioned a moment ago that with the exception of sort of DUIs, for example, most visa revocations for visa holders in the United States, student visa holders in the U.S. are handled out of visa officers -- are handled by visa officers located in Washington, isn't that right?
A. That is correct.
Q. Okay.
A. The majority of visa revocations are performed from D.C.
Q. If we can just turn back to the first page of this exhibit, 64, and I'm going to direct you to the latter couple of sentences of paragraph two, the summary paragraph.
Do you see where it's quoting from Secretary Rubio there?
A. Yes, I do see the quote from Secretary Rubio.
Q. And that quote from Secretary Rubio is guidance to visa

officers, including those who are handling the revocation of visas of students who are in the U.S., right?

MS. STROKUS: Objection, hearsay.

THE COURT: No. The document is in evidence. It's not hearsay, but I'm sustaining the objection. The document speaks for itself. That's what it says.

MR. WILKENS: Okay, Your Honor.

THE COURT: Except the identity of who said it is unclear. So we'll let Mr. Wilkens have that.

You understand that the quoted portion in that paragraph, ma'am, comes from the present Secretary of State, Marco Rubio?

THE WITNESS: Yes, Your Honor. That comes from Secretary Rubio.

THE COURT: Thank you.

By MR. WILKENS:

Q. And just to be clear, that's part of the guidance, right?

THE COURT: Well, the document speaks for itself.

MS. STROKUS: Objection.

THE COURT: The objection is sustained. I can read.

BY MR. WILKENS:

Q. Let me move off of this exhibit, Ms. Smith.

Just briefly, to go back to your role as special adviser, you mentioned that you report to Mr. Armstrong, right?

A. Yes, that is correct, I report to Mr. John Armstrong.

Q. And you also work closely with the Office of the Counselor to Secretary Rubio, correct?
A. Yes, I do work with the office of the counselor.
Q. And the Office of the Counselor -- well, could you explain just briefly the Department of State sort of organizational structure?
A. Yes, I can explain. So the Office of the Counselor -- the consular reports directly to the Secretary of State, and they are responsible for providing guidance, and also they can take on special projects for the Secretary's office.
Q. And the Office of the Counselor which reports directly to the Secretary has provided you with various tasks related to the implementation of the two executive orders we've discussed, correct?
MS. STROKUS: Objection.
THE COURT: Overruled.
A. I do sometimes receive instruction from the office of the consular, but most times it is through the senior bureau official in consular affairs.
Q. I just want to be clear, in addition to reporting to Mr. Armstrong, you also have this working relationship with the office of the consular, which reports directly to Secretary Rubio, right?
A. Yes, I do have a working relationship with the Office of the Counselor.

Q. And you've received tasks regarding the implementation of the two executive orders from Mr. Armstrong and the Bureau of Consular Affairs and also from the office of the consular to Secretary Rubio, correct?

MS. STROKUS: Objection.

THE COURT: Overruled.

A. Can you clarify which executive orders, please.

Q. Yes. The two we were speaking about earlier.

A. Yes, I have received guidance or instructions for EO 141617 and EO 14188.

Q. You spoke earlier about the connections, the work between the Department of Homeland Security and the Department of State and how that has changed or increased over time, correct?

A. Yes, I spoke earlier about how that has evolved over time, become a much closer relationship, starting really with the 1992 World Trade Center bombing and especially after the 9/11 terrorist attacks, in terms of biometric and information sharing.

Q. And in your role as special adviser, you have worked with the Department of Homeland Security, correct?

MS. STROKUS: Objection.

THE COURT: Overruled.

A. Yes, in my role as senior adviser, I have worked with the Department of Homeland Security.

Q. And I want to just focus on two aspects of that,

Ms. Smith. You have participated in what is referred to as a student visa working group, right?

MS. STROKUS: Objection.

THE COURT: I'm not clear can where that falls on the line I'm following, so I'm going to sustain it but without prejudice to you following it up.

Q. Okay. Since you became special adviser, some of your work has involved the revocation of visas of students who have engaged in student protests, correct?

MS. STROKUS: Objection.

THE COURT: Overruled.

A. Can you repeat the question, please.

Q. Yes. In your role as special adviser, you have worked on issues related to the revocation of student visas for students who engaged in student protests, correct?

A. Yes, in my role as senior adviser, I have worked on matters related to the revocation of student visas and also frankly revocation of visas for anyone, whether or not they're a student, who has been arrested or otherwise broken our laws in the United States.

Q. But you have worked, in your role as special adviser, you have worked on the revocation of student visas for students engaged in protests only since February of 2025, right?

MS. STROKUS: Objection.

THE COURT: Overruled.

A. In my role as senior adviser since February of 2025, I have worked on cases where applicants have derogatory information in our system.

THE COURT: Wait. Excuse me for interrupting, but I'm going to pretty strictly follow my line. His questions, I understood, don't deal with applicants. They only deal with people who are here lawfully on visas that have issues. And I've understood your testimony about revocation of visas to apply to such persons.

This last question, as I heard it, is only this. You first began working on the revocation of visas of the student protesters after the assumption of your role in February 2025. Is that true?

THE WITNESS: So to answer your question more directly, Your Honor, since arriving in February of 2025, my work has included not only student visa holders. So you're asking, sir, about any visa holder in the United States, including students. And yes, my work has included that.

THE COURT: But you're making the point that your work is much broader than that, at least in the revocation of visa area?

THE WITNESS: Yes, Your Honor, my work, yes.

THE COURT: Yes, I understand. Mr. Wilkens.

BY MR. WILKENS:

Q. Let me focus on two different ways, as I understand it, in

which your work has concerned the revocation of student visas involving student protesters.

One way has been referrals coming from the Department of Homeland Security to the Bureau of Consular Affairs and Mr. Armstrong that recommend -- that have recommended the revocation of the visas of certain students who were engaged in student protests, isn't that right?

MS. STROKUS: Objection.

THE COURT: Overruled.

A. Would you mind repeating the question, please.

THE COURT: He says, his question is that one way you've been involved in the revocation of visa-holding student protesters is when a recommendation comes from the Department of Homeland Security advising that such visa should be revoked; is that correct?

THE WITNESS: Thank you for repeating the question, Your Honor. That is correct.

We, as I stated during my deposition, we sometimes get information from the Department of Homeland Security about student visa holders or other types of visa holders who are in the United States and there is some sort of derogatory information.

And as I stated during my deposition, my role has been fairly limited with regard to specific visa cases, occasionally checking in our system whether the person has a valid

nonimmigrant visa, if it is an expired nonimmigrant visa, if they are a legal permanent resident, checking if someone is a U.S. citizen. So it's a little bit more verifying the actual status of the person in the United States.
BY MR. WILKENS:
Q. And Ms. Smith, with respect to that limited role, you dealt with, in that way, the case of Mahmoud Khalil, correct?
MS. STROKUS: Objection.
THE COURT: Overruled.
A. Yes, I do recognize the name Khalil Mahmoud.
Q. You were asked by the Office of the Counselor to Secretary Rubio to check in the system whether Mr. Khalil was a visa holder or a lawful permanent resident, correct?
A. I am not sure if it was from the Office of the Counselor or from the Department of Homeland Security, but yes, I did check if Khalil was a visa holder or a legal permanent resident.
Q. And did you have that sort of involvement in the cases involving Rumeysa Ozturk or Badar Khan Suri or Yunseo Chung?
MS. STROKUS: Objection.
THE COURT: Overruled.
A. As I stated during my deposition, I thought I recognized the name Suri, but I thought it was a female, and during the deposition I saw it was a male. So if I worked on it, it would have been just to verify the visa status or an LPR.

Case: 26-6906, 11/20/2026, DktEntry: 16.6, Page 108 of 300


Did you say the other name was Chung?
Q. Yes.
A. I do not recognize that name. And can you repeat the name of the other applicant, please?
Q. Mohsen Mahdawi. Sorry, go ahead.
A. Sorry. I do recognize the name Mahdawi, but I thought -- I think it's a he --
Q. Yes.
A. I thought he was from a different country. And when I saw it during the deposition, it was a different country than I had remembered. The name does sound familiar. But again, my role would have been limited to checking if the person was a valid visa holder or a legal permanent resident, visa status.
Q. Thanks. I'll ask about one more name, Rumeysa Ozturk. Were you involved in her case in any way?
A. I do not remember working on her case, no.

MR. WILKENS: Okay. Thank you. And Your Honor, I just wanted to raise one thing. It looked to me like Ms. Strokus maybe had been speaking with someone else in the room. And if there's someone else in the room, I'd like them to be identified.

MS. STROKUS: That's fine, Your Honor. We have agency counsel here. We just have a limited screen.

THE COURT: I appreciate that.

MR. ANDERSON: Carl Anderson, with the State

Department.

THE COURT: And Mr. Anderson, thank you for identifying yourself.

Is that it for this witness?

MR. ANDERSON: Thank you, Your Honor.

MR. WILKENS: Not it for my questions, Your Honor, but yes, thank you for clarifying that.

THE COURT: And Mr. Anderson, you are certainly welcome.

BY MR. WILKENS:

Q. I want to -- so you've just spoken about one way in which the Bureau of Consular Affairs has worked with the Department of Homeland Security on revoking the visas of student protesters, and I want to -- I just want to talk about one other way, as I understand it, that the two agencies have addressed or discussed the issue of visa revocations for student protesters.

And you were part of a student working group with DHS in which the issue of the revocation of student visas for students who are engaged in protests was discussed, correct?

MS. STROKUS: Objection.

THE COURT: Well, I think that may run afoul of the deliberative privilege. Sustained.

I'll ask the question. As part of your job, ma'am, at some time in the period we're talking about, you were part of a

working group within DHS, the Department of Homeland Security, that concerned itself with student protesters. Is that true?

THE WITNESS: Your Honor, in my role as senior adviser in Consular Affairs, I did participate in a group with the Department of Homeland Security about student visa protesters and other matters, yes.

THE COURT: Thank you.

BY MR. WILKENS:

Q. And I want to ask about what you referred to in your deposition as the Homeland Security Council. Do you remember talking about that?

MS. STROKUS: Objection.

THE COURT: Well, since I don't know -- I don't have the deposition before me, I'll allow her to answer yes or no.

Do you remember mentioning that individual or office in your deposition, ma'am?

THE WITNESS: Yes, Your Honor, I did mention in my deposition that the Homeland Security Council calls meetings, and I have attended several of those meetings.

BY MR. WILKENS:

Q. And in those meetings, the attendees, the meetings that you attended, the issue of student protesters and the revocation of their visas came up, didn't it?

MS. STROKUS: Objection, Your Honor. Presidential communications privilege.

THE COURT: What? Presidential? Is that --

MS. STROKUS: Yes, Your Honor.

THE COURT: -- the privilege you're asserting?

MS. STROKUS: Homeland Security Council is a direct advisory to the President, Your Honor.

THE COURT: So let me be very clear now. You're asserting the executive privilege of the President of the United States with respect to these meetings?

MS. STROKUS: Yes, Your Honor, the Homeland Security Council is part of the executive, it is part of the White House.

THE COURT: You're all part of the executive, aren't you? You're part the executive.

MS. STROKUS: I am, Your Honor. I mean specifically that this council advises directly to the President. It is part of the Executive Office of the President.

THE COURT: This council we're talking about is part of the Executive Office of the President. What's his or her name?

MS. STROKUS: Yes. Your Honor, it is a council of people who have been collected to advise on Homeland Security. It is termed the Homeland Security Council, and it is part of the Executive Office of the President.

THE COURT: Okay. I appreciate your help. So there's an informal council on Homeland Security.

MS. STROKUS: No, Your Honor. It is a formal council. It is a formal council that is part of the Executive Office of the President.

THE COURT: And its name is --

MS. STROKUS: The Homeland Security Council.

THE COURT: Thank you. And it's comprised of whom?

MS. STROKUS: Your Honor, that is part of the Presidential communications privilege.

THE COURT: So it's a secret council?

MS. STROKUS: The existence of the council is not a secret, Your Honor.

THE COURT: But its membership is secret?

MS. STROKUS: They are staff members of the Executive Office of the President, Your Honor.

THE COURT: And its membership is secret?

MS. STROKUS: I would not say that it is secret, Your Honor. I would say that it is privileged.

THE COURT: And it's privileged from this court? I may not know who these people are? I mean, you tell me that. Is that what you're saying?

MS. STROKUS: Given the ongoing issues with privilege in this court, Your Honor, I will maintain that this is the Presidential communications privilege and the identities of the individuals on the Homeland Security Council are privileged. The discussions that are had within the Homeland Security

Council and agencies are privileged under the Presidential communications privilege because this council is part of the Executive Office of the President and provides direct recommendations, direct advice for the President to take action in his duty under the Constitution.

THE COURT: Your position is clear. Let me ask you this, because this pertains to my research on Exhibit A as to which this -- and Mr. Kanter may respond to this as well. And really it does not come up in the context that counsel has now raised it where at least the name of this secret entity is Homeland Security, which the natural inference is it involves national security.

MR. KANTER: Homeland Security Council, not secret.

THE COURT: The name is not secret, no. But now its members are apparently secret.

MR. KANTER: Privilege.

THE COURT: Privilege, you say. So she takes that position, and I'm not in a position to overrule it, and I'm not going to, at least now.

But go back to Exhibit A. If I rule that Exhibit A is privileged, my review of that exhibit is, that has nothing to do with or the claim that -- if any claim were raised that it has to do with national security is so peripheral that, to be almost evanescent. Be that as it may, if it did have to do with national security and the executive privilege of the

President of the United States is invoked, the decided cases indicate that no adverse inference may be drawn from that. And those are higher courts, and I respect that. But if it didn't have to do with national security, I'm wondering when such privilege is invoked, whether, as you'll find if you were here in Massachusetts dealing with the attorney-client privilege, under the common law of Massachusetts, where I started and still reside, if you invoke the attorney-client privilege, the factfinder is entitled to draw an adverse inference that the attorney-client privilege is invoked, but you're hiding something.

I wonder whether when national security is not at play, as it appears to be as your co-counsel has invoked it, but with respect to Exhibit A where it appears it doesn't, what's the law on that?

I'm not asking now. It's a matter that could be briefed if we even get that far because I haven't ruled whether the privilege applies or not, but it's appropriate to raise it now.

Sorry for the detour, Ms. Smith. We'll let Mr. Wilkens get back to work.

MR. WILKENS: Thank you, Your Honor.

BY MR. WILKENS:

Q. So Ms. Strokus and Ms. Smith, I want to return for a moment to the Homeland Security Council with respect to what is

public about it. And a great deal has been made public by White Houses over time. And so in particular, the Homeland Security adviser is Stephen Miller, isn't that correct? That's on the White House website; isn't that right?
A. Yes, the Homeland Security security adviser is Stephen Miller.
Q. And can you name the agencies -- I'm not asking for the names of the people but the agencies and agency heads who are as a matter of public record part of the council?
MS. STROKUS: Your Honor, objection again.
THE COURT: Same grounds? Same grounds?
MS. STROKUS: Yes, Your Honor.
MR. WILKENS: Your Honor, I'd like to pull up a White House web page that shows the information that I'm trying to ask about to show that it's public.
THE COURT: Well, you may, but then why don't you pull it up and show it to the witness or read it to the witness --
MR. WILKENS: Yes, Your Honor.
THE COURT: -- because you have it, and let's see what she says about it.
MR. WILKENS: Yes, Your Honor. We'll pull it up now.
MS. STROKUS: Your Honor, I'm going to object to this. This was not produced to the defendants in discovery.
THE COURT: True. But I'm going to allow him to do it if it's on the White House website. Now, a privilege has been

invoked. I think I might want to take a look at it, and it would be helpful, can you people print things out? Why don't you take a screenshot of it and print it out? I'm swimming in paper here.

MS. CONLON: I know. Unfortunately, we have no printer access in the courthouse, but we'll put it on the screen in a second.

THE COURT: All right. Let's put it on the screen.

MR. WILKENS: Pre-marked as EP.

THE COURT: Okay. Now, EP, this is one of your newer documents. So this is EP.

MS. STROKUS: Your Honor, may we have a quick recess so that we can determine what is public and what is not? We have not seen this before, and my understanding --

THE COURT: I don't see the need for a recess. It's sufficiently public that they can get their hands on it. And it's represented to the court that this is the White House's own website. I'm reading it, it says Homeland Security Council.

MS. STROKUS: Your Honor, I would just point out that at the top of the page it says, "Under President George W. Bush," and that this is frozen in time, it is not current.

THE COURT: All right. That's fine. And therefore, the way we'll proceed is you're going to have to move on, Mr. Wilkens, because she says that this is not the current

council. When you can get to a printer, print that out, and let me have it.

BY MR. WILKENS:

Q. Can I ask you, Ms. Smith, if you read that --

THE COURT: She can't read it.

MS. STROKUS: Objection on.

THE COURT: Wait a minute. He hasn't asked his question yet. Let him ask the question.

BY MR. WILKENS:

Q. What I want to ask is, is the description of the Homeland Security Council and its agency members an accurate description of the current Homeland Security Council?

THE COURT: She doesn't have the document before her. She does? She has it before her.

MS. STROKUS: Objection, speculation, foundation. This has not been produced in discovery. It's a historical document.

THE COURT: Yes, he knows that. And so what he's asking her is, is the historical document, is the composition the same today? You object to that, asserting the same privilege, I take it?

MS. STROKUS: Yes, Your Honor, under the privilege and also because it's speculative.

THE COURT: Look. I've heard you. I understand the grounds of the objection.

Now, I'm in the middle of the trial. I need to sort this out. So without sustaining this objection in any way, I'm going to direct you to move on, because if the assertion of privilege is correct, the question you ask, since you can only come up with one from a prior administration and that's some time ago, calls for her divulging matters as to which such a claim has been made, an interesting claim. Anything else?

MR. WILKENS: Yes, Your Honor.

BY MR. WILKENS:

Q. I'd like to just briefly focus on a few cables of the type that you testified about earlier, cables that the Bureau of Consular Affairs issued as part of its implementation of the two executive orders that we spoke about.

MR. WILKENS: And I will go through them as quickly as I can, Your Honor.

Q. Let me direct you to, if we can pull up Exhibit 51, please.

MS. STROKUS: Your Honor, I'm going to object to this, make a scope objection.

THE COURT: Your objection is scope. Overruled.

A. Okay. I see Exhibit 51. I would appreciate a minute or two to read through it, please.

Okay, I am ready, sir.

Q. Okay. Thank you. Do you recognize this cable?

A. Yes, I do recognize this cable.

Q. Is it one of the cables that you were referring to earlier with respect to providing policy guidance about the implementation of the executive orders?
A. As we can see in the summary paragraph on page one, it does mention EO 14161, and the cable, to summarize it in a sentence or two, directs visa hosts abroad to catch up on their backlog of what are called system messages.
System messages are derogatory information that appears in our systems abroad when there's a visa holder. So it's someone who already has a visa, and then it's derogatory information that pops into our system once they've been arrested, or other derogatory information.
Q. If I could ask you just briefly, based on your understanding -- well, sorry. Strike that.
If you could turn to paragraph three, please, on page two of seven.
A. Okay, I see it. Can I just have a minute to read through it, please?
Q. Sure.
A. Okay.
Q. Okay. I want to direct your attention to most of the way down the paragraph where the sentence begins, "Visa holders who overstay their admission period." And in that sentence, I just want to focus on the phrase -- well, it says, "engage in conduct that poses a threat to U.S. national security or

otherwise misuse their visas should have their visas revoked under INA 221(i)." Do you see that?

A. Yes, I do see that.

Q. This is not a statutory exam, but could you briefly describe your understanding of INA 221(i)?

A. I have not read INA 221(i). I'm not an expert on that, I apologize.

Q. Okay. So with respect to the phrase "or otherwise misuse their visas," where can a visa officer in Washington who is looking at the revocation of student visas, where could they go to determine what it means to misuse a visa?

A. Well, my first look as a consular officer would be to the 9 Foreign Affairs Manual which has all of the rules about how to implement visa law and to, as I've said before and as I said during my deposition, to look at the facts for each and every case. Each and every case is analyzed individually. As a consular officer, my job is to took at the totality of circumstances and all of the facts for each and every visa applicant or each and every visa holder.

Q. Okay. Let me direct you to paragraph 11 on page five which is under a heading, "Revocation if the alien is still in the United States."

A. Yes, I see that paragraph.

Q. Okay. Obviously you see that most of it is redacted for law enforcement, but I just want to ask about the unredacted

part.

What do you understand it to mean, that requests for revocation of visas when the individuals in the U.S. have to be sent to what's called here the revocation team?

A. So it's exactly what it says there, that hosts abroad need to refer to the team in D.C. when they think that a visa merits revocation.

THE COURT: What do the initials mean, since I'm unfamiliar with your organization, VO, I assume means visa office. SAC means what?

THE WITNESS: I believe that SAC is security advisory and clearances, and I am not sure what RC stands for. But you are correct, Your Honor, it's a team within the visa office.

THE COURT: Yes. And that's the visa office in Washington?

THE WITNESS: That is correct, sir, it is the visa office in Washington.

THE COURT: Thank you.

BY MR. WILKENS:

Q. A moment ago you spoke about a visa officer, including you, looking at the totality of the circumstances in deciding whether a visa should be revoked, right?

A. Yes. Each case would be looked at individually to gather all of the facts in order to make a decision on a visa revocation.

Q. And under the two executive orders we've been talking about and the policy guidance with regard to how they should be implemented, the facts, the totality of the circumstances include a student engaging in a student protest, correct?

MS. STROKUS: Objection.

THE COURT: If I understand, your question is a hypothetical. Ask it again.

MR. WILKENS: Sorry, Your Honor.

BY MR. WILKENS:

Q. Since -- when you are considering the totality of circumstances, is engaging in a campus protest inconsistent with a student's visa status?

MS. STROKUS: Objection.

THE COURT: Overruled. She may give us her opinion.

A. Well, I think it's a bit of a hypothetical question, but we would need to look at all of the facts of the case. I mean, I don't want to veer off into, you know, if this, then that. But, you know, if it were someone, a visa holder who engages in violent activity, whether it's during a protest or not, if they were arrested for that violent activity, then that is something that we would consider for possible visa revocation.

Q. So I'm not -- so putting aside student visa holders who engage in some kind of violence or have been arrested, putting that to one side, isn't it accurate to say that engaging in a campus protest -- sorry. Isn't it accurate to say that when

you are looking at the totality of the circumstances, engaging in a campus protest is inconsistent with a student's visa status?

MS. STROKUS: Objection, asked and answered.

THE COURT: Well, she hasn't answered it, but he stated it the other way. He's asking --

THE WITNESS: Can you repeat the question, please, counsel.

