**No. 26-6906**

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

**STANFORD PUBLISHING CORPORATION, *et al.*,**

*Plaintiffs-Appellees,*

**v.**

**MARCO RUBIO, *et al.*,**

*Defendants-Appellants.*

**Appeal from a Judgment Issued by the U.S. District Court for the Northern District of California (Civil Action No. 5:25-cv-06618-NW)**

# DEFENDANTS-APPELLANTS' EXCERPTS OF RECORD VOLUME 7 of 15

**JONATHAN D. GUYNN**
**Acting Assistant Attorney General**
**Civil Division**

**DREW C. ENSIGN**
**Deputy Assistant Attorney General**

**AUGUST E. FLENTJE**
**Special Counsel for Immigration Litigation**

**SAMUEL P. GO**
**Assistant Director**

**JAMES A. HURLEY**
**Trial Attorney**
**Office of Immigration Litigation**
**U.S. Department of Justice Civil Division**
**P.O. Box 878, Ben Franklin Station**
**Washington, D.C. 20044**
**T: (202) 305-1889**
**F: (202) 305-2509**
**james.hurley@usdoj.gov**

**JAIME DURR**
**DOMINIC WEISS**
**Trial Attorneys**

**Attorneys for Respondent**

**Date: November 20, 2026**

opinion; is that right?
A. Yes.
Q. And what was the basis for your opinion?
A. It was both the fact of the detention and deportation attempt of Mahmoud Khalil as well as what I was reading in the media.
Q. In the media on the Internet?
A. We get the New York Times in its physical form but, yes, in the media.
11:15 Q. Okay. You read the New York Times, and then you saw reports on the Internet. Fair statement?
A. Yes.
Q. Did you read the executive orders issued by the President in January of this year?
A. I did, yeah.
Q. And is that also the basis for your belief that there's an ideological deportation policy?
A. I would say yes as I sit here now, but I would need to go through and look at the executive orders again to be point to
11:16 specific things.
Q. Okay. But you're not aware of any specific language sitting here in the executive orders that would indicate that there was an ideological deportation policy, correct?
A. Not without looking at them again.
Q. Right. The executive orders that were issued to your

recollection don't even contain the word "Palestine," do they?
A. I think that there were a record number of executive orders issued in the last many months, so I couldn't answer that question with any degree of certainty.
Q. Okay. You indicated, I believe, there were two virtual conferences that were held this year by AAUP, correct?
A. That's right.
Q. And you were the person who organized those conferences, right?
11:16 A. Correct.
Q. And I believe those conferences were held over Zoom, correct?
A. Yes.
Q. And you again did not physically attend, you were not physically present in a room with a bunch of other members. Is that a fair statement?
A. We had members from all over the country, and it was done in a digital space.
Q. In a digital space. So you were sitting alone in an
11:17 office, and then other members who attended were also at various different locations, correct?
A. Yes.
Q. You did not have the opportunity to talk to individuals who attended that conference outside of that space that you had created on Zoom. Fair statement?

A. I spoke to some of them both before and after the conference in individual capacities.
Q. Okay. With respect to the Zoom, I want to make sure I understand how the Zoom meeting was set up.
When the Zoom meeting was set up, was there an identifier associated with the different attendees so that you could identify who they were?
MR. WANG: Objection, objection.
THE COURT: No. Overruled.
11:17 A. Sometimes people included their actual names. Sometimes they used, you know, a fake -- you know, just like words that didn't make sense so they couldn't fully be identified. And oftentimes many people had called in so you could only see their phone number.
Q. Okay. And to be clear, under the names, it didn't list the citizenship of the people who attended, correct?
A. No.
Q. You couldn't tell from just observing the Zoom meeting whether somebody was a U.S. citizen or a citizen of another
11:18 country, could you?
A. I could not.
Q. And then when people spoke at this meeting, people didn't announce, "I'm a member" or "I'm a citizen of this country," before they spoke, right?
A. Actually, people often did when they answered the

question. So they would say, you know, "I'm here on a J visa, this is what's happening," and then they would sort of frame their question in that way, which I at the time felt very worried about because I was worried that stating their nonimmigrant status, if the Zoom were being observed, could make it easier to identify who that person was by a government entity. And I remember thinking, gosh, I really wish they wouldn't do that, but people did.

Q. To be clear, did you think these meetings were being observed?

11:19

A. I thought that that was a possibility.

Q. Possibility. These were private meetings, right?

A. They were private meetings, but we also had a private meeting that was put up on Zoom, so the privacy of our meetings were, you know, not foolproof. A full membership meeting was leaked onto Zoom by someone who was not a member. So I had to consider the possibility that even though we stated that these were private meetings, we intended them for them to be private meetings, that there could be observers, either vigilante observers or government observers who could leak the identity of people who stated that they were noncitizens or who attended the meetings to ICE.

11:20

Q. And with respect to these, what you're saying is third parties could have accessed these meetings. Fair statement?

A. They could have, and they certainly did in at least one

instance that I became aware of.
Q. Okay. And with respect to -- so with respect to the individuals who attended, you didn't know if they were members of AAUP or they were not members of AAUP, isn't that right?
A. The emails went out to only our members. So we assume that the large number of people -- largest -- you know, that the people who signed up to the Zoom were members. But as with any digital meeting, it is possible that it could have been accessed by other people.
11:21 THE COURT: Do you remember how many, can you estimate, were at the first town hall?
THE WITNESS: So I remember that the first town hall that we had 700 people sign up and about half of those people attended.
THE COURT: And the second.
THE WITNESS: Around the same. I think less people signed up, but more people attended. I can get the exact numbers for you from our staff if that's useful.
BY MR. KANELLIS:
11:21 Q. So the attendance at these events increased from the first to the second, right?
A. Yes.
Q. And you don't know who was at the events because, as you indicated, third parties could have accessed these events, correct?

A. They could have done so surreptitiously, but our staff does know who signed up for the events.
Q. Well, I'm asking about whether you know that anybody outside of the organization, AAUP, attended the event. That's quite possible --
A. I considered that it was a possibility, yes.
Q. So you don't know whether these were members who attended or they were people outside of the organization who attended?
MR. WANG: Objection. Asked and answered.
11:22 THE COURT: It has been. Let's move on.
Q. You know it's possible that the people who attended the meeting were completely unassociated with AAUP, isn't that right?
MR. WANG: Your Honor, same objection.
THE COURT: Sustained as to what's possible.
A. I'm sure that's --
THE COURT: No. That's sustained.
THE WITNESS: Sustained, okay. Sorry.
Q. And you did not, after the meeting you did not speak to
11:22 members to confirm that they were members -- or sorry.
You did not speak to the attendees to confirm whether or not they were members who attended?
A. I did not follow up with each attendee, no.
Q. And you indicated that certain members had kept their screens black, right, or attendees had kept their screens

black, right?
A. Correct.
Q. But you don't know the reason why they kept their screens black, do you?
A. I can only guess.
Q. You can only assume, right? They could have just not wanted -- they may have had a bad hair day and that may the reason they didn't want appear --
THE COURT: I think we understand. Using the word guess and the like, she drew inferences, this court can draw inferences, and having a bad hair day may be one of them. Go ahead.
Q. You have no -- you did not confirm with members after the meeting why they kept their screens black, isn't that right?
A. Sir, I would say that based on my experience in other AAUP meetings that are open to our members that most people keep their screens on and their names clear, and they state who they are before they speak. And it is very common to have meetings in which people are fully present and want their presence to be known. This was a very different kind of meeting.
Q. It's because some people had their screens blackened?
A. And -- yes.
MR. KANELLIS: No more questions, Your Honor.
THE COURT: Nothing further.
MR. WANG: Nothing further.

THE COURT: Thank you. You may step down.
THE WITNESS: Thank you, sir.
THE COURT: But for denominating -- let me stick to the plaintiffs here. But for denominating part of the record that you want culled out as to individual exhibits, plaintiffs rest?
MS. CONLON: Sorry. But for -- there's two pieces, just so I'm really clear. The first is there are several documents we just used with Mr. Armstrong that we want to
11:24 assign exhibit numbers to, and we have a proposed list that we could hand to the court if the court wants to read them into the record.
And then the second component -- sorry, I see your outstretched hand. My colleague can -- okay. This is just proposed exhibit numbers for the action memos that have been provided to us and then a related piece for us. We want to submit -- the court noted that we could submit designations from Mr. Armstrong's deposition in particular relating to some of the executive privilege stuff that came up in his
11:25 examination pursuant to Federal Rule 32(a)(iii).
THE COURT: Are you ready to recite it?
MS. CONLON: The rule?
THE COURT: Not the rule but the portions of the exhibit.
MS. CONLON: The portions of his deposition, you mean?

THE COURT: The deposition.

MS. CONLON: I am not going to recite it; nor am I ready to pass it to the court --

THE COURT: Right. You can do that on Monday.

MS. CONLON: Relatedly, Your Honor, there are other government officer depositions that we have provided designations of to the government in the event that they have counter-designations that I understand they have not had the opportunity to yet counter-designate but that we would like to submit to the court for consideration on Monday.

THE COURT: All right. Wait a minute. Wait a minute. All right, Monday. And we'll meet at 9:00, not at 10:00 to --

MS. CONLON: Okay.

THE COURT: Because it's so important to settle the record. What's in the record I'll look at. What's not in the record I'm simply not going to look at.

What I was fishing for is to hear both sides say they rest. The plaintiffs don't. But now I'll do what I said I would do.

The action memo that covers Khalil and Chung is admitted in evidence, Exhibit 247. The action memo related to Mahdawi is admitted in evidence, Exhibit 248. The action memo related to Suri is admitted in evidence as Exhibit 249. And the action memo related to Ms. Ozturk is admitted into evidence as Exhibit 250.

(Exhibits 247, 248, 249, 250 admitted into evidence.)

THE COURT: Now, the defense doesn't have to formally rest until the plaintiffs have rested, but you have more evidence you wish to produce?

MR. KANELLIS: Your Honor, yes, we do.

THE COURT: What's that?

MR. KANELLIS: We have an unavailable witness under Rule 804 that is outside this court's jurisdiction, and pursuant to 804(a) and 804(b), we would like to designate his testimony and read part of his testimony into the record because we do have some extra time.

THE COURT: You have extra time on the timing. But one, again, I have somewhere to go, frankly. I propose the following: that we meet at 9:00, we work through theirs, we work through yours, but I don't see any need to read it in open court because I can read.

MR. KANELLIS: Your Honor, I appreciate that you can read. We believe these are -- we're not going to read the entire thing, just a short excerpt that I think bears emphasis that we would like to highlight.

THE COURT: That's a candid statement. I read fast. So we'll see where we go on Monday.

Thank you. So we're clear then, once we've done that and both sides formally rest, I'm in a position for oral argument. The more I think about it, I want to revise it in

this wise, and I give you warning now. Plaintiffs will argue first, then the defense will argue, because there's questions I have to -- as I've indicated, and as I sit here I think I stand right with it, the matter is sufficiently complex that I'm pretty clearly going to take everything under advisement and wait for proposed findings and rulings. But it will just make more sense, thinking about it, if I pose my questions first to the plaintiffs, who have the burdens of proof, and then as to those questions and given the tenor of their argument, I think 11:29 it would make more sense in posing my questions to the defense counsel for the government officials. And we'll do that on Monday.

I do have somewhere to go. It's a very nice day out.

MS. KRISHNAN: Your Honor, I don't want to detain you any further. I just want to clarify how much time we have left.

THE COURT: You have 40 minutes. They have 45. We'll stand in recess until 9:00 a.m. Monday morning, but I assume we can get through the talky-talk pretty fast. We won't start the 11:30 arguments until 10:00 to give you a sense to pull yourselves together for the arguments. We'll recess.

(Adjourned, 11:30 a.m.)

CERTIFICATE OF OFFICIAL REPORTER

I, Kelly Mortellite, Registered Professional Reporter, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing transcript is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter to the best of my skill and ability.

Dated this 18th day of July, 2025.

/s/ Kelly Mortellite

________________________________

Kelly Mortellite, RPR, RMR, CRR

Official Court Reporter

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS (Boston)
No. 1:25-cv-10685-WGY

AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
Plaintiffs

vs.

MARCO RUBIO, in his official capacity as Secretary of State, et al,
Defendants

*********

For Bench Trial Before:
Judge William G. Young

United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
Monday, July 21, 2025

********

REPORTER: RICHARD H. ROMANOW, RPR
Official Court Reporter
United States District Court
One Courthouse Way, Room 5510, Boston, MA 02210
rhr3tubas@aol.com

A P P E A R A N C E S

RAMYA KRISHNAN, ESQ.
CAROLINE DeCELL, ESQ.
ALEXANDER ABDO, ESQ.
SCOTT B. WILKENS, ESQ.
ALEXANDRA CONLON, ESQ.
Knight First Amendment Institute at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
E-mail: Ramya.krishnan@knightcolumbia.org
and
COURTNEY GANS, ESQ.
NOAM BIALE, ESQ.
Sher Tremonte LLP
90 Broad Street, 23rd Floor
New York, NY 10004
(212) 540-0675
Email: Cgans@shertremonte.com
For Plaintiffs

ETHAN B. KANTER, ESQ.
WILLIAM KANELLIS, ESQ.
VICTORIA M. SANTORA, ESQ.
JESSICA STROKUS, ESQ.
DOJ-Civ
P.O. 878
Ben Franklin Station
Washington, DC 20044
(202) 616-9123
Email: Ethan.kanter@usdoj.gov
and
SHAWNA YEN, ESQ.
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, MA 02210
Email: Shawna.yen@usdoj.gov
For Defendants

I N D E X

PRELIMINARY MATTERS.................................. 4
CLOSING ARGUMENT BY MS. KRISHNAN/MS. CONLON........ 12
CLOSING ARGUMENT BY MR KANELLIS/MR. KANTER......... 36

E X H I B I T S

(None marked.)

Case: 26-6906, 11/20/2026, DktEntry: 16.8, Page 17 of 300



P R O C E E D I N G S

(Begins, 9:00 a.m.)

THE COURT: Good morning. Because we have -- I have authorized internet access to these proceedings, it's appropriate for me to say that if you are accessing these proceedings via the internet, the rules of court remain in full force and effect, that means there is no taping, streaming, rebroadcast, screen shots, or other transcription of these proceedings.

Also, it is especially important that you keep your microphone muted at all times. If you do not mute your microphone, we will necessarily have to cut you off right away.

All right. I will start with the plaintiffs. I've been given, um, 6, I think the Clerk said, and I do have 6 binders that have, um, deposition designations, um, in them, um, and --

Yes?

MR. ABDO: Yes, your Honor. Alex Abdo for the plaintiffs.

THE COURT: Yes, Mr. Abdo.

MR. ABDO: If I could just briefly lay out what happened?

THE COURT: I think so. That would be helpful.

MR. ABDO: Sure. The 6 binders are the

government's designations of the deposition of one witness. Our counterdesignations in a separate binder, so that's two of the binders. And the other 4 are our designations -- um, targeted designations with respect to 4 of the other witnesses. And we believe that those designations should come in under Rule 32 (a)(3), and are happy to explain why. But that's what you have before you.

THE COURT: Thank you. Let me go step by step.

So as to 2 -- and I take it, um, Brian, um --

MR. ABDO: Shuve, your Honor.

THE COURT: Which are the 2? So we're clear on that.

MR. ABDO: So the 2 that involve the government's designation and our counterdesignations are Mr. Shuve's deposition transcript.

THE COURT: All right, so I'll just start there.

And, Mr. Kanellis, I will read the designations and counterdesignations. I will make notations so that, for possible review, it's very clear what I've sustained. If there are objections -- if there are no objections, I will read the designations or counterdesignations. And other than that, as to Mr. Shuve, I may consider this deposition.

MR. KANELLIS: Yes, your Honor, pursuant to Rule

804(a), and that is because the witness is unavailable, and 804(b) because it is under 804(b) --

THE COURT: Well I'll get to specifics when there's objections. I hear no objection. So you can be sure that I will read the designations, the counterdesignations, and rule on any objections.

MR. KANELLIS: Your Honor, and I apologize, we would ask -- because we do have additional time and because we are about to go into closing arguments --

THE COURT: Right.

MR. KANELLIS: There are select excerpts that we think are important to highlight for the Court as far as our affirmative case.

THE COURT: Understood, but denied. I can read. However, if you want to make mention of them in closing, I'll leave this on the bench so I may look at it.

Now back to Mr. Abdo.

So is there a second witness in the same situation?

MR. ABDO: No, your Honor, that's the only witness we --

THE COURT: All right. So now we have -- I have four other, um, binders.

And you offer them?

MR. ABDO: Yes, your Honor.

Case: 26-6906, 11/20/2026, DktEntry: 10.8, Page 20 of 300



THE COURT: Do you object to these?

MR. KANELLIS: Oh, absolutely, your Honor.

THE COURT: Well absolutely. So now I have to think about ruling.

MR. KANELLIS: Sure.

THE COURT: And, Mr. Abdo, I'll hear you.

Why -- on what basis -- well let me be clear. Are there -- there are designations in here.

So on what basis ought I consider the designations in these as part of the record in this case?

MR. ABDO: Yes, your Honor. We think they should come in under Rule 32(a)(3). That rule allows an adverse party to use, for any purpose, the deposition of a party or anyone who, when deposed, was the party's officer, director, managing agent, or designee under Rule 30(b)(6). We think these individuals, all of four of them, qualify as officers or managing agents of the defendant agencies which we have sued in this case.

THE COURT: Okay, just a moment. I clearly know who Mr. Watson is, and he testified, and I know who Mr. Armstrong is. I have Mr. Veprek and, um, a person by the name of Stuart Wilson.

And, Mr. Kanellis, what is the objection?

MR. KANELLIS: The objection, your Honor, is that the -- your Honor has given us guidelines about

witnesses, your Honor has said that it expects to hear parties to identify witnesses in advance of trial. Mr. Veprek and Mr. Stuart Wilson -- the second individual, Mr. Wilson, the plaintiffs did not call them as witnesses, their statements do not qualify under Rule 804 for admission, because they were. They did not, um -- they were available to be subpoenaed, they were able to testify. They are trying to circumvent your Honor's rules about time by adding in ex-post testimony from witnesses out of context.

THE COURT: What about Andre Wilson and John Armstrong?

MR. KANELLIS: Mr. Armstrong and Mr. Watson, your Honor, we don't have an issue with respect to those designations, those witnesses testified, and we think your Honor can fairly balance, um --

THE COURT: Well so now --

MR. ABDO: Your Honor --

THE COURT: Again, so I'm clear, I heard you briefly there -- so we're clear, the record will include the designations as to Andre Watson and John Armstrong. And now I'll let you respond to what Mr. Kanellis said about these other two.

MR. ABDO: Yes, absolutely.

Mr. Kanellis is relying on the notion of witnesses

being unavailable. That proposition is --

THE COURT: He isn't, he's saying you never designated these as witnesses.

MR. ABDO: They don't need to be designated, respectfully, your Honor, under Rule 32(a)(3) to come in as deposition transcripts because they are the depositions of adverse parties -- of the officers or managing agents of an adverse party. And the rule is very clear that unavailability or the presence of a witness at trial is not a precondition to designation under that rule.

I can direct the Court's attention to --

THE COURT: No, no, no, that's okay.

So who is Veprek?

MR. ABDO: Your Honor, if you just give me one moment.

(Talks to counsel.)

MR. ABDO: A Special Assistant to the Counselor, your Honor. These are both senior officials.

THE COURT: Special Assistant to the Counselor. Of who?

MR. ABDO: Of the counsel who reports to Secretary Rubio, your Honor. Of Michael Needham, who is the counsel who reports to the Secretary.

THE COURT: All right.

And who is Stuart Wilson?

MR. ABDO: Your Honor, if I can turn it over to Ms. Conlon, who is more familiar with this.

THE COURT: Who are these people?

MS. CONLON: Good morning, your Honor. Stuart Wilson reports directly to John Armstrong, he is the person directly below John Armstrong. So he oversees not only the Visa Office, but other aspects of the Bureau of Consular Affairs. He is the person who, if you were to look at Mr. Armstrong's deposition, Mr. Armstrong repeatedly suggests would know a lot of the details about this program that Mr. Armstrong couldn't recall.

THE COURT: All right, I'll take the matter under advisement, um, as to these.

And I take it, having worked through yours, the plaintiffs now rest?

MS. CONLON: Yes, your Honor.

THE COURT: And the defendant public officials now rest?

MR. KANELLIS: Your Honor, there was one -- we do except for -- there was one outstanding issue, very early, the first day of trial, about the admissibility of an exhibit that your Honor has not ruled on. Subsequent to that first hearing, the plaintiffs

Case: 26-6906, 11/20/2026, DktEntry: 16.8, Page 24 of 300



indicated that there was a just a miscommunication about what document it was and they assented to its admissibility.

THE COURT: And the number is, or the designation is?

MR. KANELLIS: I will, um -- your Honor, if you'll allow me, I will identify that document.

THE COURT: That's fine. And assuming there's no disagreement, we'll, um -- I will of course receive it in the record.

Now I have said we'll take a deep breath now and get ready for final argument. I acknowledge the filing of two additional briefs, which I have had the opportunity to read and I thank counsel for them. I'm prepared now to recess until 10:00, unless you want to start before that.

What's the plaintiffs' pleasure?

MS. KRISHNAN: We're fine to start at 10:00 a.m.

THE COURT: At 10:00. Very well.

We'll stand in recess until 10:00 a.m. We'll recess.

THE CLERK: All rise.

(Recess, 9:15 a.m.)

(Resumed, 10:00 a.m.)

THE COURT: All right. The plaintiffs will argue

first and then I'll hear the defendants.

CLOSING ARGUMENT BY MS. CONLON/MS. KRISHNAN:

THE COURT: Ms. Conlon, let me start with a question.

What -- you've assumed throughout -- I don't quarrel with it, you've talked to your witnesses as though this ideological deportation policy was just self-evident and it existed. Tell me what it is and where the evidence of it is?

MS. CONLON: Yes, your Honor, in fact what I hoped to do is to, in 10 minutes, summarize for you what we put into evidence that showed what it is and that it exists, and our intention is that Ms. Krishnan will then explain why that policy violates the First Amendment. But in short, the policy is one of revoking the Visas and green cards of noncitizen students and faculty based on their pro-Palestinian advocacy.

THE COURT: Why? In other words, what's the goal of that policy?

MS. CONLON: Oh, I think that the goal is quite clear from the -- both from what you heard from the witnesses, the documents in evidence, and the statements of public officials. The goal is to chill speech, the goal is to silence students and scholars who wish to

express their pro-Palestinian views. It is stifling dissent, your Honor, that's the goal.

Now the government says that the policy that we've challenged is a figment of our imagination, that it doesn't exist. But outside of this courtroom, the government speaks about it quite freely and demands credit for it.

And, your Honor, over the past two weeks the government officials that you've heard from have acknowledged the policy even if they won't use that word. They've told you that there's a new process, a new program, a new guidance, new lines of effort --

THE COURT: Well there are existing processes which have been put to new uses perhaps, um --

MS. CONLON: Well, your Honor, in particular Mr. Hatch and Mr. Watson didn't say it was an existing process, I mean Mr. Hatch and Mr. Watson literally --

(Interruption, cell phone ringing.)

THE COURT: You'll have to excuse me. Go ahead.

MS. CONLON: Mr. Watson and Mr. Hatch used the word "new," they did that over and over, they just didn't call it a "policy." And if you look back both at the deposition designations we've submitted and the trial transcripts, I'm confident you'll see that, that they said that this was a new process set up to manage

this influx of referrals that needed to be dealt with quickly.

THE COURT: Well, yes, an influx of referrals, but, um -- and they dealt with that. I guess I -- you seem to be trying to cram this into some sort of Administrative Procedure Act context.

Suppose this Court is unpersuaded of that, does the case fail?

MS. CONLON: No, your Honor.

THE COURT: Why not?

MS. CONLON: Well, your Honor, the policy -- whether you call it a "policy" or something else, the fact is that the government is systematically violating the First Amendment by revoking the Visas and green cards of people based on their speech. So whether you call it a "practice," a "pattern," a "policy," what they are doing is unconstitutional, and what they're doing is having the effect of chilling the speech of the plaintiffs, which is the basis for our claim.

You know, your Honor, I hear you about the sort of cramming it into an Administrative Procedure Act claim. The reason we have spent so much time introducing evidence about the process is because our view is that the creation of the new process, and the manner in which it was executed, proves what the point of the whole

thing was, the fact that this process was developed to be as quick as possible.

The government tells you "Oh, well this is about independent layers of screening and vetting," but the evidence shows that that's not what happened and that's not true, and all of that matters, the Court's examination of the process matters for understanding the existence and the purpose of the policy that we're challenging. So with respect to the process, there's a few things we want to point out.

The Reports of Analysis, that your Honor heard so much about from the Office of Intelligence, relied almost entirely on unvetted allegations supplied by Canary Mission, an extremist pro-Israel group that compiles black lists of students and scholars that it deems to be --

THE COURT: On Canary Mission, yes, you've now characterized it as an "extremist group." Do I have that in evidence?

MS. CONLON: You do.

THE COURT: Well apparently it's a group who, um, who doxxes people -- I would say the evidence shows, it's a group who doxxes people who they say hate Israel.

MS. CONLON: Yes, and your Honor actually has in evidence the web pages. We put them into evidence. We

didn't spend a lot of time looking at them, because they speak for themselves.

But when you can look at them, you will see that that is -- what the website sets out and purports to do is only to identify people who have these views. It's not to identify people who are breaking the law. It's not to identify people who are supporting terrorism. It's to identify people who have views that they disagree with.

And the fact that that is a pool of people that the government started with for this process tells you what the point of this policy was. They started by looking at people who hold certain views to see whether there was any enforcement action they could take against those people. This is why we talked so much about the process, because we think it proves the point.

MS. CONLON: But the other critical part of the process I wanted to -- no, go ahead.

THE COURT: It's perfectly appropriate for the government to take leads from any source, it would seem to me. I mean frequently this Court sits where the lead comes from a wrongdoer or a rival gang or something like that.

MS. CONLON: Yes.

THE COURT: And that's perfectly-appropriate law

enforcement.

MS. CONLON: Well two points about that.

The first, in the instances your Honor just described, those are leads about alleged law-breaking, those are leads about alleged criminal activities. The "leads," if you call it that here, are just about people who allegedly have criticisms of Israel or criticisms of the United States. But the second point I want to make is about what you leaned about the next step in the process.

Now I assume, when the Court hears about these leads from law enforcement in other matters in criminal cases, the Court then hears about an investigation that was done, diligent steps that were taken to ensure the accuracy of those leads, particularly when they're found in an unknown or an unreliable source. But that is not what happened here.

The letters that Watson and his team wrote purport to summarize what's in Mr. Hatch's ROAs, from the Office of Intelligence. But if you line up a Watson letter next to a Hatch ROA, what you're going to see is that the Watson letter makes enormous inferential leaps that are not supported by what is in the ROA.

What happens in the ROA, as your Honor heard from Mr. Hatch quite candidly, is just a collection of what

somebody said about someone on the internet, the fact of the allegation. But what happens in the Watson letter is the adoption of those allegations as true without any explanation of how that conclusion was reached, without any vetting of the underlying sort of substance of the allegation. And that's how you wind up with someone like Ms. Ozturk being described as "pro-Hamas." The whole process relies ultimately on DHS and the State's indefensible conflation of antisemitism with speech that is anti-war, pro-Palestinian, or critical of Israel.

Now I think it's really very important that nobody from DHS or the State Department have told you that there was a defined meaning of "antisemitism" that's guiding everybody's work or that there was guidance about what that means, either to be "antisemitic" or to express support for a foreign terrorist organization. Instead, the evidence shows that senior officials, like Mr. Armstrong, relied on their own views to guide this work. And Mr. Armstrong was quite candid about his views. He believed that slogans calling for a "free Palestine" are inherently antisemitic, or that anti-Israel sentiment is in fact just antisemitism masquerading as a viewpoint, or a "dodge," as you put it. And importantly, he believed that mere association is not protected expression, but an action that can

warrant the revocation of a Visa or a green card.

And, your Honor --

THE COURT: And at least under the law he may be right?

MS. CONLON: Well in terms of whether he has the authority to revoke a Visa for any reason he wants, sure, the statute says "revoke for any reason at any time," but the statute doesn't trump the Constitution. And, Ms. Krishnan, I will not step on her toes, because she is ready and eager to talk about that.

Being mindful of my time, there's a few other -- oh, go ahead.

THE COURT: But help me out now with -- there is evidence that, as an advocate, to support the things you've just said. Where is the -- what's the best evidence of the intent now, directed not just to the people we've been talking about -- and I recognize that I limited it to 5, to have a manageable case. But not just to them, where's the evidence of, um, concern, proper concern on the part of your clients, where's the evidence of intent to influence them to chill their speech?

MS. CONLON: So I hear that as a two-part question.

THE COURT: It is.

MS. CONLON: All right. So I'll start with the evidence of intent to chill their speech. Now I think there are two very easy examples to point to.

The first are the unprecedented arrests of these targeted noncitizens, arrests that your Honor heard, from the people who have to oversee the effecting of those arrests, are not part of the ordinary course, and arrests that your Honor heard from the plaintiffs, um, terrifies them.

I think the second thing I would point to is the government officials' public statements about these arrests and what they have done. And we didn't spend time here reading into the record those statements --

THE COURT: Well what's the link between those two?

MS. CONLON: Your Honor, the statements are to the effect of, "You saw what we did to Mr. Khalil, you can be next." The public statements are designed, by the government officials, to terrorize everyone else who shares the views of the people who they have arrested. The government officials don't post on social media about every Visa they revoke, every green card holder who they determine is removable, but in evidence -- and your Honor will see it in all of the exhibits, government officials went out of their way, over and

over again, to make exactly those kinds of statements here.

THE COURT: One fact point that I think falls in what I understand is your area. I don't hear any evidence, I don't think, but I have to go back over the whole record, that any, um, member of the group, um, groups, whom you represent was on that Canary Mission list. There is no such evidence.

MS. CONLON: There is in fact, your Honor. Yes.

So, first, you heard from Nadia Abu El-Haj who described not only that she's on the list, but inaccuracies about her in her Canary Mission profile. You heard testimony from her about that. And I believe you also heard testimony from Veena Dubal about members being on Canary Mission.

And then, um, you heard -- if your Honor were to look at some of the profiles we've put into evidence -- and just one moment, I want to confirm that what I'm saying is correct.

(Speaks to co-counsel.)

MS. CONLON: The other thing we have in evidence, your Honor, is that MESA, the Middle Eastern Studies Association, is one of the groups highlighted on the Canary Mission website. In other words, that the Canary Mission website suggests that the people who are members

of MESA share the views of all of the people that they have identified on the website.

THE COURT: And that I can confirm by looking at the matters in evidence?

MS. CONLON: Yes, your Honor.

(Pause.)

MS. CONLON: And in terms of the harms, your Honor, um --

(Speaks to co-counsel.)

MS. CONLON: Okay, so I think there's a few things.

The first, um, I think it's clear from the government's public statements that it was the fact of the advocacy by the targeted noncitizens that led to the enforcement efforts against them, and that is one of the things that was terrifying for the plaintiffs.

Second, your Honor, you heard directly from three of the noncitizen plaintiffs who described to you the chilling effect that this had on them. And one point I want to make about that is that the government went out of its way in its opening to characterize the plaintiffs as "academics obsessed with theories and ideas and, you know, not grounded in reality." But here's the reality.

Some of the people you heard from are the professors of the students who were targeted for

Case 5:25-cv-05618-NW Document 82-10 Filed 03/27/26 Page 23 of 65



deportation, like Ms. Abu El-Haj. Some of the people that you heard from had made the exact same statements that Mr. Armstrong told you could be the basis potentially for an immigration action against them, have said, you know, "Free Palestine," have said -- have made public criticisms of Israel. And that, I think, is a point that makes the plaintiffs' fear objectively reasonable here.

And in terms of harms, because I thought that was the other part of the question you asked me, in terms of harms, you heard that the plaintiffs refrained from publishing Op-Eds they wrote, abandoned scholarship they were engaged in that touched on this issue, to avoid any potential consequence for being associated with it by the government. You heard about protests that they, you know, attended, um, taking precautions to attend or didn't attend at all.

And I know your Honor was listening carefully to them, so I will not belabor everything that they said, but those individuals, who testified, the noncitizens, established that the government's policy is working exactly as the government intended, that it is intimidating and scaring students and scholars into silence, to our collective detriment.

I think it may make sense at this point for

Ms. Krishnan to explain to you the First Amendment -- what the -- that the policy we're challenging is exactly what the First Amendment was meant to prevent.

THE COURT: Thank you.

Ms. Krishnan.

MS. KRISHNAN: Good morning, your Honor.

And I have three points that I would like to make this morning, um, two of which are responsive to questions your Honor has asked during trial.

The first is that noncitizens lawfully present in the United States have the same First Amendment rights as citizens do. The second is that the policy is unconstitutionally viewpoint discriminatory. And the third is that this Court need not reach the constitutionality of the foreign policy provision or any other INA provision that defendants rely on to carry out their policies.

THE COURT: Why not, as to the third?

MS. KRISHNAN: Well to be clear, we're not resisting the idea that this Court reach the question whether these, um, provisions would be unconstitutional as applied to the government using these authorities to deport people based on viewpoints, the reason why relief against the policy is essential is one that I think Ms. Conlon made, which is that defendants rely on any

number of statutory authorities to carry out their policies.

You've heard about the foreign policy provision, but as you've heard a bit in Ms. Ozturk's case, the government relied on 221(i) of the INA, which is the State Department's Visa revocation authority. You've heard from Mr. Armstrong about 4(b), which he said, um, would cover a broad range of statements that express support for Palestinians as well as statements that criticize Israel, and so that testimony made clear that those statements may form the basis of deportation.

And there's another provision too, 214(b) of the INA, which defendants have made clear, um, they believe entitles them to revoke the Visas of students when they engage in activities inconsistent with their student Visa. And in public statements, as well as in the cables that are before this Court, defendants had indicated that engaging in activism, and in particular activism they consider to be pro-Palestinian or anti-Israel, are activities inconsistent with holding a student Visa. And so that's why, you know, our argument, our primary argument is that the policy violates the First Amendment and this Court should reach that question.

And secondarily, and this is a point that we made

in our supplementary brief, um, we think that a ruling on that question would provide a complete basis for relief in this case.

THE COURT: Without -- and your point is, um, without having to hold that, as to any individual's dispute with the government, the, um, the legal authorities invoked are unconstitutional as applied. But as I follow that argument. Which is what I was pressing Ms. Conlon on. It seems to me that you have to prove an intent -- implicit perhaps, but an intent to reach the groups that you represent, and chill their speech. Retribution against these identified people to chill the speech of the larger group that you represent.

Do I understand the argument?

MS. KRISHNAN: So to be clear, your Honor, we think that intent is an essential component of our ***Bantam Books*** claim, that is that the defendants are engaged in a campaign of threats to intimidate noncitizens into silence, but we don't believe that intent is a necessary element of our claim that the policy on its face is unconstitutionally viewpoint discriminatory.

THE COURT: I hear you. All right, go ahead. I'm having trouble with this policy.

Look, it seems to me -- and I'm not making any

Case: 26-6906, 11/20/2026, DktEntry: 16.8, Page 40 of 300



findings here, I'm just trying to be helpful. It seems to me we have a new administration who has, you know, absolutely the primary authority over the foreign policy of the United States. If anything is in the executive, the foreign policy of the United States is in the executive. Public statements are made by the President, by the Secretary of State, the key officials, um, dealing with the foreign policy of our nation. And, um, changes are made lower down in Homeland Security and in the State Department. Procedures may be the same, but Ms. Conlon points to the evidence, that certainly the empathies are different, and then she develops all of that.

Now one can easily say that's an attempt by the professionals, lower-down, implicit or explicit instructions, to see what can be done under the existing legal framework, and indeed they find ways to proceed under the existing legal framework, and they do. You say, having a consequence on the people you represent. And I guess all I'm saying is, "Well we've got to find some intent to do that because how that worked out with specific individuals is a matter for those individuals and the legal processes in which they're involved, not this Court." I guess that's the framework.

Now have I got that right? Your argument, if I

hear you, is "But you have proved that," whether we call it a "policy" or, um, it is what chilled your clients unconstitutionally, because they fear retribution on the same basis.

Isn't that the essence of your argument?

MS. KRISHNAN: Yes, your Honor. Our argument is that the intent and effect of this policy was to chill, um, noncitizens, students and faculty, including our clients' members --

THE COURT: From the get-go.

MS. KRISHNAN: From the get-go. From the get-go. But I want to -- I would like to come back to the point that I made earlier, which is that our claim that the policy is viewpoint discriminatory, does not turn on us being able to show an intent to chill noncitizens into silence. Suddenly, for standing purposes, we need to show that this policy has harmed our clients. And our theory of associational standing turns on us showing that the policies have caused, um, the AAUP's and MESA's members to self-censor based on a credible threat of enforcement, and we believe that we have carried that burden.

But to be clear, the claim that the policy is unconstitutionally viewpoint discriminatory, as the Supreme Court cases on viewpoint discrimination make

clear, um, what you need to show is that the regulation is viewpoint-based on its face and that the government hasn't carried their burden to show that that regulation satisfies scrutiny.

The Court has been clear that if a regulation is viewpoint-based, and it said this in ***Reid,*** it is subject to strict scrutiny, quote, "regardless of the government's designed notice of a content-neutral justification or lack of animus towards the ideas contained in the regulated speech."

And it's true that the government -- you know, um, one of their defenses in this case is that we've always had these statutory authorities.

THE COURT: And that appears to be the rule. I mean they go back to the McCarthy era. And I don't mean that as a normative point, but that's true. And we're all complicit in that, in the sense that there have been administrations of different political stripes and the like and the majority of our people have voted them in, and Congress hasn't touched those statutes, those statutes, the regulations under which they operate. That's what's been used here in this fashion.

MS. KRISHNAN: That's true, your Honor. But the fact that these authorities were already on the books does not foreclose this Court from finding that the

administration has adopted a new enforcement policy. And one of the cases that your Honor cited in its motion to dismiss opinion, um, the case of ***Hoye*** from the Ninth Circuit, which we cite in our supplementary brief.

THE COURT: I saw that you did.

MS. KRISHNAN: I think it's a good illustration of this. Because the policy that the Court there found unconstitutional was a policy that was adopted after the statute was passed. And the Court found that notwithstanding the fact that these -- that the authority there was, um, constitutional on its face, the enforcement policy there was content discriminatory, and the government had not shown that it was narrowly-tailored to a compelling government interest. And the policies that we challenge in this case, um, we believe is one that you can find unconstitutional on a similar theory.

THE COURT: Go ahead.

MS. KRISHNAN: And it's true that the government has also pointed to national security and foreign policy concerns. But the mere indication of these concerns cannot immunize the government's actions here from judicial accountability.

THE COURT: Well I -- I urge you -- I've been thinking about that, and I urge you to, um, all of you,

to read a really brilliant law review article by Judge Jacobs of the Second Circuit called "The Secret Life of Judges," and that article has had a significant effect on my consideration of cases. And the reason that -- the essence of that article is this. All professionals look at the world through the lens of their profession. And I think that's true.

So, you know, these public officials, the lower-level professional officials that have testified in this case, they're looking at these things through the national security, um, implications of the responsible positions that they hold. That may not be determinative in this case given the cases that you cite, which of course I'm bound by, and I will carefully scrutinize. But I've got to take that testimony with respect to their job, which is not my job. I'll exercise my judicial independence.

But do you see where I'm going? The government doesn't just cite national security, these people are an aspect of our national security.

I mean one of the problems I have, and I'll tell them straight out, is here, because we've got this 5,000 list of people from Canary Mission, professionals have to be taken off international terrorism, off human trafficking, off transnational corporate greed, to deal

with this. Why? Evidently it's a pretty clear inference, they were told to do that. Not just take a look at this list and see if there's anything here, "Go through these 5,000." That is -- if not compelling, it's certainly a permissive inference.

I've got a real question about that. But that's for them. In essence I must -- I guess I'm just saying, I have to look at what they say -- and in the main it seems credible, I believe that's what they're doing, and I believe that's why they're doing it. With a couple of exceptions perhaps. And you say, "Go ahead, Judge, we still win," right?

MS. KRISHNAN: That's exactly right, your Honor.

THE COURT: All right.

MS. KRISHNAN: And no one has to doubt the sincerity of the objectives that these government employees pointed to, and we don't dispute that protecting national security is a government objective of the highest order. Our complaint is that the government has not carried its burden in showing that targeting students and faculty based on their support for Palestinian and their criticism of Israel is necessary to achieve that objective. That is our argument.

Now the other interests that the government has

pointed to in this case is countering antisemitism, and I want to be clear, that is a fourth legitimate government interest, um, that's commonly found in the case. The question in this case is over the means the government is using to pursue that interest.

The policy here -- and you've heard this from Ms. Conlon, conflates legitimate anti-war pro-Palestinian speech with antisemitic speech. It conflates criticism of Israel, support for Palestinians, and criticisms -- even if this government, the U.S. government's policies towards Israel, with antisemitism, and as a result this policy sweeps in a broad swath of speech that falls at the very core of the First Amendment's protection.

Now even if the policy was more narrowly focused on antisemitism, and in particular the suppression of antisemitic speech, the policy would still be impossible to square with the First Amendment for the reason that your Honor has alluded to at several of our -- you know during the trial and at several case-management conferences, which is that the First Amendment does protect speech that is offensive, it protects even bigoted speech. But the policy challenged here sweeps far more broadly than speech that is properly characterized as "antisemitic," and so clearly cannot be

Case: 26-6906, 11/20/2026, DktEntry: 16.8, Page 47 of 300



reconciled with established First Amendment doctrine.

The last point I wanted to address is one that your Honor posed during opening statements, which is whether noncitizens lawfully present in the U.S. have the same First Amendment rights as citizens do? And as Justice Ginsburg noted in her concurrence in ***AADC vs. Reno***, it has been well-settled, since ***Bridges vs. Wixon,*** that noncitizens residing in this country enjoy the freedoms of speech and the press, including in the deportation context. And in fact the Supreme Court has gone further, observing that the First Amendment doesn't acknowledge any distinction between citizens and noncitizens who reside here. Justice Murphy first made that observation in his concurrence in ***Bridges,*** and it was later endorsed by the Court in ***Qualified Shoe vs. Colin.***

Since then, three courts have appealed. The Second, the Fourth, and the Ninth, have all held that noncitizens present in the U.S. were entitled to First Amendment rights, including in the immigration enforcement context. To my knowledge no court of appeals has gone in the opposite direction. And that makes sense. Any other rule would make a mockery of noncitizens' First Amendment rights and of political discourse in this country.

If noncitizens can be deported based on their political speech, then they have no First Amendment rights at all, because they must always always worry that their speech and association will displease those in power. In a country where free speech is the safeguard of democracy, that cannot be the law.

And one note about the cases that the government cited when we were, um, litigating the motion to dismiss, the ***Red Scare*** line of cases, um, which predates modern First Amendment doctrine. As you recognized in your motion to dismiss opinion, they don't control.

***Turner***, one of the cases they cited Is an exclusion case and it predates development in constitutional and First Amendment law that recognized that the government can't deprive a person of a benefit in violation of their constitutional rights even if they have no right to the benefit at all.

And then there's ***Harisiades***. And as the Ninth Circuit recognized in ***AADC***, and as Judge Wilson recognized in a ***Central District Court of California*** case from the '80s, ***Harisiades*** just stands for the proposition that the Supreme Court applies the same standard to noncitizen speech that they apply to citizen speech.

At the time ***Harisiades*** was decided, um, even

citizens didn't have a First Amendment right to affiliate with and be a member of a communist party, and that explains the Supreme Court's decision in this case. But it actually redounds to plaintiffs' favor because it shows that the same standards that apply to citizens apply to noncitizens.

(Pause.)

MS. KRISHNAN: And unless your Honor has any further questions?

THE COURT: No, I don't.

Mr. Kanellis. Let's start though where she ended, and it's the question that I have posed.

Do the defendants here agree that a person, a noncitizen, lawfully present in the United States, um, has the same right to free speech as a citizen?

CLOSING ARGUMENT BY MR. KANELLIS/MR. KANTER:

MR. KANELLIS: Good morning, your Honor, and may it please the Court, William Kanellis for the United States. I also have with me Mr. Kanter, and Mr. Kanter has much more First Amendment expertise than I do and I will refer to him and allow him to answer this specific question before I go into my discussion of the facts of this case, if your Honor would permit it.

THE COURT: We can, just as I did with them, um,

we can. But that is my first question.

So, Mr. Kanter.

MR. KANTER: Yes. Thank you, your Honor, and may it please the Court.

The answer to the question of whether aliens and citizens have equivalent rights under the First Amendment is "No, they're not equivalent." But, your Honor, there is no rule --

THE COURT: And what's your authority for saying that?

MR. KANTER: My authority for saying that are the cases, one after the next, um, that find a lack of equivalence, and that it is context-dependent. So those cases. ***Bluman***. ***OPAWL,*** which is O-P-A-W-L, it's an acronym, ***vs. Feminist Leadership Association***. It's a Sixth Circuit decision, your Honor. The ***Amback,*** a Supreme Court case. These are cases involving election law contributions to campaigns, to ballot initiatives, in which money obviously is equated with speech, and they directly address whether aliens, noncitizens, lawful permanent residents -- or simply nonlawful permanent residents, but lawfully in the U.S., aliens have equivalent rights. And in those cases they hold they do not.

In the context of the national security and

foreign policy, we have many cases that go to the same point and result. The ***Munoz*** case, ***Trump vs. Hawaii***, ***Kleindienst vs. Mandel***, and, um, they all derive from what is and what must be, your Honor, a, um, a flexibility.

The nature of the right is context dependent and in relation to the competing government interests in play. That is what these cases demonstrate. And that's not to say that in every instance aliens lack First Amendment rights. It's not to say that. But both Congress and the courts have identified discrete areas in which aliens are not afforded the full panoply of free speech rights.

For example, we know that they do have lesser interests when foreign policy and national security are in play. Why? Because Congress has determined as much. It did so, um, with regard to the provisions of law that my friends have referenced, "endorsing, espousing," which is in 212(a)(3)(b) of the INA, the (a)(4)(c) foreign policy ground, which has been the subject of much testimony and evidence in this case, and it did so with regard to the charges, um, the removal charges and the five so-called "targeted noncitizens" that plaintiffs point to as a reflection of an allegedly unlawful policy.

But, your Honor, in attacking that policy, the plaintiffs are really at odds with a line already drawn by Congress, drawn by Congress in (a)(4)(c). In (a)(4)(c).

THE COURT: But do I have to reach that? You see, um, I understand what you say, and it would seem that 221(i) is even broader with respect to Visa holders.

MR. KANTER: Yes.

THE COURT: But that's not their argument as I conceive it. Their argument here is that what was done -- we'll let those cases all resolve however they resolve. But they're claiming that what was done there -- and in other cases, I limited it to 5, was intended to chill recognized free speech rights of the people whom they represent. They cite ***Bantam Books***, they cite other cases. They seek to distinguish yours. Do I have to reach what Congress has done?

So you're telling me, "Well Congress has done this and that." Ms. Krishnan, her repost is "You don't have to get into that." Here the government has not, I -- it's speech, I'm supposed to subject it to strict scrutiny. I do. And they have not borne their burden, she says.

MR. KANTER: Yes, the answer, your Honor, is "No," you don't have to reach that question, the

Constitutionality, the statutory validity of these provisions. And plaintiffs have been quite clear, they're not challenging the validity of these laws, they are challenging these laws as applied.

Now Mr. Kanellis will go into great detail on other reasons why your Honor does not need to reach this question. For example, there's no retaliation. Not one member of the plaintiffs' organizations have been arrested, detained, or removed, or charged with --

THE COURT: They're concerned about the preenforcement chilling of their speech.

MR. KANTER: Yes.

THE COURT: There's ample evidence of that. What, um, weight I give it here is ultimately going to be part of my analysis. But there's surely evidence of it.

MR. KANTER: If your Honor will permit me to, um, attempt to land the point that the Congressional provisions of the Congress's statute, the foreign policy provision "endorsing and espousing," is the representation of a line drawn by Congress in saying -- "endorsing and espousing," that's speech, and yet Congress said, "but when it relates to terrorism." We are making the judgment. We are drawing the line that it must yield.

THE COURT: "When it relates to terrorism"?

MR. KANTER: Well it is -- the provision says what it says and it has to be applied by executive branch officials.

My point is that, in the implementation of those provisions, this is simply another line that has to be drawn in difficult circumstances. And plaintiffs search for some objectionable rule of thumb to pin on government officials, something simple, something -- they've been frustrated, I believe, that's my view, in finding it in the evidence. But it's not easy and it's not simple.

For example, there's no rule -- as we heard from government agents, there's no rule requiring that masks be worn in effectuating an arrest, and there's no rule prohibiting it either.

THE COURT: No, isn't that strange? You know I don't know of a single law enforcement agency in the United States that permits their members, apparently at their option, to wear masks when carrying out their duty. Not one. And, um, it would seem that the -- the common sense inference is that that is to spread fear. And if it's at the option of the agents themselves, what -- they're afraid of doxxing? We've heard a lot about doxxing in this case. You know perhaps they're afraid considering what they're being called upon to do

is a matter of concern.

Go back to -- the Marshal Service -- hear me out.

MR. KANTER: Yes.

THE COURT: The Marshal Service -- the distinguished United States Marshal's Service was, in the course of their history, required to enforce an odious law of the United States, the Fugitive Slave Law. A marshal was killed in this city seeking to enforce that law passed by Congress. None of them ever wore masks.

Masks are an indicia that by its very nature spreads fear. Isn't it a common sense inference that your clients understand that? In allowing, alone, among all the law enforcement agents, it goes against -- in municipal law enforcement there are whole sociological tracks written on neighborhood policing and how, um, in, um, all different communities, the law enforcement can better be carried out by making the law enforcement people, um, as much as possible, as one with the community.

Now I recognize that these are federal officers, federal officers who may be deployed in different places of the United States. Of course this is much more broader, given the policies of the administration, then these, um, people that we're concerned with here.

But when you tell me about masks, I'm not so sure that that's, um -- that the inference somehow is supportive of the government's position here.

MR. KANTER: Your Honor has spoken about the masks in particular at prior hearings and that's precisely why I raised it to discuss with you, because -- and I take all of your points and, um, we thought carefully about them, and one of the most significant of course is you are the factfinder and you are the one drawing the inference, and that is why, um, I point to the testimony of the, um, HSI, um, officers who testified in this court about that practice and your Honor heard them explain. And some of them -- these are detectives in -- it's a component of ICE, HSI, Homeland Security Investigations --

THE COURT: So I beat around the bush. I, um, again, and I think it's fair to say, I generally credit them, I believe that, I believe what they say, these supervisors.

MR. KANTER: I am not disputing that. Merely to note that they -- why is there no rule requiring or prohibiting it? Because they are in undercover operations --

THE COURT: They are not in undercover operations. They weren't in an undercover operation arresting

Ms. Ozturk, were they?

MR. KANELLIS: That's true. I will accept your Honor's point, which is a good one, however it's because they're in another undercover operation, that they don't want to be seen -- they're effectuating an arrest on one individual, that draws attention, and we live in the age of cell phones and cameras and everything. The videotape is always rolling, your Honor, and wherever you are. These are some of the points that they brought to light in their testimony.

They may be --

THE COURT: Why don't then other law enforcement agencies of equal repute wear masks as a common matter?

MR. KANTER: That evidence, to my knowledge, was not the subject of testimony. These HSI detectives testified from their personal knowledge about their own practices and procedures, their own protocols.

THE COURT: That's correct.

MR. KANTER: So to the -- ultimately what they testified, your Honor, is it came down to the judgment, experience, and the operational needs of a given agent as to whether that choice was made.

And my -- because I don't want to -- I don't want to intrude on my co-counsel's presentation, your Honor, so I'll end with this. That plaintiffs' critique of

where those lines have been drawn does not prove the unlawfulness or unconstitutionality of the alleged policy in this case, it is second-guessing a judgment they are not empowered to make. Congress, in its plenary power, gave it to the agencies who are empowered to make those judgments.

Thank you, your Honor.

THE COURT: Mr. Kanellis.

MR. KANELLIS: Your Honor, if I may reframe our closing and say thank you to my colleague for discussing the First Amendment, but after hearing the closing arguments and listening to the evidence at trial, if you'll permit me, I can't help but be reminded of a classic story in literature about two adventurers crossing Spain in the 17th Century. And as they crested on the corner they saw in the distance 30 giant windmills. And upon seeing those windmills, the leader of this expedition said --

THE COURT: I think you're going into German, but now I'm with you in the literature. Go ahead.

MR. KANELLIS: I will not speak German. I promise you. Lesson learned.

THE COURT: No, go ahead.

MR. KANELLIS: But as they spotted these windmills on the horizon, the leader said to the other, "Look

there, Sancho Panza, where 30 giant -- monstrous giants present themselves, all of whom I will engage you now to slay." And upon that he raised his lance and he charged, tilted it towards these windmills, his jousts becoming caught up in the blades, knocking him off his horse. And upon sitting on the ground, now apparently before a giant windmill, he refused to relinquish his illusion, he refused to admit that these were windmills, insisting that instead what must have happened is that these were monsters and they were transforming into windmills after the fact.

And the reason I bring this up, your Honor, is because just as Don Quixote of La Mancha imagined that windmills were monsters, plaintiffs in this case imagined that the lawful arrests of individuals pursuant to laws and standards that have existed for up to 70 years amount to some grand government conspiracy, is this idea that there is an ideological deportation policy targeting individuals merely because they speak out in support of the State of Palestine. And just as Don Quixote, well-intentioned and sincere, imagined that these monsters were windmills -- I'm sorry, that windmills were monsters, erroneously, this policy is a product of the imagination and creative, um, conjuring of the plaintiffs.

Your Honor, if I may approach the slides?

As your Honor has seen the evidence in this case, what happened in this instance was the result of an extensive process exercised by career officials of the United States government pursuant to statutory authority.

THE COURT: In ways never before seen.

MR. KANELLIS: Within their authority, your Honor.

The INA -- you heard testimony that the INA has been an element of the HSI's jurisdiction since its founding in 2003.

THE COURT: My point was only in ways never before seen.

MR. KANELLIS: In ways that made, um, my point of emphasis, in different administrations, your Honor. Certainly every administration -- and your Honor has acknowledged this, every administration has the prerogative, every President has the prerogative to exercise, to deem it important, what he or she feels is most important. And our point here, your Honor, is the evidence is in, the trial is over, you have heard the facts, you've heard the testimony, you've seen the contemporaneous documents of these that articulate that it wasn't speech alone that was the basis for the making those decisions, it was speech and conduct. Your Honor,

48

the trial and the facts are in. Plaintiffs have been knocked off their horse.

And what I will do, in the remaining time I have, is I will present two prongs of evidence, the factum provanda, the two questions that this Court must decide factually in order for them to prevail. And the first one is is there a ideological deportation policy? And then the second is, if there is such a policy, then how does that harm the plaintiffs? The plaintiffs, your Honor, the institutions, the organizations.

This trial, your Honor --

THE COURT: No, you know, um -- they're very big on talking policy and I've pushed back on that. Maybe it's not policy. I've got to reflect on these things. Maybe it's concerted action. Let me give you a historical anecdote, and I think maybe this suits their argument.

So here's Henry II and he's going around his court and he's saying, "Who will rid me of this troublesome priest?" And two errant knights go out and they hatch down a bishop, maybe it was an Archbishop, Thomas Becket, in front of his alter. Now that happened. That was then.

Now, you know, the President, um, does -- it's in evidence in this case, makes various, um, raises various

concerns about campus protests and, um, you know he doesn't have errant knights, but he's got Stephen Miller, and then, um, at the level you're addressing -- and we have the statutes that Mr. Kanter quite properly raised. You see it's not like the people who testified here are lawless, that they are just going to go ahead and ignore the law. If anyone thinks that's what I've gotten from this evidence it's not. But the law is used in a -- it appears to me, in new and somewhat different ways. And that's why I've pressed the plaintiffs on intent. If there was no intent to chill the speech of their clients, they lose.

Have they proved it? They would like to say, "Well given the way it was used, it affects speech and therefore the burden is on you to show that it was completely neutral." But the framework is, that I'm grappling with, and that's the my only reason for speaking, is closer to my Henry II example.

So what's wrong with that?

MR. KANELLIS: There's nothing wrong with that example.

THE COURT: No, but on this evidence, where does the evidence -- where are the holes in the evidence in that approach to analysis?

MR. KANELLIS: The holes in the evidence, your

Honor, it's not holes, it's that we have all those that contradict that evidence, that is manifested in the contemporaneous action memos, that is manifested in the contemporaneous documentation created by the career professionals public service who articulated the actual basis for the removal decision, which was not expressly based on free speech. Those contemporaneous documents, your Honor, that's why we have argued that this case could have been resolved as an APA case. It is an APA case. And in an APA case, one of the questions before this Court is whether the agency is articulating a rational basis for its decision, and they have.

THE COURT: Well I'm telling you I have real problems with their APA case. You're absolutely right. If this is only an APA case, I think they have a -- they, the plaintiffs, have a very long road to hoe. But as I've heard the evidence develop, it appears that this is just a straight First Amendment case, um, they think they have proved concerted government action at the cabinet level and below, um, to carry out the President's wishes, they say in a manner that as to their clients is unconstitutional.

MR. KANELLIS: Your Honor, the ***Hartman*** decision -- the ***Hartman*** decision dictates that the question that the Court must ask in determining whether the threshold

question in determining whether there has been a First Amendment violation is whether or not there was legitimately probable cause for the government action. In this case, your Honor, we demonstrated that the evidence of that is overwhelming. ***Hartman*** controls. And because we have demonstrated through contemporaneous evidence that there's a rational basis, there's the processes that were in place that were followed and adhered to, the criteria that had been in place for up to 70 years, 70 years, were followed, and that is the inquiry as to whether or not this is a First Amendment violation.

Let's go to the first slide.

(On screen.)

MR. KANELLIS: Your Honor, we don't have a lot of time here, thanks to Mr. Kanellis. (Laughter.) But let me go through some of the evidence.

And I think it's helpful to compare -- and you can see on your screen, your Honor, that we have some slides, but we're not going to get through them all. But you can see on the screen that we can compare the statements that were made in the complaint, in the motion for a PI, and we can show that the evidence at trial, after a trial, we now have the benefit of trial, hearing witnesses, and the evidence hasn't bore it out.

They talked about an announced intent to carry out large-scale arrests based upon people who supported pro-Palestinian protest. Where's the evidence in there? There is none.

They talked about the government launching a new social media surveillance program, when in fact the testimony bore out that the U.S. CIS started monitoring social media in 2016, and then in 2019 and 2020, well before this administration came about. The State required Visa applicants to be on social media.

THE COURT: That is -- I won't say that's a matter of concern, and I think your recitation of the facts is exactly right, but, um, one of the things that I have to grapple with here, and as I look at the decided cases, is that today, um, we have the internet that allows people ostensibly to, um, say all sorts of things on the internet and get audiences that, um, we never had before. But on the other hand, the government knows more about us than they ever have in the past. And they especially know, since 2016, about those people who are Visa holders. No one quarrels with the justification for it. But these people -- and indeed many Americans now, after DOGE, um, the government knows an awful lot about us.

So, um, I raise that because that -- again just

thinking of the common sense inferences, would make more logical that people would be afraid.

Isn't that so?

MR. KANELLIS: Perhaps, your Honor, that issue is really not before this Court, it's not an issue. It would be an interesting trial if we were to have one on that issue. But my point is merely that the suggestion that this occurred with the new administration is simply not true.

You also heard testimony that the Executive Orders -- from two witnesses, the Executive Orders did not have the effect of law, that they simply set forth the President's priorities, and you heard testimony from AD Watson that every administration that comes in has its -- issues Executive Orders and sets its priorities.

In other words, your Honor, what happened here -- although you may disagree or people may disagree about the wisdom of these policies coming out of the --

THE COURT: Well let's be clear, I may not. That's not before this Court. And, um, while I'm trying to be vigorous in grappling with argument and while I respect and enjoy the trial process, I have nothing to say about the wisdom or unwisdom of Executive Action. The people have spoken as to that.

MR. KANELLIS: And that is our point, your Honor.

That what happened here was an exercise, a lawful exercise. That you heard Mr. Watson testify to this. You heard Mr. Armstrong testify to this. How can we implement the objectives, the broad objectives in these Executive Orders if they are existing authorities? And that is merely my point, that every President gets to choose what he or she believes is important and what was done here was done pursuant to law.

THE COURT: But at the same time, it is my unalterable duty to determine what the First Amendment to the Bill of Rights has to say about the issues that are presented in this case. I'm not going to duck that.

MR. KANELLIS: Of course not, your Honor. I think the evidence though, getting back to the point about whether there is or is not an ideological deportation policy, let's look at the hard facts, let's look at the numbers.

You heard Ms. Dubal testify that AAUP had 50,000 members and yet not a single member was arrested or deported. I will take note, your Honor, that a representation was made that Ms. Dubal testified something about Canary Mission. She did not. I did not hear Ms. Dubal say anything about Canary Mission or their identification on our list. Let's put that aside.

50,000 members of AAUP. 5,000 to 6,000

protesters, not only from Canary Mission, your Honor, because you heard these sources came from other sources outside of Canary Mission, but out of 5,000 to 6,000 protesters, they were 18 total arrests. 5,000 names were received, and HSI created Reports of Analysis for about 2 percent of the 5,000 names received.

And the next slide.

(On screen.)

And, your Honor, I think -- I remember in law school the first Latin term that I learned was res ipsa loquitur, and I think this is a classic embodiment of res ipsa loquitur right here, with this slide. There is no policy, your Honor, we started with 5,000 protesters.

Next.

(On screen.)

We moved down to 100 of all of our Reports of analyses.

Next.

(On screen.)

We moved down to HSI, NSD recommending 20 to 30 of those for, um, to State.

We moved down to State writing about 20 removal -- or justifying removal for about 20. And then we have 18 or fewer arrests.

THE COURT: One of the inferences is that once you

get on this recommendation list, it moves pretty swiftly through State.

MR. KANELLIS: Your Honor, this is res ipsa loquitur.

Next.

(On screen.)

THE COURT: It may be.

MR. KANELLIS: That is not a policy, your Honor. This is not even a statistical anomaly.

If this is a policy, it must be the worst policy in the history of the United States government. That is why Mr. Armstrong described this allegation as an "ideological deportation policy" as "silly." "Silly." Because it is. Because the evidence demonstrates that there is no such policy, because if there was, you would see at least hundreds, you would see many more.

Next slide.

(On screen.)

THE COURT: Armstrong, pause on him.

It does seem, from his testimony, that he equates, um, what I have defined here as "political speech" with antisemitism, and, um, he equates antisemitism with support for Hamas. One could at least draw those inferences.

(Pause.)

MR. KANELLIS: May I respond to that, your Honor?

THE COURT: That's why I raised it, yes.

MR. KANELLIS: He was asked a hypothetical question about his personal definition.

THE COURT: He was asked about his personal -- but of course he was the, in essence, the decision-maker.

MR. KANELLIS: But you need not speculate about what his motivation is, your Honor, you have contemporaneous documents that recorded, that memorialized his decision. And those contemporaneous documents, you saw his handwritten comments reflecting that action is not words. That is the manifestation of the decision, actions, not words.

The next slide.

(On screen.)

And from each of the 5 -- you have in front of you, your Honor, you have the 5 removal -- bases for the removal decisions for the 5. They're self-evident, as your Honor has indicated, you can read, you can read those documents and you can see what the contemporaneous justification was. That ends the input.

The next slide.

The next slide.

(On screen.)

Let's talk about -- I'm running out of time. I've

got 10 minutes.

THE COURT: You do.

MR. KANELLIS: Let's talk about First Amendment standing.

Your Honor, we'll brief this after trial, but I want to focus on one aspects of this. To establish Article III standing, the harm must be concrete, particularized, actual, or imminent, and the problem with their case is that it is so attenuated from the actual allegation -- from the actual allegation of these arrests.

Let's go through them. The next slide. Skip the next couple. I want to go to the chart.

(On screen.)

Your Honor, let's talk about what their theory is. Their theory is that these protesters spoke out and supported Palestine and as a result were arrested. And that news of their arrests -- now the protesters aren't the parties here, okay? But the news of their arrests were in the media, who broadcast their arrest, and that ran into a second party. This second party is also not a plaintiff. This second party heard news of the arrest and interpreted that to be an ideological deportation policy, and that ideological deportation policy, they communicated their fears. Now we haven't heard from any

of the supposed students who were terrified or disturbed, but then that was communicated to finally the plaintiffs.

This is not immediately -- this is not something that this Court makes -- I go back to the --

THE COURT: Well I guess wait a minute. You've lost me with the little green man there.

(Laughter.)

THE COURT: It's your chart. But I followed until we got down to the little green man.

MR. KANELLIS: Because, your Honor --

THE COURT: I thought that we had witnesses who embodied the little green man, and the people who are, um, members of the AAUP who, um, and one is MESA, saying "I am scared," "I am scared to go out of the country," "I am scared to go to a protest." And, yes, it's from the media reports of these arrests, which the media largely, um, portrayed as, um, baseless arrests. Yeah, I don't see the other steps, is all I'm saying.

MR. KANELLIS: Your Honor, because the plaintiffs are AAUP, the plaintiffs are trying to demonstrate to the Court how they were harmed. We had a trial, um, and the harm has been articulated by AAUP.

THE COURT: But so we're clear, I'm only going to give standing to those people who were in the zone of

concern, that is noncitizen members, graduate students, and professors, um, as -- with respect to Professor Nickel, they're noncitizens.

MR. KANELLIS: Yes. Yes, your Honor.

THE COURT: Look, this isn't as complex. Now this is extra records, but they fit themselves within this pattern.

The President, um, is a master of speech and is certainly, um, brilliantly uses his right to free speech. Whether he recognizes it or not, whether other people have any right to free speech, is questionable. Take he and the falling out with Elon Musk. Take he and the latest things he had to say about Adam Schiff. Not my case. But in each of those, there is at least the allegations which track the allegations here.

Then he talks as he talks, the President. Then the lower-level people look into the contracts, look into the, um, housing situation, in the Schiff case, and things happen or don't happen or the like. That's their argument here. And that is a concerning pattern, I have to tell you, because if it's a selective prosecution based upon protected speech, it would seem -- and I'm focusing and will focus only on the record I have before me, but if that's what happened here in actual fact -- not at the Presidential level, he didn't know Mahmoud

Khalil or any of these peoples, one imagines, but at the cabinet level and below, um, to please the President of the United States, um, that's a matter I have to deal with.

Isn't that right?

MR. KANELLIS: That, um -- I don't believe it is correct, your Honor, because --

THE COURT: 4 minutes to tell me why not?

MR. KANELLIS: I'll tell you in under 30 seconds. Because ***Hartman*** dictates that the first question you ask is whether there was a legitimate basis for the decisions that were made and the evidence shows that there was a legitimate basis.

THE COURT: Thank you.

MR. KANELLIS: With respect to the harm, your Honor, I have one more slide.

(On screen.)

And that is I've heard, a lot in this case, a lot about feelings in this case. You remember that I asked Harvard philosophy chair, Mr. Nickel, about -- a question about Kierkegaard and Kierkegaard's definition of anxiety, "Anxiety is the business of freedom," and I didn't do that as a throwaway question or because of my predilection for 19th Century Western European existentialism, it was because Kierkegaard made the

point, and that is that anxiety is not about the deprivation of freedom, it's about the abundance of freedom. And the individuals who have testified in this case have all thrived, they've talked about what they've been able to do.

Anxiety, your Honor, federal courts, Article III courts, do not litigate about the nebula of anxiety, they deliberate about material harms, about actual material injury. And the testimony that you've heard from these witnesses is entirely speculative.

You heard Professor Nickel talk about the heightened risk that someday he may be deported. That does not satisfy an injury-in-fact requirement of Article III.

Your Honor, I have 2 minutes, I think.

THE COURT: Go ahead.

MR. KANELLIS: Let's summarize by looking at this chart of the plaintiffs.

Have we even heard the words "AAUP" and "New York University" mentioned? No, we haven't. They're gone.

Have we heard "Rutgers" mentioned at all in this case? No. They're gone.

Have we heard the "Middle Eastern Studies Association," has the witness articulated how the Middle Eastern Studies Association was impacted by this

supposed policy? They're gone.

All we have left is reference to two associations, AAUP, and AAUP Harvard, which I will note, after Khalil's arrest, held a public protest in Harvard Square criticizing the University's decision. That is not -- that is an exercise of the First Amendment, it is not an abrogation of it.

Your Honor, subject to any questions, the government rests.

THE COURT: Thank you very much.

MS. CONLON: Your Honor?

THE COURT: Let me say --

MS. CONLON: Okay, we did have 10 minutes remaining and I was hoping to use 3 of them.

THE COURT: No, you don't have 10 minutes remaining and I don't give rebuttal. I take that back, you don't have 10 minutes, a few minutes were remaining, but I don't give rebuttal. You have the opportunity to submit the requests for findings and rulings.

I simply wanted to say how, um, pleased I am by the vigorous advocacy that's been displayed in this courtroom and by the high level of, um, civility and responsiveness and devotion to the facts that's been shown by everyone in this case, and I include the witnesses as well as the attorneys.

Case: 26-6906, 11/20/2026, DktEntry: 16.8, (77 of 300)



It's my responsibility now to deliver a fair and just written opinion on Phase 1. We have our schedule for submitting the requests for findings and rulings, and I will, um, be about that task.

But my thanks to all of you is most sincere. We'll recess.

(Ends, 11:20 a.m.)

C E R T I F I C A T E

I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do hereby certify that the forgoing transcript of the record is a true and accurate transcription of my stenographic notes, before Judge William G. Young, on Monday, July 21, 2025, to the best of my skill and ability.

/s/ Richard H. Romanow 07-22-25
________________________
RICHARD H. ROMANOW  Date

Marc Van Der Hout (Cal. Bar #80778)
Johnny Sinodis (Cal. Bar #290402)
Oona Cahill (Cal. Bar #354525)
**VAN DER HOUT LLP**
360 Post Street, Suite 800
San Francisco, CA 94108
Telephone: (415) 981-3000
Facsimile: (415) 981-3003
Email: ndca@vblaw.com

Conor T. Fitzpatrick (D.C. Bar #90015616)*
Daniel A. Zahn (D.C. Bar #90027403)*
**FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION (FIRE)**
700 Pennsylvania Avenue SE, Suite 340
Washington, DC 20003
Telephone: (215) 717-3473
Email: conor.fitzpatrick@fire.org
Email: daniel.zahn@fire.org

Colin P. McDonell (Cal. Bar #289099)
**FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION (FIRE)**
510 Walnut Street, Suite 900
Philadelphia, PA 19106
Telephone: (215) 717-3473
Email: colin.mcdonell@fire.org

*Admitted pro hac vice

*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

THE STANFORD DAILY PUBLISHING CORPORATION, JANE DOE, and JOHN DOE,

*Plaintiffs*,

v.

MARCO RUBIO, in his official capacity as Secretary of State, and

MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security,

*Defendants*.

Case No. 5:25-cv-06618-NW

**DECLARATION OF DANIEL ZAHN ABOUT SUBMITTED EXHIBITS AND MANUAL FILING NOTIFICATION**

7-ER 1653

I, Daniel Zahn, declare as follows:

1. I am a Staff Attorney at the Foundation for Individual Rights and Expression (FIRE). I am a licensed attorney in good standing in the District of Columbia, and I appear on behalf of Plaintiffs in the present case. This Court has granted my pro hac vice application.

2. Pursuant to this Court's March 13 order, Dkt. No. 78, the parties have filed the admitted trial exhibits from *American Association of University Professors v. Rubio*, No. 25-10685 (D. Mass). I submit this declaration about the *AAUP* trial exhibits that the parties filed.

3. Certain exhibits contain redactions approved by the *AAUP* Court. The filed versions therefore accurately reflect the exhibit as it exists in the *AAUP* trial record.

4. Certain exhibits indicate that they are subject to protective orders or other restrictions, such as attorneys' eyes only. To the parties' knowledge, none of the submitted exhibits are subject to access restrictions, such as a protective order or seal, even when otherwise indicated.

5. Certain exhibits contained court stamps from the *AAUP* Court. The parties were unable to access version of those exhibits without court stamps. I have edited the exhibits solely to remove the court stamps, and I declare that removing court stamps is the only modification I made to those exhibits. Defendants' counsel has reviewed those edits and approved them. The following exhibits were affected: 5, 6, 23, 31, 58–64, 232–36, 247–50.

6. Exhibits 225, 228, and 237 are in physical form only and are being maintained in the case file in the Clerk's office. For information on retrieving those exhibits directly from the Court, please see the Court's main website at http://www.cand.uscourts.gov under Frequently Asked Questions (FAQ). These exhibits were not efiled because they are video computer files.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 27, 2026.

/s/ *Daniel A. Zahn*

Daniel A. Zahn

# EXHIBIT 1

# INDEX

Declaration of John Armstrong ........ 1

Declaration of Andre Watson ........ 7

Department of State Cable 26168 ........ 12

Khalil Notification of Removability Determination under INA 237(a)(4)(C) ........ 18

Khalil Notice to Appear ........ 20

Khalil Form I-261 ........ 23

Khalil Warrant for Arrest of Alien ........ 25

Mahdawi Notification of Deportability Determination under INA 237(a)(4)(C) ........ 26

Mahdawi Notice to Appear ........ 28

Mahdawi Warrant for Arrest of Alien ........ 32

Mahdawi Notice of Custody Determination ........ 33

Ozturk Visa Revocation – Memo for ICE ........ 34

Ozturk Notice to Appear ........ 36

Ozturk Warrant for Arrest of Alien ........ 40

Chung Notification of Removability Determination under INA 237(a)(4)(C) ........ 41

Chung Unserved Warrant for Arrest of Alien ........ 43

Suri Notification of Deportability Determination under INA 237(a)(4)(C) ........ 44

Suri Notice to Appear ........ 46

# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, ET AL., | Civil Action No. 1:25-cv-10685-WGY |
| Plaintiffs, | |
| v. | **CERTIFICATION OF ADMINISTRATIVE RECORD** |
| MARCO RUBIO, in his official capacity as Secretary of State, and the DEPARTMENT OF STATE, ET AL., | |
| Defendants. | |

I, Larry W. Talbott, hereby declare under penalty of perjury:

1. I am employed by the United States Department of State, Bureau of Consular Affairs, Visa Office, Office of Information Management and Liaison. The facts attested to herein are based upon my personal knowledge and upon information provided to me in my official capacity.

2. Noting that this is not a traditional Administrative Record, because it is addressing the *absence* of a policy alleged to exist in litigation, and is further compiled for purposes of non-traditional review in a Rule 65(a) expedited proceeding, I certify that the following documents annexed hereto constitute the Department of State's administrative record in this matter, which consists of the declaration of John Armstrong, dated April 11, 2025, previously submitted to this Court (Dkt.# 65-1), describing the Department of State's requirements and polies relating to visa revocation and affirming that it is not true that the

Department is approving visa revocations for "ideological deportation" reasons, a true and correct version of the Department of State Cable 26168, redacted for Law Enforcement Privilege, and the following documents related to five individuals, filed in separate litigation:

a. Khalil Notification of Removability Determination under INA 237(a)(4)(C)

b. Mahdawi Notification of Removability Determination under INA 237(a)(4)(C)

c. Ozturk Visa Revocation – Memo for ICE

d. Chung Notification of Removability Determination under INA 237(a)(4)(C)

e. Suri Notification of Removability Determination under INA 237(a)(4)(C)

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1476, that the foregoing is true and correct to the best of my knowledge.

Larry W. Talbott

Larry W. Talbott
Deputy Director
Office of Information Management and Liaison
Visa Office, Bureau of Consular Affairs
U.S. Department of State

# EXHIBIT 3

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, ET AL.,<br><br>Plaintiffs,<br><br>v.<br><br>MARCO RUBIO, in his official capacity as Secretary of State, and the DEPARTMENT OF STATE, ET AL.,<br><br>Defendants. | Civil Action No. 1:25-cv-10685-WGY<br><br>**CERTIFICATION OF ADMINISTRATIVE RECORD** |

I, Akil Baldwin, hereby declare under penalty of perjury:

1. I am the Deputy Assistant Director for the National Security Division of Homeland Security Investigations (HSI). Prior to becoming the Deputy Assistant Director, I served as the Division Chief for the HSI Office of International Operations. I have additionally served as the HSI Attache in Hong Kong; Assistant Special Agent in Charge in New York, N.Y., and Assistant Attache in Brussels, Belgium. The facts attested to herein are based upon my personal knowledge and upon information provided to me in my official capacity.

**2.** Noting that this is not a traditional Administrative Record, because it is addressing the *absence* of a policy alleged to exist in litigation, and is further compiled for purposes of non-traditional review in a Rule 65(a) expedited proceeding, I certify that the declaration of HSI National Security Division Assistant Director Andre Watson, dated April 11,

2025, previously submitted to this Court (Dkt.# 65-2), describing the Department of Homeland Security's processes for identifying, disrupting and dismantling transnational criminal enterprises and terrorist organizations that threaten the security, and confirming that the Department has no official or unofficial "ideological deportation policy," is part of the U.S. Immigration and Customs Enforcement's administrative record in this matter.

3. In good faith, I certify the document that was put before me. There's a separate certification pertaining to other U.S. Immigration and Customs Enforcement documents and a separate certification pertaining to U.S. Department of State's documents reflected in the index and record.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1476, that the foregoing is true and correct to the best of my knowledge.

AKIL R BALDWIN

Digitally signed by AKIL R BALDWIN
Date: 2025.05.29 12:11:47 -04'00'

Akil Baldwin
Deputy Assistant Director
National Security Division
Homeland Security Investigations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

# EXHIBIT 4

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, ET AL.,<br><br>Plaintiffs,<br><br>v.<br><br>MARCO RUBIO, in his official capacity as Secretary of State, and the DEPARTMENT OF STATE, ET AL.,<br><br>Defendants. | Civil Action No. 1:25-cv-10685-WGY<br><br>**CERTIFICATION OF ADMINISTRATIVE RECORD** |

I, William S. Walker, hereby declare under penalty of perjury:

1. I am the Acting Assistant Director for Domestic Operations at Homeland Security Investigations ("HSI") at U.S. Immigration and Customs Enforcement ("ICE") within the U.S. Department of Homeland Security ("DHS"). As the Acting Assistant Director, I am responsible for oversight of 30 HSI Special Agents in Charge, ensuring all field operations are working to efficiently execute the agency mission.

2. I began my career with the U.S. Government as an Inspector with the former U.S. Customs Service at the Port of Philadelphia. Over 26 years, I have served as Deputy Special Agent in Charge, Assistant Special Agent in Charge, and Supervisory Special Agent with HSI. Most recently, I served as the Special Agent in Charge of HSI's New York Field Office where I oversaw over 700 investigators whose mission was investigating, disrupting, and dismantling transnational criminal organizations and

Case: 26-6906, 11/20/2026, DktEntry: 16.8, Page 91 of 300

terrorist networks. In my capacity as Acting Assistant Director, I now oversee 237 Domestic Field Offices and more than 7,100 Special Agents.

3. In good faith, I certify the documents that were put before me. There's a separate certification pertaining to the U.S. Department of State's documents reflected in the index and record.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1476, that the foregoing is true and correct to the best of my knowledge.

WILLIAM S WALKER Digitally signed by WILLIAM S WALKER Date: 2025.05.29 12:24:12 -04'00'

William S. Walker
HSI Acting Assistant Director for Domestic Operations
U.S. Immigration and Customs Enforcement

# EXHIBIT 5

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, ET AL.,

Plaintiffs,

v.

MARCO RUBIO, in his official capacity as Secretary of State, and the DEPARTMENT OF STATE, ET AL.,

Defendants.

Civil Action No. 1:25-cv-10685-WGY

**DECLARATION OF JOHN ARMSTRONG IN SUPPORT OF DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

I, John Armstrong, hereby declare under penalty of perjury:

1. I am the Senior Bureau Official within the U.S. Department of State's Bureau of Consular Affairs. I am a career member of the Senior Foreign Service with the rank of Counselor. Prior to becoming the Senior Bureau Official, I briefly served as the Deputy Assistant Secretary for Overseas Citizen Services. I served overseas as the Consul General in Lima, Peru, as Economic Counselor in Warsaw, Poland, as Consular Section Chief and Acting Deputy Chief of Mission in Nassau, Bahamas, Deputy Consul General in Kyiv, Ukraine, and Nonimmigrant Visa Chief in Bucharest, Romania. I have also previously served domestic assignments in Washington, D.C., as Director of the Office of Eastern European Affairs, Director of the Washington Passport Agency, Senior Political Officer on the Russia Desk, and Belarus Desk Officer.

2. As the Senior Bureau Official, I oversee the functions and responsibilities of the Bureau of Consular Affairs, including the Office of Overseas Citizen Services, the Office of Passport Services, and the Office of Visa Services ("Visa Office"), which encompasses all aspects of visa policy, procedures, and information related to U.S. visa issuance to foreign citizens who apply at more than 230 visa-issuing U.S. embassies and consulates.

3. I am familiar with the Department's requirements and policies relating to visa revocation. I base this declaration on my review of Department of State records and discussion with other Department of State employees.

4. The Visa Office's functions and responsibilities encompass all aspects of visa policy, procedures and information related to U.S. visa issuance to foreign citizens, who are applying at U.S. Embassies and Consulates worldwide, seeking to come to the United States. The responsibilities of the Visa Office include coordinating with other agencies to perform national security screening of foreign travelers, and providing guidance and recommendations on visa policy related to national security exclusions. Among its many functions, the Visa Office also revokes thousands of visas annually and provides guidance to the field on visa issuance, revocation and denial.

5. On January 20, 2025, President Trump issued Executive Order 14161, Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats ("E.O. 14161"). Consistent with E.O. 14161, the Visa Office has undertaken numerous efforts to "identify all resources that may be used to ensure that all aliens seeking admission to the United States, or who are already in the United States, are vetted and screened to the maximum degree possible."

6. On January 29, 2025, President Trump issued Executive Order 14188, Additional Measures to Combat Anti-Semitism ("E.O. 14188"). Pursuant to E.O. 14188, the Visa Office and other relevant offices at State are working with the Department of Education and the Department of Homeland Security ("DHS") on appropriate ways to "familiariz[e] institutions of higher education with the grounds for inadmissibility under 8 U.S.C. 1182(a)(3) so that such institutions may monitor for and report activities by alien students and staff relevant to those grounds and for ensuring that such reports about aliens lead, as appropriate and consistent with applicable law, to investigations and, if warranted, actions to remove such aliens."

7. One of the tools in place to ensure maximum vetting of visa applicants and visa-holders, including students, is the Department's long-standing continuous vetting program. All visa-holders are continuously vetted by law enforcement and intelligence agencies for information that surfaces after visa issuance. Processes for coordinated security-related continuous vetting have been used by the State Department and partner agencies for over 10 years.

8. The Department of State has the authority to revoke visas under Section 221(i) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1201(i), which states, in pertinent part: "After the issuance of a visa or other documentation to any alien, the consular officer or the Secretary of State may at any time, in his discretion, revoke such visa or other documentation." For example, the Department may revoke a visa if information arises that indicates an alien is potentially ineligible for that visa or that revocation is otherwise warranted, including, for example, if the alien poses a threat to U.S. public safety. The Visa

Office provides notice to DHS when a visa is revoked.

9. A visa is revoked only after the Department of State reviews available information to ascertain whether the visa revocation is supported by the facts and law.

10. Given the Department's commitment to, and responsibility for, national security, the Visa Office uses all available resources in its visa screening and vetting both when making the initial visa adjudication and during recurrent vetting.

11. Information on visa-holders can come directly from interagency partners, from offices within the Department of State, or from public sources. The Visa Office has long-standing relationships with U.S. law enforcement agencies who regularly send the Visa Office information when they believe derogatory information merits a revocation. This includes information from DHS and the Federal Bureau of Investigation.

12. A visa can be revoked for any potential ineligibility under U.S. law, including but not limited to potential ineligibility for a visa under one of the "Security and related grounds" of inadmissibility at section 212(a)(3) of the INA. The "Security and related grounds" include terrorism related inadmissibility grounds, such as endorsing or espousing terrorist activity or persuading others to endorse or espouse terrorist activity or support a terrorist organization, as well as engaging in terrorist activity by providing material support to a designated or undesignated terrorist organization. That section also includes an inadmissibility ground for foreign policy reasons, when the Secretary of State has reasonable ground to believe an alien's entry or proposed activities in the United States would have potentially serious adverse foreign policy consequences for the United States.

13. The Bureau of Consular Affairs, including the Office of Visa Services, does not carry out deportations. DHS's Immigration and Customs Enforcement ("ICE") is responsible for immigration enforcement in the United States, including initiating proceedings against aliens charged as removable.

14. As deportations are carried out by DHS, deportation policy is outside the purview of the Bureau of Consular Affairs. No ideological deportation policy has been developed or

implemented by the Bureau of Consular Affairs or the Visa Office.

15. I am aware of Secretary Rubio's public remarks indicating the U.S. government will revoke visas of and deport Hamas supporters. These statements are consistent with the State Department's long-standing implementation of visa and immigration laws, across administrations. Hamas has been a designated foreign terrorist organization under section 219 of the INA since it was designated by former Secretary Madeleine Albright in 1997. Support for a designated terrorist organization by statute is a basis for visa refusal and other immigration consequences: the INA provides that an alien who persuades others to support a terrorist organization, or who has afforded material support to a designated terrorist organization, is inadmissible and deportable. INA §§ 212(a)(3)(B), 237(a)(4)(B).

16. I am aware of plaintiffs' contention that the State Department and ICE have launched new social media surveillance programs aimed at identifying noncitizen students and faculty with alleged terrorist sympathies. It is true that the State Department has authored new guidance to consular officers on reviewing visa applicants' social media. However, it is misleading and false to refer to the Department's review of publicly available social media as a form of "surveillance" to root out "terrorist sympathies" among students and faculty. Rather, review of publicly available social media is a component of the extensive information-collection and vetting process foreign visitors undergo when they apply for and use U.S. visas.

17. I am aware of plaintiffs' contentions regarding Secretary Rubio's March 16, 2025, interview on the television news show *Face the Nation*. I understand Secretary Rubio's comments to refer to the ongoing work of the Visa Office to revoke visas, revocations which occur for a wide variety of reasons. Secretary Rubio did not state, and it is not true, that the Visa Office is approving visa revocations every day for "ideological deportation" reasons. This assertion is simply false.

I declare under the penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed on this 11th day of April, 2025.

John Armstrong
Senior Bureau Official
Bureau of Consular Affairs
U.S. Department of State

# EXHIBIT 6

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>MARCO RUBIO, *et al.*,<br><br>Defendants. | No. 1:25-CV-10685 |

**DECLARATION OF ANDRE WATSON**

I, Andre Watson pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1. I am the Senior Official within the National Security Division (NSD) for Homeland Security Investigations (HSI). I am a career member of the Senior Executive Service with the rank of Assistant Director. Prior to becoming the Assistant Director of NSD, I served on a detail assignment to the U.S. Department of Homeland Security in the capacity of Principal Deputy Assistant Secretary for the Countering Weapons of Mass Destruction Office. I served as the HSI Special Agent in Charge in Baltimore, M.D., Deputy Special Agent in Charge in Washington, D.C., Assistant Special Agent in Charge in Houston, T.X., and Supervisory Special Agent in Blaine, W.A. I have also previously served in Headquarters assignments as Chief of Staff to the Deputy Director of U.S. Immigration and Customs Enforcement (ICE), Chief of Intelligence for the U.S. Department of Justice, International Organized Crime and Intelligence Operations Center, and various supervisory positions within NSD.

2. As the Senior Official within NSD, I oversee the National Security as well as Student and Exchange Visitor Programs functions in support of ICE efforts to identify, disrupt and dismantle transnational criminal enterprises and terrorist organizations that threaten the security of the United States. These efforts encompass all investigations and aspects of terrorism, special interests involving state and non-state actors, human rights violators and war criminals as well as compliance and oversight functions for over 6,900 academic institutions, 45,000 designated school officials, and over 1.2 million foreign students studying in the United States.

3. HSI is a component of ICE that conducts significant and complex criminal investigations into individuals and international criminal networks that violate U.S. laws. HSI focuses its efforts on combating the transnational criminal networks that pose the greatest threats to the security of the United States. HSI has more than 10,000 employees stationed in more than 235 U.S. cities and more than 50 countries worldwide. The HSI workforce is made up of special agents, criminal analysts, intelligence analysts, and support personnel who live and work in the communities they are sworn to protect and serve.

4. The Student and Exchange Visitor Program (SEVP), a component of HSI's National Security Division, was created in the wake of 9/11 to provide integrity to the immigration system by collecting, maintaining and analyzing information so only legitimate nonimmigrant students or exchange visitors can gain entry in the U.S. Through a database housing information pertaining to schools and students, the Student and Exchange Visitor Information System (SEVIS), SEVP manages and tracks nonimmigrants in the F, M, and J categories. To eliminate vulnerabilities related to the nonimmigrant visa program, Congress first introduced statutory language mandating the development of a program to collect data and improve tracking of foreign students in the Illegal Immigration Reform and Immigrant Responsibility Act of (IIRIRA) of 1996. In 2001, Congress

expanded the foreign student tracking system when it enacted PATRIOT ACT, and in 2002 Congress strengthened the tracking system yet again, through the Enhanced Border Security and Visa Entry Reform Act, noting concerns with national security and emphasizing the need to carefully track student status and information. Accordingly, these laws and regulations demonstrate a clear congressional directive that ICE closely monitor foreign students and the schools in which they enroll by vigorously enforcing statutory and regulatory requirements.

5. I am aware of the above-captioned lawsuit. I provide this declaration based on my personal knowledge, reasonable inquiry, and information obtained from various records, systems, databases, other Department of Homeland Security (DHS) employees, and information portals maintained and relied upon by DHS in the regular course of business.

6. On January 29, 2025, President Trump issued Executive Order 14188, *Additional Measures to Combat Anti-Semitism* (E.O. 14188). ICE remains steadfast in its commitment to enforcing E.O. 14188 prohibiting anti-Semitism and safeguarding national security by applying existing authorities consistent with the priorities set forth in the E.O. 14188.

7. In applying existing authorities,, HSI Office of Intelligence proactively reviews open-source information to identify individuals within the parameters of E.O. 14188. Open-source information is defined as unclassified information that has been published or broadcast in some manner to the general public, could be lawfully seen or observed by a casual observer, is made available at a meeting open to the public, or is obtained by visiting any place or attending any event that is open to the public.

8. The U.S. Department of State (DOS) has broad discretion under 8 U.S.C. § 1201(i) to revoke visas and make determinations of whether an alien's present or activities in the United States would have potentially serious adverse foreign policy consequences. ICE does not make

Case: 26-6906, 11/20/2026, DktEntry: 16.8, Page 103 of 300

those determinations. Upon notification of DOS determination, ICE may take subsequent enforcement actions such as placing the alien in removal proceedings under the Immigration and Nationality Act (INA). HSI's Counter Threat Lead Development Unit (CTLD) is specifically responsible for analyzing alien nonimmigrant status violators, lawfully admitted to the United States, who violate the terms of their admission and pose a threat to national security, public safety and/or are involved in criminal activity for field referral and further investigation. Since 2003, the National Security Division has overseen this mission. Currently, CTLD receives over one million alien violator records each year, primarily from U.S. Customs and Border Protection (CBP) Arrival and Departure Information System (ADIS), as well as from SEVIS. CTLD generates viable, investigative leads on nonimmigrant overstays with national security and public safety concerns and/or criminal activity to HSI field offices for further action. CTLD may also provide information to DOS for possible visa revocation if appropriate. .

9. Procedurally, once DOS notifies ICE of its decisions concerning whether to revoke a visa or make certain determinations that would render a alien removable, the determination is then disseminated to the local field office for additional enforcement actions against the student (e.g., issuing a Notice to Appear in removal proceedings) if appropriate.

10. Enforcement actions carried out against aliens within the purview of E.O.14188 occur pursuant to ICE's existing civil immigration authorities under the INA. There is no official or unofficial "ideological deportation policy." Aliens may be charged with any deportation ground under the INA supported by fact and law.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 11th day of April 2025.

ANDRE R WATSON

Digitally signed by ANDRE R WATSON
Date: 2025.04.11 18:22:22 -04'00'

Andre Watson, Assistant Director
National Security Division
Homeland Security Investigations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

# EXHIBIT 7

**UNCLASSIFIED**
SBU

| | |
|---|---|
| **MRN:** | 25 STATE 26168 |
| **Date/DTG:** | Mar 25, 2025 / 251914Z MAR 25 |
| **From:** | SECSTATE WASHDC |
| **Action:** | ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE *Immediate* |
| **E.O:** | 13526 |
| **TAGS:** | CVIS, CMGT, PTER, KFRD |
| **Captions:** | SENSITIVE |
| **Reference:** | 25 STATE 5914 |
| **Subject:** | (U) Action Request: Enhanced Screening and Social Media Vetting for Visa Applicants |

1. (U) This is an action request. **See paragraph 7**.

2. **(SBU) SUMMARY:** The protection of our nation and its citizens is a consular officer's first consideration. Pursuant to the implementation of Executive Order (E.O.) 14161 and E.O. 14188, known respectively as *Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats* and *Additional Measures to Combat Anti-Semitism*, effective immediately, consular officers must refer certain student and exchange visitor (F, M, and J) visa applicants to the Fraud Prevention Unit (FPU) for a mandatory social media check as described below. As the Secretary stated on March 16, "We don't want people in our country that are going to be committing crimes and undermining our national security or the public safety. It's that simple. Especially people that are here as guests. That is what a visa is…It is a visitor into our country. And if you violate the terms of your visitation, you are going to leave." The Visa Office will host webinars for consular officers to discuss this guidance on April 3 and April 4, 2025. **END SUMMARY.**

3. **(SBU) Consular Officers Play a Critical Role in Protecting National Security:** As part of screening every case for potential ineligibilities, consular officers MUST ADDRESS any derogatory information indicating that a visa

applicant may be subject to the terrorism-related ineligibility grounds of the Immigration and Nationality Act (INA). This includes advocating for, sympathizing with, or persuading others to endorse or espouse terrorist activities or support a DESIGNATED FOREIGN TERRORIST ORGANIZATION (FTO).

4. **(SBU) Every Visa Decision is a National Security Decision:** In Ref A, the Visa Office directed consular officers to maintain extra vigilance and to comprehensively review and screen every visa applicant for potential security and non-security related ineligibilities including to assess whether the applicant poses a threat to U.S. national security. Any nonimmigrant visa applicant who has not established to a consular officer's satisfaction that the applicant meets all standards required in that visa classification should be refused under 214(b), as appropriate. This includes establishing that the applicant does not intend to engage in activities inconsistent with the requested visa status. If 214(b) does not apply to the visa classification, consular officers should refuse any nonimmigrant or immigrant visa case presenting such concerns under section 221(g) of the INA for further review of additional ineligibility grounds, **LE** **LE** as appropriate.

5. (U) This was reflected well by the Secretary's statement on March 16, that "when you apply to enter the United States and you get a visa, you are a guest…if you tell us when you apply for a visa, 'I'm coming to the U.S. to participate in pro-Hamas events,' that runs counter to the foreign policy interest of the United States…if you had told us you were going to do that, we never would have given you the visa."

6. **(SBU) Situations that Cast Doubt on Students' Intent or Credibility:** As described in 9 FAM 402.5-5(C), an applicant applying for an F-1 or M-1 student visa must demonstrate intent to enter the United States solely to pursue a full course of study at an approved institution. In addition, J-1 visa applicants who are college, university, and other post-secondary students are required to pursue a full course of study as described in 9 FAM 402.5-6(E)(11). Evidence suggesting a student visa applicant intends to travel to

the United States to engage in unlawful activities clearly calls into question whether the applicant possesses intent and/or the ability to solely pursue a full course of study. While many activities may not fall under the INA's definitions of "terrorist activity," you should otherwise consider that information in assessing the credibility of a visa applicant's claimed purpose of travel. INA section 214(b) requires the applicant to show credibly that all activities in which he or she is expected to engage in while in the United States are consistent with the specific requirements of their visa classification.

7. **(SBU) ACTION REQUEST: Mandatory Social Media Reviews for Students and Student Exchange Visitors.** Effective immediately, consular officers must refer all new or returning F-1, M-1, or student J-1 visa applications meeting one or more of the following criteria, that the consular officer has determined is otherwise eligible for the requested nonimmigrant status, to the FPU via ECAS as described in 7 FAH-1 H-945.4, using the SOCIAL MEDIA REVIEW category. **LE**

**LE**

**LE**

**LE**

8. **(SBU) Documenting the Results of the Social Media Review:** If the social media review uncovers potentially derogatory information indicating that the applicant may not be eligible for a visa, Fraud Prevention Units are required to take screenshots of social media findings to the extent it is relevant to a visa ineligibility, to preserve the record against the applicant's later alteration of the information. Limit screenshots to information relevant to connecting the applicant, the applicant's actions, and a visa ineligibility. **LE**

**LE**

9. **(SBU) Support for Terrorist Organizations - Grounds and Definitions for INA 212(a)(3)(B):** All consular officers should carefully review 9 FAM 302.6 to understand the grounds under which an applicant may be ineligible under 3B, including that an applicant who "endorses or espouses terrorist activity or persuades others to endorse or espouse terrorist activity or support a terrorist organization" is ineligible. Consular officers should consider these grounds and definitions when conducting interviews and pursuing lines of inquiry. Because terms in INA 212(a)(3)(B) are broadly defined, consular officers should elicit as much pertinent information as possible from visa applicants with suspected ties to terrorist organizations or terrorist activity. This includes the names of all relevant organizations potentially involved in terrorist activity and the applicant's relationship with them (for example, by current membership or past financial contributions or other support). Evidence that an applicant advocates for terrorist activity, or otherwise demonstrates a degree of public approval or public advocacy for terrorist activity or a terrorist organization, may be indicative of ineligibility under INA 212(a)(3)(B). This may be evident in conduct that bears a hostile attitude toward U.S. citizens or U.S. culture (including government, institutions, or founding principles). Or it may be evident in advocacy or sympathy for foreign terrorist organizations. All of these matters may open lines of inquiry regarding the applicant's credibility and purpose of travel. Consular officers should inquire into the nature and activities of those organizations. **LE**

LE

10. **(SBU) Intention to Engage in Unlawful Activity:** Consular officers are also reminded of guidance in 9 FAM 302.5-4 regarding the applicability of INA 212(a)(3)(A)(ii) under which a visa applicant is ineligible if the consular officer knows or has reason to believe that the applicant is traveling to the United States solely, principally, or incidentally to engage in any other unlawful activity. Consular officers should take care to enter detailed case notes regarding the specific activities expected in the United States and request an advisory opinion per 9 FAM 302.5-4(C).

11. **(SBU) Revocations of Valid Visas:** If, subsequent to visa issuance, information becomes available to post that an individual may no longer be eligible for a visa due to particularized information indicating an ineligibility under specific INA provisions, including 214(b), post should follow the procedures to revoke or request prudential revocation as described in 9 FAM 403.11 for nonimmigrant visas or 9 FAM 504.12 for immigrant visas. The Visa Office reminds posts that consular officers do not have the authority to revoke a visa based on a suspected ineligibility or based on derogatory information that is insufficient to support an ineligibility finding - other than a revocation based on driving under the influence (DUI) - and that such cases should be referred LE in accordance with 9 FAM 403.11-5(B) for further review. A consular officer's revocation must be based on an actual finding that the individual is ineligible for the visa.

12. **(U) Additional Guidance:** The Visa Office will host webinars for consular officers to discuss this guidance on Thursday, April 3 and Friday, April 4, 2025. Invitations with links to these webinars will be sent separately. The FAM will be updated to reflect this guidance.

13. **(U) Inquiries:** Post must refer any U.S. media inquiries regarding E.O.s to CA-Press@state.gov and congressional inquiries regarding E.O.s to ConsularOnTheHill@state.gov. Posts may respond to requests from

international media regarding E.O.s using CA's cleared press guidance located on CA Web, copying CA-PRESS@STATE.GOV.

14. (U) Minimize considered.

**MINIMIZE CONSIDERED**

| | |
|---|---|
| **Signature:** | RUBIO |
| **XMT:** | BASRAH, AMCONSUL; CARACAS, AMEMBASSY; CHENGDU, AMCONSUL; KABUL, AMEMBASSY; MINSK, AMEMBASSY; SANAA, AMEMBASSY; ST PETERSBURG, AMCONSUL; VLADIVOSTOK, AMCONSUL; YEKATERINBURG, AMCONSUL |

**UNCLASSIFIED**

SBU

# EXHIBIT 8

THE SECRETARY OF STATE
WASHINGTON

SENSITIVE BUT UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

MEMORANDUM FOR THE SECRETARY OF HOMELAND SECURITY

FROM: Marco Rubio

SUBJECT: (SBU) Notification of Removability Determinations under Section 237(a)(4)(C) of the Immigration and Nationality Act (INA)

(SBU) I am writing to inform you that upon notification from the Department of Homeland Security's Homeland Security Investigations (DHS/ICE/HSI) on March 7, 2025, I have determined that [redacted] and Mahmoud Khalil (DOB [redacted] POB: Algeria), both U.S. Lawful Permanent Residents (LPRs), are deportable aliens under INA section 237(a)(4)(C). I understand that ICE now intends to initiate removal charges against them, based on assurances from DHS/ICE/HSI.

(SBU) Under INA section 237(a)(4)(C)(i), an alien is deportable from the United States if the Secretary of State has reasonable ground to believe that the alien's presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States. Under INA section 237(a)(4)(C)(ii), for cases in which the basis for this determination is the alien's past, current, or expected beliefs, statements, or associations that are otherwise lawful, the Secretary of State must personally determine that the alien's presence or activities would compromise a compelling U.S. foreign policy interest.

(SBU) Pursuant to these authorities, I have determined that the activities and presence of these aliens in the United States would have potentially serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest. These determinations are based on

SENSITIVE BUT UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE
Classified by: Secretary of State Marco Rubio
E.O. 13526, Reason(s): 1.4 (justification sections)
Declassify on: Month DD, YYYY

information provided by the DHS/ICE/HSI regarding the participation and roles of [redacted] and Khalil in antisemitic protests and disruptive activities, which fosters a hostile environment for Jewish students in the United States. My determination for [redacted] is also based on [redacted] citations for unlawful activity during these protests. The public actions and continued presence of [redacted] and Khalil in the United States undermine U.S. policy to combat anti-Semitism around the world and in the United States, in addition to efforts to protect Jewish students from harassment and violence in the United States. Consistent with E.O. 14150, America First Policy Directive to the Secretary of State, the foreign policy of the United States champions core American interests and American citizens and condoning anti-Semitic conduct and disruptive protests in the United States would severely undermine that significant foreign policy objective.

**Attachments**

Tab 1 – DHS Letter on [redacted]
Tab 2 – HSI Subject Profile of [redacted]
Tab 3 – DHS Letter on Mahmoud Khalil
Tab 5 – HSI Subject Profile of Mahmoud Khalil
Tab 5 – 8 USC 1227(a)(4)(C)

# EXHIBIT 9

Uploaded on: 03/09/2025 at 10:37:47 AM (Central Daylight Time) Base City: JNA

DEPARTMENT OF HOMELAND SECURITY

# NOTICE TO APPEAR

DOB: [redacted]

Event No: [redacted]

**In removal proceedings under section 240 of the Immigration and Nationality Act:**

Subject ID: [redacted] FINS: [redacted] File No: [redacted]

In the Matter of:

Respondent: MAHMOUD KHALIL currently residing at:

[redacted]

(Number, street, city, state and ZIP code) (Area code and phone number)

☐ You are an arriving alien.

☐ You are an alien present in the United States who has not been admitted or paroled.

☒ You have been admitted to the United States, but are removable for the reasons stated below.

The Department of Homeland Security alleges that you:

1. You are not a citizen or national of the United States;

2. You are a native of SYRIA and a citizen of ALGERIA;

3. You were admitted to the United States at unknown place on or about unknown date as a unknown manner;ORYour status was adjusted to that of a lawful permanent resident on November 2024 under section 212 (a)(3)(C) of the Act;

4. The Secretary of State has determined that your presence or activities in the United States would have serious adverse foreign policy consequences for the United States.

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:

Section 237(a)(4)(C)(i) of the Immigration and Nationality Act, as amended, in that the Secretary of State has reasonable ground to believe that your presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States.

☐ This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.

☐ Section 235(b)(1) order was vacated pursuant to: ☐ 8CFR 208.30 ☐ 8CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at:

830 PINEHILL RD JENA LA 71342. LASALLE DETENTION FACILITY

*(Complete Address of Immigration Court, including Room Number, if any)*

on March 27, 2025 *(Date)* at 8:30 AM *(Time)* to show why you should not be removed from the United States based on the charge(s) set forth above.

[redacted]

*(Signature and Title of Issuing Officer)*

Date: March 9, 2025

26 Federal Plaza, New York, NY

*(City and State)*

EOIR — 1 of 3

## Notice to Respondent

**Warning:** Any statement you make may be used against you in removal proceedings.

**Alien Registration:** This copy of the Notice to Appear served upon you is evidence of your alien registration while you are in removal proceedings. You are required to carry it with you at all times.

**Representation:** If you so choose, you may be represented in this proceeding, at no expense to the Government, by an attorney or other individual authorized and qualified to represent persons before the Executive Office for Immigration Review, pursuant to 8 CFR 1003.16. Unless you so request, no hearing will be scheduled earlier than ten days from the date of this notice, to allow you sufficient time to secure counsel. A list of qualified attorneys and organizations who may be available to represent you at no cost will be provided with this notice.

**Conduct of the hearing:** At the time of your hearing, you should bring with you any affidavits or other documents that you desire to have considered in connection with your case. If you wish to have the testimony of any witnesses considered, you should arrange to have such witnesses present at the hearing. At your hearing you will be given the opportunity to admit or deny any or all of the allegations in the Notice to Appear, including that you are inadmissible or removable. You will have an opportunity to present evidence on your own behalf, to examine any evidence presented by the Government, to object, on proper legal grounds, to the receipt of evidence and to cross examine any witnesses presented by the Government. At the conclusion of your hearing, you have a right to appeal an adverse decision by the immigration judge. You will be advised by the immigration judge before whom you appear of any relief from removal for which you may appear eligible including the privilege of voluntary departure. You will be given a reasonable opportunity to make any such application to the immigration judge.

**One-Year Asylum Application Deadline:** If you believe you may be eligible for asylum, you must file a Form I-589, Application for Asylum and for Withholding of Removal. The Form I-589, Instructions, and information on where to file the Form can be found at www.uscis.gov/i-589. Failure to file the Form I-589 within one year of arrival may bar you from eligibility to apply for asylum pursuant to section 208(a)(2)(B) of the Immigration and Nationality Act.

**Failure to appear:** You are required to provide the Department of Homeland Security (DHS), in writing, with your full mailing address and telephone number. You must notify the Immigration Court and the DHS immediately by using Form EOIR-33 whenever you change your address or telephone number during the course of this proceeding. You will be provided with a copy of this form. Notices of hearing will be mailed to this address. If you do not submit Form EOIR-33 and do not otherwise provide an address at which you may be reached during proceedings, then the Government shall not be required to provide you with written notice of your hearing. If you fail to attend the hearing at the time and place designated on this notice, or any date and time later directed by the Immigration Court, a removal order may be made by the immigration judge in your absence, and you may be arrested and detained by the DHS.

**Mandatory Duty to Surrender for Removal:** If you become subject to a final order of removal, you must surrender for removal to your local DHS office, listed on the internet at http://www.ice.gov/contact/ero, as directed by the DHS and required by statute and regulation. Immigration regulations at 8 CFR 1241.1 define when the removal order becomes administratively final. If you are granted voluntary departure and fail to depart the United States as required, fail to post a bond in connection with voluntary departure, or fail to comply with any other condition or term in connection with voluntary departure, you must surrender for removal on the next business day thereafter. If you do not surrender for removal as required, you will be ineligible for all forms of discretionary relief for as long as you remain in the United States and for ten years after your departure or removal. This means you will be ineligible for asylum, cancellation of removal, voluntary departure, adjustment of status, change of nonimmigrant status, registry, and related waivers for this period. If you do not surrender for removal as required, you may also be criminally prosecuted under section 243 of the Immigration and Nationality Act.

U.S. Citizenship Claims: If you believe you are a United States citizen, please advise the DHS by calling the ICE Law Enforcement Support Center toll free at (855) 448-6903.

**Sensitive locations:** To the extent that an enforcement action leading to a removal proceeding was taken against Respondent at a location described in 8 U.S.C. § 1229(e)(1), such action complied with 8 U.S.C. § 1367.

## Request for Prompt Hearing

To expedite a determination in my case, I request this Notice to Appear be filed with the Executive Office for Immigration Review as soon as possible. I waive my right to a 10-day period prior to appearing before an immigration judge and request my hearing be scheduled.

Before:

_______________________________ *(Signature of Respondent)*

Date: _______________

_______________________________ *(Signature and Title of Immigration Officer)*

## Certificate of Service

This Notice To Appear was served on the respondent by me on March 9, 2025, in the following manner and in compliance with section 239(a)(1) of the Act.

☒ in person ☐ by certified mail, returned receipt # ____________ requested ☐ by regular mail
☐ Attached is a credible fear worksheet.
☐ Attached is a list of organization and attorneys which provide free legal services.

The alien was provided oral notice in the ____________ language of the time and place of his or her hearing and of the consequences of failure to appear as provided in section 240(b)(7) of the Act.

Refused to sign

*(Signature of Respondent if Personally Served)*

[redacted]

*(Signature and Title of officer)*

Case: 26-6906, 11/20/2026, DktEntry: 16.8, Page 118 of 300
Uploaded on: 03/09/2025 at 10:37:47 AM (Central Daylight Time) Base City: JNA

Charges: Sustains All,
Designated Country: ALGERIA | Alternate Country: SYRIA

## Privacy Act Statement

**Authority:**
The Department of Homeland Security through U.S. Immigration and Customs Enforcement (ICE), U.S Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS) are authorized to collect the information requested on this form pursuant to Sections 103, 237, 239, 240, and 290 of the Immigration and Nationality Act (INA), as amended (8 U.S.C. 1103, 1229, 1229a, and 1360), and the regulations issued pursuant thereto.

**Purpose:**
You are being asked to sign and date this Notice to Appear (NTA) as an acknowledgement of personal receipt of this notice. This notice, when filed with the U.S. Department of Justice's (DOJ) Executive Office for Immigration Review (EOIR), initiates removal proceedings. The NTA contains information regarding the nature of the proceedings against you, the legal authority under which proceedings are conducted, the acts or conduct alleged against you to be in violation of law, the charges against you, and the statutory provisions alleged to have been violated. The NTA also includes information about the conduct of the removal hearing, your right to representation at no expense to the government, the requirement to inform EOIR of any change in address, the consequences for failing to appear, and that generally, if you wish to apply for asylum, you must do so within one year of your arrival in the United States. If you choose to sign and date the NTA, that information will be used to confirm that you received it, and for recordkeeping.

**Routine Uses:**
For United States Citizens, Lawful Permanent Residents, or individuals whose records are covered by the Judicial Redress Act of 2015 (5 U.S.C. § 552a note), your information may be disclosed in accordance with the Privacy Act of 1974, 5 U.S.C. § 552a(b), including pursuant to the routine uses published in the following DHS systems of records notices (SORN): DHS/USCIS/ICE/CBP-001 Alien File, Index, and National File Tracking System of Records, DHS/USCIS-007 Benefit Information System, DHS/ICE-011 Criminal Arrest Records and Immigration Enforcement Records (CARIER), and DHS/ICE-003 General Counsel Electronic Management System (GEMS), and DHS/CBP-023 Border Patrol Enforcement Records (BPER). These SORNs can be viewed at https://www.dhs.gov/system-records-notices-sorns. When disclosed to the DOJ's EOIR for immigration proceedings, this information that is maintained and used by DOJ is covered by the following DOJ SORN: EOIR-001, Records and Management Information System, or any updated or successor SORN, which can be viewed at https://www.justice.gov/opcl/doj-systems-records. Further, your information may be disclosed pursuant to routine uses described in the abovementioned DHS SORNs or DOJ EOIR SORN to federal, state, local, tribal, territorial, and foreign law enforcement agencies for enforcement, investigatory, litigation, or other similar purposes.

For all others, as appropriate under United States law and DHS policy, the information you provide may be shared internally within DHS, as well as with federal, state, local, tribal, territorial, and foreign law enforcement; other government agencies; and other parties for enforcement, investigatory, litigation, or other similar purposes.

**Disclosure:**
Providing your signature and the date of your signature is voluntary. There are no effects on you for not providing your signature and date; however, removal proceedings may continue notwithstanding the failure or refusal to provide this information.

EOIR — 3 of 3

# EXHIBIT 10

**U.S. Department of Homeland Security**
**Immigration and Customs Enforcement**

**Additional Charges of Inadmissibility / Deportability**

**In:** [ x ] **Removal proceedings under section 240 of the Immigration and Nationality Act**

[ ] **Deportation proceedings commenced prior to April 1, 1997, under former section 242 of the Immigration and Nationality Act**

**In the Matter of:**
**Alien/Respondent:** Mahmoud Khalil

File No: A[redacted] Address: 830 Pinehill Road, Jena, Louisiana 71342

[ ] - 1. You are an arriving alien.
[ ] 2. You are an alien present in the United States who has not been admitted or paroled.
[X] 3. You have been admitted to the United States, but are removable for the reasons stated below.

There is/are hereby lodged against you the following allegation(s), [ ] in addition to or [X ] in lieu of, those set forth in the original charging document:

1. You are not a citizen or national of the United States;
2. You are a native of Syria and a citizen of Algeria;
3. You were admitted to the United States at John F. Kennedy International Airport, Queens, New York, on or about December 20, 2022, as an F-1 nonimmigrant student to attend Columbia University in New York, New York;
4. Your status was adjusted to that of a conditional lawful permanent resident on November 16, 2024, based on marriage to a U.S. Citizen spouse, under section 245(a) of the Immigration and Nationality Act;
5. The Secretary of State has determined that your activities and presence in the United States would have potentially serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest;
6. On your Form I-485, Application to Register Permanent Residence or Adjust Status, signed on March 26, 2024 and mailed on March 29, 2024, in response to the question at part 8, page 9, you failed to disclose that you were a member of the United Nations Relief and Works Agency for Palestine Refugees (UNRWA) from June through November 2023, as a political affairs officer;
7. On your Form I-485, Application to Register Permanent Residence or Adjust Status, signed on March 26, 2024 and mailed on March 29, 2024, in response to the question at part 3, page 6, you failed to disclose your continuing employment as a Program Manager by the Syria Office in the British Embassy in Beirut beyond 2022.
8. On your Form I-485, Application to Register Permanent Residence or Adjust Status, signed on March 26, 2024 and mailed on March 29, 2024, in response to the question part 8, page 9, you failed to disclose that you were a member of the Columbia University Apartheid Divest (CUAD).

There is/are hereby lodged against you the following charge(s), [X] in addition to or [ ] in lieu of, those set forth in the original charging document:

Section 237(a)(1)(A) of the Immigration and Nationality Act, as amended, in that at the time of entry or of adjustment of status, you were within one or more of the classes of aliens inadmissible by the law existing at such time, to wit: aliens who seek to procure, or have sought to procure, or who have procured a visa, other documentation, or admission into the United States, or other benefit provided under the Act, by fraud or by willfully misrepresenting a material fact, under Section 212(a)(6)(C)(i) of the Act.

3/17/2025
Dated:

[redacted]
(Signature of Deportation Officer)

EOIR – 1 of 2

FORM I-261

## Notice to Respondent

**Warning:** Any statement you make may be used against you in removal proceedings.

**Alien Registration:** This copy of the Notice to Appear served upon you is evidence of your alien registration while you are under removal proceedings. You are required to carry it with you at all times.

**Representation:** If you so choose, you may be represented in this proceeding, at no expense to the Government, by an attorney or other individual authorized and qualified to represent persons before the Executive Office for Immigration Review. Unless you so request, no hearing will be scheduled earlier than ten days from the date of this notice, to allow you sufficient time to secure counsel. A list of qualified attorneys and organizations who may be available to represent you at no cost will be provided with this Notice.

**Conduct of the hearing:** At the time of your hearing, you should bring with you any affidavits or other documents which you desire to have considered in connection with your case. If any document is in a foreign language, you must bring the original and a certified English translation of the document. If you wish to have the testimony of any witnesses considered, you should arrange to have such witnesses present at the hearing.

At your hearing, you will be given the opportunity to admit or deny any or all of the allegations in the charging document and that you are inadmissible or deportable on the charges contained in the charging document. You will have an opportunity to present evidence on your own behalf, to examine any evidence presented by the Government, to object, on proper legal grounds, to the receipt of evidence and to cross examine any witnesses presented by the Government.

You will be advised by the immigration judge before whom you appear, of any relief from removal for which you may appear eligible including the privilege of departing voluntarily. You will be given a reasonable opportunity to make any such application to the immigration judge.

**Failure to appear:** You are required to provide the INS, in writing, with your full mailing address and telephone number. You must notify the Immigration Court immediately by using Form EOIR-33 whenever you change you address or telephone number during the course of this proceeding. You will be provided with a copy of this form. Notices of hearing will be mailed to this address. If you do not submit Form EOIR-33 and do not otherwise provide an address at which you may be reached during proceedings, then the Government shall not be required to provide you with written notice of your hearing. If you fail to attend the hearing at the time and place designated on this notice, or any date and time later directed by the Immigration Court, a removal order may be made by the immigration judge in your absence, and you may be arrested and detained by the INS.

### Certificate of Service

This charging document was served on the respondent on 3/17/25, in the following manner in compliance with section 239(a)(1)(F) of the Act.

☒ in person ☐ by certified mail, return receipt requested ☐ by regular mail

to: 830 Pinehill Rd Jena LA 71342
(Alien's address)

☒ The alien was provided oral notice in the English language of the time and place of his or her hearing and of the consequences of failure to appear as provided in Section 240(b)(7) of the Act.

Refuse to Sign
(Signature of respondent if personally served)

[redacted]
(Signature and title of officer)

EOIR — 2 of 2

# EXHIBIT 11

**U.S. DEPARTMENT OF HOMELAND SECURITY** **Warrant for Arrest of Alien**

File No. [redacted]

Date: 03/09/2025

**To:** **Any immigration officer authorized pursuant to sections 236 and 287 of the Immigration and Nationality Act and part 287 of title 8, Code of Federal Regulations, to serve warrants of arrest for immigration violations**

I have determined that there is probable cause to believe that KHALIL, MAHMOUD is removable from the United States. This determination is based upon:

☑ the execution of a charging document to initiate removal proceedings against the subject;

☐ the pendency of ongoing removal proceedings against the subject;

☐ the failure to establish admissibility subsequent to deferred inspection;

☐ biometric confirmation of the subject's identity and a records check of federal databases that affirmatively indicate, by themselves or in addition to other reliable information, that the subject either lacks immigration status or notwithstanding such status is removable under U.S. immigration law; and/or

☐ statements made voluntarily by the subject to an immigration officer and/or other reliable evidence that affirmatively indicate the subject either lacks immigration status or notwithstanding such status is removable under U.S. immigration law.

**YOU ARE COMMANDED** to arrest and take into custody for removal proceedings under the Immigration and Nationality Act, the above-named alien.

[redacted]
(Signature of Authorized Immigration Officer)

[redacted]
(Printed Name and Title of Authorized Immigration Officer)

**Certificate of Service**

I hereby certify that the Warrant for Arrest of Alien was served by me at Federal Plaza, New York, (Location)

on KHALIL, MAHMOUD (Name of Alien) on March 9, 2025 (Date of Service), and the contents of this notice were read to him or her in the ________ (Language) language.

[redacted]
Name and Signature of Officer

________
Name or Number of Interpreter (if applicable)

Form I-200 (Rev. 09/16)

# EXHIBIT 12

SENSITIVE BUT UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

MEMORANDUM FOR THE SECRETARY OF HOMELAND SECURITY

FROM: Marco Rubio

SUBJECT: (SBU) Determination of Deportability under Section 237(a)(4)(C) of the Immigration and Nationality Act (INA)

(SBU) I am writing to inform you that upon notification from the Department of Homeland Security's Homeland Security Investigations (DHS/ICE/HSI) on March 14, 2025, I have determined that Mohsen MAHDAWI (DOB: [redacted]; POB: Israel), a U.S. Lawful Permanent Resident (LPR), is a deportable alien under INA section 237(a)(4)(C). I understand that ICE now intends to initiate removal charges against him, based on assurances from DHS/ICE/HSI.

(SBU) Under INA section 237(a)(4)(C)(i), an alien is deportable from the United States if the Secretary of State has reasonable ground to believe that the alien's presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States. Under INA section 237(a)(4)(C)(ii), for cases in which the basis for this determination is the alien's past, current, or expected beliefs, statements, or associations that are otherwise lawful, the Secretary of State must personally determine that the alien's presence or activities would compromise a compelling U.S. foreign policy interest.

(SBU) Pursuant to these authorities, I have determined that the activities and presence of this alien in the United States would have potentially serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest. These determinations are based on information provided by DHS/ICE/HSI that Mahdawi, through his leadership

and involvement in disruptive protests at Columbia University, has engaged in anti-Semitic conduct through leading pro-Palestinian protests and calling for Israel's destruction. Mahdawi has been identified at those protests as having engaged in threatening rhetoric and intimidation of pro-Israeli bystanders. The activities and presence of Mahdawi in the United States undermines U.S. policy to combat anti-Semitism around the world and in the United States, in addition to efforts to protect Jewish students from harassment and violence in the United States. Under E.O. 14188, Additional Measures to Combat Anti-Semitism, it is the policy of the United States to combat antisemitism, using all available and appropriate legal tools to hold to account the perpetrators of unlawful anti-Semitic harassment and violence. Consistent with E.O. 14150, America First Policy Directive to the Secretary of State, the foreign policy of the United States champions core American interests and American citizens and condoning anti-Semitic conduct and disruptive protests in the United States would severely undermine that significant foreign policy objective. Moreover, protests of the type led by Mahdawi potentially undermine the peace process underway in the Middle East by reinforcing anti-Semitic sentiment in the regional and thereby threatening the U.S. foreign policy goal of peacefully resolving the Gaza conflict.

(SBU) The Department of State also requests the opportunity to consult with the Department of Homeland Security on any public statements regarding this determination.

(SBU) I hereby expressly authorize use of this notification by the Department of Homeland Security in immigration court.

**Attachments**

Tab 1 – DHS Letter on Mohsen Mahdawi
Tab 2 – HSI Subject Profile of Mohsen Mahdawi
Tab 3 – 8 USC 1227(a)(4)(C)

# EXHIBIT 13

Uploaded on: 04/16/2025 at 06:19:06 AM (Central Daylight Time) Base City: OAK

DEPARTMENT OF HOMELAND SECURITY

# NOTICE TO APPEAR

DOB: [redacted]

Event No: [redacted]

In removal proceedings under section 240 of the Immigration and Nationality Act:

Subject ID: [redacted]

File No: [redacted]

In the Matter of:

Respondent: MOHSEN KHADER MAHDAWI AKA: MEHDAWI, Mohsen currently residing at:

[redacted] WHITE RIVER JCT,VERMONT,05001 [redacted]

(Number, street, city, state and ZIP code) (Area code and phone number)

☐ You are an arriving alien.

☐ You are an alien present in the United States who has not been admitted or paroled.

☒ You have been admitted to the United States, but are removable for the reasons stated below.

The Department of Homeland Security alleges that you:

1. You are not a citizen or national of the United States;

2. You are a native of Stateless and a citizen of Stateless;

3. You were admitted to the United States, on or about July 1, 2014, at Los Angeles International Airport, Los Angles, California, as a conditional resident (CR6);

4. Your status was adjusted to that of a lawful permanent resident on October 24, 2014, based on marriage to a U.S. Citizen spouse, under section 245(a) of the INA;

5. The Secretary of State has determined that your presence and activities in the See Continuation Page Made a Part Hereof

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:

Section 237(a)(4)(C)(i) of the Immigration and Nationality Act, as amended, in that the Secretary of State has reasonable ground to believe that your presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States.

☐ This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.

☐ Section 235(b)(1) order was vacated pursuant to: ☐ 8CFR 208.30 ☐ 8CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at:

3843 E STAGG AVE BASILE LA 70515. SOUTH LOUISIANA CORR CENTER

(Complete Address of Immigration Court, including Room Number, if any)

on May 1, 2025 (Date) at 8:30 AM (Time) to show why you should not be removed from the United States based on the charge(s) set forth above.

[redacted]

(Signature and Title of Issuing Officer)

Date: April 14, 2025 South Burlington, Vermont (City and State)

EOIR — 1 of 11

Uploaded on: 04/16/2025 at 06:19:06 AM (Central Daylight Time) Base City: OAK

DEPARTMENT OF HOMELAND SECURITY

# NOTICE TO APPEAR

DOB: [redacted]

Event No: [redacted]

In removal proceedings under section 240 of the Immigration and Nationality Act:

Subject ID: [redacted]

File No: [redacted]

In the Matter of:

Respondent: MOHSEN KHADER MAHDAWI AKA: MEHDAWI, Mohsen currently residing at

[redacted] WHITE RIVER JCT,VERMONT,05001 [redacted] [redacted]

(Number, street, city, state and ZIP code) (Area code and phone number)

☐ You are an arriving alien.

☐ You are an alien present in the United States who has not been admitted or paroled.

☒ You have been admitted to the United States, but are removable for the reasons stated below.

The Department of Homeland Security alleges that you:

1. You are not a citizen or national of the United States;

2. You are a native of Stateless and a citizen of Stateless;

3. You were admitted to the United States, on or about July 1, 2014, at Los Angeles International Airport, Los Angles, California, as a conditional resident (CR6);

4. Your status was adjusted to that of a lawful permanent resident on October 24, 2014, based on marriage to a U.S. Citizen spouse, under section 245(a) of the INA;

5. The Secretary of State has determined that your presence and activities in the See Continuation Page Made a Part Hereof

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:

Section 237(a)(4)(C)(i) of the Immigration and Nationality Act, as amended, in that the Secretary of State has reasonable ground to believe that your presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States.

☐ This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.

☐ Section 235(b)(1) order was vacated pursuant to: ☐ 8CFR 208.30 ☐ 8CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at:

3843 E STAGG AVE BASILE LA 70515. SOUTH LOUISIANA CORR CENTER

(Complete Address of Immigration Court, including Room Number, if any)

on May 1, 2025 at 8:30 AM to show why you should not be removed from the United States based on the
(Date) (Time)

charge(s) set forth above. [redacted]

(Signature and Title of Issuing Officer)

Date: April 14, 2025 South Burlington, Vermont

(City and State)

EOIR — 1 of 11

**Notice to Respondent**

**Warning:** Any statement you make may be used against you in removal proceedings.

**Alien Registration:** This copy of the Notice to Appear served upon you is evidence of your alien registration while you are in removal proceedings. You are required to carry it with you at all times.

**Representation:** If you so choose, you may be represented in this proceeding, at no expense to the Government, by an attorney or other individual authorized and qualified to represent persons before the Executive Office for Immigration Review, pursuant to 8 CFR 1003.16. Unless you so request, no hearing will be scheduled earlier than ten days from the date of this notice, to allow you sufficient time to secure counsel. A list of qualified attorneys and organizations who may be available to represent you at no cost will be provided with this notice.

**Conduct of the hearing:** At the time of your hearing, you should bring with you any affidavits or other documents that you desire to have considered in connection with your case. If you wish to have the testimony of any witnesses considered, you should arrange to have such witnesses present at the hearing. At your hearing you will be given the opportunity to admit or deny any or all of the allegations in the Notice to Appear, including that you are inadmissible or removable. You will have an opportunity to present evidence on your own behalf to examine any evidence presented by the Government, to object, on proper legal grounds, to the receipt of evidence and to cross examine any witnesses presented by the Government. At the conclusion of your hearing, you have a right to appeal an adverse decision by the immigration judge. You will be advised by the immigration judge before whom you appear of any relief from removal for which you may appear eligible including the privilege of voluntary departure. You will be given a reasonable opportunity to make any such application to the immigration judge.

**One-Year Asylum Application Deadline:** If you believe you may be eligible for asylum, you must file a Form I-589, Application for Asylum and for Withholding of Removal. The Form I-589, Instructions, and information on where to file the Form can be found at www.uscis.gov/i-589. Failure to file the Form I-589 within one year of arrival may bar you from eligibility to apply for asylum pursuant to section 208(a)(2)(B) of the Immigration and Nationality Act.

***Failure to appear:*** You are required to provide the Department of Homeland Security (DHS), in writing, with your full mailing address and telephone number. You must notify the Immigration Court and the DHS immediately by using Form EOIR-33 whenever you change your address or telephone number during the course of this proceeding. You will be provided with a copy of this form. Notices of hearing will be mailed to this address. If you do not submit Form EOIR-33 and do not otherwise provide an address at which you may be reached during proceedings, then the Government shall not be required to provide you with written notice of your hearing. If you fail to attend the hearing at the time and place designated on this notice, or any date and time later directed by the Immigration Court, a removal order may be made by the immigration judge in your absence, and you may be arrested and detained by the DHS.

***Mandatory Duty to Surrender for Removal:*** If you become subject to a final order of removal, you must surrender for removal to your local DHS office, listed on the internet at http://www.ice.gov/contact/ero, as directed by the DHS and required by statute and regulation. Immigration regulations at 8 CFR 1241.1 define when the removal order becomes administratively final. If you are granted voluntary departure and fail to depart the United States as required, fail to post a bond in connection with voluntary departure, or fail to comply with any other condition or term in connection with voluntary departure, you must surrender for removal on the next business day thereafter. If you do not surrender for removal as required, you will be ineligible for all forms of discretionary relief for as long as you remain in the United States and for ten years after your departure or removal. This means you will be ineligible for asylum, cancellation of removal, voluntary departure, adjustment of status, change of nonimmigrant status, registry, and related waivers for this period. If you do not surrender for removal as required, you may also be criminally prosecuted under section 243 of the Immigration and Nationality Act.

**U.S. Citizenship Claims:** If you believe you are a United States citizen, please advise the DHS by calling the ICE Law Enforcement Support Center toll free at (855) 448-6903.

**Sensitive locations:** To the extent that an enforcement action leading to a removal proceeding was taken against Respondent at a location described in 8 U.S.C. § 1229(e)(1), such action complied with 8 U.S.C. § 1367.

**Request for Prompt Hearing**

To expedite a determination in my case, I request this Notice to Appear be filed with the Executive Office for Immigration Review as soon as possible. I waive my right to a 10-day period prior to appearing before an immigration judge and request my hearing be scheduled.

Before: ______________________________

*(Signature of Respondent)*

Date: ______________

______________________________

*(Signature and Title of Immigration Officer)*

**Certificate of Service**

This Notice To Appear was served on the respondent by me on 04/14/2025, in the following manner and in compliance with section 239(a)(1) of the Act.

[X] in person [ ] by certified mail, returned receipt # __________ requested [ ] by regular mail

[X] Attached is a credible fear worksheet.

[X] Attached is a list of organization and attorneys which provide free legal services.

The alien was provided oral notice in the English language of the time and place of his or her hearing and of the consequences of failure to appear as provided in section 240(b)(7) of the Act.

Refused to sign w/out attorney present [redacted]

*(Signature of Respondent if Personally Served)* *(Signature and Title of officer)*

EOIR – 2 of 11

**Notice to Respondent**

**Warning:** Any statement you make may be used against you in removal proceedings.

**Alien Registration:** This copy of the Notice to Appear served upon you is evidence of your alien registration while you are in removal proceedings. You are required to carry it with you at all times.

**Representation:** If you so choose, you may be represented in this proceeding, at no expense to the Government, by an attorney or other individual authorized and qualified to represent persons before the Executive Office for Immigration Review, pursuant to 8 CFR 1003.16. Unless you so request, no hearing will be scheduled earlier than ten days from the date of this notice, to allow you sufficient time to secure counsel. A list of qualified attorneys and organizations who may be available to represent you at no cost will be provided with this notice.

**Conduct of the hearing:** At the time of your hearing, you should bring with you any affidavits or other documents that you desire to have considered in connection with your case. If you wish to have the testimony of any witnesses considered, you should arrange to have such witnesses present at the hearing. At your hearing you will be given the opportunity to admit or deny any or all of the allegations in the Notice to Appear, including that you are inadmissible or removable. You will have an opportunity to present evidence on your own behalf, to examine any evidence presented by the Government, to object, on proper legal grounds, to the receipt of evidence and to cross examine any witnesses presented by the Government. At the conclusion of your hearing, you have a right to appeal an adverse decision by the immigration judge. You will be advised by the immigration judge before whom you appear of any relief from removal for which you may appear eligible including the privilege of voluntary departure. You will be given a reasonable opportunity to make any such application to the immigration judge.

**One-Year Asylum Application Deadline:** If you believe you may be eligible for asylum, you must file a Form I-589, Application for Asylum and for Withholding of Removal. The Form I-589, Instructions, and information on where to file the Form can be found at www.uscis.gov/i-589. Failure to file the Form I-589 within one year of arrival may bar you from eligibility to apply for asylum pursuant to section 208(a)(2)(B) of the Immigration and Nationality Act.

***Failure to appear:*** You are required to provide the Department of Homeland Security (DHS), in writing, with your full mailing address and telephone number. You must notify the Immigration Court and the DHS immediately by using Form EOIR-33 whenever you change your address or telephone number during the course of this proceeding. You will be provided with a copy of this form. Notices of hearing will be mailed to this address. If you do not submit Form EOIR-33 and do not otherwise provide an address at which you may be reached during proceedings, then the Government shall not be required to provide you with written notice of your hearing. If you fail to attend the hearing at the time and place designated on this notice, or any date and time later directed by the Immigration Court, a removal order may be made by the immigration judge in your absence, and you may be arrested and detained by the DHS.

***Mandatory Duty to Surrender for Removal:*** If you become subject to a final order of removal, you must surrender for removal to your local DHS office, listed on the internet at http://www.ice.gov/contact/ero, as directed by the DHS and required by statute and regulation. Immigration regulations at 8 CFR 1241.1 define when the removal order becomes administratively final. If you are granted voluntary departure and fail to depart the United States as required, fail to post a bond in connection with voluntary departure, or fail to comply with any other condition or term in connection with voluntary departure, you must surrender for removal on the next business day thereafter. If you do not surrender for removal as required, you will be ineligible for all forms of discretionary relief for as long as you remain in the United States and for ten years after your departure or removal. This means you will be ineligible for asylum, cancellation of removal, voluntary departure, adjustment of status, change of nonimmigrant status, registry, and related waivers for this period. If you do not surrender for removal as required, you may also be criminally prosecuted under section 243 of the Immigration and Nationality Act.

**U.S. Citizenship Claims:** If you believe you are a United States citizen, please advise the DHS by calling the ICE Law Enforcement Support Center toll free at (855) 448-6903.

**Sensitive locations:** To the extent that an enforcement action leading to a removal proceeding was taken against Respondent at a location described in 8 U.S.C. § 1229(e)(1), such action complied with 8 U.S.C. § 1367.

**Request for Prompt Hearing**

To expedite a determination in my case, I request this Notice to Appear be filed with the Executive Office for Immigration Review as soon as possible. I waive my right to a 10-day period prior to appearing before an immigration judge and request my hearing be scheduled.

Before: ______________________ (*Signature of Respondent*)

Date: ______________

______________________ (*Signature and Title of Immigration Officer*)

**Certificate of Service**

This Notice To Appear was served on the respondent by me on 04/14/2025, in the following manner and in compliance with section 239(a)(1) of the Act.

- [X] in person
- [ ] by certified mail, returned receipt # ____________ requested
- [ ] by regular mail
- [X] Attached is a credible fear worksheet.
- [X] Attached is a list of organization and attorneys which provide free legal services.

The alien was provided oral notice in the English language of the time and place of his or her hearing and of the consequences of failure to appear as provided in section 240(b)(7) of the Act.

Refused to sign w/out attorney present
(Signature of Respondent if Personally Served)

[redacted]
(Signature and Title of officer)

EOIR - 2 of 11



AAUPCAR029

Case: 26-6906, 11/20/2026, DktEntry: 16.8, Page 132 of 300


**Privacy Act Statement**

**Authority:**
The Department of Homeland Security through U.S. Immigration and Customs Enforcement (ICE), U.S Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS) are authorized to collect the information requested on this form pursuant to Sections 103, 237, 239, 240, and 290 of the Immigration and Nationality Act (INA), as amended (8 U.S.C. 1103, 1229, 1229a, and 1360), and the regulations issued pursuant thereto.

**Purpose:**
You are being asked to sign and date this Notice to Appear (NTA) as an acknowledgement of personal receipt of this notice. This notice, when filed with the U.S. Department of Justice's (DOJ) Executive Office for Immigration Review (EOIR), initiates removal proceedings. The NTA contains information regarding the nature of the proceedings against you, the legal authority under which proceedings are conducted, the acts or conduct alleged against you to be in violation of law, the charges against you, and the statutory provisions alleged to have been violated. The NTA also includes information about the conduct of the removal hearing, your right to representation at no expense to the government, the requirement to inform EOIR of any change in address, the consequences for failing to appear, and that generally, if you wish to apply for asylum, you must do so within one year of your arrival in the United States. If you choose to sign and date the NTA, that information will be used to confirm that you received it, and for recordkeeping.

**Routine Uses:**
For United States Citizens, Lawful Permanent Residents, or individuals whose records are covered by the Judicial Redress Act of 2015 (5 U.S.C. § 552a note), your information may be disclosed in accordance with the Privacy Act of 1974, 5 U.S.C. § 552a(b), including pursuant to the routine uses published in the following DHS systems of records notices (SORN): DHS/USCIS/ICE/CBP-001 Alien File, Index, and National File Tracking System of Records, DHS/USCIS-007 Benefit Information System, DHS/ICE-011 Criminal Arrest Records and Immigration Enforcement Records (CARIER), and DHS/ICE-003 General Counsel Electronic Management System (GEMS), and DHS/CBP-023 Border Patrol Enforcement Records (BPER). These SORNs can be viewed at https://www.dhs.gov/system-records-notices-sorns. When disclosed to the DOJ's EOIR for immigration proceedings, this information that is maintained and used by DOJ is covered by the following DOJ SORN: EOIR-001, Records and Management Information System, or any updated or successor SORN, which can be viewed at https://www.justice.gov/opcl/doj-systems-records. Further, your information may be disclosed pursuant to routine uses described in the abovementioned DHS SORNs or DOJ EOIR SORN to federal, state, local, tribal, territorial, and foreign law enforcement agencies for enforcement, investigatory, litigation, or other similar purposes.

For all others, as appropriate under United States law and DHS policy, the information you provide may be shared internally within DHS, as well as with federal, state, local, tribal, territorial, and foreign law enforcement; other government agencies; and other parties for enforcement, investigatory, litigation, or other similar purposes.

**Disclosure:**
Providing your signature and the date of your signature is voluntary. There are no effects on you for not providing your signature and date; however, removal proceedings may continue notwithstanding the failure or refusal to provide this information.

Uploaded on: 04/16/2025 at 06:19:06 AM (Central Daylight Time)  Base City: OAK

U.S. Department of Homeland Security — Continuation Page for Form I-862

| Alien's Name | File Number | Date |
|---|---|---|
| MAHDAWI, MOHSEN KHADER | [redacted] Event No: [redacted] | 04/14/2025 |

THE SERVICE ALLEGES THAT YOU:

-------------------------------

United States would have serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest.

| Signature | Title |
|---|---|
| [redacted] | Supervisory Special Agent |

4 of 4 Pages

EOIR - 4 of 11

# EXHIBIT 14

**U.S. DEPARTMENT OF HOMELAND SECURITY** **Warrant for Arrest of Alien**

File No. [redacted]

Date: 04/14/2025

**To:** **Any immigration officer authorized pursuant to sections 236 and 287 of the Immigration and Nationality Act and part 287 of title 8, Code of Federal Regulations, to serve warrants of arrest for immigration violations**

I have determined that there is probable cause to believe that MAHDAWI, MOHSEN is removable from the United States. This determination is based upon:

☑ the execution of a charging document to initiate removal proceedings against the subject;

☐ the pendency of ongoing removal proceedings against the subject;

☐ the failure to establish admissibility subsequent to deferred inspection;

☑ biometric confirmation of the subject's identity and a records check of federal databases that affirmatively indicate, by themselves or in addition to other reliable information, that the subject either lacks immigration status or notwithstanding such status is removable under U.S. immigration law; and/or

☐ statements made voluntarily by the subject to an immigration officer and/or other reliable evidence that affirmatively indicate the subject either lacks immigration status or notwithstanding such status is removable under U.S. immigration law.

**YOU ARE COMMANDED** to arrest and take into custody for removal proceedings under the Immigration and Nationality Act, the above-named alien.

[redacted]
(Signature of Authorized Immigration Officer)

[redacted]
(Printed Name and Title of Authorized Immigration Officer)

**Certificate of Service**

I hereby certify that the Warrant for Arrest of Alien was served by me at South Burlington, VT (Location)

on MAHDAWI, MOHSEN (Name of Alien) on 04/14/2025 (Date of Service), and the contents of this notice were read to him or her in the English (Language) language.

[redacted] Signature of Officer

Name or Number of Interpreter (if applicable)

Form I-200 (Rev. 09/16)

# EXHIBIT 15

DEPARTMENT OF HOMELAND SECURITY
# NOTICE OF CUSTODY DETERMINATION

Alien's Name: MAHDAWI, MOHSEN KHADER

A-File Number: [redacted]

Date: 04/14/2025

Event ID: [redacted]

Subject ID: [redacted]

Pursuant to the authority contained in section 236 of the Immigration and Nationality Act and part 236 of title 8, Code of Federal Regulations, I have determined that, pending a final administrative determination in your case, you will be:

- [X] Detained by the Department of Homeland Security.
- [ ] Released (check all that apply):
  - [ ] Under bond in the amount of $ ____________
  - [ ] On your own recognizance.
  - [ ] Under other conditions. [Additional document(s) will be provided.]

[redacted]
Name and Signature of Authorized Officer

04/14/2025 01:12 PM
Date and Time of Custody Determination

Supervisory Special Agent
Title

11 ELMWOOD AVE STE 240 Burlington, VT US 05402
Office Location/Address

You may request a review of this custody determination by an immigration judge.

- [ ] I acknowledge receipt of this notification, and
  - [ ] I do request an immigration judge review of this custody determination.
  - [ ] I do not request an immigration judge review of this custody determination.

Refused to sign w/out attorney present
Signature of Alien

04/14/25
Date

The contents of this notice were read to MAHDAWI, MOHSEN KHADER (Name of Alien) in the ENGLISH (Name of Language) language.

[redacted]
Name and Signature of Officer

Name or Number of Interpreter (if applicable)

Special Agent
Title

# EXHIBIT 16

United States Department of State

Washington, DC 20520

**SENSITIVE BUT UNCLASSIFIED**

March 21, 2025

**Memo for ICE – Andre R. Watson, Assistant Director, National Security Division**

**FROM:** CA – John L. Armstrong, Senior Bureau Official

**SUBJECT:** (SBU) Revocation of Visa – Rumeysa OZTURK

(SBU) On March 21, 2025, in response to a request from DHS/ICE and the assessment from DHS/ICE that Rumeysa OZTURK had been involved in associations that "may undermine U.S. foreign policy by creating a hostile environment for Jewish students and indicating support for a designated terrorist organization" including co-authoring an op-ed that found common cause with an organization that was later temporarily banned from campus, the Bureau of Consular Affairs approved revocation, effective immediately, of the F-1 visa of OZTURK, DPOB: [redacted], Turkey, Visa Foil [redacted] pursuant to authority in section 221(i) of the Immigration and Nationality Act, 8 U.S.C. 1201(i). Due to ongoing ICE operational security, this revocation will be silent; the Department of State will not notify the subject of the revocation.

(U) The information in this record is confidential under INA 222(f) and specific biographical data about the alien cannot be shared in public statements.

(U) I am providing this notice to you with express authorization for use by DHS/ICE in immigration court, as needed.

John L. Armstrong
Senior Bureau Official
Bureau of Consular Affairs

# EXHIBIT 17

DEPARTMENT OF HOMELAND SECURITY
## NOTICE TO APPEAR

DOB: [redacted]
Event No: [redacted]

**In removal proceedings under section 240 of the Immigration and Nationality Act:**

Subject ID: [redacted]  FINS: [redacted]  File No: [redacted]

In the Matter of:

Respondent: RUMEYSA OZTURK currently residing at:

3843 Stagg Ave Basile, LA 70515
(Number, street, city, state and ZIP code) (Area code and phone number)

☐ You are an arriving alien.

☐ You are an alien present in the United States who has not been admitted or paroled.

☒ You have been admitted to the United States, but are removable for the reasons stated below.

The Department of Homeland Security alleges that you:

1. You are not a citizen or national of the United States;

2. You are a native of TURKIYE and a citizen of TURKIYE;

3. You were admitted to the United States at Boston, MA on or about June 28, 2024 as a nonimmigrant Student (F-1);

4. On March 21, 2025, your nonimmigrant visa was revoked by the United States Department of State.

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:

Section 237(a)(1)(B) of the Immigration and Nationality Act (Act), as amended, in that after admission as a nonimmigrant under Section 101(a)(15) of the Act, your nonimmigrant visa was revoked under section 221(i) of the Act.

☐ This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.

☐ Section 235(b)(1) order was vacated pursuant to: ☐ 8CFR 208.30 ☐ 8CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at:

1900 E Whatley Rd Oakdale, LA 71463
*(Complete Address of Immigration Court, including Room Number, if any)*

on April 7, 2025 (Date) at 8:30 am (Time) to show why you should not be removed [redacted] sed on the charge(s) set forth above.

[redacted]
*(Signature and Title of Issu*[redacted]

Date: March 25, 2025  St Albans, VT *(City and State)*

EOIR — 1 of 4

Uploaded on: 03/27/2025 at 02:16:50 PM (Central Daylight Time) Base City: OAK

## Notice to Respondent

**Warning:** Any statement you make may be used against you in removal proceedings.

**Alien Registration:** This copy of the Notice to Appear served upon you is evidence of your alien registration while you are in removal proceedings. You are required to carry it with you at all times.

**Representation:** If you so choose, you may be represented in this proceeding, at no expense to the Government, by an attorney or other individual authorized and qualified to represent persons before the Executive Office for Immigration Review, pursuant to 8 CFR 1003.16. Unless you so request, no hearing will be scheduled earlier than ten days from the date of this notice, to allow you sufficient time to secure counsel. A list of qualified attorneys and organizations who may be available to represent you at no cost will be provided with this notice.

**Conduct of the hearing:** At the time of your hearing, you should bring with you any affidavits or other documents that you desire to have considered in connection with your case. If you wish to have the testimony of any witnesses considered, you should arrange to have such witnesses present at the hearing. At your hearing you will be given the opportunity to admit or deny any or all of the allegations in the Notice to Appear, including that you are inadmissible or removable. You will have an opportunity to present evidence on your own behalf, to examine any evidence presented by the Government, to object, on proper legal grounds, to the receipt of evidence and to cross examine any witnesses presented by the Government. At the conclusion of your hearing, you have a right to appeal an adverse decision by the immigration judge. You will be advised by the immigration judge before whom you appear of any relief from removal for which you may appear eligible including the privilege of voluntary departure. You will be given a reasonable opportunity to make any such application to the immigration judge.

**One-Year Asylum Application Deadline:** If you believe you may be eligible for asylum, you must file a Form I-589, Application for Asylum and for Withholding of Removal. The Form I-589, Instructions, and information on where to file the Form can be found at www.uscis.gov/i-589. Failure to file the Form I-589 within one year of arrival may bar you from eligibility to apply for asylum pursuant to section 208(a)(2)(B) of the Immigration and Nationality Act.

**Failure to appear:** You are required to provide the Department of Homeland Security (DHS), in writing, with your full mailing address and telephone number. You must notify the Immigration Court and the DHS immediately by using Form EOIR-33 whenever you change your address or telephone number during the course of this proceeding. You will be provided with a copy of this form. Notices of hearing will be mailed to this address. If you do not submit Form EOIR-33 and do not otherwise provide an address at which you may be reached during proceedings, then the Government shall not be required to provide you with written notice of your hearing. If you fail to attend the hearing at the time and place designated on this notice, or any date and time later directed by the Immigration Court, a removal order may be made by the immigration judge in your absence, and you may be arrested and detained by the DHS.

**Mandatory Duty to Surrender for Removal:** If you become subject to a final order of removal, you must surrender for removal to your local DHS office, listed on the internet at http://www.ice.gov/contact/ero, as directed by the DHS and required by statute and regulation. Immigration regulations at 8 CFR 1241.1 define when the removal order becomes administratively final. If you are granted voluntary departure and fail to depart the United States as required, fail to post a bond in connection with voluntary departure, or fail to comply with any other condition or term in connection with voluntary departure, you must surrender for removal on the next business day thereafter. If you do not surrender for removal as required, you will be ineligible for all forms of discretionary relief for as long as you remain in the United States and for ten years after your departure or removal. This means you will be ineligible for asylum, cancellation of removal, voluntary departure, adjustment of status, change of nonimmigrant status, registry, and related waivers for this period. If you do not surrender for removal as required, you may also be criminally prosecuted under section 243 of the Immigration and Nationality Act.

U.S. Citizenship Claims: If you believe you are a United States citizen, please advise the DHS by calling the ICE Law Enforcement Support Center toll free at (855) 448-6903.

**Sensitive locations:** To the extent that an enforcement action leading to a removal proceeding was taken against Respondent at a location described in 8 U.S.C. § 1229(e)(1), such action complied with 8 U.S.C. § 1367.

Upon information and belief the language that the Alien understands is English

## Request for Prompt Hearing

To expedite a determination in my case, I request this Notice to Appear be filed with the Executive Office for Immigration Review as soon as possible. I waive my right to a 10-day period prior to appearing before an immigration judge and request my hearing be scheduled.

Before: [redacted]

*(Signature and Title of Immigration Officer)*

Refused to Sign
*(Signature of Respondent)*

Date: 03/25/25

## Certificate of Service

This Notice To Appear was served on the respondent by me on March 25, 2025, in the following manner and in compliance with section 239(a)(1) of the Act.

☒ in person ☐ by certified mail, returned receipt # ____________ requested ☐ by regular mail
☐ Attached is a credible fear worksheet.
☐ Attached is a list of organization and attorneys which provide free legal services.

The alien was provided oral notice in the ENGLISH language of the time and place of his or her hearing and of the consequences of failure to appear as provided in section 240(b)(7) of the A[redacted]

Refused to Sign
*(Signature of Respondent if Personally Served)*

[redacted] ature and Title [redacted]

Alle
Desi

## Privacy Act Statement

**Authority:**
The Department of Homeland Security through U.S. Immigration and Customs Enforcement (ICE), U.S Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS) are authorized to collect the information requested on this form pursuant to Sections 103, 237, 239, 240, and 290 of the Immigration and Nationality Act (INA), as amended (8 U.S.C. 1103, 1229, 1229a, and 1360), and the regulations issued pursuant thereto.

**Purpose:**
You are being asked to sign and date this Notice to Appear (NTA) as an acknowledgement of personal receipt of this notice. This notice, when filed with the U.S. Department of Justice's (DOJ) Executive Office for Immigration Review (EOIR), initiates removal proceedings. The NTA contains information regarding the nature of the proceedings against you, the legal authority under which proceedings are conducted, the acts or conduct alleged against you to be in violation of law, the charges against you, and the statutory provisions alleged to have been violated. The NTA also includes information about the conduct of the removal hearing, your right to representation at no expense to the government, the requirement to inform EOIR of any change in address, the consequences for failing to appear, and that generally, if you wish to apply for asylum, you must do so within one year of your arrival in the United States. If you choose to sign and date the NTA, that information will be used to confirm that you received it, and for recordkeeping.

**Routine Uses:**
For United States Citizens, Lawful Permanent Residents, or individuals whose records are covered by the Judicial Redress Act of 2015 (5 U.S.C. § 552a note), your information may be disclosed in accordance with the Privacy Act of 1974, 5 U.S.C. § 552a(b), including pursuant to the routine uses published in the following DHS systems of records notices (SORN): DHS/USCIS/ICE/CBP-001 Alien File, Index, and National File Tracking System of Records, DHS/USCIS-007 Benefit Information System, DHS/ICE-011 Criminal Arrest Records and Immigration Enforcement Records (CARIER), and DHS/ICE-003 General Counsel Electronic Management System (GEMS), and DHS/CBP-023 Border Patrol Enforcement Records (BPER). These SORNs can be viewed at https://www.dhs.gov/system-records-notices-sorns. When disclosed to the DOJ's EOIR for immigration proceedings, this information that is maintained and used by DOJ is covered by the following DOJ SORN: EOIR-001, Records and Management Information System, or any updated or successor SORN, which can be viewed at https://www.justice.gov/opcl/doj-systems-records. Further, your information may be disclosed pursuant to routine uses described in the abovementioned DHS SORNs or DOJ EOIR SORN to federal, state, local, tribal, territorial, and foreign law enforcement agencies for enforcement, investigatory, litigation, or other similar purposes.

For all others, as appropriate under United States law and DHS policy, the information you provide may be shared internally within DHS, as well as with federal, state, local, tribal, territorial, and foreign law enforcement; other government agencies; and other parties for enforcement, investigatory, litigation, or other similar purposes.

**Disclosure:**
Providing your signature and the date of your signature is voluntary. There are no effects on you for not providing your signature and date; however, removal proceedings may continue notwithstanding the failure or refusal to provide this information.

Uploaded on: 03/27/2025 at 02:16:50 PM (Central Daylight Time) Base City: OAK

U.S. Department of Homeland Security

Continuation Page for Form I-862

| Alien's Name | File Number | Date |
|---|---|---|
| OZTURK, RUMEYSA | [redacted] Event No: [redacted] | 03/25/2025 |

CURRENTLY RESIDING AT:

---

South Louisiana Imm Center 3843 W Stagg Ave Basile, LOUISIANA 70515

[redacted]

| Signature | Title |
|---|---|
| [redacted] | SDDO |

EOIR – 4 of 4

4 of 4 Pages

Form I-831 Continuation Page (Rev. 08/01/07)

# EXHIBIT 18

Case: 26-6906, 11/20/2026 DktEntry: 16.8 Page 147 of 300

**U.S. DEPARTMENT OF HOMELAND SECURITY** **Warrant for Arrest of Alien**

File No. [redacted]

Date: 03/22/2025

**To:** **Any immigration officer authorized pursuant to sections 236 and 287 of the Immigration and Nationality Act and part 287 of title 8, Code of Federal Regulations, to serve warrants of arrest for immigration violations**

I have determined that there is probable cause to believe that OZTURK, RUMEYSA is removable from the United States. This determination is based upon:

☑ the execution of a charging document to initiate removal proceedings against the subject;

☐ the pendency of ongoing removal proceedings against the subject;

☐ the failure to establish admissibility subsequent to deferred inspection;

☐ biometric confirmation of the subject's identity and a records check of federal databases that affirmatively indicate, by themselves or in addition to other reliable information, that the subject either lacks immigration status or notwithstanding such status is removable under U.S. immigration law; and/or

☐ statements made voluntarily by the subject to an immigration officer and/or other reliable evidence that affirmatively indicate the subject either lacks immigration status or notwithstanding such status is removable under U.S. immigration law.

**YOU ARE COMMANDED** to arrest and take into custody for removal proceedings under the Immigration and Nationality Act, the above-named alien.

[redacted]
(Signature of Authorized Immigration Officer)

[redacted]
(Printed Name and Title of Authorized Immigration Officer)

**Certificate of Service**

I hereby certify that the Warrant for Arrest of Alien was served by me at St. Albans, VT (Location)

on OZTURK, RUMEYSA (Name of Alien) on March 25, 2025 (Date of Service), and the contents of this notice were read to him or her in the ENGLISH (Language) language.

[redacted]
Name and Signature of Officer

Name or Number of Interpreter (if applicable)

Form I-200 (Rev. 09/16)

# EXHIBIT 19

THE SECRETARY OF STATE
WASHINGTON

SENSITIVE BUT UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

MEMORANDUM FOR THE SECRETARY OF HOMELAND SECURITY

FROM: Marco Rubio

SUBJECT: (SBU) Notification of Removability Determinations under Section 237(a)(4)(C) of the Immigration and Nationality Act (INA)

(SBU) I am writing to inform you that upon notification from the Department of Homeland Security's Homeland Security Investigations (DHS/ICE/HSI) on March 7, 2025, I have determined that Yunseo Chung (DOB: [redacted]; POB: South Korea) and [redacted], both U.S. Lawful Permanent Residents (LPRs), are deportable aliens under INA section 237(a)(4)(C). I understand that ICE now intends to initiate removal charges against them, based on assurances from DHS/ICE/HSI.

(SBU) Under INA section 237(a)(4)(C)(i), an alien is deportable from the United States if the Secretary of State has reasonable ground to believe that the alien's presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States. Under INA section 237(a)(4)(C)(ii), for cases in which the basis for this determination is the alien's past, current, or expected beliefs, statements, or associations that are otherwise lawful, the Secretary of State must personally determine that the alien's presence or activities would compromise a compelling U.S. foreign policy interest.

(SBU) Pursuant to these authorities, I have determined that the activities and presence of these aliens in the United States would have potentially serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest. These determinations are based on

information provided by the DHS/ICE/HSI regarding the participation and roles of Chung and [redacted] in antisemitic protests and disruptive activities, which fosters a hostile environment for Jewish students in the United States. My determination for Yunseo is also based on her citations for unlawful activity during these protests. The public actions and continued presence of Chung and [redacted] in the United States undermine U.S. policy to combat anti-Semitism around the world and in the United States, in addition to efforts to protect Jewish students from harassment and violence in the United States. Consistent with E.O. 14150, America First Policy Directive to the Secretary of State, the foreign policy of the United States champions core American interests and American citizens and condoning anti-Semitic conduct and disruptive protests in the United States would severely undermine that significant foreign policy objective.

**Attachments**

Tab 1 – DHS Letter on Yunseo Chung
Tab 2 – HSI Subject Profile of Yunseo Chung
Tab 3 – DHS Letter on [redacted]
Tab 5 – HSI Subject Profile of [redacted]
Tab 5 – 8 USC 1227(a)(4)(C)

# EXHIBIT 20

Case: 26-6906, 11/20/2026, DktEntry: 16.8, Page 152 of 300

**U.S. DEPARTMENT OF HOMELAND SECURITY** **Warrant for Arrest of Alien**

File No. [redacted]

Date: March 08, 2025

**To: Any immigration officer authorized pursuant to sections 236 and 287 of the Immigration and Nationality Act and part 287 of title 8, Code of Federal Regulations, to serve warrants of arrest for immigration violations**

I have determined that there is probable cause to believe that CHUNG, Yunseo is removable from the United States. This determination is based upon:

☐ the execution of a charging document to initiate removal proceedings against the subject;

☐ the pendency of ongoing removal proceedings against the subject;

☐ the failure to establish admissibility subsequent to deferred inspection;

☑ biometric confirmation of the subject's identity and a records check of federal databases that affirmatively indicate, by themselves or in addition to other reliable information, that the subject either lacks immigration status or notwithstanding such status is removable under U.S. immigration law; and/or

☐ statements made voluntarily by the subject to an immigration officer and/or other reliable evidence that affirmatively indicate the subject either lacks immigration status or notwithstanding such status is removable under U.S. immigration law.

**YOU ARE COMMANDED** to arrest and take into custody for removal proceedings under the Immigration and Nationality Act, the above-named alien.

[redacted]
(Signature of Authorized Immigration Officer)

[redacted]
(Printed Name and Title of Authorized Immigration Officer)

**Certificate of Service**

I hereby certify that the Warrant for Arrest of Alien was served by me at ______________________
(Location)

on ______________________ on ______________________, and the contents of this
(Name of Alien) (Date of Service)

notice were read to him or her in the ______________________ language.
(Language)

______________________ ______________________
Name and Signature of Officer Name or Number of Interpreter (if applicable)

AAUP C.A.R.043

Form I-200 (Rev. 09/16)

# EXHIBIT 21

SENSITIVE BUT UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

MEMORANDUM FOR THE SECRETARY OF HOMELAND SECURITY

FROM: Marco Rubio

SUBJECT: (SBU) Determination of Deportability under Section 237(a)(4)(C) of the Immigration and Nationality Act (INA)

(SBU) I am writing to inform you that upon notification from the Department of Homeland Security's Homeland Security Investigations (DHS/ICE/HSI) on March 14, 2025, I have determined that Badar Khan SURI (DOB: [redacted]; POB: India), an alien currently in the U.S. in nonimmigrant status as a research scholar, is a deportable alien under INA section 237(a)(4)(C). I understand that ICE now intends to initiate removal charges against him, based on assurances from DHS/ICE/HSI.

(SBU) Under INA section 237(a)(4)(C)(i), an alien is deportable from the United States if the Secretary of State has reasonable ground to believe that the alien's presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States. Under INA section 237(a)(4)(C)(ii), for cases in which the basis for this determination is the alien's past, current, or expected beliefs, statements, or associations that are otherwise lawful, the Secretary of State must personally determine that the alien's presence or activities would compromise a compelling U.S. foreign policy interest.

(SBU) Pursuant to these authorities, I have determined that the activities and presence of these aliens in the United States would have potentially serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest. These determinations are based on the assessment and conclusion provided by DHS/ICE/his, to which we defer

Case: 26-6906, 11/20/2026, DktEntry: 16.8, Page 155 of 300



as DHS/ICE is the principal investigative unit of DHS, that that "Suri's direct connection to Hamas leadership and involvement in antisemitic activities …[creates] a hostile environment for Jewish students and [indicates] support for a designated terrorist organization." In addition, DHS/ICE/HSI also assesses that Suri is "actively supporting Hamas terrorism" and "actively spreads its propaganda and promotes antisemitism on social media." The activities and presence of Suri in the United States undermines U.S. policy to combat antisemitism around the world and in the United States, in addition to efforts to protect Jewish students from harassment and intimidation in the United States. Under E.O. 14188, Additional Measures to Combat Anti-Semitism, it is the policy of the United States to combat antisemitism, using all available and appropriate legal tools to hold to account the perpetrators of unlawful anti-Semitic harassment and violence. Consistent with E.O. 14150, America First Policy Directive to the Secretary of State, the foreign policy of the United States champions core American interests and American citizens and condoning antisemitic conduct and disruptive protests in the United States would severely undermine that significant foreign policy objective. Moreover, the type of intimidation and incitement attributable to Suri potentially undermines the peace process underway in the Middle East by reinforcing anti-Semitic sentiment in the regional and thereby threatening the U.S. foreign policy goal of peacefully resolving the Gaza conflict.

(SBU) The Department of State also requests the opportunity to consult with the Department of Homeland Security on any public statements regarding this determination.

(SBU) I hereby expressly authorize use of this notification by the Department of Homeland Security in immigration court.

**Attachments**

Tab 1 – DHS Letter on Badar Khan Suri
Tab 2 – HSI Subject Profile of Badar Khan Suri
Tab 3 – 8 USC 1227(a)(4)(C)

# EXHIBIT 22

## DEPARTMENT OF HOMELAND SECURITY
## NOTICE TO APPEAR

DOB: [redacted]

Event No: [redacted]

In removal proceedings under section 240 of the Immigration and Nationality Act:

Subject ID: [redacted]

File No: [redacted]

In the Matter of:

Respondent: BADAR KHAN SURI currently residing at:

1209 Sunflower Ln Alvarado, TEXAS 760092810 [redacted]

(Number, street, city, state and ZIP code) (Area code and phone number)

☐ You are an arriving alien.
☐ You are an alien present in the United States who has not been admitted or paroled.
☒ You have been admitted to the United States, but are removable for the reasons stated below.

The Department of Homeland Security alleges that you:

1. You are not a citizen or national of the United States;
2. You are a native of INDIA and a citizen of INDIA;
3. You were admitted to the United States at Dulles, VA on December 10, 2022 as a Exchange Visitor;
4. On March 15, 2025, The Secretary of State has determined that your presence or activities in the United States would have serious adverse foreign policy consequences for the United States.

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:

Section 237(a)(4)(C)(i) of the Immigration and Nationality Act, as amended, in that the Secretary of State has reasonable ground to believe that your presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States.

☐ This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.
☐ Section 235(b)(1) order was vacated pursuant to: ☐ 8CFR 208.30 ☐ 8CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at:

27991 BUENA VISTA BLVD, LOS FRESNOS, TEXAS 78566 PORT ISABEL DETENTION CENTER

(Complete Address of Immigration Court, including Room Number, if any)

on May 6, 2025 at 8:30 am to show why you should not be removed from the United States based on the

(Date) (Time)

charge(s) set forth above.

CHRISTOPHER HECK [redacted]

(Signature and Title of Issuing Officer)

Date: March 17, 2025 Chantilly, VA

(City and State)

EOIR – 1 of 3

## Notice to Respondent

**Warning:** Any statement you make may be used against you in removal proceedings.

**Alien Registration:** This copy of the Notice to Appear served upon you is evidence of your alien registration while you are in removal proceedings. You are required to carry it with you at all times.

**Representation:** If you so choose, you may be represented in this proceeding, at no expense to the Government, by an attorney or other individual authorized and qualified to represent persons before the Executive Office for Immigration Review, pursuant to 8 CFR 1003.16. Unless you so request, no hearing will be scheduled earlier than ten days from the date of this notice, to allow you sufficient time to secure counsel. A list of qualified attorneys and organizations who may be available to represent you at no cost will be provided with this notice.

**Conduct of the hearing:** At the time of your hearing, you should bring with you any affidavits or other documents that you desire to have considered in connection with your case. If you wish to have the testimony of any witnesses considered, you should arrange to have such witnesses present at the hearing. At your hearing you will be given the opportunity to admit or deny any or all of the allegations in the Notice to Appear, including that you are inadmissible or removable. You will have an opportunity to present evidence on your own behalf, to examine any evidence presented by the Government, to object, on proper legal grounds, to the receipt of evidence and to cross examine any witnesses presented by the Government. At the conclusion of your hearing, you have a right to appeal an adverse decision by the immigration judge. You will be advised by the immigration judge before whom you appear of any relief from removal for which you may appear eligible including the privilege of voluntary departure. You will be given a reasonable opportunity to make any such application to the immigration judge.

**One-Year Asylum Application Deadline:** If you believe you may be eligible for asylum, you must file a Form I-589, Application for Asylum and for Withholding of Removal. The Form I-589, Instructions, and information on where to file the Form can be found at www.uscis.gov/i-589. Failure to file the Form I-589 within one year of arrival may bar you from eligibility to apply for asylum pursuant to section 208(a)(2)(B) of the Immigration and Nationality Act.

**Failure to appear:** You are required to provide the Department of Homeland Security (DHS), in writing, with your full mailing address and telephone number. You must notify the Immigration Court and the DHS immediately by using Form EOIR-33 whenever you change your address or telephone number during the course of this proceeding. You will be provided with a copy of this form. Notices of hearing will be mailed to this address. If you do not submit Form EOIR-33 and do not otherwise provide an address at which you may be reached during proceedings, then the Government shall not be required to provide you with written notice of your hearing. If you fail to attend the hearing at the time and place designated on this notice, or any date and time later directed by the Immigration Court, a removal order may be made by the immigration judge in your absence, and you may be arrested and detained by the DHS.

**Mandatory Duty to Surrender for Removal:** If you become subject to a final order of removal, you must surrender for removal to your local DHS office, listed on the internet at http://www.ice.gov/contact/ero, as directed by the DHS and required by statute and regulation. Immigration regulations at 8 CFR 1241.1 define when the removal order becomes administratively final. If you are granted voluntary departure and fail to depart the United States as required, fail to post a bond in connection with voluntary departure, or fail to comply with any other condition or term in connection with voluntary departure, you must surrender for removal on the next business day thereafter. If you do not surrender for removal as required, you will be ineligible for all forms of discretionary relief for as long as you remain in the United States and for ten years after your departure or removal. This means you will be ineligible for asylum, cancellation of removal, voluntary departure, adjustment of status, change of nonimmigrant status, registry, and related waivers for this period. If you do not surrender for removal as required, you may also be criminally prosecuted under section 243 of the Immigration and Nationality Act.

**U.S. Citizenship Claims:** If you believe you are a United States citizen, please advise the DHS by calling the ICE Law Enforcement Support Center toll free at (855) 448-6903.

**Sensitive locations:** To the extent that an enforcement action leading to a removal proceeding was taken against Respondent at a location described in 8 U.S.C. § 1229(e)(1), such action complied with 8 U.S.C. § 1367.

## Request for Prompt Hearing

To expedite a determination in my case, I request this Notice to Appear be filed with the Executive Office for Immigration Review as soon as possible. I waive my right to a 10-day period prior to appearing before an immigration judge and request my hearing be scheduled.

Before:

_______________________ (Signature of Respondent)

Date: ____________

_______________________ (Signature and Title of Immigration Officer)

## Certificate of Service

This Notice To Appear was served on the respondent by me on March 17, 2025, in the following manner and in compliance with section 239(a)(1) of the Act.

[X] In person [ ] by certified mail, returned receipt # ____________ requested [ ] by regular mail

[ ] Attached is a credible fear worksheet.

[X] Attached is a list of organization and attorneys which provide free legal services.

The alien was provided oral notice in the ENGLISH language of the time and place of his or her hearing and of the consequences of failure to appear as provided in section 240(b)(7) of the Act.

REFUSED

(Signature of Respondent if Personally Served) [redacted]

EOIR — 2 of 3

Allegations: Denies All; |

## Privacy Act Statement

**Authority:**
The Department of Homeland Security through U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS) are authorized to collect the information requested on this form pursuant to Sections 103, 237, 239, 240, and 290 of the Immigration and Nationality Act (INA), as amended (8 U.S.C. 1103, 1229, 1229a, and 1360), and the regulations issued pursuant thereto.

**Purpose:**
You are being asked to sign and date this Notice to Appear (NTA) as an acknowledgement of personal receipt of this notice. This notice, when filed with the U.S. Department of Justice's (DOJ) Executive Office for Immigration Review (EOIR), initiates removal proceedings. The NTA contains information regarding the nature of the proceedings against you, the legal authority under which proceedings are conducted, the acts or conduct alleged against you to be in violation of law, the charges against you, and the statutory provisions alleged to have been violated. The NTA also includes information about the conduct of the removal hearing, your right to representation at no expense to the government, the requirement to inform EOIR of any change in address, the consequences for failing to appear, and that generally, if you wish to apply for asylum, you must do so within one year of your arrival in the United States. If you choose to sign and date the NTA, that information will be used to confirm that you received it, and for recordkeeping.

**Routine Uses:**
For United States Citizens, Lawful Permanent Residents, or individuals whose records are covered by the Judicial Redress Act of 2015 (5 U.S.C. § 552a note), your information may be disclosed in accordance with the Privacy Act of 1974, 5 U.S.C. § 552a(b), including pursuant to the routine uses published in the following DHS systems of records notices (SORN): DHS/USCIS/ICE/CBP-001 Alien File, Index, and National File Tracking System of Records, DHS/USCIS-007 Benefit Information System, DHS/ICE-011 Criminal Arrest Records and Immigration Enforcement Records (CARIER), and DHS/ICE-003 General Counsel Electronic Management System (GEMS), and DHS/CBP-023 Border Patrol Enforcement Records (BPER). These SORNs can be viewed at https://www.dhs.gov/system-records-notices-sorns. When disclosed to the DOJ's EOIR for immigration proceedings, this information that is maintained and used by DOJ is covered by the following DOJ SORN: EOIR-001, Records and Management Information System, or any updated or successor SORN, which can be viewed at https://www.justice.gov/opcl/doj-systems-records. Further, your information may be disclosed pursuant to routine uses described in the abovementioned DHS SORNs or DOJ EOIR SORN to federal, state, local, tribal, territorial, and foreign law enforcement agencies for enforcement, investigatory, litigation, or other similar purposes.

For all others, as appropriate under United States law and DHS policy, the information you provide may be shared internally within DHS, as well as with federal, state, local, tribal, territorial, and foreign law enforcement; other government agencies; and other parties for enforcement, investigatory, litigation, or other similar purposes.

**Disclosure:**
Providing your signature and the date of your signature is voluntary. There are no effects on you for not providing your signature and date; however, removal proceedings may continue notwithstanding the failure or refusal to provide this information.

EOIR – 3 of 3

# EXHIBIT 23

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, ET AL.,

Plaintiffs,

v.

MARCO RUBIO, ET AL.

Defendants.

Case No. 1:25-cv-10685 (WGY)

**STIPULATION AND ~~PROPOSED~~ ORDER**

**WHEREAS,** Plaintiffs American Association of University Professors, American Association of University Professors-Harvard Faculty Chapter, American Association of University Professors at New York University, Rutgers American Association of University Professors-American Federation of Teachers, and Middle East Studies Association ("Plaintiffs"), by and through their undersigned counsel, and Defendants Marco Rubio, Kristi Noem, Todd Lyons, and Donald J. Trump ("Defendants") have stipulated and agreed that all statements made by government officials and agents, and quotes attributed to them, in the following documents are authenticated pursuant to Federal Rule of Evidence 901:[1]

1. Secretary of State Marco Rubio's March 6, 2025 post on X (available at https://perma.cc/KD9R-BNV3);

2. Department of Homeland Security's March 9, 2025 post on X (available at https://perma.cc/3NNQ-235L);

[1] Defendants do not waive hearsay objections to any statements other than those by government officials and agents stipulated to in this document.



AAUP-01343

Case: 26-6906, 11/20/2026, DktEntry: 16.8, Page 162 of 300

3. Secretary of State Marco Rubio's March 9, 2025 post on X (available at https://perma.cc/Q7EH-M4LW);

4. President Donald J. Trump's March 10, 2025 post on Truth Social (available at https://perma.cc/Z5PU-7MZT);

5. White House Press Secretary Karoline Leavitt's March 11, 2025 Press Briefing transcript (available at https://perma.cc/XAJ6-N2CD);

6. Secretary of State Marco Rubio's March 12, 2025 remarks to the press in Shannon, Ireland (available at https://www.state.gov/secretary-of-state-marco-rubio-remarks-to-press/);

7. Deputy Secretary of Homeland Security Tony Edgar's March 13, 2025 interview with NPR (available at https://perma.cc/Q45C-6B9A);

8. Vice President J.D. Vance's March 13, 2025 Fox New Interview Transcript (available at Dkt. No. 14-18);

9. The March 14, 2025 Department of Homeland Security Press Release (available at https://perma.cc/7YAG-38XF);

10. Secretary of State Mark Rubio's March 16, 2025 interview on CBS's Face the Nation (available at https://perma.cc/DV8P-2CWZ);

11. Department of Homeland Security Assistant Secretary for Public Affairs Tricia McLaughlin's March 19, 2025 post on X (available at https://perma.cc/JE82-K8CM);

12. Secretary of State Marco Rubio's March 27, 2025 remarks during a Joint Press Availability with Guyanese President Irfaan Ali (available at https://perma.cc/8LC9-S86R);

13. Secretary of State Marco Rubio's March 28, 2025 remarks to the press (available at https://perma.cc/5YPB-GBGX);

14. Secretary of State Marco Rubio's April 8, 2025 interview on Triggered with Don Jr. (available at https://perma.cc/6RD7-S8DN);

15. The April 9, 2025 Department of Homeland Security Press Release (available at https://perma.cc/ZSM5-X5GE);

16. White House Deputy Chief of Staff Stephen Miller's April 14, 2025 interview with Fox News (available at https://bsky.app/profile/atrupar.com/post/3lmroj5yzz723);

17. Secretary of State Marco Rubio's April 17, 2025 interview on the Ben Shapiro Show (available at https://perma.cc/K92W-A4XN);

18. Department of Homeland Security Assistant Secretary for Public Affairs Tricia McLaughlin's April 30, 2025 post on X (available at https://perma.cc/T6JE-3H9Y);

19. The May 7, 2025 NPR article quoting Department of Homeland Security Assistant Secretary for Public Affairs Tricia McLaughlin (available at https://perma.cc/U9JK-G75Z);

20. Secretary of State Marco Rubio's May 7, 2025 post on X (available at https://perma.cc/RNB6-YUUH);

21. Department of Homeland Security Assistant Secretary for Public Affairs Tricia McLaughlin's May 8, 2025 post on X (available at https://perma.cc/TA4V-8HDP);

22. The January 30, 2025 White House Fact Sheet Titled "Fact Sheet: President Donald J. Trump Takes Forceful and Unprecedented Steps to Combat Anti-Semitism" (available at https://www.whitehouse.gov/fact-sheets/2025/01/fact-sheet-president-donald-j-trump-takes-forceful-and-unprecedented-steps-to-combat-anti-semitism/).

Dated: New York, New York
June 9, 2025

Michael Tremonte
Noam Biale
Alexandra Conlon
Courtney Gans
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2603
mtremonte@shertremonte.com
nbiale@shertremonte.com

Ramya Krishnan
Carrie DeCell
Xiangnong Wang
Talya Nevins
Jackson Busch
Scott Wilkens
Alex Abdo
Jameel Jaffer
Knight First Amendment Institute
at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
ramya.krishnan@knightcolumbia.org

Ahilan T. Arulanantham
Professor from Practice
UCLA School of Law
385 Charles E. Young Dr. East
Los Angeles, CA 90095
(310) 825-1029
arulanantham@law.ucla.edu

Edwina Clarke, BBO 699702
130 Bishop Allen Drive
Cambridge, MA 02139
(617) 676-9423
edwina@zimmercitronclarke.com

*Attorneys for Plaintiffs*

YAAKOV M. ROTH
*Acting Assistant Attorney General*
DREW C. ENSIGN
*Deputy Assistant Attorney General*
LEAH B. FOLEY
*United States Attorney*
SHAWNA YEN
*Assistant United States Attorney*
*District of Massachusetts*

WILLIAM KANELLIS
*Trial Attorney*

ANTHONY NICASTRO
*Acting Director*

*/s/ Ethan B. Kanter*

ETHAN B. KANTER
Chief, National Security Unit
Office of Immigration Litigation
Civil Division, U.S. Department of Justice
P.O. 878, Ben Franklin Station
Washington, DC. 20044
(202) 616-9123
ethan.kanter@usdoj.gov

*Attorneys for Defendants*

Case: 26-6906, 11/20/2026, DktEntry: 16.8, (165 of 300)

**SO ORDERED**

*William G. Young*

Hon. William G. Young, U.S. District Judge

# EXHIBIT 24



Secretary Marco Rubio
@SecRubio

Those who support designated terrorist organizations, including Hamas, threaten our national security. The United States has zero tolerance for foreign visitors who support terrorists. Violators of U.S. law — including international students — face visa denial or revocation, and deportation.

5:30 PM · Mar 6, 2025 · 3.9M Views

11K 18K 83K 1.4K

# EXHIBIT 25

**Homeland Security**
@DHSgov

On March 9, 2025, in support of President Trump's executive orders prohibiting anti-Semitism, and in coordination with the Department of State, U.S. Immigration and Customs Enforcement arrested Mahmoud Khalil, a former Columbia University graduate student. Khalil led activities aligned to Hamas, a designated terrorist organization.

ICE and the Department of State are committed to enforcing President Trump's executive orders and to protecting U.S. national security.

9:29 PM · Mar 9, 2025 · **3.8M** Views

2.9K 3.1K 18K 1K

AAUP-01349

# EXHIBIT 26

**Marco Rubio**
@marcorubio

We will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported




From apnews.com

6:10 PM · Mar 9, 2025 · **19.5M** Views

16K 23K 134K 3.5K

AAUP-01350

# EXHIBIT 27



**Donald J. Trump**
@realDonaldTrump

Following my previously signed Executive Orders, ICE proudly apprehended and detained Mahmoud Khalil, a Radical Foreign Pro-Hamas Student on the campus of Columbia University. This is the first arrest of many to come. We know there are more students at Columbia and other Universities across the Country who have engaged in pro-terrorist, anti-Semitic, anti-American activity, and the Trump Administration will not tolerate it. Many are not students, they are paid agitators. We will find, apprehend, and deport these terrorist sympathizers from our country — never to return again. If you support terrorism, including the slaughtering of innocent men, women, and children, your presence is contrary to our national and foreign policy interests, and you are not welcome here. We expect every one of America's Colleges and Universities to comply. Thank you!

**11.3k** ReTruths **49.9k** Likes Mar 10, 2025, 1:05 PM

# EXHIBIT 28

Roll Call




Factbase Powered by FiscalNote StressLens

Donald J. Trump

Transcripts White House Calendar White House Press Releases

# Press Briefing: Karoline Leavitt Holds a Press Briefing at The White House - March 11, 2025

StressLens 6 Topics 10 Entities Moderation 2 Speakers




Full Transcript

Karoline Leavitt 00:00:00-00:00:00 ( sec)

NO STRESSLENS

How are you?

Question 00:00:00-00:00:01 (1 sec)

Great.

X

Karoline Leavitt 00:00:01-00:00:33 (32 sec) NO SIGNAL (0)

Good, I'll let my staff get settled. Uh, there's a lot of news today, so I look forward to taking your questions. Good to see you. Um, and I have some updates for you as well. Later today, President Trump will address the business roundtable's quarterly meeting where he will tout his pro-growth economic agenda and answer questions before more than 100 of our nation's leading CEOs. In fact, it's the largest attendance ever for this event because business leaders are so eager and encouraged by President Trump's return to Washington.

Karoline Leavitt 00:00:33-00:00:53 (20 sec) NO SIGNAL (0)

This follows President Trump's roundtable yesterday with the technology CEO Council here at the White House, where he met with key leaders in the technology industry. And last night, President Trump also held an official swearing in ceremony in the Oval Office for Sean Curran, who is now the 28th director of the United States Secret Service.

Karoline Leavitt 00:00:53-00:01:26 (33 sec) NO STRESSLENS

Sean demonstrated unbelievable bravery under gunfire in Butler, Pennsylvania this past July when an assassin tried to kill President Trump. As someone who got to know Sean personally throughout the campaign last year, I can say unequivocally that there is nobody better suited for this important role. And following the confirmation of Labor Secretary Lori Chavez-DeRemer last night, the Senate has now confirmed 21 of President Trump's well-qualified cabinet level nominees far outpacing the previous administration.

Karoline Leavitt 00:01:26-00:01:50 (24 sec) NO SIGNAL (0)

And looking ahead, tomorrow, the president will welcome the Taoiseach Micheal Martin, of Ireland for the annual White House -- White House Shamrock ceremony. And Thursday, President Trump will welcome the NATO secretary general for a working meeting and lunch. On the economy. February's jobs report was good news for America, particularly our manufacturing sector.

Karoline Leavitt 00:01:50-00:02:16 (27 sec) NO SIGNAL (0)

The manufacturing sector gained 10,000 new jobs in just one month under President Trump. This rebound was led by the automobile sector where we saw 9000 new auto jobs created already. That is the most auto jobs added to the economy in 15 months. This was a complete turnaround from the Biden administration where we were losing an average of 9000 manufacturing jobs per month last year.

Karoline Leavitt 00:02:16-00:02:37 (20 sec) NO SIGNAL (0)

Reuters is out with a report that a number of companies are now looking at expanding their presence or bringing their businesses into America because of President Trump's policies. And just moments ago, before coming out here, I saw another report by Reuters revealing that Merck has opened a $1 billion facility at its North Carolina site.

Karoline Leavitt 00:02:37-00:03:00 (23 sec) NO SIGNAL (0)

This is just the latest pharmaceutical company to boost its US manufacturing in lieu of President Trump's tariffs. This announcement follows Eli Lilly's plans to invest at least $27 billion to build four new manufacturing plants here in the United States. And Pfizer has also said it's considering moving their manufacturing overseas right here to the United States of America.

X

X

Karoline Leavitt 00:03:00-00:03:27 (28 sec) NO SIGNAL (0)

As the president has said over and over again, when we purchase products made in the USA, the profits stay here, the revenue stays here and most importantly, the jobs stay here. And despite the globalist mainstream media's attempts to worry consumers, President Trump will not repeat the trend of past American presidents who broke their promises to the American public and smiled while they stuck a knife in the back of American workers and shipped their jobs overseas.

Karoline Leavitt 00:03:27-00:03:54 (27 sec) NO SIGNAL (0)

Our country has lost more than 5 million jobs in more than 90,000 factories due to devastating globalization over the last three decades alone. North Carolina lost 300,000 manufacturing jobs, including 60 percent of its furniture manufacturing jobs in the years following NAFTA. And in Michigan, globalist policies destroyed 250,000 jobs, including 40 percent of the auto industry.

Karoline Leavitt 00:03:54-00:04:17 (23 sec) NO SIGNAL (0)

Which again, we know is clawing back because of President Trump's action already. These are harrowing statistics that represent countless towns and families who have been completely destroyed. But the America last globalist era is ending under President Trump. He will no longer allow our country and our workers, our hardworking American families to be ripped off.

Karoline Leavitt 00:04:17-00:04:42 (25 sec) NO SIGNAL (0)

On another very important issue for the president. He continues to work hard to secure the border. If you missed it yesterday, CBP launched an enhanced home mobile app with a new feature, the Intent to Depart, which offers unlawfully present aliens or those aliens whose parole has been revoked an orderly and defined process to notify the US government of their intent to depart the country.

Karoline Leavitt 00:04:42-00:05:06 (24 sec) NO SIGNAL (0)

The CBP home app strengthens our mission to secure the border and provides illegal aliens with a straightforward way to leave now before facing much harsher consequences later. A new report from Bloomberg just found that the number of aliens trying to reach our country by traveling through the jungle to Central America dropped a whopping 99 percent last month.

Karoline Leavitt 00:05:06-00:05:29 (23 sec) NO SIGNAL (0)

And this follows the incredible news that illegal border crossings plummeted last month as well, down 94 percent at our southern border from last February under the Biden administration. As President Trump made clear during his historic address to Congress, we must finish this job and continue to carry out the largest deportation campaign in American history.

Karoline Leavitt 00:05:29-00:05:48 (20 sec) NO SIGNAL (0)

And that is why the president fully endorses the continuing resolution that is before Congress and was negotiated by Speaker Johnson. He is encouraging all Republicans to vote, yes, on this clean CR, which freezes funding at current levels and will prevent the Democrats from getting their long awaited government shutdown.

Karoline Leavitt 00:05:48-00:06:10 (21 sec) NO SIGNAL (0)

Voting against this CR will hurt the American people and kill the incredible momentum that President Trump has built over the past 51 days. And lastly, before I take questions, I would like to commend The Washington Post, who I believe is in the room today. According to a new report from Axios, The Washington Post is overhauling their newsroom structure.

X

Karoline Leavitt 00:06:10-00:06:46 (36 sec) NO STRESSLENS

It appears that the mainstream media, including the Post is finally learning that having disdain for more than half of the country who supports this president does not help you sell newspapers. It's not a very good business model. And that's why we have people in our new media seat. And today, we have Sagar Annette, who is the host of Breaking Points a popular political YouTube news and podcast show that has racked up nearly 1 billion views on YouTube, several hundred million podcast downloads since its launch in June 2021. He's also a former member of the White House Correspondents Association, but is now a part of the thriving independent media.

Karoline Leavitt 00:06:46-00:06:50 (4 sec) NO SIGNAL (0)

We're very happy to have you with us here today. Why don't you kick off our briefing? Thank you.

Question 00:06:50-00:07:08 (18 sec) NO SIGNAL (0)

Really, really appreciate you having me, Karoline, a couple of questions for you, if I may. First is first on the stock market. So currently it's the 25th anniversary today of the dot-com bubble crash. There's a lot of concern for a lot of Americans right now about the state of the economy. President Trump has refused to rule out a recession.

Question 00:07:08-00:07:15 (8 sec) NO SIGNAL (0)

Secretary Lutnick, however, has told us there will not be one, so can the White House just tell and assure Americans today that there's not going to be a recession?

Karoline Leavitt 00:07:15-00:07:36 (20 sec) NO SIGNAL (0)

Well, there's a lot to unpack there. So, let me start by saying that first of all, when it comes to the stock market, the numbers that we see today, the numbers we saw yesterday, the numbers we'll see tomorrow are a snapshot of a moment in time. And as President Trump has said, and I'm here to echo the remarks of this president and of this White House, we are in a period of economic transition.

Karoline Leavitt 00:07:36-00:07:55 (19 sec) NO SIGNAL (0)

We are in a period of transition from the mess that was created under Joe Biden and the previous administration. Joe Biden left this country in an economic disaster. Several statistics to point out: the delinquency rate on credit card loans increased 63 percent under Joe Biden, hitting a near 12-year high.

Karoline Leavitt 00:07:55-00:08:34 (39 sec) NO STRESSLENS

Under Joe Biden, all net job growth went to foreign born Americans. Real wages declined by 1.5 percent under Joe Biden. And as we all know, and this administration continues to combat, prices soared more than 20 percent under Joe Biden because of his reckless spending and economic policies. So, we are in a period of transition from that economic nightmare under a president who had no idea what he was doing, never held the private sector job in his life, into a golden age of American manufacturing under a businessman and a deal maker in chief in President Donald J. Trump who will be implementing, is implementing the formula that we know works.

Karoline Leavitt 00:08:34-00:08:50 (16 sec) NO SIGNAL (0)

Look at President Trump's results in his first term. If people are looking for certainty, they should look at the record of this president. That's why the American people reelected him back to this office. And look at everything that President Trump has already done, and his team has already done in just 51 days.

Karoline Leavitt 00:08:50-00:09:16 (26 sec) NO SIGNAL (0)

X

The massive efforts to deregulate; tax cuts, which we need congress to pass the Trump economic agenda, the Trump tax cuts, which will unleash economic growth. And the president also addressed this directly I will point out as well, when you look at what he said on Air Force One, and he said he wants the American people to have so much money in their pockets they don't even know what to do with it. That's the intent of this administration and we're working very hard every day on that goal.

Question 00:09:16-00:09:36 (21 sec) NO SIGNAL (0)

Second question on the CR. So, President Trump came out today in a primary challenge against Congressman Thomas Massie. Congressman Massie has been a supporter of DOGE, he's been a supporter of Make America Healthy Again. What kind of message is this White House sending against a congressman who's sticking up for principles that he's long held in the chamber and voting against continuing resolution and spending?

Karoline Leavitt 00:09:36-00:10:00 (24 sec) NO SIGNAL (0)

I think the president has made it very clear that he believes it's critical for conservatives and republicans and frankly all members of congress to get behind this continuing resolution to keep the government funded. The president wants to continue the momentum that he has built over the last 51 days. In order to keep the government funded, we've got to keep moving with these deportations and he believes that everybody needs to get on board with this bill.

Karoline Leavitt 00:10:00-00:10:11 (10 sec) NO SIGNAL (0)

He's been active in this process. He's been making calls to get this over the finish line. And we're urging every republican, and democrats too, to do what's right for the American public to prevent a government shutdown.

Question 00:10:11-00:10:20 (10 sec) NO SIGNAL (0)

Just the last question here on Mahmoud Khalil. Does the administration believe that it needs to charge a green card holder with a crime to be eligible for deportation?

Karoline Leavitt 00:10:20-00:10:45 (24 sec) NO SIGNAL (0)

Well, in fact, Secretary Rubio reserves the right to revoke the visa of Mahmoud Khalil. And I'm glad you brought this up. Under the Immigration and Nationality Act, the Secretary of State has the right to revoke a green card or a visa for individuals who serve or are adversarial to the foreign policy and national security interests of the United States of America.

Karoline Leavitt 00:10:45-00:11:04 (20 sec) NO SIGNAL (0)

And Mahmoud Khalil was an individual who was given the privilege of coming to this country to study at one of our nation's finest universities and colleges. And he took advantage of that opportunity, of that privilege by siding with terrorists, Hamas terrorists who have killed innocent men, women and children.

Karoline Leavitt 00:11:04-00:11:32 (27 sec) NO SIGNAL (0)

This is an individual who organized group protests that not only disrupted college campus classes and harassed Jewish American students and made them feel unsafe on their own college campus, but also distributed pro-Hamas propaganda, fliers with the logo of Hamas. That is what the behavior and activity that this individual engaged in. And I have those fliers on my desk, they were provided to me by the Department of Homeland Security.

Karoline Leavitt 00:11:32-00:11:54 (23 sec) NO SIGNAL (0)

I thought about bringing them into this briefing room to share with all of you, but I didn't think it was worth the dignity of this room to bring that pro-Hamas propaganda. But that's what this individual distributed on the campus of Columbia University.

X

And this administration is not going to tolerate individuals having the privilege of studying in our country and then siding with pro-terrorist organizations that have killed Americans.

Karoline Leavitt 00:11:54-00:11:59 (5 sec) NO STRESSLENS

We have a zero-tolerance policy for siding with terrorists, period. Peter Doocy.

Question 00:11:59-00:12:10 (11 sec) NO SIGNAL (0)

Thank you, Karoline. So, you said that the Dow dropping and dropping and dropping is a period of transition. You're sure nobody here at the White House shorted the Dow.

Karoline Leavitt 00:12:10-00:12:11 (1 sec) NO STRESSLENS

[Laughter] No, I don't think so.

Question 00:12:11-00:12:24 (12 sec) NO SIGNAL (0)

OK. But is there any concern here that it's going to be harder to ask certain federal workers to retire if they look at their retirement accounts and they're getting robbed every day?

Karoline Leavitt 00:12:24-00:12:59 (35 sec) NO SIGNAL (0)

Well, I'm glad you brought up workers because that's exactly who President Trump is looking out for with his America First trade policy and his America First economic agenda. And if you look at -- there's great indication to be optimistic about where the economy stands and the American people, investors, CEOs, small business owners, but most importantly workers, should bet on President Trump, because his tariff policies, what he envisions is reciprocity -- fair trade practices where American workers are put first and are no longer ripped off by foreign countries all over this world.

Question 00:12:59-00:13:07 (8 sec) NO SIGNAL (0)

President Trump says he's going to buy a Tesla today. Did he buy it? And when is the last time he drove a car?

Karoline Leavitt 00:13:07-00:13:29 (21 sec) NO SIGNAL (0)

That's a very good question. I have heard the president remark that he misses being able to drive, that luxury of driving his own vehicle, although the beast is nice. But he is going to be viewing a Tesla that is making its way to the White House complex now I can confirm. Perhaps the press pool today will have an opportunity to witness this very exciting moment later this afternoon.

Karoline Leavitt 00:13:29-00:13:36 (7 sec) NO SIGNAL (0)

But Tesla -- a Tesla is on its way here now and we'll see if the president likes it when he checks it out.

Question 00:13:36-00:13:40 (4 sec) NO SIGNAL (0)

So, they're bringing him a Tesla to look at and if he likes it, he's just going to buy it.

Karoline Leavitt 00:13:40-00:13:46 (6 sec) NO SIGNAL (0)

He's intent on -- he's definitely going to buy one. But he'll take a look at it when it gets here later this afternoon.

X

Question 00:13:46-00:13:47 (1 sec) NO STRESSLENS

Full retail? [Laughter]

X

Karoline Leavitt 00:13:47-00:13:50 (2 sec) NO STRESSLENS

Yes, full market price. Kelly?

Question 00:13:50-00:14:14 (24 sec) NO SIGNAL (0)

Can we talk about Canada? What is the status of President Trump having a conversation with Mark Carney? We have seen the president use the term governor to refer to Justin Trudeau; will that moniker also go to Mr. Carney going forward? And is the decision to increase the tariffs -- is that based on a specific economic metric that he looked at? Is it impulse?

Question 00:14:14-00:14:16 (2 sec) NO STRESSLENS

How would you describe his reaction to Canada?

Karoline Leavitt 00:14:16-00:14:42 (26 sec) NO SIGNAL (0)

The president has not yet spoken to Mr. Carney, not since I checked, which was just moments ago, but certainly his phone is always open to leaders who wish to speak with him. As for the tariffs, the president made his position on this quite clear with the statement that he put out. And it was a retaliatory statement due to the escalation of rhetoric that we've seen out of Ontario, Canada.

Karoline Leavitt 00:14:42-00:15:04 (22 sec) NO SIGNAL (0)

The president saw the premier, Doug Ford, make an egregious and insulting comment threatening to shut down electricity for the American people, for hard working American families. He made that threat. The president saw that and has an obligation and a responsibility to respond accordingly and represent the interests of the American people.

Karoline Leavitt 00:15:04-00:15:27 (23 sec) NO SIGNAL (0)

So, he has made the decision to add a 25 percent tariff. So, now steel and aluminum tariffs will come into effect tomorrow at the rate of 50 percent. And our steel and aluminum industries have actually applauded these tariffs because, again, they know it's going to grow their industry here. It's going to allow them to export more steel that is made right here in the United States with American workers.

Question 00:15:27-00:15:43 (17 sec) NO SIGNAL (0)

Egregious and insulting are your words here, but that's what many Canadian leaders have said about the actions President Trump has taken toward Canada. And what do you think the timeline is for speaking to Mr. Carney? Because normally the president -- a sitting president speaks to a close ally very quickly when there's new leadership.

Karoline Leavitt 00:15:43-00:16:09 (25 sec) NO SIGNAL (0)

Well, the president is again responding to the fact that Canada has been ripping off the United States of America and hard-working Americans for decades. If you look at the rates of tariffs across the board that Canadians have been imposing on the American people and our workers here, it is egregious. In fact, I have a handy, dandy chart here that shows not just Canada, but the rate of tariffs across the board.

Karoline Leavitt 00:16:09-00:16:31 (22 sec) NO SIGNAL (0)

If you look at Canada, since you brought it up, American cheese and butter, nearly 300 percent tariff; you look at India, 150 percent tariff on American alcohol. You think that's helping Kentucky bourbon be exported into India? I don't think so. 100 percent tariff on agricultural products from India. Look at Japan tariffing rice, 700 percent.

Case: 26-0906, 11/20/2026, DktEntry: 16.3, Page 182 of 300



X

Karoline Leavitt 00:16:31-00:16:52 (21 sec) NO SIGNAL (0)

President Trump believes in reciprocity, and it is about dang time that we have a president who actually looks out for the interests of American businesses and workers. And all he's asking for at the end of the day are fair and balanced trade practices. And unfortunately, Canada has not been treating us very fairly at all over the past several decades.

Karoline Leavitt 00:16:52-00:16:58 (6 sec) NO SIGNAL (0)

To the woman in the purple, because I saw you were making a face at my previous answer. So, what's going on? [Laughter]

Question 00:16:58-00:17:18 (20 sec) NO SIGNAL (0)

Well, actually I have a couple of questions. At the core of pro-Palestinian protests on college campuses and elsewhere, is a demand to end the war in Gaza, a goal that this administration actually supports and has pursued. So, why has this not been acknowledged or highlighted even.

Karoline Leavitt 00:17:18-00:17:40 (21 sec) NO SIGNAL (0)

Because these colleges and these protests have again put out Hamas propaganda. The fliers that have been distributed call for violence. The fliers that have been distributed have the logo of an organization that has held Americans hostage, that murdered innocent babies, that murdered men, women and children.

Karoline Leavitt 00:17:40-00:18:14 (34 sec) NO SIGNAL (0)

They are a designated foreign terrorist organization. And we are not going to tolerate non-citizens, foreigners who come here on a visa engaging in such behavior siding with terrorists. And the Secretary of State reserves the authority to revoke the -- the green card or the visa of an individual who serves as a -- who -- actually it says right here, reasonable grounds to believe that the alien's presence or activities in the United States would have potentially serious adverse foreign policy consequences to the United States.

Karoline Leavitt 00:18:14-00:18:25 (11 sec) NO SIGNAL (0)

And I think siding with Hamas makes that quite clear. Secretary Rubio exercised that authority, and we fully believe that we are going to move forward with more arrests as President Trump previewed in his statement yesterday.

Question 00:18:25-00:18:26 (1 sec) NO STRESSLENS

Yeah, but the White House also --

Karoline Leavitt 00:18:26-00:18:26 (1 sec) NO STRESSLENS

Ed?

Question 00:18:26-00:18:27 (1 sec) NO STRESSLENS

Yeah, thanks, Karoline.

Karoline Leavitt 00:18:27-00:18:27 (1 sec) NO STRESSLENS

Go ahead.

X

Question 00:18:27-00:18:37 (10 sec) NO SIGNAL (0)

So are there conversations between the administration and the Canadians going on over this tariff? Because the Ontario Premier says the next step is to cut off electricity to the US.

AAUP-01359

X

Karoline Leavitt 00:18:37-00:19:02 (25 sec) NO SIGNAL (0)

And the president put out a statement after seeing those comments. And said that it would be -- there would be grave consequences imposed on Canada if they think about shutting off electricity for the United States of America and our citizens. And the president is also determined to ensure that we are depending on American electricity, not the electricity production of foreign nations, including our allies in Canada.

Karoline Leavitt 00:19:02-00:19:11 (8 sec) NO SIGNAL (0)

As for conversations, there is continued correspondence between the president's team, particularly Secretary Lutnick and the Canadians as well.

Question 00:19:11-00:19:21 (10 sec) NO SIGNAL (0)

And the market reaction, how do you -- how do you sell to the American people then after they're looking at what's happening in the markets this week and say that the tariff policy long term is something good?

Karoline Leavitt 00:19:21-00:19:40 (19 sec) NO SIGNAL (0)

Well, just think about what the tariff policy long term will do for our country. I think many of us probably grew up in small towns. I know at least I did. And the main street in my small town looks a heck of a lot worse than it probably did decades ago before I was alive. At least my parents and grandparents tell me so. And I know many Americans feel that same way.

Karoline Leavitt 00:19:40-00:19:59 (19 sec) NO SIGNAL (0)

What the president envisions for this country is for the United States of America to be a manufacturing superpower, where there are American factories and businesses owned by Americans producing goods that we are exporting to the rest of the world. Those revenues will stay here. It will increase wages for people here in our great country.

Karoline Leavitt 00:19:59-00:20:17 (18 sec) NO SIGNAL (0)

It will ensure our national security. And it will boost the morale of the American people to have thriving industries again. Think about Detroit, Michigan, think about North Carolina, as I mentioned. That used to have a thriving furniture industry that no longer exists because of the globalist trade policies of previous and past administrations.

Karoline Leavitt 00:20:17-00:20:28 (11 sec) NO SIGNAL (0)

And the American people gave the president a tremendous opportunity to restore American greatness and restore our manufacturing dominance. And he's intent on doing just that. John?

Question 00:20:28-00:20:49 (21 sec) NO SIGNAL (0)

Thanks, Karoline. Thanks a lot, Karoline. Two questions for you. First on the CR, you put up on the screen, the president's message to Republicans to support this continuing resolution. Is there outreach to Democrats? Because what we've seen since the beginning of the fiscal year is that in order to get a continuing resolution, you need bipartisan support, and you need compromise.

Karoline Leavitt 00:20:49-00:21:06 (17 sec) NO SIGNAL (0)

Well, right now, we are focused on House Republicans and on the House. Because that's the first step, as you know, John. And so, the president has engaged in correspondence with House Republicans whipping votes and getting them to a yes, which I understand has been pretty successful this morning thus far.

X

Karoline Leavitt 00:21:06-00:21:20 (14 sec) NO SIGNAL (0)

And so again, the president is encouraging Republicans especially. But again, as I said, all members of Congress to vote to continue funding this government so we can continue the business of the American people which elected President Trump to do.

Question 00:21:20-00:21:40 (21 sec) NO SIGNAL (0)

And then, on financial markets, we've seen this decline yesterday. We see it today as well. It seems that the read on the president's policies is one in which they do not have confidence in his trade tariffs policy. They do not have confidence in what the president said to Fox News over the weekend that he didn't rule out the idea of a recession.

Question 00:21:40-00:21:47 (7 sec) NO SIGNAL (0)

What is your read in terms of the decline that we've seen over the last week and a half in financial markets?

Karoline Leavitt 00:21:47-00:22:09 (22 sec) NO SIGNAL (0)

Well, I think there's actually a lot of reason to be confident. And many people do feel confident. Just look at the nearly $2 trillion in private investment that this President has secured. Look at the comments made by the CEO of Apple, one of the biggest companies in this world who said that he is bullish on the future of American innovation under the leadership of President Trump.

Karoline Leavitt 00:22:09-00:22:31 (22 sec) NO SIGNAL (0)

Look at CEO confidence. According to the Conference Board measure of CEO confidence in Q1 2025, under the leadership of this president, it jumped to its highest level in three years from cautious optimism to confident optimism. If you, again, look at the $2 trillion in investments from some of the biggest companies in the world, look at the jobs report last Friday.

Karoline Leavitt 00:22:31-00:22:55 (24 sec) NO SIGNAL (0)

As I also cited in my opening remarks, Fox business reported that Trump sees a manufacturing boom in first folds jobs report of his second term. Look at the auto jobs that have already poured back into America. We added 9000 new auto jobs. Those are sticky jobs. Those are good paying jobs. That's 9000 American families who will now be able to live the American dream because of the policies of this administration.

Karoline Leavitt 00:22:55-00:23:15 (20 sec) NO SIGNAL (0)

You also look at small business optimism. The NFIB put out a report this morning, small business optimism continues to be far higher than it ever was under the previous administration. There's a lot of reason to be optimistic. And again, the American people, CEOs and people on Wall Street and on Main Street should bet on this president.

Karoline Leavitt 00:23:15-00:23:25 (9 sec) NO SIGNAL (0)

He is a dealmaker. He is a businessman. And he's doing what's right for our country. He wants to restore wealth to the United States of America. Michael, good to see you.

Question 00:23:25-00:23:34 (9 sec) NO SIGNAL (0)

X

Hey, Karoline, thank you. Two questions if I may. Will the -- will the administration be providing any relief to states affected by the Ontario Power Tariff?

Karoline Leavitt 00:23:34-00:23:49 (15 sec) NO SIGNAL (0)

Well, the president has made it very clear that Canada would be very wise not to shut off electricity for the American people. And we hope that that does not happen. As for what would happen, if that does take place, I'll leave it to the president to make those decisions.

X

Question 00:23:49-00:23:57 (8 sec) NO SIGNAL (0)

And does President Trump share the Justice Department's concern over rising egg prices and possible collusion of Big Egg? [Laughter]

Karoline Leavitt 00:23:57-00:24:16 (20 sec) NO SIGNAL (0)

Well, we definitely -- we definitely do share the concerns of the American people when it comes to the price of eggs. However, good news, the average cost of a dozen eggs is actually down since Secretary Rollins and President Trump announced their plan. It's down $ 1.85. So that's good news on the cost of eggs.

Karoline Leavitt 00:24:16-00:24:36 (19 sec) NO SIGNAL (0)

And as we know, under the Biden administration, egg prices went up 22 percent. This is another example of an economic mess that President Trump inherited. And the Secretary of Agriculture and the president are focused on fixing it. Secretary Rollins put out a five point plan -- a four point plan rather to address this crisis.

Karoline Leavitt 00:24:36-00:24:49 (14 sec) NO SIGNAL (0)

And she has been honest and realistic with the American people as this administration always is. It will take about three to six months to get the egg supply back to where it should be. But she's focused and this administration is focused on doing that every day. Karen?

Question 00:24:49-00:25:01 (12 sec) NO SIGNAL (0)

Thanks, Karoline. Just back on the markets, you said that what we're seeing this week right now in Wall Street is a snapshot of a moment in time, but does the president think he bears any responsibility for the turmoil in the stock market this week?

Karoline Leavitt 00:25:01-00:25:16 (15 sec) NO SIGNAL (0)

Look, the president is unwavering in his commitment to restore American manufacturing and global dominance. And I think he doubled down on that this morning with his new statement and the tariffs that will be implemented tomorrow on steel and aluminum.

Question 00:25:16-00:25:32 (15 sec) NO SIGNAL (0)

And he has said recently he's not looking at the market. He said you can't really watch the stock -- the stock market, but all of the gains since Election Day have been erased in the S&P 500. At what point, how far do stocks have to fall before the president considers it a factor and changes course?

Karoline Leavitt 00:25:32-00:25:44 (12 sec) NO SIGNAL (0)

Again, as I just said, the president will look out for Wall Street and for Main Street just like he did in his first term. And people on Wall Street and Main Street should bet on this president. He's doing what's right for this country. Nick, good to see you.

X

Question 00:25:44-00:25:56 (12 sec) NO SIGNAL (0)

Good to see you, too. Thank you, Karoline. So is the president prepared like what we saw with Congressman Massie to pressure other Republican lawmakers into supporting this continuing resolution?

X

Karoline Leavitt 00:25:56-00:26:15 (19 sec) NO SIGNAL (0)

Well, he is very much, as I said, engaged in this process. He's been making calls to lawmakers on Capitol Hill. And I think his statements against Congressman Massie speak for themselves. And I will let the president put out any additional statements if he chooses to. But he fully expects all House Republicans to vote for this continuing resolution.

Question 00:26:15-00:26:24 (9 sec) NO SIGNAL (0)

And just a follow up, can we start to anticipate seeing more of the president weighing in on upcoming 2026 races like we saw this morning?

Karoline Leavitt 00:26:24-00:26:35 (10 sec) NO SIGNAL (0)

I'm not sure about that. I'm not even sure if I'm allowed to speak about that from this podium. I would check in with our outside political team for guidance on future races and the president's involvement. Elena?

Question 00:26:35-00:26:57 (22 sec) NO SIGNAL (0)

Thank you. I wanted to ask you about some comments Elon Musk made yesterday. He said that there is $500 to $700 billion in waste and fraud in entitlement spending. He called it, "the big one to eliminate." Earlier this month, he also referred to Social Security as a Ponzi scheme. Should Americans expect changes, big changes to Social Security and Medicare?

Karoline Leavitt 00:26:57-00:27:14 (17 sec) NO SIGNAL (0)

President Trump has been unequivocally clear on this. He is going to protect Social Security and Medicare benefits and Medicaid for hard working Americans who paid into these entitlement programs and deserve those hard earned benefits. And unfortunately, the mainstream media has taken Mr. Musk out of context.

Karoline Leavitt 00:27:14-00:27:43 (30 sec) NO SIGNAL (0)

I saw a Bloomberg headline that our team -- wrong, and it took Mr. Musk out of context. What he was specifically referring to cutting was the waste and the fraud and abuse that does exist in these programs. According to an IG report from the Social Security Administration, there's more than $70 billion of fraud in the Social Security program alone that we know of. And so, the president will continue to protect these programs for hard-working Americans.

Karoline Leavitt 00:27:43-00:27:48 (5 sec) NO SIGNAL (0)

And actually, cutting the waste, fraud and abuse out of these programs will protect it for hard-working Americans.

Question 00:27:48-00:28:03 (14 sec) NO SIGNAL (0)

But Karoline, respectfully -- he said around $500 billion to $700 billion, there was no evidence to claim that. And also, if that is the case, that would represent more than a third of what Social Security paid out last year, maybe 20 percent of Social Security and Medicare combined.

Karoline Leavitt 00:28:03-00:28:21 (19 sec) NO SIGNAL (0)

Again, if you read his full quote, he said we think, so it's an estimate based on what he's seen. He's not saying definitively, he's saying that's what DOGE suspects and thinks. And that's exactly why DOGE was created, to ensure that we are investigating the fraudulent spending, the wasteful abuse across our federal government.

X

Karoline Leavitt 00:28:21-00:28:32 (11 sec) NO SIGNAL (0)

X

And I would remind everybody in this room that 77 percent of the American people support this effort by Elon Musk and DOGE to identify such waste, fraud and abuse. Go ahead. You're welcome.

Question 00:28:32-00:28:47 (15 sec) NO SIGNAL (0)

Thanks, Karoline, for doing this. If we could just step back for a second, when President Trump last addressed the BRT, when he was on the campaign trail, his big push was on tax cuts. He's going there today as he's proposing tax hikes in the form of tariffs. And I'm curious --.

Karoline Leavitt 00:28:47-00:28:48 (1 sec) NO STRESSLENS

Not true. He's not doing that.

Question 00:28:48-00:28:51 (3 sec) NO STRESSLENS

For why he's prioritizing that over the tax cuts.

Karoline Leavitt 00:28:51-00:29:12 (21 sec) NO SIGNAL (0)

He's actually not implementing tax hikes; tariffs are a tax hike on foreign countries that again have been ripping us off. Tariffs are a tax cut for the American people. And the president is a staunch advocate of tax cuts. As you know, he campaigned on no taxes on tips, no taxes on overtime, no taxes on Social Security benefits.

Karoline Leavitt 00:29:12-00:29:17 (5 sec) NO SIGNAL (0)

He is committed to all three of those things and he expects congress to pass them later this year.

Question 00:29:17-00:29:24 (7 sec) NO SIGNAL (0)

I'm sorry, have you ever paid a tariff, because I have? They don't get charged on foreign companies; they get charged on the importers.

Karoline Leavitt 00:29:24-00:29:43 (20 sec) NO SIGNAL (0)

And ultimately when we have fair and balanced trade, which the American people have not seen in decades, as I said at the beginning, revenues will stay here, wages will go up and our country will be made wealthy again. And I think it's insulting that you are trying to test my knowledge of economics and the decisions that this president has made.

Karoline Leavitt 00:29:43-00:29:47 (4 sec) NO STRESSLENS

I now regret giving a question to the Associated Press. Mary, go ahead.

Question 00:29:47-00:30:01 (14 sec) NO SIGNAL (0)

Hey, Karoline, I have two if that's OK. The first one was on Russia-Ukraine. I know Special Envoy Witkoff said yesterday that Zelenskyy apologized in his letter to Trump. Can you share any more about that letter and what else might be interesting from it that we don't know?

Karoline Leavitt 00:30:01-00:30:20 (19 sec) NO SIGNAL (0)

Yes, the president did reference that letter, as you're saying, in his joint address to congress, and I do have an update. As you know, Secretary of State Rubio and our National Security advisor Mike Waltz, have been negotiating with the Ukrainians today in Saudi. They will be providing a full readout of that meeting very soon.

X

Karoline Leavitt 00:30:20-00:30:42 (22 sec) NO SIGNAL (0)

But I can assure you and everybody here and the American people that the news we've received from that meeting throughout the day and the president has been briefed on is positive. This meeting has been productive. I will let Secretary Rubio and our national security -- Secretary of State Rubio and our national security advisor speak to the specifics of what has taken place today when they are ready to do so when the meeting concludes.

Karoline Leavitt 00:30:42-00:30:43 (1 sec) NO STRESSLENS

Lindsay, go ahead.

Question 00:30:43-00:30:56 (12 sec) NO SIGNAL (0)

Thank you, Karoline. According to Mahmoud Khalil, the president has said this is the first of many arrests like this. Does the administration have a rough estimate of how many arrests you're planning to make similar?

Karoline Leavitt 00:30:56-00:31:14 (18 sec) NO SIGNAL (0)

I don't have an estimate. I do know that DHS, based on very good Intel that they have gathered at the direction of the president's executive order, which made it very clear to the Department of Homeland Security that engaging, as I said, in anti-American, anti-Semitic, pro-Hamas protests will not be tolerated.

Karoline Leavitt 00:31:14-00:31:33 (20 sec) NO SIGNAL (0)

So, since the president signed that executive order, and since Secretary Noem has taken the oath at DHS, they have been using intelligence to identify individuals on our nation's colleges and universities, on our college campuses who have engaged in such behavior and activity, and especially illegal activity.

Karoline Leavitt 00:31:33-00:31:51 (17 sec) NO SIGNAL (0)

And so, I don't have a readout on how many arrests will come, but I do know that DHS is actively working on it. And I also know that Columbia University has been given the names of other individuals who have engaged in pro-Hamas activity, and they are refusing to help DHS identify those individuals on campus.

Karoline Leavitt 00:31:51-00:32:05 (14 sec) NO SIGNAL (0)

And as the president said very strongly in his statement yesterday, he is not going to tolerate that. And we expect all America's colleges and universities to comply with this administration's policy. Jasmine?

Question 00:32:05-00:32:18 (13 sec) NO SIGNAL (0)

Thank you so much, Karoline, for the question. On Canada, after all of these threats to increase tariffs or turn off electricity, I wonder, does this administration still consider Canada to be a close ally of the United States?

Karoline Leavitt 00:32:18-00:32:36 (18 sec) NO SIGNAL (0)

Well, I think Canada is a neighbor, they are a partner. They have always been an ally, perhaps they are becoming a competitor now. But as the president also laid out in his Truth Social post today, he believes that Canadians would benefit greatly from becoming the 51st state of the United States of America.

X

Karoline Leavitt 00:32:36-00:33:08 (32 sec) NO SIGNAL (0)

And I actually looked into some of the research about the cost of living in Canada, and the cost of living is much higher than it is here in the United States of America. The average cost of a home in Canada is much higher. In Quebec, the highest tax rate

for an income of 150,000 or more is 53.3 percent, more than half of Canadians incomes they are being taxed on. So, the president has made it clear that he believes Canadians would be better served economically, militarily if they were to become the 51st state of the United States of America.

Karoline Leavitt 00:33:08-00:33:08 ( sec) NO STRESSLENS

Reagan?

Question 00:33:08-00:33:20 (12 sec) NO SIGNAL (0)

Thank you, Karoline. A week ago, Attorney General Bondi said a truckload of Epstein files had been delivered to her office from the SDNY. When can we expect those files to be released to the public?

Karoline Leavitt 00:33:20-00:33:23 (3 sec) NO STRESSLENS

I would defer you to the Department of Justice. I don't have a timeline here.

Question 00:33:23-00:33:25 (2 sec) NO STRESSLENS

Do you have any update on the JFK files?

Karoline Leavitt 00:33:25-00:33:37 (11 sec) NO SIGNAL (0)

I don't. At this moment, again, I would defer you to our DNI Director Tulsi Gabbard, and also the Department of Justice. I know that they are working on that diligently as the president requested them to do. Christian?

Question 00:33:37-00:33:46 (9 sec) NO SIGNAL (0)

Thanks, Karoline. Two questions since we've been talking a lot about tariffs. Have there been any updates on standing up the External Revenue Service to collect revenue from that?

Karoline Leavitt 00:33:46-00:34:05 (19 sec) NO SIGNAL (0)

Well, we need reciprocal tariffs to go into effect first and, as you know, the president will be rolling those out on April 2nd. And then the next start of that process is collecting that revenue to ultimately create the External Revenue Service, which Secretary Lutnick is working very hard on and is quite enthusiastic about, if you have noticed from his media interviews.

Question 00:34:05-00:34:08 (3 sec) NO STRESSLENS

Can the president do that through executive action, or will it require legislation?

Karoline Leavitt 00:34:08-00:34:23 (14 sec) NO SIGNAL (0)

Well, the president already signed an executive order to direct the secretary of commerce to establish the External Revenue Service or at least to identify ways in which it can be done. I would refer you to the Department of Commerce for more on specifics on that. Sure, in the back.

Question 00:34:23-00:34:50 (27 sec) NO STRESSLENS

Thank you very much, Karoline. I have a few questions on South Korea and North Korea. First question, as you know, South Korean President Moon has been released from illegal detention. What is the reaction of the United States as an ally? Is there a possibility of a summit with President Trump when President Moon returns?

Question 00:34:50-00:35:04 (15 sec) NO SIGNAL (0)

Second question on North Korea, Morth Korea launched the ballistic missile -- several ballistic missiles into the West Coast yesterday. What is the White House's reaction on this --

X

Note 00:35:04-00:35:04 ( sec) NO STRESSLENS

[Crosstalk]

Karoline Leavitt 00:35:04-00:35:28 (24 sec) NO SIGNAL (0)

Sure, yes, I'll start with your question on North Korea. We condemn these actions, and we call on North Korea to stop their unlawful and destabilizing actions. As for South Korea, the US and Republic of Korea's alliance is ironclad, and the Trump administration remains in close contact with our South Korean counterparts as we work together to promote a free and open Indo-Pacific.

Karoline Leavitt 00:35:28-00:35:29 (1 sec) NO STRESSLENS

Sure.

Question 00:35:29-00:35:36 (7 sec) NO SIGNAL (0)

The first question, you didn't answer that. But release of our South Korean president from jail [Inaudible]

Karoline Leavitt 00:35:36-00:35:45 (8 sec) NO SIGNAL (0)

I don't have anything on that, but I can certainly check in with the National Security Council and get back to you. Sure, good to see you.

Question 00:35:45-00:36:04 (19 sec) NO SIGNAL (0)

Press secretary, many are concerned about the validity of President Biden's official actions and also his pardons of the possible criminal actions of individuals such as his family members and Liz Cheney as information is emerging that many of his official actions were auto signed, possibly even the pardons and without his knowledge or consent.

Question 00:36:04-00:36:21 (17 sec) NO SIGNAL (0)

Does the White House have any information available currently that Biden was actually the one that approved and signed those pardons? And second question, will the DOJ investigate whether President Biden's cognitive decline allowed unelected staff to push through radical policy and pardons without his knowing approval?

Karoline Leavitt 00:36:21-00:36:28 (7 sec) NO SIGNAL (0)

I don't know the answer to that question, but I can check in with our folks here who may know the answer to that question and get back to you. Dasha, go ahead.

Question 00:36:28-00:36:46 (19 sec) NO SIGNAL (0)

Karoline, you did a great job articulating the vision that President Trump has for what his tariffs -- he believes his tariffs can do in terms of bringing jobs back to the United States. I asked you last week about how much Americans might need to buckle up for some short-term pain. A conversation that the President and Treasury Secretary Scott Bessent have had with the people.

X

Question 00:36:46-00:37:11 (24 sec) NO SIGNAL (0)

I'm wondering what is the -- how high is the pain threshold for President Trump and for this White House as you watch some of the turbulence in the stock markets, as you field concerns from businesses that potentially see some of those approval ratings

drop in the short term? How much is he willing to stomach that and will he stay committed to his vision for tariffs even as all of this comes up?

Karoline Leavitt 00:37:11-00:37:28 (18 sec) NO SIGNAL (0)

Well, the president has been working hard every single day to alleviate the pain that was inflicted by the previous administration through massive deregulation, through drill, baby, drill, as we like to call it, unleashing the might of our energy industry. Which we know will ultimately drive down costs for consumers here at home.

Karoline Leavitt 00:37:28-00:37:57 (29 sec) NO SIGNAL (0)

And again, as I mentioned, the president is intent on signing tax cuts for the American people to put more money back into their pockets, which will ultimately unlock consumer confidence. And again, I'll reiterate the president's words in layman's terms, as he does best. The president wants the American people to have so much more money in their pockets they don't know what to do with it. That's the goal of this administration through tariffs, through tax cuts, through deregulation and through unleashing the potential of our energy industry.

Karoline Leavitt 00:37:57-00:38:14 (17 sec) NO SIGNAL (0)

I have two more quick notes before I wrap up. Um, April 28th, I can confirm that the Philadelphia Eagles will be here at the White House to celebrate their Super Bowl victory. I know there was a lot of fake news about an invitation that wasn't sent or was sent. We want to correct the record. We sent an invitation.

Karoline Leavitt 00:38:14-00:38:38 (24 sec) NO SIGNAL (0)

They enthusiastically accepted. And you will see them here on April 28th. And lastly, on a sad note, I would like to express our condolences to Fox News and to the entire Fox family who did lose a cameraman, Craig Savage, who passed away at 61 years old recently. A very tragic death, an individual who was a great man and covered this building for many, many years.

Karoline Leavitt 00:38:38-00:38:51 (13 sec) NO SIGNAL (0)

So the entire Press Office, the Communications Office here wants to express our condolences with his family and also with Fox News. And I'll see you guys later. Perhaps you'll see the president in a Tesla later this afternoon. Have a good one.

Roll Call
THE SOURCE FOR NEWS ON CAPITOL HILL SINCE 1955

About Contact Us Advertise
Events Privacy RC Jobs
Newsletters The Staff Subscriptions

CQ and Roll Call are part of FiscalNote, a leading provider of political and business risk solutions.
Copyright 2025 CQ and Roll Call. All rights reserved.

# EXHIBIT 29

HOURLY NEWS
Play Live Radio
LISTEN LIVE
MY PLAYLIST

npr

DONATE

Interview highlights

# DHS official defends Mahmoud Khalil arrest, but offers few details on why it happened

MARCH 13, 2025 · 4:18 AM ET

HEARD ON MORNING EDITION

By Michel Martin, Destinee Adams

5-Minute Listen PLAYLIST TRANSCRIPT



Troy Edgar testifies during his confirmation hearing before the Senate Homeland Security and Governmental Affairs Committee on February 25, 2025.
*Chip Somodevilla/Getty Images*

President Trump has ramped up efforts to deliver on a campaign promise to carry out the largest ever deportation of immigrants in U.S. history.

Parallel to those deportation plans is a crackdown on what the administration calls antisemitism on college campuses.

Both efforts came to the forefront this week when Immigration and Customs Enforcement officers arrested Mahmoud Khalil, a recent Columbia University graduate student, who has not been charged with any crime yet. This is likely the first high profile arrest of a legal permanent resident in connection with the pro-Palestinian protests that rippled across the nation's campuses last year. Trump has vowed that this is the first of many arrests to come as he lays a framework for

Case: 26-0906, 11/20/2026, DktEntry: 16.8, Page 195 of 300


increased deportations. Trump officials are standing beside his efforts and doubling down on accusations that Khalil's actions align with those of a terrorist.

One of those officials is Troy Edgar, the deputy secretary of the Department of Homeland Security, who defended Khalil's arrest on *Morning Edition*. When NPR's Michel Martin asked him to explain what Khalil did to be arrested, aligned with terrorist activity and potentially deported, Edgar did not give a clear answer.

"I think you can see it on TV, right?" Edgar said. "We've invited and allowed the student to come into the country, and he's put himself in the middle of the process of basically pro-Palestinian activity. And at this point, like I said, the Secretary of State can review his visa process at any point and revoke it."

Khalil, a Syrian national of Palestinian descent, does not have a U.S. visa of any kind. Therefore an immigration judge would be the one to decide whether or not his status is revoked, not administration officials. He does however hold a green card, making him a lawful permanent resident in the U.S.

Khalil participated in pro-Palestine student protests at Columbia University last year, and he also negotiated with the administration on behalf of students pushing for the university to divest from Israel because of its war in Gaza against Hamas.

After his arrest, Khalil was taken to a detention center in Louisiana. Though ICE officers said that his green card was revoked, U.S. District Judge Jesse M. Furman ordered he cannot be deported while the court weighs a legal challenge brought by his lawyers.

The day before Khalil's arrest, Edgar was sworn into his new position with the Department of Homeland Security. During Trump's first term, Edgar served as the department's chief financial officer.

Edgar spoke to Martin about Mahmoud Khalil's arrest and the Trump administration's ramped-up deportations of migrants.

*The following excerpt has been edited for length and clarity.*

---

### Interview highlights

**Michel Martin**: Mahmoud Khalil says he acted as a spokesperson for pro-Palestinian demonstrators and as a mediator with Columbia University, where he was a graduate student. As you know, Mr. Edgar, any conduct that can be legally sanctioned must be described. So, what is the specific conduct the government alleges that Mr. Khalil engaged in that merits removal from the United States.

**Troy Edgar**: I think what you saw there is you've got somebody that has come into the country on a visa. And as he's going through the visa process, he is coming in to basically be a student that is not going to be supporting terrorism. So, the issue is he was let into the country on this visa. He has been promoting this antisemitism activity at the university. And at this point, the State Department has

Case: 26-0906, 11/20/2026, DktEntry: 16.8, Page 197 of 300


revoked his visa for supporting a terrorist type organization. And we're the enforcing agencies, so we've come in to basically arrest him.

**Martin**: A White House official told the Free Press that there's no allegation that he broke any laws. So, again, I have to ask, what specifically constitutes terrorist activity that he was supporting? What exactly do you say he did?

**Edgar**: Well, like I said, when you apply for a visa, you go through the process to be able to say that you're here on a student visa, that doesn't afford you all the rights of coming in and basically going through this process, agitating and supporting Hamas. So, at this point, yeah, the Secretary of State and the State Department maintains the right to revoke the visa, and that's what they've done.

**Martin**: How did he support Hamas? Exactly what did he do?

**Edgar**: Well, I think you can see it on TV, right? This is somebody that we've invited and allowed the student to come into the country, and he's put himself in the middle of the process of basically pro-Palestinian activity. And at this point, like I said, the Secretary of State can review his visa process at any point and revoke it.

**Martin**: He's a permanent resident. He's not a visa holder. He's a legal permanent resident. He has the green card, at least he did, until it's alleged that it was revoked.

If the allegation is that Mr. Khalil organized protests and made speeches after which other people engaged in prohibited activity, or, say, violent activity. Well, Mr. Trump gave a political speech on January 6, 2021, after which some individuals engaged in violent and illegal acts. How is this any different?

**Edgar**: President Trump's a citizen and the president of the United States. This is a person that came in under a visa. And again, the secretary of state at any point can take a look and evaluate that visa and decide if they want to revoke it.

**Martin**: He's a legal permanent resident. I have to keep insisting on that. He is a legal permanent resident.

So what is the standard? Is any criticism of the Israeli government a deportable offense?

**Edgar**: Like I said, I think that at this point when he entered into the country on a student visa, at any point we can go through and evaluate what his status is.

**Martin**: Is any criticism of the United States government a deportable offense?

**Edgar**: Like I said, if you go through the process and you're a student and you're here on a visa and you go through it, at any point …

**Martin**: Is any criticism of the government a deportable offense?

Case 5:25-cv-06618-NW Document 81-1 Filed 03/27/26 Page 119 of 162



**Edgar**: Let me put it this way, Michel, imagine if he came in and filled out the form and said, 'I want a student visa.' They asked him, 'What are you going to do here?' And he says, 'I'm going to go and protest.' We would have never let him into the country.

**Martin**: Is protesting a deportable offense?

**Edgar**: You're focused on protests. I'm focused on the visa process. He went through a legal process ...

**Martin**: Are you saying he lied on his application? He's a lawful permanent resident, married to an American citizen.

**Edgar**: I think if he would have declared he's a terrorist, we would have never let him in.

**Martin**: And what did he engage in that constitutes terrorist activity?

**Edgar**: I mean, Michel, have you watched it on TV? It's pretty clear.

**Michel**: No, it isn't. Well, explain it to those of us who have not or perhaps others who have not. What exactly did he do?

**Edgar**: Well, I think it's clear or we wouldn't be talking about it. I mean, the reality is that if you watch and see what he's done on the university ...

**Martin**: Do you not know? Are you telling us that you're not aware?

**Edgar**: I find it interesting that you're not aware.

**Martin**: I think you could explain it to us. I think others would like to know exactly what the offenses are, what the propaganda was that you allege, what the activity was that you allege. Well, perhaps we can talk again and you can give us more details about this.

We really appreciate your coming to join us, and we do hope we'll talk again.

**Edgar**: Thank you.

*This story was edited by Kristian Monroe. Ximena Bustillo contributed to this story.*

**The White House is one step closer to defunding public radio.**

The House has voted to claw back all federal funding for public media, and the proposal now moves to the Senate.

**We're running out of time to protect public radio's essential news, music, and emergency broadcast services to communities across the nation.**
Those in rural areas — with few other options to get their news and information — will likely be the hardest hit.

But you can still stand up for public radio.

**Spend 10 seconds at the link below.**
The consequences of this vote fall directly on the Americans who rely on local, independent stations serving communities across the country. Take action.

SAVE PUBLIC MEDIA

## More Stories From NPR



INTERVIEW HIGHLIGHTS

**DNC chair says Republicans sold 'their constituents out to help billionaires'**



INTERVIEW HIGHLIGHTS

**An Alabama food bank braces for big increase in demand if SNAP cuts take effect**



INTERVIEW HIGHLIGHTS

**Maine can't afford to lose federal funding, governor says**




INTERVIEW HIGHLIGHTS

**Republicans' big bill could hit rural hospitals hard**



MIDDLE EAST CONFLICT

**Sen. Tim Kaine says Trump likely exaggerated damage done to Iran's nuclear program**



INTERVIEW HIGHLIGHTS

**What's next for 'Vogue' after Anna Wintour moves away from day-to-day editing of magazine?**

## Popular on NPR.org



POLITICS

### How Trump's big beautiful bill aims to 'supercharge' immigration enforcement



POLICY-ISH

**5 ways Trump's megabill will limit health care access**



OBITUARIES

**Actor Michael Madsen, known for 'Kill Bill' and 'Reservoir Dogs,' dead at 67**




NEWS

**Congress passed no tax on tips in Trump's 'big, beautiful bill.' Here's how it works**



SEAN COMBS TRIAL

**What happens to Sean Combs now?**




POLITICS

## House Republicans pass Trump's megabill, sending the package to his desk to be signed

## NPR Editors' Picks



WORLD

**U.K. High Court slams MI5 over informant deception and lack of transparency**




NATIONAL

**Abrego Garcia says he was severely beaten in Salvadoran prison**




NATIONAL

**Pope Leo's scandal-plagued hometown sees a bright future in buying his childhood home**




SCIENCE

**NASA spots a new comet flying in from a distant star system**



MUSIC

## How the Irish band Kneecap went from rising hip-hop group to global lightning rod



NATIONAL

## Ghost guns may make a comeback, despite a Supreme Court ruling

READ & LISTEN

**Home**

**News**

**Culture**

**Music**

**Podcasts & Shows**

CONNECT

**Newsletters**

**Facebook**

**Instagram**

**Press**

**Public Editor**

**Corrections**

**Transcripts**

**Contact & Help**

ABOUT NPR

**Overview**

**Diversity**

**NPR Network**

**Accessibility**

**Ethics**

**Finances**

GET INVOLVED

**Support Public Radio**

**Sponsor NPR**

**NPR Careers**

**NPR Shop**

**NPR Events**

**NPR Extra**

---

terms of use

privacy

your privacy choices

text only

© 2025 npr

# EXHIBIT 30

An official website of the United States Government Here's how you know

U.S. DEPARTMENT *of* STATE



# Secretary of State Marco Rubio Remarks to Press

**REMARKS**

**MARCO RUBIO, SECRETARY OF STATE**

**SHANNON, IRELAND**

MARCH 12, 2025

Secretary Rubio's remarks to the press

**SECRETARY RUBIO:** All right, who's got a question?

Cookie Settings

**QUESTION:** I do.

**SECRETARY RUBIO:** I knew you would have a question.

**QUESTION:** So – Michael Gordon, *Wall Street Journal*. Sir, the Russians are still making gains on the battlefield. There's been no public response to the developments in Jeddah. Are you concerned they're playing for time? Have you had any contact with them? What's been their response officially and are they willing to accept the ceasefire unconditionally?

**SECRETARY RUBIO:** Well, I mean, we don't know the answer to the last question. That's what we want to know, whether they're prepared to do it unconditionally. We'll have contact with them today. There's already been contacts at different levels with counterparts, different members of the administration, and that'll continue. But as far as the Russian reaction to it, that's really the question here, and that is – this is a few hours old. We're going to bring it to them directly. We're going to say that Ukraine is prepared to stop all battlefield activity and begin the immediate process of negotiating an enduring end to the war, and we'll see what their response is.

If their response is yes, then we know we've made real progress and there's a real chance of peace. If their response is no, it'll be highly unfortunate, and it'd make their intentions clear. So that's what we're hoping to hear from them, and obviously, as I said, this was not pre-arranged with them, so they're – they're probably processing the news the same as the rest of the world. And so we hope to have a positive answer from them. The ball is truly in their court.

**QUESTION:** Mr. Secretary —

**QUESTION:** Mr. Secretary, Nike Ching with Voice of America. What would be a good G7 joint statement on Russia and on China?

**SECRETARY RUBIO:** Well, I think the perfect statement would be that the United States has done a good thing for the world in bringing this process forward, and now we all eagerly await and – the Russian response and urge them strongly to consider ending all hostilities so people will stop dying, so bullets will stop flying, and so a process can begin to find a permanent peace. I think the first step in all this is the acceptance that there is no military solution to this conflict. Neither side can militarily achieve their maximalist gains – their maximalist goals. I mean, they're just not going to achieve them through the military side. The only way this conflict can end is through negotiation. That's the only way you're going to have peace is through negotiation.

And so we need to start that process. And it is hard to start a process when people are shooting at each other and people are dying. And so our hope is that we can stop that, all these hostilities, and get to a negotiating table where both sides – over some period of time with a lot of hard work – can find a mutually acceptable outcome that, in the case of Ukraine, obviously secures their long-term prosperity and security.

**QUESTION:** Mr. Secretary, could you just update us on Mr. Witkoff's plans for Moscow and whether he'll be meeting with President Putin?

And then separately, if you wouldn't mind elaborating on something that Mr. Waltz said yesterday about the specifics that you discussed with Ukrainians about what the end of the war would look like, you had mentioned we're not going to get maps out and draw lines, but did you actually talk about territorial concessions?

**SECRETARY RUBIO:** Well, we – we had conversations. As far as Steve's trip, I'm not here to – I can't – I'm not going to make any announcements about specific dates, times, or even confirm such a trip. Suffice it to say there is going to be multiple points of contact with the Russians to gauge are they willing to do this or not. And as far as the conversations that were yesterday, yeah – when you sit down with a counterpart like Ukraine, we're not going to negotiate this publicly, we're not going to actually put out there sort of what we talked about, because in any negotiation there's certainly an element where you don't want one side to be giving away all of this leverage from a public perspective. We had a broad conversation about what it would – but I think the bulk of our conversation was what a negotiation process would look like in terms of not the specific conditions, but rather the timing of it, sort of the steps they would like to see taken.

The Ukrainians made very clear that this isn't just about ending a war. They need to get their prisoners of war back; they need to get the children back. They'd like to see an exchange of prisoners of war; they'd like to see their children back. So there's all sorts of things tied to the, humanitarian assistance is important as well. There are areas of Ukraine that have been badly damaged that require immediate assistance. So these are the sorts of things that we talked about as being inclusive in the negotiation process.

So really the bulk of our conversation, when we got to that stage of it, was discussing the kinds of items that need to be on a negotiation agenda if and when we hopefully get there.

**QUESTION:** He also mentioned security guarantees, which is something that there has been some reluctance for the administration to elaborate on. Have – are you committing to security —

**SECRETARY RUBIO:** Well, I think the point – no – the point to understand is that we're looking at securing their long-term – what we want to see – like any country in the world, Ukraine wants their long-term security. They want to make sure that this doesn't happen again. We all do. What is the point of spending all this time to get a ceasefire hopefully and then a negotiated end to the war only to see it re-spark up again in about six years, four years, three years? No one's – we're not interested in that, and they certainly aren't, either.

So I think the question really is more about a deterrence. Can Ukraine create a sufficient deterrent against future aggression, against future attack, against future invasion? Because every country in the world has a right to defend themselves, and no one can dispute that. So that will most certainly have to be part of the conversation. But again, I don't think there's – there isn't a peace to secure until you have a peace.

**QUESTION:** Not just – not —

**SECRETARY RUBIO:** There's no way to have an enduring peace without the deterrence piece being a part of it.

**QUESTION:** Can I just follow up on that particular point?

**SECRETARY RUBIO:** Yes.

**QUESTION:** Because the joint statement talks about European partners being involved in the peace process, but that's only attributed to the Ukrainian delegation. There doesn't appear to be U.S. support for that line —

**SECRETARY RUBIO:** Well, I think what it says in the statement is that they raised the need for the Europeans. But I have already said publicly the Europeans have issued a series of sanctions against the Russian Federation, and I would imagine that in any negotiation – if we get there, hopefully – with the Russians that they will raise these European – the European sanctions that have been imposed upon them. So I think that the issue of European sanctions are going to be on the table —

**QUESTION:** But it —

**SECRETARY RUBIO:** — not to mention what happens with the frozen assets and the like. And so I think it's self-evident that for there to be a peace in Ukraine, at the end of that process there is going to have to be some decision by the Europeans about what they are going to do with these sanctions and so forth. And so that's why I think they have to be necessarily involved in this regard. Now, whether they're involved at the front end of it or at the back end of it, it'll have to play itself out. And then obviously there is also all sorts of security promises that European countries have made to Ukraine, that that will also be, I imagine, a part of this conversation as we move forward.

**QUESTION:** But —

**SECRETARY RUBIO:** So we don't disagree with that statement. I think the statement just reflects that they raised it.

**QUESTION:** But do you back European peacekeepers in Ukraine, which is something Russia has categorically —

**SECRETARY RUBIO:** Well, we'll see. I mean, there's different ways to – there's different ways to construct a deterrent on the ground that prevents another war from starting in the future. We're not going to go in with any sort of preconceived notion. The bottom line is it needs to be something that makes Ukraine feel as if they can deter and prevent a future invasion. How that looks and how that's put together, that's what we're going to be talking about, if we can get to that stage.

Again, right now we're just trying to get to the stage where there's actual diplomacy happening. Here's what we'd like the world to look like in a few days: neither side is shooting at each other, not rockets, not missiles, not bullets, nothing, not artillery. The shooting stops, the fighting stops, and the talking starts. That's what we want to see. What happens during that talking and how that evolves, I think we're going to have to be flexible and nimble and creative and patient and work hard at it and hopefully turn it into something that's concrete.

You've covered – many of you have covered foreign policy for years. That's how these things happen, and they're not easy, and sometimes they're difficult to predict which way they're going to go in terms of the specifics of it. But we just want to get to that stage. That would be, for lack

of a better term, a good problem to have, to have to figure out how to negotiate a peace because we're actually negotiating a peace while the shooting has stopped.

**QUESTION:** Is the mineral deal essentially the security guarantee that you guys envisioned?

And then a second question is: President Trump appealed to a lot of Americans during his campaign on free speech arguments and not suppressing speech, especially from the government, but your revocation of the green card to many is seen as one of the most anti-speech actions a secretary can take with his powers. How do you respond?

**SECRETARY RUBIO:** Yeah, I mean, the first question was again the —

**QUESTION:** Is the minerals deal a version of the security guarantee?

**SECRETARY RUBIO:** The minerals deal, yeah. Well, I think that a minerals deal is something that I think is beneficial for both countries. Certainly one of the things that provides for Ukraine's long-term prosperity and security is vibrant economic growth and development. If their GDP is – begins to grow and – that gives them a tremendous amount of leverage and power and the ability to fund their own defenses. So I think certainly any economic development for Ukraine is positive for their own future.

Obviously if the United States has a vested economic interest somewhere, we're tied to them on an economic front, we're in partnership with them on something, we will have an interest in the future of Ukraine as well. I wouldn't couch it as a security guarantee, but certainly if the United States has a vested economic interest that's generating revenue for our people as well as for the people of Ukraine, we'd have a vested interest in protecting it if it were to be challenged or threatened.

On your first point, when you enter the – this is an important point, and I'm glad you asked this question. When you come to the United States as a visitor – which is what a visa is, which is how this individual entered this country, on a visitor's visa, okay – you are here as a visitor. We can deny you that visa. We can deny you that – if you tell us when you apply, "Hi, I'm trying to get into the United States on a student visa, I am a big supporter of Hamas, a murderous, barbaric group that kidnaps children, that rapes teenage girls, that takes hostages, that allows them to die in captivity, that returns more bodies than live hostages" – if you tell us that you are in favor of a group like this, and if you tell us when you apply for your visa, "And by the way, I intend to come

to your country as a student and rile up all kinds of anti-Jewish student, anti-Semitic activities, I intend to shut down your universities" – if you told us all these things when you applied for a visa, we would deny your visa. I hope we would. If you actually end up doing that once you're in this country on such a visa, we will revoke it. And if you end up having a green card – not citizenship but a green card – as a result of that visa while you're here and those activities, we're going to kick you out. It's as simple as that.

This is not about free speech. This is about people that don't have a right to be in the United States to begin with. No one has a right to a student visa. No one has a right to a green card, by the way. So when you apply for a student visa or any visa to enter the United States, we have a right to deny you for virtually any reason, but I think being a supporter of Hamas and coming into our universities and turning them upside down and being complicit in what are clearly crimes of vandalization, complicit in shutting down learning institutions – there are kids at these schools that can't go to class. You pay all this money to these high-priced schools that are supposed to be of great esteem and you can't even go to class, you're afraid to go to class because these lunatics are running around with covers on their face, screaming terrifying things. If you told us that's what you intended to do when you came to America, we would have never let you in. And if you do it once you get in, we're going to revoke it and kick you out.

**QUESTION:** Can I ask you about the Canada trip coming up? The President has taunted, if you will, Canada, calling it the 51st state, calling Prime Minister Trudeau the governor —

**SECRETARY RUBIO:** Well, he said it should become the 51st state from an economic standpoint. He says if they became the 51st state, we wouldn't have to worry about the border and fentanyl coming across because now we would be able to manage that. He's made an argument that it's their interest to do so. Obviously the Canadians don't agree, apparently, but —

**QUESTION:** Do you agree with it? Should there be – are you going to discuss that, becoming the 51st —

**SECRETARY RUBIO:** Well, that's not what we're going to discuss at the G7, and that's not what we're going to be discussing in our trip here. So it – they are the host nation, and I – I mean, we have a lot of other things we work on together. We defend North America through NORAD and the airspace of our continent together, so – not to mention the issues of Ukraine and other

commonalities. So we're going to be focused in the G7 on all of those things. That's what the meeting is about. It is not a meeting about how we're going to take over Canada.

**QUESTION:** But more broadly —

**QUESTION:** But are you concerned at all about the reception that you might be getting, particularly at the event?

**SECRETARY RUBIO:** I don't know, should I be? What do you know that I don't know?

**QUESTION:** They're unhappy.

**QUESTION:** I don't know, you've got the tariffs in the last 12 hours, you've just seen this escalating trade war – not just with Canada but, with the exception of Japan, all the other members of the G7.

**SECRETARY RUBIO:** Yeah, so what's your point?

**QUESTION:** Well —

**QUESTION:** Are you worried about alienating the Canadians, that they wouldn't work with the United States?

**SECRETARY RUBIO:** Yeah, I mean, they've invited us to come. We intend to go. The alternative is to not go. I think that would actually make things worse, not better. So – it's a G7 summit.

**QUESTION:** One alternative could be not to —

**SECRETARY RUBIO:** Huh?

**QUESTION:** The alternative could be not to have tariffs or not to have the language that the President —

**SECRETARY RUBIO:** No, those are policy decisions. And so at the end of the day, the President's made those decisions. He's explained why. It's not just against Canada, it's not just against Mexico, it's not just against G7 countries. He's imposed steel and aluminum tariffs now on

virtually the entire world, and the reason why is not to punish those countries; it's because he has outlined the need to develop a domestic capability. If you don't have steel and aluminum, you can't build warships, you can't build airplanes, and you are not an industrial economy. There are things we have to be able to protect and there's a lot of unfair trade practices, a lot of countries out there who subsidize their industries so that they can gain global market share, so they subsidize the industries, they're operating at a loss. Meanwhile, our industries are trying to compete fairly, and that's why you don't have steel plants and that's why you can't produce the aluminum. And that really threatens our national security in the long term.

So these are national security concerns when it comes to steel and aluminum and some of these other products. But ultimately the President feels strongly – and I personally agree – that we have made some decisions when it comes to trade policies that have led to the de-industrialization of America and have left us deeply vulnerable to any sort of interruptions in global supplies and/or it being used to extort us, not to mention our inability to produce things that we need for our own economy and for our own defense.

So that's what those policies are about. Every country in the world we expect will act in their national interest. The United States forgot that. President Trump is reminding us of that and getting us back to that, and I think it is quite possible that we could do these things and at the same time deal in a constructive way with our allies and friends and partners on all the other issues that we work together on. And that's what I expect out of the G7 and Canada.

**QUESTION:** Can I just ask on Russia? Did you have – or Waltz – have any contact with Zelenskyy while you were in Saudi Arabia? And then —

**SECRETARY RUBIO:** No, I didn't. I don't believe Mr. Waltz did either, but I did not. But that was the team he selected, and it was appropriate. It was his closest advisor, it was their foreign minister, it was their head of security. So we felt that that was the counterparts they sent and to deal with us, and that's obviously pretty common in these sorts of things. Generally the heads of state meet heads of state and appropriate counterparts meet others. He – I imagine he had to get back, and he's – he – the president of a wartime country, so he's – but we did not have any contact with him there. But I wouldn't read – read anything into it other than he selected his team for these talks and the President selected his, so —

**QUESTION:** And was there any discussion with the Ukrainians about how a ceasefire, if Russia agrees, would be enforced? How would the U.S. ensure parties —

**SECRETARY RUBIO:** Yeah, well, the interesting thing about modern warfare is there – it's easier than ever to monitor and – simply because there's so many eyes on the ground and there's also all sorts of overhead commercial satellite and the like. It would be pretty hard to hide drone strikes, it would be hard to hide missile strikes, ballistic strikes, artillery. So we feel like that is something that could be monitored. Obviously, if in fact the Russians say yes – let's hope they say yes. If they say yes, one of the things we'll have to determine is who do both sides trust to be on the ground to sort of monitor some of the small arms fires and exchanges that could happen. But those are practices that have become common in these, and I don't think that would be difficult to set up. We didn't get into specifics, but obviously the need to monitor a ceasefire is clear to everyone.

**QUESTION:** Sir, just a quick follow-up on this question.

**QUESTION:** Can I get a last question? Last question?

**MS BRUCE:** One more question. One more. This is it.

**QUESTION:** The —

**SECRETARY RUBIO:** Yeah, because we're fueling up and have to get back on the plane.

**MS BRUCE:** Right.

**QUESTION:** Last question, sir.

**SECRETARY RUBIO:** Yeah, yeah.

**QUESTION:** The – you haven't – this administration has not hesitated to put a lot of pressure on Ukraine. You reduced their intelligence support in the middle of a shooting war, you temporarily cut off their arms, criticized them publicly – not you, but leadership in public. Are you truly prepared to apply pressure on Russia should it be recalcitrant and not agree to the terms of the ceasefire? There's no been no concrete action that this administration has taken to punish Russia since it's come to office.

**SECRETARY RUBIO:** Well, a couple points. To be clear, as far as I am aware, the United States has not provided armaments to Russia. The United States is not providing assistance to Russia. Every single sanction that has been imposed on Russia remains in place. Every single sanction the President inherited has – remains in place.

**QUESTION:** Trump inherited, previous administration.

**SECRETARY RUBIO:** Right, but – well, I mean, they're pretty sanctioned up. I mean, there's a lot of sanctions on already. So my point being is that we've – there's been no steps taken to relieve any of these things. These things continue to be in place. But we don't think it's constructive for me to stand here today and begin to issue threats about what we're going to do if Russia says no. Let's hope they say yes.

At the end, let's understand. I remind everybody and bring you back to the point: The President's desire here is to bring about a lasting and enduring peace in Ukraine. He wants the shooting and the fighting to stop – not just for 30 days, not just for 60 days, but permanently. To do that, both sides have to come to the table. We are happy – we are happy that the Ukrainians have agreed to do so. Now it is up to Russia to say yes. If Russia says yes, that's very good news, and we will begin that process and do everything we can to move that process forward. If they say no, then obviously we'll have to examine everything and sort of figure out where we stand in the world and what their true intentions are. I think it'll be – if they say no, it'll tell us a lot about what their goals are and what their mindset is.

But I don't want to go into that before they've even answered us by issuing statements that are abrasive in any way. Our hope is that – when we met with them last, they expressed a willingness under the right conditions, without elaborating on the right conditions, to bring an end to this conflict. That was our question when we met with them. I think I shared it with you that were on our trip. The point of meeting with them was to find out is this a war they wanted to end or is this a war they just wanted to continue in perpetuity until they achieved whatever goals they have in mind, and they expressed a willingness, under the right circumstances, which they did not define, to bring an end to this conflict.

So we have Ukraine ready to come to the table. Now we need to get Russia to come to the table. If they do and the shooting stops, I think that's a very good day in the world. Obviously no one here is pretending that that negotiation's going to be easy or fast or simple, but at least we've

gotten to that point. If their answer is no, then obviously we'll have to deal with that and we'll have to at that point make decisions on that basis. We're not there yet. Hopefully the answer is yes.

**MS BRUCE:** Thank you, everyone.

**SECRETARY RUBIO:** Okay, thanks, guys.

---

TAGS

Bureau of European and Eurasian Affairs | G-7 | Ireland | Office of the Spokesperson
Official International Travel | Peace | Russia | Russia-Ukraine War
The Secretary of State | Ukraine

---

Case 5:25-cv-06618-NW Document 81-1 Filed 03/27/26 Page 145 of 162



Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

# EXHIBIT 31

Fox News, “JD Vance Reveals Whether More Deportations of Green Card Holders Are Coming” (Mar. 13, 2025), https://www.foxnews.com/video/6369982152112.

TRANSCRIPT:

**JD Vance:** Laura, a green card holder, even if I might like that green card holder doesn't have an indefinite right to be in the United States of America. Right? American citizens have different rights from people who have green cards, from people who have student visas. And so my attitude on this is: this is not fundamentally about free speech. And to me, yes, it's about national security, but it's also, more importantly, about who do we as an American public decide gets to join our national community? And if the Secretary of State and the President decide this person shouldn't be in America, and they have no legal right to stay here, it's as simple as that.

**Laura Ingraham:** Do you see more such deportations happening?

**JD Vance**: I think we'll certainly see some people who get deported on student visas if we determine that it's not in the best interest of the United States to have them in our country. So yeah, I don't know how high that number is going to be, but you're going to see more people.

# EXHIBIT 32

Homeland Security

U.S. Department of Homeland Security

# VIDEO: Columbia University Student Whose Visa Was Revoked for Supporting Hamas and Terrorist Activities Used CBP Home App to Self-Deport

**Release Date:** March 14, 2025

*Another student who supported Hamas was arrested by ICE HSI for overstaying her student visa.*

WASHINGTON – Today, Secretary of Homeland Security Kristi Noem announced that one of the Columbia students who had her student visa revoked for advocating for violence and terrorism self-deported using the CBP Home App and ICE arrested a Palestinian student for overstaying her expired F-1 visa.

Ranjani Srinivasan, a citizen and national of India, entered the United States on a F-1 student visa as doctoral student in Urban Planning at Columbia University. Srinivasan was involved in activities supporting Hamas, a terrorist organization. The Department of Homeland Security has obtained video footage (https://x.com/Sec_Noem/status/1900562928849326488) of her using the CBP Home App to self-deport on March 11.

Another student Leqaa Kordia, a Palestinian from West Bank, was arrested by ICE HSI Newark officers for overstaying her expired F-1 student visa. Her visa terminated on January 26, 2022, for lack of attendance. Previously, in April 2024 Kordia was arrested for her involvement in pro-Hamas protests at Columbia University in New York City.

The below statement is attributable to Secretary Noem:

*"It is a privilege to be granted a visa to live and study in the United States of America. When you advocate for violence and terrorism that privilege should be revoked, and you should not be in this country. I am glad to see one of the Columbia University terrorist sympathizers use the CBP Home app to self-deport."*

## Topics

CITIZENSHIP AND IMMIGRATION SERVICES (/TOPICS/CITIZENSHIP-AND-IMMIGRATION-SERVICES)

## Keywords

DEPARTMENT OF HOMELAND SECURITY (DHS) (/KEYWORDS/DEPARTMENT-HOMELAND-SECURITY-DHS)

IMMIGRATION AND CUSTOMS ENFORCEMENT (ICE) (/KEYWORDS/IMMIGRATION-AND-CUSTOMS-ENFORCEMENT-ICE)

Last Updated: 03/21/2025

# EXHIBIT 33

An official website of the United States Government Here's how you know

U.S. DEPARTMENT *of* STATE



★ ★ ★

# Secretary of State Marco Rubio with Margaret Brennan of CBS's Face the Nation

INTERVIEW

MARCO RUBIO, SECRETARY OF STATE
MIAMI, FLORIDA

MARCH 16, 2025

**QUESTION:** Let's get straight to it this morning with Secretary of State Marco Rubio, who joins us from Miami, Florida. Mr. Secretary, for our audience, just to explain, this Red Sea area is a really important transit point for global shipping. The Houthis out of Yemen have been disrupting transit there for some time. President Trump cited these concerns when he announced the strikes. I'm wondering, how long will this campaign last and will it involve ground forces?

**SECRETARY RUBIO:** Well, first of all, the problem here is that this is a very important shipping lane, and in the last year and a half, last 18 months, the Houthis have struck or attacked 174 naval vessels of the United States, attacking the U.S. Navy directly 174 times, and 145 times they've attacked commercial shipping. So we basically have a band of pirates with guided precision anti-ship weaponry, and exacting a toll system in one of the most important shipping lanes in the world. That's just not sustainable. We are not going to have these people controlling which ships can go through and which ones cannot. And so your question is how long will this go on. It will go on until they no longer have the capability to

AAUP-01403

**QUESTION:** Well, what does U.S. intelligence tell us at this point? Because the U.S. had been conducting strikes for some time but has not stopped the Houthis.

**SECRETARY RUBIO:** No.

**QUESTION:** So what's going to be different right now? Do you have more fidelity in the intelligence that would make this more successful?

**SECRETARY RUBIO:** Well, those strikes were retaliation strikes. So they launched one missile, we hit the missile launcher, or we sent something to do it. This is not a message. This is not a one-off. This is an effort to deny them the ability to continue to constrict and control shipping, and it's just not going to happen. We're not going to have these guys, these people with weapons able to tell us where our ships can go – where the ships of all the world can go, by the way. It's not just the U.S. We're doing the world a favor.

**QUESTION:** Yeah.

**SECRETARY RUBIO:** We're doing the entire world a favor by getting rid of these guys and their ability to strike global shipping. That's the mission here, and it will continue until that's carried out. That never happened before. The Biden administration didn't do that. All the Biden administration would do is they would respond to an attack. These guys would launch one rocket; we'd hit the rocket launcher. That's it.

This is an effort to take away their ability to control global shipping in that part of the world. That's just not going to happen anymore.

**QUESTION:** And it could –

**SECRETARY RUBIO:** So this will continue until that's finished.

**QUESTION:** It could involve ground raids?

**SECRETARY RUBIO:** Well, I – those are military decisions to be made, but I've heard no talk of ground raids. I don't think there's a necessity for it right now. I can tell you that as of last night, some of the key people involved in those missile launches are no longer with us, and I can tell you that some of the facilities that they used are no longer existing, and that will continue.

Look, it's bottom line – easy way to understand it, okay? These guys are able to control what ships can go through there. They've attacked the U.S. Navy.

**QUESTION:** Yeah.

**SECRETARY RUBIO:** A hundred and seventy-four times they've attacked the United States Navy. We're not going to have people sitting around with the missiles, attacking the U.S. Navy. It's not going to happen – not under President Trump.

**QUESTION:** The President also referenced Iran in his statement. Iran provides some support for the Houthis, as you know. Put this in context for me, because U.S. intelligence has been suggesting for some time that Israel has the desire and intent to conduct an attack on Iran's developing nuclear program in the coming months. President Trump has extended an offer for negotiations. Have you heard anything back from Iran? Is this strike in Yemen a signal to Iran?

**SECRETARY RUBIO:** This strike in Yemen is about their ability – the ability of the Houthis – to strike global shipping and attack the U.S. Navy, and their willingness to do it: 174 times against the U.S. Navy; 145-some times against global shipping. That's what the strike is about. What we can't ignore, and the reason why the President mentioned Iran, is because the Iranians have supported the Houthis. They've provided them intelligence. They've provided them guidance. They've provided them weaponry. I mean, there's no way the Houthis – okay, the Houthis – would have the ability to do this kind of thing unless they had support from Iran. And so this was a message to Iran: Don't keep supporting them, because then you will also be responsible for what they are doing in attacking Navy ships and attacking global shipping.

**QUESTION:** They also get support from Russia, potentially, which you leveraged sanctions in regard to. But I want to ask you about tariffs because you were just in Canada this past week. China is Canada's second-biggest export market; Mexico's third. In this ongoing trade back-and-forth the U.S. is having, isn't there a risk that China will ultimately be the winner? If it's too costly to deal with the United States, won't they benefit?

**SECRETARY RUBIO:** Well, actually, China and Canada are involved in a mini trade war right now. In fact, the Chinese have imposed a bunch of tariffs, reciprocal or retaliatory tariffs, on Canada after Canada imposed tariffs on them. So here's the way everyone needs to understand this, okay? The President rightfully believes that the balance of global trade is completely off-kilter. For 30 or 40 years, we have allowed countries to treat us unfairly in global trade, much of

it during the Cold War because we wanted them to be rich and prosperous because they were our allies in the Cold War. But now that has to change. You look at the European Union. The European Union's economy is about the same size as ours. It's not a low-wage economy. It's very comparable to ours in terms of its composition and so forth. Why do they have a trade surplus with us?

So what the President is saying is two things. Number one, there are critical industries – like aluminum, like steel, like semiconductors, like automobile manufacturing – that he rightfully believes, President Trump rightfully believes, the U.S. needs to have a domestic capability, and the way you protect those industries and build that capability is by ensuring that there's economic incentives to produce in the United States.

The second is global, and that is, we are going to put tariffs on countries reciprocal to what they impose on us. And so this is global – it's not against Canada, it's not against Mexico, it's not against the EU; it's everybody. And then from that new baseline of fairness and reciprocity, we will engage, potentially, in bilateral negotiations with countries around the world on new trade arrangements that make sense for both sides – fairness. But right now it's not fair. We're going to reset the baseline and then we can enter into these bilateral agreements, potentially, with countries so that our trade is fair.

What's not going to continue is – of course these countries are upset.

**QUESTION:** So this is all just about leverage to get bilateral, not free – not North American free trade deals –

**SECRETARY RUBIO:** No, it's not leverage.

**QUESTION:** – renegotiation.

**SECRETARY RUBIO:** No, no, it's not leverage. It's fairness. It's resetting baseline fairness. And then from there we can work on deals and so forth, because they'll have products we don't make, we have products they don't make. That's where trade works the best. It has to be free, but it has to be fair in that – and right now it's only free on one side and it's not fair for the other side.

**QUESTION:** Well, you know, sir, that –

**SECRETARY RUBIO:** It's an unsustainable position.

**QUESTION:** – the ad hoc nature of these policy announcements and pullbacks are causing concern in the marketplace, as we saw this past week. So I heard you describe what seemed like a strategy to get to negotiations on a bilateral front. You also seemed to negotiate – say this was national security-minded. But then we also see –

**SECRETARY RUBIO:** Yeah.

**QUESTION:** – comments by the President of, like, 200 percent tariffs on champagne. That's not a critical industry for the United States. That seems more emotional.

**SECRETARY RUBIO:** No, that – I mean, that's called retaliation. That's what happens in these trade exchanges. They're going to increase tariffs on – they already have high tariffs. They're going to add more to their tariffs? Fine. Then we'll have to find something to – I mean, you tell me. I mean, Canada is going after whiskey and orange juice and, I mean –

**QUESTION:** In retaliation.

**SECRETARY RUBIO:** Right, exactly. So that sounds pretty petty to me as well. So what's the difference? The point is – I get it. I understand why these countries don't like it, because the status quo of trade is good for them. It benefits them. They like the status quo. We don't like the status quo. We are going to set a new status quo and then we can negotiate something, if they want to, that is fair for both sides. But what we have now cannot continue. We have deindustrialized this country, okay, deindustrialized the United States of America. There are things we can no longer make, and we have to be able to make in order to be safe as a country and in order to have jobs. That's why we had a Rust Belt. That's why we have suffered all these important jobs that once sustained entire communities, wiped out by trade that basically sent these factories, these jobs, this industrial capability to other places. That cannot and will not continue. I don't –

**QUESTION:** Yeah.

**SECRETARY RUBIO:** President Trump – this is no mystery; he's been talking about this since the 1980s, actually.

**QUESTION:** Yeah.

**SECRETARY RUBIO:** Even before he was a political figure. This is going to happen and it's going to happen now.

**QUESTION:** I want to ask you about Russia. You said Envoy Steve Witkoff's meeting with Vladimir Putin that happened last week would answer the fundamental question of whether we're moving towards a ceasefire or whether Putin is using a delay tactic. You spoke with Sergei Lavrov, the foreign minister, yesterday. Is this a delay tactic?

**SECRETARY RUBIO:** Well, I think it was a promising meeting. As I've said repeatedly, we're not going to negotiate this in the public. Hopefully we'll have something to announce at some point fairly soon. I can't guarantee that, but I certainly think the meeting was promising, the exchange was promising. I don't take away from Steve's meeting, from Ambassador Witkoff's meeting, negativity. There are some challenges. This is a complex, three-year war that's been ongoing along a very long military front with a lot of complexity to it.

So no one's claiming that it's easy, but I want everyone to understand here's the plan. Plan A is get the shooting to stop so that we can move to plan B, phase two, which is have everybody at a table, maybe not – maybe with some shuttle diplomacy, to figure out a way to permanently end this war in a way that's enduring and that respects everybody's needs and so forth. No one is saying that that second part is easy, but we can't get even to that second part until we get past the first part. It's hard to negotiate an enduring end to a war as long as they're shooting at each other, and so the President wants a ceasefire. That's what we're working on. Assuming we can get that done – that won't be easy in and of itself – we move to the second phase, which is negotiating something more enduring and permanent.

That will be hard. It will involve a lot of hard work, concessions from both sides, but it has to happen. This war cannot continue. The President has been clear about that, and he's doing everything he can to bring it to an end.

**QUESTION:** Okay. We'll talk about that later in the program as well with Envoy Witkoff. I want to ask you about a decision you made to revoke a student visa from someone at Columbia University this past week. The *Wall Street Journal* editorial board writes: "The… Administration needs to be careful… [it's] targeting real promoters of terrorism… not breaking the great promise of a green card by deporting anyone with controversial political views." Can you substantiate any form of material support for terrorism, specifically to Hamas –

**SECRETARY RUBIO:** Yes.

**QUESTION:** – from this Columbia student, or was it simply that he was espousing a controversial political point of view?

**SECRETARY RUBIO:** Well, not just the student – we're going to do more. In fact, every day now we're approving visa revocations, and, if that visa led to a green card, the green card process as well. And here's why – it's very simple. When you apply to enter the United States and you get a visa, you are a guest, and you're coming as a student, you're coming as a tourist, or what have you. And in it, you have to make certain assertions. And if you tell us when you apply for a visa, I'm coming to the U.S. to participate in pro-Hamas events, that runs counter to the foreign policy interests of the United States of America. It's that simple. So you lied. You came – if you had told us that you were going to do that, we never would have given you the visa. Now you're here, now you do it, so you lied to us. You're out. It's that simple; it's that straightforward.

**QUESTION:** But is there any – but is there any evidence of a link to terrorism, or is it just his point of view?

**SECRETARY RUBIO:** Sure – yeah, they take over – I mean, do you not – I mean, you should watch the news. These guys take over entire buildings. They vandalize colleges; they shut down colleges.

**QUESTION:** We covered it intensely.

**SECRETARY RUBIO:** Well, then you should know that this is –

**QUESTION:** I'm asking about the specific justification for the revocation of his visa. Was there any evidence of material support for terrorism?

**SECRETARY RUBIO:** Well, this specific individual was the spokesperson, was the negotiator – negotiating on behalf of people that took over a campus, that vandalized buildings. Negotiating over what? That's a crime in and of itself that they're involved in being the negotiator or the spokesperson, this, that, the other. We don't want – we don't need these people in our country. We never should have allowed them in in in the first place. If he had told us, I'm going over there and I'm going over there to become the spokesperson and one of the leaders of a movement that's going to turn one of your allegedly elite colleges upside down, people can't even go to school, the library – buildings being vandalized, we never would have let him in. We never would

have let him in to begin with. And now that he's doing it and he's here, he's going to leave and so are others, and we're going to keep doing it.

We are – and by the way, I find it ironic that a lot of these people out there defending the First Amendment speech – alleged free speech rights of these Hamas sympathizers –

**QUESTION:** Yes.

**SECRETARY RUBIO:** – they had no problem, okay, pressuring social media to censor American political speech. So I think it's ironic and hypocritical. But the bottom line is this: If you are in this country to promote Hamas, to promote terrorist organizations, to participate in vandalism, to participate –

**QUESTION:** Yeah.

**SECRETARY RUBIO:** – in acts of rebellion and riots on campus, we never would have let you in if we had known that, and now that we know it, you're going to leave.

**QUESTION:** Is it only pro-Palestinian people who are going to have their visas revoked, or other points of view as well?

**SECRETARY RUBIO:** No, I think anybody who's here in favor – look, we want to get rid of Tren de Aragua gang members. They're terrorists too. We – the President designated them, asked me to designate, and I did, as a terrorist organization. We want to get rid of them as well. You are – we don't want terrorists in America. I don't know how hard that is to understand. We want people – we don't want people in our country that are going to be committing crimes and undermining our national security or the public safety.

**QUESTION:** Yeah. Okay.

**SECRETARY RUBIO:** It's that simple. Especially people that are here as guests – that is what a visa is.

**QUESTION:** Yes.

**SECRETARY RUBIO:** I don't know when we've gotten it in our head that a visa is some sort of birthright. It is not. It is a visitor into our country, and if you violate the terms of your visitation, you are going to leave.

**QUESTION:** Yeah. Okay. Secretary Rubio, we'd like to have you back, talk to you about a lot more on your plate another time, but we have to leave it there.

**SECRETARY RUBIO:** Thank you.

TAGS

Media Engagement | Office of the Spokesperson | The Secretary of State

White House
USA.gov
Office of the Inspector General
Archives
Contact Us

Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

# EXHIBIT 34

**Tricia McLaughlin**
@TriciaOhio

Suri was a foreign exchange student at Georgetown University actively spreading Hamas propaganda and promoting antisemitism on social media.

Suri has close connections to a known or suspected terrorist, who is a senior advisor to Hamas. The Secretary of State issued a determination on March 15, 2025 that Suri's activities and presence in the United States rendered him deportable under INA section 237(a)(4)(C)(i).

> **POLITICO** @politico · Mar 19
> Exclusive: Trump is trying to deport a Georgetown academic in the country legally who says he's being targeted for the pro-Palestine views of his U.S. citizen wife. politico.com/news/2025/03/1...

8:56 PM · Mar 19, 2025 · **378.1K** Views

259 487 1.7K 84

# EXHIBIT 35

An official website of the United States Government Here's how you know

U.S. DEPARTMENT *of* STATE

Home > ... > Secretary of State Marco Rubio and Guyanese Pre...

# Secretary of State Marco Rubio and Guyanese President Irfaan Ali at a Joint Press Availability

REMARKS

MARCO RUBIO, SECRETARY OF STATE

STATE HOUSE

GEORGETOWN, GUYANA

MARCH 27, 2025

Secretary Rubio holds a joint press availability with Guyanese President Irfaan Ali

Cookie Settings

**MODERATOR:** Please remain standing. You may be seated. You will be witnessing the signing of the MOU between Guyana and the United States this morning. I now invite the Ministry of Foreign Affairs representative, Mrs. Peggy McLennan, to give an overview.

**MS MCLENNAN:** Thank you, Marcia. Your Excellency Mr. President, members of cabinet, ladies and gentlemen, today, Minister of Foreign Affairs and International Cooperation Hugh Hilton Todd and Secretary of State Marco Rubio are signing a Memorandum of Understanding between our two countries to deepen security cooperation and address regional challenges, including countering narcotics trafficking and transnational organized crime. Under this mechanism, Guyana and the United States will strengthen information sharing, synthetic drug detection, transnational organized crime investigations and prosecutions, and military-to-military cooperation.

**MODERATOR:** Thank you very much. We now have the signing between the two nations.

(The Memorandum of Understanding was signed.)

(Applause.)

**MODERATOR:** Thank you very much, and now I invite his excellency to address us.

**PRESIDENT ALI:** Good afternoon, all. Secretary Rubio, you are no stranger to Guyana. Secretary Rubio has been and continues to be a strong advocate for Guyana's development, democracy, and peace. He has consistently demonstrated his personal commitment to the national rule of law, democracy, and security.

Guyana and the United States share a long bond of friendship and partnership. Indeed, the best of partnerships are those built on shared values, neutral trust, and a commitment to the rule of law and international order. This is what underpins our bilateral relationship and friendship. The United States is our trusted partner as we continue to build a stable, secure, and democratic society here.

This visit has allowed us to consolidate our bilateral agenda – defining policies and outlining clear intentions in areas of security, trade, energy, investments, infrastructure, democracy, regional peace and stability, human capital deployment, and development. I am very pleased at the reassurance of the U.S. in ensuring the safeguard of our territorial integrity and sovereignty. Our

partnership and joint commitment to the safeguard of this region from every disruptive force is key to the maintenance of democracy and adherence to the rule of law.

The threats from Venezuela were specifically discussed. Their blatant violation of the ICJ order and Argyle Declaration were noted. Our joint commitment in enhanced partnership in combating transnational crime – inclusive of narcotrafficking, human trafficking, money laundering, and all forms of smuggling – is reflected in an enhanced MOU signed today.

We have reassured our partner that we'll continue to ensure all international and local labor laws are adhered to in the hiring of regional and international labor. Further, with our expanding healthcare system and critical shortage of human capital, we'll explore areas of collaboration, filling existing gaps.

We were able to identify key infrastructure that are also critical to regional development as possible areas for investment and development. We have committed to working closely together on the deployment of our energy potential, ensuring greater integration, value creation, and regional energy security, food security, and enhanced trade through joint initiatives to remove hurdles and expand existing areas of interest is key for both countries. I am confident that the outcome of this visit has further aligned our policy agendas, shared commitment, and partnership that will see enormous benefits for our two countries and the region.

Let me once again thank Secretary Rubio for his personal commitment and that of the U.S. government to Guyana and this region in general. I thank you.

(Applause.)

**SECRETARY RUBIO:** Thank you. Thank you, Mr. President. And we have been working together and interacting for some time during my time in the Senate, but I told him I wanted to wait until I was Secretary of State to visit, and so here I am. And I didn't know that was going to happen, but I'm grateful for your – for this visit and for the warm welcome we've received, and it's an exciting time to be here.

I think – and to the people of Guyana, thank you for welcoming us. I hope you fully appreciate and understand this is one of the most exciting places in the world to be right now, because you have the opportunity, at this moment, to transform this country for generations, and we want to

be your partner. We want to be your partner in making that possible. We think it's of mutual benefit to see that happen.

I get to visit in this job – already have – a number of countries in the nine weeks. I've only been on the job for nine weeks, so let the record reflect after nine weeks this was one of my first visits here that I've taken abroad. But we get to visit a lot of counties and when you visit you have some countries, unfortunately, are facing tremendous challenges and they're just looking to stabilize. Other countries are looking to improve and make progress. This country has an opportunity to transform. And that's rare in the history of nations, to have an opportunity for transformative change. And what I mean by transformative change is not simply oil and gas fields. And that's very important – natural resources are critical – but that is just the basic ingredient that allows prosperity to happen.

One of the topics that's talked about all over the world today is data centers and the digitization of the economies, artificial intelligence. Do you know what you need in order to do that? You need to have really good scientists, and engineers, and technicians that know how to run it. But the most important thing you need to be a dominant presence in the world in data centers and artificial intelligence is reliable and affordable energy. That's just one example, among many others.

You have an opportunity to expand, in a responsible way, agriculture production, not just for the needs of your population but for the region, and to do it in a way that safeguards the beauty and the natural environment, that's pristine. You have an opportunity to expand in issues of ecotourism. I'm not a big fan of ecotourism – not – I'm not against ecotourism; I'm not an ecotourist. I like staying at hotels. I'll do it; maybe I'll go somewhere. But there are people that love this stuff. They love it. And you have an opportunity to do that in an incredibly responsible way.

I'm just touching on a few things, but – that are opportunities before you. And that shared prosperity for your country that will come as a result of that is transformative. The lives of your children, the lives of your grandchildren, your lives are going to look very different in five to ten years under this leadership and under this vision as it continues, and we just want to be a partner.

Why do we want to be a partner? Let's – just to be frank, why does the United States care about it? Number one, we care about it because we think it creates a level of stability in the region which we share – which we share. Not just stability here, stability for your neighbors, because we believe prosperity can become contagious. Just like instability can become contagious, stability and prosperity can become contagious. It won't just help you, it will help all of your neighboring partners in the Caribbean Basin and the region writ large, and we think that ultimately makes life in America safer and more prosperous as well. And so we wanted to look for every opportunity possible to partner with you.

But the basic element of any of this, the basic element of progress and transformation and prosperity, is always security. So number one, we want to make sure that some of the tragic regional problems that exist with crime, transnational crime – we have a huge problem in the world right now with organized gangs and narcotraffickers that destabilize societies – we want to make sure that never reaches here. And that's why today's MOU and the work we'll do together will – is designed not to stop it, but to prevent it from ever taking root, from ever finding its way here. Because unfortunately, sometimes crime is attracted by prosperity and targets prosperity.

And the other are regional threats – the regional threats based on illegitimate territorial claims by a narcotrafficking regime. And I want to be frank, and I've said this during my time as a senator, and I have full confidence in saying now as the Secretary of State: There will be consequences for adventurism. There will be consequences for aggressive actions. And that's why our partnership in that regard will be important. That is not what we want to be a feature of our relationship, but it is a necessity of our relationship, because you have a very difficult challenge on your hands with a dictator that's making illegitimate territorial claims.

And so you have our full commitment and support – today we're demonstrating it – both in tangible ways, and we're going to look for ways to make it long-term and sustainable ways, to make abundantly clear that we are invested both as a nation and from our people in being your partner in transformation and in prosperity. And we will not allow illegitimate territorial claims to be an impediment to your dreams and to your right to develop this country into a symbol that I hope will inspire others to follow the example you set, Mr. President.

So thank you. Thank you for the chance to be with you. (Applause.)

**MODERATOR:** Thank you very much, Excellency, and Secretary Rubio. Members of the media, in the interests of time, we will accommodate four questions. We will feed two questions from the local media, and two from our visiting media. I recognize Stabroek News from the local media, as well as Mr. Campbell from the local media. From the visiting media – okay, you represent? Good. Great. And – all right, we'll start with Marcelle from Stabroek News.

**SECRETARY RUBIO:** Hi.

**QUESTION:** Good afternoon, sir.

**SECRETARY RUBIO:** Good afternoon.

**QUESTION:** Marcelle Thomas from the Stabroek News. You just spoke of consequences for aggressive actions, and that the U.S. is Guyana's partner. Given Venezuela's unprovoked aggression towards Guyana, I want to know if your country would stand by Guyana militarily if Venezuela were to attack this country. And what would be the U.S.'s response should Venezuela attack U.S. oil major ExxonMobil, which is operating in Guyana's waters?

**SECRETARY RUBIO:** It will be a very bad day for the Venezuelan regime if they were to attack Guyana or attack ExxonMobil or anything like – it would be a very bad day, a very bad week for them. And it would not end well for them. (Applause.) I'm not going to get into details of what we'll do; we're not big on those kinds of threats. I think everybody understands, and I want it to be clear – we've made this clear repeatedly – I think the U.S. Navy today is making it clear and demonstrating our ability to – we have a big navy and it can get almost anywhere in the – it can get anywhere in the world. And we have commitments that exist today with Guyana. We want to build on those and expand on those. And we'll leave it for the appropriate time, but suffice it to say that if that regime were to do something such as that, it would be a very bad move. It would be a big mistake for them.

**MODERATOR:** We now invite from our visiting media. Please remember to identify yourself and the media house you represent.

**QUESTION:** Hi, thank you. Hello, Mr. Secretary.

**SECRETARY RUBIO:** Hi.

**QUESTION:** Hello, Mr. President. Thank you for taking questions from us. We appreciate it. Humeyra Pamuk from Reuters. Mr. Secretary, a Turkish student in Boston was detained and handcuffed on the street by plainclothes agents. A year ago she wrote an opinion piece about the Gaza war. Could you help us understand what the specific action she took led to her visa being revoked? And what was your State Department's role in that process?

**SECRETARY RUBIO:** We revoked her visa. It's an F1 visa, I believe. We revoked it, and here's why – and I'll say it again; I've said it everywhere. Let me be abundantly clear, okay. If you go apply for a visa right now anywhere in the world – let me just send this message out – if you apply for a visa to enter the United States and be a student and you tell us that the reason why you're coming to the United States is not just because you want to write op-eds, but because you want to participate in movements that are involved in doing things like vandalizing universities, harassing students, taking over buildings, creating a ruckus, we're not going to give you a visa. If you lie to us and get a visa and then enter the United States and with that visa participate in that sort of activity, we're going to take away your visa.

Now, once you've lost your visa, you're no longer legally in the United States, and we have a right, like every country in the world has a right, to remove you from our country. So it's just that simple.

I think it's crazy – I think it's stupid for any country in the world to welcome people into their country that are going to go to their universities as visitors – they're visitors – and say I'm going to your universities to start a riot, I'm going to your universities to take over a library and harass people. I don't care what movement you're involved in. Why would any country in the world allow people to come and disrupt? We gave you a visa to come and study and get a degree, not to become a social activist that tears up our university campuses. And if we've given you a visa and then you decide to do that, we're going to take it away.

I encourage every country to do that, by the way, because I think it's crazy to invite students into your country that are coming onto your campus and destabilizing it. We're just not going to have it. So we'll revoke your visa; and once your visa is revoked, you're illegally in the country and you have to leave. Every country in the world has a right to decide who comes in as a visitor and who doesn't.

If you invite me into your home because you say, "I want to come to your house for dinner," and I go to your house and I start putting mud on your couch and spray-painting your kitchen, I bet you you're going to kick me out. Well, we're going to do the same thing if you come into the United States as a visitor and create a ruckus for us. We don't want it. We don't want it in our country. Go back and do it in your country, but you're not going to do it in our country.

**QUESTION:** A follow-up?

**SECRETARY RUBIO:** Sure. Just tell me your follow-up and I'll tell every – and depending on your question, I'll answer it or not.

**MODERATOR:** No follow-up questions. All right. I now invite our Guyanese –

**SECRETARY RUBIO:** No, no. She had – can I get her follow-up real quick? Go ahead.

**QUESTION:** Could you confirm – there's new reporting that 300 visas – State Department has revoked 300 (inaudible).

**SECRETARY RUBIO:** Maybe more. It might be more than 300 at this point. We do it every day. Every time I find one of these lunatics, I take away their visa.

**QUESTION:** It could – you're saying it could be more than 300 visas?

**SECRETARY RUBIO:** Sure. I hope – I mean, at some point I hope we run out because we've gotten rid of all of them. But we're looking every day for these lunatics that are tearing things up. And by the way, we want to get rid of gang members, too.

So Venezuela sent us a bunch of gang members. I'm sure you've heard of Tren de Aragua, Mr. President – a terrible gang, vicious gang. They flooded in our – yesterday – just so everybody knows, yesterday one of these gang members who was involved in New York City in attacking a police officer was deported back to Venezuela, because they're now taking flights again because of some strong measures we've taken. And this guy lands – this guy's a guy that attacked a police officer in New York City and laughed about it in court with a smirk on his face. When he gets off the plane in Venezuela, he's welcomed by this character named Diosdado Cabello. I don't know if you've heard of this guy. And he welcomes him, hugging the guy. So does anybody have any

doubt that these people are pushing these people into the United States to destabilize us and the region?

So yeah, we're looking for people like this, and we want to get them out of the United States, absolutely.

**MODERATOR:** Thank you. We'll now field a question from Guyana.

**QUESTION:** Thank you. Kurt Campbell, Newsroom. President Ali, you've already spoken about how President Trump's plans – tariff plans for China's ships could affect regional trade. I just wanted to know if in your trade talks today if that issue was specifically discussed –

**SECRETARY RUBIO:** Yes.

**QUESTION:** – by Secretary of State Rubio.

**SECRETARY RUBIO:** And I can tell you – oh, you're asking him. I'm sorry. (Laughter.)

**QUESTION:** It's for both of you. What assurances can you give Guyana and this hemisphere in terms of stemming indirect consequences?

**SECRETARY RUBIO:** Yes. Well, that's – look, the goal the President has in doing so is we need to have an ability to build ships in this world that don't just come from China, okay. I think it's just dangerous to have one country in the world building all the ships. I assure you that – and we don't want a war, but I mean, they're not going to build ships for us if we get in trouble, right? So we need to have alternatives to Chinese ships, and we're trying to create a market and a demand for alternatives to Chinese shipping construction. And I'm the first one to admit that the United States made a terrible mistake when we deindustrialized and we allowed all these industries to leave our country and go to other places. Now we're paying the consequences, but we have to fix it.

So I do believe – I can't speak – I don't – the trade portfolio does not belong to the Department of State, but I do believe that we will take this back because we've heard this not just here, Mr. President. We've heard it throughout our visits here in the Caribbean. And we're going to take it back and explain to those who are in charge of trade policy that there are some implications to applying it to certain nations who are partners and who are seeking to develop their economies

in ways that I think serve the national interest of the United States, not to mention the national interest of our partners nations, and seeing what can happen.

So I can't make a commitment to those exempt, because that's not something we handle in the Department of State. What I can commit to is that I will most certainly raise this issue as a recurring issue, in multiple places, that it would have a real detrimental effect on economic development. Maybe in 10 years it won't be an issue because there's been some diversification, maybe in five, but right now it would be problematic. That message I'll take back to Washington and to my colleagues that are handling the trade portfolio, and we'll see how the President decides to proceed. But rest assured we will take that message back.

**PRESIDENT ALI:** And just to echo the sentiments that, yes, we did discuss it and the region would have raised it also. But there Secretary Rubio is – as he said, will take this back and to see whether there can be any special initiative for the region, given our specific circumstances.

But let me say also that we have a responsibility to our friends. The U.S. is a great friend of ours. The U.S. would have made it very clear that they are ready to stand by us in our development, in our economic expansion, in our security, and in our defense. And I will say very boldly that such friends must have some different and preferential treatment, because a friend who will defend me when I need a friend to defend me, must be a friend that enjoys some special place in our hearts and in our country, and that will be the case. Thank you.

**QUESTION:** And just quickly, illegal migration was also listed as a topic of discussion. Could you say what are the expectations from Guyana in this regard and any discussions on third-country deportations?

**SECRETARY RUBIO:** Well, we want to work with you on that. I think that's a problem for you as well. I mean, obviously, because of the combination of your growing economy, labor needs, and your geography, you have been a place where a lot of people have come in, and I think you want it to be the right people, right? So I think if we have information that someone has entered your country who has bad intentions, we want to be able to share that with your government because you don't want that.

You don't want those – if we have information on a Tren de Aragua gang member from Venezuela, we want to make sure that we're – we have collaboration and we're sharing that

information. If we have information that some narcotrafficker is taking up shop here and has decided to try to turn this into a base of operation, which could become – could lead to violence and warfare here, gang warfare, we want to be able to share that with you. We want to prevent these problems from happening.

So from the perspective of Guyana, which is not a source country of migration to the United States per se – illegal migration – but it is a country that receives, unfortunately, you're getting a lot of people. And not everybody that comes here – I mean, most people are probably here to work hard and so forth, but not everyone. So if we have information that someone is in your country that we know is a bad person, we want to be able to share it with you. We want to be able to share it with you very quickly. So that sort of information sharing has to be a cornerstone of this security agreement that we've signed today and want to continue to expand upon.

**MODERATOR:** We will now field our final question from our visiting media.

**QUESTION:** Thank you so much. Vera with the – Vera Bergengruen with Wall Street Journal.

**SECRETARY RUBIO:** They're very tough, this Wall Street – be careful. All right. (Laughter.)

**QUESTION:** Secretary Rubio, when you and President Bukele – you mentioned Tren de Aragua several times. When you and President Bukele negotiated the deal to transfer the U.S. deportees to his prison in CECOT, did you discuss any provisions to ensure that individuals mistakenly identified as gang members would have access to legal recourse and that they can secure their release if they are wrongly brought – wrongfully detained?

**SECRETARY RUBIO:** Yeah, we have – that list was carefully vetted, provided to us by Homeland Security. We have confidence in it. What we negotiated is the reality that they, in El Salvador, comply with all the international requirements for imprisonment. So we sent them people. It was a combination of people – gang members, people we knew were involved in activities that were not productive to the United States, all of them removable in terms of our laws, all of them; every single one of them was someone who was removable from the United States irrespective – and MS-13 members, some of – many of whom are Salvadoran that we had identified as MS-13 members, that they had helped us identify as well. And that – so it was a combination of people that we sent. And we may send more. We'll see. I mean, it's up to their willingness to accept, but we are grateful to them for the opportunity to do that.

And remember, one of the reasons why we had to send some of those people there was because at the time Venezuela wasn't taking their people back. The Maduro regime – I say Venezuela, but it's not – it's the Maduro regime – was not taking their people back. They refused to take people back, their own people. They have an obligation. If you are a country and someone is illegally in another country, you have an obligation to take those people back, whether they're criminals or not. Venezuela said they wouldn't take them back, so we had to find a place to send them, especially the ones that had records and – or ones that we had strong suspicions and evidence that were involved in illicit activity.

And so we had to send some to El Salvador because of that. Now they've taken them back. And one of them yesterday gets off an airplane, and this narcotrafficker Cabello greets him and hugs him on the tarmac. Now, what I heard ultimately, by the way, is that some of these gang members we sent back were so bad to Venezuela – they were so bad that after hugging them, maybe not this guy but I don't know, they had to put four or five of them back in jail. Because that's how dangerous these people are, even though they hugged them on the tarmac and put on this show.

These are some really bad people. Tren de Aragua is one of the most dangerous gangs the world has ever seen, okay? When they were held temporarily in Guantanamo while being transferred to Honduras because that's when the Venezuelans picked some of them up, the Marines at Guantanamo said these are some of the roughest people we've ever interacted with. They were worse than the al-Qaida guys that were in their jails. Think about that. So that's who we're getting rid of, and we want to get rid of more of them.

**MODERATOR:** Ladies and gentlemen, members of the media, this brings the end to our media conference. And I would like to invite his excellency and Secretary Rubio for a photo op right on the stage. (Applause.)

---

TAGS

Bureau of Western Hemisphere Affairs | Crime | Drugs and Drug Trafficking | Economic Growth and Prosperity | Economy and Trade Policy | Energy | Guyana | Office of the Spokesperson | Official International Travel | The Secretary of State

Venezuela

White House

USA.gov

Office of the Inspector General

Archives

Contact Us

Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

# EXHIBIT 36

An official website of the United States Government Here's how you know



# Secretary of State Marco Rubio Remarks to the Press

REMARKS

MARCO RUBIO, SECRETARY OF STATE
EN ROUTE MIAMI, FLORIDA

MARCH 28, 2025

**QUESTION:** Can I ask a non-trip question, because I want to know what's happening with this Ukrainian children grant.

**SECRETARY RUBIO:** Grant?

**QUESTION:** The Ukrainian children who —

**SECRETARY RUBIO:** Oh, the data. The data is secured. We secured the data. We'll transfer it to the appropriate party. We've ensured that. And we'll be able to say that next week. We already notified that. If we haven't, we're about to notify Congress. I think we've gotten some letters.

**QUESTION:** Yeah.

**SECRETARY RUBIO:** So there's no danger to the data that's been collected on that.

**QUESTION:** But is the program back on?

Cookie Settings

**SECRETARY RUBIO:** No, no, the program we're not – the program is not funded. It was part of the reductions that were made, but we secured the data and we've ensured that we have it and it can be transferred to any appropriate authorities, and we'll issue a congressional – I don't know if it's a notification or just responses to the letters they've written us.

**QUESTION:** This is the Conflict Observatory?

**SECRETARY RUBIO:** Yes.

**QUESTION:** How is the —

**SECRETARY RUBIO:** You're not going to hit me with that mike like the President got hit? (Laughter.) Okay.

**QUESTION:** And when you were answering the – Mr. Secretary, earlier, you said 300 visas? It's actually —

**SECRETARY RUBIO:** Well, the —

**QUESTION:** Are they all student visas or —

**SECRETARY RUBIO:** No, no, no, you guys – you asked – the question was, was there 300? I know that number's been cited. I said it might be more because we're doing them every day, primarily student visas, some visitors visas.

**QUESTION:** Okay, so just making sure. Just making sure.

**SECRETARY RUBIO:** I don't know actually if it's primarily student visas. It's a combination of visas. They're visitors to the country. If they're taking activities that are counter to our foreign – to our national interest, to our foreign policy, we'll revoke the visa.

**QUESTION:** Are all of those related to pro-Palestinian protests or (inaudible)?

**SECRETARY RUBIO:** I'm trying to remember – there's a lot of them now, because I've gone through every one of them. I think there might be a few that are not, that are related to other groups that are – of people – we've also identified – but this actually is – it should be automatically

revoked. We've also identified people that have criminal charges and even while in the country, and still have active visas. Some are unrelated to any protests and are just having to do with potential criminal activity.

**QUESTION:** (Inaudible.)

**SECRETARY RUBIO:** Huh?

**QUESTION:** (Inaudible.)

**SECRETARY RUBIO:** Yeah, I have to sign every single one.

**QUESTION:** And what is the —

**SECRETARY RUBIO:** Or the autopen. I'm kidding. No autopen. I'm just joking.

**QUESTION:** And what does it mean when you say against the foreign policy of the United States?

**SECRETARY RUBIO:** It runs counter to our foreign – that's how we issue visas coming in. I think about it this way. If we knew this information – my standard: If we knew this information about them before we gave them a visa, would we have allowed them in? And if the answer is no, then we revoke the visa.

**QUESTION:** Can I ask you on a different topic, Türkiye? You had the meeting with the foreign minister a few days ago. I think yesterday they – yesterday or today they expelled the BBC correspondent. They arrested an AP photographer. How concerned are you with how things are going there?

**SECRETARY RUBIO:** Well, ultimately – and look, we've expressed that we're concerned. We don't like to see the direction that's going. It's an ally. It's a partner in NATO. Anytime you have instability on the ground, you don't like to see it. Obviously, they have internal domestic political considerations. We're not necessarily going to always opine on every single one of them. To the extent we have deeper concerns, we expect to express them at least privately at the outset, certainly in a new administration when we're trying to establish relations. But we watch the same news reports everybody else sees about what's going on. We're certainly concerned about these

protests and some of the reports. But we raised that and – but I haven't seen what – what you referenced in the last day, yeah.

**QUESTION:** Just on Turkey, in your tweet —

**SECRETARY RUBIO:** Türkiye.

**QUESTION:** Yes, Türkiye. In your tweet —

**QUESTION:** Are you guys going to change that? Are you going to back to Turkey?

**SECRETARY RUBIO:** When we're in Türkiye we're going to say Türkiye.

**QUESTION:** In your tweet, the final sentence is basically about the arrest of Istanbul mayor. You're not saying that explicitly, but those are their (inaudible).

**SECRETARY RUBIO:** Well, I mean, and we talked about that. I mean, their argument is that the mayor is involved in corruption, that this has been a longstanding issue that it's finally got acted upon, and that he is seeking refuge behind his politics. I don't know all the facts about it. Obviously, that's not what the mayor is saying or what the political opposition is saying is that this is a leader that might have won the election had he been allowed to run.

So we're watching it. We've expressed concern. We don't like to see instability like that in the governance of any country that's such a close ally, especially, and it —

**QUESTION:** After your post, Turkish diplomatic sources actually denied that this had come up and you had expressed your concern. I just wanted to ask you about that.

**SECRETARY RUBIO:** Well, I did raise it with the foreign minister, and probably exactly in the words that I'm using now, and that is we're watching these reports and obviously it's disturbing to see, and we talked about it in those terms. But as I said, we don't like to see that kind of instability or these things happening inside countries that we hope to partner with on a bunch of things. And President Trump had a very good working relationship with President Erdogan in the first administration. I think they would like to restart that. But they're a NATO ally, and we would like to cooperate with them in Syria and in other places. So I think it's possible to raise concerns

and at the same time understand we have a lot of other things to partner on as well. We have – that's the balance of conducting a mature foreign policy.

**QUESTION:** Can you speak about the European leaders who said today that they – they oppose lifting sanctions on Russia, they don't think it's time to do that? Are you all considering that? Can you talk about deliberations?

**SECRETARY RUBIO:** Well, no, so we met with the Russians. Our team was over there this week. They came back and they arrived last night, I think, or early some point yesterday. So we're going to reconvene. I had some calls about it today. We're sort of going to analyze what they're – what they're raising and sort of study what exactly it is. It's a host of sanctions, including sanctions that are not American. They've raised potentially a couple – my readout of it – they're not even American sanctions, so we couldn't lift them if we wanted to. We're going to sort of analyze what our team came back with. We'll present those options to the President. The President will make those decisions. We're not there yet.

**QUESTION:** Have you received Iran's response to the President's letter?

**SECRETARY RUBIO:** Have I what? I'm sorry.

**QUESTION:** Received it, Iran's response.

**SECRETARY RUBIO:** Yeah, I'm not going to comment on that yet other than to say the President's letter has been publicly reported. I expect there will be a response, and obviously, at that point, the President will decide what steps, if any, he wants to take next.

**QUESTION:** Can we go back to visa issue just for a second? I mean, a lot of people feel freedom of speech concerns about it. Are you saying that if you come and if you apply for a visa and get a student visa and you don't lie, and you tell the truth and you're not coming to protest or anything, but during the course of your studies, wherever it is in the U.S., you develop views or opinions that are at odds with the administration's foreign policy – say you learn something in your course of study that makes you think that what the policy is wrong – and then you protest it or write something about it, don't do anything violent, is that grounds enough to revoke a visa?

**SECRETARY RUBIO:** Well, I think there's a little bit of common sense here. You come to the States and then you decide you don't like those paper straws that some of the stores are selling

and you start protesting or complaining about paper straws – I mean, we're obviously not going to yank a visa over that. I think it crosses a line – think about it this way. No one has a right to a visa. These are things that we decide. We deny visas every day for all kinds of reasons all over the world. We deny visas because we think people might overstay. We deny visas because the country they come from are people that historically overstay. We deny visas every day, and we can revoke visas. If you have the power to deny, you have the power to revoke.

I would argue that the – what I would add to it is what we have seen on campuses across the country where students literally cannot go to school, you cannot – buildings are being taken over, activities going on – this is clearly an organized movement. And if you are in this country on a student visa and are a participant in those movements, we have a right to deny your visa. I think it would make sense to deny your visa. We're going to err on the side of caution. We are not going to be importing activists into the United States. They're here to study. They're here to go to class. They're not here to lead activist movements that are disruptive and undermine the – our universities. I think it's lunacy to continue to allow that.

**QUESTION:** So expressing any kind of view —

**SECRETARY RUBIO:** And by the way, I've been saying that since I was in the Senate. Now I'm just in a position to do something about it.

**QUESTION:** Mr. Secretary —

**SECRETARY RUBIO:** Now that's a broad thing to say – any kind of views. But when you're aligning yourself with groups that are behind these activities, openly aligning yourself with these groups that are behind these disruptive criminal activities in the United States, your visa is going to get yanked.

**QUESTION:** Mr. Secretary, I don't —

**QUESTION:** Hamas?

**SECRETARY RUBIO:** Yeah, there may be others. I mean, if you come here and join Tren de Aragua, we're going to yank your visa too. If —

**QUESTION:** Mr. Secretary?

**SECRETARY RUBIO:** And so there may be other movements, but that's partly the movement we've seen on college campuses. Let's be clear: It is a movement that is supportive of the group that just slaughtered babies, like deliberately targeted and slaughtered babies and civilians and took hostages and killed hostages. That's the group they're aligning with.

But beyond that, they are spray-painting buildings. They are taking over buildings. You must have seen these reports in campus after campus where students can't go to class and can't function and the universities don't know what to do about it. When you look at it and you realize that some of the people involved in this are here on student visas, it's crazy. We're not going to keep doing that. We're not. Don't come here. If you're going to do that, go somewhere else. Don't come here.

**QUESTION:** And I brought up the protests in Hong Kong in 2019, which I covered, because there were also shutdowns of college campuses back then. There were foreign students that were involved. There was graffiti. They stopped traffic at intersections. They shut down subway stations. They were largely peaceful, but there were also these instances that disrupted public life and there were foreign students that were involved there. And so, like, under your rationale, the Hong Kong authorities or the —

**SECRETARY RUBIO:** Well, every country in the world can deny visas to whoever they want. It's that simple. That's a fact. Whether we like it or not, they can deny visas.

Number two, that movement was not a movement in favor of a group that slaughtered babies and innocents. That's not what that – that movement, they were people who were complaining because there was no democracy, but I mean and they were upset about the direction Hong Kong was headed and the Chinese law that was being imposed. But they have – every country in the world has a right to deny you a visa. I'm not entitled to a visa. You're not entitled to a visa. Nobody is entitled to a visa in any other country. They can determine it and they can revoke it at any time they want.

Now, let's – I think it's important is that there's a clear distinction between protesting against the democratic order and protesting in favor of groups that advocate the slaughter and murder of innocent people, which is what many of these groups are supportive of. Beyond that, these groups are not just taking over – these are not sit-ins we're talking about. We are talking about buildings that have been vandalized, defaced, that where they – for months on end in some

cases. We're just not going to continue to allow it. I don't understand what people don't get. A visa is a gift. It's a voluntary thing. We decide to give you a visa. We deny visas all over the world every day for a variety of reasons, and that means we can also revoke those visas. No one is entitled to a visa.

**QUESTION:** I guess some of the examples have come up like a student at Tufts University, like all they did was write an op-ed for the student newspaper advocating for a certain point of view. They're not – as far as we can tell, they haven't openly advocated for Hamas.

**SECRETARY RUBIO:** Well, we will – those – as they go, or if they seek to self-deport they can do that, because that's what we've done. We're basically asking them to leave the country. That's why they've been detained. They can do so tomorrow. Buy an airplane ticket and leave. No problem.

**QUESTION:** Mr. Secretary?

**SECRETARY RUBIO:** But I would add to this that I would caution you against solely going off of what the media has been able to identify, and those presentations, if necessary, will be made in court.

**QUESTION:** But for example, in that – the Turkish students, the Tufts student's case, I asked you today did she have – has she committed, like, or has she carried out any of those things that you just listed?

**SECRETARY RUBIO:** The activities presented to me meet the standard of what I've just described to you: people that are supportive of movements that run counter to the foreign policy of the United States. If necessary and a court compels us, we'll provide that information. But ultimately it's a visa. Judges don't issue student visas. There is no right to a student visa. We can cancel a student visa under the law just the same way that we can deny a student visa under the law. And we will do so in cases we find appropriate.

The overwhelming majority of student visas in this country will not be revoked, because the overwhelming majority of people that are coming to this country to study are not involved and associated or aligned with organizations that seek to do damage in this country, and that, frankly, organizations that hate the United States Government and hate our way of life. So I just think it's

crazy to continue to provide visas so people can come here and advocate for policies that are in direct contradiction of our national interest.

**QUESTION:** Right, but are the schools raising these issues with you? Are these – are there out —

**SECRETARY RUBIO:** Oh, I'm sure they're —

**QUESTION:** Are these outside groups that they're raising —

**SECRETARY RUBIO:** Oh, I don't know. I mean, I'm sure they are. I mean —

**QUESTION:** Like, how does it come to – come to your desk? Yeah.

**SECRETARY RUBIO:** Oh, bringing it to us? Well, we're not – we're not going to talk about the process by which we're identifying it because obviously we're looking for more people.

**QUESTION:** Have you seen the video of her being detained?

**SECRETARY RUBIO:** I haven't. But look, detention is simple. Your visa is expired, your visa is revoked, you have to leave.

**QUESTION:** But it's six hooded figures with masks on their face who don't identify themselves until they already grabbed her wrist. It's quite horrifying.

**SECRETARY RUBIO:** Yeah, I mean, unfortunately our agents – I mean, I'm not – that's a DHS or ICE, so I don't know what their practices are. But our agents have had to protect their identity because they've found themselves targeted – targeted for violence, targeted for operations against them. I would say most of these protesters are wearing masks too, and they're not in law enforcement.

**QUESTION:** Can I ask you a different topic? U.S.-funded media. Radio Martí is something that I believe you've supported in the past. What do you think of the cut in funding for that entity?

**SECRETARY RUBIO:** Well, first of all, they're not part of the – they're not – we don't control that. That's a separate entity that does it. My understanding is that Martí has actually started rebroadcasting today, and a few others. I think the executive order called for them to be – all

these agencies to be reduced to the statutory minimum. And I think the goal ultimately over time, as I understand it, is to reform these entities so that they provide news that, frankly, favors and advances the national interest of the United States. We have plenty of independent media outlets, including all of you, and then we are interested in media outlets that present America's point of view from our foreign policy standpoint. And so that review will be ongoing, but obviously that's outside the State Department. I don't control those.

**QUESTION:** What about the cuts (inaudible) —

**SECRETARY RUBIO:** I wish I did, though, but I don't. Not yet, anyway. Maybe we'll see, but I don't know.

**QUESTION:** What about cuts to some of the other programs in Cuba that were supporting dissidents, that were supporting political prisoners?

**SECRETARY RUBIO:** Yeah, well, some of them were not. Some of them will be restudied over time. I think ultimately we're trying to find programs that are effective. No one's been —

**QUESTION:** But no, it – as you know, there's (inaudible) in general always in Cuba right now.

**SECRETARY RUBIO:** Yeah, but there's – I – there's a bunch that were – that we approved that are on the – not even got waivered, just got restarted and we're doing them. There's others that we have suspended because we didn't think we were getting the return on the investment. That money may be repurposed to a program that works better for the same cost.

**QUESTION:** You mentioned that Marines have said – Marines at Guantanamo Bay have said that the Tren de Aragua members there —

**SECRETARY RUBIO:** Oh, yeah.

**QUESTION:** — were more violent than al-Qaida members.

**SECRETARY RUBIO:** Not just more violent, very well organized. They were able to communicate with each other, the hand signals, all kinds of – I mean, this is a prison gang, so it doesn't surprise me. That's how the Tren de Aragua originates from, so it doesn't surprise me that they're very effective in that setting.

They're also very dangerous to keep in our country. When you keep prison gangs in your country, they grow, they metastasize. MS-13 was actually a group that was started by Salvadoran – either Salvadoran refugees and/or actually people born in the U.S. of Salvadoran descent in prisons. MS-13 did not originate in El Salvador; they originated in U.S. prisons and spread down and back to El Salvador. Prison gangs are very dangerous because they recruit and then they – they almost create academies within the prisons that then metastasize and spill out to the general population.

**QUESTION:** Have you spoken to the Marines down in Guantanamo, or did they (inaudible)?

**SECRETARY RUBIO:** I spoke to one that was in Guantanamo because I know them through a family friend, but I've also spoken to both Pete Hegseth about this and, if I'm not mistaken, Secretary Noem as well. And they both – when I asked them, "Is this true?" they both confirmed that's what their officers and people on the ground were telling them. So actually I heard this from a personal acquaintance, and then I actually had it affirmed to me by two members of the cabinet.

**QUESTION:** (Inaudible.)

**QUESTION:** (Inaudible) some of the people sent down to El Salvador to the prison weren't actually gang members, but that, for example, there was a (inaudible) with a tattoo (inaudible) supporting autism, people with autism, but it looked like a gang tattoo to the immigration agent and then (inaudible) mistakes made. How do you address that?

**SECRETARY RUBIO:** Well, ultimately that – all of that was the work of the Department of Homeland Security. They've identified them. I have confidence in the assessments that they've made. They're – but I can't speak to any one of the individual cases because we're not involved in compiling them. But I have no reason – in fact, I have confidence that they compiled a good list. And if we have an opportunity to send more, we will – gang members, MS-13, whatever we can send.

**QUESTION:** (Inaudible) isn't it an issue of due process? I mean, was that raised with President Bukele? Do these people have a right to appeal in some way?

**SECRETARY RUBIO:** Every single one of them was deportable for reasons even beyond the Alien Enemies Act. The MS-13 as well. They were all deportable. Many of these people had orders of

deportation already and were either in custody or had been recently apprehended. So every single person that was sent there was deportable.

Unfortunately, if they're of Venezuelan descent, up until this week the Venezuelans were not picking anybody up. They were not allowing anybody to go back. They're the only country in the hemisphere that was refusing to accept anyone. They have restarted those suddenly, and hopefully they'll continue and then we won't have to use El Salvador.

**QUESTION:** So why use the Alien Enemies Act if they were deportable anyway? Because that just seems to be (inaudible) inviting a challenge to it.

**SECRETARY RUBIO:** No, I think the expedited nature of it. These gangs were organized. They were – they were presenting very real and immediate risks in a number of communities in our country in an organized fashion. We have reason to believe that they were actually being pushed towards the United States in large numbers by the regime in Venezuela. You saw just yesterday one of them arrived in Venezuela and was greeted on the tarmac as a hero. This is an individual that was arrested for – caught on video – attacking police officers in Times Square, (inaudible) to law enforcement after doing so. So we believe that in many ways the Venezuelan regime has encouraged that flow of these groups towards the United States to create harm in our country.

**QUESTION:** The reason I ask is that we know (inaudible) Thursday before we left on Friday (inaudible) spoken to President Bukele twice, and this was all arranged, and —

**SECRETARY RUBIO:** I've spoken to him a number of times.

**QUESTION:** I know, but this —

**SECRETARY RUBIO:** Not just the only time you were around.

**QUESTION:** Well, no, no, no, this was the (inaudible).

**SECRETARY RUBIO:** Yes.

**QUESTION:** This was the Thursday – Thursday night.

**SECRETARY RUBIO:** Yes.

**QUESTION:** So now we're into Friday, and it became clear with this transfer of diplomatic notes from El Salvador and the stuff that the State Department was doing to get the money ready – 20 grand per person per year for this initial tranche of (inaudible). And it made clear that the President was going to go in and sign the AEA declaration, and yet it didn't come out until after, so Saturday. Why? Was that —

**SECRETARY RUBIO:** Well, about the AEA declaration, that came from the White House. My conversations with President Bukele were as a follow-up and to finalize in a verbal agreement we had reached in my visit to El Salvador on my first trip as the Secretary, so it was just sort of following up on that and how we were going to proceed with it. We were ready now to execute at some point, and we were working through those arrangements with them. And that's what those calls were about. It was just sort of to finalize what we had agreed on.

**QUESTION:** So you don't think that the White House delayed (inaudible)? Because the President did sign the AEA declaration on Friday.

**SECRETARY RUBIO:** Yeah.

**QUESTION:** (Inaudible) it wasn't (inaudible)?

**SECRETARY RUBIO:** I can't speak to the timing of why they released the one they did. I can tell you – and I think you were on that trip – that the agreement to house criminal aliens was reached with President Bukele back in February.

**QUESTION:** Yes.

**SECRETARY RUBIO:** And so we spoke – I've spoken to him since then, but obviously this – those days that I was there we did because we had a couple of open questions that we wanted answers to and that he wanted answers to, and we were finalizing that.

**QUESTION:** Mr. Secretary, on Russia, about a month ago when we were in Riyadh, you were first starting on speaking with them, and you said something. You said soon enough we're going to find out whether they're acting in good faith or not, we just need to test it out. So a month later where do you stand? Are they (inaudible) —

**SECRETARY RUBIO:** Well, I'm not prepared to pass judgment on it. They're meeting with us. They're talking to us. They're making proposals. They're agreeing to ceasefires but with conditions that we need to analyze.

**QUESTION:** So is that dragging their feet, actually?

**SECRETARY RUBIO:** I wouldn't – I'm not prepared to characterize it as one or the other. What I've said almost from the very beginning is, I mean, this war is complex. As you can see, it's now going on three years. And I never said it was going to be simple. There's a lot of work to be done with both sides, in particular the Russian side, which we haven't talked to in years. So —

**QUESTION:** How long do you anticipate these negotiations to continue?

**SECRETARY RUBIO:** We're going to – we're trying to achieve peace. We're committed to trying to achieve peace as long as it takes. That doesn't mean that I can guarantee you that there's going to be an agreement in a week or a month. I just can't put a timeframe on it because it doesn't depend on us. It depends on the Russians and it depends on the Ukrainians. It also depends on our partners in Europe who have sanctions that will have to be taken into account, I believe, as part of any final deal.

But I always think it's progress when at least specifics are being agreed to even though they may not be agreeable to both sides, because we get to determine sort of the negotiating posture and what the impediments are to peace. So I think when you negotiate, when you sit down with people and they – and you talk about these things, they have to memorialize these things in documents, at least it begins to give definition to what the impediments to peace are.

As far as willingness, that'll be tested when the time comes to sign or if – if we've dealt with impediments and there's still resistance from one side or the other, then we'll know. But we're not at that stage yet.

**QUESTION:** Do you anticipate this moving soon beyond the technical level and back to higher-level talks?

**SECRETARY RUBIO:** Well, I think you have to make more progress on a technical level at this point, but we'll see. We're going to analyze it. As I said, when they arrive back from Saudi Arabia I want to sit and talk to our team that was on the ground and get a better sense how those

negotiations went, because a lot of it isn't just what was written and what was said over 12 hours. And by the way, we met with the Ukrainians twice as well, so we want to get that perspective, which we met with them on Sunday and again on Tuesday, and the Russians on Monday. So I need to hear from them directly a little bit more about how it went, and then we'll present that. We'll meet with the team and we'll present that to the President, and then decide on a path of what the next steps are.

**QUESTION:** Can I ask you a different topic? Sudan. We've seen certainly an upsurge in violence. The army says they have kicked out from the presidential palace. You've seen the strike on the market. Is there anything diplomatically that the U.S. can (inaudible)?

**SECRETARY RUBIO:** We're engaged in conversations with a number of countries, with Ethiopia, with Kenya, in just over the last 72 hours where we've been raising that. And we're very concerned that we're going to backslide to where we were a decade or less ago, and so we don't want to see that. And so we're trying to figure out and we've been engaging with our partners about soliciting their ideas about what can we do on this matter to – what contributions can the United States make to stabilize it now. There are a number of places we're doing that. We're doing that with DRC-Rwanda as well. So there are a couple of places like that that we find ourselves sort of asking our regional partners how do they believe we can be most helpful and engaging, and with our partners outside the region as well. We've spoken – I spoke to the foreign minister of the UK yesterday about this topic.

**QUESTION:** (Inaudible) Iran and the (inaudible) letter (inaudible)?

**SECRETARY RUBIO:** Oh, he just asked me that, but you couldn't hear.

**QUESTION:** Oh, sorry.

**SECRETARY RUBIO:** No, that's okay. I just have to – now I have to remember the answer, because it has to be identical. (Laughter.)

**QUESTION:** You have to (inaudible).

**QUESTION:** Give us the details.

**SECRETARY RUBIO:** It's been publicly reported that the – that the President sent a message. I anticipate a response on that, and – but we have nothing else to announce on that. Is that pretty much what I told you? All right.

**QUESTION:** Can I ask —

**SECRETARY RUBIO:** All right. Well, the game is going to start. That's why. (Laughter.)

**QUESTION:** What brought about your hatred for ecotourism?

**SECRETARY RUBIO:** I don't hate ecotourism. It's just —

**QUESTION:** You said —

**SECRETARY RUBIO:** No, no, no, no. I said I'm not a fan of ecotourism, but I'm not against it. People like to do that stuff. But like, to me, a vacation does not involve snakes and spiders. So that's my view. Maybe that'll change. I don't know.

**MS BRUCE:** All right.

**SECRETARY RUBIO:** All right. Thanks, guys.

---

TAGS

Bureau of European and Eurasian Affairs | Bureau of Western Hemisphere Affairs | Cuba | El Salvador | Office of the Spokesperson | Russia | The Secretary of State | Turkey | Ukraine

---

White House

USA.gov

Office of the Inspector General

Archives

Contact Us

Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

# EXHIBIT 37

An official website of the United States Government Here's how you know

U.S. DEPARTMENT of STATE



# Secretary of State Marco Rubio with Donald Trump, Jr. of Triggered with Don Jr.

INTERVIEW

MARCO RUBIO, SECRETARY OF STATE

APRIL 8, 2025

**QUESTION:** Well, guys, joining me now, Secretary of State Marco Rubio. Good to have you, Marco. How's everything?

**SECRETARY RUBIO:** Thanks for having me. Thank you. Thanks for having me on here.

**QUESTION:** Well, I imagine this is a good day given the outcome of the basketball game last night.

**SECRETARY RUBIO:** Yeah, yeah, yeah. It was good to – by the way, that young guy, he's – I think he's the youngest coach maybe since – they were saying last night on TV since Valvano to win a national title. He's only been there three years. They hired him from the University of San Francisco. He played, I think, six or seven years in Israel in basketball and then he came over, and he's done a great job. And that's a team that's not built with a bunch of like high-number recruits, like five-star famous guys. He's kind of pieced it together. So it's great. It's great for the school.

The only thing that's crazy is you watch the videos of these kids – my son's at the University of Florida – and these kids climbing up on the light poles and stuff like that, it's

Cookie Settings

I don't know. I don't remember that back in the day. People just won, they had a parade. Now they want to tear up the town even the night before. So that was the only downside of winning, is seeing these people risking their lives over in Gainesville.

**QUESTION:** Yeah, listen, kids are going to be kids. I think I'm okay with kids being kids. I think we need a little bit more of that as well. But yeah, we've got to be a little careful.

**SECRETARY RUBIO:** Yeah, I draw the line at life-threatening shows of enthusiasm. Those are the things that – luckily, my son wasn't the guy on the lightpost. But I saw that last night, I was like, somewhere there's a nervous mom.

**QUESTION:** Well, thank you again, Mr. Secretary, for taking the time. I guess to start off, it was interesting to see the Supreme Court yesterday, in my opinion, smartly lifted the restraining order against the Trump Administration as it relates to the ability to deport Tren del Aragua murderous, drug-dealing gang members to El Salvador. Can you talk about the significance of this? I know you've been dealing with this a lot on a daily basis. I know you were intimately involved, obviously, when they were trying to recall to make sure we couldn't deport murderous thugs. But can you talk about that historic work coordinating with President Bukele of El Salvador to get these criminals actually off of our streets?

**SECRETARY RUBIO:** Well, a couple things. The most important thing about that court ruling is it said you have to file it, you have to go before the judge wherever those people are being held before they're sent abroad. Because right now, what was happening is these activists were basically just finding a court – they would find – they'd forum shop. They'd find, "Where can I find a friendly federal judge that gives me the highest probability of victory in court?" So you have over 600-something District Court judges, and so you have a guy in New Jersey or a guy in New York or a guy in D.C. basically enjoining the entire country. I mean, one of these federal judges has the power to stop the entire federal government in all 50 states and every one of our territories.

And so I think the most important thing the court said is, number one, if you want to fight these things, you have to fight it in the jurisdiction where they're being sent from or being held – in this case, Texas – which clearly, for whatever reason, these lawyers, they don't want to go to Texas to file it, right?

And then the other is just the power of the federal government to conduct foreign policy. We have a judge right now that is basically trying to order the federal government, the Executive Branch, to bring people back. In essence, they are trying to order us to go to the president of El Salvador and tell him you must now send people back to us. So we can't live in a country – it's just not constitutional – where judges are now conducting the foreign policy of the United States.

The trip to El Salvador was one of the first trips I did. I think it was two weeks in, maybe three weeks in, as Secretary of State. I met with Bukele. I've known him for a long time. He's very pro-American, very – likes the President a lot. He's going to be visiting here pretty soon – I think maybe next week it is when he's going to be coming to the Oval Office. And he agreed; he said, look, I've built these prisons and I will house people here. First of all, he wants his MS-13 killers that are in the United States, because they're wanted for crimes in El Salvador too.

And then he's also willing to hold members of this dangerous Venezuelan gang, and he's doing it at a fraction of the cost of what it would cost us here in the United States to hold them. These – this is one of the most dangerous gangs ever, Tren de Aragua, one of the most dangerous gangs you've ever seen. They go in, they take over entire communities, and we want them out of the country. And Venezuela wasn't taking them, so we had to find a place to send them, and he has the perfect place to send them. And that's a deal we cut with him back in early February, and this was the execution of it. We're very grateful.

And since then, we sent another group over there – not as big, but you look at the roster of people, the next – I think nine or ten that we sent. You see the rap sheet on some of these people, it's one of the worse collections of human beings I've ever seen in my life, and I'm glad they're no longer in the United States.

**QUESTION:** Well, watching the leftists try to defend these people, have them released – I mean, it's sort of wild. I can't imagine a civilization that could survive by releasing arguably some of the most violent people in history back into our streets. Have they just lost the plot so badly that this is their hill to die on?

**SECRETARY RUBIO:** Yeah, I think they're so triggered by everything that happens in terms of any sort of removal of people from the country, it's almost automatically assumed that if you are somehow removed from this country you are a candidate for the Nobel Peace Prize or you are

some sort of – it's amazing. You read these articles; these are the greatest people who have ever lived, who just somehow all happen to be illegally in our country.

But it's a very simple and basic point: What country in the world would assume millions of people in a mass migration, not to mention thousands and thousands of people that you know are members of dangerous gangs and either have criminal records in their home country or here or are part of groups that commit crimes, who would – it's the stupidest thing I've ever heard that some country would want to keep them there. It would make all the – for a real everyday person in America, if you went to them and said, "Should we kick out people that are in here illegally and are dangerous criminals," that's, like, a no-brainer. That's got to be like a 90/10 issue in the United States, right?

**QUESTION:** The fact that there's even a 10 is shocking to me. I mean —

**SECRETARY RUBIO:** Right, or maybe it's even higher, right?

**QUESTION:** Yeah.

**SECRETARY RUBIO:** But these guys consistently fall on the other side of it, right? They consistently fall on the other side of it. And what they're basically telling the American people is these people that are in our country illegally, and by the way are dangerous, somehow have the same rights if not more rights than everyday citizens in our country who are law-abiding, were born here or naturalized here or legal citizens of the United States – they basically have the same rights that you have.

It's the same issue with the student visas. We have this concept that's been built up that this is somehow a right that people are entitled to a visa. No one is entitled to come into the U.S. illegally, much less remain here, and no one is entitled to a visa. A visa – we deny visas every day all over the world because we think somebody might overstay, because we have questions about somebody.

So none of these things are right, so it's time – in addition to doing what's good for our country, it's an important opportunity to sort of reset reality on what these things actually are.

**QUESTION:** Yeah. I'd argue the Biden administration canceled plenty of visas of people that actually could be the next astronaut, the next nuclear physicist, the next – because

they probably weren't reliable Democrat voters. But I think more importantly, as you and my father have both made very clear, gangs like Tren del Aragua – part of Maduro's narco-terrorist regime who've influenced violence on American citizens, murder, as well as the Venezuelan people – this isn't just a foreign problem; it's an American one, and it's right in our backyard. What else do people need to understand about how deep this really goes? Because this isn't just, hey, they got rid of a couple people. I mean, this – this seems to me like a serious op designed to really undermine and hurt America at the base level.

**SECRETARY RUBIO:** Yeah. No, there was no doubt that it was used as a tool against us. I think mass migration's been weaponized against America. I think as the years go on, as the months go on, as we learn more about it, there'll be evidence and proof of that out there. There is no doubt there was a concerted effort, among other things. I mean, there was a lot of people already wanting to come for a lot of reasons. On top of that, I think you had a concerted effort to push people towards the United States. It's not unprecedented. In 1980, Fidel Castro opened up his mental institutions, he opened up his jails, and he basically flooded the United States with criminals from Cuba, and we paid an extraordinary price for it. So it's not unprecedented.

In the case of Tren de Aragua, that was a prison gang inside of Venezuela. The Venezuelan regime pushed them out of the country knowing that many of them – first of all, they destabilized all kind of countries neighboring in the region, but ultimately wound their way up here to the United States. And we saw that trend begin probably in January of 2023 we started to see uptick in people arriving.

It was actually Venezuelans that were telling me this. People here in the country, they were saying, look, these people that are coming now, they're members of gangs. And at first you kind of think, well, how do you really know? But they were right. They were absolutely right. And we started to see that. And you started to see them in the unlikeliest places. It wasn't like they were all coming to Miami. They actually were going to places like Chicago and New York and Aurora, Colorado, and sprinkled all over the country. And then the crimes began.

So there's no doubt that this was a concerted effort by the Maduro regime not just to drive these gang members out of their country but to drive them towards the United States and to inflict a price on this country. And it's not – it's right out of the Fidel Castro playbook.

**QUESTION:** Yeah. Well, María Corina Machado won 92 percent of the vote there in an open primary despite brutal repression, censorship. I mean, I had her on the show two or three weeks ago. She was talking about – I mean, if she went to a restaurant – because she couldn't even fly, driving to a campaign stop – they'd shut down the restaurant for even serving her. I mean, she is clearly the choice of the Venezuelan people. She was banned from the ballot. But even her surrogate, Edmundo González, still won the election by 40 points. I mean, that's –

**SECRETARY RUBIO:** Yeah.

**QUESTION:** That's not like some of these things here where you say, hey, you won by basis points, where are the gains? I mean, that's pretty decisive even in that regime. Would you say the Venezuelan opposition today is more unified and credible than perhaps we've seen in the past, and that can actually effectuate real change going forward?

**SECRETARY RUBIO:** Well, they're as brave as they've ever been, and she in particular. María Corina Machado is an incredibly brave woman. I mean, if you – and I'm not criticizing anybody when I say this, right, but if you look at the Venezuelan opposition, a large percentage of the well-known figures in it are now living abroad, because there comes a time where your family's lives is threatened or they force you out of the country or you leave. You travel overseas to go give a speech and they don't let you back in. She has stayed. But she's in hiding. They're looking – they're hunting her down every day. Like, they're trying to get a hold of her, they've tried to arrest her a couple times. Incredible bravery. One of the bravest people in the world, and I don't think people know enough about her.

But you have to – people have to understand, I mean, being in the political opposition in Venezuela at this point is a life-threatening circumstance to be in. I mean, they will – they will put you in jail. They've jailed everybody around her, everybody – and these are not like normal jails. I mean, these are atrocious conditions that they're in.

So it's not a government. The Maduro regime is not a government. They govern territory because they have the guns and they have the security forces, but it basically is a narco-terrorist organization with strong ties to Iran, strong ties to narco-trafficking, and they just happen to control territory. They don't even control all of Venezuela because the border regions with Colombia are controlled – openly controlled – by narco-guerrilla terrorists.

So yeah, I mean, if they had a real election in Venezuela, Maduro would lose – like he did – by a lot. But obviously, the way they stay in power is they kill and jail the people who don't agree with them.

**QUESTION:** Well, I know the Biden administration – I mean, these were regimes that were largely on the ropes until we shut down our own energy production, the Keystone Pipeline, and allowed Chevron to make a deal with the Maduro regime which gave them the cash that I'm sure was siphoned off and/or funneled through back to the regime to keep them in power. I mean, I can't think of a more glaring example of basically giving a lifeline to literally a terrorist dictator than what we saw in the past.

How do we reconcile that that even happened in America, despite sort of party differences? I mean, it's so flagrant, and the fact that the media won't even talk about that, won't even talk about this; but if we do anything here, they're so vocal about any kind of change in what was ultimately a failed policy that boosted up a dictator.

**SECRETARY RUBIO:** Look, in foreign policy we want to be mature and realistic about it. You're going to have to deal with some bad people, right? You're going to have to deal with people that you don't like, people that you don't agree with, but for the purposes of foreign policy, peace, and all that kind of thing, you have to deal with them, okay?

The problem is you can't do it in a stupid way, and that's what the Biden people did. They went to Maduro and they said, okay, we're going to do a deal. You promise to hold elections, free and fair elections in like nine months or whatever, and we will immediately lift sanctions and allow you to start producing oil and getting paid for it. It was a side deal, by the way, because they didn't – they only announced that they did this deal with Chevron. What they didn't announce was that Chevron – with a side, secret deal – was allowed to pay the Maduro regime royalties. It accounted for over 25 percent of all the revenue going into that regime from oil.

So they did that deal. Well, they didn't have – you talked about the election. The election was fake. They didn't have an election. And after that, after that, they left the deal in place. They left it in place, even though they violated their word on holding free and fair elections. I think the way – if they were going to do it – and I don't think at this point you can do it – you say first you have free and fair elections, then we'll lift the sanctions. And then we'll – but they – and even if you do

it the way that the Biden people did, at least if they don't – if they break their word, undo the thing. Stop getting – allowing them to get money. But they didn't do any of that.

So I think it's one more example of stupidity in our foreign policy, which other countries look at and say, well, hell, they got away with that; we should – we could be able to get away with whatever we want as well. It's really both weakness and stupidity.

**QUESTION:** Yeah. I mean, I'm not a foreign policy wonk by any stretch, but I know enough about negotiation to say you don't give up all your leverage, you don't give the other side everything that they want before you get to the table to figure out what it is that you want. You keep maximum pressure on them so you can actually effectuate real policy changes.

**SECRETARY RUBIO:** Yeah. Well, if I want to put it in real estate terms, you don't get to say, okay, pay me for the building and I get to keep the building anyways. (Laughter.) And that's pretty much the deal they made. It's like, here's all this money for your – we want to buy your hotel or your property. We're going to send you all this money for it. But by the way, you get to keep the hotel and the property. You get the money and the hotel. That's what these guys got. They got to keep their dictatorship and their deal, but obviously President Trump is a very different kind of president, and that's over now.

**QUESTION:** I agree. Mr. Secretary, can you talk about the impact of your successful leadership and what appears to be a broader pivot into the Western Hemisphere? We've seen comparisons to the Monroe Doctrine. Can you talk about the opportunities to shake up the foundations of communism in the Western Hemisphere and build strong, long-lasting American alliances in our backyard, whether it's with Bukele in El Salvador, Milei in Argentina, María Corina Machado in Venezuela hopefully eventually, and perhaps others? What does all of that look like to you?

**SECRETARY RUBIO:** Yeah. Well, the baseline is the United States wants to be friends with our friends, right? So for a long time if you were a U.S. or pro-American ally in the region, we kind of ignored you and in some cases actually treated you bad. But if you were an irritant like Nicaragua or Cuba or Venezuela, then we made all these deals with you to make you happy, right? So we made deals with the people that hated us and we either neglected or sometimes were outright hostile towards the countries that were pro-American.

So we've reversed all of that. And you – and look, maybe I'll miss a country here, but you talk about places like Guyana, Argentina, Paraguay, Costa Rica; the president of Panama is very pro-American, meaning he wants to be our ally and our partner; El Salvador, the Dominican Republic. So we've made a concerted effort to reach out to these countries that have governments and leaders that want to be aligned with the United States, not just on regional issues but international issues, and figure out a way – we want those democratically elected leaders to go back to their people and say, hey, there's benefits to being friends of America; here are the benefits.

At the same time, it allows us to clearly define the countries that have governments that are enemies of the United States, unfortunately, in Cuba, in Nicaragua, in – and obviously the regime in Venezuela. So we identify these. And then others, we've got some tough issues to work through, like with Mexico. On fairness, I think the Mexicans are doing more today against the cartels and against migration than they have ever, ever done ever before, and obviously the credit goes to President Trump for being very strong about that. But that's an example of how positive engagement has allowed us to get things – has allowed us to reach a level of cooperation with the Mexican Government that we never have had before under previous presidents.

**QUESTION:** How would you like to see that? Because, I mean, to me that's the biggest thing. I mean, we spend in trillions in Ukraine; it doesn't matter. We – I mean, it's not really a clear and present threat to us, we – all of those things. But, I mean, the Mexican border, whether it's, honestly, a lot of the stuff I'm sure you're probably dealing with on trade as well as the cartels, with the fentanyl trade coming across and then human trafficking and child sex trafficking – I love seeing Mexico do that. What more can we do to help bolster those efforts?

Because, I mean, I think if we look at it objectively, I imagine there's probably plenty of cartel infiltration into the Mexican military. You see about X number of presidential candidates in Mexico killed, likely by the cartels.

**SECRETARY RUBIO:** Yeah, yeah.

**QUESTION:** There is undue influence. It's not like a gang in California. These are very sophisticated, very well-funded paramilitary organizations at this point. How can we help bolster that? Because when I look at 100,000 Americans dying a year – two Vietnams a year – indiscriminately across the board with fentanyl, that seems to me like the most obvious clear and

present danger to the United States of any foreign issue that we deal with, any war and any conflict.

**SECRETARY RUBIO:** Yeah, no, no doubt. So I think the first is to recognize what you just said, and that is – and I'll tell you why we recognize it. You're absolutely right. I mean, you have judges – like, let's talk about extraditions. There are people that are extraditable, like, they're wanted in the United States; they should be extradited. But they'll literally go to some corrupt judge and say, oh, that's not me, I'm not Jose Sanchez, I'm not Juan Ramirez, that's not me. And they spend 10 years in this process. And then you've got some people in that government that have been very – that want to get rid of those people, that want to take those on, and we just have to understand that in Mexico for those people to stand up and say I'm going to take on a drug cartel, it's not like you might lose the next election or be removed from office. It's like you might be beheaded. You might be killed. Your car might blow up. Your kids might and your family might be killed. Same with journalists that reveal all that.

So I think part of it is capacity building, meaning working with them. The Mexicans have capabilities. I mean, they're not – it's not a Third World country. I mean, they've got institutions there that we partner with. It's intelligence sharing, whether it's them alerting us, hey, these guys we think have crossed your border and they're operating in Tucson; or us letting them know, hey, there's a drug shipment or there's a human trafficking network moving across. Can you guys action that? So all of those sort of – all of that collaboration is going on right now as we speak, and it's more than it's ever been.

Now, there's more that needs to be done. And if you look at the border today, it's the most secure border we've probably ever had in my lifetime, that's for sure. I mean, there's just nobody crossing. In fact, one of the biggest problems we're facing or complaints we're hearing about now is that there are people that were headed here, coming up through Central America; they realized Trump won the election and he was actually serious. They made a U-turn and now they're kind of stuck in these countries along the way, whether it's Mexico or Guatemala, Honduras, whatever. They're making U-turns. So that has stopped, and I think that's – Mexicans deserve some credit for helping us on that front, because they've actually sent more national guard troops to the border than they ever have before.

Look, they've still got big problems. We've still got to deal with the fact that there are parts of Mexico where the drug cartels are way more powerful than the government. In fact, the

government might not even be present there. They are the government. It's a huge undertaking and it requires – we have to work – it's not just an us issue. I mean, it's the Department of Defense, it's Kristi Noem in DHS, it's Tom Homan, it's all of these different elements of government that are partnering with the Mexicans. This is the closest we've ever worked with them. We have a lot more to do, but this is the closest we've worked with Mexicans, the Mexican authorities, on tackling this problem, and I think there's more to be done.

**QUESTION:** That's great. Meanwhile, I guess, the State Department – we talked about visas a little bit earlier, but you guys have been sort of aggressively confronting visa holders tied to terror groups and extremism. It's sort of shocking to me that that was never done before. You would think that would be a pretty serious red flag, but apparently it wasn't. Only people who buy MAGA hats and/or Bibles would be targeted by the Biden administration. Can you lay out perhaps your mission and priorities as it relates to foreign national here on visas who are acting against America's interests?

**SECRETARY RUBIO:** Yeah. So if you go right now to a window somewhere in an embassy and apply for a United States visa, there's all kinds of reasons why we won't allow you to come in: because we think you might overstay your visa, because we don't like or have questions about some of your political activities and your views. We just won't give you a visa proactively, on the front end. My argument is if we identify people like that who we would not have given a visa to, had we known information, but now they've got a visa and now they're here and we know the information, shouldn't we ask them to leave as a result of it? In essence, if we wouldn't – if there are things about you that had we known we would not have given you a visa, we should be taking away your visa. It's as simple as that.

There's no – no one's entitled to a visa. I mean, there are all kinds of reasons why people get denied. There are people that can't tell you why their visa was denied; they just don't know. It's just we – we're not taking more people from that country, or we just – whatever it may be. So I think, at the end of the day, that's what we're trying to do right now, is we're trying to go and identify people who we have information about who, had we known that information, we never would have given them a visa. And we're revoking those visas, and they have to leave.

Now, I think everyone would tell you this – if you told me I'm applying for a student visa so I can attend a university, and while I'm at your university I'm going to become a member in support of

or even participate in groups that are going to take over libraries, spray paint monuments, start riots, bang drums all day and night, harass Jewish students – if you told me you were going to be linked to any of that stuff, we never should have given you the visa. Now that you're doing it, we should take away your visa. And that's what we're trying to do and that's what we are doing.

I know it's a lot of work, but we – it's something I wanted to do when I was a U.S. senator. I've been talking about this for two and a half years. I think it's the craziest thing I've ever seen. What country in the world – how stupid, how ridiculous is it for some country to say, "Yes, bring more people to our country that are going to disrupt and create riots in our streets and on our campuses." Who would do that? It's idiotic, and we're not doing idiotic things anymore.

**QUESTION:** Yeah. You would think that one of the major disqualifications would be on the application, if you withheld your true intentions for being there, that in and of itself would be disqualifying. And that's clearly what so many of these people are doing. They're coming in under a guise of being a student, but they're far more active in their role as activists for hate than they are actually trying to be students.

**SECRETARY RUBIO:** That's right. And look, I mean, at the end of the day one thing is you're a U.S. citizen, you go on campus, you get wrapped up in these movements – it's very unfortunate, and I think that's a societal problem we have to confront as a country, like why are the citizens of the most prosperous and freest country in the history of the world raising kids that are turning out to hate the country that made all of this possible. But another thing is to say: And by the way, we're also going to invite people into our country as guests who are going to join and foment these movements. It just makes no sense to me.

By the way, that's not the only visas that are getting revoked. That's – like if you have a DUI – if you're here on a student visa and you have a DUI or you have some other crime, that's an automatic suspension. And they weren't doing that; that wasn't happening. That should be automatic. You commit a crime while you're in this country; your visa's gone. You didn't tell us you were coming here to break the law; you told us you were coming here to study and then go back to your country. And if they're not doing that, that should be the end of the visa. And that was something that wasn't being enforced either.

**QUESTION:** Yeah. And it's not like there's not precedent for that, right? I mean, you can't get into Canada if you've had a DUI. I mean, you can't lie about an application to go to Mexico on your passports. It feels like we've had the most lax immigration laws as probably the country that most people around the world would want to get into, and yet we don't even hold ourselves to the similar standard of our neighbors and, frankly, everyone else around the world.

**SECRETARY RUBIO:** Yeah. No one else does it this way. No one else does it this way. We're the ones that – I think something has built up in the American mentality that somehow coming to America is a right, that everybody on Earth has a right to come to America legally or illegally if they want. And that's just not true. That's never been true. But that certainly can't be the standard, certainly not the legal standard. And it also makes no sense.

You – every country in the world has to be able to control who comes in, when they come in, why they came in. We have to have standards for all of that. And then you have to enforce those standards. And we just – we've just completely lost focus on that, and instead sort of created this mentality that I think really spanned both parties, that we should just allow anyone who wants to come in to come in, that our default position is yes, come in, and we'll figure it out later. And that can't be our default position anymore.

And by the way, you explain this to foreign countries – they completely understand. At least privately they completely understand.

**QUESTION:** They're all doing it. They may be outraged because they want to get rid of their —

**SECRETARY RUBIO:** Well, and the ones —

**QUESTION:** — less than desirables. But I don't think we can be the world's dumping grounds for criminals and murderers. I always talk about the statistics under the Biden – 13,000 murderers. I mean, that's Joe Biden's ICE. They knew they were murderers and let them in.

**SECRETARY RUBIO:** Yeah.

**QUESTION:** Sixteen thousand rapists and sex offenders; 600,000 criminals overall. I mean, that's insane. They knew it and we're like, "Eh, it's okay." Spread out 16,000 rapists amongst the 4,000 counties in America, four rapists per county in America. I mean,

it doesn't seem like that would go well. It's 3.6 murderers per county around the country. What good could possibly come from these things?

**SECRETARY RUBIO:** No, nothing good comes up. But it just tells you we just completely – policymaking in America became completely detached from common sense, completely detached from reality. We sort of adopted this mentality that we're welcoming – everyone who wants to come in, come in.

You know who else had that mentality? A bunch of countries in Western Europe that now deeply, deeply regret it. The Germans made the decision let everybody in, let everybody in. And now everybody in Germany is like – and all over Europe is like, okay, we made a big mistake here. Obviously, we're a bigger country, but we've made similar mistakes, right? And we can't let that continue to happen.

**QUESTION:** Well, I mean, Europe feels like it's over. And it feels like they're – actually recognize that, and they can't really do much about it. But we've had our own issues here as well. I mean, I know under the previous administration, the State Department made DEI 20 percent of Foreign Service officer performance. I mean, DEI – I don't know what that has to do with Foreign Service officer performance. But what did you find out as you got in there, and what are you doing to fix the issue of that? Because none of that seems accretive to anything that the State Department would actually need to be doing.

**SECRETARY RUBIO:** Yeah. I think what you find is that you end up sort of losing focus on promoting people on the basis of merit. And we have very good, talented people here that never got promoted or got stuck in mid-level ranks. I mean, they have to wait 25 years to be an ambassador somewhere, or 30 years. And then it's all because of some – how some supervisor judged you based on some scorecard.

It's like anything else. People are – you're going to get what you reward. You're going to get what you value. It's the reason why we keep – why we score tests. It's the reason why we have points in sports. We want to know who won and we want to know – we want to reward good behavior. We want to award good – we want to reward good qualities and we want to diminish bad ones.

Case: 26-6906, 11/20/2026, DktEntry: 16.8, Page 290 of 300


So we're changing that standard. We want to promote people within the State Department on the basis of how good they are at their job. And there are different jobs people do here. Some people are on Consular Affairs, which are the ones that review visas. Some people are diplomats or economic officers, whatever it may be. But we want people rewarded on how competent they are, how good they are at their job. And frankly, what I think that opens the door to is the ability to promote people that maybe have been here 10 years instead of 25, but really are better than the people that have been here 25 years. You know what I mean?

I mean, otherwise, you start to lose talented workforce. Imagine you're in the Foreign Service. You're there for 12 years. You realize there's another 10 years before I get promoted to anything. And by the way, it all depends on how somebody judged me on some scorecard about whether I hit some DEI metrics. So we're getting rid of that in terms of how we judge and analyze our workforce, and I think it's going to give us a more accurate way to promote people. I think it's going to help us with recruiting. I think we're going to be able to —

**QUESTION:** Yeah. Oh, and people need to know that they have a chance. If you have good talent, to your point, they don't want to know – and you've probably dealt with this in Congress; I saw that all the time. It's like people who have no business being on the most prestigious committees end up on these committees because they've been there longer and therefore have some sort of tenure, but they're making trillion-dollar decisions about something that they don't understand, whereas a freshman congressman, senator may end up there but they – their life's work was exactly that. So they actually know what they're talking about, but they have no chance of ending up in these places.

So it's really hard to recruit talent if they know that they may be more qualified than the people that are going to get that job and they've got to sit there for 25 years, not because they don't deserve it but because they just haven't been there long enough.

**SECRETARY RUBIO:** Yeah, and understand, like, nobody goes into the Foreign Service thinking they're going to become millionaires working for the U.S. Government. They do it because they want to be involved in foreign policy, they want to get around the world or what have you. But I think we're going to have trouble attracting people to that career, and I think we're going to have trouble retaining people in that career, given all the other opportunities that now exist out there, if they don't see a pathway to fulfillment, professional fulfillment.

**QUESTION:** Yeah.

**SECRETARY RUBIO:** And so I think that's going to help us do that, but I also think it's going to help us place the right people in the right places, because we're going to be judging them on the basis of how good they are at their job, which really should be how we make decisions about everything. I always go back to sports. If you think about it, I mean, how do we judge who gets to – who's on a team or who gets to play? And it's basically very simple, and that is your performance in practice and in games that determine ultimately who you put on the field or on the court or whatever it may be. And that's how we need to do it at all levels, including here in government.

**QUESTION:** Well, yeah, I'm glad that you're making that change. But how do you see all of that – whether it's the DEI stuff, et cetera – how does all of that tie into the scandal surrounding USAID? What's the status of USAID today? Is it gone? Is what's left of it now kind of completely within your authority to oversee? I know you've assembled a tough and courageous team, including top deputy Chris Landau, Acting Under Secretary Darren Beattie, who's been on this show many times, and others. What's it all mean and how do we combat sort of that years of just insanity, actually?

**SECRETARY RUBIO:** Well, I think that foreign aid is something that we need to do and we're going to continue to do, but every dollar we spend in foreign aid has to achieve at least one of three objectives. It has to make America stronger, it has to make America more prosperous, or it has to make America safer. If the program doesn't do one of those three things, it may be a great cause and I encourage the Gates Foundation or charities all over the world to take it up, but it has to be one of those three things.

I think the other big mistake that happened with foreign aid is we turned it into a tool to export our domestic policies of the far left, right? So the far left decided these are things that we think are good and it also became cultural imperialism. We began to use foreign aid not as a way to make America stronger, safer, more prosperous, but as a way to impose – impose – the domestic political agenda of the left onto foreign countries. And it became a vehicle for that.

I think the third thing that developed over time is what I call the foreign aid industrial complex. And I'm talking about dozens and dozens of these nongovernmental organizations, these NGOs, that were raking in hundreds of millions of dollars to run these programs on behalf

of the U.S. Government. And it came out – and this is not me; Samantha Power would have said this – you have to spend – in order to get $12 million to people directly, you have to spend $100 million. You have to spend 100 million to get 12 million out to – directly, because you have to pay the NGO and then the subcontractor then the sub-sub and the sub-sub-sub. And before you know it, you're paying Hamas to hand out food or whatever. And that has to stop and that has to end.

So we conducted a review of 6,000 programs, almost 6,000 programs, at USAID. We identified close to 900 that we are going to continue to do, either in their current form or amended. We canceled 5,000-some of those contracts, and now the goal is to bring all of those programs under the State Department so that we can directly review – because remember, USAID was separate from the State Department. They did whatever they wanted.

**QUESTION:** Yeah. Well, it feels like that was on purpose, right? Once it's at the NGO level, all of a sudden there's no oversight, so who knows where that money is going? I've always wondered, as you watch – that stuff gets discovered by DOGE, and within three days the top seven people at Act Blue, the big Democrat fundraising apparatus, all of a sudden magically disappear. And I've always wondered for years: How is it that they're raising 5x for every congressional seat that – what we can run, how is it that they're raising 10x on some of them? Do you think there's any ties there to this money basically just being kicked back to Democrat – the fundraising apparatus and/or other shady things? Because I – I just don't believe in enough coincidence anymore to believe that was just – magically happened at the same time.

**SECRETARY RUBIO:** Well, some of that's been referred to the Justice Department to look at, but what I can tell you most definitely is that there are people that have made a lot of money by being part of the foreign aid industrial complex, by being part of this network of NGOs who do things. And then some of it, frankly, just didn't make any sense, right? Like you – I just came back from a trip to the Caribbean where I went to Jamaica, I went to Guyana, and I went to Suriname – the Caribbean Basin. And their number one complaint is that USAID-funded NGOs didn't partner with government, right? And then – and you can even go to embassies.

By the way, this is not really well understood. There's always been tension between State Department and USAID, because there's some ambassador that's like, okay, I'm trying to get – we're trying to get good relations. The foreign policy of the U.S. is to have good relations with the

leader of this country. And then USAID, operating out of their embassy, is, like, funding the political opposition of that leader that —

**QUESTION:** Yeah, or, like, trans Elmo in places where let's just say that's not as popular as it is in California.

**SECRETARY RUBIO:** Another example, right, these sorts of things that you see. But in the case of the Caribbean, it's like, okay, they want to spend all this money on these literacy programs out in the countryside – which we're not against as a government – we're fine with that. The problem is that we can't even get to those schools, kids can't even go to school, until we first, like, get rid of the gangs that are threatening kids from going to school. So our number one priority, if you want to help us, help us with what we need. Don't help us with what you want, which is to get into these rural schools, where now you start indoctrinating people on the social priorities of the far left in the United States. It's part of that exporting of it.

So we're going to realign foreign aid, so we're actually going to be helping countries with what they generally need. And a lot of these countries, it's security assistance. What they want to do is they want to be able to build up police departments and security forces so they can become self-sufficient at taking on these gangs and not require foreign aid in the future. The best foreign aid is foreign aid that ultimately ends because it's successful, because you go in, you help somebody, they build up their capacity, and now they can handle it themselves, and they don't need foreign aid anymore. That's what foreign aid should be geared towards, not perpetual – these programs exist for 25 years. If a foreign aid program has been going on for 25 years, it has not achieved its purpose because it hasn't solved the problem.

**QUESTION:** I think that's very well said. I think, unfortunately, that machine wants to keep those people employed in whatever else they're doing. So, yeah, that's what I was wondering, sort of a – it felt like one big sort of grift, kickback apparatus. Perhaps it's incompetence, but I don't believe that either. I think these people have been very well entrenched, so I'm really glad to see you taking all of that on.

So as we wrap, because I know your time is a little limited today, I do want to say just what an incredible job I think you're doing with this.

**SECRETARY RUBIO:** Oh, thank you.

**QUESTION:** It's been so great to see this cabinet, people just getting together, not sort of taking on the positions that they would have otherwise. And I think even your worldview – JD's worldview, so many of these guys – probably has really evolved over the last 10 years. I'd love to hear how you see that happening but also how you'd like to sort of assess the almost first 100 days, and what do you see in store for the next 100?

**SECRETARY RUBIO:** Yeah. First of all, on your worldview – our worldview should always be under examination because the world is constantly changing. Like, anyone who has the same worldview today that they had 15 years ago is lost, because the world looks nothing like it did 15 years ago. So as circumstances change, the way you approach the world has to change. We're different – we're in a very different era. Fifteen, 20 years ago, we were the sole uni-power force in the world. We took on a lot of causes because nobody else could. The world looks a little different right now for a lot of different reasons. So I think it's been a very busy – clearly, like I was just saying before we went on the air here with this, that every day here feels like six months' worth of work on every front.

**QUESTION:** Yeah.

**SECRETARY RUBIO:** As you know, the President is pushing very hard on every front to get everything done, and I think he has two advantages. The first is he was president, so it's been the fastest transition you've ever seen because this is not – there was no on-the-job learning here. It was go.

I think the team is also a very good team of people that have known each other for a long time. I mean, I look at this cabinet meeting, I look around the room; I've known almost everyone in that room for at least a decade, and you have had relationships with them even before they were in government. I mean, Pete Hegseth I've known for a long time. You name it. And you go – Pam Bondi's from Florida. I've know her for almost 20 years. These are people you've worked with before, and they're all aligned with the President's vision.

I think the first time, in the first term, not to be critical of anybody, but I think the President, he wins the election and then he sort of said – they sort of bring in people and say, look, these are the people in the Republican Party that do this kind of stuff. I think now, having the advantage of having been there before and so forth, he had the ability to put together a team of people who are responsive to the President's tasking to the extent that it's not even a problem, to the extent

that what I'd say what has been challenge is the challenge is we're moving so fast, there's so much to do, everyone is so eager to deliver, that you need 26 or 27 hours in the day, because we work for someone that apparently has found a way to fit 27 hours in a 24-hour day in terms of how he works.

And so – but it's exciting to be a part of. You – we truly feel like we are making changes and decisions today in the positions we're in that are going to dramatically improve our country and life in America for two generations. Like, we feel like we're about – on achieving that, not just here in the State Department but on matters of trade, international relations, domestic economics, rebuilding our industrial capacity. And I think the President has assembled a great team to do it, and obviously he's always – he's always pushing hard, as you know better than anyone. It doesn't – what have you done – it's what you did yesterday doesn't matter.

**QUESTION:** It doesn't matter how many wins you rack up.

**SECRETARY RUBIO:** Exactly. (Laughter.)

**QUESTION:** If you get that call at 6:00 a.m., "What have you done for me lately, Marco?"

**SECRETARY RUBIO:** That's right. Why are we not undefeated? And why didn't we win by 20 instead of 15? We got the championship, oh, but why didn't we win by 20 or 25? And it's good. That's the way you push the envelope and that's the way you achieve excellence.

**QUESTION:** Well, Secretary Rubio, thank you so much for the time. I really appreciate it. Keep up the great work. I look forward to seeing so many more great things coming out of the State Department and so much more. Thank you.

**SECRETARY RUBIO:** Yeah. Awesome. Thank you. Thanks for having me on.

---

TAGS

[Bilateral Relations and Engagement] [Bureau of Western Hemisphere Affairs] [Crime]

Drugs and Drug Trafficking | El Salvador | Elections | Energy

Foreign Assistance and Humanitarian Aid | Foreign Governments | Foreign Policy

Office of the Spokesperson | Outreach and Engagement | The Secretary of State

U.S. Agency for International Development (USAID) | Venezuela

---

White House

USA.gov

Office of the Inspector General

Archives

Contact Us

Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

# EXHIBIT 38

# DHS to Begin Screening Aliens' Social Media Activity for Antisemitism

Release Date : 04/09/2025

**WASHINGTON**— Today U.S. Citizenship and Immigration Services (USCIS) will begin considering aliens' antisemitic activity on social media and the physical harassment of Jewish individuals as grounds for denying immigration benefit requests. This will immediately affect aliens applying for lawful permanent resident status, foreign students and aliens affiliated with educational institutions linked to antisemitic activity.

Consistent with President Trump's executive orders on Combatting Anti-Semitism, Additional Measures to Combat Anti-Semitism and Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats, DHS will enforce all relevant immigration laws to the maximum degree, to protect the homeland from extremists and terrorist aliens, including those who support antisemitic terrorism, violent antisemitic ideologies and antisemitic terrorist organizations such as Hamas, Palestinian Islamic Jihad, Hezbollah, or Ansar Allah aka: "the Houthis."

"There is no room in the United States for the rest of the world's terrorist sympathizers, and we are under no obligation to admit them or let them stay here," said DHS Assistant Secretary for Public Affairs Tricia McLaughlin. "Sec. Noem has made it clear that anyone who thinks they can come to America and hide behind the First Amendment to advocate for anti-Semitic violence and terrorism – think again. You are not welcome here."

Under this guidance, USCIS will consider social media content that indicates an alien endorsing, espousing, promoting, or supporting antisemitic terrorism, antisemitic terrorist organizations, or other antisemitic activity as a negative factor in any USCIS discretionary analysis when adjudicating immigration benefit requests. This guidance is effective immediately.

For more information on USCIS and its programs, please visit uscis.gov or follow us on X (formerly Twitter), Instagram, YouTube, Facebook and LinkedIn.

Last Reviewed/Updated: 04/09/2025

Need Help?
Chat with Emma™

# EXHIBIT 39

**Aaron Rupar**
@atrupar.com
+ Follow

HEMMER: Will Mahmoud Khalil be deported?

STEPHEN MILLER: Yes he will, as will anyone who preaches hate for America.




April 14, 2025 at 9:34 AM Everybody can reply

**282** reposts **224** quotes **1K** likes

484 506 1K

AAUP-01466