**No. 26-6906**

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

**STANFORD PUBLISHING CORPORATION, *et al.*,**

*Plaintiffs-Appellees,*

**v.**

**MARCO RUBIO, *et al.*,**

*Defendants-Appellants.*

**Appeal from a Judgment Issued by the U.S. District Court for the Northern District of California (Civil Action No. 5:25-cv-06618-NW)**

# DEFENDANTS-APPELLANTS' EXCERPTS OF RECORD VOLUME 8 of 15

**JONATHAN D. GUYNN**
**Acting Assistant Attorney General**
**Civil Division**

**DREW C. ENSIGN**
**Deputy Assistant Attorney General**

**AUGUST E. FLENTJE**
**Special Counsel for Immigration Litigation**

**SAMUEL P. GO**
**Assistant Director**

**JAMES A. HURLEY**
**Trial Attorney**
**Office of Immigration Litigation**
**U.S. Department of Justice Civil Division**
**P.O. Box 878, Ben Franklin Station**
**Washington, D.C. 20044**
**T: (202) 305-1889**
**F: (202) 305-2509**
**james.hurley@usdoj.gov**

**JAIME DURR**
**DOMINIC WEISS**
**Trial Attorneys**

**Date: November 20, 2026**

**Attorneys for Respondent**

# EXHIBIT 40

An official website of the United States Government Here's how you know

U.S. DEPARTMENT *of* STATE



★ ★ ★

# Secretary of State Marco Rubio with Ben Shapiro on the Ben Shapiro Show

**INTERVIEW**

**MARCO RUBIO, SECRETARY OF STATE**
**WASHINGTON, D.C.**

APRIL 17, 2025

**QUESTION:** Joining us on the line, Secretary of State Marco Rubio. Secretary Rubio, thanks so much for joining the show. Really appreciate it.

**SECRETARY RUBIO:** Thank you. Thanks for having me on.

**QUESTION:** So let's talk about this major move that you just made at the State Department getting rid of a big chunk of the censorship bureaucracy that had been created and pushed a while back but then exacerbated over the course of the last few years, hidden. What's the story with what you are doing over at the State Department to get rid of the body formerly known as the Global Engagement Center?

**SECRETARY RUBIO:** Yeah, I think you have to understand the history behind it. It's real brief. They started it by saying al-Qaida, ISIS, all these terrible groups are radicalizing people online, we should do something about it. Back when they came up with that 12 years ago, whatever it was, people were like, well, whatever, it makes sense.

Cookie Settings

And then it metastasized and it's like, oh, there's foreign interference in our elections, we need to start going after that. Well then, by 2020, it became a moment to go after voices inside of American politics and begin to label people. And they put a guy in charge who basically was going around saying Trump is – Trump speaks just like these foreign terrorists, his supporters speak just like these foreign terrorists – so now you have an individual running a State Department entity that was labeling American speech by Americans as foreign interference.

And then really, the kicker was not only were they doing all that formally from the State Department, but they were taking State Department money and they were giving it to these third-party groups who are supposed to be like independent, verified arbiters of what's true and what isn't, what's good and what's bad. And these groups were deliberately targeting – I believe you were one of the ones they targeted, I think the Federalist – began putting labels on people.

Now you may say okay, "Well, what's the importance of a label?" Well, that's not just the issue here. The issue is not only did they put labels on people; that was then used to go to social media companies, it was used to go to outlets and say you have to deplatform these people or you have to cut back on how much views they're getting, you have to go after them – in essence, silence them.

So in essence, it metastasized and the metamorphosis into a government-run entity that was targeting political speech in America, labeling it disinformation, and silencing it – all paid for by the American taxpayers directly and indirectly. And that ends.

So what happened when we took – right before we took over, they got rid of this Global Engagement Center, they renamed it, and moved it somewhere else. But renaming something doesn't change it; you still leave the thing around.

So we've undertaken 12 weeks of looking how do we reorganize this whole thing, how do we get rid of it, how do we – and that's what we're announcing today is we're taking the whole thing down. And it's about $50 million. I mean, it's not a small amount of money. And we're not going to be in the business of doing this anymore. In fact, we're going to be in the business of promoting free speech in America and around the world as a core American value, and that really is what we're going to be about right now.

And we're also going to go back and look at, as an accountability project, all of the instances in which this was used as a weapon against American political voices. And the reason why that's

important is not just because of accountability; it's to make sure it never happens again. You document these things so that someone in the future, when they get some bright idea like this, realize why we shouldn't do it, because this is what it turns into.

**QUESTION:** And Secretary Rubio, it's a really good object lesson in what happens with some of these government agencies which started off decades ago with the right purposes and then gradually are infiltrated by people with a significant political partisan agenda, who then proceed to weaponize these institutions against Americans. We've seen this in USAID.

**SECRETARY RUBIO:** Correct.

**QUESTION:** Obviously we see this here with the GEC turned into another sort of body that was then hidden inside these agencies. I mean, when people like President Trump talk about the deep state, this is the kind of stuff that he's talking about.

**SECRETARY RUBIO:** Yeah. So USAID is another great example. Humanitarian aid – it was created for development and humanitarian aid. Where it really went off the rails is when humanitarian aid and development aid was turned into: How do we infuse domestic political priorities into what we fund around the world? So when it became a domestic political priority to take on transgender rights, now all of a sudden you've got programs by Americans couched as humanitarian or development aid in other countries around the world. In essence, they injected domestic political considerations into foreign aid, and the result is now it has to be rolled back. So it's another example.

We're going to continue to do humanitarian aid. What we're not going to do is use humanitarian aid to spread a domestic ideological movement globally. We're not going to do that.

**QUESTION:** Secretary Rubio, obviously this is a – it's a big move by the State Department. You've been making a lot of moves over at the State Department that are different than your predecessor's. That includes moves to get out of the United States people who are terrorist supporters, not just people who say bad things but people who are actual terrorist supporters, act in ways that are conducive to actual terror groups.

I wanted to give you a moment to sort of explain the approach that the State Department is taking in taking a look at, for example, student visa holders.

**SECRETARY RUBIO:** Right.

**QUESTION:** What are the standards that are being used to determine whether somebody should stay in the United States or should go? Because obviously opponents of the administration are arguing it's violations of free speech, people have the ability to say what they want. That's not an argument that the administration is actually arguing with. The administration is not trying to crack down on free speech. You're trying to actually stop something else.

**SECRETARY RUBIO:** Yeah. Well, let's start with a baseline, okay? No one is entitled to a student visa to the enter the United States. No one. It's not a constitutional right. It's not a law. Every day, consular officers on the ground in face-to-face interviews are denying people visas for all kinds of reasons – because we think you're going to overstay, because we think your family member is a member of a drug ring, whatever it may be. We deny visas every day all over the world. No one is entitled to a visa. Let's start with that, because I hear some of this reporting out there like if somehow we – you're allowed to have a visa unless we can come up with a reason why you shouldn't have one. That's not true. The burden of proof is the other way.

Now, let's say you go to a window somewhere in the world and say, "I want to go to the United States to study at a university," and as part of that interview it comes out you think Hamas is actually a good group. We probably would not let you in. I would hope we wouldn't let you in. Okay?

But let's say we don't ask you that question and you get into the U.S. on a student visa, and all of a sudden it becomes obvious you think Hamas is a good group. Well, then we should revoke your visa. In essence, if we would have denied – if we had learned things about you once you're here that would have caused us to deny you a visa when you were overseas, that's grounds for revocation. It is not in the national interest of the United States, it's not in our foreign policy interest, it's not in our national security interest, to invite people onto our university campuses who are not just going to go there to study physics or engineering but who are also going to go there to foment movements that support and excuse foreign terrorist organizations who are committed to the destruction of the United States and the killing and the raping and the kidnapping of innocent civilians, not just in Israel but anywhere they can get their hands on them. That's not in our national interest.

So we have a right to deny visas before you get here, and we have a right to revoke them if we believe that your presence in our country undermines our national interest, our national security, and our foreign policy. And that's what we intend to do.

Now listen, there are other student visas that are being canceled that have nothing to do with us, by the way. And that has to do with someone, for example, who is here on a student visa and has a DUI. And I don't know – that's not us. That's DHS. But I don't know if people realize if you commit a crime while you're in the U.S., that's an automatic grounds for revoking your visa. And no one was ever doing it. They weren't doing it. They weren't cross-referencing the system. Now they're starting to do that.

So that's the majority of these, but we have identified – I can't tell you the exact number because it's static and it's constantly moving, but when someone is presented to me and it's clear that this person is a supporter of a foreign terrorist organization, we're going to remove them from the country. You're not going to be here; it's just that simple. What a stupid thing, what a ridiculous thing, to invite people in your country so they can be part of these movements that are terrorizing fellow students, tearing up campuses, shutting down campuses. We have campuses in America that couldn't even operate for weeks. People couldn't go to class. Are we – are we crazy? What other country in the world would allow this? We shouldn't allow it.

**QUESTION:** Secretary Rubio, I think that the controversy that's arisen over, for example, the detention of Mahmoud Khalil, who is one of the students at Columbia University who has a green card but who was also engaged in protest activities that violated the law, who obviously was sympathizing openly with terror attacks by Hamas and all the rest of this, that the sort of controversy here, there's a common thread to the opposition to the Trump Administration on this stuff, which is, as you mentioned, this bizarre idea that people are somehow owed entry to the United States.

I think that ties in very strongly to the Democrats' new approach to what's going on with this Salvadoran migrant who's now been deported to El Salvador. The administration has taken a legal position that basically, now that he's in Salvadoran custody, that it's up to the Salvadorans whether to return this person to the United States or not for further due process concerns.

But that's really not the case that's being made by opponents of the administration. Many of the opponents of the administration are making a more significant case, which is the idea that basically, if you get into the United States, you are somehow owed a permanent status in the United States. And you're seeing this across the board, ranging from the Trump Administration's moves to get rid of temporary protected status for people who have entered en masse under the Biden administration, to the resistance to DHS or the State Department making moves with regard to the tens of millions, possibly, of illegal immigrants who have brought into the country

by the Biden administration. There is this bizarre supposition that everyone on Earth is somehow owed passage to the United States and permanent membership in our society.

**SECRETARY RUBIO:** Yeah, and I think it explains to you why we have the immigration crisis that we had. And it was the belief – they would all say we believe we should have immigration laws, of course, but if you get into the United States you should be allowed to stay; if you make it here illegally, no matter how you got here, then you should be allowed to stay. I mean, I think that that mindset that's being revealed in these cases tells you how you get 12, 13, 14, 20 million people entering the country unlawfully and illegally over the last few years, because of this mindset that, yeah, we have immigration laws, but we don't really mean it; once you get in, you should be allowed to stay here indefinitely, and we have some sort of obligation to accommodate you here in the country. That's how you create this mindset that led to that crisis, and people know it.

It's all incentive based. People believed under Joe Biden – rightfully, they believed – if I could just get across the border, I'm going to get to stay. And in 90-something percent of the cases they were absolutely right, and that's why more people kept coming. There's a reason why no one's coming now. You know one of the problems I'm facing right now with countries in Central America and the Western Hemisphere? U-turns. A lot of people were headed here, they realized Trump was serious, they made a U-turn, and now these countries are complaining, oh, they're stuck in my country. Well, you facilitated their transit for years. And now they're stuck with them as a result of it.

But that's actually happening. Why? Because the incentives are no longer to come; the incentives are not to come. It's been successful. It's the most secure border we've had in my lifetime, I mean, if you just think about it. And it's not just because there are people there. It's because people aren't coming anymore because they know that the President is serious about enforcing our immigration laws.

**QUESTION:** Well, Secretary of State Marco Rubio, really appreciate your time. Thanks for what you're doing inside the State Department to get rid of shadow organizations designed to crack down on free speech, as well as to move people out of the United States who actually don't like America very much. Secretary of State Rubio, thanks so much for stopping by.

**SECRETARY RUBIO:** Thank you. Thanks for having me.

TAGS

Office of the Spokesperson

The Secretary of State

White House
USA.gov
Office of the Inspector General
Archives
Contact Us

Privacy Policy
Accessibility Statement
Copyright Information
FOIA
No FEAR Act

# EXHIBIT 41



**Tricia McLaughlin**
@TriciaOhio

When you advocate for violence, glorify and support terrorists that relish the killing of Americans and harass Jews, that privilege should be revoked and you should not be in this country.

We have the law, facts and commonsense on our side.

No judge, not this one or another, is going to stop the Trump Administration from restoring the rule of law to our immigration system. x.com/cbsnews/status...

This post is unavailable.

Last edited 1:27 PM · Apr 30, 2025 · **17.2K** Views

37 81 332 10

# EXHIBIT 42

HOURLY NEWS
Play Live Radio
LISTEN LIVE
MY PLAYLIST

npr

DONATE

NATIONAL

# Federal court rules Rümeysa Öztürk must be transferred to detention in Vermont

UPDATED MAY 7, 2025 · 1:36 PM ET

Sergio Martínez-Beltrán




People take part in a rally and a protest in solidarity with Rumeysa Ozturk and Mohsen Mahdawi outside New York Federal Court as the court hears the U.S. government request to appeal the decisions in their cases in New York, United States on May 06, 2025.

*Mostafa Bassim/Anadolu via Getty Images*

A federal appeals court in New York Wednesday ordered the Trump administration to transfer Rümeysa Öztürk, a Tufts University doctoral student, from Louisiana to

Vermont to continue her immigration detention in that state while a judge there decides whether to release her on bail.

The Trump administration has one week to comply with the transfer, a three-judge panel of the 2nd U.S. Circuit Court of Appeals ruled.

"The District of Vermont is likely the proper venue to adjudicate Öztürk's habeas petition because, at the time she filed, she was physically in Vermont," the panel wrote in its ruling.

Sponsor Message

Öztürk has been detained at a federal facility in Louisiana after being arrested on the street in Somerville, Massachusetts on March 25 by six federal plainclothes immigration agents. The Department of Homeland Security later accused her of engaging "in activities in support of Hamas."

Last year she wrote an opinion essay in a university paper criticizing the school for its handling of a handful of resolutions passed by the student senate related to the Israel-Hamas war in Gaza, including one calling on the university's president to acknowledge and condemn "the Ongoing Genocide in Gaza."

Her attorneys say she's being held in violation of her free speech and due process rights and that the government has not shown any evidence she supports terrorism. She has not been charged with any crime.

"No one should be arrested and locked up for their political views," said Esha Bhandari with the ACLU, which is representing her in federal court. "We're grateful the court refused the government's attempt to keep her isolated from her community and her legal counsel as she pursues her case for release."

In a statement to NPR, DHS Assistant Secretary Tricia McLaughlin said having a visa to live and study in the U.S. "is a privilege not a right."

"Today's ruling does not prevent the continued detention of Ms. Ozturk, and we will continue to fight for the arrest, detention, and removal of aliens who have no right to be in this country," McLaughlin said.

In court documents, the Trump administration has claimed that ICE sent Öztürk and other students to Louisiana because there was not enough detention space in immigration facilities where they were arrested.

But a federal judge in Massachusetts found earlier last month that there were detention beds available in Maine, a state closer to Vermont than Louisiana.

Wednesday's ruling by the 2nd Circuit Court of Appeals is a win for Öztürk. Legal experts have said that fighting deportation is more challenging in Louisiana than in Vermont. Any appeal from the southern state would be considered by the 5th Circuit Court of Appeals, one of the most conservative courts in the nation.

Öztürk's attorneys say she suffers from asthma attacks that have worsened in detention.

She is one of several international students arrested by the Trump administration as part of its crackdown on foreign students who express what the administration claims is support for terrorism and create a hostile environment for Jewish students.

A federal judge in Vermont has scheduled a bail hearing for Öztürk for Friday.

us immigration donald trump student activism israel-hamas war

## The White House is one step closer to defunding public radio.

The House has voted to claw back all federal funding for public media, and the proposal now moves to the Senate.

**We're running out of time to protect public radio's essential news, music, and emergency broadcast services to communities across the nation.**
Those in rural areas — with few other options to get their news and information — will likely be the hardest hit.

But you can still stand up for public radio.

**Spend 10 seconds at the link below.**
The consequences of this vote fall directly on the Americans who rely on local, independent stations serving communities across the country. Take action.

**SAVE PUBLIC MEDIA**

READ & LISTEN

**Home**

**News**

**Culture**

**Music**

CONNECT

**Newsletters**

**Facebook**

**Instagram**

**Press**

**Podcasts & Shows**

**Public Editor**

**Corrections**

**Transcripts**

**Contact & Help**

ABOUT NPR

**Overview**

**Diversity**

**NPR Network**

**Accessibility**

**Ethics**

**Finances**

GET INVOLVED

**Support Public Radio**

**Sponsor NPR**

**NPR Careers**

**NPR Shop**

**NPR Events**

**NPR Extra**

---

terms of use

privacy

your privacy choices

text only

© 2025 npr

# EXHIBIT 43



**Secretary Marco Rubio**
@SecRubio

We are reviewing the visa status of the trespassers and vandals who took over Columbia University's library.

Pro-Hamas thugs are no longer welcome in our great nation.

9:44 PM · May 7, 2025 · **2.1M** Views

5.2K 14K 96K 1.2K

AAUP-01480

# EXHIBIT 44

**Tricia McLaughlin** @TriciaOhio

If you are in this country on a visa, green card or otherwise, you are a guest.

Act like it.

If you are pushing Hamas propaganda, glorifying terrorists that relish the killing of Americans, harassing Jews, taking over buildings, or other anti-American actions that we have seen lately on these campuses, you can book yourself a ticket home. You can expect your visa will be revoked.

> **Eden Yadegar** @edenyadegar · May 7
> RIGHT NOW AT COLUMBIA: Masked anti-Israel students just broke into the library during finals week.
>
> Columbia Public Safety unsuccessfully attempted to stop them.




10:26 AM · May 8, 2025 · **54K** Views

62 181 775 16



AAUP-01481

# EXHIBIT 45

*The* WHITE HOUSE

FACT SHEETS

# Fact Sheet: President Donald J. Trump Takes Forceful and Unprecedented Steps to Combat Anti-Semitism

The White House

January 30, 2025

**COMBATING ANTI-SEMITISM IN THE UNITED STATES:** Today, President Donald J. Trump signed an Executive Order to Combat Anti-Semitism.

- Expanding on his Executive Order 13899, President Trump's new Order takes forceful and unprecedented steps to marshal all Federal resources to combat the explosion of anti-Semitism on our campuses and in our streets since October 7, 2023.
- Every Federal executive department and agency leader will review and report to the White House within sixty days on *all* criminal and civil authorities and actions available for fighting anti-Semitism.
- Immediate action will be taken by the Department of Justice to protect law and order, quell pro-Hamas vandalism and intimidation, and investigate and punish anti-Jewish racism in leftist, anti-American colleges and universities.
- The Order demands the removal of resident aliens who violate our laws.

**GOING ON OFFENSE TO ENFORCE LAW AND ORDER AND TO PROTECT CIVIL RIGHTS:** Immediately after the jihadist terrorist attacks against the people of Israel on October 7, 2023, pro-Hamas aliens and left-wing radicals began a campaign of intimidation, vandalism, and violence on the campuses and streets of America.

- Celebrating Hamas' mass rape, kidnapping, and murder, they physically blocked Jewish Americans from attending college classes, obstructed synagogues and assaulted worshippers, and vandalized American monuments and statues.
- The Biden Administration turned a blind eye to this coordinated assault on public order; it simply refused to protect the civil rights of Jewish Americans, especially

students. According to a December 2024 U.S. House of Representatives Staff Report on anti-Semitism, "the failure of our federal government departments and agencies is astounding."

**PRESIDENT TRUMP KEEPS HIS PROMISES AND BUILDS ON HIS SUCCESS:** In his first term, President Trump kept his biggest promises:

- He moved the American Embassy in Israel to Jerusalem: After decades of broken promises and despite much criticism, President Trump was the President who finally kept his commitment to Israel to move the American embassy from Tel-Aviv to Israel's true and rightful capital: Jerusalem.
- He established the Abraham Accords: President Trump delivered the greatest breakthrough for peace in the Middle East in decades by brokering the normalization of ties between Israel and the United Arab Emirates, Bahrain, Sudan, and Morocco, protecting Israel and Jews and spreading security and prosperity to the entire region.

Now, President Trump has promised that the Federal Government will:

- Protect the civil rights of our Jewish citizens: "My promise to Jewish Americans is this: With your vote, I will be your defender, your protector, and I will be the best friend Jewish Americans have ever had in the White House."
- Aggressively enforce the law, protect public order, and prosecute anti-Semitic crimes: "I will issue clear orders to my Attorney General to aggressively prosecute terroristic threats, arson, vandalism and violence against American Jews."
- Deport Hamas Sympathizers and Revoke Student Visas: "To all the resident aliens who joined in the pro-jihadist protests, we put you on notice: come 2025, we will find you, and we will deport you. I will also quickly cancel the student visas of all Hamas sympathizers on college campuses, which have been infested with radicalism like never before."

NEWS

ADMINISTRATION

ISSUES

CONTACT

EOP

VISIT

GALLERY

VIDEO LIBRARY

AMERICA 250

FOUNDING FATHERS

Subscribe to The White House newsletter

Your email

SIGN UP

Text POTUS to 45470 to receive updates

THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

WH.GOV

Copyright

Privacy

# EXHIBIT 46

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



# Privacy Impact Assessment

for

## Immigration and Customs Enforcement Operational Use of Publicly Available Information Including Social Media Information for Law Enforcement Investigations

**DHS Reference No. DHS/ICE/PIA-064**

**December 15, 2023**

Homeland Security

## Abstract

The U.S. Department of Homeland Security (DHS) U.S. Immigration and Customs Enforcement (ICE) has a statutory mission to enforce the nation's immigration laws and combat transnational crime. To achieve its mission, ICE personnel collect information from a variety of sources, including publicly available information on the internet and on social media platforms. ICE personnel use publicly available information found on the internet, including on social media platforms, in support of ICE's law enforcement mission. ICE is conducting this Privacy Impact Assessment (PIA) because some of the publicly available information that its personnel collect, maintain, or share may include personally identifiable information (PII).[1] This Privacy Impact Assessment focuses on the collection and use of publicly available information including social media information for law enforcement investigations, leaving in-depth analysis of maintenance and sharing to the respective Privacy Impact Assessments for ICE systems in which the data is ultimately stored. These systems are listed in the Appendix to this Privacy Impact Assessment.

## Introduction

To fulfill its statutory mission, ICE uses a variety of sources from which it collects information related to criminal investigations and immigration enforcement matters. Accordingly, ICE may access, collect, and use information available on the internet and social media platforms,[2] including publicly available information as one of its information assets.[3] ICE maintains compliance with DHS Directive 110-01, *Privacy Policy for Operational Use of Social Media,*[4] and

[1] DHS defines "personally identifiable information" as any information that permits the identity of an individual to be directly or indirectly inferred, including any other information that is linked or linkable to that individual, regardless of whether the individual is a U.S. citizen, lawful permanent resident, visitor to the United States, or employee of or contractor to the Department. *See* DHS INSTRUCTION MANUAL 047-01-007, REVISION 3 (2017), HANDBOOK FOR SAFEGUARDING SENSITIVE PERSONALLY IDENTIFIABLE INFORMATION (PII), *available at* https://www.dhs.gov/publication/handbook-safeguarding-sensitive-personally-identifiable-information.

[2] DHS defines "social media" as the sphere of websites, applications, and web-based tools that connect users to engage in dialogue, share information and media, collaborate, and interact. Social media takes many different forms, including but not limited to, web-based communities and hosted services, social networking sites, video and photo sharing sites, blogs, virtual worlds, social bookmarking, and other emerging technologies. The definition of "social media" does not include internal Department intranets or applications. *See* DHS LEXICON, REVISION 2 (2017), *available at* https://www.dhs.gov/publication/dhs-lexicon.

[3] DHS defines "publicly available information" as "unclassified information that has been published or broadcasted in some manner to the general public, is available to the public by subscription or purchase, could lawfully be seen or heard by a casual observer, is made available at a meeting open to the public, or is obtained by visiting any place or attending any event that is open to the public." "Open source" information is a form of publicly available information and defined as "unclassified information that has been published or broadcast in some manner to the general public, could lawfully be seen or heard by a casual observer, is made available at a meeting open to the public, or is obtained by visiting any place or attending any event that is open to the public." *See* DHS LEXICON, REVISION 2 (2017), *available at* https://www.dhs.gov/publication/dhs-lexicon.

[4] *See* U.S. DEPARTMENT OF HOMELAND SECURITY, PRIVACY POLICY DIRECTIVE 110-01, OPERATIONAL USE OF SOCIAL MEDIA (2012), *available at* https://www.dhs.gov/privacy-policy-guidance.

its accompanying Instruction, 110-01-001.[5] These policy documents establish privacy policy and requirements for DHS and its components for the access, collection, use, maintenance, retention, disclosure, deletion, and destruction of personally identifiable information in relation to the operational use of social media. Due to the trend toward including interactive, social media-style features on "traditional" internet sites, ICE has determined DHS's Privacy Policy governs the collection of personally identifiable information online on all internet sites,[6] not only on social media platforms.

ICE may only access information online from open source sites (e.g., blogs, news sites, public record repositories) and on social media platforms that is publicly available.[7] This includes any public messages, posts, and media (e.g., photos, documents, geolocation information).[8] The ICE offices that access publicly available social media information as part of their law enforcement activities include the following:

- Office of Homeland Security Investigations (HSI): HSI is the primary investigative arm of DHS and combats criminal organizations exploiting U.S. trade, travel, financial, and immigration systems.
- Office of Professional Responsibility: The Office of Professional Responsibility is responsible for upholding ICE's professional standards through a multi-disciplinary approach of security, inspections, and investigations. The Office accomplishes its mission by investigating allegations of employee misconduct; conducting independent reviews and audits of ICE programs, offices, and detention facilities; measuring compliance with applicable policies, regulations, and laws; and administering ICE's internal security program to protect and secure people, information, and facilities.[9]

This Privacy Impact Assessment covers the following items related to ICE employee and contractor use of publicly available and social media information in law enforcement investigations:

- ICE's operational uses of publicly available online content and social media information;
- ICE's use of technology and tools that collect and analyze publicly available information including social media information;

[5] *See* U.S. DEPARTMENT OF HOMELAND SECURITY, PRIVACY INSTRUCTION 110-01-001, OPERATIONAL USE OF SOCIAL MEDIA (2012), *available at* https://www.dhs.gov/privacy-policy-guidance.
[6] This Privacy Impact Assessment only assesses ICE's collection and use of publicly available information including social media information for law enforcement investigations. This Privacy Impact Assessment does not cover ICE undercover operations, which are governed by separate legal and privacy guidelines.
[7] *Id.*
[8] Geographic data may come from publicly shared social media information.
[9] This Privacy Impact Assessment does not address use of publicly available and social media information by ICE Office of Professional Responsibility in support of its internal security program to protect and secure people, information, and facilities.

- ICE's use of the deep and dark webs;
- ICE's policy and Rules of Behavior (ROB) for ICE personnel use of social media information;
- First Amendment and Equal Protection restrictions placed on ICE online collections;
- Select mitigation measures for the use of tools to access, collect, and/or analyze publicly available information, including social media information; and
- identification of privacy risks and steps that ICE takes to mitigate risks to personally identifiable information.

## ICE's Operational Uses of Publicly Available Information, including Social Media Information

This section details how each ICE program engages with social media and how publicly available information obtained from social media or other publicly available online content is used in furtherance of ICE's law enforcement mission.

*HSI Use of Publicly Available Online Content and Social Media Information*

ICE HSI investigations cover a broad range of topics, including, but not limited to, national security threats, financial and smuggling violations (including illegal arms exports), financial crimes, commercial fraud, human trafficking, narcotics smuggling, child sexual abuse/exploitation, and immigration fraud. Given HSI's vast portfolio, its agents and support personnel rely on a variety of sources of information to generate leads, including information from publicly available sources and social media. Generally, HSI searches of publicly available information will have a nexus to an existing investigation; however, if the information or social media posting is indicative of a criminal violation enforceable by ICE HSI (e.g., child sexual abuse material, an online marketplace for narcotics), that information can be used to initiate an investigation. The following examples provide a comprehensive list of the ways in which HSI personnel use publicly available content and social media information. In the future, if HSI's use of such information deviates from the list below, this Privacy Impact Assessment will be updated to provide additional transparency on the new uses as well as assess any potential privacy risks and appropriate mitigation measures.

HSI uses social media and publicly available information for tactical planning activities prior to a specific law enforcement action to ensure safety of officers and other individuals at or near the scene. Any information that HSI uses in this context is documented in the Investigative Case Management system (ICM) and in the Repository for Analytics in a Virtualized Environment (RAVEn).[10] HSI also uses publicly available information, including social media

[10] *See* U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement, Privacy Impact

information, to enhance information from various government and law enforcement databases in furtherance of its law enforcement investigations.[11]

Social media searches are conducted as needed and must be associated with a specific case, operation, or mission-related purpose, such as combatting human trafficking or money laundering.

HSI may consolidate corroborated open source and social media information with information maintained in government databases and create a report that is entered into an ICE case management or lead generation system.[12] The information may then be shared within HSI for investigative action.

HSI may also conduct open source and social media research on schools as part of the certification[13] and recertification[14] compliance process of the Student Exchange and Visitor Program (SEVP).[15] For example, HSI may use publicly available information to verify a school's petition as part of the Student Exchange and Visitor Program certification, recertification, or unannounced review (e.g., following up on tips received from federal agents or the Field Representative Units). HSI does not target[16] individuals, such as school officials or students, when researching schools to determine the institutions' compliance with SEVP certification requirements.

HSI personnel also will access and use publicly available information online to verify data contained on a school's Form I-17, "Petition for Approval of School for Attendance by Nonimmigrant Student."[17] HSI will use online content, including social media information, to verify the accuracy of the school's official name and other data listed on the Form I-17, such as

---

Assessment for the Investigative Case Management System (ICM), *available at* https://www.dhs.gov/privacy-documents-ice. Any information introduced as evidence in a prosecution would be obtained directly from the social media platform via subpoena or search warrant. *See also* U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement, Privacy Impact Assessment for the Repository for Analytics in a Virtualized Environment (RAVEn), DHS/ICE/PIA-055, *available at* https://www.dhs.gov/privacy-documents-ice.

[11] *See* U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, PRIVACY IMPACT ASSESSMENT FOR LEADTRAC, DHS/ICE/PIA-044, and INVESTIGATIVE CASE MANAGEMENT SYSTEM (ICM), DHS/ICE/PIA-045, *available at* www.dhs/gov/privacy-documents-ice.

[12] *See* U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, PRIVACY IMPACT ASSESSMENT FOR LEADTRAC, DHS/ICE/PIA-044, and INVESTIGATIVE CASE MANAGEMENT SYSTEM (ICM), DHS/ICE/PIA-045, *available at* www.dhs/gov/privacy-documents-ice.

[13] The Student and Exchange Visitor Program's (SEVP) School Certification Unit certifies schools to accept F (academic) and M (vocational) visa holder students.

[14] Designated School Officials, acting on behalf of SEVP-certified institutions, must complete recertification every two years to confirm compliance with SEVP eligibility, record keeping, and recording requirements on F and/or M visa holder students at various types of schools.

[15] *See* U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, PRIVACY IMPACT ASSESSMENT FOR THE STUDENT EXCHANGE AND VISITOR PROGRAM (SEVP), DHS/ICE/PIA-001, *available at* www.dhs/gov/privacy-documents-ice.

[16] ICE SEVP does not target individuals outside of HSI's regulatory requirements to vet and conduct routine background checks on school officials/students and refer potential visa violators for further investigation.

[17] Form I-17, Petition for Approval of School for Attendance by Nonimmigrant Student, *available at* https://studyinthestates.dhs.gov/sevis-help-hub/school-records/school-certification/form-i-17-initial-certification.

the school's county, city, state, and address.

HSI may also review the school's social media homepage and school website to verify information on the Form I-17, including program(s) of instruction information (e.g., listed courses, course descriptions, schedules, graduate requirements). If HSI finds discrepancies between the information posted on the Form I-17 and what is publicly available, HSI will generate a lead to the field for further investigation.

Additionally, HSI may use publicly available information to investigate F-1 and M-1 student visa holders who are suspected of overstaying their visas or otherwise violating the terms of their admission into the United States.[18]

Further, HSI uses publicly available information, including social media information to investigate suspected illegal activity by foreign students on college campuses,[19] or other administrative issues related to a foreign student's non-immigrant status. As described above, any HSI use of social media information must have a nexus to an authorized investigation or the social media information itself be indicative of a crime enforceable by ICE HSI.

All information HSI retrieves from social media will be documented in the appropriate ICE case management or lead generation system.[20]

HSI also assists the Department of State in conducting the initial vetting of visa applicants.

*ICE Office of Professional Responsibility Use of Publicly Available Online Content and Social Media Information*

The ICE Office of Professional Responsibility will complement its investigations of allegations of criminal violations or misconduct by ICE personnel with publicly available information. ICE Office of Professional Responsibility will review publicly available postings on the social media accounts associated with ICE employees under investigation to further investigate any claims of criminal or administrative misconduct submitted to the Office by the public or other ICE employees. ICE Office of Professional Responsibility collects any information relevant to the investigation, documenting it in the Office's case management system, the Joint Integrity Case

---

[18] *See* U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement, Privacy Impact Assessment for LeadTrac, DHS/ICE/PIA-044, and U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement, Privacy Impact Assessment for Student and Exchange Visitor Program (SEVP), DHS/ICE/PIA-001, a*vailable at* www.dhs/gov/privacy-documents-ice.

[19] For example, foreign students suspected of stealing intellectual property to provide to their home countries.

[20] *See* U.S. Department Of Homeland Security, U.S. Immigration and Customs Enforcement, Privacy Impact Assessment for The Investigative Case Management System (ICM), *available at* https://www.dhs.gov/privacy-documents-ice. Any information introduced as evidence in a prosecution would be obtained directly from the social media platform via subpoena or search warrant. *See also* U.S. Department Of Homeland Security, U.S. Immigration and Customs Enforcement, Privacy Impact Assessment for The Repository for Analytics in a Virtualized Environment (RAVEn), DHS/ICE/PIA-055, *available at* https://www.dhs.gov/privacy-documents-ice.

Management System (JICMS).[21]

**<u>ICE Use of Technology and Tools that Collect and Analyze Publicly Available Information Including Social Media Information</u>**

ICE uses commercial databases and analytical products to help search, monitor, and process publicly available data from online, public records data sources, and social media platforms pursuant to ongoing investigations. ICE offices and programs may use one or a combination of tools to accomplish their mission. Prior to its use of any technology or tool that accesses, collects, and/or uses personally identifiable information, an ICE program must submit a Privacy Threshold Analysis (PTA) to ICE Privacy to assess the technology or tool's impacts on individual privacy. All Privacy Threshold Analyses must be submitted to and approved by the DHS Privacy Office. All personnel who use a technology or tool must be trained on the appropriate uses of that instrument. The following is a description of the tools that ICE uses to achieve its statutory mission using publicly available information. Each tool may raise unique privacy risks, which are assessed using the Fair Information Practice Principles as discussed later in this Privacy Impact Assessment.

*Analytical Search Engines and Data Aggregators*

ICE also uses tools that collect and compile information from multiple publicly available sources across the internet in support of open law enforcement investigations. These aggregator tools retrieve data from credit bureaus, government public records, news sites, and other publicly available information resources. The data the aggregator retrieves is available to the public, either through internet searches or purchase. Data aggregators present data from search queries in a format that is meaningful or useful to the user. Data aggregators used by ICE are specifically designed to search public records and publicly available social media information, filter duplicate information, and present returned information in a manner that is useful to ICE personnel and directly related to an ICE investigation.[22]

ICE users will access data aggregator tools via a web portal and enter the search terms directly related to a person of interest (e.g., fugitive, suspect).[23]

*Link Analysis Applications*

Link analysis applications capture digital connections. ICE may use link analysis

---

[21] The Joint Integrity Case Management System (JICMS) is owned by U.S. Customs and Border Protection and is used by ICE. For more information, *see* U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. CUSTOMS AND BORDER PROTECTION, PRIVACY IMPACT ASSESSMENT FOR THE JOINT INTEGRITY CASE MANAGEMENT SYSTEM (JICMS), DHS/CBP/PIA-044, *available at* <u>www.dhs.gov/privacy-documents-cbp</u>.

[22] ICE is prohibited from using data aggregators or other tools to access, collect, or use data that ICE is otherwise prohibited from accessing, collecting, or using.

[23] Persons Of Interest (POI) may include individuals who are reasonably suspected of a crime, are the subject of investigative interest based on the individuals' association with illegal cross-border activity or another criminal network, such as terrorist groups, are wanted in connection with a crime (e.g., arrest warrant), or for whom there is investigative evidence linking the individual to criminal acts within ICE's mission to enforce (e.g., bombing).

applications in support of open investigations. These applications aggregate connected online accounts and social media data to assist investigators with identifying possible connections to an investigation. This is also known as "link analysis." Link analysis helps investigators identify and assess suspected criminal networks by detecting similarities.[24]

The data must be reviewed by an ICE investigator, who is required to assess the information and corroborate it before it can be used in an investigation.

*Automated Collection Tools*

ICE may use automated applications or tools that collect information from publicly available websites and chatrooms identified as relevant to ICE investigations. This process, sometimes referred to as "scraping" is an automated process that copies and collects website data that has been pre-designated by a user as related to an investigation, on a recurrent basis, then loads the copied data into a database for later analysis and use.

ICE personnel will use all available and relevant information such as witness statements, investigative reports, and other documentary evidence, to assess the accuracy and authenticity. ICE is not permitted to collect entire websites or information unrelated to an investigation. The site selection must be submitted to an ICE supervisor for approval before it can be subject to an automated collection tool.

The ICE supervisor must verify that the website or chatroom contains relevant and credible evidence of suspected violations within ICE's statutory law enforcement mission and that the parameters of collection are narrowly tailored to collect only that information directly relevant to a law enforcement investigation. As noted, collection and analysis is only permitted on subjects and information determined to be relevant to and within the scope of an investigation.

Automated collection tools do not modify data in any way. All collection by the tool is passive. These tools do not violate or circumvent privacy settings and protections placed on the information by a website or chatroom. These tools do not "friend" or "follow" social media accounts, may not post content on social media websites, and may not prompt the collection of information from other individuals or accounts. All collections are manually reviewed by ICE personnel for credibility and relevance to the open investigation. If data collected by these tools is deemed irrelevant, then ICE deletes the information, and it will not be stored or retained in the repository. Any information retained by ICE will be documented in the relevant case file, including the tools that were used to acquire the information and the source of the information. If at any point a site is determined to no longer be relevant to the ICE investigation for which its use was initiated,

---

[24] Link analysis tools also can sort, match, and link multiple open-source databases. The link analysis tool user interface platforms can provide further attribution to the subject of an authorized, ongoing investigation. HSI will use link analysis tools to identify the following information directly related to an open investigation: criminal suspects, witnesses, the location of at-large individuals, businesses, and assets of targets of investigations for potential arrest, seizure, and forfeiture. HSI can access link analysis tools through a web-based portal (username/password) and/or submit queries directly to the tools via Short Messaging Service (SMS) text.

the collection will be immediately discontinued. Similarly, if ICE becomes aware that a site may no longer present credible information, then automated collections will be discontinued immediately.

*Recurrent Query Platforms/Tools*

ICE uses web-based platforms/tools to recurrently query open source websites and publicly available social media accounts for information directly related to ICE investigations. A platform must only retrieve information that would be accessible to the public through basic internet searches (e.g., a web browser search); therefore, recurrent query platforms/tools may not be used to access information that requires an account (e.g., a social media profile). ICE uses the information gathered through use of the platforms/tools to generate investigative leads. Prior to the procurement or development of a query platform/tool, ICE Privacy, through the Privacy Threshold Analysis process, will confirm that the platform/tool does not violate any website or social media account's privacy settings on which the tool is intended to be used.

ICE personnel must review responsive information to determine whether it is accurate/corroborated and whether the information is relevant to an investigation. Users can select relevant information in the results that will then automatically be added to a report that can be exported from the web portal for later ingestion into an ICE system. Information not selected (because it is determined not to be relevant to the specific investigation) will be deleted from the portal by the vendor. By selecting information as relevant to an investigation, the platform search algorithms are enhanced for future searches. If a report is exported, the ICE user will re-initiate checks against government systems and again manually search for additional open source information for corroboration prior to entering information into any ICE system or generating a lead.

## ICE Policy for Using Publicly Available Online Content and Social Media Information

In 2012, the then-ICE Director issued a memorandum to all ICE personnel titled "Use of Public and Non-Public Online Information"[25] outlining core principles for ICE law enforcement use of online information (hereinafter "Morton Memo"). The memorandum laid out key principles under which ICE personnel are allowed to use social media for operational purposes. ICE use of publicly available information for operational purposes must abide by the 2012 Morton Memo and DHS Privacy Policy 110-01. Key principles of the 2012 Morton Memo include the following:

- Obtaining Information from Unrestricted Sources: Law enforcement personnel may obtain information from publicly accessible online sources and facilities under the same conditions as those by which they may obtain information from other sources generally

[25] U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, POLICY GUIDANCE MEMORANDUM 100821.1 USE OF PUBLIC AND NON-PUBLIC ONLINE INFORMATION (2012), on file with ICE Privacy. This memorandum is also referred to as the "2012 Morton Memo." This memorandum is being reviewed and may be updated or superseded as needed.

open to the public. This principle applies to publicly accessible sources located in foreign jurisdictions as well as those in the United States.

- Obtaining Identifying Information about Users or Networks: Law enforcement personnel may use available software tools in their intended lawful manner under the same circumstances in which ICE guidelines and procedures permit them to look up similar identifying information (e.g., a telephone number) through non-electronic means. However, law enforcement personnel may not use software tools, including those which are generally available as standard operating system software, to circumvent restrictions placed on system users.
- Real-Time Communications: Law enforcement personnel may passively[26] observe and log real-time electronic communications open to the public under the same circumstances in which they may attend a public meeting.
- Accessing Restricted Sources: Law enforcement personnel may not access restricted online sources or facilities absent legal authority permitting entry into a private space.
- Online Communications Generally: Law enforcement personnel may use online services to communicate in the same manner as they may use other types of communication tools, such as the telephone and the mail. Law enforcement personnel should retain the contents of a stored electronic message if they would have retained that message had it been written on paper. The contents should be preserved in a manner authorized by ICE procedures governing the preservation of electronic communications.

Any update to these principles will necessitate a corresponding update to this Privacy Impact Assessment.

Additionally, ICE Privacy works with relevant ICE program offices to ensure that ICE guidance and policy remains current and consistent with the evolution of internet use in law enforcement operations. As new publicly available information programs or tools are used, procured, or developed by ICE, ICE Privacy may require more focused and tailored rules of behavior and other safeguards for ICE's uses of publicly available information. Rules of behavior are reviewed for compliance with DHS and ICE policy, including the 2012 Morton Memo. ICE Privacy, ICE Office of the Principle Legal Advisor, and the DHS Privacy Office must approve new and updated ICE rules of behavior.

**First Amendment and Equal Protection restrictions**

[26] As discussed in this Privacy Impact Assessment, passive observation includes a prohibition on communicating directly with an individual, eliciting websites to collect information, responding to an individual's posts, or posting content meant to elicit a response from an individual.

In 2019, the then-DHS Secretary reaffirmed that DHS personnel would observe and protect individuals' First Amendment rights, regardless of the medium through which those rights are exercised.[27] ICE, as a Component of DHS, will not collect information regarding an individual's religious beliefs; political and personal beliefs; lawful associations; or protest unless, consistent with the Privacy Act, the information is pertinent to and within the scope of an authorized criminal, civil, or administrative law enforcement activity (e.g., a crime within the scope of ICE law enforcement authorities). ICE use of social media information is directly related to an open investigation and often subject-focused, meaning that searches and collections are centered around targets of investigation or information that is, on its face, relevant to an open criminal, civil, or administrative investigation undertaken pursuant to ICE law enforcement authority (e.g., child sexual abuse material).

In addition, the Privacy Act of 1974[28] generally prohibits ICE from collecting records describing how an individual, defined as a U.S. citizen or Lawful Permanent Resident, exercises rights guaranteed by the First Amendment. There are exceptions, however, if the record is "pertinent to and within the scope of an authorized law enforcement activity," or if either a law or the individual about whom the record is maintained expressly authorizes such maintenance.[29] ICE personnel must successfully complete social media training, created by ICE Privacy in consultation with the ICE Office of the Principle Legal Advisor and the DHS Office for Civil Rights and Civil Liberties, on how to identify First Amendment activity, ensure there is a lawful basis to collect the information, and confirm the collection will be performed using the least intrusive means[30] possible to accomplish the authorized law enforcement action or activity.

DHS also prohibits the consideration of protected individual characteristics (i.e., race, ethnicity, gender, national origin, religion, sexual orientation, gender identity, and disability) in investigation, screening, and law enforcement activities in all but the most exceptional instances. The Department of Justice "Guidance For Federal Law Enforcement Agencies Regarding the Use of Race, Ethnicity, Gender, National Origin, Religion, Sexual Orientation, Gender Identity, and Disability" (DOJ Guidance)[31] is the policy of DHS as it applies to federal law enforcement

---

[27] *See* SECRETARY OF HOMELAND SECURITY MEMORANDUM, INFORMATION REGARDING FIRST AMENDMENT PROTECTED ACTIVITIES (2019), *available at* https://www.dhs.gov/sites/default/files/publications/info_regarding_first_amendment_protected_activities_as1_signed_05.17.2019.pdf.

[28] 5 U.S.C. § 552a.

[29] 5 U.S.C. § 552a(e)7.

[30] "Least-Intrusive-Means" doctrine refers to the requirement that ICE begin with a collection method that is less invasive for the individual, and only increasingly so if no other less invasive collection methods exist. For example, ICE requires its investigators to use information available via public internet searches.

[31] *See* U.S. Department of Homeland Security Policy Guidance Memorandum: Guidelines for Enforcement Actions In Or Near Protected Areas (2021); The Department of Homeland Security's Commitment to Nondiscriminatory Law Enforcement and Screening Activities (2013), *available at* 21_1027_opa_guidelines-enforcement-actions-in-near-protected-areas.pdf (dhs.gov). *See also* U.S. DEPARTMENT OF JUSTICE, GUIDANCE FOR FEDERAL LAW ENFORCEMENT AGENCIES REGARDING THE USE OF RACE, ETHNICITY, GENDER, NATIONAL ORIGIN, RELIGION,

personnel and federal non-law enforcement personnel engaged in or supporting federal law enforcement activity and intelligence activity conducted by Federal law enforcement agencies.[32] Consideration of race, ethnicity, gender, national origin, religion, sexual orientation, gender identity, and disability in DHS law enforcement activities occurs only in strict accordance with DOJ Guidance.[33]

DHS personnel may use protected individual characteristics only when a compelling governmental interest is present, and only in a manner narrowly tailored to meet the compelling interest. The Department of Justice Guidance does not apply to (1) interdiction activities at the border or its functional equivalent (such as airports, seaports, and other ports of entry) and related traveler and cargo vetting activities, as well as protective and inspection activities; (2) non-law enforcement screening activities; and (3) all activities that use country of birth or nationality as a security screening, enforcement, or investigative criterion.[34] These activities remain subject to Department of Homeland Security's 2013 policy.[35]

Further, information collection supporting HSI administrative immigration enforcement activities is governed by the DHS policy "Guidelines for Enforcement Actions in or Near Protected Areas," that superseded previous ICE policy.[36] The policy discourages actions that may detrimentally affect the willingness of an individual to seek essential services, including the monitoring of social media accounts associated with protected areas. Protected areas include churches, schools, and healthcare facilities. The policy specifically constrains "immigration enforcement surveillance" at these locations. ICE personnel are required by policy to conduct enforcement actions and information gathering activities in support of an enforcement action, in such a manner as to avoid targeting these protected areas.[37]

**Select Mitigation Measures for the Use of Tools to Access, Collect, and/or Analyze Publicly**

SEXUAL ORIENTATION, GENDER IDENTITY AND DISABILITY (May 25, 2023), *available at* https://www.dhs.gov/publication/guidance-federal-law-enforcement-agencies-regarding-use-race-ethnicity-gender-national.

[32] *See* U.S. Department of Homeland Security Policy Statement 500-02 Reaffirming the Commitment to Nondiscrimination in Department of Homeland Security Activities (May 25, 2023), *available at* https://www.dhs.gov/publication/department-homeland-security-commitment-nondiscriminatory-law-enforcement-and-screening.

[33] *Id.*

[34] *Id.*

[35] *See* U.S. Department of Homeland Security Memorandum For Component Heads, the Department of Homeland Security's Commitment to Nondiscriminatory Law Enforcement and Screening Activities (April 26, 2013), *available at* https://www.dhs.gov/sites/default/files/publications/secretary-memo-race-neutrality-2013_0_1.pdf

[36] *See* U.S. DEPARTMENT OF HOMELAND SECURITY POLICY GUIDANCE MEMORANDUM: GUIDELINES FOR ENFORCEMENT ACTIONS IN OR NEAR PROTECTED AREAS (2021), *available at* https://www.dhs.gov/sites/default/files/publications/21_1027_opa_guidelines-enforcement-actions-in-near-protected-areas.pdf.

[37] *See* U.S. HOMELAND SECURITY POLICY MEMORANDUM: GUIDELINES FOR ENFORCEMENT ACTIONS IN OR NEAR PROTECTED AREAS (2021), *available at* https://www.dhs.gov/sites/default/files/publications/21_1027_opa_guidelines-enforcement-actions-in-near-protected-areas.pdf.

**Available Information, Including Social Media Information**

The following are additional safeguards applicable to the use of tools, known at the time of this Privacy Impact Assessment, to facilitate ICE's use of publicly available and social media information. If ICE proposes to use additional services/platforms/tools/applications in the future, it will complete required Privacy Threshold Analyses and update this Privacy Impact Assessment as appropriate.

**Use of Application Programming Interfaces/"Scraping"**

The use of application programming interfaces (APIs) and/or scraping can be inconsistent with a website or social media platform's terms of service. Therefore, ICE's use of tools/applications that facilitate their use could impact personal privacy. Accordingly, some mitigation measures are in place, as discussed above, for the use of these tools/applications.

The use of APIs that facilitate scraping is akin to the use of automated collection tools. Therefore, the use of scraping tools/applications must satisfy the requirements for use of automated collection tools as discussed above.

For example, users must first assess the accuracy and authenticity of the information sought for collection and then receive supervisory approval to use this tool/application. The supervisor must verify that the site or platform targeted for collection contains relevant and credible information of suspected violations related to an open investigation and that the parameters of collection only collect information directly relevant to the investigation.

ICE is not permitted to collect entire websites or information unrelated to the investigation. Further, use of these tools/applications will be in a manner that respects all privacy settings. And, if at any point a site or platform is determined to no longer be relevant to the ICE investigation for which its use was initiated, or it may no longer present credible information, the collection by the tool/application will be immediately discontinued.

**Network Analysis**

Network analysis tools/applications are the same as link analysis applications discussed above. Therefore, use of these tools/applications will be in a manner consistent with the parameters outlined above. Additionally, there is a privacy risk associated with analyzing a person's network, including that the individuals who are a part of that network may have no connection to the suspected individual and/or illegal activity. For example, simply liking a post, tagging or being included in a photo, or having a relationship with a suspected individual does not indicate a connection to criminal activity under investigation. To mitigate this risk, establishing parameters around perceived relationships is critical, such as limiting collection on the number of connections out from the suspected individual (i.e., "hops") and ensuring a direct connection to the person under investigation and criminal activity by the connected individual.

Supervisors will review and confirm the user's written justification. Also, supervisors will verify ICE personnel compliance with agency-wide and tool-specific training and adherence to the applicable rules of behavior. Supervisors may require additional safeguards if they identify inconsistencies or other concerns.

**Keyword Queries:**

Use of keyword queries by a tool/application is the same as use of recurrent query platforms/tools discussed above. Therefore, use of keyword queries in tools/applications will be in a manner consistent with the parameters outlined previously. For example, information sought through keyword queries must be directly related to an ICE investigation. Only information accessible to the public through basic internet searches can be retrieved; therefore, the keyword queries tool/application cannot be used to access information that requires an account (e.g., social media profile). Users must review responsive information to assess its accuracy and direct relevance to an open investigation. Further, users must corroborate the information before it may be used. If information is retrieved that is not directly relevant to an open investigation, then it must be deleted and the collection discontinued.

Additionally, there is a risk that using certain keywords to search an individual's publicly available information may implicate the "purpose specification" principle. Accordingly, any keywords used to query publicly available information will be designed in such a way as to not profile, target, or discriminate against any individual for lawfully exercising their First Amendment rights. Keywords will be directly relevant to the suspected criminal actions of the person of interest, specific events, or specific locations directly related to the investigation. To ensure that keyword searches are conducted in an authorized manner, keywords used to query publicly available information will be documented and subject to periodic review by the Office of the General Counsel, ICE Privacy, DHS Privacy, and the DHS Office for Civil Rights and Civil Liberties. Additionally, ICE Privacy will meet monthly with the program to assess how keywords are being used.

**Vendor Limitations**

There is a risk that ICE's use of vendors or contractors could implicate the "purpose specification" principle. As noted previously, ICE may not use a vendor-provided tool or application, nor may a contractor perform work on behalf of ICE, in a manner inconsistent with governing law and policy. Contractors and vendors should not collect, use, maintain, or disseminate personally identifiable information that ICE does not have the authority to collect, use, maintain, or disseminate. For example, while contractors may collect personally identifiable information related to First Amendment protected activity when operating independent of any government involvement, contractors may not collect such personally identifiable information to fulfill any obligations to the government.

Additionally, there is a risk that a vendor could have access to personally identifiable information ICE users input into the tools/applications and ICE sensitive law enforcement activities. Accordingly, while vendors will retain administrative functions within a tool/application, ICE will maintain control of all use restriction and auditing capabilities, unless any additional functions assigned to the vendor are detailed in the contract or agreement and are performed under general ICE direction. Additionally, the vendor may not use personally identifiable information input into the tool/application by an ICE user to further refine and/or train the tool or its model(s).

**Other tools/applications**

The platforms or tools that ICE uses on publicly available information, including social media information, for investigations may include other applications or functions that are not permitted for use at this time. For example, ICE may not use emotional or sentiment analysis tools/applications, "risk profile," facial recognition, or reverse image searching tools in this context. If in the future ICE wishes to reevaluate the tools it uses in this context, it will coordinate with the DHS Privacy Office and the Office for Civil Rights and Civil Liberties to assess the proposed tool's efficacy and assess any related potential privacy, civil rights, and civil liberties risks.

# Fair Information Practice Principles (FIPPs)

The Privacy Act of 1974[38] articulates concepts of how the Federal government should treat individuals and their information and imposes duties upon Federal agencies regarding the collection, use, dissemination, and maintenance of personally identifiable information. The Homeland Security Act of 2002 Section 222(2) states that the Chief Privacy Officer shall assure that information is handled in full compliance with the fair information practices as set out in the Privacy Act of 1974.[39]

In response to this obligation, the DHS Privacy Office developed a set of Fair Information Practice Principles (FIPPs) from the underlying concepts of the Privacy Act to encompass the full breadth and diversity of the information and interactions of DHS.[40] The FIPPs account for the nature and purpose of the information being collected in relation to DHS's mission to preserve, protect, and secure.

DHS conducts Privacy Impact Assessments on both programs and information technology systems, pursuant to the E-Government Act of 2002 Section 208 and the Homeland Security Act of 2002 Section 222.[41] Because ICE use of publicly available and social media information is not

---

[38] 5 U.S.C. § 552a.
[39] 6 U.S.C. § 142(a)(2).
[40] U.S. DEPARTMENT OF HOMELAND SECURITY, PRIVACY POLICY GUIDANCE MEMORANDUM 2008-01/PRIVACY POLICY DIRECTIVE 140-06, THE FAIR INFORMATION PRACTICE PRINCIPLES: FRAMEWORK FOR PRIVACY POLICY AT THE DEPARTMENT OF HOMELAND SECURITY (2008), *available at* https://www.dhs.gov/privacy-policy-guidance.
[41] 6 U.S.C. § 142.

an information technology system, this Privacy Impact Assessment is conducted as it relates to the DHS construct of the Fair Information Practice Principles. This Privacy Impact Assessment examines the potential privacy impact of ICE use of publicly available and social media information.

## 1. Principle of Transparency

Notice of ICE operational use of publicly available information including social media information for law enforcement investigations is provided by the publication of this Privacy Impact Assessment and relevant system of records notices governing systems in which social media information collections are maintained.[42] ICE also includes notice of other instances of its use and maintenance of publicly available information including social media information in an ICE system via that system's Privacy Impact Assessment.[43] Since ICE collection and use of publicly available and social media information collections are law enforcement activities related to law enforcement investigations, it may not be feasible to provide direct notice to individuals at the time their information is collected from publicly available sources because to do so could provide notice of sensitive, ongoing law enforcement investigations.

**Privacy Risk:** There is a risk that individuals who use publicly available platforms, including social media platforms, may not know that the information they publicly share on the platform may be collected by ICE to support an open law enforcement investigation.

**Mitigation:** The risk is partially mitigated. To the extent information in this Privacy Impact Assessment is made publicly available, this Privacy Impact Assessment provides notice of ICE's collection, use, and maintenance of publicly available information, including social media information, to support law enforcement investigations.

While publicly available sources, including social media platforms, may provide notice of the potential use of information posted to the sites for law enforcement investigations pursuant to lawful process, notice of ICE's use of publicly available information as discussed in this Privacy Impact Assessment often is not provided by the platform. Further, as noted previously, ICE cannot notify an individual when their information is collected by ICE from publicly available sources because doing so could risk informing a target of an active law enforcement activity of an open investigation.

To mitigate this risk, ICE personnel may only view information that is available to the public (e.g., not behind added privacy walls). ICE assumes the individual is on notice that their information, not subject to additional privacy restrictions, is viewable by anyone that has access to the publicly available source/social media platform. In other words, ICE will only access publicly available sources to collect and analyze data that is available (either for free or for

---

[42] For a list of all ICE system Privacy Impact Assessments, *see* www.dhs.gov/privacy-documents-ice. For a list of Systems of Records Notices published by ICE, *see* https://www.dhs.gov/system-records-notices-sorns.
[43] *See* the Appendix to this Privacy Impact Assessment for a list of ICE systems that contain publicly available and social media information.

purchase) to the public and directly relevant to an open law enforcement investigation.

**Privacy Risk:** There is a risk that a third party may post an individual's information to a website or social media platform without the individual's consent and that information is then used by ICE in a law enforcement investigation.

**Mitigation:** This risk cannot be mitigated. At the time of collection, ICE cannot determine whether an individual provided a third party with consent to publicly post their information to a website or social media platform. Similarly, ICE cannot determine whether an individual understands the privacy policies and settings of a social media platform before they posted the information to a publicly available source.

**Privacy Risk:** There is a risk that individuals will not know that their information was obtained by ICE to support an open law enforcement investigation.

**Mitigation:** This risk is partially mitigated.

Targets of investigations and their associates who are directly related to the law enforcement matter being investigated may not be aware ICE is actively collecting their information from publicly available sources/social media platforms. Providing notice to these individuals could inform them that they are the target of an actual or potential law enforcement activity or reveal ICE's investigative interest in them.

All individuals present in the United States, however, have constitutional protections in criminal proceedings entitling them to discovery production.[44] The discovery obligations of federal criminal prosecutors established by the Federal Rules of Criminal Procedure include Rule 16, and Rule 26.2. Additionally, the requirements of 18 U.S.C. § 3500 (the Jencks Act), *Brady v. Maryland*,[45] and *Giglio v. United States* apply.[46] In court, each party is responsible for producing evidence upon which it seeks to rely in the litigation. Therefore, if ICE seeks to use publicly available information or evidence derived from such information to sustain any charge or otherwise use as evidence, it would be required to produce that information to the defendant.

Further, as noted previously, ICE may not collect information that is not directly relevant to an open law enforcement investigation, which helps mitigate the number of individuals potentially impacted by ICE's use of publicly available information to support law enforcement investigations.

## 2. Principle of Individual Participation

As with notice, ICE cannot involve the individual in the process of using their personally

---

[44] Discovery is the pre-trial process parties use to gather information in preparation for trial. Parties may obtain discovery regarding any nonprivileged matter in the form of records, testimony, and other information, that is relevant to any party's claim or defense. *See* Fed. R. Civ. P. 26-37, and Fed. R. Crim. P. 16 and 26.2, *available at* https://www.uscourts.gov/rules-policies/current-rules-practice-procedure.
[45] 373 U.S. 83 (1963).
[46] 405 U.S. 150 (1972).

identifiable information to support open investigations. To seek consent for the collection, use, dissemination, and maintenance of their personally identifiable information could risk exposing an ongoing law enforcement investigation. To mitigate this risk, ICE is not permitted to access and use information from publicly available sources that is subject to additional privacy safeguards. For instance, social media platforms may allow individual users to set privacy restrictions on who may access and see their content. If these restrictions are in place, ICE may not access that information. Additionally, individuals may edit, correct, or update information shared in their own posts or in comments they made to the posts of others.

An individual's ability to access or amend information in ICE law enforcement information systems is limited by law and policy due to the need to protect the integrity of national security or law enforcement sensitive information.[47] Access to ICE records might also permit the individual who is the subject of a record to impede the investigation, to tamper with witnesses or evidence, harm victims, or avoid detection or apprehension. Individuals may submit requests for information access and correction as permitted by the Privacy Act, and the requests will be reviewed on a case-by case basis. Individuals seeking to correct records, or seeking to contest their content, may submit a request in writing to the ICE Office of Information Governance and Privacy by mail:

U.S. Immigration and Customs Enforcement Office of Information Governance and Privacy
Attn: Privacy Unit
500 12th Street SW, Stop 5004
Washington, D.C. 20536-5004
http://www.ice.gov/management-administration/privacy

**Privacy Risk:** There is a risk that individuals cannot access and amend inaccuracies in ICE systems that maintain publicly available information, including social media information.

**Mitigation:** The risk is partially mitigated. For example, vendors of commercial data should endeavor to ensure their information collections contain near real-time data for the efficacy of the product that ICE would utilize. However, if a vendor collects data from publicly available sources, any edit, correction, or update the individual makes to the information in the data sources might be delayed before it is reflected in the vendor database. Moreover, vendors may not notify ICE when an edit, update, or correction occurs within its own proprietary database. Likewise, information ICE accesses from other publicly available sources, including social media information, may be amended without notice to ICE.

In accordance with ICE policy, ICE users will research and corroborate the source data to ensure that the information is as accurate, timely, and complete prior to using the data to generate an investigative lead or pursuing a law enforcement action. Likewise, as noted above, users will

---

[47] *See* DHS/ICE-009 External Investigations, 85 FR 74362, (November 20, 2020), Final Rule for Privacy Act Exemptions, 74 FR 4508 (August 31, 2009), *available at* https://www.dhs.gov/system-records-notices-sorns.

document the source(s) of information, including whether a vendor was used to obtain the information, in the relevant investigative case file.

### 3. Principle of Purpose Specification

ICE is authorized to collect information under Section 701 of the USA PATRIOT Act; 6 U.S.C. § 112; 8 U.S.C. §§ 1105, 1103(a)(4), 1357(a) and (b); and Executive Order 13388. Pursuant to the Homeland Security Act of 2002 (HSA), as amended, Pub. L. 107-296, 116 Stat. 2135 §§ 102, 403, 441 (Nov. 25, 2002), the U.S. Secretary of Homeland Security has the authority to enforce numerous federal criminal and civil laws. These include laws contained in Titles 8, 18, 19, 21, 22, 31, and 50 of the U.S. Code. The Secretary delegated this enforcement authority to the Director of ICE in DHS Delegation Order No. 7030.2, Delegation of Authority to the Assistant Secretary for U.S. Immigration and Customs Enforcement (Nov. 13, 2004), and the Reorganization Plan Modification for the Department of Homeland Security (January 30, 2003). Through these statutes and orders, ICE has broad legal authority to enforce an array of federal statutes including responsibility for enforcing customs authorities and federal criminal authorities.

As noted previously, this Privacy Impact Assessment addresses ICE's operational use of publicly available information, including social media information to identify, investigate, locate, arrest, and support prosecution of individuals suspected of violations of laws.

**Privacy Risk:** There is a risk that ICE may use publicly available information including social media information for purposes beyond what is described in this Privacy Impact Assessment.

**Mitigation:** This risk is mitigated. ICE mitigates this risk through training, privacy compliance processes (e.g., Privacy Threshold Analysis), auditing, and oversight. ICE Privacy has created mandatory training and rules of behaviors for ICE personnel that detail the restraints and safeguards outlined in this Privacy Impact Assessment. Additionally, new tools used to collect and use publicly available and social media information must be submitted to ICE Privacy and the DHS Privacy Office for review to ensure that the proposed use and function comply with DHS social media policy and this Privacy Impact Assessment. Prior to adoption of a new tool to access, collect, use, and maintain publicly available information, including social media information to support ICE law enforcement investigations, an ICE program or office must document the purpose of the tool's use through the Privacy Threshold Analysis process. At that time, any restrictions on its use to safeguard privacy may be set by ICE Privacy or DHS Privacy. Further, ICE supervisors audit ICE case files to ensure that the source of data and the use of publicly available and social media information in law enforcement investigations complies with the principles stated in this Privacy Impact Assessment. ICE personnel who operate in contravention to the relevant rules of behavior and this Privacy Impact Assessment may have their access to tools used on publicly available information, including social media information, revoked and could potentially face disciplinary action.

**Privacy Risk:** There is a risk that the use of certain keywords or recurrent query tools to collect and use publicly available and social media information may be inconsistent with ICE's authority to collect such information.

**Mitigation:** This risk is partially mitigated. Any information sought through keyword queries must have a direct nexus to an authorized law enforcement investigation or activity. Further, any keywords used to query publicly available information will be designed in such a way as to not profile, target, or discriminate against any individual for lawfully exercising their First Amendment rights. To ensure that keyword searches are conducted in an authorized manner, keywords used to query publicly available information, including social media information, will be documented and may be periodically reviewed by the Office of the General Counsel, ICE Privacy, the DHS Privacy Office, and the DHS Office for Civil Rights and Civil Liberties. Additionally, ICE Privacy will meet monthly with the respective program to assess how keywords are being used to ensure compliance with this Privacy Impact Assessment and DHS and ICE policies.

**Privacy Risk:** There is a risk that ICE will use a third-party vendor or contractor to collect publicly available information that it otherwise would not be authorized to collect.

**Mitigation:** This risk is mitigated. ICE may not use a vendor or contractor to collect, use, maintain, or disseminate personally identifiable information that ICE does not have the authority to collect, use, maintain, or disseminate. Prior to collection, ICE ensures vendors do not collect First Amendment protected information on their behalf by providing to the vendor guidelines on permissible and prohibited collection activities. After collection, ICE personnel routinely conduct oversight of any information collected by an ICE vendor or tool to ensure the information has a direct nexus to an open investigation, is accurate, and does not run afoul of any First Amendment protections.

## 4. Principle of Data Minimization

ICE will collect only the minimum amount of personally identifiable information necessary and relevant to an ICE law enforcement investigation and safeguard that personally identifiable information as required by law, regulation, and/or Department or ICE policy. Further, information found on a publicly available website or social media platform that is used in an investigation will be saved in appropriate case files and ICE systems, including information about which vendor the information was first identified (if applicable). The data will be maintained in accordance with the relevant Systems of Records Notice(s) and Privacy Impact Assessment(s), as well as the NARA-approved retention schedule(s). Relevant case files and case systems are periodically audited by supervisors and the ICE Records and Information Management Unit to ensure proper record retention and disposition.

**<u>Privacy Risk</u>:** There is a risk that ICE will collect and retain more publicly available information, including social media information, than necessary or relevant to support an open law enforcement investigation.

**<u>Mitigation</u>:** This risk is mitigated. Pursuant to ICE policy, ICE may only collect information relevant to an authorized law enforcement investigation. Because collection of publicly available information, including social media information, may implicate First Amendment protected activities, ICE personnel would not collect information about how an individual exercises their First Amendment rights "unless expressly authorized by statute, or by the individual about whom the record is maintained, or unless pertinent to and within the scope of an authorized law enforcement activity" as prescribed by the Privacy Act. As previously discussed, ICE personnel document how information relates to an investigation or specific violation of law investigated and enforced by ICE prior to its collection.

Further, if ICE personnel discover that collected information is irrelevant to an open law enforcement investigation, they will not use or maintain it. Similarly, if information discovered not to be relevant was previously added to a case file, responsible ICE personnel will remove such information. Additionally, as noted previously, there are safeguards in place to ensure that targeted collection of publicly available information, including social media information, is directly relevant to an open law enforcement investigation. Supervisory approval is required before ICE users may automatically collect information from websites. And ongoing collection must be continually evaluated to ensure that only information directly related to an investigation is being collected. If the information is determined to be inaccurate, no longer credible, and/or no longer relevant, collection must end immediately, and such information may not be used or retained.

**<u>Privacy Risk</u>:** There is a risk that ICE will collect First Amendment-protected information.

**<u>Mitigation</u>:** This risk is partially mitigated. The Privacy Act generally prohibits the collection of records describing how an individual exercises rights guaranteed by the First Amendment.[48] There are exceptions, however, including if the record is "pertinent to and within the scope of an authorized law enforcement activity." ICE personnel receive social media training created by ICE Privacy, ICE Office of the Principle Legal Advisor, and the DHS Office for Civil Rights and Civil Liberties on how to identify protected First Amendment activity and determine if publicly available content is pertinent to and within the scope of an authorized ICE law enforcement investigation. If the information does not meet this standard, then ICE may not collect or use it. Additionally, ICE personnel manually review publicly available information, including social media information, to assess its accuracy, credibility and timeliness and corroborate it by, for example, comparing it to other information maintained in government databases and other credible sources. ICE personnel will also determine and document the relevance of the information collected to the authorized law enforcement activity and whether it contains protected speech. ICE

[48] 5 U.S.C. § 552a(e)(7).

personnel may contact ICE Privacy and the Office of the Principle Legal Advisor to aid in this determination.

This determination will be periodically reviewed by the supervisory investigative agent to ensure ICE personnel adhere to the Privacy Act and do not collect First Amendment-protected information. Protected speech that is either not pertinent to or outside the scope of an ICE law enforcement activity must not be collected, used, and/or retained.

**Privacy Risk:** There is a risk that ICE use of automated collection and query tools (e.g., "scraping" tools) to support law enforcement investigations will collect information on or about individuals who are not suspected of violations of laws enforced by ICE.

**Mitigation:** This risk is partially mitigated. ICE's use of tools, such as recurrent query platforms or automated collection tools, is subject to the polices and safeguards discussed above, to minimize the risk of collecting information irrelevant to a law enforcement investigation and focus collections on information that is directly relevant to an ICE law enforcement investigation. Prior to a tool's implementation, an ICE program or office must document the purpose of the tool's use through the Privacy Threshold Analysis process. At that time, any restrictions on and privacy safeguards required for its use may be set by ICE Privacy or the DHS Privacy Office. Once in use, automated collection tools are only used for sites or chatrooms verified by ICE supervisors to contain information of suspected violations directly relevant to an authorized open investigation.

Similarly, ICE only uploads known suspect information to recurrent query platforms. Therefore, the returns created by these tools are designed and expected to be directly related to an open ICE law enforcement investigation. ICE does not use information about individuals who are not the targets of ICE law enforcement activities. Any returns are also assessed by ICE personnel to verify their accuracy and relevance to an ongoing ICE case. That verification is required before the data is loaded into an ICE case file or ICE case management system. Any data that is deemed irrelevant, inaccurate, and/or unreliable, is purged from the tool and may result in a determination to end collection on a designated site or platform.

## 5. Principle of Use Limitation

ICE personnel collect publicly available information, including social media information to support open law enforcement investigations. As discussed previously, search techniques and queries are governed by ICE and DHS policy, including applicable rules of behavior and this Privacy Impact Assessment.

ICE also uses tools, such as data aggregators, anonymizers, recurrent query platforms, and/or automated collection tools, to collect publicly available information directly relevant to an open law enforcement investigation. Some of these tools automate methods for detecting, summarizing, and graphically representing patterns of relationships between entities within the parameters discussed above. This allows ICE personnel to identify potentially criminal and fraudulent behavior directly related to a law enforcement investigation and assists them in

detecting crimes enforceable by ICE. ICE personnel will use these tools either alone or in combination to research and identify individuals, businesses, and business assets as targets of open law enforcement investigations. For every new tool that ICE plans to use, the relevant ICE program must submit a Privacy Threshold Analysis to ICE Privacy for review to ensure its use complies with law and policy and this Privacy Impact Assessment. At that time, ICE Privacy may recommend additional mitigation strategies to protect individual privacy. The Privacy Threshold Analysis must also be reviewed and approved by the DHS Privacy Office, which may also include additional privacy safeguards as a condition to use the tool.

In addition, ICE will not share personally identifiable information collected from publicly available information including social media information with third parties or external agencies unless directly related to an ICE law enforcement investigation. For example, after ICE has corroborated information and determined its accuracy, relevance, and timeliness, ICE may generate a shareable lead. Leads generated from publicly available information, including social media information may ultimately be shared with federal, state, tribal, local, and foreign law enforcement agencies, as well as relevant law enforcement fusion centers with which ICE has pre-existing information sharing agreements. ICE data may be shared only if the recipient agency has a need to know the information, sharing will further U.S. law enforcement and/or national security efforts, and disclosure is consistent with applicable law and agency policies. Sharing may be done manually by ICE personnel (e.g., via secure email or file transfer) or via system-to-system connections between ICE systems and a third-party system. Prior to sharing, ICE will ensure that the transfer is compatible with the original purpose of the collection (i.e., pursuant to a law enforcement investigation) and meets a routine use(s) of the applicable ICE system's System of Records Notice. ICE will share information outside the agency in accordance with the procedures and safeguards of the relevant ICE system in which the information is maintained, as described in the system's Privacy Impact Assessment and System of Records Notice[49] and consistent with information sharing agreements and applicable privacy safeguards.

**Privacy Risk:** There is a risk that ICE personnel without a legitimate need to know may access publicly available information, including social media information, including through access to a tool or database used by ICE in support of its law enforcement investigations.

**Mitigation:** This risk is mitigated. In addition to supervisors nominating and approving ICE personnel to use the tools discussed in this Privacy Impact Assessment, ICE personnel must apply to the ICE administrator of a tool or platform to be granted access to it. ICE supervisors must review every application before it is approved. Only authorized ICE personnel with a need to know and who have completed, and are current on, the prerequisite privacy and other training will be granted access to a tool or platform, including access to publicly available information accessed through the tool or platform. Lists of authorized users are reviewed periodically by ICE

---

[49] *See* the Appendix to this Privacy Impact Assessment for a list of ICE systems that contain publicly available and social media information and their associated Privacy Impact Assessments and System of Records Notices.

supervisory personnel to ensure a user's ongoing need to access the tool. Additionally, DHS Directive 110-01 requires that access authority be renewed annually consistent with annual training requirements. Access is contingent upon ICE personnel's successful completion of privacy and other training for operational use of publicly available information and social media information.

**Privacy Risk:** There is a risk that ICE may share information with parties who do not have a need to know or in a manner inconsistent with law and policy.

**Mitigation:** This risk is partially mitigated. If publicly available information, including social media information, is discovered in the course of an ICE law enforcement investigation and requires action by a federal, state, local, or international agency, ICE may share that information in a manner consistent with ICE policy and only for purposes permitted in the relevant System of Records Notice. ICE personnel are trained regarding whether information sharing is compatible with the purpose for which the information was originally collected. Personnel may also contact ICE Privacy for advice and guidance regarding permissible disclosures of personally identifiable information. Further, ICE personnel must document instances of information sharing in the relevant case file(s) and ICE case management systems. Instances of unauthorized disclosure are referred to the ICE Office of Professional Responsibility.

## 6. Principle of Data Quality and Integrity

There is a risk that information collected from publicly available sources, including social media information, may be inaccurate, incomplete, and/or irrelevant to an ICE law enforcement investigation. Accordingly, ICE must corroborate any publicly available information collected to support an open ICE law enforcement investigation to ensure that the information is accurate, relevant, timely, and complete. Additionally, if at any time ICE learns that it has received or is in possession of inaccurate information, it will correct, annotate, block or delete the incorrect information and will not use or disseminate the incorrect information. Further, ICE personnel may corroborate social media information with other data from public records data sources, information available in commercial and government databases, or information obtained from other governmental partners. ICE may not rely solely on information obtained from social media to take law enforcement action against any individual. ICE only uses this information to generate a possible lead and must corroborate the information before taking such action, including applying for a warrant or subpoena.

Finally, to ensure ICE is complying with the data quality safeguards articulated in this Privacy Impact Assessment, ICE, in coordination with ICE Privacy, will routinely review and audit all ICE offices that access publicly available information, including social media information as part of their law enforcement activities. Additionally, the DHS Chief Privacy Officer may choose to conduct a Privacy Compliance Review of ICE's use of publicly available information for law enforcement investigations.

**Privacy Risk:** There is a risk that information collected by ICE from publicly available sources, including social media sites, will be inaccurate and unverifiable.

**Mitigation:** This risk is partially mitigated. ICE uses traditional investigative methods to assess the accuracy and reliability of any publicly available information collected to support an open law enforcement investigation prior to generating a lead or entering the data into an ICE system. This includes using the totality of the information available and reviewing information from multiple sources, including public records data sources and government databases. To use publicly availability information, including social media information to support open ICE law enforcement investigations, ICE users must complete relevant training, including privacy training, to learn to analyze information and determine its reliability. ICE only considers corroborated information derived from social media to support a law enforcement investigative lead. ICE does not take any law enforcement action based solely on social media posts.

## 7. Principle of Security

ICE limits social media access to users who have completed annual social media training, show a need to access social media for their work, have agreed to specific rules of behavior associated with access to social media tools, and are approved to use it by a supervisor. All relevant publicly available information, including social media information, collected by ICE personnel will be stored in an ICE system(s) with built in audit controls. Users are granted access on a "need to know" basis. ICE operates its systems in compliance with the information security requirements of the Federal Information Security Modernization Act of 2014.

DHS/ICE policies and rules of behavior ensure appropriate online behavior and limit how information collected from the internet can be used for ICE operational purposes. Only ICE personnel whose official duties necessitate access to social media to support an open law enforcement investigation will be allowed to input information collected from publicly available sources, including social media platforms, into ICE systems. ICE supervisors monitor and approve which users are designated to collect publicly available information, including social media information, to support open law enforcement investigations, and that their training is current.

Supervisors must also monitor who is given access to tools and aggregators to collect publicly available information to support an open law enforcement investigation.

Access roles are assigned by a supervisor based on the user's job responsibilities and are reviewed periodically to ensure that users have the appropriate level of access. Individuals who no longer require access are removed from the access list by program managers and/or system administrators. Programs have limited numbers of accounts to access a tool, and operational needs will require a manager to transition access between and among ICE personnel needing access to a given tool. Additionally, tools are acquired on a license basis, and each instance of use must be justified each contract or option year. This is an additional opportunity for supervisors and program managers to determine which ICE personnel need access to a tool. It is incumbent upon the ICE

supervisors to maintain log files containing this information and make them available for ICE Privacy for inspection or for ICE Office of Professional Responsibility to conduct a complete audit.

ICE systems that contain publicly available information, including social media information, are restricted to personnel that have a need to know the information according to their job duties. When investigative data is imported into ICE systems, ICE personnel are required to either manually or electronically share this data with their supervisors for review.[50] ICE personnel are also required to record a description of the data being uploaded, such as source name/category and date retrieved, and the tool used to collect the information, which helps the supervisor evaluate whether the upload complies with ICE policy and helps other users better understand and evaluate the data. Supervisors are responsible for identifying any data imported into ICE systems in contravention of DHS/ICE policy. Supervisors may request that the system administrator delete any improperly uploaded data in an ICE system.

**Privacy Risk:** There is a risk that an unauthorized individual without a legitimate need to know may access publicly available information including social media information maintained in ICE systems.

**Mitigation:** This risk is mitigated. ICE system security measures are determined on a system-by-system basis, and all systems have varying degrees of access controls. Additionally, all ICE systems must abide by ICE and DHS security policies.[51] Moreover, because these systems contain law enforcement sensitive information (information that, if disclosed, could be detrimental to ICE law enforcement activities), additional scrutiny is placed upon user access restrictions in the systems to ensure that only authorized users are granted access. These systems go through security accreditations and Privacy Impact Assessments to ensure that only authorized users with a need to know will have access to data stored in the system, including social media information and publicly available data.

## 8. Principle of Accountability and Auditing

ICE ensures compliance with this Privacy Impact Assessment by instituting rigorous standards for training, rules of behavior, information sharing, auditing, and supervisory oversight. Additionally, rules of behaviors for ICE users of social media platforms to support open law enforcement investigations have been created in consultation with ICE Privacy and ICE Office of the Principle Legal Advisor to ensure the practices protect the privacy, civil rights, and civil liberties of individuals. ICE users who collect data from social media platforms certify annually that they have read and understand ICE policy and privacy guidance on the use of social media information.

---

[50] System specific controls are found in the system's Privacy Impact Assessment. ICE systems that contain publicly available and social media information can be found in the Appendix to this Privacy Impact Assessment, and are available at www.dhs.gov/privacy/documents-ice.
[51] *See* U.S. DEPARTMENT OF HOMELAND SECURITY, 4300A SENSITIVE SYSTEMS HANDBOOK, VER. 13.1 (2017), *available at* https://www.dhs.gov/privacy-policy-guidance.

A mandated training program is also in place to teach ICE personnel how to properly collect information from publicly available sources, including social media platforms and to do so in accordance with ICE and DHS policies. This training is an annual requirement for ICE personnel with a need to collect personally identifiable information from publicly available sources, such as social media, for an operational purpose to support an ICE law enforcement investigation, and each user must sign a confirmation that they received and understood the training.

Most, but not all, tools used to collect publicly available information, including social media information provide auditing and accountability mechanisms, and provide a log of the date, time, user identity, and search terms that are queried. In these instances, ICE has access to the logs to ensure that the use of the systems is compliant with ICE and DHS policy. Otherwise, supervisors must create a local logging and auditing regime to mimic these requirements. ICE Privacy will work with supervisors to create appropriate logging and auditing capabilities.

ICE Privacy will develop and periodically administer an inspection mechanism to assess whether ICE's use of publicly available information, including social media information to support ICE law enforcement investigations is in compliance with the terms of this Privacy Impact Assessment. ICE Privacy will regularly evaluate the operations of program offices to ensure social media information users have completed required training and have agreed to follow the terms outlined in the corresponding rules of behavior. ICE Privacy will also assess a program's monitoring/auditing processes to ensure their efficacy and advise on best practices. Finally, ICE Privacy, in coordination with the DHS Privacy Office, through the Privacy Threshold Analysis process, will assess whether the use of publicly available information and associated tools to support ICE law enforcement investigations is consistent with this Privacy Impact Assessment and the safeguards described herein.

Additionally, ICE cybersecurity policies require personnel to use government furnished equipment for official operations. Tools that collect publicly available information, including social media information are accessed via government furnished equipment that is equipped with logging and oversight mechanisms to ensure the proper use of government IT systems. This equipment is assigned to specific ICE personnel who agree to be monitored regarding the equipment's use. Any interaction these tools may have with government furnished equipment (e.g., URL access, downloads, uploads) would therefore be logged and may be audited by ICE system administrators.

Further, audit logs are created when social media information is entered into ICE systems. Per the 2012 Morton Memorandum,[52] ICE personnel will retain any information derived from online sources in the same manner as if that content had been derived from a hard copy document or other data source (e.g., database). This includes noting the information collection or uploading the information into ICE systems prior to using the information for operational purposes.

[52] *See* U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, POLICY GUIDANCE MEMORANDUM 100821.1 USE OF PUBLIC AND NON-PUBLIC ONLINE INFORMATION (2012).

Generally, such documentation would include the date, time, and name of the user who uploaded the data into the system, the origin of the information collected, such as the date the information was collected and the site(s) accessed, as well as any tool used to access the information. Automated documentation mechanisms are system-specific and are detailed in the system's respective Privacy Impact Assessment.[53]

ICE supervisors routinely check these logs and their accompanying data to ensure that the data entered does not violate ICE policy or system requirements. The electronic records are preserved and maintained in accordance with an applicable National Archives and Records Administration (NARA) General Records Schedule (GRS) or a NARA-approved agency-specific records control schedule. If the records are subject to a litigation hold, they may not be disposed of under a records schedule until further notification.

**Privacy Risk**: There is a risk that ICE personnel will collect publicly available information without the appropriate training or oversight.

**Mitigation:** This risk is partially mitigated. While the internet allows easy access to publicly available information, ICE users must follow all policies and procedures, including as discussed in this Privacy Impact Assessment before they may use publicly available information, including social media information in an ICE law enforcement investigation. This includes completing required privacy and other training, reviewing and agreeing to follow applicable rules of behavior, obtaining required supervisory approval, and making any required relevancy determinations as discussed previously. Additionally, publicly available information must be corroborated for accuracy and reliability before it may be used in an investigation, and no law enforcement action may be based solely on information obtained from social media.

Information relevant to a law enforcement investigation must be documented in the appropriate case file. Access, collection, use, and retention of publicly available information is subject to supervisor review. These checks help ensure ICE users have a need to acquire publicly available information to support an ICE law enforcement investigation and abide by ICE and DHS policy regarding training and oversight. Any user found to be using social media platforms or tools for a purpose that is inconsistent with law, regulation, or policy will have their access revoked and could face disciplinary action, in addition to deletion of the information.

**Privacy Risk:** There is a risk that a third-party vendor could have access to personally identifiable information ICE users input into vendor-provided tools or applications.

**Mitigation:** This risk is mitigated. While vendors may need to retain some administrative functions within the tools and applications, ICE will maintain control of all use restrictions and auditing capabilities, unless any additional functions assigned to the vendor are detailed in the contract and performed under general ICE supervision. Additionally, the vendor may not use personally identifiable information input into a tool or application by an ICE user to further refine

---

[53] For more information see the Appendix to this Privacy Impact Assessment.

or train its tools/models.

## Conclusion

ICE uses publicly available information, including social media information, in its law enforcement investigations. ICE also uses tools to assist with its collection and analysis of this information. ICE ensures that individual privacy, civil rights, and civil liberties are respected by ensuring appropriate safeguards are in place for the use of this information and maintaining compliance with DHS policy for the operational use of social media. Through proper training and oversight, ICE ensures its personnel collect, use, and maintain information collected online in a lawful and responsible manner.

## Responsible Officials

Peter J. Hatch
Assistant Director
Homeland Security Investigations
U.S. Immigration and Customs Enforcement

Kenneth N. Clark, Ph.D.
Assistant Director
Management and Administration
U.S. Immigration & Customs Enforcement

## Approval Signature

Original, signed version on file with the DHS Privacy Office.

________________________________

Mason C. Clutter
Chief Privacy Officer
U.S. Department of Homeland Security
(202) 343-1717

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



# Appendix

## ICE Systems that maintain Publicly Available Information and Social Media Information for Law Enforcement Investigations

| Name of System | Privacy Impact Assessment Citation | Associated System of Record Notice | Retention Schedule/Period |
|---|---|---|---|
| Student and Exchange Visitor Information System (SEVIS) | DHS/ICE/PIA-001- Student and Exchange Visitor Program (SEVP) | DHS/ICE-001 Student and Exchange Visitor Program (SEVP) | DAA-0567-2016-0004-0003.<br>Retention Period: Destroy when no longer needed for reference or 10 years after cut off, whichever is later. |
| Law Enforcement Intelligence Fusion System (IFS) | DHS/ICE/PIA-007 Law Enforcement Intelligence Fusion System (IFS) | DHS/ICE-006 ICE Intelligence Records (IIRS) | N1-567-09-08 Item 1A(2)<br>Retention Period: Destroy 75 years after cutoff, and only after verification that it is no longer needed to conduct agency business. |
| Significant Event Notification System (SEN) | DHS/ICE/PIA-023 Significant Event Notification System (SEN) | DHS/ICE-006 - IIRS<br>DHS/ICE-009 - External Investigations | N1-567-2011-004<br>Retention Period: Destroy 75 years after cutoff. |
| ICE Subpoena System | DHS/ICE/PIA-027 ICE Subpoena System | DHS/ICE-009 - External Investigations | N1-567-2011-011.<br>Retention Period: Destroy 10 years after cutoff. |
| National Intellectual Property Rights Coordination Center | DHS-ICE-PIA-041 National Intellectual Property Rights Coordination Center | DHS/ICE-009 - External Investigations | A retention schedule is currently under development. ICE is proposing a 5 year period for unpursued claims and a period for investigations of 25 years after the case is closed |
| ICE SharePoint Sites | DHS/ICE/PIA-043 SharePoint Matter Tracking Systems | SORN will be dependent on the program the SharePoint site is supporting (see PIA) | Determined by the purpose for the original collection |
| LeadTrac System | DHS/ICE/PIA-044 | DHS/ICE-009 | DAA-563-2013-0001-0006. |

| | | | |
|---|---|---|---|
| | LeadTrac System | External Investigations<br><br>DHS/ICE-015 LeadTrac System | Retention Period: Destroy 75 years after cutoff. |
| ICE Investigative Case Management (ICM) | DHS/ICE/PIA-045 ICE Investigative Case Management (ICM) | DHS/ICE-009 External Investigations | N1-36-86-001<br><br>Retention Period: Destroy when 20 years old. |
| Pre-Adjudicated Threat Recognition Intelligence Operations Team Tracking System (PATRIOT) | DHS/ICE/PIA-052 Visa Security Program Pre-Adjudicated Threat Recognition Intelligence Operations Team Tracking System | DHS/ICE-012 Visa Security Program Records | N1-567-10-005.<br><br>Retention Period: Destroy 25 years after cutoff for Visa Security Reviews without a nexus to terrorism. Destroy 75 years after cutoff for Visa Security Reviews found to be a nexus to terrorism. |
| Repository for Analytics in a Virtualized Environment (RAVEn) | DHS/ICE/PIA-055 Repository for Analytics in a Virtualized Environment (RAVEn) | DHS/ICE-018 Analytical Records | Determined by the purpose for the original collection |

# EXHIBIT 47

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Policy Number: 10082.1
FEA Number: 360-112-002b

*Office of the Director*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, DC 20536

**U.S. Immigration and Customs Enforcement**

JUN 28 2012

MEMORANDUM FOR: Law Enforcement Personnel

FROM: John Morton
Director

SUBJECT: Use of Public and Non-Public Online Information

Purpose

This memorandum provides U.S. Immigration and Customs Enforcement (ICE) law enforcement personnel guidance on the acceptable use of online information within the scope of their law enforcement duties.

Background

On December 8, 2010, Secretary Napolitano approved a decision memorandum titled, "Use of Public and Non-Public Online Information for Law Enforcement, Situational Awareness, and Intelligence Purposes," ("The Online Information Memorandum") that adopted a recommendation whereby the Department of Homeland Security (DHS), except members of the Intelligence Community governed by Executive Order 12333, would "follow the Department of Justice (DOJ) 1999 guidelines for online investigative and situational awareness activities." The Online Information Memorandum also suggested that DHS Components develop supplementary guidance, as necessary, for their mission-specific purposes consistent with DHS policy.

Discussion

Pursuant to the Online Information Memorandum, ICE law enforcement personnel should follow the below principles for the use of public and non-public online information, which have been adapted from the online investigative principles outlined in DOJ's 1999 Online Investigative Principles for Federal Law Enforcement Agents.[1]

[1] Law enforcement personnel are ICE employees who conduct and support criminal, civil, and administrative law enforcement investigations and operations. Examples include special agents and other law enforcement officers, law enforcement investigative support personnel, intelligence research specialists, criminal research specialists, and attorneys prosecuting criminal, civil or administrative matters.

To implement these core principles, ICE directorates and program offices may establish guidance and/or modify existing guidance, as necessary, or reference the DOJ guidance as applicable to the activities in question.

ICE Principles for Law Enforcement Use of Public and Non-Public Online Information:

1. Obtaining Information from Unrestricted Sources. Law enforcement personnel may obtain information from publicly accessible online sources and facilities under the same conditions they may obtain information from other sources generally open to the public. This principle applies to publicly accessible sources located in foreign jurisdictions as well as those in the United States.

2. Obtaining Identifying Information about Users or Networks. There are widely available software tools for obtaining publicly available identifying information about a user or a host computer network. Law enforcement personnel may use such tools in their intended lawful manner under the same circumstances in which ICE guidelines and procedures permit them to look up similar identifying information (e.g., a telephone number) through non-electronic means. However, law enforcement personnel may not use software tools, even those generally available as standard operating system software, to circumvent restrictions placed on system users.

3. Real-Time Communications. Law enforcement personnel may passively observe and log real-time electronic communications open to the public under the same circumstances in which they may attend a public meeting.

4. Accessing Restricted Sources. Law enforcement personnel may not access restricted online sources or facilities absent legal authority permitting entry into private space.

5. Online Communications Generally. Law enforcement personnel may use online services to communicate as they may use other types of communication tools, such as the telephone and the mail. Law enforcement personnel should retain the contents of a stored electronic message if they would have retained that message had it been written on paper. The contents should be preserved in a manner authorized by ICE procedures governing the preservation of electronic communications.

6. Undercover Communications. Law enforcement personnel communicating online with witnesses, subjects, or victims must disclose their affiliation with law enforcement when ICE guidelines would require such disclosure if the communication were taking place in person or over the telephone. Law enforcement personnel may communicate online under a non-identifying name or fictitious identity if ICE guidelines and procedures would authorize such communications in the physical world. For purposes of ICE undercover guidelines, each discrete conversation online constitutes a separate undercover activity or contact, but such a conversation may comprise more than one transmission between the law enforcement personnel and another person.

7. Online Undercover Activities. Just as law enforcement agencies may establish physical-world undercover entities, they also may establish online undercover facilities, such as bulletin board systems and Web sites, which covertly offer information or services to the public. Online undercover facilities, however, can raise novel and complex legal issues, especially if law enforcement personnel seek to use the system administrator's powers for criminal investigative purposes. Further, these facilities may raise unique and sensitive policy issues involving privacy, international sovereignty, and unintended harm to unknown third parties. Because of these concerns, a proposed online undercover facility, like any undercover entity, may be established only if the operation is authorized pursuant to ICE's guidelines and procedures for evaluating undercover operations.

8. Communicating Online Through the Use of the Identity of a Cooperating Witness, with Consent. Law enforcement personnel may ask a cooperating witness to communicate online with other persons in order to further an investigation if agency guidelines and procedures authorize such a consensual communication in person, over the telephone, or through other non-electronic means. Law enforcement personnel may communicate online using the identity of another person if that person consents, if the communications are within the scope of the consent, and if such activity is authorized by ICE guidelines and procedures. Personnel who communicate online through the identity of a cooperating witness are acting in an undercover capacity.

9. Appropriating Online Identity. "Appropriating online identity" occurs when law enforcement personnel electronically communicate with others by deliberately assuming the known online identity (such as the username) of a real person, without obtaining that person's consent. Appropriating identity is an intrusive law enforcement technique that should be used infrequently and only in serious criminal cases. When assuming an online identity, law enforcement personnel must follow all applicable ICE policies and guidelines.

10. Activity by Law Enforcement Personnel during Personal Time. While not on duty, law enforcement personnel are generally free to engage in personal online pursuits. If, however, the off-duty online activity directly and substantially relates to a law enforcement investigation, operation, or prosecution, law enforcement personnel are bound by the same restrictions regarding the use of online information as would apply when on duty.

11. International Issues. Unless gathering information from online facilities configured for public access, law enforcement personnel conducting investigations should use reasonable efforts to ascertain whether any pertinent computer system, data, witness, or subject is located in a foreign jurisdiction. Whenever an item or person is located abroad, law enforcement personnel should follow ICE's policies and procedures for international investigations.

Personnel who conduct and support criminal and civil law enforcement investigations and/or operations must adhere to the above principles when using information gathered online in support of an official agency criminal or civil law enforcement investigations and/or operations.

The principles that address the use of the Internet for undercover activities apply only to ICE personnel with the authority to conduct undercover investigations.

Personnel who conduct civil and criminal law enforcement activities for Enforcement and Removal Operations should also adhere to the above principles when using information gathered online in support of their law enforcement activities. Such personnel should remain mindful that the principles that address the use of the Internet for undercover activities apply only to those vested with such authority.

Attorneys with the Office of the Principal Legal Advisor should also adhere to the above principles, except those that are applicable to undercover activities, when using information gathered online in support of their handling of criminal, civil, or administrative matters.

<u>No Private Right of Action</u>

This memorandum is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

Case: 26-6906, 11/20/2026, DktEntry: 16.9, Page 64 of 300

# EXHIBIT 48

This document has been updated, as of 4/8/2025, to be in compliance with Executive Order 14168, "Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," signed 1/20/2025; Executive Order 14151, "Ending Radical and Wasteful Government DEI Programs and Preferencing," signed 1/20/2025; the ICE Office of the Director Memo, titled "Terminology for Communications Materials and Internal and External Communications," dated 1/20/2025, and the ICE Office of the Director Memo, titled "Updated Terminology for Communications Materials and Internal and External Communications," dated 3/31/2025. (Note: This document is also being reviewed for alignment with other Presidential issuances.)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER




*Homeland Security Investigations*

# Arrest Procedures Handbook

HSI HB 15-03 / July 21, 2015

U.S. Immigration and Customs Enforcement

# Foreword

The Arrest Procedures Handbook provides a single source of national policies, procedures, responsibilities, guidelines, and controls that should be followed by U.S. Immigration and Customs Enforcement (ICE) Homeland Security Investigations (HSI) Special Agents when exercising the authority to detain, arrest, and transport individuals in custody in the course of conducting investigations and other enforcement-related activities within the scope of their authority. This Handbook contains instructions and guidance that will help ensure uniformity and operational consistency among all HSI field offices. (Note: HSI SAs must comply with the Department of Homeland Security's Commitment to Nondiscriminatory Law Enforcement and Screening Activities and with ICE Directive 11062.2 entitled, "Sexual Abuse and Assault Prevention and Intervention," dated May 11, 2014, or as updated.)

This Handbook supersedes Office of Investigations Handbook 07-02 entitled, "Arrest Procedures Handbook," dated October 7, 2007, and all other policies or other documents on arrest procedures issued by HSI since October 7, 2007.

The Arrest Procedures Handbook is an internal policy of HSI. It is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter, nor are any limitations hereby placed on otherwise lawful enforcement prerogatives of ICE. This Handbook is For Official Use Only (FOUO) – Law Enforcement Sensitive. It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with Department of Homeland Security policy relating to FOUO information and the ICE Directive on Safeguarding Law Enforcement Sensitive Information. This information shall not be distributed beyond the original addressees without prior authorization of the originator. If disclosure of this Handbook or any portion of it is demanded in any judicial or administrative proceeding, the HSI Records and Disclosure Unit, as well as the ICE Office of the Principal Legal Advisor and/or U.S. Attorney's Office, are to be consulted so that appropriate measures can be taken to invoke privileges against disclosure. This Handbook contains information which may be exempt from disclosure to the public under the Freedom of Information Act, Title 5, United States Code, Section 552(b), and protected from disclosure pursuant to the law enforcement privilege. Any further request for disclosure of this Handbook or information contained herein should be referred to the Records and Disclosure Unit.

The HSI Policy Unit is responsible for coordinating the development and issuance of HSI policy. All suggested changes or updates to this Handbook should be submitted to the HSI Policy Unit which will coordinate all needed revisions.

Peter T. Edge
Executive Associate Director
Homeland Security Investigations

JUL 21 2015
Date

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# ARREST PROCEDURES HANDBOOK

## Table of Contents

**Chapter 1. PURPOSE AND SCOPE ........ 1**

**Chapter 2. INTRODUCTION ........ 1**

**Chapter 3. DEFINITIONS ........ 1**

- 3.1 Adult ........ 1
- 3.2 Arrest ........ 1
- 3.3 Booking ........ 2
- 3.4 Detention ........ 2
- 3.5 High Risk Prisoner ........ 2
- 3.6 Juvenile ........ 2
- 3.7 Low Risk Prisoner ........ 2
- 3.8 Medical Professional ........ 2
- 3.9 Weapon ........ 2

**Chapter 4. RESPONSIBILITIES ........ 2**

- 4.1 Executive Associate Director, Homeland Security Investigations ........ 2
- 4.2 Special Agents in Charge ........ 2
- 4.3 Special Agents ........ 3

**Chapter 5. AUTHORITIES/REFERENCES ........ 3**

- 5.1 Authorities ........ 3
- 5.2 References ........ 4

**Chapter 6. LIABILITY ........ 4**

**Chapter 7. DETENTION AND RELATED ISSUES ........ 5**

- 7.1 Border Detention ........ 5
- 7.2 Detention During Execution of Search Warrant ........ 5
- 7.3 Investigative Detentions (Terry Stops) ........ 5
- 7.4 Limited Search for Officer Safety Concerns (Frisk) ........ 6
- 7.5 Time of Detention and Release ........ 6
- 7.6 Need for Special Equipment or Personnel ........ 6
- 7.7 Access to Food, Water, and Restrooms ........ 6
- 7.8 Access to Prescription Drugs and Medical Assistance ........ 6

- 7.9 Identification ....... 6
- 7.10 Detainment on Behalf of a Different Agency ....... 6
- 7.11 Diplomats ....... 7

**Chapter 8. ARREST PROCEDURES AND RELATED ISSUES ....... 7**

- 8.1 Arrest Defined ....... 7
- 8.1.1 Criminal Arrest ....... 8
- 8.1.2 Administrative Arrest ....... 8
- 8.2 Number of Officers Making an Arrest ....... 9
- 8.3 Foot Pursuits ....... 9
- 8.4 Use of Restraints ....... 9
- 8.4.1 Length of Time Restraints Are Used ....... 9
- 8.4.2 Method of Restraint ....... 9
- 8.4.3 Individuals to Be Restrained ....... 10
- 8.4.4 Aggressive Individuals ....... 10
- 8.4.5 Transport of Individuals Using Restraints ....... 10
- 8.5 Searches Incident to Arrest ....... 11
- 8.5.1 Initial Weapons Search ....... 11
- 8.5.2 Complete Search ....... 11
- 8.5.3 Search of Cell Phones Incident to Arrest ....... 12
- 8.6 Smoking ....... 13
- 8.7 Threat from Third Parties ....... 13
- 8.8 Hostile Environments ....... 13
- 8.9 Safety for Individuals in Custody ....... 14
- 8.10 Immunity from Arrest ....... 14
- 8.11 Arrest of Foreign Nationals ....... 14
- 8.11.1 Right to Communicate with Consular Official ....... 14
- 8.12 Statement of Rights ....... 14
- 8.12.1 Miranda Warning Following a Criminal Arrest ....... 15
- 8.12.2 Notice of Rights Warning Following an Administrative Arrest ....... 15
- 8.13 Juveniles ....... 15
- 8.13.1 Criminal Arrest of Juveniles ....... 15
- 8.13.2 Administrative Detention of Juveniles ....... 16

**Chapter 9. TRANSPORTATION PROCEDURES AND RELATED ISSUES ....... 16**

- 9.1 General Guidelines for Transporting Individuals in Custody by Motor Vehicle ....... 16
- 9.2 Number of Officers Transporting an Individual in Custody ....... 16
- 9.3 Securing Weapons ....... 16
- 9.4 Use of Restraints Prior to, During, and After the Transportation ....... 16
- 9.5 Vehicle Search and Child Safety Locks ....... 16

- 9.6 Seating of Individuals in Custody ........ 18
- 9.7 Transporting Juveniles ........ 18
- 9.8 Use of Restrooms During the Transportation ........ 18
- 9.9 Medical Considerations ........ 19
- 9.10 High Risk Individuals ........ 19
- 9.11 Required Communications ........ 19
- 9.12 Transportation of Prisoners Via Commercial Air Carrier ........ 20
- 9.13 Outside Enforcement Activities ........ 21

**Chapter 10. BOOKING PROCEDURES ........ 22**

**APPENDIX** Acronyms ........ A-i

# ARREST PROCEDURES HANDBOOK

## Chapter 1. PURPOSE AND SCOPE

The Arrest Procedures Handbook establishes policy and procedures for U.S. Immigration and Customs Enforcement (ICE) Homeland Security Investigations (HSI) Special Agents (SAs) when they exercise the authority to detain, arrest, or transport individuals. (Note: Any force used to detain, arrest, and/or transport individuals must be used in accordance with the Interim ICE Use of Force Policy, issued July 7, 2004, or as updated.)

## Chapter 2. INTRODUCTION

The scope of HSI SAs' authority is established by the United States Constitution and by statute, and SAs must know the bases for their authority as well as the limits of such authority. SAs may take an individual into custody only when acting within the scope of their legal authority.

The detention, arrest, and transport of individuals are among the most dangerous duties performed by HSI SAs. Many law enforcement officer casualties occur in the course of performing such duties. The procedures and standards set forth in this Handbook have been developed to minimize such casualties. These procedures and standards can also preclude costly and time-consuming lawsuits or trial tactics that might divert the attention of courts and juries from the substantive facts of a case to the nature of HSI's treatment of a defendant or respondent.

Compliance with the procedures and standards set forth in this Handbook, along with HSI SAs' training, will help to ensure officer safety, safeguard the rights of those individuals in the custody of SAs, and maximize the admissibility of evidence obtained by SAs.

## Chapter 3. DEFINITIONS.

The following definitions are provided for the purposes of this Handbook:

### 3.1 Adult

Any person who is 18 years of age or older.

### 3.2 Arrest

An actual or constructive restraint or detention of an individual performed with the purpose of taking the individual into custody.

### 3.3 Booking

The act of processing an arrestee into a detention facility. This process generally includes recording the subject's personal information, photographing, fingerprinting, criminal records check, medical questionnaire, property inventory, and entrance into a detention facility. This facility may be operated by Federal, State, and/or local jurisdictions.

### 3.4 Detention

Restraining an individual's freedom of movement or ability to walk away during an investigative inquiry by establishing temporary control over the individual.

### 3.5 High Risk Prisoner

A prisoner who SAs believe poses an exceptional escape risk and/or who is charged with, or convicted of, a violent crime.

### 3.6 Juvenile

Any person under the age of 18.

### 3.7 Low Risk Prisoner

Any prisoner who has not been designated as high risk.

### 3.8 Medical Professional

A licensed doctor, nurse practitioner, technician, or aide trained to treat, provide care, or administer medication or services specific to the medical needs of the individual.

### 3.9 Weapon

Any object, item, or device that may be used to cause physical injury, incapacitate, or diminish capability, temporarily or permanently.

## Chapter 4. RESPONSIBILITIES.

### 4.1 Executive Associate Director, Homeland Security Investigations

The Executive Associate Director of HSI has the overall responsibility for the oversight of the policies and procedures set forth in this Handbook.

### 4.2 Special Agents in Charge

Special Agents in Charge (SACs) are responsible for implementing the policies and procedures set forth in this Handbook within their respective areas of responsibility (AORs). SACs are also responsible for providing the appropriate restraining devices to all SAs in their AORs.

### 4.3 Special Agents

SAs are responsible for complying with the provisions of this Handbook.

## Chapter 5. AUTHORITIES/REFERENCES

### 5.1 Authorities

A. Federal Authorities

HSI SAs' authority to arrest a person is based on various sections of law, including, but not limited to, the authority provided in Title 19, United States Code (U.S.C.), Section 1589a and 8 U.S.C. § 1357.

B. State Peace Officer Authority

In addition to Federal arrest authority, SAs may, in certain circumstances, exercise arrest authority as designated State peace officers or in their capacity as private citizens who witness a crime. As separate sovereigns, each State may determine who is authorized to enforce its laws. Usually, this means that arrest power is granted to State police, sheriffs, and various municipal police departments. Some States have enacted legislation designating Federal law enforcement officers as State peace officers with the power to enforce State law. (See HSI Directive 13-01 entitled, "HSI Special Agents Responding to State Crimes," dated May 30, 2013, or as updated.)

In addition to statutory authorization for SAs to serve as State peace officers, it may be possible to obtain State peace officer status by being "deputized" by a local sheriff or other State law enforcement official. SAs so deputized should confirm that the deputization is not merely honorary and actually carries with it the power of arrest.

Further, it is important for SAs to bear in mind that any State law enforcement authority they possess or receive should be used to further Federal law enforcement priorities.

C. Citizen's Arrest Authority

In addition to Federal and State arrest authority, HSI SAs have the power to arrest, search, or seize persons or things just as any private citizen would, and local law governs in such instances. SAs must therefore act in accordance with local law in any situation where they make an arrest for an offense that is not within the jurisdiction of

ICE. Generally, a private person may make an arrest when a crime (felony or misdemeanor) is committed or is attempted in his or her presence, or when the person arrested has committed a felony, even though not in the presence of the private person. However, SAs should check local law to see under what circumstances they may make arrests as private persons or as HSI SAs. (Note: For more information regarding citizen arrest authority and liabilities, see HSI Directive 13-01 entitled, "HSI Special Agents Responding to State Crimes," May 30, 2013, or as updated.)

## 5.2 References

A. ICE Interim Use of Force Policy, dated June 11, 2004, or as updated.

B. ICE Directive 10066.1 (former number: 7-3.), Consular Notification of Detained or Arrested Foreign Nationals, dated February 13, 2006, or as updated.

C. HSI Directive 14-01, Mandatory Booking of Arrestees Using EAGLE, dated April 23, 2014, or as updated.

D. HSI Directive 13-01, HSI Special Agents Responding to State Crimes, dated May 30, 2013, or as updated.

E. HSI Handbook (HB) 12-04, Search and Seizure Handbook, dated September 14, 2012, or as updated.

F. HSI HB 11-01, Computer Forensics Handbook, dated April 27, 2011, or as updated.

G. Office of Investigations (OI) HB 10-03, Interviewing Techniques Handbook, dated April 28, 2010, or as updated.

# Chapter 6. LIABILITY

When seizing or arresting an individual, HSI SAs assume responsibility for the well-being of the individual, as well as the well-being of fellow officers and other people who may come in contact with the individual. SAs who carry out their duties in a negligent or wrongful manner may subject themselves, their supervisors, and the Federal government to civil liability.

SAs are subject to individual liability under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971) if, while enforcing Federal law, they violate an individual's clearly-established rights under the U.S. Constitution. Under 42 U.S.C. § 1983, SAs face similar liability for Federal civil rights violations committed while enforcing State or local law.

In rare cases, SAs may face criminal liability for alleged civil rights violations or other misconduct.

## Chapter 7. DETENTION AND RELATED ISSUES

### 7.1 Border Detention

The border search exception to the warrant and probable cause requirements of the Fourth Amendment permits HSI SAs to detain people at the border, functional equivalent of the border, or extended border, with no suspicion, for the purpose of searching for merchandise, determination of alienage, and any evidence of admissibility.

19 U.S.C. §§ 482, 1581, and 1582 set forth SAs' customs statutory authority in this regard, while 8 U.S.C. §§ 1225 and 1357 set forth the primary immigration authority to temporarily detain aliens in the border environment. Customs detention is authorized to search for merchandise and for evidence related to the importation or exportation of merchandise. Immigration detention is authorized to determine the admissibility of an individual. In some cases, searches by SAs are limited by policy; for example, a search involving a pat down of an individual for merchandise requires one articulable fact that merchandise will be found on the person. In order to retrieve an item discovered during such a pat down, SAs must have a reasonable suspicion that the item is merchandise. Likewise, reasonable suspicion that a person is carrying merchandise inside his or her body is necessary in order to refer that person to an approved medical facility to have medical personnel conduct an internal examination.

### 7.2 Detention During Execution of Search Warrant

SAs executing a criminal search warrant have the authority to briefly detain any individuals present at the location of the enforcement site. Included in this authority are individuals attempting to leave the enforcement site in the presence of SAs arriving and individuals who arrive or attempt to obtain access to the enforcement site. An individual may be detained at the enforcement site during the execution of the criminal search warrant for as long as deemed necessary by the SAs. Restraints may be used in accordance with the procedures outlined in Section 8.4. The principles applicable to a Terry Stop (see Section 7.3 below) are fully applicable to those present during the execution of a search warrant.

### 7.3 Investigative Detentions (Terry Stops)

SAs may temporarily detain an individual when they have reasonable suspicion that the individual is engaged in criminal activity. If SAs fail to develop a probable cause belief that the person committed (or is committing) a crime or fail to establish a reasonable suspicion of wrongdoing distinct from the reason for the initial stop, they must release the individual. A stop must not be longer than the circumstances justifiably require and must not be more intrusive than reasonably necessary to verify or dispel the SAs' suspicions. A stop which is sufficiently long or unreasonable in duration or intrusiveness will constitute an arrest.

SAs may also perform a pat down search or frisk of an individual during the temporary detention as long as they have reasonable suspicion that the individual is armed and dangerous. For the SAs' protection (and the protection of others) during the detention, the SAs can conduct a limited search of the person to confirm or dispel that suspicion.

### 7.4 Limited Search for Officer Safety Concerns (Frisk)

Whenever there is reasonable suspicion that an individual is armed, SAs are justified, for officer safety concerns, in conducting a frisk for weapons during a detention. This limited search is performed pursuant to a Terry Stop. (See Section 7.3).

### 7.5 Time of Detention and Release

The amount of time that an individual may be detained must be determined by the totality of the circumstances involving the detention. Detained persons should be released as soon as possible, unless probable cause is developed and they are to be placed under arrest.

### 7.6 Need for Special Equipment or Personnel

If the need arises for special equipment or personnel in order to complete an investigative or enforcement action, for example canine (K-9) assistance, an interpreter, or contraband detection equipment, SAs must document the facts supporting the continued detention. Failure to do so may result in a court later ruling that any evidence found was the result of an unlawful arrest.

### 7.7 Access to Food, Water, and Restrooms

Individuals in custody for more than 6 hours must be given access to food at the expense of the investigating HSI field office. Water and restroom facilities should be made available to individuals in custody on an as-needed basis. Restroom facilities may be restricted if the detention results from a suspicion that the persons in custody are concealing merchandise or contraband in their body.

### 7.8 Access to Prescription Drugs and Medical Assistance

SAs shall ensure that detained individuals have access to their own legally prescribed medication or medical assistance during the time that they are in custody. In the event of a medical emergency, SAs should contact emergency services immediately.

### 7.9 Identification

All individuals detained by HSI SAs must be identified and the identities must subsequently be appropriately documented. Every effort should be taken to identify the detained individuals through the Integrated Automated Fingerprint Identification System, if feasible.

### 7.10 Detainment on Behalf of a Different Agency

If an individual has been detained on behalf of another agency, SAs must document the legal basis for the detention, the time the requesting agency made contact or was contacted, the time of arrival of officers from the requesting agency, and the identity of the officer to whom the person was released. In addition, it is important to note the physical and mental condition of the individual in custody at the time of the initial detention and at the time of the subsequent release.

### 7.11 Diplomats

Diplomats may be detained only as long as needed to determine their identity and status. If, after reviewing a diplomat's Diplomatic or Consular Identification Card, HSI SAs determine that the diplomat is accredited and not subject to any form of detention or arrest, the HSI SAs must immediately release the diplomat. The SAs should treat the diplomat with due respect and shall take all appropriate steps to prevent any attack on his or her person, freedom, or dignity. The diplomat's local consulate or embassy may assist in the verification of identity and status. Also, the U.S. Department of State (DOS)'s "Diplomatic List," which may change on a daily basis, covers foreign missions (embassies, interest sections) in the United States. The list contains the names of the staff of the foreign mission having diplomatic rank. These individuals enjoy full immunity under the provisions of the Vienna Convention on Diplomatic Relations except for U.S. nationals. The immunity status of the individual encountered during an enforcement action or investigation should be verified with DOS' Office of Protocol. Assistance is available through the Protocol Duty Officer on duty for the Office of Protocol or the Diplomatic Security Agent on duty. They can be contacted through the Diplomatic Security Command Center at (571) 345-3146 (open 24 hours a day). More information regarding this subject can be found at the following DOS link: http://www.state.gov/s/cpr/rls/dpl/. Valid Non-Immigrant Visas A-1, A-2, G-1, G-3, and North Atlantic Treaty Organization (NATO) 1-6 indicate possible status of immunity from criminal arrest or prosecution.

## Chapter 8. ARREST PROCEDURES AND RELATED ISSUES

### 8.1 Arrest Defined

As stated in Section 3.2, an arrest is an actual or constructive restraint or detention of an individual performed with the purpose of taking the individual into custody. A detention may also be deemed an arrest if, based on the totality of the circumstances, a reasonable individual would believe himself or herself to be in custody. An arrest does not depend solely on whether the SA announces that the suspect has been placed under arrest. If an SA's conduct is more intrusive than an investigative stop, an arrest may take place. In determining whether an SA's conduct is tantamount to an arrest, consideration must be given to the relevant facts and circumstances, including but not limited to:

A. when and where the encounter occurred;

B. the duration of the encounter;

C. the number of SAs and other officers present;

D. what the SA(s) and the suspect said and did;

E. the use of weapons, handcuffs, a guard blocking the door, verbal commands, or other physical restraints;

F. the nature of the questioning;

G. whether SAs escorted the suspect to another location for questioning;

H. whether the SA(s) retained custody of important travel or identification documents during the encounter; and

I. whether the suspect was permitted to leave following the encounter.

HSI SAs are authorized to make arrests with or without an arrest warrant for criminal and administrative violations.

### 8.1.1 Criminal Arrest

A criminal arrest must be supported by probable cause to believe that the individual arrested has committed a criminal offense. Probable cause is articulable facts and circumstances that would lead a reasonably prudent person to believe that a criminal offense has been committed or is being committed by the individual to be arrested. Probable cause is more than mere suspicion, but less than absolute certainty of guilt.

In determining whether probable cause was present at the time of an arrest, courts consider the totality of the circumstances as viewed by a reasonably prudent SA, coupled with the SA's training and experience.

Pertinent factors include personal knowledge or observation by the SA; information contained in official communication to the SA; information from reliable informants, victims, or witnesses; actions and appearance of the suspect(s); criminal reputation of the suspects; inconsistent and unpersuasive answers to routine questions; and possession, disposal, or concealment of evidence.

Under certain circumstances where a suspect forcibly resists an arrest, the suspect could be arrested for a violation of 18 U.S.C. § 111 (Assaulting, resisting, or impeding certain officers), or 18 U.S.C. § 2231 (Interfering with an officer authorized to make a search).

### 8.1.2 Administrative Arrest

An SA has the authority to arrest an individual if the SA has reason to believe (consistently interpreted as requiring probable cause) that the individual is in violation of the Immigration and

Nationality Act (INA). An administrative arrest is initiated when the disposition of the case will be sought in civil proceedings rather than in a criminal court proceeding. This is most often associated with immigration proceedings.

### 8.2 Number of Officers Making an Arrest

Criminal and administrative arrests must be conducted by at least two law enforcement officers in order to ensure officer safety, except in unforeseeable, exigent circumstances. Cases where SAs respond to a duty call and there is a possibility that an arrest may be effected do not constitute an unforeseeable, exigent circumstance; therefore, SAs must adhere to the above requirement that at least two law enforcement officers conduct criminal and administrative arrests.

### 8.3 Foot Pursuits

SAs are authorized to engage in foot pursuits taking into consideration training and officer safety concerns. In addition, SAs should use the amount of force that is necessary and reasonable when stopping and apprehending an individual fleeing on foot, in accordance with the Interim ICE Use of Force Policy, dated July 7, 2004, or as updated.

### 8.4 Use of Restraints

The use of restraints on individuals in HSI custody must be conducted in a manner that is safe, secure, humane, and professional. Only the amount of restraint necessary and reasonable to ensure the safety of the SAs, the individual(s) in custody, the public, and/or to prevent escape shall be employed. Restraints shall not be used to inflict punishment or to restrict blood circulation or breathing. (Note: SAs should consult the Office of Firearms and Tactical Programs (OFTP) for questions regarding authorized restraining devices.)

#### 8.4.1 Length of Time Restraints Are Used

All restraints are only temporary devices and should be removed when the individual in custody is placed in a secure holding facility and/or they are no longer required.

#### 8.4.2 Method of Restraint

SAs shall handcuff (double-lock) all individuals in custody with their hands placed behind their back and the palms facing outward, unless a belly chain or transportation belt is used. If a belly chain or transportation belt is used on an individual in custody, the individual may be handcuffed in the front. Additionally, if necessary to ensure the security and safety of all, leg restraints should be used. An individual in custody who is in restraints must not be left unattended.

The SA is authorized to handcuff the individual in custody with his or her hands in the front without a belly chain, transportation belt, or other appropriate and approved restraining device(s) only if the individual in custody:

# LE

Large individuals or those who are overly muscled such as weightlifters may require the use of several sets of handcuffs linked together. Flex-Cuffs or other specifically designed flexible police restraints may be used if necessary.

Individuals in custody shall not be handcuffed to an SA, officer, another person, or any object that may potentially cause an injury.

SAs may remove handcuffs from prisoners during processing only to facilitate the taking of fingerprints and to accommodate sanitation needs. Handcuffs may also be removed for medical emergencies when the circumstances dictate. Enhanced diligence is required during these times to ensure security and the safety of all.

### 8.4.3 Individuals to Be Restrained

Age, size, and sex are not valid reasons for failing to handcuff an individual. Juveniles may be handcuffed for officer safety.

Females shall be subject to the same handcuffing and restraint procedures used for males. (Also see Section 8.4.2(A).)

### 8.4.4 Aggressive Individuals

Combative individuals in custody may require the use of leg irons or other flexible restraints applied to prevent kicking by the individual.

Additional approved restraint devices may be used to secure an individual who violently resists arrest, poses a threat to officer safety, or who manifests mental disorders such that he or she presents a threat to himself or herself or to the public. (Note: SAs should contact OFTP for a list of authorized retraining devices.)

### 8.4.5 Transport of Individuals Using Restraints

Along with other considerations contained in this chapter, SAs should remember that, when using restraints, individuals in custody shall not be handcuffed to any moving vehicle or other conveyance. Furthermore, SAs must not transport individuals in custody who are restrained in a prone position. Individuals in custody shall never be left unsupervised in a vehicle or locked within a vehicle without supervision and appropriate ventilation. During transport, individuals in

custody are to remain restrained as described in Section 8.4.2. In circumstances where custody of an individual is turned over to other SAs for transport, the receiving SAs must search the individual regardless of any prior searches conducted by the arresting SAs or other law enforcement officers. (Note: See Chapter 9 for additional guidance on transporting individuals.)

## 8.5 Searches Incident to Arrest

There are two types of searches that must be conducted following each arrest: 1) an initial weapons search; and 2) a complete search.

### 8.5.1 Initial Weapons Search

A search for weapons should immediately follow handcuffing of any individual who may or may not be a suspect or prisoner.

Whenever possible, an SA or other officer of the same sex should conduct an initial weapons search of the individual being handcuffed and/or taken into custody. However, a frisk for weapons immediately following an arrest will not be delayed if an officer of the same sex is not available.

The discovery of a weapon or potential weapon during the search must be immediately communicated to the other officers at the scene of the encounter and/or to the members of the arrest team. The presence of one weapon suggests that other weapons might be present and calls for a heightened state of alertness by all personnel involved.

### 8.5.2 Complete Search

As soon as practical, a thorough search for evidence shall be conducted on the individual in custody. This search will not be limited as a result of an individual's objections, embarrassment, etc. A law enforcement officer of the same sex as the individual in custody should conduct this search if available; however, the search should not be unreasonably delayed due to the unavailability of a same-sex officer.

All property of the prisoner will be removed from him or her and secured in a plastic bag or other container. Special care should be given to document items of value. Currency should be counted in the presence of the individual in custody and another member of a law enforcement agency. If the prisoner was arrested while driving a vehicle, the vehicle will also be searched incident to arrest and detained in furtherance of the arrest. During an arrest that is made in a room or building, SAs may conduct a search of the immediate area to ensure officer safety only. Any evidence of a crime observed may be seized under the plain view doctrine. Any evidence found on the individual in custody should be kept separately from any items that do not have evidentiary value.

The prisoner will be afforded the opportunity to relinquish all personal property to a third party, either in person or by mail. This transaction will be recorded on a Department of Homeland

Security (DHS) Form 6051R, "Receipt of Property." If this cannot be accomplished, the prisoner will be afforded the opportunity to abandon his or her property. Prisoners must be informed and understand that if they abandon the property, they will have 30 days during which to recover their property, after which the property may be destroyed. This transaction will be recorded on DHS Form 4607, "Notice of Abandonment and Assent to Forfeiture of Prohibited or Seized Merchandise," and, as needed, DHS Form 4613, "Order to Destroy and Record of Destruction of Forfeited, Abandoned, or Unclaimed Merchandise."

**LE**

The searching officer and others present must take precautions to prevent the spread of infectious diseases from the prisoner(s). The use of protective gloves to prevent contact with bodily fluids is strongly recommended.

### 8.5.3 Search of Cell Phones Incident to Arrest

SAs may discover cell phones and other smartphone devices during the search incident to arrest. In order to conduct a search of a cell phone upon arrest, SAs must either secure a warrant before searching the content of the cell phone or rely on another exception to the warrant requirement, such as consent, exigent circumstances, or plain view. If timing and circumstances permit, SAs should consider obtaining an anticipatory search warrant for a suspect's cell phone(s). SAs may still seize a cell phone during a lawful arrest, and may still examine the physical aspects of the phone to ensure that it will not be used as a weapon, including, for example, searching between the phone and its case for a razor blade. For further details, reference is made to the U.S. Supreme Court decision in Riley v. California, 134 S. Ct. 2473 (2014), holding that law enforcement officers must generally secure a warrant before conducting a search of a cell phone incident to arrest.

Since a search authorized by consent is wholly valid, SAs should always request consent (in writing, if possible) to search the contents of a cell phone of an individual who is arrested. If consent is not secured, exigent circumstances may still justify a search. Emergencies such as texts that are sent to armed and dangerous accomplices or location data of missing children in an abductor's cell phone could qualify as exigent circumstances and justify warrantless searches of cell phones upon arrest. However, such searches should be limited to addressing the exigency, and should not be used as a means to collect evidence

**LE**

LE

(Note: For guidance on searches of other electronic devices, SAs should see the Search and Seizure Handbook (HSI HB 12-04), dated September 14, 2012, or as updated.)

**8.6 Smoking**

Individuals in custody will not be allowed to smok LE LE At the discretion of the arresting SAs and once the individuals in custody are in a secure location that allows smoking, SAs may choose to allow them to smoke as part of the interviewing techniques. Individuals in a detention cell will not be allowed access to smoking materials.

**8.7 Threat from Third Parties**

SAs and other officers should take into consideration the potential threat from third parties that could cause harm to the SAs, officers, and/or the individual(s) in custody. SAs or other officers must be assigned to concentrate on the individual(s) in custody while others remain alert for third party threats.

**8.8 Hostile Environments**

In hostile environments, any and all individuals in custody must be removed as quickly as possible to a safe place. Individuals in custody must not be used as shields by SAs or other officers present during the completion of the law enforcement operation.

### 8.9 Safety for Individuals in Custody

SAs should not engage in any enforcement activities while they have an individual in custody unless failure to act at the immediate moment would risk death or serious bodily injury to oneself or another person. In both life threatening and non-life threatening yet serious situations, SAs should attempt to call for back-up assistance if practicable and SAs may remain on hand until such assistance has arrived. Regardless, SAs must maintain the safety of individuals in custody at all times.

### 8.10 Immunity from Arrest

Individuals who have immunity from arrest are:

A. Diplomats who are accredited to the United States or their family members (with the exception of U.S. nationals). (See Section 7.11.)

B. Diplomats accredited to a foreign country or their family members who are directly en route between their home country and the country of accreditation. (Note: Mere possession of a diplomatic passport does not confer diplomatic immunity.) (See Section 7.11.)

C. Sitting judges while court is in session.

D. Members of Congress during their attendance at sessions of Congress, or while traveling to or from a session may be arrested but may not be otherwise detained. (Note: Immunity from arrest is a privilege; members of Congress can be detained and/or arrested when Congress is not in session.)

### 8.11 Arrest of Foreign Nationals

The arrest of foreign nationals requires certain actions depending on their nationality, immigration status in the United States, and where the arrest took place. If the individuals are aliens, they have the right to speak to their consular officer. (See ICE Directive 10066.1 (former number: 7-3.0), entitled "Consular Notification of Detained or Arrested Foreign Nationals," dated February 13, 2006, or as updated.)

### 8.11.1 Right to Communicate with Consular Official

An alien who is being detained must be notified that he or she may communicate with a consular official in accordance with Title 8, Code of Federal Regulations (C.F.R.), Section 236.1(e). If an alien is a national of one of the countries listed in 8 C.F.R. § 236.1(e), a consular official of that country must be notified, even if the alien specifically requests that no notification be made. SAs must not reveal to any consular official the fact that the alien may have requested asylum.

### 8.12 Statement of Rights

### 8.12.1 Miranda Warning Following a Criminal Arrest

Following a criminal arrest and prior to questioning beyond what is needed for identification or processing purposes, individuals in custody must be informed that anything they say may be used against them and that they have the right to remain silent, to consult with a lawyer, to have a lawyer present during questioning, and, if indigent, to have counsel appointed. The purpose of these warnings, commonly termed Miranda warnings, is to provide an individual in a custodial setting with notice of Fifth and Sixth Amendment rights available to that person prior to their interrogation. Absent exigent circumstances, Miranda warnings should be conducted in writing using ICE Form 73-025, "Statement of Rights," used for criminal cases. (Note: For additional information on Miranda warnings and on the definitions of "interview" and "interrogation," see OI HB 10-03, Interviewing Techniques Handbook, dated April 28, 2010, or as updated.)

### 8.12.2 Notice of Rights Warning Following an Administrative Arrest

Every apprehended individual charged with a violation of the INA must be given an administrative notice of rights, including the right to communicate with the alien's respective consular official as stated in Section 8.11.1. ICE uses multiple forms for this purpose as a result of decisions in certain court cases. Salvadorans are given a Notice of Rights to Salvadorans (DHS Form I-848), juveniles are given the Notice of Rights and Request for Disposition (DHS Form I-770), which is a simplified version, and all others are given DHS Form I-826, which bears the same title as DHS Form I-770. As part of the processing procedure of an apprehended alien, SAs must provide a copy of the appropriate form and make sure that the alien understands these rights.

Each of the rights forms contains a section for recording a decision by the apprehended alien to accept voluntary departure and immediate return, under appropriate safeguards, in lieu of formal removal proceedings.

## 8.13 Juveniles

### 8.13.1 Criminal Arrest of Juveniles

Juveniles require special handling as established in 18 U.S.C. § 5031 *et seq*. SAs must immediately notify the U.S. Attorney of the criminal arrest. If prosecution is authorized, the following steps must be taken:

A. SAs must advise juveniles of their Miranda rights using language the juveniles can understand.

B. The parents or guardian of the juvenile must immediately be notified of the nature of the charges and of the juvenile's rights.

C. Juveniles must immediately be brought before an appropriate legal authority, e.g., a magistrate, a judge, etc., for their initial appearance.

D. SAs must not release the name of the juveniles, fingerprints, photographs, or any reports of information about the juveniles to anyone other than as authorized by 18 U.S.C. § 5031 *et seq.* or by order of the court.

E. Juveniles 14 years old and older should be fingerprinted and photographed. Those under 14 should not.

### 8.13.2 Administrative Detention of Juveniles

Aliens who are defined as minors should be treated in accordance with the *Flores v. Reno* Settlement Agreement which sets nationwide policies for the detention, release, and treatment of juveniles in ICE custody. At the earliest opportunity, coordination and notification should be made with the appropriate local Enforcement and Removal Operations (ERO) office for the disposition of the juvenile(s).

The appropriate foreign consulate must be notified in the event that a minor is taken into custody by HSI who is not accompanied by a parent, family member, or legal guardian.

## Chapter 9. TRANSPORTATION PROCEDURES AND RELATED ISSUES

### 9.1 General Guidelines for Transporting Individuals in Custody by Motor Vehicle

Transporting an individual can be one of the most dangerous undertakings that SAs will encounter. The hazards and problems that they may encounter are countless. When considering the transportation of one or more restrained individuals, SAs must take into account:

A. The nature of the charge;

B. The name, address, history, etc. of the individual(s);

C. The kind of vehicle that will be used for the transportation – for example, caged or not caged;

D. The number of SAs involved in the transportation;

E. The number of individuals to be transported;

F. Possibility of injury to the individual(s) or the SAs;

G. The time that will elapse during the time of transportation; and

H. Whether the individual(s) was/were compliant prior to being restrained.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

SAs should determine whether the need to immediately transport the individual(s) outweighs the danger if the SAs were to wait and call for a different vehicle or a back-up unit. Individuals in custody shall be transported in a government vehicle.

LE

Whenever possible, at least one of the SAs shall be of the same sex as the individual(s) in custody. Female and male individuals should be separated during the transportation, if possible.

If possible, juveniles should be transported within the same vehicle as their parent or guardian if the parent or guardian is also in custody. (Note: For specific questions regarding juveniles, SAs should contact ERO's Juvenile Family Residential Management Unit.)

### 9.2 Number of Officers Transporting an Individual in Custody

In order to ensure officer safety, at least two law enforcement officers must transport an individual in custody, except in unforeseeable, exigent circumstances. This requirement applies regardless of whether it is for criminal or administrative offenses, and regardless of the means of transportation. If a vehicle is used, this should be accomplished by having two officers in the same vehicle. Utilizing two vehicles to transport one individual in custody should not be employed without first obtaining supervisory approval unless exigent circumstances clearly prevent this approval from being obtained.

When utilizing a prisoner transport van to move more than one individual in custody, a minimum of two officers must be involved. Supervisors have the discretion of assigning additional vehicles to follow the transport van for officer safety concerns.

(Note: See Section 9.12 for guidance on transporting prisoners via a commercial air carrier.)

### 9.3 Securing Weapons

SAs shall take measures to secure their handguns in an OFTP-defined and approved holster. Long guns shall be secured using an approved retention device for long guns. This will ensure that individuals in custody cannot gain access to the SAs' weapons during the transportation.

### 9.4 Use of Restraints Prior to, During, and After the Transportation

The use of restraints will be in accordance with Section 8.4 of this Handbook.

### 9.5 Vehicle Search and Child Safety Locks

All vehicles to be used in the transportation of individuals in custody should be searched for weapons, evidence, and any item that can inflict injury or be used by the individual(s) to aid an escape. This search should be done before the individuals in custody are placed in the vehicle and again immediately after they are removed from the vehicle. When transporting individuals in custody, SAs or other law enforcement officers should activate the vehicle's child safety locks if the vehicle is so equipped.

### 9.6 Seating of Individuals in Custody

Individuals should be transported in a manner that allows for constant visual observation. The seating of SAs, other law enforcement officers, and individuals in custody should be as follows:

A. Individuals in custody shall always be seated in the back seat of a vehicle and safety

LE

### 9.7 Transporting Juveniles

Juveniles should not be transported in the same area of a vehicle with adult individuals, unless the juveniles are being transported along with their parent(s) or guardian(s).

### 9.8 Use of Restrooms During the Transportation

Individuals in custody must be afforded the opportunity to utilize restroom facilities during the transportation only if:

A. the time in transit to reach the final destination is substantial; <u>and</u>

B. the use of the restroom can be accomplished in a safe and secure manner.

### 9.9 Medical Considerations

The physical well-being of individuals in custody should be monitored during transit. Particular attention should be directed to individuals reported or suspected of being under the influence of drugs and/or alcohol or who have a history of, or propensity for, violence.

Individuals in custody who report/display symptoms of serious illness during transit should immediately receive medical attention by a medical professional. LE

LE

LE any deviation during the transit of the individuals in custody should immediately be reported to management. (<u>Note:</u> See Section 9.11 for instructions on required communications during the transportation of individuals in custody.)

Symptoms or reports of physical or mental illness, such as threats of suicide or psychotic behavior, should be reported to all SAs or other law enforcement officers involved in the processing of the individuals in custody.

### 9.10 High Risk Individuals

Special precautions should be employed when transporting high risk individuals.

A. Belly chains and leg irons should be employed in addition to handcuffs.

B. Rival gang members should not be transported together.

SAs should consider having a second vehicle (with additional SAs or other law enforcement officers) follow to render immediate assistance.

### 9.11 Required Communications

LE

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

LE

## 9.12 Transportation of Prisoners Via Commercial Air Carrier

General safety precautions remain when transporting prisoners via commercial air carrier; however, the Federal Aviation Regulations (F.A.R.) have specific guidelines related to the transportation of prisoners. SAs and management need to be aware that not every airline will allow prisoners onboard. Furthermore, for those airlines which allow for the transportation of prisoners, the aircraft captain is the final authority and may refuse boarding for the prisoner. It is recommended that, if possible, SAs and supervisors explore other transportation options prior to deciding to utilize commercial air services.

The F.A.R. limit the type of prisoners onboard a commercial aircraft, the number of prisoners, and the officer-to-prisoner ratio. SAs transporting prisoners via commercial aircraft must have completed the "Law Enforcement Officers Flying Armed" course.

SAs must determine whether the prisoner is considered high risk or low risk prior to contacting the commercial air carrier

LE

In order to transport a prisoner onboard a commercial aircraft, SAs must notify the airline at least 24 hours prior to the departure or, if not possible, as far in advance as possible of the identity of the prisoner, the proposed flight number, and whether the prisoner is high risk or low risk.

SAs should arrive at the airline check-in counter at least 1 hour prior to the scheduled takeoff, or as advised by the airline. The SAs will be required to assure the airline personnel that each prisoner has been searched and does not have on or about his or her person or property anything that can be used as a deadly or dangerous weapon.

Prisoners shall remain handcuffed at all times during the transportation. LE

LE

Food and beverage will not be served to the prisoner without the authorization of the escorting SAs. If a meal is anticipated, SAs should confirm the type of eating utensils provided and, if necessary, bring plastic eating utensils with them. Prisoners will not be given metal eating utensils. (Note: If the decision is made to feed the prisoner prior to boarding the airline, SAs should confirm that the prisoner has returned all metal eating utensils provided to him or her.) Neither the prisoner nor the escorting SAs will be served alcohol.

Prior to boarding the aircraft, one of the escorting SAs shall contact the NLECC and provide the flight information, scheduled departure and arrival times, and the identity of the prisoner. Prior to the announcement that the cabin door is being closed, one of the SAs will update the NLECC with the departure time. Upon landing, one of the SAs will again notify the NLECC with the landing time and arrival gate information, if known.

(Note: SAs should also see Part 1, Section D of the Interim ICE Firearms Policy, dated July 7, 2004, or as updated.)

### 9.13 Outside Enforcement Activities

LE

## Chapter 10. BOOKING PROCEDURES

The arrest of an individual is not complete until he or she has been properly "booked" in the ICE Enforcement Integrated Database Arrest Graphic User Interface for Law Enforcement (EAGLE) and turned over to a law enforcement detention facility. (See HSI Directive 14-01 entitled, "Mandatory Booking of Arrestees Using EAGLE," dated April 23, 2014, or as updated.) Examples of such facilities would be a county jail or a Federal detention facility. This type of facility should not be confused with a holding cell in either an HSI office or a U.S. Customs and Border Protection port of entry. SAs are responsible for the individual until they have turned him or her over to the U.S. Marshals Service (in the case of an arrest on Federal offenses) or a State or local authority (in the case of an arrest on State or local offenses).

Detention facilities will generally accept only individuals in good health. If the individual has been injured and needs immediate medical attention or has a pre-existing injury or health condition (e.g., a heart condition or cancer), SAs should coordinate with their Group Supervisors to determine if the individual can be turned over to a detention facility or if another option can be identified.

Symptoms or reports of physical or mental illness, such as threats of suicide or psychotic behavior, should be reported to all SAs or other officers involved in the processing of the individuals in custody.

SAs should consult with their Group Supervisors regarding the specific process and procedures for booking individuals in their SAC's AOR. SAs must be familiar with local procedures as they may vary greatly between each jurisdiction or location. SAs are required to use Federal Bureau of Prisons Form BP-a377, "Prisoner Remand," to document the arrest of individuals arrested for violating Federal law. (<u>Note:</u> Since many SACs' AORs cross State and county lines, there may be many different procedures within just one SAC's AOR.)

**Appendix A**

# ACRONYMS

| | |
|---|---|
| AOR | Area of Responsibility |
| C.F.R. | Code of Federal Regulations |
| DHS | Department of Homeland Security |
| DOS | Department of State |
| EAGLE | Enforcement Integrated Database Arrest Graphic User Interface for Law Enforcement |
| ERO | Enforcement and Removal Operations |
| F.A.R. | Federal Aviation Regulation |
| FOUO | For Official Use Only |
| HB | Handbook |
| HSI | Homeland Security Investigations |
| ICE | U.S. Immigration and Customs Enforcement |
| INA | Immigration and Nationality Act |
| NATO | North Atlantic Treaty Organization |
| NLECC | National Law Enforcement Communications Center |
| OFTP | Office of Firearms and Tactical Programs |
| OI | Office of Investigations |
| SA | Special Agent |
| SAC | Special Agent in Charge |
| U.S.C. | United States Code |

# EXHIBIT 49

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER




[redacted] – welcome to VO Webinar on…

Introduce self + participants (MD [redacted], [redacted] of CA/LE [redacted] of VO/SAC, [redacted] [Thurs]/[redacted] [Fri] of L/CA)

First/second of two identical webinars, will not be recorded

As a reminder, please be sure you are muted.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER




[redacted] to run through agenda

I know there are a lot of questions about this process and we hope to answer many of them along the way.

turn it over to MD [redacted]

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# Opening Remarks

[redacted], Managing Director

CA/VO

[redacted]

SENSITIVE BUT UNCLASSIFIED

MD [redacted]

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

## Secretary Rubio – March 16, 2025

**"If you tell us when you apply for a visa, 'I'm coming to the U.S. to participate in pro-Hamas events,' that runs counter to the foreign policy interests of the United States…We don't want people in our country that are going to be committing crimes and undermining our national security or the public safety. It's that simple."**

[redacted]

SENSITIVE BUT UNCLASSIFIED

[redacted]

This guidance is part of our implementation of Executive Orders 14161 and 14188 aimed at protecting the U.S. from foreign terrorists, supporters, and other threats as well as combatting antisemitism. As Secretary Rubio has said, engaging in activities that advocate for terrorist activity or organizations is contrary to our foreign policy and national interests.




[redacted]

The guidance that we put out in 25 STATE 26168 is the preventative piece of this policy – ensuring that we address any derogatory information related to intent to engage in prohibited activities or those that are inconsistent with the visa status. Any applicant who has not demonstrated to your satisfaction that they meet all of the standards required by their visa classification should be refused.

As part of this screening effort, Consular officers must refer specific student visa applicants to the [redacted] for social media checks. Consular officers should then use the information obtained by the checks as part of their assessment of the totality of the applicant's circumstances.

In the next slide, we'll discuss which students are included in this requirement.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

## Which Students?

**F-1, M-1, certain J-1* visa applicants who are otherwise eligible and who meet one or more of the following criteria:**

LE

*J-1 applicants in the "student" exchange program category as described in 9 FAM 402.5-6(E)(11): secondary school students, college/university students, degree students, nondegree students, and student interns.

[redacted]

SENSITIVE BUT UNCLASSIFIED

[redacted]

By "students" we mean F-1, M-1, and J-1 applicants in the "student" category of exchange programs as noted at the bottom of the slide. The social media review is not mandatory for J-1 applicants who *happen* to be students but are applying for other exchange programs such as au pair or SWT.

So, this universe of students, who are otherwise eligible and meet one or more of the three criteria:

LE

Remember that social media reviews are only for applicants who are otherwise eligible for the visa. If you've already determined they don't overcome 214(b), that's the end of the road for them.

Now moving on from which applicants to review, we'll talk about how to conduct and document the review. I'll turn it over to [redacted] from LE.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# Conducting and Documenting Social Media Reviews

[redacted]

International Division

Office of [redacted] LE

[redacted] LE

[redacted]

SENSITIVE BUT UNCLASSIFIED

CA/LE [redacted]

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER




CA/LE [redacted]

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER




CA/LE [redacted]

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# Documenting Social Media Reviews

LE [redacted]

LE [redacted]

SENSITIVE BUT UNCLASSIFIED

CA/LE [redacted]

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# Documenting Social Media Reviews

**Road ahead**

- Refining guidance for searching specific social media platforms
- Want to hear your best practices
- Reach to [redacted] with any questions about conducting or documenting social media reviews



[redacted]

SENSITIVE BUT UNCLASSIFIED

CA/[redacted]

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

## Assessing Student Credibility

**Consider how the applicant's activity reflects:**

- Intent and ability to solely pursue a full course of study.
- Intent to engage in unlawful activities or those inconsistent with student status.

**Has the applicant credibly shown that *all* activities in which he or she is expected to engage are consistent with FMJ status?**

[redacted]

SENSITIVE BUT UNCLASSIFIED

[redacted] Now, turning to what consular officers should do with the results of the social media review.

We've received a few questions about what activity should or should not be considered derogatory. Broadly speaking, you should look for any information that impacts the applicant's eligibility for the visa – [redacted] LE

The FAM requires that an F-1 or M-1 applicant must demonstrate intent to enter the United States solely to pursue a full course of study. Relatedly, J-1 applicants for student programs are required to pursue a full course of study.

[redacted] LE

For applicants whose activities may rise to a higher level, I'll turn to [redacted] of L/CA and [redacted] of VO/SAC to talk about assessing applicants for [redacted] LE ineligibilities.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

AC0

# Potential [redacted] LE Ineligibilities

**Consular officer's role: the finder of fact**

[redacted] LE

SENSITIVE BUT UNCLASSIFIED

**L/CA and SAC**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# USG Coordination

- **E.O. 14161 requires all relevant agencies to:**
  - **"vet and screen to the maximum degree possible all aliens who intend to be admitted, enter, or are already inside the United States."**
  - **"Evaluate and adjust all existing regulations, policies, procedures, and provisions…or guidance of any kind pertaining to each of the grounds of inadmissibility listed in sections 212(a)(2)-(3) of the INA"**

[redacted]

SENSITIVE BUT UNCLASSIFIED

[redacted] We received a few questions related to DHS's involvement in the enhanced vetting procedures, whether that's through screening at the POE or in the removal process. EO14161 tasks all relevant agencies to evaluate their policies and procedures to ensure maximum vetting.

We have been working closely with DHS on several lines of effort related to vetting and information sharing. As one example, we've established a Student Visa Working Group to facilitate information flow and coordinate actions on individuals with derogatory information.

While we won't get into depth today on these efforts, we wanted to reassure you that CA is not doing this alone – we are closely coordinating with our partner agencies on enhanced vetting efforts.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

## Questions

- Will all applicants with a prior SEVIS termination [redacted] LE
  [redacted] LE

- [redacted] LE
  [redacted] LE

SENSITIVE BUT UNCLASSIFIED

We're going to dig into the Q&A portion of the webinar, starting with questions that were submitted by posts ahead of time. Similar questions have been combined in the interests of time.

1. VO/F [redacted]: [redacted] LE
   [redacted] LE

2. VO/F [redacted]: [redacted] LE
   LE

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

## Questions

- How are IW student applicants affected?

- What about applicants who are applying for other NIV categories but still meet some of the criteria [redacted]

[redacted]

SENSITIVE BUT UNCLASSIFIED

1. VO/F[redacted]: [redacted]

2. VO/F[redacted]: You aren't limited to conducting social media checks for only student visa applicants. While the social media check is mandatory for student visa applicants who fall into the criteria, if you have doubts about any applicant's activities during their previous stay as a student, and you otherwise intend to issue, post should conduct a social media review to help you assess the totality of the applicant's circumstances.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# Questions

- Can LE Staff conduct the social media review?
- What social networks are we allowed to check? Is Tiktok ok?
- What if the account is set to private?

[redacted]

SENSITIVE BUT UNCLASSIFIED

Back over to [redacted] for a few questions about the social media review process.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# Questions

- How should we handle applicants who don't provide accurate/any social media information?

[redacted]

SENSITIVE BUT UNCLASSIFIED

VO/F [redacted]:

1. [redacted] LE

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# Questions

- Will Consular Sections need to shift resources [redacted] due to these changes?
- Is there a push from DC [redacted]?

SENSITIVE BUT UNCLASSIFIED

1. VO/F[redacted]:[redacted]
2. VO/F[redacted]:[redacted]

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



# EXHIBIT 50

UNCLASSIFIED
SBU

| | |
|---|---|
| **MRN:** | 25 STATE 45612 |
| **Date/DTG:** | May 15, 2025 / 151708Z MAY 25 |
| **From:** | SECSTATE WASHDC |
| **Action:** | ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE *Routine* |
| **E.O:** | 13526 |
| **TAGS:** | CVIS, CMGT, KCSY |
| **Captions:** | SENSITIVE |
| **Reference:** | A) 25 STATE 17178<br>B) 25 STATE 5914 |
| **Subject:** | Caught and Revoked: Updated Guidance on Systems Messages |

1. (SBU) **SUMMARY:** E.O. 14161 states to "protect Americans the United States must be vigilant during the visa-issuance process to ensure that those aliens approved for admission into the United States do not intend to harm Americans or our national interests. More importantly the United States must identify them before their admission or entry into the United States." Thanks to consular sections' [redacted], visa revocation actions increased by 200 percent in the week following the action request (REF A). To help posts continue to focus resources on priority cases and protect U.S. borders, [redacted] This cable also serves to correct an error in the original request (REF A), which incorrectly stated that INA 222(g) does not apply to overstays of fewer than 180 days. INA 222(g) renders void an NIV on which an alien entered if that alien remains beyond the period of authorized stay. The alien does not have to have remained more than 180 days beyond the period of authorized stay for INA 222(g) to apply (see 9 FAM 302.1-9). **END SUMMARY.**

**A LEG UP FROM WASHINGTON**

2. (SBU) [redacted] LE

3. (SBU) [redacted] LE

[redacted] LE

| | Before | Removed | After | Percentage |
|---|---|---|---|---|
| [redacted] LE | | | | |

*Contact your VO/F analyst and/or your RCO if you need specific data for your post.

4. (SBU) This initial sweep addressed the backlog of system messages. New messages in these categories will continue to accumulate. [redacted] LE

5. (SBU) Following the transmission of REF A on March 1, [redacted] LE to protect U.S. borders and Americans in the weeks following REF

A. This focused work resulted in an immediate doubling in visa revocations for aliens who no longer qualify for their visas, and a sustained 150 percent increase in visa revocations as compared to March 1-April 15, 2024.

**VISA REVOCATIONS PORTAL**

6. (SBU) With the migration of CAWeb, there is a new link to the Visa Revocations Portal containing the new template spreadsheet for bulk prudential revocation requests, links to 9 FAM revocation sections, and the email address of the VO/SAC revocations team where requests should be sent. There is also helpful guidance on what to consider when submitting revocation requests and tips.

**ADDRESSING [redacted] RECORDS**

7. (SBU) [redacted]

**FURTHER GUIDANCE**

8. (U) Please contact your VO/F analyst with questions on this effort. Please contact [redacted] with questions about prudential revocations.

| | |
|---|---|
| **Signature:** | RUBIO |
| **XMT:** | BASRAH, AMCONSUL; CARACAS, AMEMBASSY; CHENGDU, AMCONSUL; KABUL, AMEMBASSY; MINSK, AMEMBASSY; SANAA, AMEMBASSY; ST PETERSBURG, AMCONSUL; VLADIVOSTOK, AMCONSUL; YEKATERINBURG, AMCONSUL |

**UNCLASSIFIED**
SBU

# EXHIBIT 51

**UNCLASSIFIED**
SBU

| | |
|---|---|
| **MRN:** | 25 STATE 17178 |
| **Date/DTG:** | Feb 28, 2025 / 280143Z FEB 25 |
| **From:** | SECSTATE WASHDC |
| **Action:** | ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE *Routine* |
| **E.O:** | 13526 |
| **TAGS:** | CVIS, CMGT, KCSY |
| **Captions:** | SENSITIVE |
| **Reference:** | 25 STATE 5914 |
| **Subject:** | (U) Catch And Revoke: National Security Through Timely Processing of Visa Systems Messages |

1. (U) This is an **Action Request**. Please see paragraph 5.

2. (SBU) **SUMMARY**: Among the best evidence of a person's eligibility for a visa is his or her actual behavior. Therefore, recurrent vetting conducted throughout the entire validity period of a visa - based on actual travel to the United States and actual encounters with United States law enforcement authorities - is necessary to protect Americans and U.S. borders. Under Executive Order (E.O.) 14161, "Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats," the Department is directed to ensure maximum screening and vetting throughout the visa process. Therefore, consular officers must utilize whole-of-government law enforcement systems to vigilantly monitor the activities of aliens - whether they are inside the United States or not. In particular, Posts LE [redacted] daily and revoke or request revocation of any visas for a visa holder you determine is no longer eligible under Section 214(b) or 212(a) of the Immigration and Nationality Act (INA), or has overstayed. In other words, when a consular officer catches an alien misusing a visa, the officer should generally revoke it. Catch and revoke. **END SUMMARY.**

**3. (SBU) Section 1(b) of E.O. 14161 states that, "[t]o protect Americans, the United States must be vigilant during the visa-issuance process to ensure that those aliens approved for admission into the United States do not intend to harm Americans or our national interests. More importantly, the United States must identify them before their admission or entry into the United States." Timely and stringent processing of** LE [redacted] **after visa issuance, and revoking visas when appropriate, is necessary to this effort. Visa holders who overstay their admission period in the United States even by one day, engage in conduct that poses a threat to U.S. national security, or otherwise misuse their visas should have their visas revoked under INA 221(i). In accordance with 9 FAM 403.11-(A), Posts should also carefully review for revocation any visa holders who are arrested or convicted of crimes in the United States, including assessing whether the visa holder remains eligible for the visa classification under INA 214(b).**

4. (SBU) LE [redacted]

**ACTION REQUEST/IMPLEMENTATION GUIDANCE**

5. (SBU) **ACTION REQUEST:** LE [redacted]

LE [redacted] If a post anticipates a large quantity of cases will require prudential revocation, post must also include the VO/SAC revocations team. Managers should monitor the queue size daily and take action if messages accumulate.

6. (SBU) LE [redacted]

- LE [redacted]

[redacted]

LE [redacted]

7. (SBU) LE [redacted] LE [redacted]

8. (SBU) Applicants may not or visa holders may no longer overcome 214(b) if they engage in activities that are inconsistent with the claimed nonimmigrant status (Ref A). Even if an alien has not yet been convicted of crime and his or her visa is not yet revocable under INA 212(a)(2)(A)(i)(1), consular officers must evaluate whether the visa should be revoked under INA 214(b). LE [redacted], you must assess whether INA 214(b) applies as a basis for revocation. Every overstay and/or arrest requires you to weigh whether the alien is ineligible under 212(a) or no longer overcomes INA 214(b). Remember, applicants may not, or visa holders may no longer, overcome 214(b) if they engage in activities that are inconsistent with the claimed nonimmigrant status (Ref A).

9. (SBU) If a consular officer already suspects at the interview window that an applicant has committed a crime in the United States, then the consular officer must carefully consider all potentially applicable grounds of ineligibility and enter these considerations through case notes. A consular officer will usually refuse to issue a visa to such a suspected criminal applicant. LE [redacted]

LE [redacted] If a consular officer knows at the window that an applicant will overstay a visa even beyond the admit-until date permitted by U.S. Customs and Border Protection authorities at ports of entry (let alone beyond the applicant's stated purpose of travel), then the consular officer will likely refuse to issue a visa to such an applicant. Yet this is exactly what a visa overstay means: a one-day overstay is still an overstay. Even if such a visa holder has not yet overstayed by more than 180 days and his or her visa is therefore not yet void under INA 222(g), nonetheless the alien likely no longer overcomes INA 214(b).

**Revocation If the Alien Has Departed the United States**

10. (SBU) LE [redacted] If the alien has departed from the United States, posts should initiate revocation procedures in accordance with 9 FAM 403.11-3(A)(2), including LE [redacted]. Consular officers do not have the authority to revoke a visa for individuals who are still in the United States based on a suspected ineligibility or based on derogatory information that is insufficient to support an ineligibility finding, other than a revocation based on driving under the influence (DUI).

**Revocation If the Alien is Still in the United States**

11. (SBU) Requests for revocation of visas where the individual is in the United States must be sent to the Revocation Team in VO/SAC/RC at LE [redacted]

**Immigrant Visa (IV) Cases**

12. (SBU) LE [redacted] For unused, valid IVs, use the guidance in 9 FAM 303.7-6(C)(1) to determine whether the information is sufficient to render the person ineligible for an IV. If so, initiate revocation procedures in accordance with the guidance in 9 FAM 504.12.

**TRAINING & GUIDANCE**

13. (SBU) LE [redacted]

14. (U) Additional guidance and contacts: Guidance related to Executive Orders can be found on CAWeb. State Department personnel can also join the CA/VO Transition Coordination Team to review official guidance and submit questions to VO subject matter experts regarding the E.O.

15. (U) Inquiries: For any media or congressional inquiries on E.O.s, posts must use pre-cleared language from public talking points located on CA Web (linked here), and copy CA/P on any responses. When responding to general or press inquiries about the E.O., copy CAPressRequests@state.gov. When responding to any congressional inquiries, copy ConsularOnTheHill@state.gov.

16. Minimize Considered.

**MINIMIZE CONSIDERED**
**Signature:** RUBIO

**XMT:** BASRAH, AMCONSUL; CARACAS, AMEMBASSY; CHENGDU, AMCONSUL; KABUL, AMEMBASSY; MINSK, AMEMBASSY; SANAA, AMEMBASSY; ST

Case: 26-6906, 11/20/2026, DktEntry: 16.9, Page 126 of 300




PETERSBURG, AMCONSUL; VLADIVOSTOK, AMCONSUL;
YEKATERINBURG, AMCONSUL

---

**UNCLASSIFIED**

SBU

# EXHIBIT 52

# MEMORANDUM OF AGREEMENT BETWEEN UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES (USCIS) AND UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT (ICE) REGARDING COORDINATION OF ICE OPERATIONAL VISITS TO USCIS FACILITIES

## 1. Introduction

U.S. Citizenship and Immigration Services (USCIS) and U.S. Immigration and Customs Enforcement (ICE) have long maintained an effective and cooperative relationship, as both agencies share a primary mission to protect national security and public safety. USCIS leadership recognizes the importance of seamless cooperation with law enforcement partners such as ICE. Therefore, this Memorandum of Agreement (MOA) is designed to memorialize each agency's commitment to work together, in terms of proper visit notification and facility access for ICE visits to USCIS facilities for the questioning, apprehension, and/or arrest of Persons of Interest (POIs), and information sharing, while also ensuring that information is appropriately safeguarded when addressing emergent matters of national security and public safety.

## 2. Scope

This MOA applies to all domestic USCIS Field Offices, USCIS Asylum Field Offices, and all domestic ICE Field Offices.

## 3. Parties

The parties to this agreement are the Department of Homeland Security USCIS and ICE.

## 4. Authorities

- Department of Homeland Security (DHS) Delegation Number 7030.2, Delegation of Authority to the Assistant Secretary for U.S. Immigration and Customs Enforcement (Nov. 13, 2004)
- DHS Delegation No. 0150.1, Delegation to the Bureau of Citizenship and Immigration Services (Mar. 1, 2003)

## 5. Purpose and Intent

USCIS and ICE jointly enter into this MOA and hereby agree to:

- Maintain and follow all existing information-sharing laws, regulations, policies, procedures, and guidelines when addressing matters of national

security and public safety;

- Follow established information-sharing guidelines and processes for routine case inquiries; and
- Follow visitation procedures listed in this MOA during exigent circumstances, operational, and undercover activity. Operational activity not specified in this MOA is governed locally by USCIS field office and asylum field office policy and procedures.

**6. Responsibilities of the Parties to the Agreement**

USCIS and ICE agree to the following:

A. Regular Meetings

USCIS Field Office Directors (FODs), USCIS Asylum Office Directors, ICE Homeland Security Investigations (HSI) Special Agents in Charge (SACs), and ICE Enforcement Removal Operations (ERO) FODs and/or their respective designated senior staff shall meet regularly - but no less than on a quarterly basis - to discuss trends, issues, and concerns arising from the terms of the MOA. Additional meetings may be scheduled as needed to address any concerns or urgent matters. At the discretion of USCIS FODs and USCIS Asylum Office Directors, USCIS Office of Chief Counsel (OCC) may be included in the aforementioned meetings. Also, at the discretion of the HSI SAC or ERO FOD, the OPLA Chief Counsel may be included in the aforementioned meetings.

B. Scheduling Operational Visits to USCIS Facilities

LEP [redacted]

C. Enforcement Activities and FDNS Coordination

LEP [redacted]

[redacted] LEP

D. Coordinating Exigent Visits to USCIS Facilities

[redacted] LEP

**7. Other Provisions**

Nothing in this MOA is intended to conflict with current law or regulation or the directives of DHS. If a term of this MOA is inconsistent with such authority, then that term will be invalid, but the remaining terms and conditions of this MOA shall remain in full force and effect.

**8. Effective Date**

The terms of this agreement will become effective on May 31, 2016.

**9. Modifications of this MOA**

This MOA may be modified upon the mutual written consent of the parties

**10. Termination**

The terms of this signed MOA and any subsequent modifications consented to in writing by both parties to the MOA will remain in effect until terminated by either party to the MOA. Either party to the MOA may terminate the agreement by providing 60 (sixty) days' written notice to the other party.

Case: 26-6906, 11/20/2026, DktEntry: 16.9, Page 131 of 300





Lori Scialabba
Lori L. Scialabba
Deputy Director
DHS USCIS
5/31/16
DATE

Daniel H. Ragsdale
Daniel H. Ragsdale
Deputy Director
DHS ICE
5/31/16
DATE

# EXHIBIT 53

**UNCLASSIFIED**
SBU

| | |
|---|---|
| **MRN:** | 25 STATE 50220 |
| **Date/DTG:** | May 27, 2025 / 271422Z MAY 25 |
| **From:** | SECSTATE WASHDC |
| **Action:** | ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE *Immediate* |
| **E.O:** | 13526 |
| **TAGS:** | CVIS, CMGT, PTER, KFRD |
| **Captions:** | SENSITIVE |
| **Reference:** | A) 25 STATE 5914<br>B) 25 STATE 26168 |
| **Subject:** | (U) Action Request: Expanding Screening and Social Media Vetting for Visa Applicants - Part 1 |

1. (U) This is an action request. **See paragraph 3**.

2. (SBU) In Ref A, the Department directed consular officers to maintain extra vigilance and to comprehensively review and screen every visa applicant for potential security and non-security related ineligibilities including to assess whether the applicant poses a threat to U.S. national security. In Ref B, consular officers were instructed to refer certain student and exchange visitor (F, M, and J) visa applicants to LE [redacted] for a mandatory social media check, pursuant to the implementation of Executive Order (E.O.) 14161 and E.O. 14188, known respectively as *Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats* and *Additional Measures to Combat Anti-Semitism*. The next step is for posts to evaluate operations and processes in preparation for this expanded social media vetting of all student and exchange visitor (F, M, J) visa applicants.

3. (SBU) **ACTION REQUEST:** Effective immediately, in preparation for an expansion of required social media screening and vetting, consular sections should **not add any additional student or exchange visitor (F, M, and J) visa appointment capacity until further guidance is issued septel, which we**

**<u>anticipate in the coming days</u>**. Appointments already scheduled can proceed under current guidelines. However, appointments that are available, but not taken as of the release of this cable, should be immediately removed from availability. Consular sections must consult with VO if they seek to schedule any new student or exchange visitor (F, M, or J) visa appointments in light of this guidance.

4. (SBU) The Department is conducting a review of existing operations and processes for screening and vetting of student and exchange visitor (F, M, J) visa applicants, and based on that review, plans to issue guidance on expanded social media vetting for all such applicants. Expanded social media screening and vetting of all F, M, and J visa applicants will require consular sections to modify current operations, processes, and allocation of resources. In light of the potentially significant implications for consular section operations, processes, and resource allocations, consular sections will need to take into consideration the workload and resource requirements of each case prior to scheduling them going forward. This immediate action ensures that consular sections can make fully informed calibrations of capacity and appointment scheduling going forward. Consular sections should remain focused on consular priorities including services for U.S. citizens, immigrant visas, and fraud prevention.

5. (SBU) Consular sections will be given guidance on expanded social media screening and vetting requirements septel.

| | |
|---|---|
| **Signature:** | RUBIO |
| **XMT:** | BASRAH, AMCONSUL; CARACAS, AMEMBASSY; CHENGDU, AMCONSUL; KABUL, AMEMBASSY; MINSK, AMEMBASSY; SANAA, AMEMBASSY; ST PETERSBURG, AMCONSUL; VLADIVOSTOK, AMCONSUL; YEKATERINBURG, AMCONSUL |

**<u>UNCLASSIFIED</u>**
SBU

# EXHIBIT 54

**UNCLASSIFIED**
SBU

| | |
|---|---|
| **MRN:** | 25 STATE 52014 |
| **Date/DTG:** | May 30, 2025 / 300208Z MAY 25 |
| **From:** | SECSTATE WASHDC |
| **Action:** | ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE *Immediate* |
| **E.O:** | 13526 |
| **TAGS:** | CMGT, CVIS, KFRD, KPAO |
| **Captions:** | SENSITIVE |
| **Reference:** | A) 25 STATE 5914<br>B) 25 STATE 50220<br>C) 25 STATE 49972<br>D) 25 STATE 48928<br>E) 25 STATE 26168 |
| **Subject:** | ACTION REQUEST - Enhanced vetting for All Nonimmigrant Visa Applicants Traveling to Harvard University |

1. (U) This is an action request. **See paragraph 3.**

2. (SBU) **SUMMARY**: In Ref A, the Department directed consular officers to maintain extra vigilance and to comprehensively review and screen every visa applicant for potential security and non-security related ineligibilities including to assess whether the applicant poses a threat to U.S. national security. In Ref B, consular officers were instructed to prepare for expanded social media screening and vetting, pursuant to the implementation of Executive Orders (E.O.) 14161 and E.O. 14188, known respectively as *Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats* and *Additional Measures to Combat Anti-Semitism*. To address acute concerns of violence and anti-Semitism at Harvard University, this cable instructs posts to immediately begin additional vetting of **any** nonimmigrant visa applicant seeking to travel to Harvard University for **any** purpose. Such applicants include, but are not limited to prospective students, students, faculty, employees, contractors, guest speakersk, and tourists. Implementation of this ALDAC will also serve

as a pilot for expanded screening and vetting of visa applicants. This pilot will be expanded over time. **END SUMMARY.**

3. (SBU) **ACTION REQUEST:** Effective immediately, consular sections must conduct a complete screening of the online presence of **<u>any</u>** nonimmigrant visa applicant seeking to travel to Harvard University for **<u>any</u>** purpose. Such applicants include, but are not limited to prospective students, students, faculty, employees, contractors, guest speakers, and other visitors. To determine whether an applicant seeks to travel to Harvard University, consular sections should use information provided by applicants in the DS-160 application, during pre-screening, or during the interview. LE [redacted]

4. (SBU) LE [redacted] Consistent with 9 FAM 302.1-2(B)(6), if you are not satisfied that the applicant credibly, and to your personal satisfaction, meets the standards required by the visa classification for which he is applying, refuse the applicant under INA 214(b). This is true even in cases where the applicant has convinced you that he is not an intending immigrant, and even in cases where the applicant is also ineligible under another section of the law.

5. (SBU) Once a consular officer has determined the applicant is otherwise eligible for the requested nonimmigrant status, the consular officer must refuse the case under INA 221(g), inform the applicant that his case is subject to review of his online presence, request that the applicant set all of his social media accounts to "public," and remind him that limited access to or visibility of social media activity could be construed as an effort to evade or hide certain activity. LE [redacted]

LE [redacted] All visa cases referred for online presence review **must** be referred LE [redacted]

6. (SBU) LE [redacted] must not limit their review of these cases to the applicant's social media activity alone. Rather, LE [redacted] conduct a comprehensive and thorough vetting of each such applicant, including social media activity based on identifiers provided in the DS-160, and more generally any online presence, to identify possible inadmissibilities, information suggesting the applicant intends to engage in activities inconsistent with the visa classification sought, or other information that might call into question the applicant's credibility.

7. (SBU) LE [redacted] INA 214(b) requires the applicant to show credibly that all activities in which he is expected to engage in while in the United States are consistent with the specific requirements of his visa classification. LE [redacted]

8. (SBU) Per Ref E, when an online presence review uncovers potentially derogatory information that might lead to an INA 212(a)(3) ineligibility, the consular officer should follow the instructions in 9 FAM 304.2 LE [redacted]. Consular officers are reminded to apply inadmissibility grounds under INA 212(a) only in accordance with applicable procedures, LE [redacted] Consular officers are also reminded of guidance in 9 FAM 302.5-4 regarding the applicability of INA 212(a)(3)(A)(ii) under which a visa

applicant is ineligible if the consular officer knows or has reason to believe that the applicant is traveling to the United States solely, principally, or incidentally to engage in any other unlawful activity. LE [redacted]

9. (SBU) LE [redacted] arvard University failed to maintain a campus environment free from violence and anti-Semitism, the enhanced vetting measures described in this guidance aim at ensuring that consular officers can appropriately identify such visa applicants with histories of anti-Semitic harassment and violence, and to duly consider their visa eligibility under U.S. immigration law. This guidance is consistent with E.O. 14188, Additional Measures to Combat Anti-Semitism, which states that it is the "policy of the United States to combat anti-Semitism vigorously, using all available and appropriate legal tools...or otherwise hold to account the perpetrators of unlawful anti-Semitic harassment and violence." Implementation of this vetting measure for applicants traveling to Harvard will also serve as a pilot for expanded screening and vetting of visa applicants, and as the Department continues to develop and expand any enhanced vetting requirements for student visas generally, it may announce similar measures for other groups of visa applicants as appropriate, and in accordance with U.S. law.

| | |
|---|---|
| **Signature:** | RUBIO |
| **XMT:** | BASRAH, AMCONSUL; CARACAS, AMEMBASSY; CHENGDU, AMCONSUL; KABUL, AMEMBASSY; MINSK, AMEMBASSY; SANAA, AMEMBASSY; ST PETERSBURG, AMCONSUL; VLADIVOSTOK, AMCONSUL; YEKATERINBURG, AMCONSUL |

**UNCLASSIFIED**
SBU

# EXHIBIT 55

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

### *9 FAM 402.5-5(C)(1) (U) Intent to Solely Pursue a Full Course of Study*

*(CT:VISA-2150; 04-29-2025)*

a. ***(SBU)*** *Evidence suggesting students intend to travel, or have traveled, to the United States to engage in unlawful activities or to pursue activities that are not consistent with a full course of study calls into question whether they possess intent to solely pursue a full course of study. Evidence suggesting that an*

*applicant has endorsed or espoused terrorist activity, or persuaded others to support a terrorist organization should be submitted* LE [redacted] *(See 9 FAM 304.2). In addition, you should consider whether there is reason to believe that the applicant intends to engage in any form of unlawful activity or any activity that poses a threat to U.S. national security, as part of the totality of the applicant's circumstances in applying 214(b) and other applicable grounds of inadmissibility. See 9 FAM 302.1-2(B)(6).*

b. ***(SBU) Mandatory social media reviews***: *You must refer all new F-1 or M-1 visa applicant cases as well as returning F-1 or M-1 visa applicant cases meeting one or more of the criteria below, and are otherwise eligible,* LE [redacted] *for a social media review as described in 7 FAH-1 H-945.4:*

(1) LE [redacted]

(2) LE [redacted]; or

(3) LE [redacted].

c. ***(SBU) Documenting the results of the social media review:***

(1) LE [redacted]

(2) LE [redacted]

LE [redacted]

*(3) **(SBU) When to submit*** LE [redacted]

[redacted]

[redacted]

# EXHIBIT 56

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

## 7 FAH-1 H-945.4 (U) Social Media Rules of Conduct in Fraud Assessments

*(CT:CMH-139; 05-15-2024)*

a. (SBU) The following guidance on social media use only applies to consular staff engaging in fraud assessments on pending consular casework. LE [redacted] LE [redacted] LE [redacted] (for guidance on other social media use by Department personnel, please see 5 FAM 790, Using Social Media):

(1) (SBU) Setting Up Social Media Accounts for Fraud Assessments: Consular personnel engaging in fraud prevention activities at posts abroad should be aware of the following when creating accounts for fraud prevention purposes:

(a) LE [redacted]

(b) (U) Employees who use social media accounts for the purpose of fraud assessments are responsible for maintaining appropriate passwords and should set all available privacy settings at the highest level possible; and

(c) (U) As noted in 5 FAM 790, employees who set up an account on a social media website for the purpose of fraud assessments must abide by the contractual rules of that service or platform provider;

(2) (SBU) Conduct While Reviewing Social Media in Fraud Assessments: Employees reviewing social media for fraud assessments must also adhere to the following guidelines:

(a) LE [redacted]

(b) (SBU) Adjudicators should not apply a 212(a) visa ineligibility or make a non-citizenship determination based solely on information from a social media site without consulting with L/CA;

(c) LE [redacted]

(d) LE [redacted]

(3) (SBU) Creating and Keeping Social Media Records: Because social media accounts can be disabled or deleted, it is important that fraud prevention

Confidential - Subject to Protective Order

staff clearly document relevant findings LE [redacted]

b LE [redacted]

c. [redacted]

d [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

# EXHIBIT 57

Case: 26-6906, 11/20/2026, DktEntry: 16.9, Page 149 of 300
Case 5:25-cv-[illegible] Document 81-1 Filed [illegible] Page 86 of 469

[statedept.substack.com](statedept.substack.com)

# Secretary Rubio: 100 Days of an America First State Department

*StateDept*

8–10 minutes

---

Author: **U.S. Secretary of State Marco Rubio**

One hundred days ago, America's borders were open, while China could close the Panama Canal at a time of Xi Jinping's choosing. Our leaders seemed content to allow violence to become the permanent norm, from Ukraine to Gaza, to our own college campuses and southern border. From every post abroad, and office in Washington, memos poured in describing what we must do, what we couldn't do, but not what it was possible to do.

Only one hundred days later, change has come. From reorganizing the Department to meet the challenges of the 21st Century, to bringing transparency to foreign assistance, to ensuring Panama's exit from the Belt and Road Initiative, and working hand in hand with regional partners to deport illegal immigrants and designate vicious cartels as Foreign Terrorist Organizations, our team has proven it is possible not merely to admire problems, but to solve them.



AAUP-01534

8-ER 2023




Secretary Rubio (second from left) at President Trump's February 26 Cabinet meeting (White House/Molly Riley)

In the process, the State Department is becoming a leaner machine, eager to deliver for the taxpayers. Gone are offices like the former Global Engagement Center, which sought to censor the American people. Gone are tens of billions of dollars in contracts to NGOs at home and abroad that often undermined the interests and foreign policy of the United States. And gone are the days when merit took a back seat to radical, anti-American ideologies. By consolidating offices, eliminating bureaucracy, and ensuring a culture where the State Department's many talented voices can be heard, our impending reorganization will leave the United States with a foreign policy that is less expensive and more effective.

The State Department has begun, once more, to speak for our citizens' interests abroad. Our hemisphere is our neighborhood, and we cannot allow it to be conquered by an adversary. In my first hundred days, I undertook three trips to our hemisphere, including central America and the Caribbean where I stressed that Chinese efforts to gain control of critical infrastructure threaten the United States, and secured an agreement to terminate Beijing's management of the Panama Canal.

I brought a similar message to our friends in Europe, making clear that our extensive shared interests, especially in resisting Chinese aggression and Islamic extremism, are precisely why the United States cannot afford to shoulder the burden of every conflict imaginable in Europe. At the recent NATO summit I attended, our allies recognized the need to increase defense spending not to 2 percent as requested in 2017, but to 5 percent, following the lead of nations like Poland. There was a shared understanding that ending the war in Ukraine is in the interests of both the combatants, and the entire Transatlantic alliance.

While in Europe, I also made clear that while we are bound by a common history, faith, culture, and economic interests, friendship is not a one-way street. It requires honesty when reciprocity is lacking, and not just in the realm of defense spending. Efforts to regulate, exclude or censor US companies directly concern the United States, and raise questions about just how common our values may be. Europe's energy policies also directly affect the United States as they left the continent dependent on Russian gas, and exposed "green" supply chains to Communist China control.

In Africa, America needs a policy of trade, not aid, and over the past hundred days the State Department has replaced handouts with firm diplomatic engagement aimed at ending conflicts and expanding opportunities for American companies. Last week, the Foreign Ministers of Rwanda and the Democratic Republic of Congo joined me here at the State Department to sign a Declaration of Principles to end a war that has dragged on in one form or another for over twenty-five years. In Africa, and around the world, our message is that while USAID may be closed, America is open for business.

There is no more immediate American interest than the protection of our nation's borders. Both during my trips to the region, and across dozens

Case 5:25-cv-06926, 11/20/2026, DktEntry: 16.3, Page 152 of 300 Document 81-4 Filed 03/17/26 Page 89 of 469

of bilateral engagements, I have made clear that the arrival of millions of foreign nationals at our border is unacceptable. Foreign nations have a responsibility to prevent their citizens from illegally entering the United States and possess a duty to assist us in removing those already here. We are working with regional allies in Latin America to secure agreements to take back both their own illegal aliens, but also those from third nations. And we have made it clear to less friendly nations such as Venezuela that a refusal to take back their nationals constitutes a hostile act. Partnership is valued, but hostility will be punished.

Critically, the State Department has now made clear that a visa is a privilege, not a right. Under the Biden Administration's "Catch and Release" policy, illegal aliens were often provided with a get-out-of-jail-free card after arrests for criminal activity including domestic violence, and assault. There is now a one-strike policy: Catch-And-Revoke. Whenever the government catches non-U.S. citizens breaking our laws, we will take action to revoke their status. The time of contemptuously taking advantage of our nation's generosity ends.

This extends to the thousands of foreign students studying in the United States who abuse our hospitality. When Hamas, one of the world's most notorious terrorist organizations, launched its barbaric October 7, 2023, attack on Israel, brutally murdering more than 1,200 innocents, and parading the dead bodies of murdered babies through the streets of Gaza, the Biden Administration did very little to protect our Jewish citizens and the American people at large from foreign terrorist sympathizers in their midst. They allowed campus buildings to be overrun by violent thugs, and Jewish students to be excluded from classrooms.

No more. Under the Immigration and Nationality Act, any alien who "endorses or espouses terrorist activity or persuades others to endorse

or espouse terrorist activity or support a terrorist organization" is inadmissible to the United States, and henceforth that law will be enforced to the letter. The State Department now reviews law-enforcement information about student visa holders and when we find those who have supported terrorists or otherwise abused our hospitality, their visas are instantly revoked.

Terrorists are on the run not just in America but around the world. With the unyielding support of the United States Department of State, Israel has crippled Hezbollah in Lebanon, and shattered Hamas in Gaza, leaving the terrorist group facing destruction if they do not release their hostages and lay down their arms. We have re-designated the Houthis as what they are – a foreign terrorist organization and made clear that those who disrupt the freedom of navigation and trade in the Red Sea will meet the fate of pirates throughout history. Iran, having seen the consequences its proxies have faced after challenging the new Administration, is now pursuing an agreement that will allow them to save face while surrendering their nuclear capabilities.

I am honored by the trust President Trump placed in me and I am proud of the work the Department of State has done over the past hundred days to implement his agenda and put the American people first. With an impending reorganization that will unleash the Department's talent from the ground-up, the State Department is set to continue to play a pivotal role in ensuring the safety, security and prosperity of the American people over the next four years.

*Marco Rubio was sworn in as the 72nd secretary of state on January 21, 2025. The secretary is creating a Department of State that puts America First.*

# EXHIBIT 58

# INDEX

Declaration of John Armstrong ........ 1

Declaration of Andre Watson ........ 7

Department of State Cable 26168 ........ 12

[redacted] Notification of Removability Determination under INA 237(a)(4)(C) ........ 18

[redacted] Notice to Appear ........ 20

[redacted] Form I-261 ........ 23

[redacted] Warrant for Arrest of Alien ........ 25

[redacted] Notification of Deportability Determination under INA 237(a)(4)(C) ........ 26

[redacted] Notice to Appear ........ 28

[redacted] Warrant for Arrest of Alien ........ 32

[redacted] Notice of Custody Determination ........ 33

[redacted] Visa Revocation – Memo for ICE ........ 34

[redacted] Notice to Appear ........ 36

[redacted] Warrant for Arrest of Alien ........ 40

[redacted] Notification of Removability Determination under INA 237(a)(4)(C) ........ 41

[redacted] Unserved Warrant for Arrest of Alien ........ 43

[redacted] Notification of Deportability Determination under INA 237(a)(4)(C) ........ 44

[redacted] Notice to Appear ........ 46

# EXHIBIT 59

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, ET AL.,

Plaintiffs,

v.

MARCO RUBIO, in his official capacity as Secretary of State, and the DEPARTMENT OF STATE, ET AL.,

Defendants.

Civil Action No. 1:25-cv-10685-WGY

**CERTIFICATION OF ADMINISTRATIVE RECORD**

I, Larry W. Talbott, hereby declare under penalty of perjury:

1. I am employed by the United States Department of State, Bureau of Consular Affairs, Visa Office, Office of Information Management and Liaison. The facts attested to herein are based upon my personal knowledge and upon information provided to me in my official capacity.
2. Noting that this is not a traditional Administrative Record, because it is addressing the *absence* of a policy alleged to exist in litigation, and is further compiled for purposes of non-traditional review in a Rule 65(a) expedited proceeding, I certify that the following documents annexed hereto constitute the Department of State's administrative record in this matter, which consists of the declaration of John Armstrong, dated April 11, 2025, previously submitted to this Court (Dkt.# 65-1), describing the Department of State's requirements and polies relating to visa revocation and affirming that it is not true that the

Department is approving visa revocations for "ideological deportation" reasons, a true and correct version of the Department of State Cable 26168, redacted for Law Enforcement Privilege, and the following documents related to five individuals, filed in separate litigation:

a. [redacted] Notification of Removability Determination under INA 237(a)(4)(C)

b. [redacted] Notification of Removability Determination under INA 237(a)(4)(C)

c. [redacted] Visa Revocation – Memo for ICE

d. [redacted] Notification of Removability Determination under INA 237(a)(4)(C)

e. [redacted] Notification of Removability Determination under INA 237(a)(4)(C)

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1476, that the foregoing is true and correct to the best of my knowledge.

Larry W. Talbott

Larry W. Talbott
Deputy Director
Office of Information Management and Liaison
Visa Office, Bureau of Consular Affairs
U.S. Department of State

# EXHIBIT 60

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, ET AL.,

Plaintiffs,

v.

MARCO RUBIO, in his official capacity as Secretary of State, and the DEPARTMENT OF STATE, ET AL.,

Defendants.

Civil Action No. 1:25-cv-10685-WGY

**CERTIFICATION OF ADMINISTRATIVE RECORD**

I, Akil Baldwin, hereby declare under penalty of perjury:

1. I am the Deputy Assistant Director for the National Security Division of Homeland Security Investigations (HSI). Prior to becoming the Deputy Assistant Director, I served as the Division Chief for the HSI Office of International Operations. I have additionally served as the HSI Attache in Hong Kong; Assistant Special Agent in Charge in New York, N.Y., and Assistant Attache in Brussels, Belgium. The facts attested to herein are based upon my personal knowledge and upon information provided to me in my official capacity.

**2.** Noting that this is not a traditional Administrative Record, because it is addressing the *absence* of a policy alleged to exist in litigation, and is further compiled for purposes of non-traditional review in a Rule 65(a) expedited proceeding, I certify that the declaration of HSI National Security Division Assistant Director Andre Watson, dated April 11,

2025, previously submitted to this Court (Dkt.# 65-2), describing the Department of Homeland Security's processes for identifying, disrupting and dismantling transnational criminal enterprises and terrorist organizations that threaten the security, and confirming that the Department has no official or unofficial "ideological deportation policy," is part of the U.S. Immigration and Customs Enforcement's administrative record in this matter.

3. In good faith, I certify the document that was put before me. There's a separate certification pertaining to other U.S. Immigration and Customs Enforcement documents and a separate certification pertaining to U.S. Department of State's documents reflected in the index and record.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1476, that the foregoing is true and correct to the best of my knowledge.

AKIL R BALDWIN

Digitally signed by AKIL R BALDWIN
Date: 2025.05.29 12:11:47 -04'00'

Akil Baldwin
Deputy Assistant Director
National Security Division
Homeland Security Investigations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

# EXHIBIT 61

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, ET AL.,

Plaintiffs,

v.

MARCO RUBIO, in his official capacity as Secretary of State, and the DEPARTMENT OF STATE, ET AL.,

Defendants.

Civil Action No. 1:25-cv-10685-WGY

**CERTIFICATION OF ADMINISTRATIVE RECORD**

I, William S. Walker, hereby declare under penalty of perjury:

1. I am the Acting Assistant Director for Domestic Operations at Homeland Security Investigations ("HSI") at U.S. Immigration and Customs Enforcement ("ICE") within the U.S. Department of Homeland Security ("DHS"). As the Acting Assistant Director, I am responsible for oversight of 30 HSI Special Agents in Charge, ensuring all field operations are working to efficiently execute the agency mission.
2. I began my career with the U.S. Government as an Inspector with the former U.S. Customs Service at the Port of Philadelphia. Over 26 years, I have served as Deputy Special Agent in Charge, Assistant Special Agent in Charge, and Supervisory Special Agent with HSI. Most recently, I served as the Special Agent in Charge of HSI's New York Field Office where I oversaw over 700 investigators whose mission was investigating, disrupting, and dismantling transnational criminal organizations and

terrorist networks. In my capacity as Acting Assistant Director, I now oversee 237 Domestic Field Offices and more than 7,100 Special Agents.

3. In good faith, I certify the documents that were put before me. There's a separate certification pertaining to the U.S. Department of State's documents reflected in the index and record.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1476, that the foregoing is true and correct to the best of my knowledge.

WILLIAM S WALKER
Digitally signed by WILLIAM S WALKER
Date: 2025.05.29 12:24:12 -04'00'

William S. Walker
HSI Acting Assistant Director for Domestic Operations
U.S. Immigration and Customs Enforcement

# EXHIBIT 62

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, ET AL.,

Plaintiffs,

v.

MARCO RUBIO, in his official capacity as Secretary of State, and the DEPARTMENT OF STATE, ET AL.,

Defendants.

Civil Action No. 1:25-cv-10685-WGY

**DECLARATION OF JOHN ARMSTRONG IN SUPPORT OF DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

I, John Armstrong, hereby declare under penalty of perjury:

1. I am the Senior Bureau Official within the U.S. Department of State's Bureau of Consular Affairs. I am a career member of the Senior Foreign Service with the rank of Counselor. Prior to becoming the Senior Bureau Official, I briefly served as the Deputy Assistant Secretary for Overseas Citizen Services. I served overseas as the Consul General in Lima, Peru, as Economic Counselor in Warsaw, Poland, as Consular Section Chief and Acting Deputy Chief of Mission in Nassau, Bahamas, Deputy Consul General in Kyiv, Ukraine, and Nonimmigrant Visa Chief in Bucharest, Romania. I have also previously served domestic assignments in Washington, D.C., as Director of the Office of Eastern European Affairs, Director of the Washington Passport Agency, Senior Political Officer on the Russia Desk, and Belarus Desk Officer.

2. As the Senior Bureau Official, I oversee the functions and responsibilities of the Bureau of Consular Affairs, including the Office of Overseas Citizen Services, the Office of Passport Services, and the Office of Visa Services ("Visa Office"), which encompasses all aspects of visa policy, procedures, and information related to U.S. visa issuance to foreign citizens who apply at more than 230 visa-issuing U.S. embassies and consulates.

3. I am familiar with the Department's requirements and policies relating to visa revocation. I base this declaration on my review of Department of State records and discussion with other Department of State employees.

4. The Visa Office's functions and responsibilities encompass all aspects of visa policy, procedures and information related to U.S. visa issuance to foreign citizens, who are applying at U.S. Embassies and Consulates worldwide, seeking to come to the United States. The responsibilities of the Visa Office include coordinating with other agencies to perform national security screening of foreign travelers, and providing guidance and recommendations on visa policy related to national security exclusions. Among its many functions, the Visa Office also revokes thousands of visas annually and provides guidance to the field on visa issuance, revocation and denial.

5. On January 20, 2025, President Trump issued Executive Order 14161, Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats ("E.O. 14161"). Consistent with E.O. 14161, the Visa Office has undertaken numerous efforts to "identify all resources that may be used to ensure that all aliens seeking admission to the United States, or who are already in the United States, are vetted and screened to the maximum degree possible."

6. On January 29, 2025, President Trump issued Executive Order 14188, Additional Measures to Combat Anti-Semitism ("E.O. 14188"). Pursuant to E.O. 14188, the Visa Office and other relevant offices at State are working with the Department of Education and the Department of Homeland Security ("DHS") on appropriate ways to "familiariz[e] institutions of higher education with the grounds for inadmissibility under 8 U.S.C. 1182(a)(3) so that such institutions may monitor for and report activities by alien students and staff relevant to those grounds and for ensuring that such reports about aliens lead, as appropriate and consistent with applicable law, to investigations and, if warranted, actions to remove such aliens."

7. One of the tools in place to ensure maximum vetting of visa applicants and visa-holders, including students, is the Department's long-standing continuous vetting program. All visa-holders are continuously vetted by law enforcement and intelligence agencies for information that surfaces after visa issuance. Processes for coordinated security-related continuous vetting have been used by the State Department and partner agencies for over 10 years.

8. The Department of State has the authority to revoke visas under Section 221(i) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1201(i), which states, in pertinent part: "After the issuance of a visa or other documentation to any alien, the consular officer or the Secretary of State may at any time, in his discretion, revoke such visa or other documentation." For example, the Department may revoke a visa if information arises that indicates an alien is potentially ineligible for that visa or that revocation is otherwise warranted, including, for example, if the alien poses a threat to U.S. public safety. The Visa

Office provides notice to DHS when a visa is revoked.

9. A visa is revoked only after the Department of State reviews available information to ascertain whether the visa revocation is supported by the facts and law.

10. Given the Department's commitment to, and responsibility for, national security, the Visa Office uses all available resources in its visa screening and vetting both when making the initial visa adjudication and during recurrent vetting.

11. Information on visa-holders can come directly from interagency partners, from offices within the Department of State, or from public sources. The Visa Office has long-standing relationships with U.S. law enforcement agencies who regularly send the Visa Office information when they believe derogatory information merits a revocation. This includes information from DHS and the Federal Bureau of Investigation.

12. A visa can be revoked for any potential ineligibility under U.S. law, including but not limited to potential ineligibility for a visa under one of the "Security and related grounds" of inadmissibility at section 212(a)(3) of the INA. The "Security and related grounds" include terrorism related inadmissibility grounds, such as endorsing or espousing terrorist activity or persuading others to endorse or espouse terrorist activity or support a terrorist organization, as well as engaging in terrorist activity by providing material support to a designated or undesignated terrorist organization. That section also includes an inadmissibility ground for foreign policy reasons, when the Secretary of State has reasonable ground to believe an alien's entry or proposed activities in the United States would have potentially serious adverse foreign policy consequences for the United States.

13. The Bureau of Consular Affairs, including the Office of Visa Services, does not carry out deportations. DHS's Immigration and Customs Enforcement ("ICE") is responsible for immigration enforcement in the United States, including initiating proceedings against aliens charged as removable.

14. As deportations are carried out by DHS, deportation policy is outside the purview of the Bureau of Consular Affairs. No ideological deportation policy has been developed or

implemented by the Bureau of Consular Affairs or the Visa Office.

15. I am aware of Secretary Rubio's public remarks indicating the U.S. government will revoke visas of and deport Hamas supporters. These statements are consistent with the State Department's long-standing implementation of visa and immigration laws, across administrations. Hamas has been a designated foreign terrorist organization under section 219 of the INA since it was designated by former Secretary Madeleine Albright in 1997. Support for a designated terrorist organization by statute is a basis for visa refusal and other immigration consequences: the INA provides that an alien who persuades others to support a terrorist organization, or who has afforded material support to a designated terrorist organization, is inadmissible and deportable. INA §§ 212(a)(3)(B), 237(a)(4)(B).

16. I am aware of plaintiffs' contention that the State Department and ICE have launched new social media surveillance programs aimed at identifying noncitizen students and faculty with alleged terrorist sympathies. It is true that the State Department has authored new guidance to consular officers on reviewing visa applicants' social media. However, it is misleading and false to refer to the Department's review of publicly available social media as a form of "surveillance" to root out "terrorist sympathies" among students and faculty. Rather, review of publicly available social media is a component of the extensive information-collection and vetting process foreign visitors undergo when they apply for and use U.S. visas.

17. I am aware of plaintiffs' contentions regarding Secretary Rubio's March 16, 2025, interview on the television news show *Face the Nation*. I understand Secretary Rubio's comments to refer to the ongoing work of the Visa Office to revoke visas, revocations which occur for a wide variety of reasons. Secretary Rubio did not state, and it is not true, that the Visa Office is approving visa revocations every day for "ideological deportation" reasons. This assertion is simply false.

I declare under the penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed on this 11th day of April, 2025.

John Armstrong
Senior Bureau Official
Bureau of Consular Affairs
U.S. Department of State

# EXHIBIT 63

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>MARCO RUBIO, *et al.*,<br><br>Defendants. | No. 1:25-CV-10685 |

**DECLARATION OF ANDRE WATSON**

I, Andre Watson pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1. I am the Senior Official within the National Security Division (NSD) for Homeland Security Investigations (HSI). I am a career member of the Senior Executive Service with the rank of Assistant Director. Prior to becoming the Assistant Director of NSD, I served on a detail assignment to the U.S. Department of Homeland Security in the capacity of Principal Deputy Assistant Secretary for the Countering Weapons of Mass Destruction Office. I served as the HSI Special Agent in Charge in Baltimore, M.D., Deputy Special Agent in Charge in Washington, D.C., Assistant Special Agent in Charge in Houston, T.X., and Supervisory Special Agent in Blaine, W.A. I have also previously served in Headquarters assignments as Chief of Staff to the Deputy Director of U.S. Immigration and Customs Enforcement (ICE), Chief of Intelligence for the U.S. Department of Justice, International Organized Crime and Intelligence Operations Center, and various supervisory positions within NSD.

Case: 26-6906, 11/20/2026, DktEntry: 16.9, Page 175 of 300

2. As the Senior Official within NSD, I oversee the National Security as well as Student and Exchange Visitor Programs functions in support of ICE efforts to identify, disrupt and dismantle transnational criminal enterprises and terrorist organizations that threaten the security of the United States. These efforts encompass all investigations and aspects of terrorism, special interests involving state and non-state actors, human rights violators and war criminals as well as compliance and oversight functions for over 6,900 academic institutions, 45,000 designated school officials, and over 1.2 million foreign students studying in the United States.

3. HSI is a component of ICE that conducts significant and complex criminal investigations into individuals and international criminal networks that violate U.S. laws. HSI focuses its efforts on combating the transnational criminal networks that pose the greatest threats to the security of the United States. HSI has more than 10,000 employees stationed in more than 235 U.S. cities and more than 50 countries worldwide. The HSI workforce is made up of special agents, criminal analysts, intelligence analysts, and support personnel who live and work in the communities they are sworn to protect and serve.

4. The Student and Exchange Visitor Program (SEVP), a component of HSI's National Security Division, was created in the wake of 9/11 to provide integrity to the immigration system by collecting, maintaining and analyzing information so only legitimate nonimmigrant students or exchange visitors can gain entry in the U.S. Through a database housing information pertaining to schools and students, the Student and Exchange Visitor Information System (SEVIS), SEVP manages and tracks nonimmigrants in the F, M, and J categories. To eliminate vulnerabilities related to the nonimmigrant visa program, Congress first introduced statutory language mandating the development of a program to collect data and improve tracking of foreign students in the Illegal Immigration Reform and Immigrant Responsibility Act of (IIRIRA) of 1996. In 2001, Congress

expanded the foreign student tracking system when it enacted PATRIOT ACT, and in 2002 Congress strengthened the tracking system yet again, through the Enhanced Border Security and Visa Entry Reform Act, noting concerns with national security and emphasizing the need to carefully track student status and information. Accordingly, these laws and regulations demonstrate a clear congressional directive that ICE closely monitor foreign students and the schools in which they enroll by vigorously enforcing statutory and regulatory requirements.

5. I am aware of the above-captioned lawsuit. I provide this declaration based on my personal knowledge, reasonable inquiry, and information obtained from various records, systems, databases, other Department of Homeland Security (DHS) employees, and information portals maintained and relied upon by DHS in the regular course of business.

6. On January 29, 2025, President Trump issued Executive Order 14188, *Additional Measures to Combat Anti-Semitism* (E.O. 14188). ICE remains steadfast in its commitment to enforcing E.O. 14188 prohibiting anti-Semitism and safeguarding national security by applying existing authorities consistent with the priorities set forth in the E.O. 14188.

7. In applying existing authorities,, HSI Office of Intelligence proactively reviews open-source information to identify individuals within the parameters of E.O. 14188. Open-source information is defined as unclassified information that has been published or broadcast in some manner to the general public, could be lawfully seen or observed by a casual observer, is made available at a meeting open to the public, or is obtained by visiting any place or attending any event that is open to the public.

8. The U.S. Department of State (DOS) has broad discretion under 8 U.S.C. § 1201(i) to revoke visas and make determinations of whether an alien's present or activities in the United States would have potentially serious adverse foreign policy consequences. ICE does not make

those determinations. Upon notification of DOS determination, ICE may take subsequent enforcement actions such as placing the alien in removal proceedings under the Immigration and Nationality Act (INA). HSI's Counter Threat Lead Development Unit (CTLD) is specifically responsible for analyzing alien nonimmigrant status violators, lawfully admitted to the United States, who violate the terms of their admission and pose a threat to national security, public safety and/or are involved in criminal activity for field referral and further investigation. Since 2003, the National Security Division has overseen this mission. Currently, CTLD receives over one million alien violator records each year, primarily from U.S. Customs and Border Protection (CBP) Arrival and Departure Information System (ADIS), as well as from SEVIS. CTLD generates viable, investigative leads on nonimmigrant overstays with national security and public safety concerns and/or criminal activity to HSI field offices for further action. CTLD may also provide information to DOS for possible visa revocation if appropriate. .

9. Procedurally, once DOS notifies ICE of its decisions concerning whether to revoke a visa or make certain determinations that would render a alien removable, the determination is then disseminated to the local field office for additional enforcement actions against the student (e.g., issuing a Notice to Appear in removal proceedings) if appropriate.

10. Enforcement actions carried out against aliens within the purview of E.O.14188 occur pursuant to ICE's existing civil immigration authorities under the INA. There is no official or unofficial "ideological deportation policy." Aliens may be charged with any deportation ground under the INA supported by fact and law.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 11th day of April 2025.

ANDRE R WATSON Digitally signed by ANDRE R WATSON Date: 2025.04.11 18:22:22 -04'00'

Andre Watson, Assistant Director
National Security Division
Homeland Security Investigations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

# EXHIBIT 64

**UNCLASSIFIED**
SBU

| | |
|---|---|
| **MRN:** | 25 STATE 26168 |
| **Date/DTG:** | Mar 25, 2025 / 251914Z MAR 25 |
| **From:** | SECSTATE WASHDC |
| **Action:** | ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE *Immediate* |
| **E.O:** | 13526 |
| **TAGS:** | CVIS, CMGT, PTER, KFRD |
| **Captions:** | SENSITIVE |
| **Reference:** | 25 STATE 5914 |
| **Subject:** | (U) Action Request: Enhanced Screening and Social Media Vetting for Visa Applicants |

1. (U) This is an action request. **See paragraph 7**.

2. **(SBU) SUMMARY:** The protection of our nation and its citizens is a consular officer's first consideration. Pursuant to the implementation of Executive Order (E.O.) 14161 and E.O. 14188, known respectively as *Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats* and *Additional Measures to Combat Anti-Semitism*, effective immediately, consular officers must refer certain student and exchange visitor (F, M, and J) visa applicants to the Fraud Prevention Unit (FPU) for a mandatory social media check as described below. As the Secretary stated on March 16, "We don't want people in our country that are going to be committing crimes and undermining our national security or the public safety. It's that simple. Especially people that are here as guests. That is what a visa is…It is a visitor into our country. And if you violate the terms of your visitation, you are going to leave." The Visa Office will host webinars for consular officers to discuss this guidance on April 3 and April 4, 2025. **END SUMMARY.**

3. **(SBU) Consular Officers Play a Critical Role in Protecting National Security:** As part of screening every case for potential ineligibilities, consular officers MUST ADDRESS any derogatory information indicating that a visa

applicant may be subject to the terrorism-related ineligibility grounds of the Immigration and Nationality Act (INA). This includes advocating for, sympathizing with, or persuading others to endorse or espouse terrorist activities or support a DESIGNATED FOREIGN TERRORIST ORGANIZATION (FTO).

4. **(SBU) Every Visa Decision is a National Security Decision:** In Ref A, the Visa Office directed consular officers to maintain extra vigilance and to comprehensively review and screen every visa applicant for potential security and non-security related ineligibilities including to assess whether the applicant poses a threat to U.S. national security. Any nonimmigrant visa applicant who has not established to a consular officer's satisfaction that the applicant meets all standards required in that visa classification should be refused under 214(b), as appropriate. This includes establishing that the applicant does not intend to engage in activities inconsistent with the requested visa status. If 214(b) does not apply to the visa classification, consular officers should refuse any nonimmigrant or immigrant visa case presenting such concerns under section 221(g) of the INA for further review of additional ineligibility grounds, **LE** **LE** as appropriate.

5. (U) This was reflected well by the Secretary's statement on March 16, that "when you apply to enter the United States and you get a visa, you are a guest…if you tell us when you apply for a visa, 'I'm coming to the U.S. to participate in pro-Hamas events,' that runs counter to the foreign policy interest of the United States…if you had told us you were going to do that, we never would have given you the visa."

6. **(SBU) Situations that Cast Doubt on Students' Intent or Credibility:** As described in 9 FAM 402.5-5(C), an applicant applying for an F-1 or M-1 student visa must demonstrate intent to enter the United States solely to pursue a full course of study at an approved institution. In addition, J-1 visa applicants who are college, university, and other post-secondary students are required to pursue a full course of study as described in 9 FAM 402.5-6(E)(11). Evidence suggesting a student visa applicant intends to travel to

the United States to engage in unlawful activities clearly calls into question whether the applicant possesses intent and/or the ability to solely pursue a full course of study. While many activities may not fall under the INA's definitions of "terrorist activity," you should otherwise consider that information in assessing the credibility of a visa applicant's claimed purpose of travel. INA section 214(b) requires the applicant to show credibly that all activities in which he or she is expected to engage in while in the United States are consistent with the specific requirements of their visa classification.

7. **(SBU) ACTION REQUEST: Mandatory Social Media Reviews for Students and Student Exchange Visitors.** Effective immediately, consular officers must refer all new or returning F-1, M-1, or student J-1 visa applications meeting one or more of the following criteria, that the consular officer has determined is otherwise eligible for the requested nonimmigrant status, to the FPU via ECAS as described in 7 FAH-1 H-945.4, using the SOCIAL MEDIA REVIEW category. **LE**

**LE**

**LE** E

**LE**

8. **(SBU) Documenting the Results of the Social Media Review:** If the social media review uncovers potentially derogatory information indicating that the applicant may not be eligible for a visa, Fraud Prevention Units are required to take screenshots of social media findings to the extent it is relevant to a visa ineligibility, to preserve the record against the applicant's later alteration of the information. Limit screenshots to information relevant to connecting the applicant, the applicant's actions, and a visa ineligibility. **LE**

LE

9. **(SBU) Support for Terrorist Organizations - Grounds and Definitions for INA 212(a)(3)(B):** All consular officers should carefully review 9 FAM 302.6 to understand the grounds under which an applicant may be ineligible under 3B, including that an applicant who "endorses or espouses terrorist activity or persuades others to endorse or espouse terrorist activity or support a terrorist organization" is ineligible. Consular officers should consider these grounds and definitions when conducting interviews and pursuing lines of inquiry. Because terms in INA 212(a)(3)(B) are broadly defined, consular officers should elicit as much pertinent information as possible from visa applicants with suspected ties to terrorist organizations or terrorist activity. This includes the names of all relevant organizations potentially involved in terrorist activity and the applicant's relationship with them (for example, by current membership or past financial contributions or other support). Evidence that an applicant advocates for terrorist activity, or otherwise demonstrates a degree of public approval or public advocacy for terrorist activity or a terrorist organization, may be indicative of ineligibility under INA 212(a)(3)(B). This may be evident in conduct that bears a hostile attitude toward U.S. citizens or U.S. culture (including government, institutions, or founding principles). Or it may be evident in advocacy or sympathy for foreign terrorist organizations. All of these matters may open lines of inquiry regarding the applicant's credibility and purpose of travel. Consular officers should inquire into the nature and activities of those organizations. LE

**LE**

10. **(SBU) Intention to Engage in Unlawful Activity:** Consular officers are also reminded of guidance in 9 FAM 302.5-4 regarding the applicability of INA 212(a)(3)(A)(ii) under which a visa applicant is ineligible if the consular officer knows or has reason to believe that the applicant is traveling to the United States solely, principally, or incidentally to engage in any other unlawful activity. Consular officers should take care to enter detailed case notes regarding the specific activities expected in the United States and request an advisory opinion per 9 FAM 302.5-4(C).

11. **(SBU) Revocations of Valid Visas:** If, subsequent to visa issuance, information becomes available to post that an individual may no longer be eligible for a visa due to particularized information indicating an ineligibility under specific INA provisions, including 214(b), post should follow the procedures to revoke or request prudential revocation as described in 9 FAM 403.11 for nonimmigrant visas or 9 FAM 504.12 for immigrant visas. The Visa Office reminds posts that consular officers do not have the authority to revoke a visa based on a suspected ineligibility or based on derogatory information that is insufficient to support an ineligibility finding - other than a revocation based on driving under the influence (DUI) - and that such cases should be referred **LE** in accordance with 9 FAM 403.11-5(B) for further review. A consular officer's revocation must be based on an actual finding that the individual is ineligible for the visa.

12. **(U) Additional Guidance:** The Visa Office will host webinars for consular officers to discuss this guidance on Thursday, April 3 and Friday, April 4, 2025. Invitations with links to these webinars will be sent separately. The FAM will be updated to reflect this guidance.

13. **(U) Inquiries:** Post must refer any U.S. media inquiries regarding E.O.s to CA-Press@state.gov and congressional inquiries regarding E.O.s to ConsularOnTheHill@state.gov. Posts may respond to requests from

Case: 26-0906, 11/20/2026, DktEntry: 16.9, (185 of 300)


international media regarding E.O.s using CA's cleared press guidance located on CA Web, copying CA-PRESS@STATE.GOV.

14. (U) Minimize considered.

**MINIMIZE CONSIDERED**

| | |
|---|---|
| **Signature:** | RUBIO |
| **XMT:** | BASRAH, AMCONSUL; CARACAS, AMEMBASSY; CHENGDU, AMCONSUL; KABUL, AMEMBASSY; MINSK, AMEMBASSY; SANAA, AMEMBASSY; ST PETERSBURG, AMCONSUL; VLADIVOSTOK, AMCONSUL; YEKATERINBURG, AMCONSUL |

**UNCLASSIFIED**
SBU

# EXHIBIT 65

5:46 5G 24

[redacted]

Monday, Mar 10 • 9:56 AM

Hey [redacted], was lovely to see you last week, however briefly, and I hope I wasn't too belligerent on this point about needing to be ready to be adversarial toward the university. I really valued hearing your perspective, which is much better informed than mine about university workings.

The news about the student protestor, Mahmoud Kahlil's, deportation at Columbia has me fairly climbing the walls this morning. Are you plugged in to anything at the university that gives you a sense of how committed the admin is to protecting our students here? Also, if you'd like to discuss but not over text, lmk

RCS message

5:46 • 5G 24

[redacted]

No way were you too belligerent! What would that even mean? I'm always so happy to hear from you— and am open to the possibility that I am too trusting of university leadership as I hold out for a big-tent pro-democracy movement

I need to read up on this case you mention

The university, like the city of Evanston, is committed to not sharing information with ICE or allowing immigration enforcement officials access to university facilities without a judicial warrant. As far as can tell, they don't think that they have power to protect students who are subject to deportation orc

RCS message

5:46 5G 24

[redacted]

a judicial warrant. As far as can tell, they don't think that they have power to protect students who are subject to deportation orders.

And they're probably right about not having this power of course. I am glad if they are still committed to not cooperating with ICE. I guess I worry about their compromising on this count as a sop to the feds

This Khalil case is horrific 👍

Exactly. He's a permanent resident and he hasn't had a trial. This could be many of our students. This could many of our faculty.

Monday, · 7:53 PM

RCS message

# EXHIBIT 66

Case: 26-0906, 11/20/2026, DktEntry: 16.9, Page 191 of 300

**To resist Trump, draw meaningful red lines**

Many are reckoning with the ways in which the incremental accumulation of Trump 2.0 destruction and brutishness is transforming their day-to-day lives. And we grasp, instinctively, that we must not let the units of bad news blur into one another; we must notice that some changes demand our full attention. These changes are the events that we designate *red lines*.

The impulse to cope with growing authoritarianism by drawing red lines is a good one; at its best, it arrests shifting baseline syndrome, the phenomenon where we continually redefine "normal" in terms of how things are today and, when tomorrow is only *slightly* worse, conclude that nothing much has happened, failing to see our cumulative deterioration since a more remote starting point. It also allows us to act thoughtfully in an information environment designed to derange us.

But our red-line reckoning currently suffers from a few main defects: it is often reactive rather than proactive; theoretical rather than practical; and individual rather than collective. To revive the project of democracy in this country, and to deliberate with dignity in dark times, we must improve this practice in three ways:

**1. Red lines must be proactive**

A dynamic familiar to many organizers is that of being stuck in a reactive loop: something unplanned-for happens, and it feels like a moral imperative that you respond *right now*. Then, halfway through planning your response, something new happens, and this keeps happening until you have expended a great deal of energy and never found the space to identify a strategic orientation to the terrain you're dealing with.

Escaping the reactive loop while a drumroll of urgent moments is already vibrating across the social membrane is very difficult. The ideal solution is one that involves going back in time and building out organizational capacity and a plan for future contingencies adequate to the present moment.

But this isn't possible. In reality, organizers get saved from reactive loops in two ways: first, they can be rescued by forming a coalition with other organizations who have greater pre-existing capacity and, most importantly, a better theorized plan for handling the moment. Second, where there is no one else who already has an authoritative strategy, we break out of the reactive cycle only by letting some moments pass by with minimal response while we develop a branching diagram of future possibilities and decide which of these future events will constitute red lines. These possibilities need to be analyzed with an eye to their significance to the overall terrain. And then we need to figure out which of them will be treated as triggers for which actions. This brings us to point 2.

**2. Red lines must be practical.**

they will do when they get there. Only if all this is done can the really hard work of effective political resistance even truly begin.

Case: 26-0906, 11/20/2026, DktEntry: 16.9, (193 of 300)

A red line isn't a point at which we are allowed to say "ok, now things are really bad". Their proper function isn't to give us permission to feel some kind of way. Rather, they are *thresholds for escalated action*. They are the point we have identified (ideally in advance, per point 1) as making new forms of resistance appropriate.

It does little good to draw all eyes to the imminence of a constitutional crisis if we don't also deliberate about what sort of political action we will engage in once the crisis is announced. Indeed, in the dithering about whether such a crisis is not already upon us it is hard not to discern an anxiety about what happens when the breaching of this red line is announced by the relevant experts but, due to a failure to organize for this eventuality, the announcement proves practically impotent.

It similarly does little good to designate classroom censorship as the red line at universities if we don't talk about what we will do when this line is crossed. Where the red line is deferred off into the future without a practical plan for what we will do when we get there, it is hard not to suspect that the function of the deferral is to make us acquiesce to all the ways in which our academic mission will be compromised prior to that point so that by the time we are unambiguously there (if Columbia's agreeing to put a department into academic receivership doesn't already count), we will be "without any dignity left to protect" and will simply comply once more.

We must of course be thoughtful about what sort of actions will be effective, and which will be possible. These actions will almost certainly require large numbers of people. And unless you are the general of your own private army, associating mass practical responses with future red lines is something that has to be done alongside at least some of the people who would take part in the mobilization. This brings us to point 3.

**3. Red lines must be identified collectively**

Of course, people around the country are reaching practical conclusions about what they will soon have to do. Some who can are deciding to try to move abroad; others are altering what they allow themselves to say on social media; many non-citizens are deciding that it's too risky to leave the country when they can't be sure they won't be detained on their way back through the border. Some are steeling themselves to the sort of personal and professional sacrifices they will have to make in order not to be morally mutilated by complicity with the regime. But too many of us are making decisions for our own individual action while sitting alone in our cars and living rooms reading the news on our phones. In contrast, the most hopeful glimmers in the national firmament are those cases where people are flexing their abilities to voice collective dissent and to work across differences to form collectives that can be mobilized to stare down the authoritarians and to win.

These three rules for the articulation of red lines function in concert. We need groups of people to meet, educate themselves about what is on the political horizon, and collectively plan what

# EXHIBIT 67

**The Daily Northwestern** • April 24, 2024 •
https://dailynorthwestern.com/2024/04/24/uncategorized/lte-an-open-letter-from-171-faculty-do-not-ban-protest-at-nu/

# LTE: An Open Letter from 171 Faculty — Do not ban protest at NU

**171 members of NU Faculty**

Dear President Schill and Provost Hagerty,

Northwestern's University Mission declares its commitment to encourage debate; champion access, diversity and belonging; strengthen our community; and care about one another. NU Student Affairs pledges to uphold a commitment to social justice; confront practices that inhibit equity and justice; seek first to listen and understand; be curious and open to learning; and ask questions instead of ascribing intent.

We, the undersigned NU faculty of different backgrounds and political viewpoints, come together in support of these principles and in the firm belief that the University will violate its own commitments if it were to take any action to block our students' rights to peaceful speech, assembly and dissent.

This is a historic moment in which students across the country and around the world are voicing what they want their universities to be and do in terms of policies, ethics, partnerships and finances. These students' visions are based on an informed understanding of our collective well-being and, oftentimes, in a principled objection to that which impedes it.

As NU affirms, students have a right to ask questions. NU's vision statements require us to listen and engage with respect. The University will fail in its most basic promises and commitments if it moves to shut down student gatherings rather than open spaces for transparent and serious discussion.

Northwestern has a long history of successful student protests and strikes dating back to the 1960s. The students who are engaging in protests today are upholding and strengthening that proud tradition. Should the current administration choose to stand in their way, it will be on the wrong side of history.

We return to NU's pledge to "ask questions instead of ascribing intent." We will not tolerate the weaponization of unfounded presumptions of bigotry to smear and silence students who are not engaging in anything of the sort. And as educators, we will not stand for the criminalization of peaceful protest on our campus.

Signed,

Wendy Pearlman, Professor of Political Science and Middle East & North Africa Studies, WCAS
Elizabeth Shakman Hurd, Professor of Religious Studies & Political Science, WCAS
Elizabeth Smith, Assistant Professor of Instruction, Anthropology and WCAS Advising
Josh Honn, Humanities and Prison Education Librarian, University Libraries
Hannah Feldman, Associate Professor of Art History, WCAS
Ipek Kocaomer Yosmaoglu, Associate Professor of History, WCAS
katrina quisumbing king, Assistant Professor of Sociology, WCAS

Katherine E. Hoffman, Associate Professor, Anthropology & MENA Studies, WCAS
Michelle N. Huang, Assistant Professor, English & Asian American Studies, WCAS
Michael Loriaux, Professor of Political Science, WCAS
Shirin Vossoughi, Associate Professor, SESP
Zach Wood-Doughty, Assistant Professor of Instruction, Computer Science, WCAS
Nitasha Sharma, Professor and Director, Black Studies and Asian American Studies, WCAS
Kalyan Nadiminti, Assistant Professor of English, WCAS
Moya Bailey, Professor of Communication Studies
Doug Kiel, Associate Professor of History, Center for Native American and Indigenous Research (CNAIR), and Kaplan Humanities Institute
Loubna El Amine, Assistant Professor of Political Science, WCAS
Beatriz O. Reyes, Assistant Professor of Instruction, Global Health Studies Program; Native American and Indigenous Studies, CNAIR
Qiu Fogarty, Associate Director, Social Justice Education
Emrah Yildiz, Assistant Professor, Anthropology & Middle East & North African Studies
Sonya Kaleel, Adjunct Faculty/Coach, School of Education & Social Policy / MSLOC
Erica Weitzman, Associate Professor of German, WCAS
Ian Hurd, Professor & Director, Political Science & Weinberg Center for Int'l & Area Studies
alithia zamantakis, Research Assistant Professor, ISGMH and Medical Social Sciences, FSM
Luis Amaral, E.O. Haven Professor, McCormick
Santiago Molina, Assistant Professor of Sociology, WCAS
Steven W. Thrasher, Daniel Renberg Chair, Medill
Brannon Ingram, Associate Professor of Religious Studies, WCAS
Kim Marion Suiseeya, Associate Professor, Political Science, Environmental Policy & Culture
Sirus Bouchat, Assistant Professor, Political Science, WCAS
Rebecca C. Johnson, Associate Professor, English and Middle East & North African Studies
Barnor Hesse, Associate Professor, Black Studies, WCAS
Robert Orsi, Professor, Religious Studies and History, WCAS
Kelly Wisecup, Professor, English and Center for Native American & Indigenous Studies
James Bielo, Associate Professor, Religious Studies, WCAS
Leslie M. Harris, Professor, History, WCAS
Justin L. Mann, Assistant Professor, English and Black Studies, WCAS
Jamie Carlstone, Authority Metadata Librarian, University Libraries
Mark Hauser, Professor and Director, Anthropology and Latin American & Caribbean Studies
Nicole Spigner, Assistant Professor, Black Studies & English, WCAS
Ivy Wilson, Associate Professor, English, WCAS
Martha Biondi, Professor, Black Studies and History, WCAS
Rebecca Zorach, Mary Jane Crowe Professor, Art and Art History, WCAS
Thadeus Dowad, Assistant Professor, Art History, WCAS
Shalini Shankar, Professor, Anthropology & Asian American Studies, WCAS
Shelby Hatch, Associate Professor of Instruction, Chemistry, WCAS
Helen Tilley, Associate Professor, History, WCAS
Sarah Schulman, Ralla Klepak Professor of English, MFA Program in Creative Writing, English
J. Seawright, Professor, Political Science, WCAS
Miriam Petty, Associate Professor, Radio/Television/Film
Sepehr Vakil, Associate Professor, School of Education and Social Policy
Dotun Ayobade, Assistant Professor, Performance Studies and Black Studies, WCAS
Kennetta Hammond Perry, Associate Professor, Black Studies and History, WCAS
Alec Powers, MPH, FSM ISGMH
Mary Pattillo, Professor, Black Studies and Sociology, WCAS
Elham Hoominfar, Assistant Professor of Instruction, Global Health Studies Program
Spencer Evans, Senior Research Technologist, Dermatology
Sean Hanretta, Associate Professor, Department of History, WCAS

Sean Hanretta, Associate Professor, Department of History, WCAS

Lauren Stokes, Associate Professor, History, WCAS
Mérida M. Rúa, Professor, Latina and Latino Studies, WCAS
Gregory Phillips II, Associate Professor, Department of Medical Social Sciences
Tabitha Bonilla, Associate Professor, Human Development & Social Policy, SESP
Brent Huffman, Professor, Medill
Michael Anthony Turcios, Postdoctoral Fellow, Radio/Television/Film; Center for Native American and Indigenous Research
Emily Maguire, Associate Professor, Spanish and Portuguese, WCAS
Saad Ranginwala, MD, Assistant Professor, Feinberg School of Medicine
Jennifer Cole, Assistant Chair, Chemical and Biological Engineering
Megan Hyska, Assistant Professor, Philosophy
Megan Bang, Professor & Director, SESP & Center for Native American & Indigenous Research
Julie Lee Merseth, Assistant Professor, Political Science, WCAS
Curtis Miller, Lecturer, Art Theory & Practice
Kasey Evans, Associate Professor of English, WCAS
Annie Wilkinson, Postdoctoral Scholar, Anthropology, WCAS
Ana Aparicio, Associate Professor, Anthropology and Latina & Latino Studies Program, WCAS
becca greenstein, stem librarian, university libraries
Bimbola Akinbola, Assistant Professor, Performance Studies, WCAS
Ana Arjona, Associate Professor of Political Science, WCAS
Jackie Stevens, Professor, Political Science
Joshua Chambers-Letson, Professor of Performance Studies and Asian American Studies, Performance Studies and Asian American Studies
Anna Parkinson , Associate Professor, German
Michael Metzger, Academic Curator of Cinema and Media Arts, Block Museum of Art
Mary McGrath, Assistant Professor, Political Science, WCAS
Arionne Nettles, Lecturer, Medill
Ray San Diego, Assistant Professor of Instruction, Asian American Studies, WCAS
Sami Hermez, Associate Professor and Director of Liberal Arts Program, Northwestern in Qatar
Jorge Coronado, Professor, Spanish and Portuguese /LACS, WCAS
Samuel Weber, Avalon Foundation Professor of Humanities, German/CLS
David Schoenbrun, Professor, History and African Studies, WCAS
Nichole Pinkard, Professor, School of Education and Social Policy
Averill Curdy Murr, Professor of Instruction, English, WCAS
Hollyamber Kennedy, Assistant Professor, Art History, WCAS
Tracy Vaughn-Manley, Assistant Professor, Black Studies, WCAS
Mariajose Rodriguez Pliego, Assistant Professor, English, WCAS
James Mahoney, Gordan Fulcher Professor of Decision-Making, Political Science and Sociology
Jeffrey A. Winters, Professor, Political Science, WCAS
Ricky Hill, Research Assistant Professor, Sexual and Gender Minority Health & Wellbeing
Nate Cohen, Adjunct Professor of Instruction, Theatre
Michelle Birkett, Associate Professor, Medical Social Sciences
Karen Olivo, Director of Music Theatre Certificate Program, Theatre
Lina Britto, Associate Professor of History, Department of History, WCAS
Kevin Buckelew, Assistant Professor, Religious Studies, WCAS
Liz Hamilton, Copyright Librarian, University Libraries
Alessia Ricciardi, Professor, CLS
LaShandra Sullivan, Associate Professor, Anthropology, WCAS
Gina Petersen, Assessment Librarian, Northwestern University Libraries
Peter H. S. Sporn, MD, Professor of Medicine, Cell and Developmental Biology, and Medical Education, Feinberg School of Medicine
Tara Fickle, Associate Professor, Asian American Studies Program
Alejandra Uslenghi, Associate Professor, Spanish & Portuguese, Comparative Literary Studies
Penelope Deutscher, Professor, Philosophy and CLS

Penelope Deutscher, Professor, Philosophy and CLS

Marianne Hopman, Associate Professor, Classics and Comparative Literary Studies
Nick Winters, Assistant Professor, Classics
Hasheem Hakeem, Assistant Professor of Instruction, Department of French and Italian
Namratha Kandula, Professor, Medicine, Feinberg School of Medicine
AJ Christian, Professor, Communication Studies
Tara Gonsalves, Assistant Professor, Sociology
Torsten Menge, Assistant Professor, Liberal Arts, Northwestern in Qatar
Katie Risseeuw, Librarian, University Libraries
Charlotte Rosen, Postdoctoral Scholar in Public Service, Center for Historical Studies
Iñigo Manglano-Ovalle, Professor, Art Theory and Practice
Sulafa Zidani, Assistant Professor, Communication Studies
Patty Loew, Prof. Emerita, Medill; Center for Native American & Indigenous Research
Katia Viot-Southard, Associate Professor of Instruction, French and Italian
Megan Baker, College Fellow, Anthropology
Igal Szleifer, Professor, Biomedical Engineering
Jeong Eun Annabel We, Assistant Professor, Asian Languages and Cultures
Rebecca Ewert, Assistant Professor of Instruction, Sociology
Doron Shiffer-Sebba, Postdoctoral Fellow, Sociology
TJ Billard, Associate Professor, Communication Studies and, by courtesy, Sociology
Leila Tayeb, Assistant Professor in Residence, Communication & Liberal Arts, NUQ
Calvin Liang, Postdoctoral Fellow, Communication Studies
Nasrin Qader, Associate Professor, French and Italian, WCAS
Heather Jaber, Assistant Professor in Residence, Communication & Liberal Arts, NUQ
Gretchen Neidhardt, Librarian, Galter Health Sciences Library and Learning Center
Diego Arispe-Bazán, Assistant Professor, Anthropology, WCAS
Cynthia Robin, Professor and Chair, Anthropology, WCAS
Alfonso Fierro, Assistant Professor, Spanish and Portuguese, WCAS
William Leonard, Professor, Anthropology and Global Health Studies, WCAS
Laura Beth Nielsen, Professor of Sociology, WCAS
Noelle Sullivan, Professor Instruction and Associate Director, Program in Global Health Studies
Amanda Logan, Associate Professor of Anthropology, WCAS
Lauren Beach, Assistant Professor of Medical Social Sciences
Laura Brueck, Professor of South Asian and Comparative Literature, WCAS
Lydia Barnett, Associate Professor of History, WCAS
Rayvon Fouché, Professor, Communication Studies and Medill
kihana miraya ross, Assistant Professor, Black Studies
Diane Knoepke, Adjunct Instructor, MS in Learning & Organizational Change
Aldon D. Morris, Emeritus Professor, Sociology and Black Studies
Karrie Ann Snyder, Associate Professor of Instruction , Sociology, WCAS
Kari Lydersen, Assistant Professor, Medill
Domietta Torlasco, Professor, French and Italian/CLS
Patrick Janulis, Associate Professor, Department of Medical Social Sciences
Charlayne Mitchell, Assistant Professor of Instruction, Global Health Studies
Jonathon Glassman, Wayne V. Jones Research Professor Emeritus, History, WCAS
Mary Ann Weston, Associate Professor Emerita, Medill
Kate Masur, Professor of History, WCAS
J. Michelle Molina, Associate Professor, Religious Studies, WCAS
Lakshmi Padmanabhan, Assistant Professor, Radio, TV, Film
Peter Locke, Associate Professor of Instruction, Global Health Studies
Paul Ramirez, Associate Professor of History, WCAS
Sandra L. Richards, Professor Emerita, Black Studies & Theatre
Nina Gurianova, Professor, Slavic and CLS, WCAS

Case: 26-0906, 11/20/2026, DktEntry: 16.9, Page 199 of 300

Nina Gurianova, Professor, Slavic and CLS, WCAS

Jose Medina, Walter Dill Scott Professor of Philosophy, WCAS
Caitlin Fitz, Associate Professor of History, WCAS
Michael Rakowitz, Professor of Art Theory & Practice and MENA Studies
Jen Munson, Assistant Professor, Learning Sciences, School of Education and Social Policy
Vilna Bashi, Osborn Professor of Race, Ethnicity, and Global Diversity, Sociology, WCAS
Corey Byrnes, Associate Professor, Kaplan, Asian Languages and Cultures, Comparative Literary Studies
Shayna Silverstein, Assistant Professor, Performance Studies and MENA Studies
Patrick Noonan, Assistant Professor, Asian Languages and Cultures, CLS

If you would like to respond publicly to this op-ed, send a Letter to the Editor to opinion@dailynorthwestern.com. The views expressed in this piece do not necessarily reflect the views of all staff members of The Daily Northwestern.

Case: 26-6906, 11/20/2026, DktEntry: 16.9, Page 200 of 300

# EXHIBIT 68

# Supporting Dr. Steven Thrasher

**March 20, 2025**

We are appalled by Northwestern University's denial of tenure to Dr. Steven Thrasher and call upon Dean Charles F. Whitaker of the Medill School of Journalism to reconsider his decision.

This is the latest in a months-long campaign of retaliation against Dr. Thrasher for engaging in constitutionally protected political speech against Israel's war in Gaza and for defending students who stood against it during a peaceful protest at Northwestern last April. At that demonstration, Dr. Thrasher was among a group of faculty who formed a defense line around students who were setting up tents in Dearing Meadow, on the university's main Evanston campus. Northwestern Police attempted to break the defense line, physically assaulting Dr. Thrasher in the process.

One month after that protest, Northwestern University President Michael Schill was called before a Congressional hearing where U.S. Rep. Jim Banks (R-Indiana) publicly pressured him to fire Dr. Thrasher. Weeks later, Dr. Thrasher was one of four Northwestern University employees charged with Class-A misdemeanors for allegedly obstructing police activities during the April protest. When Cook County's State Attorney declined to prosecute and dropped the charges (charges that have since been formally expunged from Dr. Thrasher's record), Northwestern opened up an ad hoc investigation into his teaching and suspended him from the classroom.

The Northwestern University, Illinois and national bodies of the American Association of University Professors (AAUP) all criticized Dean Whitaker's decision to sanction Dr. Thrasher before he was even granted the opportunity for due process. In December, Dr. Thrasher was formally exonerated by a three-faculty committee of his peers from across the university. The day after Dean Whitaker accepted their report which deemed Dr. Thrasher's suspension to be unwarranted, he announced yet another internal investigation of Dr. Thrasher—this time for his participation in the April protest.

In light of this litany of retaliatory actions, we question Dean Whitaker's ability to impartially assess Dr. Thrasher's case for tenure—the denial of which is tantamount to purging Dr. Thrasher from the Northwestern faculty.

Northwestern recognized Dr. Thrasher as an outstanding scholar when they hired him in 2019 as the inaugural Daniel H. Renberg Chair for Social Justice in Reporting, with a Focus on LGBTQ Issues. His chair was formally renewed in 2023, months before the April protest that made him a target of the university's ire.

As an assistant professor, Dr. Thrasher has already earned an international reputation that is not only tenure-worthy, but would garner a full professorship at most universities. Dr. Thrasher's award-winning first book, *The Viral Underclass*, is an incredible and moving piece of journalism that tackles some of the most pressing questions of our collective moment. In this book, he uses viruses as a lens to reveal and understand startling inequalities of race, class, gender, ability, and sexuality. The public reception for *The Viral*

*Underclass* was overwhelmingly positive. *The New York Times* named the paperback an Editor's Choice. It was long-listed for the 2023 *PEN/America John Kenneth Galbraith Award for Excellence in Nonfiction Literature* and the *Carnegie Medal for Excellence in Nonfiction*.

In both *The Viral Underclass* and his other work, Dr. Thrasher bears witness and stands in solidarity with people the US often considers disposable. He is part of a cohort of journalists of color who collectively challenge the faux objectivity that has long defined the profession. It is not lost on us that as a Black gay man in the academy, Dr. Thrasher is both a rarity and disproportionately likely to be politically targeted, as data from the AAUP confirms. Until recently, Northwestern has touted its commitment to "diversity and inclusion." The demeaning and disrespectful treatment of Dr. Thrasher is wholly inconsistent with that espoused value. Are Black and LGBTQ faculty welcome only to the extent that they remain silent on issues that matter to them and have profound global significance?

The academy is under attack from people committed to dividing the polity, promoting disinformation, and protecting the powerful. These attacks are central to a well-funded campaign to undermine higher education in America as part of a far-right political project. Journalists, scholars, and teachers like Dr. Thrasher are needed more than ever if we hope to learn about and undo the harms inflicted by unequal systems. We call on Northwestern to reject this new McCarthyism and to reconsider its decision to deny tenure to our colleague, Dr. Steven Thrasher.

Anyone willing and able to offer material support for Dr. Thrasher can do so here.

**Institutional affiliations are offered for identification purposes only*
1. Kiese Laymon, Moody Professor of English and Creative Writing, Rice University
2. Andrew Ross, New York University
3. Lisa Hajjar, Sociology, UC Santa Barbara
4. Cathy Cohen, University of Chicago
5. Hoda El Shakry, Associate Professor of Comparative Literature, University of Chicago
6. Dan Sheehan, Lit Hub
7. A.J. Bauer, University of Alabama
8. Elliott Powell, University of Minnesota
9. Jeanne Theoharis, Distinguished Professor, Brooklyn College
10. Eman Abdelhadi, University of Chicago
11. Lisa Duggan, Professor, New York University
12. Alireza Doostdar, University of Chicago
13. Anton Ford, Associate Professor of Philosophy, University of Chicago
14. Victoria Law, author and independent journalist
15. Julie Orlemanski, Associate Professor of English and Director of Graduate Studies, University of Chicago
16. Darryl Li, University of Chicago
17. Allyson Nadia Field, University of Chicago
18. Daniel Morgan, Professor, University of Chicago
19. Christina Sharpe, CRC, York University
20. Douglas Foster, Professor, Northwestern University
21. Heba Gowayed, CUNY Hunter College & Graduate Center
22. Shantel Gabrieal Buggs, Associate Professor, Florida State University
23. Louise Seamster, University of Iowa

24. Sonya Posmentier, New York University
25. Zach Samalin, New York University
26. Nicholas Mirzoeff, Professor and chair, NYU
27. Monica Kim, University of Wisconsin-Madison
28. Cynthia Chris, College of Staten Island
29. Bilge Yesil, CUNY College of Staten Island and The Graduate Center
30. A. Naomi Paik, Associate Professor
31. Karma R. Chavez, Professor, University of Texas at Austin
32. Kevin Murphy, University of Minnesota
33. Leah Feldman, University of Chicago
34. Helga Tawil Souri, NYU
35. Sarah Jaffe, author and journalist
36. Jorge Coronado, Northwestern University
37. Rebecca Zorach, Northwestern University
38. Helen Tilley, Associate Professor, History, Northwestern University
39. Martha Biondi Professor, Northwestern
40. Riché Richardson, Cornell University
41. Lewis Wallace, journalist
42. Luís A Nunes Amaral, Northwestern University
43. Tej Nagaraja, Cornell University
44. Dan Berger, University of Washington Bothell
45. Steven High, Concordia University
46. Natasha Mhatre, Western University
47. Felicity Callard, Professor, University of Glasgow
48. Crystal Shackleford, Yale University
49. Spencer Richards
50. Anthony Tomaso, Northwestern alumni (2004)
51. Charlotte Rosen, Haymarket Books, Northwestern University alum
52. Lisa Stampnitzky, University of Sheffield
53. Ben Kiem, University of Toronto
54. Gabriel Winant, University of Chicago
55. John Pringle, PhD, Independent Researcher
56. Erik Reinbergs, Utah State University
57. Lauren Rendon, UChicago
58. Jacqueline Moss, Attorney
59. Anne Alt, Northwestern alumna
60. Siddhartha Mitter, independent journalist
61. Ben Chappell, University of Kansas
62. Austin B. Harvey, Northwestern alum (2004)
63. Jacob Devine, School of Communication ‘13
64. Ai Miller, University of Minnesota Libraries
65. Danielle Koonce, PhD, Cage Bird Research
66. Will Newsom, Austin Humane Society
67. Cynthia Gao, Middlebury College
68. Zach Schwartz-Weinstein, PhD
69. Michael Metzger, Northwestern University
70. Gyunghee Park, Westchester Community College
71. David Keegan, MD, Cumming School of Medicine, University of Calgary
72. Kat Naphas, Individual

73. Emily Rodriguez, Massachusetts General Hospital
74. Anthony Weems, Coastal Carolina University
75. Jason Guthartz, Northwestern alumnus
76. Shannan Clark, Montclair State University
77. Lauren Rothman, Journalist
78. John Saunders, Independent Researcher
79. Morgan Harper, University of Toronto
80. Lydia Kiesling, writer
81. Victor Ray, The University of Iowa
82. Jarrad Davis, Medill School
83. S. Gronkiewicz-Doran, Northwestern Alum, 2005
84. Jaime Lawson, Student
85. Patrick Hayes, Michigan State University
86. Jennifer Selwyn, History Department, Cal State, Sacramento
87. Steve Rhodes, photojournalist
88. David Palumbo-Liu, Stanford University
89. Rebecca Duffy, Northwestern University
90. Donovan Miyasaki, Professor, Wright State University
91. Tim Mackie, University of Minnesota Class of 2012
92. Javier Gonzalez, Individual
93. Scott Anton, Illinois Resident
94. Julia Valdes, PhD, Northwestern alumnus
95. Vincent Wong, University of Windsor
96. Jake Mann, Northwestern
97. Tiana Reid, York University
98. Ian Liujia Tian, Assistant Professor, Mount Saint Vincent University, Canada
99. Michael Munnik, Cardiff University
100. Alex Lubin, Penn State University
101. J. Benton Heath, Temple University
102. Dr. Sami Schalk, Professor, University of Wisconsin Madison
103. Leor Galil, Chicago Reader
104. Xine Yao, University College London
105. Steve Macek, North Central College, IL AAUP
106. Lauren Eastwood, Professor of Sociology State University of New York at Plattsburgh
107. Alyssa Harad, PhD
108. Sarah Watkins, Western Washington University
109. Andrew Douglas
110. Ali Alkhatib
111. Anne Kosseff-Jones, Journalist and Editor
112. Andrew Douglas, Morehouse College
113. David Loner, independent scholar
114. Steven Melendez, independent journalist and Medill alum
115. Patrick Michels, Northwestern alum
116. Stacey Watson, artist, Canada
117. Amie M Marie, individual
118. Suzanne Faysal Aref Barghouti
119. Nasar Meer, University of Glasgow
120. Elizabeth Meehan, WCAS '17
121. Torsten Menge, Northwestern University in Qatar

122. Maryann Germaine
123. Lizabeth Roemer, Professor, U Mass Boston (NU '89)
124. Sarah Schulman, Northwestern
125. Genevieve Lakier, University of Chicago
126. Lee Ann Fullington, Brooklyn College
127. Gavin Mueller, University of Amsterdam
128. Christopher Lioi, individual
129. Nathan Alderman (Medill Alum, 2000)
130. Kristin Bergen
131. Ann Kennedy University of Maine Augusta
132. Timothy Babulski, University of Maine
133. Kay Daly, Independent Writer, Scholar, Teacher
134. Christy Thornton, New York University
135. Mary Ensz, individual
136. Daniel Littlewood, Swarthmore College alum
137. Ferial Pearson, University of Nebraska
138. Benjamin Swerdlow, Lake Forest College
139. Caitlin Finn, individual
140. Maggie Dougherty, Northwestern Medill MSJ
141. Abdellali Hajjat, Associate Professor, Université libre de Bruxelles, Belgium
142. Chelsea Herman
143. Brendan Morales-Doyle, NU Alum, Class of 2016
144. Zaeem Haq, Individual
145. Lisa Gilson, Bates College
146. Benjamin Balthaser
147. Julia Métraux, journalist
148. Sabina Sawhney Retired Hofstra
149. Sarah Tuttle, Assocciate Professor, University of Washington, Seattle
150. Benjamin Balthaser, Associate Professor of English, Indiana University
151. Benjamin J. Robertson, University of Colorado, Boulder
152. Dan Immergluck, Professor, Georgia State University
153. Yasmeen Mekawy, Northwestern University in Qatar
154. Maida Avdic, Individual
155. Erica Weitzman, Northwestern University
156. Merve Fejzula, University of Missouri
157. Lauren Carbajal, NU Alum '13
158. Kat Tenbarge, independent journalist
159. Nicholas Garbaty, Northwestern Alum
160. Prof. Sunny Singh, lindon Metropolitan University
161. Sara Chatfield, Associate Professor, University of Denver
162. Sarah Shamash, Assistant Professor Emily Carr University of Art and Design
163. Audra Mitchell, Professor and CRC, Wilfrid Laurier University
164. Tony S. Jugé, Pasadena City College
165. Kapish Bhutani
166. Jeff Doctor, University of Toronto
167. Tashmia Owen. Artist. Writer.
168. John Horn, individual
169. Sunny Xiang, Yale University
170. James M. McCarthy, individual

171. Nandita Sharma, Professor, Sociology, University of Hawaii at Manoa
172. Cory Barker, Penn State University
173. Lauren Brentnell, Texas State University
174. Terri Friedline, Professor of Social Work, University of Michigan
175. Jason Haslam, Dalhousie University
176. Matthew Lloyd Roberts, University of Cambridge
177. Elise A. Mitchell, Swarthmore College
178. Nate Kruger, Vanderbilt University
179. Derek Ludovici, Anthropology Brooklyn College, CUNY
180. Tommy Craggs (Medill '01)
181. Samuel Harper, coopérative de solidarité Pivot
182. Natasha Kessler, Metropolitan Community College
183. Richard W Morrison, Editorial Director, Fordham University Press
184. Chanda Prescod-Weinstein, Theoretical Physicist
185. David Wittenberg, Professor, University of Iowa
186. Dr. Daniela Nadj, St. Mary's University, London
187. Tariq Khan, Yale University
188. Nick Ward, Loyola University
189. David Wells, Northwestern Alum
190. Siobhán McElduff, University of British Columbia
191. Kelsey Fong, Individual
192. Kimiko Soto
193. Jordan Shannon, Seattle University
194. Shannon Bucci, Graduate student of sociology—CU Denver
195. Philip Holden, University of Westminster, London
196. Bailey Remmers, PhD candidate at the University of Texas at Austin
197. Olivia Lewis,
198. Beatrix Hoffman, Northern Illinois University
199. Grace Kyungwon Hong, UCLA
200. Shannon Townsend, Washington University in St Louis
201. Bruce Simon, SUNY Fredonia
202. Janie Breton, Individual
203. Melanie Brewster, Teachers College, Columbia University
204. Rich DeYoung, Individual
205. Michelle Anya Anjirbag, University of Antwerp
206. Lukas Neville, University of Manitoba
207. David Murakami Wood, Canada Research Chair in Critical Surveillance and Security Studies, University of Ottawa
208. Bill Walker, Chicago Resident
209. Julia Chang, Cornell University
210. Saba Igbe, student - University of the West Indies
211. andré carrington, University of California-Riverside
212. Sarah Disbro, Northwestern Medill MSJ
213. Ebony Elizabeth Thomas, University of Michigan
214. John Knefel
215. Florence Ashley, University of Alberta
216. Greg Burris, Northwestern University in Qatar
217. Tage Rai, UCSD
218. Alithia Zamantakis, Northwestern University ISGMH

219. Summer House, Northwestern University staff
220. Shelby Seier, All Kinds Accessibility Consulting
221. Marie Salter Northwestern Law Alumnus
222. Megan Jennings Quist, Northwestern
223. Keisuke Sista, Depaul University
224. Izzy Grosof, Assistant Professor, Northwestern University
225. Begum Adalet, Cornell University
226. Andres Pinedo, Vanderbilt University
227. Alex Boodrookas, MSU Denver
228. Orven Mallari, University of Michigan
229. Amina M. Steinfels, Associate Professor of Religion, Mount Holyoke College
230. Taylor Tefft, Loyola University
231. Yuri Cartier, Research staff, University of California San Francisco
232. Jonathan Feingold, Boston University School of Law
233. Cass Turner, UCLA
234. Burcu Baykurt, University of Massachusetts Amherst
235. Leigh Kimberg, MD, Professor of Medicine, UCSF (for ID)
236. Jessie Nguyen, Northwestern University
237. Matthew Vega, University of San Diego
238. Sarah Bracke, University of Amsterdam
239. Micol Bez, Northwestern Philosophy and Comparative Literature
240. Leah Munsey, Case Western Reserve University
241. Tyler Coates, journalist and former Northwestern University employee
242. Danielle Welch, individual
243. Hale McSharry, Northwestern '17, NU Loyal
244. Duncan MacKinnon
245. Zinya Salfiti, Northwestern Medill MSJ
246. Lindsay Ballant, former adjunct professor, Maryland Institute College of Art and School of Visual Arts
247. Kevin McQueeney, Loyola University New Orleans
248. Rinaldo Walcott, University at Buffalo
249. Amber Robinson, librarian
250. Victoria Frye, professor, Columbia University
251. Wesley R. Bishop, PhD, Assistant Professor History, Jacksonville State University
252. Khaleel Rahman, Northwestern University
253. Eli V. Kean, Northwestern University
254. Lisa Diedrich, Stony Brook University
255. Katherine Blouin, University of Toronto
256. Matthew Phelan, journalist (MA, NYU SHERP)
257. Frank Edwards, Associate Professor, Rutgers University
258. Sean Bland, Santa Clara University
259. Elia Silbey, Northwestern Student
260. Nesrien Hamid, University of Michigan
261. Kendall Riley, University of Iowa
262. Grace OLeary, Chicago Resident
263. Ujju Aggarwal, The New School
264. aeriell bach, seiu local 73
265. Marla Jaksch, Professor, The College of New Jersey
266. Carrie Tirado Bramen, Professor, University at Buffalo

267. Amrie Moraga, California State University Channel Islands
268. Elias Khalil, University of Toronto
269. Olivia Stovicek, editor and journalist
270. James M. Thomas, University of Mississippi
271. David McNally, Distinguished Professor, University of Houston
272. Beth Capper, Assistant Professor, University of Alberta
273. Keith Miyake, University of California, Riverside
274. Kayla Renée Wheeler, Assistant Professor, Xavier University
275. Anthony Rains, Iowa State University (alum)
276. Trey Moody, Creighton University
277. Jessica Daly, College of Lake County
278. Christa Noel Robbins, UVA
279. Dr Mohsin Badat, Queen Mary University London
280. Ruby Daniel, Individual
281. Lyle Jeremy Rubin, Author
282. Salonee Bhaman, NYU
283. W. Carson Byrd, University of Michigan
284. Tristan J Schweiger, Assistant Instructional Professor, University of Chicago
285. Whitney Strub, Rutgers University-Newark
286. Patrick Blanchfield, Brooklyn Institute for Social Research (BISR)
287. Shehram Mokhtar, Northwestern University in Qatar
288. Micah Bazant
289. Tulsi McDaniels with the Chicago Alliance (CAARPR)
290. Altha Cravey, UNC Chapel Hill
291. Molly Schiffer, Northwestern University
292. Kai Ngu, University of Michigan, journalist
293. Paul Renfro, Florida State University
294. Cynthia Franklin, University of Hawai'i
295. Briana Finegan, University of Chicago
296. Anna E. Lindner, Nazareth University
297. Michael Kraus, Northwestern University
298. Noah Berlatsky, journalist
299. Caroline Bowman, Barnard College
300. Lawrence Chillrud, Northwestern University
301. LaToya Baldwin Clark, Professor, UCLA School of Law
302. Joshua L. Mayer, University of Connecticut
303. Nate Holdren, Drake University
304. Cailey Hall, UCLA
305. Laleh Khalili, University of Exeter
306. Daniel Rück, University of Ottawa
307. Jordan Owens, Northwestern Univery
308. Edouard Machery, University of Pittsburgh
309. Richard Wood, Retired Chair, Sociology, DeAnza College, Cupertino, CA
310. Eli Newell, Northwestern University (SoC '18)
311. Mauro Gatti, University of Bologna
312. Peter Chesney, Vanderbilt University
313. Toby Smith, UC Davis
314. Maxim Voronov, York University
315. Ellison Snider

316. Julia Steinberger, University of Lausanne, Switzerland
317. Nitish Pahwa, journalist
318. George De Stefano, Alumnus, CUNY
319. Donald Cotter, Mt Holyoke College
320. Caroline Abidin, college graduate, concerned citizen
321. Zsuzsa Kaldy, University of Massachusetts Boston
322. Miriam Posner, UCLA
323. Nicholas Caverly, University of Massachusetts
324. Uahikea Maile, University of Chicago
325. Peter Sheik, individual
326. Albe Gilmore, University of Ottawa
327. Tina Shull, UNC Charlotte
328. Emek Ergun, UNC Charlotte
329. Anne Marie Creighton, University of Michigan, Ann Arbor
330. Aven Peters, Northwestern University
331. Avi Sheehan, UChicago Alum, Northwestern Alum
332. Nadia Aubin-Horth, Professor, Universite Laval, Canada
333. Jonny Diamond, Lit Hub
334. Steven Blevins, Lecturer, Univ. of North Carolina Asheville
335. Natasha Lightfoot, Associate Professor, Columbia University
336. Eric Reinhart, Northwestern University
337. Seema Yasmin, Stanford University
338. C. Riley Snorton, University of Chicago
339. Nikhil Pal Singh, Chair Department of Social and Cultural Analysis, NYU
340. Candice Baumgardner, Western Oregon University
341. Dylan O'Brien, Paraprofessional
342. Anna Drake, Associate Professor, University of Waterloo
343. Leni Zumas, Portland State University
344. Rebecca Slayton, Cornell University
345. Shakuntala Banaji, Professor, London School of Economics and Political Science
346. Susan Kingsland, Individual
347. Michael Tristano Jr., Assistant Professor, Towson University
348. Cristian Valenzuela, Northwestern University
349. Jim Logan, retired journalist
350. Laura Colaneri, University of Chicago
351. Jennifer Nelson, University of Delaware
352. Jonathan Hannau, Roosevelt University
353. Tahera Ahmad (former 15 year Chaplain at Northwestern also wrongfully terminated by the university's discrimination)
354. Allison McCracken, DePaul University
355. Amesika Nyaku, MD, MS; Northwestern University Feinberg School of Medicine
356. Savithry Namboodiripad, University of Michigan
357. David Ponton III, University of South Florida
358. Zeke Pratchett, Individual
359. Derek Silva, Associate Professor, King's University College
360. Kristin Urquiza, co-founder Marked By Covid
361. Danielle Purifoy, UNC Chapel Hill
362. Jason Schulman, John Jay College, CUNY
363. Russell Rickford, Cornell University

364. Neel Ahuja, University of Maryland, College Park
365. Teke Wiggin, Northwestern sociology PhD student
366. Jennifer Spitzer, Ithaca College
367. Sebastian Avery Morris, MDiv
368. Aradhana Sharma, Professor, Wesleyan University
369. Vernadette Gonzalez, Ethnic Studies, UC Berkeley
370. Mara Mills, New York University
371. Greg Ryan, London Metropolitan University
372. David Schmid, University at Buffalo
373. Will E. Bachar
374. Brian Goldstone, author and journalist
375. Eraldo Souza dos Santos, Cornell University
376. Meredith Farkas, Portland Community College
377. Yusra Shawar, John's Hopkins University
378. Jackson Tenclay, previous TA at Northwestern
379. Oarteze Hunter, University of California, Los Angeles
380. Eskil Elling, PhD candidate, Northwestern
381. Nicholas Rodelo, Researcher
382. Edgar Rivera Colón, University of Southern California
383. Georgios Argyropoulos, University of Stirling
384. Dominick Knowles, Ph.D., UMass Boston
385. Mark Libin, University of Manitoba
386. Carolyn Elerding, PhD, former tenure-track professor
387. Sherry Wolf, Northwestern, Class of 1987
388. Ashlyn Keefe, Individual
389. Alana Lee Glaser, Associate Professor, St Johns University (PhD, Northwestern University, Dept of Anthropology, 2015)
390. Yasser Munif, Emerson College
391. Andres Fabián Henao Castro, Political Science, University of Massachusetts Boston
392. Susan Marsh, individual
393. Ivón Padilla-Rodríguez, University of Illinois Chicago
394. Kevin Delucio, Western Washington University
395. Ali Watts, Bowling Green State University
396. Cameron, UCSF, nurse
397. Amanda Hernandez, Southwestern University
398. Ana Carolina Díaz Beltran, Assistant Professor, University of Texas Rio Grande Valley
399. Lisa Geiszler
400. Tamara Lee, Rutgers University (BSIE, Northwestern University '96)96)
401. Suzanne Abu-Shaaban, DBA
402. Cairo Dye, NU Alumni
403. Marla Arbach, per-course faculty, various institutions
404. Maria Hantzopoulos, Vassar College
405. Terri Ginsberg, Rutgers University
406. Leanne Betasamosake Simpson, Independent Scholar
407. Jairo I. Funez-Flores
408. Sinan Richards, University College Cork
409. Ira Dworkin, Texas A-M
410. Hakim Williams, Gettysburg College
411. Susan Morrissey, University of California, Irvine

412. Bharat Venkat, UCLA
413. Kristin Burnett, professor, Lakeahead University
414. Caitlin Schroering, Assistant Professor, Global Studies, UNCC
415. John Palmer, Universitat Pompeu Fabra
416. Sanghyuk Shin, UC Irvine
417. Eli Meyerhoff, Duke University
418. Ryan Griffis, University of Illinois, Urbana-Champaign
419. Michael Loeb, CUNY
420. Sarah Hale, SUNY Buffalo
421. Rana Jaleel, Associate Professor, University of California, Davis
422. Melanie Richter-Montpetit, University of Sussex (UK)
423. Brian Cabral, UT Austin
424. Jih-Fei Cheng, Associate Professor, Scripps College
425. Jeff Liss, City College of San Francisco
426. David Bateman, Associate Professor, Cornell University
427. Michael Litwack, Associate Professor, University of Alberta
428. Jake mattox, Indiana university, south bend
429. Catia Cecilia Confortini, Professor of Peace and Justice Studies, Wellesley College (USA)
430. Dan Hirschman, Associate Professor, Cornell University
431. David Polanski, Independent Scholar
432. Christina Heatherton, Everett and Joanne Elting Associate Professor for Human Rights and Global Citizenship and Associate Professor of American Studies
433. Lara Cohen, Swarthmore College
434. Shama Rangwala, York University
435. Steven Louis Goldstein, Medill ‘15 alum, proud Jewish supporter of Dr. Thrasher
436. Jack Mirkinson, journalist
437. M. I. Bernal Uruchurtu, UAEM, México
438. Kate Quinn, University College London (UCL)
439. Ari Paul, Fairness and Accuracy in Reporting
440. Elena Shih, Manning Assistant Professor of American Studies
441. Christina Dunbar-Hester, Professor, University of Southern California
442. Angela Jones, Stony Brook University
443. Andrea Brower, Gonzaga university
444. Aria Snedegar, Northwestern ‘21
445. Miles Hentrup, Florida Gulf Coast University
446. Tricia Gallagher-Geurtsen, UC Santa Cruz
447. Yulia Gilich, Institute for the Critical Study of Zionism
448. Victoria C. Chávez, Northwestern University
449. Alana Lentin, Western Sydney University
450. Zareena Grewal
451. Israel Perez, U of I at Urbana-Champaign
452. Aisha Syed
453. Carolynn Ekbaeck, Graduate Student & Union Organizer, UT San Antonio
454. W. David Ball, Santa Clara Law School
455. Stephen Sheehi, William & Mary
456. Tamara Golan, University of Chicago
457. Lara Sheehi, Doha Institute for Graduate Studies
458. Becca Greenstein, Northwestern University

459. Sophie McMillan-Myers, University of Chicago
460. Andrés Moreira, Rutgers University
461. J. Mijin Cha, UC Santa Cruz
462. Christina Hanhardt, University of Maryland
463. Nicholas Emmerson, University of Iceland
464. Randy R. Potts, journalist
465. Mostafa Minawi, Cornell University
466. Nicole Guenther Discenza, University of South Florida (but not representing it)
467. Lauren Gutterman, University of Texas at Austin
468. Maurianne Reade, Associate Professor, Northern Ontario School of Medicine University
469. Loretta Capeheart, retired Justice Studies, Northeastern Illinois University
470. Matt Weston, musician - composer
471. Analu Lopez, Librarian
472. Iyko Day, Mount Holyoke
473. Genevieve Renard Painter, Concordia University
474. Brandon Sward, PhD UChicago ‘23
475. Bill V Mullen Professor Emeritus Purdue
476. Mimosa Shah, Librarian
477. Jeremy Rotner, Northwestern '14
478. Abigail Boggs, Assistant Professor, Wesleyan University
479. Lene Myong, University of Stavanger, Norway
480. Rouhollah Aghasaleh, Cal Poly Humboldt
481. Gordon Beeferman, Adjunct Professor, New York University
482. John King Associate Adjunct Professor NYU
483. Matthew Murrey, MLS - poet and retired librarian, Urbana, IL
484. Lucie Fiala, Environmental Scientist
485. Gulzar R. Charania, University of Ottawa
486. Mabel Wilson, Columbia University
487. Fereshteh Toosi, Florida International University
488. James Schamus, Columbia University
489. Tommy H. Proffitt III, individual
490. Natalie Araujo Melo, Northwestern University
491. Heike Schotten, Professor of Political Science, UMass Boston
492. Cristina Groeger, Associate Professor of History, Lake Forest College
493. Mary Rambaran-Olm, PhD, unaffiliated
494. Melissa Weiner, College of the Holy Cross
495. Deborah Armintor, University of North Texas
496. Laura Bray, University of Oklahoma
497. Celia E. Naylor, Barnard College
498. Chris Cynn, Virginia Commonwealth University
499. Courtney Joseph, Lake Forest College
500. Nahyan Fancy, DePauw University
501. Michelle Birkett, Northwestern University
502. Susan Rinkunas, independent journalist
503. Ashley Dawson, Distinguished Professor, City University of New York
504. Arionne Nettles, Florida A&M University
505. Nate Wagner, Yale University
506. Viva Butler, individual

507. Jigna Desai, UC Santa Barbara
508. Fushcia-Ann Hoover, faculty, UNC Charlotte
509. Kathryn Macapagal, Northwestern University
510. Tom Alter, Texas State University
511. Rabab Abdulhadi, San Francisco State University
512. Fadi Ennab, Vanier Scholar, PhD Candidate, University of Manitoba
513. Ira Beare, Northwestern University
514. Maryann Blackburn, individual
515. Anthony Colella, Individual
516. Jessica Rish, DePaul University
517. Steve Rolf, University of Sussex
518. Shabana Mir, Associate Professor
519. Ethan Roberts, Calvary Presbyterian Church
520. Caroline Hugh, MPH, unaffiliated
521. Jamie Carlstone, Northwestern University
522. Sarah Lazare, journalist
523. Margaret Russell, Santa Clara University
524. Adam Murphree, PhD
525. Colleen Wynn, University of Indianapolis
526. Paul de Revere
527. Ben Manski, George Mason University
528. Ragini Shah, Suffolk University NU alum 1993
529. Nitasha Sharma, Professor of Asian American Studies and Black Studies, Northwestern University
530. Danielle Carr, UCLA
531. Violet Fox, Galter Health Sciences Library, Feinberg School of Medicine
532. Maria Arettines, CUNY
533. Ari Appel, (Washington University in St. Louis, undergraduate)
534. Isaac West, Vanderbilt University
535. Steph Brown, University of Arizona
536. Blake Stimson
537. Matthew Kovac, UC Berkeley, Medill '14
538. Theodore Tollefson, Independent Journalist
539. Matt Chorpenning, MSW - Portland State University
540. Jack E Licata, Northwestern University alumnus (B.A., 2013; J.D., 2018)
541. Naoko Shibusawa, Brown University, NU PhD
542. Amira Jarmakani, San Diego State University
543. Raia Small, MFA Candidate at San Francisco State University
544. Elizabeth Ziff, University of Indianapolis
545. Gopalan Nadathur, Professor, University of Minnesota
546. Ashley Lindsey, University of Arkansas
547. Eleanor Chung, MD, University of California-San Francisco
548. Ethan Bleemel, University of Louisville
549. Cristina Kotz Cornejo, Professor, Emerson College
550. Barry Trachtenberg, Rubin Presidential Chair of Jewish History, Wake Forest University
551. Joel Thorson, DePaul University
552. Shubhankar Kashyap, DPhil (PhD), University of Oxford
553. Kerwin Kaye, Wesleyan University
554. Luke Peterson, PhD, University of Colorado Boulder, NU Alumni (2019)

555. Henry Rogers, Northwestern University
556. Briana Markoff, Michigan State University
557. Hari Ziyad, Author and Journalist
558. Daisy Baeza
559. Sean Hanretta, Northwestern University
560. Fade Eadeh, Seattle University
561. Lyric Hathaway, Northwestern University
562. Alexander Aviña, Arizona State University
563. Natalie Kouri-Towe, Concordia University
564. Nina Farnia, Albany Law School
565. Peter Jamea Hudson, University of British Columbia
566. Joselyne Ruiz Zuniga (teacher)
567. Kim F. Hall, Barnard College
568. Erik Wade, SUNY Oswego
569. Corinna Mullin, CUNY
570. Eli Valley
571. Shaine Scarminach, University of Connecticut
572. Turner Spencer
573. Elizabeth Ford, educator
574. Desiree Poets, Virgínia Tech
575. Christina Garrett
576. John Ritchie, affiliation near Washington DC
577. David Letwin, Rutgers University
578. Marianna Ritchey, Associate Professor, UMass Amherst
579. Manu Karuka, Barnard College
580. Richmond Eustis, Nicholls State University
581. Myrna Moretti, Northwestern '24
582. Jess A. Goldberg, New Mexico Highlands University
583. Qriddur, AWC
584. Sarah Smith, Anti War Committee Chicago
585. Melixa Abad Izquierdo, Farmingdale State College
586. Hilary Fung, Northwestern University
587. Nathaniel Mills, University of Minnesota - Twin Cities
588. Zach Russo, unaffiliated
589. Shannon Heffernan, journalist
590. Andreas Petrossiants, NYU
591. Amy Kristl, Northwestern University
592. Omer Aijazi, University of Manchester
593. Navid Farnia, Wayne State University
594. William Noseworthy, Cornell University
595. Bethany Letiecq, George Mason University
596. Daniel Sidorick, Rutgers University
597. George Duton, UCLA
598. Brian L. Evans, UT Austin
599. Melanie Gleason, public interest attorney
600. Megan Hyska, Assistant Professor of Philosophy, Northwestern University
601. Maria Guglielmo, Brown University
602. Michael Gallope, University of Minnesota
603. Thomas Moore, Policy Analyst

604. Charlie Thame, Assistant Professor, Thammasat University
605. Michael Billeaux, Madison Area Technical College
606. Joe Jaggi
607. jj skolnik, journalist
608. Greg McGarry, University of San Francisco
609. Jan L Clausen. adjunct faculty, New York University
610. Natascha Chtena, Simon Fraser University
611. Tiffany N. Florvil, University of New Mexico
612. James Factora, journalist
613. Steve Held, Northwestern Alum 1995, independent journalist
614. Susan Stryker, Distinguished Visitor, Clayman Institute for Gender Research, Stanford University, and Professor Emerita of Women's, Gender and Sexuality Studies, University of Arizona
615. Caeli Kean, Anti-War Committee Chicago
616. Marcy Newman, independent scholar
617. Benjamin Hulett, Columbia University
618. Denish Jaswal, Harvard University
619. Lori Carriere, Stony Brook University
620. Jason Grote, writer
621. Sarah Gilbert, Pitzer College
622. Carrie Heckel, NU Alum
623. Zach D Roberts, Independent Photojournalist
624. Jennifer Greiman, Wake Forest University
625. Elinor Keener, Anti-War Committee
626. Hilah Kohen, University of Pennsylvania
627. Alexander Manevitz, Baruch College, CUNY
628. Seth Sanders, UC Davis
629. Jane Lehr, Professor, Cal Poly
630. Andrew Kadi
631. Lisa Uperesa, UCLA
632. Alejandra Marchevsky, Professor, California State University Los Angeles
633. Huda Ayyad
634. Elaine Chang
635. Michelle Moyd, Michigan State University
636. Ralph Ghoche, Barnard College
637. Erin White, Northeastern Illinois Alumn
638. João Florêncio, Professor of Gender Studies, Linköping University
639. May Fu, California State University, Los Angeles
640. Jessica Halliday Hardie, Hunter College CUNY
641. Mattilda Bernstein Sycamore, Author
642. Malek Abisaab, McGill University
643. James Gross Cornell University
644. Sara Heymann, Library worker
645. Sarah Elizabeth, Formerly NYU, Loyola University, UIC, DePaul University & Roosevelt University
646. Avery Gendell, Virginia Tech
647. Norma Rantisi, Concordia University
648. Marcy J. Dinius, Professor of English DePaul University, Northwestern University Ph.D. 2003

649. Omar Rahman, Fellow, Middle East Council on Global Affairs
650. Anthony Alessandrini, City University of New York
651. Carl Gelderloos, Binghamton University (SUNY)
652. Maryann Blackburn, Illinois resident
653. Laurel George, New York University
654. Juno Salazar Parrenas, Cornell University
655. Lucien Baskin, CUNY Graduate Center
656. Vivian Lu, Rice University
657. Steven Chappell, 2023 College Media Hall of Fame; 2022 Associated Collegiate Press Pioneer Inductee;
2018 Missouri College Media Association Educator of the Year
658. Travis Chi Wing Lau, Kenyon College
659. Jordan H. Carver, Yale University
660. May Lin, Cal State Long Beach
661. Michael W. Yarbrough, City University of New York
662. Aaron Katzeman, Getty Research Institute
663. Jason Mittell, Middlebury College
664. Katherine Wilson, Fordham University
665. Haleigh Martin-Morrissey, concerned citizen
666. Charlie Wang, PhD Student, Cornell University
667. Rachele Dini, Lecturer in English and Creative Writing, Coventry University
668. Maha Nassar, University of Arizona
669. Minahil Asim, university of Ottawa
670. Heather Atherton, J.D. Candidate, Northeastern University School of Law
671. Joe Iosbaker, Chicago Alliance Against Racist & Political Repression
672. Jordana Silverstein, University of Melbourne
673. Sonia Alexander, Medill alumna
674. Naomi Braine, Professor of Sociology, Brooklyn College, CUNY
675. Ayden Scheim, Drexel University
676. Maggie Clinton, MIddlebury College
677. Meena Hasan, Harvard University
678. Mika Shibuya
679. Kirsten Weld, Harvard University
680. Susila Gurusami, UIC
681. Rebecca Vaughan, CUNY, SUNY
682. Farah Ali, DePauw University
683. Brahim Aoude, professor emeritus-University of Hawaii
684. Teri L. Caraway, Professor of Political Science, University of Minnesota, Twin Cities
685. Edwin Mayorga
686. Aren Aizura, University of Minnesota
687. Don Barry, Cornell University (retired)
688. Christopher J Smith, Texas Tech University
689. Ben Calderwood, UCLA
690. Nick Okafor, Stanford University
691. David Cohen, Swarthmore College
692. Victor Pickard, University of Pennsylvania
693. Stuart Schrader, Johns Hopkins University
694. Gia Yetikyel, Northwestern University alumni
695. Marijke Hecht, The Ohio State University

696. Jaden Janak, Assistant Professor of History, St.Olaf College
697. Vernon P Nickerson, MA (BSIE, McC 1981)
698. Elizabeth Koslov, University of California, Los Angeles
699. Shannon Sotomayor, Northwestern University, Brown University
700. Caleb Smith, Brandeis University
701. Semya Hakim, St. Cloud State University
702. Rafael A. Mutis García, Labor4Palestine
703. Georgette Kirkendall
704. Ron J Smith, Bucknell University
705. Sangina Patnaik, Swarthmore College
706. Sophia Lo, Northwestern alum
707. Raya Shapiro, University of Illinois Chicago
708. Samuel P. Catlin, Visiting Assistant Professor of Jewish Thought, University at Buffalo (SUNY)
709. Celena Chong, Northwestern University
710. Christopher Sieving, University of Georgia
711. Saadia Toor, CUNY
712. Helen Smith, University of Wisconsin-Madison
713. Onn Brown, Information Professional
714. John Blank, Berklee College of Music
715. Adam Miyashiro, Stockton University
716. Zack Furness, Penn State University
717. Andrew Ginsberg
718. Rebecca Kurti
719. Amber Martin, Hunter College CUNY
720. David Helps, University of Southern California
721. Ian Alexander, Carnegie Mellon University
722. Gregg Gonsalves, Yale University
723. Brooke Lober, UC Berkeley
724. Anders Tobiason, Boise State University
725. Alicia Badea, University of Chicago
726. Abdul Hasania
727. Eliza Epstein, PhD.
728. Ari Bloomekatz, In These Times
729. Heydy Herbert, Emory University
730. Katie Risseeuw, Northwestern University
731. Jamella Gow, Bowdoin College
732. Kevin Ouyang, PhD Student, Northwestern University
733. Duane Wright
734. helen DeVinney, George Washington University
735. Mike Duncan, University of Houston-Downtown
736. Mark Minch-de Leon, UC Riverside
737. Glen David Kuecker, Professor, DePauw University
738. Frank Anthony, UCLA
739. Joshua Sealy-Harrington, Associate Professor & Chair of Equality Law, University of Windsor, Faculty of Law
740. Jonathan Jenner, University of Manitoba
741. Bikrum Gill, Virginia Tech
742. Abby Kluchin, Ursinus College

743. Derek Pavlik
744. Amirah Ford, Northwestern University Medill Alum
745. Molly Talcott
746. Lilian Ha, Columbia University
747. Abraham Flaxman, University of Washington
748. Michelle Chen, Cornell University
749. Rahsaan Mahadeo, University of Minnesota
750. Antonio Ramirez, Associate Professor, Elgin Community College
751. Mohammad Fadel, University of Toronto Faculty of Law
752. Adam Schwartz
753. Esther Isaac, PhD Candidate, University of Chicago
754. Nicole Lopez-Jantzen, CUNY: Borough of Manhattan CC
755. Jessie Fredlund, SUNY New Paltz
756. Colin Vanderburg, New York University
757. Nick O’Reilly
758. Dan Erdman, Media Burn Archive
759. Dorotea Gucciardo, PhD, King's University College
760. Lachina McKenzie, Toronto Metropolitan University
761. Momodou Taal, cornell
762. Natalia Reyes, University of Pennsylvania
763. Suzanne Faysal  Aref AlBarghouti
764. Suzanne Kessler ( retired police officer)
765. Marina Seyffert
766. Molly Benitez, Portland State University
767. Dara Orenstein, George Washington University
768. Amanda Lapid, Northwestern alumni
769. Nicholas Holterman, Northwestern Alumnus
770. Natasha Lennard, The New School
771. Natalie Oswin
772. Ronak K. Kapadia, University of Illinois Chicago
773. Justin Flatt, Rutgers University
774. David Boyk, Northwestern University
775. Jonathan Washington, Swarthmore College
776. Alexandra Barraclough, Northwestern Medill Undergraduate and Graduate Alumna
777. Ellen Schrecker, Yeshiva University, (ret)
778. Issac Shihabi
779. Jared McCormick, NYU
780. Margaret Russell, Santa Clara University
781. Kate Zambon, University of New Hampshire
782. Scott Ritner,. University of Colorado Boulder
783. Dwight K Lewis Jr, University of Minnesota TC
784. Cathy Chu, City University of New York
785. Jennifer Goett, Michigan State University
786. Juliane Hammer, UNC Chapel Hill
787. Charisse Burden-Stelly, Wayne State University
788. Ateka Gunja
789. Esrea Perez-Bill, Northwestern University
790. Jason Horn, Medill MSJ alum (‘06)
791. Risa Lieberwitz, Cornell University

792. Jeremy Zallen, Lafayette College
793. Michael Rodríguez-Muñiz, Associate Professor of Sociology, UC Berkeley
794. Jamal Ali, Rutgers University
795. Yasmin Nair, Writer
796. Emily Thuma, University of Washington Tacoma
797. Mari Rubio, The New School
798. Andres Guzman, University of Southern California
799. Michael Anthony Turcios, Northwestern University
800. Rachel Slocum, Portland State University
801. Kate Levin, Associate Professor (Teaching), University of Southern California
802. Molly Geidel, Dartmouth College
803. Charles Fogelman, University of Illinois
804. Briallen Hopper, Queens College, CUNY
805. Kate Bronfenbrenner, Cornell University
806. Seema Golestaneh, Cornell University
807. Donatella Galella, UC Riverside
808. James Holmes, retired
809. Zeynep Korkman, UCLA
810. Naib Mian, Northwestern University
811. Héctor Alcalá, Unversity of Maryland College Park
812. Jalin Sama, Albany Medical College
813. Rae Hamilton-Vargo, Northwestern University class of 2016
814. Tannous Chalhoub, University Professor, Laval
815. Jonathan Basile, University of Toronto
816. Brendan Baum
817. Adam Spanos, University of Southern California
818. Alexandra Mathieu, Yale university
819. Tania Powers - Hofstra University - Bachelor of Arts
820. Corbin Hiday, University of Illinois at Chicago
821. Hana Masri, University of Wisconsin
822. Dina Sorour
823. Ashley Bennett, University of Southern California
824. Winona Xu, UCLA
825. John Keene, Rutgers University-Newark
826. Ashon Crawley, University of Virginia
827. Graeme Blair, UCLA
828. Isabella Schoonover, Northwestern University
829. Levi Vonk, University of Virginia
830. Darren Allumier, University of Wisconsin
831. Courtney R. Baker, Associate Professor, UC Riverside
832. Fernando Hernandez, Ventura College
833. Carlin Christy
834. Stacie Thurman, President Oxnard Educators Association
835. Elizabeth Tang, civil rights attorney
836. Sylvia Chan-Malik, Rutgers-New Brunswick
837. Jonathon Catlin, University of Rochester
838. Asma Sayeed-UCLA
839. Garrett Wright
840. Alyson K. Spurgas, Trinity College

841. Hermán Chávez, University of Colorado
842. Harris Kornstien, University of Arizona
843. Armando García, University of California, Riverside
844. Jerome Clarke, American University
845. Armando García, University of California, Riverside
846. Kelly Gillespie
847. Summer Kim Lee, UCLA
848. Annabelle Dowd, Northwestern University alumni
849. Andy Lentz
850. Claire Hancock, Université Paris-Est Créteil, France
851. Stuart Chen-Hayes, CUNY Lehman College
852. Emma Stapely, UC Riverside
853. Farid Azfar, Swarthmore College
854. Matthew Evangelista, Cornell University
855. Carol Quirke, SUNY Old Westbury
856. Elizabeth Anderson, citizen
857. Hailey Bosek, Medill Graduate Student.
858. Zachary Levenson, Florida International University
859. Nir Shafir, UCSD
860. Gail Shuck, Boise State University
861. Reginald Harris, poet & writer
862. Erin Wente, University of Nevada, Las Vegas
863. Anders Riel Müller, University of Stavanger, Norway
864. Sabreen Akhter, Associate Professor, University of Washington
865. Ruari Paterson-Achenbach, University of Cambridge
866. Jennifer Kelly, University of California, Santa Cruz
867. Francisco Perez, University of Utah
868. Professor Christine Ferguson, University of Stirling
869. Anila Daulatzai, UC Berkeley
870. Wendell Nii Laryea Adjetey, McGill University
871. Klementine Burrell-Sander, the University of Sydney
872. Aoife Dare, PhD student, University College Cork, Ireland
873. Steven McAvinue, former Paratrooper and advocate for Human Rights and fact-checking
874. Dana McLachlin, Duke University
875. Ben Ehrenreich, author
876. Keith Zelinske
877. M. V. Ramana, Professor, University of British Columbia
878. Paul O'Keefe, Rutgers University
879. Andrew Delatolla, University of Leeds
880. Mollie Goldstrom
881. Ayesha Omer, York University
882. Premilla Nadasen
883. Arlo Fosburg, UC Santa Cruz
884. Martin Shaw, University of Sussex
885. Varun Bhatnagar, Northwestern alumnus
886. Eli Friedman, Cornell University
887. Afeef Nessouli, Parsons
888. Matthew Nichter, Rollins College

889. Francesco Amoruso, University of Exeter
890. Ana Ivasiuc, University College Dublin
891. Sarah Besky, Cornell University
892. Daniel Rizk, University of Maryland
893. Ian Alan Paul, Professor Associat, Universitat Pompeu Fabra
894. Ben Shurina, Rensselaer Polytechnic Institute
895. Faye Gleisser, Associate Professor of Art History, Indiana University
896. Filip Stabrowski, LaGuardia Community College CUNY
897. Lisa Tilley, SOAS University of London
898. Maura Finkelstein, independent writer, anthropologist
899. Ian Greer, Cornell University
900. Lukas Dornieden
901. John Cox, UNC Charlotte
902. Ronald Cox, Florida International University
903. J.T. Roane, Rutgers University
904. Anand Patel, University of Chicago (Northwestern alum)
905. Christo El Morr, York University, Canada
906. Ana Maria Candela, historian (Ph.D. UC Santa Cruz)
907. Kirstie Dorr
908. Prithi Kanakamedala, Bronx Community College and The Graduate Center CUNY
909. Antonia Randolph, University of North Carolina Chapel Hill (Northwestern alum)
910. Derek Chang, Cornell University
911. Cami Touloukian, Doctoral Candidate, Teachers College, Columbia University
912. Saida Hodzic, Cornell University
913. Nancy Stern, The City College of New York, CUNY
914. Sarah Geis, lecturer Northwestern University & University of Chicago
915. Jordy Rosenberg, Professor, University of Massachusetts Amherst
916. Lindsay Thomas, Cornell University
917. Sophia Brown, FU Berlin
918. Justine Modica, Cornell University
919. Michael Kranz, individual
920. Sam Markwell, independent researcher and high school teacher
921. Mia Charlene White, The New School
922. Mark Lance, Professor emeritus, Georgetown University
923. Tarik Aougab, Haverford College
924. Ailish Hopper, Goucher College
925. Kelly Vaughan
926. Matthew Morrison, NYU
927. Anjali Enjeti, Antioch University Los Angeles
928. Farah Bakaari, Cornell University
929. Nadia Ahmad, Yale University
930. Anthony Reed, Vanderbilt University
931. Christina Burt, Evanston resident
932. Leah Bernardo-Ciddio (PhD University of Michigan ‘24)
933. Tey-Marie Astudillo, Medill School of Journalism Alum, M.S. 2012
934. Robert Clines, Western Carolina University
935. Ritty Lukose, New York University
936. Nanette Milner
937. Misty Saribal, Louisiana State University

938. Michelle Billies, Kingsborough Community College, CUNY
939. Shelby Capacio, Journalist
940. Amanda Holman, SESP 2021
941. David Delgado Shorter
942. Ames Robb
943. S. Ani Mukherji, HWS Colleges
944. Emma Teitelman, Cornell University
945. Randeep Samra
946. Florence Rushton, Sheffield University
947. Joseph Getzoff, Boston College
948. Shira Robinson, George Washington University
949. Rebecca Weston, LCSW private
950. Jennifer Doyle, UC Riverside
951. Wendy W. Walters, Emerson College
952. James Rushing Daniel, Seton Hall University
953. Griffin Epstein, George Brown College
954. Khaled Hroub - Professor of Middle Eastern Studies, Northwestern Univeristy/Qatar
955. Jack LaViolette, Columbia University
956. Miriam Markowitz, writer and founder of the Jewish Antifascism Alliance (JAFA)
957. Gina Chen, PhD Candidate at Carnegie Mellon University
958. Rose Werth, Northwestern University
959. David Gruskin, Columbia University
960. Tatiana Sifri
961. Kathleen Mills, Cornell University
962. Caroline Levine, Professor of Humanities, Cornell University
963. Siân Silyn Roberts, Queens College, CUNY
964. Carlos Hernandez
965. Reagan Dunham, University of Chicago
966. Dheepa Sundaram, University of Denver
967. Leila Tayeb, Northwestern University in Qatar
968. Jonathan Flatley, University of Chicago
969. Rachel Jones, City University of New York
970. Casey Mathur, UChicago
971. Sara Lefsyk, Ethel Zine & Micro Press
972. Catherine M. Appert, Cornell University
973. Marisel Vera, Novelist
974. Katherine Vallera, Freelance Journalist, Columbia College Graduate
975. Eliza Bettinger, Cornell University
976. Ebonee Johnson
977. Matt Hindman, University of Tulsa
978. Jessica Ross, Northwestern Univeristy '14 and '17
979. Kathryn Montalbano, University of Kentucky
980. Justin Rawlins, University of Tulsa
981. Elizabeth Elliott, alum, PhD Sociology, Northwestern University
982. Jenna Loyd, UW-Madison
983. Liza Bernstein
984. Hillary Haldane, Quinnipiac University
985. Heather Davis, The New School
986. Nathan Kalman-Lamb, University of New Brunswick

987. Amelia Burke, University of Michigan
988. Aparna Nair
989. Adam Haber, Harvard University
990. Gina Fedock, University of Chicago
991. Erin Durban, University of Minnesota
992. Darlene Evans, Cornell University
993. Cassandra Leveille
994. Elizabeth Dale, University of Florida
995. Professor Ranabir Samaddar
996. Lola Dickinson, Birkbeck, University of London
997. Daniel Wilson, University of Illinois Chicago
998. Patricia Sarrafian Ward, author
999. Avi Steinberg, University of Chicago
1,000. Ashley Sellers, Florida State University, Northwestern alum
1,001. Minju Bae, NYU
1,002. Jennifer Brier, University of Illinois Chicago
1,003. Anna McCarthy, NYU
1,004. Leslyn Stobbs, University of Toronto
1,005. Jieyi Cai, Visiting Assistant Professor, Macalester College
1,006. David Stein, University of California, Santa Barbara
1,007. Simeon Man, UC San Diego
1,008. Jennie Ikuta, University of Missouri-Columbia
1,009. Anjo Brekalo, UW-Madison
1,010. Gail Buttorff, University of Houston
1,011. Nick Burke, University of Sheffield
1,012. Sarah Covington, City University of New York
1,013. Zoe Smith, Loyola University Chicago
1,014. Ameena Ghaffar-Kucher, UPenn
1,015. Cynthia Cox, Northwestern University, 1987
1,016. Andrew Parayil Boge, University of Maryland, College Park
1,017. Auna Stewart
1,018. Frederick Neuhouser, Columbia University
1,019. Jean Beaman/CUNY Graduate Center and University of California-Santa Barbara
1,020. Alan Wald, H. Chandler Davis Collegiate Professor Emeritus, University of Michigan
1,021. Ariel Sheffey, Northwestern University 2020
1,022. Lois Weiner, Professor Emerita, New Jersey City University
1,023. Avik Chatterjee, Boston University
1,024. Charles Gelman, New York University
1,025. Stephen Scapelliti
1,026. Crystal Garcia, Associate Professor, University of Nebraska-Lincoln
1,027. Mark Rice, Baruch College
1,028. Jean Bae, NYU
1,029. Lewis Oh, Northwestern '22
1,030. Shannon Cutler
1,031. Angela Harris, Seattle University School of Law
1,032. Gary Krenz, NU CAS '80, retired Univ of Michigan lecturer and director
1,033. Stephen Wulff, University of Tennessee-Knoxville
1,034. Scott Williams
1,035. Kentaro Toyama, University of Michigan

1,036. Benjamin Goldfrank, Seton Hall University
1,037. Sidra Kamran, Assistant Professor, Lewis & Clark College
1,038. Kiran James, Executive Director, Kalapriya
1,039. India Hilty, University of Chicago Pritzker School of Medicine
1,040. Keith Woodward, University of Wisconsin–Madison
1,041. Stephen Charbonneau, Florida Atlantic University
1,042. Samer Ali, Associate Professor, U of Michigan
1,043. KD Thompson, University of Wisconsin-Madison
1,044. Jennifer Row, university of Minnesota
1,045. Gabriel Mercogliano, Evergreen '19, MCAD
1,046. Alan Hedrick
1,047. Jeremiah Chin, University of Washington
1,048. Shoshana Schwebel, University of British Columbia
1,049. Emmeline Kaiser
1,050. Sam Casey, Northwestern University staff
1,051. Kelly Smith-Frank, Carnegie Mellon 2011
1,052. Jake Nussbaum, The Library Company of Philadelphia
1,053. Christopher Martell, Associate Professor, University of Massachusetts Boston
1,054. V.V. Ganeshananthan, University of Minnesota
1,055. Farnoosh Fathi, Barnard College
1,056. Mobina Hashmi, Brooklyn College - CUNY
1,057. Jane Mantey, Dir. of Narrative and Cultural Strategies at Race Forward and freelance writer.
1,058. Naina Khanna, founding executive director, Positive Women's Network-USA
1,059. Michael Drexler, Professor of English, Bucknell University
1,060. Britt Rusert, UMass Amherst
1,061. Brian Sargent, University of Massachusetts Amherst
1,062. John Willoughby, Economics, American University
1,063. Elizabeth Casline, Northwestern University
1,064. Steve Fernandez, (unable to provide affiliation due to employment risk)
1,065. Megan Wilson
1,066. Alan Maass, Northwestern University, 1984
1,067. Madeline Hennessey, University of Michigan
1,068. Haley Stehulak
1,069. Prathim-Maya Dora-Laskey, Alma College
1,070. Ayasha Guerin, UCLA
1,071. David Young, Retired Educator
1,072. Megan Wilson, Clarion Alley MuralProject
1,073. Zirwat Chowdhury, UCLA
1,074. Gabriel Hetland, SUNY Albany
1,075. Yogita Goyal, Professor, UCLA
1,076. Maggie Brown, The College of Wooster
1,077. Em Gunter, Student Worker, University of Virginia
1,078. Adam Parker, journalist
1,079. R. D. Hamilton, Baruch College, CUNY
1,080. Kathleen Forslund , University of Chicago alum
1,081. Gayatri Gopinath, Professor, NYU
1,082. David Levitsky, Cornell University
1,083. Tali Ruskin, university of Pennsylvania

1,084. Kaliris Salas, RWJMS
1,085. Ray Bush, Emeritus Uni Leeds
1,086. David Hobbs, University of Lethbridge
1,087. Melissa Barone, teacher
1,088. Robert Lynn, Texas Tech University (PhD student)
1,089. Anjelica O'Brien, SUNY Purchase 2013
1,090. Kuros Charney, William Paterson University
1,091. Jane Marcellus, writer/Medill alum
1,092. Meera Sakthivel, University of Chicago
1,093. Sondra Morin, former Northwestern Employee
1,094. Emmaia Gelman, Institute for the Critical Study of Zionism
1,095. Trevor Lies, University of Kansas
1,096. Katarzyna Bartoszyńska, Ithaca College
1,097. Jacinda Swanson, Western Michigan University
1,098. Dorothy Kim, Brandeis University
1,099. Svati Shah, Associate Professor, UMass Amherst
1,100. Julie DiCaro, Writer
1,096. Katarzyna Bartoszyńska, Ithaca College
1,097. Jacinda Swanson, Western Michigan University
1,098. Dorothy Kim, Brandeis University
1,099. Svati Shah, Associate Professor, UMass Amherst
1,100. Julie DiCaro, Writer
1,101. Miss Rosen, Journalist
1,102. Gina Morong, individual
1,103. Prof. Mario D, Garrett, San Diego State University
1,104. Jules Boykoff, Pacific University
1,105. Natalie Southwick, Medill '10 alum
1,106. Maryam Jamshidi, University of Colorado Law School
1,107. Nadia Segura, Stanford University
1,108. Matthew Thomas Miller, University of Maryland
1,109. Glenn Hendler, Professor of English and American Studies, Fordham University
1,110. Aneil Rallin, Retired Associate Professor of Rhetoric and Composition
1,111. Dr. Earl Aguilera, California State University, East Bay
1,112. Mohammed Albow, University of Denver
1,113. Kate Duva, writer
1,114. Jeff Melnick, UMass Boston
1,115. Sue Breckenridge, Northwestern University alum ('89)
1,116. Emily Fishkin, Northwestern University Class of 2016
1,117. Keona Katrice Ervin, Bowdoin College
1,118. Kelly McHugh, UNC Chapel Hill
1,119. Hannah Jackson, Northwestern alum
1,120. Shannon Gleeson, Cornell University
1,121. Shiraz Ahmed, University of Mississippi (Medill alum 13)
1,122. Maya Mikdashi, Rutgers University
1,123. Ayanna Legros, Northwestern Alumna
1,124. Ronnie Berg, individual
1,125. Daniel Olmos, Associate Professor of Sociology, CSU Northridge
1,126. Leo Parascondola, William Paterson University
1,127. Ryan Marks

1,128. Joshua Cooper, University of South Carolina
1,129. Alhaji Conteh, Hunter College-CUNY
1,130. Jennifer Ruth, Professor, Portland State University
1,131. Elena Ailes, School of the Art Institute of Chicago
1,132. Jacob Quinn Shenker, PhD, researcher
1,133. Ann Pellegrini, New York University
1,134. Emma Greenstein
1,135. Walter Meier, San Francisco State University '95
1,136. Raymond Craib, Marie Underhill Noll Professor of History, Cornell University
1,137. Karen Reyes, Medill Alum
1,138. Ernest Hardy, author/journalist
1,139. Samuel Sachs, brother and son of NU alum
1,140. Adrian Avalos, Stanford University
1,141. Dori Rodriguez, Stanford University
1,142. Rashmi Luther, Professor (retired), school of Social Work, Carleton University
1,143. Kristofer Petersen-Overton, Babson College
1,144. Nate Schmidt, PhD, IU Bloomington
1,145. Heather Freeman, PhD
1,146. Jason Read, Professor of Philosophy, University of Southern Maine
1,147. Rosalind Petchesky, Hunter College & the Graduate Center, CUNY (retired)
1,148. Johnicia Bailey, Community Member
1,149. Lukas Daniel Klausner, St. Pölten University of Applied Sciences
1,150. Asli Peker, NYU
1,151. Naka Elelleh, Northeastern University PhD
1,152. Schneur Newfield, Associate Professor of sociology and Jewish Studies, Hunter College, CUNY
1,153. Victoria Barron, Educator
1,154. Joe McComb, University of Colorado Boulder alumni
1,155. Mars Alvarez, Dartmouth College '21
1,156. Michael Letwin, former President, Association of Legal Aid Attorneys/UAW 2325; Labor for Palestine
1,157. Ian Barnard, Professor of Rhetoric and Composition, Chapman University
1,158. Jack Schimmel, class of 2019
1,159. Dr. Eamonn Crudden, Dundalk Institute of Technology, Dundalk, Republic of Ireland
1,160. Kelly Reyna, Emory University
1,161. Hồng-Ân Trương, UNC Chapel Hill
1,162. Queen Adesuyi, Partner, Reframe Health and Justice
1,163. Krishna Stone, activist
1,164. Mila Re, UC Santa Cruz
1,165. Nancy Khalil, UMich Ann Arbor
1,166. Eric Cheyfitz, Ernest I. White Professor of American Studies and Humane Letters, Cornell University
1,167. Cathy Park Hong, Professor, UC Berkeley
1,168. David Faust
1,169. Subini Annamma, Stanford University
1,170. Lauren Baker, PhD Candidate Northwestern University Department of Political Science
1,171. Merryl A. Sloane, academic editor
1,172. Chantal David, Concordia University

1,173. Alexis rodriguez, LAUSD, RGBanditos Collective Co-founder
1,174. Refia Aliyeva
1,175. David Klein, Emeritus Professor, Cal State Northridge
1,176. Kathryn Pope, Libraries staff, Columbia University
1,177. JH, University of Reading
1,178. Jill Spiker, Northwestern alum
1,179. Susan Zieger, UC Riverside
1,180. Taylor Billings
1,181. Sandra Radwan, Northwestern Alum '21, Law Student
1,182. Rebecca Cohen, Medill alumna
1,183. Beth Jenkins
1,184. Pheroze Unwalla, University of British Columbia
1,185. Julie Kliegman, Medill '13
1,186. Mohammad Anadani
1,187. Dora Segall, Northwestern alum
1,188. Barbara Strupp, Cornell University
1,189. Boutayna Chokrane, Northwestern Alum
1,190. Lina Asaad, Graduate from Sciences Po Paris + University of Jordan
1,191. Jana AlSaad
1,192. Murad Banaji, University of Oxford
1,193. Ekin Kiyici, Yeshiva University
1,194. Loraine Frintrup
1,195. Katherine Lee, Sonoma State University
1,196. Jai Broome, University of Washington; WCAS 2013
1,197. Cameron Roberts, Northwestern University
1,198. Taylor Billings
1,199. Sarah Stark, Medill MSJ alumna and freelance journalist
1,200. Tanya Tovar, Northwestern University
1,201. Jared Hanson, individual
1,202. Andrew Bell, Cornell University
1,203. Isabella Soto, Medill '19
1,204. Molly DiTullio
1,205. Violet Barron, Harvard College
1,206. Amanda Lagji, Associate Professor Pitzer College
1,207. Nasser Abourahme, Bowdoin College
1,208. Emma Drake, Northwestern '21
1,209. Melissa Thompson, Professor of Sociology, Portland State University
1,210. Yahya Salem, Northwestern Alum
1,211. Evan Murphy, MS Colorado School of Mines
1,212. Hannah Baggenstoss, NU alum
1,213. Matt Mager
1,214. Charlotte Karem albrecht, University of Michigan
1,215. Zahir Janmohamed, Bowdoin College
1,216. Hanna Kaufman, JD, Illinois resident
1,217. Diane Bush
1,218. Christopher Berardino, UC Riverside
1,219. Jennifer L. Morgan, Professor of History, Dept of SCA, New York University
1,220. Elizabeth Wood

1,221. Irie Evans
1,222. Adam Sitze, 951 Professor in Law, Jurisprudence and Social Thought, Amherst College
1,223. Traise Yamamoto, UC Riverside
1,224. Fuson Wang, University of California, Riverside
1,225. Bianca C. Williams, Bowdoin College
1,226. Eran Zelnik, California State University, Chico
1,227. Zenia Kish, Ontario Tech University
1,228. Ranna Shahbazi, Northwestern Alum
1,229. Gabriela Dickson La Rotta, American University Washington College of Law
1,230. Francesca Martinez, NU community member
1,231. Elizabeth Wrigley-Field, McKnight Presidential Scholar and Associate Professor of Sociology, University of Minnesota, Twin Cities
1,232. Kate Ringland, University of California Santa Cruz
1,233. Linus Höller, Medill '23
1,234. Seppo Niemi-Colvin, Indiana University
1,235. Professor David Lloyd
1,236. Enid Blount Press, Individual
1,237. Kevin Winkler, City University of New York
1,238. Rachel Rubin, MD, MPH, University of Illinois School of Public Health
1,239. Kera Bolonik
1,240. Sherene Seikaly, UCSB
1,241. sang kil, job suspended professor at San Jose state
1,242. Albert Armstrong, Adjunct Instructor, University of Massachusetts Boston
1,243. Colin Bossen, Distinguished Scholar, Starr King School for the Ministry1,244. Andrew Montequin, Northwestern University
1,244. Ariek Norford, Stony Brook University
1,245. Syeda Masood, Hamline university
1,246. Konstanze Kobel-Höller, journalist
1,247. Sharareh Frouzesh, UC Irvine
1,248. Sonia Hernandez, Texas A&M University
1,249. Lynn Comerford, CSU East Bay
1,250. Carolyne Thrasher, no relation to Dr. Steven Thrasher
1,251. Neha Pashankar, alumni of Northwestern University 2022
1,252. Maureen Milligan, Staff, University at Buffalo, United University Professions (UUP)
1,253. William Meaney, former SBU grad student
1,254. Xelena González, author (Medill '01)
1,255. Ken habib, Cal Poly
1,256. Max Abrams, Medill '21
1,257. Lorraine Nibut, Designing Justice + Designing Spaces
1,258. Constance Penley, Professor Emerita, University of California-Santa Barbara
1,259. Andrew Gurza, Disability Consultant
1,260. Nantina Vgontzas, City University of New York
1,261. Nerissa Russell, Cornell University
1,262. Sam del Corral, Individual
1,263. Diego Alcalá Laboy, Assistant Professor, Albany Law School
1,264. Nour El Didi, Concordia University of Montreal
1,265. Nicholas De Dominic, University of Southern California
1,266. Will Clark, Assistant Professor, San Francisco State University

1,267. Scott Tobias, The Reveal
1,268. Marta Knapstad Narlesky
1,269. Mildred Williamson, Retired HIV Services Director, Cook County Health
1,270. Rachel Kwak, UC Davis School of Law, Northwestern University Alumna
1,271. Madisyn Robinson, student
1,272. James Nealy, New York University
1,273. Emi Sawada, University of Illinois, Urbana-Champaign
1,274. Jessica Fremland, Brown University
1,275. Cormac Collins, Brown University
1,276. Eva Davis, Curator and Arts Advocate
1,277. Dylan Rodríguez, Distinguished Professor, University of California
1,278. Jill Rounds, University of Rhode Island
1,279. Kushal Gourikrishna, Northwestern University (2018)
1,280. Daria Reaven, NYU
1,281. Matthew Ritchie, Medill ‘22
1,282. Jason Rogers, Rogers Law Company, P.C.
1,283. Andrew Lee, University of California, Santa Barbara
1,284. Whitney Jordan, Northwestern alum
1,285. James Walker
1,286. Farshid Baghai, Villanova University
1,287. Sean Malloy, University of California, Merced
1,288. Zane Weissman, Worcester Polytechnic Institute
1,289. Gregory J Seigworth, Millersville University
1,290. Trevor Jensen
1,291. Ashley Shew, Virginia Tech
1,292. Ruth Marshall, Associate Professor, University of Toronto
1,293. Franco Barchiesi, Ohio State University
1,294. Caitlin Wood
1,295. Kate Clancy, Professor of Anthropology, University of Illinois Urbana-Champaign
1,296. Muriel Leung, California Institute of the Arts
1,297. Dan Sloan, WCAS '13
1,298. Corey Campbell, writer
1,299. Ahlam Muhtaseb, Media Studies, California State University, San Bernardino
1,300. Alexandra Andrade
1,301. Chris McGowan, Lecturer, Yale University
1,302. Natasha Raheja, Cornell University
1,303. Morgan O’Neill, University of Toronto
1,304. Maryam Kashani, Associate Professor, University of Illinois at Urbana-Champaign
1,305. Martha Jackson, Northwestern University
1,306. Paul David Wadler, Ph.D.
1,307. Kara Gillmore, colleague
1,308. MT Vallarta, Cal Poly San Luis Obispo
1,309. Claire Alexander, BSN, RN, PMH-BC
1,310. Junaid Rana, University of Illinois at Urbana-Champaign
1,311. Anthony Ratcliff, Professor of Pan-African Studies at Cal State Los Angeles
1,312. Brent Armendinger, Professor of English and World Literature, Pitzer College
1,313. Jim DelRosso, Cornell University
1,314. Jennifer Mogannam, UC Santa Cruz
1,315. Ramin Yadegari, Professor, University of Arizona

1,316. Ashraf Tubeileh, Associate Professor, California Polytechnic State University, San Luis Obispo, CA
1,317. Ahmed Deif, California Polytechnic State University
1,318. James Finley, Associate Professor, Texas A&M University - San Antonio
1,319. Devin Bryson, professor, Illinois College
1,320. Taher Saif, University of Illinois at Urbana-Champaign
1,321. Lauren Kang, The University of Chicago Pritzker School of Medicine
1,322. Richard Zili, Chicago resident
1,323. A.W. Peet, Professor, University of Toronto
1,324. Kevin A. Young, UMass Amherst
1,325. Jan Nespor, The Ohio State University
1,326. Deepa Kumar, Professor, Journalism and Media Studies, Rutgers University.
1,327. David Finkel., editor, AGAINST THE CURRENT magazine
1,328. Naib Mian, Northwestern University (Medill '17)
1,329. Millie Thayer, University of Massachusetts, Amherst
1,330. Tim Charlebois, Political Science, Northwestern University
1,331. Shannon Winnubst, Ohio State University
1,332. Sam Wrigglesworth, The Ohio State University
1,333. Ednie Kaeh Garrison, Cal Poly San Luis Obispo
1,334. Gwyneth Lonergan, Northumbria University
1,335. Shane Young
1,336. Jonathan Combs-Schilling, Ohio State University
1,337. Hunter Felt, writer
1,338. Ruth Sergel, Street Pictures
1,339. Jordan Lome, Disability Consultant
1,340. Marisol LeBrón, Associate Professor of Critical Race and Ethnic Studies at UCSC
1,341. Wendi Williams, Medill School of Journalism alum
1,342. Mark S. James
1,343. Charles Schultz IV, Northwestern University Alumnus
1,344. Ross Smith, Vancouver Public Library, CUPE 391
1,345. Reese Owens, Northwestern University
1,346. Leila Kawar, University of Michigan
1,347. K Ware, parent of enrolled Northwestern University Student
1,348. Lauren Manning, Medill '13
1,349. Sarah Unruh, University of Minnesota
1,350. J. E. Vidal
1,351. Maria Bustillos
1,352. Alyssa Baldridge, UNL alum
1,353. Ann Russo, DePaul University
1,354. Luke Jarzyna, graduate student
1,355. Kelly McElroy, Associate Professor, Oregon State University
1,356. Sophia Artola, WCAS 22
1,357. Javier Osorio, University of Arizona
1,358. Mahruq Khan, U of IL, Urbana-Champaign
1,359. Daisy Conant, Medill '22, thesis advisee of Dr. Thrasher (and winner of the Carl Smith Prize for Best Thesis in American Studies, an award I largely attribute to Dr. Thrasher's guidance)
1,360. Laura Kina, Professor, The Art School, DePaul University
1,361. Marji Mendelsohn-parent of 2NW alums.

1,362. Malini Ranganathan, American University
1,363. Jian Neo Chen, The Ohio State University
1,364. Dylan Stillwood, Columbia University alum, CC ’04
1,365. Margaret Miller, CUNY Graduate Center and Brooklyn College
1,366. Mark Berrettini, Professor, Portland State University
1,367. Noe Pliego Campos, Assistant Professor of History, Wabash College
1,368. Matt Kavanagh, Okanagan College
1,369. Lydia Saravia, DePaul University
1,370. Sarah Irving, University of Staffordshire
1,371. Sarah Shulist, Queen's University
1,372. Nakho Kim, Drexel University
1,373. Dan Hu, Medill '23
1,374. Arben Kalziqi, PhD, Georgia Tech '19
1,375. Ruha Benjamin
1,376. Liam Lecka, Medill ‘21
1,377. Rachel G Riskind, Guilford College
1,378. Mel Katz, The College of New Jersey
1,379. Chaz Baker, Mass College of Liberal Arts
1,380. James Tobias, UC Riverside
1,381. Emma Follman, PhD Candidate, Stanford
1,382. David K. Seitz, Harvey Mudd College
1,383. Noe Montez, Emory University
1,384. Katelyn Taylor, Northwestern University
1,385. Michael Palm, UNC-Chapel Hill
1,386. Sky Minkoff, student, SUNY Oswego
1,387. Dana Knisely-Southerland, Individual
1,388. Dror WARSCHAWSKI, Sorbonne Université, Paris, France
1,389. Jasmin Patrón-Vargas, Texas A&M University
1,390. The Rev. Jarrett Kerbel (NU 89, CAS)
1,391. Dana Francisco Miranda, University of Massachusetts Boston
1,392. Stephanie Flores Loyola University MD
1,393. Constance Istratescu, JD, GGU School of Law
1,394. Emily Runde, Columbia University
1,395. Olivia Stent, Northwestern University
1,396. Masa Dajani, Queen’s University
1,397. Dr. Randa Tawil, University of Washington
1,398. Rossa Coyle, Student, Queen's University Belfast
1,399. Greg Peshek (Northwestern Alumni 2013)
1,400. Matt Hauske, Purdue University
1,401. Caryn Bell
1,402. Sara Rezvi, Dominican University
1,403. Ellis Garey, Postdoctoral Fellow, Brown University
1,404. Andrew Cornell, PhD, New York University
1,405. Maya Hislop, Cal Poly San Luis Obispo
1,406. Taylor Bell, University of California, Davis
1,407. J. T. Huitt, Angry
1,408. Gary Hoyano
1,409. Natalia Cecire, University of Sussex
1,410. Jocelyn Leitzinger, University of Illinois Chicago

1,411. Tosten Burks, Los Angeles Review of Books
1,412. Eli Lichtenstein, Lewis & Clark College, Northwestern Alum
1,413. Alex Sher, Northwestern University (Medill 2018)
1,414. Matthew Blesse, Individual
1,415. Adam Gordon, Assistant Professor, Northwestern University
1,416. Kelly McKinney, John Abbott College
1,417. Rebecca Dickinson, University of Northern Iowa
1,418. Marios Falaris, Johns Hopkins University
1,419. Mary Wong, University of New Mexico
1,420. Ashara Ekundayo, Artist As First Responder
1,421. Kendra Calhoun, University of Illinois, Urbana-Champaign
1,422. Anup Grewal, University of Toronto
1,423. Anna-Claire Steffen, UMass Amherst
1,424. Constance Gordon, San Francisco State University
1,425. Carrie Matthews, Assoc. Teaching Prof, UW Seattle
1,426. Matthieu Chapman, SUNY New Paltz
1,427. Eliot Cardinaux, Individual
1,428. Neil deMause, journalist
1,429. Denise M. Walsh, University of Virginia
1,430. Diana Casteel, University of Illinois at Chicago
1,431. Alexander Wallace
1,432. Abou Farman, The New School
1,433. Ivan Albertson, Northwestern University
1,434. Sheila Orr
1,435. Ben Curtis, Rhodes College
1,436. Ranita Ray, University of New Mexico
1,437. Ellen Dichner, City University of New York
1,438. Sarah Gessler, Concerned Citizen
1,439. Samer Hassan, Harvard
1,440. Ann Douglas, author
1,441. Natalie Lin, Medill ‘22
1,442. Nina Harawa at UCLA
1,443. Annelise Orleck, Dartmouth College
1,444. David Kanj, UC Berkeley
1,445. Anne Mahady, PhD (IU alumni)
1,446. Alexandria Ramos, University of Washington (Seattle)
1,447. Victoria Reyes, University of California, Riverside
1,448. Tamara Malhas, University of British Columbia
1,449. Iman Alfayez, Toronto Metropolitan University
1,450. Zein Haj Hasan, University British of Columbia
1,451. Mirian Martinez-Aranda, Sociology, UC Irvine
1,452. Greg Purcell, UMass Amherst
1,453. Angela Inferrera,
1,454. Daniel Abbe (WCAS 2006)
1,455. Axeen James
1,456. Kayla Little, Northwestern University
1,457. Julilly Kohler Hausmann, Cornell University
1,458. Susanna Collinson, UCSC
1,459. Matthew Farish, University of Toronto

1,460. Myca Treat
1,461. S. Shimono, UC Berkeley
1,462. Joan S. M. Meyers, Cal Poly, San Luis Obispo
1,463. Andrea Denny-Brown, University of California, Riverside
1,464. Soo-Young Kim, Princeton University
1,465. Erika L. Iverson
1,466. Hilary Strang, University of Chicago
1,467. Laila Shereen Sakr, UCSB
1,468. Ahmed Elbanna, University of Illinois
1,469. Jade Pagkas-Bather, Assistant Professor of Medicine
1,470. Pedro Alonso Serrano, MPH, CPH
1,471. Jennifer Cypher, PhD
1,472. Laura Quilter, Librarian & Attorney, University of Massachusetts Amherst
1,473. Tristan Cabello (Senior Lecturer, The Johns Hopkins University)
1,474. Zach Watson, University of Virginia
1,475. Alicia Boyce, PhD, Chapman University
1,476. Vivian Yan-Gonzalez, Chapman University
1,477. Alex Chun, Brown University
1,478. Maria Pyra, Northwestern University
1,479. B Waid, CSU Fullerton
1,480. Anna Carvlin, Eastern New Mexico University
1,481. Erika Marin-Spiotta, UW-Madison
1,482. soto jesus
1,483. Brett Story, University of Toronto
1,484. Amber Larks, Washington State University
1,485. Audrey Zhou, Northwestern University ‘25
1,486. Robin L. Turner, Butler University
1,487. John Gianvito, Emerson College
1,488. Julia Bernier, W&J College
1,489. Nels Highberg, University of Hartford
1,490. Naomi Schneider, University of California
1,491. Natalie Oswin, University of Toronto
1,492. Pamela J. Smock, University of Michigan
1,493. Kendall Thomas, Columbia University
1,494. Faisal Chaudhry, University of Massachusetts
1,495. Brittney Cooper, Rutgers University
1,496. E. Wayles Browne, emeritus, Cornell University
1,497. Barry Eidlin, Associate Professor of Sociology, McGill University
1,498. Jay Jordan, University of Utah
1,499. Ishan Santra, Michigan State University
1,500. Sherryl Kleinman, Professor Emerita, UNC
1,501. Charlotte Jacobs, adjunct associate professor, University of Pennsylvania
1,502. Jodi Howard, Northwestern University 1991
1,503. Mandi Spishak-Thomas, Rutgers University
1,504. Lauren Bailey, NYU '99
1,505. Javiera Barandiaran, UCSB
1,506. Anna Anthropy, DePaul University
1,507. Fatima Suarez, UNLV
1,508. Martin Hunter, Senior Lecturer, Biomedical Engineering, UMass Amherst

1,509. Jevan Hutson, University of Washington
1,510. Patricio Boyer, Davidson College
1,511. Ruhan Nagra, University of Utah
1,512. Fatima Suarez, UNLV
1,513. Maile Arvin, University of Utah
1,514. James G. Buell, Ph.D., Independent Researcher
1,515. Sara Johnson, Moore College of Art & Design alumna
1,516. Dalton Lackey, University of Maryland
1,517. Cynthia Wu, Indiana U
1,518. Lauren May Washington, Northwestern University Alum
1,519. Krystal Alvarez-Hernandez, Northwestern University
1,520. Heba Khalil, Nebraska Wesleyan University
1,521. Zoë Plakias, Western Washington University
1,522. Franco Posa, McCormick 2016
1,523. Cole Sias, Northwestern University ‘22 and ‘25
1,524. Helen Lee, Medill School of Journalism 2018
1,525. Varda Nisar, Concordia University
1,526. Kamel Awayda, UCSF
1,527. Laura Blecha, Associate Professor, University of Florida, NU alum ('05)
1,528. John Hames, PhD
1,529. Morgan Amonett, Graduate Student, University of Virginia
1,530. Mary Moussa, Hunter College
1,531. Christina Connerton, none
1,532. Julie Ming Liang, Northwestern University Alum
1,533. Kristin Meekes, Ottawa ON
1,534. Michael Angland, Northwestern University
1,535. Naomi Banuelos-Lozano, MA University of Macedonia, BA NU
1,536. Kaya Baker
1,537. David Srouji, UC Irvine, USC
1,538. Foaad Khosmood, California Polytechnic State University
1,539. Tosten Burks, Medill '15
1,540. Raphaëlle Fourlinnie, EHESS, France
1,541. Ian Walling, Whitman College
1,542. Brian Shuve, Harvey Mudd College
1,543. P. Kerim Friedman, National Dong Hwa University, TAIWAN
1,544. Jude bawalsa
1,545. Ann E. Lopez
1,546. Maria Paz Noyen, writer
1,547. Sayeedul Islam Associate Professor Farmingdale state college
1,548. Jodi A. Byrd, University of Chicago
1,549. Mara Kelly, Northwestern University ‘21
1,550. Atalia Omer, The University of Notre Dame
1,551. Rachel Burten, University of Massachusetts Amherst
1,552. Abbas Khan, Medill alum
1,553. Sole Anatrone, Vassar Collehe
1,554. Connie Chow
1,555. Jessica Cook-Qurayshi, DePaul
1,556. Diane Johnson, Ph.D., independent scholar
1,557. Michael McIntyre, Associate Professor of International Studies, DePaul University

1,558. Michael Rogerson, NU Alum
1,559. Alex Sayf Cummings, Georgia State University
1,560. Megan Unden, UCSB & Rutgers alum
1,561. Douglas Struck, Senior Journalist-in-Residence, Emerson College
1,562. Taina Maki Chahal, Lakehead University
1,563. Tatiana Anoushian, Northwestern University
1,564. Kathleen Brown, University of Michigan
1,565. Alexandria Boutros, DePaul Alumni
1,566. Laura Tanenbaum, LaGuardia Community College/City University of New York
1,567. Chad Anderson, Incheon National University
1,568. Aaron Dorman, Medill alum and journalist
1,569. Ariel Mae Lambe, University of Connecticut
1,570. Chris Robinson, Clarkson University
1,571. Matt Lazio MD, NU WCAS '01
1,572. Susan Bernofsky, Professor, Columbia University
1,573. Ramon Esquivel, California Polytechnic State University, San Luis Obispo
1,574. Meghan A. Watts, PhD Student, North Carolina State University
1,575. Charlotte Tauss, Northwestern Alum
1,576. Albert Stabler, Illinois State University
1,577. Seth Uzman, PhD Student, University of Houston
1,578. Felice Blake, UC Santa Barbara
1,579. Ishan Daya, Northwestern University ('13)
1,580. Christie Toth, University of Utah
1,581. Laila Farah Depaul University
1,582. RiShawn Biddle, Dropout Nation
1,583. Lewis Rosenbaum, individual
1,584. Alexandra Gjesdahl
1,585. Reza Talebi, University of Leipzig
1,586. Sahar D. Sattarzadeh, University of Texas at Arlington; Nelson Mandela University
1,587. Anwar Samad Montgomery, Northwestern Alum C/O 2022
1,588. Yarden Azoulay Katz, University of Michigan
1,589. Alexis Morin, M. Div '24, Union Theological Seminary
1,590. Layna Hong, Northwestern University
1,591. Dr. Emily B. Wong, Africa Health Research Institute
1,592. Ashley Quiterio, Northwestern University
1,593. Chris Baker, Loyola University Chicago
1,594. Andrew McCumber, Virginia Tech Sociology
1,595. Drew Broussard, Rough Draft Bar & Books / Literary Hub
1,596. Romeo Guzman, Claremont Graduate University
1,597. J. Giacalone, Public School Teacher
1,598. Jorge Zeballos, individual
1,599. Deen Sharp, LSE
1,600. Dusty Baker, Northwestern University
1,601. Chance Douglas, Riverside Culinary Academy '21
1,602. Evelyn zermeno, uci alum
1,603. Matthew Cunningham-Cook, NewsGuild-CWA rank and file
1,604. Allyson Byers, Northwestern University, Medill School alum
1,605. Sana Saeed, independent journalist
1,606. Dr. B. Richard Cook, emerita

1,607. Fatima Zaheer, Northwestern University 2009
1,608. Adam Pumm, WCAS '10
1,609. Nida Pervez, Northwestern University
1,610. Dylan Flesch, New York Public Radio
1,611. Sana Ali, Northwestern University
1,612. Matt O'Driscoll, reader
1,613. Bassel Ghandour, University of Southern California Alum
1,614. Manal Saleh, NU Class of 2016
1,615. Sarah Shaaban, NU SoC 2012
1,616. Imane Ridouh, Northwestern University
1,617. Heather White, Northwestern University
1,618. Hibah Shariff, Medill 2009
1,619. Scott Kelley, San Diego State University
1,620. Michelle Felix, photographer
1,621. Ariana Thompson-Lastad, University of California San Francisco
1,622. Xiaobo Yuan, Whitman College
1,623. Beth Herbel-Eisenmann, Michigan State University
1,624. Nour Saudi, CUNY Journalism School alum and journalist
1,625. Melissa Phruksachart, Assistant Professor, University of Michigan
1,626. Amanda Fanniff, Northwestern alum
1,627. David A. Briggs
1,628. Karen Sewick
1,629. Ingrid Semaan, University of Connecticut
1,630. Rachel Klein, USC
1,631. Rebecca Givan, Rutgers University
1,632. Brittany Croone, Northwestern alumna
1,633. Sarah Dar, WCAS '09
1,634. Jisoo Kim, University of the South
1,635. Gabriella Martinez, Baldwin Wallace University
1,636. Asma Ahmad, Medill 2010
1,637. Imoye Francis, Individual
1,638. Alissa Weber
1,639. Loren March, York University
1,640. Lydia Platón
1,641. Delaney Glassner, Northwestern alum
1,642. Mariana Gutierrez Lowe, Northwestern University
1,643. S Tanaka Independent Scholar
1,644. Syed Ali, Long Island University
1,645. Shawna Williams, freelance journalist
1,646. Fizza Joffrey, University of Oxford
1,647. Alida Bouris, Associate Professor, University of Chicago
1,648. Professor Priyamvada Gopal
1,649. Dave Lambert, unaffiliated
1,650. Pantea Javidan, Stanford University
1,651. Christopher Alario, librarian, Northwestern University in Qatar
1,652. Ahmad Haidar, McGill university
1,653. Adam El-Sayed, Carleton University (23')
1,654. Steven Pierce, University of Manchester
1,655. Lauren Stokes, Northwestern University

Case: 26-6906, 11/20/2026, DktEntry: 16.9, Page 237 of 300


1,656. Alan Aja, Brooklyn College (CUNY)
1,657. Catherine Denial, Knox College
1,658. Dr. Pauline Strong, U of Texas at Austin
1,659. Patricia Alessandrini, Rieman and Baketel Fellow for Music, Radcliffe Institute for Advanced Studies, Harvard University
1,660. Paula Fernandez
1,661. Mathew Foresta, Writer
1,662. Claudia Calhoon, CUNY York College
1,663. Jessica Becker, individual
1,664. Kenn Vance, John Jay College CUNY
1,665. Ann Braithwaite, University of Prince Edward Island
1,666. Nathan Tempey, journalist
1,667. Kevin Gannon, Queens University
1,668. Kirk Ahrens, individual
1,669. L.H. Roper, State University of New York--New Paltz
1,670. Jamie McHugh, independent researcher
1,671. Derek Newman, Harvard University ‘90
1,672. Jaclyn Michael, University of Tennessee at Chattanooga
1,673. Sarah Sophie Flicker
1,674. Dr. Sara Fadlalla, Northwestern University 2011
1,675. Alice Finen, Mistwood Educational Center
1,676. Nishant Shahani, Washington State University Vancouver
1,677. Kaelin Rapport, Northwestern Alum
1,678. Jennifer Ibarra, Northwestern alum
1,679. John Maerhofer, Rutgers
1,680. Stella Linder Byrne
1,681. Heather Jaber, Northwestern University Qatar
1,682. Trisha Remetir, UC Riverside
1,683. Max Cavitch, University of Pennsylvania
1,684. Amit Baishya,Associate Professor, English, University of Oklahoma
1,685. Katherine Gillen, Texas A&M University-San Antonio
1,686. Layla Williams, OU
1,687. Nesrine Chahine, TTU
1,688. Ashley Hope Pérez, The Ohio State University
1,689. Hannah Manshel, University of Hawaii Mānoa
1,690. Raj Chetty, St. John’s University
1,691. Howard Brick, Professor Emeritus of History, University of Michigan
1,692. Jackson Smith, University of Oregon
1,693. Sharon Conlon, individual
1,694. Aditi Adve, Northwestern University
1,695. Ashvin R. Kini, Stonehill College
1,696. Min Song, Boston College
1,697. Valerie Booth, Teaching Professor, Drexel University
1,698. Laura Mauldin, University of Connecticut
1,699. Sofía Sánchez, Medill ‘21, Presented at the American Studies Association after I report I wrote in Dr. T’s FIRST class at NU was accepted under his critique and mentorship
1,700. Iszy Hirschtritt Licht, Northwestern University 2015
1,701. Maris Kreizman
1,702. Mingwei Huang, Dartmouth College

Case: 26-0906, 11/20/2026, DktEntry: 16.9, (238 of 300)


1,703. Dominique Heinke, Northwestern 2007
1,704. Catherine Ndovu, Northwestern University
1,705. Maud McInerney, Haverford College
1,706. Jose Camacho, University of Illinois Chicago
1,707. Dina Sorour
1,708. Megan Teramoto, Pritzker School of Medicine student
1,709. Alessondra Springmann, PhD, individual researcher
1,710. Mary Beth Campbell, individual
1,711. Catherine Morrison, University of Rhode Island
1,712. Matthew Shields, Assistant Professor of Philosophy, Wake Forest University
1,713. Andy Carr, The New School
1,714. King Kaufman, journalist, formerly San Francisco Chronicle, Salon.com, Bleacher Report
1,715. Iris Swarthout
1,716. Knar Gavin, University of Pennsylvania
1,717. Richard Estes, Attorney, Sacramento, CA
1,718. Sal Nicolazzo, UC Davis
1,719. Liam O'Loughlin, Capital University
1,720. Scott Gordon, publisher at Tone Madison and Northwestern alum
1,721. Stanley Thangaraj
1,722. Faith Kares, Northwestern Alum
1,723. Soteria Reid, Northwestern University c/o '21
1,724. Emily Van Duyne, Associate Professor of Writing, Stockton University
1,725. Faria Kamal, Assistant Professor. Columbia University Medical Center
1,726. Saffron Turner, individual
1,727. Noah Tamarkin, Cornell University
1,728. Johanna Riordan, Haverford College Libraries
1,729. Sean Tucker, Professor, University of Regina (Canada)
1,730. Nicole Lopez-Jantzen, Associate Professor of History, Borough of Manhattan CC
1,731. Aviva German, University of Toronto
1,732. Marc Spooner, University of Regina
1,733. Joe Wachter, Harper College
1,734. Danielle Allor, Visiting Assistant Professor, Haverford College
1,735. Que-Lam Huynh, CSU Northridge
1,736. Andie Tipton, Northwestern Class of '24
1,737. Alan Cordle Villegas, Faculty Librarian, Portland Community College
1,738. Ayesha Lat, Northwestern University class of 2022
1,739. Robin Ganev, University of Regina
1,740. Jeannine Tang, Assistant Professor, NYU
1,741. Elyse Crystall, UNC-Chapel Hill
1,742. Sukanya Mukherjee, Architect and Filmmaker
1,743. Tammy Kim, writer
1,744. James Huynh, Assistant Professor of Health Management & Policy, University of Michigan
1,745. Sara Tolbert, Univ of Canterbury
1,746. Trude Bennett, UNC Chapel Hill
1,747. Vorris Nunley, Associate Professor of English and Black Study
1,748. William Richardson
1,749. Carole Boyce Davies, Professor emerita Cornell University

1,750. Eleanor Craig, Emory University
1,751. Matthew Ezzell, James Madison University
1,752. Nazia Kazi, Stockton University
1,753. Lounes Chikhi, CNRS, Toulouse
1,754. Jay M. Smith, University of North Carolina-Chapel Hill
1,755. Anisa Mian, Northwestern University ‘15
1,756. Tyler Jeremiah, Indiana University Northwest
1,757. Matthew J. Smith, Alma College
1,758. Lucila Vargas, University of North Carolina at Chapel Hill
1,759. Layan Masri, Virginia Tech
1,760. Keerthi Yalamanchili, Northwestern alum (2021)
1,761. Alexsandria Sánchez, Northeastern Illinois University
1,762. Jacinda Tran, Harvard University
1,763. Levon J Polinelli, film producer
1,764. Emily Morris, Northwestern class of 2017; University of Michigan
1,765. Amanda Lanthorne, San Diego State University
1,766. Michael Schwalbe, Professor Emeritus, North Carolina State University
1,767. leslie j yerman
1,768. Marcela Alvarez, University of Illinois Urbana-Champaign
1,769. Musa Syeed, Harvard University
1,770. Crystal Rudds, University of Utah
1,771. Jeffrey Gonzales, Individual
1,772. Samantha Iyer, Fordham University
1,773. Ricky Baldwin, union organizer
1,774. Grace Li, University of Chicago
1,775. Robert W. Barrett, Jr., University of Illinois at Urbana-Champaign
1,776. Matt Ferrel, concerned citizen
1,777. Daniella Tello, Northwestern University
1,778. Catherine Skeen, University of Chicago alumna (AB, MA, PhD)
1,779. Nora Livesay, University of MN
1,780. Ruby Phillips, Northwestern Class of 2020 Alumni
1,781. Natalie Vazquez (Northwestern 2020)
1,782. Catherine Henderson, IWMF, Northwestern ‘21
1,783. Alexander Chee, Professor of English and Creative Writing, Dartmouth College
1,784. Kaitlyn Maloney, Individual
1,785. Mark Bray, Rutgers University
1,786. Janet Lee, Northwestern alumni
1,787. Daniel D. Kelson, Astrophysicist
1,788. Luodan Rojas, Medill 2020
1,789. Elon Green, writer
1,790. Leslye Guadian, Northwestern University ‘22
1,791. Allyna Mota Melville, Northwestern Medill alum '19
1,792. Annette Braden-Rozier
1,793. Betsy Wilson, Evanston business owner
1,794. Neha Samuel, University of Illinois Urbana Champaign
1,795. Alethea Deyhle, Evanston born and raised, student at University of Illinois Urbana-Champaign
1,796. Adhy Kim, Cornell University
1,797. Christine Karatnytsky, independent theatre archivist

1,798. Alyssa Hadley Dunn, Professor of Curriculum and Instruction, University of Connecticut
1,799. Ross Dispenza, Columbia Law School
1,800. Jonathan Rosa, Stanford University
1,801. Bench Ansfield, Temple University
1,802. Anna Guevarra, University of Illinois Chicago
1,803. Timothy Lombardo, University of South Alabama
1,804. Brian Connolly, University of South Florida
1,805. Ann Russo, Professor, DePaul University
1,806. Judith Roeder, SESP Alum
1,807. Nikhil Rao, Harvard University
1,808. McKenzie Scott
1,809. Faith Lazar, Yale
1,810. Jennifer Brody, Harvard Medical School
1,811. Sameer ud Dowla Khan, Reed College
1,812. Michael Galvan
1,813. Jessica Tanner, UNC-CH
1,814. Karlyn Koh, CUNY/LaGuardia
1,815. Dr. Kirt Cundick, Licensed Psychologist
1,816. Matthew Ellis, Portland State University
1,817. Hope McCaffrey, Northwestern University
1,818. Brian Marcus, University of British Columbia
1,819. Adam Mahoney, Medill'20
1,820. Dagmawi Woubshet, University of Pennsylvania
1,821. Tylor Brand, Trinity College, Dublin
1,822. Aree Worawongwasu, University of Hawaiʻi at Mānoa
1,823. Jeremy Littau, Lehigh University
1,824. Kelda Choc
1,825. Francine Almash
1,826. Elyana B. Walling, University of Texas at Austin Moody College 2014
1,827. Laura Jaliff, Northwestern University
1,828. Yiping Xia, Texas A&M University
1,829. Alex Schlehuber
1,830. Abhi Ramakrishnan, Northwestern University
1,831. Elliott Prasse-Freeman, National University of Singapore
1,832. Kelsey Wright, Northwestern University
1,833. Ariel Halle, Northwestern
1,834. Ria Almo, Northwestern University
1,835. Madeleine Vessely, Northwestern University Graduate Worker
1,836. Diane L. Moore, Harvard Divinity School
1,837. Carolynn Gonzalez, Northwestern University
1,839. Joshua Craft, Northwestern University
1,840. Madeleine Straubel, UNC Chapel Hill
1,841. Neethu Nazar, Northwestern University
1,842. Katherine Furl, UNC Chapel-Hill
1,843. Gulrana Syed, MD, Northwestern Medicine
1,844. Braxton Brewington, UNC Chapel Hill
1,845. Chelsie Greene, Northwestern University

1,846. Jori Mills, Northwestern University
1,847. Josephine Ong, Dartmouth College
1,848. Jake Pyne, York University, Toronto, Canada
1,849. Steph Tuazon, UCLA
1,850. Irene Siegel
1,851. Amelia Parenteau
1,852. Sarah Aie, Northwestern Medill ‘24
1,853. Madeline Farr, Northwestern University
1,854. Grace Kulas, Northwestern University ‘24
1,855. Chen Chen, University of Connecticut
1,856. Judy Lawrence, Northwestern University
1,857. Cedar Turner, Northwestern University ‘24
1,858. Hope Mcknight, Northwestern University ‘24
1,859. Seth Lauver, Northwestern Bienen '23
1,860. Natalie Piehl, Northwestern University
1,861. William Matchett, St. Olaf College
1,862. October Krausch, adjunct faculty & journalist
1,863. Steve Bennett, Western Washington University
1,864. Noelle Dubay, University of Maine Farmington
1,865. Tiffanie Green, Medill BSJ '10
1,866. Gundeep Singh, Cornell University
1,867. Kimberly Robertson, Professor, California state university long beach
1,868. Mary Maddux, Iowa State University
1,869. Giancarlo Sena
1,870. Anand Vaidya, Reed College
1,871. Cory Johnson, Northwestern University
1,872. Alexandra Carter, Humboldt State Alumni
1,873. Cate Be, Humboldt for Palestine
1,874. Tyler Wall, University of Tennessee
1,875. Travis Linneman
1,876. Michelle Brown, University of Tennessee
1,877. Judah Schept, Eastern Kentucky University
1,878. Jon Shefner, University of Tennessee
1,879. Kim Rybacki, SUNY
1,880. Alejandra Carrillo, JD/MBA Candidate 2025
1,881. Tarek Loubani, Western University
1,882. Gabrielle Bozarth, JD-PhD Candidate The University of Chicago
1,883. Andrea Bartz, Northwestern University '08
1,884. Lisa East, University of Tennessee
1,885. Meghan Conley, University of Tennessee
1,886. Natalie Tuseth, University of Chicago
1,887. Bill McClanahan, University of Tennessee
1,888. Katja Stroke-Adolphe, law student, University of Chicago
1,889. Emily Krebs, Fordham University
1,890. Martha Copp, East Tennessee State University
1,891. Joseph Vess, Medill 2001
1,892. Nathan Reeves, University of Tennessee (Bienen '24)
1,893. Abigail Neill, University of Chicago
1,894. Vincent Mousseau, Dalhousie University

1,895. Roger Freedman, U. of California, Santa Barbara
1,896. James Suazo, CSULB, UCLA
1,897. Christine Ferguson, University of Stirling
1,898. Charles Post, Graduate Center-CUNY
1,899. Callum Goetz, Northwestern University
1,900. Marwa Tahboub, Northwestern University
1,901. Tabor Whitney, PhD Candidate Northwestern University
1,902. Jorin Graham, Graduate Worker, Northwestern University
1,903. Emily Anderson, Metropolitan Community College
1,904. Chenjerai Kumanyika, NYU Journalism, AAUP
1,905. Jay Cowit, New York University
1,906. Raul Mata Jr., University of Texas at San Antonio, College of Engineering, Class '16
1,907. Daisy Hernández, Northwestern University
1,908. Helen Poynton, Professor, UMass Boston
1,909. Bebel DeMoura Nilo
1,910. Francesca Hyatt, CUNY-Queens College
1,911. Junior C- University of Texas at San Antonio
1,912. Ryan B. Morrison, University of Michigan
1,913. Ashley Clark
1,914. Kelsey Rodgers, UT Austin
1,915. Talila A. Lewis, Esq.; independent public scholar
1,916. Franklin Bell, Evanston resident
1,917. Rayyan Najeeb, Northwestern University
1,918. Neeti Madan, Medill '89
1,919. Yuki Miyamoto, DePaul University
1,920. David Lawton, Professor emeritus, Washington University in St Louis,
1,921. Kay Whitlock, Co-Author, "Queer (In)Justice" & "Considering Hate"
1,922. Susanna Kemp, Medill '22
1,923. Paul McEwan, Muhlenberg College, Northwestern '03
1,924. ronit kitei, alumni
1,925. Michelle R. Martinelli, Medill MSJ, 2016
1,926. Gesina Phillips, Carnegie Mellon University
1,927. Ananth Shankar, Northwestern University
1,928. Michael Harris, Columbia University
1,929. Anna Piela, Northwestern University
1,930. Larkin Stephanos, Northwestern University
1,931. Newland F. Smith, 3rd Librarian Emeritus Seabury-Western Theological Seminary
1,932. Karin Ruetzel, PhD.
1,933. Gavin Farrow, DePaul University, Resident of Evanston, IL
1,934. Morgan Willison
1,935. Anna Piela, Northwestern University
1,936. Anna Borges, Northwestern Medill '14
1,937. Timothea Papas, NU '67
1,938. Beth Brady
1,939. José Moya, Phd
1,940. Max Sullivan, Medill student
1,941. Ayesha Rahman, Northwestern University, 2019
1,942. Robin Brown
1,943. Mariah Garcia, Attorney and Evanston Resident

1,944. Sophia Heath, Northwestern University, Class of 2026
1,945. Kyra Martinez, University of Tennessee
1,946. Asiyah Arastu, Northwestern University
1,947. Justin Liu, Northwestern University '20
1,948. Michelle Bueno Vásquez, Northwestern MS and PhD Candidate
1,949. Erin Bosack, Chicago Area Peace Action (CAPA)
1,950. Camille Beredjick, Medill '13, Medill Equal Media Project Editor-in-Chief
1,951. Paul Farrand, Evanston Reisdent
1,952. Paul O'Connor, Northwestern University
1,953. Heather Shaughnessy, Free Palestine
1,954. Ash Capirala
1,955. Kirby Anwar, CUNY
1,956. Nneoma Adaku, Harvard University
1,957. Nadira Long, Northwestern University '14
1,958. Caitlin Jones, UConn Law
1,959. Zoe Lewis, Northwestern University, Class of 2025
1,960. Wynn Graham Northwestern class of 1968
1,961. Michelle Sheen, Northwestern University
1,962. Ryan Choe, Medill '24
1,963. Kathy McGroarty-Torres, Northwestern University '16
1,964. César Hoyos Álvarez, Northwestern University
1,965. Amanda Torres, CUNY Queens College
1,966. Jackie Stevens, Northwestern University
1,967. Val Dorsey, Northwestern University Class of 2011
1,968. Megha Garg, Northwestern University

Sign in to Google to save your progress. Learn more

* Indicates required question

Name, Affiliation *

Your answer

Email address (won't be shared publicly) *

Your answer

Submit

Clear form

Never submit passwords through Google Forms.

This content is neither created nor endorsed by Google. Terms of Service Privacy Policy

Does this form look suspicious? Report

Google Forms

?

# EXHIBIT 69

April 17, 2025

To: President Michael Schill and Provost Kathleen Hagerty
CC: Board of Trustees Chair Peter Barris
From: Concerned Faculty

We come together as concerned faculty to ask that you take forceful steps to meet the challenges of the current crisis and strongly defend Northwestern against the ongoing and intensifying attacks on higher education. Bedrock principles of a democratic society, due process, and the rights of free expression and association are now at stake. These attacks threaten Northwestern and other institutions across the United States. In light of this assault, we urge Northwestern's leadership to **take these steps:**

1. **Legally contest the federal funding freeze and refuse to comply with unprecedented demands that threaten academic freedom and university self-governance**. Freedom from political interference has allowed US universities to stand as leaders in producing cutting-edge knowledge across fields—medicine, science, humanities, engineering, and social sciences, among others. The entire country, indeed the world, benefits from the scientific and medical innovations produced by American universities. We call on you to stand up against intolerable threats to interfere in the conduct of teaching and research, and to refuse any further requests to turn over personal data and academic, disciplinary, and personnel records to the federal government.

2. **Be a leader among peer institutions in condemning attacks on universities.** In addition to condemning attacks, use all opportunities to assert the value of higher education visibly and publicly. Be forceful in making the case for the enduring values that are central to institutions of higher learning and the many contributions the sector makes to our society. Insist on the importance of independent voices to a functioning democracy and civil society, highlight the value of the diversity that exists in our institutions, and encourage free expression and vigorous debate within our community.

3. **Support our international students, staff and faculty** by taking the following steps: avoid voluntary cooperation or information sharing with Immigration and

Customs Enforcement or other federal agencies charged with facilitating deportation or other forms of immigration enforcement; maintain the enrollment of international students in the event of visa revocation, legal status termination, detention, and/or deportation; allow any such students and scholars to continue their studies and research remotely, if necessary, ensuring that if enrollment is contingent upon funding through teaching or fellowships, they can continue their coursework, research, and teaching appointments; communicate timely information to international students and scholars, including immediate notification of changes in their legal status; and provide legal counsel for students and scholars whose visas have been revoked without due process.

4. **Work purposefully and proactively with other universities** and Northwestern's alumni networks, taking and creating opportunities to develop coordinated opposition to these anti-democratic attacks.

Thank you for your efforts to stand up for Northwestern and our shared values.

Rebecca Zorach, Professor, Art History, Weinberg College

Shirin Vossoughi, Associate Professor, School of Education and Social Policy

Elizabeth Shakman Hurd, Professor, Religious Studies and Political Science, Weinberg College

Laura Beth Nielsen, Professor of Sociology, Weinberg College

Helen Tilley, Associate Professor, History, Weinberg College

Michael Peshkin, Professor, McCormick School of Engineering

Nitasha Sharma, Professor, Black Studies and Asian American Studies, Weinberg College

Leslie M. Harris, Professor, History and Black Studies, Weinberg College

Rosemary Braun, Associate Professor, Molecular Biosciences, Weinberg College

Izzy Grosof, Assistant Professor, Industrial Engineering and Management Science

Megan Bang, Professor, School of Education and Social Policy

Luis A. Nunes Amaral, Professor, McCormick School of Engineering

Jorge Coronado, Professor, LACS and Spanish & Portuguese, Weinberg College

Martha Biondi, Professor, Black Studies and History, Weinberg College

Vilna Bashi, Professor, Sociology, Weinberg College, and the Buffett Institute of Global Affairs

Daisy Hernández, Associate Professor, English, Weinberg College

Sarah Schulman, Ralla Klepak Professor of English, Weinberg College

Anonymous (Weinberg)

Alyson Carrel, Clinical Professor, Pritzker School of Law

Sara Sommervold, Deputy Director, Center on Wrongful Convictions, Pritzker School of Law

Michael Anthony Turcios, Assistant Professor, Department of Radio/Television/Film, School of Communication

Annie Buth, Clinical Associate Professor, Pritzker School of Law

Lina Britto, Associate Professor of History, WCAS

Eric Sirota, Clinical Associate Professor, Tenant Advocacy Clinic, Pritzker School of Law

Shayna Silverstein, Associate Professor, School of Communication

Michael Kraus, Professor, Psychology, Weinberg College

Mark Hauser, Professor, Anthropology

Brian J. Reiser, Orrington Lunt Professor of Learning Sciences, School of Education and Social Policy

Karen Olivo, Associate Professor, Director of Music Theatre Area, SoC

Gregory Schwartz, Associate Professor, Ophthalmology and Neuroscience, Feinberg

Sheila Bedi, Clinical Law Professor, Pritzker School of Law

Michael Rakowitz, Alice Welsh Skilling Professor of Art, Department of Art Theory and Practice, Weinberg College

Michelle Birkett, Associate Professor, Medical Social Sciences, Feinberg

Karen M. Ridge, Professor, Medicine (Pulmonary), Feinberg

Ann Shola Orloff, Professor, Sociology, Board of Lady Managers of the Colombian Exposition Chair, Weinberg College

alithia zamantakis, Research Assistant Professor, ISGMH, Feinberg School of Medicine

Barnor Hesse, Associate Professor, Black Studies, Weinberg Collegeies,

Wendy Pearlman, Professor, Political Science, Weinberg College

Darren Gergle, Professor, Communication Studies, School of Communication

Brannon Ingram, Associate Professor, Religious Studies, Weinberg College

Brady Clark, Associate Professor of Instruction/College Adviser, Linguistics, Weinberg College

Kennetta Hammond Perry, Associate Professor, Black Studies and History, Weinberg

Angela G. Ray, Associate Professor, Communication Studies. School of Communication

Judith T Moskowitz, Professor, Medical Social Sciences, Feinberg School of Medicine

Amesika Nyaku, MD, MS, Assistant Professor, Department of Medicine, Division of Infectious Diseases, FSM

Leiszle Lapping-Carr, Assistant Professor, Department of Psychiatry & Behavioral Science, Feinberg School of Medicine

Jeremy Keys, Assistant Professor of Instruction, McCormick School of Engineering

Lisa Wilsbacher, Associate Professor, Medicine-Cardiology, Feinberg School of Medicine

Natalie Y Moore, Senior Lecturer, Medill

Tabitha Bonilla, Associate Professor, HDSP, SESP

Nick Davis, Associate Professor, English and Gender & Sexuality Studies, Weinberg College

Moya Bailey, Professor, Communication Studies, School of Communication

Case: 26-6906, 11/20/2026, DktEntry: 16.9, Page 252 of 300

Galen V. Bodenhausen, Professor, Psychology, WCAS

Marcelo Worsley, Associate Professor, School of Education and Social Policy & McCormick School of Engineering

Shalini Shankar, Professor of Anthropology and Asian American Studies, Weinberg College

Niall M. Mangan, Assistant Professor, Engineering Sciences and Applied Mathematics, McCormick School of Engineering

Tessie Liu, Professor, History and Gender & Sexuality Studies, Weinberg College

Fabian E. Bustamante, Professor, Computer Science, McCormick School of Engineering and Applied Sciences

Lauren Rivera, Professor, Kellogg School of Management

Kathleen Carmichael, Professor of Instruction, Cook Family Writing Program, Weinberg College

Melissa Simon, Professor, Obgyn, Feinberg

Gregory Ward, Professor, Linguistics and Gender & Sexuality Studies, Weinberg College

Jackie Stevens, Professor, Poitical Science

Alejandra Uslenghi, Associate Professor, Spanish and Portuguese - CLS, Weinberg Vollege

Julia Behrman, Associate Professor of Sociology

Abigail Barefoot, Assistant Professor of Instruction, Legal Studies

Kevin Boyle, Professor, History, Weinberg College

Stephanie Knezz, Associate Professor of Instruction, Chemistry, WCAS

Sepehr Vakil, Associate Professor, School of Education and Social Policy

John W. Rudnicki, Professor, McCormick School of Engineering

Peter Sporn: Professor of Medicine, Cell and Developmental Biology, and Medical Education; Feinberg School of Medicine

Mary Kwasny, Professor, Preventive Medicine, Feinberg School of Medicine

Namratha Kandula, Professor, Medicine, Feinberg School of Medicine

Susan Pearson, Professor, History, WCAS

Maria Pyra, Asst Professor, Medical Social Sciences, Feinberg

Robert Orsi, Professor, Religious Studies, History, American Studies, Weinberg

Nichole Pinkard, Professor, Learning Sciences, SESP

Pascal Brixel, Assistant Professor, Philosophy, Weinberg College

Michelle Molina, Associate Professor, Religious Studies, Weinberg College

Laura Brueck, Professor and Director, Alice Kaplan Institute for the Humanities

Benjamin Owen, Associate Professor of Research, Chemistry, Weinberg College

Alex Kotlowitz, professor, Medill

Elizabeth Casline, Research Assistant Professor, Institute for Sexual and Gender Minority Health and Wellbeing

James Bielo, Associate Professor, Religious Studies, Weinberg College

Rebecca Ewert, Assistant Professor of Instruction, Sociology, Weinberg College

Allison Wade, Assistant Professor of Instruction, Art Theory and Practice, Weinberg College

S.B. West, Associate Professor of Instruction, Gender & Sexuality Studies, Weinberg College

Brent E. Huffman, Professor, Medill School of Journalism

Pablo Durango-Cohen, Associate Professor, Civil & Environmental Engineering, MEAS

Jon Marshall, Associate Professor, Medill

Priyanka Motaparthy, Clinical Professor of Law, Pritzker School of Law

Joe Feinglass, Research Professor of Medicine, Feinberg School of Medicine

Jen Munson, Assistant Professor, School of Education and Social Policy

Jesse Yeh, Asst. Professor of Instruction, Legal Studies, Weinberg College

Cliff Zimmerman, Professor of Practice, Pritzker School of Law

Erica Weitzman, Associate Professor, German, WCAS

Dennis Li, Assistant Professor, Psychiatry/Medical Social Sciences/IPHAM/ISGMH, Feinberg

Josh Honn, Humanities and Prison Education Librarian, University Libraries

Curt M. Horvath, Professor, Molecular Biosciences, Weinberg College

Case: 26-0906, 11/20/2026, DktEntry: 16.9, (255 of 300)

Stephen Adam, Associate Professor, Cell and Developmental Biology, Feinberg

Jonathon Glassman, Professor emeritus, History, WCAS

Bradley Stevenson, Research Associate Professor, Earth, Environmental, and Planetary Sciences, Weinberg College

Anonymous (Feinberg)

Magdalena Osburn, Associate Professor, DEEPS, Weinberg College

Ian Grant, MD, Assistant Professor of Neurology, Feinberg School of Medicine

Dedre Gentner, Professor, Psychology, Weinberg College

Mark Sheldon, Distinguished Senior Lecturer Emeritus, Philosophy, Weinberg College

Michelle Driscoll, Associate Professor, Physics & Astronomy, Weinberg College

Jenna Christensen, Assistant Professor, Molecular Biosciences, Weinberg College

Exal Iraheta, Assistant Prof. of Instruction, RTVF/Performance Studies, School of Communication

Steven Epstein, Professor of Sociology and John C. Shaffer Professor in the Humanities

Christina Kiaer, Professor, Art History, Weinberg College

Douglas Foster, Professor, Journalism, Medill School

Rebecca Johnson, Associate Professor of English, Weinberg College

Zayd Dohrn, Professor, Radio/TV/Film, School of Communications

Anonymous (Weinberg)

John Flaherty, Professor, Medicine. Feinberg School of Medicine

Kenneth D. Forbus, Professor, Computer Science, McCormick Engineering

Jennifer Jones, Sociology, Weinberg College

Allison Carroll, Assistant Professor, Feinberg School of Medicine

Domietta Torlasco, Professor, French and Italian, Weinberg College

Laura Lackner, Associate Professor, Molecular Biosciences, Weinberg College

Mei-Ling Hopgood, William F. Thomas Professor of Journalism, Medill

Kate Weisshaar, Associate Professor, Sociology, Weinberg College

Ken Gentry, Professor of Instruction, McCormick School

Mary Ann Weston, Associate Professor Emerita, Medill School

Dmitry Tamarkin, Professor, Mathematics, Weinberg College

Aarati Didwania, Profess of Medicine, Department of Medicine, Feinberg School of Medicine

Jonathan Copulsky, Senior Lecturer, IMC, Medill School

Erica Hartmann, Associate Professor, Civil and Environmental Engineering, McCormick School of Engineering

Becca Greenstein, STEM Librarian, University Libraries

Micaela di Leonardo, Professor Emerita, Anthropology, Weinberg College

Erin Korth, Research Coordinator, Pulmonary and Critical Care, Feinberg School of Medicine

Abe Peck, Professor Emeritus in Service, Medill/NU

Robert Launay, Professor, Anthropology, WCAS

Nasrin Qader, Associate Professor, French and Italian

Marc Sala, MD, Associate Professor, Feinberg School of Medicine

Janice Radway, Walter Dill Scott Professor Emerita, Communication

Miriam Petty, Associate Professor, Radio/Television/Film

Dayne Swearer, Asst. Professor, Chemistry, Chemical and Biological Engineering

Jessica Villagomez, Lecturer, Medill

Anonymous (Weinberg)

Maureen Daly, Assistant Professor, Psychiatry & Behavioral Sciences, Feinberg School of Medicine

Jonathan Moreira, Associate Professor, Feinberg School of Medicine

Peter Locke, Professor of Instruction, Global Health Studies

Anna Parkinson, Associate Professor, German, Weinberg College

Matt Kiefer, Assistant Professor, Journalism, Medill School

Caryn Ward, Professor, Journalism, Medill

Tristram Wolff, Associate Professor, English, Weinberg College

Noelle Sullivan, Director and Professor of Instruction, Program in Global Health Studies, Weinberg College

J.A. Adande, Director of Sports Journalism, Medill

Nicole Stephens Jeanne Brett Chair of Negotiations, Kellogg School of Management

Jennifer Cole, McCormick School of Engineering

Donna R Leff, Emeritus Professor, Journalism, Medill School

Paola Zamperini, Associate Professor, Weinberg College

Doris Garraway, Associate Professor, French and Italian, Weinberg College

Joseph Schofer, emeritus professor of Civil & Environmental Engineering

Cindy Wilson, Clinical Professor, Law School

William Leonard, Professor of Anthropology & Global Health, Weinberg College

Anonymous (McCormick)

Caitlin Body, Professor, Stage Manager AEA, School of Communication

D.Soyini Madison, Professor Emerita, Performance Studies, School of Communication

Cynthia Coburn, Professor, SESP

Anonymous (McCormick)

Jessica Thebus, Professor, Theater, SOC

Paul Gowder, Professor, Pritzker

Ashy S. Karim, Assistant Professor, McCormick School of Engineering

Bridget Arimond, Clinical Professor of Law, Northwestern Pritzker School of Law

Danielle Hamilton, Asst. Clinical Professor, Northwestern Pritzker School of Law

Sean Hanretta, Associate Professor, History, WCAS

Andrea Lewis Hartung, Clinical Professor, Pritzker School of Law

Lynn Cohn law, clinical professor

Alessia Ricciardi, Professor, Comp. Lit/French and Italian, Weinberg

Heidi Kitrosser, William W. Gurley Professor of Law, Northwestern -- Pritzker School of Law

Joanna Grisinger, Associate Professor of Instruction, Legal Studies, WCAS

Heather Hendershot, Professor, Medill and School of Communication

Anna Pfenniger, Assistant Professor, Feinberg School of Medicine

John Elson, Emeritus orofeesor of law, Pritzker School of Law

Nicolette Bruner, Assistant Professor of Instruction, Legal Studies and American Studies, Weinberg College

Sylvester A. Johnson

Shari Diamond, Professor, Pritzker School of Law

Anonymous (Weinberg)

Kimberly Gray, Professor, Civil & Environmental Engineering, McCormick

Karrie Snyder, Associate Professor of Instruction, Sociology, Weinberg College

Jeremy Birnholtz, Professor, School of Communication

Ed Colgate, Professor, Mechanical Engineering, McCormick

Lisandra Vila Ellis, Assistant Professor, Cell and Developmental Biology, Feinberg School of Medicine

Igal Szleifer, Professor, McCormick School of Engineering

Susanna McColley, Professor of Pediatrics, Feinberg School of Medicine

Cristina Lafont, Professor, Philosophy, Weinberg College

Zach Nissen, Assistant Professor of Instruction, Anthropology, Weinberg

Anonymous (Weinberg)

James Schwoch, Professor, School of Communication

Michael Alpert, Research Associate, Neurobiology, Weinberg College

Christopher Bush, Associate Professor and Chair, French and Italian, Weinberg College

Joe Mathewson, professor, Mdill

Melissa Rosenzweig, Associate Professor of Instruction, Anthropology and Environmental Policy & Culture

Keith Woodhouse, Associate Professor, History, Weinberg College

Shana Bernstein, Clinical Associate Professor, Legal Studies, Weinberg

Kyle Henry, Associate Professor, Radio TV Film, Communications

Anonymous (McCormick)

Lisa Beutler, Assistant Professor, Department, Feinberg of Medicine

Jen Brown, Lecturer, Preventive Medicine, Feinberg School of Medicine

Lily Stewart, Visiting Assistant Professor, Religious Studies Department at NU

Gerry Chiaro, Associate Professor, Medill

Murali Prakriya, Professor of Pharmacology, Feinberg School of Medicine

Aaron Shaw, Associate Professor, Communication Studies, School of Communication

Sadie Wignall, Professor, Molecular Biosciences, Weinberg College

Gregory Wagner, Associate Professor, McCormick School of Engineering

Thomas J Billard, Associate Professor, Communication Studies, School of Communication

Robert Nelson, Professor, Sociology, Weinberg College

Gianluca Cusatis, Professor, CEE, McCormick School of Engineering and Applied Science

Jennifer Brace, Assistant Professor of Instruction, Molecular Biosciences, Weinberg College

Gregory Phillips II, Associate Professor, Medical Social Sciences, Feinberg School of Medicine

Kevin Lynch, Professor, McCormick School of Engineering

Jason Hartline, Professor, Computer Science, McCormick

Samuel Weber, Avalon Professor, German/CLS Weinberg

Elizabeth Gerber, Professor, Mechanical Engineering, McCormick

J.P. Sniadecki, Radio/TV/Film Department

Jamelia Morgan, Professor of Law, Northwestern Pritzker School of Law

Krista Thompson, Professor, Art History, Weinberg

Stephan Moore, Professor of Instruction, School of Communication

Erin Courtney, Associate Professor, RTVF, School of Communication

Denise Meuser, Professor of Instruction, German, Weinberg College

L. Clayton Dahm, Lecturer, Music Education, Bienen

Pedro A. Serrano, Instructor, Feinberg

Morgan Barry, PhD Candidate, History, Weinberg College

Ezra Friedman, Professor, Pritzker School of Law

Anonymous (Weinberg)

Jeong Eun Annabel We, Assistant Professor, Asian Langs. and Cultures, Weinberg

Ji-Yeon Yuh, Assoc. Professor, History and Asian American Studies, WCAS

Linda Gates, Professor of Instruction, Head of Voice, Dept. of Theatre, School of Communication

Ian Hurd, Professor, Political Science

Anonymous (Feinberg)

Hai Zhou, Professor, ECE, McCormick School of Engineering

Douglas Vaughan, Professor, Medicine, FSM

Kyla Ebels-Duggan, Professor, Philosophy, Weinberg College

Anonymous (School of Communication)

Claudio E. Benzecry, Professor, Communication Studies and Sociology, School of Communication and Weinberg

Fay Rosner, WCAS Adviser & Assoc. Prof of Instruction, French

Matthew Kugler, Professor of Law, Pritzker School of Law

Christine Percheski, Associate Professor, Sociology, Weinberg College

Russell Johnson, Assistant Professor, Physical Medicine and Rehabilitation, Feinberg

Anonymous (Weinberg)

Bennett Goldberg, Professor, Physics and Astronomy

Sara Thomas, Research Assistant Professor, Feinberg School of Medicine

Christine Helmer, Professor of German, Weinberg College

Paola Morgavi, Professor of Instruction, French and Italian, Weinberg College

Michelle Falkoff, Clinical Professor of Law

Christina Nguyen, Assistant Professor of Instruction, Radio/Television/Film, School of Communications

Rajeev Kinra, Associate Professor, History, Comparative Literature, MENA, ALC, and ISP

Benjamin Golub, Professor, Economics, Weinberg College

Evan Mwangi, Professor, English, Weinberg College

Deborah Rosenberg, Associate Prof of Instruction, Spanish and Portuguese, Weinberg College

Branden Ghena, Assistant Professor of Instruction, Computer Science, McCormick School of Engineering

Seema Shah, Professor, Pediatrics and Medical Ethics, Feinberg School of Medicine

Angira Patel, MD, MPH, Professor, Feinberg School of Medicine

Mita Sanghavi Goel, Professor of Medicine, Feinberg School of Medicine

Vera Brunner-Sung, Associate Professor, Radio/Television/Film, School of Communication

Surendra Shah, Walter p Murphy Professor(Emeritus),Civil Engineering

Stacy Benjamin, Clinical Faculty, Segal Design Institute, McCormick

Elizabeth Inglehart, Clinical Associate Professor of Law, Northwestern Pritzker School of Law

Christian Petersen, Professor, Molecular Biosciences, Weinberg College

Rebecca Vonesh, CTD Program Coordinator

David Morton, Professor, McCormick School of Engineering

Barbara Newman, Professor of English, Classics and History

Barry L Nelson, Walter P Murphy Professor Emeritus, IEMS, McCormick

Anonymous (School of Communication)

Gordon Hazen, Professor Emeritus, McCormick School of Engineering

AJ Christian, Professor, Communication Studies, School of Communication

John Anderson, Senior Lecturer, Segal Design Institute

Wendy Murray, Professor, McCormick School of Engineering

Lawrence Stuelpnagel, Clinical Associate Professor Medill/Political Science

Anonymous (Weinberg)

Anonymous (Weinberg)

Shana Cooper, Associate Professor, School of Communication

Carolyn Frazier, Clinical Professor, Pritzker School of Law

Sridhar Krishnaswamy, Professor, Mechanical Engineering, McCormick

Kyle Henry, Associate Professor, Radio/TV/Film, School of Communications

Talia Lerner, Associate Professor, Neuroscience, Feinberg School of Medicine

Anonymous (School of Communication)

Luisa Morales-Nebreda, Assistant Professor, Feinberg

Kari Lydersen, Assistant Professor, Journalism, Medill

Licheng Gu, Professor of Instruction, Weinberg College

Toshiko Uchida, Professor, Medicine and Medical Education, Feinberg

Shobha Mahadev, Clinical Professor of Law, Northwestern Pritzker School of Law

Stephanie Kollmann, Visiting Clinical Professor, Children and Family Justice Center, Pritzker School of Law

Andrea Russell, Assistant Professor, Psychiatry & Behavioral Sciences, Feinberg

Lauren B. Beach, Assistant Professor, Medical Social Sciences, Feinberg School of Medicine

Mark Werwath, Clinical Professor, IEMS, McCormick

Courtney Scherr, Associate Professor, Communication Studies, School of Communication

Laura Kipnis, Professor emeritus, Radio-TV-Film

Michael Angarone DO FIDSA, Associate Professor, Feinberg School of Medicine

Sylvie Romanowski, Professor emerita of French

katrina quisumbing king, Assistant Professor, Sociology, Weinberg College

Ariel Rogers, Associate Professor, Radio/Television/Film, School of Communication

Cynthia Robin, Professor, Anthropology, Weinberg College

Edward Malthouse, Professor, IMC and IEMS, Medill and McCormick

Mary Weismantel, Professor, Anthropology, Weinberg College

Zach Wood-Doughty, Assistant Professor of Instruction, Computer Science, McCormick

Anonymous (Weinberg)

Lakshmi Padmanabhan, Assistant Professor, School of Communication

Yusra Cheema, Assistant Professor, Department of Medicine, Feinberg School of Medicine

Theresa L. Walunas, Associate Professor, Medicine, Feinberg School of Medicine

Adia Benton, Associate Professor, Anthropology, Weinberg College

Stephanie Lipscomb Teterycz, Senior Director, Trienens Institute

Anonymous (Pritzker)

JJ Johnson, Pathology, Dermatology, Medical Social Sciences

Haley Bowen, Assistant Professor, History, Weinberg College

Anonymous (School of Communication)

Anonymous (Weinberg)

Alona Furmanchuk, Research Asst. Prof., Medicine, Feinberg School of Medicine

Caitlin Fitz, Associate Professor of History, Weinberg College

Neil Golden, Sr. Lecturer, Medill School of Integrated Marketing Communications

Daniel Galvin, Professor, Political Science, Weinberg College

Jennifer Bierman, Professor of Medicine, Feinberg

Baron Reed, Professor, Philosophy, Weinberg

Herbert N. Beller, Professor of Practice Emeritus, Pritzker School of Law

Aashish Didwania, Professor, Medicine

Ingrid Zeller, Professor, German Department, Weinberg College

Megan Baker, Assistant Professor, Anthropology, Weinberg College

Ana Arjona, Associate Professor, Political Science, Weinberg College

Anonymous (McCormick)

Sanjiv Shah, Professor, Medicine/Cardiology, Feinberg

Kate Masur, Professor, History, Weinberg

Carol Haywood, Assistant Professor, Department of Medical Social Sciences, Feinberg

Nausheen Akhter, Associate Professor of Medicine, Feinberg School of Medicine

Daniel Arango, Assistant Professor, Department of Pharmacology

Jill Wilson, Professor of Instruction, McCormick School of Engineering

Elizabeth Son, Associate Professor, Theatre, School of Communication

Nina Gurianova, Professor, Russian and Comparative Literature Studies, Weinberg College

Thrasyvoulos Pappas, Professor, ECE

Quinn Mulroy, Assistant Professor, School of Education & Social Policy

Anonymous (Weinberg)

Andreas Waechter, Professor, Industrial Engineering & Management Sciences, McCormick

Anonymous (McCormick)

LaShandra Sullivan, Associate Professor, Anthropology, Weinberg College

Rachel OConor, Assistant Professor, Feinberg School of Medicine

Anonymous (Feinberg)

David Gatchell, Clinical Professor, Segal Design Institute, McCormick School of Engineering and Applied Science

Stephanie Eisenbarth, Professor, Department of Medicine, Feinberg School of Medicine

Robert Murphy, Professor, Department of Medicine (Infectious Diseases), Feinberg School of Medicine

Tom Wolff, Research Assistant Professor, Medical Social Sciences, Feinberg

Anonymous (McCormick)

Daniel Evans, Associate Professor of Medicine, Feinberg

Mérida M. Rúa, Professor, Latina and Latino Studies, Weinberg College

Anonymous (Feinberg)

Anonymous (School of Communication)

Rachel Kornfield, Assistant Professor, Feinberg

Anonymous (McCormick)

Megan Hyska, Assistant Professor, Philosophy, Weinberg College

Anonymous (Feinberg)

Jeremy O'Sullivan, Research Assistant Professor, Division of Allergy and Immunology, Feinberg School of Medicine

Chloe Thurston, Associate Professor, Political Science, Weinberg College

Anonymous (Weinberg)

Anonymous (Weinberg)

Steven Morrison, Professor, Music Education, Bienen School of Music

Claudia Yau, Assistant Professor, Philosophy, Weinberg College

Betina Yanez, Associate Professor, Feinberg School of Medicine

David Shyovitz, Assoc. Prof. of History, Weinberg College

Kathleen J Green, Professor, Pathology and Dermatology, Feinberg

Matthew Goldrick, Professor, Linguistics, Weinberg College

Lincoln Quillian, Professor, Sociology, Weinberg College

Neil Verma, Associate Professor, Radio/TV/Film, School of Communication

Mary McGrath, Assistant Professor, Political Science, Weinberg College

Ryan Truby, Assistant Professor, Materials Science and Engineering, Mechanical Engineering

Jose Medina, Walter Dill Scott Professor, Philosophy, Weinberg College

Rachel Amdur, Assistant Professor, Medicine, Feinberg School of Medicine

Beatriz O. Reyes, Assistant Professor of Instruction, Global Health Studies Program

Anonymous (Kellogg)

Teresa H Horton, Associate Professor of Research, Anthropology, Weinberg College

Benjamin Singer, MD, Associate Professor, Feinberg

Anonymous (Weinberg)

Anonymous (Feinberg)

Fei Li Kuang, Assistant Professor, Allergy and Immunology, Feinberg School of Medicine

Anonymous (Weinberg)

Emily Maguire, Associate Professor, Spanish and Portuguese, WCAS

Will Reno, Professor, Political Science, Weinberg

Kelly Bachta, Assistant Professor, Department of Medicine, Division of Infectious Diseases

Ty Blakeney, Assistant Professor, French and Italian

Emily Esposito, Postdoctoral Scholar, MSS, Feinberg

Eric Zaslow, Henry S. Noyes Chair in Mathematics, Mathematics, Weinberg College

Paul Umbanhowar, Research Professor, Mechanical Engineering, McCormick School of Engineering

Annette D'Onofrio, Associate Professor, Linguistics, Weinberg College

Alexandra Psihogios, Assistant Professor, Medical Social Sciences, Feinberg

Anonymous, Weinberg College

Anonymous, Feinberg

Aaron Godwin, Assistant Professor of Instruction, Theatre, School of Communication

Helen Thompson, Professor, English, Weinberg College

Anonymous, Associate Professor, Medical Social Sciences

Bruce Henschen, Associate Professor, Feinberg School of Medicine

Marquita Lewis, Assistant Professor Feinberg School of Medicine

Peter Slevin, Professor, Medill

Elizabeth Anne Scharle, Assistant Professor, Feinberg School of Medicine

Carole Silver, Professor of Global Law & Practice, Emerita

André de Gouvêa, Professor, Physics and Astronomy, Weinberg College

Amy Partridge, Assoc. Prof. of Instruction, Weinberg College

Cecilia Berin, Professor of Medicine, Feinberg School of Medicine

Robert Weinstock, Clinical Associate Professor of Law, Pritzker School of Law

Frances R. Aparicio, Professor Emerita, Latina and Latino Studies Program, Weinberg College

William A. Muller, MD, PhD, Professor, Pathology, Feinberg School of Medicine

Jeffrey A. Linder, Professor of Medicine, Feinberg School of Medicine

Ciaran Kohli-Lynch, Preventive Medicine, Feinberg School of Medicine

César Hoyos Álvarez, Assistant Professor of Instuction, Spanish and Portuguese, Weinberg College

Alexander Misharin, Associate Professor, Feinberg School of Medicine

Benette Phillips, Research Assistant Professor, Lurie Cancer Center

Katharine Breen, Professor, English, Weinberg College

Christine Schaeffer, Associate Professor, Medicine, Feinberg School of Medicine

Michael Maltenfort, Assistant Professor of Instruction, Weinberg College Advising and Mathematics

Noah Chaskin, Assistant Professor of Instruction, English, Weinberg College

Ava Thompson Greenwell, Professor, Medill

Anonymous (School of Communication)

Daniel Majchrowicz, Associate Professor, Asian Languages and Cultures, Weinberg College

Shelby Hatch, Associate Professor of Instruction, Weinberg College

Eli Kean, Assistant Professor of Instruction, Gender and Sexuality Studies, Weinberg College

Anonymous (Weinberg)

Anonymous (School of Communication)

Leonard L. Riskin, Visiting Prof., Pritzker School of Law

Lauren Clark, Core Scientist, Center for Synthetic Biology

Anonymous (SESP)

Anonymous (Center for Synthetic Biology)

Anonymous (SESP)

Caitlin Musil, Research Technician, Feinberg School of Medicine

Cuong Nguyen, Assistant Professor, Dermatology, Feinberg School of Medicine

Case: 26-0906, 11/20/2026, DktEntry: 16.9, (275 of 300)

Andrew Tout, Assistant Professor, Medicine, Feinberg School of Medicine

Lisa Del Torto, Professor of Instruction, Cook Family Writing Program, Weinberg College

Andrew Rivers, Professor of Instruction, Physics and Astronomy, Weinberg Collge

Jeffrey Lopez, Assistant Professor, Chemical and Biological Engineering, McCormick

Laura Hein, Professor History, WCAS

William N. West, Professor, English, Classics, and Comparative Literary Studies, WCAS

Anonymous (Weinberg)

Morgan Thompson, Assistant Professor, Philosophy, Weinberg College

Edward Muir, Clarence L. Ver Steeg Professor in the Arts and Science, History, Weinberg College

James O'Laughlin, Associate Professor of Instruction, Cook Family Writing Program, Weinberg College

Julia Yoshino Benavente, Research Assistant Professor, Medicine, Feinberg School of Medicine

David Boyk, Associate Professor of Instruction, Asian Languages and Cultures, Weinberg College

Katie Risseeuw, Preservation Librarian, University Libraries

Elizabeth Addington, Assistant Professor, Medical Social Sciences, Feinberg

Anonymous (Feinberg)

Anonymous (Feinberg)

Scott Durham, Associate Professor, French and Italian, Weinberg College

Annie Howard, English Department, Weinberg College

Matt Easterday, Associate Professor, School of Education and Social Policy

Brianna Borger, Assistant Professor of Instruction, Theatre, School of Communication

Anthony S. Chen, Associate Professor, Sociology and Political Science, Weinberg College

Sherwin Ovid, Assistant Professor of Instruction, ATP, Weinberg College

Martina Kerlova, Professor of Instruction, German, WCAS

Corey Byrnes, Associate Professor, Kaplan, Asian Languages and Cultures, Comparative Literary Studies

Lizzie Burslem, Lecturer, Mathematics, Weinberg College

Paul Gillingham, Professor, History, Weinberg College

Ronald T. Ackermann, Professor of Medicine, Feinberg School of Medicine

Wei Chen, Professor, Mechanical Engineering, McCormick

J.-F. Gaillard, Professor, Civil and Environmental Engineering, McCormick

Paul Gillingham, Professor, History, Weinberg College

Case: 26-0906, 11/20/2026, DktEntry: 16.9, Page 277 of 300

Anonymous (McCormick)

Helen B. Schwartzman Professor Emerita of Anthropology, Weinberg College

Paloma Martinez, Assistant Professor, Radio, TV and Film, School of Communication

Aparna Gupta, Assistant Professor, Feinberg

Gary Martin M.D., Professor of Medicine, Feinberg

David Liebovitz, Associate Professor of Medicine, Feinberg School of Medicine

Dominic Fullenkamp, Assistant Professor, Feinberg School of Medicine

Deborah Douglas, Senior Lecturer, Medill

Felicia D Henderson, Associate Professor, Radio/Television/Film, School of Communication

Anonymous (Feinberg)

Stephen Persell, Professor, Medicine, Feinberg

Heather Colburn, Professor of Instruction, Spanish & Portuguese, Weinberg

Ranya Sweis, Professor of Medicine/Cardiology, Feinberg SOM.

Juned Siddique, Professor, Preventive Medicine, Feinberg School of Medicine

Robert Anthony Ward, Assistant Professor, Cook Family Writing Program, Weinberg College

Alex Birdwell, Assoc. Prof. of Instruction, Segal Design Institute, McCormick

Sarah Chuzi, Assistant Professor of Medicine at NU Feinberg

Nabil Issa, MD, Professor of Surgery and Medical Education, Feinberg School of Medicine

Carol Saltoun, Associate Professor, Feinberg

Lucia Stein-Montalvo, Assistant Professor, Civil and Environmental Engineering, McCormick

Alison Flaum, Clinical Professor, Pritzker School of Law

Jon Ziomek, associate professor emeritus, Medill School

Lydia Barnett, Associate Professor, History, WCAS

Michael Certo, Assistant Professor of Pediatrics, Feinberg School of Medicine

Miriam White, Professor, Radio/TV/Film, School of Communication

Anonymous (Feinberg)

Brenna Argall, Professor, Mechanical Engineering, Computer Science, and Physical Medicine & Rehabilitation, McCormick and Feinberg

Ceci Rodgers, professor, Medill School of Journalism,

Ana Maria Acosta, Professor, Physical Therapy and Human Movement Sciences, Feinberg School of Medicine

Case: 26-0906, 11/20/2026, DktEntry: 16.9, Page 279 of 300

# EXHIBIT 70

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO



Federal Register
Vol. 90, No. 19
Thursday, January 30, 2025

# Presidential Documents

Title 3—

The President

**Executive Order 14161 of January 20, 2025**

## Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.,* and section 301 of title 3, United States Code, it is hereby ordered:

**Section 1**. *Policy and Purpose.* (a) It is the policy of the United States to protect its citizens from aliens who intend to commit terrorist attacks, threaten our national security, espouse hateful ideology, or otherwise exploit the immigration laws for malevolent purposes.

(b) To protect Americans, the United States must be vigilant during the visa-issuance process to ensure that those aliens approved for admission into the United States do not intend to harm Americans or our national interests. More importantly, the United States must identify them before their admission or entry into the United States. And the United States must ensure that admitted aliens and aliens otherwise already present in the United States do not bear hostile attitudes toward its citizens, culture, government, institutions, or founding principles, and do not advocate for, aid, or support designated foreign terrorists and other threats to our national security.

**Sec. 2**. *Enhanced Vetting and Screening Across Agencies.*

(a) The Secretary of State, in coordination with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall promptly:

(i) identify all resources that may be used to ensure that all aliens seeking admission to the United States, or who are already in the United States, are vetted and screened to the maximum degree possible;

(ii) determine the information needed from any country to adjudicate any visa, admission, or other benefit under the INA for one of its nationals, and to ascertain whether the individual seeking the benefit is who the individual claims to be and that the individual is not a security or public-safety threat;

(iii) re-establish a uniform baseline for screening and vetting standards and procedures, consistent with the uniform baseline that existed on January 19, 2021, that will be used for any alien seeking a visa or immigration benefit of any kind; and

(iv) vet and screen to the maximum degree possible all aliens who intend to be admitted, enter, or are already inside the United States, particularly those aliens coming from regions or nations with identified security risks.

(b) Within 60 days of the date of this order, the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence shall jointly submit to the President, through the Assistant to the President for Homeland Security, a report:

(i) identifying countries throughout the world for which vetting and screening information is so deficient as to warrant a partial or full suspension on the admission of nationals from those countries pursuant to section 212(f) of the INA (8 U.S.C. 1182(f)); and

(ii) identifying how many nationals from those countries have entered or have been admitted into the United States on or since January 20,

2021, and any other information the Secretaries and Attorney General deem relevant to the actions or activities of such nationals since their admission or entry to the United States.

(c) Whenever information is identified that would support the exclusion or removal of any alien described in subsection 2(b), the Secretary of Homeland Security shall take immediate steps to exclude or remove that alien unless she determines that doing so would inhibit a significant pending investigation or prosecution of the alien for a serious criminal offense or would be contrary to the national security interests of the United States.

**Sec. 3**. *Additional Measures to Protect the Nation.* As soon as possible, but no later than 30 days from the date of this order, the Secretary of State, in coordination with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall also:

(a) Evaluate and adjust all existing regulations, policies, procedures, and provisions of the Foreign Service Manual, or guidance of any kind pertaining to each of the grounds of inadmissibility listed in sections 212(a)(2)–(3) of the INA (8 U.S.C. 1182(a)(2)–(3)), to ensure the continued safety and security of the American people and our constitutional republic;

(b) Ensure that sufficient safeguards are in place to prevent any refugee or stateless individual from being admitted to the United States without undergoing stringent identification verification beyond that required of any other alien seeking admission or entry to the United States;

(c) Evaluate all visa programs to ensure that they are not used by foreign nation-states or other hostile actors to harm the security, economic, political, cultural, or other national interests of the United States;

(d) Recommend any actions necessary to protect the American people from the actions of foreign nationals who have undermined or seek to undermine the fundamental constitutional rights of the American people, including, but not limited to, our Citizens' rights to freedom of speech and the free exercise of religion protected by the First Amendment, who preach or call for sectarian violence, the overthrow or replacement of the culture on which our constitutional Republic stands, or who provide aid, advocacy, or support for foreign terrorists;

(e) Ensure the devotion of adequate resources to identify and take appropriate action for offenses described in 8 U.S.C. 1451;

(f) Evaluate the adequacy of programs designed to ensure the proper assimilation of lawful immigrants into the United States, and recommend any additional measures to be taken that promote a unified American identity and attachment to the Constitution, laws, and founding principles of the United States; and

(g) Recommend any additional actions to protect the American people and our constitutional republic from foreign threats.

**Sec. 4**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.



THE WHITE HOUSE,
*January 20 2025.*

[FR Doc. 2025–02009
Filed 1–29–25; 8:45 am]
Billing code 3395–F4–P

# EXHIBIT 71

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO



**Federal Register**
Vol. 90, No. 21
Monday, February 3, 2025

# Presidential Documents

**Title 3—**

## The President

**Executive Order 14188 of January 29, 2025**

## Additional Measures To Combat Anti-Semitism

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1**. *Purpose.* My Administration has fought and will continue to fight anti-Semitism in the United States and around the world. On December 11, 2019, I issued Executive Order 13899, my first Executive Order on Combating Anti-Semitism, finding that students, in particular, faced anti-Semitic harassment in schools and on university and college campuses. Executive Order 13899 provided interpretive assistance on the enforcement of the Nation's civil rights laws to ensure that they would protect American Jews to the same extent to which all other American citizens are protected. The prior administration effectively nullified Executive Order 13899 by failing to give the terms of the order full force and effect throughout the Government. This order reaffirms Executive Order 13899 and directs additional measures to advance the policy thereof in the wake of the Hamas terrorist attacks of October 7, 2023, against the people of Israel. These attacks unleashed an unprecedented wave of vile anti-Semitic discrimination, vandalism, and violence against our citizens, especially in our schools and on our campuses. Jewish students have faced an unrelenting barrage of discrimination; denial of access to campus common areas and facilities, including libraries and classrooms; and intimidation, harassment, and physical threats and assault. A joint report by the House Committees on Education and the Workforce, Energy and Commerce, Judiciary, Oversight and Accountability, Veterans' Affairs, and Ways and Means calls the Federal Government's failure to fight anti-Semitism and protect Jewish students ''astounding.'' This failure is unacceptable and ends today.

**Sec. 2**. *Policy.* It shall be the policy of the United States to combat anti-Semitism vigorously, using all available and appropriate legal tools, to prosecute, remove, or otherwise hold to account the perpetrators of unlawful anti-Semitic harassment and violence.

**Sec. 3**. *Additional Measures to Combat Campus Anti-Semitism.* (a) Within 60 days of the date of this order, the head of each executive department or agency (agency) shall submit a report to the President, through the Assistant to the President for Domestic Policy, identifying all civil and criminal authorities or actions within the jurisdiction of that agency, beyond those already implemented under Executive Order 13899, that might be used to curb or combat anti-Semitism, and containing an inventory and analysis of all pending administrative complaints, as of the date of the report, against or involving institutions of higher education alleging civil-rights violations related to or arising from post-October 7, 2023, campus anti-Semitism.

(b) The report submitted by the Attorney General under this section shall additionally include an inventory and an analysis of all court cases, as of the date of the report, against or involving institutions of higher education alleging civil-rights violations related to or arising from post-October 7, 2023, campus anti-Semitism and indicate whether the Attorney General intends to or has taken any action with respect to such matters, including filing statements of interest or intervention.

(c) The Attorney General is encouraged to employ appropriate civil-rights enforcement authorities, such as 18 U.S.C. 241, to combat anti-Semitism.

(d) The report submitted by the Secretary of Education under this section shall additionally include an inventory and an analysis of all Title VI complaints and administrative actions, including in K–12 education, related to anti-Semitism—pending or resolved after October 7, 2023—within the Department's Office for Civil Rights.

(e) In addition to identifying relevant authorities to curb or combat anti-Semitism generally required by this section, the Secretary of State, the Secretary of Education, and the Secretary of Homeland Security, in consultation with each other, shall include in their reports recommendations for familiarizing institutions of higher education with the grounds for inadmissibility under 8 U.S.C. 1182(a)(3) so that such institutions may monitor for and report activities by alien students and staff relevant to those grounds and for ensuring that such reports about aliens lead, as appropriate and consistent with applicable law, to investigations and, if warranted, actions to remove such aliens.

**Sec. 4**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.



THE WHITE HOUSE,
*January 29, 2025.*

[FR Doc. 2025–02230
Filed 1–31–25; 11:15 am]
Billing code 3395–F4–P

# EXHIBIT 72

# Board of Trustees Chair Letter (2025-04-04)

TO: Mr. Peter Barris, Chair, and Members of Northwestern's Board of Trustees
FR: Concerned Faculty, Northwestern University

Add your signature 18 March 2025

Dear Mr. Barris and members of Northwestern's Board of Trustees:

We are an ad hoc group of concerned Northwestern faculty and we write to request that the Board of Trustees add consultations with faculty, students, and staff to your deliberations during this emergency. We would like an opportunity to brief members of the Board about how the current threats to higher education, civil liberties, and democratic institutions in the United States and beyond are affecting our campus community. The stakes of this moment are high for us all and we need to pull together.

Many of you have invested deeply in Northwestern over the years. We have too. Many of us began our careers here and have spent decades building programs, directing departments, chairing committees, and doing our part to make Northwestern a premier institution in STEM fields, education, medical research, humanities and the arts, the social sciences, journalism, and law, among other fields. We are deliberately working to bridge schools and disciplines because we know Northwestern is greater than the sum of its parts.

In advance of briefings, we want to share our diagnosis of the current situation.

**1. There is no time to lose:** The new administration is taking steps that are intended to radically destabilize the foundations of higher education in this country.[1] It takes decades to build first-rate programs of the kind Northwestern has in abundance. When crucial funding and staff are cut on so many fronts simultaneously – as this administration is doing – it can serve only one purpose: to destroy precious repositories of knowledge, expertise, and public goods. Historically, we know that when autocratic leaders have targeted their own universities, it has only weakened democracies and exacerbated or re-entrenched inequalities. We see this happening already.

**2. Young people need us:** We teach our students to wrestle with big questions and societal challenges, placing these in historical context and tying them to debates at the cutting edge of different fields. We have a responsibility as educators to support critical inquiry, engage with multiple perspectives, and explore different knowledge systems, past and present. Given our role in training teachers, doctors, psychologists, counselors, coaches and many others, disruptions to universities have immediate and widespread effects on our society, including K-12 systems.

**3. We must speak with one voice in defense of our freedoms:** The Trump administration is breaking laws and trampling on governing norms as fast as possible because they know legal challenges and court proceedings move slowly. On February 4th, Georgetown law professor David Super made this point to a *Washington Post* reporter: "So many of these [administrative actions] are so wildly illegal that I think they're playing a quantity game and assuming the system can't react to all this illegality all at once." Ruth Ben-Ghiat, a historian of fascism at New York University, stated that "We're in a real emergency situation for our democracy."[2]

Northwestern is one of several thousand universities and colleges in the United States. Our collective goal should be to defend our freedoms and call out illegalities as if our lives, and so many others, depend on it, because they do. Malicious and bad faith attacks – on faculty, students, staff, our president, our provost, our research, and our

# Board of Trustees Chair Letter (2025-04-04)

**4. We must not repeat myths or falsehoods:**[2] US universities have an unparalleled breadth of intellectual opinion and are home to diverse constituencies. Yet, as most of us know, things were once much more homogeneous. It took decades of effort and social struggle to make universities more representative of and responsive to the needs of our society. In doing so, universities have played a crucial role in building more tolerant and equitable communities. What we are seeing now is a backlash of *intolerance* and *exclusion*, designed to intimidate and silence a plurality of perspectives and debate itself. Universities provide a necessary antidote to false claims because we endorse debate.

**5. We must protect those who stand for human rights and peace:** We would never expect members of the Board of Trustees to have uniform opinions since we ourselves disagree on points of substance. We do expect Board members to share our concern when constitutional and human rights are objectively under attack. Students, staff, and faculty at Northwestern have mobilized on various social, environmental, and geopolitical issues for decades. These campaigns have sought to extend human rights, redress past and ongoing wrongs, and ensure viable futures for all. Serious problems on all fronts will only get worse if US universities comply with draconian directives to arrest, expel, deport, or fire those who dissent from government policies. These directives are anathema to the values and mission of our University.

We hope that in this moment of crisis, you will make the time to hear from representative delegations and begin to exchange strategies on what we can do to sustain the vibrant intellectual community at Northwestern.

CC: President Michael Schill
Provost Kathleen Hagerty
Bryan Brayboy, Dean, School of Education and Social Policy
Adrian Randolph, Dean, Weinberg College of Liberal Arts
Francesca Cornelli, Dean, Kellogg School of Business
E. Patrick Johnson, Dean, School of Communications
Kelly Mayo, Dean, The Graduate School
Marwan Kraidy, Dean, Northwestern University in Qatar
Jonathan Bailey Holland, Dean, Bienen School of Music
Eric Neilson, Dean, Feinberg School of Medicine
Hari Osofsky, Dean, Pritzker School of Law
Christopher Schuh, Dean, McCormick School of Engineering
Charles Whitaker, Dean, Medill School of Journalism
Xuemao Wang, Dean of Libraries

**Add your signature**
Helen Tilley, Associate Professor, History, Anthropology (courtesy), and Law (courtesy)
Shirin Vossoughi, Associate Professor of Learning Sciences, School of Education & Social Policy
Martha Biondi, Professor, Black Studies and History
Leslie Harris, Professor, History and Black Studies
Luis A. Nunes Amaral, Professor, ESAM, McCormick School of Engineering
katrina quisumbing king, Assistant Professor, Sociology
Sheila Bedi, Clinical Professor of Law, Pritzker School of Law
Jorge Coronado, Professor, Spanish and Portuguese
Kate Masur, Professor, Department of History
Michelle Birkett, Associate Professor, Medical Social Sciences
Daisy Hernández, Associate Professor, English
Peter Sporn, Professor of Medicine, Feinberg School of Medicine
Elizabeth Shakman Hurd, Professor of Religious Studies and Political Science
Joanna Grisinger, Associate Professor of Instruction, Legal Studies
Megan Bang, Professor of Learning Sciences, School of Education and Social Policy

# Board of Trustees Chair Letter (2025-04-04)

Michael Peshkin, Professor, Mechanical Engineering
Namratha Kandula, Professor of Medicine, Feinberg School of Medicine
Sean Hanretta, Associate Professor, History
Sarah Schulman, Professor, English
Vilna Bashi, William and Cathy Osborne Professor, Sociology
Kevin Boyle, Professor, History
Shayna Silverstein, Associate Professor, Performance Studies
Barnor Hesse, Associate Professor, Black Studies
D. Soyini Madison, Professor Emeritus, Department of Performance Studies
Jessica Winegar, Professor, Anthropology and Middle East and North African Studies
Nick Davis, Associate Professor, English and Gender & Sexuality Studies
Susan Pearson, Professor of History
Dotun Ayobade, Associate Professor, Performance Studies/Black Studies
Adia Benton, Associate Professor, Anthropology
Rebecca Johnson, Associate Professor of English and Middle East and North African Studies
Tristram Wolff, Associate Professor, English & Comparative Literary Studies
Anonymous, Black Studies and Gender and Sexuality Studies
Krista Thompson, Professor, Art History
Megan Baker, Assistant Professor, Anthropology
Ji-Yeon Yuh, Associate Professor, History and Asian American Studies
Keith Woodhouse, Associate Professor, History
Paul Ramírez, Associate Professor, History and Religious Studies (courtesy)
Lauren Stokes, Associate Professor, History
Wendy Pearlman, Jane Long Professor of Arts and Sciences, Political Science
Michael Rakowitz, Professor, Art Theory and Practice and Middle East North African Studies
Nasrin Qader, Associate Professor of French and Comparative Literature
Natalie Y Moore, Senior Lecturer and Director of Audio Programming, Medill
Mérida M. Rúa, Professor, Latina and Latino Studies
Helen Thompson, Professor, English
Tessie P. Liu, Professor, History and Gender & Sexuality Studies
Cynthia Coburn, Professor, SESP
Tabitha Bonilla, Associate Professor, Human Development & Social Policy and Political Science
Angela G. Ray, Associate Professor, Communication Studies
Brian Reiser, Orrington Lunt Professor of Learning Sciences, SESP
Laura Lackner, Associate Professor, Molecular Biosciences
Laura Beth Nielsen, Board of Lady Managers of the Columbian Exposition Chair, Professor of Sociology
Doris Garraway, Associate Professor, French and Italian
Laura Brueck, Professor, Asian Languages and Cultures and Comparative Literary Studies
Corey Byrnes, Associate Professor, Kaplan Institute for the Humanities, Asian Languages and Culture, Comparative Literary Studies
Jenna Christensen, Assistant Professor of Molecular Biosciences
Tara Fickle, Associate Professor, Asian American Studies
Robert L. Nelson, Professor, Sociology
Iñigo Manglano-Ovalle, Professor, Art Theory and Practice
Cynthia Robin, Professor, Anthropology
Shana Bernstein, Clinical Associate Professor, Legal Studies and American Studies
Emily Maguire, Associate Professor, Spanish and Portuguese
Benjamin Frommer, Associate Professor, Department of History
Jonathon Glassman, Professor Emeritus, History
Zach Nissen, Assistant Professor of Instruction, Anthropology

# Board of Trustees Chair Letter (2025-04-04)

LaShandra Sullivan, Associate Professor, Anthropology
Jeffrey A. Linder, MD, MPH, FACP, Michael A. Gertz Professor of Medicine and Chief, Division of General Internal Medicine
Sadie Wignall, Professor, Molecular Biosciences, and Director, Interdisciplinary Biological Sciences PhD program
Zachary Buchner, Assistant Professor of Instruction, Art Theory & Practice
Anonymous, Assistant Professor, Molecular Biosciences
Joe Feinglass, Research Professor of Medicine, Division of General Internal Medicine
Curt M. Horvath, Professor of Molecular Biosciences
Shelby Blythe, Assistant Professor, Molecular Biosciences
Diego Arispe-Bazán, Assistant Professor, Department of Anthropology
Steven Epstein, Professor of Sociology and John C. Shaffer Professor in the Humanities
Michael Kraus, Professor, Department of Psychology
Bennett Goldberg, Professor of Physics and Astronomy
Shalini Shankar, Professor, WCAS, Anthropology and Asian American Studies
Michelle M. Driscoll, Associate Professor, Physics & Astronomy
Robert Launay, Professor of Anthropology
AJ Christian, Professor, School of Communications
Kenzie A. Cameron, Professor of Medicine, Division of General Internal Medicine
Michael Anthony Turcios, Assistant Professor, Department of Radio/Television/Film; Center for Native American and Indigenous Research; Latina and Latino Studies Program
Santiago J. Molina, Assistant Professor, Sociology
Jen Munson, Assistant Professor, Learning Sciences, SESP
Beatriz O. Reyes, Assistant Professor of Instruction, Global Health Studies Program and NAIS minor
Megan Hyska, Assistant Professor, Philosophy
Hector Carrillo, Professor, Sociology and Gender and Sexuality Studies
Peter van Elswyk, Assistant Professor, Philosophy
Lisa Del Torto, Professor of Instruction, Cook Family Writing Program
Ray San Diego, Associate Professor of Instruction, Asian American Studies Program
S. B. West, Associate Professor of Instruction, Gender & Sexuality Studies, Spanish and Portuguese
Peter Locke, Professor of Instruction, Global Health Studies
Matthew O'Brien Associate Professor of Medicine and Preventive Medicine, Feinberg School of Medicine
Annalise Buth, Clinical Associate Professor, Pritzker School of Law
Cliff Zimmerman, Professor of Practice, Pritzker School of Law
Paul Gowder, Professor of Law, Pritzker School of Law
Alejandra Uslenghi, Associate Professor, Spanish & Portuguese - CLS
Melissa Simon, MD MPH, George H. Gardner MD Professor of Clinical Gynecology, Department of Obstetrics and Gynecology
Marc Sala, MD, Associate Professor, Pulmonary and Critical Care Medicine
Cybele Ghossein, Professor of Medicine - Feinberg school of Medicine
Cara J. Gottardi Pulmonary Medicine/Cell&Developmental Biology
Calvin Liang, School of Communication
Moya Bailey, Professor, Communication Studies
Galen Bodenhausen, Professor, Psychology
Aarati Didwania, Professor of Medicine, Feinberg School of Medicine
Alan R. Hauser, Professor, Feinberg School of Medicine
Becca Greenstein, STEM Librarian, University Libraries
Stacy Benjamin, Clinical Professor, Segal Design Institute
John Anderson, Senior Lecturer, Segal Design Institute
John Lake, Instructor, Segal Design Institute

# Board of Trustees Chair Letter (2025-04-04)

Stephanie Knezz, Associate Professor of Instruction, Chemistry
Lakshmi Padmanabhan, Assistant Professor, Department of Radio, TV, Film.
Emma Adam, Edwina S. Tarry Professor of Human Development and Social Policy, School of Education and Social Policy
Gregory Ward, Professor, Linguistics, Gender and Sexuality Studies, Philosophy (courtesy)
Frances R. Aparicio, Professor Emerita, Latina and Latino Studies Program
Cristina Lafont, Professor, Philosophy
Pascal Brixel, Assistant Professor, Philosophy
Claire Kirwin, Assistant Professor, Philosophy
Marcela A. Fuentes, Associate Professor, Performance Studies
Murali Prakriya, Professor of Pharmacology
Claudio Benzecry, Professor of Communication studies and Sociology
Aaron Shaw, Associate Professor, Communication Studies
Sepehr Vakil, Associate Professor, SESP
Kennetta Hammond Perry, Associate Professor, Black Studies and History
Allison Carroll, Assistant Professor, Psychiatry and Behavioral Sciences
Ava Thompson Greenwell, Professor, Medill
Karen M. Ridge, Professor of Medicine/Cell & Developmental Biology Feinberg School of Medicine
Deborah Douglas, Senior Lecturer and Director of the Medill Solutions Journalism Hub
Doug Kiel, Associate Professor, History
Samuel Weber, Avalon Professor of Humanities, German & CLS
Anonymous, Philosophy
Jonathan Moreira, Associate Professor, Feinberg School of Medicine
Jennifer Bierman, Professor of Medicine, Feinberg School of Medicine
Laura Hein, Professor of History
Alyson Carrel, Clinical Professor, Law
Jon Marshall, Associate Professor, Medill
Christian Petersen, Professor, Molecular Biosciences
Stephen Adam, Associate Professor, Cell and Developmental Biology
Mita Sanghavi Goel, MD, MPH, FACP, Professor of Medicine and Medical Education, Feinberg School of Medicine
Susanna A. McColley, Professor of Pediatrics in Pulmonary and Sleep Medicine
Priyanka Motaparthy, Clinical Professor of Law, Pritzker School of Law
Michael P. Angarone, Associate Professor, Feinberg School of Medicine
Andrea Lewis Hartung, Clinical Professor, Pritzker School of Law
Christine Percheski, Associate Professor of Sociology
Kyla Ebels-Duggan, Professor, Philosophy; Director, Brady Program in Ethics and Civic Life
Alfonso Mondragon, Professor, Molecular Biosciences
Amesika Nyaku, Assistant Professor, Feinberg School of Medicine
Brannon Ingram, Associate Professor, Religious Studies
Niall Mangan, Assistant Professor, ESAM, McCormick School of Engineering
Jennifer A. Jones, Associate Professor, Sociology
Jeremy Birnholtz, Professor, Communication Studies
Benjamin D. Singer, Lawrence Hicks Professor of Pulmonary Medicine, Department of Medicine, Feinberg School of Medicine
Karrie Snyder, Associate Professor of Instruction - Sociology
James Mahoney, Professor, Sociology and Political Science
Julia Behrman, Associate Professor of Sociology
Yingdan Lu, Assistant Professor, Communication Studies
Rebecca Ewert, Assistant Professor of Instruction, Sociology

# Board of Trustees Chair Letter (2025-04-04)

Ann Shola Orloff, Professor, Sociology and Political Science
Kate Weisshaar, Associate Professor, Sociology
Robert Weinstock, Clinical Associate Professor of Law, Pritzker Law School
Laura Pigozzi, Associate Professor of Instruction, Cook Family Writing Program
Duri Long, Assistant Professor, Communication Studies
Darren Gergle, Professor of Communication Studies and Computer Science (by courtesy)
Laurel Harbridge-Yong, Professor, Political Science
Eli Kean, Assistant Professor of Instruction, Gender & Sexuality Studies
Courtney Scherr, Associate Professor, Communication Studies
Lisandra Vila Ellis, Assistant Professor, Cell and Developmental Biology
Betty Tran, Associate Professor of Medicine, Feinberg School of Medicine
Jamie Carlstone, Associate Librarian, Northwestern Libraries
Linda A. Teplin, Owen L. Coon Professor of Psychiatry and Behavioral Sciences
Sara Thomas, Research Assistant Professor, Feinberg School of Medicine
Krishnan Warrior, Assistant Professor of Medicine, Feinberg School of Medicine
Mary Kwasny, Professor, Preventive Medicine
Judith Moskowitz, PhD, MPH, Vice Chair for Faculty Research, Feinberg School of Medicine
Sera Young, Professor of Anthropology
Thomas J Billard, Associate Professor, Communication Studies and Sociology (courtesy)
Christina Normore, Associate Professor, Art History
Marcelo Worsley, Karr Family Associate Professor, Learning Sciences and Computer Science
Almaz Mesghina, Assistant professor of instruction, Psychology
Brady Clark, Associate Professor of Instruction, Linguistics and WCAS Advising
Wendy Espeland, Professor, Sociology
Anonymous, Professor, Microbiology-Immunology
Mimi White, Professor, Radio/TV/Film
Milkie Vu, Assistant Professor, Preventive Medicine
Rajeev Kinra, Associate Professor, History, Comparative Literature, Middle East and North African Studies, Asian Languages and Cultures, and International Studies
Morgan Thompson, Assistant Professor, Philosophy
Shobha Mahadev, Clinical Professor of Law, Pritzker School of Law
Anonymous, Assistant Professor, Department of Medicine
Peter Slevin, Professor, Medill
Janice Radway, Walter Dill Scott Professor of Communication Emerita
Rosemary Bush, Associate Professor of Instruction, Earth, Environmental, and Planetary Sciences
Suzan van der Lee, Professor, Earth, Environmental, and Planetary Sciences
Lawrence Stuelpnagel, Clinical Associate Professor Medill/Political Science
Ashlee Humphreys, Professor, Medill School of Journalism, Media, and Integrated Marketing Communications
Brent E. Huffman, Professor, Medill School of Journalism
Caryn Ward, Professor, Medill
Michael A. Deas, Assistant Professor, Medill
Ajay K. Mehrotra, Professor of Law & History
Greg Wagner, Associate Professor, Mechanical Engineering
Gregory Phillips II, Associate Professor, Department of Medical Social Sciences
Jeremy Keys, Assistant Professor of Instruction, Mechanical Engineering
Manjot K Gill, Professor, Ophthalmology and Medical Education
Kathryn Macapagal, Associate Professor, Medical Social Sciences and Psychiatry
Malcolm A. MacIver, Professor, Mechanical Engineering, Biomedical Engineering
Reema Habiby, Associate Professor of Pediatrics
Lisa Wilsbacher, Associate Professor, Feinberg School of Medicine

# Board of Trustees Chair Letter (2025-04-04)

Douglas E Vaughan, Professor, Feinberg School of Medicine
Angira Patel MD MPH, Professor of Pediatrics and Medical Education, Feinberg School of Medicine
Carol Haywood, Assistant Professor, Medical Social Sciences
Shawn Smith, MD, Assistant Professor, Feinberg School of Medicine
Michael Beltran, Senior Lecturer, Mechanical Engineering
Magdalena Osburn, Associate Professor, Earth, Environmental, and Planetary Sciences
John W. Rudnicki, Professor, Mechanical Engineering and Civil and Environmental Engineering
Jeff Rice, Senior Lecturer Emeritus, Political Science
Angela Lee, Professor of Marketing, Kellogg School
Jesse Yeh, Assistant Professor of Instruction, Legal Studies
Doreen Weisenhaus, Associate Professor, Medill School of Journalism/Senior Lecturer, Pritzker School of Law,
Gianluca Cusatis, Professor, Department of Civil and Environmental Engineering, McCormick School of Engineering and Applied Science
Elizabeth Shogren, Associate Professor, Medill
Douglas Foster, Professor, Medill School
Josh Honn, Humanities and Prison Education Librarian, University Libraries
Eric Sirota, Clinical Associate Professor of Law, Pritzker School of Law
Igal Szleifer, Christina Enroth-Cugell Professor of Biomedical Engineering
Joshua Hauser, Professor, Department of Medicine
Thrasos Pappas, Professor, Electrical and Computer Engineering
Pablo L. Durango-Cohen, Associate Professor, Civil & Environmental Engineering
Wendy Murray, Professor, Departments of Biomedical Engineering and PM&R
Branden Ghena, Assistant Professor of Instructions, Computer Science
Zach Wood-Doughty, Assistant Professor of Instruction, Computer Science
Lynn Cohn, Clinical Professor, Pritzker School of Law
Nivedita Arora, Assistant Professor, Electrical and Computer Engineering & Computer Science, McCormick
Eleanor O'Rourke, Associate Professor of Computer Science and the Learning Sciences
Mahdi Hosseini, Associate Professor of Electrical and Computer Engineering
Hai Zhou, Professor of ECE and CS (courtesy), McCormick School of Engineering
Mark Sheldon, Distinguished Senior Lecturer Emeritus, Philosophy
Katrina T. Obleada, PhD, Assistant Professor in the Department of Psychiatry and Behavioral Health in Feinberg School of Medicine
David Gatchell, Clinical Professor of Engineering, Segal Design Institute, McCormick
Baron Reed, Professor, Philosophy
John Flaherty, Professor, Medicine (Infectious Diseases)
Matthew Grayson, Professor of Electrical & Computer Engineering, McCormick
James Bielo, Associate Professor of Religious Studies
Barry Wimpfheimer, Associate Professor, Religious Studies and Law
Ian Hurd, Professor, Political Science, and President-Elect of Faculty Senate
J Michelle Molina, Religious Studies and History
Robert Orsi, Religious Studies and History
Christine Helmer, Peter B. Ritzma Chair of Humanities, Professor, German and Religious Studies (courtesy)
Anna Parkinson, Associate Professor, Department of German
Erica Weitzman, Associate Professor, German and Comparative Literary Studies
Ian Horswill, Associate Professor of Computer Science
Jason Hartline, Professor, Computer Science
Kenneth D. Forbus, Walter P. Murphy Professor of Computer Science & Professor of Education (by courtesy)
Ivuoma Onyeador, Assistant Professor, Management & Organizations (Kellogg), Psychology (courtesy), Pritzker (courtesy)
Fabián E. Bustamante, Professor, Department of Computer Science

# Board of Trustees Chair Letter (2025-04-04)

Anonymous, Professor, Learning Sciences and Human Development and Social Policy
Cindy Wilson, Clinical Professor, Pritzker School of Law
William Reno, Professor of Political Science
Sally Nuamah, Associate Professor, SESP
Kyle Henry, Associate Professor, Radio Television Film
K O, Associate Professor, Director of Music Theater Area, School of Communications

Wendy Muchman, Professor of Practice, Northwestern University Pritzker School of Law
Ed Colgate, Professor, Mechanical Engineering
Tabitha Bonilla, Associate Professor, HDSP and Political Science
Sarah Cushman, Senior Lecturer, History
Lina Britto, Associate Professor, Department of History
Melissa Rosenzweig, Associate Professor of Instruction, Anthropology and EPC
Nicole Stephens Jeanne Brett Chair in Negotiations Professor of Management & Organizations
Annette D'Onofrio, Associate Professor, Linguistics
Quincy Thomas Stewart, Associate Professor, Sociology
Lauren Rivera, Professor of Management and Organizations, Kellogg School of Management
Anonymous, Department of Pediatrics, Division of Pulmonary and Sleep Medicine
Greg J. Beitel
J. Michelle Molina, Religious Studies
Susan Manning, Bergen Evans Professor in the Humanities
Kathleen Carmichael, Professor of Instruction, Cook Family Writing Program
Mark Hauser, Professor, Anthropology
Michael Certo, Assistant Professor of Pediatrics, Feinberg School of Medicine
Zayd Dohrn, Professor, Radio/TV/Film
William R. Leonard, Professor of Anthropology & Global Health Studies
Domietta Torlasco, Professor, French and Italian - CLS
Sarah M. Cushman, Senior Lecturer, History
Mark Sheldon, Distinguished Senior Lecturer Emeritus, Philosophy
Benjamin C. Owen, Associate Professor of Research, Chemistry

---

[1] In a *New York Times* interview on 10th March, Christopher Rufo said that the goal is to "put universities into recession, into declining budgets…in a way that puts them into an existential terror."
[2] During her interview on MSNBC (February 4), Ben-Ghiat referred to this administration's "obsessive haste to purge bureaucracy so quickly," as a *coup*. "I'm a historian of coups," she continued, "and I would use that word." Yale historian of fascism, Timothy Snyder, published his own article the next day headlined "Of Course It's a Coup – Miss the Obvious, Lose Your Republic."
[3] Scholars who study authoritarian leaders have explained that they flourish by invoking a mythic past that bears little resemblance to reality. Autocratic leaders will lie about their targets and repeat these lies until their followers and even opponents start speaking the same language and agreeing to falsehoods.

# EXHIBIT 73

# Curriculum Vitae

Bernhard Nickel · Harvard University

Spring 2025

## Address

207 Emerson Hall
Department of Philosophy
Harvard University
Cambridge, MA 02138

Email: bnickel@fas.harvard.edu
http://scholar.harvard.edu/bernhardnickel

## Academic Appointments

| | | |
|---|---|---|
| 2013 - | *Professor* | Department of Philosophy<br>Harvard University<br>Cambridge, MA |
| 2011 - 2013 | *Associate Professor* | Department of Philosophy<br>Harvard University<br>Cambridge, MA |
| 2006 - 2011 | *Assistant Professor* | Department of Philosophy<br>Harvard University<br>Cambridge, MA |
| 2005-2006 | *Instructor* | Department of Philosophy<br>Tufts University<br>Medford, MA |
| 2005-2006 | *Visiting Scholar* | Department of Linguistics and Philosophy<br>MIT<br>Cambridge, MA |

## Education

| | |
|---|---|
| 2000 - 2005 | MIT<br>Ph.D. in Philosophy |
| 1995-1999 | Cornell University<br>B.A. in Philosophy and College Scholar |

## Publications

Nickel, B. "Semantics for Characterizing Sentences". In J. Gajewski, V. Hacquard, B. Nickel, and S. Yalcin, eds., *Recent Work on Modality*, 123–147 (Cambridge, MA: MIT Press, 2006).

—. "Against Intentionalism". *Philosophical Studies*, 136(3), (2007), 279–304.

—. "Generics and the Ways of Normality". *Linguistics and Philosophy*, 31(6), (2008), 629–648.

—. "*Ceteris Paribus Laws*: Generics and Natural Kinds". *Philosophers' Imprint*, 10(6), (2010a), 1–25.

—. "Generic Comparisons". *Journal of Semantics*, 27(2), (2010b), 207–42.

—. "Generically Free Choice". *Linguistics and Philosophy*, 33(6), (2010c), 479–512.

—. "How General Do Theories of Explanation Need to Be?" *Noûs*, 44(6), (2010d), 305–328.

—. "Philosophy of Language". In *Oxford Bibliographies Online: Linguistics* (Oxford: Oxford UP, 2012a).

—. "Plurals". In G. Russell and D. G. Fara, eds., *The Routledge Handbook of Philosophy of Language*, 392–408 (New York: Routledge, 2012b).

—. "Saying and Doing: The Role of Semantics in the Use of Generic Sentences". *Canadian Journal of Linguistics*, 57(2), (2012c), 289–302.

—. "*Dutchmen are Good Sailors*: Generics and Gradability". In A. Mari, C. Beyssade, and F. D. Prete, eds., *Genericity*, 390–405 (Oxford, UK: Oxford UP, 2013a).

—. "Dynamics, Brandom-Style". *Philosophical Studies*, 162(2), (2013b), 333–354.

—. "The Role of Kinds in the Semantics of *Ceteris Paribus* Laws". *Erkenntnis*, 79, (2014), 1729–1744.

—. "Explanatory Strategies in Linguistic Practice". In C. Kendig, ed., *Natural Kinds and Classification in Scientific Practice* (Routledge, 2015).

—. *Between Logic and the World* (Oxford: Oxford UP, 2016).

—. "Generics". In B. Hale, A. Miller, and C. Wright, eds., *The Blackwell Companion to the Philosophy of Language, 2nd Edition* (Blackwell, 2017).

—. "Generics, Conservativity, and Kind-Subordination". *Philosophers' Imprint*, 18(13), (2018a), 1–18.

—. "Ways of Normality: Reply to Hoeltje". *Linguistics and Philosophy*, 41(3), (2018b), 289–293.

## Teaching

### Awards and Grants

- Named one of the favorite professors of the Harvard class of 2011, 2022.
- Harvard Initiative for Learning and Teaching Grant to transform an introductory course into a team-based-learning methodology ($8000), 2017.
- Star Family Award for Excellence in Advising, 2018.

### Dissertation Committees

(* denotes current)

[redacted]

[redacted]

### Senior Theses Supervised

[redacted]

[redacted]

## Service

### Department Chair

- AY 2022–25

### Chair of Graduate Admissions Committee

- AY 2010–11
- AY 2012–13
- AY 2013–14
- AY 2022–23
- AY 2024–25

### Director Of Undergraduate Studies

- AY 2014–15
- AY 2015–16
- AY 2017–18
- AY 2018–19
- AY 2019–20
- AY 2020–21

### Other Service

- Member of the executive board, PIKSI Boston: 2015–current
- Member of the Education Policy Committee's subcommittee on evaluating teaching, AY 2017–18.
- Chairperson of the Committee on Course Registration, Harvard University, 2018/19–2021/22
- Member of the Standing Committee on General Education, Harvard University, 2018/19

# EXHIBIT 74

# Syllabus for PHIL 148r
# Spring 2025

January 24, 2025

## 1 The Topic

The course centers on generic generalizations or generics for short. These are generalizations that describe kinds of things and that do not have any explicit indication about how widely they apply, such as.

(1) Ravens are black.

(2) Tigers have stripes.

(3) Lions have manes.

(4) Lions give birth to live young.

These contrast with explicitly quantified claims, such as the following.

(5) All students work hard.

(6) Some students work hard.

(7) 28% of students work hard.

(8) Few students work hard.

Below is a somewhat narrative schedule of meetings and readings. We'll meet once a week on Wednesdays from 3-5pm in Emerson 310 (the Tanner Room), except at the end of the term when we will have student presentations of their research topics. For these last two meetings, we might meet somewhat longer so that every student can give a presentation and get some feedback.

## 2 Schedule of Meetings and Readings

### 2.1 *Starting Out*

**Meeting 01: Wed, 01/29/2025**
**Overview**

The first meeting of the class will be an overview of the mechanics of the course and of some of the main issues we'll be looking at. If you have the time, read the Stanford Encyclopedia article on Generics. If you can do that and still have time, start reading the introduction to *Generic Book* from 1995.

The study of generics has a somewhat striking history. It began in the late 70s with Greg Carlson's dissertations on generics (Carlson, 1977), and then saw only sporadic work for the next almost 20 years.