**No. 26-6906**

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

**STANFORD PUBLISHING CORPORATION, *et al.*,**

*Plaintiffs-Appellees,*

**v.**

**MARCO RUBIO, *et al.*,**

*Defendants-Appellants.*

**Appeal from a Judgment Issued by the U.S. District Court for the Northern District of California (Civil Action No. 5:25-cv-06618-NW)**

# DEFENDANTS-APPELLANTS' EXCERPTS OF RECORD VOLUME 13 of 15

**JONATHAN D. GUYNN**
**Acting Assistant Attorney General**
**Civil Division**

**DREW C. ENSIGN**
**Deputy Assistant Attorney General**

**AUGUST E. FLENTJE**
**Special Counsel for Immigration Litigation**

**SAMUEL P. GO**
**Assistant Director**

**JAMES A. HURLEY**
**Trial Attorney**
**Office of Immigration Litigation**
**U.S. Department of Justice Civil Division**
**P.O. Box 878, Ben Franklin Station**
**Washington, D.C. 20044**
**T: (202) 305-1889**
**F: (202) 305-2509**
**james.hurley@usdoj.gov**

**JAIME DURR**
**DOMINIC WEISS**
**Trial Attorneys**

**Date: November 20, 2026**

**Attorneys for Respondent**

**(I)** is convicted of a crime involving moral turpitude committed within five years (or 10 years in the case of an alien provided lawful permanent resident status under section 1255(j) of this title) after the date of admission, and

**(II)** is convicted of a crime for which a sentence of one year or longer may be imposed,

is deportable.

**(ii) Multiple criminal convictions**

Any alien who at any time after admission is convicted of two or more crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct, regardless of whether confined therefor and regardless of whether the convictions were in a single trial, is deportable.

**(iii) Aggravated felony**

Any alien who is convicted of an aggravated felony at any time after admission is deportable.

**(iv) High speed flight**

Any alien who is convicted of a violation of section 758 of Title 18 (relating to high speed flight from an immigration checkpoint) is deportable.

**(v) Failure to register as a sex offender**

Any alien who is convicted under section 2250 of Title 18 is deportable.

**(vi) Waiver authorized**

Clauses (i), (ii), (iii), and (iv) shall not apply in the case of an alien with respect to a criminal conviction if the alien subsequent to the criminal conviction has been granted a full and unconditional pardon by the President of the United States or by the Governor of any of the several States.

**(B) Controlled substances**

**(i) Conviction**

Any alien who at any time after admission has been convicted of a violation of (or a conspiracy or attempt to violate) any law or regulation of a State, the United States, or a foreign country relating to a controlled substance (as defined in section 802 of Title 21), other than a single offense involving possession for one's own use of 30 grams or less of marijuana, is deportable.

**(ii) Drug abusers and addicts**


WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Any alien who is, or at any time after admission has been, a drug abuser or addict is deportable.

**(C) Certain firearm offenses**

Any alien who at any time after admission is convicted under any law of purchasing, selling, offering for sale, exchanging, using, owning, possessing, or carrying, or of attempting or conspiring to purchase, sell, offer for sale, exchange, use, own, possess, or carry, any weapon, part, or accessory which is a firearm or destructive device (as defined in section 921(a) of Title 18) in violation of any law is deportable.

**(D) Miscellaneous crimes**

Any alien who at any time has been convicted (the judgment on such conviction becoming final) of, or has been so convicted of a conspiracy or attempt to violate--

**(i)** any offense under chapter 37 (relating to espionage), chapter 105 (relating to sabotage), or chapter 115 (relating to treason and sedition) of Title 18 for which a term of imprisonment of five or more years may be imposed;

**(ii)** any offense under section 871 or 960 of Title 18;

**(iii)** a violation of any provision of the Military Selective Service Act (50 U.S.C. App. 451 et seq.) or the Trading With the Enemy Act (50 U.S.C. App. 1 et seq.); or

**(iv)** a violation of section 1185 or 1328 of this title,

is deportable.

(E) Crimes of domestic violence, stalking, or violation of protection order, crimes against children and [1]

**(i) Domestic violence, stalking, and child abuse**

Any alien who at any time after admission is convicted of a crime of domestic violence, a crime of stalking, or a crime of child abuse, child neglect, or child abandonment is deportable. For purposes of this clause, the term “crime of domestic violence” means any crime of violence (as defined in section 16 of Title 18) against a person committed by a current or former spouse of the person, by an individual with whom the person shares a child in common, by an individual who is cohabiting with or has cohabited with the person as a spouse, by an individual similarly situated to a spouse of the person under the domestic or family violence laws of the jurisdiction where the offense occurs, or by any other individual against a person who is protected from that individual's acts under the domestic or family violence laws of the United States or any State, Indian tribal government, or unit of local government.

**(ii) Violators of protection orders**


WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Any alien who at any time after admission is enjoined under a protection order issued by a court and whom the court determines has engaged in conduct that violates the portion of a protection order that involves protection against credible threats of violence, repeated harassment, or bodily injury to the person or persons for whom the protection order was issued is deportable. For purposes of this clause, the term "protection order" means any injunction issued for the purpose of preventing violent or threatening acts of domestic violence, including temporary or final orders issued by civil or criminal courts (other than support or child custody orders or provisions) whether obtained by filing an independent action or as a pendente lite order in another proceeding.

**(F) Trafficking**

Any alien described in section 1182(a)(2)(H) of this title is deportable.

**(3) Failure to register and falsification of documents**

**(A) Change of address**

An alien who has failed to comply with the provisions of section 1305 of this title is deportable, unless the alien establishes to the satisfaction of the Attorney General that such failure was reasonably excusable or was not willful.

**(B) Failure to register or falsification of documents**

Any alien who at any time has been convicted--

**(i)** under section 1306(c) of this title or under section 36(c) of the Alien Registration Act, 1940,

**(ii)** of a violation of, or an attempt or a conspiracy to violate, any provision of the Foreign Agents Registration Act of 1938 (22 U.S.C. 611 et seq.), or

**(iii)** of a violation of, or an attempt or a conspiracy to violate, section 1546 of Title 18 (relating to fraud and misuse of visas, permits, and other entry documents),

is deportable.

**(C) Document fraud**

**(i) In general**

An alien who is the subject of a final order for violation of section 1324c of this title is deportable.

**(ii) Waiver authorized**


WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

The Attorney General may waive clause (i) in the case of an alien lawfully admitted for permanent residence if no previous civil money penalty was imposed against the alien under section 1324c of this title and the offense was incurred solely to assist, aid, or support the alien's spouse or child (and no other individual). No court shall have jurisdiction to review a decision of the Attorney General to grant or deny a waiver under this clause.

**(D) Falsely claiming citizenship**

**(i) In general**

Any alien who falsely represents, or has falsely represented, himself to be a citizen of the United States for any purpose or benefit under this chapter (including section 1324a of this title) or any Federal or State law is deportable.

**(ii) Exception**

In the case of an alien making a representation described in clause (i), if each natural parent of the alien (or, in the case of an adopted alien, each adoptive parent of the alien) is or was a citizen (whether by birth or naturalization), the alien permanently resided in the United States prior to attaining the age of 16, and the alien reasonably believed at the time of making such representation that he or she was a citizen, the alien shall not be considered to be deportable under any provision of this subsection based on such representation.

**(4) Security and related grounds**

**(A) In general**

Any alien who has engaged, is engaged, or at any time after admission engages in--

**(i)** any activity to violate any law of the United States relating to espionage or sabotage or to violate or evade any law prohibiting the export from the United States of goods, technology, or sensitive information,

**(ii)** any other criminal activity which endangers public safety or national security, or

**(iii)** any activity a purpose of which is the opposition to, or the control or overthrow of, the Government of the United States by force, violence, or other unlawful means,

is deportable.

**(B) Terrorist activities**

Any alien who is described in subparagraph (B) or (F) of section 1182(a)(3) of this title is deportable.

**(C) Foreign policy**


WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case: 26-6906, 11/20/2026, DktEntry: 16.14, Page 6 of 300



**(i) In general**

An alien whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is deportable.

**(ii) Exceptions**

The exceptions described in clauses (ii) and (iii) of section 1182(a)(3)(C) of this title shall apply to deportability under clause (i) in the same manner as they apply to inadmissibility under section 1182(a)(3)(C)(i) of this title.

**(D) Participated in Nazi persecution, genocide, or the commission of any act of torture or extrajudicial killing**

Any alien described in clause (i), (ii), or (iii) of section 1182(a)(3)(E) of this title is deportable.

**(E) Participated in the commission of severe violations of religious freedom**

Any alien described in section 1182(a)(2)(G) of this title is deportable.

**(F) Recruitment or use of child soldiers**

Any alien who has engaged in the recruitment or use of child soldiers in violation of section 2442 of Title 18 is deportable.

**(5) Public charge**

Any alien who, within five years after the date of entry, has become a public charge from causes not affirmatively shown to have arisen since entry is deportable.

**(6) Unlawful voters**

**(A) In general**

Any alien who has voted in violation of any Federal, State, or local constitutional provision, statute, ordinance, or regulation is deportable.

**(B) Exception**

In the case of an alien who voted in a Federal, State, or local election (including an initiative, recall, or referendum) in violation of a lawful restriction of voting to citizens, if each natural parent of the alien (or, in the case of an adopted alien, each adoptive parent of the alien) is or was a citizen (whether by birth or naturalization), the alien permanently resided in the United States prior to attaining the age of 16, and the alien reasonably believed at the time of such violation that he or she was a citizen, the alien shall not be considered to be deportable under any provision of this subsection based on such violation.


WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**(7) Waiver for victims of domestic violence**

**(A) In general**

The Attorney General is not limited by the criminal court record and may waive the application of paragraph (2)(E)(i) (with respect to crimes of domestic violence and crimes of stalking) and (ii) in the case of an alien who has been battered or subjected to extreme cruelty and who is not and was not the primary perpetrator of violence in the relationship--

**(i)** [2] upon a determination that--

**(I)** the alien was acting is [3] self-defense;

**(II)** the alien was found to have violated a protection order intended to protect the alien; or

**(III)** the alien committed, was arrested for, was convicted of, or pled guilty to committing a crime--

**(aa)** that did not result in serious bodily injury; and

**(bb)** where there was a connection between the crime and the alien's having been battered or subjected to extreme cruelty.

**(B) Credible evidence considered**

In acting on applications under this paragraph, the Attorney General shall consider any credible evidence relevant to the application. The determination of what evidence is credible and the weight to be given that evidence shall be within the sole discretion of the Attorney General.

**(b) Deportation of certain nonimmigrants**

An alien, admitted as a nonimmigrant under the provisions of either section 1101(a)(15)(A)(i) or 1101(a)(15)(G)(i) of this title, and who fails to maintain a status under either of those provisions, shall not be required to depart from the United States without the approval of the Secretary of State, unless such alien is subject to deportation under paragraph (4) of subsection (a).

**(c) Waiver of grounds for deportation**

Paragraphs (1)(A), (1)(B), (1)(C), (1)(D), and (3)(A) of subsection (a) (other than so much of paragraph (1) as relates to a ground of inadmissibility described in paragraph (2) or (3) of section 1182(a) of this title) shall not apply to a special immigrant described in section 1101(a)(27)(J) of this title based upon circumstances that existed before the date the alien was provided such special immigrant status.


WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case: 26-6906, 11/20/2026, DktEntry: 16.14, Page 8 of 300



**(d) Administrative stay**

**(1)** If the Secretary of Homeland Security determines that an application for nonimmigrant status under subparagraph (T) or (U) of section 1101(a)(15) of this title filed for an alien in the United States sets forth a prima facie case for approval, the Secretary may grant the alien an administrative stay of a final order of removal under section 1231(c)(2) of this title until

**(A)** the application for nonimmigrant status under such subparagraph (T) or (U) is approved; or

**(B)** there is a final administrative denial of the application for such nonimmigrant status after the exhaustion of administrative appeals.

**(2)** The denial of a request for an administrative stay of removal under this subsection shall not preclude the alien from applying for a stay of removal, deferred action, or a continuance or abeyance of removal proceedings under any other provision of the immigration laws of the United States.

**(3)** During any period in which the administrative stay of removal is in effect, the alien shall not be removed.

**(4)** Nothing in this subsection may be construed to limit the authority of the Secretary of Homeland Security or the Attorney General to grant a stay of removal or deportation in any case not described in this subsection.

**CREDIT(S)**

(June 27, 1952, c. 477, Title II, c. 4, § 237, formerly c. 5, § 241, 66 Stat. 204; July 18, 1956, c. 629, Title III, § 301(b), (c), 70 Stat. 575; Pub.L. 86-648, § 9, July 14, 1960, 74 Stat. 505; Pub.L. 87-301, § 16, Sept. 26, 1961, 75 Stat. 655; Pub.L. 89-236, § 11(e), Oct. 3, 1965, 79 Stat. 918; Pub.L. 94-571, § 7(e), Oct. 20, 1976, 90 Stat. 2706; Pub.L. 95-549, Title I, § 103, Oct. 30, 1978, 92 Stat. 2065; Pub.L. 97-116, § 8, Dec. 29, 1981, 95 Stat. 1616; Pub.L. 99-570, Title I, § 1751(b), Oct. 27, 1986, 100 Stat. 3207-47; Pub.L. 99-603, Title III, § 303(b), Nov. 6, 1986, 100 Stat. 3431; Pub.L. 99-639, § 2(b), Nov. 10, 1986, 100 Stat. 3541; Pub.L. 99-653, § 7(c), Nov. 14, 1986, 100 Stat. 3657; Pub.L. 100-525, §§ 2(n)(2), 9(m), Oct. 24, 1988, 102 Stat. 2613, 2620; Pub.L. 100-690, Title VII, §§ 7344(a), 7348(a), Nov. 18, 1988, 102 Stat. 4470, 4473; Pub.L. 101-649, Title I, § 153(b), Title V, §§ 505(a), 508(a), 544(b), Title VI, § 602(a), (b), Nov. 29, 1990, 104 Stat. 5006, 5050, 5051, 5061, 5077, 5081; Pub.L. 102-232, Title III, §§ 302(d)(3), 307(h), (k), Dec. 12, 1991, 105 Stat. 1745, 1755, 1756; Pub.L. 103-322, Title XIII, § 130003(d), Sept. 13, 1994, 108 Stat. 2026; Pub.L. 103-416, Title II, §§ 203(b), 219(g), Oct. 25, 1994, 108 Stat. 4311, 4317; Pub.L. 104-132, Title IV, §§ 414(a), 435(a), Apr. 24, 1996, 110 Stat. 1270, 1274; renumbered c. 4, § 237, and amended Pub.L. 104-208, Div. C, Title I, § 108(c), Title III, §§ 301(d), 305(a)(2), 308(d)(2), (3)(A), (e)(1)(E), (2)(C), (f)(1)(L) to (N), (5), 344(b), 345(b), 347(b), 350(a), 351(b), Title VI, § 671(a)(4)(B), (d)(1)(C), Sept. 30, 1996, 110 Stat. 3009-558, 3009-579, 3009-598, 3009-617, 3009-619 to 3009-622, 3009-637 to 3009-640, 3009-721, 3009-723; Pub.L. 106-386, Div. B, Title V, § 1505(b)(1), (c)(2), Oct. 28, 2000, 114 Stat. 1525, 1526; Pub.L. 106-395, Title II, § 201(c)(1), (2), Oct. 30, 2000, 114 Stat. 1634, 1635; Pub.L. 107-56, Title IV, § 411(b)(1), Oct. 26, 2001, 115 Stat. 348; Pub.L. 108-458, Title V, §§ 5304(b), 5402, 5501(b), 5502(b), Dec. 17, 2004, 118 Stat. 3736, 3737, 3740, 3741; Pub.L. 109-13, Div. B, Title I, § 105(a)(1), (b), May 11, 2005, 119 Stat. 309, 310; Pub.L. 109-248, Title IV, § 401, July 27, 2006, 120 Stat. 622; Pub.L. 109-271, § 6(c), Aug. 12, 2006, 120 Stat. 763; Pub.L. 110-340, § 2(c), Oct. 3, 2008, 122 Stat. 3736; Pub.L. 110-457, Title II, §§ 204, 222(f)(2), Dec. 23, 2008, 122 Stat. 5060, 5071.)


WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Notes of Decisions (2648)

## Footnotes

1 So in original.

2 So in original. No cl. (ii) has been enacted

3 So in original. Probably should be "in".

8 U.S.C.A. § 1227, 8 USCA § 1227
Current through P.L. 119-18. Some statute sections may be more current, see credits for details.

End of Document © 2025 Thomson Reuters. No claim to original U.S. Government Works.


WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 223

SINCE 1891
THE BROWN DAILY HERALD

Print Editions
Thursday June 12th, 2025

go.grow.grad.tcnj.edu
Earn Your Master's at TCNJ
OPEN ›

OPINIONS

# When Brown students speak, the University should listen: A faculty letter in support of student activism




Media by Colleen Cronin | The Brown Daily Herald

By Brown University faculty members
April 2, 2019 | 1:25am EDT

We, the undersigned Brown faculty, wish to express our concern about the content and tenor of President Christina Paxson P'19's letter to the Brown community March 22 in response to the overwhelming support for a student referendum that called on the University to "divest all stocks, funds, endowment and other monetary instruments from companies complicit in human rights abuses in Palestine and establish a means of implementing financial transparency and student oversight of the University's investments." Following weeks of campus debate which produced a higher-than-average turnout in a much-watched election, 69 percent —1,939 out of 2,810 voting students — voted in favor of the referendum.

Paxson's response, issued to the entire Brown community the day after the referendum results were announced, diminishes the divestment vote as "polarizing" and something that would "detract from the inclusive, intellectually-vibrant community we aspire to be." Belying her own claim that the University does not take sides on contested issues, Paxson also took this opportunity to reiterate her opposition to the global Boycott, Divest, Sanctions

movement, even though the movement itself was not explicitly on the ballot. These strong statements can have the political effect of stifling student activism. They can also be read as an admonishment of students who organized the referendum and, implicitly, of all those who voted in favor of divestment.

We write in defense of student activism and against making Palestine an exception to the right of free speech on campus. Regardless of one's position on divestment, the roughly two thousand undergraduate students at Brown who, exercising their democratic right, voted in favor of the referendum deserve better than the unfounded accusation that they are politically polarizing an otherwise neutral campus. All students deserve respect, protection and a fair hearing when they exercise their legitimate right to pose questions and vote. That must include those who voted against the President's views.

We are deeply concerned by Paxson's statement that "instead" of calls for divestment, the Brown community should "engage in productive discourse on this issue through our teaching, research and contributions to diplomacy." This statement unacceptably narrows the range of legitimate activism by students and other members of the Brown community. By using the phrase "on this issue" it also sets up a double standard, in that it seems to apply only to activism that is critical of Israeli government policies. The 1968 Black Student Walkout, the 1975 student vote to strike in favor of budget transparency, the 1987 Students Against Apartheid demands for divestment from South Africa and more recently, the 2015 student organizing against university inaction on racial and class representation on campus were also entirely peaceful and democratic forms of activism that sought to challenge indifference or political gridlock that existed at the time. Ultimately, they made Brown a better place.

It is precisely such examples of student activism for social justice that have inspired supporters of Brown Divest. The numerous public events they organized during the six months prior to the March 21 referendum contributed positively to informed and lively debate on campus and reaffirmed that all groups, without exception, are entitled to basic human rights. Through the referendum vote, many students have made clear their view that the Israeli government's policies towards Palestinians are diametrically opposed to Brown University's self-proclaimed values, enshrined in its strategic plan, Building on Distinction, which calls for "Creating Peaceful, Just, and Prosperous Societies." And they are not alone. Similar divestment referendums have passed in student government bodies at other campuses such as Stanford University, New York University, Barnard College, the University of Minnesota and George Washington University, among others.

It is not surprising that many Brown undergraduates resorted to a referendum in order to make their voices heard. As she acknowledges in her March 22 letter to the community, Paxson in 2012 rejected the recommendation of Brown's Advisory Committee on Corporate Responsibility in Investment Policies to initiate dialogue about possible divestment from companies that profit from the Israeli occupation of Palestinian Territories. Indeed, Brown Divest students have worked diligently through University processes and have sought dialogue rather than confrontation. In this, they have shown extraordinary courage in the face of not only Paxson's record of rejection on this issue, but also aggressive national campaigns of intimidation and censorship aimed at college students and professors who dare to speak out against Israeli government policies, as well as attempts by President Donald Trump's administration to conflate legitimate criticisms of Israeli policies with anti-Semitism.

It is vital to recognize that students active in Brown Divest have consistently called for upholding the human rights of all people. They have repeatedly condemned anti-Semitism along with any other form of racism and bigotry. Many attended vigils in honor of Jewish and Muslim victims of recent terrorist attacks by white supremacists in Pittsburgh and New Zealand. Several, also, responded constructively to the arguments of students who opposed the referendum — whose voices should and are being heard — in a succession of spirited op-eds in this newspaper. These exchanges highlighted the diversity of opinions among Jewish students on divestment, many of whom supported the

referendum. While these students have engaged in productive discourse, Brown's senior administration has yet to condemn egregious blacklisting websites, such as Canary Mission, that have threateningly listed Brown students and professors who criticize the Israeli government's actions and speak up for Palestinian human rights.

At a time when there is as dire a need as ever for moral clarity, transparency and democratic participation in our country, we call on our University administration to take seriously our students' concern about injustices in which our institution may be complicit. Is Brown University a beneficiary of investments in companies that profit from the Israeli occupation of Palestine? That is the still unanswered question at the heart of last week's campus vote. It is not a question we or anyone else should admonish our students for asking. Rather, let us support and honor all our students — and with it Brown's renowned tradition of rigorous, conscientious and engaged scholarship — by organizing campus-wide discussions and debates on that question and others like it. If principled inquiry is our method and the pursuit of knowledge for a better world is our goal, what do we have to fear?

Respectfully,

*Aliyyah I. Abdur-Rahman, Departments of American Studies and English*

*Faiz Ahmed, Department of History*

*Umer Akbar, Department of Neurology*

*Nadje Al-Ali, Department of Anthropology and Watson Institute for International and Public Affairs*

*Leticia Alvarado, Department of American Studies*

*Iradj Anvar, Center for Language Studies*

*Ariella Azoulay, Departments of Modern Culture and Media and Comparative Literature*

*Timothy Bewes, Department of English*

*Leslie Bostrom, Department of Visual Art*

*Lundy Braun, Departments of Africana Studies and Pathology and Laboratory Medicine*

*Palmira Brummett, Department of History*

*Mari Jo Buhle, Departments of History and American Studies*

*Paul Buhle, Department of American Studies*

*Caroline Castiglione, Departments of Italian Studies and History*

*John Cayley, Department of Literary Arts*

*Tamara Chin, Departments of Comparative Literature and East Asian Studies*

*Nitsan Chorev, Department of Sociology and Watson Institute for International and Public Affairs*

*Mirena Christoff, Center for Language Studies*

*Mark Cladis, Department of Religious Studies*

*Joan Copjec, Department of Modern Culture and Media*

*Denise Davis, Pembroke Center for Teaching and Research on Women*

*Kelly Dobson, Department of Modern Culture and Media*

*Fulvio Domini, Department of Cognitive, Linguistic and Psychological Sciences*

*Beshara Doumani, Department of History*

*Emily Drumsta, Department of Comparative Literature*

*Paja Faudree, Department of Anthropology*

*Masako Fidler, Department of Slavic Studies*

*James Fitzgerald, Department of Classics*

*Scott Frickel, Department of Sociology and Institute at Brown for Environment and Society*

*Lina Fruzetti, Department of Anthropology*

*Leela Gandhi, Department of English and Cogut Institute for the Humanities*

*Alex Gourevitch, Department of Political Science*

*Matthew Guterl, Departments of Africana Studies and American Studies*

*Matthew Gutmann, Department of Anthropology*

*Yannis Hamilakis, Department of Classics and Joukowsky Institute for Archaeology and the Ancient World*

*Françoise Hamlin, Departments of History and Africana Studies*

*Alla Hassan, Center for Language Studies*

*Juliet Hooker, Department of Political Science*

*Lung-Hua Hu, Department of East Asian Studies*

*Evelyn Hu-Dehart, Departments of History and American Studies*

*Jose Itzigsohn, Department of Sociology*

*Lynne Joyrich, Department of Modern Culture and Media*

*Tamar Katz, Department of English*

*William Keach, Department of English*

*Adrienne Keene, Department of American Studies and Ethnic Studies*

*Michael Kennedy, Department of Sociology and Watson Institute for International and Public Affairs*

*Nancy Khalek, Department of Religious Studies*

*Daniel Kim, Departments of English and American Studies*

*Brian Lander, Department of History and Institute at Brown for Environment and Society*

*Robert Lee, Department of American Studies*

*Mary Rebecca Leuchak, Center for Language Studies*

*Evelyn Lincoln, Departments of History of Art and Architecture and Italian Studies*

*Catherine Lutz, Department of Anthropology and Watson Institute for International and Public Affairs*

*Amanda Lynch, Department of Earth, Environmental and Planetary Sciences*

*Sreemati Mitter, Department of History and Watson Institute for International and Public Affairs*

*Elias Muhanna, Department of Comparative Literature*

*Monica Muñoz Martinez, Department of American Studies and Ethnic Studies*

*Rebecca Nedostup, Department of History*

*Laura Odello, Department of French Studies*

*Adi Ophir, Cogut Institute for the Humanities and Middle East Studies*

*Emily Owens, Department of History*

*Samuel Perry, Department of East Asian Studies*

*Kevin Quashie, Department of English*

*Thangam Ravindranathan, Department of French Studies*

*Marc Redfield, Departments of English and Comparative Literature*

*Syed Rizvi, Department of Neurology*

*Daniel A. Rodriguez, Department of History*

*Ellen Rooney, Department of Modern Culture and Media*

*Christopher Rose, School of Engineering*

*Tricia Rose, Department of Africana Studies*

*Philip Rosen, Department of Modern Culture and Media*

*Nidia Schuhmacher, Department of Hispanic Studies*

*Robert Self, Department of History*

*Thomas Serre, Department of Cognitive Linguistic and Psychological Sciences*

*Naoko Shibusawa, Departments of History and American Studies*

*Elena Shih, Department of American Studies and Ethnic Studies*

*Daniel Jordan Smith, Department of Anthropology*

*Kerry Smith, Department of History*

*Victoria Smith, Department of Hispanic Studies*

*Susan Smulyan, Department of American Studies*

*Patricia Sobral, Department of Portuguese and Brazilian Studies*

*Silvia Sobral, Department of Hispanic Studies*

*Suzanne Stewart-Steinberg, Departments of Italian Studies and Comparative Literature*

*Lulei Su, Department of East Asian Studies*

*Mark Suchman, Department of Sociology*

*Peter Szendy, Department of Comparative Literature and Cogut Institute for the Humanities*

*Nina Tannenwald, Department of Political Science*

*Peter van Dommelen, Department of Archaeology and Joukowsky Institute for Archaeology and the Ancient World*

*Lingzhen Wang, Department of East Asian Studies*

*William H. Warren, Department of Cognitive, Linguistic, and Psychological Sciences*

*Elizabeth Weed, Pembroke Center for Teaching and Research on Women*

*Deborah Weinstein, Department of American Studies*

*Andre C. Willis, Department of Religious Studies*

*David Wills, Departments of French Studies and Comparative Literature*

*Patricia Ybarra, Department of Theatre Arts and Performance Studies*

*Vazira Zamindar, Department of History*

*Asli Zengin, Department of Anthropology*

An updated list of Brown Faculty signatories can be found here.

***Correction: Due to a miscommunication in the editorial process, an earlier version of this op-ed included the following question: "Is Brown University a beneficiary of investments in companies that profit from companies complicit in human rights abuses in Palestine?" This misstates the authors' original argument and has been corrected to read: "Is Brown University a beneficiary of investments in companies that profit from the Israeli occupation of Palestine?" The Herald regrets the error.***


Grand Hotel, Mackinac Island
Get Lost in the Charms of Mackinac Island. Scenic, Historic and Romantic.
Grand Hotel
Book Now



BDH

The Brown Daily Herald, Inc. is a financially independent, nonprofit media organization with more than 250 students working across our journalism, business and web divisions.

13-ER 3390

AAUP 00695

Your Email Address

Subscribe

Powered by SNWORKS Solutions by The State News
All Content © 2025 The Brown Daily Herald, Inc.

# EXHIBIT 224

SINCE 1891
THE BROWN DAILY HERALD

Print Editions
Thursday June 12th, 2025

Lawn Mower Recycle LLC
In All 50 States
OPEN

OPINIONS

# Brown faculty call for a ceasefire in Israel-Palestine and the protection of academic freedom and student activism




By Brown University Faculty Members
November 7, 2023 | 11:28pm EST

*Editors' note: The letter below was first internally circulated to faculty Nov. 2, 2023. This letter has been sent to President Christina Paxson P'19 P'MD'20 with additional signatories who opted not to make their names public.*

We, the undersigned faculty at Brown University, are deeply aggrieved by the catastrophic events unfolding in Israel and Palestine, especially but not limited to Gaza. We unequivocally condemn any attacks on civilians, including the horrific attacks by Hamas on Oct. 7 which killed up to 1,400 Israelis, including children, and we call for the immediate release of all hostages. So, too, do we condemn the Israeli military's appalling siege and bombardment of Gaza that, largely with U.S.-made weapons, has now killed over 8,500 Palestinians, 67% of whom are women and children, and displaced over 1 million Palestinians since Oct. 7.

At a time of such staggering civilian casualties and destruction in Gaza, which is coinciding with unprecedented national and media-driven campaigns to silence or stigmatize voices in support of Palestinian human rights, we call on our colleagues and the administration to draw strength from the core values of Brown and use their power to:

13-ER 3393
AAUP-00697

1. Join the international calls for an immediate ceasefire and an end to Israel's siege of Gaza so that life-saving food, water and medicine can reach Palestinian civilians.

2. Affirm and advocate for the protection and ability of our students, staff and faculty to speak up for Palestinian human rights without censorship or intimidation.

In this charged national environment, we understand that universities are under pressure to silence criticism of Israeli government actions and activism for Palestinian human rights by equating such speech and activism with antisemitism. Yet, it is precisely at such times of crisis, fear and misinformation that we as scholars, faculty and university leaders must demand moral consistency, including the protection of all civilian lives. It is precisely now that we must affirm the principles of academic freedom and free speech for all on our campus, alongside the rejection of hate speech including antisemitism, Islamophobia and anti-Arab racism. And it is precisely now that we must allow for open, informed and evidence-based discussions so that the most rigorous, scrupulous and compelling arguments on contested issues can come forward.

At this pivotal historical juncture, we respectfully call on our University president to: (1) Urge Rhode Island's senators to support legislation demanding a ceasefire, an end to Israel's siege and a political resolution to this conflict based on justice and equality; (2) issue a public-facing letter decrying the recent threats to freedom of expression and inquiry on American campuses, which have sought to intimidate those addressing the context and root causes of ongoing violence in Israel-Palestine and (3) issue a letter to our University community affirming that — as with any other subject — the University administration will not tolerate efforts to intimidate, censor or punish Brown students, staff and faculty for exercising their constitutional right to free speech, activism and scholarship when it comes to Israel-Palestine. There must be no "Palestine Exception" to free speech at Brown.

As for a ceasefire, some may say it is not the place of university leaders to interfere in thorny questions of foreign policy. What is happening in Gaza is far beyond that. On Oct. 29, Save the Children reported 3,195 Palestinian children have been killed in Gaza by Israel's air strikes and auxiliary operations over three weeks — surpassing the annual number of children killed across the world's conflict zones (over 20 countries) since 2019. Given the critical role of U.S. munitions and political support for Israel's ongoing military operations in Gaza, we firmly believe this is a moral concern that implicates all Americans regardless of ethnicity, religion or political opinion. It is the same moral concern that — long before Oct. 7, 2023 — inspired the acclaimed legal scholar and civil rights activist Michelle Alexander (author of "The New Jim Crow," Brown First Reading for 2015), to declare that America's civic leaders must no longer remain silent on "one of the great moral challenges of our time: the crisis in Israel-Palestine."

We encourage the ongoing efforts of our University administration to cultivate a campus community in which all students, staff and faculty — especially those with loved ones directly affected by the conflict — are supported and heard. However, we cannot and should not support fanning the flames of war by inflicting collective punishment on innocent Palestinian civilians with American weapons and technology. And no one should be allowed to restrict the right of our students, staff or faculty for raising these points loudly and clearly.

Sincerely,

*Signing Members of the Brown University faculty in Alphabetical Order as of Nov. 7, 2023:*

aliyyah i. abdur-rahman, Departments of American Studies and English

Faiz Ahmed, Department of History

Nadje Al-Ali, Department of Anthropology, Center for Middle East Studies and Watson Institute for International and Public Affairs

Leticia Alvarado, Department of American Studies

Elsa Amanatidou, Department of Classics

Amanda Anderson, Cogut Institute for the Humanities and Department of English

Peter Andreas, Department of Political Science and Watson Institute for International and Public Affairs

Ariella Aïsha Azoulay, Departments of Modern Culture and Media and Comparative Literature

Saleem Ashkar, Department of Music

Joshua Babcock, Department of Anthropology

Muhammad Baig, Warren Alpert Medical School

Tiraana Bains, Department of History

Richard Baldoz, Department of American Studies

Omer Bartov, Department of History

Laura Bass, Department of Hispanic Studies

Reda Bensmaia, Emeritus, Departments of French and Francophone Studies and Comparative Literature

Susan Bernstein, Departments of Comparative Literature and German Studies

Timothy Bewes, Department of English

John Bodel, Departments of Classics and History

Anthony Bogues, Simmons Center for the Study of Slavery and Justice, Departments of Africana Studies and the History of Art and Architecture

Sheila Bonde, Department of the History of Art and Architecture, Joukowsky Institute for Archaeology and the Ancient World

Leslie Bostrom, Department of Visual Art

Cynthia Brokaw, Departments of History and East Asian Studies

Mari Jo Buhle, Emerita, Departments of American Studies and History

Stuart Burrows, Department of English

Stephen Bush, Department of Religious Studies

Vangelis Calotychos, Department of Classics

Prudence Carter, Department of Sociology

Holly Case, Department of History

John Cayley, Department of Literary Arts

Melody Chan, Department of Mathematics

Silvia Chiang, Department of Pediatrics, Warren Alpert Medical School

Tamara Chin, Department of Comparative Literature

Mahasan Chaney, Department of Education

Kenneth Chay, Department of Economics

Mark Cladis, Department of Religious Studies

Michelle Clayton, Departments of Hispanic Studies and Comparative Literature

Alexandra Collins, Department of Epidemiology, School of Public Health

Ruth Colwill, Department of Cognitive, Linguistic and Psychological Sciences

Hal Cook, Department of History

Joan Copjec, Department of Modern Culture and Media

Denise Davis, Gender and Sexuality Studies Program, Pembroke Center

Bathsheba Demuth, Department of History and Institute at Brown for Environment and Society

Lisa Di Carlo, Department of Sociology

Fulvio Domini, Department of Cognitive, Linguistic and Psychological Sciences

Beshara Doumani, Department of History

Carolina Ebeid, Department of Literary Arts

Miled Faiza, Center for Language Studies

Paja Faudree, Department of Anthropology and Program in Linguistics

Linford Fisher, Department of History

James L. Fitzgerald, Emeritus, Department of Classics

Lina M. Fruzzetti, Department of Anthropology

Leela Gandhi, Cogut Institute for Humanities and Department of English

Eva Gómez García, Department of Hispanic Studies

Macarena Gómez-Barris, Department of Modern Culture and Media and Brown Arts Institute

Matthew Guterl, Departments of Africana Studies and American Studies

Matthew Gutmann, Emeritus, Department of Anthropology

Yannis Hamilakis, Joukowsky Institute for Archaeology and the Ancient World and Department of Classics

Françoise Hamlin, Departments of Africana Studies and History

Jae Han, Department of Religious Studies

Susan Harvey, Department of Religious Studies

Alla Hassan, Center for Language Studies

Patrick Heller, Department of Sociology and Watson Institute for International and Public Affairs

Alani Hicks-Bartlett, Departments of Comparative Literature, French and Francophone Studies and Hispanic Studies

Bonnie Honig, Departments of Modern Culture and Media and Political Science

Evelyn Hu-DeHart, Departments of History and American Studies/Ethnic Studies

Laird Hunt, Department of Literary Arts

Jose Itzigsohn, Department of Sociology

Nancy J. Jacobs, Department of History

Julia Jarcho, Department of Theatre Arts and Performance Studies

Lynne Joyrich, Department of Modern Culture and Media

Ieva Jusionyte, Department of Anthropology and Watson Institute for International and Public Affairs

Coppélia Kahn, Emerita, Department of English

William Keach, Emeritus, Department of English

Adrienne Keene, Department of American Studies

Nancy Khalek, Departments of Religious Studies and History

Michael D. Kennedy, Department of Sociology and Watson Institute for International and Public Affairs

Daniel Kim, Departments of English and American Studies

Stephen Kinzer, Watson Institute for International and Public Affairs

Brian Lander, Department of History and Institute at Brown for Environment and Society

Robert Lee, Emeritus, Department of American Studies

Shelley Lee, Department of American Studies

Wendy Allison Lee, Pembroke Center and Gender and Sexuality Studies Program

Jeremy Lehnen, Center for Language Studies and Portuguese and Brazilian Studies

Leila Lehnen, Portuguese and Brazilian Studies

Myles Lennon, Department of Anthropology and Institute at Brown for Environment and Society

Ainsley LeSure, Departments of Africana Studies and Political Science

Patsy Lewis, Department of Africana Studies

Glenn C. Loury, Department of Economics, Watson Institute for International and Public Affairs

Enongo Lumumba-Kasongo, Department of Music and Brown Arts Institute

Catherine Lutz, Emerita, Department of Anthropology

Brandon Marshall, Department of Epidemiology, School of Public Health

Felipe Martinez-Pinzon, Department of Hispanic Studies

Kevin McLaughlin, Departments of English, Comparative Literature and German Studies, and John Nicholas Brown Center for Advanced Study

Brian Meeks, Department of Africana Studies

Kristina Mendicino, Department of German Studies

Kiri Miller, Department of American Studies

Ourida Mostefai, Departments of Comparative Literature and French and Francophone Studies

Elias Muhanna, Departments of Comparative Literature and History

Rebecca Nedostup, Departments of History and East Asian Studies

Tara Nummedal, Departments of History and Italian Studies

Mark Ocegueda, Department of History

Mohamed Omer, Department of Pathology and Laboratory Medicine, Warren Alpert Medical School

Adi M. Ophir, Cogut Institute for the Humanities and Center for Middle East Studies

Emily Owens, Department of History

Esra Ozdemir, Center for Language Studies

Robert Preucel, Department of Anthropology

Jason Protass, Department of Religious Studies

Michelle Quay, Center for Language Studies and Center for Middle East Studies

Abrar Qureshi, Departments of Dermatology and Epidemiology, Warren Alpert Medical School and School of Public Health

Momotazur Rahman, Department of Health Services Policy and Practice, School of Public Health

Dixa Ramirez-D′Oleo, Department of English

Stéphanie Ravillon, Department of French and Francophone Studies

Thangam Ravindranathan, Department of French and Francophone Studies

Sherief Reda, School of Engineering and Department of Computer Science

Marc Redfield, Departments of Comparative Literature, English and German Studies

Ravit Reichman, Department of English

Gerhard Richter, Departments of Comparative Literature and German Studies

Lukas Rieppel, Department of History and Science, Technology and Society Program

Katie Rieser, Department of Education

Massimo Riva, Department of Italian Studies

Timmons Roberts, Institute at Brown for Environment and Society and Department of Sociology

Gabriel Rocha, Departments of History and Portuguese and Brazilian Studies

Seth Rockman, Department of History

Daniel A. Rodríguez, Department of History

Noliwe Rooks, Department of Africana Studies

Ellen Rooney, Departments of English and Modern Culture and Media

Tricia Rose, Department of Africana Studies, Center for the Study of Race and Ethnicity in America

Poulami Roychowdhury, Department of Sociology and Watson Institute for International and Public Affairs

Stephanie Savell, Watson Institute for International and Public Affairs

Janine Anderson Sawada, Departments of Religious Studies and East Asian Studies

Rebecca Schneider, Department of Modern Culture and Media

Nidia A. Schuhmacher, Department of Hispanic Studies

Lewis Seifert, Department of French and Francophone Studies

Robert Self, Department of History

Roberto Serrano, Department of Economics

Thomas Serre, Department of Cognitive Linguistics and Psychological Sciences

Ahmed Shahab, Warren Alpert Medical School

Matthew Shenoda, Department of Literary Arts and Brown Arts Institute

Naoko Shibusawa, Departments of History and American Studies

Elena Shih, Department of American Studies

Eleni Sikelianos, Department of Literary Arts

Prerna Singh, Department of Political Science and Watson Institute for International and Public Affairs

Ada Smailbegović, Department of English

Kerry Smith, Department of History

Susan Smulyan, Department of American Studies

Patricia Sobral, Department of Portuguese and Brazilian Studies

Tracy Steffes, Departments of Education and History

Michael Steinberg, Departments of History and Music

Suzanne Stewart-Steinberg, Departments of Comparative Literature and Italian Studies

Kera Street, Department of Religious Studies

Cole Swensen, Department of Literary Arts

Peter Szendy, Cogut Institute for the Humanities and Department of Comparative Literature

Nina Tannenwald, Department of Political Science

Sarah Thomas, Department of Hispanic Studies

Alison Tovar, Department of Behavioral and Social Sciences, School of Public Health

Daniel Vaca, Department of Religious Studies

Peter van Dommelen, Joukowsky Institute for Archaeology and the Ancient World and Department of Anthropology

Rajiv Vohra, Department of Economics

Lingzhen Wang, Department of East Asian Studies

William Warren, Department of Cognitive, Linguistic and Psychological Sciences

Elizabeth Weed, Pembroke Center for Teaching and Research on Women

Alexander Weheliye, Department of Modern Culture and Media

Annie Wiart, Department of French and Francophone Studies

Andre C. Willis, Department of Religious Studies

David Wills, Department of French and Francophone Studies

Patricia Ybarra, Department of Theatre Arts and Performance Studies

Vazira Zamindar, Department of History

*Affiliations are stated for identification purposes only. An updated list of Brown Faculty signatories can be found here.*

---

JustAnswer
Chat w/ an expert Online Now
OPEN

About us
Contact us
Advertising
Donate
Terms of Service
Privacy Policy
Masthead
Alumni

BDH

The Brown Daily Herald, Inc. is a financially independent, nonprofit media organization with more than 250 students working across our journalism, business and web divisions.

Subscribe to our newsletter

Your Email Address

Subscribe

Powered by SNWORKS Solutions by The State News
All Content © 2025 The Brown Daily Herald, Inc.

# EXHIBIT 225

**[.mp4 filed manually]**

# EXHIBIT 226

OPINION | GUEST

# Op-ed: Try again, President Kumar: Renewing calls for Tufts to adopt March 4 TCU Senate resolutions

By Rumeysa Ozturk, Fatima Rahman, Genesis Perez and Nicholas Ambeliotis
Published Tuesday, March 26, 2024

On March 4, the Tufts Community Union Senate passed 3 out of 4 resolutions demanding that the University acknowledge the Palestinian genocide, apologize for University President Sunil Kumar's statements, disclose its investments and divest from companies with direct or indirect ties to Israel. These resolutions were the product of meaningful debate by the Senate and represent a sincere effort to hold Israel accountable for clear violations of international law. Credible accusations against Israel include accounts of deliberate starvation and indiscriminate slaughter of Palestinian civilians and plausible genocide.

Unfortunately, the University's response to the Senate resolutions has been wholly inadequate and dismissive of the Senate, the collective voice of the student body. Graduate Students for Palestine joins Tufts Students for Justice in Palestine, the Tufts Faculty and Staff Coalition for Ceasefire and Fletcher Students for Palestine to reject the University's response. Although graduate students were not allowed by the University into the Senate meeting, which lasted for almost eight hours, our presence on campus and financial entanglement with the University via tuition payments and the graduate work that we do on grants and research makes us direct stakeholders in the University's stance.

While an argument may be made that the University should not take political stances and should focus on research and intellectual exchange, the automatic rejection, dismissive nature and condescending tone in the University's statement have caused us to question whether the University is indeed taking a stand against its own declared commitments to free speech, assembly and democratic expression. According to the Student Code of Conduct, "[a]ctive citizenship, including exercising free speech and engaging in protests, gatherings, and demonstrations, is a vital part of the Tufts community." In addition, the Dean of Students Office has written, "[w]hile at times the exchange of controversial ideas and opinions may cause discomfort or even distress, our mission as a university is to promote critical thinking, the rigorous examination and discussion of facts and theories, and diverse and sometimes contradictory ideas and opinions." Why then is the University discrediting and disregarding its students who practice the very ideals of critical thinking, intellectual exchange and civic engagement that Tufts claims to represent?

The role of the TCU Senate resolutions is abundantly clear. The Senate's resolutions serve as a "strong lobbying tool that expresses to the Tufts administration the wants and needs of the student body. They speak as a collective voice and are instrumental in enacting systemic changes." In this case, the "systemic changes" that the collective voice of the student body is calling for are for the University to end its complicity with Israel insofar as it is oppressing the Palestinian people and denying their right to self-determination — a right that is guaranteed by international law. These strong lobbying tools are all the more urgent now given the order by the International Court of Justice confirming that the Palestinian people of Gaza's rights under the Genocide Convention are under a "plausible" risk of being breached.

This collective student voice is not without precedent. Today, the University may remember with pride its decision in February 1989 to divest from South Africa under apartheid and end its complicity with the then-racist regime. However, we must remember that the University divested up to 11 years after some of its peers. For instance, the Michigan State University Board of Regents passed resolutions to end its complicity with Apartheid South Africa as early as 1978. Had Tufts heeded the call of the student movement in the late 1970s, the University could have been on the right side of history sooner.

We reject any attempt by the University or the Office of the President to summarily dismiss the role of the Senate and mischaracterize its resolution as divisive. The open and free debate demonstrated by the Senate process (exemplified by the length, open notice and substantive exchange in the proceedings and the non-passing of one of the proposed resolutions), together with the serious organizing efforts of students, warrant credible self-reflection by the Office of the President and the University. We, as graduate students, affirm the equal dignity and humanity of all people and reject the University's mischaracterization of the Senate's efforts.

The great author and civil rights champion James Baldwin once wrote: “The paradox of education is precisely this: that as one begins to become conscious one begins to examine the society in which [they are] being educated.” As an educator, President Kumar should embrace efforts by students to evaluate “diverse and sometimes contradictory ideas and opinions.” Furthermore, the president should trust in the Senate’s rigorous and democratic process and the resolutions that it has achieved.

We urge President Kumar and the Tufts administration to meaningfully engage with and actualize the resolutions passed by the Senate.

This op-ed was written by Nick Ambeliotis (CEE, ‘25), Fatima Rahman (STEM Education, ‘27), Genesis Perez (English, ‘27) and Rumeysa Ozturk (CSHD, ‘25) and is endorsed by 32 other Tufts School of Engineering and Arts and Sciences Graduate Students.

## TRENDING

**[SMFA union files unfair labor practice complaint against Tufts following administrative restructure]**

By **Josué Pérez** | June 20




## THE PRINT EDITION

13-ER 3404

AAUP-01593




SECTIONS

- News
- Features
- Arts
- Opinion
- Sports

QUICK LINKS

- About
- Masthead
- Contact
- Submit a Tip
- Join Us

Investigative
Science
Magazine
Audio
Video
Newsletter

Advertising
RSS Feeds
Privacy Policy
Terms of Service

SOCIAL

CONTACT
The Tufts Daily
PO Box 53018
Medford, MA 02155
daily@tuftsdaily.com

All Content © 2025 The Tufts Daily

Powered by Solutions by The State News

# EXHIBIT 227

Search for

# Rumeysa Ozturk



Status: Student
State: Massachusetts
Organizations: BDS
University: Tufts, TC

Share:

Rumeysa Ozturk engaged in anti-Israel activism in March 2024, in the wake of the Hamas terrorist attacks on Israelis on October 7, 2023.

On October 7, 2023, Hamas murdered approximately 1,200 Israelis, kidnapped hundreds and wounded thousands. War crimes included mass rape and torture. Many Palestinian civilians participated in and supported the attacks, and Gazans working in the targeted Israeli communities gave intelligence to Hamas on where to strike.

For more information, see the Canary Mission page on Hamas.

Ozturk is a supporter of the Boycott, Divestment, Sanctions (BDS) movement.

As of January 2025, Ozturk was listed as the course instructor of "Intro to Children's Media - 04" and "Youth and Media - 06" at Tufts University (Tufts).

The courses were scheduled to take place in February and April 2025, respectively. Both course descriptions said: "...reserved for high school students who are rising 10th, 11th, or 12th grade students...students will be prompted to submit an additional application after enrollment..." Tufts is located in Medford and Somerville, Massachusetts.

As of January 2025, Ozturk's LinkedIn profile said she had worked as a graduate research assistant at Tufts since August 2023, and as a course instructor at Tufts from July 2024 to August 2024.

As of the same date, Ozturk's LinkedIn said she was studying for a doctorate in child study and human development at Tufts, slated to graduate in 2026.

Ozturk graduated with a master's degree in developmental and child psychology from Teachers College, Columbia University (TC) in 2020. TC is located in New York, New York.

As of February 2025, Ozturk's LinkedIn said she was located in the Greater Boston area, Massachusetts.

1 of 2






On March 26, 2024, Ozturk co-authored an op-ed published in the Tufts Daily newspaper titled: "Try again, President Kumar: Renewing calls for Tufts to adopt March 4 TCU Senate resolutions." The authors urged "President Kumar and the Tufts administration to meaningfully engage with and actualize the resolutions passed by the Senate."

The op-ed referred to the passing of anti-Israel resolutions by the Tufts Community Union (TCU) Senate, which demanded the University "...acknowledge the Palestinian genocide, apologize for University President Sunil Kumar's statements, disclose its investments, and divest from companies with direct or indirect ties to Israel."

On March 4, 2024, Tufts President Kumar published a "Message on TCU Senate Resolutions" addressed to Tufts students, faculty, and staff. Kumar wrote: "...the Tufts Community Union Senate...passed three resolutions, initially proposed by the Coalition for Palestinian Liberation..."

President Kumar's message continued: "...we're disappointed that a majority voted to pass three of the four resolutions. To be clear: as we have done in the past, we reject the Boycott Divestment Sanctions movement, we wholeheartedly support academic freedom and all our academic and exchange programs, and we will continue to work with all companies that we engage with and do business with now."

## Social Media and Weblinks

- https://www.linkedin.com/in/rumeysaozturk/
- ResearchGate
- Google Scholar
- Academia.edu

HOME
OUR MISSION
ETHICS POLICY
CONTACT US
STUDENTS
PROFESSORS
PROFESSIONALS
MEDICAL

ORGANIZATIONS
EX-CANARY
BLOG
CAMPAIGNS
CANADA

Copyright © 2024 Canary Mission Inc.
All rights reserved.

# EXHIBIT 228

**[.mp4 filed manually]**

# EXHIBIT 229

CANARY MISSION

Search for a Professional

# OUR MISSION

Canary Mission documents individuals and organizations that promote hatred of the USA, Israel and Jews on North American college campuses and beyond. Canary Mission investigates hatred across the entire political spectrum, including the far right, far left and anti-Israel activists.

Canary Mission is motivated by a desire to combat the rise in anti-Semitism on college campuses. We pursue our mission by presenting the words and deeds of individuals and organizations that engage in anti-Semitism, racism and bigotry on the far right, far left and among the array of organizations that comprise the anti-Semitic Boycott, Divestment, Sanctions (BDS) movement.

Canary Mission gathers content from publicly available sources. Additionally, we collect and validate materials submitted privately through our website. We aggregate this information into a concise and easily searchable format, providing free access to the general public.

Before publication, all content is verified, meeting our high standards of accuracy and authenticity.

When published content is based on validated information submitted privately, a note indicating this is placed on the page.

The addition of individuals to our database is governed by our Ethics Policy .

Individuals who believe that they should be removed from the Canary Mission website are encouraged to be in touch with us and may become an Ex-Canary.

CANARY MISSION

we all have the right to know if an individual has been affiliated with movements that routinely engage in anti-Semitic rhetoric and actions, promote hatred of Jews and seek the destruction of Israel.

CANARY MISSION

HOME
OUR MISSION
ETHICS POLICY
CONTACT US
STUDENTS
PROFESSORS
PROFESSIONALS
MEDICAL
ORGANIZATIONS
EX-CANARY
BLOG
CAMPAIGNS
CANADA

Copyright © 2024 Canary Mission Inc.
All rights reserved.

# EXHIBIT 230

Search for a P

# Mohsen Mahdawi



Status: Unknown
State: New York
Organizations: WOL, SJP, JVP, DAR, BDS
University: Columbia, BZU

Share:

## Mohsen Mahdawi's Arrest, Call for Israel's Destruction, Justification of Hamas Terrorism and Support for the Pro-Hamas Encampment at Columbia University (Columbia)



Mahdawi speaking at an anti-Israel rally

03:10

Mohsen Mahdawi is a leading anti-Israel activist who was arrested in April 2025 for his pro-Hamas activism. He has also called for Israel's destruction and justified Hamas terrorism in late 2023. Ten years earlier, he celebrated a terrorist who had murdered dozens of Israeli Jews in 1978. Mahdawi also showed support for the pro-Hamas encampment at Columbia in April 2024.

Mahdawi made his late 2023 statements after a series of Hamas terror atrocities and war crimes against Israeli civilians, including mass murder, torture, rape, beheadings and kidnappings, which were executed on October 7, 2023. The attacks left over 1,200 Israelis dead, hundreds kidnapped and thousands wounded. Israel retaliated with a war called "Swords of Iron."

Hamas has been designated as a terrorist organization by the U.S., Canada, European Union, Israel and other countries. Founded in 1987, it has killed thousands of Israeli civilians through mass shootings and suicide bombings. Hamas has also kidnapped children, families and the elderly and held them hostage in Gaza. It has desecrated [slide 7] dead bodies and launched numerous rocket attacks against Israeli civilians.

In December 2023, Mahdawi served as co-president of DAR Palestine at Columbia University (Dar at Columbia), Columbia's Palestinian student union, which is reportedly part of a coalition of 80 anti-Israel student groups. Columbia is located in New York, New York.

Mahdawi was also affiliated with the pro-terror activist group Within Our Lifetime (WOL) in 2023. He was reportedly a member of Students for Justice in Palestine (SJP) that same year.

Mahdawi is a supporter of the Boycott, Divestment, Sanctions (BDS) movement.

In December 2023, CBS reported [00:07:10] that Mahdawi "grew up in a refugee camp in the Israeli-occupied West Bank."

As of February 20, 2024, Mahdawi, who also goes by Mohsen Khader Mahdawi, was listed in Columbia's online directory as a student in the Department of Philosophy at Columbia's School of General Studies.

As of March 7, 2024, Mahdawi's since-deleted LinkedIn profile said he was slated to graduate from Columbia in 2024.

As of the same date, Mahdawi's LinkedIn also said he studied computer engineering at Birzeit University (Birzeit) from 2008 to 2014.

Birzeit University's student body has celebrated terrorists since at least 2003. That year, student government elections featured models of exploding Israeli buses, as parties competed on the basis of which Palestinian faction had killed the most Israelis.







13-ER 3416
AAUP-01561


"Hamas is a product of the Israeli occupation," he said. Hamas, which has governed Gaza since 2007, has been designated as a terrorist organization by the U.S. and European Union.

Mahdawi shares the view of many Palestinians that Gaza is a longtime "open-air prison" of Israel's doing.


is rooted in international law, under which occupied peoples have the right to resist the occupation of their land," they wrote. "If every political avenue available to Palestinians is blocked, we should not be surprised when resistance and violence break out."

On Oct. 12, Mahdawi was among hundreds of pro-Palestinian demonstrators who gathered on Columbia's South Lawn. Supporters were called terrorists and had water thrown at them, he said.



1 of 8

## Arrested by ICE

On April 14, 2025, ABC News reported that Mahdawi was arrested by agents from the United States Immigration and Customs Enforcement (ICE) at the Immigration Services office in Colchester, Vermont. After his arrest, ICE began the process of deporting him.

In a court filing concerning the immigration status of Mahmoud Khalil, who co-founded the Palestinian Student Union at Columbia with Mahdawi and also faces deportation, United States Secretary of State Marco Rubio asserted that Khalil should be deported because of his role in "antisemitic protests and disruptive activities, which fosters a hostile environment for Jewish students in the United States."

## Calling for Israel's Destruction

On November 15, 2023, Mahdawi spoke at an anti-Israel rally titled: "All Out for Gaza at Columbia University," where he led [00:07:07] the crowd in chanting: "From the river to the sea, Palestine will be free!"

"From the River to the Sea, Palestine will be Free" is a chant used [00:02:47] to call for the elimination of the State of Israel. It has also been employed by Hamas leader Khaled Mashal to call for the replacement of Israel with an Islamic state. In April 2024, the U.S. House of Representatives passed a resolution condemning the chant as antisemitic.

Mahdawi then said [00:07:30]: "We were accused by the administration that we are calling for genocide, while the administration itself is ignoring the current genocide that is taking place in Gaza. Shame on you, Columbia!"

Mahdawi continued [00:09:01]: "[Columbia's] excuse of safety and security is a weaponization of this word, its the same weaponization that Israel has used as a tactic to steal land to con people, to suppress us, to keep us in refugee camps and to commit genocide and apartheid."

Mahdawi's mention of "refugee camps" referred to a policy known as the "right of return."

The "right of return" is a Palestinian demand discredited as a means to eliminate Israel. International law mandates no absolute right of return and UN Resolution 194, which defined principles for "refugees wishing to return to their homes," was unanimously rejected by Arab nations following the 1948 Arab-Israeli War.

The rally, which "ended in front of the university's main entrance," was reportedly co-organized by WOL and the City University of New York (CUNY) School of Law (CUNY Law) chapter of the Jewish Law Students Association (CUNY JLSA).

Mahdawi appeared at the rally wearing a keffiyeh and standing between WOL co-founder and chairperson Nerdeen Kiswani and leading WOL activist Abdullah Akl.

## Justifying Hamas Terrorism in 2023

In an October 22, 2023 interview for a local New England newspaper, Mahdawi said: "Hamas is a product of the Israeli occupation."

According to the newspaper, soon after October 7, 2023, Mahdawi and leaders of other anti-Israel student groups at Columbia wrote a statement that said: "We remind Columbia students that the Palestinian struggle for freedom is rooted in international law, under which occupied peoples have the right to resist the occupation of their land."

Anti-Israel activists use the term "resistance" to refer to violence and terror perpetrated against Israeli civilians and their allies. It is used to glorify and encourage anti-Israel and anti-Semitic violence. Anti-Israel activists chant slogans such as: "Resistance by any means necessary!" and "Resistance is justified when people are occupied!" in response to terror attacks.

The statement that Mahdawi reportedly co-authored continued: "If every political avenue available to Palestinians is blocked, we should not be surprised when resistance and violence break out."

mutilation.

Hamas broadcast videos of their butchery on social media, often to victims' accounts for families to see. Israel retaliated with a war called "Swords of Iron." As of November 10, 2023, approximately 1,200 Israelis, the vast majority of them civilians, were murdered during the attacks. Hamas kidnapped 242 Israelis, including at least 30 children. At least 3,500 people were wounded, many severely.

A terrorist detained by Israel admitted he raped an Israeli woman when he broke into a kibbutz house during the October 7, 2023 attack. In March 2024, a former hostage of Hamas publicly stated she was sexually abused and tortured while in captivity.

For more information on the October 7, 2023 terror attacks, see the Canary Mission page on Hamas.

In December 2023, during Israel's war against Hamas, Mahdawi was interviewed [00:06:07] on the television show "60 Minutes" to discuss his campus activism.

During the interview, Mahdawi said [00:08:17]: "When somebody is hurting you, when you see this person is being punched in the face and this feeling, it is: You now feel my pain."

The interviewer replied [00:08:30] back to Mahdawi: "But this Hamas attack wasn't a punch in the face. This was a horrible terror attack."

Mahdawi then said [00:08:43] that he "can empathize" with what Hamas did and continued: "To empathize is to understand the root cause and to not look at any event or situation in a vacuum. This is for me the path moving forward."

## Celebrating a Terrorist in 2013

On February 3, 2013, a Facebook user shared a poem Mahdawi wrote that paid tribute to terrorist Dalal Mughrabi. Mahdawi left comments thanking the poster for sharing the text.

The poem said: "I will breathe home… / And fill my shame / And clean my gun / And collect my packages, my bombs / And embrace my gun…"

Dalal Mughrabi, a member of the Fatah faction of the Palestine Liberation Organization (PLO), participated in the 1978 Coastal Road massacre in Israel. She and other terrorists hijacked a bus in an attack that left 38 Israeli civilians dead, including 13 children.

## Anti-Israel Activism (BDS)

In January 2024, Mahdawi participated [00:00:04] as a speaker at a "divestment now" rally organized by Columbia University Apartheid Divest (CUAD) and other student organizations. The protest called on Columbia to divest from Israel and promoted [slide 3; 00:00:01] "global intifada."

The term "intifada," which translates from Arabic as "uprising" or "insurrection," carries the connotation of violence. Palestinian intifadas waged against Israel have been marked since 1987 by hundreds of hijackings, shootings, stabbings, bombings and suicide missions.

On December 5, 2023, Mahdawi posted photos of himself speaking at a November 14, 2023 rally organized by DAR at Columbia and held on the Columbia campus. He wrote on his post: "We come here today to stand tall, to raise our voices, and to lift our spirits… chanting for humanity: Free, free Palestine!"

The aim of the November 14, 2023 rally and another one on November 15, 2023, where he called for Israel's destruction, was to protest Columbia's "unjust suspension" of the university's Jewish Voice for Peace (JVP) and SJP chapters for violating university policies.

## Showing Support for the Pro-Hamas Encampment at Columbia

Mahdawi appeared [00:06:02] in an AJ+ video in which he was interviewed during the April 30, 2024 "occupation" of Columbia's Hamilton Hall by encampment participants. Discussing the university administration's decision to call in the New York Police Department (NYPD) to clear the locked, barricaded and vandalized building, Mahdawi claimed [00:06:34]: "This [police action] is a strategy that is used by the oppressor, and Columbia University…are doing the same thing."

On April 30, 2024, participants in Columbia's second pro-Hamas encampment forced their way into the university's Hamilton Hall, barricading themselves in the building and taking three Columbia custodians hostage. Protesters also vandalized [00:00:55] and destroyed university property inside the hall. A police raid on Hamilton found knives, gas masks, ropes and literature that read: "…DESTROY zionist business interests everywhere!…DEATH TO AMERICA!…"

building and taking a university worker hostage.

Activists protested Israel's war against Hamas and demanded that Columbia "divest from companies and institutions that profit from Israeli apartheid, genocide and occupation…"

The action had reportedly been planned for months and was organized by the Columbia University Apartheid Divest (CUAD) coalition. The encampment was also organized by Columbia's banned pro-Hamas activist group Students for Justice in Palestine (SJP) and the university chapter of Jewish Voice for Peace (JVP). Activists reportedly received training from National SJP and other anti-Israel organizations.

Among the encampment leaders was Columbia student Khymani James who had said [00:00:25]: "Zionists…They are nazis!… They're supporters of genocide! Why would we want people who are supporters of genocide to live?… Be glad, be grateful that I am not just going out and murdering Zionists." Aidan Parisi, another encampment leader, responded to Columbia's demand to disband the encampment by declaring online that: "COLUMBIA WILL BURN."

The encampment was forcibly dismantled at the directive of Columbia's president and administration. The NYPD [New York Police Department] entered the area, cleared the encampment and arrested more than 100 protestors, approximately 80 of whom were Columbia students. The students were charged with trespassing and suspended from Columbia indefinitely.

The next day, activists created a new encampment. When divestment negotiations with Columbia failed, protesters illegally forced their way into the university's Hamilton Hall on April 30, 2024. They smashed [00:00:55] through a glass-paneled door, broke security cameras, threw university property out of the windows and unfurled [00:00:01] a banner in the building's wall that read: "INTIFADA," a term in Arabic for uprising or insurrection that carries the connotation of violence.

While barricading themselves in the building, agitators kept three Columbia custodians hostage and stopped them from leaving. When the NYPD raided and dismantled the encampment a second time, they arrested more than 100 students, nearly half of whom were reportedly not affiliated with Columbia.

NYPD shared on Twitter photos of objects the police found in Hamilton Hall. These included knives, hammers, gas masks, ropes and a pamphlet that read [video 1]: "…DISRUPT/RECLAIM/DESTROY zionist business interests everywhere! DEATH TO ISRAELI REAL STATE! DEATH TO AMERICA!…LONG LIVE THE INTIFADA!"

Just outside the encampment area, Jewish students were called [slide 2]: "Uncultured a** b**ches!" and were told to "Go back to Europe!" Activists also said [slide 3] to them: "Yahoodim [Jews], yahoodi [Jew], f**k you!" and "Stop killing children!" as they walked from campus to their dorm rooms.

Also just outside the encampment area, anti-Israel activists chanted [slide 5]: "Ya Hamas, ya habib, odrob, odrob Tel Aviv! [Oh Hamas, oh loved one, strike, strike Tel Aviv!]", a chant that celebrates Hamas rocket attacks against Israel.

An activist just outside the encampment area held [photo 4] a sign that said, referring to the Izz ad-Din al-Qassam Brigades, Hamas's military wing: "AL-QASAM'S NEXT TARGETS." Her sign contained an arrow pointing to a pro-Israel crowd.

On May 31, 2024, Columbia SJP announced that its activists had set up a third encampment at the university. At the encampment, protesters reportedly displayed on a big screen a video that portrayed Hamas as a peace-seeking organization and made a sign that contained an inverted red triangle, a symbol in support of Hamas.

The Columbia encampment reportedly inspired a wave of protest encampments across North American campuses, where pro-Israel students were blocked or restricted from campus facilities. Jewish students were reportedly harassed in several other ways.

00:22

## ^ SJP

SJP is the leading student organization engaged in anti-Israel activity on North American college and university campuses. The first chapter of SJP was founded in 2001 at the University of California at Berkeley by Professor Hatem Bazian, who has spread anti-Semitism and defended the Hamas terror group.

SJP organizes anti-Israel campus campaigns, including running annual Israel Apartheid Weeks and pushing the Boycott, Divestment, Sanctions (BDS) movement. SJP activists have reportedly physically assaulted, intimidated and harassed Jewish students, and SJP chapters have often endorsed and campaigned for terrorists.

01:30

The Boycott, Divestment, Sanctions (BDS) movement was founded by pro-terror activist Omar Barghouti in 2005 to turn "Israel into a pariah state, as South Africa once was." Barghouti has also called for Israel's destruction and the BDS movement demands would result in that same goal.

BDS initiatives include calling on institutions and individuals to divest from Israeli-affiliated companies, promoting academic and cultural boycotts of Israel, and organizing anti-Israel rallies, protests and campaigns.

The movement's most notable achievement has been infiltrating university campuses through lobbying for "BDS resolutions." In these cases, student governments propose resolutions to boycott or divestment from Israel or Israeli-affiliated entities. BDS activity is often aggressive and disruptive. It has been noted that universities that pass BDS resolutions see a marked increase in anti-Semitic incidents and pro-terror activism on campus.

06:01

## Social Media and Weblinks

- https://www.facebook.com/mohsen.k.mahdawi
- https://twitter.com/MohsenPalestine/ [deleted]
- https://twitter.com/Mohsen_Mahdawi_ [deleted]
- https://www.instagram.com/mohsen.of.palestine/
- https://www.instagram.com/mohsen.palestine/ [deleted]
- https://www.instagram.com/mohsen__mahdawi/ [deleted]
- https://www.linkedin.com/in/mohsen-m-843046265/
- https://www.threads.net/@mohsen.palestine [deleted]
- https://www.tiktok.com/@mohsenmahdawi1 [deleted]
- https://www.youtube.com/@mohsenmehdawi7848 [deleted]

Case: 26-0906, 11/20/2026, DktEntry: 16.1, Page 48 of 300


HOME
OUR MISSION
ETHICS POLICY
CONTACT US
STUDENTS
PROFESSORS
PROFESSIONALS
MEDICAL
ORGANIZATIONS
EX-CANARY
BLOG
CAMPAIGNS
CANADA

Copyright © 2024 Canary Mission Inc.
All rights reserved.

# EXHIBIT 231

Search for a Medical P

# Mahmoud Khalil



Status: Student
State: New York
Organizations: CUAD, BDS
University: Columbia

Share:

## PROFILE UPDATE - MARCH 12, 2025

- In March 2025, Mahmoud Khalil was arrested by the U.S. Immigration and Customs Enforcement (ICE), which reportedly revoked his student visa. A Department of Homeland Security (DHS) spokesperson said that Khalil "led activities aligned to Hamas, a designated terrorist organization."
- Khalil has been leading anti-Israel protests at Columbia since at least October 12, 2023—just days after Hamas' attack on Israel. That day, he led a rally where activists chanted "From the river to the sea," a slogan condemned by the U.S. House of Representatives as antisemitic and used by Hamas to call for Israel's destruction.
- Khalil is a leader of the Columbia University Apartheid Divest group (CUAD), the current home for Students for Justice in Palestine (SJP) and Jewish Voice for Peace (JVP), after they were suspended for pro-terror activities. It is now a coalition of "over 80 student groups."
- Khalil openly justified Hamas terrorism, speaking as a CUAD representative in a video posted on X. He stated, "We've tried armed resistance, which is legitimate under international law, but Israel calls it terrorism."
- On October 7, 2024, the first anniversary of Hamas' terror attack where they murdered 1,200 Israelis, Khalil held a leadership role in a CUAD-organized pro-Hamas protest at Columbia. The next day, CUAD defined this protest by their desire to "bring the war home"—a phrase tied to the movement's broader strategy of bringing about the downfall of the USA. For more information on their war on America, see Canary Mission's campaign "Bringing the War Home."
- CUAD's members wrote on August 16, 2024, that they "must work hard to weaken US imperialism." The New York Post also reported on March 9, 2025, that Khalil's group seeks the "total eradication of Western civilization."
- On March 24, 2024, CUAD co-organized a pro-terror event titled "Palestinian Resistance 101," featuring Khaled Barakat, a senior member of the Popular Front for the Liberation of Palestine (PFLP), a designated terrorist organization.
- Khalil has acted as a lead negotiator for CUAD during several major incidents in 2024 and 2025.
    - In April 2024, Mahmoud Khalil acted as a lead negotiator for the pro-Hamas encampment at Columbia on behalf of CUAD. The Columbia encampment was a violent, pro-Hamas stronghold where activists took over buildings, held workers hostage, and chanted for Israel's destruction. Police found weapons and antisemitic propaganda, while Jewish students faced harassment and threats.
    - Khalil served as a negotiator after pro-Hamas agitators occupied the library lobby at Barnard College on March 5, 2025, in protest of students suspended for "interrupting a 'History of Modern Israel' class on Jan. 21 and distributing fliers, including one that showed a jackboot squashing a Jewish star." The takeover was organized by CUAD. During the protest, anti-Israel activists reportedly shared posters that read: "DEATH TO AMERICA," writing the same message on the library's guest book. Classes were reportedly disrupted and the police were sent to the location citing a "bomb threat."

## Mahmoud Khalil's Participation in the Pro-Hamas Encampment at Columbia University (Columbia) & Arrest for Pro-Hamas Activities



Palestinian supporters demonstrate during a protest at Columbia University on Oct. 12, 2023, in New York.

Mahmoud Khalil participated in the pro-Hamas encampment at Columbia in April 2024 as a lead negotiator [00:36:30] on behalf of Columbia University Apartheid Divest (CUAD), an anti-Israel student coalition. He has also expressed support for Hamas terrorism as a CUAD representative.

CUAD is a coalition of "over 80 student groups working toward the goal of collective liberation." CUAD is part of the Boycott, Divestment, Sanctions (BDS) movement. The group's demands included "a ceasefire in the Israel-Hamas war, divestment from Israel… and to reinstate" the pro-terror campus groups Students for Justice in Palestine (SJP) and Jewish Voice for Peace (JVP) after the Columbia administration suspended them. CUAD members have also declared that their goal is "to weaken US imperialism" and the "total eradication of Western civilization."

In March 2025, Khalil was arrested by U.S. Immigration and Customs Enforcement (ICE), which reportedly revoked his student visa. A Department of Homeland Security (DHS) spokesperson said that Khalil "led activities aligned to Hamas, a designated terrorist organization." Khalil was scheduled to appear before a federal immigration judge.

On October 7, 2024, the first anniversary of Hamas' terror attack on Israel, Khalil participated in a leadership role in a pro-Hamas protest organized by CUAD at Columbia. The next day, CUAD wrote that it was necessary to "bring the war home."

**For more information on the anti-Israel movement's war on America, check Canary Mission's campaign "Bringing the War Home."**

On March 5, 2025, Khalil served [video 1] as a negotiator, after pro-Hamas agitators occupied the library lobby at Barnard College in support of students suspended for "interrupting a 'History of Modern Israel' class on Jan. 21 and distributing fliers, including one that showed a jackboot squashing a Jewish star." The takeover was organized by CUAD. During the protest, anti-Israel activists reportedly shared posters that read: "DEATH TO AMERICA," writing the same message on the library's guest book. Classes were reportedly disrupted. The police were sent to the location, citing a "bomb threat," making a series of arrests.

On March 24, 2024, CUAD co-organized a pro-terror event that hosted Khaled Barakat, a leader of a foreign terror organization. The event was titled: "Palestinian Resistance 101." The event also featured Charlotte Kates and Nerdeen Kiswani. Kates and Barakat are the

across New York City.

**Mahmoud Khalil's Participation in the Pro-Hamas Encampment at Columbia**

On April 24, 2024, the New York chapter of the Palestinian Youth Movement (PYM) posted on Instagram: "THE PEOPLE'S (POPULAR) UNIVERSITY FOR PALESTINE: For the past week, students at Columbia's Gaza Solidarity Encampment have put on alternative programming for those joining on the lawns, from teach-ins to cultural performances..." The post included a video in which Khalil appeared [00:00:31] dancing at the encampment, alongside other anti-Israel activists.

On April 26, 2024, the New York Post reported: "The anti-Israel tent encampment at Columbia University is being led by a cohort of controversial student leaders...these students are the ones negotiating directly with leaders of the Ivy League university – holding campus hostage with dozens of tents and hundreds of protesters splayed out on the lawn..." The article quoted Khalil saying: "The university understood that we cannot operate on timelines. We cannot operate under time pressure."

In an April 27, 2024 Quds News Network (QNN) interview posted on X, Khalil said [00:00:05] in Arabic: "We have been negotiating since last night for more than 11 hours with the university to meet our demands regarding the cutting economic and academic ties with Israeli universities and the universities involved in slaughtering our Palestinian people..."

On April 29, 2024, Bwog Columbia Student News reported: "...Columbia University Apartheid Divest (CUAD) held a press conference to address the end of negotiations and the University's plans to clear the Encampment..." Speaking on behalf of CUAD, Khalil said: "...the students in this Encampment are a gift to Columbia" and "...the University should be proud of its student activists rather than suspend them and 'trample its reputation.'"

On April 30, 2024, a user posted on Instagram a video interview from CNN in which Khalil was asked [00:00:01]: "Are you...going to listen to the University and leave the encampment here?" Khalil replied [00:00:04]: "Of course not! The University is the one who should listen to us. They should listen to their student body who are demanding to end the war that's happening in Palestine. Our...demands are clear...regarding divestment from the Israeli occupation that companies that are profiting [sic] and...contributing to the genocide of our people..."

Asked by CNN [00:00:47]: "How far are you all willing to go here on campus?", Khalil replied [00:01:08]: "...the students will remain here... until they achieve their...demands."

On April 30, 2024, USA Today reported: "The school...suspended graduate student Mahmoud Khalil, lead negotiator for Columbia University Apartheid Divest in talks with the administration that have failed to resolve the crisis."

On May 2, 2024, the BBC, in a news brief titled: "Columbia student has suspension reversed," reported: "...Mahmoud Khalil...was suspended yesterday. Today...Khalil received a surprising message: it was abruptly reversed." Khalil reportedly said: "[They said] that after reviewing the evidence, they don't have any evidence to suspend..."

The BBC report said: "Khalil, a Palestinian international student who was born in [sic] raised in Syria, said that the thought of suspension had 'been stressful,' given that his visa in the US is dependent on his status as a student."

On April 26, 2024, The Verge reported: "Mahmoud Khalil, a Palestinian student who has been involved in the negotiations with Shafik's office, also spoke, saying international students were especially at risk. 'I am here on a foreign visa. That's why for the past six months, I've barely appeared on the media,' Khalil said."

The encampment was also in support of the BDS movement.

David lederer
@Davidlederer6
CAPTURED BY CANARY MISSION
... 1 of 6



13-ER-3426

On March 8, 2025, Khalil was arrested by U.S. Immigration and Customs Enforcement (ICE), which reportedly revoked his student visa. A Department of Homeland Security (DHS) spokesperson said that Khalil "led activities aligned to Hamas, a designated terrorist organization."

Hamas has been designated as a terrorist organization by the U.S., Canada, European Union, Israel and other countries. Founded in 1987, it has killed thousands of Israeli civilians through mass shootings and suicide bombings. Hamas has also kidnapped children, families and the elderly and held them hostage in Gaza. It has desecrated [slide 7] dead bodies and launched numerous rocket attacks against Israeli civilians.

On March 9, 2025, Marco Rubio, U.S secretary of state, posted on X: "We will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported," and linked to an article about Khalil's arrest.

Khalil was scheduled to appear before a federal immigration judge.

## Support for Hamas Terrorism

On October 12, 2023, Khalil led [photo 2] a protest at Columbia where activists chanted [00:00:01]: "..from the river to the sea, Palestine will be free..." Khalil appeared [00:00:05] next to anti-Israel agitator Maryam Iqbal, who led the chant calling for Israel's destruction.

"From the River to the Sea, Palestine will be Free" is a chant used [00:02:47] to call for the elimination of the State of Israel. It has also been employed by Hamas leader Khaled Mashal to call for the replacement of Israel with an Islamic state. In April 2024, the U.S. House of Representatives passed a resolution condemning the chant as antisemitic.

On October 7, 2023, Hamas murdered approximately 1,200 Israelis, kidnapped hundreds and wounded thousands. War crimes included mass rape and torture. Many Palestinian civilians participated in and supported the attacks, and Gazans working in the targeted Israeli communities gave intelligence to Hamas on where to strike.

For more information, see the Canary Mission page on Hamas.

On March 11, 2025, Khalil was featured in a video posted on X, speaking to a crowd as a CUAD representative.

In the video, Khalil said [00:00:01]: "As you've seen, Palestinians have tried multiple times resistance, whether it is armed, unarmed resistance, peaceful, whatever. But Israel and the propaganda always find something to attack."

Among Palestinians and anti-Israel activists, the term "resistance" is a euphemism for nationalistic terror and is used to glorify and encourage anti-Israel and anti-Semitic violence.

## Leading Role in a Pro-Hamas Protest

On October 7, 2024, Khalil participated in a leadership role in a pro-Hamas protest at Columbia. CUAD, which organized the protest, called to "bring the war home."

**For more information on the anti-Israel movement's war on America, check Canary Mission's campaign "Bringing the War Home."**

During the protest, demonstrators held [photos 2 and 4] a newspaper with Hamas propaganda, which included an article [p.12] by convicted Popular Front for the Liberation of Palestine (PFLP) terrorist Walid Daqqa and articles [p.4] by the pro-terror groups PYM and [p.7] National SJP.

Walid Daqqa was convicted and sentenced to life imprisonment for reportedly having been part of a PFLP terror cell that abducted and killed an Israeli soldier in 1984.

Also on October 7, 2024, CUAD promoted on Instagram an event titled: "OCTOBER 7 / WALKOUT." The post said: "...After an entire year of uninterrupted genocide...it is our duty to act, to resist...WALK OUT...join the movement for Palestinian liberation."

During the walkout, protesters chanted [video; 00:00:01]: "Resistance is glorious! We will be victorious!" and held [video; 00:00:35] yellow signs that read: "GLORY TO THE MARTYRS. VICTORY TO THE RESISTANCE." Protesters also chanted [00:00:42]: "Intifada, intifada! Globalize the intifada!"

Anti-Israel activists use the term "resistance" to refer to violence and terror perpetrated against Israeli civilians and their allies. It is used to glorify and encourage anti-Israel and anti-Semitic violence. Anti-Israel activists chant slogans such as: "Resistance by any means necessary!" and "Resistance is justified when people are occupied!" in response to terror attacks.

missions.

Also on October 7, 2024, CUAD posted on Instagram a video of the protest and wrote: "…We must recognize our liberations as connected and bring the war home. The Palestinian resistance is moving their struggle to a new phase of escalation, and it is our duty to meet them there…WALKOUT NOW! JOIN US! JOIN THE MOVEMENT FOR A FREE PALESTINE!"

## ^ Leading Role in a Library Takeover

On March 5, 2025, Khalil served [video 1] as a negotiator, after pro-Hamas agitators occupied the library lobby at Barnard College in support of students suspended for "interrupting a 'History of Modern Israel' class on Jan. 21 and distributing fliers, including one that showed a jackboot squashing a Jewish star."

During the protest, anti-Israel activists shared posters that called for the "DEATH TO AMERICA." They also shared posters in support of former Hamas leader Yahya Sinwar.

Yahya (Yehiya) Sinwar masterminded the October 7, 2023 terror attacks on Israel. While serving four life sentences in Israel, he was released to Gaza following the Gilad Shalit prisoner exchange deal. On October 17, 2024, the Israel Defense Forces eliminated Sinwar in Gaza.

Khalil appeared [00:00:27] in a video during the library occupation, as agitators chanted: "Disclose! Divest! We will not stop! We will not rest!"

During the protest, agitators displayed [slide 2] a puppet of Barnard president Laura Ann Rosenbury and chanted: "Intifada, intifada! Globalize the Intifada!"

The term "intifada," which translates from Arabic as "uprising" or "insurrection," carries the connotation of violence. Palestinian intifadas waged against Israel have been marked since 1987 by hundreds of hijackings, shootings, stabbings, bombings and suicide missions.

On March 5, 2025, the New York Times reported that this was the "second such sit-in to take place at Barnard over the issue," with anti-Israel activists having previously "staged a sit-in at Milbank Hall."

## ^ Pro-Hamas Encampment at Columbia University

On April 17, 2024, Columbia students and anti-Israel activists set up a pro-Hamas "Gaza Solidarity Encampment" on the university's main lawn. Many participants were arrested and the encampment featured multiple violent incidents, including taking over a campus building and taking a university worker hostage.

Activists protested Israel's war against Hamas and demanded that Columbia "divest from companies and institutions that profit from Israeli apartheid, genocide and occupation…"

The action had reportedly been planned for months and was organized by the Columbia University Apartheid Divest (CUAD) coalition. The encampment was also organized by Columbia's banned pro-Hamas activist group Students for Justice in Palestine (SJP) and the university chapter of Jewish Voice for Peace (JVP). Activists reportedly received training from National SJP and other anti-Israel organizations.

Among the encampment leaders was Columbia student Khymani James who had said [00:00:25]: "Zionists…They are nazis!… They're supporters of genocide! Why would we want people who are supporters of genocide to live?… Be glad, be grateful that I am not just going out and murdering Zionists." Aidan Parisi, another encampment leader, responded to Columbia's demand to disband the encampment by declaring online that: "COLUMBIA WILL BURN."

The encampment was forcibly dismantled at the directive of Columbia's president and administration. The NYPD [New York Police Department] entered the area, cleared the encampment and arrested more than 100 protestors, approximately 80 of whom were Columbia students. The students were charged with trespassing and suspended from Columbia indefinitely.

The next day, activists created a new encampment. When divestment negotiations with Columbia failed, protesters illegally forced their way into the university's Hamilton Hall on April 30, 2024. They smashed [00:00:55] through a glass-paneled door, broke security cameras, threw university property out of the windows and unfurled [00:00:01] a banner in the building's wall that read: "INTIFADA," a term in Arabic for uprising or insurrection that carries the connotation of violence.

While barricading themselves in the building, agitators kept three Columbia custodians hostage and stopped them from leaving. When the NYPD raided and dismantled the encampment a second time, they arrested more than 100 students, nearly half of whom were reportedly not affiliated with Columbia.

TO AMERICA!...LONG LIVE THE INTIFADA!"

Just outside the encampment area, Jewish students were called [slide 2]: "Uncultured a** b**ches!" and were told to "Go back to Europe!" Activists also said [slide 3] to them: "Yahoodim [Jews], yahoodi [Jew], f**k you!" and "Stop killing children!" as they walked from campus to their dorm rooms.

Also just outside the encampment area, anti-Israel activists chanted [slide 5]: "Ya Hamas, ya habib, odrob, odrob Tel Aviv! [Oh Hamas, oh loved one, strike, strike Tel Aviv!]", a chant that celebrates Hamas rocket attacks against Israel.

An activist just outside the encampment area held [photo 4] a sign that said, referring to the Izz ad-Din al-Qassam Brigades, Hamas's military wing: "AL-QASAM'S NEXT TARGETS." Her sign contained an arrow pointing to a pro-Israel crowd.

On May 31, 2024, Columbia SJP announced that its activists had set up a third encampment at the university. At the encampment, protesters reportedly displayed on a big screen a video that portrayed Hamas as a peace-seeking organization and made a sign that contained an inverted red triangle, a symbol in support of Hamas.

The Columbia encampment reportedly inspired a wave of protest encampments across North American campuses, where pro-Israel students were blocked or restricted from campus facilities. Jewish students were reportedly harassed in several other ways.

## Background on Pro-Hamas Encampments

The encampment was one of over 140 pro-Hamas and anti-Israel college encampments set up in North America, and over 20 more globally, in the spring of 2024. The first began on April 17, 2024, at Columbia University. The encampments were unofficially known as the "student intifada," borrowing a term associated with terrorist violence.

Protesters harassed Jewish students, blocked Jews from campus facilities and shouted anti-Semitic slogans. They occupied campus grounds, in many cases illegally, caused property damage, violently took over buildings, celebrated terrorism and promoted the Boycott, Divestment, Sanctions (BDS) movement.

Activists set up encampments to oppose Israel's right to wage war against the Hamas terror group following October 7, 2023, when Hamas murdered approximately 1,200 people, including 32 American and 8 Canadian citizens. Hamas also kidnapped 252 people, including 11 Americans and the bodies of 2 murdered Canadians. As of May 26, 2024, 125 hostages remained in Hamas captivity.

For more information on the October 7, 2023 terror attacks, see the Canary Mission page on Hamas.

## The Columbia Student Intifada

00:22

## ^ The Pro-Terror & Anti-Israel Movement After 10/7/2023

03:10

## ^ Mahmoud Khalil's Work and Education

As of the same date, Khalil's LinkedIn said he had worked as a political affairs officer at the United Nations Relief Works Agency (UNRWA)'s office in New York from June to November 2023.

The United Nations Relief Works Agency (UNRWA) has been infiltrated by Palestinian terrorist organizations to wage war against Israel under the guise of UN immunities. UNRWA employs terrorists who indoctrinate children to hate Jews and kill Israelis. UNRWA facilities, schools and medical clinics are systematically used as terrorist command centers and weapons depots. UNRWA also provided electricity to Hamas's main data center and UNRWA employees have kidnapped and held hostage Israeli civilians.

Khalil's LinkedIn said he was located in New York, New York.

## Social Media and Weblinks

- https://www.instagram.com/mhod.khalil/ [private]
- https://www.threads.net/@mhod.khalil
- https://www.linkedin.com/in/khalilmahmoud/
- Clubhouse

HOME
OUR MISSION
ETHICS POLICY
CONTACT US
STUDENTS
PROFESSORS
PROFESSIONALS
MEDICAL
ORGANIZATIONS
EX-CANARY
BLOG
CAMPAIGNS
CANADA

Copyright © 2024 Canary Mission Inc.
All rights reserved.

# EXHIBIT 232

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

EXHIBIT 232

# (U//LES) OZTURK, Rumeysa

SUBJECT PROFILE

## (U) Analysis Findings

- (U//LES) Turkish national Rumeysa OZTURK holds a F1 visa and is a co-author of an Op-Ed calling for divestment from Israel and associates with Tufts Students for Justice in Palestine, which was suspended for calls for student intifada.
- (U//LES) OZTURK is currently a post doctorate student at Tufts University in the Child Study & Human Development program with a start date of 1 February 2021 and end date of 23 December 2027. OZTURK completed her master's degree at Columbia University in 2019.
- (U//LES) She has prior U.S. travel on an internship in 2016 at Boston University in Psychology and Brain Sciences under a B1/B2 visa.

## (U) Biographical Information




- (U//LES) **Name:** Rumeysa OZTURK
- (U//LES) **SSN:** [redacted]
- (U//LES) **DOB:** [redacted]
- (U//LES) **Immigration Status:** F1 Nonimmigrant Student
- (U//LES) **COB:** Turkey
- (U//LES) **COC:** Turkey
- (U//LES) **Current Passport:** [redacted], Turkey (Expiration: 9 July 2029)
- (U//LES) **Visa Type, Number:** F1, [redacted] (expiration: 9 December 2025)
- (U//LES) **FIN:** [redacted]
- (U//LES) **SEVIS ID:** [redacted] (program end date: 23 December 2027)

## (U) Criminal History

(U//LES) No associated criminal history or HSI investigation was located for OZTURK. [NCIC, ICM]

## (U) USCIS Applications

(U//LES) No applications found. [PCQS]

## (U) Residences

- (U//LES) [redacted] (April 2023 – January 2025) [Accurint]
- (U//LES) [redacted] 02144 (January 2025) [PCQS]

## (U) Communications

- (U//LES) **Phone Numbers:** [redacted] (cell) (January 2025) [Accurint]
- (U) **Social Media:**
  - (U//LES) [redacted]
  - (U//LES) [redacted]
  - (U//LES) [redacted]
  - (U//LES) X [redacted] [Commercial]
  - (U//LES) X (Twitter)/ [redacted] [Commercial]
- (U) **Email:**
  - (U//LES) [redacted] [AFI]
  - (U//LES) [redacted] [AFI]
  - (U//LES) [redacted] [AFI]

## (U) Travel and Border Crossing History

- (U//LES) 28 June 2024: air travel from Istanbul Airport, Istanbul (IST), Turkey to Logan International Airport, Boston (BOS), Massachusetts. [UPAX]

*Prepared for/in collaboration with HSI Office of Intelligence* *ROA Published Date: 17 March 2025*

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

## (U//LES) OZTURK, Rumeysa

- (U//LES) 26 May 2024: air travel from BOS to IST. [UPAX]
- (U//LES) 30 December 2023: air travel from IST to BOS. [UPAX]
- (U//LES) 8 December 2023: air travel from BOS to IST. [UPAX]
- (U//LES) 3 July 2023: air travel from IST BOS. [UPAX]
- (U//LES) 9 May 2023: air travel from BOS to IST (IST). [UPAX]
- (U//LES) 9 August 2022: air travel from IST to BOS. [UPAX]
- (U//LES) 29 May 2022: air travel from BOS to IST. [UPAX]
- (U//LES) 31 August 2021: air travel from IST to BOS. [UPA]
- (U//LES) 13 July 2021: air travel from BOS to IST. [UPAX]

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

# (U//LES) OZTURK, Rumeysa

ICE-HQINT-30159-25

SUBJECT PROFILE

## (U) Social Media and Open Sources

**(U) Canary Mission profile on Rumeysa OZTURK stating her participation in anti-Israel activism in March 2024 -** Posted 06 February 2025
https://canarymission.org/individual/Rumeysa_Ozturk

REPORT AN INDIVIDUAL REPORT AN EVENT

CANARY MISSION HOME ABOUT US PROFILES BLOG CAMPAIGNS CANADA DONATE

Ozturk FILTERS

Last updated: Feb. 6, 2025

Share:

# Rumeysa Ozturk

Rumeysa Ozturk engaged in anti-Israel activism in March 2024, in the wake of the Hamas terrorist attacks on Israelis on October 7, 2023.

On October 7, 2023, Hamas murdered approximately 1,200 Israelis, kidnapped hundreds and wounded thousands. War crimes included mass rape and torture. Many Palestinian civilians participated in and supported the attacks, and Gazans working in the targeted Israeli communities gave intelligence to Hamas on where to strike.

For more information, see the Canary Mission page on Hamas.

Ozturk is a supporter of the Boycott, Divestment, Sanctions (BDS) movement.

As of January 2025, Ozturk was listed as the course instructor of "Intro to Children's Media - 04" and "Youth and Media - 06" at Tufts University (Tufts).

The courses were scheduled to take place in February and April 2025, respectively. Both course descriptions said: "...reserved for high school students who are rising 10th, 11th, or 12th grade students...students will be prompted to submit an additional application after enrollment..." Tufts is located in Medford and Somerville, Massachusetts.



**Rumeysa Ozturk**
Status: Student
State: Massachusetts
Organizations: BDS
University: Tufts, TC

**Sign up for our weekly newsletter**

Enter your email

Subscribe

Donate

**(U//LES) Open Source**

(U//LES) OZTURK, Rumeysa

ICE-HQINT-30159-25

SUBJECT PROFILE

**(U) The Tufts Daily article synopsizing the four resolutions introduced by the Coalition for Palestinian Liberation at Tufts University** – Date 27 February 2024
https://www.tuftsdaily.com/article/2024/02/ng4hfkjplejxe53

(U//LES) OZTURK, Rumeysa

THE TUFTS DAILY

NEWS | UNIVERSITY

# TCU Senate to vote Sunday on genocide acknowledgment, university divestment

**The Coalition for Palestinian Liberation proposed four resolution drafts to TCU Senate targeting university connections to Israel.**




Aaron Green / The Tufts Daily
The Joyce Cummings Center is pictured on Feb. 22, 2023.

By Cady Cohen
Published Tuesday, February 27, 2024

On Sunday, the Coalition for Palestinian Liberation at Tufts introduced four full-text resolutions to the Tufts Community Union Senate which, if passed, will call on the Office of the President and other senior leadership to acknowledge Israel's continued assault on Gaza and to end all ties to the country. Senators will vote on finalized versions of all four resolutions at next week's meeting, just two weeks after the introduction of abstracts on Feb. 18.

(U//LES) Open Source

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

# (U//LES) OZTURK, Rumeysa

"The Coalition for Palestinian Liberation at Tufts has introduced these four TCU Senate resolutions to emphasize the importance of institutional boycott and divestment from Israel at multiple administrative levels," CPLT wrote in a statement to the Daily. "These resolutions demonstrate that any and all measures that the university and its officials can take to end Tufts' complicity in Israel's genocide on Gaza are crucial to the broader goals of the [boycott, divestment and sanctions] movement."

While resolutions are all based on the shared premise of Israel's human rights violations, each of the four takes a different approach to cut the university's ties to the country.

The first, S.24-1, calls on Tufts Global Education to end approval for external study abroad programs in Israel. According to the Global Education website, the school currently approves programs at Ben Gurion University of Negev, Technion Israel Institute of Technology, University of Haifa, Hebrew University of Jerusalem and Tel Aviv University.

S.24-1 "urges Tufts University to end its study abroad programs in Israel indefinitely" and "to

not approve or offer new study abroad programs in Israel." The resolution, if passed, will solicit a written response from Tufts Global Education within two weeks.

The second, S.24-2, calls for Tufts Dining to end the sale of Sabra, Pillsbury and other products connected to Israel at Tufts. In its proposal, CPLT explained the reasoning behind this request.

"Sabra has documented ties to human rights violations in the Occupied Palestinian

Territories. It is 'a joint venture between PepsiCo and the Strauss Group, a multinational corporation and Israel's largest food and beverage company.' ... The Strauss Group has materially supported the Golani Brigade of the Israel Defense Forces. ... Pillsbury, a food manufacturing corporation owned by General Mills, operates a factory in the Atarot Industrial Zone. ... The factory has displaced Palestinians and profits off of their land, water, and other resources,'" the resolution reads.

The resolution "urges the Tufts Dining office to stop selling any Israeli products immediately and indefinitely" and requests a written response from Tufts Dining within two weeks.

CPLT's third resolution, S.24-3, demands that "[University President Sunil Kumar], Deans, and Provosts release a statement both recognizing [and] condemning the Ongoing Genocide in Gaza." The resolution further calls on the administration to "release a statement apologizing for their previous statements" and "urges the Office of the President and the Deans of the school to hold a public open meeting with the Coalition for Palestinian Liberation at Tufts."

The resolution asserts that the "Tufts Administration and President have made several biased statements in the Fall semester of 2023 about the ongoing genocide, under the name of 'Israel-Hamas War.'" Last semester, the university put out several emails addressing the conflict, and Kumar released a video message on campus discourse at the beginning of the spring semester.

(U//LES) Open Source

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

# (U//LES) OZTURK, Rumeysa

In this resolution, the coalition requests a written response from the university president, deans and provosts within two weeks.

The final resolution, S.24-4, takes specific aim at the school's investment portfolio.

S.24-4 "urges the Tufts University investment office to immediately disclose all investments, with emphasis on any and all direct and indirect investments in companies based in or which profit from partnership with Israel." The resolution urges the university "to divest from Israeli Companies [and] to divest from companies invested in Israeli Apartheid and with ties to Israel."

S.24-4, as well as S.24-3, cite a TCU Senate resolution passed in 2017, titled "A Resolution Calling for Tufts University to End Investments in The Israeli Occupation." Despite this, the university has continually reiterated its opposition to the BDS movement and has not publicly shared its full investment portfolio.

"With Tufts continuing to not comply with this resolution, we reiterate that it is more important than ever that we do not invest in companies that provide weapons to Israel, or any Israeli companies that are built on stolen Palestinian land," CPLT wrote in the S.24-4 abstract. "Many groups on campus have expressed concern over the Administration's refusal to disclose what investments they hold in Israel and companies tied to it. We are also concerned about other investments that Tufts holds, which do not comply with their 'Anti-racist' promise, and, in this sense, we are asking for the investment office to disclose all the investments they have so that all students are made aware of where tuition dollars are spent."

Both S.24-3 and S.24-4 also reference Tufts' divestment from South Africa during apartheid, in response to student and faculty activism.

"Just as students fought for and ultimately won Tufts' divestment from apartheid South Africa, Tufts students are once again fighting for the university's divestment from apartheid, occupation, and genocide; by making clear the specific ways in which the university is complicit, these resolutions also make clear that divestment is entirely actionable, and that the student body demands these tangible steps be taken against the occupation of Palestine," CPLT wrote in its statement to the Daily.

S.24-4 requests a written response from Tufts Investment Office and the Office of the Board of Advisors within two weeks.

"Resolutions are a vehicle for students at Tufts to advocate for a given change and may be proposed by anyone in the Tufts Community Union," the TCU Senate Executive Board wrote in a statement to the Daily. "This extensive and exhaustive process allows for students to propose reform which then, based on the vote, is directed towards administration or the appropriate management at Tufts. While the Senate takes necessary steps to follow up, the final onus rests on the administration and management, not us."

(U//LES) Open Source

# (U//LES) OZTURK, Rumeysa

Class of 2026 Senator Anand Patil reiterated that the Senate will carefully examine each of the four resolutions, asking questions and debating before finally voting.

"These resolutions will bring strong opinions and feelings from many members of our community, so all who are planning to attend are strongly urged to treat the resolution process, TCU Senators, and fellow students with the utmost respect and civility," Patil wrote in a message to the Daily.

Senators will vote on the four resolutions at next week's open meeting, taking place on Sunday at 7 p.m. at the Joyce Cummings Center in rooms 160 and 170.

*Matthew Sage contributed reporting.*

**(U//LES) Open Source**

# (U//LES) OZTURK, Rumeysa

SUBJECT PROFILE

**(U) Guest Opinion (Op-ed) co-authored by OZTURK on the Tufts Community Union Senate resolutions for University to acknowledge the Palestinian genocide** – Accessed 18 March 2025

https://www.tuftsdaily.com/article/2024/ 03/4ftk27sm6jkj

THE TUFTS DAILY

OPINION | GUEST

## Op-ed: Try again, President Kumar: Renewing calls for Tufts to adopt March 4 TCU Senate resolutions

By Rumeysa Ozturk, Fatima Rahman, Genesis Perez and Nicholas Ambeliotis
Published Tuesday, March 26, 2024

On March 4, the Tufts Community Union Senate passed 3 out of 4 resolutions demanding that the University acknowledge the Palestinian genocide, apologize for University President Sunil Kumar's statements, disclose its investments and divest from companies with direct or indirect ties to Israel. These resolutions were the product of meaningful debate by the Senate and represent a sincere effort to hold Israel accountable for clear violations of international law. Credible accusations against Israel include accounts of deliberate starvation and indiscriminate slaughter of Palestinian civilians and plausible genocide.

Unfortunately, the University's response to the Senate resolutions has been wholly inadequate and dismissive of the Senate, the collective voice of the student body. Graduate Students for Palestine joins Tufts Students for Justice in Palestine, the Tufts Faculty and Staff Coalition for Ceasefire and Fletcher Students for Palestine to reject the University's response. Although graduate students were not allowed by the University into the Senate meeting, which lasted for almost eight hours, our presence on campus and financial entanglement with the University via tuition payments and the graduate work that we do on grants and research makes us direct stakeholders in the University's stance.

While an argument may be made that the University should not take political stances and should focus on research and intellectual exchange, the automatic rejection, dismissive nature and condescending tone in the University's statement have caused us to question whether the University is indeed taking a stand against its own declared commitments to free speech, assembly and democratic expression. According to the Student Code of Conduct, "[a]ctive citizenship, including exercising free speech and engaging in protests, gatherings, and demonstrations, is a vital part of the Tufts community." In addition, the Dean of Students Office has written, "[w]hile at times the exchange of controversial ideas and opinions may cause discomfort or even distress, our mission as a university is to promote critical thinking, the rigorous examination and discussion of facts and theories, and diverse and sometimes contradictory ideas and opinions." Why then is the University discrediting and disregarding its students who practice the very ideals of critical thinking, intellectual exchange and civic engagement that Tufts claims to represent?

**(U//LES) Open Source**

# (U//LES) OZTURK, Rumeysa

THE TUFTS DAILY

The role of the TCU Senate resolutions is abundantly clear. The Senate's resolutions serve as a "strong lobbying tool that expresses to the Tufts administration the wants and needs of the student body. They speak as a collective voice and are instrumental in enacting systemic changes." In this case, the "systemic changes" that the collective voice of the student body is calling for are for the University to end its complicity with Israel insofar as it is oppressing the Palestinian people and denying their right to self-determination — a right that is guaranteed by international law. These strong lobbying tools are all the more urgent now given the order by the International Court of Justice confirming that the Palestinian people of Gaza's rights under the Genocide Convention are under a "plausible" risk of being breached.

This collective student voice is not without precedent. Today, the University may remember with pride its decision in February 1989 to divest from South Africa under apartheid and end its complicity with the then-racist regime. However, we must remember that the University divested up to 11 years after some of its peers. For instance, the Michigan State University Board of Regents passed resolutions to end its complicity with Apartheid South Africa as early as 1978. Had Tufts heeded the call of the student movement in the late 1970s, the University could have been on the right side of history sooner.

We reject any attempt by the University or the Office of the President to summarily dismiss the role of the Senate and mischaracterize its resolution as divisive. The open and free debate demonstrated by the Senate process (exemplified by the length, open notice and substantive exchange in the proceedings and the non-passing of one of the proposed resolutions), together with the serious organizing efforts of students, warrant credible self-reflection by the Office of the President and the University. We, as graduate students, affirm the equal dignity and humanity of all people and reject the University's mischaracterization of the Senate's efforts.

The great author and civil rights champion James Baldwin once wrote: "The paradox of education is precisely this: that as one begins to become conscious one begins to examine the society in which [they are] being educated." As an educator, President Kumar should embrace efforts by students to evaluate "diverse and sometimes contradictory ideas and opinions." Furthermore, the president should trust in the Senate's rigorous and democratic process and the resolutions that it has achieved.

We urge President Kumar and the Tufts administration to meaningfully engage with and actualize the resolutions passed by the Senate.

This op-ed was written by Nick Ambeliotis (CEE, '25), Fatima Rahman (STEM Education, '27), Genesis Perez (English, '27) and Rumeysa Ozturk (CSHD, '25) and is endorsed by 32 other Tufts School of Engineering and Arts and Sciences Graduate Students.

(U//LES) Open Source

# (U//LES) OZTURK, Rumeysa

**(U) Boston.com News Article: Pro-Palestine group disaffiliates from Tufts after being suspended until 2027. –** Accessed 19 March 2025

https://www.boston.com/news/local-news/2024/11/18/pro-palestine-group-disaffiliates-from-tufts-after-being-suspended-until-2027/

Note: (U//LES) This article ties into the Op-Ed and demonstrates that the Tufts SJP was suspended by the university for violations of having signs demonstrating weapons and calls for student intifada. Analysts were unable to locate images matching the exact reference to signs.

BOSTON.com

NEWS LOCAL NEWS NATIONAL NEWS POLITICS OBITUARIES CRIME KAREN READ TRAFFIC

## Pro-Palestine group disaffiliates from Tufts after being suspended until 2027

After an interim suspension earlier this fall, Tufts Students for Justice in Palestine was dealt a full suspension for repeatedly violating university policy.




A sign sits at the entrance to a student protest encampment at Tufts in April 2024.

By Rose Cristantiello
November 18, 2024
3 minutes to read

(U//LES) Open Source

Tufts University officially suspended a pro-Palestine student organization through January 2027, prompting the group to announce its "formal break and disaffiliation" from the university last week.

Tufts Students for Justice in Palestine has frequently sought to disrupt campus life in the interest of raising awareness about Israel's military practices and any ties between the university and Israel.

A United Nations report released last week found that "Israel's warfare in Gaza is consistent with the characteristics of genocide, with mass civilian casualties and life-threatening conditions intentionally imposed on Palestinians there."

Tufts SJP was officially suspended on Nov. 6 The group was placed on interim suspension in early October after it used images of weapons to promote a protest rally and urged members of the Tufts community to "join the student intifada." That incident was one of five incidents this year that led to the suspension, according to Tufts Executive Director of Media Relations Patrick Collins. Over those five incidents, Tufts SJP was responsible for nine violations of university policy.

ADVERTISEMENT:

The group was found to have violated the university's Gatherings, Demonstrations and Protests Policy and its Posting Policy during an October event. It violated the Threats Policy in October when it posted the images of weapons and used the term "intifada" to urge student action. It failed to comply with university officials by refusing to take down threatening posts, violated the demonstration policy in September, did not comply with other officials, and violated the Gambling Policy during a student organization fair at the beginning of the semester, according to Collins.

Tufts SJP "failed to complete sanctions" assigned from previous violations, leading the university to announce a full suspension.

(U//LES) Open Source

# (U//LES) OZTURK, Rumeysa

**(U) X.com (Twitter) posting of Eyal Yakoby, "an incoming MIT student dedicated to combating anti-Americanism," stating stickers plastered on Tufts University campus by students – Posted 2 October 2024**




(U//LES) Open Source




(U//LES) Open Source

# (U//LES) OZTURK, Rumeysa

*(U) **Warning:** This product is preliminary criminal analysis supporting an ongoing criminal investigation; the analysis may change, subject to new information developed over the course of the ongoing investigation.*

*(U) **Warning:** This is a U.S. Immigration and Customs Enforcement internal document and may not be shared externally.*

*(U) This document has been designated by DHS as UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE (U//LES) and is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS and ICE policy relating to LES information. This information can be distributed further within DHS on a need-to-know basis; however, it may not be distributed outside DHS without authorization from the originating office.*

*(U) This document contains information that is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public, the media, or other personnel who do not have a valid need-to-know without prior approval of an authorized DHS official.*

*(U) This product contains U.S. person information that has been deemed necessary for the intended recipient to understand, assess, or act on the information provided. It has been highlighted in this document with the label USPER and should be handled in accordance with the recipient's intelligence oversight/information handling procedures. U.S. person information should be protected in accordance with constitutional requirements and all federal and state privacy and civil liberties laws.*

**(U//FOUO) Please be advised that you may request assistance or follow-up information from the Criminal Analysis Division (CAD). In this capacity, CAD leverages its resources, partnerships, and capabilities to provide additional criminal analysis collaboration and coordination, and intelligence support. For any feedback or comments, please send to [redacted].**

# EXHIBIT 233

EXHIBIT
233

# (U) Mahmoud KHALIL

SUBJECT PROFILE

## (U) Analysis Findings

- (U//FOUO) Mahmoud KHALIL received a B1/B2 visa on 30 January 2018 and entered the United States on 11 March 2018. KHALIL was issued an F1 visa on 12 December 2022 and entered the United States under that visa on 20 December 2022.
- (U//FOUO) KHALIL's status was changed to CR6, Spouse of a United States Citizen, on 16 November 2024 and received an LPR status.

## (U) Biographical Information




- (U) Name: Mahmoud KHALIL
- (U//FOUO) **DOB:** [redacted]
- (U//FOUO) **COB:** Algeria
- (U//FOUO) **COC:** Algeria
- (U//FOUO) **Current Passport:** [redacted]; Algeria (expiration: 21 August 2029)
- (U//FOUO) **Former Passport:** [redacted]; Algeria
- (U//FOUO) **SSN:** [redacted]
- (U//FOUO) **A#:** [redacted]
- (U//FOUO) **FIN:** [redacted]

## (U) USCIS Applications

- (U//FOUO) 20 November 2024—Application to Register Permanent Residence or Adjust Status-Family Based (spouse of a U.S. citizen)—Approved.
- (U//FOUO) KHALIL does not have any current pending USCIS applications.

## (U) Residence

(U//FOUO) [redacted] (December 2024)

## (U) Communications

- (U) **Phone Numbers:**
  - (U//FOUO) [redacted] (cell)
  - (U//FOUO) [redacted] (home)
- (U//FOUO) **Email:** [redacted]

## (U) Travel and Border Crossing History

- (U//FOUO) 5 February 2025–9 February 2025: round-trip air travel from John F. Kennedy International Airport (JFK), Queens, New York to Licenciado Benito Juarez International Airport, Mexico City, Mexico.
- (U//FOUO) 2 February 2025: air travel from Keflavik International Airport (KEF), Keflavik, Iceland to Stewart International Airport (SWF), New Windsor, New York.
- (U//FOUO) 12 January 2025: air travel from KEF to SWF.
- (U//FOUO) 4 December 2024: air travel from Paris-Orly Airport, Paris, France to Newark Liberty International Airport, Newark, New Jersey.
- (U//FOUO) 22 November 2024: air travel from JFK to London Gatwick Airport, London, United Kingdom.

# (U) Mahmoud KHALIL

## (U) News Articles

- **(U) Facing Trump's threats, Columbia investigates students critical of Israel**—Published 7 March 2025

  https://www.wisn.com/article/columbia-university-student-discipline-israel-criticism/64086002

  KHALIL acted as a negotiator for pro-Palestinian protestors during Spring protests.

  *"Mahmoud Khalil, a graduate student who served as a negotiator for pro-Palestinian protesters during the previous spring's encampment, said he was accused by the office of misconduct just weeks before his graduation this December. "I have around 13 allegations against me, most of them are social media posts that I had nothing to do with," he said.*

  *"After refusing to sign the nondisclosure agreement, Khalil said the university put a hold on his transcript and threatened to block him from graduating. But when he appealed the decision through a lawyer, they eventually backed down, Khalil said."*

  *"They just want to show Congress and right-wing politicians that they're doing something, regardless of the stakes for students," Khalil said. "It's mainly an office to chill pro-Palestine speech."*

- **(U) Columbia investigates students critical of Israel amid Trump's threats**—Published 6 March 2025

  https://www.theguardian.com/us-news/2025/mar/06/columbia-university-students-protest

  KHALIL acted as a negotiator for pro-Palestinian protestors during Spring protests.

  *"Mahmoud Khalil, a graduate student who served as a negotiator for pro-Palestinian protesters during the previous spring's encampment, said he was accused by the office of misconduct just weeks before his graduation this December. "I have around 13 allegations against me, most of them are social media posts that I had nothing to do with," he said.*

  *"After refusing to sign the non-disclosure agreement, Khalil said the university put a hold on his transcript and threatened to block him from graduating. But when he appealed the decision through a lawyer, they eventually backed down, Khalil said."*

  *"They just want to show Congress and right-wing politicians that they're doing something, regardless of the stakes for students," Khalil said. "It's mainly an office to chill pro-Palestine speech."*

- **(U) Mahmoud Khalil's Participation in the Pro-Hamas Encampment at Columbia University (Columbia)**—Published 24 February 2025

  https://canarymission.org/individual/Mahmoud_Khalil

  Entire article concerns KHALIL

  *"Mahmoud Khalil participated in the pro-Hamas encampment at Columbia in April 2024 as a lead negotiator [00:36:30] on behalf of Columbia University Apartheid Divest (CUAD), an anti-Israel student coalition."*

- **(U) These are the extremist student leaders of the anti-Israel protest camp bringing Columbia to its knees**—Published 26 April 2024

  https://nypost.com/2024/04/26/us-news/the-extremist-student-leaders-leading-columbias-anti-israel-camp/

  KHALIL previously worked for UNRWA.

  *"The leaders later crowed that they were winning: "We are not actually negotiating on the state of the encampment as of now," Palestinian graduate student Mahmoud Khalil, one of the protesters' lead negotiators, told The Post Friday afternoon."*

# (U) Mahmoud KHALIL

*"Khalil —who did his undergraduate degree in Beirut— told the Columbia Daily Spectator that he has not participated in any of the protests over the past week and a half because he is worried about losing his student visa that allows him to remain in the US."*

*"Khalil was a political affairs officer with UNRWA — the United Nations' agency that supports Palestinian refugees — from June through November 2023, according to LinkedIn."*

*"The university understood that we cannot operate on timelines. We cannot operate under time pressure," Khalil said".*




- (U) **Instagram Posting of CNN News Clip of KHALIL**—Posted 30 April 2024 and **Instagram Posting of Canary Mission of KHALIL**—Posted 6 March 2025

https://www.instagram.com/mosheh/reel/C6ZKrh-r5Zx/?hl=en
https://www.instagram.com/canarymission/reel/DG3FdjiNJ5R/






UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

# (U) Mahmoud KHALIL

**(U) X Post of Documenting Jew Hatred on Campus at Columbia U of KHALIL—Posted 6 March 2025**

← **Post**

Documenting Jew Hatred on Campus at Columbia U
@CampusJewHate

Mahmoud Khalil is a Palestinian who was raised in Syria. He was enrolled at @columbia as of last year; his current enrollment status remains unknown.

Regardless, Khalil served as a key negotiator for the pro-Hamas encampment in the spring. He kept a low profile until recently when Khalil was spotted at the jihadist protest in front of @Columbia's campus on Tuesday and then again yesterday serving as a negotiator for the jihadists inside the Milstein Library.

Khalil was on a student visa as of last year and may still be on one. This is why he has gone on record as saying he takes fewer risks with the jihadist movement to avoid deportation.

In other words, Khalil is fine having others do the heavy lifting and risking their academic and professional careers, but he is unwilling to in order to save himself. In our view, the person who purchases the gun knowing it'll be used to murder someone is just as culpable as the one who pulls the trigger.

Khalil is a key part of the problem. He is the brains of the operation and needs to be flagged by @columbia and @POTUS for his involvement in the terrorists movement overtaking Columbia and in this country.

We demand consequences for all jihadists on college campuses and across this country!

@presirosenbury and @katrinarmstrong, ban Khalil from your campuses now! And if he is on a student visa tied to @columbia, we call on you to revoke it. It should be an honor and privilege to study at an American university, but we are far from that point right now.

@SecRubio
@EdWorkforceCmte
@EliseStefanik
@SenHawleyPress @SenHawleyPR
@RitchieTorres




2:49 PM · Mar 6, 2025 · 5,765 Views

UNCLASSIFIED

## (U) Social Media

(U) Linkedin (Currently locked) [redacted] (No image located)

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

# (U) Mahmoud KHALIL

*(U) Warning: This product is preliminary criminal analysis supporting an ongoing criminal investigation; the analysis may change, subject to new information developed over the course of the ongoing investigation.*

*(U) Warning: This is a U.S. Immigration and Customs Enforcement internal document and may not be shared externally.*

*(U) This document has been designated by DHS as UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE (U//LES) and is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS and ICE policy relating to LES information. This information can be distributed further within DHS on a need-to-know basis; however, it may not be distributed outside DHS without authorization from the originating office.*

*(U) This document contains information that is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public, the media, or other personnel who do not have a valid need-to-know without prior approval of an authorized DHS official.*

**(U//FOUO) Please be advised that you may request assistance or follow-up information from the Criminal Analysis Division (CAD). In this capacity, CAD leverages its resources, partnerships, and capabilities to provide additional criminal analysis collaboration and coordination, and intelligence support. For any feedback or comments, please send to** [redacted]

# EXHIBIT 234

EXHIBIT 234

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

# (U) Badar Khan SURI

ICE-HQINT-30148-25

SUBJECT PROFILE

## (U) Analysis Findings

- (U//LES) Badar KHAN SURI is a research scholar (postdoctoral fellow) sponsored by Georgetown University with a program beginning date of 1 January 2023 and end date of 31 December 2026 and program status listed as active. [SEVIS; 20250312]
- (U//LES) KHAN SURI entered the United States on a J1 visa issued on 15 November 2022 with an expiration date of 31 October 2023. [SEVIS]
- (U//FOUO) According to open-source reporting, KHAN SURI is married to U.S. citizen, Mapheze Ahmad YOUSEF SALEH[USPER], a daughter of Ahmed YOUSEF, a senior Hamas figure in Gaza and an advisor to a Hamas leader. KHAN SURI has three children who applied for citizenship based on their mother's U.S. citizenship and were denied in June 2024. [Open Source/ELIS; 20250312]
- (U//FOUO) According to open-source reporting, KHAN SURI actively spreads Hamas propaganda and promotes antisemitism on social media. [Open Source; 20250311]

## (U) Biographical Information



- (U) Name: Badar KHAN SURI
- (U//FOUO) DOB: [redacted]
- (U//FOUO) COB: India
- (U//FOUO) COC: India
- (U//FOUO) Current Passport: [redacted]; India (expiration: 16 June 2027)
- (U//LES) SSN: [redacted]
- (U//FOUO) FIN: [redacted]
- (U//FOUO) SEVIS ID: [redacted]
- (U//FOUO) Visa Foil: [redacted]; USA (expiration 31 October 2023)

## (U) Criminal History

(U) No associated criminal history or HSI investigation was located for KHAN SURI. [redacted]]

## (U) USCIS Applications

(U//FOUO) KHAN SURI has no filings for himself. He did file Application for Certificate of Citizenship for his three children:

- (U//FOUO) Elia Khan Suri—Applied on 1 April 2024; Denied on 20 June 2024
- (U//FOUO) Watan Khan Suri—Applied on 31 March 2024; Denied on 11 June 2024
- (U//FOUO) Arafat Khan Suri—Applied on 31 March 2024; Denied on 11 June 2024

## (U) Residence

- (U//FOUO) [redacted], Arlington, Virginia 22209 (21 January 2023); [Accurint, SEVIS; [redacted]]
- (U//FOUO) [redacted], Arlington, Virginia 22209 (February 2023); [Accurint; [redacted]]
- (U//FOUO) [redacted], Virgina 22203 (18 January 2023); [UPAX, SEVIS; [redacted]]
- (U//FOUO) [redacted], Washington DC 20057 (December 2022); (University Office); [I-94, APIS, SEVIS, [redacted]]

## (U) Communications

- (U) Phone Numbers:
  - (U//FOUO) [redacted] (cell) (August 2024); [SEVIS; [redacted]]
  - (U//FOUO) [redacted] (home) (October 2022); [CCDI; [redacted]]
- (U//FOUO) Email:
  - (U//FOUO) [redacted]]
  - (U//FOUO) [redacted]]
- (U//FOUO) Social Media:
  - (U//FOUO) [redacted]
  - (U//FOUO) [redacted]]
  - (U//FOUO) [redacted]
- [redacted]

*Prepared for/in collaboration with HSI Office of Intelligence*

*ROA Published Date: 10 March 2025*

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

# (U) Badar Khan SURI

## (U) Travel and Border Crossing History

(U//FOUO) 10 December 2022: air travel from Indira Gandhi International Airport, New Delhi, India to Dulles International Airport, Washington, DC.

# (U) Badar Khan SURI

ICE-HQINT-30148-25

SUBJECT PROFILE

## (U) Social and Open Sources

- (U) **For Georgetown Univ. Couple, Terror-Ties are a Family Affair**—Published 24 February 2025
  https://www.meforum.org/campus-watch/for-georgetown-univ-couple-terror-ties-are-a-family-affair

  *"The Middle East Forum think tank has uncovered that Saleh, the daughter of longtime Hamas leader Ahmed Yousef, is married to Georgetown post-doctoral fellow Badar Khan Suri. Even more troubling, Suri—who holds a position at Georgetown's Alwaleed Center for Christian and Muslim Understanding, funded by Saudi tycoon Alwaleed bin Talal—has repeatedly endorsed Hamas terror and actively spreads its propaganda while claiming to specialize in "peace processes in the Middle East."*

  *"Suri isn't just connected to Hamas by family. He actively spreads the terror group's propaganda and promotes virulent antisemitism on social media. In a blatant act of revisionism, he denied well-documented reports of the Hamas-led massacre in southern Israel on Oct. 7, 2023, posting on Facebook: "Three lies by Israeli occupation, no proof whatsoever of babies beheaded, rapes or mass killings at carnival."*

  *In another post, he stated that Palestine's elected government must sustain its resistance, legitimizing Hamas's violent actions. Years ago, he expressed support for Hamas founder Sheikh Ahmed Yassin, posting a video saying, "This is what Hamas argues. Sheikh Yaseen giving the reasons why his group is fighting for their land which was stolen," legitimizing Hamas's violent actions.*

  *Perhaps most disturbingly, Suri posted a video showing Hamas terrorists holding Israeli child hostages and wrote, "This is how Hamas men dealt with kids on Oct. 7." Rather than condemn the horrifying abduction of Israeli children, Suri appeared to defend and even praise how Hamas militants "dealt" with the children."*

- (U) **Middle East Monitor (MEMO)**—Contributed articles in 2018 and 2023 for the site
  https://www.middleeastmonitor.com/6-author/badar-khan-suri/

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

# (U) Badar Khan SURI

MEMO
MIDDLE EAST MONITOR

*Creating new perspectives since 2009*

News Opinion Reviews Features Publications Multimedia More | English Edition | Free Subscription



**Badar Khan Suri**

Badar Khan Suri Postdoctoral Fellow School of Foreign Service Georgetown University Washington DC.

**Items by Badar Khan Suri**



September 30, 2023 | BADAR KHAN SURI

**Hate against Muslims in India, whether on the streets or in Parliament, is the same**

Hate is the chief ingredient of everyday discourse on the streets and the country's socio-political ...



October 20, 2018 | BADAR KHAN SURI

**Unveiling its vision of apartheid: Israel's Nation-State law**

Democracy never came to Israel Finally, it is here: the masquerade of advocating Jewishness and ...



May 16, 2018 | BADAR KHAN SURI

**Democracy has taken a leap forward in Iraq**

A conversation with Shadi Hamid of Brookings Institution on the performance of Iraqi democracy ...

**UNCLASSIFIED [Open Source]**

- (U) **Twitter Posting by Anna Stanley**—Posted on 25 February 2025
  https://x.com/_Anna_Stanley_/status/1894358989086842939

**Post claiming KHAN SURI has pro-Hama sympathies and direct link to Hamas via spouse. Anna Stanley lists herself as a Research Associate/OSINT Investigator for the Middle East Forum Think Tank.**

X

Settings

← **Post**

**Anna Stanley**
@_Anna_Stanley_

⚫ Badar Khan Suri's father-in-law, was a top adviser to Hamas chief Ismail Haniyeh. Yet, Suri **teaches future U.S. diplomats** "Middle East peace process" at @Georgetown, while denying Hamas atrocities & spreading terror propaganda. • •

7:09 AM · Feb 25, 2025 · **1,224** Views

- (U) **Instagram Profile Photos**—Posting date is not visible

**UNCLASSIFIED [Open Source]**

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

ECT PROFILE

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

# (U) Badar Khan SURI

[redacted]

KHAN SURI appears to post pro-Palestine content




[redacted]




- (U) Georgetown University—Biographic Information listed for KHAN SURI
  https://acmcu.georgetown.edu/profile/badar-khan-suri/

  *"Dr. Badar Khan Suri is a Postdoctoral Fellow at the Alwaleed Bin Talal Center for Muslim-Christian Understanding at the Edmund A. Walsh School of Foreign Service, Georgetown University, Washington, D.C. He completed his Ph.D. in Peace & Conflict Studies from Nelson Mandela Center for Peace and Conflict Resolution, Jamia Millia Islamia, New Delhi in 2020. He wrote his thesis on "Transitional Democracy, Divided Societies and Prospects for Peace: A Study of State Building in Afghanistan and Iraq" in which he underlined the complexities involved in introducing democracy in ethnically diverse societies; as well as challenges to project state building."*

  *"He has travelled extensively in the conflict zones of India, Pakistan, Balochistan in Iran, Iran, Turkey, Kurdish Areas in Turkey, Syria, Lebanon and its southern region, Egypt and Palestine. He is an interdisciplinary scholar who's areas of interest are religion, violence and peace; ethnic conflicts and peace processes in Middle East and South Asia. He is working on a project that looks into potential causes that hinder cooperation among religiously diverse societies and possibilities to overcome those hindrances."*

- (U) GUfaculty360.Georgetown.edu—Biographic Information and Featured Works Profile—Date of Information 10 March 2025
  https://gufaculty360.georgetown.edu/s/contact/0031Q00002e7tV9QAI/badar-khan-suri?searchType=Contact-Info&searchText=khan%20suri UNCLASSIFIED [Open Source] UNCLASSIFIED [Open Source]

  *Postdoctoral Associate—Email: badarsuri@gmail.com*

  *"Dr. Badar Khan Suri is a Postdoctoral Fellow at the Alwaleed Bin Talal Center for Muslim-Christian Understanding at the Edmund A. Walsh School of Foreign Service, Georgetown University, Washington, D.C."*

  *"He completed his Ph.D. in Peace & Conflict Studies from Nelson Mandela Center for Peace and Conflict Resolution, Jamia Millia Islamia, New Delhi in 2020. He wrote his thesis on "Transitional Democracy, Divided Societies and Prospects for Peace: A Study of State Building in Afghanistan and Iraq" in which he underlined the complexities involved in introducing democracy in ethnically diverse societies; as well as challenges to project state building."*

  *"He has travelled extensively in the conflict zones of India, Pakistan, Balochistan in Iran, Iran, Turkey, Kurdish Areas in Turkey, Syria, Lebanon and its southern region, Egypt and Palestine."*

  *"He is an interdisciplinary scholar who's areas of interest are religion, violence and peace; ethnic conflicts and peace processes in Middle East and South Asia. He is working on a project that looks into potential causes that hinder cooperation among religiously diverse societies and possibilities to overcome those hindrances."*

- (U) GUfaculty360.Georgetown.edu—Courses Teaching—Date of Information 10 March 2025

PROFILE

[illegible]

## (U) Badar Khan SURI

https://gufaculty360.georgetown.edu/s/faculty-teaching?id=0031Q00002e7tV9QAI

### Badar Khan Suri

Postdoctoral Associate

**Contact**

Email [redacted]

**Teaching**

| Title | Semester | Course Number | CRN |
|---|---|---|---|
| Minrtsm&Mnrty Rghts in S Asia | Spring 2025 | CMCU-4190-01 | 48330 |

**(U) Coursicle.com—Course information for classes taught by KHAN SURI—Date of Information 10 March 2025**
https://www.coursicle.com/georgetown/professors/Badar+Suri/

### Badar Suri

**Courses**
CMCU 4190 Mnrtsm&Mnrty Rghts in S Asia

**Department**
CMCU

**Email**
[redacted]

**Recent Semesters Teaching**
Spring 2025

**Typical Class Size**
12

**Course Chat**
Chat with other students in Badar Suri's classes

**Schedule Planner**
View Badar Suri's Fall 2025 classes

UNCLASSIFIED [Open Source]

UNCLASSIFIED [Open Source]

[illegible]

# (U) Badar Khan SURI

*(U) Warning: This product is preliminary criminal analysis supporting an ongoing criminal investigation; the analysis may change, subject to new information developed over the course of the ongoing investigation.*

*(U) Warning: This is a U.S. Immigration and Customs Enforcement internal document and may not be shared externally.*

*(U) This document has been designated by DHS as UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE (U//LES) and is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS and ICE policy relating to LES information. This information can be distributed further within DHS on a need-to-know basis; however, it may not be distributed outside DHS without authorization from the originating office.*

*(U) This product contains U.S. person information that has been deemed necessary for the intended recipient to understand, assess, or act on the information provided. It has been highlighted in this document with the label USPER and should be handled in accordance with the recipient's intelligence oversight/information handling procedures. U.S. person information should be protected in accordance with constitutional requirements and all federal and state privacy and civil liberties laws.*

*(U) This document contains information that is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public, the media, or other personnel who do not have a valid need-to-know without prior approval of an authorized DHS official.*

**(U//FOUO) Please be advised that you may request assistance or follow-up information from the Criminal Analysis Division (CAD). In this capacity, CAD leverages its resources, partnerships, and capabilities to provide additional criminal analysis collaboration and coordination, and intelligence support. For any feedback or comments, please send to** [redacted]

# EXHIBIT 235

EXHIBIT
235
tabbies

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

# (U//LES) Mohsen Khader MAHDAWI

ICE-HQINT-30150-25

SUBJECT PROFILE

## (U) Analysis Findings

- (U//LES) Palestinian national Mohsen Khader MAHDAWI holds Legal Permanent Resident (LPR) status through marriage to U.S. citizen in Palestine in June 2013.
- (U//LES) MAHDAWI changed residence status following divorce by spouse in December 2015.
- (U//LES) MAHDAWI submitted N-400 Application for Citizenship on 14 February 2024.
- (U//LES) On January 12, 2019 MAHDAWI was encountered at Derby Line, Vermont POE in possession of LSD, mushrooms (opiate), and methamphetamine.

## (U) Biographical Information




- (U) Name: MAHDAWI, Mohsen Khader Mohsen
- (U//LES) Alias: Mohsen Mehdawi
- (U//LES) DOB: [redacted]
- (U//LES) COB: Israel (Nablus)
- (U//LES) COC: Palestinian Territory
- (U//LES) Current Passport: [redacted], Palestinian Territory (expiration: 25 June 2029) [ADIS]
- (U//LES) Former Passport: [redacted], Palestinian Territory
- (U//LES) SSN: [redacted]
- (U//LES) Alien Number: [redacted]
- (U//LES) FIN: [redacted]
- (U//LES) FBI Number: [redacted]
- (U//LES) [redacted]
- (U//LES) Legal Permanent Resident Card: [redacted]
- (U//LES) Driver's License: [redacted]

## (U) Criminal History

- ([redacted]

## (U) USCIS Applications

- (U//LES) 14 February 2024: N-400 Application for Naturalization – Process pending. [ELIS: 20250311]
- (U//LES) 29 June 2018: I-551 Legal Permanent Resident – Active; expiration 06/27/2028. [CPMS: 20250312]
- (U//LES) 15 November 2016: I-751 Petition to Remove Conditions on Residence - Approved. [ELIS: 20250312]

## (U) Residences

- (U//LES) [redacted], [redacted]
- (U//LES) [redacted] (July 2023 [redacted] August 2021 [redacted]
- (U//LES) [redacted], [redacted] (June 2020) [redacted]
- (U//LES) [redacted], [redacted] (June 2019 [redacted]
- (U//LES) [redacted], [redacted]

## (U) Communications

- (U) Phone Numbers:
  - (U//LES) [redacted] (cell) [redacted]
- (U) Social Media:
  - (U//LES) [redacted]
  - (U//LES) [redacted]

for/in collaboration with HSI Office of Intelligence

ROA Published Date: 12 March 2025

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

# (U//LES) Mohsen Khader MAHDAWI

- (U//LES) [redacted]
- (U//LES) [redacted]
- (U//LES) [redacted]
- (U//LES) [redacted]
- (U//LES) [redacted]
- (U//LES) [redacted]
- (U//LES) [redacted]
- (U//LES) [redacted]
- (U//LES) [redacted]
- (U//LES) [redacted]
- (U//LES) [redacted]
- (U//LES) [redacted] [Deleted]
- (U//LES) [redacted]
- (U//LES) [redacted]
- (U) Email:
  - (U//LES) [redacted] [ELIS: 20240214]

## (U) Travel and Border Crossing History

- (U//LES) 08 August 2024: air travel from John F Kennedy International Airport (JFK) to Athens (ATH), Greece.
- (U//LES) 22 August 2024: air travel from Gardermoen Airport (OSL), Oslo, Norway to Los Angeles International Airport (LAX), California.
- (U//LES) 12 January 2019: inbound border crossing: Derby Line (L026), Vermont in 2013, White Audi/A5; license plate: GTA561, Vermont. [UPAX, NLETS]

## (U) Vehicles

- (U//LES) 1996 Silver BMW Z3: Tag: [redacted]
- (U//LES) 2010 Ducati Monster: VIN: [redacted]

# (U//LES) Mohsen Khader MAHDAWI

ICE-HQINT-30150-25

## (U) Social and Open Sources

- **(U) Twitter (X) post stating the subject is pro-Hamas, appeared on 60 Minutes justifying October 7th Hamas attack on Israel, calling for the destruction of Israel.**—Viewed 11 March 2025

← Post

[redacted]

COLUMBIA UNIVERSITY

Hello PAM Mam . @TheJusticeDept Hi, Marco. @SecRubio

This is Mohsen Mahdawi. He's co-President of the Palestinian Student Union and organizer of pro-Hamas rallies. He appeared on 60 Minutes justifying the Oct 7th massacre.

He's currently at Columbia on a student visa.

Mohsen Mahdawi is an anti-Israel activist leader who called for Israel's destruction and justified Hamas terrorism in late 2023. Ten years earlier, he celebrated a terrorist who had murdered dozens of Israeli Jews in 1978. Mahdawi also showed support for the pro-Hamas encampment at Columbia in April 2024.

Mahdawi made his late 2023 statements after a series of Hamas terror atrocities and war crimes against Israeli civilians, including mass murder, torture, rape, beheadings and kidnappings, which were executed on October 7, 2023. The attacks left over 1,200 Israelis dead, hundreds kidnapped and thousands wounded. Israel retaliated with a war called "Swords of Iron."

Hamas is a designated terrorist organization founded in 1987 that is dedicated to destroying Israel and killing Jews. Since 2001, Hamas has launched thousands of rockets at Israel and on October 7, 2023, Hamas murdered approximately 1,200 Israelis and kidnapped over 200

**(U//LES) Open Source**

- **(U) Mohsen MAHDAWI video posted by TRT World on Twitter (X) accusing Israel of genocide**—Posted 10 October 2024

← Post

TRTWorld
@trtworld

Mohsen Mahdawi, a Palestinian studying philosophy at Columbia University in NYC, tells TRT World that his school is complicit in Israel's genocidal war on Gaza given its financial ties with Tel Aviv




12:07 PM · Oct 10, 2024 · 3,359 Views

**(U//LES) Open Source**

# (U//LES) Mohsen Khader MAHDAWI

- (U) **Twitter (X) posted from Congresswoman Rep. Beth Van Duyne stating the subject praised the death of his "martyr" cousin; implying the cousin may have been a militant.** —Posted 5 September 2024

منشور

Congresswoman Beth Van Duyne
@RepBethVanDuyne

There is no denying that Hamas sympathizers have embedded themselves in our educational institutions, from teachers down to the students. The fact that school administrators continue to ignore this is why antisemitism has been allowed to flourish across college campuses since October 7th.

Columbia Jewish & Israeli Students @CUJewsIs... ٤ سبتمبر ٢٠٢٤

STUDENT TIES TO TERRORISM AT COLUMBIA: Last week @Columbia student and @ColumbiaBDS leader Mohsen Mahdawi praised his "martyred" cousin and his high-ranking Hamas friends on Instagram.
"I received the news of the martyrdom of my cousin....Masra Masharqa, after a clash with a



(U//LES) Open Source

- (U) **X (Twitter) post to TheJusticeDept (Department of Justice) and SecRubio (Secretary of State Marco Rubio) posting of Mohsen MAHDAWI**—Unknown Date

Post

[redacted] Follow

Hi, Pam. @TheJusticeDept Hi, Marco. @SecRubio

This is Mohsen Mahdawi. He's co-President of the Palestinian Student Union and organizer of pro-Hamas rallies. He appeared on 60 Minutes justifying the Oct 7th massacre.

He's currently at Columbia on a student visa.



(U//LES) Open Source

# (U//LES) Mohsen Khader MAHDAWI

**(U) Twitter (X) post showing 60-Minutes interview with a Columbia University student who claims to have heard MAHDAWI speak about Jews in a derogatory way with antisemitic rhetoric—Published 31 January 2025**

← Post

[redacted]

Mohsen Mahdawi, a Columbia University student on a visa, has been added to the deportation database due to his support for Hamas, including celebrating their October 7 massacre and praising terrorist Dalal Mughrabi.



12:57 AM · Jan 31, 2025 · 3,323 views

Read 7 replies

**(U//LES) Open Source**

# (U//LES) Mohsen Khader MAHDAWI

*(U) Warning: This product is preliminary criminal analysis supporting an ongoing criminal investigation; the analysis may change, subject to new information developed over the course of the ongoing investigation.*

*(U) Warning: This is a U.S. Immigration and Customs Enforcement internal document and may not be shared externally.*

(U) *This document has been designated by DHS as UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE (U//LES) and is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS and ICE policy relating to LES information. This information can be distributed further within DHS on a need-to-know basis; however, it may not be distributed outside DHS without authorization from the originating office.*

*(U) This document contains information that is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public, the media, or other personnel who do not have a valid need-to-know without prior approval of an authorized DHS official.*

*(U) This product contains U.S. person information that has been deemed necessary for the intended recipient to understand, assess, or act on the information provided. It has been highlighted in this document with the label USPER and should be handled in accordance with the recipient's intelligence oversight/information handling procedures. U.S. person information should be protected in accordance with constitutional requirements and all federal and state privacy and civil liberties laws.*

**(U//FOUO) Please be advised that you may request assistance or follow-up information from the Criminal Analysis Division (CAD). In this capacity, CAD leverages its resources, partnerships, and capabilities to provide additional criminal analysis collaboration and coordination, and intelligence support. For any feedback or comments, please send to [redacted].**

# EXHIBIT 236

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

EXHIBIT 236

# (U//FOUO) Yunseo CHUNG

SUBJECT PROFILE

## (U) Analysis Findings

(U//LES) Yunseo CHUNG is a U.S. Legal Permanent Resident (LPR). CHUNG entered the United States on an F2 visa on 23 June 2009. She requested legal permanent resident status on 18 June 2020. CHUNG was issued an LPR card on 27 August 2021.

## (U) Biographical Information



(U//FOUO)

- (U) **Name:** Yunseo CHUNG
- (U) **Alias:** unknown
- (U//FOUO) **DOB:** [redacted]
- (U//FOUO) **COB:** South Korea
- (U//FOUO) **COC:** South Korea
- (U//FOUO) **Current Passport:** [redacted]; South Korea (expiration: 12 November 2031)
- (U//FOUO) **Alien #:** [redacted]
- (U//FOUO) **FIN:** [redacted]
- (U//FOUO) **FBI Number:** [redacted]
- (U//FOUO) **Criminal Record:** [redacted]
- (U//FOUO) **SSN:** [redacted]

## (U) Criminal History

- (U//LES) Obstruct Governmental Administration 2nd Degree—Prevent Official Function; New York County Criminal Court (March 2025)
- (U//LES) Disorderly Conduct—Refusing to Move On; New York County Criminal Court (March 2025)
- (U//LES) Trespass; New York County Criminal Court (March 2025)

## (U) USCIS Application

- (U//FOUO) 21 February 2025—Permanent resident applying to replace permanent resident card on 20 February 2025—In process.
- (U//FOUO) 1 September 2021—Applied for I-485 Employment Authorization Car[redacted] Completed.

## (U) Residence

(U//FOUO) [redacted]

## (U) Communications

- (U) **Phone Numbers:**
  - (U//FOUO) [redacted] (cell)
  - (U//FOUO) [redacted] (cell)
- (U) **Possible Social Media:**
  - (U) [redacted]
- (U) **Email:**
  - (U//FOUO) [redacted]
  - (U//FOUO) [redacted]

## (U) Travel and Border Crossing History

| Date | Flight |
|---|---|
| 11 August 2024 | AA 280 (ICN > DFW) |
| 17 July 2024 | AA 281 (DFW > ICN) |
| 14 March 2024 | NK 528 (CUN > FLL) |
| 11 March 2024 | NK 1280 (MSY > CUN) |
| 12 August 2022 | KE 93 (ICN > IAD) |
| 2 July 2022 | KE 94 (IAD > ICN) |
| 12 March 2022 | AA 2248 (CUN > CLT) |
| 5 March 2022 | AA 1778 (CLT > CUN) |
| 26 July 2010 | UA 892 (ICN > SFO) |

(U//FOUO)

*Prepared for/in collaboration with HSI Office of Intel*

*ROA Published Date: 6 March 2025*

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

**(U//FOUO) Yunseo CHUNG** ICE-HQINT-30144-25

## (U) News Articles

- (U) **Anti-Israel protesters arrested at Barnard were mostly privileged youths, including woman whose family started Hamptons Jitney**—Published 6 March 2025

  https://nypost.com/2025/03/06/us-news/arrested-anti-israel-protesters-at-barnard-include-repeat-offender-woman-whose-family-started-hampton-jitney-bus-service/

  Describes her as being part of the protests.

  *"Others hauled off campus by police included Hanna Puelle — whose Instagram identifies her as publisher of Columbia Law Review — and Yunseo Chung, a Columbia women's studies junior, former high school valedictorian and social media editor for Quarto, the university's official undergraduate literary magazine."*

- (U) **Meet the Columbia Radicals Arrested for Storming a Barnard Building**— Published 6 March 2025

  https://freebeacon.com/campus/meet-the-columbia-radicals-arrested-for-storming-a-barnard-building/

  Describes her as being part of the protests and includes a screenshot of her Linkedin page.

  *"Of the nine individuals arrested after storming Millstein Library, four are Columbia students: Gabrielle Wimer, Hannah Puelle, Yunseo Chung, and Symmes Cannon. One, Tramy Dong, is a Barnard student. Another, Christopher Holmes, attends Union Theological Seminary, a Columbia affiliate, while the remaining three appear unassociated with either school. They were charged with disorderly conduct, trespassing, and obstructing governmental administration, according to an NYPD spokesman..."*

  *"The third, Chung, is a Columbia junior pursuing her bachelor's degree in English and Women's and Gender Studies. According to a screenshot of her LinkedIn taken before it was deleted, she is involved in Columbia's Criminal Justice Coalition and Columbia's Queer Alliance and was the valedictorian of the high school she attended."*

## (U) Social Media

(U) Linkedin (currently locked)

[redacted]




UNCLASSIFIED

# (U) Yunseo CHUNG

*(U) Warning: This product is preliminary criminal analysis supporting an ongoing criminal investigation; the analysis may change, subject to new information developed over the course of the ongoing investigation.*

*(U) Warning: This is a U.S. Immigration and Customs Enforcement internal document and may not be shared externally.*

*(U) This document has been designated by DHS as UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE (U//LES) and is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS and ICE policy relating to LES information. This information can be distributed further within DHS on a need-to-know basis; however, it may not be distributed outside DHS without authorization from the originating office.*

*(U) This document contains information that is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public, the media, or other personnel who do not have a valid need-to-know without prior approval of an authorized DHS official.*

**(U//FOUO) Please be advised that you may request assistance or follow-up information from the Criminal Analysis Division (CAD). In this capacity, CAD leverages its resources, partnerships, and capabilities to provide additional criminal analysis collaboration and coordination, and intelligence support. For any feedback or comments, please send to** [redacted]

# EXHIBIT 237

**[.mp4 filed manually]**

# EXHIBIT 238

**UNCLASSIFIED (U)**

# 9 FAM 403.11
# (U) NIV REVOCATION

*(CT:VISA-2150; 04-29-2025)*
*(Office of Origin: CA/VO)*

## 9 FAM 403.11-1 (U) STATUTORY AND REGULATORY AUTHORITIES

### 9 FAM 403.11-1(A) (U) Immigration and Nationality Act

*(CT:VISA-1; 11-18-2015)*

**(U)** INA 221(i) (8 U.S.C. 1201(i)).

### 9 FAM 403.11-1(B) (U) Code of Federal Regulations

*(CT:VISA-1; 11-18-2015)*

**(U)** 22 CFR 41.122.

## 9 FAM 403.11-2 (U) NIV REVOCATION

*(CT:VISA-1; 11-18-2015)*

**(U)** Regulations no longer distinguish between invalidation and revocation in cases when it is determined that the bearer of a visa is ineligible. The visa should be revoked in accordance with INA 221(i), 22 CFR 41.122 and this subchapter.

## 9 FAM 403.11-3 (U) WHEN TO REVOKE A VISA

### 9 FAM 403.11-3(A) (U) When You May Revoke Visas

*(CT:VISA-1948; 03-07-2024)*

**(U) There are four circumstances under which you may revoke a visa:**

(1) **Unavailable**

(2) **(U)** The individual is not eligible for the visa classification (this includes ineligibility under INA 214(b));

(3) **(U)** The visa has been physically removed from the passport in which it was issued; or

(4) **(U)** The individual is subject to an IDENT Watchlist record in System Messages for an arrest or conviction of driving under the influence, driving while intoxicated, or similar arrests/convictions (DUI) that occurred within the previous five years, pursuant to 9 FAM 403.11-5(B) paragraph c, below.

## 9 FAM 403.11-3(B) (U) When You May Not Revoke A Visa

*(CT:VISA-1463; 02-01-2022)*

a. **(U)** You do not have the authority to revoke a visa based on a suspected ineligibility or based on derogatory information that is insufficient to support an ineligibility finding, other than a revocation based on driving under the influence (DUI). A consular revocation must be based on an actual finding that the individual is ineligible for the visa.

b. **(U)** Under no circumstances should you revoke a visa when the individual is in the United States, or after the individual has commenced an uninterrupted journey to the United States, other than a revocation based on driving under the influence (DUI). Outside of the DUI exception, revocations of individuals in, or en route to, the United States may only be done by the Department's Visa Office of Screening, Analysis, and Coordination (CA/VO/SAC).

# 9 FAM 403.11-4 (U) REVOCATION PROCEDURES

## 9 FAM 403.11-4(A) (U) Visa Revocations by Consular Officers

*(CT:VISA-2088; 10-02-2024)*

**(U)** Although the decision to revoke a visa is a discretionary one, you should not use this authority arbitrarily. When practicable:

(1) **(U)** Notify the individual of the intention to revoke the visa;

(2) **(U)** Allow the individual the opportunity to show why the visa should not be revoked; and

(3) **(U)** Request the individual to present the travel document in which the visa was issued.

### 9 FAM 403.11-4(A)(1) (U) Required Procedures

*(CT:VISA-2088; 10-02-2024)*

a. **(U) Informing Individual of Intent to Revoke Visa:**

(1) **(U)** Notify the individual of the intent to revoke a visa if such notification is practicable. The notice of intent to revoke a visa affords the individual the opportunity to demonstrate why the visa should not be revoked. An after-the-fact notice that the visa has already been revoked is not sufficient unless prior notice of intent to revoke was not practicable.

(2) **(U)** A prior notification of intent to revoke a visa would not be practicable if, for instance, you do not know the whereabouts of the individual, or if the individual's departure is believed to be imminent. In cases where the individual can be contacted and travel is not imminent, prior notice of intent to revoke the visa is normally required, unless you have reason to believe that a notice of this type would prompt the individual to attempt immediate travel to the United States.

b. **(U) Physical Cancellation of Visa:** If a decision to revoke the visa is reached after the case has been reviewed, print or stamp the word "REVOKED" in large block letters across the face of the visa. Also date and sign this action. If you are at a post other than the one where the visa was issued, the title and location of your post should be written below the signature.

c. **(U) If the Individual Possesses Another Valid U.S. Visa:** When you have taken action to revoke a visa, you should determine whether the individual holds another current U.S. visa in the same or another passport. You should revoke that visa as well, if the grounds for revoking the first visa apply to any other visa the individual may hold, or if independent grounds for revocation apply. In the latter case, if practicable, give the individual an opportunity to rebut or overcome that ground(s) of ineligibility.

d. **Unavailable**

e. **Unavailable**

## 9 FAM 403.11-4(A)(2) (U) When to Notify Department Regarding Revocation

*(CT:VISA-1948; 03-07-2024)*

a. **(U)** If a visa is physically cancelled before the individual's departure to the United States, then there is no need to report the revocation to the Department, except in cases involving A, G, C-2, C-3, or NATO visas.

b. **(U)** L/CA, the Diplomatic Liaison Division (CA/VO/DO/DL), the Chief of Protocol (S/CPR), and the appropriate country desk should be promptly notified whenever any diplomatic or official visa, or any visa in the A, G, C-2, C-3, or NATO classification is revoked.

c. **(U)** See 9 FAM 403.11-4(C)(1) below for more information about notifying the Department of visa revocations that may have political, public relations, or law enforcement consequences.

# 9 FAM 403.11-4(B) Unavailable

*(CT:VISA-2088; 10-02-2024)*

a. **Unavailable**

b. **Unavailable**

c. **(U)** See 9 FAM 402.8-8, Procedures to be Followed When Derogatory Information Received.

# 9 FAM 403.11-4(C) (U) Revoking Visas in Sensitive Cases

## 9 FAM 403.11-4(C)(1) (U) Keeping Department Informed in High Profile Cases

*(CT:VISA-1948; 03-07-2024)*

a. **(U)** You should be alert to the political, public relations, and law enforcement consequences that can follow a visa revocation and should work with the Department to ensure that all legally available options are fully and properly assessed. The revocation of the visa of a public official or prominent local or international person can have immediate and long-term repercussions on our political relationships with foreign powers and on our public diplomacy goals in a foreign state. The visa laws must be applied to such persons like any others, recognizing that certain visa categories, particularly A's and G's, are not subject to the same standards of ineligibility as others. Hasty action, however, must be avoided in such high-profile visa cases and you should seek the Department's guidance before any visa revocation unless unusual and exigent circumstances prevent such a consultation. Consultation both within the mission and with the Department may result in a decision that the Department, rather than the consular officer, should undertake the revocation, since Department revocations pursuant to the Secretary's revocation authority provide more flexibility in managing the relevant issues.

b. **(U) When to Consult with the Department:**

(1) **(U)** You are responsible for keeping the Department (CA/VO/SAC, CA/VO/F, L/CA, and the appropriate country desk) informed of visa actions that may affect our relations with foreign states or our public diplomacy, or that may affect or impede ongoing or potential investigations and prosecutions by U.S. and other cooperating foreign law enforcement agencies.

(2) **(U)** This is particularly true when you use the power granted under INA 221(i) as implemented in 22 CFR 41.122 and this section, to revoke the visas of officials of foreign governments, prominent public figures, and subjects or potential subjects of U.S. and foreign criminal investigations.

(3) **(U)** In such cases, you should seek the Department's guidance before any visa revocation unless unusual and exigent circumstances prevent such a consultation. In the rare cases in which advance consultation is not possible, you should inform the Department immediately after the revocation.

c. **Unavailable**

## 9 FAM 403.11-4(C)(2) (U) Diplomatic and Official Visas

*(CT:VISA-1650; 11-21-2022)*

**(U)** You must keep in mind that most A, G, C-2, C-3, and North Atlantic Treaty Organization (NATO) visa categories are exempt from most INA 212(a) ineligibility provisions per 22 CFR 41.21(d). Precipitant action must be avoided in cases involving foreign government officials and other prominent public figures. Consultations at post and with the Department might result in the decision that the Department, rather than the consular officer, should undertake the revocation. The Department's revocation authority provides more flexibility in managing relevant issues. For example, Department revocations may be undertaken prudentially, rather than based on a specific finding of ineligibility and are not subject to the 22 CFR 41.122 requirement with respect to notification to the individual.

## 9 FAM 403.11-4(C)(3) (U) When Revocation Subject is Subject of Criminal Investigation

*(CT:VISA-2088; 10-02-2024)*

a. **(U)** In cases in which the individual whose visa is revocable is also the subject of a criminal investigation involving U.S. law enforcement agencies, action without prior Department consultation and coordination could:

(1) **(U)** Jeopardize an ongoing investigation;

(2) **(U)** Prejudice an intended prosecution;

(3) **(U)** Preclude apprehension of the subject in the United States;

(4) **(U)** Put informants at risk; or

(5) **(U)** Damage cooperative law enforcement relationships with foreign police agencies.

b. **Unavailable**

c. **(U)** In deciding what cases to report in advance to the Department, err on the side of prudence. It is always better to report cases requiring no Department action rather than having to inform the Department after the fact in a case that has adverse consequences for U.S. law enforcement or diplomatic interests. Contact CA/VO/SAC and other functional bureaus, as appropriate.

# 9 FAM 403.11-5 (U) REVOCATION OF VISAS BY THE DEPARTMENT

*(CT:VISA-1948; 03-07-2024)*

a. **(U)** When the Department revokes a visa, when possible, a revocation notice will be sent to the consular section by email furnishing a point of contact in the Visa Office. You must follow the instructions in the revocation notice.

b. **(U)** Although the Department is not required to notify an individual of a revocation done pursuant to the Secretary's discretionary authority, you should do so unless instructed otherwise, especially in cases where the revoked visa was issued to a government official.

## 9 FAM 403.11-5(A) (U) Notice to Department of Presence in United States

*(CT:VISA-2150; 04-29-2025)*

a. **Unavailable**

b. **(U)** Upon receipt of your report, the Department will decide whether the visa should be revoked. Alternatively, the Department may inform DHS of the data submitted and give DHS an opportunity to initiate proceedings under the pertinent provisions of INA 237. If the latter course is followed, the Department will request that DHS advise the Department of the individual's date of departure and destination, so the individual's *visa may be physically canceled after their* departure from the United States.

## 9 FAM 403.11-5(B) (U) Prudential Revocations

*(CT:VISA-2150; 04-29-2025)*

a. **(U)** Although you usually may revoke a visa only if the individual is ineligible under INA 212(a), or INA 214(b), or is no longer entitled to the visa classification, the Department may revoke a visa if an ineligibility or lack of entitlement is suspected, when an individual would not meet requirements for admission, or in other situations where warranted. This is known as a "prudential revocation." In addition to the conditions described in 9 FAM 403.11-5(A) above, the Department may revoke a visa when it receives derogatory information directly from another U.S. Government agency, including a member of the intelligence or law enforcement community. These requests are reviewed by CA/VO/SAC/RC, which forwards an electronic memo requesting revocation to a duly authorized official in the Visa Office, along with a summary of the available intelligence and/or background information and any other relevant documentation. When prudential revocation is approved, the subject's name is entered into CLASS, the visa case status is updated to "Revoke", and the revocation is communicated within the Department and to other agencies by the following means:

(1) **Unavailable**

(2) **Unavailable**

(3) **Unavailable**

b. **Unavailable**

c. **(U) Prudential Revocation for Driving Under the Influence:** Either the consular section or the Department has the authority to prudentially revoke a visa based on a potential INA 212(a)(1)(A) ineligibility when an IDENT Watchlist Record appears in System Messages for a CJIS Search of US-VISIT or a CJIS Search of OBIM record. Before doing so, re-send the fingerprints to NGI to obtain a RAP sheet for an arrest or conviction of driving under the influence, driving while intoxicated, or similar arrests/convictions (DUI) that occurred within the previous five years. This does not apply when the arrest has already been addressed within the context of a visa application; i.e., the individual has been through the panel physician's assessment due to the arrest. This does not apply to other alcohol related arrests such as public intoxication that do not involve the operation of a vehicle. Unlike other prudential revocations, you do not need to refer the case to the Department but can prudentially revoke on your own authority. Process the revocation from the Spoil tab NIV and add P1A3 and VRVK lookouts from the Refusal window.

## *9 FAM 403.11-5(C) Unavailable*

*(CT:VISA-2150; 04-29-2025)*

*a.* ***Unavailable***

*b.* ***Unavailable***

*c.* ***Unavailable***

*(1)* ***Unavailable***

*(2)* ***Unavailable***

*(3)* ***Unavailable***

*d.* ***Unavailable***

*e.* ***Unavailable***

# 9 FAM 403.11-6 (U) RECONSIDERATION OF REVOCATIONS

## 9 FAM 403.11-6(A) (U) Reinstatement Following Revocation

*(CT:VISA-2088; 10-02-2024)*

**Unavailable**

(1) **Unavailable**

(2) **(U) If Visa Has Been Revoked and Physically Canceled:** If a visa has been revoked and the revoked visa physically canceled, the individual may apply for a new visa; however, they may not travel on the physically cancelled visa.

(3) **Unavailable**

(4) **Unavailable**

# 9 FAM 403.11-7 (U) ACTIONS BY DHS

## 9 FAM 403.11-7(A) (U) Cancellation of Visas by Immigration Officers Under 22 CFR 41.122(e)

*(CT:VISA-2088; 10-02-2024)*

a. **(U) When a visa is canceled by a DHS officer, one of the following notations will normally be entered in the individual's passport:**

(1) **(U)** Canceled. Adjusted;

(2) **(U)** Canceled. Excluded. DHS (Office) (Date);

(3) **(U)** Canceled. Application withdrawn. DHS (Office) (Date);

(4) **(U)** Canceled. Final order of deportation/voluntary departure entered DHS (Office) (Date) Canceled. Departure required. DHS (Office) (Date);

(5) **(U)** Canceled. Waiver revoked. DHS (Office) (Date); and

(6) **(U)** Canceled. Presented by impostor. DHS (Office) (Date).

b. **(U)** Except when a visa is canceled after the individual's status has been adjusted to that of a permanent resident, DHS will inform the consular section that issued the visa of the cancellation action. The I-275, Withdrawal of Application/Consular Notification form, will be used to inform consular officers at the issuing office of the cancellation action. The I-275 form and any other attached forms should not be released to individuals or their representatives.

# 9 FAM 403.11-7(B) (U) Voidance of Counterfeit Visas

*(CT:VISA-1275; 05-10-2021)*

**(U)** When DHS has determined through examination that a visa has been altered or is counterfeit, it will void the visa by entering one of the following notations on the visa page, together with the action officer's signature, title, and office location:

(1) **(U)** Counterfeit visa per testimony of individual (file number); or

(2) **(U)** Counterfeit visa per telecon, letter, e-mail from U.S. Embassy (U.S. Consul).

**UNCLASSIFIED (U)**

# EXHIBIT 239

[redacted]

**From:** SMART Core
**Sent:** Wednesday, June 18, 2025 1:47 PM
**Cc:** [redacted]
**Subject:** Action Request: Expanding Screening and Vetting for FMJ Applicants

UNCLASSIFIED

SBU

**Action Office:**
**Info Office:** ALDACS

**MRN:** 25 STATE 59756 Reply
**Date/DTG:** Jun 18, 2025 / 181737Z JUN 25
**From:** SECSTATE WASHDC
**Action:** ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE *Immediate*
**E.O:** 13526
**TAGS:** CMGT, CVIS, KFRD
**Captions:** SENSITIVE
**Reference:** A) 25 STATE 5914
B) 25 STATE 26168
C) 25 STATE 50220
**Subject:** Action Request: Expanding Screening and Vetting for FMJ Applicants

1. (U) This is an action request. See paras. 26-29.

## INTRODUCTION AND SUMMARY

2. (SBU) In ref A, the Department directed consular officers to maintain extra vigilance and to comprehensively review and screen every visa applicant for potential security and non-security related ineligibilities including to assess whether the applicant poses a threat to U.S. national security. In ref B, consular officers were instructed to conduct expanded social media screening and vetting for certain F, M, and J nonimmigrant visa (FMJ) applicants. In ref C, the Department directed consular sections to temporarily suspend scheduling FMJ cases pending further guidance on FMJ vetting. This guidance supersedes ref B, which was limited to social media vetting for certain FMJ applicants.

3. (SBU) This updated guidance requires consular officers to conduct a comprehensive and thorough vetting of all FMJ applicants, including online presence, to identify applicants who bear hostile attitudes toward our citizens, culture, government, institutions, or founding principles; who advocate for, aid, or support designated foreign terrorists and other threats to U.S. national security; or who perpetrate unlawful antisemitic harassment or violence. Consular sections should resume scheduling FMJ appointments but should consider the effect of this guidance on workload and schedule accordingly. **Posts should prioritize expedited FMJ appointment requests as described in para 29.** Posts should implement these vetting procedures within five business days.

**WHY ARE WE DOING THIS?**

4. (U) E.O. 14161, Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats, directs us to ensure that foreign nationals admitted to the United States do not bear hostile attitudes toward the citizens, culture, government, institutions, or founding principles of the United States, and that they do not advocate for, aid, or support designated foreign terrorists and other threats to U.S. national security. E.O. 14188, Additional Measures to Combat Anti-Semitism, establishes U.S. policy to combat antisemitism vigorously, using all available legal tools to hold to account perpetrators of unlawful antisemitic harassment and violence, including on university campuses.

5. (U) Removing foreign nationals from the United States, even when they have clearly violated our laws, is a lengthy, expensive, and difficult process. Therefore, we must be vigilant during the visa issuance process. We must ensure that aliens seeking admission

to the United States are screened and vetted to the maximum extent possible and that they will respect the terms of their admission to the United States. As Secretary Rubio said, "a visa is a privilege, not a right."

6. (SBU) Such pre-admission vetting is particularly important for long-stay NIV holders, and acutely for FMJ cases. The FBI has long warned that foreign powers seek access to American higher education institutions to, among other things, steal technical information, exploit U.S. research and development, and spread false information for political or other reasons. In addition, a recent CA/FPP study suggested that almost half of international students seek to remain in the United States, whether legally or illegally.

**WHICH CASES ARE COVERED?**

7. (SBU) This guidance for consular officers covers **all FMJ applicants,** new or returning. This updated guidance supersedes that in ref B, which was limited to social media vetting for certain FMJ applicants.

**HOW DO I HANDLE THESE CASES?**

8. (SBU) Post should conduct intake and interviews in accordance with standard procedures. Once you determine an FMJ applicant is otherwise eligible for the requested nonimmigrant status, you must refuse the case under INA 221(g). Inform the applicant that his case is refused and requires additional administrative processing to establish his eligibility for the visa. Request that the applicant set all of his social media accounts to "public" and remind the applicant that limited access to, or visibility of, online presence could be construed as an effort to evade or hide certain activity.

**WHO DOES THE VETTING?**

9. (SBU) The same consular officer who interviews the applicant should perform the vetting described below. This "caseworker" approach is a best practice that allows a single decisionmaker to consider the whole applicant and the totality of facts surrounding the application. It also permits better detection of potentially derogatory information and inconsistencies. Other consular staff may perform discrete portions of the vetting that cannot be performed by the interviewing officer. For example, if only FPU staff have access to LexisNexis, FPU staff may conduct that check and return the results to the interviewing consular officer.

10. (SBU) **Vetting is not a fraud assessment.** Do not refer a case to post FPU for vetting or for any portion of the vetting. However, you might discover information during vetting that leads to an FPU referral. Posts should handle such cases according to their FPU referral SOPs and 7 FAH-1 H-940, Overseas FPU Responsibilities.

11. (SBU) To promote thorough vetting of visa applicants, and to promote quality decision-making generally, consular managers shall not maintain or establish any formal or informal production or processing quotas or targets for consular officers or those involved in administrative processing of visa cases. Rather consular officers shall take the time necessary to satisfy themselves that visa applicants qualify for the visas they seek, and personnel involved in back-office processing shall take the time necessary to perform their tasks thoroughly.

**WHERE DO I LOOK?**

12. (SBU) You must conduct a comprehensive and thorough vetting of each FMJ applicant who is otherwise issuable (i.e. overcomes 214(b)). Vetting means examining all aspects of the case, including the application, supporting evidence, and information you gather during the interview. You should review these in light of your personal knowledge, your expertise, and all sources of information available to you. It should include a review of the applicant's entire online presence -- not just social media activity -- using any appropriate search engines or other online resources. It also should include a check of any databases to which the consular section has access (e.g., LexisNexis or local equivalents).

13. (SBU) Consular sections may consult LE staff and Public Diplomacy sections to understand the social media environment at post and which search engines and techniques are best for comprehensively exploring an applicant's online presence. LE

staff can help provide context, including when assessing the credibility of applicants who apparently lack any online presence or who did not provide social media identifiers.

14. (SBU) If it is necessary to sign in to an account to view all of an applicant's activity on a particular social media platform (e.g., Instagram), you must do so using an official account that is publicly attributable to the Department. Consular sections may create such accounts in accordance with the platform's Terms of Service. Do not use accounts that are used for public communication. Follow the guidance on social media use in 7 FAH-1 H-945.4, Social Media Rules of Conduct in Fraud Assessments, but recall that **vetting is not a fraud assessment,** so you should not track such vetting activities in ECAS.

15. (SBU) If you are unable to review any aspect of an applicant's online presence because social media accounts are set to "private" or otherwise limited, you should treat the case as any other where an applicant fails to provide certain information on request. **You must consider whether such failure reflects evasiveness or otherwise calls into question the applicant's credibility.**

**WHAT AM I LOOKING FOR?**

16. (U) During the vetting, you simply are looking for any potentially derogatory information about the applicant. You must review any such information to ensure it does not indicate an ineligibility under INA 212(a) or 214(b). For example, during an online presence search, you might discover in local media that an applicant had been arrested and charged with a serious crime, a possible 2A1 ineligibility, that he did not disclose on his application. In such a case, you could request additional information from the applicant to help you determine whether he is ineligible.

17. (U) You should consider as potentially derogatory any indications of hostility toward the citizens, culture, government, institutions, or founding principles of the United States; of advocacy for, aid, or support for designated foreign terrorists and other threats to U.S. national security; or of support for unlawful antisemitic harassment or

Case: 26-6906, 11/20/2026, DktEntry: 16.3, Page 114 of 300

**violence. You must review any such indicators to ensure they do not indicate an ineligibility under INA 212(a). For example, during an online presence search, you might discover on social media that an applicant endorsed Hamas or its activities, a possible 3B ineligibility, that he did not disclose on this application.**

18. (SBU) You also should be alert to any inconsistencies between what you discover during vetting and how the applicant presented himself in his application, in his supporting evidence, or during the interview. You must explore all such inconsistencies to ensure they do not indicate visa ineligibilities. **Even when such inconsistencies do not point to an INA 212(a) ineligibility, they can call into question the applicant's credibility.**

19. (U) You must document the results of your vetting in detailed case notes, including all potentially derogatory information and inconsistencies. If you find any relevant information online, take screenshots to preserve the record against possible later alteration or loss of the information and upload those screenshots to the applicant's case record in the CCD.

**DOES THE APPLICANT STILL OVERCOME INA 214(B)?**

20. (U) INA 214(b) requires an applicant to show credibly that all activities in which he is expected to engage in while in the United States are consistent with the specific requirements of his visa classification. That is, **if you are not completely satisfied (1) that the applicant is credible and (2) that, during his time in the United States, the applicant will engage only in activities consistent with his nonimmigrant visa status, you should refuse the visa under INA 214(b).** That is true even in cases where the applicant has convinced you that he is not an intending immigrant, and even in cases where the applicant is also ineligible under another section of the law.

21. (SBU) Even if inconsistencies or potentially derogatory information you uncover during vetting do not rise to the level of an INA 212(a) ineligibility, you must consider whether they undermine the applicant's credibility or suggest that the applicant will not

respect the terms of his admission to the United States. For example, while vetting applicants, many posts have discovered evidence online that those applicants had worked illegally while in the United States previously, thus seriously undermining their credibility in subsequent visa applications.

22. (SBU) In the same way, indications of hostility toward the citizens, culture, government, institutions, or founding principles of the United States; of advocacy for, aid, or support for designated foreign terrorists and other threats to U.S. national security; or of support for unlawful anti-Semitic harassment or violence might not lead to an INA 212(a) ineligibility. However, you must consider whether applicants who express such strong animus are likely to respect the terms of their admission to the United States, including respecting all of its laws.

23. (SBU) Likewise, for applicants who demonstrate a history of political activism, especially when it is associated with violence or with the views and activities described above, you must consider the likelihood they would continue such activity in the United States and, if so, whether such activity is consistent with the nonimmigrant visa classification they seek. As Secretary Rubio has said, we do not seek to import activists who will disrupt and undermine scholarly activity at U.S. universities.

**IS THE APPLICANT INELIGIBLE UNDER INA 212(a)(3)?**

24. (SBU) If you uncover information that might lead to an INA 212(a)(3) ineligibility, you should follow the instructions in 9 FAM 304.2 to request an SAO. This includes but is not limited to ineligibilities under:

- INA 212(a)(3)(A)(ii), where an applicant is traveling solely, principally, or incidentally to engage in any unlawful activity (9 FAM 302.5-4).
- INA 212(a)(3)(A)(iii), where an applicant seeks to engage solely, principally, or incidentally in any activity, a purpose of which is the opposition to, or the control or overthrow of, the U.S. government by force, violence, or other unlawful means (9 FAM 302.5-5).
- INA 212(a)(3)(B), where an applicant engages in certain terrorist activities, including espousing such activities, or has provided any form of material support to a terrorist organization (9 FAM 302.6).

25. (SBU) In any case where an applicant:

- expresses hostile attitudes toward the citizens, culture, government, institutions, or founding principles of the United States;
- **OR** advocates for, aids, or supports designated foreign terrorists and other threats to U.S. national security;
- **OR** expresses support for or perpetrates unlawful anti-Semitic harassment or violence;
- **AND** overcomes INA 214(b);
- **AND** is not ineligible under any other provision of INA 212(a)(3);
- **THEN** you should pursue a finding that the applicant is ineligible under INA 212(a)(3)(C), where an applicant's entry or proposed activities would have potentially serious foreign policy consequences or compromise a compelling U.S. foreign policy interest. Only the Secretary can make such a finding, which requires an SAO. See 9 FAM 302.14-2 for details.

**ACTION REQUESTS**

26. (U) Posts should implement these vetting procedures within five business days.

27. (U) In addition, posts should work with their Public Diplomacy Sections on any public announcements for appropriate social media platforms and/or in local press. Cleared social media content for posts to translate for this purpose will be available on the Consular Affairs Outreach Hub, and cleared press guidance will be available on CAWeb. The GSS Program Team will instruct vendors to update GSS websites.

**RESUMING FMJ SCHEDULING**

[redacted]

28. (U) Posts should resume regular scheduling of FMJ visa applications once these actions requests are implemented. However, posts should consider overall scheduling volume and the resource demands of appropriate vetting; posts might need to schedule fewer FMJ cases than they did previously.

29. (SBU) Posts may resume processing of FMJ Referrals and Priority Appointment Requests (PARs), as well as FMJ expedited appointment requests. However, among expedited appointment requests for FMJs, posts should prioritize the following groups:

- J-1 physicians
- F-1 students seeking to study at a U.S. university where international students constitute 15 percent or less of the total student population, according to the U.S. Department of Education. CA will post a list of such schools on CAWeb.

**APPLICATION PROCESS CONSIDERATIONS**

30. (U) For FMJ cases currently in "open" status that have not yet been interviewed or, in the case of interview waiver cases, otherwise adjudicated, posts should request that applicants make their social media accounts "public," then conduct the vetting described in this cable. If no potentially derogatory information is found, post can adjudicate the case to completion. If potentially derogatory information is found, post should refuse the case under the appropriate refusal code; or, if needed, post should call the applicant back for a follow-up interview.

31. (U) For FMJ cases that were interviewed before the release of ref C and are otherwise approvable but currently in INA 221(g) status, posts should request that applicants make their social media accounts "public," then conduct the vetting described in this cable. If no potentially derogatory information is found, post can adjudicate the case to completion. If potentially derogatory information is found, post should refuse the case under the appropriate refusal code; or, if needed, post should call the applicant back for a follow-up interview.

# EXHIBIT 240

AAUP & MESA Political Activity April 17, 2024



AAUP Political Activity April 17, 2025



# Comparison of AAUP Political Activity April 2024 and April 2025






# EXHIBIT 241


Comparison of AAUP Public Events 2022 - 2025
Events
Palestine/Israel Associated Events
45
40
35
30
25
20
15
10
5
0
1
20
32
1
41
3
2022
2023
2024
2025

# EXHIBIT 242

Case: 26-6906, 11/20/2026, DktEntry: 16.3, Page 126 of 300

AAUP v. RUBIO - ATTORNEYS EYES ONLY

*Homeland Security Investigations*
*National Security Division*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C. 20536

LAW ENFORCEMENT SENSITIVE

Andrea Toll Whiting
Director
Field Operations
Department of State

Re: Mahmoud KHALIL

Director Whiting:

I am writing to provide a summary of the actions by Mahmoud Khalil that violate President Trump's executive orders on anti-Semitism and may be sufficient for the Secretary of State to determine there are compelling adverse foreign policy consequences for the United States from the alien's presence or activities consistent with Section 237(a)(4)(C) of the Immigration and Nationality Act (INA), codified as 8 U.S.C. § 1227(a)(4)(C).

Khalil was issued an F1 visa on December 12, 2022, and entered the United States under that visa on December 20, 2022. His status was changed to that of a Conditional Resident (CR6), Spouse of a United States Citizen, on November 16, 2024, and he received Legal Permanent Resident (LPR) status.

Mahmoud Khalil's involvement in the March 6, 2025, protest at Barnard College, where Hamas flyers were distributed, aligns with the executive order's focus on deporting "Hamas sympathizers." His leadership in these disruptive protests creates a hostile environment for Jewish students, meeting Title VI criteria. Khalil is identified as a former graduate student of Columbia University and a prominent pro-Palestinian activist involved in antisemitic activities. Social media posts and open-source articles document his leadership roles, including the occupation of Columbia University's Hamilton Hall in April 2024. Recent social media posts from March 6, 2025, indicate he was a key figure in the Barnard College library occupation, where protesters distributed Hamas-authored flyers.

HSI is concerned that the distribution of Hamas-authored flyers, leadership roles in antisemitic activities, and leadership in disruptive protests may undermine U.S. foreign policy by creating a hostile environment for Jewish students and indicating support for a designated terrorist organization. As the Secretary of State is the top U.S. diplomat and steward of U.S. foreign policy, HSI requests that the Secretary of State determine whether there are compelling adverse foreign policy consequences for the United States from the alien's presence or activities

AAUP v. RUBIO - ATTORNEYS EYES ONLY



consistent with INA § 237(a)(4)(C). If the Secretary of State makes that determination, HSI would initiate removal charges against the alien.

Enclosed with this letter is supporting factual documentation.

If you require further assistance or additional information, I can be reached at [redacted].

Respectfully,
ANDRE R WATSON
Digitally signed by ANDRE R WATSON
Date: 2025.03.07 18:25:26 -05'00'
Andre R. Watson
Assistant Director
National Security Division

# EXHIBIT 243

AAUP v. RUBIO - ATTORNEYS EYES ONLY

*Homeland Security Investigations*
*National Security Division*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C. 20536

LAW ENFORCEMENT SENSITIVE

Andrea Toll Whiting
Director
Field Operations
Department of State

Re: Yunseo CHUNG

Director Whiting:

I am writing to provide a summary of the actions by Yunseo Chung that violate President Trump's executive orders on anti-Semitism and may be sufficient for the Secretary of State to determine there are compelling adverse foreign policy consequences for the United States from the alien's presence or activities consistent with Section 237(a)(4)(C) of the Immigration and Nationality Act (INA), codified as 8 U.S.C. § 1227(a)(4)(C).

Chung is a U.S. Legal Permanent Resident (LPR). Chung entered the United States on an F2 visa on 23 June 2009. She requested legal permanent resident status on 18 June 2020. Chung was issued an LPR card on 27 August 2021.

Yunseo Chung's involvement in the March 5, 2025, protest at Barnard College, where Hamas flyers were distributed, aligns with the executive order's focus on deporting "Hamas sympathizers." Her involvement in these disruptive protests created a hostile environment for Jewish students, meeting Title VI criteria. Chung is identified as a student of Columbia University and involved in antisemitic activities. Recent social media posts from March 6, 2025, indicate she was a figure in the Barnard College library occupation, where protesters distributed Hamas-authored flyers.

HSI is concerned that the distribution of Hamas-authored flyers, leadership in disruptive protests, involvement in antisemitic activities may undermine U.S. foreign policy by creating a hostile environment for Jewish students and indicating support for a designated terrorist organization. As the Secretary of State is the top U.S. diplomat and steward of U.S. foreign policy, HSI requests that the Secretary of State determine whether there are compelling adverse foreign policy consequences for the United States from the alien's presence or activities consistent with INA § 237(a)(4)(C). If the Secretary of State makes that determination, HSI would initiate removal charges against the alien.

Enclosed with this letter is supporting factual documentation.

AAUP v. RUBIO - ATTORNEYS EYES ONLY



If you require further assistance or additional information, I can be reached at [redacted].

Respectfully,
ANDRE R WATSON
Digitally signed by ANDRE R WATSON
Date: 2025.03.07 18:18:15 -05'00'
Andre R. Watson
Assistant Director
National Security Division

# EXHIBIT 244

AAUP v. RUBIO - ATTORNEYS EYES ONLY

*Homeland Security Investigations*
*National Security Division*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C. 20536

LAW ENFORCEMENT SENSITIVE

John L. Armstrong
Senior Bureau Official
Bureau of Consular Affairs
Department of State

Re: Mohsen MAHDAWI

Dear Mr. Armstrong:

I am writing to provide a summary of the actions by Mohsen MAHDAWI in violation of President Trump's executive orders on anti-Semitism and for the Secretary of State to assess whether the alien's presence or activities in the U.S. compromise a compelling U.S. foreign policy interest and would have potentially serious adverse foreign policy consequences consistent with Section 237(a)(4)(C) of the Immigration and Nationality Act (INA), codified as 8 U.S.C. § 1227(a)(4)(C).

MAHDAWI first entered the U.S. as B2 nonimmigrant visitor for pleasure. MAHDAWI received his CR6 Conditional Legal Resident status in January 2015 after marrying a U.S. Citizen in Palestine in June 2013. His marriage was dissolved in December 2015. He filed a petition to remove the conditions on residence in 2016, after which he received Legal Permanent Resident (LPR) status (IR6). MAHDAWI filed an N-400 Application for Naturalization, which is on hold.

Mohsen MAHDAWI's involvement in disruptive protests at Columbia University align with the executive orders' focus on deporting "Hamas sympathizers." His leadership and involvement in these disruptive protests creates a hostile environment for Jewish students. MAHDAWI is identified as a student of Columbia University and a prominent pro-Palestinian activist involved in pro-Hamas rhetoric and events. News media articles refer to MAHDAWI calling for Isreal's destruction and justifying Hamas terrorism in late 2023. They also state that MAHDAWI has openly expressed support for eliminating Israel, leading protests with chants such as "From the river to the sea, Palestine will be free."

A post from stopantisemitism.org states that MAHDAWI's glorification of terrorism was exemplified by a poem posted online and attributed to him that said, "I will breathe home…and fill my shame, and clean my gun, and collect my packages, my bombs and embrace my gun." The poem also praises Dalal Mughrabi, who perpetrated the 1978 Coastal Road massacre, which resulted in the murder of Jews.

MAHDAWI served as co-president of DAR Palestine at Columbia University. MAHDAWI was also affiliated with the pro-terror activist group Within Our Lifetime, (WOL) in 2023 and was reportedly a member of Students for Justice in Palestine (SJP) that same year.

HSI is concerned that MAHDAWI's participation in the above activities may undermine U.S. foreign policy by creating a hostile environment for Jewish students and indicating support for a designated terrorist organization. As the Secretary of State is the top U.S. diplomat and steward of U.S. foreign policy, HSI provides this summary of actions for the Secretary of State to determine whether the alien's presence and activities compromise a compelling U.S. foreign policy interest and would have potentially serious adverse foreign policy consequences for the United States consistent with INA § 237(a)(4)(C). If the Secretary of State makes that determination, HSI would initiate removal charges against the alien.

Enclosed with this letter is supporting factual documentation. If you require further assistance or additional information, please let me know. I can be reached at [redacted].

Respectfully,
ANDRE R WATSON Digitally signed by ANDRE R WATSON Date: 2025.03.14 12:51:37 -04'00'
Andre R. Watson
Assistant Director
National Security Division

# EXHIBIT 245

*Homeland Security Investigations*
*National Security Division*

**U.S. Department of Homeland Security**
**500 12th Street, SW**
**Washington, D.C. 20536**

LAW ENFORCEMENT SENSITIVE

John L. Armstrong
Senior Bureau Official
Bureau of Consular Affairs
Department of State

Re: Rumeysa OZTURK

Mr. Armstrong:

I am writing to provide a summary of the actions by Rumeysa OZTURK for consideration of actions that may constitute violations of President Trump's executive orders on anti-Semitism, and for the Secretary of State to assess whether the alien's presence or activities in the U.S. compromise a compelling U.S. foreign policy interest and would have potentially serious adverse foreign policy consequences consistent with Section 237(a)(4)(C) of the Immigration and Nationality Act (INA), codified as 8 U.S.C. § 1227(a)(4)(C).

OZTURK is a national of Turkey enrolled at Tufts University (Tufts) pursuing a post doctorate degree in Child Studies and Human Development. OZTURK last entered the United States on June 28, 2024, on a nonimmigrant student visa (F1). The initial student program start date was February 1, 2021, and the program end date is December 23, 2027.

On March 26, 2024, OZTURK engaged in anti-Israel activism in the wake of the Hamas terrorist attacks on Israelis on October 7, 2023. Specifically, on March 26, 2024, OZTURK co-authored an Op-ed article titled Try again, President Kumar: Renewing Calls for Tufts to adopt March 4 TCU Senate resolutions, which was published in The Tufts Daily. The Op-ed was in response to Tufts President Kumar's statement regarding the Tufts Community Union Senate vote on proposed resolutions by the Coalition for Palestinian Liberation at Tufts (CPLT). The CPLT resolutions proposed an end to study abroad programs in Israel, for Tufts dining to stop selling items connected to Israel, for Tufts to acknowledge a "Palestinian genocide, and for Tufts Investment office and administration to disclose all investments and divest from companies tied to Israel.

The authors of the Op-ed, including OZTURK, again called for Tufts to "disclose its investments and divest from companies with direct or indirect ties to Isreal." The authors also state that Graduate Students for Palestine joins Tufts Students for Justice in Palestine (SJP) and other student groups to reject the University's response to the resolutions. Tufts SJP was officially suspended on Nov. 6, 2024, until January 2027 after it used images of weapons to promote a

AAUP v. RUBIO - ATTORNEYS EYES ONLY



protest rally and urged members of the Tufts community to "join the student intifada." According to a news article on Boston.com, SJP violated the Threats Policy in October when it posted the images of weapons and used the term "intifada" to urge student action. Intifada is a call for the uprising or rebellion specifically: an armed uprising of Palestinians against Israeli occupation of the West Bank and Gaza Strip. On October 2, 2024, an X.com (Twitter) posting by Eyal Yakoby, "an incoming MIT student dedicated to combating anti-Americanism," showed stickers claiming to have been plastered on Tufts University campus by students. The post depicts signage placed around Tufts campus with the statement "Bring the war home" with a Palestinian flag and Hamas inverted red triangle above what appears to be a Tufts Police Department vehicle. The post states that this is a call to "bring the war to campus."

HSI is concerned that OZTURK's involvement in these activities and associations with these groups may undermine U.S. foreign policy by creating a hostile environment for Jewish students and indicating support for a designated terrorist organization. As the Secretary of State is the top U.S. diplomat and steward of U.S. foreign policy, HSI provides this summary of the alien's actions for the Secretary of State to assess whether the alien's presence and activities compromise a compelling U.S. foreign policy interest and would have potentially serious adverse foreign policy consequences for the United States consistent with INA § 237(a)(4)(C) (8 U.S.C. § 1227(a)(4)(C)). If the Secretary of State makes that determination, HSI would initiate removal charges against the alien.

Additionally, HSI provides the above information relating to OZTURK's nonimmigrant status and activities in the United States for the Secretary of State to assess whether revocation of the visa, effective immediately, is appropriate pursuant to INA § 221(i) (8 U.S.C. § 1201(i)). If the Secretary of State determines that this alien's visa should be revoked effective immediately, the revocation will support a ground of removability under INA § 237(a)(1)(B), codified as 8 U.S.C. § 1227(a)(1)(B).

Enclosed with this letter is supporting factual documentation. If you require further assistance or additional information, please let me know. I can be reached at [redacted].

Respectfully,
ANDRE R WATSON Digitally signed by ANDRE R WATSON Date: 2025.03.21 07:29:10 -04'00'
Andre R. Watson
Assistant Director
National Security Division

# EXHIBIT 246

*Homeland Security Investigations*
*National Security Division*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C. 20536



John L. Armstrong
Senior Bureau Official
Bureau of Consular Affairs
Department of State

Re: Badar Khan SURI

Dear Mr. Armstrong:

I am writing to provide a summary of the actions by Badar Khan SURI in violation of President Trump's executive orders on anti-Semitism and for the Secretary of State to assess whether the alien's presence or activities in the U.S. compromise a compelling U.S. foreign policy interest and would have potentially serious adverse foreign policy consequences consistent with Section 237(a)(4)(C) of the Immigration and Nationality Act (INA), codified as 8 U.S.C. § 1227(a)(4)(C).

SURI last entered the United States on 12/10/2022 on a nonimmigrant exchange visa (J1) to attend Georgetown University as a research scholar. Suri's student status is currently ACTIVE, scheduled for a program end date of 12/31/2026.

SURI is identified as a research exchange student at Georgetown University actively supporting Hamas terrorism, who actively spreads it's propaganda and promotes antisemitism on social media. SURI is married to the U.S. Citizen daughter of a known or suspected terrorist, who is a senior advisor to Hamas.

HSI is concerned that SURI's direct connection to Hamas leadership and involvement in antisemitic activities may undermine U.S. foreign policy by creating a hostile environment for Jewish students and indicating support for a designated terrorist organization. As the Secretary of State is the top U.S. diplomat and steward of U.S. foreign policy, HSI provides this summary of the alien's actions for the Secretary of State to determine whether the alien's presence and activities compromise a compelling U.S. foreign policy interest and would have potentially adverse foreign policy consequences for the United States consistent with INA § 237(a)(4)(C). If the Secretary of State makes that determination, HSI would initiate removal charges against the alien.

Enclosed with this letter is supporting factual documentation. If you require further assistance or additional information, please let me know. I can be reached at [redacted].

Respectfully,
ANDRE R WATSON Digitally signed by ANDRE R WATSON Date: 2025.03.14 12:59:02 -04'00'
Andre R. Watson
Assistant Director
National Security Division

# EXHIBIT 247

REC1|Approve|3-8-2025|MR
REC2|Approve|3-8-2025|MR
REC3|Approve|3-8-2025|MR

AAUP v. RUBIO - ATTORNEYS EYES ONLY

2025001959

United States Department of State

Washington, DC 20520

EXHIBIT
247

SENSITIVE BUT UNCLASSIFIED//
LAW ENFORCEMENT SENSITIVE

March 8, 2025

**Action Memo for the Secretary**

FROM: CA – John Armstrong, SBO

SUBJECT: (SBU) Removal of Yunseo Chung and Mahmoud Khalil, both U.S. LPRs, under Section 237(a)(4)(C) of the Immigration and Nationality Act (INA)

**(SBU) Recommendation 1:** That you determine the presence and activities of Yunseo Chung ([redacted]) have potentially serious adverse foreign policy consequences for the United States and would compromise a compelling U.S. foreign policy interest, rendering her deportable under Section 237(a)(4)(C) of the INA.
**Decision: ☐ Approve ☐ Disapprove ☐ Discuss**

**(SBU) Recommendation 2:** That you determine the presence and activities of [redacted]), have potentially serious adverse foreign policy consequences for the United States and would compromise a compelling U.S. foreign policy interest, rendering him deportable under Section 237(a)(4)(C) of the INA.
**Decision: ☐ Approve ☐ Disapprove ☐ Discuss**

**(SBU) Recommendation 3:** That you authorize the transmission of the attached notification to the secretary of Homeland Security of the determination(s) as a basis for the removal(s).
**Decision: ☐ Approve ☐ Disapprove ☐ Discuss**

**Background**

(SBU) On March 7, DHS/ICE requested that CA seek your determination that Chung and Khalil are deportable under INA section 237(a)(4)(C) in order to initiate removal charges against them. Under INA section 237(a)(4)(C)(i), an alien is deportable from the United States if the Secretary of State has reasonable ground to believe that the alien's presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States. Under INA section 237(a)(4)(C)(ii), for cases in which the basis for this determination is the alien's past, current, or expected beliefs, statements, or associations that are otherwise lawful, the Secretary of State must personally determine that the alien's presence or activities would compromise a compelling U.S. foreign policy interest.

(SBU) Yunseo Chung is an LPR of the United States and a current undergraduate student at Columbia University. Press reporting and social media identify Chung as a participant in protests on March 5 at Barnard College, and specifically as a participant in the occupation of the Barnard's Millstein Library. According to a DHS/ICE summary of Chung, she received three charges of unlawful conduct stemming from the March protests, including charges related to obstructing governmental administration, disorderly conduct, and trespass. On March 7, DHS/ICE provided a summary of Chung's actions to CA, reporting that "Hamas-authored flyers" were distributed at the protests, and that Chung's involvement in the protests "created a hostile environment for Jewish students, meeting Title VI criteria."

(SBU) Mahmoud Khalil is a U.S. LPR and a former graduate student at Columbia University. According to social media and open-source articles, Khalil has been involved in numerous pro-Palestinian protests, including serving as the lead negotiator of an encampment at Columbia in April 2024, and also a key figure in the March 6 Barnard College library occupation, where protestors distributed Hamas-authored flyers. On March 7, DHS/ICE provided a summary of Khalil's actions to CA, reporting that "Hamas-authored flyers" were distributed at the March 6 protests, and that Khalil's leadership in the protests "created a hostile environment for Jewish

students, meeting Title VI criteria." Unlike Chung, we are not aware of any prior arrests or citations for Khalil regarding unlawful activity.

(SBU) The activities and presence of Chung and Khalil in the United States have potentially serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest, because their participation and roles in antisemitic protests and disruptive activities fosters a hostile environment for Jewish students in the United States, and the public actions undermine U.S. policy to combat anti-Semitism around the world. Under E.O. 14188, *Additional Measures to Combat Anti-Semitism*, it is the policy of the United States to combat anti-Semitism, using all available and appropriate legal tools to hold to account the perpetrators of unlawful anti-Semitic harassment and violence. Allowing Chung and Khalil to remain in the United States undermines the U.S. policy to combat anti-Semitism and efforts to protect Jewish students from harassment and violence in the United States. Consistent with E.O. 14150, *America First Policy Directive to the Secretary of State*, the foreign policy of the United States champions core American interests and U.S. citizens, and condoning anti-Semitic conduct and disruptive protests in the United States would severely undermine that significant foreign policy objective.

(SBU) DHS has not identified any alternative grounds of removability that would be applicable to Chung and Khalil, including the ground of removability for aliens who have provided material support to a foreign terrorist organization or terrorist activity. We are not aware of any prior exercises of the Secretary's removal authority in INA section 237(a)(4)(C), and given their LPR status, Chung and Khalil are likely to challenge their removal under this authority, and courts may scrutinize the basis for these determinations.

**Attachments**

- Tab 1 – DHS Letter on Chung
- Tab 2 – HSI Subject Profile of Chung
- Tab 3 – DHS Letter on Khalil
- Tab 4 – HSI Subject Profile of Khalil
- Tab 5 – State Notification Letter to DHS
- Tab 6 – 8 USC 1227(a)(4)(C)

**Approved: CA – John L. Armstrong, Senior Bureau Official [JLA]**
**I confirm the drafter received guidance on this paper's intent, objectives, topics, scope, and structure. ☒ Yes ☐ No**

Drafted: CA - Various Drafters

Cleared:

| **Bureau** | Name | **Clearance Status** |
|---|---|---|
| CA/VO | [redacted] | (ok) |
| CA/VO | | (ok) |
| CA/VO/F | | (ok) |
| L/CA | | (ok) |
| S/P | | (ok) |
| C | | (ok) |
| M | | (info) |
| D | | (info) |
| P | | (info by request) |
| NEA/FO | | (info) |
| EAP/FO | | (info) |

# EXHIBIT 248

REC1|Approve|3-15-2025|MR
REC2|Approve|3-15-2025|MR



2025002362

United States Department of State

Washington, DC 20520

[redacted]
EXHIBIT
248

SENSITIVE BUT UNCLASSIFIED//
LAW ENFORCEMENT SENSITIVE

March 15, 2025

**Action Memo for the Secretary**

FROM: CA – John Armstrong, SBO

SUBJECT: (SBU) Determination of Deportability of Mohsen Mahdawi, a U.S. Lawful Permanent Resident (LPR), under Section 237(a)(4)(C) of the Immigration and Nationality Act (INA)

**(SBU) Recommendation 1:** That you determine the presence and activities of Mohsen MAHDAW[redacted] have potentially serious adverse foreign policy consequences for the United States and would compromise a compelling U.S. foreign policy interest, rendering him deportable under Section 237(a)(4)(C) ("4C") of the INA.

**Decision: ☐ Approve ☐ Disapprove ☐ Discuss**

**(SBU) Recommendation 2:** That you authorize the transmission of a notification to the Secretary of Homeland Security of the determination as a basis for the removal and authorize use of that notification by DHS in immigration court.

**Decision: ☐ Approve ☐ Disapprove ☐ Discuss**

**Background**

(SBU) On March 14, the Assistant Director of the National Security Division of DHS/ICE's Homeland Security Investigations referred to CA information on three aliens in the United States, Momodou Taal, Badar Khan Suri, and Mohsen Mahdawi, for your determination that they are deportable under INA section 237(a)(4)(C), in order to initiate removal charges against them. CA will transmit an action memo to you regarding a 4C determination for

Suri under separate cover, and CA has revoked the nonimmigrant visa of Taal, allowing DHS/ICE to pursue removal on that basis.

(SBU) Under INA section 237(a)(4)(C)(i), an alien is deportable from the United States if the Secretary of State has reasonable ground to believe that the alien's presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States. Under INA section 237(a)(4)(C)(ii), for cases in which the basis for this determination is the alien's past, current, or expected beliefs, statements, or associations that are otherwise lawful, the Secretary of State must personally determine that the alien's presence or activities would compromise a compelling U.S. foreign policy interest.

(SBU) Mohsen Mahdawi is a LPR of the United States and according to information provided by DHS/ICE/HSI, is "identified as a student of Columbia University and a prominent pro-Palestinian activist involved in pro-Hamas rhetoric and events."

(SBU) DHS/ICE/HSI reports that Mahdawi, through his leadership and involvement in disruptive protests at Columbia University, has engaged in anti-Semitic conduct through leading pro-Palestinian protests and calling for Israel's destruction. While DHS/ICE/HSI reporting provided only several screenshots of social media activity as evidence of Mahdawi's involvement in anti-Semitic activity, additional open-source reporting indicates that Mahdawi played an active role in fall 2024 student protests at Columbia University, instructing protestors to physically push a small group of pro-Israel students, events that university officials later acknowledged as threatening rhetoric and intimidation. Open-source reporting also identifies Mahdawi as behind anti-Semitic rhetoric in the fall 2024 protests, referring to Israeli Defense Force solders as terrorists and shouting through a megaphone at Jewish bystanders and Israel supporters.

(SBU) The activities and presence of Mahdawi in the United States have potentially serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest, because his

participation and roles in anti-semitic protests and reported intimidating and harassment of Jewish students during fall 2024 protests at Columbia University undermine U.S. policy to combat anti-Semitism around the world and in the United States. Under E.O. 14188, *Additional Measures to Combat Anti-Semitism*, it is the policy of the United States to combat anti-Semitism, using all available and appropriate legal tools to hold to account the perpetrators of unlawful anti-Semitic harassment and violence. Allowing Mahdawi to remain in the United States undermines the U.S. policy to combat anti-Semitism and efforts to protect Jewish students from harassment and violence in the United States. Consistent with E.O. 14150, *America First Policy Directive to the Secretary of State*, the foreign policy of the United States champions core American interests and American citizens, and condoning antisemitic conduct and disruptive protests in the United States would severely undermine that significant foreign policy objective. Moreover, protests of the type led by Mahdawi potentially undermine the peace process underway in the Middle East by reinforcing anti-Semitic sentiment in the regional and thereby threatening the U.S. foreign policy goal of peacefully resolving the Gaza conflict.

(SBU) DHS/ICE/HSI has not identified any alternative grounds of removability applicable to Mahdawi, including any indication that Mahdawi has provided material support to a foreign terrorist organization or terrorist activity; however, in September 2015, CA revoked Mahdawi's B1/B2 nonimmigrant visa at the request of CBP's National Targeting Center (NTC) based on derogatory information in reporting in USG interagency holdings that was identified after visa issuance. At that time, NTC concluded Mahdawi would be inadmissible pursuant to INA section 212(a)(3)(B)(i)(I) for having engaged in terrorist activity, as defined in the INA. At the time of the visa revocation, Mahdawi was already in the United States and had adjusted status to a conditional Lawful Permanent Resident. A CA search of interagency databases on March 14, did not reveal any record indicating that the interagency currently assesses that Mahdawi has links to terrorism. In February 2024, Mahdawi filed an application to naturalize, although DHS has not indicated whether that it will deny his application upon pursuing removal.

(SBU) Like the legal challenge brought by Mahmoud Khalil with respect to your March 8, 2025, 4C determination regarding him, as an LPR, Mahdawi is likely to challenge his removal under the 4C authority, including whether the Department in fact has a compelling basis for determination. Given the potential that a court may consider his actions inextricably tied to speech protected under the First Amendment, it is likely that courts will closely scrutinize the basis for this determination. We understand that Khalil intends to seek an injunction of the determination in his case, and we could anticipate Mahdawi to do the same.

(SBU) While State is required to report visa denials under the similar authority in INA section 212(a)(3)(C) to certain congressional committees, we have identified no such requirement to report 4C determinations.

**Attachments**

Tab 1 – State Notification Letter to DHS
Tab 1a – DHS Letter on Mohsen Mahdawi
Tab 1b – HSI Subject Profile of Mohsen Mahdawi
Tab 1c – 8 USC 1227(a)(4)(C)

**Approved:** **CA – John L. Armstrong, Senior Bureau Official [JLA]**
**I confirm the drafter received guidance on this paper's intent, objectives, topics, scope, and structure. ☒ Yes ☐ No**

**Drafted:** **CA - Various Drafters**

**Cleared:**

| **Bureau** | Name | **Clearance Status** |
|---|---|---|
| CA | [redacted], Acting | ok |
| CA/VO | [redacted], Acting | ok |
| CA/VO/SAC | [redacted] | info |
| CA/VO/F | [redacted], Acting | info |
| L/FO | [redacted] | ok |
| L/CA | [redacted] | ok |
| L/CA | [redacted] | ok |
| S/P | [redacted] | ok |
| C | [redacted] | ok |
| M | [redacted] | ok |
| D | [redacted] | info |
| P | [redacted] | ok |
| NEA/FO | [redacted] | info |

# EXHIBIT 249

AAUP v. RUBIO - ATTORNEYS EYES ONLY

2025002363

United States Department of State

Washington, DC 20520

[redacted]
EXHIBIT
249

<u>SENSITIVE BUT UNCLASSIFIED//</u>
<u>LAW ENFORCEMENT SENSITIVE</u>

March 15, 2025

**Action Memo for the Secretary**

FROM: CA – John Armstrong, SBO

SUBJECT: (SBU) Determination of Deportability of Badar Khan Suri under Section 237(a)(4)(C) of the Immigration and Nationality Act (INA)

**(SBU) Recommendation 1:** That you determine the presence and activities of Badar Khan Suri [redacted] have potentially serious adverse foreign policy consequences for the United States and would compromise a compelling U.S. foreign policy interest, rendering him deportable under Section 237(a)(4)(C) ("4C") of the INA.

**Decision: ☐ Approve ☐ Disapprove ☐ Discuss**

**(SBU) Recommendation 2:** That you authorize the transmission of a notification to the Secretary of Homeland Security of the determination as a basis for the removal and authorize use of that notification by DHS in immigration court.

**Decision: ☐ Approve ☐ Disapprove ☐ Discuss**

**Background**

(SBU) On March 14, the Assistant Director of the National Security Division of DHS/ICE's Homeland Security Investigations referred to CA information on three aliens in the United States, Momodou Taal, Badar Khan Suri, and Mohsen Mahdawi, for your determination that they are deportable under INA section 237(a)(4)(C), in order to initiate removal charges against them. CA will transmit an action memo to you regarding a 4C determination for

Mahdawi under separate cover, and CA has revoked the nonimmigrant visa of Taal, allowing DHS/ICE to pursue removal on that basis.

(SBU) Under INA section 237(a)(4)(C)(i), an alien is deportable from the United States if the Secretary of State has reasonable ground to believe that the alien's presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States. Under INA section 237(a)(4)(C)(ii), for cases in which the basis for this determination is the alien's past, current, or expected beliefs, statements, or associations that are otherwise lawful, the Secretary of State must personally determine that the alien's presence or activities would compromise a compelling U.S. foreign policy interest.

(SBU) Badar Khan Suri is an Indian national, currently in J1 nonimmigrant status in the United States as a Postdoctoral Associate at Georgetown University's School of Foreign Service, where he is currently teaching a course on "Majoritarianism and Minority Rights in South Asia." His J1 visa was issued November 15, 2022, and expired October 31, 2023, but he remains in valid nonimmigrant status. Suri is married to a U.S. citizen who is the daughter of Ahmed Yousef, a senior Hamas figure in Gaza and a senior advisor to Hamas leadership.

(SBU) According to the assessment provided by DHS/ICE, Suri is "actively supporting Hamas terrorism" and "actively spreads its propaganda and promotes antisemitism on social media." Evidence cited by DHS/ICE includes a post by the "Middle East Forum" think tank referencing two Facebook posts by Suri in fall 2023 that denied certain reports regarding Hamas actions in the October 7 attack, and one expressing support for Hamas founder Ahmed Yassin. DHS/ICE also notes a 2018 article authorized by Suri in the Middle East Monitor labeling Israel as apartheid, in additional to Instagram photos by Suri that DHS/ICE assesses as "pro-Palestine content." We have not independently uncovered additional open-source information regarding Suri's involvement in antisemitic conduct or intimidation of Jewish students.

(SBU) CA did not identify any particularized information on Suri in relevant interagency databases, and Suri's most recent visa application in November 2022 was reviewed by the Department's interagency vetting partners through the National Vetting Center, none of whom returned any derogatory information. DHS/ICE/HSI has not provided CA with an assessment of any alternative grounds of removability that would be applicable to Suri, including whether Suri may be removable under the terrorism-related grounds based on his relationship with Ahmed Yousef.

(SBU) The activities and presence of Suri in the United States has potentially serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest. This conclusion is based on the assessment by DHS/ICE/HSI, to which we defer as ICE is the principal investigative unit of DHS, that "Suri's direct connection to Hamas leadership and involvement in antisemitic activities ... [creates] a hostile environment for Jewish students and [indicates] support for a designated terrorist organization." Under E.O. 14188, *Additional Measures to Combat Anti-Semitism*, it is the policy of the United States to combat antisemitism, using all available and appropriate legal tools to hold to account the perpetrators of unlawful anti-Semitic harassment and intimidation. Allowing Suri to remain in the United States undermines the U.S. policy to combat anti-Semitism and efforts to protect Jewish students from intimidation in the United States. Consistent with E.O. 14150, *America First Policy Directive to the Secretary of State*, the foreign policy of the United States champions core American interests and American citizens, and condoning anti-Semitic conduct and intimidation of Jewish students in the United States would severely undermine that significant foreign policy objective. Moreover, the type of intimidation and incitement attributable Suri potentially undermines the peace process underway in the Middle East by reinforcing anti-Semitic sentiment in the regional and thereby threatening the U.S. foreign policy goal of peacefully resolving the Gaza conflict.

(SBU) Like the legal challenge brought by Mahmoud Khalil with respect to your March 8 determination regarding him, Suri is likely to challenge his removal under the 4C authority. Such a challenge would likely question

whether the Department in fact has a compelling basis for determination. Given the reliance on Suri's public statements as an academic, and the potential that a court may consider his actions inextricably tied to speech protected under the First Amendment, it is likely that courts will closely scrutinize the basis for this determination. We understand that Khalil intends to seek an injunction of the determination in his case, and we could anticipate Suri to do the same.

(SBU) State also requests the opportunity to consult with the DHS on any public statements regarding this determination.

(SBU) While State is required to report visa denials under the similar authority in INA section 212(a)(3)(C) to certain congressional committees, we have identified no such requirement to report 4C determinations.

**Attachments**

Tab 1 – State Notification Letter to DHS
Tab 1a – DHS Letter on Badar Khan Suri
Tab 1b – HSI Subject Profile of Badar Khan Suri
Tab 1c – 8 USC 1227(a)(4)(C)

Case: 26-6906, 11/20/2026, DktEntry: 16.3, Page 157 of 300

AAUP v. RUBIO - ATTORNEYS EYES ONLY

2025002363

SENSITIVE BUT UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE

-5-

**Approved: CA – John L. Armstrong, Senior Bureau Official [JLA]**
**I confirm the drafter received guidance on this paper's intent, objectives, topics, scope, and structure. ☒ Yes ☐ No**

Drafted: CA – Various Drafters

Cleared:

| **Bureau** | Name | **Clearance Status** |
|---|---|---|
| CA | [redacted], Acting | ok |
| CA/VO | [redacted], Acting | ok |
| CA/VO/SAC | [redacted] | info |
| CA/VO/F | [redacted], Acting | info |
| L/FO | [redacted] | ok |
| L/CA | [redacted] | ok |
| L/CA | [redacted] | ok |
| S/P | [redacted] | ok |
| C | [redacted] | ok |
| M | [redacted] | ok |
| D | [redacted] | info |
| P | [redacted] | ok |
| SCA/FO | [redacted] | info |

# EXHIBIT 250

AAUP v. RUBIO - ATTORNEYS EYES ONLY

United States Department of State

Washington, DC 20520

[redacted]
EXHIBIT
250

SENSITIVE BUT UNCLASSIFIED – LAW ENFORCEMENT SENSITIVE

March 21, 2025

**Action Memo for Senior Bureau Official John Armstrong**

FROM: CA/VO – Stuart Wilson, Deputy Assistant Secretary

SUBJECT: (SBU) Revocation of F1 Visa for Rumeysa OZTURK

**(SBU) Recommendation 1:** That you approve the revocation of the F1 visa, effective immediately, for [redacted]) under section 221(i) of the Immigration and Nationality Act (INA). Due to ongoing ICE operational security, this revocation will be silent; the Department will not notify the subject. (Approve/Disapprove by 03/21/25)

**Decision:** ☒ Approve ☐ Disapprove ☐ Discuss

JA 3/21/25

**(SBU) Recommendation 2:** That you authorize the transmission of the attached notification to the Department of Homeland Security noting the immediate revocation of OZTURK's visa. (Approve/Disapprove by 03/21/25)

**Decision:** ☒ Approve ☐ Disapprove ☐ Discuss

JA 3/21/25

**Background**

(SBU) On March 21, 2025, the Assistant Director of the National Security Division of DHS/ICE's Homeland Security Investigations referred to CA information regarding Rumeysa OZTURK, a Turkish national, for a possible determination by the Secretary that the alien is deportable under INA section 237(a)(4)(C). As a nonimmigrant visa holder, such a determination is not necessary for DHS/ICE to pursue removal of OZTURK from the United States, as INA section 237(a)(1)(B) provides that an alien is deportable if their nonimmigrant visa has been revoked under INA section 221(i).

(SBU) Under INA section 221(i), the Secretary of State may at any time, in his discretion, revoke a visa. This authority is delegated to you pursuant to Delegation of Authority 367-4. Department policy reflected in 9 FAM 403.11-5(B) provides that a visa may be revoked in cases of a suspected ineligibility, when an individual would not meet requirements for admission, or "in other situations where warranted."

Has valid visa

(SBU) OZTURK was issued an F-1 visa on December 14, 2020, valid until December 9, 2025. According to information provided by DHS/ICE/HSI, OZTURK is a post doctorate degree candidate in Child Studies and Human Development at Tufts University. On March 21, 2025, DHS/ICE/HSI referred information to CA indicating that OZTURK co-authored an op-ed in Tufts' student newspaper. In this article, the authors wrote, "Graduate Students for Palestine joins Tufts Students for Justice in Palestine (TSJP), the Tufts Faculty and Staff Coalition for Ceasefire, and Fletcher Students for Palestine to reject the University's response" (to a student government resolution). According to DHS/ICE/HSI, Tufts Students for Justice in Palestine was placed on interim suspension "after it used images of weapons to promote a protest rally and urged members of the Tufts community to 'join the student intifada.'" DHS/ICE/HSI referral concluded that "OZTURK's involvement in these activities and associations with these groups may undermine U.S. foreign policy by creating a hostile environment for Jewish students and indicating support for a designated terrorist organization."

actions, not words

(SBU) While OZTURK has been involved with actions protesting Tufts' relationship with Israel, DHS/ICE/HSI has not, however, provided any evidence showing that OZTURK has engaged in any antisemitic activity or made any public statements indicating support for a terrorist organization or antisemitism generally. While the report implies a connection between OZTURK and the now-banned Tufts Student for Justice in Palestine (TJSP), the report presents no evidence other than OZTURK's membership in Graduate Students for Palestine which supported proposals to Tufts which were also supported by TSJP. Nor has DHS/ICE/HSI shown any evidence that

OZTURK was involved in any of the activities which resulted in TJSP being suspended from Tufts.

(SBU) Through a search on March 21, 2025, on available USG interagency databases, CA/VO identified no reporting specific to OZTURK, and interagency vetting partners did not provide any response to OZTURK's 2024 visa application indicating the existence of derogatory terrorism-related information.

(SBU) DHS did not identify any alternative grounds of removability that would be applicable to OZTURK, including the ground of removability for aliens who have provided material support to a foreign terrorist organization or terrorist activity, and have not indicated whether it plans to consider termination of OZTURK's SEVIS registration. Although information provided by DHS/HSI/ICE does not establish any potential ineligibility for OZTURK, you may, in your discretion and in accordance with Department policy in 9 FAM 403.11-5(B), approve revocation of her F-1 visa effective immediately based on the totality of the circumstances presented indicating that revocation may be warranted.

**Attachments**

Tab 1 – DHS Letter on OZTURK
Tab 2 – HSI Subject Profile of OZTURK
Tab 3 – State Notification Memo to DHS

**Approved:** CA/VO – Stuart Wilson, Deputy Assistant Secretary [SRW]
**I confirm the drafter received guidance on this paper's intent, objectives, topics, scope, and structure.** ☒ **Yes** ☐ **No**

Drafted: CA - Various Drafters

Cleared:

| Bureau | Name | Clearance Status |
|---|---|---|
| CA | [redacted] | ok |
| CA/VO | [redacted] | Info |
| CA/VO/F | [redacted] | info |
| CA/VO/SAC | [redacted] | ok |
| CA/P | [redacted] | info |
| L/CA | [redacted] | ok |

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STANFORD DAILY PUBLISHING CORPORATION, et al.,<br>Plaintiffs,<br>v.<br>MARCO RUBIO, et al.,<br>Defendants. | Case No. 25-cv-06618-NW<br><br>**ORDER DENYING MOTION TO DISMISS**<br><br>Re: ECF No. 66 |

Plaintiffs Stanford Daily Publishing Corporation, along with Jane Doe and John Doe, noncitizen students holding F-1 visas issued by the United States, filed an amended complaint alleging claims under the First and Fifth Amendments against Marco Rubio, in his official capacity as Secretary of State, and Kristi Noem, in her official capacity as Secretary of Homeland Security (together, the "Government"). First Am. Compl., ECF No. 65 ("FAC").

Jane Doe and John Doe allege that since March 2025, the Government has changed its immigration policy and pattern of enforcement, namely arresting, detaining, and deporting students with F-1 visas when those students voice opinions that express support or empathy for Palestinian people or are critical of Israel's actions regarding Palestine or the conflict in Gaza. Because Jane Doe and John Doe fear that the Government will revoke their visas and deport them for expressing views that the Government may now deem "anti-American or anti-Israel," Jane Doe and John Doe have self-censored. FAC ¶ 2. They have stopped exercising their First Amendment rights when it comes to the subject of Israel and Palestine, including publishing commentary online. They have also changed their social media practices and have avoided wearing clothing that indicates a pro-Palestinian view.

Similarly, Stanford Daily Publishing ("Stanford Daily"), the parent company of campus

newspaper *The Stanford Daily*, fears for its student journalists. Noncitizen student-journalists who hold valid F-1 visas — and are therefore lawfully present in the United States — are asking Stanford Daily to take down their previously published articles about Israel and Palestine. And although they have already expended considerable effort investigating and writing new articles about the Israel-Palestine conflict, noncitizen student-journalists are choosing not to publish those articles because they are afraid the Government will revoke their visas and deport them.

In their amended complaint, Plaintiffs point to the news of Mahmoud Khalil, Rümeysa Öztürk, Mohsen Mahdawi, and other students lawfully in the United States who expressed opinions about Israel and Palestine; the Government then arrested, detained, and transferred those students to immigration jails. Plaintiffs quote public statements by Secretary of State Rubio and the President, including comments he made prior to being elected, warning noncitizens that they will be deported if they express similar views.

Plaintiffs argue that the provisions of the Immigration and Nationality Act ("INA") (8 U.S.C. §§ 1182(a)(3)(C)(iii), 1227(a)(4)(C)(i) and § 1201(i)) that the Government relies on for its authority to cancel student visas and initiate deportation proceedings, are facially unconstitutional. Plaintiffs bring eight claims under the First and Fifth Amendments for declaratory and injunctive relief. *See* FAC.

The Government now moves to dismiss Plaintiffs' complaint solely for lack of standing. Mot. to Dismiss, ECF No. 66. The matter is fully briefed, and the Court held a hearing on January 6, 2026. ECF Nos. 66, 67, and 68. The Court DENIES the Government's motion to dismiss.

## I. BACKGROUND[1]

On October 7, 2023, Hamas attacked Israel killing more than 1,200 people. Protests, both planned and spontaneous, erupted across the United States, particularly on university campuses. In the following months, which turned to years, "some students and faculty [who] viewed Israel's response as disproportionate . . . [called] for a ceasefire, increased humanitarian aid to Palestinians, and university divestment of financial portfolios" that supported Israel. FAC ¶ 22.

[1] Unless otherwise noted, the background information comes directly from Plaintiffs' operative complaint. *See* FAC.

"Some protests featured calls for a 'free Palestine' and included chants such as 'from the river to the sea, Palestine will be free' and 'intifada revolution.'" *Id.* ¶ 23. "Other events featured pro-Palestinian advocates handing out flyers." *Id.* ¶ 24. "Some protesters engaged in violence, property damage, and blockades of pro-Israel students attending classes," while many protests "remained peaceful." *Id.* ¶ 25. Many individuals, including students, "voiced their viewpoints on the conflict through social media, in news interviews and editorials, and in other forums." *Id.* ¶ 26.

On January 30, 2025, shortly after taking office, President Trump issued a policy statement titled "*Fact Sheet: President Donald J. Trump Takes Forceful and Unprecedented Steps to Combat Anti-Semitism*," stating:

> To all the resident aliens who joined in the pro-jihadist protests, we put you on notice: come 2025, we will find you, and we will deport you. I will also quickly cancel the student visas of all Hamas sympathizers on college campuses, which have been infested with radicalism like never before.

FAC ¶ 38 (quoting *Fact Sheet: President Donald J. Trump Takes Forceful and Unprecedented Steps to Combat Anti-Semitism*, The White House (Jan. 30, 2025), https://perma.cc/GY4H-7ASR).

Plaintiffs allege that the "administration considers '[f]rom the river to the sea, Palestine will be free' to express support for Hamas, capable of justifying action under the [INA] . . . . Likewise, calling Israel 'an apartheid state,' 'calling for an arms embargo on Israel,' or 'criticizing Israel's actions in Gaza' might be sufficient to invoke the [INA]." *Id.* ¶ 39.

### A. Immigration Policy

#### 1. Revocation and Deportation Provisions of the INA

"Congress passed the Immigration and Nationality Act, 8 U.S.C. § 1101 et seq., ("INA") in 1952 [and] delegated to the Secretary of State significant authority to exclude or classify as deportable non-citizens from the United States, and to revoke visas." *Am. Ass'n of Univ. Professors v. Rubio*, No. CV 25-10685-WGY, 2025 WL 2777659, at *3 (D. Mass. Sept. 30, 2025). The INA sections relevant to this case are 8 U.S.C. §§ 1182(a)(3)(C)(iii), 1227(a)(4)(C)(i) (the "Deportation Provision") and § 1201(i) (the "Revocation Provision"), which authorize the Government to revoke student visas and deport visa holders.

Under 8 U.S.C. § 1201(i), the Secretary of State has broad, discretionary power to revoke visas:

> **After the issuance of a visa or other documentation to any [noncitizen],** the consular officer or the **Secretary of State may at any time, in his discretion, revoke such visa or other documentation**. Notice of such revocation shall be communicated to the Attorney General, and such revocation shall invalidate the visa or other documentation from the date of issuance . . . . There shall be no means of judicial review . . . of a revocation under this subsection, except in the context of a removal proceeding if such revocation provides the sole ground for removal under section 1227(a)(1)(B) of this title.

8 U.S.C. § 1201(i) (emphasis added).[2] After revoking a visa, the Government may place the noncitizen into removal proceedings. *See id.* § 1227(a)(1)(B).

Under 8 U.S.C. § 1227(a)(4)(C)(i), if the "Secretary of State has reasonable ground to believe" that a noncitizen's presence or "activities in the United States . . . would have potentially serious adverse foreign policy consequences for the United States," the noncitizen "is deportable." There is an exception, however; noncitizens *shall not be* deportable because of their "past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States . . . ." 8 U.S.C. § 1182(a)(3)(C)(iii).[3] The exception is then subject to a further exception: noncitizens shall not be deportable because of their lawful "beliefs, statements, or associations" "*unless* the Secretary of State *personally determines* that the [noncitizen's] admission would compromise a compelling United States foreign policy interest." 8 U.S.C. § 1182(a)(3)(C)(iii) (emphasis added).[4]

While the Secretary of State has the discretion to revoke visas and render noncitizens

[2] Unlike the Deportation Provision, the Revocation Provision, 8 U.S.C. § 1201(i), does not contain an exception for revocation of visas based on "beliefs, statements, or associations" that "would be lawful within the United States." *Compare id.* § 1182(a)(3)(C)(iii).

[3] 8 U.S.C. § 1182(a)(3)(C)(iii) provides an exception to the grounds upon which a noncitizen seeking admission to the United States is "inadmissible" or "excludable." Section 1227(a)(4)(C)(ii) incorporates this exception into the criteria for when a noncitizen is deportable.

[4] In *Am. Ass'n of Univ. Professors*, the court stated that these "exceptions place profound -- but narrow . . . deportability classification power solely with the Secretary of State." 2025 WL 2777659, at *3.

deportable, the Secretary of Homeland Security has the practical role of carrying out that authority. The Department of Homeland Security ("DHS") and its sub-agency U.S. Immigration Customs and Enforcement ("ICE") have "authority over the operation and enforcement of the immigration laws, including authority to initiate removal proceedings in immigration court and arrest and detain noncitizens while removal proceedings are pending." FAC ¶ 20.

**2. Enforcement**

In March 2025, DHS and ICE began "aggressively targeting lawfully present noncitizens for protected speech, particularly at universities." *Id.* ¶ 40. Plaintiffs point to the arrests of Mahmoud Khalil, Rümeysa Öztürk, and Mohsen Mahdawi as emblematic of the Government's enforcement strategy.

Mr. Khalil is a lawful permanent resident in the United States and was a graduate student at Columbia University. Mr. Khalil actively participated in the campus protests against Israel's military campaign in Gaza. On the evening of March 8, 2025, DHS agents arrested Mr. Khalil without notice, transferred him to a Louisiana immigration jail, and initiated proceedings to deport him. "The DHS document initiating removal proceedings against Mr. Khalil cited his protected speech as the sole basis for his deportation under the Deportation Provision. DHS later explained Secretary Rubio had 'personally determined' Mr. Khalil's continued presence 'would have potentially severe adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest' because of Mr. Khalil's 'participation' in 'antisemitic protests and disruptive activities, which fosters a hostile environment for Jewish students in the United States.'" *Id.* ¶ 44 (quoting *Khalil v. Trump*, No. 25-cv-01963, 2025 WL 1514713, at *7 (D.N.J. May 28, 2025), *appeal docketed sub nom.*, *Khalil v. President United States of America*, No. 25-2162 (3d Cir. June 23, 2025)). Following Mr. Khalil's arrest, Secretary Rubio posted a photo of Mr. Khalil with a comment stating: "We will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported." *Id.* ¶ 45 (quoting Marco Rubio (@marcorubio), X (Mar. 9, 2025, at 6:10 PM), https://perma.cc/726Z-VT4Z).

Ms. Öztürk is a PhD student at Tufts University who is lawfully present in the United States on an F-1 student visa. Ms. Öztürk co-authored an opinion article in the Tufts student

Case: 26-6906, 11/20/2026, DktEntry: 16.14, Page 168 of 300

newspaper that criticized the university's "refusal to adopt several resolutions approved by the undergraduate student senate urging the University to, among other things, recognize a genocide in Gaza and divest from Israeli companies." *Id.* ¶ 52. On March 25, 2025, six plain-clothes federal officers surrounded Ms. Öztürk on the street outside her home, detained her, and transported her to a Louisiana immigration jail. "Four days before Ms. Öztürk's arrest, the State Department, relying solely on her protected expression, had revoked Ms. Öztürk's visa under the Revocation Provision. A DHS spokesperson justified the revocation by asserting Öztürk's editorial '[g]lorif[ied] and support[ed] terrorists.'" *Id.* ¶ 54.

Mr. Mahdawi, an undergraduate student at Columbia University, is a lawful permanent resident in the United States. He made public statements criticizing Israel's military campaign in Gaza on televised news interviews, in news articles, and during protests. On April 14, 2025, when Mr. Mahdawi had completed the United States citizenship exam, masked DHS agents entered the interview room, arrested Mr. Mahdawi, transferred him to a Vermont immigration jail, and initiated proceedings to deport him from the United States. "Secretary Rubio relied upon the Deportation Provision to attempt Mr. Mahdawi's removal, claiming his protests and rhetoric undermined the U.S. foreign policy goal of promoting peace in the Middle East." *Id.* ¶ 59 (citing Resp. in Opp'n to Mot. for Release, Ex. A, at 2, *Mahdawi v. Trump*, No. 25-cv-00389, 2025 WL 1243135 (D. Vt. Apr. 30, 2025), ECF No. 42-1, *appeal docketed*, No. 25-1113 (2d Cir. May 1, 2025)).

Since March 2025, the Government has continued to revoke visas, arrest, detain, and attempt deportation of lawfully present noncitizens based on their expression related to Israel and Palestine. *See* FAC ¶ 61. Plaintiffs cite to a multitude of public statements the Government has made regarding its current revocation and deportation policy including:

- "[DHS] Assistant Secretary for Public Affairs Tricia McLaughlin posted on X that noncitizens 'pushing Hamas propaganda,' 'glorifying terrorists,' or otherwise engaging in 'anti-American' conduct 'can expect your visa will be revoked.'" *Id.* ¶ 63 (quoting Tricia McLaughlin (@TriciaOhio), X (May 8, 2025, at 10:26 AM), https://perma.cc/5ZJ3-4VUU).

- "White House Deputy Chief of Staff and Homeland Security Advisor Stephen Miller posted on X that administration officials are 'working continuously' to revoke visas from noncitizens 'who espouse hatred for American [sic] or its people'—not just noncitizens who criticize Israel." *Id.* ¶ 67 (quoting Stephen Miller (@StephenM), X (July 29, 2025, at 9:08 PM), https://perma.cc/U9JN-FQK7).
- "DHS posted on X: '. . . There is no room in the United States for the rest of the world's terrorist sympathizers, and we are under no obligation to admit them or let them stay here. @Sec_Noem has made it clear that anyone who thinks they can come to America and hide behind the First Amendment to advocate for anti-American and anti-Semitic violence and terrorism – think again.'" *Id.* ¶ 79 (quoting Homeland Security (@DHSgov), X (Nov. 5, 2025, at 11:10 AM), https://perma.cc/2A8P-4QPS) (comment made in the context of arrest of Sami Hamdi, British political commentator who was visiting the U.S.).
- "On November 18, 2025, Stephen Miller said, 'The State Department has revoked tens of thousands of visas, and they're just getting started on tens of thousands more.'" *Id.* ¶ 80.

**B. Plaintiffs**

Plaintiffs Jane Doe and John Doe are noncitizen student F-1 visa holders who are lawfully present in the United States.[5] Jane Doe has published commentary online that contains pro-Palestine and anti-Israel sentiments and has peacefully attended pro-Palestinian protests. John Doe has likewise peacefully attended pro-Palestinian protests and academic discussions and has shared pro-Palestine and anti-Israel commentary online.

Because they fear that the Government will revoke their visas and deport them, Jane Doe and John Doe are self-censoring, refraining from voicing their true opinions regarding Palestine and Israel. Jane Doe "no longer attends pro-Palestinian protests, no longer wears a keffiyeh to

[5] Jane Doe and John Doe are not current or former Stanford University students and have never been members of Stanford Daily.

support the Palestinian cause, no longer engages in direct-action organizing supporting Palestinians, no longer holds up the Palestinian flag, no longer maintains her main social media account, and no longer posts pro-Palestinian content on her other social media accounts." *Id.* ¶ 155. John Doe has made his social media account private, temporarily paused publication of his study related to Israel's actions in Gaza (since published), and avoids wearing apparel that shows a pro-Palestinian message. Additionally, members of John Doe's extended family who are also noncitizens lawfully residing in the United States have "substantially reduced their contact with him because they fear he will be targeted by the Trump administration because of his pro-Palestinian/anti-Israel commentary and advocacy." *Id.* ¶ 170.

"But for the threat of visa revocation under the Revocation Provision and deportation under the Deportation Provision," Jane Doe and John Doe "would resume publishing and voicing [their] true opinions regarding Palestine and Israel." *Id.* ¶¶ 149, 166.

Plaintiff Stanford Daily, a California nonprofit corporation, is the parent organization for *The Stanford Daily*. *The Stanford Daily* is the independent, student-run newspaper of Stanford University. The paper covers news related to Stanford University and "[f]or decades" has covered "student opinions and campus protests related to the conflict between Israel and Palestine." *Id.* ¶ 16. Stanford Daily is a "voluntary membership organization" with "over 150 identifiable members." *Id.* ¶¶ 89-99. Its members include "noncitizens lawfully present in the United States pursuant to lawful admissions on nonimmigrant visas, such as the F-1 student visa." *Id.* ¶ 94.

Since March 2025, "many of the paper's noncitizen writers who are lawfully present in the United States have self-censored" due to fears that Secretary Rubio will revoke their visas under the Revocation Provision and render them deportable under the Deportation Provision. *Id.* ¶ 16. These writers have declined to cover pro-Palestinian student protests at Stanford University, refrained from covering topics related to the conflict in Gaza, and requested removal of their previous articles about the topic. Stanford Daily continues to see examples of noncitizen writers altering their expression. *See generally* FAC ¶¶ 132-134.

## II. LEGAL STANDARD

The First Amendment ensures that "Congress shall make no law . . . abridging the freedom of speech, or of the press . . . or the right of the people peaceably to assemble[.]" U.S. Const. amend. I. The "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *United States v. Stevens*, 559 U.S. 460, 468 (2010). The right to freedom of speech has generally been accorded to noncitizens living in the United States. *Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1064 (9th Cir. 1995); *Bridges v. Wixon*, 326 U.S. 135, 148 (1945) ("[f]reedom of speech and of press is accorded [to noncitizens] residing in this country."). First Amendment protections are crucial for protecting people in the United States from Government overreach and for ensuring that individuals "participate in the public debate through political expression." *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 203 (2014). Freedom of speech is fundamental to our democracy and is at the heart of this case.

Under the "case or controversy" requirement of Article III to the United States Constitution, a federal court has subject matter jurisdiction over a claim only if the plaintiff has standing to bring the claim. *Chandler v. State Farm Mutual Automobile Ins. Co.,* 598 F.3d 1115, 1121 (9th Cir. 2010). To demonstrate standing, a plaintiff must show three things: (1) injury-in-fact, (2) causation, and (3) redressability. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). The party invoking federal jurisdiction bears the burden of establishing standing. *Id.*

"First Amendment cases raise 'unique standing considerations,' that 'tilt[ ] dramatically toward a finding of standing.'" *Lopez v. Candaele*, 630 F.3d 775, 781 (9th Cir. 2010) (cleaned up). In the context of a pre-enforcement challenge, the injury-in-fact "is the anticipated enforcement of the challenged statute in the future." *Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 487 (9th Cir. 2024). A plaintiff sufficiently alleges a pre-enforcement injury where she demonstrates "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony v. Driehaus*, 573 U.S. 149, 159 (2014). The inquiry focuses on: (1) whether the plaintiffs have a "concrete plan" to violate the law; (2) whether the enforcement authorities have communicated a specific warning or threat to initiate proceedings; and (3) whether there is a

history of past prosecution or enforcement. *See Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc); *Tingley v. Ferguson,* 47 F.4th 1055, 1067 (9th Cir. 2022) (applying the factors set forth in *Thomas*). "As the Supreme Court recently reiterated, for a First Amendment pre-enforcement challenge, the plaintiff need only 'show that the threatened injury is certainly impending, or there is a substantial risk that the harm will occur.'" *Flaxman v. Ferguson*, 151 F.4th 1178, 1185 (9th Cir. 2025) (quoting *Mahmoud v. Taylor*, 606 U.S. 522, 145 (2025). "[A] chilling of the exercise of First Amendment rights is, itself, a constitutionally sufficient injury." *Planned Parenthood v. Labrador*, 122 F.4th 825, 836 (9th Cir. 2024) (quoting *Libertarian Party of L.A. Cnty. v. Bowen*, 709 F.3d 867, 870 (9th Cir. 2013)).

"The existence of standing turns on the facts as they existed at the time the plaintiff filed the complaint." *Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 838 (9th Cir. 2007). In reviewing a motion to dismiss for lack of standing, the Court "must accept as true all material allegations of the complaint and must construe the complaint in favor of the complaining party." *Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011) (quotation and citation omitted).

## III. DISCUSSION

The Government challenges standing for both the Doe Plaintiffs and Stanford Daily.[6]

### A. Doe Plaintiffs

Jane Doe and John Doe argue that they have each established standing to challenge the Revocation and Deportation Provisions because they have self-censored based on actual and well-founded fears of the Government's enforcement of the Provisions. They allege that, but for the Government's threat of visa revocation and deportation under the Revocation and Deportation Provisions, Jane Doe and John Doe "would resume publishing and voicing [their] true opinions regarding Palestine and Israel." FAC ¶¶ 149, 168. The Court agrees and finds that Jane Doe and

[6] In their reply brief and during the hearing, the Government asserted that it was making both a factual and facial challenge to Plaintiffs' standing. Reply at 1, ECF No. 68; Tr. 15:19 – 16:22. But the Government failed to assert that it was bringing a factual attack in its motion. The declaration filed in support of its reply does not convert the Government's argument into a factual challenge. Accordingly, the Court only addresses the Government's facial challenge.

Case: 26-6900, 11/20/2026, DktEntry: 16.14, Page 173 of 300

John Doe have established standing.

Plaintiffs must demonstrate (1) injury-in-fact, (2) causation, and (3) redressability. *TransUnion*, 594 U.S. at 423. To demonstrate injury-in-fact for pre-enforcement First Amendment claims, as here, Plaintiffs need only show that they have "refrained from engaging in expressive activity for fear of prosecution under the challenged statute . . . based on 'an actual and well-founded fear' that the challenged statute will be enforced." *Hum. Life of Washington Inc. v. Brumsickle*, 624 F.3d 990, 1001 (9th Cir. 2010) (quoting *Cal. Pro–Life Council Inc. v. Getman (CPLC–I),* 328 F.3d 1088, 1095 (9th Cir. 2003). "[T]he Supreme Court has dispensed with rigid standing requirements, and recognized 'self-censorship' as a harm that can be realized even without an actual prosecution." *Id.* (cleaned up).

Since March 2025, Jane Doe and John Doe have refrained from engaging in expressive activity regarding their opinions about Israel and Palestine. Previously, Jane Doe published pro-Palestine/anti-Israel commentary online, including commentary accusing Israel of committing "genocide" and perpetuating "apartheid," and using the slogan, "from the river to the sea, Palestine will be free." FAC ¶ 140. Jane Doe was a member of the pro-Palestinian student group Students for Justice in Palestine at her university.

Now, "[b]ecause of the government's threats to enforce the Revocation and Deportation Provisions based on protected speech, and its past enforcement of the Provisions based on protected speech, Jane Doe has self-censored, including decreasing or eliminating her expression supporting Palestinians, criticizing American foreign policy, or opposing the Israeli government." *Id.* ¶ 154. She has stopped: attending pro-Palestinian protests and holding up the Palestinian flag; wearing a keffiyeh to show her support for Palestine; engaging in direct-action organizing; maintaining her main social media account and posting pro-Palestinian content on her other social media accounts.

John Doe studies journalism. A primary reason he chose to study in the United States "is its strong protection for freedom of speech and freedom of the press." *Id.* ¶ 158. Consistent with those freedoms, he previously and frequently published pro-Palestine/anti-Israel commentary online. He attended pro-Palestinian protests where he participated in chants including, "'[f]rom

the river to the sea, Palestine will be free,' as well as chants accusing Israel of committing 'genocide,' and chants calling Israel a 'terrorist state.'" *Id.* ¶ 163.

Because of his fears of visa revocation and deportation, John Doe delayed "publishing his findings containing criticism of Israel's actions in Gaza." *Id.* While he has resumed some commentary, his fears have prompted him to alter and reduce his expression. He avoids wearing "Palestinian Youth Movement" apparel. He has made his "social media account, which contains pro-Palestinian/anti-Israel commentary, private." *Id.* ¶ 169. "Additionally, because of the Trump administration's tactics when pursuing noncitizens for protected speech, . . . some members of John Doe's extended family who are noncitizens but lawfully reside in the United States fear associating with him and have substantially reduced their contact with him because they fear he will be targeted by the Trump administration because of his pro-Palestinian/anti-Israel commentary and advocacy." *Id.* ¶ 170.

Based on their fear that the Government will revoke their visas and deport them, Jane Doe and John Doe, through the time they filed their amended complaint, have continued to refrain from expressing their opinions regarding Israel and Palestine. Their fears stem from a plethora of examples alleged in their complaint where the Government has engaged in enforcement actions since March 2025, and myriad Government statements that threaten immigration enforcement against noncitizens who express opinions critical of Israel or its actions in Gaza, or who express support for Palestine or anguish over the conditions for Palestinian people living in Gaza.

Jane Doe and John Doe are concerned that their speech and behavior related to Israel and Palestine was substantially like the speech and behavior of noncitizens who the Government arrested, detained, and sought to deport. For example, the Government invoked the Deportation Provision against Mahmoud Khalil, Rümeysa Öztürk, and Mohsen Mahdawi because they participated in pro-Palestinian protests and engaged in pro-Palestinian associations. *See id.* ¶¶ 140-166.

Jane Doe has read about the "detention and attempted deportation of noncitizens like Mahmoud Khalil and Rümeysa Öztürk for engaging in protected pro-Palestinian speech." *Id.* ¶ 148. She read the Government's public statements about its intentions to revoke visas and

deport visa holders. Jane Doe was listed on the Canary Mission website, which is an anonymously and privately run website that publishes personal information of individuals and organizations that the Canary Mission personally deems "anti-Israel." In their motion and during the hearing, the Government explained that DHS had asked ICE to generate "reports" for the State Department on individuals listed on the Canary Mission website to aid in decision-making about visa revocations. Mot. at 7. Notably, before the Government brought enforcement actions against them, Mahmoud Khalil, Rümeysa Öztürk, and Mohsen Mahdawi all had profiles published about them on the Canary Mission website.

John Doe has read news articles "about the detention and attempted deportation of noncitizens like Mahmoud Khalil and Badar Khan Suri[7] for engaging in protected pro-Palestinian speech," and has read "articles quoting government statements about the detention and deportation of these noncitizens." *Id.* ¶ 165. John Doe received advice from one of his professors that he should "reconsider engaging in protected advocacy related to Israel and Palestine due to potential danger to his immigration status." *Id.* ¶ 164.

Jane Doe and John Doe have sufficiently alleged that their behavior falls into the crosshairs of the Government's stated enforcement priorities. The Government has also not disavowed plans to continue invoking the Revocation and Deportation Provisions. "On November 18, 2025, Stephen Miller said, 'The State Department has revoked tens of thousands of visas, and they're just getting started on tens of thousands more.'" *Id.* ¶ 80. The Government continues to regularly comment about revoking visas of those non-citizens it perceives as supporting anti-Semitism. For instance, on November 5, 2025, DHS posted on X:

> The U.S. has no obligation to host foreigners, like Sami Hamdi, who support terrorism and actively undermine the safety of Americans. And we won't. There is no room in the United States for the rest of the world's terrorist sympathizers, and we are under no obligation to admit them or let them stay here. @Sec_Noem has made it clear that anyone who thinks they can come to America and hide behind the First Amendment to advocate for anti-American and anti-Semitic violence and terrorism – think again.

[7] Plaintiffs also referenced Badar Khan Suri, another non-citizen who participated in pro-Palestine expression and who was arrested pursuant to the Revocation and Deportation Provisions. *See* FAC ¶ 173.

*Id.* ¶ 79 (quoting Department of Homeland Security (@DHSgov), X (Nov. 5, 2025, at 11:10 AM), https://perma.cc/2A8P-4QPS).

Jane Doe and John Doe have adequately alleged facts to support their fear that the Government may interpret their pro-Palestine expression to be counter to the Government's current stated policies, similar to how the Government viewed the expression of Mahmoud Khalil, Rümeysa Öztürk, and Mohsen Mahdawi. Further, Jane Doe and John Doe have credibly alleged that when they read the Government's repeated public statements threating to enforce the Revocation and Deportation Provisions against noncitizens who participate in pro-Palestinian protests or express pro-Palestine/anti-Israel views, Jane Doe and John Doe "fear[] adverse immigration action for engaging in [similar] protected speech." *Id.* ¶¶ 150, 172.

The Government argues that Jane Doe and John Doe have not demonstrated a substantial threat of visa revocation or deportation because they failed to allege that they have been personally targeted for enforcement. Mot. at 17. Additionally, the Government states that it has completed its review of 5,000 campus protester "leads," and that less than 1% of such leads led to a visa revocation. Mot. at 8. The Government concludes that Jane Doe and John Doe are therefore unlikely to face enforcement. *Id.* The Court finds the Government's arguments unavailing. As an initial matter, the Government provided no details that would allow the Court to interpret how the Government's alleged 1% enforcement rate applies to the facts alleged in this case.[8] Further, the Government has not disavowed that it would take future enforcement actions under the Revocation and Deportation Provisions for noncitizens who engage in pro-Palestine/anti-Israel speech. The Court is unpersuaded that the mere fact that Jane Doe and John Doe have not yet been targeted for Government enforcement means the Government is unlikely to target them in the future — particularly if they fail to rigorously self-censor their views that are supportive or empathetic to Palestinians. Finally, while the Government argues that the "review" of campus

[8] For example, the Government did not explain: how or why it received the 5,000 campus protester leads; how many of those 5,000 individuals were expressing opinions that the Government viewed as being supportive versus critical of Israel; how many of those 5,000 leads were for noncitizens; or what percentage of the overall noncitizens were targeted for visa revocation or deportation.

protesters has concluded, the Government provided no assurance that it would not "review" future campus protests.

The Court finds that Jane Doe and John Doe have established an injury in fact because they have adequately alleged that they refrained from expression based on an actual and well-founded fear of the Government's enforcement action. *Driehaus*, 573 U.S. at 157-58 (a plaintiff must adequately allege "(1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision.") (cleaned up). Jane Doe and John Doe have sufficiently demonstrated a causal connection between their injury of self-censorship since March 2025 and the Government's threats of enforcement and actual enforcement of the Revocation and Deportation provisions against similarly situated individuals during that time. Interpreting the facts in the light most favorable, as the Court must, Jane Doe and John Doe have adequately shown that their injuries are redressable because an order declaring unlawful and enjoining the Government from invoking the Revocation and Deportation Provisions to revoke visas or initiate deportation on the basis of their pro-Palestine expression would ameliorate Jane Doe and John Doe's fears of engaging in such expression.

### B. Stanford Daily Publishing

Stanford Daily contends that it has standing under three separate doctrines: (a) associational standing, (b) organizational standing, or (c) corporate standing. The Government challenges all three theories that Plaintiffs advance. The Court finds that Stanford Daily has plausibly pled that it has standing under the associational and organizational standing theories and does not reach the corporate standing arguments.[9]

An association has associational standing to bring suit on behalf of its members when (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation in the lawsuit of each of the individual members. *Hunt v.*

[9] "[O]nly one plaintiff with standing is sufficient for Article III" purposes. *Vasquez Perdomo*, 148 F.4th at 674.

*Washington State Apple Adver. Comm'n.*, 432 U.S. 333, 343 (1977). "The first prong . . . requires only 'that at least one of the group's members have standing as an individual.'" *Am. Ass'n of Univ. Professors v. Rubio*, 780 F. Supp. 3d 350, 375 (D. Mass. 2025) (quoting *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016)). However, the organization need not "'identify by name the member or members injured" "'[w]here it is relatively clear, rather than merely speculative, that one or more members have been or will be adversely affected by a defendant's action, and where the defendant need not know the identity of a particular member to understand and respond to an organization's claim of injury.'" *Vasquez Perdomo v. Noem*, 148 F.4th 656, 676 (9th Cir. 2025) (quoting *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015)).

Here, Stanford Daily has alleged sufficient facts to show that noncitizen members of Stanford Daily satisfy Article III standing on their own due to well-founded fears of immigration consequences for engaging in pro-Palestine expression. "[I]t is relatively clear" that at least one of Stanford Daily's legally present noncitizen members has "been or will be adversely affected" by the Government's practices. *Vasquez Perdomo*, 148 F.4th at 676. The interests Stanford Daily seeks to protect – First Amendment rights – are germane to Stanford Daily's purpose, namely "striv[ing] to serve the Stanford community with relevant, unbiased journalism [that] provides its editorial, tech and business staffs with unparalleled educational opportunities." *Id.* ¶ 84. Stanford Daily alleges that, "[a]s part of its mission, Stanford Daily has defended and advocated for press rights and the rights of all journalists to report the news and publish opinions without government or university retaliation." *Id.* ¶ 85. Finally, Stanford Daily has adequately established its ability to litigate this matter. Neither the claims asserted nor the relief sought in the amended complaint requires the individual members' participation. Plaintiffs requested relief does not require individual proof, and Plaintiffs' claims do not raise individualized questions. Stanford Daily has therefore established associational standing.

While Stanford Daily needs only one path to establish standing, the Court finds that Stanford has also sufficiently pled facts to establish organizational standing. An organization has standing to sue when it has "alleged . . . a personal stake in the outcome of the controversy," because the challenged actions have caused "concrete and demonstrable injury to the

organization's activities," with a "consequent drain on the organization's resources" that is "more than simply a setback to the organization's abstract social interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982).

The Court finds that Stanford Daily has sufficiently alleged that its mission has been frustrated by the Government's threats of immigration enforcement, which has chilled student speech. The chilling effects have caused concrete and demonstrable injury to Stanford Daily's activities, including decreased "quantity and diversity of opinion pieces" in *The Stanford Daily*; "substantially reduced participation from noncitizen contributors"; fewer and less-diverse on-the-record sources for articles; and numerous requests from noncitizen members for articles to be published anonymously, not to be published at all, or for articles already published to be taken down. Stanford Daily also reported that due to the Government's threats and actual enforcement against noncitizens who express pro-Palestinian views, its members have quit. *See* FAC ¶¶ 112-134. By example, a lawfully present noncitizen editor "decided to quit Stanford Daily" because they feared "visa revocation, arrest, and deportation for association with articles about Israel or Palestine." *Id.* ¶ 114. Another noncitizen student with a valid visa who was on staff signed up to write an article, attended an event, took notes, and interviewed sources, but due to "fear that they may face adverse immigration consequences if they published the article, the student decided against publishing the article." *Id.* ¶ 116. Other students have "asked Stanford Daily to remove articles they had previously written about pro-Palestinian campus activism and related issues and to no longer assign them to edit stories involving Israel or Palestine." *Id.* ¶ 118.

The Court finds that like Jane Doe and John Doe, Stanford Daily has established an injury in fact, has sufficiently alleged that the Government caused the injuries by threatening enforcement of the Revocation and Deportation Provisions, and that Stanford Daily's injuries are redressable at this stage by the injunctive and declaratory relief sought in the amended complaint.

* * *

Plaintiffs have sufficiently alleged standing, and the Court accordingly denies the Government's motion to dismiss.

The Court notes that the Government made an argument, both in its briefs and during the

hearing, that does not clearly fit within the Court's standing analysis but is worthy of acknowledgement. Specifically, the Government challenges the scope of the "protected speech" alleged by Plaintiffs and implies that Plaintiffs' claims would be more aptly framed, and perhaps only have the possibility of success, as an as-applied rather than a constitutional facial challenge. The Government's argument is well-taken but ill-timed.

In denying the Government's motion to dismiss, the Court concludes that Jane Doe, John Doe, and Stanford Daily sufficiently demonstrated *their individualized standing* based on *their* credible, well-founded fear of immigration enforcement against *themselves* (Jane Doe and John Doe) and noncitizen student members of Stanford Daily, who engage in pro-Palestine expression. Plaintiffs provided concrete examples of the Government's threats and actions chilling *their* First Amendment expression related to pro-Palestine topics.

Going forward, however, Plaintiffs ask the Court to hold unconstitutional two statutes (the Revocation Provision and the Deportation Provision) of the INA, because they infringe upon "protected speech" — the scope of which Plaintiffs did not define in the hearing. FAC ¶ 8; *see also* Tr. 56:16 – 57:14. When a court is asked to review the constitutionality of a law "facially . . *only* with respect to protected speech," *see* FAC ¶¶ A–H, the court is required to "determine what the law covers" and "decide which of the laws' applications violate the First Amendment, and to measure them against the rest." *Moody v. NetChoice, LLC*, 603 U.S. 707, 725 (2024). As currently pled, Plaintiffs' claims will require the Court to determine if either of the INA's Revocation and Deportation Provisions — laws that broadly implicate U.S. immigration policy and national security — infringe on First Amendment "protected speech," not just as applied to Plaintiffs, but facially, meaning in all situations.

The Court acknowledges the Government's argument but does not reach that issue today.

/ / /

/ / /

/ / /

## IV. CONCLUSION

The Government's motion to dismiss is DENIED. The Government shall file an answer to Plaintiffs' complaint within 28 days of this order. The parties are encouraged to meet and confer regarding next steps and a proposed case schedule.

**IT IS SO ORDERED.**

Dated: January 16, 2026

Noël Wise
United States District Judge

Marc Van Der Hout (Cal. Bar #80778)
Johnny Sinodis (Cal. Bar #290402)
Oona Cahill (Cal. Bar #354525)
**VAN DER HOUT LLP**
360 Post Street, Suite 800
San Francisco, CA 94108
Telephone: (415) 981-3000
Facsimile: (415) 981-3003
Email: ndca@vblaw.com

Conor T. Fitzpatrick (Mich. Bar #P78981)*
Daniel A. Zahn (D.C. Bar #90027403)*
**FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION (FIRE)**
700 Pennsylvania Avenue SE, Suite 340
Washington, DC 20003
Telephone: (215) 717-3473
Email: conor.fitzpatrick@thefire.org
Email: daniel.zahn@thefire.org

Colin P. McDonell (Cal. Bar #289099)
**FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION (FIRE)**
510 Walnut Street, Suite 900
Philadelphia, PA 19106
Telephone: (215) 717-3473
Email: colin.mcdonell@thefire.org

*Admitted pro hac vice

*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

THE STANFORD DAILY PUBLISHING CORPORATION, JANE DOE, and JOHN DOE,

*Plaintiffs*,

v.

MARCO RUBIO, in his official capacity as Secretary of State, and

KRISTI NOEM, in her official capacity as Secretary of Homeland Security,

*Defendants*.

Case No. 5:25-cv-06618-NW

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS**

Date: January 8, 2026
Time: 9:00 AM
Courtroom: 3, 5th Floor

Judge Noël Wise

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ iii

INTRODUCTION ........ 1

BACKGROUND ........ 3

Secretary Rubio and the Trump administration abuse the INA to target protected speech. ........ 3

The Trump administration has continued to abuse the INA to target protected speech. ........ 6

The administration's targeting of noncitizens' protected speech chills Plaintiffs' expression. ........ 6

LEGAL STANDARD ........ 9

ARGUMENT ........ 10

I. Plaintiffs have standing to challenge the Revocation and Deportation Provisions. ........ 10

A. Plaintiffs are suffering an injury in fact. ........ 11

1. The Doe Plaintiffs have alleged a credible threat of enforcement. ........ 12

a. The Doe Plaintiffs intend to engage in protected speech. ........ 12

b. The Doe Plaintiffs' intended speech is arguably proscribed by the Provisions. ........ 13

c. The Doe Plaintiffs face a substantial threat of future enforcement. ........ 13

i. The government has threatened future enforcement. ........ 14

ii. The government has not disavowed future enforcement. ........ 15

iii. The government has a history of enforcement. ........ 17

2. Stanford Daily has alleged organizational, corporate, and associational injuries. ........ 18

a. Stanford Daily has alleged organizational injuries. ........ 18

b. Stanford Daily has alleged corporate injuries. ........ 20

c. Stanford Daily has alleged associational injuries. ........ 21

B. The Plaintiffs' injuries are traceable to the government and redressable by the limited relief Plaintiffs seek. .......... 23

1. The Plaintiffs' injuries are traceable to the government. .......... 24

2. The Plaintiffs' injuries are redressable by the limited relief sought. .......... 25

CONCLUSION .......... 25

Case: 26-6906, 11/20/2026, DktEntry: 16.14, (185 of 300)

# TABLE OF AUTHORITIES

**Cases**

*303 Creative LLC v. Elenis*,
600 U.S. 570 (2023) ........................................ 1

*Am. Ass'n of Univ. Professors v. Rubio*,
No. CV 25-10685, 2025 WL 2777659 (D. Mass. Sept. 30, 2025) ........................................ passim

*Am. Encore v. Fontes*,
152 F.4th 1097 (9th Cir. 2025) ........................................ 1, 11, 13, 14

*Am.-Arab Anti-Discrimination Comm. v. Thornburgh*,
970 F.2d 501 (9th Cir. 1991) ........................................ 3, 15

*Ariz. Right to Life Pol. Action Comm. v. Bayless*,
320 F.3d 1002 (9th Cir. 2003) ........................................ 11

*Barke v. Banks*,
25 F.4th 714 (9th Cir. 2022) ........................................ 25

*Bland v. Fessler*,
88 F.3d 729 (9th Cir. 1996) ........................................ 11

*Bridges v. California*,
314 U.S. 252 (1941) ........................................ 1

*Burwell v. Hobby Lobby Stores, Inc.*,
573 U.S. 682 (2014) ........................................ 20, 21, 24

*Cal. First Amend. Coal. v. Calderon*,
150 F.3d 976 (9th Cir. 1998) ........................................ 23

*Cal. Pro-Life Council, Inc. v. Getman*,
328 F.3d 1088 (9th Cir. 2003) ........................................ 1, 11, 14

*Columbia Basin Apartment Ass'n v. City of Pasco*,
268 F.3d 791 (9th Cir. 2001) ........................................ 23

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) ........................................ 24, 25

*Dombrowski v. Pfister*,
380 U.S. 479 (1965) ........................................ 11

*Edison v. United States*,
822 F.3d 510 (9th Cir. 2016) ........................................ 10

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) .......... 18

*Fellowship of Christian Athletes v. S.J. Unified Sch. Dist. Bd. of Educ.*,
82 F.4th 664 (9th Cir. 2023) .......... 22

*Flaxman v. Ferguson*,
151 F.4th 1178 (9th Cir. 2025) .......... 11, 12

*Fleck & Assocs., Inc. v. City of Phoenix*,
471 F.3d 1100 (9th Cir. 2006) .......... 22

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977) .......... 18, 21, 22

*John Doe No. 1 v. Reed*,
561 U.S. 186 (2010) .......... 2, 25

*Keyishian v. Bd. of Regents*,
385 U.S. 589 (1967) .......... 24

*Khalil v. Joyce*,
No. 25-cv-01963, 2025 WL 2092376 (D.N.J. July 25, 2025) .......... 11, 12

*Khalil v. Trump*,
784 F. Supp. 3d 705 (D.N.J. 2025) .......... 5

*L.A. Press Club v. City of Los Angeles*,
No. 25-cv-05423, 2025 WL 2640421 (C.D. Cal. Sep. 10, 2025) .......... 23

*Leonard v. Clark*,
12 F.3d 885 (9th Cir. 1993) .......... 9

*Lew v. Kona Hosp.*,
754 F.2d 1420 (9th Cir. 1985) .......... 10

*Libertarian Party of L.A. Cnty. v. Bowen*,
709 F.3d 867 (9th Cir. 2013) .......... 11

*Lopez v. Candaele*,
630 F.3d 775 (9th Cir. 2010) .......... passim

*Mahdawi v. Trump*,
781 F. Supp. 3d 214 (D. Vt. 2025) .......... 5, 10, 17

*Mahmoud v. Taylor*,
606 U.S. 522 (2025) .......... 1

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) .......... 20

*MSP Recovery Claims, Series LLC v. Amgen Inc.*,
787 F. Supp. 3d 1046 (C.D. Cal. 2025) ....... 10

*N.Y. Times Co. v. Sullivan*,
376 U.S. 254 (1964) ....... 1

*NAACP v. Button*,
371 U.S. 415 (1963) ....... 18, 20, 24

*Nat. Grocers v. Rollins*,
157 F.4th 1143 (9th Cir. 2025) ....... 9

*Ozturk v. Trump*,
783 F. Supp. 3d 801 (D. Vt. 2025) ....... 5

*Peace Ranch, LCC v. Bonta*,
93 F.4th 482 (9th Cir. 2024) ....... 12

*Planned Parenthood Great Nw., Haw., Alaska, Ind., Ky. v. Labrador*,
122 F.4th 825 (9th Cir. 2024) ....... 14

*Porter v. Martinez*,
68 F.4th 429 (9th Cir. 2023) ....... 16

*Regal Knitwear Co. v. NLRB*,
324 U.S. 9 (1945) ....... 14

*Region 8 Forest Serv. Timber Purchasers Council v. Alcock*,
993 F.2d 800 (11th Cir. 1993) ....... 22

*S.D. Cnty. Credit Union v. Citizens Equity First Credit Union*,
65 F.4th 1012 (9th Cir. 2023) ....... 9

*Salter v. Quality Carriers, Inc.*,
974 F.3d 959 (9th Cir. 2020) ....... 9, 10

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
600 U.S. 181 (2023) ....... 21, 22

*Suri v. Trump*,
No. 25-1560, 2025 WL 1806692 (4th Cir. July 1, 2025) ....... 17

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) ....... passim

*The Presbyterian Church (U.S.A.) v. United States*,
870 F.2d 518 (9th Cir. 1989) ....... 19

*Thomas v. County of Humboldt*,
124 F.4th 1179 (9th Cir. 2024) ....... 9

*Tingley v. Ferguson*,
47 F.4th 1055 (9th Cir. 2022) ....................12, 13

*United States v. Stevens*,
559 U.S. 460 (2010)....................16

*Vasquez Perdomo v. Noem*,
148 F.4th 656 (9th Cir. 2025) ....................23

*Younger v. Harris*,
401 U.S. 37 (1971)....................17

**Statutes**

8 U.S.C.
§ 1182(a)(3)(C)(iii) ....................passim
§ 1201(i)....................passim
§ 1227(a)(4)(C)(i) ....................13, 25
§ 1227(a)(4)(C)(ii) ....................4, 13, 16
§ 1252(g)....................11, 12

**Rules**

Fed. R. Civ. P. 65(d)(2)....................14

## INTRODUCTION

Since 1791, the First Amendment has barred the government from infringing the inalienable rights to free speech and a free press. The Founders' goal was simple: to place a shackle on the government's power to retaliate against disfavored speakers and thereby secure "much greater freedom of religion, expression, assembly, and petition than the people of Great Britain had ever enjoyed." *Bridges v. California*, 314 U.S. 252, 265 (1941) (invalidating conviction of noncitizen on First Amendment grounds). The First Amendment embodies our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

Because of the importance of protecting free speech, "the Supreme Court has dispensed with rigid standing requirements" in First Amendment lawsuits. *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1095 (9th Cir. 2003). Chiefly, as the Supreme Court reaffirmed earlier this year, "when a deprivation of First Amendment rights is at stake, a plaintiff need not wait for the damage to occur before filing suit." *Mahmoud v. Taylor*, 606 U.S. 522, 559–60 (2025). Instead, plaintiffs have standing when they "allege an intention to engage in" protected speech, which is "proscribed by a statute," and there is a "credible threat" the government will enforce the statute against them. *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010) (cleaned up). These "unique standing considerations" when First Amendment rights are at stake "tilt dramatically toward a finding of standing." *Am. Encore v. Fontes*, 152 F.4th 1097, 1113 (9th Cir. 2025) (cleaned up).

But you'd never know it from reading the government's brief. The government proceeds as though First Amendment pre-enforcement standing rules do not exist, confidently proclaiming that Plaintiffs lack standing because "the government has not revoked their visas or initiated removal proceedings against them." Defs.' Mot. to Dismiss ("Mot.") 1, Dkt. No. 66. But that is why Plaintiffs bring a *pre*-enforcement challenge. In this posture, "the plaintiffs themselves need not be the direct target of government enforcement." *Lopez*, 630 F.3d at 786. Rather, "past enforcement against parties similarly situated to the plaintiffs" confers pre-enforcement standing. *Id.* at 786–87; *see also 303 Creative LLC v. Elenis*, 600 U.S. 570, 583 (2023) (noting "history of past enforcement against nearly identical conduct" helped establish a credible threat (quotation marks omitted)).

And there is such past enforcement in spades, giving Plaintiffs standing to challenge the Revocation and Deportation Provisions as applied to protected speech.[1]

Since March 2025, Secretary Rubio and the Trump administration have publicly, repeatedly, and gleefully used these Provisions to target lawfully present noncitizens just like Plaintiffs for protected speech just like their own. Senior District Judge William G. Young found "by clear and convincing evidence" that Secretaries Rubio and Noem "deliberately and with purposeful aforethought" used the Provisions to violate the First Amendment by targeting noncitizens for visa revocation and deportation based on such protected speech as coauthoring a student newspaper editorial criticizing Israel and chanting "from the river to the sea, Palestine will be free." *Am. Ass'n of Univ. Professors v. Rubio* (*AAUP*), No. CV 25-10685, 2025 WL 2777659, at *1–2, *19–20, *25 (D. Mass. Sept. 30, 2025). Judge Young called their weaponization of the Provisions against speech "not only unconstitutional, but a thing virtually unknown to our constitutional tradition." *Id.* at *46.

And the threat to noncitizens for sharing their views has not ceased. The Verified Amended Complaint details that, as recently as late October, the government arrested and revoked the visa of Sami Hamdi, a British political commentator on a pro-Palestinian speaking tour of the United States, making no secret that the revocation was due to the Trump administration's disagreement with his views. Am. Compl. ¶¶ 76–79. And on November 18, White House Deputy Chief of Staff and National Security Advisor Stephen Miller announced, "The State Department has revoked tens of thousands of visas, and they're just getting started on tens of thousands more." *Id.* ¶ 80.

Plaintiffs are directly in the crosshairs of the administration's efforts to wield the Provisions to punish protected speech and have self-censored their expression to avoid that fate. The Verified Amended Complaint explains that Jane Doe engaged in pro-Palestinian activism on social media and attended protests where she chanted "from the river to the sea." *Id.* ¶¶ 139–41. But because of

[1] The "Deportation Provision" allows the Secretary of State to render a noncitizen deportable if he "personally determines" their *lawful* "beliefs, statements, or associations" "compromise a compelling United States foreign policy interest." 8 U.S.C. §§ 1182(a)(3)(C)(iii), 1227(a)(4)(C)(ii). The "Revocation Provision" allows the Secretary to, "at any time, in his discretion, revoke" a "visa or other documentation." 8 U.S.C. § 1201(i). Plaintiffs challenge the two provisions solely as to their use against protected speech. *See John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010) (explaining the process for assessing a challenge as to only some of a statute's applications).

Case: 26-6906, 11/20/2026, DktEntry: 16.14, Page 191 of 300

the administration's threats and actions, she has stopped attending protests and deactivated social media accounts. *Id.* ¶¶ 148–55. Similarly, John Doe made his X account private and is refraining from wearing certain pro-Palestinian apparel. *Id.* ¶¶ 169, 171. And noncitizen writers and editors at Stanford Daily are refusing to write or edit stories or opinion pieces related to Israel and Palestine and even quitting the paper, fearing the same fate as Rümeysa Öztürk, who submitted a pro-Palestinian op-ed to her student newspaper only to find herself thrown into the back of a van by masked federal agents and rushed to an ICE detention facility in rural Louisiana. *See AAUP*, 2025 WL 2777659, at *28 (describing, and including a picture of, ICE's ambush of Ms. Öztürk).

The Verified Amended Complaint alleges that Plaintiffs have engaged and wish to engage in speech falling within the crosshairs of an immigration statute the administration is actively using to target, detain, and deport other speakers just like them. That is precisely what is required of plaintiffs asserting a First Amendment challenge to the statute. *See Am.-Arab Anti-Discrimination Comm. v. Thornburgh*, 970 F.2d 501, 508 (9th Cir. 1991) (holding plaintiffs had pre-enforcement standing to mount a First Amendment challenge to immigration statute, noting that prior enforcement of the challenged statute against similar speech "underscores the government's willingness" to use it against the plaintiffs). The Court should deny the government's motion.

## BACKGROUND

President Donald Trump campaigned on a platform that included deporting lawfully present noncitizens for protected speech, promising to throw out "any student that protests" because "[as] soon as they hear, they're going to behave." Am. Compl. ¶ 35. He pledged to revoke visas of "radical, anti-American, and anti-Semitic" students and "aggressively deport" noncitizens with "jihadist sympathies." *Id.* ¶ 31. Now in power, his administration is using the Revocation and Deportation Provisions to do just that.

**Secretary Rubio and the Trump administration abuse the INA to target protected speech.**

On January 20, 2025, the President issued an executive order instructing the government to ensure resident noncitizens "do not bear hostile attitudes" toward the United States or "advocate for" or "support" "foreign terrorists and other threats to our national security." *Id.* ¶ 36. Ten days later, the White House committed to revoking the visas of and deporting "Hamas Sympathizers,"

Case: 26-6906, 11/20/2026, DktEntry: 16.14, Page 192 of 300

including those whom the administration viewed as having "joined in the pro-jihadist protests." *Id.* ¶ 38. The administration considers the phrase "from the river to the sea, Palestine will be free" to express support for Hamas and to thus justify action under the Revocation or Deportation Provisions. *Id.* ¶ 39. Likewise, calling Israel "an apartheid state," "calling for an arms embargo on Israel," or "criticizing Israel's actions in Gaza" could also be sufficient to invoke the provisions. *Id.* ¶ 39.

In early March 2025, Department of Homeland Security (DHS) agents arrested Mahmoud Khalil—a peaceful participant in pro-Palestinian advocacy at Columbia University—and transported him to an immigration jail in rural Louisiana. *Id.* ¶¶ 41–43. Proceedings followed under the Deportation Provision, which authorizes the Secretary of State to trigger deportation proceedings against noncitizens solely because of their protected speech, so long as the Secretary of State "personally determines" their activity compromises "a compelling United States foreign policy interest." 8 U.S.C. §§ 1182(a)(3)(C)(iii), 1227(a)(4)(C)(ii). Secretary Rubio claimed Mr. Khalil's continued presence "would have potentially severe adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest" because of his "participation" in "antisemitic protests and disruptive activities, which fosters a hostile environment for Jewish students in the United States." Am. Compl. ¶ 44. The day after Mr. Khalil's arrest, Secretary Rubio announced the federal government "will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported." *Id.* ¶ 45. President Trump pledged that Mr. Khalil's arrest was the "first" of "many to come," and that his administration would deport any noncitizen student involved in "pro-terrorist, anti-Semitic, anti-American activity." *Id.* ¶ 47.

In mid-April, masked DHS agents entered the naturalization interview of Mohsen Mahdawi—a legal permanent resident who had been a critic of Israel's military campaign in Gaza—and arrested him. *Id.* ¶¶ 56–58. As with Mr. Khalil, Secretary Rubio relied solely on Mr. Mahdawi's protected speech and cited the Deportation Provision as the basis for Mr. Mahdawi's arrest and deportation proceedings, bizarrely alleging the advocacy of this single international student hindered the United States government's ability to "promot[e] peace in the Middle East." *Id.* ¶ 59.

Weeks prior, six plain-clothed DHS officers surrounded and detained Tufts University PhD student Rümeysa Öztürk—a lawfully present noncitizen pursuant to an F-1 student visa—outside

Case: 26-6906, 11/20/2026, DktEntry: 16.14, (193 of 300)

her home. *Id.* ¶¶ 51, 53. Her offense? During her time at Tufts, Ms. Öztürk coauthored an editorial in the student newspaper urging Tufts, among other things, to recognize a genocide in Gaza and divest from Israeli companies. *Id.* ¶ 52. The State Department revoked Ms. Öztürk's visa without notice, DHS ambushed her, and then, as with Mr. Khalil, DHS immediately transferred her to an immigration jail in remote Louisiana to await deportation proceedings. *Id.* ¶¶ 53–55.

Secretary Rubio's department relied on the Revocation Provision to revoke Ms. Öztürk's visa. *Id.* ¶ 54. The Revocation Provision, 8 U.S.C. § 1201(i), provides that "[a]fter the issuance of a visa or other documentation to any alien, the … Secretary of State may at any time, in his discretion, revoke such visa or other documentation." It places no constraints on the Secretary's discretion and no guardrails against revoking visas based on protected speech.

Citing constitutional grounds, federal courts have ordered the release of Mr. Khalil, Ms. Öztürk, and Mr. Mahdawi during their deportation proceedings. Am. Compl. ¶¶ 49, 55, 60. The court in Ms. Öztürk's action concluded "the government has neither rebutted the argument that retaliation for Ms. Ozturk's op-ed was the motivation for her detention nor identified another specific reason for Ms. Ozturk's detention." *Ozturk v. Trump*, 783 F. Supp. 3d 801, 810 (D. Vt. 2025). In Mr. Mahdawi's action, the court explained that he "raised a substantial claim that the Government arrested him to stifle speech with which it disagrees." *Mahdawi v. Trump*, 781 F. Supp. 3d 214, 228 (D. Vt. 2025), *appeal argued*, No. 25-1113 (2d Cir. Sep. 30, 2025). And in Mr. Khalil's suit, the court concluded the Deportation Provision was likely unconstitutionally vague as applied to him. *Khalil v. Trump*, 784 F. Supp. 3d 705, 771 (D.N.J. 2025), *appeal argued*, No. 25-2162 (3d Cir. Oct. 21, 2025); Order, *id.* (No. 25-cv-01963), Dkt. No. 316 (ordering Mr. Khalil's release).

Secretary Rubio and the Trump administration promised more visa revocations for protected speech. On May 8, 2025, DHS Assistant Secretary Tricia McLaughlin announced that noncitizens "pushing Hamas propaganda," "glorifying terrorists," or otherwise engaging in "anti-American" conduct "can expect your visa will be revoked." Am. Compl. ¶ 63. At a May 21, 2025, congressional hearing, Secretary Rubio, responding to a question about the revocation of Ms. Öztürk's visa based on her speech, said that he "proudly" revoked her visa, that he revokes visas every day, and that he would continue revoking visas based on expression. *Id.* ¶ 65. And on July 29, 2025, Stephen Miller

posted on X that administration officials are "working continuously" to revoke visas from noncitizens "who espouse hatred for America or its people." *Id.* ¶ 67.

**The Trump administration has continued to abuse the INA to target protected speech.**

Since Plaintiffs filed this lawsuit, the Trump administration has continued to revoke visas based on protected speech. For example, on September 11, 2025, after Charlie Kirk's assassination, Deputy Secretary of State Christopher Landau declared that noncitizens who "glorify violence and hatred are not welcome visitors in our country" and that the State Department would "undertake appropriate action." *Id.* ¶ 69. On September 15, Secretary Rubio affirmed that visa revocations were "under way," and that anyone "here on a visa and cheering on the public assassination of a political figure" should "prepare to be deported." *Id.* ¶ 71. In September and October, the State Department publicized a series of visa revocations based on protected speech about Charlie Kirk. *Id.* ¶¶ 70, 74.

Further, in late October, the State Department revoked the visa of, and DHS arrested, Sami Hamdi, a British political commentator who was on a speaking tour in the United States and often voices support for Palestinians. *Id.* ¶¶ 76–77. The State Department and DHS confirmed the basis for revoking his visa was that he "support[ed]" terrorism. *Id.* ¶¶ 77–79. DHS warned that noncitizens who want to "hide behind the First Amendment to advocate for anti-American and anti-Semitic violence and terrorism" should "think again." *Id.* ¶ 79. These threats continued through the fall. *Id.* ¶¶ 68, 72, 75. On November 18, Stephen Miller warned: "The State Department has revoked tens of thousands of visas, and they're just getting started on tens of thousands more." *Id.* ¶ 80.

**The administration's targeting of noncitizens' protected speech chills Plaintiffs' expression.**

Plaintiff Jane Doe is a graduate of a United States university, with no relationship to Stanford Daily (or Stanford University), who resides in the United States pursuant to her lawful admission on an F-1 student visa and was a member of the pro-Palestinian student group Students for Justice in Palestine ("SJP") at her university. *Id.* ¶¶ 17, 135–36, 139.[2] She published pro-Palestinian/anti-Israel commentary online, including accusing Israel of committing "genocide" and perpetuating "apartheid." *Id.* ¶ 140. She has also used the slogan "from the river to the sea, Palestine will be free"

---

[2] The government deemed it significant that Ms. Öztürk's op-ed "joined in voicing opposition to Tufts' investment in Israel with" the Tufts SJP chapter. *AAUP*, 2025 WL 2777659, at *26.

Case: 26-6906, 11/20/2026, DktEntry: 16.14, Page 195 of 300

and criticized American foreign policy, particularly its relationship with Israel. *Id.* ¶¶ 140–41. In other words, Jane Doe has said essentially all the same things Rümeysa Öztürk did.

In late 2023 or early 2024, Jane Doe appeared in a profile on the anonymously run Canary Mission website,[3] which a senior official in ICE's Homeland Security Investigations unit testified his team uses to generate "reports" on individuals that the State Department relies on to decide, among other things, "visa revocations." *Id.* ¶¶ 142–45.[4] Mahmoud Khalil, Rümeysa Öztürk, and Mohsen Mahdawi—all targeted by Secretary Rubio's State Department with the Provisions—each appeared on Canary Mission. *Id.* ¶ 147. In March 2025, Jane Doe read news articles about the detention and attempted deportation of noncitizens like Mahmoud Khalil and Rümeysa Öztürk for engaging in protected pro-Palestinian speech, including articles quoting government statements about the detention and deportation of these noncitizens. *Id.* ¶ 148.

Since then, fearing Secretary Rubio will revoke her visa under the Revocation Provision or render her deportable under the Deportation Provision, Jane Doe has refrained from publicly publishing and voicing her opinions regarding Palestine and Israel, including by no longer attending pro-Palestinian protests, deactivating her main social media account and no longer posting pro-Palestinian content on her other social media accounts, no longer engaging in organizing supporting Palestinians, and refraining from wearing a keffiyeh or holding a Palestinian flag to show support for the Palestinian cause. *Id.* ¶¶ 149, 155. Through 2025, as she read and learned more about the government's visa revocations based on protected speech and its vows to continue them, she continued to self-censor. *See id.* ¶¶ 150–56. The only advocacy Jane Doe now feels comfortable engaging in is wearing watermelon earrings,[5] which are quickly removable. *Id.* ¶ 155.

Similarly, Plaintiff John Doe is a graduate of a major United States university, with no relationship to Stanford Daily (and, like Jane Doe, did not attend Stanford), who is lawfully present in the United States pursuant to his admission on an F-1 student visa and has studied and worked in journalism. *Id.* ¶¶ 18, 158–59. John Doe came to the United States to study journalism because of

[3] Canary Mission exists to expose people it considers "anti-Israel." Am. Compl. ¶ 143.

[4] Canary Mission provided "most" protesters DHS asked ICE to investigate. Am. Compl. ¶ 146.

[5] Watermelons share the same colors as the Palestinian flag, and advocates often use the symbol to support the Palestinian cause. Am. Compl. ¶ 155.

his admiration for America's strong protection for free speech and freedom of the press. *Id.* ¶ 158. After the October 7, 2023, attack and Israel's counter-offensive, he attended pro-Palestinian protests and published pro-Palestinian/anti-Israel commentary online. *Id.* ¶ 162. At protests, he participated in chants including "from the river to the sea, Palestine will be free," accusing Israel of committing "genocide," and calling Israel a "terrorist state." *Id.* ¶ 163. After Secretary Rubio and the Trump administration began targeting lawfully present noncitizen students because of their speech, the professor for whom John Doe served as a teaching assistant told him to reconsider his advocacy related to Israel and Palestine due to potential danger to his immigration status. *Id.* ¶ 164. And he read news articles about the detention and attempted deportation of noncitizens like Mahmoud Khalil and Badar Khan Suri for engaging in protected pro-Palestinian speech, including articles quoting government statements about the detention and deportation of these noncitizens. *Id.* ¶ 165. He has also read about the government's continued visa revocations based on protected speech and its vows to continue doing so. *Id.* ¶¶ 165, 172–74.

Because of the administration's actions and threats, John Doe has substantially reduced his pro-Palestinian speech and advocacy. *Id.* ¶¶ 165, 169, 171. For example, he made his social media account containing pro-Palestinian content private and is refraining from wearing certain pro-Palestinian apparel. *Id.* John Doe also delayed publishing his findings containing criticism of Israel's actions in Gaza for months, fearing adverse immigration action. *Id.* ¶ 165. Though John Doe has resumed a limited amount of protected speech, he continues to largely self-censor his expression (e.g., his social media account and clothing) out of fear of visa revocation and deportation. *Id.* ¶ 176.

Plaintiff The Stanford Daily Publishing Corporation is a nonprofit that publishes *The Stanford Daily*, the independent, student-run newspaper at Stanford University. *Id.* ¶¶ 81–82. Stanford Daily's mission statement explains that it "strives to serve the Stanford community with relevant, unbiased journalism and provides its editorial, tech and business staffs with unparalleled educational opportunities." *Id.* ¶ 84. But the government's use of the Revocation and Deportation Provisions to target noncitizens' protected speech is thwarting Stanford Daily's journalistic and educational activities by chilling its noncitizen writers, reporters, and editors. Stanford Daily's noncitizen members have quit, withheld articles, refused assignments, requested articles be taken

down, and asked for anonymity, all because they fear visa revocation, arrest, detention, and deportation under the administration's ongoing enforcement of the Provisions. *Id.* ¶¶ 112, 132–33.

For example, in March 2025, a lawfully present noncitizen editor on staff decided to quit out of fear of adverse immigration consequences if they were associated with articles about Israel or Palestine. *Id.* ¶¶ 114–15. As another example, a lawfully present noncitizen writer signed up to cover a story about a vigil that brought together Jewish and Palestinian families to honor those who died in the conflict in Gaza. *Id.* ¶ 116. The writer had attended, taken notes, and interviewed sources. *Id.* But due to fear of adverse immigration consequences, the student decided against publishing an article about the event. *Id.* ¶¶ 116–17. Other Stanford Daily members and contributors have asked the paper to take down their past articles about the Middle East, fearing visa revocation or deportation if they came to the attention of Trump administration officials. *See, e.g.*, *id.* ¶¶ 118–23, 133–34. The government's past enforcement and continuing threats to enforce the Revocation and Deportation Provisions based on speech have harmed the quality and quantity of pieces Stanford Daily is able to publish on the conflict between Israel and Palestine, as noncitizen members, contributors, and sources have substantially reduced their participation. *Id.* ¶¶ 130–31, 133.

## LEGAL STANDARD

The Court should deny the government's motion because Plaintiffs' allegations, when accepted as true and viewed in the light most favorable to Plaintiffs, confer standing. *See Thomas v. County of Humboldt*, 124 F.4th 1179, 1186 (9th Cir. 2024). And because at least one plaintiff has standing, this Court has jurisdiction to consider the claims, without needing to consider the other Plaintiffs' standing. *Nat. Grocers v. Rollins*, 157 F.4th 1143, 1157 (9th Cir. 2025); *see also Leonard v. Clark*, 12 F.3d 885, 888 (9th Cir. 1993) (highlighting the "general rule" "that once the court determines that one of the plaintiffs has standing, it need not decide the standing of the others").

A party may strategically decide to assert a "factual jurisdictional attack." *S.D. Cnty. Credit Union v. Citizens Equity First Credit Union*, 65 F.4th 1012, 1028 (9th Cir. 2023). The government omits whether it considers its attack facial or factual, but it has failed to assert a factual attack. Whether an attack is "facial" (where allegations are presumed true) or "factual" (entailing evaluation of evidence) turns on whether the challenger disputes the allegations' truth. *Salter v. Quality*

*Carriers, Inc.*, 974 F.3d 959, 964 (9th Cir. 2020) (determining attack was facial when party had "not really challenged" the allegations' truth). The government asserts a facial attack because it does not dispute the allegations' truth, but whether they confer standing. *See, e.g.*, Mot. 16–17 (not disputing truth of Doe Plaintiffs' allegations). That remains true despite its outside evidence. *See MSP Recovery Claims, Series LLC v. Amgen Inc.*, 787 F. Supp. 3d 1046, 1077 (C.D. Cal. 2025) (concluding party failed to assert factual attack when evidence did not dispute relevant allegations).[6]

## ARGUMENT

The Trump administration has used, promised to use, and continues using the Revocation and Deportation Provisions to target lawfully present noncitizens like Jane Doe, John Doe, and Stanford Daily's members for protected speech about the Middle East, American foreign policy, and American politics. As Judge Young found, "Secretaries Noem and Rubio are engaged in a mode of enforcement leading to detaining, deporting, and revoking noncitizens' visas solely on the basis of political speech, and with the intent of chilling such speech and that of others similarly situated." *AAUP*, 2025 WL 2777659, at *46. Another court put it this way: "Legal residents—not charged with crimes or misconduct—are being arrested and threatened with deportation for stating their views on the political issues of the day." *Mahdawi v. Trump*, 781 F. Supp. 3d at 233.

Plaintiffs have engaged in the type of speech the Trump administration has wielded the Provisions against and are self-censoring to avoid those consequences. They therefore have standing to challenge the Provisions with respect to protected speech under the First Amendment.

### I. Plaintiffs have standing to challenge the Revocation and Deportation Provisions.

Plaintiffs have standing to challenge the Provisions because they can demonstrate "(1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–58 (2014) (cleaned up). First Amendment suits present "unique standing considerations" because the inability to quickly vindicate free speech rights can cause

---

[6] Even if the government brought a factual attack, it would not change the analysis. The complaint's verified allegations constitute evidence akin to affidavits. *Lew v. Kona Hosp.*, 754 F.2d 1420, 1423 (9th Cir. 1985). And with a factual attack, any factual disputes are resolved in the plaintiffs' favor. *Edison v. United States*, 822 F.3d 510, 517 (9th Cir. 2016).

speakers to self-censor. *Ariz. Right to Life Pol. Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003). The Constitution abhors that possibility because "free expression—of transcendent value to all society, and not merely to those exercising their rights—might be the loser." *Dombrowski v. Pfister,* 380 U.S. 479, 486 (1965). These unique First Amendment standing considerations "tilt dramatically toward a finding of standing." *Am. Encore*, 152 F.4th at 1113 (cleaned up).

**A. Plaintiffs are suffering an injury in fact.**

It is well settled that "a chilling of the exercise of First Amendment rights is, itself, a constitutionally sufficient injury." *Libertarian Party of L.A. Cnty. v. Bowen*, 709 F.3d 867, 870 (9th Cir. 2013); *see Dombrowski,* 380 U.S. at 486 (recognizing the "sensitive nature of constitutionally protected expression," in permitting a pre-enforcement action involving the First Amendment); *Bland v. Fessler,* 88 F.3d 729, 736–37 (9th Cir. 1996) ("That one should not have to risk prosecution to challenge a statute is especially true in First Amendment cases …."). Thus, in First Amendment cases, "the Supreme Court has endorsed" a "hold your tongue and challenge now" method that enables proceeding against laws whose potential enforcement causes plaintiffs to self-censor. *Cal. Pro-Life Council*, 328 F.3d at 1094 (quotation marks omitted).

When, as here, plaintiffs elect to stay silent rather than risk government retribution for speech, "such self-censorship is a constitutionally sufficient injury as long as it is based on an actual and well-founded fear that the challenged statute will be enforced." *Bowen*, 709 F.3d at 870 (quotation marks omitted). Similarly, continuing to engage in protected speech under threat of enforcement is also an injury in fact sufficient to confer standing. *See Flaxman v. Ferguson*, 151 F.4th 1178, 1185–86 (9th Cir. 2025) (reversing district court's dismissal because professors alleged policies will chill their speech even though they continued engaging in the protected conduct). That means John Doe is doubly covered in light of his resumption of some limited speech.

A final note on pre-enforcement standing: Secretaries Rubio and Noem are not showing their full hand to the Court. Their (incorrect) argument that Plaintiffs lack standing "in the absence of any actual enforcement action taken against them," Mot. 1, neglects to mention that their position in related litigation is that 8 U.S.C. § 1252(g) *bars* federal district courts from reviewing "actual enforcement actions." *See, e.g.*, Resp'ts' Mot. to Stay 3, *Khalil v. Joyce*, No. 25-cv-01963, 2025

WL 2092376 (D.N.J. July 25, 2025), Dkt. No. 360-1 (arguing Section 1252(g) deprives district courts of "authority to disrupt or control removal proceedings"). In short, Secretaries Rubio and Noem are asking this Court to bless a "heads I win, tails you lose" system of constitutional rights, where noncitizens lack pre-enforcement standing to protect their free speech rights before an immigration enforcement action and are barred from seeking the district court's help after. The Trump administration's attempt to deny the nation's federal district courts the ability to review unconstitutional immigration statutes and actions should go nowhere.

**1. The Doe Plaintiffs have alleged a credible threat of enforcement.**

The Doe Plaintiffs' self-censorship is an injury sufficient to confer pre-enforcement standing under the *Driehaus* test because (1) they intend to engage in conduct affected with a constitutional interest, (2) their speech is subject to the Revocation and Deportation Provisions, and (3) there is a credible threat the government will enforce the Provisions against them. *Driehaus*, 573 U.S. at 159.

**a. The Doe Plaintiffs intend to engage in protected speech.**

First, the Doe Plaintiffs intend to engage in constitutionally protected speech. The government does not contest that "political speech" is constitutionally protected. *Id.* at 162. And here, Jane Doe intends to resume publishing and voicing her true opinions regarding Palestine and Israel and would reactivate her social media account containing her past expression. Am. Compl. ¶ 149. This includes publishing pro-Palestinian/anti-Israel commentary online, such as commentary accusing Israel of committing "genocide" and perpetuating "apartheid" and using the slogan "from the river to the sea, Palestine will be free." *Id.* ¶ 140. John Doe intends to publish and voice his true opinions regarding Palestine and Israel. *Id.* ¶ 166. He would make public his X social media account containing pro-Palestinian commentary, wear "Palestinian Youth Movement" apparel, and increase his expression supporting Palestinians, criticizing American foreign policy, and opposing the Israeli government. *Id.* ¶¶ 169–71, 176.

The Doe Plaintiffs have "specifically plead[ed] [their] intent and allege[d] corroborating past practice." *Peace Ranch, LCC v. Bonta*, 93 F.4th 482, 488 (9th Cir. 2024). They have no obligation to allege "specific speech they would have made but for the challenged policies." *Flaxman*, 151 F.4th at 1187; *accord Tingley v. Ferguson*, 47 F.4th 1055, 1068 (9th Cir. 2022) (Plaintiffs need not

"specify 'when, to whom, where, or under what circumstances' they plan to violate the law when they have already violated the law in the past."). But in the interest of completeness, the Verified Amended Complaint does just that, with factual allegations Defendants do not dispute. Mot. 16.

**b. The Doe Plaintiffs' intended speech is arguably proscribed by the Provisions.**

Second, the Doe Plaintiffs' intended speech is "arguably proscribed by" the Provisions. *Driehaus*, 573 U.S. at 162 (cleaned up). That is because they enable the Secretary of State to revoke a visa and render noncitizens deportable based on protected speech about American foreign policy.

The Deportation Provision's text allows the Secretary to render lawfully present noncitizens deportable for their protected speech if he "personally determines" their activities "compromise a compelling United States foreign policy interest." 8 U.S.C. §§ 1182(a)(3)(C)(iii), 1227(a)(4)(C)(i)–(ii). Noncitizens are thus within the Provision's reach if they engage in any expression arguably implicating American foreign policy. And the Revocation Provision allows the Secretary "at any time, in his discretion" to "revoke [a] visa or other documentation." *Id.* § 1201(i). Noncitizen speakers are thus always within the Revocation Provision's reach because it places no constraints on the Secretary's discretion nor guardrails against revoking visas based on protected speech.

"[F]or the purposes of standing, [courts] accept Plaintiffs' interpretation of the statute so long as it is an arguable interpretation." *Am. Encore*, 152 F.4th at 1116. Here, Plaintiffs' interpretation is not just an arguable interpretation, but the *only* interpretation: the government has expressly adopted it. *See* Defs.' Cross-Mot. and Opp'n 24, Dkt. No. 33 ("That Congress did not limit the discretion to revoke visas and did not define what constitutes 'potentially serious foreign policy consequences' is telling."). At no point has the government argued Plaintiffs' speech is beyond the textual reach of the statutes. And that is what matters for standing.

**c. The Doe Plaintiffs face a substantial threat of future enforcement.**

And third, the Doe Plaintiffs face a substantial threat of future enforcement because "the enforcement authorities have 'communicated a specific warning or threat to initiate proceedings,'" the government has not "disavowed enforcement," and "there is a 'history of past prosecution or enforcement.'" *Am. Encore*, 152 F.4th at 1118 (quoting *Tingley*, 47 F.4th at 1067).

Case: 26-6906, 11/20/2026, DktEntry: 16.14, (202 of 300)

i. **The government has threatened future enforcement.**

As the Ninth Circuit explained, when a law countenances punishment for protected speech, a plaintiff "need not show that the authorities have threatened to prosecute him; the threat is latent in the existence of the statute." *Cal. Pro-Life Council*, 328 F.3d at 1095 (quotation marks omitted). Still, the officials with enforcement authority have communicated specific warnings to and threatened every noncitizen, which necessarily includes Jane Doe and John Doe, with visa revocation and deportations for engaging in anti-Israel, pro-Palestinian, or anti-American speech. Am. Compl. ¶¶ 30–36, 38, 39, 45, 47, 62–75, 77–80. So, unlike the generic "we will enforce all laws" promises the government's caselaw addresses, this matter involves specific threats to enforce particular statutes against protected speech on defined topics. *Compare Lopez*, 630 F.3d at 787 (citing as a general-threat example a promise to enforce "all of the laws of San Diego, State, Federal and County" (quotation marks omitted)), *with Planned Parenthood Great Nw., Haw., Alaska, Ind., Ky. v. Labrador*, 122 F.4th 825, 838 (9th Cir. 2024) ("Far from a general warning of enforcement, the [enforcer's threat] singled out Idaho health care professionals who perform the specific act of referring patients to abortion providers across state lines." (cleaned up)).

These specific threats have come from those statutorily empowered to enforce the challenged Provisions. Only the Secretary of State can "personally determine[]" to render noncitizens deportable under the Deportation Provision. 8 U.S.C. § 1182(a)(3)(c)(iii). And the Secretary likewise has personal authority to revoke visas under the Revocation Provision. *Id.* § 1201(i). Even if the Secretary could delegate his authority and the statutory command to "personally determine[]" the Deportation Provision's applicability, Plaintiffs would still have standing "by virtue of the enforcement authority delegated by the Secretary." *Am. Encore*, 152 F.4th at 1118. The "potential for [lower level] workers to expose individuals to [adverse government action] for exercising First Amendment speech that others find offensive creates its own chilling effect," which "presents enough of a collective threat to create a credible or substantial risk of enforcement." *Id.* at 1119. Plus, Secretaries Rubio and Noem lead and set the policy for their departments, so an injunction against them binds everyone at their agencies. Fed. R. Civ. P. 65(d)(2); *see Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945). At the State Department and DHS, the buck stops with Defendants.

**ii. The government has not disavowed future enforcement.**

The government's brief insists the government has "expressly disavowed any policy or intention to target individuals based on pure political speech" Mot. 8–9. No, it hasn't. President Trump, Secretary Rubio, Secretary Noem, and those authorized to speak on their behalf have never disavowed revoking visas or deporting noncitizens based on protected speech. Instead, as shown above, high-ranking officials including Secretary Rubio and Stephen Miller continue to not only brag about revoking visas and pursuing deportations for protected speech, but promise more will come. The Court should take the President, and his Cabinet, at their word.

The government next points to Judge Young's finding that the government lacked an "ideological deportation policy" and uses that to suggest Judge Young found the government was not invoking the statutes based on speech. Mot. 19 & n.4 (quoting *AAUP*, 2025 WL 2777659, at *39). Not so. In context, Judge Young was discussing whether there was a "policy," within the context of an Administrative Procedure Act suit, "to deport all pro-Palestinian non-citizens." *AAUP*, 2025 WL 2777659, at *39. Though he determined *that* policy did not exist, he expressly found the existence of a continuing policy to deport noncitizens based on speech and use those ongoing deportation efforts to chill other noncitizens from speaking. *Id.* And he explicitly found that government officials "*do not disavow* an intention to detain, deport, or revoke student visas in response to what would inarguably be constitutionally protected speech if engaged in by a citizen." *Id.* at *44 (emphasis added).

The only statements the government points to as reflecting a "disavowal" arose in the context of litigation, Mot. 19—but that is immaterial under the Ninth Circuit requirement that a "government's disavowal[s] must be more than a mere litigation position." *Lopez*, 630 F.3d at 788; *see also Thornburgh*, 970 F.2d at 508 (holding noncitizens had standing to challenge immigration statute on First Amendment grounds, despite the government dropping charges against them four days before the hearing "for tactical reasons"). Outside of litigation, the government has maintained its position that it can—and will—enforce the Provisions against noncitizens for protected speech. Am. Compl. ¶¶ 30–36, 38, 39, 45, 47, 62–75, 77–80. In short, "Plaintiffs could well be the next

Case: 26-6906, 11/20/2026, DktEntry: 16.14, (204 of 300)

target given the Trump Administration's vow to continue applying the Revocation and Deportation Provisions to protected speech." Amicus Br. of ACLU of N. Cal. et al. 10, Dkt. No. 40-1.

The government argues it has completed its review of campus protesters with less than 1% of those protesters receiving nonimmigrant visa revocations—a meaningless statistic here, given those protesters reviewed included citizens, who don't have visas to revoke. Mot. 2, 8, 17; *see also* Dkt. No. 33-1 at 108. Regardless, the Ninth Circuit has already rejected a similar argument. In *Porter v. Martinez*, the state tried to defeat standing by arguing "the odds of anyone being cited [under the challenged statute] are 'vanishingly small.'" 68 F.4th 429, 437 (9th Cir. 2023). The court rejected that argument because the state "nevertheless do[es] enforce [the challenged statute]" and did "not disclaim their ability to do so in [future] cases." *Id.* So too here. The government does enforce the Deportation and Revocation Provisions against speech and has not disclaimed doing so in the future.

Finally, disavowals are effective only when "the enforcing authority has disavowed the applicability of the challenged law to the plaintiffs" or "expressly interpreted the challenged law as not applying to the plaintiffs' activities." *Lopez*, 630 F.3d at 788. The government never asserts Plaintiffs' past or future speech is beyond the *textual* reach of the Provisions. Nor could it. The Deportation Provision, by its plain text, applies *solely* to "lawful" (i.e. protected) speech. 8 U.S.C. §§ 1182(a)(3)(C)(iii), 1227(a)(4)(C)(ii). The Revocation Provision places no constraints on scope, enabling Secretary Rubio to revoke a visa for "any" reason, including speech. *Id.* § 1201(i).

The government's pledges in its brief, including that it would not deport a speaker for accusing Israel of "genocide" or using the "river to the sea" chant—even if not contradicted by its ongoing deportation efforts—amount to nothing more than the government "invoking its prosecutorial discretion" to promise not to punish Plaintiffs for their speech. *United States v. Stevens*, 559 U.S. 460, 480 (2010). "But the First Amendment protects against the Government; it does not leave us at the mercy of *noblesse oblige*." *Id.* Courts will not "uphold an unconstitutional statute merely because the Government promise[s] to use it responsibly." *Id.* Rather, a government "assurance that it will apply [a statute] far more restrictively than its language provides is pertinent only as an implicit acknowledgement of the potential constitutional problems with a more natural reading." *Id.* *Stevens* confirms the Provisions' irredeemable constitutional frailty as to speech.

### iii. The government has a history of enforcement.

The Ninth Circuit has been clear that a "history of past enforcement against parties similarly situated to the plaintiffs cuts in favor of a conclusion that a threat is specific and credible." *Lopez*, 630 F.3d at 786–87. And here, the government has enforced the Provisions against similarly situated legally present noncitizens who engage in comparable protected expression to the Doe Plaintiffs.

Secretary Rubio invoked the Deportation Provision against Mr. Mahdawi because he used the slogan "from the river to the sea, Palestine will be free" and led "pro-Palestinian protests." Resp. in Opp'n to Mot. for Release Ex. A, at 2, *Mahdawi*, 781 F. Supp. 3d 214 (No. 25-cv-389), Dkt. No. 42-1; *AAUP*, 2025 WL 2777659, at *19–22; *see also* Am. Compl. ¶¶ 140, 149, 163, 166 (describing how the Doe Plaintiffs have used and intend to continue using the same slogan). Secretary Rubio enforced the Deportation Provision against Mr. Khalil because he participated in pro-Palestinian protests. Reply to Resp. to Mot. for Prelim. Inj. Ex. E, at 7, *AAUP*, 2025 WL 2777659 (No. 25-cv-10685), Dkt. No. 68-6; *see also* Am. Compl. ¶¶ 155, 162 (describing how the Doe Plaintiffs have and intend to continue participating in protests and pro-Palestinian expression). He enforced the Deportation Provision against Dr. Badar Khan Suri for pro-Palestinian speech and never contested detaining "Suri in retaliation for his First Amendment activity." *Suri v. Trump*, No. 25-1560, 2025 WL 1806692, at *4 (4th Cir. July 1, 2025); *see also* Am. Compl. ¶¶ 140, 149, 163, 166 (describing how the Doe Plaintiffs have and wish to continue engaging in pro-Palestinian speech). And his department enforced the Revocation Provision against Ms. Öztürk because she "protest[ed] Tufts' relationship with Israel" in a student newspaper op-ed and engaged in other pro-Palestinian "activities and associations." *AAUP*, 2025 WL 2777659, at *26 (quotation marks omitted); *see also* Am. Compl. ¶¶ 139, 140, 149, 163, 166 (describing how the Doe Plaintiffs have and wish to continue engaging in pro-Palestinian advocacy, including through journalism and social media, and how Jane Doe was a member of Students for Justice in Palestine). The Doe Plaintiffs do not want to (and to bring this challenge, they need not) find themselves in the same position facing deportation.[7]

---

[7] The government, like the unsuccessful respondents in *Driehaus*, relies on *Younger v. Harris*, which involved intervenors who alleged a leafleteer's prosecution "inhibited" their speech but—critically—not that their own prosecutions were "likely, or even that a prosecution is remotely possible." 401 U.S. 37, 42 (1971). "That is not this case." *Driehaus*, 573 U.S. at 166. The Doe

**2. Stanford Daily has alleged organizational, corporate, and associational injuries.**

Stanford Daily has alleged three injuries, each of which confers standing. First, it has alleged organizational injuries because the Provisions have "directly affected and interfered with [its] core business activities." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024). Second, it has alleged corporate injuries because it is "directly engaged" in activities like publishing noncitizens' work, enacting noncitizens' editorial choices, and sponsoring noncitizens' speech. *NAACP v. Button*, 371 U.S. 415, 428 (1963). Third, it has alleged associational injuries because it can assert its members' injuries. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

Curiously, the government spends most of its brief attacking associational standing while spending just two paragraphs on organizational standing and five *sentences* on corporate standing. Yet organizational and corporate standing—the doctrines designed to allow organizations to remedy constitutional violations directly impacting their core purpose—provide the most straightforward paths for the Court to find standing. But, as shown below, Stanford Daily readily satisfies all three.

**a. Stanford Daily has alleged organizational injuries.**

First, Stanford Daily has alleged organizational injuries because it alleges the government's use of the Revocation and Deportation Provisions against protected expression has affected and interfered with the paper's reporting, its core business activity. The government's threats to enforce and past enforcement of the Revocation and Deportation Provisions, and the threat of those Provisions' future enforcement, have directly harmed Stanford Daily by causing lawfully present noncitizen members to quit, withhold articles, refuse assignments, request articles be taken down, and seek anonymity due to fear of adverse immigration consequences under the Provisions. Am. Compl. ¶ 112. This has hurt Stanford Daily's coverage by decreasing the quantity of opinion pieces *The Stanford Daily* is able to publish on the conflict between Israel and Palestine. *Id.* ¶ 130. And it has specifically impacted Stanford Daily by affecting the quality of pieces *The Stanford Daily* is able to publish because its readers are deprived of the unique perspectives of *The Stanford Daily*'s

---

Plaintiffs have alleged a credible threat because the government is attempting to deport noncitizens like them for protected pro-Palestinian speech like theirs. That is what *Driehaus* requires.

Case: 26-6906, 11/20/2026, DktEntry: 16.14, Page 207 of 300

international contributors. *Id.* ¶ 131; *see also* Amicus Br. of Student Press L. Ctr. et al. ("SPLC Br.") 10, Dkt. No. 42-1 ("International student journalists bring worldviews shaped by different political systems, cultures, and lived experiences. Their participation enriches campus dialogue, broadens understanding of global issues, and exposes all students to the practice of democracy as both an American ideal and a universal value.").

The Ninth Circuit's decision in *The Presbyterian Church (U.S.A.) v. United States* is instructive. 870 F.2d 518 (9th Cir. 1989). There, the Presbyterian Church claimed the government's undercover surveillance violated the church's First and Fourth Amendment rights. *Id.* at 520–21. The church alleged that "as a result of the surveillance of worship services, members have withdrawn from active participation in the churches, a bible study group has been canceled for lack of participation, clergy time has been diverted from regular pastoral duties, support for the churches has declined, and congregants have become reluctant to seek pastoral counseling and are less open in prayers and confessions." *Id.* at 521–22. The Ninth Circuit held these injuries supported organizational standing, explaining: "When congregants are chilled from participating in worship activities, when they refuse to attend church services because they fear the government is spying on them and taping their every utterance, all as alleged in the complaint, we think a church suffers organizational injury because its ability to carry out its ministries has been impaired." *Id.* at 522.

The same is true here. Stanford Daily's noncitizen members are chilled from writing and editing the newspaper, refuse to accept reporting assignments related to campus events involving Israel and Palestine, and some outright quit the paper, all to avoid adverse immigration consequences under the Provisions. These harms directly and materially impair its ability to carry out its publishing function. Stanford Daily has thus alleged precisely what *Presbyterian Church* found sufficient to establish organizational standing.

The ruling in *AAUP* is likewise instructive. There, Judge Young held the Middle East Studies Association ("MESA"), an organization dedicated to fostering study of the Middle East, had organizational standing to challenge the government's targeting of pro-Palestinian speakers for deportation based on protected speech. *AAUP*, 2025 WL 2777659, at *43. He concluded MESA had organizational standing because it "alleged … the challenged mode of enforcement and campaign

of coercive threats has significantly harmed its core activity of facilitating academic discourse and scholarship about issues impacting the Middle East, including by reducing projected membership numbers and so membership dues, a reduced anticipated participation in its flagship annual meeting in November based on current submission numbers, and … by pressuring members to self-censor and so not to contribute scholarship and perspectives that they would otherwise contribute, which scholarship and discourse are the lifeblood of the organization." *Id.*

Stanford Daily's injuries are indistinguishable in form. The government's ability to enforce, threats to enforce, and past enforcement of the Revocation and Deportation Provisions based on protected speech has reduced Stanford Daily's membership, reduced participation by noncitizen members and contributors, and pressured noncitizens into self-censoring news articles, opinion pieces, and information they would otherwise contribute. Am. Compl. ¶¶ 112–134. This has significantly harmed Stanford Daily's core activity of providing the Stanford community with relevant, comprehensive, and unbiased journalism and serving as an outlet for Stanford community members to voice their opinions. *Id.* ¶¶ 105–06. Like the Presbyterian Church and MESA, Stanford Daily has organizational standing.[8]

**b. Stanford Daily has alleged corporate injuries.**

Second, Stanford Daily alleged corporate injuries because the people associated with it have been injured. "Corporations, which are composed of human beings with First Amendment rights, possess First Amendment rights themselves." *Moody v. NetChoice, LLC*, 603 U.S. 707, 746–47 (2024) (Barrett, J., concurring). So when the government infringes on the rights of noncitizens "who are associated with [Stanford Daily] in one way or another," Stanford Daily has standing "to protect the rights of these people." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 706–07 (2014); *see also NAACP*, 371 U.S. at 428 (holding corporation can "assert [its members'] right on its own

[8] The government notes AAUP lacked organizational standing. Mot. 15–16. But its asserted harm materially differed from MESA's and from Stanford Daily's here. AAUP established only "deterred and diminished noncitizen participation in AAUP events and diverted resources from more typical core advocacy issues," but not a threat to the organization's core function. *AAUP*, 2025 WL 2777659, at *44. Here, like with MESA, noncitizens' contributions are vital to Stanford Daily's core mission of reporting the news and views of Stanford's diverse community. Plus, the government ignores that Judge Young still held that AAUP had associational standing. *Id.*

behalf, because, though a corporation, it is directly engaged in those activities, claimed to be constitutionally protected, which the statute would curtail").

The government has infringed on the rights of noncitizens associated with Stanford Daily. It has infringed the rights of Stanford Daily's noncitizen members, who have self-censored expression for fear of visa revocation, arrest, detention, and deportation. Am. Compl. ¶ 112. And it has infringed the rights of Stanford Daily's noncitizen contributors, who have self-censored expression for fear of visa revocation, arrest, detention, and deportation. *Id.* ¶ 113. Corporations can assert "the rights and obligations of the *people* (including shareholders, officers, and employees) who are associated with a corporation in one way or another." *Hobby Lobby*, 573 U.S. at 706. That is precisely what Stanford Daily is doing here: asserting the First Amendment right of its members and contributors to report the news without fear of arrest, detention, and deportation.

**c. Stanford Daily has alleged associational injuries.**

Third, Stanford Daily has alleged associational injuries. "[V]oluntary membership organization[s] with identifiable members" can assert associational standing to protect the interest of members. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.* (*SFFA*), 600 U.S. 181, 201 (2023).[9] That's Stanford Daily, a "voluntary membership organization" with "over 150 identifiable members" who produce Stanford Daily's content. Am. Compl. ¶¶ 89–99.

Contrary to the government's argument, status as a voluntary membership organization is not restricted to advocacy organizations. The government latches on to the fact that many organizations securing associational standing happen (unsurprisingly) to be advocacy organizations. Mot. 13. But it fails to note that in *none* of its authority was the organization's status as an advocacy group part of the court's associational standing test. For example, in a recent en banc decision, the Ninth Circuit held a voluntary school membership organization that "seeks to equip 'student athletes from all backgrounds for fellowship, spiritual growth, and service on their campuses'" had

[9] An organization that is "not a traditional voluntary membership organization" but satisfies *Hunt*'s "indicia of membership analysis" can also assert this type of standing. *SFFA*, 600 U.S. at 200, 201 (quoting *Hunt*, 432 U.S. at 342). But here, because Stanford Daily is a voluntary membership organization with identifiable members, "[t]he indicia of membership analysis employed in *Hunt* has no applicability." *Id.* at 201.

associational standing to pursue First Amendment claims. *Fellowship of Christian Athletes v. S.J. Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 672, 681–82 (9th Cir. 2023). Here, Stanford Daily squarely alleges that it seeks to "provide[] its editorial, tech and business staffs with unparalleled educational opportunities" through its rigorous and comprehensive news operations. Am. Compl. ¶ 84; *see also* SPLC Br. 4 ("[S]tudent media outlets are … training grounds for future journalists [and] provide a forum for democratic engagement for all participants.").[10]

The government cites only two cases for its idea that associational standing is limited to advocacy groups. The first concerned a corporation without members trying to assert its customers' interests with the purpose "to turn a profit." *Fleck & Assocs., Inc. v. City of Phoenix*, 471 F.3d 1100, 1106 (9th Cir. 2006). The second concerned a corporation's standing to assert its employees' interests. *Region 8 Forest Serv. Timber Purchasers Council v. Alcock*, 993 F.2d 800, 810 n.15 (11th Cir. 1993). The government supplies no cases holding that an organization representing identifiable members lacks associational standing if it is not characterized as an advocacy group.

That underbrush cleared, Stanford Daily fulfills all three requirements for associational standing. *See Hunt*, 432 U.S. at 343. First, its noncitizen members have standing to sue in their own right because they, like the Doe Plaintiffs, face a credible threat of future enforcement based on speech and journalism about American foreign policy. *See supra* Part A.1.

Second, the free speech interests Stanford Daily seeks to protect—writing and publishing without fear of adverse immigration action—are germane to its purpose as a newspaper, which is "to cover all relevant campus activities in an unbiased fashion and provide an outlet for Stanford

[10] For a comparator, Stanford Daily is directly analogous to Students for Fair Admissions (SFFA), which the Supreme Court held had associational standing. *SFFA*, 600 U.S. at 201. Stanford Daily is a validly incorporated 501(c)(3) nonprofit with over 150 identifiable members who joined voluntarily to support its mission. Am. Compl. ¶¶ 82, 91–92; *SFFA*, 600 U.S. at 201 (SFFA is "a validly incorporated 501(c)(3) nonprofit with forty-seven members who joined voluntarily to support its mission." (quotation marks omitted)). Stanford Daily's members receive updates about this case's status from Stanford Daily's leadership and elect directors who represent their interests and have input on this case's direction. Am. Compl. ¶¶ 92–93; *SFFA*, 600 U.S. at 201 (SFFA's members "receive updates about the status of the case from SFFA's President; and they have had the opportunity to have input and direction on SFFA's case." (quotation marks omitted)). "Where, as here, an organization has identified members and represents them in good faith," courts "do not require further scrutiny into how the organization operates." *SFFA*, 600 U.S. at 201.

community members to publish opinions" and "defend[] and advocate[] for press rights and the rights of all journalists to report the news and publish opinions without government or university retaliation." Am. Compl. ¶¶ 83, 85; *see also Cal. First Amend. Coal. v. Calderon*, 150 F.3d 976, 981 (9th Cir. 1998) ("[T]he interests the Coalition seeks to protect here—to cover and report news without government interference—are germane to the Coalition's purpose."); *L.A. Press Club v. City of Los Angeles*, No. 25-cv-05423, 2025 WL 2640421, at *9 (C.D. Cal. Sep. 10, 2025) ("Both organizations seek to protect the right of journalists to safely cover and report news without government interference, an interest clearly germane to their purposes." (quotation marks omitted)); SPLC Br. 4 (highlighting student media's purpose to instill "the principles of inquiry, critical thinking and reasoned debate central to democracy").

And third, Stanford Daily's members' participation in the case is unnecessary. Neither the constitutional question (whether the government can render noncitizens deportable or revoke visas based on protected speech) nor the requested relief (declarations and injunctions) require Stanford Daily members' individual participation. *See Columbia Basin Apartment Ass'n v. City of Pasco*, 268 F.3d 791, 799 (9th Cir. 2001) ("Because [injunctive and declaratory] relief do not require individualized proof, the third [requirement] is satisfied."); *Vasquez Perdomo v. Noem*, 148 F.4th 656, 677 (9th Cir. 2025) ("As a general matter, membership organizations may bring constitutional claims on behalf of their members."). Stanford Daily has associational standing.

**B. The Plaintiffs' injuries are traceable to the government and redressable by the limited relief Plaintiffs seek.**

The credible threat of enforcement Jane Doe and John Doe face, and the organizational, corporate, and associational injuries Stanford Daily is suffering, are traceable to the government's ability to enforce, threats to enforce, and past enforcement of the Revocation and Deportation Provisions based on protected speech. And their injuries are redressable by the limited declaratory and injunctive relief the Plaintiffs seek: declaring the Deportation Provision unconstitutional and enjoining its enforcement *solely with respect to* deportations based on protected speech, Am. Compl. ¶¶ B, C, D, and declaring the Revocation Provision unconstitutional and enjoining its enforcement *solely with respect to* revocations based on protected speech, *id.* ¶¶ E, F, G.

### 1. The Plaintiffs' injuries are traceable to the government.

The government does not contest that the Doe Plaintiffs' injuries are traceable to Secretaries Rubio and Noem, who lead the departments charged with enforcing the Revocation and Deportation Provisions. Stanford Daily's injuries are also traceable to the Defendants because its members and people who associate with Stanford Daily have self-censored because of the government's actions.

Contrary to the government's suggestion, self-censorship is not "the result of third parties making their own independent decisions." Mot. 16. For one thing, those decisions are not independent of the government's unlawful conduct but the *product* of the government's unlawful conduct. *See, e.g.*, *AAUP*, 2025 WL 2777659, at *38–39, *43 (rejecting government's attempt to "dismiss[] … claims of collective chill as somehow wholly self-imposed" and holding "both AAUP and MESA have associational standing to pursue their claim that the Public Officials are engaged in a policy of targeting noncitizens based on their viewpoints in order to chill speech"). Plaintiffs' decisions are not independent of the government's conduct because "the threat of sanctions may deter almost as potently as the actual application of sanctions" and the "danger of that chilling effect upon the exercise of vital First Amendment rights must be guarded against." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 604 (1967) (quoting *NAACP*, 371 U.S. at 433) (cleaned up). As the Student Press Law Center amicus brief explained, "Given the risk of deportation, the loss of educational opportunities and the prospect of tremendous personal harm upon return to their home countries, it is inaccurate to characterize such an agonizing choice—and similar ones that have repeatedly played out in similar conversations—as reflecting students making their own independent decisions under anything less than duress." SPLC Br. 9–10 (cleaned up).

For another thing, those decisions are not the decisions of third parties. Stanford Daily's injuries stem from its own members—writers, editors, and contributors—self-censoring their contributions to the paper. They are not third parties but "the human beings" without which the paper "cannot do anything at all." *Hobby Lobby*, 573 U.S. at 707.

And even if its writers and editors are third parties, Stanford Daily still has standing because its own injuries remain traceable to Defendants, which in this context requires only that "third parties will likely react in predictable ways" to the government's action. *Dep't of Com. v. New York*, 588

U.S. 752, 768 (2019). Third parties' predictable reaction to the government's enforcement of the Revocation and Deportation Provisions has been self-censorship, harming Stanford Daily's ability to associate with its noncitizen writers, editors, and contributors. *See* Am. Compl. ¶¶ 112–34. Those reactions have been substantiated by the Verified Amended Complaint, the declarations of Garry Kasparov and Uriel Epshtein, *see* Decl. of Garry Kasparov, Dkt. No. 23-1; Decl. of Uriel Epshtein, Dkt. No. 23-2, and the experiences of fifty-five student media outlets and newsroom leaders and other amici, *see* SLPC Br. 6 ("Contrary to Defendants' assertions, the chilling effects of the government's actions are real, widespread, and well-documented."); Amicus Br. of 19 States and DC 17 & n.42, Dkt. No. 37-1 (highlighting "[c]ountless news articles have documented this chilling effect"); Amicus Br. of Cato Inst. et al. 4, Dkt. No. 39 ("Predictably, the fear of adverse consequences, such as deportation, has produced a chilling effect.").

**2. The Plaintiffs' injuries are redressable by the limited relief sought.**

Plaintiffs' injuries are redressable by the limited relief they seek: prohibiting the government from enforcing the Provisions against protected speech. Plaintiffs have facially challenged the statutes *only* with respect to protected speech. *See, e.g.*, Compl. ¶¶ A–H, Dkt. No. 1 (limiting relief to actions "based on protected speech" or "for engaging in protected speech"); Am. Compl. ¶¶ A–H (same); Mot. for Prelim. Inj. 14, Dkt. No. 11 ("This is not a challenge to Sections 1201(i) and 1227(a)(4)(C)(i) in all their applications, but only a narrow facial challenge as they apply to the government's reliance on protected speech to revoke immigration documentation or render a noncitizen deportable."); Mot. for Summ. J. 14, Dkt. No. 32-1 (same). A ruling in Plaintiffs' favor still allows the government to enforce the statutes on non-speech bases. *See John Doe No. 1*, 561 U.S. at 194 (explaining how to assess a challenge as to only some of a statute's applications).

## CONCLUSION

The Court should deny the government's motion to dismiss.[11]

[11] The government asks for a dismissal with prejudice, Mot. 22, but "dismissals for lack of Article III jurisdiction must be entered without prejudice." *Barke v. Banks*, 25 F.4th 714, 721 (9th Cir. 2022) (quotation marks omitted) (concluding district court abused its discretion by dismissing the complaint with prejudice after determining plaintiffs lacked standing).

Case: 26-6906, 11/20/2026, DktEntry: 16.14, (214 of 300)

Dated: December 19, 2025

Respectfully Submitted,

/s/ *Conor T. Fitzpatrick*

Marc Van Der Hout (Cal. Bar #80778)
Johnny Sinodis (Cal. Bar #290402)
Oona Cahill (Cal. Bar #354525)
**VAN DER HOUT LLP**
360 Post Street, Suite 800
San Francisco, CA 94108
Telephone: (415) 981-3000
Facsimile: (415) 981-3003
Email: ndca@vblaw.com

Conor T. Fitzpatrick (Mich. Bar #P78981)*
Daniel A. Zahn (D.C. Bar #90027403)*
**FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION (FIRE)**
700 Pennsylvania Avenue SE, Suite 340
Washington, DC 20003
Telephone: (215) 717-3473
Email: conor.fitzpatrick@thefire.org
Email: daniel.zahn@thefire.org

Colin P. McDonell (Cal. Bar #289099)
**FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION (FIRE)**
510 Walnut Street, Suite 900
Philadelphia, PA 19106
Telephone: (215) 717-3473
Email: colin.mcdonell@thefire.org

*Admitted pro hac vice

*Counsel for Plaintiffs*

CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney
PAMELA T. JOHANN (CABN 145558)
Chief, Civil Division
KELSEY J. HELLAND (CABN 298888)
Assistant United States Attorney

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-6488
FAX: (415) 436-6748
kelsey.helland@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

STANFORD DAILY PUBLISHING CORP., *et al.*,

Plaintiffs,

v.

RUBIO, *et al.*,

Defendants.

Case No. 5:25-cv-06618-NW

**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS VERIFIED AMENDED COMPLAINT WITH PREJUDICE**

Date: January 8, 2026
Time: 9:00 a.m.
Place: Courtroom 3, 5th Floor

The Honorable Noël Wise

# TABLE OF CONTENTS

NOTICE OF MOTION ..... 1
RELIEF REQUESTED ..... 1
MEMORANDUM OF POINTS AND AUTHORITIES ..... 1
I. INTRODUCTION ..... 1
II. ISSUES TO BE DECIDED ..... 2
III. BACKGROUND ..... 2
A. Statutory Background. ..... 2
1. Nonimmigrant student visas. ..... 2
2. Visa-revocation and foreign-policy-removal provisions. ..... 3
B. Longstanding Enforcement of the Statutes. ..... 5
C. Enforcement of the Statutes by the Current Administration. ..... 6
D. Plaintiffs Have Not Been Threatened With Enforcement. ..... 9
IV. LEGAL STANDARD ..... 11
V. ARGUMENT ..... 11
A. Plaintiffs Lack Standing. ..... 11
1. Stanford Daily lacks standing. ..... 12
(i) Stanford Daily lacks associational standing. ..... 12
(ii) Stanford Daily lacks corporate standing. ..... 15
(iii) Stanford Daily lacks organizational standing. ..... 15
2. The individual Plaintiffs lack standing. ..... 16
(i) There is no substantial threat of enforcement for protected pro-Palestinian speech. ..... 17
(ii) Defendants have disavowed enforcement for pure political speech. ..... 19
(iii) Plaintiffs cannot rely on other unidentified "protected speech." ..... 20
B. The Court Should Dismiss The Action With Prejudice. ..... 22
VI. CONCLUSION ..... 23

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*AAUP v. Rubio*,
780 F. Supp. 3d 350 (D. Mass. 2025) ........ 20

*AAUP v. Rubio*,
No. 25-10685-WGY, 2025 WL 2777659 (D. Mass. Sept. 30, 2025) ........ 16, 19

*Abourezk v. Reagan*,
592 F. Supp. 880 (D.D.C. 1984) ........ 4

*Cal. Cmtys. Against Toxics v. Armorcast Prods. Co.*,
No. CV 14-5728 PA, 2014 WL 12966008 (C.D. Cal. Nov. 12, 2014) ........ 12

*California v. Texas*,
593 U.S. 659 (2021) ........ 21

*Cervantes v. Countrywide Home Loans, Inc.*,
656 F.3d 1034 (9th Cir. 2011) ........ 22

*Chaset v. Fleer/Skybox Int'l, LP*,
300 F.3d 1083 (9th Cir. 2002) ........ 22

*Culinary Workers Union, Loc. 226 v. Del Papa*,
200 F.3d 614 (9th Cir. 1999) ........ 21

*DCD Programs, Ltd. v. Leighton*,
833 F.2d 183 (9th Cir. 1987) ........ 22

*Dreier v. United States*,
106 F.3d 844 (9th Cir. 1997) ........ 11

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ........ 12, 13, 15

*Fitzgerald Reno, Inc. v. DOT*,
60 F. App'x 53 (9th Cir. 2003) ........ 14

*Fleck & Assocs., Inc. v. City of Phoenix*,
471 F.3d 1100 (9th Cir. 2006) ........ 12, 14

*Foman v. Davis*,
371 U.S. 178 (1962) ........ 22

*Goldstein v. Galvin*,
719 F.3d 16 (1st Cir. 2013) ........ 20

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977) ........ 12, 14

*Int'l Ps. for Ethical Care Inc. v. Ferguson*,
146 F.4th 841 (9th Cir. 2025) ........ 16

*Johnson v. Buckley*,
356 F.3d 1067 (9th Cir. 2004) ........ 22

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
511 U.S. 375 (1994) ........ 11

*Lopez v. Candaele*,
630 F.3d 775 (9th Cir. 2010) ........ 19, 20

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ........ 15, 16

*Murthy v. Missouri*,
603 U.S. 43 (2024) ........ 11, 12, 18, 20

*NAACP v. Button*,
371 U.S. 415 (1963) ........ 15

*Or. Advocacy Ctr. v. Mink*,
322 F.3d 1101 (9th Cir. 2003) ........ 12

*Peace Ranch, LLC v. Bonta*,
93 F.4th 482 (9th Cir. 2024) ........ 16, 17, 19

*Presidio Golf Club v. National Park Service*,
155 F.3d 1153 (9th Cir. 1998) ........ 14

*Pritkin v. DOE*,
254 F.3d 791 (9th Cir. 2001) ........ 15, 16

*Region 8 Forest Serv. Timber Purchasers Council v. Alcock*,
993 F.2d 800 (11th Cir. 1993) ........ 14

*Robinson v. United States*,
586 F.3d 683 (9th Cir. 2009) ........ 11

*Safe Air for Everyone v. Meyer*,
373 F.3d 1035 (9th Cir. 2004) ........ 11

*Saul v. United States*,
928 F.2d 829 (9th Cir. 1991) ... 22

*Savage v. Glendale Union High Sch., Dist. No. 205, Maricopa Cnty.*,
343 F.3d 1036 (9th Cir. 2003) ... 11

*Steckman v. Hart Brewing, Inc.*,
143 F.3d 1293 (9th Cir. 1998) ... 22

*Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*,
600 U.S. 181 (2023) ... 13, 14

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) ... 13

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) ... 16, 20, 21

*Thomas v. Anchorage Equal Rights Comm'n*,
220 F.3d 1134 (9th Cir. 2000) ... 11, 17, 21

*Tingley v. Ferguson*,
47 F.4th 1055 (9th Cir. 2022) ... 17

*Trump v. Hawaii*,
585 U.S. 667 (2018) ... 20

*United Pub. Workers of Am. v. Mitchell*,
330 U.S. 75 (1947) ... 20

*Warth v. Seldin*,
422 U.S. 490 (1975) ... 12, 13

*White v. Lee*,
227 F.3d 1214 (9th Cir. 2000) ... 11

*Younger v. Harris*,
401 U.S. 37 (1971) ... 18

*Zivkovic v. S. Cal. Edison Co.*,
302 F.3d 1080 (9th Cir. 2002) ... 22

**Statutes**

8 U.S.C. § 1101 ... 3
8 U.S.C. § 1182 ... 4
8 U.S.C. § 1201 ... 3, 5
8 U.S.C. § 1227 ... 3, 4, 5, 6
8 U.S.C. § 1229a ... 4

Pub. L. 101-649 .......... 4

**Rules**

Fed. R. Civ. P. 12 .......... 1, 11
Fed. R. Civ. P. 15 .......... 22

**NOTICE OF MOTION**

PLEASE TAKE NOTICE that on January 8, 2026 at 9:00 a.m., or as soon thereafter as the matter may be heard in Courtroom 3, 5th Floor, 280 South 1st Street, San Jose, CA 95113, the Honorable Noël Wise presiding, Defendants Marco Rubio, in his official capacity as Secretary of State, and Kristi Noem, in her official capacity as Secretary of Homeland Security, will and hereby do move this Court for an order dismissing with prejudice the Verified Amended Complaint of Plaintiffs Stanford Daily Publishing Corporation ("Stanford Daily"), Jane Doe, and John Doe. This motion is made pursuant to Federal Rule of Civil Procedure 12(b)(1). This motion is based on this Notice, the accompanying Memorandum of Points and Authorities, the Court's files in this matter, other matters of which the Court takes judicial notice, and any oral argument and additional evidence presented.

**RELIEF REQUESTED**

Defendants seek dismissal of the Verified Amended Complaint with prejudice.

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

Plaintiffs ask this Court for the remarkable relief of defining how the First Amendment applies to nonimmigrant student visa holders in the absence of any actual enforcement action taken against them. Plaintiffs claim that months ago they attended protests and made various political remarks, but they admit that the government has not revoked their visas or initiated removal proceedings against them. Nor do Plaintiffs inform the Court of what, exactly, they wish to say which they contend could render them subject to potential enforcement in the future. In other words, Plaintiffs ask the Court for an advisory opinion.

Plaintiffs lack standing to seek their requested relief. Article III requires plaintiffs to demonstrate an actual injury that is concrete and particularized. Parties must rely on their own injuries, not those of third parties. And a threatened future injury must be substantial and imminent or certainly impending. Plaintiffs do not come close to meeting this standard here. Indeed, the Court has already expressed its "concerns regarding whether Plaintiffs have alleged sufficient facts to establish standing," Dkt. 52 at 2, and expressly found that there were "insufficient facts alleged in the [original] complaint for the Court to analyze whether any of the Plaintiffs have met their burden to establish standing," Dkt.

13-ER 3595

Case: 26-6906, 11/20/2026, DktEntry: 16.14, (222 of 300)

60 at 2. But the Verified Amended Complaint does not cure the original Complaint's deficiencies.

Plaintiff Stanford Daily is a college newspaper. It portrays itself as an advocacy organization for purposes of this litigation, but in reality, it simply reports on campus affairs. It is neither the type of organization that could invoke the "associational-standing" doctrine for the claims in this case, nor has it shown any concrete or imminent injury to itself or its staff that could satisfy any other doctrine.

Nor have the unidentified individual Plaintiffs demonstrated a sufficiently imminent future injury. To the contrary, less than 1% of the thousands of campus protestors reviewed by DHS earlier this year (with only a small fraction referred to the State Department) have been subject to revocation or removability enforcement, and such enforcement actions were based on more than pure protected speech. Indeed, the individual Plaintiffs admit that they have not been subject to enforcement themselves, in spite of their prior speech, and government officials have disavowed enforcement based solely upon such speech. Nor can Plaintiffs rely on other, unidentified and hypothetical "protected speech" to invoke this Court's jurisdiction to declare acts of Congress unconstitutional.

Plaintiffs have already amended their Complaint once to try to bolster their assertion of standing. But their new allegations are not good enough, nor could they plausibly add other allegations that would be. The Court should therefore dismiss Plaintiffs' Amended Complaint with prejudice.

## II. ISSUES TO BE DECIDED

1. Whether Plaintiffs have Article III standing, where one of them is a student newspaper and the other two are individual student-visa holders, none of whom has been subject to enforcement under the statutes at issue.

2. Whether the Court should dismiss the Verified Amended Complaint with prejudice, where the Court has previously articulated its concerns with Plaintiffs' standing, Plaintiffs' amended pleading remains deficient, and the government has submitted an evidentiary record confirming that Plaintiffs face no substantial threat of future enforcement for any identified speech.

## III. BACKGROUND

### A. Statutory Background.

#### 1. Nonimmigrant student visas.

Student and exchange visitor visa holders are nonimmigrants under the Immigration and

Nationality Act ("INA"). *See* 8 U.S.C. § 1101(a)(15)(F), (J), (M). With respect to F-1 nonimmigrant students, the INA allows for the entry of an alien who is "a bona fide student qualified to pursue a full course of study and who seeks to enter the United States temporarily and solely for the purpose of pursuing such a course of study. . . at an established college, university, seminary, conservatory, academic high school, elementary school, or other academic institution or in an accredited language training program in the United States." *Id.* § 1101(a)(15)(F)(i) ("F-1 status"). An F-1 nonimmigrant student visa permits only temporary presence in the United States, and the student must maintain "a residence in a foreign country which he [or she] has no intention of abandoning." *Id.* So, aliens present in the United States on F-1 nonimmigrant student visas are neither *residents* nor *immigrants*; rather, they have been granted permission to enter the United States temporarily for specific and limited educational purposes. The same foreign residence requirement applies for J-1 nonimmigrant exchange visitor visas and M-1 vocational student visas. *See id.* § 1101(a)(15)(J) & (15)(M).

**2. Visa-revocation and foreign-policy-removal provisions.**

Since its first enactment in 1952, the INA has provided that nonimmigrant visas may be revoked at any time at the discretion of a consular officer or the Secretary of State. *See* Immigration and Nationality Act § 221, Pub. L. 82-414 (1952). In its current form, the statute provides:

> After the issuance of a visa or other documentation to any alien, the consular officer or the Secretary of State may at any time, in his discretion, revoke such visa or other documentation. Notice of such revocation shall be communicated to the Attorney General, and such revocation shall invalidate the visa or other documentation from the date of issuance . . . . There shall be no means of judicial review . . . of a revocation under this subsection, except in the context of a removal proceeding if such revocation provides the sole ground for removal under section 1227(a)(1)(B) of this title.

8 U.S.C. § 1201(i). An alien whose nonimmigrant visa has been revoked effective immediately may be placed into removal proceedings on that basis. *See id.* § 1227(a)(1)(B).

Similarly, the INA has for decades provided the Secretary of State the authority to determine that an alien is subject to deportation for foreign-policy reasons: The INA's list of "classes of deportable aliens" includes those "whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States." *Id.* § 1227(a)(4)(C)(i).

Case: 26-6900, 11/30/2026, DktEntry: 16.14, Page 224 of 300

The current foreign-policy-removal provision resulted from efforts to revise and restructure the various grounds for deportation and exclusion contained in the INA. Prior to 1990, the INA provided that an alien could be excluded from this country if there was reason to believe that the alien sought "to enter the United States solely, principally, or incidentally to engage in activities which would be prejudicial to the public interest." 8 U.S.C. § 1182(a)(27) (1988). The prior "public interest" ground—which was arguably *broader* than the current provision—was long interpreted to permit the government to exclude aliens for foreign policy reasons.[1] To address concerns about the breadth of the prior version, the Executive suggested replacing it "with language that limits the grounds of exclusion to potentially serious foreign policy consequences." 1987 Hearing at 40 (testimony of Legal Adviser Sofaer). Thus, the current language was enacted in 1990. *See* Immigration Act of 1990, Pub. L. 101-649, 8 U.S.C. § 1251(a)(4)(C)(i) (1990) (predecessor to current § 1227(a)(4)(C)).

Importantly, the foreign-policy-removal provision specifies that an alien cannot be removable "because of the alien's past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States *unless the Secretary of State personally determines that the alien's [presence] would compromise a compelling United States foreign policy interest*." 8 U.S.C. § 1227(a)(4)(C)(ii) (referring to the inadmissibility provision at 8 U.S.C. § 1182(a)(3)(C)(iii) (emphasis added)).

The revocation of an alien's visa, or the Secretary of State's determination that an alien is removable, does not necessarily mean they will be removed from the United States. Those are merely grounds for removability that the Department of Homeland Security ("DHS") may assert in formal removal proceedings in immigration court. Aliens in removal proceedings are afforded procedural protections under 8 U.S.C. § 1229a. If an alien whose nonimmigrant visa has been revoked effective immediately is placed into removal proceedings on the basis of the nonimmigrant visa revocation, and

[1] *See, e.g.*, *Abourezk v. Reagan*, 592 F. Supp. 880, 885 (D.D.C. 1984) (noting that Otto Skorzeny and Mme. Ngo Dinh Nhu had been excluded on foreign policy grounds). Indeed, when some representatives proposed to eliminate that provision in 1987, there were strong objections. *See Exclusion and Deportation of Aliens: Hearing before the Subcomm. on Immigration, Refugees and International Law of the H. Comm. on the Judiciary*, 100th Cong., 1st Sess. 30 (1987) ("1987 Hearing") (testimony of Judge Abraham D. Sofaer, State Department Legal Adviser); *id.* at 45 (testimony of INS Commissioner Alan Nelson); *id.* at 47 (letter from Ass't Atty Gen. John R. Bolton).

there is no other valid basis for removal, an immigration judge, and later a federal court of appeals, may review the revocation as it relates to the final order of removal. *See* 8 U.S.C. § 1201(i); *see also id.* § 1252(a)(5) (providing that the federal courts of appeals have exclusive jurisdiction over final orders of removal rendered in removal proceedings). And courts of appeals retain jurisdiction to review "constitutional claims or questions of law" in removal proceedings. *Id.* § 1252(a)(2)(D).

**B. Longstanding Enforcement of the Statutes.**

To determine whether a visa should be revoked under § 1201(i) and whether an alien is removable under § 1227(a)(4)(C), the State Department ("State") has long relied on various sources, including DHS. *See* Dkt. 33-1 Ex. 3 at 17-20, 35-38; Ex. 5 at 34-38.

Specifically, DHS Immigration and Customs Enforcement ("ICE") Homeland Security Investigations ("HSI") has throughout its history provided law enforcement-based derogatory information to State for purposes of vetting aliens. The HSI Office of Intelligence has historically analyzed potential referrals regarding derogatory information from a variety of sources and, after conducting extensive open-source reviews of information, prepared Reports of Analysis ("ROAs") for potential referral to State based on the information obtained by HSI Office of Intelligence during its review. *See id.* Ex. 5 at 45.

When they receive such referrals, Office of Intelligence analysts conduct open-source analysis and various checks to validate the availability of information and/or the referral, and, if warranted, prepare an ROA. *See id.* at 48-50. The Office of Intelligence has historically generated approximately 25,000 to 30,000 ROAs per year—regarding a wide range of investigation subjects, not simply visa referrals—from its efforts to collect, analyze, and disseminate intelligence and law enforcement information to its leadership and other Executive Branch partners. *See* Dkt. No. 14, Ex. K at 49. Many of these ROAs are referred to State for potential further action.

When State receives a referral from DHS, State first determines whether the information received from DHS relates to a nonimmigrant visa holder or lawful permanent resident. *See* Dkt. 33-1 Ex. 4 at 89. In the case of a nonimmigrant visa holder, the information is sent to the Visa Office within the Bureau of Consular Affairs. *See id.* The Visa Office examines the information to determine whether it warrants revoking the nonimmigrant visa. *See id.* at 90-92. If the Visa Office agrees the

nonimmigrant visa should be revoked, the visa will be revoked under § 1201(i). *See id.* at 90. Prior to a revocation decision, DHS may be asked to provide additional information. *See id.* at 93-94.

State procedures for revoking visas are set forth in the Foreign Affairs Manual, 9 FAM 403.11. *See id.* Ex. 1. The Foreign Affairs Manual instructs consular officers that, "[a]lthough the decision to revoke a visa is a discretionary one, [they] should not use this authority arbitrarily." *Id.* at 9 FAM 403.11-4(A); *see also id.* Ex. 3 at 31-32, 52-55; Ex. 4 at 65, 85. Staff should only revoke a visa "where warranted" for various specified reasons. *Id.* Ex. 1 at 9 FAM 403.11-5(B)(a). These reasons include "when [the State Department] receives derogatory information directly from another U.S. Government agency." *Id.*

In addition to the visa revocation process described above, the Bureau of Consular Affairs analyzes DHS referrals for potential removability determinations under § 1227. Each referral is assessed individually. Depending on the visa status of the individual and the concerns raised in the referral, the Bureau may consider whether the foreign-policy-removal provision of § 1227(a)(4)(C) applies to such individual. Upon an assessment that the individual's presence or activities may present foreign policy concerns under § 1227(a)(4)(C), the Bureau then develops an action memo to pursue a determination from the Secretary of State. *See* Dkt. 33-1 Ex. 4 at 85-91.

**C. Enforcement of the Statutes by the Current Administration.**

On January 20, 2025, the President signed Executive Order 14161: *Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats*. 90 Fed. Reg. 9451. The EO declares the United States' policy to "protect its citizens from aliens who intend to commit terrorist attacks, threaten our national security, espouse hateful ideology, or otherwise exploit the immigration laws for malevolent purposes." *Id.* § 1(a). To the extent that EO 14161 requires departments or agencies to act in furtherance of its policy goals (*see, e.g.*, §§ 2(b)(iii), 2(b)(iv), 3(a), 3(b), 3(e)), § 4 makes express that any such action must be done consistent with all applicable law. *Id.* § 4(a)(i)-(ii).

Just over one week later, on January 29, 2025, the President signed Executive Order 14188, *Additional Measures to Combat Anti-Semitism*. 90 Fed. Reg. 8847. EO 14188 calls for stepped up federal enforcement in the wake of an "unprecedented wave" of antisemitic "discrimination, vandalism, and violence" against citizens and "especially in our schools and on our campuses." *Id.* § 1. EO 14188

directs executive agencies to use "all available and appropriate legal tools, to prosecute, remove, or otherwise hold to account the perpetrators of unlawful anti-Semitic harassment and violence." *Id.* § 2. As above, however, EO 14188 makes express that any such action must be taken "consistent with applicable law," and affirms that "agencies shall not diminish or infringe upon any right protected under Federal law or under the First Amendment." *Id.* § 4(b); *see also* EO 13899 § 2(b), 84 Fed. Reg. 68779.

Following this issuance of EOs 14161 and 14188, DHS and State undertook measures to implement the priorities and emphases the EOs established. *See* Dkt. 33-1 Ex. 3 at 21-22, 31-33; Ex. 5 at 43-46. With respect to EO 14161, State issued guidance in the form of a cable to its diplomatic posts abroad to review the nonimmigrant visa system, and when derogatory information related to an individual appeared in the system, to revoke the individual's visa, if warranted. *See id.* Ex. 4 at 99-101. However, State did not change its criteria or procedures for revoking nonimmigrant visas. *See id.* at 94.

Similarly, based on the EOs, DHS aligned its resources and priorities, within the existing statutory and regulatory framework, to best accomplish those goals. *See id.* Ex. 5 at 43. HSI developed a plan to process referrals from a variety of sources to complement the EOs and use HSI's existing lines of effort. *See id.* at 46. The plan created a team, based within the ICE HSI Office of Intelligence, to process the especially large volume of referrals it was receiving, particularly related to protesters. *See id.* at 48. Following the EOs, the Office of Intelligence received a list of over 5,000 names of individuals involved with protests related to Israel (including both citizens and aliens), whom the Office of Intelligence team investigated under Title 8 and for potential violations of law. *See id.* Ex. 2 at 83-84, 97. Part of the Office of Intelligence team's work involved reviewing the Canary Mission website, which itself listed more than 5,000 names of protesters. *See* Dkt. No. 14 Ex. J at 109-112; Dkt. 33-1 Ex. 2 at 98-99. However, Canary Mission was only one of multiple publicly available sources the team reviewed. Dkt. No. 14 Ex. J at 118; *see* Dkt. 33-1 Ex. 2 at 75-78. The team also obtained police records for individuals arrested by police during protests. Dkt. No. 14 Ex. J at 118-119.

In the context of sharing information with the State Department, each ROA would be reviewed and ultimately submitted for approval within the Office of Intelligence leadership framework. *See* Dkt. 33-1 Ex. 5 at 49-50. Thereafter, the Office of Intelligence would send a package for referral to the Assistant Director of the HSI National Security Division. *See id.* If the Assistant Director approved the

Case: 26-6900, 11/30/2026, DktEntry: 16.14, Page 228 of 300

referral package, it would be formally referred to the Department of State for information sharing purposes. *See id.* at 50-51.

HSI has completed its review of the 5,000-plus campus-protester names referred to it. From those leads, the Office of Intelligence team generated between 100 and 200 ROAs, representing no more than, at most, about 4% of the total. *See id.* Ex. 2 at 83-84, 97-98, 105-108. Those ROAs were sent to the National Security Division. For the remaining more-than-95% of leads, the Office of Intelligence took no further action. *See id.* at 106. From the roughly 200 ROAs, between approximately 10 and 50 were referred to State regarding specific individuals associated with these protests. *See id.* Ex. 5 at 55-56, 77. Of those referrals to State involving nonimmigrant visa holders, approximately 25% to 30% did not result in revocations or removability determinations, either because they were sent back to DHS to ask for more information or because State found the information not significant enough to warrant revocation. *See id.* Ex. 4 at 93-94. Thus, less than 1% of campus-protest leads (at most, approximately 40 out of more than 5,000) have resulted in nonimmigrant visa revocations—and these revocations were the result of the individuals' *conduct* at protests or other information discovered about them from the resulting investigations, *not* their mere participation in or presence at public protests or pure political speech. *See, e.g.*, *id.* Ex. 4 at 121-22; Ex. 5 at 39-41, 54-60, 92-95.

To be clear: Neither State nor DHS have a policy of targeting individuals based on protected political speech. *See id.* Ex. 4 at 121-22; Ex. 5 at 59-60. State adheres to statutory authority rendering aliens inadmissible for certain support for terrorist activity (*see, e.g.*, 8 U.S.C. § 1182(a)(3)(B)-(C)) and maintains that supporting a terrorist organization can result in the revocation of a visa (*see* Dkt. 33-1 Ex. 4 at 121-22), but as explained below, such revocations do not burden protected speech. And for its part, DHS views supporting terrorism and certain kinds of disruptive conduct as warranting investigation and potential referral—such as engaging in violence during protests, promoting the destruction of property, etc. (*see id.* Ex. 5 at 39-41, 59-60, 92-95)—but this, too, does not implicate protected speech. Indeed, DHS does not refer individuals for visa revocations solely because they participated in public protests. *See id.* at 39. Nor does DHS refer individuals for visa revocations solely because they have used the phrase "from the river to the sea, Palestine will be free," or described Israel as having committed "genocide" or "apartheid" in Gaza. *See id.* at 59-60. In short, both agencies have expressly disavowed

any policy or intention to target individuals based on pure political speech.

**D. Plaintiffs Have Not Been Threatened With Enforcement.**

Plaintiffs are Stanford University's independent student-run newspaper and two pseudonymous individuals with no apparent ties to the University or the newspaper. According to their own representations, none of the three Plaintiffs has been subject to any enforcement action.

Plaintiff Stanford Daily "strives to serve the Stanford community with relevant, unbiased journalism and provides its editorial, tech, and business staffs with unparalleled educational opportunities." Dkt. 65 ("VAC") ¶ 84. "Because Stanford Daily seeks to cover all relevant news and provide an outlet to the Stanford community to publish opinions, the scope of its content is vast," and includes:

> news articles about academics, campus life, data, graduate students, science and technology, and Stanford University; sports articles; opinion articles by columnists, the editorial board, and community members; arts and life articles about culture, music, books, and the screen; humor articles, including cartoons; multimedia content, including videos; games, including mini crosswords, full-size crosswords, and the "Stanfordle" (based on the *New York Times*'s "Wordle" game); "The Grind," which welcomes any potential contributors to think deeply about any aspect of their lives and large society they want to explore, whether Stanford related or not; and *The Stanford Daily Magazine*, which is published twice per year.

*Id.* ¶ 104.

The Stanford Daily asserts that "since the Trump administration began targeting lawfully present noncitizens for deportation based on protected speech in March 2025, lawfully present noncitizen students who are Stanford Daily members have self-censored expression for fear of visa revocation, arrest, detention, and deportation." *Id.* ¶ 112. "For example, in March 2025, a lawfully present noncitizen editor on staff decided to quit Stanford Daily because of the student's nonimmigrant visa status. Fearing visa revocation, arrest, and deportation for association with articles about Israel or Palestine, the student decided to leave the newspaper." *Id.* ¶ 114. "As another example, one lawfully present noncitizen student on staff signed up to cover a story about a vigil that brought together Jewish and Palestinian families to honor those who died in the conflict in Gaza." *Id.* ¶ 116. "But because of the student's nonimmigrant visa status, and fear that they may face adverse immigration consequences if they published the article, the student decided against publishing the article." *Id.* The newspaper asserts that other current and former staff writers and editorial board members have asked to be removed from

the website, and that international students have been less willing to speak with Stanford Daily journalists, especially on the record and about topics like Israel and Palestine. *Id.* ¶¶ 118-29. It does not assert that any immigration enforcement action has been taken against it, its staff, its editorial board, or any international students at Stanford. *See id.* ¶¶ 81-134.

Plaintiff Jane Doe asserts that she is "a noncitizen lawfully present in the United States pursuant to a lawful admission on an F-1 student visa." *Id.* ¶ 135. She is "a former student at a United States university," but has "no relationship" with Stanford Daily. *Id.* ¶¶ 136-37. She has "published pro-Palestinian/anti-Israel commentary online, including accusing Israel of committing 'genocide' and perpetuating 'apartheid.'" *Id.* ¶ 140. "She has also used the slogan 'from the river to the sea, Palestine will be free,'" and "criticized American foreign policy, particularly its relationship with Israel." *Id.* ¶¶ 140-41. Jane Doe "appeared in a profile on the Canary Mission website." *Id.* ¶ 142. She claims that, starting in March 2025, "fearing that Secretary Rubio will revoke her visa . . . Jane Doe has refrained from publishing and voicing her true opinions regarding Palestine and Israel and has deleted a social media account to guard against retaliation for past expression." *Id.* ¶ 148. She does not assert that any enforcement action has been taken against her. *See id.* ¶¶ 135-157.

Plaintiff John Doe asserts that he "is a noncitizen lawfully present in the United States pursuant to a lawful admission on an F-1 student visa." *Id.* ¶ 158. He is "a former student at a United States university," but has "no relationship" with Stanford Daily. *Id.* ¶¶ 159-60. "After the October 7, 2023, attack, John Doe attended pro-Palestinian protests and published pro-Palestinian/anti-Israel commentary online." *Id.* ¶ 162. "At protests, John Doe participated in chants including '[f]rom the river to the sea, Palestine will be free,' chants accusing Israel of committing 'genocide,' and chants calling Israel a 'terrorist state.'" *Id.* ¶ 163. "After Secretary Rubio and the Trump administration began targeting other lawfully present noncitizen students," John Doe's professor told him "to reconsider engaging in protected activity related to Israel and Palestine due to potential danger to his immigration status." *Id.* ¶ 164. "In March 2025," "fearing Secretary Rubio would revoke his visa . . . John Doe refrained from publishing his findings containing criticism of Israel's actions in Gaza." *Id.* ¶ 165. However, he has since "resumed engaging in some protected pro-Palestinian/anti-Israel commentary, including accusing Israel of committing genocide, as well as commentary critical of American foreign policy towards Israel

Case: 26-6900, 11/30/2026, DktEntry: 16.14, Page 231 of 300

and Palestine." *Id.* ¶ 167. He does not assert that any enforcement action has been taken against him. *See id.* ¶¶ 158-78.

**IV. LEGAL STANDARD**

"Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'" *Murthy v. Missouri*, 603 U.S. 43, 56 (2024). "A proper case or controversy exists only when at least one plaintiff establishes that she has standing to sue." *Id.* at 57 (cleaned up). "She must show that she has suffered, or will suffer, an injury that is concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Id.* (cleaned up). "An allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Id.* at 58 (cleaned up). As the party invoking the federal court's jurisdiction, "[t]he plaintiff bears the burden of establishing standing as of the time she brought the lawsuit and maintaining it thereafter." *Id.* (cleaned up); *see also, e.g.*, *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

A defendant may move to dismiss a complaint for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). *See Savage v. Glendale Union High Sch., Dist. No. 205, Maricopa Cnty.*, 343 F.3d 1036, 1039-40 (9th Cir. 2003). "A Rule 12(b)(1) jurisdictional attack may be facial or factual." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). A facial attack "asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Id.* A factual challenge, on the other hand, allows the court to look beyond the complaint without "presum[ing] the truthfulness of the plaintiff's allegations." *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). On a Rule 12(b)(1) motion, the Court can hear evidence outside the pleadings and resolve factual disputes, if necessary, without treating the motion as one for summary judgment. *Robinson v. United States*, 586 F.3d 683, 685 (9th Cir. 2009); *Dreier v. United States*, 106 F.3d 844, 847 (9th Cir. 1997).

**V. ARGUMENT**

**A. Plaintiffs Lack Standing.**

"This is a case in search of a controversy." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1137 (9th Cir. 2000) (en banc) (dismissing First Amendment challenge for lack of standing).

Plaintiffs have put forward various theories for why they can invoke this Court's Article III jurisdiction, but all of them fail because Plaintiffs have not shown they face an imminent injury that is traceable to the federal government.

**1. Stanford Daily lacks standing.**

Stanford Daily has argued that it has standing under three separate doctrines: (i) associational standing; (ii) corporate standing; and (iii) organizational standing. None apply here.

**(i) Stanford Daily lacks associational standing.**

The doctrine of "associational standing" allows an organization to rely on the injuries of its members to invoke the Article III jurisdiction of a federal court. *See, e.g.*, *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333 (1977). The doctrine is an exception to the rule that "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975).

Indeed, there are reasons to doubt the continued viability of the associational-standing doctrine. *See, e.g.*, *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 398 (2024) (quotation omitted) (Thomas, J., concurring) ("Our third-party standing doctrine is mistaken. . . . [A] plaintiff cannot establish an Article III case or controversy by asserting another person's rights. . . . Associational standing . . . is simply another form of third-party standing."). "Associational standing" flouts the requirements of Article III by allowing one party to rely on the injuries of another; "standing is not dispensed in gross." *Murthy*, 603 U.S. at 61.

Even if the doctrine survives, it has no application here. As the Ninth Circuit has made clear, "[a]ssociational standing is reserved for organizations that 'express the collective views and protect the collective interests' of their members." *Fleck & Assocs., Inc. v. City of Phoenix*, 471 F.3d 1100, 1106 (9th Cir. 2006) (quoting *Hunt*, 432 U.S. at 345) (cleaned up). Thus, "[t]o satisfy the requirements for associational standing, the association's members must possess sufficient 'indicia of membership—enough to satisfy the purposes that undergird the concept of associational standing: that the organization is sufficiently identified with and subject to the influence of those it seeks to represent as to have a 'personal stake in the outcome of the controversy.'" *Cal. Cmtys. Against Toxics v. Armorcast Prods. Co.*, No. CV 14-5728 PA, 2014 WL 12966008, at *2 (C.D. Cal. Nov. 12, 2014) (quoting *Or. Advocacy*

*Ctr. v. Mink*, 322 F.3d 1101, 1111 (9th Cir. 2003)).

Stanford Daily is not an "association" of "members" in the relevant sense. It is not an advocacy organization. It is a general-purpose student-run newspaper. In its Amended Complaint, the newspaper alleges that its mission is "to serve the Stanford community with relevant, unbiased journalism and provid[e] its editorial, tech and business staffs with unparalleled educational opportunities." VAC ¶ 84. It claims that its members "joined the organization to support its mission." *Id.* ¶ 92. It explains that its members are "either editorial members or business members," who each have different responsibilities. *Id.* ¶¶ 95-97. But it admits that, "[b]ecause Stanford Daily seeks to cover all relevant news and provide an outlet to the Stanford community to publish opinions, the scope of its content is vast." *Id.* ¶ 104. Indeed, the Stanford Daily publishes: "news articles about academics [and] campus life"; "sports articles"; "opinion articles by columnists, the editorial board, and community members"; "arts and life articles about culture, music, books, and the screen"; "humor articles, including cartoons"; "games, including mini crosswords, full-size crosswords, and the 'Stanfordle'"; "'The Grind,' which welcomes any potential contributors to think deeply about any aspect of their lives and large society they want to explore, whether Stanford related or not"; and "*The Stanford Daily Magazine*, which is published twice per year. *Id.* Although it sometimes publishes articles about international issues, it has no particular focus on foreign policy, immigration, or constitutional law. *See id.* ¶¶ 104-09. Thus, while Stanford Daily is plainly a volunteer-run student newspaper, it is not the type of organization that can invoke the associational-standing doctrine to establish the article III jurisdiction of this Court.

In fact, Stanford Daily is fundamentally unlike any kind of organization that the Supreme Court has previously held, or even suggested, could invoke the doctrine of associational standing. It is not an advocacy organization with a mission "to defend human and civil rights secured by law." *Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*, 600 U.S. 181, 197 (2023); *cf., e.g.*, *All. for Hippocratic Med.*, 602 U.S. at 376 (denying standing to "pro-life medical associations); *Summers v. Earth Island Inst.*, 555 U.S. 488, 490 (2009) (denying standing to "a group of organizations dedicated to protecting the environment"); *Warth*, 422 U.S. at 494 (denying standing to organization with purpose "to alert ordinary citizens to problems of social concern . . . and to urge action on the part of citizens to alleviate the general housing shortage for low and moderate income persons"). Nor is it a "trade

association" with a purpose of "protecting and enhancing the market for Washington apples." *Hunt*, 432 U.S. at 344. In each of these prior cases, the very purpose of the organization was to advocate for its members' interests regarding specific issues.

Here, by contrast, the purpose of Stanford Daily is to report on campus events. If the doctrine of associational standing has any remaining vitality at all, *see* Dkt. 33 at 12, it should not be extended to a general-purpose student newspaper challenging provisions of the Immigration and Nationality Act. *See Fleck*, 471 F.3d at 1106; *accord Region 8 Forest Serv. Timber Purchasers Council v. Alcock*, 993 F.2d 800, 810 n.15 (11th Cir. 1993) ("The associational standing test articulated in *Hunt* is properly reserved for voluntary membership organizations—*like trade associations or environmental groups*.") (emphasis added).

Nor can Stanford Daily even satisfy the doctrine's criteria. "To invoke [associational standing], an organization must demonstrate that '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Students for Fair Admissions*, 600 U.S. at 199 (quoting *Hunt*, 432 U.S. at 343).

Most prominently—and for similar reasons as why the newspaper is fundamentally not the type of organization that can even invoke this doctrine, discussed above—the interests that Stanford Daily seeks to vindicate by this lawsuit are not "germane" to its mission of reporting about campus activities. *See, e.g.*, *Fleck*, 471 F.3d at 1106 (privacy interests of members of gay men's social club not germane to club's profit-seeking mission); *Fitzgerald Reno, Inc. v. DOT*, 60 F. App'x 53, 53 (9th Cir. 2003) ("TTAX has no standing because it is a taxpayer organization whose purported environmental interests are not germane to its members."). Plaintiffs have previously argued that the "germaneness" requirement is "undemanding," citing the Ninth Circuit's decision in *Presidio Golf Club v. National Park Service*, 155 F.3d 1153 (9th Cir. 1998). *See* Dkt. 44 at 11. But the environmental and historical issues in that case were much more "germane" to the Presidio Golf Club's bona fide "interest in maintaining the historical and environmental integrity of the Clubhouse" than Plaintiffs' interest in immigration issues here. 155 F.3d at 1159. Again, Stanford Daily has no special focus on foreign policy or immigration; it is a general-purpose newspaper with an admittedly "vast" scope. VAC ¶ 104.

Second, as discussed with respect to the individual Plaintiffs below, no "members" of Stanford Daily would have "standing to sue in their own right," because there are no allegations or evidence that any of them have actually faced enforcement or have demonstrated a substantial threat of future enforcement. *See id.* ¶¶ 94, 110-34. And third, Plaintiffs have put the experiences of "individual members" at issue by purporting to base their harms on such members' mere beliefs; the "participation" of those members will therefore be necessary if the case persists past summary judgment.

Finally, Plaintiffs' associational-standing theory has no limiting principle. If a newspaper can file suit based on its reporters' and interviewees' fears of immigration enforcement, so could any other organization that happens to rely on the effort of a noncitizen. Rather than start down this slippery slope, the Court should reject Plaintiffs' associational-standing theory.

**(ii) Stanford Daily lacks corporate standing.**

The newspaper's "corporate standing" theory fares no better. *Cf. NAACP v. Button*, 371 U.S. 415, 428 (1963). To be sure, Stanford Daily alleges that it has sometimes been involved in publishing noncitizens' work or speech. *See generally* VAC ¶¶ 112-34. But the newspaper does not claim that the federal government has stopped it from doing so; at most, it claims that noncitizens themselves have opted out of those activities for their own reasons. *See id.* This case is therefore unlike *NAACP*, where the challenged state law directly prohibited the NAACP and its members from offering legal representation to black people in Virginia. *See* 371 U.S. at 423-26, 428. Rather, the intervening decisions of third parties here prevent Stanford Daily from establishing its standing to challenge federal statutes in its own right. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Pritkin v. DOE*, 254 F.3d 791, 798 (9th Cir. 2001).

**(iii) Stanford Daily lacks organizational standing.**

For similar reasons, Stanford Daily cannot establish that the statutes at issue have "directly affected and interfered with [its] core business activities" under the doctrine of "organizational standing." *All. for Hippocratic Med.*, 602 U.S. at 395. The Supreme Court has cautioned that the organizational standing doctrine is reserved for "unusual case[s]" and should not be "extend[ed]." *Id.* at 396. The Court should decline to extend the doctrine here.

Indeed, the district court in *AAUP* determined that the lead plaintiff group in that case *lacked*

organizational standing. *See AAUP v. Rubio*, No. 25-10685-WGY, 2025 WL 2777659, at *44 (D. Mass. Sept. 30, 2025). As that court explained, the "harms" upon which AAUP attempted to rely—"deterred and diminished noncitizen participation in AAUP events and diverted resources from more typical core advocacy issues such as 'adjunctification' to dealing with immigration law"—were insufficient for an organization to demonstrate standing in its own right. *Id.*

Here, again, any alleged "interference" has been the result of third parties making their own independent decisions, none of whom would have standing in their own right (as discussed further below). *See generally* VAC ¶¶ 112-34; *see also Defenders of Wildlife*, 504 U.S. at 560-61; *Pritkin*, 254 F.3d at 798. Moreover, even if the Court were to consider these alleged indirect harms, Plaintiffs fail to quantify or substantiate them. *See id.* Although they vaguely allege that government actions (via the decisions of third parties) have "decreas[ed] the quantity and diversity of opinion pieces" and "affect[ed] the quality of pieces *The Stanford Daily* is able to publish," they do not provide any numbers or other specific facts to support those generalizations. *Id.* ¶¶ 130-31. This is not a foundation on which the newspaper can ask this Court to declare federal statutes unconstitutional.

**2. The individual Plaintiffs lack standing.**

The individual Plaintiffs lack standing because they cannot show a substantial likelihood that they will face visa revocations or removal proceedings based on their protected speech. *See Int'l Ps. for Ethical Care Inc. v. Ferguson*, 146 F.4th 841, 853 (9th Cir. 2025) (denying standing where "Plaintiffs have not demonstrated that their injuries are imminent").

At the outset, despite having previously published content regarding Israel and Gaza; criticized America's foreign policy; described Israel's actions in Gaza as a "genocide"; used the slogan "from the river to the sea, Palestine will be free"; attended protests; and been the subject of profiles on the website Canary Mission, neither individual Plaintiff claims that they have been subject to enforcement under the statutes. *See* VAC ¶¶ 17-18, 135-78. Thus, their standing must be based, if at all, on their fear of *future* enforcement.

In order for a plaintiff to demonstrate standing based on potential future enforcement, the threat of enforcement must be "substantial." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158, 164 (2014); *Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 489 (9th Cir. 2024). Under earlier Ninth Circuit

precedent, "part of the essence" of which was "incorporat[ed]" into the Supreme Court's standard, *Peace Ranch*, 93 F.4th at 487, courts would evaluate the likelihood of future enforcement by considering, among other things, "whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings, and the history of past prosecution or enforcement under the challenged statute," *Thomas*, 220 F.3d at 1139; *see also, e.g.*, *Tingley v. Ferguson*, 47 F.4th 1055, 1067 (9th Cir. 2022).

Plaintiffs fail to demonstrate a substantial likelihood of enforcement here. As discussed below, Plaintiffs admit that they have not been the subject of any enforcement action to date, even though they engaged in the specific pro-Palestinian speech they are concerned about and the government conducted—and has completed—a specific enforcement initiative related to protests regarding that issue. Moreover, the government has disavowed taking immigration enforcement action for the "pure" political speech Plaintiffs claim to rely on, as opposed to violent speech or other disruptive conduct. Finally, Plaintiffs cannot rely on other, unidentified "protected speech," because Plaintiffs have alleged no personal intention to engage in such speech, and the Court cannot issue an advisory opinion holding a federal statute unconstitutional based on such an abstract hypothetical.

**(i) There is no substantial threat of enforcement for protected pro-Palestinian speech.**

Despite having previously engaged in the very speech that they are concerned about, neither individual Plaintiff alleges they have been targeted for enforcement or received any direct threat of enforcement, much less suffered any actual enforcement action. *See* VAC ¶¶ 135-78. Rather, their claimed standing depends on their allegation that the government is taking ongoing immigration-enforcement actions based solely on protected political speech, especially related to protesting Israel's treatment of Palestinians. *See* VAC ¶¶ 155-57, 176-78.

However, Defendants have already demonstrated that the government months ago "completed its review of the 5,000-plus campus-protester names referred to it," with "less than 1% of campus-protest leads . . . result[ing] in nonimmigrant visa revocations"—none of which included Plaintiffs, despite their prior speech. Dkt. 33 at 8. And the revocations that did occur "were the result of the individuals' conduct at protests or other information discovered about them from the resulting investigations, not

their mere participation in or presence at public protests or pure political speech." *Id.*; *see also* Dkt. 14 Ex. J at 92-95.[2] Thus, "without proof of an ongoing pressure campaign, it is entirely speculative" that Plaintiffs will be targeted for enforcement, and their claim for standing fails. *Murthy*, 603 U.S. at 69.

Plaintiffs cannot rely on historic enforcement actions against other individuals when there is no substantial likelihood that they themselves will be subject to similar action. The Supreme Court's decision in *Younger v. Harris*, 401 U.S. 37 (1971), is instructive. The Court contrasted a plaintiff who had actually been indicted with others who had not even been threatened. *Id.* at 42. Even though one plaintiff had already been subject to enforcement action, the others had not sufficiently claimed "that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible." *Id.* Rather, "[t]hey claim[ed] the right to bring [their] suit solely because, in the language of their complaint, they 'feel inhibited.'" *Id.* Such "persons having no fears of state prosecution except those that are imaginary or speculative, are not to be accepted as appropriate plaintiffs in such cases." *Id.* In this case, as in *Harris*, to Defendants' knowledge Plaintiffs have not engaged in any action or conduct that puts them in imminent danger of enforcement action. To be sure, Plaintiffs have alleged that enforcement against them is "possible"; but they have not alleged specific facts indicating that it would be "likely," whereas the government has put forward substantial evidence that the risk of any such enforcement would be vanishingly small. *See, e.g.*, Dkt. 33 at 8.

In their Amended Complaint, Plaintiffs add a handful of allegations regarding the government's enforcement action against Sami Hamdi, "a British political commentator who was on a speaking tour in the United States and often supports Palestine." VAC ¶ 76; *see also id.* ¶¶ 77-79. Plaintiffs do not allege that Mr. Hamdi was on a student visa like themselves, or had any interest in remaining in the United States besides his speaking tour. *See id.*[3] They do not identify any specific speech or remarks that he made, nor indicate whether they intend to make similar remarks. *See id.* In short, Plaintiffs offer

---

[2] It would be inappropriate for this Court to adjudicate the validity of enforcement actions taken against third parties, who are not before the Court and who are in fact parties to separate litigation in their own right. The government has consistently taken the position across these cases that individuals subject to enforcement under the statutes have done more than exercise pure political speech.

[3] Indeed, Mr. Hamdi voluntarily departed the United States to the United Kingdom on November 12, 2025, and dropped a lawsuit he had initiated against the government. *See Hamdi v. Trump*, No. 1:25-CV-01434-JLT (E.D. Cal. dismissed Nov. 17, 2025).

nothing to indicate that any enforcement actions taken against Mr. Hamdi indicate that they themselves face any threat of enforcement. *See id.*

**(ii) Defendants have disavowed enforcement for pure political speech.**

Moreover, the question whether a threat of future enforcement is "substantial" "often rises or falls with the enforcing authority's willingness to disavow enforcement." *Peace Ranch*, 93 F.4th at 490. "[P]laintiffs' claims of future harm lack credibility when . . . the enforcing authority has disavowed the applicability of the challenged law to the plaintiffs." *Lopez v. Candaele*, 630 F.3d 775, 788 (9th Cir. 2010). That is the case here—both State and DHS have represented in this litigation, and elsewhere, that they do *not* pursue visa revocations and removal proceedings purely based on political speech. *See* Dkt. 33-1 Ex. 4 at 121-22; Ex. 5 at 39, 59-60. Contrary to Plaintiffs' implication, merely using the terms "genocide," "apartheid," and "from the river to the sea, Palestine will be free" has not been used as the sole basis for revoking student visas and initiating removal proceedings. Rather, revocations have been based on the types of conduct described above and other derogatory information related to potential violations of U.S. law, including but not limited to Title 8. *See ibid*.

Plaintiffs have previously described this disavowal as a mere "litigation position" that is limited to this action. Dkt. 44 at 8. To the contrary, the government has shown, as a factual matter, through the testimony of its non-attorney agency-employee witnesses in another case, that "[n]either State nor DHS have a policy of targeting individuals based on protected political speech"; "DHS does not refer individuals for visa revocations solely because they participated in public protests"; "[n]or does DHS refer individuals for visa revocations solely because they have used the phrase 'from the river to the sea, Palestine will be free,' or described Israel as having committed 'genocide' or 'apartheid' in Gaza." Dkt. 33 at 8-9 (citing Dkt. 33-1 Exs. 4 & 5). And the district court in that case expressly found, after a full trial, that there "was no ideological deportation policy," and that "[i]t was never the Secretaries' immediate intention to deport all pro-Palestinian non-citizens." *AAUP*, 2025 WL 2777659, at *39.[4]

---

[4] The government has previously explained that the facts and claims in *AAUP* were distinct from those in this case, and involved what the court called a specific, "discrete enforcement initiative" that had already concluded by the time of the trial in that matter in July. *See* 2025 WL 2777659, at *4, *8-10, *52. The plaintiffs there alleged that their participation in public protests led to them being targeted for deportation under an "ideological deportation policy." The court concluded there was no such policy, and that AAUP itself lacked organizational standing, but nevertheless its faculty and student

13-ER 3613

Further, Plaintiffs cannot rely on abstract statements from the Secretaries of State and Homeland Security (much less other federal officials who are not even employed by the defendant agencies). "'[G]eneral threat[s] by officials to enforce those laws which they are charged to administer' do not create the necessary injury in fact." *Lopez*, 630 F.3d at 787 (quoting *United Pub. Workers of Am. v. Mitchell*, 330 U.S. 75, 88 (1947)). Crucially here, it is not the Secretary of State or Homeland Security who analyze and recommend that a student visa should be revoked or removability proceedings should be initiated; rather, as described above, those threshold recommendations are made by staff in various offices at State and DHS. Plaintiffs therefore cannot rely on general statements from the agencies' political leadership to establish how the statutes are actually enforced. *See, e.g.*, *Trump v. Hawaii*, 585 U.S. 667, 701-02 (2018) ("[T]he issue before us is not whether to denounce the statements. It is instead the significance of those statements in reviewing a Presidential directive, neutral on its face, addressing a matter within the core of executive responsibility.").[5] Nor do those statements suggest that pure political speech is used as a basis for enforcement, as opposed to support for terrorism or other unprotected conduct.

Plaintiffs bear the burden of establishing that State and DHS actually enforce the statutes against individuals like them based on pure protected speech. They have failed to do so.

**(iii) Plaintiffs cannot rely on other unidentified "protected speech."**

Finally, to establish standing based on a threat of future enforcement, Plaintiffs must "alleg[e] an intention to engage in a course of conduct arguably affected with a constitutional interest." *Susan B. Anthony List*, 573 U.S. at 161 (internal quotation marks omitted). This means that Plaintiffs cannot establish their own standing based on the unrelated speech of third parties that Plaintiffs have no intention of engaging in themselves. *See Murthy*, 603 U.S. at 69 ("[T]he plaintiffs have only explicitly identified an interest in speaking about COVID–19 or elections—so the defendants' discussions about content-moderation issues must focus on those topics.").

---

members who were not U.S. citizens had sufficient standing to mount a First Amendment "as-applied" challenge that they had been specifically targeted for enforcement based on their viewpoints.

[5] Of course, "[n]ot only do public officials have free speech rights, but they also have an obligation to speak out about matters of public concern." *Goldstein v. Galvin*, 719 F.3d 16, 30 (1st Cir. 2013); *see also AAUP v. Rubio*, 780 F. Supp. 3d 350, 384 n.11 (D. Mass. 2025).

For example, in their Amended Complaint, Plaintiffs also point to a handful of social-media posts in which officials at DHS and the State Department discussed removing foreign nationals who celebrated the murder of Charlie Kirk. *See* VAC ¶¶ 69-75. According to a DHS account, individuals who had their visas revoked had said things like "[Kirk] deserves to burn in hell"; "there are people who deserve to die"; and that Kirk "DIED TOO LATE." *Id.* ¶ 73. Such remarks made by temporary foreign visitors would not be protected under the First Amendment. *See* Dkt. 33 at 16-20. But in any event, Plaintiffs do not allege that they intend to make any similarly violent remarks directed at American citizens themselves, so they cannot rely on them to establish their own standing. *See, e.g.*, *Thomas*, 220 F.3d at 1141 (distinguishing past acts of enforcement as too different to establish plaintiffs' standing).

Indeed, the ambiguity of Plaintiffs' future plans underscores why the Court should deny their request to litigate the contours of the First Amendment here. Plaintiffs do not ask the Court to evaluate whether certain specific speech is protected. *See generally* VAC. Rather, they ask the Court to ponder in the abstract about the boundaries of "protected speech" and then hold unconstitutional two statutes passed by Congress to the extent they might cross the Court's hypothetical boundaries. *See id.* But Article III does not allow the Court to render such an "advisory opinion." *See California v. Texas*, 593 U.S. 659, 673 (2021) ("To find standing here" "would threaten to grant unelected judges a general authority to conduct oversight of decisions of the elected branches of Government.").

Other cases upholding standing for pre-enforcement challenges have involved speech and conduct that is much more concrete than the unidentified "protected speech" Plaintiffs try to rely on here. For example, in *Susan B. Anthony List*, the plaintiffs "pleaded specific statements they intend to make in future election cycles." 573 U.S. at 161. Similarly, in *Culinary Workers Union, Loc. 226 v. Del Papa*, a union challenged a statute "that criminalizes the willful and malicious making of derogatory statements about banks" after "distributing handbills criticizing the management and financial performance of the Commercial Bank of Nevada" and receiving a letter threatening enforcement by the state Attorney General. 200 F.3d 614, 616 (9th Cir. 1999).

In short, even though Plaintiffs faced no enforcement action for their own historic speech and face no substantial threat of future enforcement for any similar speech they might engage in, they nevertheless want to serve as *de facto* class-action representatives on behalf of every foreign national in

the United States whose unidentified future speech might raise foreign-policy or national-security concerns, and ask this Court to toss out longstanding statutes passed by Congress on that basis. Federal courts do not engage in such armchair decision-making. The Court should dismiss Plaintiffs' claims.

**B. The Court Should Dismiss The Action With Prejudice.**

Rule 15(a) of the Federal Rules of Civil Procedure states that, after a prior amendment, a party may amend its complaint only with the opposing party's written consent or the court's leave. *See* Fed. R. Civ. P. 15(a)(2). The court should "freely grant leave to amend when justice so requires." *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987) (cleaned up). However, leave to amend is not to be granted automatically. *See id.*; *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1087 (9th Cir. 2002).

"Five factors are taken into account to assess the propriety of a motion for leave to amend: bad faith, undue delay, prejudice to the opposing party, futility of amendment, and whether the plaintiff has previously amended the complaint." *Johnson v. Buckley*, 356 F.3d 1067, 1077 (9th Cir. 2004) (citation omitted); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962). However, "[f]utility alone can justify the denial of a motion to amend." *Johnson*, 356 F.3d at 1077. Amending a pleading is futile "where the amended complaint would also be subject to dismissal." *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1298 (9th Cir. 1998) (citing *Saul v. United States*, 928 F.2d 829, 843 (9th Cir. 1991)).

Any further amendment would be futile here. The Court has already articulated concerns with Plaintiffs' standing, *see* Dkt. 60 at 2-3; Dkt. 52 at 2-3, and Plaintiffs have already had an opportunity to fix them. *See* Dkt. 65. But the Verified Amended Complaint did not cure the original Complaint's deficiencies. And as explained in detail above, there is no reason to think those deficiencies could be cured by further amendment. The Court should therefore dismiss the Verified Amended Complaint with prejudice. *See Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1041 (9th Cir. 2011) (dismissal without leave to amend is proper if amendment would be futile); *Chaset v. Fleer/Skybox Int'l, LP*, 300 F.3d 1083, 1088 (9th Cir. 2002) ("Because any amendment would be futile, there is no need to prolong the litigation by permitting further amendment").

//

Case: 26-6900, 11/30/2026, DktEntry: 16.14, Page 243 of 300

## VI. CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' Verified Amended Complaint with prejudice.

Dated: December 12, 2025

CRAIG H. MISSAKIAN
United States Attorney

*/s/ Kelsey J. Helland*
KELSEY J. HELLAND
Assistant United States Attorney

Attorneys for Defendants

CRAIG H. MISSAKIAN (CABN 125202)
Acting United States Attorney
PAMELA T. JOHANN (CABN 145558)
Chief, Civil Division
KELSEY J. HELLAND (CABN 298888)
Assistant United States Attorney

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-6488
FAX: (415) 436-6748
kelsey.helland@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| STANFORD DAILY PUBLISHING CORP., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>RUBIO, *et al.*,<br><br>Defendants. | Case No. 5:25-cv-06618-NW<br><br>**[PROPOSED] ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**<br><br>Date: January 8, 2026<br>Time: 9:00 a.m.<br>Place: Courtroom 3, 5th Floor<br><br>The Honorable Noël Wise |

**[PROPOSED] ORDER**

Good cause appearing, Defendants' Motion to Dismiss is hereby GRANTED for the reasons stated therein. Plaintiffs' Verified Amended Complaint is hereby DISMISSED WITH PREJUDICE. The Clerk shall close the file.

DATED:

__________________________________
HON. NOËL WISE
United States District Judge

Marc Van Der Hout (Cal. Bar #80778)
Johnny Sinodis (Cal. Bar #290402)
Oona Cahill (Cal. Bar #354525)
**VAN DER HOUT LLP**
360 Post Street, Suite 800
San Francisco, CA 94108
Telephone: (415) 981-3000
Facsimile: (415) 981-3003
Email: ndca@vblaw.com

Conor T. Fitzpatrick (Mich. Bar #P78981)*
Daniel A. Zahn (D.C. Bar #90027403)*
**FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION (FIRE)**
700 Pennsylvania Avenue SE, Suite 340
Washington, DC 20003
Telephone: (215) 717-3473
Email: conor.fitzpatrick@thefire.org
Email: daniel.zahn@thefire.org

Colin P. McDonell (Cal. Bar #289099)
**FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION (FIRE)**
510 Walnut Street, Suite 900
Philadelphia, PA 19106
Telephone: (215) 717-3473
Email: colin.mcdonell@thefire.org

*Admitted pro hac vice

*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

THE STANFORD DAILY PUBLISHING CORPORATION, JANE DOE, and JOHN DOE,

*Plaintiffs*,

v.

MARCO RUBIO, in his official capacity as Secretary of State, and

KRISTI NOEM, in her official capacity as Secretary of Homeland Security,

*Defendants*.

Case No. 5:25-cv-06618

**VERIFIED AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

"We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty, and the pursuit of Happiness."

## INTRODUCTION

1. In the United States of America, no one should fear a midnight knock on the door for voicing the wrong opinion. That is because America's founding principle, core to who and what we are as a Nation, is that liberty comes not from the benevolent hand of a king, but is an inherent right of every man, woman, and child. American liberty enshrines in the First Amendment the "inalienable human rights" to "think as you will and to speak as you think." *303 Creative LLC v. Elenis*, 600 U.S. 570, 584 (2023) (internal quotation marks omitted).

2. But Secretary of State Marco Rubio and the Trump administration are trying to turn the inalienable human right of free speech into a privilege contingent upon the whims of a federal bureaucrat, triggering deportation proceedings against noncitizens residing lawfully in this country for their protected political speech regarding American and Israeli foreign policy. The Secretary of State and the President claim to possess unreviewable statutory authority to deport any lawfully present noncitizen for speech the government deems anti-American or anti-Israel.

3. They are wrong. The Federalists tried the same gambit 227 years ago with the Alien Friends Act, which allowed President Adams to deport any noncitizen he deemed dangerous to "peace and safety." An Act Concerning Aliens, ch. 58, § 1, 1 Stat. 570, 571 (1789) (expired Mar. 3, 1801). It was "one of the most notorious laws in our country's history," "widely condemned as unconstitutional," and "may have cost the Federalist Party its existence." *Sessions v. Dimaya*, 584 U.S. 148, 185 (2018) (Gorsuch, J., concurring in part and in judgment).

4. 225 years after the Alien Friends Act expired, the danger of nighttime raids on noncitizens for perceived thoughtcrime is reality once more. Secretary Rubio and the Trump administration's war against noncitizens' freedom of speech is intended to send an unmistakable message: Watch what you say, or you could be next.

5. Message received. At Plaintiff Stanford Daily, the independent, student-run newspaper at Stanford University, writers present on student visas are declining assignments related

to the conflict in the Middle East, worried that even reporting on the conflict will endanger their lawful immigration status. And Plaintiffs Jane Doe and John Doe, lawfully present noncitizens with no criminal history, have likewise self-censored because of their rational concern about the ongoing danger of deportation for expression Secretary Rubio deems anti-American or anti-Israel.

6. This pall of fear is incompatible with American liberty. Our First Amendment stands as a bulwark against the government infringing the inalienable human right to think and speak for yourself. That is why the Supreme Court held over 80 years ago that "[f]reedom of speech and of press is accorded aliens residing in this country." *Bridges v. Wixon*, 326 U.S. 135, 148 (1945). Our First Amendment does not "acknowledge[] any distinction between citizens and resident aliens." *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 n.5 (1953) (internal quotation marks omitted).

7. Secretary Rubio and the administration rely on two provisions of the Immigration and Nationality Act ("INA") for their supposed power to censor lawfully present noncitizens. The first allows the Secretary of State to render a noncitizen deportable if he "personally determines" their *lawful* "beliefs, statements, or associations" "compromise a compelling United States foreign policy interest." 8 U.S.C. §§ 1182(a)(3)(C)(iii), 1227(a)(4)(C)(i) (the "Deportation Provision"). The second allows the Secretary to "at any time, in his discretion, revoke" a "visa or other documentation." *Id.* § 1201(i) (the "Revocation Provision").

8. Both provisions are unconstitutional as applied to protected speech. The First Amendment cements America's promise that the government may not subject a speaker to disfavored treatment because those in power do not like his or her message. And when a federal statute collides with First Amendment rights, the Constitution prevails. U.S. Const. amend. I ("Congress shall make no law … abridging the freedom of speech …."); *see also, e.g.*, *United States v. Robel*, 389 U.S. 258, 268 n.20 (1967) (rejecting "balancing" First Amendment rights against "interests of national security").

9. Secretary Rubio and the Trump administration claim (as all censors do) that this time is different, that the supposed repulsiveness of anti-American and anti-Israel views mean the government should get a free pass for censorship. But "[i]f there is a bedrock principle underlying

the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989) (holding the First Amendment protects burning the American flag in protest). Plaintiffs, who are affected by this censorship, bring this case to restore freedom of speech in the United States.

## JURISDICTION AND VENUE

10. This action arises under the First and Fifth Amendments to the United States Constitution.

11. The Court has jurisdiction under 28 U.S.C. § 1331 and the First and Fifth Amendments to the U.S. Constitution.

12. The Court has authority to issue the requested relief under the Declaratory Relief Act at 28 U.S.C. §§ 2201–2202, Rules 57 and 65 of the Federal Rules of Civil Procedure, and the Court's inherent equitable powers. The Court has authority to award costs and attorneys' fees under 28 U.S.C. § 2412.

13. Venue in this action against officers and employees of the United States is proper in this district under 28 U.S.C. § 1391(e)(1)(B) because a substantial part of the events or omissions giving rise to these claims occurred in this district and additionally under 28 U.S.C. § 1391(e)(1)(C) because Plaintiff Stanford Daily resides in this district.

## DIVISION

14. This action should be assigned to the San Jose Division because a substantial part of the events giving rise to these claims occurred in the county of Santa Clara, where Plaintiff Stanford Daily resides. Civil L.R. 3-2(c), (e).

## THE PARTIES

***Plaintiffs***

15. Plaintiff Stanford Daily Publishing Corporation ("Stanford Daily") is a California nonprofit corporation based in Stanford, California. Its primary holding is *The Stanford Daily*, which is the independent, student-run newspaper of Stanford University.

16. *The Stanford Daily* covers news related to Stanford University, publishing short- and long-form articles, along with editorials. For decades, *The Stanford Daily* has included coverage of student opinions and campus protests related to the conflict between Israel and Palestine. Its coverage has increased considerably since the October 7, 2023, attack. Since March 2025, fearing Secretary Rubio will revoke their visas under the Revocation Provision or render them deportable under the Deportation Provision, many of the paper's noncitizen writers who are lawfully present in the United States have self-censored by declining to cover pro-Palestinian student protests at Stanford, refraining from covering topics related to the conflict in Gaza, and seeking removal of their previous articles about it.

17. Plaintiff Jane Doe[1] is a noncitizen lawfully present in the United States, having entered lawfully pursuant to an F-1 student visa. Jane Doe has published pro-Palestinian/anti-Israel commentary online. Jane Doe has not been accused of violating any university rules nor has she been charged with or convicted of any crime. Yet she is listed on the Canary Mission website, which compiles profiles on individuals the organization views as having "anti-Israel" opinions. A Trump administration official testified that "most of the names" of individuals targeted for deportation based on pro-Palestinian advocacy come from Canary Mission. Since March 2025, fearing Secretary Rubio will revoke her visa under the Revocation Provision or render her deportable under the Deportation Provision, Jane Doe has refrained from publishing and voicing her true opinions regarding Palestine and Israel.

18. Plaintiff John Doe is a noncitizen lawfully present in the United States in valid nonimmigrant status, having entered lawfully pursuant to an F-1 student visa. After the October 7, 2023, attack, John Doe peacefully attended pro-Palestinian academic discussions at his university and protests at his university and elsewhere. John Doe composed academic papers related to Israel and Palestine and shared pro-Palestinian/anti-Israel (which John Doe considers "anti-genocide")

---

[1] Jane Doe and John Doe are pseudonyms that two lawfully present noncitizens plaintiffs are using because they fear government retaliation for their protected expression. The Court granted the Doe Plaintiffs' unopposed motion to proceed pseudonymously and reserved the right to revisit the use of pseudonyms at a later stage of the proceedings if circumstances change. Dkt. No. 51.

Case: 26-6906, 11/20/2026, DktEntry: 16.14, (251 of 300)

commentary online. John Doe has not been accused of violating any university rules nor has he been charged with or convicted of any crime. Beginning in March 2025 and continuing into April 2025, John Doe feared that Secretary Rubio would revoke his visa under the Revocation Provision or render him deportable under the Deportation Provision based on his published works and pro-Palestinian stance. John Doe therefore refrained, for example, from publishing findings from his study related to Israel's actions in Gaza. He has since engaged in journalism about Israel and Palestine, including publishing those findings, and engaged in pro-Palestinian advocacy, all of which places him at risk of visa revocation and deportation.

***Defendants***

19. Defendant Marco Rubio is the Secretary of State and has authority over the operations of the State Department. In that capacity and through his agents, Defendant Rubio has broad authority over the operation and enforcement of the immigration laws. Relevant here, the Revocation Provision provides Secretary Rubio unilateral discretion to "revoke" "visa[s] or other documentation," and the Deportation Provision provides Secretary Rubio unilateral discretion to render noncitizens deportable for protected speech if he "personally determines" a noncitizen's speech "compromise[s] a compelling United States foreign policy interest." Plaintiffs sue Secretary Rubio in his official capacity.

20. Defendant Kristi Noem is the Secretary of Homeland Security and has ultimate authority over the Department of Homeland Security ("DHS"), which includes various component agencies including U.S. Immigration Customs and Enforcement ("ICE"). In that capacity and through her agents, Defendant Noem has broad authority over the operation and enforcement of the immigration laws, including authority to initiate removal proceedings in immigration court and arrest and detain noncitizens while removal proceedings are pending, and therefore leads a mechanism by which Secretary Rubio's revocation and deportation proclamations are executed. Plaintiffs sue Secretary Noem in her official capacity.

## FACTUAL ALLEGATIONS

### I. The October 7 Attacks and Ensuing Protests and Other Speech

21. On October 7, 2023, Hamas and other Palestinian militant groups launched a coordinated attack in southern Israel, leading Israel to launch a counterattack and ground invasion of Gaza.

22. At American universities, some students and faculty viewed Israel's response as disproportionate. Planned and spontaneous protests erupted across the country, variously calling for a ceasefire, increased humanitarian aid to Palestinians, and university divestment of financial portfolios from Israel.

23. Some protests featured calls for a "free Palestine" and included chants such as "from the river to the sea, Palestine will be free" and "intifada revolution."

24. Other events featured pro-Palestinian advocates handing out flyers.

25. Some protesters engaged in violence, property damage, and blockades of pro-Israel students attending classes. Many protests, however, remained peaceful.

26. Apart from protests, others on and off campus voiced their viewpoints on the conflict through social media, in news interviews and editorials, and in other forums.

### II. During the 2024 Campaign and After the Election, Trump Makes Clear His Administration Will Target Noncitizens Based on Speech.

27. President Donald J. Trump was the Republican Party's 2024 nominee for President of the United States.

28. The 2024 platform of the Republican Party expressed support for "revoking Visas of Foreign Nationals who support terrorism and jihadism."

29. Mr. Trump's campaign website linked to the Republican Party platform.

30. Mr. Trump's campaign website separately promised to "[d]eport pro-Hamas radicals and make our college campuses safe and patriotic again."

Case: 26-6906, 11/20/2026, DktEntry: 16.14, (253 of 300)

31. At campaign rally on October 16, 2023, Mr. Trump promised to revoke the visas of foreign students deemed "radical, anti-American, and anti-Semitic" and to "aggressively deport" resident aliens with "jihadist sympathies."

32. At an event on October 28, 2023, Mr. Trump committed, "I will cancel the student visas of Hamas sympathizers on college campuses. The college campuses are being taken over, and all of the resident aliens who joined in the pro-jihadist protest this month—nobody's ever seen anything like it—come 2025 we will find you and we will deport you. We will deport you."

33. At a campaign rally on November 8, 2023, Mr. Trump promised, "I will also quickly cancel the student visas of all Hamas sympathizers on college campuses, which have been infested with radicalism like never before."

34. At the same rally, Mr. Trump said, "If you hate America, if you want to abolish Israel, if you sympathize with jihadists, then we don't want you in our country …. To all the resident aliens who joined in the pro-jihadist protests … we put you on notice: Come 2025, we will find you and we will deport you."

35. On May 14, 2024, Mr. Trump said at a campaign event, "One thing I do is, any student that protests, I throw them out of the country. You know, there are a lot of foreign students. As soon as they hear that, they're going to behave."

36. On January 20, 2025, President Trump issued an executive order stating that the government would ensure that noncitizens present in the United States "do not bear hostile attitudes" toward the United States government and do not "advocate for" or "support" "foreign terrorists and other threats to our national security." Exec. Order No. 14,161, 90 Fed. Reg. 8451, 8451 (Jan. 20, 2025).

37. The U.S. Senate unanimously confirmed Mr. Rubio as Secretary of State, and he took office on January 21, 2025. The Secretary of State serves at the pleasure of the President.

38. On January 30, 2025, the White House issued a fact sheet promising to revoke the visas of and deport "Hamas Sympathizers," stating, "To all the resident aliens who joined in the pro-jihadist protests, we put you on notice: come 2025, we will find you, and we will deport you. I

will also quickly cancel the student visas of all Hamas sympathizers on college campuses, which have been infested with radicalism like never before." *Fact Sheet: President Donald J. Trump Takes Forceful and Unprecedented Steps to Combat Anti-Semitism*, The White House (Jan. 30, 2025), https://perma.cc/GY4H-7ASR.

39. The administration considers "[f]rom the river to the sea, Palestine will be free" to express support for Hamas, capable of justifying action under the Revocation or Deportation Provisions. Trial Tr. vol. 1, 32–35, *Am. Ass'n of Univ. Professors v. Rubio*, No. 25-cv-10685 (D. Mass. July 18, 2025), https://perma.cc/S854-PXXK. Likewise, calling Israel "an apartheid state," "calling for an arms embargo on Israel," or "criticizing Israel's actions in Gaza" might be sufficient to invoke the Revocation or Deportation Provisions. *Id.*

## III. The Trump Administration Arrests, Detains, and Attempts to Deport Noncitizens for Protected Speech.

40. Trump and his administration made good on their promises, aggressively targeting lawfully present noncitizens for protected speech, particularly at universities.

41. Mahmoud Khalil was a graduate student at Columbia University and a lawful permanent resident (green card holder).

42. Mr. Khalil had been an active participant at Columbia in demonstrations and advocacy against Israel's actions following the October 7, 2023, attack. Mr. Khalil repeatedly criticized Israel's military operations in Gaza and what he viewed as Columbia's financing and facilitation of those activities.

43. Late in the evening on March 8, 2025, agents from DHS arrested Mr. Khalil with no prior notice at his apartment, transferred him to a Louisiana immigration jail, and initiated proceedings to deport him from the United States.

44. The DHS document initiating removal proceedings against Mr. Khalil cited his protected speech as the sole basis for his deportation under the Deportation Provision. DHS later explained Secretary Rubio had "personally determined" Mr. Khalil's continued presence "would have potentially severe adverse foreign policy consequences and would compromise a compelling

U.S. foreign policy interest" because of Mr. Khalil's "participation" in "antisemitic protests and disruptive activities, which fosters a hostile environment for Jewish students in the United States." *Khalil v. Trump*, No. 25-cv-01963, 2025 WL 1514713, at *7 (D.N.J. May 28, 2025), *appeal docketed sub nom.*, *Khalil v. President United States of America*, No. 25-2162 (3d Cir. June 23, 2025).

45. On March 9, 2025, reacting on social media to Mr. Khalil's arrest, Secretary Rubio wrote, "We will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported." Marco Rubio (@marcorubio), X (Mar. 9, 2025, at 6:10 PM), https://perma.cc/726Z-VT4Z.




46. That same day, DHS posted on social media, "On March 9, in support of President Trump's executive orders prohibiting anti-Semitism, and in coordination with the Department of State, U.S. Immigration and Customs Enforcement arrested Mahmoud Khalil, a former Columbia University graduate student. Khalil led activities aligned to Hamas, a designated terrorist organization." Homeland Security (@DHSgov), X (Mar. 9, 2025, at 9:29 PM), https://perma.cc/YS5C-2TKG.

47. On March 10, 2025, reacting to Mr. Khalil's arrest, President Trump warned that additional students involved in "pro-terrorist, anti-Semitic, anti-American activity" will be found and deported, vowing that "the Trump administration will not tolerate it" and that Mr. Khalil's arrest was the "first" of "many to come." Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 10, 2025, at 1:05 PM), https://perma.cc/6VPC-AESU.

48. On March 11, 2025, White House Press Secretary Karoline Leavitt told reporters that Mr. Khalil faced deportation because he "sid[ed] with terrorists, Hamas terrorists, who have killed innocent men, women, and children." Ms. Leavitt also asserted Mr. Khalil "distributed pro-Hamas propaganda flyers with the logo of Hamas" on Columbia's campus, though the government never offered evidence to substantiate this statement. She emphasized, "This administration is not going to tolerate individuals … studying in our country and then siding with pro-terrorist organizations."

49. Mr. Khalil remained in a Louisiana immigration jail until June 20, 2025, when a federal court ordered his release on constitutional grounds. *Khalil v. Trump*, No. 25-cv-01963 (D.N.J. June 20, 2025), ECF No. 316, *appeal docketed sub nom.*, *Khalil v. President United States of America*, No. 25-2162 (3d Cir. June 23, 2025).

50. On March 13, 2025, in an interview with NPR, Deputy Homeland Security Secretary Troy Edgar conceded that Mr. Khalil's deportable "offense" was participating in protests.

51. Rümeysa Öztürk is a PhD student at Tufts University in Boston, Massachusetts. She is a citizen of Turkey and studies in the United States on an F-1 student visa.

52. Ms. Öztürk coauthored an op-ed in the Tufts student newspaper, *The Tufts Daily*, in March 2024. The article criticized the University's refusal to adopt several resolutions approved by the undergraduate student senate urging the University to, among other things, recognize a genocide in Gaza and divest from Israeli companies.

53. On March 25, 2025, six plain-clothes federal officers surrounded Ms. Öztürk on the street outside her home in Somerville, Massachusetts. The officers detained her and quickly transported her to a Louisiana immigration jail.

54. Four days before Ms. Öztürk's arrest, the State Department, relying solely on her protected expression, had revoked Ms. Öztürk's visa under the Revocation Provision. A DHS spokesperson justified the revocation by asserting Öztürk's editorial "[g]lorif[ied] and support[ed] terrorists."

55. Ms. Öztürk remained in a Louisiana immigration jail until May 9, 2025, when a federal court ordered her release on constitutional grounds. *Ozturk v. Trump*, No. 25-cv-374, 2025 WL 1355667 (D. Vt. May 9, 2025).

56. Mohsen Mahdawi is an undergraduate student at Columbia University and a legal permanent resident (green card holder) in the United States.

57. As a student at Columbia, Mr. Mahdawi was an outspoken critic of Israel's military campaign in Gaza. He appeared on televised news interviews, in print news articles, and spoke at protests.

58. On April 14, 2025, after Mr. Mahdawi completed the citizenship test to become a United States citizen, masked DHS agents entered the interview room and arrested him, after which the Trump administration began proceedings to deport him from the United States.

59. Secretary Rubio relied upon the Deportation Provision to attempt Mr. Mahdawi's removal, claiming his protests and rhetoric undermined the U.S. foreign policy goal of promoting peace in the Middle East. Resp. in Opp'n to Mot. for Release Ex. A, at 2, *Mahdawi v. Trump*, No. 25-cv-00389, 2025 WL 1243135 (D. Vt. Apr. 30, 2025), ECF No. 42-1, *appeal docketed*, No. 25-1113 (2d Cir. May 1, 2025).

60. Mr. Mahdawi remained in a Vermont immigration jail until May 9, 2025, when a federal court ordered his release on constitutional grounds. *Mahdawi*, 2025 WL 1243135.

61. Since March 2025, the Trump administration has continued revoking the visas of and arresting, detaining, and attempting to deport lawfully present noncitizens under the Deportation and Revocation Provisions based on protected expression and has reiterated its intention in public statements to continue doing so.

62. On April 14, 2025, White House Deputy Chief of Staff and Homeland Security Advisor Stephen Miller said on Fox News that any noncitizen "who preaches hate for America" will be deported.

63. On May 8, 2025, Department of Homeland Security Assistant Secretary for Public Affairs Tricia McLaughlin posted on X that noncitizens "pushing Hamas propaganda," "glorifying

terrorists," or otherwise engaging in "anti-American" conduct "can expect your visa will be revoked." Tricia McLaughlin (@TriciaOhio), X (May 8, 2025, at 10:26 AM), https://perma.cc/5ZJ3-4VUU.

64. On May 20, 2025, Secretary Rubio testified before the Senate foreign relations committee. He said, in reference to visa revocations, "There are more coming. We're going to continue to revoke the visas of people who are here as guests and are disrupting our higher education facilities. People are paying money, these kids pay money to go to school and they have to walk through a bunch of lunatics who are here on student visas. It's as simple as that. I want to do more. I hope we can find more of these people."

65. On May 21, 2025, Secretary Rubio testified before the House foreign affairs committee. Responding to a question about the revocation of Öztürk's visa based on her speech, he said he "proudly" revoked her visa, that he revokes visas every day, and that he would continue revoking visas.

66. On July 18, 2025, John Armstrong, Senior Bureau Official in the Bureau of Consular Affairs, testified in the United States District Court for the District of Massachusetts that mere criticism of Israel, such as calling for an arms embargo or calling Israel an "apartheid state," are, per the Trump administration, legitimate grounds to revoke a visa. Trial Tr. vol. 1, 32–35, *Am. Ass'n of Univ. Professors v. Rubio*, No. 25-cv-10685 (D. Mass. July 18, 2025), https://perma.cc/S854-PXXK.

67. On July 29, 2025, White House Deputy Chief of Staff and Homeland Security Advisor Stephen Miller posted on X that administration officials are "working continuously" to revoke visas from noncitizens "who espouse hatred for American or its people"—not just noncitizens who criticize Israel. Stephen Miller (@StephenM), X (July 29, 2025, at 9:08 PM), https://perma.cc/U9JN-FQK7.


Stephen Miller
@StephenM

This is just patently false. We have officials working continuously to identity, revoke or deny foreigners' visas who espouse hatred for America or its people. This is a top priority. College students who witness such conduct can use the ICE tip line. Also: there is no "speech code" of any kind in the Columbia deal. There is an ironclad requirement — with enforcement mechanisms — to admit students based on actual merit and not illegal racial quotas, set asides or preferences.

Glenn Greenwald @ggreenwald · 19h
Exactly. No foreign students are being deported by the Trump State Department and ICE for criticizing the US - only for criticizing Israel.

Just like the "hate speech" codes Trump demanded US colleges adopt allows students to call the US a "racist endeavor" but not Israel. ...

9:08 PM · Jul 29, 2025 · 540.6K Views

68. On August 20, 2025, DHS posted on X: "If you hate America, you have no business demanding to live in America." Homeland Security (@DHSgov), X (Aug. 20, 2025, at 12:30 PM), https://perma.cc/K649-DNLK.

69. On September 11, 2025, in response to Charlie Kirk's assassination, Deputy Secretary of State Christopher Landau posted on X: "In light of yesterday's horrific assassination of a leading political figure, I want to underscore that foreigners who glorify violence and hatred are not welcome visitors to our country. I have been disgusted to see some on social media praising, rationalizing, or making light of the event, and have directed our consular officials to undertake appropriate action. Please feel free to bring such comments by foreigners to my attention so that the @StateDept can protect the American people." Christopher Landau (@DeputySecState), X (Sep. 11, 2025, at 8:20 AM), https://perma.cc/7N8S-TT75.

70. On September 14, 2025, Deputy Landua responded on X to a video of a noncitizen mocking Charlie Kirk's assassination: "Rest assured that the @StateDept has revoked his visa so at least he will not be engaging in his grotesque diatribes on American soil." Christopher Landau (@DeputySecState), X (Sep. 14, 2025, at 12:35 PM), https://perma.cc/6KB2-DJ9M.

71. On September 15, 2025, Secretary Rubio posted on X: "America will not host foreigners who celebrate the death of our fellow citizens. Visa revocations are under way. If you are here on a visa and cheering on the public assassination of a political figure, prepare to be deported. You are not welcome in this country." Secretary Marco Rubio (@SecRubio), X (Sep. 15, 2025, at 10:54 PM), https://perma.cc/L24D-NRKV.

72. On October 5, 2025, DHS posted on X that it arrested "terrorist sympathizers across our country." Homeland Security (@DHSgov), X (Oct. 5, 2025, at 7:09 PM), https://perma.cc/MX99-CR62.

73. On October 14, 2025, the State Department posted on X: "The United States has no obligation to host foreigners who wish death on Americans. The State Department continues to identify visa holders who celebrated the heinous assassination of Charlie Kirk. Here are just a few examples of aliens who are no longer welcome in the U.S." The post was followed by six examples:

> "An Argentine national said that Kirk 'devoted his entire life spreading racist, xenophobic, misogynistic rhetoric' and deserves to burn in hell. Visa revoked."

> "A South African national mocked Americans grieving the loss of Kirk, saying 'they're hurt that the racist rally ended in attempted martyrdom' and alleging 'he was used to astroturf a movement of white nationalist trailer trash.' Visa revoked."

> "A Mexican national said that Kirk 'died being a racist, he died being a misogynist' and stated that 'there are people who deserve to die. There are people who would make the world better off dead.' Visa revoked."

> "A Brazilian national charged that 'Charlie Kirk was the reason for a Nazi rally where they marched in homage to him' and that Kirk 'DIED TOO LATE.' Visa revoked."

> "A German national celebrated Kirk's death and attempted to justify his murder, writing 'when fascists die, democrats don't complain.' Visa revoked."

"A Paraguayan national charged that 'Charlie Kirk was a son of a b**** and he died by his own rules.' Visa revoked."[2]

74. The State Department also posted: "Aliens who take advantage of America's hospitality while celebrating the assassination of our citizens will be removed." Department of State (@StateDept), X (Oct. 14, 2025, at 5:55 PM), https://perma.cc/S6FW-WR3C.

75. On October 17, 2025, the State Department posted on X: "We heard Bluesky is a great place to research visa revocations." Department of State (@StateDept), X (Oct. 17, 2025), at 7:24 PM), https://perma.cc/G7CC-YUHP.

76. On October 26, 2025, ICE arrested Sami Hamdi, a British political commentator who was on a speaking tour in the United States and often supports Palestine.

77. That same day, Tricia McLaughlin quoted a post about Mr. Hamdi's arrest and said: "Thanks to the work of @Sec_Noem and @SecRubio and the men and women of law enforcement, this individual's visa was revoked and he is in ICE custody pending removal. Under President Trump, those who support terrorism and undermine American national security will not be allowed to work or visit this country. It's commonsense." Tricia McLaughlin (@TriciaOhio), X (Oct. 26, 2025, at 2:28 PM), https://perma.cc/ZKQ8-Q8RY.

78. That same day, the State Department quoted Ms. McLaughlin's post and said: "We've said it before, we'll say it again: The United States has no obligation to host foreigners who support terrorism and actively undermine the safety of Americans. We continue to revoke the visas of persons engaged in such activity. Thank you to our partners at @DHSgov for their efforts to remove this individual." Department of State (@StateDept), X (Oct. 26, 2025, at 5:46 PM), https://perma.cc/WMP6-XMK7.

79. On November 5, 2025, DHS posted on X: "The U.S. has no obligation to host foreigners, like Sami Hamdi, who support terrorism and actively undermine the safety of Americans. And we won't. There is no room in the United States for the rest of the world's terrorist

[2] Department of State (@StateDept), X (Oct. 14, 2025, at 5:55 PM). The posts have been archived at the following links: https://perma.cc/2AVU-8P9Z; https://perma.cc/4898-YRE3; https://perma.cc/R47Y-D293; https://perma.cc/8RSE-5MGP; https://perma.cc/QYQ3-4WEU; https://perma.cc/MPC2-653S; https://perma.cc/CQQ7-GM8B.

sympathizers, and we are under no obligation to admit them or let them stay here. @Sec_Noem has made it clear that anyone who thinks they can come to America and hide behind the First Amendment to advocate for anti-American and anti-Semitic violence and terrorism – think again." Homeland Security (@DHSgov), X (Nov. 5, 2025, at 11:10 AM), https://perma.cc/2A8P-4QPS.

80. On November 18, 2025, Stephen Miller said, "The State Department has revoked tens of thousands of visas, and they're just getting started on tens of thousands more."

## IV. Stanford Daily's Noncitizen Staff Self-Censors, Fearing Immigration Consequences for Protected Speech.

81. Stanford Daily operates and publishes *The Stanford Daily*, the student-run newspaper at Stanford University.

82. Stanford Daily is a validly incorporated 501(c)(3) organization.

83. Since its founding as *The Daily Palo Alto* in 1892, Stanford Daily has sought to cover all relevant campus activities in an unbiased fashion and provide an outlet for Stanford community members to publish opinions.

84. Stanford Daily's mission statement explains that it "strives to serve the Stanford community with relevant, unbiased journalism and provides its editorial, tech and business staffs with unparalleled educational opportunities."

85. As part of its mission, Stanford Daily has defended and advocated for press rights and the rights of all journalists to report the news and publish opinions without government or university retaliation.

86. For a famous example, after the chief of the Palo Alto Police Department James Zurcher raided *The Stanford Daily*'s offices in 1971, Stanford Daily sued to protect its members and defend press freedom. *See Zurcher v. Stanford Daily*, 436 U.S. 547 (1978).

87. And for a recent example, in 2024, Stanford Daily advocated against its reporter's arrest, highlighting the "violation of his First Amendment and Fourth Amendment rights" and the "threat to the freedom of the press."

Case: 26-6900, 11/30/2026, DktEntry: 16.14, Page 263 of 300

88. Even before filing this suit, Stanford Daily had started advocating against the government's use of the Revocation and Deportation Provisions to punish legally present noncitizens, noting in April 2025 that "student speech, from our own reporters and those we're reporting on, is startlingly chilled" by the government's threats and past enforcement actions.

89. Stanford Daily is a voluntary membership organization.

90. Everyone who wants to join Stanford Daily is guaranteed a spot.

91. Stanford Daily has over 150 identifiable members.

92. Stanford Daily's members voluntarily joined the organization to support its mission.

93. Stanford Daily's members receive updates about the status of this case from Stanford Daily's leadership. Stanford Daily's members elect seven directors who sit on Stanford Daily's nine-member board. The board represents the interests of Stanford Daily's members and has input on the direction of this case.

94. Stanford Daily's members include United States citizens and noncitizens. Some of Stanford Daily's members are noncitizens lawfully present in the United States pursuant to lawful admissions on nonimmigrant visas, such as the F-1 student visa. Other noncitizen members are lawfully present in the United States pursuant to their status as lawful permanent residents on immigrant visas.

95. Stanford Daily's members are either editorial members or business members.

96. To be considered an editorial member, one must have worked for Stanford Daily for at least two calendar months in the current or most recent fall, winter, or spring academic quarter and demonstrated continued interest and commitment through meeting attendance and/or contributions to Stanford Daily's operations.

97. To be considered a business member, one must have worked for Stanford Daily at least two months prior to the date of the approval of the membership list and have worked for an average of five or more hours per week since beginning work at Stanford Daily.

98. Stanford Daily's content is produced by Stanford Daily members and contributors.

99. Any individual who submits and has content of any type published in *The Stanford Daily* is a contributor. Contributors need not be Stanford Daily members nor Stanford affiliates. Although contributors to *The Stanford Daily* are associated with Stanford Daily, contributors are not necessarily Stanford Daily members.

100. Stanford Daily disseminates its content to readers through its website, social media accounts, email digests, and print editions.

101. Stanford Daily publishes content on its website, stanforddaily.com. It also publishes content on X (x.com/StanfordDaily), Instagram (instagram.com/stanforddaily/), Facebook (facebook.com/stanforddaily/), YouTube (youtube.com/@stanforddaily/), TikTok (tiktok.com/@stanforddaily), and Spotify (open.spotify.com/show/2ty8gvAnvYP31X8TUrFwoj). In the past, Stanford Daily published content on LinkedIn, but it does not currently use that platform.

102. Stanford Daily also disseminates its content through two types of email digests. First, it disseminates a Daily Digest that comes out every morning of the school week, providing headlines, descriptions, and links to articles in each of its print sections to offer a general overview of what is happening in the Stanford community. And second, Stanford Daily occasionally disseminates a Breaking News email when an article is deemed by its editorial staff to be sufficiently urgent and important to include in its own email to its subscribers after a story breaks.

103. Stanford Daily also disseminates its content by printing *The Stanford Daily*. The newspaper is printed once a week over the academic school year aside from breaks and finals weeks. It is distributed every Friday with content from the past week of publication.

104. Because Stanford Daily seeks to cover all relevant news and provide an outlet to the Stanford community to publish opinions, the scope of its content is vast. *The Stanford Daily*'s content includes news articles about academics, campus life, data, graduate students, science and technology, and Stanford University; sports articles; opinion articles by columnists, the editorial board, and community members; arts and life articles about culture, music, books, and the screen; humor articles, including cartoons; multimedia content, including videos; games, including mini crosswords, full-size crosswords, and the "Stanfordle" (based on the *New York Times*'s "Wordle"

game); "The Grind," which welcomes any potential contributors to think deeply about any aspect of their lives and large society they want to explore, whether Stanford related or not; and *The Stanford Daily Magazine*, which is published twice per year.

105. In line with Stanford Daily's mission and core business activities, *The Stanford Daily* has endeavored to provide the Stanford community with relevant and unbiased journalism about campus events or issues related to Hamas's October 7, 2023, attack on Israel and Israel's war in Gaza.

106. Also in line with Stanford Daily's mission and operations, the newspaper provides a platform for Stanford community members to voice their opinions on the Israeli-Palestinian conflict and other foreign policy issues.

107. To support its mission, Stanford Daily covers matters related to foreign affairs, Israel, and Palestine, such as covering student groups like Students for Justice in Palestine, Law Students for Justice in Palestine, and Stanford Israel Association; student events such as the "All Eyes on Gaza" vigil and the "Rally for Hostages" event, both on October 7, 2025; Israel's detention and deportation of a Stanford alumna who attempted to sail toward Gaza on the Global Sumud Flotilla; Stanford pro-Palestinian protesters being indicted on felony charges; a Stanford chemist suing Stanford University for antisemitism and anti-Israel discrimination; and similar issues.

108. Stanford Daily also provides an outlet for people to publish opinions. Some of this content relates to American foreign affairs, Israel, and Palestine, such as opinion pieces about standing in solidarity with the Palestinian cause, opposing Hamas's actions on October 7, the prosecution of Stanford pro-Palestinian protestors, hunger strikes in support of Palestine, and inviting more pro-Palestinian speakers to campus.

109. To support its mission, Stanford Daily has covered this news and provided this outlet for opinions before Hamas's October 7, 2023, attack on Israel and Israel's war in Gaza. It has continued to cover news related to foreign affairs, Israel, and Palestine since Israel and Hamas entered a ceasefire and hostage-exchange agreement on October 9, 2025, and it expects to continue covering news and publishing opinions related to foreign affairs, Israel, and Palestine.

110. Many Stanford Daily members, including lawfully present noncitizen members, have personally read and are aware of the government's statements and enforcement actions referenced in this Complaint.

111. Outside of the litigation documents filed in this case, Stanford Daily members are unaware of any government officials disavowing invoking the Deportation and Revocation Provisions against protected speech.

112. The government's threats to enforce and past enforcement of the Revocation and Deportation Provisions, and the threat of those Provisions' future enforcement, have specifically impacted Stanford Daily by causing lawfully present noncitizen members to quit, withhold articles, refuse assignments, request articles be taken down, and ask for anonymity due to fear of adverse immigration consequences under the Deportation and Revocation Provisions. Thus, since the Trump administration began targeting lawfully present noncitizens for deportation based on protected speech in March 2025, lawfully present noncitizen students who are Stanford Daily members have self-censored expression for fear of visa revocation, arrest, detention, and deportation.

113. The government's threats to enforce and past enforcement of the Revocation and Deportation Provisions, and the threat of those Provisions' future enforcement, have also specifically impacted Stanford Daily by causing lawfully present noncitizen contributors and sources to refuse to talk on the record with Stanford Daily reporters and stop submitting opinion pieces to *The Stanford Daily*. Thus, since the Trump administration began targeting lawfully present noncitizens for deportation based on protected speech in March 2025, lawfully present noncitizens who are Stanford Daily contributors have self-censored expression for fear of visa revocation, arrest, detention, and deportation.

114. For example, in March 2025, a lawfully present noncitizen editor on staff decided to quit Stanford Daily because of the student's nonimmigrant visa status. Fearing visa revocation, arrest, and deportation for association with articles about Israel or Palestine, the student decided to leave the newspaper.

115. But for the threat of visa revocation under the Revocation Provision and of deportation under the Deportation Provision, the student would continue being a member of Stanford Daily.

116. As another example, one lawfully present noncitizen student on staff signed up to cover a story about a vigil that brought together Jewish and Palestinian families to honor those who died in the conflict in Gaza. The student attended, took notes, and interviewed sources. But because of the student's nonimmigrant visa status and fear that they may face adverse immigration consequences if they published the article, the student decided against publishing the article.

117. But for the threat of visa revocation under the Revocation Provision and of deportation under the Deportation Provision, the student would publish the article.

118. Similarly, a lawfully present noncitizen editor on staff, fearing adverse immigration consequences, asked Stanford Daily to remove articles they had previously written about pro-Palestinian campus activism and related issues and to no longer assign them to edit stories involving Israel or Palestine.

119. But for the threat of visa revocation under the Revocation Provision and of deportation under the Deportation Provision, the editor would republish the article they had taken down and would edit stories involving Israel and Palestine.

120. Another lawfully present noncitizen Stanford Daily staff writer, who had written about Israeli and Palestinian officials, as well other foreign affairs topics, asked Stanford Daily to remove all her articles from Stanford Daily's website, fearing adverse immigration consequences.

121. But for the threat of visa revocation under the Revocation Provision and of deportation under the Deportation Provision, the staff writer would not have asked Stanford Daily to remove the articles.

122. Additionally, a lawfully present noncitizen Stanford Daily editorial board member asked for an article about the Israeli Defense Forces to be removed from the website, fearing adverse immigration consequences.

123. But for the threat of visa revocation under the Revocation Provision and of deportation under the Deportation Provision, the editorial board member would not have asked to remove the article.

124. Secretary Rubio's use of the Deportation Provision and Revocation Provision to target protected expression has hindered Stanford Daily's journalism in other ways, too. Since the Trump administration began targeting lawfully present noncitizens for deportation based on protected speech in March 2025, Stanford Daily has received numerous requests from lawfully present noncitizens who either wrote or were quoted or pictured in articles to remove their name, image, or article for fear of adverse immigration action based on their speech.

125. Since the Trump administration began targeting lawfully present noncitizens for deportation based on protected speech in March 2025, international students have also largely stopped talking to Stanford Daily journalists and, when they do speak, often refuse to speak on the record, particularly when it comes to discussing topics like Israel and Palestine.

126. But for the threat of visa revocation under the Revocation Provision and the threat of deportation under the Deportation Provision, international students would resume speaking freely with Stanford Daily.

127. Since Secretary Rubio started using the Deportation Provision and Revocation Provision against protected speech, Stanford Daily has received other requests from current and former writers, asking it to remove opinion editorials they published, quotes they provided, or their names in bylines or articles.

128. But for the threat of visa revocation under the Revocation Provision and of deportation under the Deportation Provision, the current and former writers would not seek to have their pieces, quotes, or identities removed from the newspaper.

129. But for the threat of visa revocation under the Revocation Provision and deportation under the Deportation Provision, Stanford Daily noncitizen contributors would resume contributing articles to Stanford Daily.

130. The government's threats to enforce and past enforcement of the Revocation and Deportation Provisions, and the threat of those Provisions' future enforcement, have specifically impacted Stanford Daily by decreasing the quantity and diversity of opinion pieces *The Stanford Daily* is able to publish on the conflict between Israel and Palestine. Before the government's threats to enforce and past enforcement of the Revocation and Deportation Provisions, and the threat of those Provisions' future enforcement, Stanford Daily published opinion pieces by noncitizen contributors. But since the government began enforcing the Provisions against protected speech, Stanford Daily has experienced substantially reduced participation from noncitizen contributors.

131. The government's threats to enforce and past enforcement of the Revocation and Deportation Provisions, and the threat of those Provisions' future enforcement, have specifically impacted Stanford Daily by affecting the quality of pieces *The Stanford Daily* is able to publish. Before the government's threats to enforce and past enforcement of the Revocation and Deportation Provisions, and the threat of those Provisions' future enforcement, Stanford Daily writers could incorporate a wide variety of sources and quotes into their news articles, including perspectives from international students. But now, legally present noncitizen students no longer want to speak with Stanford Daily as sources or contribute opinion pieces.

132. The specific effects of the government's threats to enforce and past enforcement of the Revocation and Deportation Provisions, and the threat of those Provisions' future enforcement, are ongoing.

133. Legally present noncitizen Stanford Daily members who have quit, withheld articles, refused assignments, requested articles be taken down, and asked for anonymity have continued to take those actions since this case was filed.

134. Legally present noncitizen Stanford Daily members face a credible and imminent threat of adverse immigration action under the Deportation and Revocation Provisions if they engage in constitutionally protected speech based on the government's threats and enforcement of the challenged Provisions.

Case: 26-6900, 11/30/2026, DktEntry: 16.14, Page 270 of 300

**V. Plaintiff Jane Doe Fears Deportation Due to Her Pro-Palestinian Speech.**

135. Plaintiff Jane Doe is a noncitizen lawfully present in the United States pursuant to a lawful admission on an F-1 student visa.

136. Jane Doe is a former student at a United States university.

137. There is no relationship between Stanford Daily and Jane Doe.

138. Jane Doe has never been a student at Stanford University, never submitted to or published content with *The Stanford Daily*, and never affiliated with Stanford Daily.

139. Jane Doe was a member of the pro-Palestinian student group Students for Justice in Palestine (SJP) at her university.

140. Jane Doe has published pro-Palestinian/anti-Israel commentary online, including commentary accusing Israel of committing "genocide" and perpetuating "apartheid." She has also used the slogan, "from the river to the sea, Palestine will be free."

141. Jane Doe has publicly criticized American foreign policy, particularly its relationship with Israel.

142. Due to her advocacy, Jane Doe appeared in a profile on the Canary Mission website.

143. Canary Mission is an anonymously run website that publishes the personal information of students, professors, and organizations it deems "anti-Israel."

144. On July 9, 2025, during a trial in the United States District Court for the District of Massachusetts, Peter Hatch, a senior official in ICE's Homeland Security Investigations unit, testified that Derek Gordon, Deputy Special Agent in Charge of Homeland Security Investigations at DHS, asked Hatch to instruct Hatch's team to generate "reports" on individuals identified on Canary Mission's website. Trial Tr. vol. 2, 108–10, *Am. Ass'n of Univ. Professors v. Rubio*, No. 25-cv-10685 (D. Mass. July 9, 2025), https://perma.cc/PCL4-6YTQ.

145. The "reports" Mr. Hatch's team prepares are for the State Department, which uses them to make decisions regarding, among other things, "[v]isa revocations." *Id.* at 101.

146. Mr. Hatch testified that "most" of the names of student protestors that DHS asked ICE to investigate "came from" Canary Mission's website. *Id.* vol. 1, 44.

Case: 26-6900, 11/30/2026, DktEntry: 16.14, Page 271 of 300

147. Prior to their detentions and attempted deportations, Canary Mission published profiles of Mahmoud Khalil, Rümeysa Öztürk, and Mohsen Mahdawi.

148. In March 2025, Jane Doe read news articles about the detention and attempted deportation of noncitizens like Mahmoud Khalil and Rümeysa Öztürk for engaging in protected pro-Palestinian speech, including articles quoting government statements about the detention and deportation of these noncitizens. Consequently, fearing that Secretary Rubio will revoke her visa under the Revocation Provision or render her deportable under the Deportation Provision, Jane Doe has refrained from publishing and voicing her true opinions regarding Palestine and Israel and has deleted a social media account to guard against retaliation for past expression.

149. But for the threat of visa revocation under the Revocation Provision and deportation under the Deportation Provision, Jane Doe would resume publishing and voicing her true opinions regarding Palestine and Israel and would reactivate her social media account containing her past expression.

150. Jane Doe has personally read and is aware of government statements threatening visa revocation and deportation under the Revocation and Deportation Provisions for engaging in protected speech, including the government's statements referenced in this Complaint or substantially similar statements, and, based on those statements, fears adverse immigration action for engaging in protected speech.

151. Jane Doe is personally aware of the government's past enforcement of the Deportation and Revocation Provisions based on protected speech against pro-Palestinian individuals such as Mahmoud Khalil, Rümeysa Öztürk, and Mohsen Mahdawi.

152. Jane Doe is aware of the government's recent enforcement of the Deportation and Revocation Provisions against noncitizens who voiced criticism of Charlie Kirk.

153. Jane Doe is unaware of any government officials tasked with enforcing the Revocation and Deportation Provisions disavowing invoking the Provisions against protected speech.

154. Because of the government's threats to enforce the Revocation and Deportation Provisions based on protected speech, and its past enforcement of the Provisions based on protected speech, Jane Doe has self-censored, including decreasing or eliminating her expression supporting Palestinians, criticizing American foreign policy, or opposing the Israeli government.

155. Specifically, because of the government's threats and its past enforcement, Jane Doe no longer attends pro-Palestinian protests, no longer wears a keffiyeh to support the Palestinian cause, no longer engages in direct-action organizing supporting Palestinians, no longer holds up the Palestinian flag, no longer maintains her main social media account, and no longer posts pro-Palestinian content on her other social media accounts. The only public expression in which Jane Doe now engages to support the Palestinian cause is wearing watermelon earrings that are easily removable. (Watermelons share the same colors as the Palestinian flag, and pro-Palestinian speakers often use the symbol to support the Palestinian cause.) The government's threats to enforce the Revocation and Deportation Provisions based on protected speech, and its past enforcement of the Provisions based on protected speech, have chilled Jane Doe from engaging in every other form of public expression.

156. The chilling effect of the government's threats to enforce and its past enforcement of the Revocation and Deportation Provisions based on protected speech, and the threat of those Provisions' future enforcement, on Jane Doe has continued since she filed this lawsuit and will continue unless judicial relief is secured.

157. Based on the government's threats to enforce and its enforcement of the challenged Provisions, Jane Doe faces a credible and imminent threat of adverse immigration action under the Deportation and Revocation Provisions if she engages in constitutionally protected speech.

**VI. John Doe Fears Adverse Immigration Action for His Protected Speech.**

158. Plaintiff John Doe is a noncitizen lawfully present in the United States pursuant to a lawful admission on an F-1 student visa. John Doe traveled to the United States to study journalism, and a primary reason he chose the United States is its strong protection for freedom of speech and freedom of the press.

159. John Doe is a former student at a United States university.

160. There is no relationship between Stanford Daily and John Doe.

161. John Doe has never been a student at Stanford University, never submitted to or published content with *The Stanford Daily*, and never affiliated with Stanford Daily.

162. After the October 7, 2023, attack, John Doe attended pro-Palestinian protests and published pro-Palestinian/anti-Israel commentary online.

163. At protests, John Doe participated in chants including, "[f]rom the river to the sea, Palestine will be free," chants accusing Israel of committing "genocide," and chants calling Israel a "terrorist state."

164. After the Trump administration began targeting other lawfully present noncitizen students for deportation based on protected speech, the professor for whom John Doe served as a teaching assistant advised John Doe to reconsider engaging in protected advocacy related to Israel and Palestine due to potential danger to his immigration status.

165. In March 2025, John Doe read news articles about the detention and attempted deportation of noncitizens like Mahmoud Khalil and Badar Khan Suri for engaging in protected pro-Palestinian speech, including articles quoting government statements about the detention and deportation of these noncitizens. Consequently, fearing Secretary Rubio would revoke his visa under the Revocation Provision or render him deportable under the Deportation Provision, John Doe refrained from publishing his findings containing criticism of Israel's actions in Gaza, which John Doe views as a genocide backed by the United States' foreign policy.

166. But for the threat of visa revocation under the Revocation Provision and deportation under the Deportation Provision, John Doe would have published and voiced his true opinions regarding Palestine and Israel without delay or fear of arrest, detention, or deportation for his protected speech.

167. John Doe has resumed engaging in some protected pro-Palestinian/anti-Israel commentary, including accusing Israel of committing genocide, as well as commentary critical of American foreign policy towards Israel and Palestine. His continuing expression places him in

danger of visa revocation under the Revocation Provision and deportation under the Deportation Provision.

168. The government's threats to enforce and its past enforcement of the Revocation and Deportation Provisions based on protected speech have caused John Doe to alter and reduce his pro-Palestinian/anti-Israel protected expression because the threat of those Provisions' future enforcement.

169. For example, John Doe has made his X social media account, which contains pro-Palestinian/anti-Israel commentary, private.

170. Additionally, because of the Trump administration's tactics when pursuing noncitizens for protected speech, which include midnight raids, masked ICE agents, and detention thousands of miles from home, some members of John Doe's extended family who are noncitizens but lawfully reside in the United States fear associating with him and have substantially reduced their contact with him because they fear he will be targeted by the Trump administration because of his pro-Palestinian/anti-Israel commentary and advocacy.

171. Additionally, fearing adverse immigration consequences, John Doe avoids wearing "Palestinian Youth Movement" apparel including a sweatshirt with "Gaza, the Occupier's Graveyard" written in Arabic:



172. John Doe has personally read and is aware of government statements threatening visa revocation and deportation under the Revocation and Deportation Provisions for engaging in protected speech, including the government's statements referenced in this Complaint or substantially similar statements, and, based on those statements, fears adverse immigration action for engaging in protected speech.

173. John Doe is personally aware of the government's past enforcement of the Deportation and Revocation Provisions against pro-Palestinian individuals such as Mahmoud Khalil, Rümeysa Öztürk, Badar Khan Suri, and Mohsen Mahdawi.

174. John Doe is aware of the government's recent enforcement of the Deportation and Revocation Provisions against noncitizens who voiced criticism of Charlie Kirk.

175. John Doe is unaware of any government officials tasked with enforcing the Revocation and Deportation Provisions disavowing invoking the Provisions against protected speech.

176. Because of the government's threats to enforce the Revocation and Deportation Provisions based on protected speech, and its past enforcement of the Provisions based on protected speech, John Doe has self-censored, including decreasing his expression supporting Palestinians, criticizing American foreign policy, and opposing the Israeli government.

177. Based on the government's threats to enforce and its enforcement of the challenged Provisions, John Doe faces a credible and imminent threat of adverse immigration action under the Deportation and Revocation Provisions when he engages in constitutionally protected speech.

178. Because John Doe faces a credible and imminent threat of adverse immigration action under the Deportation and Revocation Provisions when he engages in constitutionally protected speech, he has reduced and limited his protected expression. But because he agrees with George Orwell that "[i]f liberty means anything at all, it means the right to tell people what they do not want to hear," he continues some of his constitutionally protected speech despite that threat.

## INJURIES TO PLAINTIFFS

179. Secretary Rubio and Secretary Noem violate Plaintiffs' First Amendment rights by enforcing the Deportation Provision and Revocation Provision based on protected expression, the threatened enforcement of which chills Plaintiffs and/or their lawfully present noncitizen members from engaging in protected expression like attending protests, using certain slogans, and publicly voicing their true views about American foreign policy, Israel, and Palestine.

180. The chill is amplified because Secretary Rubio and Secretary Noem's enforcement of the Deportation Provision and Revocation Provision has entailed ambush arrests by masked agents accompanied by prolonged detention in ICE holding facilities thousands of miles from detainees' homes.

181. Secretary Rubio and Secretary Noem have enforced the Deportation Provision and Revocation Provision based on protected expression and will continue to do so absent declaratory and injunctive relief prohibiting enforcement of these statutes based on protected expression.

182. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality op.)).

183. Plaintiffs have suffered and continue to suffer irreparable harm due to the Deportation Provision's and Revocation Provision's enforcements based on protected expression, which will continue absent declaratory and prospective injunctive relief.

184. Because Plaintiffs and their lawfully present noncitizen members have engaged and wish to continue engaging in expression which Secretary Rubio might consider anti-American, anti-Israel, or detrimental to American foreign policy, they face an ongoing and credible threat of continued enforcement of the Deportation Provision and Revocation Provision.

185. Secretary Rubio and Secretary Noem's ongoing threat to the protected expression of Plaintiffs and their members presents an actual controversy within this Court's jurisdiction.

## FIRST CLAIM

### First Amendment

Case: 26-6900, 11/30/2026, DktEntry: 16.14, (277 of 300)

**Deportation Provision**

**(Declaratory Relief)**

186. Plaintiffs reallege and incorporate by reference the preceding paragraphs as though fully set forth herein.

187. The First Amendment provides "Congress shall make no law … abridging the freedom of speech, or of the press; or of the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I.

188. America's First Amendment reflects "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

189. Political protests are an exercise of "basic constitutional rights in their most pristine and classic form." *Edwards v. South Carolina*, 372 U.S. 229, 235 (1963).

190. The "advocacy of a politically controversial viewpoint is the essence of First Amendment expression," and "no form of speech is entitled to greater constitutional protection." *McCullen v. Coakley*, 573 U.S. 464, 488–89 (2014) (cleaned up).

191. A free press "serves and was designed to serve as a powerful antidote to any abuses of power by government officials and as a constitutionally chosen means for keeping officials elected by the people responsible to all the people whom they were selected to serve." *Mills v. Alabama*, 384 U.S. 214, 219 (1966).

192. To that end, "[s]uppression of the right of the press to praise or criticize government agents and to clamor and contend for or against change … muzzles one of the very agencies the Framers of our Constitution thoughtfully and deliberately selected to improve our society and keep it free." *Id.*

193. A press/communication platform's own rights are infringed when its contributors are chilled. *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 121–23 (1991).

194. The Supreme Court has made clear that "freedom of speech and of press is accorded aliens residing in this country." *Wixon*, 326 U.S. at 148.

195. "It has long been recognized that resident aliens enjoy the protections of the First Amendment." *Price v. U.S. INS*, 962 F.2d 836, 841 (9th Cir. 1991).

196. The INA allows the Secretary of State to render deportable noncitizens "whose … activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States." 8 U.S.C. § 1227(a)(4)(C)(i).

197. That deportation authority is subject to "[t]he exceptions" to the Secretary of State's authority to exclude noncitizens from the United States on foreign policy grounds. *Id.* § 1227(a)(4)(C)(ii) (incorporating *id.* § 1182(a)(3)(C)(ii)–(iii)).

198. Those exceptions include that a noncitizen "shall not be excludable [for protected speech], unless the Secretary of State personally determines that the alien's admission would compromise a compelling United States foreign policy interest." *Id.* § 1182(a)(3)(C)(iii).

199. The Deportation Provision, therefore, allows the Secretary of State to render lawfully present noncitizens deportable for protected speech if he "personally determines" that the noncitizen's activities "compromise a compelling United States foreign policy interest." *Id.* §§ 1182(a)(3)(C)(iii), 1227(a)(4)(C)(i).

200. When the government determines that a noncitizen is no longer lawfully in the United States through operation of the Deportation Provision, immigration officers may obtain a warrant to arrest and detain the noncitizen pending completing of removal proceedings. *See id.* § 1226(a); 8 C.F.R. § 287.8(c).

201. Detention and/or deportation would deter a person of ordinary firmness from engaging in protected activity.

202. As a result of the Deportation Provision, lawfully present noncitizens must either forego protected expression or risk detention and deportation.

203. As applied to protected speech, the Deportation Provision is facially viewpoint based and content based because it applies solely to speech the government believes adversely affects its foreign policy.

204. The government "may not discriminate against speech based on the ideas or opinions it conveys." *Iancu v. Brunetti*, 588 U.S. 388, 393 (2019).

205. "Viewpoint discrimination is thus an egregious form of content discrimination" because "[t]he government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

206. The Deportation Provision is facially viewpoint discriminatory as applied to protected speech for two reasons. First, it affords the Secretary of State unbounded discretion to render lawfully present noncitizens deportable on the basis of protected speech. Second, opinions the Secretary deems in his sole discretion adverse to America's foreign policy subject noncitizens to potential deportation, while those he views as aligning with or praising American foreign policy do not.

207. Secretary Rubio and the Trump administration's enforcement of the Deportation Provision demonstrates the Deportation Provision's viewpoint-discriminatory nature as applied to protected speech.

208. For example, the basis for Secretary Rubio's determination that Mr. Khalil's protected expression regarding Israel and Palestine triggered the Deportation Provision is that Secretary Rubio believed Mr. Khalil's opinions and expression "undermine[d] U.S. policy to combat anti-Semitism around the world and in the United States."

209. The basis for Secretary Rubio's determination that Mr. Mahdawi's protected speech regarding Israel and Palestine triggered the Deportation Provision is that Secretary Rubio believed Mr. Mahdawi's opinions and expression undermined the government's position regarding the Middle East peace process.

Case: 26-6900, 11/30/2026, DktEntry: 16.14, Page 280 of 300

210. Laws discriminating based on viewpoint are per se unconstitutional. *See Iancu*, 588 U.S. at 399 ("The Court's finding of viewpoint bias ended the matter.")

211. In the alternative, viewpoint-discriminatory laws are subject to strict scrutiny.

212. The First Amendment also generally forbids government actions that discriminate based on the content of the speaker's expression. "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* Content-discriminatory laws are subject to strict scrutiny. *Id.* at 163–64.

213. The Deportation Provision is not narrowly tailored to achieve a compelling government interest with respect to deportations based on protected speech.

214. Restricting speech to tilt public debate and opinion in the government's preferred direction "is not [a] valid, let alone substantial" government interest. *Moody v. NetChoice, LLC*, 603 U.S. 707, 740 (2024).

215. Nor is the Deportation Provision's allowance for deportation based on protected speech narrowly tailored. It vests the Secretary of State with unbounded, unbridled, and unconstrained discretion to deem any noncitizen's protected speech a foreign policy threat and to banish the speaker from the United States on that basis.

216. The Deportation Provision's allowance for deportation based on protected speech is not the least restrictive means of advancing the government's foreign policy objectives because, at minimum, the government can counter the noncitizen's speech with its own speech.

217. The "First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech." *Lozman v. Riviera Beach*, 585 U.S. 87, 90 (2018).

218. By allowing the Secretary of State to render lawfully present noncitizens deportable for protected speech about America's foreign policy, the Deportation Provision also blatantly

discriminates based on viewpoint by codifying the ability of the government to take adverse action against protected speech by targeting its foreign policy critics with deportation.

219. Deporting someone for protected speech would deter and is deterring people of ordinary firmness from engaging in protected speech.

220. Plaintiffs are entitled to a declaration under 28 U.S.C. § 2201 that the Deportation Provision is viewpoint and content based when applied to protected speech and that the First Amendment prohibits deporting Plaintiffs and/or their noncitizen members under it for engaging in protected speech.

**SECOND CLAIM**

**First Amendment**

**Deportation Provision**

**(Injunctive Relief)**

221. Plaintiffs re-allege and re-incorporate the preceding paragraphs as though fully set forth herein.

222. The Deportation Provision violates the First Amendment for the reasons stated in Claim I.

223. Plaintiffs are entitled to injunctive relief preventing Secretary Rubio from rendering Plaintiffs and/or their noncitizen members deportable under the Deportation Provision for engaging in protected speech. *See Bell v. Hood*, 327 U.S. 678, 684 (1946) ("[I]t is established practice for this Court to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution."); *see also Ex parte Young*, 209 U.S. 123 (1908).

224. Plaintiffs are entitled to injunctive relief preventing Secretary Noem from initiating deportation proceedings against or otherwise invoking the Deportation Provision against Plaintiffs and/or their noncitizen members based on protected speech. *See Bell*, 327 U.S. at 684; *Ex parte Young*, 209 U.S. 123.

225. Plaintiffs have no adequate legal, administrative, or other remedy by which to prevent or minimize the continuing irreparable harm to their First Amendment rights. Without

injunctive relief against the Deportation Provision as applied to protected speech, Secretary Rubio's suppression and chill of Plaintiffs' First Amendment rights will continue, and Plaintiffs will suffer per se irreparable harm indefinitely.

226. The balance of equities and the public interest favor permanent injunctive relief because "it is always in the public interest to prevent the violation of a party's constitutional rights." *X Corp. v. Bonta*, 116 F.4th 888, 904 (9th Cir. 2024) (internal quotation marks omitted).

227. Plaintiffs acknowledge that, under 8 U.S.C. § 1252(f)(1), only the Supreme Court has jurisdiction to "enjoin or restrain the operation" of the Deportation Provision. Plaintiffs therefore plead the request for injunctive relief so it is contained in the operative pleading and may be raised to the Supreme Court in later proceedings.

**THIRD CLAIM**

**Fifth Amendment (Vagueness)**

**Deportation Provision**

**(Declaratory Relief)**

228. Plaintiffs re-allege and re-incorporate the preceding paragraphs as though fully set forth herein.

229. The Due Process Clause of the Fifth Amendment to the U.S. Constitution prohibits laws, including immigration statutes, that are impermissibly vague. *Sessions*, 584 U.S. at 174–75 (majority op.).

230. A law is unconstitutionally vague when it "fails to provide a person of ordinary intelligence fair notice of what is prohibited" or "is so standardless that it authorizes or encourages seriously discriminatory enforcement." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)).

231. Because deportation is a "drastic measure, often amounting to lifelong banishment or exile," the "most exacting vagueness standard" applicable to criminal laws also applies to immigration laws. *Sessions*, 584 U.S. at 156–57 (plurality op.) (cleaned up).

232. Moreover, when a regulation "is capable of reaching expression sheltered by the First Amendment," the vagueness doctrine "demands a greater degree of specificity than in other contexts." *Smith v. Goguen*, 415 U.S. 566, 573 (1974).

233. The Deportation Provision is vague on its face as applied to protected speech because it provides no guidance to noncitizens regarding when a person's expression would "compromise a compelling United States foreign policy interest." 8 U.S.C. § 1182(a)(3)(C)(iii).

234. The Deportation Provision is also vague on its face as applied to protected speech because it provides standardless, limitless discretion to government officials charged with its enforcement regarding when a person's expression would "compromise a compelling United States foreign policy interest."

235. The Deportation Provision is also vague on its face as applied to protected speech because it authorizes arbitrary and discriminatory enforcement, granting the Secretary of State unfettered and unreviewable discretion to arbitrarily enforce the Deportation Provision based on his own subjective determination of what will compromise or adversely affect foreign policy.

236. The Deportation Provision is also vague on its face as applied to protected speech because the United States' foreign policy interests are vast, ever-changing, and often kept confidential from the public. *See Massieu v. Reno*, 915 F. Supp. 681, 700–03 (D.N.J.) (concluding 8 U.S.C. § 1227(a)(4)(C)(i) is void for vagueness), *rev'd on other grounds*, 91 F.3d 416 (3d Cir. 1996).

237. Plaintiffs are entitled to a declaration under 28 U.S.C. § 2201 that the Deportation Provision is void for vagueness under the Fifth Amendment as applied to deportations based on protected speech and that the Fifth Amendment prohibits deporting Plaintiffs and/or their noncitizen members under the Deportation Provision for engaging in protected speech.

**FOURTH CLAIM**

**Fifth Amendment (Vagueness)**

**Deportation Provision**

**(Injunctive Relief)**

238. Plaintiffs re-allege and re-incorporate the preceding paragraphs as though fully set forth herein.

239. The Deportation Provision is unconstitutionally void for vagueness under the Fifth Amendment as applied to deportations based on protected speech for the reasons stated in Claim III.

240. Plaintiffs are entitled to injunctive relief preventing Secretary Rubio from rendering Plaintiffs and/or their noncitizen members deportable under the Deportation Provision based on protected speech. *See Bell*, 327 U.S. at 684; *Ex parte Young*, 209 U.S. 123.

241. Plaintiffs are entitled to injunctive relief preventing Secretary Noem from initiating deportation proceedings against or otherwise invoking the Deportation Provision against Plaintiffs and/or their noncitizen members based on protected speech. *See Bell*, 327 U.S. at 684; *Ex parte Young*, 209 U.S. 123.

242. Plaintiffs have no adequate legal, administrative, or other remedy by which to prevent or minimize the continuing irreparable harm to their First and Fifth Amendment rights. Without injunctive relief against the Deportation Provision as applied to protected speech, Secretary Rubio's suppression and chill of Plaintiffs' First Amendment rights will continue, and Plaintiffs will suffer per se irreparable harm indefinitely.

243. The balance of equities and the public interest favor permanent injunctive relief because "it is always in the public interest to prevent the violation of a party's constitutional rights." *X Corp.*, 116 F.4th at 904 (internal quotation marks omitted).

244. Plaintiffs acknowledge that, under 8 U.S.C. § 1252(f)(1), only the Supreme Court has jurisdiction to "enjoin or restrain the operation" of the Deportation Provision. Plaintiffs therefore plead the request for injunctive relief so it is contained in the operative pleading and may be raised to the Supreme Court in later proceedings.

**FIFTH CLAIM**

**First Amendment**

**Revocation Provision**

**(Declaratory Relief)**

245. Plaintiffs re-allege and re-incorporate the preceding paragraphs as though fully set forth herein.

246. Subjecting noncitizens to adverse immigration action for protected speech violates the First Amendment for the reasons stated in Claim I.

247. The Revocation Provision, 8 U.S.C. § 1201(i), provides that "[a]fter the issuance of a visa or other documentation to any alien, the … Secretary of State may at any time, in his discretion, revoke such visa or other documentation."

248. The Revocation Provision allows the Secretary of State to revoke a "visa or other documentation" based on protected speech.

249. For example, Secretary Rubio used the Revocation Provision to revoke Rümeysa Öztürk's visa based on her protected speech of coauthoring an article for *The Tufts Daily* newspaper, and he committed to revoking visas of other lawfully present noncitizens in the future based on protected speech.

250. The "First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech." *Lozman*, 585 U.S. at 90.

251. Revoking the visa or other documentation of a noncitizen would deter and is deterring people of ordinary firmness from engaging in protected speech.

252. Revocations of visas and other documents for protected speech necessarily rely on viewpoint or content discrimination, because the Secretary of State is singling out particular expression for disfavored treatment, making the Revocation Provision subject to strict scrutiny as applied to protected speech.

Case: 26-6900, 11/20/2026, DktEntry: 16.14, Page 286 of 300

253. Restricting speech to tilt public debate and opinion about American foreign policy and silence views contrary to the current government's foreign policy "is not [a] valid, let alone substantial" government interest. *Moody*, 603 U.S at 740.

254. The Revocation Provision, as applied to protected speech, is not narrowly tailored because it vests the Secretary of State with unbounded, unbridled, and unconstrained discretion to revoke visas and other documentation based on protected speech for whatever reason the Secretary personally deems sufficient.

255. The Revocation Provision, as applied to protected speech, is not the least restrictive means of advancing the government's objectives because, at minimum, the government can counter the noncitizen's speech with its own speech.

256. Plaintiffs are entitled to a declaration under 28 U.S.C. § 2201 that the First Amendment prohibits revoking the visa or other documentation of Plaintiffs or their noncitizen members under the Revocation Provision based on protected speech.

**SIXTH CLAIM**

**First Amendment**

**Revocation Provision**

**(Injunctive Relief)**

257. Plaintiffs re-allege and re-incorporate the preceding paragraphs as though fully set forth herein.

258. Revoking noncitizens' visas or other documentation based on protected speech violates the First Amendment for the reasons stated in Claim V.

259. Plaintiffs are entitled to injunctive relief preventing Secretary Rubio from revoking the visas or other documentation of Plaintiffs and/or their noncitizen members under the Revocation Provision based on protected speech. *See Bell*, 327 U.S. at 684; *Ex parte Young*, 209 U.S. 123.

260. Plaintiffs are entitled to injunctive relief preventing Secretary Noem from initiating deportation proceedings against Plaintiffs and/or their noncitizen members based on visas revoked

under the Revocation Provision for engaging in protected speech. *See Bell*, 327 U.S. at 684; *Ex parte Young*, 209 U.S. 123.

261. Plaintiffs have no adequate legal, administrative, or other remedy by which to prevent or minimize the continuing irreparable harm to their First Amendment rights. Without injunctive relief against the Revocation Provision as applied to protected speech, Secretary Rubio's suppression and chill of Plaintiffs' First Amendment rights will continue, and Plaintiffs will suffer per se irreparable harm indefinitely.

262. The balance of equities and the public interest favor permanent injunctive relief because "it is always in the public interest to prevent the violation of a party's constitutional rights." *X Corp.*, 116 F.4th at 904 (internal quotation marks omitted).

263. The Revocation Provision is not subject to Section 1252(f)'s bar on injunctive relief because it falls outside "the provisions of part IV of this subchapter [8 U.S.C. §§ 1221–1232]." 8 U.S.C. 1252(f)(1).

**SEVENTH CLAIM**

**Fifth Amendment (Vagueness)**

**Revocation Provision**

**(Declaratory Relief)**

264. Plaintiffs re-allege and re-incorporate the preceding paragraphs as though fully set forth herein.

265. For the reasons stated in Claim III, the Fifth Amendment prohibits vague laws that fail to give the public notice of what is required or lack standards to prevent arbitrary or discriminatory enforcement.

266. The Revocation Provision is unconstitutionally vague as applied to protected speech because it provides noncitizens no notice of what protected expression could trigger the revocation of their visa or other documentation.

267. The Revocation Provision is also vague on its face as applied to protected speech, because it provides limitless discretion to government officials charged with its enforcement

Case: 26-6900, 11/30/2026, DktEntry: 16.14, Page 288 of 300

regarding when a noncitizen's protected speech provides a basis revoke a visa or other documentation.

268. The Revocation Provision is also unconstitutionally vague as applied to protected speech because it provides no guidance to government officials charged with its enforcement regarding when a noncitizen's expression should trigger revocation of a visa or other documentation.

269. The Revocation Provision is also unconstitutionally vague as applied to protected speech because it authorizes arbitrary and discriminatory enforcement by granting the Secretary of State and subordinate officials unfettered and unreviewable authority to revoke a visa "at any time, in his discretion." 8 U.S.C. § 1201(i).

270. Plaintiffs are entitled to a declaration under 28 U.S.C. § 2201 that the Fifth Amendment prohibits revoking the visa or other documentation of Plaintiffs or their noncitizen members under the Revocation Provision based on protected speech.

**EIGHTH CLAIM**

**Fifth Amendment**

**Discretionary Revocation Provision**

**(Injunctive Relief)**

271. Plaintiffs re-allege and re-incorporate the preceding paragraphs as though fully set forth herein.

272. The Revocation Provision is unconstitutionally void for vagueness under the Fifth Amendment as applied to revocations of visas or other documentation based on protected speech for the reasons stated in Claim VII.

273. Plaintiffs are entitled to injunctive relief preventing Secretary Rubio from revoking visas or other documentation of Plaintiffs and/or their noncitizen members under the Revocation Provision based on protected speech. *See Bell*, 327 U.S. at 684; *Ex parte Young*, 209 U.S. 123.

274. Plaintiffs are entitled to injunctive relief preventing Secretary Noem from initiating deportation proceedings against Plaintiffs and/or their noncitizen members based on visas revoked

under the Revocation Provision for engaging in protected speech. *See Bell*, 327 U.S. at 684; *Ex parte Young*, 209 U.S. 123.

275. Plaintiffs have no adequate legal, administrative, or other remedy by which to prevent or minimize the continuing irreparable harm to their First Amendment rights. Without injunctive relief against the Revocation Provision as applied to protected speech, Secretary Rubio's suppression and chill of Plaintiffs' First Amendment rights will continue, and Plaintiffs will suffer per se irreparable harm indefinitely.

276. The balance of equities and the public interest favor permanent injunctive relief because "it is always in the public interest to prevent the violation of a party's constitutional rights." *X Corp.*, 116 F.4th at 904 (internal quotation marks omitted).

277. The Revocation Provision is not subject to Section 1252(f)'s bar on injunctive relief because it falls outside "the provisions of part IV of this subchapter [8 U.S.C. §§ 1221–1232]." 8 U.S.C. 1252(f)(1).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment against Defendants in their official capacities and issue the following relief:

A. Declare that the First Amendment prohibits deporting Plaintiffs and/or their noncitizen members under the Deportation Provision[3] for engaging in protected speech;[4]

B. Declare that, as to Plaintiffs and/or their noncitizen members, the Deportation Provision is void for vagueness under the Fifth Amendment as applied to deportations based on protected speech;

---

[3] As used in the Prayer for Relief, "Deportation Provision" has the same meaning as in Paragraph Seven above.

[4] To be clear, Plaintiffs' lawsuit does not challenge the Secretary's separate exclusion authority under 8 U.S.C. § 1182(a)(3)(C)(iii). Plaintiffs' challenge is solely to 8 U.S.C. § 1227(a)(4)(C)(i) as applied to the initiation of deportation proceedings based on protected speech.

C. A preliminary and permanent injunction prohibiting Secretary Rubio from rendering Plaintiffs and/or their noncitizen members deportable under the Deportation Provision based on protected speech;[5]

D. A preliminary and permanent injunction prohibiting Secretary Noem from initiating deportation proceedings or otherwise invoking the Deportation Provision against Plaintiffs and/or their noncitizen members based on protected speech;

E. Declare that the First Amendment prohibits revoking the visas or other documentation of Plaintiffs and/or their noncitizen members under the Revocation Provision[6] based on protected speech;

F. Declare that as to Plaintiffs and/or their noncitizen members, the Revocation Provision is void for vagueness under the Fifth Amendment as applied to revocations of visas or other documentation based on protected speech;

G. A preliminary and permanent injunction prohibiting Secretary Rubio from revoking the visas or other documentation of Plaintiffs and/or their noncitizens members under the Revocation Provision for engaging in protected speech;[7]

H. A preliminary and permanent injunction prohibiting Secretary Noem from initiating deportation proceedings against Plaintiffs and/or their noncitizen members based on visas revoked under the Revocation Provision for engaging in protected speech;

[5] Plaintiffs acknowledge that, under 8 U.S.C. § 1252(f), only the Supreme Court has jurisdiction to "enjoin or restrain the operation" of the Deportation Provision. Plaintiffs therefore plead the request for injunctive relief so it is contained in the operative pleading and may be raised to the Supreme Court in later proceedings. Section 1252(f) does not, however, constrain this Court's ability to enjoin the Revocation Provision or render declaratory relief regarding the constitutionality of the Deportation Provision as to Plaintiffs and their noncitizen members. *See Biden v. Texas*, 597 U.S. 785, 800–01 (2022).

[6] As used in the Prayer for Relief, "Revocation Provision" has the same meaning as in Paragraph Seven above.

[7] The Revocation Provision is not subject to Section 1252(f)'s bar on injunctive relief because it falls outside "the provisions of part IV of this subchapter [8 U.S.C. §§ 1221–1232]." 8 U.S.C. 1252(f)(1).

I. Award reasonable attorneys' fees and costs under 28 U.S.C. § 2412(b) and any other applicable law; and

J. Award such other relief as the Court may deem just and proper.

Dated: December 4, 2025

Respectfully Submitted,

/s/ *Marc Van Der Hout*
Marc Van Der Hout (Cal. Bar #80778)
Johnny Sinodis (Cal. Bar #290402)
Oona Cahill (Cal. Bar #354525)
**VAN DER HOUT LLP**
360 Post Street, Suite 800
San Francisco, CA 94108
Telephone: (415) 981-3000
Facsimile: (415) 981-3003
Email: ndca@vblaw.com

/s/ *Conor T. Fitzpatrick*
Conor T. Fitzpatrick (Mich. Bar #P78981)*
Daniel A. Zahn (D.C. Bar #90027403)*
**FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION (FIRE)**
700 Pennsylvania Avenue SE, Suite 340
Washington, DC 20003
Telephone: (215) 717-3473
Email: conor.fitzpatrick@thefire.org
Email: daniel.zahn@thefire.org

Colin P. McDonell (Cal. Bar #289099)
**FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION (FIRE)**
510 Walnut Street, Suite 900
Philadelphia, PA 19106
Telephone: (215) 717-3473
Email: colin.mcdonell@thefire.org

*Admitted pro hac vice

*Counsel for Plaintiffs*

## VERIFICATION OF GRETA REICH

Under 28 U.S.C. § 1746, I, Greta Reich, declare as follows:

1. I am the president of The Stanford Daily Publishing Corporation ("Stanford Daily") and editor-in-chief of *The Stanford Daily*.

2. I am an officer of Stanford Daily and am authorized by the corporation to act on its behalf.

3. I have read the foregoing Verified Complaint for Declaratory and Injunctive Relief.

4. I have personal knowledge of the factual allegations in paragraphs 15–16 and 81–134 of the Verified Complaint and know them to be true.

5. I verify under penalty of perjury that the foregoing is true and correct.

Executed on December 4, 2025.

[signature]

Greta Reich

## VERIFICATION OF JANE DOE

Under 28 U.S.C. § 1746, I, Jane Doe, declare as follows:

1. I am a Plaintiff in the present case.

2. I have read the foregoing Verified Complaint for Declaratory and Injunctive Relief.

3. I have personal knowledge of the factual allegations in paragraphs 17 (as to the allegations concerning my immigration status, my speech, and the impact of the challenged provisions on my speech), 135–142, and 148–157 of the Verified Complaint and know them to be true.

4. I verify under penalty of perjury that the foregoing is true and correct.

Executed on December 4, 2025.

Jane Doe

## VERIFICATION OF JOHN DOE

Under 28 U.S.C. § 1746, I, John Doe, declare as follows:

1. I am a Plaintiff in the present case.

2. I have read the foregoing Verified Complaint for Declaratory and Injunctive Relief.

3. I have personal knowledge of the factual allegations in paragraphs 18 and 158–178 of the Verified Complaint and know them to be true.

4. I verify under penalty of perjury that the foregoing is true and correct.

Executed on December 4, 2025.

John Doe

John Doe

Marc Van Der Hout (Cal. Bar #80778)
Johnny Sinodis (Cal. Bar #290402)
Oona Cahill (Cal. Bar #354525)
**VAN DER HOUT LLP**
360 Post Street, Suite 800
San Francisco, CA 94108
Telephone: (415) 981-3000
Facsimile: (415) 981-3003
Email: ndca@vblaw.com

Conor T. Fitzpatrick (Mich. Bar #P78981)*
Daniel A. Zahn (D.C. Bar #90027403)*
**FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION (FIRE)**
700 Pennsylvania Avenue SE, Suite 340
Washington, DC 20003
Telephone: (215) 717-3473
Email: conor.fitzpatrick@thefire.org
Email: daniel.zahn@thefire.org

Colin P. McDonell (Cal. Bar #289099)
**FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION (FIRE)**
510 Walnut Street, Suite 900
Philadelphia, PA 19106
Telephone: (215) 717-3473
Email: colin.mcdonell@thefire.org

*~~Pro~~Admitted pro hac vice ~~application forthcoming~~

*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

THE STANFORD DAILY PUBLISHING CORPORATION, JANE DOE, and JOHN DOE,

*Plaintiffs*,

v.

MARCO RUBIO, in his official capacity as Secretary of State, and

KRISTI NOEM, in her official capacity as Secretary of Homeland Security,

*Defendants*.

Case No. 5:25-cv-06618

**VERIFIED AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

13-ER 3669

"We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty, and the pursuit of Happiness."

## INTRODUCTION

1. In the United States of America, no one should fear a midnight knock on the door for voicing the wrong opinion. That is because America's founding principle, core to who and what we are as a Nation, is that liberty comes not from the benevolent hand of a king, but is an inherent right of every man, woman, and child. American liberty enshrines in the First Amendment the "inalienable human rights" to "think as you will and to speak as you think." *303 Creative LLC v. Elenis*, 600 U.S. 570, 584 (2023) (internal quotation marks omitted).

2. But Secretary of State Marco Rubio and the Trump administration are trying to turn the inalienable human right of free speech into a privilege contingent upon the whims of a federal bureaucrat, triggering deportation proceedings against noncitizens residing lawfully in this country for their protected political speech regarding American and Israeli foreign policy. The Secretary of State and the President claim to possess unreviewable statutory authority to deport any lawfully present noncitizen for speech the government deems anti-American or anti-Israel.

3. They are wrong. The Federalists tried the same gambit 227 years ago with the Alien Friends Act, which allowed President Adams to deport any noncitizen he deemed dangerous to "peace and safety." An Act Concerning Aliens, ch. 58, § 1, 1 Stat. 570, 571 (1789) (expired Mar. 3, 1801). It was "one of the most notorious laws in our country's history," "widely condemned as unconstitutional," and "may have cost the Federalist Party its existence." *Sessions v. Dimaya*, 584 U.S. 148, 185 (2018) (Gorsuch, J., concurring in part and in judgment).

4. 225 years after the Alien Friends Act expired, the danger of nighttime raids on noncitizens for perceived thoughtcrime is reality once more. Secretary Rubio and the Trump administration's war against noncitizens' freedom of speech is intended to send an unmistakable message: Watch what you say, or you could be next.

5. Message received. At Plaintiff Stanford Daily, the independent, student-run newspaper at Stanford University, writers present on student visas are declining assignments related

Case: 26-6906, 11/20/2026, DktEntry: 16.14, Page 297 of 300

to the conflict in the Middle East, worried that even reporting on the conflict will endanger their lawful immigration status. And Plaintiffs Jane Doe and John Doe, lawfully present noncitizens with no criminal history, have likewise self-censored because of their rational concern about the ongoing danger of deportation for expression Secretary Rubio deems anti-American or anti-Israel.

6. This pall of fear is incompatible with American liberty. Our First Amendment stands as a bulwark against the government infringing the inalienable human right to think and speak for yourself. That is why the Supreme Court held over 80 years ago that "[f]reedom of speech and of press is accorded aliens residing in this country." *Bridges v. Wixon*, 326 U.S. 135, 148 (1945). Our First Amendment does not "acknowledge[] any distinction between citizens and resident aliens." *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 n.5 (1953) (internal quotation marks omitted).

7. Secretary Rubio and the administration rely on two provisions of the Immigration and Nationality Act ("INA") for their supposed power to censor lawfully present noncitizens. The first allows the Secretary of State to render a noncitizen deportable if he "personally determines" their *lawful* "beliefs, statements, or associations" "compromise a compelling United States foreign policy interest." 8 U.S.C. §§ 1182(a)(3)(C)(iii), 1227(a)(4)(C)(i) (the "Deportation Provision"). The second allows the Secretary to "at any time, in his discretion, revoke" a "visa or other documentation." *Id.* § 1201(i) (the "Revocation Provision").

8. Both provisions are unconstitutional as applied to protected speech. The First Amendment cements America's promise that the government may not subject a speaker to disfavored treatment because those in power do not like his or her message. And when a federal statute collides with First Amendment rights, the Constitution prevails. U.S. Const. amend. I ("Congress shall make no law … abridging the freedom of speech …."); *see also, e.g.*, *United States v. Robel*, 389 U.S. 258, 268 n.20 (1967) (rejecting "balancing" First Amendment rights against "interests of national security").

9. Secretary Rubio and the Trump administration claim (as all censors do) that this time is different, that the supposed repulsiveness of anti-American and anti-Israel views mean the government should get a free pass for censorship. But "[i]f there is a bedrock principle underlying

the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989) (holding the First Amendment protects burning the American flag in protest). Plaintiffs, who are affected by this censorship, bring this case to restore freedom of speech in the United States.

## JURISDICTION AND VENUE

10. This action arises under the First and Fifth Amendments to the United States Constitution.

11. The Court has jurisdiction under 28 U.S.C. § 1331 and the First and Fifth Amendments to the U.S. Constitution.

12. The Court has authority to issue the requested relief under the Declaratory Relief Act at 28 U.S.C. §§ 2201–2202, Rules 57 and 65 of the Federal Rules of Civil Procedure, and the Court's inherent equitable powers. The Court has authority to award costs and attorneys' fees under 28 U.S.C. § 2412.

13. Venue in this action against officers and employees of the United States is proper in this district under 28 U.S.C. § 1391(e)(1)(B) because a substantial part of the events or omissions giving rise to these claims occurred in this district and additionally under 28 U.S.C. § 1391(e)(1)(C) because Plaintiff Stanford Daily resides in this district.

## DIVISION

14. This action should be assigned to the San Jose Division because a substantial part of the events giving rise to these claims occurred in the county of Santa Clara, where Plaintiff Stanford Daily resides. Civil L.R. 3-2(c), (e).

## THE PARTIES

***Plaintiffs***

15. Plaintiff Stanford Daily Publishing Corporation ("Stanford Daily") is a California nonprofit corporation based in Stanford, California. Its primary holding is *The Stanford Daily*, which is the independent, student-run newspaper of Stanford University.

16. *The Stanford Daily* covers news related to Stanford University, publishing short- and long-form articles, along with editorials. ~~Since the October 7, 2023, attack~~For decades, *The Stanford Daily* has included coverage of student opinions and campus protests related to the conflict ~~in Gaza.~~between Israel and Palestine. Its coverage has increased considerably since the October 7, 2023, attack. Since March 2025, fearing Secretary Rubio will revoke their visas under the Revocation Provision or render them deportable under the Deportation Provision, many of the paper's noncitizen writers who are lawfully present in the United States have self-censored by declining to cover pro-Palestinian student protests at Stanford, refraining from covering topics related to the conflict in Gaza, and seeking removal of their previous articles about it.

17. Plaintiff Jane Doe[1] is a noncitizen lawfully present in the United States~~ in valid nonimmigrant status~~, having entered lawfully pursuant to an F-1 student visa. Jane Doe has published pro-Palestinian/anti-Israel commentary online. Jane Doe has not been accused of violating any university rules nor has she been charged with or convicted of any crime. Yet she is listed on the Canary Mission website, which compiles profiles on individuals the organization views as having "anti-Israel" opinions. A Trump administration official testified that "most of the names" of individuals targeted for deportation based on pro-Palestinian advocacy come from Canary Mission. Since March 2025, fearing Secretary Rubio will revoke her visa under the Revocation Provision or render her deportable under the Deportation Provision, Jane Doe has refrained from publishing and voicing her true opinions regarding Palestine and Israel.

18. Plaintiff John Doe is a noncitizen lawfully present in the United States in valid nonimmigrant status, having entered lawfully pursuant to an F-1 student visa. After the October 7, 2023, attack, John Doe peacefully attended pro-Palestinian academic discussions at his university and protests at his university and elsewhere~~ and published~~. John Doe composed academic papers

[1] Jane Doe and John Doe are pseudonyms that two lawfully present noncitizens plaintiffs are using because they fear government retaliation for their protected expression. ~~The Doe Plaintiffs are contemporaneously filing a Motion to Proceed Pseudonymously.~~The Court granted the Doe Plaintiffs' unopposed motion to proceed pseudonymously and reserved the right to revisit the use of pseudonyms at a later stage of the proceedings if circumstances change. Dkt. No. 51.

related to Israel and Palestine and shared pro-Palestinian/anti-Israel (which John Doe considers "anti-genocide") commentary online. John Doe has not been accused of violating any university rules nor has he been charged with or convicted of any crime. Beginning in March 2025 and continuing into April 2025, John Doe feared that Secretary Rubio would revoke his visa under the Revocation Provision or render him deportable under the Deportation Provision based on his published works and pro-Palestinian stance. John Doe therefore refrained, for example, from publishing ~~a~~ findings from his study related to Israel's actions in Gaza. He has since ~~resumed his~~engaged in journalism about Israel and Palestine, including publishing those findings, and engaged in pro-Palestinian advocacy, ~~placing~~all of which places him at risk of visa revocation and deportation.

***Defendants***

19. Defendant Marco Rubio is the Secretary of State and has authority over the operations of the State Department. In that capacity and through his agents, Defendant Rubio has broad authority over the operation and enforcement of the immigration laws. Relevant here, the Revocation Provision provides Secretary Rubio unilateral discretion to "revoke" "visa[s] or other documentation," and the Deportation Provision provides Secretary Rubio unilateral discretion to render noncitizens deportable for protected speech if he "personally determines" ~~the~~a noncitizen's speech "compromise[s] a compelling United States foreign policy interest." Plaintiffs sue Secretary Rubio in his official capacity.

20. Defendant Kristi Noem is the Secretary of Homeland Security and has ultimate authority over the Department of Homeland Security ("DHS"), which includes various component agencies including U.S. Immigration Customs and Enforcement ("ICE"). In that capacity and through her agents, Defendant Noem has broad authority over the operation and enforcement of the immigration laws, including authority to initiate removal proceedings in immigration court and arrest and detain noncitizens while removal proceedings are pending, and therefore leads a mechanism by which Secretary Rubio's revocation and deportation proclamations are executed. Plaintiffs sue Secretary Noem in her official capacity.