THE COURT: Well, the information ultimately is coming to me, and I guess what he's trying to get at is, do you think that engaging in a student protest, nonviolent and standing alone, is inconsistent with a student's visa status -- I'll state it differently -- is grounds for revoking his visa status? Do you think that?

THE WITNESS: I think it's a difficult question to answer. If it's a nonviolent protest and it's not a protest that is supporting terrorism, then I'm not sure that that would be a problem. I think that we would probably see it in a negative light if the person were protesting in a way that supports terrorism, even if it's a nonviolent protest.

THE COURT: Thank you.

THE WITNESS: Again, I think we'd have to look at the totality of the circumstances for the individual applicants.

MR. WILKENS: Just one moment, Your Honor.

THE COURT: Of course.

While we're waiting, I've waffled on the document, HM for identification, which was proffered by the defendants as admissible evidence under 611. Reviewing it and on reflection, it's not. It doesn't meet the criteria of 611, but the court receives it as a chalk or demonstrative aid, illustrative of the witness's testimony.

MS. STROKUS: Your Honor, just to clarify, it was also offered under 107(a).

THE COURT: And I am excluding it. Thank you for your precision. Your rights are saved.

Is that it for this witness?

MS. CONLON: No.

MR. WILKENS: Your Honor, we're trying to pull up a document. We're going to return for a moment, but it will be brief, to the Homeland Security Council and a current White House document that describes, it's a Presidential memorandum from President Trump issued since he entered office that describes the National Security Council and also describes when that becomes the Homeland Security Council through the change of agency heads who are part of the Homeland Security Council but not the National Security Council.

THE COURT: Well, you know, where does it come from?

MR. WILKENS: The Whitehouse.gov. It's an executive -- it's in the same part of the Whitehouse.gov website that has the executive orders that we've been talking

about.

THE COURT: If it does, I mean, I suppose it's something of which I could take judicial notice. I mean, you proffered something that was not current, so the objection was very well taken. But if you have something current, I don't know what this witness can add to it because, at least for presiding here in the midst of trial, I'm not going to take it upon myself to overrule the objection that's been stated as to Presidential communications. I am going to reflect on it.

MR. WILKENS: Yes, Your Honor. We would like to just offer it. It's EQ for identification.

THE COURT: Where is it physically?

MR. WILKENS: It's coming up.

MS. STROKUS: Your Honor, I object.

MR. WILKENS: It will come up on screen.

MS. STROKUS: Objection.

THE COURT: Yes. And your objection is sustained because that's too evanescent for this old guy, a ruling not found in the Federal Rules of Evidence.

Look, when you get me a paper copy, life goes on, then I'll take a look at it.

MR. WILKENS: Yes, Your Honor. We'll do that over the break.

THE COURT: And it seems to me that it's a type of thing as to which I can take judicial notice. It doesn't have

to be marked as an exhibit, unless of course there's some dispute that that is in fact what the White House website itself is putting out.

BY MR. WILKENS:

Q. So Ms. Smith, just returning to the issue of student -- a student protest and a student visa holder who is present at a student protest, when that is inconsistent with the student visa status, which we spoke about a couple of minutes ago, I want to ask you, so a nonviolent protest but a protest that can be considered pro-Hamas, that is consistent with a student's visa status, correct?

MS. STROKUS: Objection.

THE COURT: Sustained. These questions are argumentative. The language is what it is. She's an employee of the agency, and therefore you may argue that's a statement of the agency, but these matters are all subject to argument here.

No. Sustained. And I've allowed her to give her answer, not on your specific question, but as to how she would go about it.

MR. WILKENS: Thank you, Your Honor. Let me just quickly go --

THE COURT: How much more have you for her?

MR. WILKENS: Just, I think, Your Honor, we're going to break soon. I think I just need ten, ten more minutes.

Case: 26-6906, 11/20/2026, DktEntry: 16.6, Page 127 of 300


THE COURT: I think I can go ten more minutes. Go ahead.

MR. WILKENS: Thank you, Your Honor.

BY MR. WILKENS:

Q. So if we could turn to Exhibit 50 and pull that up, please.

A. Okay. I have Exhibit 50 open. The subject is "Caught and revoked."

Q. Okay.

A. Could I have a minute to read through it, please?

Q. Oh, yes. Please go ahead.

A. Okay, I'm ready.

Q. Okay. And do you recognize this cable?

A. Yes, I recognize this cable.

Q. And is it one of the cables that we referred to earlier that was put in place as policy guidance to implement the executive orders?

MS. STROKUS: Objection, scope.

THE COURT: Overruled.

A. Yes, it is related to EO 14161 as it mentions in the opening line of the cable.

Q. Okay. And one thing we didn't do when we looked at Exhibit 51, and maybe we can do this without turning to it, but that exhibit, the cable is titled "Catch and Revoke, National Security Through Timely Processing of Visa Systems Messages."

This one, as you mentioned, is titled "Caught and Revoked, Updated Guidance."

Is it fair to say that this cable here is an update, updated guidance to the cable that we were speaking about earlier, Exhibit 51, "Catch and Revoke"?

A. I'd just like to check Exhibit 51 to make sure that we're referring to the other one.

Q. Sure.

A. Just a moment. Yes, Exhibit 51 is "Catch and Revoke" and Exhibit 50 is, "Caught and Revoked." So yes, that is correct that it is a follow-up cable to Exhibit 51.

Q. Thank you.

Let me just quickly address two more cables. If we can turn to Exhibit 53, please.

A. Okay, I see Exhibit 53. Let me just open it and review it, please.

Q. Sure.

A. Okay, I'm ready.

Q. Thank you. Do you recognize this cable as well, Ms. Smith?

A. Yes, I do recognize this cable.

Q. Okay. And just quickly to confirm, this is also one of the cables that provides policy guidance on the implementation of the two executive orders we've been talking about, correct?

MS. STROKUS: Objection to scope.

THE COURT: Well, I've been overruling scope objections, and of course this is an agreed-upon exhibit, but this one seems directed entirely to visa applicants, so I'm just not going to permit it, because of the implications for national security. Sustained.

MR. WILKENS: Objection.

BY MR. WILKENS:

Q. If I could pull up Exhibit CG, which is another cable.

A. Okay. I am clicking on it now. I'm going to look at it. I need a minute to read through.

Q. Yes.

MS. STROKUS: Your Honor, I'm going to object to this exhibit. It doesn't appear that -- it has been pointed out to me by the witness that there's something in this document that is incorrect.

THE COURT: Well, it can be corrected then, if it's necessary. The document has been marked for identification. She can be inquired of.

MS. STROKUS: Your Honor, it has been pointed out to me that this exhibit is marked by the plaintiffs. It appears to be a leaked cable. It was not produced by the defendants in discovery, and therefore we cannot verify the accuracy of this exhibit.

THE COURT: Well, that may be. He may inquire about it. You're saying it may not be authentic. I can follow that.

BY MR. WILKENS:
Q. Ms. Smith, you have seen this cable before, correct?
A. Let me -- so the other documents that are produced here in AgileLaw have a REF number at the bottom, and this one does not. This one has a number in the bottom right-hand side. And there are some -- it looks, as Jessica said, it looks to be a leaked cable because someone provided it from their email I can see. So I really can't attest to the veracity of the document.
There's also some, I can see, like, for example, on the bottom of page one and the top of page two, there appear to be some sort of like black fuzzy markings. So I'm not sure I feel comfortable attesting to the veracity of this document.
THE COURT: Well, I take your testimony, ma'am, and I appreciate it. But his question was have you seen this cable? Do you recognize it?
THE WITNESS: Let me just take a minute to look at it, please. Okay. Yes, Your Honor, this cable does look familiar.
BY MR. WILKENS:
Q. All right. And when you say it looks familiar, you recall seeing this cable with the subject line "Action Request Expanding Screening and Vetting For FMJ Applicants," correct?
THE COURT: I don't see anything here that goes to people who are valid visa holders in the United States. This concerns itself with increased scrutiny of the issuance of visas. And so I'm going to sustain it, consistent with my

other rulings, though it appears to be an authentic document, albeit perhaps leaked.

MR. WILKENS: Your Honor, this cable states at paragraph two, the bottom of paragraph two it states that it -- "This guidance supersedes REF B." And if you look at page one of the cable, where it says "Reference," REF B is a cable that we earlier, the witness earlier talked about and put into evidence, which is 25 State 26168. That's Exhibit 64, which applies to the revocation of visas. So this cable that the witness has just --

THE COURT: But it doesn't talk about that.

MR. WILKENS: So the specific relevance of what's in this cable to revocation of visa holders is that it addresses activities that are inconsistent with holding a visa.

THE COURT: Where? Where does it do that?

MR. WILKENS: Let me -- it's -- maybe, let me just come at this it a different way, Your Honor.

THE COURT: All right.

BY MR. WILKENS:

Q. Ms. Smith, am I correct that -- am I correct that one ground for revoking a visa of someone present in the U.S. is if the visa officer considers that they would not have been granted a visa in the first instance?

A. Okay. So just to clarify, are we moving on from Exhibit CG? Because I thought we were talking about Exhibit CG.

THE COURT: We are. I'm moving on from it. We'll see where we go. He's over ten minutes now. Final few questions, Mr. Wilkens?

But you can answer that. Is it a valid ground to revoke a visa that never should have been issued in the first place?

THE WITNESS: Yes, that is a valid ground. If we see that a consular officer should not have issued a visa in the first place, that there are facts to support that, yes, that would be grounds to revoke a visa.

THE COURT: All right.

MR. WILKENS: Your Honor, could we -- I may have just very few questions. If we could take a break now, I will quickly determine whether --

THE COURT: Very few questions? You told me ten minutes. You're at 13 by my counting.

MR. WILKENS: I apologize, Your Honor.

THE COURT: We'll take the recess for one half hour.

MR. WILKENS: Thank you, Your Honor.

THE COURT: Understand, we are not getting into the application for visas. That's an inventive strategy, I follow that. I'm not going to let her answer questions now because they could now, under their heightened scrutiny, use it to revoke a presently existing visa. So far in this case I haven't seen that ground asserted at all, but the very few I

Case: 26-6906, 11/20/2026, DktEntry: 16.6, Page 133 of 300



take it, and you will represent to the court, will not exceed five minutes, right, not exceed five minutes?

MR. WILKENS: I'll do my best, Your Honor -- yes.

THE COURT: I hear the answer yes. We'll recess until 25 minutes after 11:00. We'll recess.

(Recess, 10:56 a.m.)

* * * * *

CERTIFICATE OF OFFICIAL REPORTER

I, Kelly Mortellite, Registered Professional Reporter, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing transcript is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter to the best of my skill and ability.

Dated this 11th day of July, 2025.

/s/ Kelly Mortellite

________________________________

Kelly Mortellite, RPR, RMR, CRR

Official Court Reporter

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS (Boston)

No. 1:25-cv-10685-WGY
Volume 2, Page 66 to 131

AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
Plaintiffs

vs.

MARCO RUBIO, in his official capacity as
Secretary of State, et al,
Defendants

*********

For Bench Trial Before:
Judge William G. Young

United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
Friday, July 11, 2025

********

REPORTER: RICHARD H. ROMANOW, RPR
Official Court Reporter
United States District Court
One Courthouse Way, Room 5510, Boston, MA 02210
rhr3tubas@aol.com

A P P E A R A N C E S

RAMYA KRISHNAN, ESQ.
CAROLINE DeCELL, ESQ.
ALEXANDER ABDO, ESQ.
SCOTT B. WILKENS, ESQ.
ALEXANDRA CONLON, ESQ.
Knight First Amendment Institute at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
E-mail: Ramya.krishnan@knightcolumbia.org
and
COURTNEY GANS, ESQ.
NOAM BIALE, ESQ.
Sher Tremonte LLP
90 Broad Street, 23rd Floor
New York, NY 10004
(212) 540-0675
Email: Cgans@shertremonte.com
For Plaintiffs

ETHAN B. KANTER, ESQ.
WILLIAM KANELLIS, ESQ.
VICTORIA M. SANTORA, ESQ.
JESSICA STROKUS, ESQ.
DOJ-Civ
P.O. 878
Ben Franklin Station
Washington, DC 20044
(202) 616-9123
Email: Ethan.kanter@usdoj.gov
and
SHAWNA YEN, ESQ.
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, MA 02210
Email: Shawna.yen@usdoj.gov
For Defendants

INDEX


| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| MAUREEN SMITH (By Zoom, continued.) | | | | |
| By Ms. Strokus | | | | |
| By Mr. Wilkens | | 69 | | |
| JOHN ARMSTRONG | | | | |
| By Ms. Santora | 78 | | | |
| By Ms. Conlon | | 124 | | |


EXHIBITS


EXHIBIT 238.................................. 72

EXHIBIT 239.................................. 76

P R O C E E D I N G S

(Resumed, 11:30 a.m.)

THE COURT: Mr. Wilkens, go ahead, for your 5 minutes. I have been given a document, the heading is the "White House Organization of the National Security Council and Subcommittees," January 20th, 2025.

Go ahead.

MR. WILKENS: Yes, your Honor, and I will come back to that in a little while. I want to focus --

THE COURT: In your 5 minutes?

MR. WILKENS: Yes. I want to focus my 5 minutes on Visa revocations, not applications for Visas. But with respect to Visa revocations, why the cable that we were talking about, marked as CG, is relevant to Visa revocations.

CROSS-EXAMINATION BY MR. WILKENS: (By Zoom, Continued.)

Q. So you earlier, several times today, have spoken about the Foreign Affairs Manual. Do you remember that?

A. Yes, I have referred several times to the Foreign Affairs Manual today.

Q. Okay.

MR. WILKENS: And if we can pull up Exhibit CK, please.

(On screen.)

Case: 26-6906, 11/20/2026, DktEntry: 16.6, Page 138 of 300



A. Okay, I see the document. I'm going to open it and review it. I just need a minute or two.
Q. Sure. And I'm going to only ask you about one specific provision, but -- on Page 6.
A. Oh, okay.
Q. And I can tell you which number.
MS. STROKUS: Your Honor, I'm going to object again on the same grounds as the prior document.
THE COURT: I haven't got it yet. I haven't got it.
It's on Page 6?
MS. STROKUS: This document was not produced by the government in discovery, and we therefore cannot attest to its authenticity. It appears to be a leaked version.
THE COURT: Yeah, once again this is allegedly a "leaked version" of a government document.
All right, um, so you're going to have to prove authenticity, and that's fine. Go ahead.
MR. WILKENS: Your Honor, if I could? In the bottom left this shows that it's the public version of the FAM. There is a nonpublic version, but this is from the state.gov website, that's where it comes from. And it was produced by the plaintiffs in this case.
THE COURT: Yeah, all right.

MS. STROKUS: I'll withdraw my objection that it is, um -- that it is leaked. However, I continue to state that the government did not produce this document.

THE COURT: It isn't even offered yet, so let's see his question. But we'll take it as authentic.

Q. Ms. Smith, do you recognize this document?

A. Yes, this appears to be a section of 9 FAM.

Q. Okay. And you're aware that portions of the 9 FAM are publicly available, correct?

A. Yes, that is correct. There is one version online for the public that has some sections that are labeled unavailable, um, and we have the full version internally in Consular Affairs.

A. Okay. And you'll see the heading here, that this 9 FAM 403.11 deals with or covers Visa revocations, correct?

A. That is correct, 9 FAM 403.11 does cover Visa revocations.

Q. Okay. And let me ask you to turn to -- oh, um, let me first move this into evidence.

What exhibit number?

MS. STROKUS: Objection, your Honor, proper foundation. Foundation and authenticity. Again, it was not produced by the government in discovery.

THE COURT: Understood. But I thought you waived

the foundation when you agreed that it was part of the public manual, the Foreign Affairs Manual?

MS. STROKUS: Your Honor, it was not stipulated to as part of the exhibit list.

THE COURT: Isn't it marked as one of the, um, unagreed-to exhibits?

MS. STROKUS: It is not agreed to.

THE COURT: I know it's not agreed to, but it was marked for identification as a nonagreed-to exhibit, isn't that correct?

MS. STROKUS: Yes, your Honor.

THE COURT: Overruled. It may be admitted and it will be Exhibit 200 and --

MR. WILKENS: 238, your Honor.

THE COURT: 238. Thank you.

(Exhibit 238, marked.)

Q. If I could direct you, Ms. Smith, to Page 6 of Exhibit 238, and to the provision at the bottom, which is titled 9 FAM 403.11-5(b), "Prudential Revocations." Do you see that?

A. I do. I would like a minute to read through that paragraph, since you're focusing on that one.

Q. Sure.

A. (Reads.) Okay.

Q. Okay. And just looking at this paragraph, um, if

you go down to the third line, after that first word classification, there's a comma, it says, "The Department may revoke a Visa if an ineligibility or lack of entitlement is suspected when an individual would not meet requirements for admission or in other situations where warranted."

Do you see that?

A. Yes, I do see that text.

Q. Okay. And so based on that text, isn't it correct that the bases for eligibility or for admission and the reasons for ineligibility for admission are relevant to the prudential revocation of a Visa?

MS. STROKUS: Objection.

THE COURT: Overruled.

A. So, um, I'm not qualified to talk about admission because that is a Customs and Border Protection decision, they deal with inadmissibility. So would you mind repeating the question, um, focusing on what you would like me to answer, please?

Q. Yes. So with respect to the granting of Visas, um, isn't this passage indicating that with respect to the revocation of Visas, the factors that a Visa officer can look at for the, um, eligibility of a person for the granting of a Visa are relevant to Visa revocations?

MS. STROKUS: Objection.

THE COURT: No, overruled. I'll let him have that question and one more.

A. Well I think it's a complicated question to answer because Visa eligibility is covered in other sections of the FAM. This citation that you're noting on Page 6 of Exhibit CK is related to, um, revoking a Visa, and as it, you know, pretty simply states in the text, if, um -- the Department can revoke a Visa if ineligibility is um, you know, identified, um, or if an -- if the person is believed to no longer be entitled to their Visa. And so, um, I hope that answers the question.

THE COURT: All right. One more.

MR. WILKENS: Yes, your Honor.

Q. If we could turn to Exhibit CG, the cable that we were speaking about earlier, please. Oh, sorry. Yes, CG.

A. Yes, I'm bringing that up now. Just a moment. Okay. I am ready.

Q. Okay. And if we turn to a Page 6 of that exhibit, and, um, the paragraphs, um -- well beginning with 20, that describe, um, factors that can be taken into account for the eligibility or ineligibility for the granting of a Visa.

A. Okay, I'll read through Paragraphs 20 and 21. Just a moment, please.

Q. Yeah.
A. (Reads.) Okay.
Q. Am I right that these factors, identified here in this cable, can be taken into account in revoking a Visa?
MS. STROKUS: Objection, your Honor.
THE COURT: Overruled.
A. Yes, the information contained in Paragraphs 20 and 21 of Exhibit CG can be taken into account when a decision is made to revoke a Visa. Paragraphs 20 and 21 talk about if an applicant is not credible, um, if their activities are inconsistent with, um, their Visa class, um, if there are inconsistencies or derogatory information that is discovered during vetting, and so all of these factors could be relevant to a Visa revocation. And as I've stated prior, a Consular officer always looks at the totality of circumstances, um, and all facts for every case, um, before making, um, a decision to revoke a Visa.
Q. Okay.
MR. WILKENS: Your Honor, I would move this exhibit into evidence.
THE COURT: Do you object?
MS. STROKUS: Objection, your Honor.
THE COURT: Overruled. It may be admitted,

Exhibit 239.

(Exhibit 239, marked.)

THE COURT: Now do you have any further questions for this witness?

MR. WILKENS: I do not, your Honor.

THE COURT: I take it you do not.

(Laughter.)

THE COURT: And counsel for the government, any further questions for the witness?

MS. STROKUS: No, your Honor, and cognizant of the Court's time.

THE COURT: Thank you. And thank you, Ms. Smith.

Very well. Call your next witness.

MS. SANTORA: Your Honor, the government calls John Armstrong.

MR. BIALE: And, your Honor, before this witness comes in, and this is just the issue I raised at the beginning --

THE COURT: Yes, and I'll hear you.

MR. BIALE: With respect to -- you know we have a dispute about what documents can be used. Our plan is to cross-examine this witness, Ms. Conlon will cross-examine this witness using some of the documents that were initially produced in-camera --

THE COURT: I understand. I'm not surprised.

Case: 26-6906, 11/20/2026, DktEntry: 16.6, Page 145 of 300



MR. BIALE: I just want to make that clear, so we don't have a fight about it in the middle of the testimony.

THE COURT: Well they can object, but I intend, having given the documents to you, if they pertain to his cross-examination, they may use them.

MR. BIALE: Thank you, Judge.

THE COURT: Mr. Armstrong may be called.

(Witness takes the stand.)

(JOHN ARMSTRONG, sworn.)

THE CLERK: And please state your full name, spelling your last name for the record.

THE WITNESS: John Armstrong, A-R-M-S-T-R-O-N-G.

THE COURT: And if I may start, um, welcome. I had originally thought we were going to hear your testimony remotely because you were or are on your way to the United Kingdom?

THE WITNESS: Um, no, that is not me, sir. I just run things in Washington. Although we do have official travel from time to time.

THE COURT: Okay, I am mistaken. But you are welcome.

THE WITNESS: Thank you, sir.

THE COURT: Ms. Santora, go right ahead.

MS. SANTORA: Thank you, your Honor.

Case: 26-6906, 11/20/2026, DktEntry: 16.6, Page 146 of 300



**************

JOHN ARMSTRONG

**************

DIRECT EXAMINATION BY MS. SANTORA:

Q. Hello, Mr. Armstrong, thank you for being here today.

Can you tell us your current role at the State Department?

A. My current position is Senior Bureau Official in the Bureau of Consular Affairs.

Q. And how long have you been in that role?

A. I assumed it on the 27th of February of this year.

Q. How long have you worked for the State Department?

A. It's, um, over 30 years. It will be 31 in October.

Q. So when did you first start working for the State Department, in what year?

A. 1994, in October, I believe. It was October 14th.

Q. And in what capacity?

A. When I began, I started as a Foreign Service Officer. I continue to be one today.

Q. Can you briefly tell the Court about your assignments starting with your first and going up

Case: 26-6906, 11/20/2026, DktEntry: 16.6, Page 147 of 300



through your current role?

A. I'd be happy to. Initially when I came in in October of 1994, I was assigned, um, following basic training, to take consular training, and then Rumanian language, and then sent to Rumania for 2 years as a Vice Consul where I ran the nonimmigrant Visa section and the fraud prevention section.

After Rumania, I went to Warsaw Poland where I served as the trade officer on -- working on trade issues for two years.

And then from there, I went back to Washington D.C. where I served as the Belarus desk officer in the Office of Western Slavic and Moldovan Affairs.

Following that position -- just a moment, I have to think. I went back to Warsaw for four years, where I was a political officer and I was also the labor officer.

Following that time in Warsaw, I went to the Russia desk, the Office of Russia Affairs, where I was a Senior Political Officer for two years.

After that I studied Ukrainian for a year and then went to Kyiv Ukraine to our embassy where I was the Deputy Consul General.

Following Kyiv, I went to -- my next posting was in the Bahamas, at Embassy Nassau, where I was the

Consular Section Chief, which I did for a year, and then I was Acting Deputy Chief Admission, the Number 2 position, for two years.

Following that, I returned to Washington D.C. where I was the Director of the Washington Passport Agency for three years.

After that, I went to Embassy Warsaw in Poland where I was the Economic Counselor running the Economics Section for three years.

After that, in 2020, during covid, I returned to Washington and was the Director of the Office of Eastern European Affairs which deals with Ukraine, Belarus, and Molodova.

Following that position, where I was for two years, I was a Senior Advisor in the Office of Sanction Coordination, also at the main building of the State Department.

Following that, I studied Spanish and went to Lima, Peru, where I was Consul General, and I served until returning to Washington in the middle of February of this year, and I was briefly the Deputy Assistant Secretary for Overseas Citizen Services.

And then I assumed my current position on February 27th of this year.

Q. And are you -- is there anyone senior -- can you

remind the Court of what is your current position?
A. My current position is Senior Bureau Official in the Bureau of Consular Affairs. I'm the top official in the Bureau of Consular Affairs.
Q. And who is senior to you at the State Department?
A. The Undersecretary for Management.
Q. Anyone else senior to you at the State Department?
A. Um, yes. Well there's the two Deputy Secretaries, the Deputy Secretary, and then the Deputy Secretary for Management and Resources. And above them is the Secretary of State.
Q. What does the Bureau of Consular Affairs do?
A. Basically we have three missions. First of all, we're responsible for passport issuance throughout the United States at 29 passport bureaus and centers. It's approximately 25 million passport products a year.
Secondly, we are in charge of, um, processing Visas at Foreign Missions -- our Foreign Missions abroad or diplomatic posts, that's over 200 of them, and there's approximately 14 million applications a year.
And then finally, we are responsible for the welfare of American citizens abroad and providing them services they need. If they're in need, we try to help them. Overall we have a staff of approximately 13,000 and a budget of $5.5 billion.

Case: 26-6906, 11/20/2026, DktEntry: 16.6, Page 150 of 300



Q. What are your responsibilities as a Senior Official in the Bureau of Consular Affairs?

A. I am responsible for the operations of the Bureau. The buck stops with me.

Q. And that includes being responsible for the Visa section that you mentioned?

A. Yes, ma'am.

Q. Are you aware of the policies applicable to Visas?

A. Yes.

Q. Would you say that you're aware of all policies applicable to Visas?

A. In general, yes, I would say that.

Q. Would you say it would be possible for a policy related to Visas to exist without you knowing about it?

MS. CONLON: Objection, your Honor.

THE COURT: She may have it in that form.

A. I would be very surprised if there was such a policy. I have a good hand on the pulse of what's done by the Visa office, your Honor.

Q. Does the Bureau of Consular Affairs get involved in issuance of Visas, is that correct?

A. Could you repeat the question please?

Q. Is the Bureau of Consular Affairs involved in the issuance of Visas?

A. Yes, it is, we are responsible for that overseas.

Q. And are there different types of Visas?
A. Yes, there are. There are two basic types, or the nonimmigrant Visa and the immigrant Visa.
Q. What is a nonimmigrant Visa?
A. Nonimmigrant Visas are for people who are coming for temporary purposes in the United States and will be leaving and returning -- leaving the United States for another destination, students, tourists, um, people coming to work, um, journalists.
Q. And how is an immigrant Visa different from that?
A. Immigrant Visas are for people who are coming to remain in the United States, permanently.
Q. Are you familiar with the allegations in this case?
A. I have some knowledge, but I haven't ever seen all of them.
Q. Is it fair to say, based on your knowledge, that this case does not involve immigrant Visa holders?
A. Yes.
Q. So when I ask you questions about Visa holders, if I don't specify, I'm referring to nonimmigrant Visa holders. Okay?
A. I understand.
Q. I believe you mentioned this, but what type of Visa, nonimmigrant or immigrant, is a student Visa?

A. Student Visas are nonimmigrant Visas, they're Fs, Ms, and they can be Exchange Visitors, which are Js.

Q. What standards apply to the issuance of nonimmigrant Visas?

A. Could you clarify the question?

Q. What legal authorities apply to the issuance of nonimmigrant Visas?

A. The applicant for the Visa has to, um, show that they are qualified for that Visa. In some cases they need a petition. In others they need forms, like students will need a form from an accredited university. Students also, as do tourists, have to overcome Section 214(b) of the Immigration and Nationality Act, which is an intending immigrant. They have to show that they do not intend to remain in the United States to the satisfaction of a Consul Officer at an interview. The law, which we all follow very strictly, places the burden of proof on the applicant, on the alien. If our Consul Officer is not convinced, the Consul Officer -- of that, they must refuse that application.

Q. Does the Bureau of Consular Affairs deal with the revocations of nonimmigrant Visas?

A. Yes, we do. Yes. And it has for years. It's in the Immigration and Nationality Act, I believe it's Section 221(i).

Q. And what standards apply -- I believe you just mentioned one, what legal authorities apply to Visa revocations?
A. The key legal authority for a revocation is Section 221(i) of the Immigration and Nationality Act, which if I remember correctly, your Honor, gives the Secretary of State and any Consular Officer the ability to revoke a Visa at any time for any reason. We treat this seriously. And of course some sort of evidence is needed. We don't go do this on a whim. We review each case individually and carefully.
Q. Does the Bureau of Consular Affairs make removability determinations?
A. I'm sorry?
THE COURT: I didn't catch it either. Would you ask the question again.
MS. SANTORA: Sure, I'll rephrase it a little bit.
Q. Does the State Department make removability determinations?
THE COURT: Removability determinations.
A. Yes, the Secretary of State can make those determinations, I believe it's, um -- it's also in the INA. We call it 4(c) is the section. But it's a longer section citation.
Q. Would that be INA Section 237(a)(4)(c)?

A. I believe that's it, yes.
Q. Okay. Are you familiar with the State Department's process and protocols for, um, the revocations of Visas, which we talked about a few questions ago?
A. Yes, I am.
Q. And are you familiar with the State Department's process and protocols for making determinations under 237(a)(4)(c), the statute you just referenced?
A. Yes, ma'am, I am.
Q. How are you familiar with those, um, processes and protocols?
A. It's part of my job. I have to know about these things in order to lead the Bureau of Consular Affairs.
Q. Have you prepared a chart to assist the Court with explaining how the process and protocol works?
A. My staff and I have reviewed the chart, yes.
Q. Okay.
MS. SANTORA: Your Honor, I would like to identify Exhibit H, or mark for identification Exhibit HN. This is the chart that Mr. Armstrong referred to.
THE COURT: Um, do I have it?
MS. SANTORA: It should be in a binder.
THE COURT: Yes, well I have -- yes, I do have it. Yes. HN. And I will permit this chalk to be used as --

I will permit this chart to be used as a chalk.

Go ahead.

MS. SANTORA: Thank you.

Q. Mr. Armstrong, I think we're going to pull the chart up on the screen.

(Technical difficulties.)

MS. SANTORA: Your Honor, may I approach? I can also give him a paper copy.

THE COURT: He can use mine. But of course you may.

THE WITNESS: I'll take this one, sir, so you can also see it.

THE COURT: Thank you.

(Hands up.)

THE COURT: A question I have, and I've seen these initials come up. I'm roughly familiar with this chart. But do you see, um, the Bureau of Consular Affairs is there roughly in the center. And then to the right, there's two little boxes, "NIV" and "LPR." What do those initials stand for?

THE WITNESS: Your Honor, "NIV" is "Nonimmigrant Visa," and "LPR" is "Legal Permanent Residence."

THE COURT: Yes, understood.

Proceed.

THE WITNESS: No problem.

Q. Okay, it looks like we might not be able to pull the chart up on the screen, so, um -- um, okay.

Mr. Armstrong, is this the chart that you were just referring to when I asked if you had prepared a chart?

A. Yes, it is.

Q. Okay. Based on your experience at the Bureau of Consular Affairs, does the chart accurately represent the State Department's process and protocol for Visa revocations and foreign policy determinations under INA Section 237(a)(4)(c)?

A. It accurately represents that in the case of referrals from the Department of Homeland Security.

Q. Okay. So does the State Department rely on information when it is revoking a nonimmigrant Visa or making a foreign policy determination under INA Section 237(a)(4)(c)?

A. I'm sorry, I don't understand the question. Do we rely on information? From various sources. We do rely on information from various sources, including it may come from the Department of Homeland Security, it may come from sources that we have, it may come from law enforcement, diplomatic sources abroad, the media. So a variety of sources. Yes, we do actually look at information.

Q. Okay, let's focus on information that you received from, you mentioned, the Department of Homeland Security. Do you see them referenced in the chart?
A. Yes, on the left-hand side, the big blue box.
Q. Okay. And how does information come, if it does, to the Bureau of Consular Affairs from the Department of Homeland Security?
A. From my experience it comes in the form of an e-mail, which serves as a cover letter, and then an attachment with additional information about the case.
Q. And is that attachment referred to as a "referral"?
A. Yes.
Q. And when the Bureau of Consular Affairs receives the information, um, what do they first determine about the individual?
A. Well the first thing they do is confirm receipt to DHS, that we have actually received this, your Honor, and that we are acting on it. After that, um, the -- as related to your Honor's question, the question is whether it's a nonimmigrant Visa or whether it's a legal permanent resident. Nonimmigrant Visas go for processing and review to the Visa office. The legal permanent residents take a different track and go up to the Secretary of State if we find that the evidence is

sufficient to take action.
Q. Okay, let's stick with the nonimmigrant Visas first. You said they go to the Visa office. What does the Visa office then do with the referral after they receive it?
A. The Visa office examines the information, seeing if it's serious enough to enact a revocation. It will also consult with, um, lawyers at the State Department who work for the Legal Advisor, they don't work for Consul Affairs directly, but there are lawyers assigned to look at it from a legal point of view.
After that, if the Visa office finds it's sufficient, they'll discuss it with whoever received the, um, referral from DHS, and if that person agrees, then it will go into the revocation process and the Visa will be revoked. If not, um, then -- well actually in either case, whether it's revoked or whether it's not, there'll be a communication back to DHS telling DHS what was done in that case. Or there's one other possibility. If I may?
Q. Sure.
A. There may be a request for more information.
Q. And who would they request more information from?
A. They would write back to whoever in DHS had sent the referral.

Q. Okay. Let's talk now about the other part of the chart, relating to this "LPR" on the chart. That's a "Lawful Permanent Resident"?

A. Yes.

Q. And how is a lawful permanent resident different from a nonimmigrant Visa?

A. Um, first of all, we cannot revoke the status of a lawful permanent resident. Um, the Secretary of State can have a finding that that person is removable, but we cannot do that in the -- in the Bureau of Consular Affairs. So what happens in that case, after an analysis of information -- and this is done in each case individually, an action memo, um, sometimes called a "decision memo," is sent to the Secretary of State, and the Secretary of State will have a choice then, and from my experience in most cases there are three choices. One, agree and find the person removable, usually under, um, 4(c), as we talked about. Um, disagree and find the person not removable. Or discuss, in other words ask for more information.

Q. And in the event that the Secretary of State finds the person removable, um, what happens after that?

A. Um, the, um, Department of Homeland Security is informed of this, and this usually take two routes. There will be an informal notification back to the

Case: 26-6906, 11/20/2026, DktEntry: 16.6, Page 160 of 300



person who sent the original referral, as a courtesy, but the official notification goes from the Secretary of State to, um, the DHS secretary, because the DHS secretary is his interlocutor.

Q. And I believe you also mentioned that it's possible for the Secretary of State to determine that the person is not removable, correct?

A. That's correct. And in which case the Bureau of Consular Affairs would contact the person in DHS who made the referral and say the Secretary has found -- has disagreed and does not fine the person removable.

Q. Okay, I want to go back to --

THE COURT: Just to get a feel for this.

THE WITNESS: Yes, sir.

THE COURT: With respect to, um, legal permanent residence.

THE WITNESS: Yes, sir.

THE COURT: Under the statute, this is a determination that is, um, by statute, given to the Secretary, that officer in the government, that cabinet Secretary himself or herself?

THE WITNESS: Yes.

THE COURT: And then as I'm listening to you, pretty much as a matter of courtesy, since it's a Cabinet Secretary who's made that determination, the

communication as to the result, goes to the Cabinet Secretary in the Department of Homeland Security, and in today's world, she, then takes action, because action falls within the Department of Homeland Security.

Is that right?

THE WITNESS: That is correct, sir. The actual formal -- Homeland Security will not take action in those cases until they receive the official notification Secretary to Secretary. What we would send to Consular Affairs is a courtesy that, yes, the Secretary has made this finding. Then the official notification will go from Executive Secretary to Executive Secretary.

THE COURT: Thank you.

THE WITNESS: Certainly.

Q. I want to go back, for a second, to nonimmigrant Visas.

Does the Visa office independently analyze the referral that it received from DHS?

A. Yes, most definitely, that's our job. We're not a rubber stamp for DHS.

Q. Do all referrals of nonimmigrant Visa holders from DHS that go to the Visa office result in Visa revocations?

A. No.

Q. Do you have any idea of the percentage that does

result in Visa revocations?

A. Based on my time in my current position, I would say approximately 25 to 30 percent are sent back without action be taken, either to ask for more information or we just find the information not significant enough to take action.

Q. Okay. And you've been in your position since February of 2025, correct?

A. Yes, ma'am.

Q. And has the Bureau of Consular Affairs handled DHS referrals consistently with this chart that we've been discussing since that time?

A. Yes, and it's my understanding even before. We do not create any policy or procedure here.

MS. CONLON: Objection, move to strike as nonresponsive.

THE COURT: Overruled. That may stand.

Q. Does this chart depict how the Bureau of Consular Affairs handles all referrals from DHS?

A. Yes.

Q. Does it accurately depict how the Bureau of Consular Affairs would handle a DHS referral involving protesters?

A. Yes, all referrals from DHS.

Q. Okay. So the chart focuses on a referral from

DHS, but you mentioned that the State Department, in revoking Visas and, um, making removability determinations, can rely on information from other sources, correct?

A. That is correct.

Q. And, um, what are those other sources?

A. For example, the media. There can be derogatory information that comes up after a Visa was issued, some action the Visa holder took or is planning to take, and if it's significant enough, that could lead to a, um, revocation of the Visa. Information received from law enforcement. Information that happens that is, um, sent by the public. Poison pen letters.

I, in fact, know of a case like this, when I was in Ukraine, of a security guard who worked at the embassy, who supposedly was going as a tourist, but one of his colleagues revealed his true intention, which was to remain in the United States. And we revoked that Visa and fired him.

Q. And so would you say that some of the information, um, is internal information to the State Department?

A. It can be, yes.

Q. And in the case of information that it not based on a referral, um, say we're talking about a nonimmigrant Visa holder, so it goes to the Visa office

and the Visa office determines that the Visa should not be revoked. In those circumstances, again where there's no referral, does the Visa office tell DHS about the Visa revocation?

A. No, DHS is not involved in this.

Q. Okay.

(Pause.)

MS. SANTORA: Your Honor, I move to introduce into evidence this chart.

MS. CONLON: Your Honor, we understand it doesn't aid or assist with testimony, so we object for it coming in for sort of its truth, but to the extent that it's a demonstrative aid, I don't even know that it needs to be admitted.

THE COURT: I think that's a proper characterization. If he says this is accurate and it's been accurate throughout his tenure, as I understand it, it will be part of the record, but as HN, a chalk. And the difference is, as factfinder, I have to decide whether to believe, disbelieve, or believe in part any witness's testimony.

Here the chart depends on my belief of this witness's testimony, it doesn't stand alone. They created it for this trial. And I accept it in that fashion. I mean no disrespect, that's just my

responsibility. Actually I find this helpful and I will be referring to it. But it was created for the witness, for his testimony, and so what he has to say about it really governs.

Go ahead.

MS. SANTORA: Thank you, your Honor.

Q. Mr. Armstrong, I'm going to show you a document that is an exhibit in this case, this is Exhibit 70.

MS. SANTORA: Your Honor, may I approach to hand this document to the witness?

THE COURT: Of course.

(Hands to witness.)

THE WITNESS: Thank you.

May I familiarize myself with it?

THE COURT: Of course.

THE WITNESS: Thank you, sir.

A. (Reads.) I have finished my review.

Q. Okay, thank you. Have you seen this document before?

A. Yes.

Q. And what is it?

A. It's an Executive Order from the President.

Q. What is the title?

A. "Protecting the United States from Foreign Terrorists and other National Security and Public Safety

Threats."

Q. In what capacity have you seen it?

A. In my official capacity as the top official in the Bureau of Consular Affairs.

Q. What is the purpose of the document?

A. The purpose is to protect the United States and the American people from foreign threats.

Q. Have you relied on this document to do your job?

A. Yes, we have referred to this document in doing my job, as have other people in the Bureau of Consular Affairs, and not only.

Q. How would you use it with respect to doing your job?

A. Well I think the key thing is, um, to summarize this document, is it instructs all of us to use existing procedures to maximize the security of the American people.

Q. Does it require anything of the State Department?

A. It requires quite a few things of the State Department. They're enumerated. Again, to summarize, it's increasing our vigilance and to make sure we're using all existing mechanisms, procedures, and policies that we have to ensure the security of the American people.

Q. Did it create new legal authorities related to the

State Department's work?
A. To my knowledge, no.
Q. Did the State Department do anything in response to the Executive Order?
A. Yes, we take our orders from the President, whoever that is, and we increase our use of the -- it reviewed actually what we were doing, and that review is actually ongoing.
Q. And can you explain what exactly, if anything, the State Department did in response to this Executive Order?
A. Well one thing I can actually say, and it's -- it's a bit of "Inside Baseball," your Honor, if I may? Um, there's -- in our nonimmigrant Visa system, there are messages that come when derogatory information appears, and a lot of our posts are very -- have a lot of work to do, a lot of people to interview, they have backlogs, and they don't always review those messages in a timely manner and act upon them. We noted this and we emphasized to our diplomats overseas that they need to review this information, and when justified, to revoke Visas, not to let it build up. It needs to be kept up. Because people -- if there is negative information and they have a Visa and it should be revoked, we need to do that, and not delay. I think this was talked about,

some people have called it the "Catch and Revoke Policy."

Q. I'd like to show you -- okay, I'd like to show you the document, um, you just referred to.

MS. SANTORA: Your Honor, may I approach?

THE COURT: You may.

MS. SANTORA: This is Exhibit 21 for the record, and I'm going to show it to the witness.

(Hands to witness.)

THE WITNESS: Thank you.

THE WITNESS: May I review it?

THE COURT: Of course.

THE WITNESS: Thank you.

A. (Reads.) I've completed my review.

Q. Okay. Is this the document you were referring to?

A. Yes.

Q. And can you explain what it is?

A. This is an instruction, a guidance to our diplomatic posts abroad, over 200 posts. In particular you can see that because it says "All diplomatic and consular posts collective," it's known as an "all-back." It was sent out talking about this very thing I spoke about, about the need to review systems messages on a regular timely basis, and to take action where warranted.

Q. Okay. And is this document implementing the Executive Order we were just talking about, Executive Order 14161?
A. Yes, it even refers to it in the second paragraph.
Q. And how does it implement the Executive Order?
A. By increasing the emphasis on and the vigilance in reviewing systems messages which carry -- can carry significant negative information about Visa holders, and then when justified, revoking these Visas, which is done at the diplomatic posts.
Q. Does it provide new legal authority for revoking Visas?
A. No, not -- no, it's using the 221(i).
Q. So in revoking Visas under this guidance, the State Department is relying on existing legal authority, correct?
A. Yes, I believe so. I believe 221(i) has been in the INA since the beginning, 70 years ago.
Q. Okay. Are you aware of anything else that the State Department has done in response to Executive Order 14161?
A. We've issued guidance to the field, again emphasizing the importance of security and the importance of reviews, for example the importance of 214(b) has been an issue that we've raised with the

field. Again, these are using existing policies and authorities, it's nothing new in that regard.
Q. I'd like to show you another document.
MS. SANTORA: This has been entered into evidence as Exhibit 53 in this case, your Honor.
THE COURT: Say again the document number?
MS. SANTORA: Exhibit 53.
THE COURT: 53.
MS. SANTORA: No, I'm sorry, your Honor, it actually is Exhibit 64.
THE COURT: 64.
MS. SANTORA: May I approach to give a copy of this document --
THE COURT: You may.
(Hands to witness.)
THE WITNESS: Thank you.
May I review it, your Honor?
THE COURT: Of course.
THE WITNESS: Thank you, sir.
A. (Reads.) I've completed my review.
Q. Okay. Do you recognize that document?
A. Could you repeat the question please?
Q. Do you recognize that document?
A. I do recognize this document.
Q. What is it?

A. It is a guidance to the field. As discussed previously, it is an all-back, it's sent out to all our posts abroad.

Q. And, um, what is the guidance related to?

A. It's related to, um, social media and online screening of students and exchange visitors, the F, M, and J Visa classes.

Q. And is it guidance that was issued in response to the Executive Order we were just talking about?

A. Yes.

Q. And how does it implement that Executive Order?

A. It increases the vetting of, um, a class of Visa applicants.

Q. Why does it do that?

A. In order to improve the security of the United States.

Q. What class of Visa applicants does it increase vetting to?

A. Students and exchange visitors.

Q. And that's social media vetting, correct?

A. Yes.

Q. And why does it focus on students and exchange visitors?

A. Well I can think of a couple of reasons. First of all, the social media is -- when the INA was written --

and in the past this hasn't been considered, it didn't exist, but it's a gold mine of information. And also, um, people who are younger, students, and most students and exchange visitors are -- I'm 60 and I don't use social media much, but they do use social media a lot. So they're a group that uses all that information and those tools. And so it makes it available to us.

Q. Does it create new legal authority, um, for vetting through social media chats?

MS. CONLON: Objection, your Honor, these questions about legal authority seem to call for a legal conclusion.

THE COURT: No, I want to hear his view.

You may answer, sir.

THE WITNESS: Thank you, your Honor.

A. No, it doesn't. It talks about Section 214(b) of the Immigration and Nationality Act, and also, um, Section 212(a)(3)(b), which is, um, support for terrorist organizations. These are not new.

Q. And how do those sections that you just referred to relate to vetting?

A. In the vetting one could find information that would lead to a 214(b) refusal under an intending immigrant, for example, if someone talks about their previous unauthorized work in the United States. Or it

could lead to a finding on support for a terrorist organization, someone brags about how they've given money to Hamas.

Q. And both of those would bear on someone's eligibility for a Visa?

A. Most definitely.

Q. Are you aware of anything else that, um, the Department of State did in response to Executive Order 14161?

A. There were, um -- there was a review, um, at least a partial review of 3(c) policies, and, um, that's a foreign policy ground for refusal under the INA, um, and there were some that the Secretary authorized to be added. One, for example, for, um, government officials who assist in a legal migration to the United States.

Q. You said 3(c) policies. Are you referring to a section of the INA when you say that?

A. Yes, ma'am.

Q. What section is that?

A. I don't know the whole number, we call it "3(c)." It's the foreign policy section. Ineligibility on foreign policy grounds.

Q. Okay.

(Pause.)

MS. SANTORA: Your Honor, I'd like to mark for

identification Exhibit JJ, the statute that the witness just referred to.

THE COURT: The statute?

MS. SANTORA: Yes.

THE COURT: I see no reason for adding statutes in.

MS. SANTORA: Okay.

THE COURT: A citation to them is sufficient.

MS. SANTORA: Okay. May I approach to show the witness a copy of the statute to refresh his recollection?

THE COURT: Of course.

(Approaches, hands document to witness.)

THE WITNESS: Thank you.

May I review it, your Honor?

THE COURT: Well it's pretty thick, I don't even know what she's going to ask here. But of course take a look at it.

THE WITNESS: May I ask which part you're referring to? It is rather thick.

MS. SANTORA: Yes, I was referring to the section you referenced, which I believe is Section (a)3(c), it's INA 312 of 1182, the statute.

A. (Looks.) Is this, ma'am, the section that says "See foreign policy"?

Q. Yes.
A. Yes, I believe that is it.
Q. Okay. Can you take a moment to review it.
A. (Looks.) I've reviewed it.
MS. SANTORA: If you don't mind, may I approach also to get it back?
(Approaches witness to get document back.)
Q. So the statute you just reviewed, Mr. Armstrong, was that the statute you were referring to when you referred to "3(c) policies"?
A. Yes.
Q. And do 3(c) policies apply to, um, Visa holders or to Visa applicants?
A. It could be both actually, um, if a Visa holder was outside the United States. But also an applicant could be found ineligible under 3(c).
Q. Okay. So 3(c) policies do not apply to Visa holders in the United States?
A. No. That's my understanding.
Q. Okay. I'd like to show you another document.
MS. SANTORA: If I could approach? This has been marked as Exhibit 71 in this case.
(Approaches witness with document.)
THE WITNESS: Thank you.
A. (Looks.) I'm familiar with this document.

Q. Okay, what is the document?
A. It's an Executive Order from the President of the United States.
Q. And what is it titled?
A. "Additional Measures to Combat Antisemitism."
Q. And how are you familiar with that document? In what capacity have you seen that document before?
A. In carrying out my job.
Q. And how have you relied on it to do your job?
A. It makes clear that the official policy of the United States is to combat antisemitism both at home and abroad.
Q. Did the State Department rely on this document to revoke Visas?
A. We would rely on the Immigration and Nationality Act. It doesn't give us any authority here, it instructs us and emphasizes. It's a document that informs what we're doing, yes, but not as a part of the law that we would use to revoke a Visa.
Q. Okay. Did the document change the State Department's authority to revoke Visas?
A. It's my understanding it didn't.
Q. Did the document change the State Department's process and protocols for revoking Visas?
A. No.

Q. Did the document change the State Department's authority to make removability determinations?
A. No.
Q. Did the document change the State Department's process and protocols for making removability determinations?
A. No.
Q. I'd like to show you a few more documents.
MS. SANTORA: Your Honor, the documents that I'm intending to show the witness are not privileged but have been marked as confidential, um, based on the protective order signed between the parties. We would ask that the courtroom be cleared of the public for the purposes of putting on this document.
THE COURT: I'm not going to clear the courtroom unless I see what the documents are.
MS. CONLON: What documents are we talking about?
MS. SANTORA: So they are -- the documents will be Exhibits 8, 12, 16, 19, and --
THE COURT: 8.
MS. SANTORA: 8. 12.
THE COURT: Wait a minute.
MS. CONLON: Sorry, are these the documents from the certified administrative record in this case, are those all from that record?

MS. SANTORA: They're from the sealed version of the administrative record.

MS. CONLON: I see. So 8, 12 --

MS. SANTORA: So 16, 19, and 21.

THE COURT: Well I'm not disposed to clear the courtroom, there's a constitutional right --

MS. CONLON: And we would object to that.

THE COURT: -- to have a public courtroom for public trials. So, um -- and these have been marked in evidence in this case, which means they are documents upon which I may, and I may be required, to make my decision. So that request is denied. You see -- I'm not doing it.

MS. SANTORA: Thank you, your Honor.

Q. Mr. Armstrong, I would like to show you a document, I'll show you one at a time.

MS. SANTORA: If I may approach?

Q. The first has been marked as Exhibit 8 in this case.

(Approaches witness, hands document.)

THE WITNESS: Thank you.

May I review it?

MS. SANTORA: Sure.

THE WITNESS: Thank you.

A. (Reads.) I've completed my review.

Q. Okay. Do you recognize this document?
A. I do.
Q. What is it?
A. It's a memorandum from Secretary Rubio to the Secretary of Homeland Security.
Q. And in what capacity have you seen this document?
A. In doing my job, my official duties at the State Department.
Q. What does the memorandum relate to?
A. The memorandum informs, um, the Secretary of Homeland Security of Secretary Rubio's finding in a case of a particular alien, finding the person, um, removable under 273(a)(4)(c) of the Immigration and Nationality Act. Actually two people, one is blacked out.
Q. Okay. Who is the person whose name is not redacted?
A. Mahmoud Khalil.
Q. And can you summarize what the document finds with respect to Mr. Khalil?
A. That section of the INA deals with foreign policy grounds for finding removability, which the Secretary of State does, or if given a different document. It informs of it here and then talks about Mr. Khalil's antisemitic -- role in antisemitic protests and disruptive activities that foster a hostile environment

for students in the United States.
Q. And it provides that as the basis for finding Mr. Khalil removable?
A. Yes, it describes it on the back, on the second page.
Q. What does it say about Mr. Khalil's activities?
THE COURT: Well in view of your objection, remember it's in evidence. I've read it.
MS. SANTORA: Okay, thank you, your Honor, we can move on.
Q. Mr. Armstrong, I'd like to show you another document.
MS. SANTORA: If I may approach? This has been marked as Exhibit 12 in this case.
(Approaches witness, hands document.)
THE WITNESS: Thank you, your Honor. May I review it?
THE COURT: Of course.
THE WITNESS: Thank you.
A. (Reads.) I've completed my review.
Q. Do you recognize this document?
A. I do.
Q. Have you seen it before?
A. I have, in performance of my official duties in leading the Bureau of Consular Affairs.

Q. Okay. And what is the document?
A. The document's similar to the previous one, it's a memorandum from the Secretary of State informing the Secretary of Homeland Security of a decision made regarding the removability of an alien.
Q. What alien does it refer to?
A. It refers to Mohsen Mahdawi.
Q. And what does it find with respect to Mr. Mahdawi?
A. Oh, sorry I pronounced it wrong. The Secretary of State informs us that he found Mr. Mahdawi removable under Section 237(a)(4)(c)(1) of the Immigration and Nationality Act.
Q. And does the document provide the Secretary's rationale for that finding?
A. It does, on the second page. That rationale was Mr. Mahdawi's involvement and leadership of disruptive protests at Columbia University, and that included antisemitic conduct and calling for the destruction of Israel. The Secretary also noted that this is clearly against U.S. policy to counter antisemitism. And Mr. Mahdawi's activities undermine the peace process in the Middle East, including coming to a peaceful resolution of the ongoing conflict in Gaza.
Q. Thank you. I'd like to show you another document.
MS. SANTORA: If I can approach? This is Exhibit

Number 19.

THE COURT: Say again the number?

MS. SANTORA: 19.

THE COURT: Thank you.

(Approaches, hands to witness.)

THE WITNESS: Thank you.

May I review it, your Honor?

THE COURT: Of course.

THE WITNESS: Thank you.

A. (Reads.) I've completed my review.

Q. Do you recognize this document?

A. I do.

Q. Have you seen it before?

A. I have, in performance of my duties as the senior Bureau official of the Bureau of Consular Affairs at the State Department.

A. What is the document?

A. The document is a communication, a memorandum from Secretary Rubio to the Secretary of Homeland Security.

Q. And what is the memo about?

A. The memo informs Secretary Noem that Secretary Rubio has found two aliens, um, one is Yunseo Chung, and the other one is blacked out, so I don't know who the person is, um, to be removable under the foreign policy section of the INA, Section 237(a)(4)(c)(1).

Q. And does the document provide the Secretary's rationale for this determination?
A. Yes, it does. It found that Ms. Chung and the other unnamed person were involved in, um, participation and apparently leadership roles in antisemitic protests and disruptive activities. It created a hostile environment for Jewish students in the United States.
Q. Thank you. I'd like to show you another document.
MS. SANTORA: If I could approach. This is labeled as Exhibit 21 in this case.
(Approaches, hands witness document.)
THE WITNESS: Thank you.
Your Honor, may I review it?
THE COURT: Yes.
THE WITNESS: Thank you.
A. (Reads.) I've completed my review.
Q. Do you recognize this document?
A. I do.
Q. And have you seen it before?
A. Yes, I have, as in my leadership role of the Bureau of Consular Affairs at the Department of State.
Q. What is the document?
A. The document is a memorandum from Secretary Rubio informing Secretary Noem, the Secretary of Homeland Security, of Secretary Rubio's decision to find Badar

Khan Suri deportable under INA Section 273(a)(4)(c)(1), which is the foreign policy section.

Q. And does the memo provide the rationale for the Secretary's determination?

A. Yes, it does, it cites Mr. Suri's direct connection to Hamas leadership as well as his involvement in antisemitic activities that created a hostile environment for Jewish students in the United States.

Q. Okay, I have one more document to show you.

MS. SANTORA: If I could approach? This is Exhibit 16.

(Approaches, hands to witness.)

THE WITNESS: Thank you.

Your Honor, I'd like to review?

THE COURT: Sure.

THE WITNESS: Thank you.

A. (Reads.) I've completed my review.

Q. Do you recognize the document?

A. I most certainly do.

Q. What is it?

A. It's a communication, um, a memorandum from me to Andre Watson, who's the Assistant Director of the National Security Division of ICE, at DHS.

Q. And you wrote that in your official capacity as

the Senior Bureau Official at the Bureau of Consular Affairs, correct?
A. I did not write it, I signed it. Other people drafted the document.
Q. Okay. But you have reviewed what the memo said, correct?
A. I did, before signing it, yes.
Q. And, um, what is the purpose of the memorandum?
A. The purpose is to inform Mr. Watson of the decision made to, um, revoke, um, Rumeysa Ozturk's Visa due to her activities in the United States, and it was revoked under Section 221(i) of the Immigration and Nationality Act.
Q. And --
A. And I signed it on the back. That's me.
Q. Thank you.
What was the basis for your determination?
THE COURT: His determination?
Q. What was basis for your determination that the Visa should be revoked?
THE COURT: He may answer.
THE WITNESS: Thank you, your Honor.
A. The basis was her antisemitic activities in the U.S., as detailed. It talks about creating a hostile environment for Jewish students, and indicating support

for a designated terrorist organization. I believe it was Hamas, but it might have been Hezbollah. I don't remember exactly.
Q. I want to direct your attention to the last line, the last line of the first paragraph of the memorandum. It says, "Due to ongoing ICE operations, security of this revocation will be silent. The Department of State will not notify the subject of the revocation."
Does the Department of State, when it revokes nonimmigrant Visas, typically inform the Visa holder that their Visa has been revoked?
A. Yes, we usually do.
Q. And in this case you did not?
A. That is correct. And judging from the context, ICE had made a request that we not inform so that they could take action to remove Ms. Ozturk from the United States.
THE COURT: Let me ask you a couple of questions here, but I'm going back to the other four that you've been shown, and I'm talking about the chart.
You know about the Secretary's actions because, as I understand it, your involvement here, as the Director of the Bureau of Consular Affairs, you're the one who causes the memo or in fact sends the memo to the Secretary of State saying "Agree," "Disagree,"

"Discuss"?

THE WITNESS: Yes, I'm the last one who looks at it, yes.

THE COURT: All right. So, um, my question is broader than the, um, what you've been shown.

But since you've been there, in your official capacity, can you estimate how many such memos involve student protests, protesters, and concerns about antisemitism, limit it as to that. About how many such memos have you sent to the Secretary of State?

THE WITNESS: I would estimate the number of such memos would be between 15 to 20.

THE COURT: All right. And of those 15 to 20, if you can break down how many were agreed and executed, how many were disagreed, how many were discussed?

THE WITNESS: In my recollection, almost all were agreed. There may have been one that was not. I'm the not sure. And there may have been another one that was discussed and later agreed to.

THE COURT: Yeah, just asking for your best recollection.

Go ahead, Ms. Santora.

Q. And related to those memos that your Honor was just discussing, um, the -- your office, before sending an action memo to the Secretary, independently analyzes

the information in referrals, correct?

A. That is correct, we analyze it. The Visa office, along with legal counsel, analyze it, um, independently of DHS, the information.

Q. And then makes a recommendation on removability to the Secretary, correct?

A. That is correct. And the recommendation is reviewed by many people. And then I -- or whoever is sitting in the position I am currently in, makes the final determination of whether it goes forward to the Secretary or not. My practice is to read the whole memo.

Q. And the Secretary, um, makes the ultimate determination on removability, correct?

A. That is correct, the Secretary of State, Marco Rubio.

Q. You said before that you were familiar with the allegations in this complaint, correct?

A. I have some knowledge of them, I have not read the complaint.

Q. Are you familiar with the fact that the plaintiffs in this case allege that the government is implementing an ideological deportation policy?

A. I have heard that --

MS. CONLON: Objection, your Honor.

THE COURT: No, she may so characterize it. And she may ask the question. And his answer may stand.
A. I have heard that accusation. I believe it's groundless.
Q. So is there an ideological deportation policy?
A. No.
Q. How do you know?
A. I run the Bureau of Consular Affairs. I'm responsible for everything those 13,000 people do. At the end of the day, the buck stops with me. I would know if there was an ideological deportation policy going on that involved the Bureau of Consular Affairs or the State Department for that matter. It's silly to suggest that there's such a policy that I didn't know about.
Q. Does the State Department have any policy to revoke Visas based on protected speech?
A. No.
Q. Does the State Department have any policy to find people removable based on protected speech?
A. No.
Q. Does the State Department have any policy to revoke Visas based on political viewpoints?
A. Um, if you're supporting a terrorist organization, yes, in that case. And it's been made clear by the

statements of Marco Rubio and, um -- this is not something that we started with Marco Rubio. If you support terrorism, you can have your Visa revoked.

Q. And is that a provision of the law?

A. It's in the law. There's the ineligibility, the 3(b) that we talked about. And actually that example you gave me, right before 3(c), they have 3(b) that goes into several pages of discussion of this. These officers abroad are required to put in a security advisory opinion on any case that they think that there's any indication of support for terrorism. We treat this very seriously.

Q. Has anyone ever told you to revoke the Visas on the basis of protected speech?

A. No.

Q. As anyone ever told you to find someone removable on the basis of their protected speech?

A. I can't find anyone removable, but no one has instructed me to prepare the materials for the Secretary to make that finding.

Q. Could the State Department be deploying an ideological deportation policy in secret without your knowledge?

MS. CONLON: Objection.

THE COURT: Based upon the entire record, I'm

going to sustain that.

(Pause.)

Q. To be clear, it's your testimony that it would not be possible for an ideological deportation policy to be implemented at the State Department without your knowledge, correct?

A. That is my --

MS. CONLON: Objection.

THE COURT: No, no, he can -- and I sustained the earlier objection because the whole gravamen of the case is that it is an avowedly public operation supported by the statements of the -- here the defendant public officials. And I'll let his testimony stand.

Anything else for this witness?

MS. SANTORA: No, that's it. Thank you, your Honor.

THE COURT: All right.

Ms. Conlon?

MS. CONLON: Yes, may I, um, go to the podium?

THE COURT: You may.

THE WITNESS: Your Honor, may I stand up for a minute?

THE COURT: Of course you can.

THE WITNESS: Thank you, sir.

(Stands.)

(Then Sits.)

CROSS-EXAMINATION BY MS. CONLON:

Q. Good afternoon, Mr. Armstrong.

A. Good afternoon.

Q. Okay. So you were asked --

THE COURT: Wait. Wait a minute. Wait a minute. I have, at this moment, received an order from the Court of Appeals, so let me read it.

(Reads.)

THE COURT: Here's how we're going to proceed. Let me read this in open court and you'll all have copies. This is entered and I received it as you hear it, and this is the order of the Court of Appeals in the First Circuit.

"The government has filed a mandamus petition and accompanying request for interim relief. Plaintiffs have opposed. After initial review of the parties' submissions and relevant portions of the record, we grant the government's request for a stay of any further disclosure of documents for which the government says it has claimed privilege and where waiver is the only basis stated for rejecting the claim of privilege. Plaintiffs may file a more fulsome answer to the petition by Monday, July 14, 2025, at 5:00 p.m.

The District Court is invited to address the petition by Tuesday, July 15, 2025 at 5:00 p.m. The Court's response should identify what the reason was for the in-camera review and detail the rationale for its waiver rulings on the government's assertion of certain privileges. The motion for administrative stay is denied as moot. The Court will rule promptly on the petition."

In light of the order of the First Circuit, and because it's 5 minutes to 1:00, I think we'll suspend proceedings at this time.

Ms. Conlon?

MS. CONLON: Could I begin my examination, with the 5 minutes remaining, without anything that will affect the order from the First Circuit just so we can get started?

THE COURT: Well I'm deferential to their order. I've got to reflect on what it reaches. But for my review of this order, it reaches everything that has been -- that this Court has disclosed to you as to which the government has objected.

And you've got 5 minutes.

MS. CONLON: 5 minutes to argue it or 5 minutes to --

THE COURT: No, no, 5 minutes to question him.

MS. CONLON: Okay. Just for the clarity for the Court and the record, our understanding, I think, is different in terms of the group of documents that we understood the government to be filing the petition about, um, but I am certainly able to start examining this witness without using any documents at all. So I just wanted to be clear, because I hear the Court saying that the Court thinks that the documents that I might use in this examination, which is to say the ones we received from the Court yesterday, are implicated by the government's petition, and I want to be clear that our understanding is that they are not, and that that relates to documents that have yet to be disclosed to us. But I understand the Court needs to review the document that's in front of you more thoroughly. So if I may begin the examination --

THE COURT: It's not a document, it's an order.

MS. CONLON: Correct, the binding order. So I will not -- I have no intention, in this remaining minute --

THE COURT: Right. You have 4 minutes. Go ahead.

MS. CONLON: Thank you, your Honor.

(Pause.)

Q. Mr. Armstrong, you testified on direct examination about certain noncitizens, um, by name, that the

government asked you about. To be clear, um, you had personal involvement in the decisions with respect to all of them, is that right?
A. That's my recollection, because in the case of the ones that went to the Secretary of State for decision, the action memo would have gone through me before it went up. And in the one remaining case, I -- as I recall, the action memo actually went to me from one of the Deputy Assistant Secretaries. So, yes, I was involved, in my professional duties, in these cases.
Q. And when you say that it went to you before it went up to Secretary Rubio, it's the case that you actually had to clear the document to go to Secretary Rubio, is that right?
A. That's correct. I'm the -- for the action memo, before it can leave the Bureau of Consular Affairs, it comes from -- it's actually from me, um, the decision -- the action memo is from me. And as I stated, it's my practice to read, um, the documents before they go up. I treat it seriously, I treat my duties seriously to read it in full. And make corrections, if needed, I may add.
Q. And when you say "corrections," what kind of corrections?
A. Um, there's any number. It's part of the

Case: 26-0906, 11/20/2026, DktEntry: 16.6, Page 196 of 300



clearance or the approval process. It's serious business. For example, sometimes, despite best efforts, there's simple grammatical errors or punctuation errors. I can't send something to the Secretary with not enough commas or a semicolon in the wrong place. Sometimes it's more serious, there are what I believe, in my position, I judge to be something that is not phrased in the clearest way to get across our point or, for example, not the best evidence is used to make our point. Sometimes I disagree completely and send the document back to the drafter and I say, "This can't stand, you have to fix this."

Q. You're describing a sort of searching review before it goes to the Secretary, is that right?

A. That's correct, much of my time is spent doing such activities.

Q. With respect to the five individuals whose documents you just reviewed with the government, you didn't make any corrections about those, right?

A. I -- I'm trying to be helpful, but I review in a week, you know, sometimes 10, 15, or more action memos that go to other parts of the State Department, and I can't recall what I did on a memo that was, you know, several months ago.

Q. You don't have an independent recollection of the

back and forth on these memos that the government showed you, is that right?

A. I do not. But my general practice is that I review things thoroughly and judiciously before I sign them. I have to sign off on it, and that's my responsibility, even if it's someone else's fault.

Q. And if you disagreed with a memo that came to you that was intended for the Secretary, you could stop it from going to him, right, by not clearing it?

A. That's correct, I could send it back.

Q. You didn't do that for any --

THE COURT: I think that's a good place to stop.

MS. CONLON: Okay.

THE COURT: We'll stop taking testimony today. We'll start promptly at 9:00 a.m. on Monday next week.

The total elapsed time is, um, for the plaintiffs, 3 days, 55 minutes. For the defense, 1 day, 1 hour, um, 35 minutes.

Understand you've only got four days -- four and a half days for the plaintiffs, and I thought that that included -- I intend that that include closing arguments. So assuming you want some cross-examination here, um, time is of the essence.

Now have a good weekend.

MR. KANELLIS: Your Honor, I apologize.

Case: 26-0906, 11/20/2026, DktEntry: 16.6, Page 198 of 300



THE COURT: Well now the apology is properly sought. I said we're stopping at 1:00. We're stopping. We'll recess.

(Adjourned, 1:00 p.m.)

Case: 26-0906, 11/20/2026, DktEntry: 16.6, Page 199 of 300



C E R T I F I C A T E

I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do hereby certify that the forgoing transcript of the record is a true and accurate transcription of my stenographic notes, before Judge William G. Young, on Friday, July 11, 2025, to the best of my skill and ability.

/s/ Richard H. Romanow 07-11-25
________________________
RICHARD H. ROMANOW Date

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS (Boston)

No. 1:25-cv-10685-WGY

AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
Plaintiffs

vs.

MARCO RUBIO, in his official capacity as
Secretary of State, et al,
Defendants

*********

For Bench Trial Before:
Judge William G. Young

United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
Monday, July 14, 2025

********

REPORTER: RICHARD H. ROMANOW, RPR
Official Court Reporter
United States District Court
One Courthouse Way, Room 5510, Boston, MA 02210
rhr3tubas@aol.com

A P P E A R A N C E S

RAMYA KRISHNAN, ESQ.
CAROLINE DeCELL, ESQ.
ALEXANDER ABDO, ESQ.
SCOTT B. WILKENS, ESQ.
ALEXANDRA CONLON, ESQ.
Knight First Amendment Institute at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
E-mail: Ramya.krishnan@knightcolumbia.org
and
COURTNEY GANS, ESQ.
NOAM BIALE, ESQ.
Sher Tremonte LLP
90 Broad Street, 23rd Floor
New York, NY 10004
(212) 540-0675
Email: Cgans@shertremonte.com
For Plaintiffs

ETHAN B. KANTER, ESQ.
WILLIAM KANELLIS, ESQ.
VICTORIA M. SANTORA, ESQ.
JESSICA STROKUS, ESQ.
DOJ-Civ
P.O. 878
Ben Franklin Station
Washington, DC 20044
(202) 616-9123
Email: Ethan.kanter@usdoj.gov
and
SHAWNA YEN, ESQ.
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, MA 02210
Email: Shawna.yen@usdoj.gov
For Defendants

P R O C E E D I N G S

(Begins, 9:05 a.m.)

THE COURT: Good morning.

As I've authorized internet access to these proceedings, let me say, as I've said each morning, if you are observing these proceedings via the internet, the rules of court remain in full force and effect, that is to say there is no taping, streaming, rebroadcast, screen shots, or other transcription of these proceedings.

It's very important also that you keep your microphone muted. If you do not, you'll be cut off.

With that said, we have one witness this morning, which is the only trial time, and then we have matters to discuss. But let's start with the witness and call the witness.

MS. CONLON: Your Honor, um, as we previewed in our e-mail to the Court, we would be and now have filed a motion for additional time, because of course we didn't expect a ruling by today, we made a very difficult decision to not call -- and understanding that we won't have the opportunity at a later time to call Mr. Reger, whose testimony we frankly think is important, but we need to be able to cross-examine the government's witnesses with these documents with the

time that it takes. So we have -- we have withdrawn our request to present testimony out of order and call Mr. Reger.

THE COURT: I follow that. So the witness, Reger, is not going to be called?

MS. CONLON: That's right.

THE COURT: Then we'll start then with the discussion without -- trial time is not being recorded now and I need your help really, and I have some observations to make about further proceedings in light of the stay, but before we do that, um, two --

Yes, Ms. Strokus, I simply want to offer an apology for not getting your name right.

MS. STROKUS: No problem, your Honor.

THE COURT: No, in my mind it's a problem. By now in the trial I should recognize your name and I have mispronounced it and I apologize.

Thank you.

MS. STROKUS: Thank you, your Honor.

THE COURT: And, Mr. Kanellis, I was brusk at 1:00 only to -- it had nothing to do with the trial or the mandamus proceedings, I had someplace to go. And as you have said, and now I say, I'm apologizing for being brusk.

But let's start with whatever it was you wanted to

say at 1:00 on Friday, and we'll go from there.

MR. KANELLIS: Thank you, your Honor.

I note that the Court has scheduled the post-trial briefs to be due this Friday. Is my understanding shared with your Honor?

THE COURT: I think that's correct.

MR. KANELLIS: Your Honor, I believe, and I don't -- we've talked about it with the plaintiffs and I'm not sure what their position is, I believe that all parties would be benefitted if we were given a few extra days to capture the final testimony that's going to be presented on --

THE COURT: Actually I've had a chance to reflect on these things as well. I'm not disposed to give -- let's start there. I'm not disposed to give the plaintiffs any extra trial time. Of course I'm going to devote all the time that we agreed to concluding the trial, which until the stay, and this is not whining, was going swimmingly.

So let's be clear. This is a case that involves, among other things, motive and intent, and, um, since I've had another of these cases that involve the administration, um, and I thought it appropriate -- and I absolutely thought it appropriate, that right after final arguments I had various important things to say,

um, and then following it up with a written opinion. The ***Kennedy*** case involving the National Institutes of Health. But this case is not like that. Here's what I expect to happen in this case.

In one part it's a, um, what I hope will happen with respect to the trial. I hope that, with respect to the trial, the stay will be lifted, and either I'll -- either lifted and I'll be allowed to muddle through to the end of the trial or will be lifted with instructions, which of course I will scrupulously follow. But action will be taken promptly by the Court of Appeals and I will get through the trial this month.

Now, um, this is a case in which I'm going to need requests for findings and rulings and I've appreciated the fact that you've ordered daily copy so that I have a full transcript. So, um, there's going to be a period of time, um, once the matter has been taken under advisement and these post-trial filings have been submitted to the Court before the Court -- and we understand we're only in the first phase. The first phase may be the last phase, the case may come to an end after the Court's findings and rulings on the first phase. And, um, contrary-wise the opposite result is possible, that that may result in what we might call a "finding of liability," and then the Court would have to

wrestle with the second phase, which is the issue of redressability, the issue of a correction, if any is possible.

So, um, what Mr. Kanellis -- if we start there, I am, um, perfectly amenable to extending the time for such filings because I have a lot of under-advisement work to do. And, Mr. Kanellis, thank you.

So here I guess is -- what would be helpful to me, now that I have the detailed privilege log -- I will say in a font so small that I need a magnifying glass to read it.

(Laughs.)

I want to talk with you, um -- well let's start the talk like this, because it's a matter of interest to me.

What, um -- on the plaintiffs' -- the plaintiffs have rested but for certain witnesses, and that makes perfect sense, and these witnesses include the cross-examination of Armstrong, Watson, and who else?

MS. CONLON: As far as we know, that's it.

THE COURT: Well --

MS. CONLON: Oh, I'm sorry, I thought you were asking me about whose cross-examinations were affected, in our view, by the documents. Is that not the question?

THE COURT: I agree that those two are affected by the documents which have been disclosed to the plaintiffs, those two.

MS. CONLON: Yes.

THE COURT: So if any event, the stay, however construed, applies until the Court of Appeals permits me to go forward, and that's perfectly fine. But now I'll ask the broader question.

What else did you observe?

MS. CONLON: Yeah, I see. We reserved testimony from our two witnesses who are traveling into the U.S. to testify in this case who will both testify, time-permitting on the 18th. And that's Veena Dubal, who is the General Counsel to the AAUP, and Cinzia Arruzza, who is a noncitizen member of the AAUP. And the person we are not able to present, take testimony for, is Jeffrey Reger, who is the Executive Director of MESA.

THE COURT: Yeah, understood.

MS. CONLON: Oh, I'm sorry, your Honor, my colleague corrected me. We also anticipate -- we had told your Honor that we -- rather than asking the law-enforcement witnesses who are set to come tomorrow, these four, um, ICE agents who are of a supervisory level who the government intends to present, we also want the chance to question them potentially more

broadly than the soap of their directs, which the government I think has agreed to rather than asking that we bring them back a second time. And so to the extent that we need to go outside of their direct, I suppose that's off the part of our case that remains.

THE COURT: Thank you, that's a helpful answer. And again, just to move things along, as to those witnesses, my custom is to allow you to go beyond the direct. Of course the rule requires you to take them as though -- on direct as though it is cross. But I've allowed you to treat those witnesses as adverse because they are employees of, um, one of the agencies where the defendant public official is the top of that agency. So there's the answer of what the plaintiffs are going to do with the remainder of their time.

What else are we going to hear -- what witnesses, beyond what has been mentioned, do the defendant public officials want to present?

MS. CONLON: Your Honor, if I may correct myself one more time, my smarter colleagues reminded me of another point, which is that at least -- there's sort of two components to this.

As I understand, we have now questioned one of the agents who will be testifying tomorrow in a deposition and there were many fights about privilege yet again,

um, relating to the scope of the law enforcement privilege, as well as, I think, the deliberative process privilege. So to the extent that the Court's guidance to the parts on how those privileges apply or don't, with the documents in front of the Court, I think that will potentially affect -- in other words I anticipate --

THE COURT: To make use of that.

MS. CONLON: Yes, exactly.

Unlike Mr.(s) Armstrong and Watson, these agents are not, um, senders or receivers of the documents, the affected documents, but we very well may have questions for them based on those documents in terms of the content. And so I don't -- I'm correcting my having misspoken and saying, "Oh, the documents are totally separate and apart from these agents," I should not have made that representation. Just to complicate things a little further to the Court.

THE COURT: No, no, that's very helpful. Very helpful, and I thank you.

Mr. Kanellis, what are the defendants' public officials going to present?

MR. KANELLIS: Your Honor, as indicated, tomorrow we will present the four agents, as your Honor has requested, who were at the sites of the arrest. On

Thursday, we have put aside time for, um, AD Armstrong -- sorry, AD Watson with HSI to describe the HSI's role in these, um -- in these, um, facts at issue.

THE COURT: Thank you.

MR. KANELLIS: We have -- we intend to present a summary witness. It's not extensive, but some summary exhibits through a summary witness. And then there's a witness, you Honor, that falls outside the purview of the Court's jurisdiction, that we will have briefly. That witness is Brian Shuvea's deposition testimony entered pursuant to 804(a) and (b) as an unavailable witness. That is the extent of what we anticipate our case to be.

THE COURT: The deposition testimony -- in other words, he's not going to be a live witness, but you're going to present his deposition?

MR. KANELLIS: Yes, your Honor, it will be very brief, I just think it's significant, so it's important.

THE COURT: I'm sure you do.

So, um, that shouldn't take any time, because the, um, plaintiffs, if you have portions that you think are inadmissible, they can be indicated on the deposition and I will read the transcript and make rulings, and my rulings will decide what's part of the record or not.

All right, let's -- and I appreciate what you've

said, all of this makes sense. Let's talk then about, um, what I call the core documents that the Court -- and I don't -- well that's an appropriate phraseology.

I see the issues about the submission of documents by the government to fall into three parts. The core documents, by which I mean the documents which evidence the procedures of the Department of Homeland Security transmitting ROAs to the Department of State and the, um, procedures that the Department of State followed in acting on those documents. They started out as B through K, which have been subject now to cross-examination. And, um, they involve, um, without characterizing them in -- or I think it's permissible at least to identify them in light of the stay, Watson letters and, um, also these decision procedures, the "agree," "disagree," um, "discuss," forms that were used to present matters to the Secretary of State, those have been mentioned. And, um, in reviewing them -- and I want to talk about them as a group. I consider them core documents here. I note that certain of them have attorney-written, um, data on the documents.

So not having reviewed the privilege log in detail, um, but I think it's a good place to start, and I think it will be helpful to the Court of Appeals to -- for the Court -- I can address this issue of waiver, and

I intend to, but -- which the Court specifically -- which the Court of Appeals specifically invited me to speak, but I think it would be helpful for us to discuss now where I have agreed to entertain the privilege log and the claims of privilege with respect to the core documents, and that's what I'd like to discuss. And hopefully rule on. I'm familiar with these documents. The ones that have been disclosed to the plaintiffs, the plaintiffs are surely familiar with them. And defense counsel is familiar with them.

So let me, um, identify first, as a place -- because it affects various aspects of what the Court's duties are here, let's identify in the core documents those written statements by attorneys.

Now as to those, I understand that the defense raises the attorney-client privilege.

Is that correct?

MR. KANTER: Your Honor, I understand you to be referring to the action memo with the -- you refer to "agree," "disagree," "discuss." So I think we're talking about the same sort of thing, there are some handwritten notations --

THE COURT: Right.

MR. KANTER: -- which presumably Mr. Armstrong, who -- this is his action memo.

THE COURT: No, I understand that.

MR. KANTER: They'll be able to clear that up, or the meaning or significance of it. And what I understand you to be asking is what is the nature of the privilege --

THE COURT: But not as to Armstrong, he's not an attorney. There is an attorney --

MR. KANTER: Yeah, there was attorney-client privilege with regard to other e-mails in that core subset.

THE COURT: That's what I'm talking about.

MR. KANTER: Yes, discussions of ICE officials with their counsel.

THE COURT: Right.

MR. KANTER: And as your Honor knows, redactions -- proposed redactions have been made with respect to that attorney-client privilege. Obviously, um, CK counsel is to be encouraged in the government. And, um, this is a matter of some importance, um, I would say -- I would put it this way, on principle. Because as your Honor also knows, the content -- I remember when you were telling me, "Why" -- "This shows the government in a good light, why would you not want to, in effect, just voluntarily?" And our response was "That's of course" --

THE COURT: So you were listening, and it does show that.

MR. KANTER: That's for the client and the attorney-client relationship to, you know, at a minimum say, "I want to keep it privileged," right? And as a result, we, um -- we are pursuing that privilege on their behalf. And --

THE COURT: That's fair. That's fair. And I understand it. I overrule it.

Now what other privilege applies? And I'll work out from this with the implication. And I overrule it on the ground that, um, you cannot give such data to the -- the factfinder and then say, "Here it is, but it's privileged, and therefore you can't consider it." That -- and the basis is that is a knowing and intelligent waiver of the privilege as to that data. That's the ground that the Court's ruling.

Now are there other grounds to seek, um, a privilege?

MR. KANTER: Over those e-mails?

THE COURT: Yes.

MR. KANTER: The proposed redactions reflect the identities of the participants to those exchanges. Your Honor's initial ruling was only e-mails and phone numbers --

(Interruption.)

THE COURT: Okay.

MR. KANTER: Not identities, um, where the government had proposed to redact, including the identities, as law enforcement privileged. But otherwise putting --

THE COURT: I guess I don't -- no, no, I hear you. Why should the names of the people be redacted, they're public officers of the United States?

MR. KANTER: The, um -- your Honor, it has to do with the, um, the individuals and their responsibilities and the nature of their responsibilities. There are sometimes law enforcement interests that pertain to identity that the government, um, seeks to maintain the integrity -- for example, an analogy would be maintaining the integrity of an investigation.

THE COURT: Well, of course. You see that I understand. But, um, these are in-house people doing their in-house work, um, I don't understand why their names -- we ought not know who they are?

MR. KANTER: The contents of the communication, um, absent an attorney-client privilege, reflect the nature of the discussion. The agency, um -- and there are limitations to what I would say in open court. Your Honor has --

THE COURT: Well that's fine.

MR. KANTER: Okay.

THE COURT: And I -- I hear you, Mr. Kanter.

So again, I'm not disposed to redact the names, absent some showing, um, which may -- an affidavit, which may show the ongoing, um, concern that the identity of a particular person, um, his or her name be redacted. That may be filed under seal and I will consider it.

Is there anything else?

MR. KANTER: Yes, there is one other matter that your Honor enumerated, um, related to the action memos, which, um -- the issue here is --

MR. ABDO: Your Honor, before you move on from this --

MR. KANTER: May I finish my remark?

THE COURT: Yes, I will hear Mr. Kanter.

Mr. Abdo, I'll hear you in time.

Go ahead, Mr. Kanter.

MR. KANTER: I'll get right to the point.

THE COURT: Please.

MR. KANTER: The lead contention of my friend is if you find that the action memos are not privileged under the deliberative process privilege, then the cross-examination of Mr. Armstrong and Mr. Watson may go

forward, that's their contention, and I would like to address it.

THE COURT: Yes, and I agree. I agree that that is a central issue here. And, um, let's -- but I want to start out with the attorney's, the attorney advice that's here in the e-mail.

I've overruled the -- I've overruled the assertion of the attorney-client privilege because these were voluntarily submitted to the adjudicator, on the basis that that is a knowing and intelligent waiver. Now the deliberative process privilege, in this Court's mind, is something else again. And the analogy -- I think in analogies too, and I was talking with the law clerk, that if -- it isn't the same thing as the deliberative process privilege, but courts hold certain things absolutely privileged, and it's roughly the same, how the Court comes to a decision.

So if, for instance, a civil case, like this is a civil case, a motion for summary judgment, before it are briefs and affidavits. None of those are in a deliberative process privilege, though they are what the parties have served up that will form the basis of the Court's decision.

Then an attorney on the Court's staff takes an affidavit, this happened more often in the covid days

when we were working remotely, and underlines, writes in the margin, advice. We're not deliberating, we're not in a meeting. There was that meeting, for instance, that Hatch attended and I have sustained the deliberative process privilege and allowed him to be asked only what came out of the meeting, which was the classic situation in my mind and easy to follow.

Here when an attorney does that, I think these things fall within the deliberative process privilege. I'm talking about the attorney. And indeed you've -- you've, um, anticipated it.

So it's conceptually, it's easy for me to think about it with these attorney interlineations on e-mail. That's my concern.

So let's say I sustain that because I think that that is within the deliberative process privilege, that is, that's the attorney advising, albeit remotely, the decision-maker to make the decision, the actual policy, what the Secretary of State decided, that's public, and no one -- there's no objection as to that. So it falls within the deliberative process privilege, it seems to me.

We're in the middle of trial. And then we get to the next problem. If I say, "No, that's within the deliberative process privilege," candidly I've dealt --

in jury-waived cases, criminal cases, the stakes are higher where matters were suppressed and I felt perfectly comfortable in putting aside matters which legally had to be suppressed. Perhaps not in every case, but certainly in most cases. And making my rulings on matters properly before me. But this is different because we're in the middle of trial and these have been disclosed to the plaintiffs.

So the truth is, as I always try to speak the truth and be transparent, that as to the lawyer interlineations, I could put those aside. I could characterize them -- well I don't know that I have, and I'll say no more. I can put those aside. But I'll say this, well certainly some of the things that they said are things that occurred to me before I read these documents, that is, "Is this unprecedented?" "Are we concerned about blow-back?" I need not go on. But things which, um, you could readily argue are informed by reading what lawyers, in their lawyer-like way were saying, that both occur to the Court and I'm sure have occurred to, um, plaintiffs.

So suppose, because I'm -- I think I'm prepared to say, we can put those to one side, what the lawyers had to say.

Now when -- because attorneys can fashion

questions that don't depend on it, you can't cross-examine -- "Oh, but do you see here your own lawyer said this and that?" We can exclude that. But are you saying that I should curb their cross-examination to questions that don't depend directly on, um, what the lawyers had to say?

MR. KANTER: I --

THE COURT: You're following my --

MR. KANTER: I am following it, and I have -- I've seen your Honor make these distinctions throughout this trial frankly about many matters, admitting evidence, for example, as limited, not for the content but for the reaction, distinctions are made. This is a bench trial. Your Honor is the judge and the jury, as it were. And, um, those decisions and distinctions are yours to make.

I think the key, um -- the key aspect of this process for the government, um, was the -- in handing over the core documents to the plaintiffs, your Honor, um, made a very important stipulation, the stipulation was they were attorneys' eyes only, which I understood, and your Honor can correct me if I am mistaken.

(Pause.)

THE COURT: Go ahead.

MR. KANTER: However I think your Honor was trying to strike a balance, which is acknowledging either the

Case: 26-6906, 11/20/2026, DktEntry: 16.6, Page 221 of 300



asserted privileges of the government or if the matter of waiver is, um, pending before the First Circuit, or there were other considerations related to attorney-client or deliberative or law enforcement, your Honor was striking a balance to enable the trial to proceed and the examinations to proceed, attorneys'-eyes only. And I think in asking me, "Can there be a robust cross-examination based on these core documents?" I think the government's answer is "Yes."

There may be matters which, for example, I had to talk around in open court and matters for which a sidebar was required, um, but what I'd like to underscore is the plaintiffs have the documents, they have all the documents. In fact, they have them unredacted.

With respect to the, um, "agree," "disagree," "discuss" memos that your Honor, um, they not only have those unredacted, they have the Secretary of State's decisional memos unredacted. Why? Because we gave it to them when we agreed to file it under seal with the Court. The decision memos are, um, not, um, under seal in full, there's a companion set that is public.

The plaintiffs have the information. They have the ability to fashion questions. And if any of those questions were to touch on areas of sensitivity, whether

the Court has ruled directly with respect to the privilege or the government maintains their -- for example, the other day when there was an exhibit, most of which we had no objection to the questions based on that exhibit, we never stood up and objected, but there was one part of that one exhibit, and we brought it to the Court's attention, and you acted immediately, and my friends complied immediately. I think we were all on the same page there. But the --

THE COURT: All right, that's very helpful, Mr. Kantor, and I'm listening to you.

One last question before I hear Mr. Abdo, because I -- you've -- I hear no suggestion in our discussion that, um, while I said I could set aside the attorney interlineations as, um, part of the deliberative privilege, and I want to hear him on that, um -- and if I decide to do that, I can do that, it does not affect the integrity of my factfinding. No one suggests, when I come to decide this case, because, as you have characterized and I think accurately, these documents cut both ways. I can't be more transparent. They do cut both ways.

No one says -- on the government's side, no one says I can't look at the documents, even if I excluded the attorney data, the core documents, isn't that

correct?

MR. KANTER: Yes, that's absolutely correct.

THE COURT: Thank you.

MR. KANTER: And if I may? One last point or not. I can sit down.

THE COURT: No, no, go ahead.

MR. KANTER: If the issue is -- what I'm saying is the issue of whether it's deliberative or not is a nonissue in terms of being able to question the witness about it, work around it --

THE COURT: That's what I heard you say.

MR. KANTER: That's my main point.

As to whether it's deliberative? I do have an argument that it is deliberative, even putting aside the delineation, because this action memo is a proposed decision.

THE COURT: Oh, you're talking about the interlineations of Mr. Armstrong?

MR. KANTER: Mr. Armstrong's memo -- the whole memo is a proposal to the Secretary of State. It's not a decision, it's an offer recommending approval.

So "approve," right, can, like your Honor said, things can be -- have two meanings at once.

THE COURT: Well that intrigues me. So we're talking about these action memos now.

MR. KANTER: Yes.

THE COURT: In which there are interlineations by Mr. Armstrong, the witness here at trial. We've all seen them in their unredacted form. But you now make an argument that the memo, because it has the interlineations, is, um, part of the deliberative privilege.

MR. KANTER: Yes, I do.

THE COURT: Yes, I understand.

MR. KANTER: And I think my friend helped me with my argument for the following reason.

THE COURT: Well we'll let them make their own arguments.

MR. KANTER: Okay, then I won't say that.

THE COURT: All right.

MR. KANTER: They made an argument that it's not deliberative when it becomes final. Those are two different things actually, but they make the critical point that they're virtually identical in content, right?

THE COURT: Yeah, let me. Let me hear their argument from them.

MR. KANTER: Thank you, your Honor.

THE COURT: Mr. Abdo, we've talked about the attorney -- the attorney statements and e-mails, we've

talked about these memos of -- we're pretty clear what they are, that Mr. Armstrong gives to the Secretary of State. Please address both.

MR. ABDO: Thank you, your Honor. And before I address those, if I could just say one thing.

Last night, as you may know, we e-mailed Ms. Belmont with a filing that we had hoped to file under seal later today. We provided a copy to opposing counsel. And if your Honor would like to have a copy of it, I'd be happy to approach and provide it.

THE COURT: I have it, don't I?

MR. ABDO: Well I don't know if you have the printout. But if you don't, I'm happy to provide you one.

THE COURT: Oh, I have a printout.

MR. ABDO: Oh, okay. So let me just -- a few points your Honor.

First, with respect to the attorney-client privilege, we understand your Honor's ruling. We would just encourage you to overrule the assertion of privilege for the additional reason that, with the exception of maybe one or two sentences in the e-mail thread that we're talking about, nothing in that e-mail thread is plausibly protected by that privilege. Most of it concerns, um, decisions already made, not sought

-- you know not offered in the context of seeking legal advice or received in that context.

The fact that attorneys happened to have been copied on the e-mail is relevant, but it certainly isn't dispositive to the assertions of privilege, and we'd ask you to base your ruling on that additional basis, which we think would, you know, clear up the record.

A second point with respect to, um, the interlineations. I think I now understand where things, um, have landed, but just to be clear. The interlineations we're talking about, and I believe Mr. Kanter was talking about, were ones made apparently by Mr. Armstrong on the action memo, not by a lawyer.

THE COURT: I -- I never was under a misapprehension as to that. The problem is we're being cautious about documents, and he started off talking about interlineations by Mr. Armstrong, I said, no, no, no, and he moved to e-mails. We talked about e-mails, I allowed him to expand now to interlineations, undisputed apparently by Mr. Armstrong on this decision memo. And, um, I've heard his argument. I'll hear yours.

MR. ABDO: Thank you.

And then a third point, your Honor, has to do with the deliberative process privilege and connects to the action memo that we were just talking about. As you'll

have seen from our filing, we don't think the deliberative process privilege covers any of the documents that have been turned over to plaintiffs for a variety of reasons. We explained four in the memo. I won't repeat them here. But let me just highlight two of them.

One is that all of the documents we're talking about have been adopted, including especially the action memo that we were just talking about. Mr. Armstrong -- well I don't want to go into any details, but I think a review of the document on its face makes clear that it was adopted, and once a document is adopted as a decision of the government, whatever predecisional and deliberative character it had before that might have justified invocation of the privilege falls away.

So, you know, we think it would be proper to overrule all the government invocations for that reason.

THE COURT: There have been opinions of this Court which, if you looked at the draft, which otherwise was privileged, I -- I don't know as I'll use the word "confess," the only changes I made were to avoid split infinitives, which is an issue of mine, and to move a few, um, commas. So that reveals that the draft, by the law clerk, was 95 percent acceptable to the responsible judicial officer when I signed my, um, my -- put my

Case: 26-6906, 11/20/2026, DktEntry: 16.6, (228 of 300)



signature on it.

I do not conceal from the bar that in the main, um, I delegate to clerks and interns initial drafts. Frequently I do rewrite or add sections and subtract, and all of that business. But, um, it does add a little more information if you were to know the last draft before the judge put, in my case, his signature on it. And I always thought that was privileged.

I think that's correct, your Honor, but two points about that. One is that once you put your signature on the document, then it is expressly adopted.

THE COURT: Exactly.

MR. ABDO: I don't think there's any debate in the doctrine about that proposition.

And the second point is that, even with respect to documents that were once predecisional and deliberative, if they were incorporated by reference into the decision, or relied upon, as many of these documents were expressly in the decisional document, that incorporation waives whatever deliberative process privilege there would be.

So just to be very concrete. In the decisional memos we have, in the certified administrative record, you know the ones from the Secretary, those memos expressly base their decision on underlying memoranda

setting out the factual understanding of the Department of State or the Department of Homeland Security. They quote them. They site them. They list them as attachments. That incorporation also waives whatever predecisional and deliberative character the underlying memos might otherwise have had prior to the final decision.

And we think that applies to the bulk of -- and between those two arguments, we think it covers all of the documents over which the government has asserted the privilege.

THE COURT: And I'm saying it back to you now. At some stage I will write an opinion here, and in legal writing they'll be citations, and the citations will be to the record, or to opinions and the like, all of which -- and your point is, "If you do that, Judge, all of those necessarily are public, because, in legal writing, that is explication of what you relied on, it shows your reasoning."

MR. ABDO: Precisely, that is the basis for your decision. And the bases cannot be withheld under the deliberative process privilege.

THE COURT: Okay.

MR. ABDO: One final point, your Honor, has to do with our ability to cross-examine on the basis of these

documents. And to that I'd like to turn it over to Ms. Conlon. If that's okay?

THE COURT: Of course it is.

MS. CONLON: I have a very extra-vested interest because I am, as you know, have begun the cross-examination of Mr. Armstrong.

So our friends on the other side make the point that even if the documents couldn't be used by us in terms of entered into evidence or shown to a witness, that we wouldn't be hampered because we could ask important, you know well-crafted questions.

THE COURT: He didn't say you wouldn't be hampered, he says you can think of ways around it.

MS. CONLON: And I want to let the Court know some important context that there's no reason the Court would have known, which is this.

I sat in a room with Mr. Armstrong for a whole day. He did not recall and could not answer a single question about the basis for any of these decisions, even the manner of these decisions, and he repeatedly said, "Please show me the documents." I cannot tell you how many times he asked me to show him the action memo and the Watson letter, and of course I didn't have them because, until the Court shared them with us, we had never seen them. We could not effectively get at the

truth without them.

THE COURT: Wait. Now, um -- I'm going to cut you off, Ms. Conlon, but only for this witness. My ask to the Court of Appeals is that they lift their stay, um, not really that they, um, dismiss -- and I don't know that it properly is before me, that they dismiss the petition, that's up to counsel arguing the several positions.

But at their invitation, I am going to ask that they lift the stay, and as I put it, "allow me to muddle through to the end of the evidentiary process." Mr. Kanter referred to it, and respectful to plaintiffs' counsel, deservedly so. And I -- the counsel I have here in the courtroom before me, I have genuine respect for you all. We have worked cooperatively and I have been able to make rulings that I have thought prudential.

I'm talking to the -- I can't decide -- I'm having this discussion. We have daily copy. You can transmit it all to the Court of Appeals. But I can't -- I put on the record that I'm ruling that the assertions of attorney-client privilege are, um, overruled on the basis of waiver, because they were put before the factfinder.

I am ruling that the, um, claim of deliberative

privilege as to -- I want to reflect on what Mr. Abdo said, but as to so much of the e-mails that actually reflect attorney advice is sustained, so long as we are clear, as Mr. Kanter has made it clear, that the Court may look at those things, draw inferences and the like. But I'm going to treat those as having sustained, um, that on the deliberative process privilege.

Beyond that, I'm not making any rulings as to the reach of the deliberative process privilege because the process Mr. Kanter has described is, um, both acceptable to the Court and workable. And if the Court of Appeals will allow me to proceed with Mr. Armstrong and Mr. Watson, um, I don't think there's any more I can say. I've tried to be transparent to counsel and to the Court of Appeals.

Yes?

MS. STROKUS: Your Honor, I just wanted to put on the record before you that Ms. Conlon has mischaracterized what occurred at Mr. Armstrong's deposition. I was also there the entire day. And plaintiffs repeatedly asked him to speculate on documents that they could not produce to him. So he's under oath --

THE COURT: Well because they --

MS. STROKUS: So he's under oath. It's important

that he tell them, "I'm not going to speculate on the contents of these documents."

THE COURT: I'm not drawing any conclusions. If the Court of Appeals will allow him to resume the stand, I can handle the examination.

Now that --

Yes?

MS. CONLON: Your Honor, may I ask you a question?

THE COURT: Oh, of course you may. We're talking now. And I'm fine with talking, but I can't -- I've made the rulings I've made to try to be helpful, because I have enough of a basis to make those rulings. Beyond that, I'm asking that they let the trial go on, and a trial is a trial.

MS. CONLON: And when your Honor said, "If the trial is permitted to continue with examinations of Mr. Armstrong and Mr. Watson, that we can use the process we have used so far," which I understand -- that's the part I wanted to get clarification on. I take that to mean to deal with things as they come up.

THE COURT: Yes.

MS. CONLON: Okay. We have discussed the action memos today and we've discussed the e-mails, but we have not discussed, unless I missed it, the letters from Mr. Watson to the State Department. I wanted to make

sure that that's also something we're addressing today to the extent that the Court is willing.

THE COURT: I am willing, because I consider them core documents. And, um, maybe I should go back to Mr. Kanter to be -- to see if, um, there's any ruling I can make.

Mr. Kanter, as to the Watson letters?

MR. KANTER: Yes.

The Watson letters are referrals from one agency to another, and, um, the government stands on the, um, log entries as to those documents we submitted to the Court.

THE COURT: Yeah, but they really are very fine points.

MR. KANTER: (Laughs.) Fine?

THE COURT: What are your objections?

MR. KANTER: You're right, and I apologize for that.

THE COURT: No, no, that's all right.

MR. KANTER: I strained to read them myself.

THE COURT: I have a magnifying glass.

MR. KANTER: Um -- okay.

In my recollection, the referral letters are law-enforcement sensitive, they were the subject of a motion to compel by the plaintiffs, which your Honor

denied. They were among the documents that your Honor held the privilege had been waived.

We have not changed the assertions as to those documents. They remain law-enforcement sensitive. Your Honor handed them to plaintiffs with the AEO stipulation. We, um, believe that is a compromise that enables the trial to proceed.

THE COURT: Thank you. Yeah, I think that's well-said.

MR. ABDO: Your Honor, if I may just add one note with respect to those?

THE COURT: Yes, please.

MR. ABDO: You know those documents appear on the chart that we provided to the Court last night. Among the first, I think 9 or 10, all withheld only under the law-enforcement privilege. And we understand your court to have overruled that assertion of privilege with respect to these documents based on your Court's conclusion, which we fully agree with, that the government had interpreted that privilege far too broadly to cover not just information that was disclosed with compromise and investigation, but the sort of information we've seen from these memos, which is largely factual information. And using techniques that have already been disclosed to the public and described

in open court, mainly the collection of social media information and the like.

So we think the Court has already ruled with respect to those documents on the merits, not on the basis of waiver, such that the First Circuit's order doesn't even implicate our use of these documents at trial.

THE COURT: Actually you've stated it better than I. But the use of the word "waiver" there, by the Court, was infelicitous, because while I went on to explain my focus on the law-enforcement privilege and explain what I believed was the scope of the law-enforcement privilege and functionally overrule that privilege as to these documents, as you have properly said and more effectively described, the use of the word "waiver" was infelicitous. And now that I've gone back and looked at the transcript, I said, "You may submit law-enforcement privileged data and I used words much like "and I will honor it." And that's their basis for saying, in effect, that they were snookered. They were not snookered. That didn't estop the Court from making a ruling on the privilege. I made the ruling on the privilege. But they did not waive it by asserting it and giving me the documents.

What they did was give me the documents, allow me

to rule on the privilege, I overruled it, and as a matter of trial management, have decided, and persist in that decision, that they may be used to get in the trial. Everyone agrees I may look at them. But I think that, um, I may look at them more effectively if I permit cross-examination, which has been the Court's reason and process for turning things over under the stipulation of attorneys'-eyes only. Thank you.

MS. CONLON: Your Honor, I'm so sorry, may I ask you a question?

THE COURT: Don't apologize. You know we're talking.

Go ahead, Ms. Conlon.

MS. CONLON: Okay.

So understanding the Court's point that if we can continue, we will use the process that we have used, which is collaborative with the Court and the government, the concern that I hope was clear in our application for time is that that process takes time, meaningful time, and I am deeply concerned that with only several hours we will not be able to even finish this process.

THE COURT: I'm sure you're concerned, but that was clearly to be anticipated in a trial of this sort. No additional time.

Now, um, there's one other document and we haven't talked about it and I actually talked about it in trial, but we haven't talked about it here. And I think my, um -- I think, one, the document, as I understand it, is not implicated in this application for a writ of mandamus, and that is the single document marked A as to which the government has asserted the Executive Privilege. They call it the "Presidential Privilege," which has thrown me a little bit, but it's the same thing as the "Executive Privilege," which I am somewhat familiar.

As to that document, I have characterized it in open court saying, "It appears to be peripherally relevant." Here's how I'm going to handle that document, if it hasn't been clear. And again all of this I fact expect you to transmit to the Court of Appeals should you take a position with respect to it or have issue with it.

The Executive Privilege has not in any way been waived, and has been asserted, and timely asserted. The matter was and is under advisement by the Court without respect to the, um -- without respect to the mandamus proceedings.

It seems to me there are three possible outcomes. The Court determines that the privilege applies. If

that happens, the document itself will be returned to the government forthwith. But notification will be put either by my saying so during the trial or if it's in the under-advisement period, um, by notification on the docket.

Second, that, um, the ruling, whether it applies, um, is deferred by the Court until the, um, time I am writing up the opinion and I decide that while relevant, it's so peripheral that no mention of the document need be made in the opinion, nor reference to it. If that happens, the document at that point will be returned to the government forthwith, physically, no copies retained in the file of the Court at all. It's treated in our procedures as a highly-sensitive document. I have custody of it.

The third possibility is that the Court finds that the privilege -- rules that the privilege does not apply, and further, um, wants to cite. The second option, I don't have to decide whether the privilege applies, if I'm not going to cite it, I'll give it back, because I'm not relying on it in any way. If I find that the rule -- that the privilege does not apply, and the -- and I'm going to cite it or use it, in that case I will give notice, and then I would think that would be ripe, um, and indeed -- why don't I say it right now, I

will not do anything for -- I will automatically, I'm putting it on the record now, stay any further action as to the document for 7 days so that the government may, um, seek to protect the document.

I have said one thing that, on reflection, I want to retract, and I'm looking for you, Mr. Kanter, who's arguing these privileges. I suggested the possibility that assertion of the privilege could be a basis, even if it wasn't national security, for an adverse inference. That's error. And I would not do that. And the reason, on the record, is there is an institutional, um, reason, wholly apart from this case, for the Office of the President of the United States to assert the Executive Privilege and vigorously to patrol its parameters to preserve the Office of the President of the United States, both as to Congress and the courts and the public. That's established in the case law. I fully respect it. And, um, the privilege asserted here, I can readily conceive of reasons why the government, as an institutional matter, would assert it, utterly regardless of any issue laid before the Court.

So any adverse inference from asserting it is -- will be improper, and I assure you I would draw no such inference. That's how I'm going to handle that. So we're clear on that.

Now with that I think I -- let me tell you what I plan to do. I plan to go back and talk to the law clerk, um, we'll say a 20-minute recess. Then I'm going to come back and I propose, really briefly, to -- subject to Mr. Abdo being heard here, to briefly, um, accept the Court of Appeals invitation and to explain myself on the record. Again, this is not a brief. I will just explain how I -- if permitted, I will ask to have the stay lifted, but the writ I take no position on, the proceedings for the writ could depend, um, and that will constitute my response. And I will, because we've got daily copy, I will transmit a copy of my remarks, soon to be made, to the Court of Appeals.

I do want to add, with thanks, the Chalk HN, it really sort of walks through the -- what I've described as the "Core" documents. And, um, I should append it to my remarks and I'll see that that's done. So I'll ask you to wait for that because I think it will be helpful for you to, um -- my whole reason for doing it this way is for you to hear it.

And, Mr. Abdo.

MR. ABDO: Thank you, your Honor, just one brief point.

We obviously don't have Exhibit A, the document for which the government has asserted the Executive

Privilege or the Presidential Communications Privilege. Just one note about that document, if the Court determines it is relevant and is weighing the question of whether it is properly privileged.

One of the key elements of the Presidential Communications Privilege is that the information in the document at issue not have been distributed beyond the President's close advisors involved in the decision-making at issue. Mr. Lapowski's declaration which asserted the privilege does not address the distribution of this document. And so it is our position that the government has not yet met its burden of invoking that privilege. We obviously have no basis to know the distribution of the document, but it's our position that they have yet to satisfy that element of the burden. And so we'd ask them, at the very least, to supplement their filing in that regard.

THE COURT: Thank you.

I thank you all. We'll take a recess for 20 minutes and, um, the Clerk will advise you as to what will next happen. But I'm hopeful to come back and briefly accept the invitation of the Court of Appeals and, um, so that you may all support or take issue with it and the like.

And with that done, I think that would, um,

conclude the proceedings for today. Because when I'm done, I'm going to recess. So let me go around.

Is there anything else that you think we ought be discussing today? I've told you what I'm going to ask for.

(Silence.)

MS. CONLON: Um, to make sure we understand we're proceeding tomorrow. If there is no ruling from the First Circuit with respect to the, um --

THE COURT: If there is no ruling, then, um, I understand the boundaries of the stay and I will scrupulously adhere to them.

MS. CONLON: And to make sure that I understand that same understanding, when we are questioning the ICE agent tomorrow, so that we don't run afoul of anything here, um, if there is no ruling from the Court of Appeals, are we permitted to ask questions that rely upon information that we know from those documents?

THE COURT: It depends upon how you ask them.

MS. CONLON: Okay.

THE COURT: I don't, in any way, mean to be coy. We can't unring the bell. For good and sufficient reason, I have turned the documents over to you because candidly I wanted them, um, to subject them to cross-examination so that I could better understand the full

context. That's where we are in this case.

MS. CONLON: A related question, your Honor.

These documents, in particular the Watson letters and the action memos, does the Court understand and review them as part of the record that's in evidence that the Court may consider in reaching its findings or are these from the Court's perspective outside of the --

THE COURT: No, the Court -- that I think I made clear, and I don't think the government has an objection to that.

I take these documents, with the exception of attorney, um, volunteering of, um, or giving -- I shouldn't say "volunteering," giving legal advice, as to which I am prepared to exclude as part of the deliberative process, I'm not saying the whole e-mails, um, and I'm going to put that to one side.

MS. CONLON: Okay.

THE COURT: Having said that, everything else -- and I don't hear defense counsel objecting to it, unredacted, is part of the record on which -- except perhaps for this Executive document as to which Executive Privileges -- well let me start again.

As to the core documents -- I'm speaking to the core documents. As to the core documents, I can look and rely upon them all, with the one exception that I've

just now stated in open court. As to the document as to which Executive Privilege is asserted, I've told you how I'll handle that.

As to the other documents, if there are more, um, I take the position -- we haven't discussed it here today, but I take the position that the privileges that I have allowed now to be asserted are asserted with respect to those documents, and I will rule upon them. Rather broadly I have, um, overruled the assertion of the attorney-client privilege. I intend to sort through them, in the deliberative process, post-trial and, um -- it's a benal phrase, "Let the chips fall where they may." If I accept the privilege, I won't rely on it. If I don't, I will. And it should be clear.

Has that answered your question? That is a good question. And that's what I intend to do.

MS. CONLON: Nearly. Nearly. I think I nearly have an understanding.

A concern, your Honor, or a related question, is, um, if we spend time of our remaining time questioning witnesses about the content of certain documents -- and I'll call them the "core documents," forgetting the e-mails, putting aside the e-mails, the "core documents," being the Watson letters and the action memos. If we spend time questioning witnesses on them

and the Court later concludes those materials are under some sort of a privilege and therefore the Court can't rely on them or use them, you can see how it puts us -- all of us, I think, in a difficult position if we've elicited all of this testimony --

THE COURT: We're all in a difficult position.

MS. CONLON: You too, of course. And in particular, because the Court knows I'm quite focused on this time issue, it puts us in the hard position of potentially having used all our time on stuff that I think the Court can't even consider. And so --

THE COURT: No, what I've heard from them, I can consider them. I'm going to consider them, the core documents. I'm going to consider them all. Whatever your cross-examination, I'm going to consider them. With the exception of what attorneys may have advised -- may have advised, but as we've said in open court, those were logical questions which I was asking before I'd even looked at the documents. But I am permitted, they are part of the record on which the Court will make its decision. Part of the record. If I cite them, implicit in that is I've overruled any privilege of any sort.

MS. CONLON: And the Court will likewise consider testimony from witnesses about those documents?

THE COURT: Of course.

MS. CONLON: Okay.

THE COURT: Well I don't understand -- well the Court of Appeals can instruct me as it wishes. I would be -- look, I'd be very surprised. The Court of Appeals, because I've made clear to the government I'm going to -- with one exception, I am going to look at the core documents. If the Court of Appeals were to instruct me otherwise, I would have seriously to -- to strike some or most or, um, but a significant part of the core documents, if I have made such a mistake, I would seriously have to consider recusal. Because if this -- then if this case comes out and plaintiffs lose, the integrity of the Court's factfinding will always be suspect, truly suspect, that if only I had considered those things, you would win.

Contrary-wise, if I were to find these high, significant, the President of the United States, among others, liable for infringing core constitutional rights on such a truncated record, it will always be believed that this Court didn't put it aside, as I've asserted, all the attorney stuff I could put aside. I was asking those questions. And I'm not going to be put in that position. I should recuse and we'll start over in accordance with the, um, decisions of the Court of Appeals, which of course I will follow scrupulously.

So if I've made that mistake, um, I'd seriously considering recusal. But I don't hear anyone saying that. Now maybe I'm mistaken.

MS. CONLON: No, your Honor.

THE COURT: Yes? Mr. Kanellis, before I take the recess.

MR. KANELLIS: Just briefly, your Honor. That instruction we will plan on presenting four witnesses tomorrow, one of them testifying from London.

THE COURT: Oh, he was the one from London. And that's fine, that's worked well.

MR. KANELLIS: Thank you, sir.

THE COURT: All right. 20 minutes, we'll recess. Thank you.

THE CLERK: All rise.

(Recess, 10:25 a.m.)

(Resumed, 10:55 a.m.)

THE COURT: The Court takes this opportunity, on the record, in the presence -- in open court, in the presence of counsel, to accept gratefully the invitation of the Court of Appeals to address the, um, mandamus petition both generally and expressly to address the issue of waiver with respect to that petition.

I'm going to start by, um, making a request to the Court of Appeals. I'm not going to argue in any way the

substance of the petition. That's for the parties. The Court's conduct is all a matter of record. And the transcript governs and is more, um, important than anything I say now. But I'm going to start with the request, simply as a matter of case management, that I would make of the Court of Appeals. And it is this.

I request the Court of Appeals to lift the stay, though I express no opinion on the disposition of the petition for mandamus, and it might well, um -- it's entirely up to the Court of Appeals, it might well make sense to let the petition survive so that it may have the benefit of further proceedings in this court.

But I would ask the Court of Appeals to lift the stay so that the evidentiary portion of this first phase of this jury-waived trial might complete.

We are in the, um, second week of a two-week -- 9-day trial, and once that trial is over, or the evidentiary portion is over, it's appropriate for this Court to sketch what I anticipate will be the necessary further proceedings.

This is a case -- and I know the Court of Appeals appreciates this, but this is a case where intent and motive play a significant role, and once the evidence is fully before the Court, it's the Court's intention to take the matter under advisement. This is not a case

where even as to a portion of the case the Court expects that, because of the evidence, to be in a position to make any ruling from the bench, rather the Court expects to take the case under advisement, seek, um, requested findings and rulings from all parties, carefully review the record, and then issue a full written opinion.

The actual likelihood of that opinion emerging before September is unlikely. So the urgency to fully decide the, um, petition is, um, not grave. Given the fact that what's done is done, the plaintiffs have access to the material which the Court deemed appropriate to subject to cross-examination during the trial, and I adhere to that decision and expect to adhere to it, subject to a proper, um, a claim of privilege during the course of the remaining proceedings. And I'll speak to that in a moment.

And one can anticipate, of course, that as this is only the first phase of this case, if the case were to resolve in favor of the defendant public officials, then of course the plaintiffs would have the right to a plenary appeal. Contrary-wise, if the case were, at least on what I'll call the "liability phase," resolved against one or more, and I treat them separately, of the defendant public officials, um, that would afford an opinion -- that would afford a place for an

interlocutory appeal, should the Court of Appeals wish to evaluate the propriety of that decision while this Court wrestled with the very real problem, even if that's how it were to play out, of redressability, something this Court has not addressed in the -- its hearings thus far. So that's the Court's approach to the management of this case.

Let me then, without arguing the point, um, explain the Court's position with respect to matters to be considered on the petition for mandamus. And I think it's important to understand that the Court, and I believe the parties, place the documents in question, because at bottom, this is an issue over evidentiary rulings mid trial as to certain documents produced.

I separate the documents into three buckets. What I've called the "core documents," these documents are documents that evidence the transmission of materials about certain target subjects, which I've required the plaintiffs to designate, which they are arguing are exemplars of their so-called "ideological deportation policy." The Court of Appeals will understand that the defense asserts there is no such policy and that the proceedings of the government agencies were lawful in every relevant part.

So the core documents are the "ROAs," so-called,

and transmittal letters, um, e-mails commenting thereon, that were transmitted from the Department of Homeland Security to the Department of State, specifically to the Bureau of Consular Affairs, and certain of those, the transmittal letters that so transmitted them, and, um, thereafter the "decision memos," so-called by this Court, that the Director of the Bureau of Consular Affairs transmitted most, but not all, of the packet to the Secretary of State for decision, as required under the law.

The actual interplay is -- and the standard procedure is best illustrated in a chalk that the Court has marked HN, and will attach to the cover letter sent to the Court of Appeals, which, um, so far as this Court can see, accurately describes the standing procedure of both executive departments in handling matters. It of course does not answer the key question which concerns the content of the materials so transmitted. So those core materials are the materials that I understand the petition to center upon, and I'll come back to them.

There are two other packets of materials that I transmitted in bulk to the Court all together, but I've broken them out for this discussion. As to one document, which I'll call Exhibit A, the government has properly, and the Court recognizes the proper --

"proper" in the sense that I recognize that it's been properly asserted and not waived, the government has asserted an Executive Privilege. That's a, in this Court's eyes, a difficult issue and one the Court has not resolved and which the Court understands it is free to resolve as the case goes on. So it's appropriate to indicate to the Court of Appeals what I've told the parties about how it will be resolved.

It seems to this Court that there are three possible resolutions. First, that the Court resolves that the specific document in question is subject to an Executive Privilege. If it is, whenever the Court makes that determination, it physically forthwith will return the document to defense counsel and make a notation on the record.

The second possibility is that, without deciding whether the document is, um, subject to an Executive Privilege, the Court, as it comes to analyze the case -- I've read the document and I largely understand it, um, it makes no difference to the decision and the Court needs not cite it. If that is, um, decided, the Court will immediately return it to the defense counsel and again make a notation on the record.

The third possibility is that the Court, um, rejects, overrules the assertion of an Executive

Privilege and also decides that the document, which the Court has thus far characterized as "peripherally relevant," is in fact relevant to some conclusion the Court determines to make. In that case, if the -- if this present petition were, um, still pending, a dispute over this document might be beholden to that petition. And I've told counsel, if I make that decision, I will stay it for 7 days so that they may take action with respect to that document.

The third packet of documents are documents as to which I have now allowed privileges to be asserted, and they have been, but which will not figure in the, um, oral testimony as no further documents are going to be produced to the plaintiff -- the plaintiffs by the Court, but which all parties agree the Court may look at, determine privileges, as it goes forward, and I shall do so.

Again, if I decide to rely upon and cite a document, implicitly or explicitly, it will be clear that I have overruled the privilege. If I don't cite the document, it, um -- no ruling is necessary and those documents no longer figure in the case.

The written -- were a decision on the petition of mandamus -- for mandamus to await either appeal or allow an interlocutory appeal, again that could all be

reviewed in the ordinary course, and evidentiary error will be reviewed, and of course it is, as to whether it makes a substantial difference in the outcome. And I would have the liberty of, on a full record, to make the findings and rulings that, um, I believe either have or have not been proved by a fair preponderance of the evidence.

So let me conclude simply by focusing on the core documents and reiterate -- which do seem central to the issues raised by the petition for mandamus, and, um, respond directly to the Court's use of the word "waiver," which the invitation expressly sought the Court's further explanation.

The use of the word "waiver," upon reflection, was infelicitous, so, um, it caused no prejudice to anyone, because the Court followed it up with an explanation. Here is the Court's view of what has happened.

The -- during a discussion on the plaintiffs' motion to compel certain documents for, um, which the plaintiffs claim were part of the record of decision of its so-called "ideological deportation policy," the Court declined to, um -- the Court denied the plaintiffs' motion. But did say -- and again the transcript of what I actually said at the time governs, but I'll characterize it, said, "But I would receive

documents as to which the law-enforcement privilege was asserted and I would honor it."

Now again the transcript governs. What happened happened, was that ultimately over 300 documents were submitted to the Court where the defense asserted not only the law-enforcement privilege, but various privileges, and, um, took, with respect to -- when you look at these documents, a very aggressive, um, position. The Court's -- the Court's review of the documents became more, um, thorough as trial approached and as the acting trial became to the front burner and trial commenced, and the Court, as to these core documents, um, came to the conclusion that the law-enforcement privilege was inapplicable and was asserted extraordinarily overbroadly. The Court therefore was in a quandary.

Should, having overruled the -- that privilege, should the documents be disclosed to the defense? And the Court determined, to have the fairest possible trial, that such disclosure was in the interests of justice, and I did disclose it. Disclose them.

Various minor issues with respect to the -- I shouldn't call them "minor," but with respect to those -- to that disclosure have been worked out, I believe, to the satisfaction of the parties. The

Case: 26-6906, 11/20/2026, DktEntry: 16.6, (257 of 300)



documents in their raw form I anticipated and expected redaction of e-mails and telephone numbers. The defense wants more. The, um -- there was indeed one reference to something that, in all fairness, in fact bore on the law-enforcement privilege, despite the Court's ruling. That was corrected by full cooperation between all parties, and the proper redaction made.

I say the use of the word "waiver" was infelicitous because the Court did ask the defense to submit the documents with respect to which it claimed a law-enforcement privilege. The government now says that they were -- they don't say this expressly, but their position is they were snookered, and I got the documents just to disclose them. Well that's not so. I certainly never conceived that anything I said could be thought to estop the Court from making proper rulings with respect to the documents. And again, the transcript will govern. But it's the Court's position that proper rulings have been made.

One last point which, um, I state again simply to be of assistance to the Court of Appeals. Today the parties and the Court have had a very productive discussion, the full transcript is of course available to the Court of Appeals, and I recite only determinations that I believe I am still authorized to

make with respect to these core documents. And I have made the following.

Actually I've made the following with respect to the assertion of the attorney-client privilege. Having reviewed the documents and the arguments, I do rule that the attorney-client privilege has been waived. It simply is inapplicable in a situation where counsel has provided documents to the factfinder, um, on the theory that these documents are relative -- are relevant to the decision, as certainly the core documents are. That constitutes a waiver of the attorney-client privilege, and the Court, less there be any doubt about it, so rules.

In one respect the Court sustains the, um, claim of deliberative process privilege and I have sustained it as to, um, certain provision of legal advice by attorneys in certain e-mails that form a portion of the core documents. Beyond that sustaining, after discussion with counsel, I make no further rulings as to the deliberative process privilege, or any other privilege, as to the core documents. And, um, I won't say it's by agreement, but we've worked out that if permitted to continue the trial, I will make what the Court considers appropriate rulings on a question-by-question basis.

Essentially the issues relate to the Director of the Bureau of Consular Affairs, Mr. Armstrong, whose testimony had just commenced cross-examination when the stay, um, was transmitted, and a Mr. Watson, who wrote, um, the transmittal letters from the Department of Homeland Security to the State Department.

One other thing is significant and I will state it. I understand that whatever ruling the Court makes as to cross-examination in the course of the trial, the Court is empowered, without objection by the government, to review all the records in its possession, make proper privilege rulings, and rely upon those which it rules the privilege or qualified privilege does not apply.

With those explanations, which I truly hope are helpful, the Court will respectfully submit this transcript, just as soon as I get my hands on it, to the Court of Appeals, respectfully and with appreciation for being given the opportunity to comment on these proceedings.

All right. So much for reporting to the Court of Appeals.

Is there anything else we should discuss before tomorrow at 9:00?

MR. ABDO: No, your Honor.

THE COURT: The defense?

Case: 26-6906, 11/20/2026, DktEntry: 16.6, (260 of 300)



MR. KANELLIS: No, your Honor.

THE COURT: Thank you.

All right, 9:00 tomorrow morning. It's good to see you all.

We'll recess.

(Adjourned, 11:20 a.m.)

Case: 26-6906, 11/20/2026, DktEntry: 16.6, Page 261 of 300



C E R T I F I C A T E

I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do hereby certify that the forgoing transcript of the record is a true and accurate transcription of my stenographic notes, before Judge William G. Young, on Monday, July 14, 2025, to the best of my skill and ability.

/s/ Richard H. Romanow 07-14-25
________________________
RICHARD H. ROMANOW Date

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS (Boston)

No. 1:25-cv-10685-WGY
Volume 1, Page 1 to 82

AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
Plaintiffs

vs.

MARCO RUBIO, in his official capacity as
Secretary of State, et al,
Defendants

*********

For Bench Trial Before:
Judge William G. Young

United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
Tuesday, July 15, 2025

********

REPORTER: RICHARD H. ROMANOW, RPR
Official Court Reporter
United States District Court
One Courthouse Way, Room 5510, Boston, MA 02210
rhr3tubas@aol.com

A P P E A R A N C E S

RAMYA KRISHNAN, ESQ.
CAROLINE DeCELL, ESQ.
ALEXANDER ABDO, ESQ.
SCOTT B. WILKENS, ESQ.
ALEXANDRA CONLON, ESQ.
Knight First Amendment Institute at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
E-mail: Ramya.krishnan@knightcolumbia.org
and
COURTNEY GANS, ESQ.
NOAM BIALE, ESQ.
Sher Tremonte LLP
90 Broad Street, 23rd Floor
New York, NY 10004
(212) 540-0675
Email: Cgans@shertremonte.com
For Plaintiffs

ETHAN B. KANTER, ESQ.
WILLIAM KANELLIS, ESQ.
VICTORIA M. SANTORA, ESQ.
JESSICA STROKUS, ESQ.
DOJ-Civ
P.O. 878
Ben Franklin Station
Washington, DC 20044
(202) 616-9123
Email: Ethan.kanter@usdoj.gov
and
SHAWNA YEN, ESQ.
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, MA 02210
Email: Shawna.yen@usdoj.gov
For Defendants

# I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| WILLIAM CROGAN (By Zoom) | | | | |
| By Ms. Safavi (By Zoom) | 5 | | | |
| By Ms. Conlon | | 33 | | |
| PATRICK CUNNINGHAM | | | | |
| By Ms. Santora | 39 | | | |
| By Mr. Tremonte | | 63 | | |

## E X H I B I T S

(None marked.)

Case: 26-6906, 11/20/2026, DktEntry: 16.6, Page 265 of 300



P R O C E E D I N G S

(Begins, 9:00 a.m.)

THE COURT: Good morning. As I've allowed internet access to these proceedings, let me say if you are attending this session of the court via the internet, the rules of court remain in full force and effect, that means there is no taping, streaming, rebroadcast, screen shots, or other transcription of these materials.

It is very important that you keep your microphone muted. If you do not, I shall have to cut off your access.

I believe we're ready to go. The first witness is remote. And if the witness is available, let's swear the witness.

(WILLIAM CROGAN, sworn.)

THE CLERK: And can you please state your full name and spell your last name for the record.

THE WITNESS: My name is William Crogan. My last name is spelled C-R-O-G-A-N.

THE COURT: Thank you.

**************

WILLIAM CROGAN

**************

DIRECT EXAMINATION BY MS. SAFAVI: (By Zoom:)

Q. Good afternoon, Mr. Crogan.

(Interruption by Court Reporter.)

THE COURT: Just a moment. The Court Reporter needs you to state your name again. And I'm talking to the attorney, Ms. Safavi.

Would you state your name so the Court Reporter may make a complete record.

MS. SAFAVI: Sure. My name is Nancy Safavi.

THE COURT: And you are an attorney for the government?

MS. SAFAVI: Yes.

THE COURT: And now you may proceed.

MS. SAFAVI: Thank you.

Q. Mr. Crogan, good afternoon. I'd like to ask you some questions about your background and your employment with the U.S. government.

When did you first start working for the government?

A. I began my career with the government in 2004 when I was hired by Homeland Security Investigations.

Q. And why did you decide to enter into a career with the federal government?

A. I wanted to work in public service and work as a

criminal investigator.
Q. And what was your first job with the federal government?
A. As a Special Agent with HSI.
Q. And where were you located?
A. I was assigned to Philadelphia, Pennsylvania.
Q. And what were your day-to-day duties in that position?
A. I worked as a Special Agent and I was assigned to a narcotics investigation group where I investigated narcotics smuggling and other violations related to drug activity.
Q. And how long were you there?
A. I worked in Philadelphia for 12 years where I was also promoted to Supervisory Special Agent where I also investigated financial crimes as well as crimes against children.
Q. Okay. And then what was your next role?
A. I was transferred to headquarters for Homeland Security Investigations in Washington D.C. where I worked in multiple capacities including an Operations Chief for the Northern region of the United States. I worked as a liaison for the U.S. Department of Justice. And I also worked in our International Operations Division.

Q. And, um, how long were you there?
A. I was assigned to Washington D.C headquarters for approximately 4 years.
Q. And then, um, where did you go after that?
A. After my headquarters tour, I was assigned to Homeland Security Investigations in New England where I worked as an Assistant Special Agent in charge, which assigned me responsibility for HSI operations in the states of Vermont, New Hampshire, and Maine.
Q. Okay. And, um, how long were you there?
A. I was assigned in the ASAC role for approximately 5 years.
Q. Okay. And where did you go after that?
A. I recently reported to HSI International Operations and I'm working at the embassy in London in the United Kingdom.
Q. And what is your current title?
A. Attache.
Q. And what are your day-to-day duties as an HSI Attache?
A. I represent HSI's interests, as well as the Department of Homeland Security, here at the embassy with the Department of State, and I work as a liaison with members of the United Kingdom's law-enforcement community.

Q. Okay. So now I'd like to ask you about the training that you've received throughout, um, your service as an agent.
What was the first training that you received when you, um, entered on duty?
A. The first training I received upon duty was attending the Federal Law Enforcement Training Center, where HSI runs its academy, which is approximately 6 months long, and it introduces instruction on constitutional law, criminal justice matters, and instruction on HSI policies and procedures. The goal of the academy is to train future Special Agents to work in the capacity as criminal investigators.
Q. Okay. And after that, um, what other types of training have you received?
A. I've received different types of training throughout my career, and it's maybe prompted by an assignment to a particular investigative group. I've received training in advanced financial crimes and fraud, in asset forfeiture, I've received training in cyber crimes and investigations, as well as national security matters. I've also attended multiple trainings for management and leadership.
Q. So you have been trained in, um, basic law-enforcement techniques and HSI procedures and

protocols?
A. Yes.
Q. And is the training continuous?
A. The training is, um, periodically introduced per policy. So some policies by HSI require maintenance and proficiency on a regular basis to be displayed for the use of firearms. Or there's other regular trainings regarding other policies that occur throughout the career.
Q. So how often would you say that you received training?
A. Regularly.
Q. Okay. And, um, how long were the trainings usually?
A. A training can take many shapes and forms, sometimes it can take place over an hour, and it can be in a classroom environment or online. Or it can take place over a matter of weeks in a more intensive classroom instruction environment as well.
Q. And, um, throughout your 20 years of federal service and receiving, um, these various trainings on, um, protocols and procedures, has anything substantially, um, changed in terms of how to make an arrest?
MS. CONLON: Objection.

THE COURT: No, overruled. We'll let him answer.

A. HSI's practices in terms of affecting arrests have stayed relatively stable throughout my career. The fundamentals of what HSI does to maintain safety and accountability, in my experience, has been very consistent.

Q. Okay. And this would be the case as well as for the past 5 years?

A. Yes.

Q. And what about the past 6 months?

A. Yes.

Q. Okay. So now I'd like to turn to your role at HSI.

Currently as an Attache, um, are you a supervisor?

A. Yes.

Q. So how many individuals do you supervise?

A. I supervise approximately 12 to 14 employees that are based in the UK and, um, other parts of Western Europe.

Q. And when you say "employees," are they all Special Agents?

A. It's a mix of employees. It's mostly Special Agents as well as some locally-employed staff.

Q. Okay. And prior to this when you were an ASAC, did you supervise employees?

A. I did, yes, I supervised approximately 80 employees across the three-state region for which I was responsible for.
Q. Okay. And of those employees, were they all Special Agents?
A. No. The -- similar to by current position, it's a mix of different employees and positions. In the capacity as an ASAC, the majority of the employees were HSI Special Agents, but we also host Task Force Officers, which are police and law-enforcement officers hailing from different police organizations, as well as support staff, which includes Mission Support Specialists, clerical staff, and analysts as well.
Q. So in supervising the Special Agents, both as an ASAC and as an Attache, do all of the Special Agents receive the same training you have on law-enforcement techniques?
A. Yes.
Q. Okay. And you are aware of those, correct?
A. I am.
Q. Okay. And, um, what steps do you take to insure that those protocols and law-enforcement techniques are followed by your Special Agents?
A. It's my responsibility, as a leader and a manager, to review operational planning, to engage in regular

discussions with, um, agents and supervisors under my command as to their activities and what they're planning. So this takes shape in, again, different forms, in regular conversations, but it's also prompted by law enforcement actions that are planned, which require us to, um, make plans, organize, um, manpower to affect operations. So all of these things take place very regularly, almost on a daily basis.

Q. Okay. And in part of those operations you're describing, um, when you were an ASAC and currently as an Attache, um, do any of your Special Agents conduct Title VIII investigations?

A. Yes, as an ASAC, Title VIII investigations were part of our investigative workload.

THE COURT: What's a "Title VIII investigation"?

THE WITNESS: Your Honor, "Title VIII" is a reference, in our vernacular, to the INA. So any, um, either criminal or civil immigration violation.

THE COURT: Thank you.

Q. Okay. And so now I'd like to ask you, um, some specific questions about HSI's policies or protocols for making arrests.

Would you explain, for the Court's benefit, what "operational security" is?

A. Yes, "operational security" can be a broad

concept, but it's essentially the priority to protect the, um, the presence of an operation or an initiative from opponents, or a bad actor. So when HSI talks about "operational security," we talk about discretion, and we talk about, um, keeping or protecting government information. So the presence of an investigation may not be revealed unnecessarily or before the government wants to make an official act. That's what "operational security" means to me.

Q. Okay. And so Agent Crogan, you mentioned a "bad actor." Do -- in terms of operational security, do Special Agents factor into account, um, a subject's history of violence?

A. Yeah, as law-enforcement officers, when we're conducting an investigation, um, many times a, um, person of interest or the subject of an investigation may already have a criminal history that, um, details crimes of violence. We also investigate people that may have never been arrested or convicted of a crime, but are participating in violence. And whether or not the indication comes from a criminal record or comes from an observation or information we received, one of the factors we, um, prioritize and consider is any and all information we have about someone's indicators for violence, about things they do, or things they may have

said, or planned to do. We're very vigilant for that because then that informs how we would handle a potential interaction with said subject.

Q. So in terms of, um, how you would handle a specific subject, are there variations then based on the specific circumstances?

A. There are, there are many variables, and it can be influenced also by environmental factors. If someone were to be placed under arrest or planned to be placed under arrest, the location is also a critical factor. The number of other subjects or people around or maybe aligned with the person is a factor as well. And these are all things we consider. Because, um, it's a priority for myself and other HSI agents to conduct our business in a safe and accountable manner. No one wants to get hurt.

Q. You mentioned conducting an arrest in a safe and accountable manner.

So what would be the circumstances for an agent to use handcuffs during an arrest?

THE COURT: Well wait a minute.

A. These --

THE COURT: Wait a minute. I'm allowing all of this, but it seems somewhat theoretical, now you're asking subjunctive questions, "What would be the

circumstances?" Let's tie it to something, and then I'll allow you to expand it into these areas.

Go ahead.

MS. SAFAVI: Yes, your Honor.

Q. Agent Crogan, you familiar with Mr. Mahdawi?

A. Yes, I am.

Q. Were you -- did you play a role in his arrest?

A. I was present for Mr. Mahdawi's arrest and I was aware of the investigation of him and the planning for his arrest.

Q. In terms of planning for an arrest with Mr. Mahdawi, um, what factors would an agent consider for using handcuffs?

THE COURT: No, I have a problem with "would." What factors did or were considered? And of course I'll let you have that.

MS. SAFAVI: Okay, thank you, your Honor.

THE COURT: In this case. Do you want to ask it? Let's ask it.

In this case what factors were considered, sir, with respect to the use of handcuffs?

THE WITNESS: Yes, your Honor.

A. The factors that contributed to the use of handcuffs were our training and experience as agents, the policy and practice of HSI to restrain individuals

who were being arrested for violations of law, and the transportation, the movement of the subject from one location to another.

When we arrest somebody, we, um, put them under restraints, typically it's a set of handcuffs, and that subject is patted down. We check a subject to make sure they don't have any dangerous items on their person, that they could use to hurt themselves, or the officers, or a member of the public. And it's also our policy, when a subject who is under arrest is transported, they are restrained, during that transportation, to again protect subjects and the officers.

Q. Okay. What factors did you consider in, um -- actually withdrawn.

How many agents, including yourself, were a part of Mr. Mahdawi's arrest?

A. I don't recall the exact number, but I was certainly present. I would say approximately 10 to 15.

Q. Okay. What factors did you consider in determining the number of agents who would be involved in the arrest?

A. The -- the location of the arrest. And again, as I mentioned earlier, the environment that the arrest is anticipated to take place in is a major factor. And the location was a -- a public, um, building and a CIS

Case: 26-6906, 11/20/2026, DktEntry: 16.6, Page 278 of 300



office that, um, had a three-sided parking lot, and, um, it required, um, elements of surveillance, so we could observe the exterior of the building as well as an arrest team that would be located inside the building. So these are all factors that contribute to the approximate number of law enforcement officers that would be present for the -- for the operation.
Q. Is that a typical number for an arrest?
A. It's hard to say what's typical for an arrest, but for one subject and a, um, physical location of that type, in my experience that is consistent, um, that number.
Q. What factors, um, were considered, um, in terms of the agents deciding to wear masks during the arrest of Mr. Mahdawi?
A. The use of masks, um, is a decision that's made by the Special Agent or the officer at -- you know at the time of the planning of the arrest. And this is a more common practice, in my experience it's occurred in the past, that it's not necessarily a new thing in my experience. We've traditionally done this for undercover agents who may be acting or are acting in an undercover capacity and we don't want to betray their true employment as law-enforcement officers, but they also have to go out and help out and perform an arrest

and --

THE COURT: Who makes the decision here?

THE WITNESS: The individual employees, your Honor.

THE COURT: And how was that choice conveyed to them?

THE WITNESS: It was articulated to me, your Honor, by the individual employees because of a concern of their faces being put in the public eye and being victims potentially of doxxing or harassment, because these employees --

THE COURT: How many of them expressed that concern?

THE WITNESS: For this operation? I'd say two or three of the agents expressed that concern to me.

THE COURT: And at the time the operation went down, how many were masked?

THE WITNESS: Two were masked, your Honor, and a third agent, I recall, pulled a baseball cap low over his head and put a hood over his head.

THE COURT: Now you talked about the instance of this in the past and you gave, as an example, people you were using undercover.

When before this -- and I don't need specifics, we're focused on this case, but you were the ASAC there

for a while.

When before this, um, were masks used in an arrest? And we're not going into the subjects, I just want to know when was the last time before this?

THE WITNESS: I recall in, um, years past. So within the 5-year time period, your Honor, as working as an ASAC.

THE COURT: Thank you.

THE WITNESS: Yes, sir. I recall an undercover agent who was under my command.

THE COURT: But that's an undercover agent. Other than undercover agents, when before this?

THE WITNESS: I recall other instances in the more recent past where agents are out in the public eye conducting other operations and media was anticipated and they were masked there. These are multiple occasions since I was an ASAC.

THE COURT: All right. And am I correct in assuming that these were Title VIII investigations, Title VIII arrests?

THE WITNESS: Yes, your Honor, some of these were Title VIII, and some of these were also criminal investigations, like narcotics investigations.

THE COURT: And in narcotics investigations, um -- and again I'm not wanting any specifics, but in

narcotics investigations when you, um, mask-up, um, when was that done, um, other than in undercover situations, in the past 5 years, while you were an ASAC here in New England?

THE WITNESS: I only specifically remember the undercovers, your Honor.

THE COURT: Thank you.

All right, go ahead Ms. Safavi.

MS. SAFAVI: Thank you, your Honor.

Q. During the arrest of Mr. Mahdawi, did the Special Agents wear, um, plain clothes?

A. Yes, the Special Agents wore plain clothes, which is a common and frequent practice for an operation where the individual was going to be observed before the arrest was initiated.

We have some operations, um, for the Court I would explain it as a search warrant or arrest warrant execution of a residence with a warrant in hand, and the agents may not be in plain clothes, they may be donning their garments that are labeled with "Police." But very frequently, and in many different forms of investigations, we don't have the luxury of identifying the target or the subject positively right away, and we have to, um, surreptitiously or discreetly observe from a distance or in plain clothes. And --

THE COURT: I think I understand, and forgive me for the interruption, but you used the word "search warrant."

On those occasions where, um, HSI officers, which you supervise, Special Agents, are executing a search warrant, where does the search warrant come from?

THE WITNESS: A court of law, your Honor.

THE COURT: Yes. All right.

Now when you are, um -- well let's come to Mr. Mahdawi's situation.

When Mr. Mahdawi was taken into, um, custody, what was the authority for taking him into custody?

THE WITNESS: Your Honor, the authority was conducted with an I200 arrest form, which is a civil and administrative arrest form, that, um, was produced after a body of facts were reviewed by the ICE, the Office of Principal Legal Advisor, and --

THE COURT: Yeah, actually, thank you, that answer is very helpful to the Court. Let me, um -- really I just want to repeat it to you and see if I understand it, because I have not understood this.

Because this is a civil proceeding -- though obviously you have the right to detain, deprive someone of their liberty, there's a form, and it's an ICE 200 form?

THE WITNESS: Yes, your Honor.

THE COURT: And that form, um, goes to -- it is reviewed, you said, by an ICE legal officer?

THE WITNESS: Yes, your Honor.

THE COURT: Okay. Now, um -- and -- all right, that's helpful.

Go ahead, Ms. Safavi.

MS. SAFAVI: Okay, thank you, your Honor.

Q. In terms of Mr. Mahdawi's arrest, did the agents use a marked vehicle?

A. No, HSI does not typically have or use marked vehicles, and again akin to the same principle of plain-clothes operations, because criminal investigators are not a uniformed police service who respond to or react to calls for service, whereas it's implied that a law-enforcement officer needs to very clearly and overtly label and present as a law-enforcement officer. We are investigators, and by that nature much of what we do starts out in a discreet and again surreptitious manner. So the vehicles are much of the same.

We do, um, equip our vehicles with lights and sirens that comply with local codes of law, and those are used in enforcement situations when we need to, um, basically identify ourselves in the vehicle as law-enforcement officers.

Q. So in terms of when the Special Agents, um, make an arrest, when would they identify themselves as law enforcement?

THE COURT: Well again I'm having trouble, Ms. Safavi, with the "would." We're focusing on Mr. Mahdawi's arrest, properly, and if he knows, I'd like to know when did they?

MS. SAFAVI: Okay, so I'll rephrase.

Q. When did they identify themselves as law enforcement?

A. Immediately. I was present for, um, our encounter with Mr. Mahdawi at the conclusion of his interview with CIS and I identified myself as an HSI Special Agent, I presented, um, my credentials, and I was accompanied by three other Special Agents who presented their credentials, and this occurred in a small office inside of the CIS work space.

THE COURT: When you say you "presented your credentials," can you describe what that means? Is that an identification card? Do you have a badge? Both? Don't let me suggest. You tell me what you meant by that.

THE WITNESS: Yes, your Honor. When I refer to "credentials," I refer to my agency-issued ID card and badge that corresponds to my HSI identification number.

THE COURT: Are you able to tell me whether the other Special Agents present had the same identification that you just described you had, and produced it?

THE WITNESS: Um, I don't recall exactly, your Honor, but what I do recall is that it was clear that the other three agents were with me. And, um, because we were in plain clothes, um, sometimes agents wear belt badges, which is essentially a badge affixed to someone's waist.

THE COURT: And these folks who now, in this small office, how many of them, if any, were masked, and were you masked?

THE WITNESS: No, sir, I was not masked.

THE COURT: How about the agents?

THE WITNESS: I recall that, um, 2 of the 4 of us eventually placed masks on. I don't recall exactly when they donned their masks. But, um, they -- I'd presume they placed them on when they were -- between the time when they left the office and when they were outside in a public area where the HSI transport vehicle was waiting.

MS. CONLON: Objection, move to strike the last portion as speculation.

THE COURT: No, I'm going to let it stand.

And proceed, Ms. Safavi.

MS. SAFAVI: Thank you, your Honor.

Q. Mr. Crogan, um, was there -- I'm sorry, Agent Crogan, were there any, um, other things, um, that you, um, participated in in terms of Mr. Mahdawi's arrest?

THE COURT: I don't understand the question? Well evidently he does.

(Laughter.)

THE COURT: Well if you understand it, sir, go ahead and answer.

THE WITNESS: Yes, your Honor.

A. I understand it to be as my involvement was part of the planning and the supervision of the planning for Mr. Mahdawi's investigation, which came first, um, and eventually the arrest, when that was authorized.

Q. And when did you first learn of Mr. Mahdawi, when did he first come to your attention?

A. Um, approximately mid March of 2025.

Q. And, um, did you receive a communication informing you about this subject?

A. Yes, I did. My supervisor communicated to me that the State Department may be providing a finding against Mr. Mahdawi, and then eventually a finding was transmitted to me via e-mail, where I recall there was an attached document, um, produced by the U.S. Department of State, referencing Mr. Mahdawi.

Q. Was there any other communication involving Mr. Mahdawi that you received?

A. Yes, I also, um, engaged with the HSI New York office, um, on Mr. Mahdawi, and the HSI New York office provided information about Mr. Mahdawi's, um, alleged activities and engagement with, um, police and law enforcement in the past. And, um, yeah, I believe that's, you know, most of what I recall.

Q. And after receiving --

THE COURT: Wait a minute.

And how did the New York office communicate this data to you, sir?

THE WITNESS: The New York office provided information, your Honor, regarding, um, Mr. Mahdawi's interactions with the FBI of being --

THE COURT: My question was not for you to characterize it, but how did you get it? E-mail? Snail mail? Telephone call? That type of thing.

THE WITNESS: Yes, your Honor. I received it principally by e-mail and also phone calls.

THE COURT: Thank you.

Q. And after receiving the communications, what did you do next?

A. I ensured that agents at the HSI Vermont office were proceeding with their investigation and following

up with the information that came from New York.
Q. Was Mr. Mahdawi, um -- was there surveillance operations?
A. There were -- inside of that information package, if you will, there were addresses for Mr. Mahdawi in Vermont. I believe that's why we were contacted, because the government records had addressed this for Mr. Mahdawi in New York and in Vermont. And as a matter of routine investigative procedure, agents checked the addresses in Vermont, um, trying to determine if Mr. Mahdawi was present in the district.
Q. And, um, when did you -- what date did you make the arrest?
A. The arrest of Mr. Mahdawi occurred in mid April of 2025, I believe April 14th.
Q. And where did it occur?
A. It occurred at the CIS office in Colchester, Vermont.
Q. Okay. And, um, in terms of Mr. Mahdawi's arrest, um, as the supervisor, was the arrest consistent with HSI's procedures and policies?
A. Yes, it was.
THE COURT: Did I hear an objection? No. Very well.
Proceed.

MS. SAFAVI: Thank you, your Honor.
THE COURT: Go ahead, Ms. Safavi.
MS. SAFAVI: Thank you, your Honor.
Q. And, um, in your oversight of the arrest, um, was there anything inconsistent, um, that the agents did in terms of arresting Mr. Mahdawi?
A. Um, no, not that I recall.
Q. And, um, were you -- did anyone ever communicate to you or ever suggest that Mr. Mahdawi's arrest was because of his pro-Palestinian views?
MS. CONLON: Objection.
THE COURT: No, overruled.
A. No, I don't recall that either. No.
Q. Did anyone ever tell you or suggest that Mr. Mahdawi's arrest was, um, based on his criticisms of Israel?
A. No.
Q. Did anyone ever communicate to you or suggest that Mr. Mahdawi's arrest is based on his political views?
A. No.
MS. CONLON: Objection, asked and answered.
THE COURT: Overruled, and his answer, "No," may stand.
Q. And, um, in terms of, um, after the -- Mr. Mahdawi was arrested, in your role as, um, ASAC, are you

involved with any of the decisions regarding the detention of Mr. Mahdawi?
A. No, HSI relies on other elements of ICE and Homeland Security to maintain custody or detention of someone who's arrested for a civil immigration violation.
THE COURT: Well let me just follow that up because I'm not clear what you know.
So you make the arrest in the little CIS office there in Colchester, Vermont. You, um -- he's handcuffed. You take him out to a -- to an HSI vehicle. A couple agents put masks on because you go into the public area. And then what happens to your --
THE WITNESS: Yes, your Honor.
THE COURT: Wait a minute.
THE WITNESS: Yes, your Honor.
After Mr. Mahdawi is placed, escorted to a vehicle, the vehicle drives to the HSI office and --
THE COURT: Which is where?
THE WITNESS: Which is in South Burlington, Vermont.
THE COURT: Okay. All right.
THE WITNESS: I --
THE COURT: Do you -- all right, keep going.
THE WITNESS: Yes, your Honor.

Eventually I also travel to the South Burlington office, um, and Mr. Mahdawi is presented paperwork, um, to finish essentially what we term as "processing," his paperwork is processed, and he is then transferred to the custody of Enforcement and Removal Operations, commonly referred to as "ERO."

THE COURT: So as -- as HSI is organized here, um, evidently that -- that ends your part of it, and Enforcement and Removal Operations takes over, is that -- do I have it right?

THE WITNESS: Yes, your Honor.

THE COURT: And where did that -- to your knowledge, this is what you personally know. Where did that take place?

THE WITNESS: I did not, um, directly observe Mr. Mahdawi's transfer, um, from HSI to ERO, but it's my understanding it happened at the HSI office in South Burlington.

THE COURT: All right. So -- and do you know where he went from there?

THE WITNESS: Yes, your Honor.

THE COURT: Where?

THE WITNESS: Mr. Mahdawi, it's my understanding, was transported by ERO, from the South Burlington office, to the airport in Burlington, and they attempted

to fly out of the district.

THE COURT: Why?

THE WITNESS: I don't know. I don't have any involvement with custody location or determination.

THE COURT: I see. All right.

Go ahead, Ms. Safavi. Anything else for this witness?

MS. SAFAVI: Your Honor, at this time the defendants pass the witness.

THE COURT: Well I have a question. I don't know -- I'm going to ask it of the defense team generally.

The written records here, the, um, the ICE 200 form, the State Department authorizations, the e-mails from the New York office, have I got all of those? Can anyone answer that? Including Ms. Safavi.

MR. KANELLIS: Your Honor, I'll do my best.

I'm not sure about the latter, the e-mail from the New York office. I don't recall that information being even -- yeah, I don't recall that that information is --

THE COURT: Well he's so testified, and I heard him testify in the plural. So you're not speaking to that.

But the others?

MR. KANELLIS: I believe those are -- those are in

the administrative record. The bases for -- if you're asking what the bases --

THE COURT: Well the documents to which he referred.

MR. KANELLIS: I believe they are.

THE COURT: Thank you.

Ms. Conlon?

Or excuse me?

MR. TREMONTE: I wish I were as good as Ms. Conlon. This is Michael Tremonte, your Honor, for the plaintiffs.

THE COURT: Thank you, Mr. Tremonte, you did just right. I expected her to be standing there. I still can see that far.

(Laughter.)

THE COURT: Mr. Tremonte.

MR. TREMONTE: Thank you, your Honor.

So at least 2, if not 3 of the 4 depositions, we specifically requested the production of the documents that your Honor is focused on, in addition to other documents that these witnesses have mentioned in connection with their sworn testimony. Some of the -- a very small subset I believe we have, the rest we do not. And if it would help the Court, we would be pleased to prepare a list before the end of the day of the

Case: 26-6906, 11/20/2026, DktEntry: 16.6, Page 294 of 300



documents that we have requested but still have not received.

THE COURT: All right.

MR. TREMONTE: And to be clear, we requested them before testimony today and we did not receive them.

THE COURT: Well prepare such a list.

Very well. And it's your witness.

Who's going to -- yes, Ms. Conlon.

MS. CONLON: Yes. And, your Honor, I'll question from here since the witness is --

THE COURT: Of course you may.

MS. CONLON: Okay.

CROSS-EXAMINATION BY MS. CONLON.

Q. Good morning, Mr. Crogan.

A. Good morning.

Q. Okay. So going back for a moment.

You were just asked by the Court about, um, what happened to Mr. Mahdawi after you tendered him to ERO and indicated that he was going to be flown out of the district.

He was going to be flown, so far as you know, to Louisiana, right?

MS. SAFAVI: Objection.

THE COURT: No, overruled.

A. Yes, I recall one of the documents I was shown yesterday, that there was an address in Louisiana on custody-type paperwork for Mr. Mahdawi.

Q. Okay. Now going back to your learning about Mr. Mahdawi.

When you learned of Mr. Mahdawi, you were told to prioritize his investigation, right?

A. Yes, I think that's fair to say.

Q. You were told that by people senior to you in HSI, correct?

A. That was my understanding from my supervisor.

Q. Right, the supervising agent or the Special Agent in charge, is that right, that's who supervised you at the time?

A. Yes.

Q. And you had multiple follow-up conversations about the status of that investigation with your Special Agent in charge, right?

A. Yes.

Q. And it was your understanding that the order to prioritize Mr. Mahdawi came from above the Special Agent in charge, from someone senior to him, correct?

A. That's the impression I was working under, yes.

Q. Okay. Now the decision to arrest Mr. Mahdawi at his citizenship interview was made in coordination with

HSI New York, right?

MS. SAFAVI: Objection.

THE COURT: Overruled.

A. I recall that the HSI New York office made us aware, they shared information about Mr. Mahdawi's appointment they learned from their communications with CIS.

Q. In other words, HSI New York had looked for him, had not found him, and then let you know that he was going to have an interview at a CIS office in Vermont, correct?

MS. SAFAVI: Objection.

THE COURT: Well I do -- that assumes a lot.

Is that what the New York office told you?

THE WITNESS: No, your Honor. Um, what I characterize it as the HSI office in New York, and HSI collectively in the New England area, shared information about Mr. Mahdawi as routine practices, and they made me aware of his possible presence at this appointment in Vermont with CIS. I -- I haven't observed myself, but it's my understanding that, like surveillance and address checks that we performed in the District of Vermont, I also understand it that HSI New York also did address checks for Mr. Mahdawi in their AOR as well.

THE COURT: Thank you.

Go ahead, Ms. Conlon.
Q. So you said you learned about his possible presence at the CIS interview. You say "possible presence" because that was a voluntary decision for Mr. Mahdawi, correct?
A. I don't know what the decision was for Mr. Mahdawi. I don't know what he decided.
Q. It's your understanding that he was invited to attend an interview at the CIS building in Vermont, right, for his citizenship?
A. I know he had an appointment with CIS that had to do with his immigration process.
Q. He wasn't brought there in handcuffs, right?
MS. SAFAVI: Objection.
THE COURT: Well I really don't know where this is going, it's undisputed that he went there for a naturalization interview or as part of the potential naturalization process. Now I guess that I get that from, um, the newspapers, but that's what I understand. And that was the -- so he came there voluntarily. Unless that's disputed, and I don't think anyone does dispute it, I accept it and as a basis for going forward.
MS. CONLON: Okay, then I can move on from that.
Q. Now Mr. Mahdawi entered the CIS building through

the metal detector and security procedures they have in the lobby of that building, right?
A. Yes.
Q. In other words, he was processed like any person would be in that building to make sure that he had no weapons on his person?
A. Yes.
Q. And Mr. Mahdawi was there with his lawyer, right?
A. Yes.
Q. Now after Mr. Mahdawi had gone through security, he and his lawyer were alone in a room with a CIS officer doing the interview, right?
A. Yes.
Q. There were no special security precautions taken about Mr. Mahdawi being alone in this room with the CIS agent, right?
A. No, it's my understanding that it was a routine entry into the states, like you mentioned, anyone else, and he proceeded with his scheduled interviewer meeting.
Q. And in fact you waited to arrest him until he had done his entire interview to become a citizen, right?
A. Yes. We also learned that it was -- he was positively identified by the CIS employee, um, as a matter of the interview. When they proceed with the the interview, the CIS employee checks the identity of the

Case: 26-6906, 11/20/2026, DktEntry: 16.6, Page 299 of 300



subject who appears. So we also knew that by waiting.
Q. Now to be clear, this arrest was not a criminal violation arrest, right?
A. No, this arrest was based on the A4(c) citation that came from the Department of State.
Q. And speaking of that determination, in your 20 years of law enforcement, you have never seen a determination under 4(c) of the INA before, isn't that right?
A. Yes, I believe so. Yes.
Q. You have never seen a memo like the one you received about Mr. Mahdawi from the Secretary of State's Office before, have you?
A. No.
Q. You have never seen a removal from the United States based on similar facts to those alleged about Mr. Mahdawi, correct?
A. I -- I don't recall others.
Q. Thank you.
MS. CONLON: Nothing further.
THE COURT: Nothing further, Ms. Safavi?
MS. SAFAVI: Um, no, your Honor.
THE COURT: Very well.
Thank you, Mr. Crogan. And you are excused.
And the government may call its next witness.

Yes?

MS. SANTORA: Your Honor, the defendants call Special Agent Patrick Cunningham.

THE COURT: He may be called.

(Witness takes the stand.)

(PATRICK CUNNINGHAM, sworn.)

THE CLERK: Can you please state your full name and spell your last name.

THE WITNESS: My name is Patrick Cunningham, my last name is C-U-N-N-I-N-G-H-A-M.

THE CLERK: Thank you.

THE COURT: Ms. Santora, you may proceed.

******************

PATRICK CUNNINGHAM

******************

DIRECT EXAMINATION BY MS. SANTORA:

Q. Good morning, Special Agent Cunningham. Thank you for being here today.

A. Good morning.

Q. Where do you currently work?

A. I'm currently an Assistant Special Agent in charge with HSI Homeland Security investigations here in Boston.