**No. 26-6906**

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

**STANFORD PUBLISHING CORPORATION, *et al.*,**

*Plaintiffs-Appellees,*

**v.**

**MARCO RUBIO, *et al.*,**

*Defendants-Appellants.*

**Appeal from a Judgment Issued by the U.S. District Court for the Northern District of California (Civil Action No. 5:25-cv-06618-NW)**

# DEFENDANTS-APPELLANTS' EXCERPTS OF RECORD VOLUME 14 of 15

**JONATHAN D. GUYNN**
**Acting Assistant Attorney General**
**Civil Division**

**DREW C. ENSIGN**
**Deputy Assistant Attorney General**

**AUGUST E. FLENTJE**
**Special Counsel for Immigration Litigation**

**SAMUEL P. GO**
**Assistant Director**

**JAMES A. HURLEY**
**Trial Attorney**
**Office of Immigration Litigation**
**U.S. Department of Justice Civil Division**
**P.O. Box 878, Ben Franklin Station**
**Washington, D.C. 20044**
**T: (202) 305-1889**
**F: (202) 305-2509**
**james.hurley@usdoj.gov**

**JAIME DURR**
**DOMINIC WEISS**
**Trial Attorneys**

**Date: November 20, 2026**

**Attorneys for Respondent**

## FACTUAL ALLEGATIONS

### I. The October 7 Attacks and Ensuing Protests and Other Speech

21. On October 7, 2023, Hamas and other Palestinian militant groups launched a coordinated attack in southern Israel, leading Israel to launch a counterattack and ground invasion of Gaza.

22. At American universities, some students and faculty viewed Israel's response as disproportionate. Planned and spontaneous protests erupted across the country, variously calling for a ceasefire, increased humanitarian aid to Palestinians, and university divestment of financial portfolios from Israel.

23. Some protests featured calls for a "free Palestine" and included chants such as "from the river to the sea, Palestine will be free" and "intifada revolution."

24. Other events featured pro-Palestinian advocates handing out flyers.

25. Some protesters engaged in violence, property damage, and blockades of pro-Israel students attending classes. Many protests, however, remained peaceful.

26. Apart from protests, others on and off campus voiced their viewpoints on the conflict through social media, in news interviews and editorials, and in other forums.

### II. During the 2024 Campaign and After the Election, Trump Makes Clear His Administration Will Target Noncitizens Based on Speech.

27. President Donald J. Trump was the Republican Party's 2024 nominee for President of the United States.

28. The 2024 platform of the Republican Party expressed support for "revoking Visas of Foreign Nationals who support terrorism and jihadism."

29. Mr. Trump's campaign website linked to the Republican Party platform.

30. Mr. Trump's campaign website separately promised to ~~"Deport~~"[d]eport pro-Hamas radicals and make our college campuses safe and patriotic again."

31. At campaign rally on October 16, 2023, Mr. Trump promised to revoke the visas of foreign students deemed "radical, anti-American, and anti-Semitic" and to "aggressively deport" resident aliens with "jihadist sympathies."

32. At an event on October 28, 2023, Mr. Trump committed, "I will cancel the student visas of Hamas sympathizers on college campuses. The college campuses are being taken over, and all of the resident aliens who joined in the pro-jihadist protest this month—nobody's ever seen anything like it—come 2025 we will find you and we will deport you. We will deport you."

33. At a campaign rally on November 8, 2023, Mr. Trump promised, "I will also quickly cancel the student visas of all Hamas sympathizers on college campuses, which have been infested with radicalism like never before."

34. At the same rally, Mr. Trump said, "If you hate America, if you want to abolish Israel, if you sympathize with jihadists, then we don't want you in our country …. To all the resident aliens who joined in the pro-jihadist protests … we put you on notice: Come 2025, we will find you and we will deport you."

35. On May 14, 2024, Mr. Trump said at a campaign event, "One thing I do is, any student that protests, I throw them out of the country. You know, there are a lot of foreign students. As soon as they hear that, they're going to behave."

36. On January 20, 2025, President Trump issued an executive order stating that the government would ensure that noncitizens present in the United States "do not bear hostile attitudes" toward the United States government and do not "advocate for" or "support" "foreign terrorists and other threats to our national security." Exec. Order No. 14,161, 90 Fed. Reg. 8451, 8451 (Jan. 20, 2025).

37. The U.S. Senate unanimously confirmed Mr. Rubio as Secretary of State, and he took office on January 21, 2025. The Secretary of State serves at the pleasure of the President.

38. On January 30, 2025, the White House issued a fact sheet promising to revoke the visas of and deport "Hamas Sympathizers," stating, "To all the resident aliens who joined in the pro-jihadist protests, we put you on notice: come 2025, we will find you, and we will deport you. I

will also quickly cancel the student visas of all Hamas sympathizers on college campuses, which have been infested with radicalism like never before." *Fact Sheet: President Donald J. Trump Takes Forceful and Unprecedented Steps to Combat Anti-Semitism*, The White House (Jan. 30, 2025), https://perma.cc/GY4H-7ASR.

39. The administration considers ~~"From~~"[f]rom the river to the sea, Palestine will be free" to express support for Hamas, capable of justifying action under the Revocation or Deportation Provisions. Trial Tr. vol. 1, 32–35, *Am. Ass'n of Univ. Professors v. Rubio*, No. 25-cv-10685 (D. Mass. July 18, 2025), https://perma.cc/S854-PXXK. Likewise, calling Israel "an apartheid state," "calling for an arms embargo on Israel," or "criticizing Israel's actions in Gaza" might be sufficient to invoke the Revocation or Deportation Provisions. *Id.*

**III. The Trump Administration Arrests, Detains, and Attempts to Deport Noncitizens for Protected Speech.**

40. Trump and his administration made good on their promises, aggressively targeting lawfully present noncitizens for protected speech, particularly at universities.

41. Mahmoud Khalil was a graduate student at Columbia University and a lawful permanent resident (green card holder).

42. Mr. Khalil had been an active participant at Columbia in demonstrations and advocacy against Israel's actions following the October 7, 2023, attack. Mr. Khalil repeatedly criticized Israel's military operations in Gaza and what he viewed as Columbia's financing and facilitation of those activities.

43. Late in the evening on March 8, 2025, agents from DHS arrested Mr. Khalil with no prior notice at his apartment, transferred him to a Louisiana immigration jail, and initiated proceedings to deport him from the United States.

44. The DHS document initiating removal proceedings against Mr. Khalil cited his protected speech as the sole basis for his deportation under the Deportation Provision. DHS later explained Secretary Rubio had "personally determined" Mr. Khalil's continued presence "would have potentially severe adverse foreign policy consequences and would compromise a compelling

U.S. foreign policy interest" because of Mr. Khalil's "participation" in "antisemitic protests and disruptive activities, which fosters a hostile environment for Jewish students in the United States." *Khalil v. Trump*, No. 25-cv-01963, 2025 WL 1514713, at *7 (D.N.J. May 28, 2025), *appeal docketed sub nom.*, *Khalil v. President United States of America*, No. 25-2162 (3d Cir. June 23, 2025).

45. On March 9, 2025, reacting on social media to Mr. Khalil's arrest, Secretary Rubio wrote, "We will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported." Marco Rubio (@marcorubio), X (Mar. 9, 2025, at 6:10 PM), https://perma.cc/726Z-VT4Z.




46. That same day, DHS posted on social media, "On March 9, in support of President Trump's executive orders prohibiting anti-Semitism, and in coordination with the Department of State, U.S. Immigration and Customs Enforcement arrested Mahmoud Khalil, a former Columbia University graduate student. Khalil led activities aligned to Hamas, a designated terrorist organization." Homeland Security (@DHSgov), X (Mar. 9, 2025, at 9:29 PM), https://perma.cc/YS5C-2TKG.

~~46.~~47. On March 10, 2025, reacting to Mr. Khalil's arrest, President Trump warned that additional students involved in "pro-terrorist, anti-Semitic, anti-American activity" will be found and deported, vowing that "the Trump administration will not tolerate it" and that Mr. Khalil's arrest was the "first" of "many to come." Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 10, 2025, at 1:05 PM), https://perma.cc/6VPC-AESU.

~~47.~~48. On March 11, 2025, White House Press Secretary Karoline Leavitt told reporters that Mr. Khalil faced deportation because he "sid[ed] with terrorists, Hamas terrorists, who have killed innocent men, women, and children." Ms. Leavitt also asserted Mr. Khalil "distributed pro-Hamas propaganda flyers with the logo of Hamas" on Columbia's campus, though the government never offered evidence to substantiate this statement. She emphasized, "This administration is not going to tolerate individuals … studying in our country and then siding with pro-terrorist organizations."

~~48.~~49. Mr. Khalil remained in a Louisiana immigration jail until June 20, 2025, when a federal court ordered his release on constitutional grounds. *Khalil v. Trump*, No. 25-cv-01963 (D.N.J. June 20, 2025), ECF No. 316, *appeal docketed sub nom.*, *Khalil v. President United States of America*, No. 25-2162 (3d Cir. June 23, 2025).

~~49.~~50. On March 13, 2025, in an interview with NPR, Deputy Homeland Security Secretary Troy Edgar conceded that Mr. Khalil's deportable "offense" was participating in protests.

~~50.~~51. Rümeysa Öztürk is a PhD student at Tufts University in Boston, Massachusetts. She is a citizen of Turkey and studies in the United States on an F-1 student visa.

~~51.~~52. Ms. Öztürk coauthored an op-ed in the Tufts student newspaper, *The Tufts Daily*, in March 2024. The article criticized the University's refusal to adopt several resolutions approved by the undergraduate student senate urging the University to, among other things, recognize a genocide in Gaza and divest from Israeli companies.

~~52.~~53. On March 25, 2025, six plain-clothes federal officers surrounded Ms. Öztürk on the street outside her home in Somerville, Massachusetts. The officers detained her and quickly transported her to a Louisiana immigration jail.

~~53.~~54. Four days before Ms. Öztürk's arrest, ~~Secretary Rubio~~the State Department, relying solely on her protected expression, had revoked Ms. Öztürk's visa under the Revocation Provision. A DHS spokesperson justified the revocation by asserting Öztürk's editorial "[g]lorif[ied] and support[ed] terrorists."

~~54.~~55. Ms. Öztürk remained in a Louisiana immigration jail until May 9, 2025, when a federal court ordered her release on constitutional grounds. *Ozturk v. Trump*, No. 25-cv-374, 2025 WL 1355667 (D. Vt. May 9, 2025).

~~55.~~56. Mohsen Mahdawi is an undergraduate student at Columbia University and a legal permanent resident (green card holder) in the United States.

~~56.~~57. As a student at Columbia, Mr. Mahdawi was an outspoken critic of Israel's military campaign in Gaza. He appeared on televised news interviews, in print news articles, and spoke at protests.

~~57.~~58. ~~Upon information and belief, on~~On April 14, 2025, after Mr. Mahdawi completed the citizenship test to become a United States citizen, masked DHS agents entered the interview room and arrested him, after which the Trump administration began proceedings to deport him from the United States.

~~58.~~59. Secretary Rubio relied upon the Deportation Provision to attempt Mr. Mahdawi's removal, claiming his protests and rhetoric undermined the U.S. foreign policy goal of promoting peace in the Middle East. Resp. in Opp'n to Mot. for Release Ex. A, at 2, *Mahdawi v. Trump*, No. 25-cv-00389, 2025 WL 1243135 (D. Vt. Apr. 30, 2025), ECF No. 42-1, *appeal docketed*, No. 25-1113 (2d Cir. May 1, 2025).

~~59.~~60. Mr. Mahdawi remained in a Vermont immigration jail until May 9, 2025, when a federal court ordered his release on constitutional grounds. *Mahdawi*, 2025 WL 1243135.

~~60.~~61. Since March 2025, the Trump administration has continued revoking the visas of and arresting, detaining, and attempting to deport lawfully present noncitizens under the Deportation and Revocation Provisions based on protected expression and has reiterated its intention in public statements to continue doing so.

62. On April 14, 2025, White House Deputy Chief of Staff and Homeland Security Advisor Stephen Miller said on Fox News that any noncitizen "who preaches hate for America" will be deported.

~~61.~~63. On May 8, 2025, Department of Homeland Security Assistant Secretary for Public Affairs Tricia McLaughlin posted on X that noncitizens "pushing Hamas propaganda," "glorifying terrorists," or otherwise engaging in "anti-American" conduct "can expect your visa will be revoked." Tricia McLaughlin (@TriciaOhio), X (May 8, 2025, at 10:26 AM), https://perma.cc/5ZJ3-4VUU.

64. ~~At~~On May 20, 2025, Secretary Rubio testified before the Senate foreign relations committee. He said, in reference to visa revocations, "There are more coming. We're going to continue to revoke the visas of people who are here as guests and are disrupting our higher education facilities. People are paying money, these kids pay money to go to school and they have to walk through a bunch of lunatics who are here on student visas. It's as simple as that. I want to do more. I hope we can find more of these people."

~~62.~~65. On May 21, 2025, ~~congressional hearing,~~ Secretary Rubio~~, responding~~ testified before the House foreign affairs committee. Responding to a question about the revocation of Öztürk's visa based on her speech, he said he "proudly" revoked her visa, that he revokes visas every day, and that he would continue revoking visas.

~~63.~~66. On July 18, 2025, John Armstrong, Senior Bureau Official in the Bureau of Consular Affairs, testified in the United States District Court for the District of Massachusetts that mere criticism of Israel, such as calling for an arms embargo or calling Israel an "apartheid state~~"~~," are, per the Trump administration, legitimate grounds to revoke a visa. Trial Tr. vol. 1, 32–35, *Am. Ass'n of Univ. Professors v. Rubio*, No. 25-cv-10685 (D. Mass. July 18, 2025), https://perma.cc/S854-PXXK.

~~64.~~67. On July 29, 2025, White House Deputy Chief of Staff and Homeland Security Advisor Stephen Miller posted on X that administration officials are "working continuously" to revoke visas from noncitizens "who espouse hatred for American or its people"—not just noncitizens who criticize Israel. Stephen Miller (@StephenM), X (July 29, 2025, at 9:08 PM), https://perma.cc/U9JN-FQK7.




68. On August 20, 2025, DHS posted on X: "If you hate America, you have no business demanding to live in America." Homeland Security (@DHSgov), X (Aug. 20, 2025, at 12:30 PM), https://perma.cc/K649-DNLK.

69. On September 11, 2025, in response to Charlie Kirk's assassination, Deputy Secretary of State Christopher Landau posted on X: "In light of yesterday's horrific assassination of a leading political figure, I want to underscore that foreigners who glorify violence and hatred are not welcome visitors to our country. I have been disgusted to see some on social media praising, rationalizing, or making light of the event, and have directed our consular officials to undertake appropriate action. Please feel free to bring such comments by foreigners to my attention so that the @StateDept can protect the American people." Christopher Landau (@DeputySecState), X (Sep. 11, 2025, at 8:20 AM), https://perma.cc/7N8S-TT75.

70. On September 14, 2025, Deputy Landua responded on X to a video of a noncitizen mocking Charlie Kirk's assassination: "Rest assured that the @StateDept has revoked his visa so at least he will not be engaging in his grotesque diatribes on American soil." Christopher Landau (@DeputySecState), X (Sep. 14, 2025, at 12:35 PM), https://perma.cc/6KB2-DJ9M.

71. On September 15, 2025, Secretary Rubio posted on X: "America will not host foreigners who celebrate the death of our fellow citizens. Visa revocations are under way. If you are here on a visa and cheering on the public assassination of a political figure, prepare to be deported. You are not welcome in this country." Secretary Marco Rubio (@SecRubio), X (Sep. 15, 2025, at 10:54 PM), https://perma.cc/L24D-NRKV.

72. On October 5, 2025, DHS posted on X that it arrested "terrorist sympathizers across our country." Homeland Security (@DHSgov), X (Oct. 5, 2025, at 7:09 PM), https://perma.cc/MX99-CR62.

73. On October 14, 2025, the State Department posted on X: "The United States has no obligation to host foreigners who wish death on Americans. The State Department continues to identify visa holders who celebrated the heinous assassination of Charlie Kirk. Here are just a few examples of aliens who are no longer welcome in the U.S." The post was followed by six examples:

> "An Argentine national said that Kirk 'devoted his entire life spreading racist, xenophobic, misogynistic rhetoric' and deserves to burn in hell. Visa revoked."

> "A South African national mocked Americans grieving the loss of Kirk, saying 'they're hurt that the racist rally ended in attempted martyrdom' and alleging 'he was used to astroturf a movement of white nationalist trailer trash.' Visa revoked."

> "A Mexican national said that Kirk 'died being a racist, he died being a misogynist' and stated that 'there are people who deserve to die. There are people who would make the world better off dead.' Visa revoked."

> "A Brazilian national charged that 'Charlie Kirk was the reason for a Nazi rally where they marched in homage to him' and that Kirk 'DIED TOO LATE.' Visa revoked."

> "A German national celebrated Kirk's death and attempted to justify his murder, writing 'when fascists die, democrats don't complain.' Visa revoked."

> "A Paraguayan national charged that 'Charlie Kirk was a son of a b**** and he died by his own rules.' Visa revoked."[2]

74. The State Department also posted: "Aliens who take advantage of America's hospitality while celebrating the assassination of our citizens will be removed." Department of State (@StateDept), X (Oct. 14, 2025, at 5:55 PM), https://perma.cc/S6FW-WR3C.

75. On October 17, 2025, the State Department posted on X: "We heard Bluesky is a great place to research visa revocations." Department of State (@StateDept), X (Oct. 17, 2025), at 7:24 PM), https://perma.cc/G7CC-YUHP.

76. On October 26, 2025, ICE arrested Sami Hamdi, a British political commentator who was on a speaking tour in the United States and often supports Palestine.

77. That same day, Tricia McLaughlin quoted a post about Mr. Hamdi's arrest and said: "Thanks to the work of @Sec_Noem and @SecRubio and the men and women of law enforcement, this individual's visa was revoked and he is in ICE custody pending removal. Under President Trump, those who support terrorism and undermine American national security will not be allowed to work or visit this country. It's commonsense." Tricia McLaughlin (@TriciaOhio), X (Oct. 26, 2025, at 2:28 PM), https://perma.cc/ZKQ8-Q8RY.

78. That same day, the State Department quoted Ms. McLaughlin's post and said: "We've said it before, we'll say it again: The United States has no obligation to host foreigners who support terrorism and actively undermine the safety of Americans. We continue to revoke the visas of persons engaged in such activity. Thank you to our partners at @DHSgov for their efforts to remove this individual." Department of State (@StateDept), X (Oct. 26, 2025, at 5:46 PM), https://perma.cc/WMP6-XMK7.

79. On November 5, 2025, DHS posted on X: "The U.S. has no obligation to host foreigners, like Sami Hamdi, who support terrorism and actively undermine the safety of Americans. And we won't. There is no room in the United States for the rest of the world's terrorist

[2] Department of State (@StateDept), X (Oct. 14, 2025, at 5:55 PM). The posts have been archived at the following links: https://perma.cc/2AVU-8P9Z; https://perma.cc/4898-YRE3; https://perma.cc/R47Y-D293; https://perma.cc/8RSE-5MGP; https://perma.cc/QYQ3-4WEU; https://perma.cc/MPC2-653S; https://perma.cc/CQQ7-GM8B.

sympathizers, and we are under no obligation to admit them or let them stay here. @Sec_Noem has made it clear that anyone who thinks they can come to America and hide behind the First Amendment to advocate for anti-American and anti-Semitic violence and terrorism – think again." Homeland Security (@DHSgov), X (Nov. 5, 2025, at 11:10 AM), https://perma.cc/2A8P-4QPS.

80. On November 18, 2025, Stephen Miller said, "The State Department has revoked tens of thousands of visas, and they're just getting started on tens of thousands more."

## IV. Stanford Daily's Noncitizen Staff Self-Censors, Fearing Immigration Consequences for Protected Speech.

65.81. Stanford Daily operates and publishes *The Stanford Daily*, the student-run newspaper ofat Stanford University.

66.82. Stanford Daily is a voluntary membershipvalidly incorporated 501(c)(3) organization. Everyone who wants to join Stanford Daily is guaranteed a spot, and any Stanford student who *The Stanford Daily* publishes becomes a member of Stanford Daily.

67. Stanford Daily has over 150 members.

68. Stanford Daily "strives to serve the Stanford community with relevant, unbiased journalism and provides its editorial, tech, and business staffs with unparalleled educational opportunities."

69.83. Since its founding as *The Daily Palo Alto* in 1892, Stanford Daily has sought to cover all relevant campus activities in an unbiased fashion and provide an outlet for Stanford community members to publish opinions.

84. Stanford Daily's mission statement explains that it "strives to serve the Stanford community with relevant, unbiased journalism and provides its editorial, tech and business staffs with unparalleled educational opportunities."

85. As part of its mission, Stanford Daily has defended and advocated for press rights and the rights of all journalists to report the news and publish opinions without government or university retaliation.

86. For a famous example, after the chief of the Palo Alto Police Department James Zurcher raided *The Stanford Daily*'s offices in 1971, Stanford Daily sued to protect its members and defend press freedom. *See Zurcher v. Stanford Daily*, 436 U.S. 547 (1978).

87. And for a recent example, in 2024, Stanford Daily advocated against its reporter's arrest, highlighting the "violation of his First Amendment and Fourth Amendment rights" and the "threat to the freedom of the press."

88. Even before filing this suit, Stanford Daily had started advocating against the government's use of the Revocation and Deportation Provisions to punish legally present noncitizens, noting in April 2025 that "student speech, from our own reporters and those we're reporting on, is startlingly chilled" by the government's threats and past enforcement actions.

89. Stanford Daily is a voluntary membership organization.

90. Everyone who wants to join Stanford Daily is guaranteed a spot.

91. Stanford Daily has over 150 identifiable members.

92. Stanford Daily's members voluntarily joined the organization to support its mission.

93. Stanford Daily's members receive updates about the status of this case from Stanford Daily's leadership. Stanford Daily's members elect seven directors who sit on Stanford Daily's nine-member board. The board represents the interests of Stanford Daily's members and has input on the direction of this case.

94. Stanford Daily's members include United States citizens and noncitizens. Some of Stanford Daily's members are noncitizens lawfully present in the United States pursuant to lawful admissions on nonimmigrant visas, such as the F-1 student visa. Other noncitizen members are lawfully present in the United States pursuant to their status as lawful permanent residents on immigrant visas.

95. Stanford Daily's members are either editorial members or business members.

96. To be considered an editorial member, one must have worked for Stanford Daily for at least two calendar months in the current or most recent fall, winter, or spring academic quarter

and demonstrated continued interest and commitment through meeting attendance and/or contributions to Stanford Daily's operations.

97. To be considered a business member, one must have worked for Stanford Daily at least two months prior to the date of the approval of the membership list and have worked for an average of five or more hours per week since beginning work at Stanford Daily.

98. Stanford Daily's content is produced by Stanford Daily members and contributors.

99. Any individual who submits and has content of any type published in *The Stanford Daily* is a contributor. Contributors need not be Stanford Daily members nor Stanford affiliates. Although contributors to *The Stanford Daily* are associated with Stanford Daily, contributors are not necessarily Stanford Daily members.

100. Stanford Daily disseminates its content to readers through its website, social media accounts, email digests, and print editions.

101. Stanford Daily publishes content on its website, stanforddaily.com. It also publishes content on X (x.com/StanfordDaily), Instagram (instagram.com/stanforddaily/), Facebook (facebook.com/stanforddaily/), YouTube (youtube.com/@stanforddaily/), TikTok (tiktok.com/@stanforddaily), and Spotify (open.spotify.com/show/2ty8gvAnvYP31X8TUrFwoj). In the past, Stanford Daily published content on LinkedIn, but it does not currently use that platform.

102. Stanford Daily also disseminates its content through two types of email digests. First, it disseminates a Daily Digest that comes out every morning of the school week, providing headlines, descriptions, and links to articles in each of its print sections to offer a general overview of what is happening in the Stanford community. And second, Stanford Daily occasionally disseminates a Breaking News email when an article is deemed by its editorial staff to be sufficiently urgent and important to include in its own email to its subscribers after a story breaks.

103. Stanford Daily also disseminates its content by printing *The Stanford Daily*. The newspaper is printed once a week over the academic school year aside from breaks and finals weeks. It is distributed every Friday with content from the past week of publication.

104. Because Stanford Daily seeks to cover all relevant news and provide an outlet to the Stanford community to publish opinions, the scope of its content is vast. *The Stanford Daily*'s content includes news articles about academics, campus life, data, graduate students, science and technology, and Stanford University; sports articles; opinion articles by columnists, the editorial board, and community members; arts and life articles about culture, music, books, and the screen; humor articles, including cartoons; multimedia content, including videos; games, including mini crosswords, full-size crosswords, and the "Stanfordle" (based on the *New York Times*'s "Wordle" game); "The Grind," which welcomes any potential contributors to think deeply about any aspect of their lives and large society they want to explore, whether Stanford related or not; and *The Stanford Daily Magazine*, which is published twice per year.

~~70.~~105. In line with Stanford Daily's mission and core business activities, *The Stanford Daily* has endeavored to provide the Stanford community with relevant and unbiased journalism about campus events or issues related to Hamas's October 7, 2023, attack on Israel and Israel's war in Gaza.

~~71.~~106. Also in line with Stanford Daily's mission and operations, the newspaper provides a platform for Stanford community members to voice their opinions on the Israeli-Palestinian conflict and other foreign policy issues.

107. ~~But~~To support its mission, Stanford Daily covers matters related to foreign affairs, Israel, and Palestine, such as covering student groups like Students for Justice in Palestine, Law Students for Justice in Palestine, and Stanford Israel Association; student events such as the "All Eyes on Gaza" vigil and the "Rally for Hostages" event, both on October 7, 2025; Israel's detention and deportation of a Stanford alumna who attempted to sail toward Gaza on the Global Sumud Flotilla; Stanford pro-Palestinian protesters being indicted on felony charges; a Stanford chemist suing Stanford University for antisemitism and anti-Israel discrimination; and similar issues.

108. Stanford Daily also provides an outlet for people to publish opinions. Some of this content relates to American foreign affairs, Israel, and Palestine, such as opinion pieces about standing in solidarity with the Palestinian cause, opposing Hamas's actions on October 7, the

prosecution of Stanford pro-Palestinian protestors, hunger strikes in support of Palestine, and inviting more pro-Palestinian speakers to campus.

109. To support its mission, Stanford Daily has covered this news and provided this outlet for opinions before Hamas's October 7, 2023, attack on Israel and Israel's war in Gaza. It has continued to cover news related to foreign affairs, Israel, and Palestine since Israel and Hamas entered a ceasefire and hostage-exchange agreement on October 9, 2025, and it expects to continue covering news and publishing opinions related to foreign affairs, Israel, and Palestine.

110. Many Stanford Daily members, including lawfully present noncitizen members, have personally read and are aware of the government's statements and enforcement actions referenced in this Complaint.

111. Outside of the litigation documents filed in this case, Stanford Daily members are unaware of any government officials disavowing invoking the Deportation and Revocation Provisions against protected speech.

~~72.~~112. The government's threats to enforce and past enforcement of the Revocation and Deportation Provisions, and the threat of those Provisions' future enforcement, have specifically impacted Stanford Daily by causing lawfully present noncitizen members to quit, withhold articles, refuse assignments, request articles be taken down, and ask for anonymity due to fear of adverse immigration consequences under the Deportation and Revocation Provisions. Thus, since the Trump administration began targeting lawfully present noncitizens for deportation based on protected speech in March 2025, lawfully present noncitizen students ~~working at and contributing to~~who are Stanford Daily members have self-censored expression for fear of visa revocation, arrest, detention, and deportation.

113. The government's threats to enforce and past enforcement of the Revocation and Deportation Provisions, and the threat of those Provisions' future enforcement, have also specifically impacted Stanford Daily by causing lawfully present noncitizen contributors and sources to refuse to talk on the record with Stanford Daily reporters and stop submitting opinion pieces to *The Stanford Daily*. Thus, since the Trump administration began targeting lawfully present

noncitizens for deportation based on protected speech in March 2025, lawfully present noncitizens who are Stanford Daily contributors have self-censored expression for fear of visa revocation, arrest, detention, and deportation.

~~73.~~114. For example, in March 2025, a lawfully present noncitizen editor on staff decided to quit Stanford Daily because of the student's nonimmigrant visa status. Fearing visa revocation, arrest, and deportation for association with articles about Israel or Palestine, the student decided to leave the newspaper.

~~74.~~115. But for the threat of visa revocation under the Revocation Provision and of deportation under the Deportation Provision, the student would continue being a member of Stanford Daily.

~~75.~~116. As another example, one lawfully present noncitizen student on staff signed up to cover a story about a vigil that brought together Jewish and Palestinian families to honor those who died in the conflict in Gaza. The student attended, took notes, and interviewed sources. But because of the student's nonimmigrant visa status~~,~~ and fear that they may face adverse immigration consequences if they published the article, the student decided against publishing the article.

~~76.~~117. But for the threat of visa revocation under the Revocation Provision and of deportation under the Deportation Provision, the student would publish the article.

~~77.~~118. Similarly, a lawfully present noncitizen editor on staff, fearing adverse immigration consequences, asked Stanford Daily to remove articles they had previously written about pro-Palestinian campus activism and related issues and to no longer assign them to edit stories involving Israel or Palestine.

~~78.~~119. But for the threat of visa revocation under the Revocation Provision and of deportation under the Deportation Provision, the editor would republish the article they had taken down and would edit stories involving Israel and Palestine.

~~79.~~120. Another lawfully present noncitizen Stanford Daily staff writer, who had written about Israeli and Palestinian officials, as well other foreign affairs topics, asked Stanford

Daily to remove all her articles from Stanford Daily's website, fearing adverse immigration consequences.

~~80.~~121. But for the threat of visa revocation under the Revocation Provision and of deportation under the Deportation Provision, the staff writer would not have asked Stanford Daily to remove the articles.

~~81.~~122. Additionally, a lawfully present noncitizen Stanford Daily editorial board member asked for an article about the Israeli Defense Forces to be removed from the website, fearing adverse immigration consequences.

~~82.~~123. But for the threat of visa revocation under the Revocation Provision and of deportation under the Deportation Provision, the editorial board member would not have asked to remove the article.

~~83.~~124. Secretary Rubio's use of the Deportation Provision and Revocation Provision to target protected expression has hindered Stanford Daily's journalism in other ways, too. Since the Trump administration began targeting lawfully present noncitizens for deportation based on protected speech in March 2025, Stanford Daily has received numerous requests from lawfully present noncitizens who either wrote or were quoted or pictured in articles to remove their name, image, or article for fear of adverse immigration action based on their speech.

~~84.~~125. Since the Trump administration began targeting lawfully present noncitizens for deportation based on protected speech in March 2025, international students have also largely stopped talking to Stanford Daily journalists and, when they do speak, often refuse to speak on the record, particularly when it comes to discussing topics like Israel and Palestine.

~~85.~~126. But for the threat of visa revocation under the Revocation Provision and the threat of deportation under the Deportation Provision, international students would resume speaking freely with Stanford Daily.

~~86.~~127. Since Secretary Rubio ~~starting~~started using the Deportation Provision and Revocation Provision against protected speech, Stanford Daily has received other requests from

current and former writers, asking it to remove opinion editorials they published, quotes they provided, or their names in bylines or articles.

~~87.~~128. But for the threat of visa revocation under the Revocation Provision and of deportation under the Deportation Provision, the current and former writers would not seek to have their pieces, quotes, or identities removed from the newspaper.

129. But for the threat of visa revocation under the Revocation Provision and deportation under the Deportation ~~provision~~Provision, Stanford Daily noncitizen contributors would resume contributing articles to Stanford Daily.

130. The government's threats to enforce and past enforcement of the Revocation and Deportation Provisions, and the threat of those Provisions' future enforcement, have specifically impacted Stanford Daily by decreasing the quantity and diversity of opinion pieces *The Stanford Daily* is able to publish on the conflict between Israel and Palestine. Before the government's threats to enforce and past enforcement of the Revocation and Deportation Provisions, and the threat of those Provisions' future enforcement, Stanford Daily published opinion pieces by noncitizen contributors. But since the government began enforcing the Provisions against protected speech, Stanford Daily has experienced substantially reduced participation from noncitizen contributors.

131. The government's threats to enforce and past enforcement of the Revocation and Deportation Provisions, and the threat of those Provisions' future enforcement, have specifically impacted Stanford Daily by affecting the quality of pieces *The Stanford Daily* is able to publish. Before the government's threats to enforce and past enforcement of the Revocation and Deportation Provisions, and the threat of those Provisions' future enforcement, Stanford Daily writers could incorporate a wide variety of sources and quotes into their news articles, including perspectives from international students. But now, legally present noncitizen students no longer want to speak with Stanford Daily as sources or contribute opinion pieces.

132. The specific effects of the government's threats to enforce and past enforcement of the Revocation and Deportation Provisions, and the threat of those Provisions' future enforcement, are ongoing.

133. Legally present noncitizen Stanford Daily members who have quit, withheld articles, refused assignments, requested articles be taken down, and asked for anonymity have continued to take those actions since this case was filed.

~~88.~~134. Legally present noncitizen Stanford Daily members face a credible and imminent threat of adverse immigration action under the Deportation and Revocation Provisions if they engage in constitutionally protected speech based on the government's threats and enforcement of the challenged Provisions.

**V. Plaintiff Jane Doe Fears Deportation Due to Her Pro-Palestinian Speech.**

~~89.~~135. Plaintiff Jane Doe is a noncitizen lawfully present in the United States pursuant to a lawful admission on an F-1 student visa.

~~90.~~136. Jane Doe is a former student at a United States university.

137. There is no relationship between Stanford Daily and Jane Doe.

138. Jane Doe has never been a student at Stanford University, never submitted to or published content with *The Stanford Daily*, and never affiliated with Stanford Daily.

~~91.~~139. Jane Doe was a member of the pro-Palestinian student group Students for Justice in Palestine (SJP) at her university.

~~92.~~140. Jane Doe has published pro-Palestinian/anti-Israel commentary online, including commentary accusing Israel of committing "genocide" and perpetuating "apartheid." She has also used the slogan, "from the river to the sea, Palestine will be free."

~~93.~~141. Jane Doe has publicly criticized American foreign policy, particularly its relationship with Israel.

~~94.~~142. Due to her advocacy, Jane Doe appeared in a profile on the Canary Mission website.

~~95.~~143. Canary Mission is an anonymously run website that publishes the personal information of students, professors, and organizations it deems "anti-Israel."

~~96.~~144. On July 9, 2025, during a trial in the United States District Court for the District of Massachusetts, Peter Hatch, a senior official in ICE's Homeland Security Investigations

unit, testified that Derek Gordon, Deputy Special Agent in Charge of Homeland Security Investigations at DHS, asked Hatch to instruct Hatch's team to generate "reports" on individuals identified on Canary Mission's website. Trial Tr. vol. 2, 108–10, *Am. Ass'n of Univ. Professors v. Rubio*, No. 25-cv-10685 (D. Mass. July 9, 2025), https://perma.cc/PCL4-6YTQ.

~~97.~~145. The "reports" Mr. Hatch's team prepares are for the State Department, which uses them to make decisions regarding, among other things, "[v]isa revocations." *Id.* at 101.

~~98.~~146. Mr. Hatch testified that "most" of the names of student protestors that DHS asked ICE to investigate "came from" Canary Mission's website. *Id.* vol. 1, 44.

~~99.~~147. Prior to their detentions and attempted deportations, Canary Mission published profiles of Mahmoud Khalil, Rümeysa Öztürk, and Mohsen Mahdawi.

~~100.~~148. ~~Since March 2025~~In March 2025, Jane Doe read news articles about the detention and attempted deportation of noncitizens like Mahmoud Khalil and Rümeysa Öztürk for engaging in protected pro-Palestinian speech, including articles quoting government statements about the detention and deportation of these noncitizens. Consequently, fearing that Secretary Rubio will revoke her visa under the Revocation Provision or render her deportable under the Deportation Provision, Jane Doe has refrained from publishing and voicing her true opinions regarding Palestine and Israel and has deleted a social media account to guard against retaliation for past expression.

~~101.~~149. But for the threat of visa revocation under the Revocation Provision and deportation under the Deportation Provision, Jane Doe would resume publishing and voicing her true opinions regarding Palestine and Israel and would reactivate her social media account containing her past expression.

150. Jane Doe has personally read and is aware of government statements threatening visa revocation and deportation under the Revocation and Deportation Provisions for engaging in protected speech, including the government's statements referenced in this Complaint or substantially similar statements, and, based on those statements, fears adverse immigration action for engaging in protected speech.

151. Jane Doe is personally aware of the government's past enforcement of the Deportation and Revocation Provisions based on protected speech against pro-Palestinian individuals such as Mahmoud Khalil, Rümeysa Öztürk, and Mohsen Mahdawi.

152. Jane Doe is aware of the government's recent enforcement of the Deportation and Revocation Provisions against noncitizens who voiced criticism of Charlie Kirk.

153. Jane Doe is unaware of any government officials tasked with enforcing the Revocation and Deportation Provisions disavowing invoking the Provisions against protected speech.

154. Because of the government's threats to enforce the Revocation and Deportation Provisions based on protected speech, and its past enforcement of the Provisions based on protected speech, Jane Doe has self-censored, including decreasing or eliminating her expression supporting Palestinians, criticizing American foreign policy, or opposing the Israeli government.

155. Specifically, because of the government's threats and its past enforcement, Jane Doe no longer attends pro-Palestinian protests, no longer wears a keffiyeh to support the Palestinian cause, no longer engages in direct-action organizing supporting Palestinians, no longer holds up the Palestinian flag, no longer maintains her main social media account, and no longer posts pro-Palestinian content on her other social media accounts. The only public expression in which Jane Doe now engages to support the Palestinian cause is wearing watermelon earrings that are easily removable. (Watermelons share the same colors as the Palestinian flag, and pro-Palestinian speakers often use the symbol to support the Palestinian cause.) The government's threats to enforce the Revocation and Deportation Provisions based on protected speech, and its past enforcement of the Provisions based on protected speech, have chilled Jane Doe from engaging in every other form of public expression.

156. The chilling effect of the government's threats to enforce and its past enforcement of the Revocation and Deportation Provisions based on protected speech, and the threat of those Provisions' future enforcement, on Jane Doe has continued since she filed this lawsuit and will continue unless judicial relief is secured.

157. Based on the government's threats to enforce and its enforcement of the challenged Provisions, Jane Doe faces a credible and imminent threat of adverse immigration action under the Deportation and Revocation Provisions if she engages in constitutionally protected speech.

**VI. John Doe Fears Adverse Immigration Action for His Protected Speech.**

102.158. Plaintiff John Doe is a noncitizen lawfully present in the United States pursuant to a lawful admission on an F-1 student visa. John Doe traveled to the United States to study journalism, and a primary reason he chose the United States is its strong protection for freedom of speech and freedom of the press.

159. John Doe is a former student at a United States university.

160. There is no relationship between Stanford Daily and John Doe.

103.161. John Doe has never been a student at Stanford University, never submitted to or published content with *The Stanford Daily*, and never affiliated with Stanford Daily.

104.162. After the October 7, 2023, attack, John Doe attended pro-Palestinian protests and published pro-Palestinian/anti-Israel commentary online.

105.163. At protests, John Doe participated in chants including, "From"[f]rom the river to the sea, Palestine will be free," as well as chants accusing Israel of committing "genocide," and chants calling Israel a "terrorist state."

106.164. After the Trump administration began targeting other lawfully present noncitizen students for deportation based on protected speech, the professor for whom John Doe served as a teaching assistant advised John Doe to reconsider engaging in protected advocacy related to Israel and Palestine due to potential danger to his immigration status.

107.165. After March 2025In March 2025, John Doe read news articles about the detention and attempted deportation of noncitizens like Mahmoud Khalil and Badar Khan Suri for engaging in protected pro-Palestinian speech, including articles quoting government statements about the detention and deportation of these noncitizens. Consequently, fearing Secretary Rubio would revoke his visa under the Revocation Provision or render him deportable under the Deportation Provision following the administration's actions against other noncitizens, John Doe

refrained from publishing ~~a study~~his findings containing criticism of Israel's actions in Gaza, which John Doe views as a genocide backed by the United States' foreign policy.

~~108.~~166. But for the threat of visa revocation under the Revocation Provision and deportation under the Deportation Provision, John Doe would have published and voiced his true opinions regarding Palestine and Israel without delay or fear of arrest, detention, or deportation for his protected speech.

~~109.~~167. John Doe has resumed engaging in some protected pro-Palestinian/anti-Israel commentary, including accusing Israel of committing genocide, as well as commentary critical of American foreign policy towards Israel and Palestine. His continuing expression places him in danger of visa revocation under the Revocation Provision and deportation under the Deportation Provision.

168. The government's threats to enforce and its past enforcement of the Revocation and Deportation Provisions based on protected speech have caused John Doe to alter and reduce his pro-Palestinian/anti-Israel protected expression because the threat of those Provisions' future enforcement.

169. For example, John Doe has made his X social media account, which contains pro-Palestinian/anti-Israel commentary, private.

170. Additionally, because of the Trump administration's tactics when pursuing noncitizens for protected speech, which include midnight raids, masked ICE agents, and detention thousands of miles from home, some members of John Doe's extended family who are noncitizens but lawfully reside in the United States fear associating with him and have substantially reduced their contact with him because they fear he will be targeted by the Trump administration because of his pro-Palestinian/anti-Israel commentary and advocacy.

171. Additionally, fearing adverse immigration consequences, John Doe avoids wearing "Palestinian Youth Movement" apparel including a sweatshirt with "Gaza, the Occupier's Graveyard" written in Arabic:




172. John Doe has personally read and is aware of government statements threatening visa revocation and deportation under the Revocation and Deportation Provisions for engaging in protected speech, including the government's statements referenced in this Complaint or substantially similar statements, and, based on those statements, fears adverse immigration action for engaging in protected speech.

173. John Doe is personally aware of the government's past enforcement of the Deportation and Revocation Provisions against pro-Palestinian individuals such as Mahmoud Khalil, Rümeysa Öztürk, Badar Khan Suri, and Mohsen Mahdawi.

174. John Doe is aware of the government's recent enforcement of the Deportation and Revocation Provisions against noncitizens who voiced criticism of Charlie Kirk.

175. John Doe is unaware of any government officials tasked with enforcing the Revocation and Deportation Provisions disavowing invoking the Provisions against protected speech.

176. Because of the government's threats to enforce the Revocation and Deportation Provisions based on protected speech, and its past enforcement of the Provisions based on protected speech, John Doe has self-censored, including decreasing his expression supporting Palestinians, criticizing American foreign policy, and opposing the Israeli government.

177. Based on the government's threats to enforce and its enforcement of the challenged Provisions, John Doe faces a credible and imminent threat of adverse immigration action under the Deportation and Revocation Provisions when he engages in constitutionally protected speech.

178. Because John Doe faces a credible and imminent threat of adverse immigration action under the Deportation and Revocation Provisions when he engages in constitutionally protected speech, he has reduced and limited his protected expression. But because he agrees with George Orwell that "[i]f liberty means anything at all, it means the right to tell people what they do not want to hear," he continues some of his constitutionally protected speech despite that threat.

**INJURIES TO PLAINTIFFS**

~~110.~~179. Secretary Rubio and Secretary Noem violate Plaintiffs' First Amendment rights by enforcing the Deportation Provision and Revocation Provision based on protected expression, the threatened enforcement of which chills Plaintiffs and/or their lawfully present noncitizen members from engaging in protected expression like attending protests, using certain slogans, and publicly voicing their true views about American foreign policy, Israel, and Palestine.

~~111.~~180. The chill is amplified because Secretary Rubio and Secretary Noem's enforcement of the Deportation Provision and Revocation Provision has entailed ambush arrests by masked agents accompanied by prolonged detention in ICE holding facilities thousands of miles from detainees' homes.

~~112.~~181. Secretary Rubio and Secretary Noem have enforced the Deportation Provision and Revocation Provision based on protected expression and will continue to do so absent declaratory and injunctive relief prohibiting enforcement of these statutes based on protected expression.

~~113.~~182. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality op.)).

~~114.~~183. Plaintiffs have suffered and continue to suffer irreparable harm due to the Deportation Provision's and Revocation Provision's enforcements based on protected expression, which will continue absent declaratory and prospective injunctive relief.

~~115.~~184. Because Plaintiffs and their lawfully present noncitizen members have engaged and wish to continue engaging in expression which Secretary Rubio might consider anti-American, anti-Israel, or detrimental to American foreign policy, they face an ongoing and credible threat of continued enforcement of the Deportation Provision and Revocation Provision.

~~116.~~185. Secretary Rubio and Secretary Noem's ongoing threat to the protected expression of Plaintiffs and their members presents an actual controversy within this Court's jurisdiction.

**FIRST CLAIM**

**First Amendment**

**Deportation Provision**

**(Declaratory Relief)**

~~117.~~186. Plaintiffs reallege and incorporate by reference the preceding paragraphs as though fully set forth herein.

~~118.~~187. The First Amendment provides "Congress shall make no law … abridging the freedom of speech, or of the press; or of the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I.

~~119.~~188. America's First Amendment reflects "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

~~120.~~189. Political protests are an exercise of "basic constitutional rights in their most pristine and classic form." *Edwards v. South Carolina*, 372 U.S. 229, 235 (1963).

~~121.~~190. The "advocacy of a politically controversial viewpoint is the essence of First Amendment expression," and "no form of speech is entitled to greater constitutional protection." *McCullen v. Coakley*, 573 U.S. 464, 488–89 (2014) (cleaned up).

~~122.~~191. A free press "serves and was designed to serve as a powerful antidote to any abuses of power by government officials and as a constitutionally chosen means for keeping officials elected by the people responsible to all the people whom they were selected to serve." *Mills v. Alabama*, 384 U.S. 214, 219 (1966).

~~123.~~192. To that end, "[s]uppression of the right of the press to praise or criticize government agents and to clamor and contend for or against change … muzzles one of the very agencies the Framers of our Constitution thoughtfully and deliberately selected to improve our society and keep it free." *Id.*

~~124.~~193. A press/communication platform's own rights are infringed when its contributors are chilled. *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 121–23 (1991).

~~125.~~194. The Supreme Court has made clear that "freedom of speech and of press is accorded aliens residing in this country." *Wixon*, 326 U.S. at 148.

~~126.~~195. "It has long been recognized that resident aliens enjoy the protections of the First Amendment." *Price v. U.S. INS*, 962 F.2d 836, 841 (9th Cir. 1991).

~~127.~~196. The INA allows the Secretary of State to render deportable noncitizens "whose … activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States." 8 U.S.C. § 1227(a)(4)(C)(i).

~~128.~~197. That deportation authority is subject to "[t]he exceptions" to the Secretary of State's authority to exclude noncitizens from the United States on foreign policy grounds. *Id.* § 1227(a)(4)(C)(ii) (incorporating *id.* § 1182(a)(3)(C)(ii)–(iii)).

~~129.~~198. Those exceptions include that a noncitizen "shall not be excludable [for protected speech], unless the Secretary of State personally determines that the alien's admission would compromise a compelling United States foreign policy interest." *Id.* § 1182(a)(3)(C)(iii).

~~130.~~199. The Deportation Provision, therefore, allows the Secretary of State to render lawfully present noncitizens deportable for protected speech if he "personally determines" that the noncitizen's activities "compromise a compelling United States foreign policy interest." *Id.* §§ 1182(a)(3)(C)(iii), 1227(a)(4)(C)(i).

~~131.~~200. When the government determines that a noncitizen is no longer lawfully in the United States through operation of the Deportation Provision, immigration officers may obtain a warrant to arrest and detain the noncitizen pending completing of removal proceedings. *See id.* § 1226(a); 8 C.F.R. § 287.8(c).

~~132.~~201. Detention and/or deportation would deter a person of ordinary firmness from engaging in protected activity.

~~133.~~202. As a result of the Deportation Provision, lawfully present noncitizens must either forego protected expression or risk detention and deportation.

~~134.~~203. As applied to protected speech, the Deportation Provision is facially viewpoint based and content based because it applies solely to speech the government believes adversely affects its foreign policy.

~~135.~~204. The government "may not discriminate against speech based on the ideas or opinions it conveys." *Iancu v. Brunetti*, 588 U.S. 388, 393 (2019).

~~136.~~205. "Viewpoint discrimination is thus an egregious form of content discrimination" because "[t]he government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

~~137.~~206. The Deportation Provision is facially viewpoint discriminatory as applied to protected speech for two reasons. First, it affords the Secretary of State unbounded discretion to render lawfully present noncitizens deportable on the basis of protected speech. Second, opinions

the Secretary deems in his sole discretion adverse to America's foreign policy subject noncitizens to potential deportation, while those he views as aligning with or praising American foreign policy do not.

~~138.~~207. Secretary Rubio and the Trump administration's enforcement of the Deportation Provision demonstrates the Deportation Provision's viewpoint-~~-~~discriminatory nature as applied to protected speech.

~~139.~~208. For example, the basis for Secretary Rubio's determination that Mr. Khalil's protected expression regarding Israel and Palestine triggered the Deportation Provision is that ~~Mr.~~Secretary Rubio believed Mr. Khalil's opinions and expression "undermine[d] U.S. policy to combat anti-Semitism around the world and in the United States."

~~140.~~209. The basis for Secretary Rubio's determination that Mr. Mahdawi's protected speech regarding Israel and Palestine triggered the Deportation Provision is that ~~Mr.~~Secretary Rubio believed Mr. Mahdawi's opinions and expression undermined the government's position regarding the Middle East peace process.

~~141.~~210. Laws discriminating based on viewpoint are per se unconstitutional. *See Iancu*, 588 U.S. at 399 ("The Court's finding of viewpoint bias ended the matter.")

~~142.~~211. In the alternative, viewpoint-~~-~~discriminatory laws are subject to strict scrutiny.

~~143.~~212. The First Amendment also generally forbids government actions that discriminate based on the content of the speaker's expression. "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* Content-discriminatory laws are subject to strict scrutiny. *Id.* at 163–64.

~~144.~~213. The Deportation Provision is not narrowly tailored to achieve a compelling government interest with respect to deportations based on protected speech.

~~145.~~214. Restricting speech to tilt public debate and opinion in the government's preferred direction "is not [a] valid, let alone substantial" government interest. *Moody v. NetChoice, LLC*, 603 U.S. 707, 740 (2024).

~~146.~~215. Nor is the Deportation Provision's allowance for deportation based on protected speech narrowly tailored. It vests the Secretary of State with unbounded, unbridled, and unconstrained discretion to deem any noncitizen's protected speech a foreign policy threat and to banish the speaker from the United States on that basis.

~~147.~~216. The Deportation Provision's allowance for deportation based on protected speech is not the least restrictive means of advancing the government's foreign policy objectives because, at minimum, the government can counter the noncitizen's speech with its own speech.

~~148.~~217. The "First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech." *Lozman v. Riviera Beach*, 585 U.S. 87, 90 (2018).

~~149.~~218. By allowing the Secretary of State to render lawfully present noncitizens deportable for protected speech about America's foreign policy, the Deportation Provision also blatantly discriminates based on viewpoint by codifying the ability of the government to take adverse action against protected speech by targeting its foreign policy critics with deportation.

~~150.~~219. Deporting someone for protected speech would deter and is deterring people of ordinary firmness from engaging in protected speech.

~~151.~~220. Plaintiffs are entitled to a declaration under 28 U.S.C. § 2201 that the Deportation Provision is viewpoint and content based when applied to protected speech and that the First Amendment prohibits deporting Plaintiffs and/or their noncitizen members under it for engaging in protected speech.

**SECOND CLAIM**

**First Amendment**

**Deportation Provision**

**(Injunctive Relief)**

~~152.~~221. Plaintiffs re-allege and re-incorporate the preceding paragraphs as though fully set forth herein.

~~153.~~222. The Deportation Provision violates the First Amendment for the reasons stated in Claim I.

~~154.~~223. Plaintiffs are entitled to injunctive relief preventing Secretary Rubio from rendering Plaintiffs and/or their noncitizen members deportable under the Deportation Provision for engaging in protected speech. *See Bell v. Hood*, 327 U.S. 678, 684 (1946) ("[I]t is established practice for this Court to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution."); *see also Ex parte Young*, 209 U.S. 123 (1908).

~~155.~~224. Plaintiffs are entitled to injunctive relief preventing Secretary Noem from initiating deportation proceedings against or otherwise invoking the Deportation Provision against Plaintiffs and/or their noncitizen members based on protected speech. *See Bell*, 327 U.S. at 684; *Ex parte Young*, 209 U.S. 123.

~~156.~~225. Plaintiffs have no adequate legal, administrative, or other remedy by which to prevent or minimize the continuing irreparable harm to their First Amendment rights. Without injunctive relief against the Deportation Provision as applied to protected speech, Secretary Rubio's suppression and chill of Plaintiffs' First Amendment rights will continue, and Plaintiffs will suffer per se irreparable harm indefinitely.

~~157.~~226. The balance of equities and the public interest ~~favors~~favor permanent injunctive relief because "it is always in the public interest to prevent the violation of a party's constitutional rights." *X Corp. v. Bonta*, 116 F.4th 888, 904 (9th Cir. 2024) (internal quotation marks omitted).

~~158.~~227. Plaintiffs acknowledge that, under 8 U.S.C. § 1252(f)(1), only the Supreme Court has jurisdiction to "enjoin or restrain the operation" of the Deportation Provision. Plaintiffs therefore plead the request for injunctive relief so it is contained in the operative pleading and may be raised to the Supreme Court in later proceedings.

**THIRD CLAIM**

**Fifth Amendment (Vagueness)**

**Deportation Provision**

**(Declaratory Relief)**

~~159.~~228. Plaintiffs re-allege and re-incorporate the preceding paragraphs as though fully set forth herein.

~~160.~~229. The Due Process Clause of the Fifth Amendment to the U.S. Constitution prohibits laws, including immigration statutes, that are impermissibly vague. *Sessions*, 584 U.S. at 174–75 (majority op.).

~~161.~~230. A law is unconstitutionally vague when it "fails to provide a person of ordinary intelligence fair notice of what is prohibited" or "is so standardless that it authorizes or encourages seriously discriminatory enforcement." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)).

~~162.~~231. Because deportation is a "drastic measure, often amounting to lifelong banishment or exile," the "most exacting vagueness standard" applicable to criminal laws also applies to immigration laws. *Sessions*, 584 U.S. at 156–57 (plurality op.) (cleaned up).

~~163.~~232. Moreover, when a regulation "is capable of reaching expression sheltered by the First Amendment," the vagueness doctrine "demands a greater degree of specificity than in other contexts." *Smith v. Goguen*, 415 U.S. 566, 573 (1974).

~~164.~~233. The Deportation Provision is vague on its face as applied to protected speech because it provides no guidance to noncitizens regarding when a person's expression would "compromise a compelling United States foreign policy interest." 8 U.S.C. § 1182(a)(3)(C)(iii).

~~165.~~234. The Deportation Provision is also vague on its face as applied to protected speech because it provides standardless, limitless discretion to government officials charged with its enforcement regarding when a person's expression would "compromise a compelling United States foreign policy interest."

~~166.~~235. The Deportation Provision is also vague on its face as applied to protected speech because it authorizes arbitrary and discriminatory enforcement, granting the Secretary of State unfettered and unreviewable discretion to arbitrarily enforce the Deportation Provision based on his own subjective determination of what will compromise or adversely affect foreign policy.

~~167.~~236. The Deportation Provision is also vague on its face as applied to protected speech because the United States' foreign policy interests are vast, ever-changing, and often kept confidential from the public. *See Massieu v. Reno*, 915 F. Supp. 681, 700–03 (D.N.J.) (concluding 8 U.S.C. § 1227(a)(4)(C)(i) is void for vagueness), *rev'd on other grounds*, 91 F.3d 416 (3d Cir. 1996).

~~168.~~237. Plaintiffs are entitled to a declaration under 28 U.S.C. § 2201 that the Deportation Provision is void for vagueness under the Fifth Amendment as applied to deportations based on protected speech and that the Fifth Amendment prohibits deporting Plaintiffs and/or their noncitizen members under the Deportation Provision for engaging in protected speech.

**FOURTH CLAIM**

**Fifth Amendment (Vagueness)**

**Deportation Provision**

**(Injunctive Relief)**

~~169.~~238. Plaintiffs re-allege and re-incorporate the preceding paragraphs as though fully set forth herein.

~~170.~~239. The Deportation Provision is unconstitutionally void for vagueness under the Fifth Amendment as applied to deportations based on protected speech for the reasons stated in Claim III.

~~171.~~240. Plaintiffs are entitled to injunctive relief preventing Secretary Rubio from rendering Plaintiffs and/or their noncitizen members deportable under the Deportation Provision based on protected speech. *See Bell*, 327 U.S. at 684; *Ex parte Young*, 209 U.S. 123.

~~172.~~241. Plaintiffs are entitled to injunctive relief preventing Secretary Noem from initiating deportation proceedings against or otherwise invoking the Deportation Provision against Plaintiffs and/or their noncitizen members based on protected speech. *See Bell*, 327 U.S. at 684; *Ex parte Young*, 209 U.S. 123.

~~173.~~242. Plaintiffs have no adequate legal, administrative, or other remedy by which to prevent or minimize the continuing irreparable harm to their First and Fifth Amendment rights. Without injunctive relief against the Deportation Provision as applied to protected speech, Secretary Rubio's suppression and chill of Plaintiffs' First Amendment rights will continue, and Plaintiffs will suffer per se irreparable harm indefinitely.

~~174.~~243. The balance of equities and the public interest ~~favors~~favor permanent injunctive relief because "it is always in the public interest to prevent the violation of a party's constitutional rights." *X Corp.*, 116 F.4th at 904 (internal quotation marks omitted).

~~175.~~244. Plaintiffs acknowledge that, under 8 U.S.C. § 1252(f)(1), only the Supreme Court has jurisdiction to "enjoin or restrain the operation" of the Deportation Provision. Plaintiffs therefore plead the request for injunctive relief so it is contained in the operative pleading and may be raised to the Supreme Court in later proceedings.

**FIFTH CLAIM**

**First Amendment**

**Revocation Provision**

**(Declaratory Relief)**

~~176.~~245. Plaintiffs re-allege and re-incorporate the preceding paragraphs as though fully set forth herein.

~~177.~~246. Subjecting noncitizens to adverse immigration action for protected speech violates the First Amendment for the reasons stated in Claim I.

~~178.~~247. The Revocation Provision, 8 U.S.C. § 1201(i), provides that "[a]fter the issuance of a visa or other documentation to any alien, the … Secretary of State may at any time, in his discretion, revoke such visa or other documentation."

~~179.~~248. The Revocation Provision allows the Secretary of State to revoke a "visa or other documentation" based on protected speech.

~~180.~~249. For example, Secretary Rubio used the Revocation Provision to revoke Rümeysa Öztürk's visa based on her protected speech of coauthoring an article for *The Tufts Daily* newspaper, and he committed to revoking visas of other lawfully present noncitizens in the future based on protected speech.

~~181.~~250. The "First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech." *Lozman*, 585 U.S. at 90.

~~182.~~251. Revoking the visa or other documentation of a noncitizen would deter and is deterring people of ordinary firmness from engaging in protected speech.

~~183.~~252. Revocations of visas and other documents for protected speech necessarily rely on viewpoint or content discrimination, because the Secretary of State is singling out particular expression for disfavored treatment, making the Revocation Provision subject to strict scrutiny as applied to protected speech.

~~184.~~253. Restricting speech to tilt public debate and opinion about American foreign policy and silence views contrary to the current government's foreign policy "is not [a] valid, let alone substantial" government interest. *Moody*, 603 U.S at 740.

~~185.~~254. The Revocation Provision, as applied to protected speech, is not narrowly tailored because it vests the Secretary of State with unbounded, unbridled, and unconstrained discretion to revoke visas and other documentation based on protected speech for whatever reason the Secretary personally deems sufficient.

~~186.~~255. The Revocation Provision, as applied to protected speech, is not the least restrictive means of advancing the government's objectives because, at minimum, the government can counter the noncitizen's speech with its own speech.

~~187.~~256. Plaintiffs are entitled to a declaration under 28 U.S.C. § 2201 that the First Amendment prohibits revoking the visa or other documentation of Plaintiffs or their noncitizen members under the Revocation Provision based on protected speech.

**SIXTH CLAIM**

**First Amendment**

**Revocation Provision**

**(Injunctive Relief)**

~~188.~~257. Plaintiffs re-allege and re-incorporate the preceding paragraphs as though fully set forth herein.

~~189.~~258. Revoking noncitizens' visas or other documentation based on protected speech violates the First Amendment for the reasons stated in Claim V.

~~190.~~259. Plaintiffs are entitled to injunctive relief preventing Secretary Rubio from revoking the visas or other documentation of Plaintiffs and/or their noncitizen members under the Revocation Provision based on protected speech. *See Bell*, 327 U.S. at 684; *Ex parte Young*, 209 U.S. 123.

~~191.~~260. Plaintiffs are entitled to injunctive relief preventing Secretary Noem from initiating deportation proceedings against Plaintiffs and/or their noncitizen members based on visas revoked under the Revocation Provision for engaging in protected speech. *See Bell*, 327 U.S. at 684; *Ex parte Young*, 209 U.S. 123.

~~192.~~261. Plaintiffs have no adequate legal, administrative, or other remedy by which to prevent or minimize the continuing irreparable harm to their First Amendment rights. Without injunctive relief against the Revocation Provision as applied to protected speech, Secretary Rubio's suppression and chill of Plaintiffs' First Amendment rights will continue, and Plaintiffs will suffer per se irreparable harm indefinitely.

~~193.~~262. The balance of equities and the public interest ~~favors~~favor permanent injunctive relief because "it is always in the public interest to prevent the violation of a party's constitutional rights." *X Corp.*, 116 F.4th at 904 (internal quotation marks omitted).

~~194.~~263. The Revocation Provision is not subject to Section 1252(f)'s bar on injunctive relief because it falls outside "the provisions of part IV of this subchapter [8 U.S.C. §§ 1221–1232]." 8 U.S.C. 1252(f)(1).

**SEVENTH CLAIM**

**Fifth Amendment (Vagueness)**

**Revocation Provision**

**(Declaratory Relief)**

~~195.~~264. Plaintiffs re-allege and re-incorporate the preceding paragraphs as though fully set forth herein.

~~196.~~265. For the reasons stated in Claim III, the Fifth Amendment prohibits vague laws that fail to give the public notice of what is required or lack standards to prevent arbitrary or discriminatory enforcement.

~~197.~~266. The Revocation Provision is unconstitutionally vague as applied to protected speech because it provides noncitizens no notice of what protected expression could trigger the revocation of their visa or other documentation.

~~198.~~267. The Revocation Provision is also vague on its face as applied to protected speech, because it provides limitless discretion to government officials charged with its enforcement regarding when a noncitizen's protected speech provides a basis revoke a visa or other documentation.

~~199.~~268. The Revocation Provision is also unconstitutionally vague as applied to protected speech because it provides no guidance to government officials charged with its enforcement regarding when a noncitizen's expression should trigger revocation of a visa or other documentation.

~~200.~~269. The Revocation Provision is also unconstitutionally vague as applied to protected speech because it authorizes arbitrary and discriminatory enforcement by granting the Secretary of State and subordinate officials unfettered and unreviewable authority to revoke a visa "at any time, in his discretion." 8 U.S.C. § 1201(i).

~~201.~~270. Plaintiffs are entitled to a declaration under 28 U.S.C. § 2201 that the Fifth Amendment prohibits revoking the visa or other documentation of Plaintiffs or their noncitizen members under the Revocation Provision based on protected speech.

**EIGHTH CLAIM**

**Fifth Amendment**

**Discretionary Revocation Provision**

**(Injunctive Relief)**

~~202.~~271. Plaintiffs re-allege and re-incorporate the preceding paragraphs as though fully set forth herein.

~~203.~~272. The Revocation Provision is unconstitutionally void for vagueness under the Fifth Amendment as applied to revocations of visas or other documentation based on protected speech for the reasons stated in Claim VII.

~~204.~~273. Plaintiffs are entitled to injunctive relief preventing Secretary Rubio from revoking visas or other documentation of Plaintiffs and/or their noncitizen members under the Revocation Provision based on protected speech. *See Bell*, 327 U.S. at 684; *Ex parte Young*, 209 U.S. 123.

~~205.~~274. Plaintiffs are entitled to injunctive relief preventing Secretary Noem from initiating deportation proceedings against Plaintiffs and/or their noncitizen members based on visas revoked under the Revocation Provision for engaging in protected speech. *See Bell*, 327 U.S. at 684; *Ex parte Young*, 209 U.S. 123.

~~206.~~275. Plaintiffs have no adequate legal, administrative, or other remedy by which to prevent or minimize the continuing irreparable harm to their First Amendment rights. Without injunctive relief against the Revocation Provision as applied to protected speech, Secretary Rubio's suppression and chill of Plaintiffs' First Amendment rights will continue, and Plaintiffs will suffer per se irreparable harm indefinitely.

~~207.~~276. The balance of equities and the public interest ~~favors~~favor permanent injunctive relief because "it is always in the public interest to prevent the violation of a party's constitutional rights." *X Corp.*, 116 F.4th at 904 (internal quotation marks omitted).

~~208.~~277. The Revocation Provision is not subject to Section 1252(f)'s bar on injunctive relief because it falls outside "the provisions of part IV of this subchapter [8 U.S.C. §§ 1221–1232]." 8 U.S.C. 1252(f)(1).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment against Defendants in their official capacities and issue the following relief:

A. Declare that the First Amendment prohibits deporting Plaintiffs and/or their noncitizen members under the Deportation Provision[3] for engaging in protected speech;[4]

B. Declare that, as to Plaintiffs and/or their noncitizen members, the Deportation Provision is void for vagueness under the Fifth Amendment as applied to deportations based on protected speech;

C. A preliminary and permanent injunction prohibiting Secretary Rubio from rendering Plaintiffs and/or their noncitizen members deportable under the Deportation Provision based on protected speech;[5]

---

[3] As used in the Prayer for Relief, "Deportation Provision" has the same meaning as in Paragraph Seven above.

[4] To be clear, Plaintiffs' lawsuit does not challenge the Secretary's separate exclusion authority under 8 U.S.C. § 1182(a)(3)(C)(iii). Plaintiffs' challenge is solely to 8 U.S.C. § 1227(a)(4)(C)(i) as applied to the initiation of deportation proceedings based on protected speech.

[5] Plaintiffs acknowledge that, under 8 U.S.C. § 1252(f), only the Supreme Court has jurisdiction to "enjoin or restrain the operation" of the Deportation Provision. Plaintiffs therefore plead the request for injunctive relief so it is contained in the operative pleading and may be raised to the Supreme Court in later proceedings. Section 1252(f) does not, however, constrain this Court's ability to enjoin the Revocation Provision or render declaratory relief regarding the constitutionality of the Deportation Provision as to Plaintiffs and their noncitizen members. *See Biden v. Texas*, 597 U.S. 785, 800–01 (2022).

D. A preliminary and permanent injunction prohibiting Secretary Noem from initiating deportation proceedings or otherwise invoking the Deportation Provision against Plaintiffs and/or their noncitizen members based on protected speech;

E. Declare that the First Amendment prohibits revoking the visas or other documentation of Plaintiffs and/or their noncitizen members under the Revocation Provision[6] based on protected speech;

F. Declare that as to Plaintiffs and/or their noncitizen members, the Revocation Provision is void for vagueness under the Fifth Amendment as applied to revocations of visas or other documentation based on protected speech;

G. A preliminary and permanent injunction prohibiting Secretary Rubio from revoking the visas or other documentation of Plaintiffs and/or their noncitizens members under the Revocation Provision for engaging in protected speech;[7]

H. A preliminary and permanent injunction prohibiting Secretary Noem from initiating deportation proceedings against Plaintiffs and/or their noncitizen members based on visas revoked under the Revocation Provision for engaging in protected speech;

I. Award reasonable attorneys' fees and costs under 28 U.S.C. § 2412(b) and any other applicable law; and

J. Award such other relief as the Court may deem just and proper.

---

[6] As used in the Prayer for Relief, "Revocation Provision" has the same meaning as in Paragraph Seven above.

[7] The Revocation Provision is not subject to Section 1252(f)'s bar on injunctive relief because it falls outside "the provisions of part IV of this subchapter [8 U.S.C. §§ 1221–1232]." 8 U.S.C. 1252(f)(1).

Dated: ~~August 6~~December 4, 2025

/s/ *Marc Van Der Hout*
Marc Van Der Hout (Cal. Bar #80778)
Johnny Sinodis (Cal. Bar #290402)
Oona Cahill (Cal. Bar #354525)
**VAN DER HOUT LLP**
360 Post Street, Suite 800
San Francisco, CA 94108
Telephone: (415) 981-3000
Facsimile: (415) 981-3003
Email: ndca@vblaw.com

Respectfully Submitted,

/s/ *Conor T. Fitzpatrick*
Conor T. Fitzpatrick (Mich. Bar #P78981)*
Daniel A. Zahn (D.C. Bar #90027403)*
**FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION (FIRE)**
700 Pennsylvania Avenue SE, Suite 340
Washington, DC 20003
Telephone: (215) 717-3473
Email: conor.fitzpatrick@thefire.org
Email: daniel.zahn@thefire.org

Colin P. McDonell (Cal. Bar #289099)
**FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION (FIRE)**
510 Walnut Street, Suite 900
Philadelphia, PA 19106
Telephone: (215) 717-3473
Email: colin.mcdonell@thefire.org

*~~Pro~~Admitted pro hac vice ~~application forthcoming~~

*Counsel for Plaintiffs*

CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney
PAMELA T. JOHANN (CABN 145558)
Chief, Civil Division
KELSEY J. HELLAND (CABN 298888)
Assistant United States Attorney

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-6488
FAX: (415) 436-6748
kelsey.helland@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| STANFORD DAILY PUBLISHING CORP., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>RUBIO, *et al.*,<br><br>Defendants. | Case No. 5:25-cv-06618-NW<br><br>**DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date: November 19, 2025<br>Time: 9:00 a.m.<br>Place: Courtroom 3, 5th Floor<br><br>The Honorable Noël Wise |

# TABLE OF CONTENTS

NOTICE OF MOTION ..... 1
RELIEF REQUESTED ..... 1
MEMORANDUM OF POINTS AND AUTHORITIES ..... 1
I. INTRODUCTION ..... 1
II. ISSUES TO BE DECIDED ..... 2
III. BACKGROUND ..... 3
A. Statutory Background. ..... 3
1. Nonimmigrant student visas. ..... 3
2. Visa-revocation and foreign-policy-removal provisions. ..... 3
B. Longstanding Enforcement of the Statutes. ..... 5
C. Enforcement of the Statutes by the Current Administration. ..... 6
D. Plaintiffs Have Not Been Threatened With Enforcement. ..... 9
IV. LEGAL STANDARD ..... 11
V. ARGUMENT ..... 11
A. Plaintiffs Lack Standing. ..... 11
1. Stanford Daily lacks standing. ..... 11
2. The individual Plaintiffs lack standing. ..... 13
B. Plaintiffs' Claims Lack Merit. ..... 16
1. The statutes do not violate the First Amendment. ..... 16
2. The statutes do not violate the Fifth Amendment. ..... 20
VI. CONCLUSION ..... 25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abourezk v. Reagan*,
592 F. Supp. 880 (D.D.C. 1984) .......... 4, 22

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .......... 11

*Arab Anti-Discrimination Comm. v. Reno*,
70 F.3d 1045 (9th Cir. 1995) .......... 18

*Baggett v. Bullitt*,
377 U.S. 360 (1964) .......... 25

*Bluman v. FEC*,
800 F. Supp. 2d 281 (D.D.C. 2011) .......... 18

*Boutilier v. INS*,
387 U.S. 118 (1967) .......... 24

*Bridges v. California*,
314 U.S. 252 (1941) .......... 17

*Bridges v. Wixon*,
326 U.S. 135 (1945) .......... 17

*Buckley v. Valeo*,
424 U.S. 1 (1976) .......... 19

*Cal. Pac. Bank v. FDIC*,
885 F.3d 560 (9th Cir. 2018) .......... 23

*California v. Texas*,
593 U.S. 659 (2021) .......... 14

*Carlson v. Landon*,
342 U.S. 524 (1952) .......... 21, 22

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .......... 11

*Citizens United v. FEC*,
558 U.S. 310 (2010) .......... 19

*Culinary Workers Union, Loc. 226 v. Del Papa*,
200 F.3d 614 (9th Cir. 1999) .... 15

*Demore v. Kim*,
538 U.S. 510 (2003).... 16, 20, 21

*Dep't of State v. Muñoz*,
602 U.S. 899 (2024).... 19

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024).... 12, 13

*Fiallo v. Bell*,
430 U.S. 787 (1977).... 21

*Goldstein v. Galvin*,
719 F.3d 16 (1st Cir. 2013).... 16

*Grayned v. City of Rockford*,
408 U.S. 104 (1972).... 21, 25

*Harisiades v. Shaughnessy*,
342 U.S. 580 (1952).... 17, 20, 21, 22

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010).... 19, 22, 25

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977).... 11, 12

*Int'l Ps. for Ethical Care Inc. v. Ferguson*,
146 F.4th 841 (9th Cir. 2025) .... 13

*Johnson v. Eisentrager*,
339 U.S. 763 (1950).... 17

*Khalil v. Trump*,
784 F. Supp. 3d 705 (D.N.J. 2025) .... 25

*Jordan v. DeGeorge*,
341 U.S. 223 (1951).... 24

*Kleindienst v. Mandel*,
408 U.S. 753 (1972).... 19

*Kolender v. Lawson*,
461 U.S. 352 (1983).... 21, 25

*Kwong Hai Chew v. Colding*,
344 U.S. 590 (1953) .......... 17

*Lopez v. Candaele*,
630 F.3d 775 (9th Cir. 2010) .......... 15, 16

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) .......... 13

*Mahler v. Eby*,
264 U.S. 32 (1924) .......... 24, 25

*Massieu v. Reno*,
915 F. Supp. 681 (D.N.J. 1996) .......... 25

*Mathews v. Diaz*,
426 U.S. 67 (1976) .......... 16, 20, 21

*Murthy v. Missouri*,
603 U.S. 43 (2024) .......... 12

*NAACP v. Button*,
371 U.S. 415 (1963) .......... 13

*Negusie v. Holder*,
555 U.S. 511 (2009) .......... 20

*OPAWL - Bldg. AAPI Feminist Leadership v. Yost*,
118 F.4th 770 (6th Cir. 2024) .......... 18, 20

*Palestine Info. Off. v. Shultz*,
853 F.2d 932 (D.C. Cir. 1988) .......... 21

*Papachristou v. City of Jacksonville,*
405 U.S. 156 (1972) .......... 25

*Pritkin v. DOE*,
254 F.3d 791 (9th Cir. 2001) .......... 13

*Qatanani v. Bondi*,
144 F.4th 485 (3d Cir. 2025) .......... 18

*Regan v. Wald*,
468 U.S. 222 (1984) .......... 22

*Reno v. Am-Arab Anti-Discrimination Comm.*,
525 U.S. 471 (1999) .......... 18

Case: 26-6909, 11/30/2026, DktEntry: 16.15, Page 48 of 300

*Rodriguez Diaz v. Garland*,
53 F.4th 1189 (9th Cir. 2022) .......... 16, 21

*AAUP v. Rubio*,
780 F. Supp. 3d 350 (D. Mass. 2025) .......... 16

*Sessions v. Dimaya*,
584 U.S. 148 (2018) .......... 22

*Smith v. Goguen*,
415 U.S. 566 (1974) .......... 25

*Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*,
600 U.S. 181 (2023) .......... 12, 13

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) .......... 15

*Thomas v. Anchorage Equal Rights Comm'n*,
220 F.3d 1134 (9th Cir. 2000) .......... 11, 14, 15

*Tingley v. Ferguson*,
47 F.4th 1055 (9th Cir. 2022) .......... 14

*Trump v. Hawaii*,
585 U.S. 667 (2018) .......... 16, 21

*Turner v. Williams*,
194 U.S. 279 (1904) .......... 17

*United Pub. Workers of Am. v. Mitchell*,
330 U.S. 75 (1947) .......... 16

*United States v. Curtiss–Wright Export Corp.*,
299 U.S. 304 (1936) .......... 21, 24

*United States v. Singh*,
979 F.3d 697 (9th Cir. 2020) .......... 18, 19

*United States v. Verdugo-Urquidez*,
494 U.S. 259 (1990) .......... 17

*United States v. Williams*,
553 U.S. 285 (2008) .......... 25

*Younger v. Harris*,
401 U.S. 37 (1971) .......... 15

*Zemel v. Rusk*,
381 U.S. 1 (1965) ........ 21, 24

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
576 U.S. 1, (2015) ........ 24

**Statutes**

8 U.S.C. § 1101 ........ 3
8 U.S.C. § 1182 ........ 4, 20, 23
8 U.S.C. § 1201 ........ passim
8 U.S.C. § 1227 ........ passim
8 U.S.C. § 1229a ........ 5
8 U.S.C. § 1429 ........ 19
Pub. L. 82-414 ........ 3
Pub. L. 101-649 ........ 4

**Rules**

Federal Rule of Civil Procedure 56 ........ 1, 11

**Other Authorities**

Executive Order 13899 ........ 7
Executive Order 14161 ........ passim
Executive Order 14188 ........ 7, 19

Case: 26-6900, 11/20/2026, DktEntry: 16.15, Page 50 of 300

**NOTICE OF MOTION**

PLEASE TAKE NOTICE that on November 19, 2025 at 9:00 a.m., or as soon thereafter as the matter may be heard in Courtroom 3, 5th Floor, 280 South 1st Street, San Jose, CA 95113, the Honorable Noël Wise presiding, Defendants Marco Rubio, in his official capacity as Secretary of State, and Kristi Noem, in her official capacity as Secretary of Homeland Security, will and hereby do move this Court for an order granting summary judgment in favor of Defendants and against Plaintiffs Stanford Daily Publishing Corporation ("Stanford Daily"), Jane Doe, and John Doe. This motion is made pursuant to Federal Rule of Civil Procedure 56. If summary judgment is not granted in full, Defendants seek summary adjudication on each of Plaintiffs' claims and each event as the basis therefor. This motion is based on this Notice, the accompanying Memorandum of Points and Authorities, the Declaration of Kelsey J. Helland ("Helland Decl.") and exhibits attached thereto, the Court's files in this matter, other matters of which the Court takes judicial notice, and any oral argument and additional evidence presented.

**RELIEF REQUESTED**

Defendants seek entry of judgment in their favor on each of Plaintiffs' claims.

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

Plaintiffs ask this Court for the remarkable relief of defining how the First Amendment applies to nonimmigrant student visa holders in the absence of any actual enforcement action taken against them. Plaintiffs claim that months ago they attended protests and made various political remarks, but they admit that the government has not revoked their visas or initiated removal proceedings against them. Nor do Plaintiffs inform the Court of what, exactly, they wish to say which they contend could render them subject to potential enforcement in the future. In other words, Plaintiffs ask the Court for an advisory opinion.

Plaintiffs lack standing to seek their requested relief. Article III requires plaintiffs to demonstrate an actual injury that is concrete and particularized. Parties must rely on their own injuries, not those of third parties. And a threatened future injury must be imminent and certainly impending. Plaintiffs do not come close to meeting this standard here. Plaintiff Stanford Daily is a college

Case: 26-6900, 11/20/2026, DktEntry: 16.15, Page 51 of 300

newspaper; it portrays itself as an advocacy organization for purposes of this litigation, but in reality, it simply reports on campus affairs. It cannot maintain standing based on speculative injuries to its staff or interviewees. Nor have the unidentified individual Plaintiffs demonstrated a sufficiently imminent future injury. To the contrary, less than 1% of the thousands of campus protestors reviewed by DHS this year (with only a small fraction referred to the State Department) have been subject to revocation or removability enforcement, and such enforcement actions were based on more than pure protected speech. Indeed, the individual Plaintiffs admit that they have not been subject to enforcement themselves, in spite of their prior speech.

Even if Plaintiffs had standing, their claims would fail on the merits. Nonimmigrant student-visa holders have only temporary and tenuous connections to the United States. Congress has wide discretion to legislate, and the Executive has wide discretion to vindicate, the foreign-policy interests of the United States with respect to such temporary visitors. For decades, Congress has authorized the Executive to revoke visas and initiate removal proceedings for foreign-policy reasons. Especially in light of the limited constitutional protections afforded to such visitors, these statutes pass constitutional muster under the First and Fifth Amendments.

The Court should therefore deny Plaintiffs' motion for summary judgment and grant this cross-motion for summary judgment.

**II. ISSUES TO BE DECIDED**

1. Whether Plaintiffs have Article III standing, where one of them is a student newspaper and the other two are individual student-visa holders, none of whom has been subject to enforcement under the statutes at issue.

2. Whether Plaintiffs' First Amendment claims fail, because nonimmigrant student-visa holders have reduced First Amendment rights, and the government has facially neutral and bona fide reasons for being able to revoke visas and initiate removal proceedings for foreign-policy reasons.

3. Whether Plaintiffs' Fifth Amendment claims fail, because Plaintiffs have not been subject to any enforcement action and the statutes at issue appropriately recognize Congress's and the Executive's foreign-policy and national-security prerogatives.

## III. BACKGROUND

### A. Statutory Background.

#### 1. Nonimmigrant student visas.

Student and exchange visitor visa holders are nonimmigrants under the Immigration and Nationality Act ("INA"). *See* 8 U.S.C. § 1101(a)(15)(F), (J), (M). With respect to F-1 nonimmigrant students, the INA allows for the entry of an alien who is "a bona fide student qualified to pursue a full course of study and who seeks to enter the United States temporarily and solely for the purpose of pursuing such a course of study. . . at an established college, university, seminary, conservatory, academic high school, elementary school, or other academic institution or in an accredited language training program in the United States." *Id.* § 1101(a)(15)(F)(i) ("F-1 status"). An F-1 nonimmigrant student visa permits only temporary presence in the United States and the student must maintain "a residence in a foreign country which he [or she] has no intention of abandoning." *Id.* So, aliens present in the United States on F-1 nonimmigrant student visas are neither *residents* nor *immigrants*; rather, they have been granted permission to enter the United States temporarily for specific and limited educational purposes. The same foreign residence requirement applies for J-1 nonimmigrant exchange visitor visas and M-1 vocational student visas. *See id.* § 1101(a)(15)(J) & (15)(M).

#### 2. Visa-revocation and foreign-policy-removal provisions.

Since its first enactment in 1952, the INA has provided that nonimmigrant visas may be revoked at any time at the discretion of a consular officer or the Secretary of State. *See* Immigration and Nationality Act § 221, Pub. L. 82-414 (1952). In its current form, the statute provides:

> After the issuance of a visa or other documentation to any alien, the consular officer or the Secretary of State may at any time, in his discretion, revoke such visa or other documentation. Notice of such revocation shall be communicated to the Attorney General, and such revocation shall invalidate the visa or other documentation from the date of issuance . . . . There shall be no means of judicial review . . . of a revocation under this subsection, except in the context of a removal proceeding if such revocation provides the sole ground for removal under section 1227(a)(1)(B) of this title.

8 U.S.C. § 1201(i). An alien whose nonimmigrant visa has been revoked effective immediately may be placed into removal proceedings on that basis. *See id.* § 1227(a)(1)(B).

Similarly, the INA has for decades provided the Secretary of State the authority to determine that

Case: 26-6906, 11/20/2026, DktEntry: 16.15 (53 of 300)

an alien is subject to deportation for foreign-policy reasons: The INA's list of "classes of deportable aliens" includes those "whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States." *Id.* § 1227(a)(4)(C)(i).

The current foreign-policy-removal provision resulted from efforts to revise and restructure the various grounds for deportation and exclusion contained in the INA. Prior to 1990, the INA provided that an alien could be excluded from this country if there was reason to believe that the alien sought "to enter the United States solely, principally, or incidentally to engage in activities which would be prejudicial to the public interest." 8 U.S.C. § 1182(a)(27) (1988). The prior "public interest" ground—which was arguably *broader* than the current provision—was long interpreted to permit the government to exclude aliens for foreign policy reasons.[1] To address concerns about the breadth of the prior version, the Executive suggested replacing it "with language that limits the grounds of exclusion to potentially serious foreign policy consequences." 1987 Hearing at 40 (testimony of Legal Adviser Sofaer). Thus, the current language was enacted in 1990. *See* Immigration Act of 1990, Pub. L. 101-649, 8 U.S.C. § 1251(a)(4)(C)(i) (1990) (predecessor to current § 1227(a)(4)(C)).

Importantly, the foreign-policy-removal provision specifies that an alien cannot be removable "because of the alien's past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States *unless the Secretary of State personally determines that the alien's [presence] would compromise a compelling United States foreign policy interest*." 8 U.S.C. § 1227(a)(4)(C)(ii) (referring to the inadmissibility provision at 8 U.S.C. § 1182(a)(3)(C)(iii) (emphasis added)).

The revocation of an alien's visa, or the Secretary of State's determination that an alien is removable, does not necessarily mean they will be removed from the United States. Those are merely

[1] *See, e.g.*, *Abourezk v. Reagan*, 592 F. Supp. 880, 885 (D.D.C. 1984) (noting that Otto Skorzeny and Mme. Ngo Dinh Nhu had been excluded on foreign policy grounds). Indeed, when some representatives proposed to eliminate that provision in 1987, there were strong objections. *See Exclusion and Deportation of Aliens: Hearing before the Subcomm. on Immigration, Refugees and International Law of the H. Comm. on the Judiciary*, 100th Cong., 1st Sess. 30 (1987) ("1987 Hearing") (testimony of Judge Abraham D. Sofaer, State Department Legal Adviser); *id.* at 45 (testimony of INS Commissioner Alan Nelson); *id.* at 47 (letter from Ass't Atty Gen. John R. Bolton).

grounds for removability that the Department of Homeland Security ("DHS") may assert in formal removal proceedings in immigration court. Aliens in removal proceedings are afforded procedural protections under 8 U.S.C. § 1229a. If an alien whose nonimmigrant visa has been revoked effective immediately is placed into removal proceedings on the basis of the nonimmigrant visa revocation, and there is no other valid basis for removal, an immigration judge, and later a federal court of appeals, may review the revocation as it relates to the final order of removal. *See* 8 U.S.C. § 1201(i); *see also id.* § 1252(a)(5) (providing that the federal courts of appeals have exclusive jurisdiction over final orders of removal rendered in removal proceedings). And courts of appeals retain jurisdiction to review "constitutional claims or questions of law" in removal proceedings. *Id.* § 1252(a)(2)(D).

**B. Longstanding Enforcement of the Statutes.**

To determine whether a visa should be revoked under § 1201(i) and whether an alien is removable under § 1227(a)(4)(C), the State Department ("State") has long relied on various sources, including DHS. *See* Helland Decl. Ex. 3 at 17-20, 35-38; Ex. 5 at 34-38.[2]

Specifically, DHS Immigration and Customs Enforcement ("ICE") Homeland Security Investigations ("HSI") has throughout its history provided law enforcement-based derogatory information to State for purposes of vetting aliens. The HSI Office of Intelligence has historically analyzed potential referrals regarding derogatory information from a variety of sources and, after conducting extensive open-source reviews of information, prepared Reports of Analysis ("ROAs") for potential referral to State based on the information obtained by HSI Office of Intelligence during its review. *See id.* Ex. 5 at 45.

When they receive such referrals, Office of Intelligence analysts conduct open-source analysis and various checks to validate the availability of information and/or the referral, and, if warranted, prepare an ROA. *See id.* at 48-50. The Office of Intelligence has historically generated approximately 25,000 to 30,000 ROAs per year—regarding a wide range of investigation subjects, not simply visa referrals—from its efforts to collect, analyze, and disseminate intelligence and law enforcement

[2] Both Plaintiffs and Defendants have submitted testimony from State and DHS officials from the recent trial in *AAUP v. Rubio*, No. 1:25-cv-10685-WGY (D. Mass.). *See* Dkt. No. 13 Ex. D; Dkt. No. 14 Exs. J, K; Helland Decl. Exs. 2-5.

information to its leadership and other Executive Branch partners. *See* Dkt. No. 14, Ex. K at 49. Many of these ROAs are referred to State for potential further action.

When State receives a referral from DHS, State first determines whether the information received from DHS relates to a nonimmigrant visa holder or lawful permanent resident. *See* Helland Decl. Ex. 4 at 89. In the case of a nonimmigrant visa holder, the information is sent to the Visa Office within the Bureau of Consular Affairs. *See id.* The Visa Office examines the information to determine whether it warrants revoking the nonimmigrant visa. *See id.* at 90-92. If the Visa Office agrees the nonimmigrant visa should be revoked, the visa will be revoked under § 1201(i). *See id.* at 90. Prior to a revocation decision, DHS may be asked to provide additional information. *See id.* at 93-94.

State procedures for revoking visas are set forth in the Foreign Affairs Manual, 9 FAM 403.11. *See id.* Ex. 1. The Foreign Affairs Manual instructs consular officers that, "[a]lthough the decision to revoke a visa is a discretionary one, [they] should not use this authority arbitrarily." *Id.* at 9 FAM 403.11-4(A); *see also id.* Ex. 3 at 31-32, 52-55; Ex. 4 at 65, 85. Staff should only revoke a visa "where warranted" for various specified reasons. *Id.* Ex. 1 at 9 FAM 403.11-5(B)(a). These reasons include "when [the State Department] receives derogatory information directly from another U.S. Government agency." *Id.*

In addition to the visa revocation process described above, the Bureau of Consular Affairs analyzes DHS referrals for potential removability determinations under § 1227. Each referral is assessed individually. Depending on the visa status of the individual and the concerns raised in the referral, the Bureau may consider whether the foreign-policy-removal provision of § 1227(a)(4)(C) applies to such individual. Upon an assessment that the individual's presence or activities may present foreign policy concerns under § 1227(a)(4)(C), the Bureau then develops an action memo to pursue a determination from the Secretary of State. *See* Helland Decl. Ex. 4 at 85-91.

**C. Enforcement of the Statutes by the Current Administration.**

On January 20, 2025, the President signed Executive Order 14161: *Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats*. 90 Fed. Reg. 9451. The EO declares the United States' policy to "protect its citizens from aliens who intend to commit terrorist attacks, threaten our national security, espouse hateful ideology, or otherwise exploit the immigration

laws for malevolent purposes." *Id.* § 1(a). To the extent that EO 14161 requires departments or agencies to act in furtherance of its policy goals (*see, e.g.*, §§ 2(b)(iii), 2(b)(iv), 3(a), 3(b), 3(e)), § 4 makes express that any such action must be done consistent with all applicable law. *Id.* § 4(a)(i)-(ii).

Just over one week later, on January 29, 2025, the President signed Executive Order 14188, *Additional Measures to Combat Anti-Semitism*. 90 Fed. Reg. 8847. EO 14188 calls for stepped up federal enforcement in the wake of an "unprecedented wave" of antisemitic "discrimination, vandalism, and violence" against citizens and "especially in our schools and on our campuses." *Id.* § 1. EO 14188 directs executive agencies to use "all available and appropriate legal tools, to prosecute, remove, or otherwise hold to account the perpetrators of unlawful anti-Semitic harassment and violence." *Id.* § 2. As above, however, EO 14188 makes express that any such action must be taken "consistent with applicable law," and affirms that "agencies shall not diminish or infringe upon any right protected under Federal law or under the First Amendment." *Id.* § 4(b); *see also* EO 13899 § 2(b), 84 Fed. Reg. 68779.

Following this issuance of EOs 14161 and 14188, DHS and State undertook measures to implement the priorities and emphases the EOs established. *See* Helland Decl. Ex. 3 at 21-22, 31-33; Ex. 5 at 43-46. With respect to EO 14161, State issued guidance in the form of a cable to its diplomatic posts abroad to review the nonimmigrant visa system, and when derogatory information related to an individual appeared in the system, to revoke the individual's visa, if warranted. *See id.* Ex. 4 at 99-101. However, State did not change its criteria or procedures for revoking nonimmigrant visas. *See id.* at 94.

Similarly, based on the EOs, DHS aligned its resources and priorities, within the existing statutory and regulatory framework, to best accomplish those goals. *See id.* Ex. 5 at 43. HSI developed a plan to process referrals from a variety of sources to complement the EOs and use HSI's existing lines of effort. *See id.* at 46. The plan created a team, based within the ICE HSI Office of Intelligence, to process the especially large volume of referrals it was receiving, particularly related to protesters. *See id.* at 48. Following the EOs, the Office of Intelligence received a list of over 5,000 names of individuals involved with protests related to Israel (including both citizens and aliens), whom the Office of Intelligence team investigated under Title 8 and for potential violations of law. *See id.* Ex. 2 at 83-84, 97. Part of the Office of Intelligence team's work involved reviewing the Canary Mission website, which itself listed more than 5,000 names of protesters. *See* Dkt. No. 14 Ex. J at 109-112; Helland Decl.

Case: 26-6906, 11/20/2026, DktEntry: 16.15 (57 of 300)

Ex. 2 at 98-99. However, Canary Mission was only one of multiple publicly available sources the team reviewed. Dkt. No. 14 Ex. J at 118; *see* Helland Decl. Ex. 2 at 75-78. The team also obtained police records for individuals arrested by police during protests. Dkt. No. 14 Ex. J at 118-119.

In the context of sharing information with the State Department, each ROA would be reviewed and ultimately submitted for approval within the Office of Intelligence leadership framework. *See* Helland Decl. Ex. 5 at 49-50. Thereafter, the Office of Intelligence would send a package for referral to the Assistant Director of the HSI National Security Division. *See id.* If the Assistant Director approved the referral package, it would be formally referred to the Department of State for information sharing purposes. *See id.* at 50-51.

HSI has completed its review of the 5,000-plus campus-protester names referred to it. From those leads, the Office of Intelligence team generated between 100 and 200 ROAs, representing no more than, at most, about 4% of the total. *See id.* Ex. 2 at 83-84, 97-98, 105-108. Those ROAs were sent to the National Security Division. For the remaining more-than-95% of leads, the Office of Intelligence took no further action. *See id.* at 106. From the roughly 200 ROAs, between approximately 10 and 50 were referred to State regarding specific individuals associated with these protests. *See id.* Ex. 5 at 55-56, 77. Of those referrals to State involving nonimmigrant visa holders, approximately 25% to 30% did not result in revocations or removability determinations, either because they are sent back to DHS to ask for more information or because State found the information not significant enough to warrant revocation. *See id.* Ex. 4 at 93-94. Thus, less than 1% of campus-protest leads (at most, approximately 40 out of more than 5,000) have resulted in nonimmigrant visa revocations—and these revocations were the result of the individuals' *conduct* at protests or other information discovered about them from the resulting investigations, *not* their mere participation in or presence at public protests or pure political speech. *See, e.g.*, *id.* Ex. 4 at 121-22; Ex. 5 at 39-41, 54-60, 92-95.

To be clear: Neither State nor DHS have a policy of targeting individuals based on protected political speech. *See id.* Ex. 4 at 121-22; Ex. 5 at 59-60. State adheres to statutory authority rendering aliens inadmissible for certain support for terrorist activity (*see, e.g.*, 8 U.S.C. § 1182(a)(3)(B)-(C)) and maintains that supporting a terrorist organization can result in the revocation of a visa (*see* Helland Decl. Ex. 4 at 121-22), but as explained below, such revocations do not burden protected speech. And for its

part, DHS views supporting terrorism and certain kinds of disruptive conduct as warranting investigation and potential referral—such as engaging in violence during protests, promoting the destruction of property, etc. (*see id.* Ex. 5 at 39-41, 59-60, 92-95)—but this, too, does not implicate protected speech. Indeed, DHS does not refer individuals for visa revocations solely because they participated in public protests. *See id.* at 39. Nor does DHS refer individuals for visa revocations solely because they have used the phrase "from the river to the sea, Palestine will be free," or described Israel as having committed "genocide" or "apartheid" in Gaza. *See id.* at 59-60. In short, both agencies have expressly disavowed any policy or intention to target individuals based on pure political speech.

**D. Plaintiffs Have Not Been Threatened With Enforcement.**

Plaintiffs are Stanford University's independent student-run newspaper and two pseudonymous individuals with unclear ties to the University or the newspaper. According to their own representations, none of the three Plaintiffs has been subject to any enforcement action.

Plaintiff Stanford Daily "strives to serve the Stanford community with relevant, unbiased journalism and provides its editorial, tech, and business staffs with unparalleled educational opportunities." Dkt. No. 32-1 ("Mot.") 8 (quoting Dkt. No. 1 ("Compl.") ¶ 68). It "has sought to cover all relevant campus activities in an unbiased fashion and provide an outlet for Stanford community members to publish opinions." Compl. ¶ 69. The Stanford Daily asserts that "since the Trump administration began targeting lawfully present noncitizens for deportation based on protected speech in March 2025, lawfully present noncitizen students working at and contributing to Stanford Daily have self-censored expression for fear of visa revocation, arrest, detention, and deportation." *Id.* ¶ 72. "For example, in March 2025, a lawfully present noncitizen editor on staff decided to quit Stanford Daily because of the student's nonimmigrant visa status. Fearing visa revocation, arrest, and deportation for association with articles about Israel or Palestine, the student decided to leave the newspaper." *Id.* ¶ 73. "As another example, one lawfully present noncitizen student on staff signed up to cover a story about a vigil that brought together Jewish and Palestinian families to honor those who died in the conflict in Gaza." *Id.* ¶ 75. "But because of the student's nonimmigrant visa status, and fear that they may face adverse immigration consequences if they published the article, the student decided against publishing the article." *Id.* The newspaper asserts that other current and former staff writers and editorial board

members have asked to be removed from the website, and that international students have been less willing to speak with Stanford Daily journalists, especially on the record and about topics like Israel and Palestine. *Id.* ¶¶ 77-88; *see also* Mot. 8. It does not assert that any immigration enforcement action has been taken against it, its staff, its editorial board, or any international students at Stanford. *See* Mot. 8; Compl. ¶¶ 65-88.

Plaintiff Jane Doe asserts that she "is a graduate of a United States university, resides in the United States lawfully pursuant to her admission on an F-1 student visa, and was a member of a pro-Palestinian student group." Mot. 7.[3] "She published pro-Palestinian/anti-Israel commentary online, including accusing Israel of committing 'genocide' and perpetuating 'apartheid.'" *Id.* "She has also used the slogan 'from the river to the sea, Palestine will be free,' and criticized American foreign policy, particularly its relationship with Israel." *Id.* Jane Doe "appeared in a profile on" the Canary Mission website. *Id.* "Since March 2025, fearing Secretary Rubio will revoke her visa . . . Jane Doe has refrained from publishing and voicing her true opinions regarding Palestine and Israel and has deactivated her social media accounts to guard against retaliation for past expression." *Id.* She does not assert that any enforcement action has been taken against her. *See id.*; *see also* Compl. ¶¶ 89-101.

Plaintiff John Doe asserts that he "is a graduate of a major United States university and is lawfully present in the United States pursuant to his admission on an F-1 student visa, working in journalism." Mot. 7. "After the October 7, 2023, attack and Israel's counter-offensive, he attended pro-Palestinian protests and published pro-Palestinian/anti-Israel commentary online." *Id.* "At protests, he participated in chants including 'from the river to the sea, Palestine will be free' and accusing Israel of committing 'genocide.'" *Id.* at 7-8. "After Secretary Rubio and the Trump administration began targeting lawfully present noncitizen students," John Doe's professor "told him to reconsider engaging in protected activity related to Israel and Palestine due to potential danger to his immigration status." *Id.* at 8. "He followed that advice, refraining from publishing an article criticizing Israel." *Id.* However, he has since "resumed engaging in protected pro-Palestinian/anti-Israel commentary, including accusing

[3] Because the individual Plaintiffs are proceeding pseudonymously, the government has no way of confirming their immigration status, the veracity of their allegations, or whether they have committed any non-speech conduct that may bear on their status. For purposes of these cross-motions, the government does not dispute the truth of their representations regarding their individual experiences.

Israel of committing genocide as well as commentary critical of American foreign policy." *Id.*; *see also* Compl. ¶¶ 102-09. He does not assert that any enforcement action has been taken against him. *See id.*

## IV. LEGAL STANDARD

The purpose of summary judgment is to identify and dispose of unsupported claims. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The existence of a "scintilla" of evidence in support of the non-moving party's position is not sufficient; the non-moving party must offer sufficient evidence on which a finder of fact could reasonably find for it. *See id.* at 252. A fact is "material" if it might affect the outcome of the case. *Id.* at 248. The party moving for summary judgment has no burden to produce any evidence on elements of a claim on which the non-moving party will bear the burden at trial. *See Celotex*, 477 U.S. at 322-23. Summary judgment is proper if the non-moving party fails to produce sufficient evidence on any element. *See id.* at 322.

## V. ARGUMENT

### A. Plaintiffs Lack Standing.

"This is a case in search of a controversy." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1137 (9th Cir. 2000) (en banc) (dismissing First Amendment challenge for lack of standing). Plaintiffs put forward various theories for why they can invoke this Court's Article III jurisdiction, but all of them fail because Plaintiffs have not shown they face an imminent injury that is traceable to the federal government.

#### 1. Stanford Daily lacks standing.

Stanford Daily argues that it has standing under three separate doctrines: (i) associational standing; (ii) corporate standing; and (iii) organizational standing. None apply here.

##### (i) Stanford Daily lacks associational standing.

The doctrine of "associational standing" allows an organization to rely on the injuries of its members to invoke the Article III jurisdiction of a federal court. *See, e.g.*, *Hunt v. Wash. State Apple*

*Advert. Comm'n*, 432 U.S. 333 (1977). "To invoke it, an organization must demonstrate that '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (quoting *Hunt*, 432 U.S. at 343).

There are reasons to doubt the continued viability of the associational-standing doctrine. *See, e.g.*, *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 398 (2024) (quotation omitted) (Thomas, J., concurring) ("Our third-party standing doctrine is mistaken. . . . [A] plaintiff cannot establish an Article III case or controversy by asserting another person's rights. . . . Associational standing . . . is simply another form of third-party standing."). Indeed, the doctrine flouts the requirements of Article III by allowing one party to rely on the injuries of another; "standing is not dispensed in gross." *Murthy v. Missouri*, 603 U.S. 43, 61 (2024).

Even if the doctrine survives, it has no application here. Stanford Daily is not an "association" of "members." It is not an advocacy organization. It is a general-purpose student-run newspaper. To be sure, the Supreme Court has allowed an advocacy organization to rely on the doctrine even when it was not "a traditional voluntary membership organization." *Hunt*, 432 U.S. at 344. But in so doing, the Court focused on the facts that the organization "perform[ed] the functions of a traditional trade association representing the Washington apple industry," and "the apple growers and dealers . . . possess all of the indicia of membership in an organization." *Id.* By contrast, Stanford Daily is not a "trade association" representing international students; it is a newspaper. Applying the doctrine here would stretch it past the breaking point. *See Students for Fair Admissions*, 600 U.S. at 200 (recognizing that the apple growers in *Hunt* were "*effectively* members of the Commission") (emphasis in original).

Nor can Stanford Daily even satisfy the doctrine's criteria. As discussed with respect to the individual Plaintiffs below, no individuals would have standing to sue in their own right, because there is no evidence that any of them have actually faced enforcement or have demonstrated a substantial threat of future enforcement. Nor are the "interests" at issue here "germane" to the newspaper's purpose—again, Stanford Daily is a general-purpose newspaper that covers "all relevant campus activities." Compl. ¶ 69. Stanford Daily has no special focus on international students or immigration

issues. *See id.* Finally, Plaintiffs have put the experiences of "individual members" at issue by purporting to base their harms on such members' mere beliefs; the "participation" of those members will therefore be necessary, especially if the case persists past summary judgment.

**(ii) Stanford Daily lacks corporate standing.**

The newspaper's "corporate standing" theory fares no better. Stanford Daily claims that it is "'directly engaged' in activities like publishing noncitizens' work, enacting noncitizens' editorial choices, and sponsoring noncitizens' speech." Mot. 13 (quoting *NAACP v. Button*, 371 U.S. 415, 428 (1963)). But the newspaper does not claim that the federal government has stopped it from taking any of these actions; at most, it claims that noncitizens themselves have opted out of those activities for their own reasons. Those intervening third-party decisions prevent Stanford Daily from establishing its own standing to challenge federal statutes itself. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Pritkin v. DOE*, 254 F.3d 791, 798 (9th Cir. 2001).

**(iii) Stanford Daily lacks organizational standing.**

For similar reasons, Stanford Daily cannot establish that the statutes at issue have "'directly affected and interfered with [its] core business activities.'" Mot. 13 (quoting *All. for Hippocratic Med.*, 602 U.S. at 395). The entirety of Plaintiffs' argument on this theory is that "Stanford Daily has encountered significant interference with its core business activity–reporting." *Id.* (citing Compl. ¶ 72). But, again, that "interference" has been the result of third parties making their own independent decisions, none of whom would have standing in their own right (as discussed further below). Moreover, the newspaper has submitted no evidentiary basis for the Court to conclude that any supposed "interference" has in fact been "significant"; there are no declarations testifying that the newspaper has been unable to publish as much as it previously did, or that the quality of its reporting has suffered by any measure. There is no foundation on which to conclude that Stanford Daily has established standing.

**2. The individual Plaintiffs lack standing.**

The individual Plaintiffs lack standing because they cannot show a substantial likelihood that they will face visa revocations or removal proceedings based on their protected speech. *See Int'l Ps. for Ethical Care Inc. v. Ferguson*, 146 F.4th 841, 853 (9th Cir. 2025) (denying standing where "Plaintiffs have not demonstrated that their injuries are imminent").

At the outset, despite having previously published content regarding Israel and Gaza; criticized America's foreign policy; described Israel's actions in Gaza as a "genocide"; used the slogan "from the river to the sea, Palestine will be free"; attended protests; and been the subject of profiles on the website Canary Mission, neither individual Plaintiff claims (much less submits evidence) that they have been subject to enforcement under the statutes. *See* Mot. 11-12; *see also* Compl. ¶¶ 17-18, 89-109. Thus, their standing must be based, if at all, on their fear of *future* enforcement.

The Ninth Circuit has established a three-part test to determine whether a plaintiff can establish standing based on an alleged threat of future enforcement, considering "whether the plaintiffs have articulated a 'concrete plan' to violate the law in question, whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings, and the history of past prosecution or enforcement under the challenged statute." *Thomas*, 220 F.3d at 1139; *see also, e.g.*, *Tingley v. Ferguson*, 47 F.4th 1055, 1067 (9th Cir. 2022). These factors defeat Plaintiffs' standing here.

First, neither Jane nor John Doe has articulated a "concrete plan" to commit conduct that would make them subject to visa revocation or removal. At most, "Jane Doe has refrained from publishing and voicing her true opinions regarding Palestine and Israel." Mot. 7. For his part, John Doe apparently once "refrain[ed] from publishing an article criticizing Israel," but has since "resumed engaging in protected pro-Palestinian/anti-Israel commentary, including accusing Israel of committing genocide as well as commentary critical of American foreign policy"—again, without suffering any enforcement action. *Id.* 8. Plaintiffs submit no actual evidence on this point, confining their discussion to a handful of lines in their brief. Neither Defendants nor the Court can say that Plaintiffs have a "concrete plan" to act in ways that would render them subject to enforcement under the statutes.

Indeed, the ambiguity of Plaintiffs' future plans underscores why the Court should deny their request to litigate the contours of the First Amendment. Plaintiffs do not ask the Court to evaluate whether certain speech is protected. *See generally* Compl. Rather, they ask the Court to ponder in the abstract about the boundaries of "protected speech" and then hold unconstitutional two statutes passed by Congress to the extent they might cross the Court's hypothetical boundaries. *See id.* But Article III does not allow the Court to render such an "advisory opinion." *See California v. Texas*, 593 U.S. 659, 673 (2021) ("To find standing here" "would threaten to grant unelected judges a general authority to

conduct oversight of decisions of the elected branches of Government.”).

Second, Defendants have not threatened Plaintiffs with enforcement. *See* Mot. 7-8, 11-12; Compl. ¶¶ 89-109. Rather, “the record is devoid of any threat” directed toward them; “[t]here has been no specific threat or even hint of future enforcement or prosecution.” *Thomas*, 220 F.3d at 1140. This case is therefore unlike cases where courts have found standing based on specific threats. *Cf., e.g.*, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014) (“Most obviously, there is a history of past enforcement here: SBA was the subject of a complaint in a recent election cycle,” and “the Commission panel actually found probable cause to believe that SBA's speech violated the false statement statute”); *Culinary Workers Union, Loc. 226 v. Del Papa*, 200 F.3d 614, 618 (9th Cir. 1999) (“Here, there has clearly been a specific threat of prosecution; the attorney general’s letter to the union is precise and exact—she will cause the statute to be enforced unless the union ceases distribution of the handbill.”).

The Supreme Court’s decision in *Younger v. Harris*, 401 U.S. 37 (1971), is instructive. The Court contrasted a plaintiff who had actually been indicted with others who had not even been threatened. *Id.* at 42. In this case, as in *Harris*, to Defendants’ knowledge Plaintiffs have not engaged in any action or conduct that puts them in immigrant danger of enforcement action.

Finally, the “history of enforcement” does not support Plaintiffs here. “[P]laintiffs’ claims of future harm lack credibility when . . . the enforcing authority has disavowed the applicability of the challenged law to the plaintiffs.” *Lopez v. Candaele*, 630 F.3d 775, 788 (9th Cir. 2010). That is the case here—both State and DHS have represented in this litigation, and elsewhere, that they do *not* pursue visa revocations and removal proceedings purely based on political speech. *See* Helland Decl. Ex. 4 at 121-22; Ex. 5 at 39, 59-60. Contrary to Plaintiffs’ implication, merely using the terms “genocide,” “apartheid,” and “from the river to the sea, Palestine will be free” has not been used as the sole basis for revoking student visas and initiating removal proceedings. Rather, revocations have been based on the types of conduct described above and other derogatory information related to potential violations of U.S. law, including but not limited to Title 8. *See ibid*; *see also* Dkt. No. 14 Ex. J at 92-95.[4]

[4] It would be inappropriate for this Court to adjudicate the validity of enforcement actions taken against third parties, who are not before the Court and who are in fact parties to separate litigation in their own right. The government has consistently taken the position across these cases that individuals subject to enforcement under the statutes have done more than exercise pure political speech.

Further, Plaintiffs cannot rely on abstract statements from the Secretaries of State and Homeland Security. "'[G]eneral threat[s] by officials to enforce those laws which they are charged to administer' do not create the necessary injury in fact." *Lopez*, 630 F.3d at 787 (quoting *United Pub. Workers of Am. v. Mitchell*, 330 U.S. 75, 88 (1947)). Crucially here, it is not the (politically-appointed) Secretary of State or Homeland Security who makes threshold decisions about whether a student visa should be revoked or removability proceedings should be initiated; rather, as described above, those initial decisions are made by staff in various offices at State and DHS. Plaintiffs therefore cannot rely on general statements from the agencies' political leadership to establish how the statutes are actually enforced. *See, e.g.*, *Trump v. Hawaii*, 585 U.S. 667, 701-02 (2018) ("[T]he issue before us is not whether to denounce the statements. It is instead the significance of those statements in reviewing a Presidential directive, neutral on its face, addressing a matter within the core of executive responsibility.").[5] Nor do those statements suggest that pure political speech is used as a basis for enforcement, as opposed to support for terrorism or other unprotected conduct. Plaintiffs bear the burden of establishing that State and DHS actually enforce the statutes against individuals like them based on pure protected speech. They have failed to do so.

**B. Plaintiffs' Claims Lack Merit.**

**1. The statutes do not violate the First Amendment.**

**(i) Aliens have reduced First Amendment rights.**

The starting principle is that the First Amendment rights of citizens and aliens are not coextensive. The Supreme Court "has firmly and repeatedly endorsed the proposition that Congress may make rules as to aliens that would be unacceptable if applied to citizens." *Demore v. Kim*, 538 U.S. 510, 522 (2003); *see also, e.g.*, *Mathews v. Diaz*, 426 U.S. 67, 79-80 (1976); *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1206 (9th Cir. 2022). The Supreme Court has therefore recognized that "[t]he alien . . . has been accorded a generous and ascending scale of rights as he increases his identity with our society," that "become more extensive and secure when he makes preliminary declaration of intention to become

[5] Of course, "[n]ot only do public officials have free speech rights, but they also have an obligation to speak out about matters of public concern." *Goldstein v. Galvin*, 719 F.3d 16, 30 (1st Cir. 2013); *see also AAUP v. Rubio*, 780 F. Supp. 3d 350, 384 n.11 (D. Mass. 2025).

Case: 26-6906, 11/20/2026, DktEntry: 16.15 (66 of 300)

a citizen, and [] expand to those of full citizenship upon naturalization." *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 n.5 (1953) (quoting *Johnson v. Eisentrager*, 339 U.S. 763, 770 (1950)); *see also, e.g.*, *United States v. Verdugo-Urquidez*, 494 U.S. 259, 269 (1990) (holding that only as a noncitizen "increases his identity with our society" do the "generous and ascending scale of rights" apply).

Consistent with this principle, the Supreme Court has held that the First Amendment does not prohibit Congress or the Executive from deporting resident aliens based on their membership in the Communist Party. *Harisiades v. Shaughnessy*, 342 U.S. 580, 591-92 (1952). That decision rested on judicial findings that "the Communist Party during the period of the alien's membership taught and advocated overthrow of the Government of the United States by force and violence." *Id.* at 583. The Court recognized that "it often is difficult to determine whether ambiguous speech is advocacy of political methods or subtly shades into a methodical but prudent incitement to violence." *Id.* at 592. And the deportation orders at issue were not based on the aliens' personal advocacy for violence, but rather their mere membership in the Communist Party. *See id.* at 582-84. Nevertheless, the Court concluded that "the First Amendment does not prevent the deportation of these aliens." *Id.* at 592; *see also Turner v. Williams*, 194 U.S. 279, 293 (1904) (rejecting First Amendment challenge to deportation based on alien's anarchist beliefs and advocacy).

To be sure, the Supreme Court has also held that the First Amendment prohibited a criminal contempt charge based on "comments pertaining to pending litigation which were published in newspapers," where the affected parties included a lawful permanent resident and a corporation. *Bridges v. California*, 314 U.S. 252, 258 (1941). But the Court in that case did not address the petitioner's citizenship. *See generally id.*; *cf. id.* at 280 (Frankfurter, J., dissenting). In a subsequent decision, the Court held that there was insufficient evidence of the petitioner's alleged membership in the Communist Party to support his deportation, and stated in *dicta* that "[f]reedom of speech and of press is accorded aliens residing in this country," citing only its prior decision in the petitioner's case. *Bridges v. Wixon*, 326 U.S. 135, 148 (1945). Writing only for himself, Justice Murphy would have held that the statute at issue was unconstitutional. *Id.* at 150 (Murphy, J., concurring). Three other justices, by contrast, would have upheld the petitioner's deportation under Congress's "plenary power over the deportation of aliens." *Id.* at 167 (Stone, J., dissenting). Thus, "*Wixon* does not resolve whether the

Case: 26-6906, 11/20/2026, DktEntry: 16.15 (67 of 300)

First Amendment applies to all resident aliens . . . . At most, its dicta suggests that lawful resident aliens, what we today could call LPRs, can potentially invoke the First Amendment in some criminal prosecutions." *Qatanani v. Bondi*, 144 F.4th 485, 516-17 (3d Cir. 2025) (Matey, J., dissenting).

Additionally, the Ninth Circuit previously held that "the values underlying the First Amendment require the full applicability of First Amendment rights to the deportation setting." *Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1064 (9th Cir. 1995) (*AADC I*). Thus, according to the Ninth Circuit, plaintiff aliens could bring a selective enforcement claim on the ground that their removal proceedings were retaliatory, and obtain injunctive relief to stop those proceedings in order to vindicate their First Amendment rights. *See id.* at 1065. But the Supreme Court disagreed; it expressly rejected the argument that post-removal relief "would come too late to prevent the 'chilling effect' upon [the aliens'] First Amendment rights." *Reno v. Am-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 488 (1999) (*AADC II*). The Court explained that "an alien unlawfully in this country has no constitutional right to assert selective enforcement as a defense against his deportation." *Id.* Ultimately, "[w]hen an alien's continuing presence in this country is in violation of the immigration laws, the Government does not offend the Constitution by deporting him for the additional reason that it believes him to be a member of an organization that supports terrorist activity." *Id.* at 491-92.

Like the Supreme Court, other lower courts have recognized that, because "[f]oreigners fall outside the community that's entitled to participate in the democratic process," "a lesser level of scrutiny could apply to" First Amendment challenges involving aliens' speech. *OPAWL - Bldg. AAPI Feminist Leadership v. Yost*, 118 F.4th 770, 777 (6th Cir. 2024) (noting issue without deciding it, because statute survived strict scrutiny); *see also, e.g.*, *Bluman v. FEC*, 800 F. Supp. 2d 281, 287 (D.D.C. 2011) (Kavanaugh, J.) (citing *Harisiades* and noting that "aliens' First Amendment rights might be less robust than those of citizens in certain discrete areas"), *aff'd*, 565 U.S. 1104 (2012).

And indeed, since *AADC I* the Ninth Circuit has held that a federal statute prohibiting foreign nationals from contributing to election campaigns, as applied to a nonimmigrant visa holder, did not violate the First Amendment. *See United States v. Singh*, 979 F.3d 697, 711 (9th Cir. 2020). The court in that case did not address the standard for such a First Amendment claim, instead recognizing that it was bound by the Supreme Court's summary affirmance in *Bluman*, which had concerned a virtually

identical issue. *See id.* Nevertheless, the outcome of *Singh* (and *Bluman*) confirms that, even in the Ninth Circuit, foreign nationals have reduced First Amendment rights compared to United States citizens. Otherwise, a statute prohibiting campaign contributions would violate the First Amendment. *See, e.g.*, *Citizens United v. FEC*, 558 U.S. 310, 339 (2010); *Buckley v. Valeo*, 424 U.S. 1, 21 (1976).

Here, Plaintiffs base their claims solely on the rights of nonimmigrant student-visa holders. *See generally* Compl. As explained above, such individuals are neither "residents" nor "immigrants" in the United States and do not intend to be; they have been allowed to study here on a temporary basis, but, among other things, must maintain a permanent residence in a foreign country which they have "no intention of abandoning." 8 U.S.C. § 1101(a)(15)(F)(i). Contrast such connections with those of a lawful permanent resident, who must have been admitted on an *immigrant* visa (based only on certain enumerated grounds), and who has manifested an intention to reside in the United States permanently and been granted permission by the United States to do so (subject to certain conditions). Contrast them further with those of a citizen, whose connections are either established by birth or by completing the rigorous naturalization process. *See, e.g.*, 8 U.S.C. § 1429.

On the "ascending scale" of constitutional rights, the interests implicated by nonimmigrants in this case are therefore significantly lower than those of United States citizens and immigrants.

**(ii) Public interests outweigh any burdens on Plaintiffs' speech.**

Because this case involves the First Amendment interests of nonimmigrant student-visa holders, the challenged statutes are constitutional so long as the government has articulated a facially legitimate and bona fide justification for their use. *See Dep't of State v. Muñoz*, 602 U.S. 899, 908 (2024); *Kleindienst v. Mandel*, 408 U.S. 753, 769-70 (1972).

The statutes easily pass that test. Indeed, the Executive Orders issued in January reflect the government's interests in "protect[ing] its citizens from aliens who intend to commit terrorist attacks, threaten our national security, espouse hateful ideology, or otherwise exploit the immigration laws for malevolent purposes," EO 14161, Sec. 1(a), and guarding against antisemitic "discrimination, vandalism, and violence" against citizens, EO 14188, Sec. 1. There can be no dispute that the government has legitimate national-security and foreign-policy interests in countering support for terrorist groups and addressing antisemitism. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 31-

32 (2010) (*HLP*) (affirming restrictions on speech in criminal material support for terrorism bar).

But even applying intermediate or strict scrutiny, the statutes would survive. This is because regulating who comes to and lives or resides in the United States is, itself, a compelling government interest. *See Harisiades*, 342 U.S. at 588-89 (immigration policies are "intricately interwoven" with foreign affairs and "are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference"); *see also Negusie v. Holder*, 555 U.S. 511, 526-27 (2009) ("in the context of immigration law, 'culpability' as a relevant factor in determining admissibility is only one facet of a more general consideration: desirability").

Congress has granted the Secretary of State broad authority in §§ 1182 and 1227 to find noncitizens inadmissible and deportable, even when it may burden their speech. Indeed, the government's authority over noncitizens has no comparator to citizens, as "[t]he exclusion of aliens and the reservation of the power to deport have no permissible counterpart in the Federal Government's power to regulate the conduct of its own citizenry." *Mathews*, 426 U.S. at 80. As a result, "[i]n the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens." *Kim*, 538 U.S. at 521 (citation and quotation omitted).

Here, therefore, Plaintiffs challenge executive and congressional conduct where their authority is at its zenith and entitled to the most deference from the courts: decisions concerning the presence of noncitizens, national security, and foreign affairs. *See Kim*, 538 U.S. at 522 ("any policy toward aliens is . . . interwoven with . . . policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government"). For example, even lawful permanent residents can be held under a no-bail provision of the INA during the pendency of civil immigration proceedings. *See id.* at 521-23. And, under state law, lawful permanent residents can be prohibited from contributing to political campaigns. *See OPAWL*, 118 F.4th at 777. So too here, statutes allowing for immigration-related enforcement actions for pro-terrorist and antisemitic speech rely on both congressional and executive authority over foreign affairs, and, hence, would satisfy any standard of review.

**2. The statutes do not violate the Fifth Amendment.**

Plaintiffs' Fifth Amendment claims fare no better. The statutes are not unconstitutionally vague under the Due Process Clause because Congress and the Executive have substantial discretion with

respect to the admission and exclusion of nonimmigrants, and in that context, the statutes provide sufficient notice to nonimmigrants that they may be subject to enforcement.

**(i) Congress has increased discretion in the immigration context.**

"For more than a century, [the Supreme Court] has recognized that the admission and exclusion of foreign nationals is a 'fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'" *Hawaii*, 585 U.S. at 702 (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977)); *see also Harisiades*, 342 U.S. at 588-89 ("[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations [and] the war power."). "Because decisions in these matters may implicate 'relations with foreign powers,' or involve 'classifications . . . defined in the light of changing political and economic circumstances,' such judgments 'are frequently of a character more appropriate to either the Legislature or the Executive.'" *Hawaii*, 585 U.S. at 702 (quoting *Mathews*, 426 U.S. at 81).

The vagueness doctrine is meant to avoid "arbitrary and discriminatory enforcement" by providing "fair warning[s]" that are "clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972); *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). But "[t]he Supreme Court has long recognized that the special exigencies of foreign policy require Congress to draft statutes that 'provide a standard far more general than that which has always been considered requisite with regard to domestic affairs.'" *Palestine Info. Off. v. Shultz*, 853 F.2d 932, 944 (D.C. Cir. 1988) (quoting *United States v. Curtiss–Wright Export Corp.*, 299 U.S. 304, 324 (1936)). As the Supreme Court has recognized, "because of the leeway necessary to represent adequately this nation's interests in foreign affairs, Congress 'must of necessity paint with a brush broader than that it customarily wields in domestic areas.'" *Id.* (quoting *Zemel v. Rusk*, 381 U.S. 1, 17 (1965)). And given aliens' reduced constitutional protections, the Due Process Clause is not offended by such increased discretion in this context. *See Kim*, 538 U.S. at 522 ("Congress may make rules as to aliens that would be unacceptable if applied to citizens."); *Mathews*, 426 U.S. at 78; *Rodriguez Diaz*, 53 F.4th at 1206.

Thus, the Supreme Court has held that Congress's authorization of immigration detention based on membership in the Communist Party does not violate the Due Process Clause of the Fifth Amendment. *See Carlson v. Landon*, 342 U.S. 524, 542 (1952). "As all alien Communists are

deportable, like Anarchists, because of Congress' understanding of their attitude toward the use of force and violence in such a constitutional democracy as ours to accomplish their political aims, evidence of membership plus personal activity in supporting and extending the Party's philosophy concerning violence gives adequate ground for detention." *Id.* at 541. Thus, "[t]here is no denial of the due process of the Fifth Amendment under circumstances where there is reasonable apprehension of hurt from aliens charged with a philosophy of violence against this Government." *Id.* at 542.

Indeed, the government is not aware of the Supreme Court ever invalidating an immigration statute, facially or as-applied, on void-for-vagueness grounds. *See Abourezk*, 592 F. Supp. at 886 n.19, *vacated*, 785 F.2d 1043 (D.C. Cir. 1986), *aff'd*, 484 U.S. 1 (1987).[6] The Court should therefore reject the inquiry at the outset. *See Regan v. Wald*, 468 U.S. 222, 242 (1984) ("Matters relating 'to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.'") (quoting *Harisiades*, 342 U.S. at 589).

**(ii) The statutes are not unconstitutionally vague here.**

The Supreme Court has made clear that courts must "consider whether a statute is vague as applied to the particular facts at issue, for 'a plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'" *HLP*, 561 U.S. at 18-19. A court therefore must not "consider[] the statute's application to facts not before it"; such a decision regarding "how the statute applied in hypothetical circumstances" would impermissibly "incorporate elements of First Amendment overbreadth doctrine" into a Fifth Amendment vagueness challenge. *Id.* at 19. "[A] plaintiff whose speech is clearly proscribed cannot raise a successful vagueness claim under the Due Process Clause of the Fifth Amendment for lack of notice. And he certainly cannot do so based on the speech of others." *Id.* at 20.

In any event, "'perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity.'" *Id.* at 19 (citation omitted). Rather, what matters is whether the statute "grants too much enforcement discretion to the Government," or fails to provide "'a person of ordinary intelligence fair notice of what is prohibited.'" *Id.* at 20 (citation omitted). In evaluating these

[6] *Sessions v. Dimaya* did not deem an entire immigration statute invalid for vagueness. *See* 584 U.S. 148, 174-75 (2018) (holding that a "residual clause" is vague).

Case: 26-6906, 11/20/2026, DktEntry: 16.15, Page 72 of 300

questions, an agency's regulations and guidance in implementing the statute can clarify the statute's scope. *See Cal. Pac. Bank v. FDIC*, 885 F.3d 560, 571-72 (9th Cir. 2018).

Here, especially in light of nonimmigrant student visa-holders' limited due-process rights, the statutes do not violate the vagueness doctrine of the Fifth Amendment. Rather, they reflect the broad brush that Congress must take to foreign policy-related statutes. Congress has directly authorized the State Department to revoke aliens' visas. *See* 8 U.S.C. § 1201(i). The State Department's discretion in this regard has been clarified by the Foreign Affairs Manual, such that State Department staff should only revoke a visa "where warranted" for various specified reasons. Helland Decl. Ex. 1, 9 FAM 403.11-5(B)(a). These reasons include "when [the State Department] receives derogatory information directly from another U.S. Government agency." *Id.* And the Foreign Affairs Manual instructs consular officers that, "[a]lthough the decision to revoke a visa is a discretionary one, [they] should not use this authority arbitrarily." *Id.* § 403.11-4(A). The statute, as clarified by this implementing guidance, sufficiently limits the government's enforcement discretion and supplies fair notice to nonimmigrant visa holders that their visas are subject to revocation on the specified grounds.

Similarly, Congress specifically and clearly stated that "[a]n alien whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is deportable." 8 U.S.C. § 1227(a)(4)(C)(i). That removability ground is subject to limited exceptions, such that the individual would not be removable based on his "past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States." 8 U.S.C. § 1182(a)(3)(C)(iii). Congress created an exception to that exception: the Secretary of State could override that consideration if he "personally determines that the alien's admission would compromise a compelling United States foreign policy interest." *Id.*

Thus, these provisions create a careful framework. Under that framework, the Executive has significant discretion to determine that one's mere presence, let alone activities, would potentially have serious adverse foreign policy consequences and compromise compelling foreign policy interests. The Executive's constitutional role in determining what constitutes foreign policy considerations must be respected.

That Congress did not limit the discretion to revoke visas and did not define what constitutes "potentially serious adverse foreign policy consequences" is telling. Expecting Congress to do so would be problematic when the issue of "foreign policy" is specifically within the Executive's bailiwick. *See, e.g.*, *Zemel*, 381 U.S. at 17 (reiterating that Congress must "paint with a brush broader" in this area "because of the changeable and explosive nature of contemporary international relations, and the fact that the Executive is immediately privy to information which cannot be swiftly presented to, evaluated by, and acted upon by the legislature"); *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936) (describing the President as "the sole organ of the federal government in the field of international relations"); *cf. Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 32, (2015) ("To allow Congress to control the President's communication in the context of a formal recognition determination is to allow Congress to exercise that exclusive power itself. As a result, the statute is unconstitutional.").

Put otherwise, so long as Congress wanted to maintain the State Department's discretion to revoke visas and make aliens removable whose presence threatened American foreign policy interests, the only way to do so was to draft statutes like §§ 1201(i) and 1227(a)(4)(C). That is because the relevant standard—whether an alien's presence and activities would potentially have serious adverse foreign policy consequences or compromise a compelling United States foreign policy interest—is something that is *necessarily* within the competency of the Executive, and the Executive alone. Congress cannot preemptively adopt a comprehensive standard on the front-end to predict every fact pattern that might fit this mold; nor can courts intelligently review on the back-end whether an alien meets any such standard. Instead, given our constitutional system, the decision is inevitably one that must turn on the Executive's discretion. And nothing in the Fifth Amendment prevents that.

Moreover, the standards set forth in these statutes are plainly *more* definite than other provisions that the Supreme Court has upheld against vagueness challenges, even assuming the doctrine applies here. *See, e.g.*, *Boutilier v. INS*, 387 U.S. 118, 123 (1967) (affirming deportation on ground that alien was "afflicted with psychopathic personality" at the time of his entry, against challenge that he had not received adequate warning that sexual orientation was covered by the statute); *Jordan v. DeGeorge*, 341 U.S. 223, 225, 232 (1951) (upholding deportability provision for a "crime involving moral turpitude" as providing a "sufficiently definite warning as to the prescribed conduct"); *Mahler v. Eby*, 264 U.S. 32, 40

(1924) ("[T]he expression 'undesirable residents of the United States' is sufficiently definite to make the delegation quite within the power of Congress.").

Plaintiff's arguments to the contrary are unavailing. *See* Mot. 23-25. First, Plaintiffs primarily rely on cases involving statutes applied to U.S. citizens. *See id.* (citing *United States v. Williams*, 553 U.S. 285 (2008); *Kolender,* 461 U.S. 352; *Smith v. Goguen*, 415 U.S. 566 (1974); *Grayned*, 408 U.S. 104; *Papachristou v. City of Jacksonville,* 405 U.S. 156 (1972); *Baggett v. Bullitt*, 377 U.S. 360 (1964)). None of these cases addressed the reduced due-process protections available to aliens, nor the specific Congressional and Executive interests raised in the foreign-policy context, described at length above.

Second, each of Plaintiffs' cases involved the actual enforcement of a statute to actual conduct. *See generally id.* Here, by contrast, Plaintiffs request an advisory opinion based on unspecified, hypothetical future conduct. *See generally* Compl. That is an improper subject for a vagueness challenge. *See HLP*, 561 U.S. at 18-19.

Finally, Plaintiffs' limited cases involving other aliens' vagueness challenges are distinguishable. For example, in *Massieu v. Reno*, the district court actually acknowledged that "Congress could not have statutorily dictated to the Secretary the seriousness of particular foreign policy consequences" and that "neither the legislature nor the judiciary possesses the institutional competence to question the Secretary of State's decisions on matters of foreign policy" because "this nation's foreign policy is an ever-changing amalgamation of interests and alliances often known only to the Secretary, himself." 915 F. Supp. 681, 701 (D.N.J. 1996), *rev'd*, 91 F.3d 416 (3d Cir. 1996). And the district court decision in *Khalil v. Trump*—which is currently under review by the Third Circuit, and which, again, arose in the context of an actual enforcement action—failed to give sufficient weight to Congress's and the Executive's need for discretion in matters of foreign policy. *See generally* 784 F. Supp. 3d 705 (D.N.J. 2025).

## VI. CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion for Summary Judgment, grant Defendants' Cross-Motion for Summary Judgment, and enter final judgment in favor of Defendants.

Dated: September 24, 2025

CRAIG H. MISSAKIAN
United States Attorney

*/s/ Kelsey J. Helland*
KELSEY J. HELLAND
Assistant United States Attorney

Attorneys for Defendants

CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney
PAMELA T. JOHANN (CABN 145558)
Chief, Civil Division
KELSEY J. HELLAND (CABN 298888)
Assistant United States Attorney

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-7200
FAX: (415) 436-6748
kelsey.helland@usdoj.gov

Attorneys for Defendant

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| STANFORD DAILY PUBLISHING CORP., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>RUBIO, *et al.*,<br><br>Defendants. | Case No. 5:25-cv-06618-NW<br><br>**DECLARATION OF KELSEY J. HELLAND IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT** |

I, Kelsey J. Helland, declare as follows:

1. I am an Assistant United States Attorney in the Northern District of California and counsel of record for Defendants in the above-captioned matter. If called to testify, I would and could competently testify as to the facts in this declaration.

2. Attached hereto as Exhibit 1 is a true and correct copy of the public version of the State Department Foreign Affairs Manual section regarding Nonimmigrant Visa Revocations, 9 FAM 403.11. This document is also available on the State Department website at https://fam.state.gov/FAM/09FAM/09FAM040311.html.

3. Attached hereto as Exhibit 2 is a true and correct copy of volume two of the July 10, 2025 trial transcript from the matter of *AAUP v. Rubio*, No. 1:25-cv-10685-WGY (D. Mass.), which I downloaded from the website https://knightcolumbia.org/content/aaup-v-rubio-trial-transcripts.

4. Attached hereto as Exhibit 3 is a true and correct copy of volume one of the July 11, 2025 trial transcript from the matter of *AAUP v. Rubio*, No. 1:25-cv-10685-WGY (D. Mass.), which I downloaded from the website https://knightcolumbia.org/content/aaup-v-rubio-trial-transcripts.

5. Attached hereto as Exhibit 4 is a true and correct copy of volume two of the July 11, 2025 trial transcript from the matter of *AAUP v. Rubio*, No. 1:25-cv-10685-WGY (D. Mass.), which I downloaded from the website https://knightcolumbia.org/content/aaup-v-rubio-trial-transcripts.

6. Attached hereto as Exhibit 5 is a true and correct copy of the July 17, 2025 trial transcript from the matter of *AAUP v. Rubio*, No. 1:25-cv-10685-WGY (D. Mass.), which I downloaded from the website https://knightcolumbia.org/content/aaup-v-rubio-trial-transcripts.

I declare under penalty of perjury under the laws of the United States that the above is true and accurate. Executed this 24th day of September, 2025, in San Francisco, California.

*/s/ Kelsey J. Helland*
KELSEY J. HELLAND

# EXHIBIT 1

UNCLASSIFIED (U)

# 9 FAM 403.11
# (U) NIV REVOCATION

*(CT:VISA-2150; 04-29-2025)*
*(Office of Origin: CA/VO)*

## 9 FAM 403.11-1 (U) STATUTORY AND REGULATORY AUTHORITIES

### 9 FAM 403.11-1(A) (U) Immigration and Nationality Act

*(CT:VISA-1; 11-18-2015)*

**(U)** INA 221(i) (8 U.S.C. 1201(i)).

### 9 FAM 403.11-1(B) (U) Code of Federal Regulations

*(CT:VISA-1; 11-18-2015)*

**(U)** 22 CFR 41.122.

## 9 FAM 403.11-2 (U) NIV REVOCATION

*(CT:VISA-1; 11-18-2015)*

**(U)** Regulations no longer distinguish between invalidation and revocation in cases when it is determined that the bearer of a visa is ineligible. The visa should be revoked in accordance with INA 221(i), 22 CFR 41.122 and this subchapter.

## 9 FAM 403.11-3 (U) WHEN TO REVOKE A VISA

### 9 FAM 403.11-3(A) (U) When You May Revoke Visas

*(CT:VISA-1948; 03-07-2024)*

**(U) There are four circumstances under which you may revoke a visa:**

(1) **Unavailable**

(2) **(U)** The individual is not eligible for the visa classification (this includes ineligibility under INA 214(b));

(3) **(U)** The visa has been physically removed from the passport in which it was issued; or

(4) **(U)** The individual is subject to an IDENT Watchlist record in System Messages for an arrest or conviction of driving under the influence, driving while intoxicated, or similar arrests/convictions (DUI) that occurred within the previous five years, pursuant to 9 FAM 403.11-5(B) paragraph c, below.

## 9 FAM 403.11-3(B) (U) When You May Not Revoke A Visa

*(CT:VISA-1463; 02-01-2022)*

a. **(U)** You do not have the authority to revoke a visa based on a suspected ineligibility or based on derogatory information that is insufficient to support an ineligibility finding, other than a revocation based on driving under the influence (DUI). A consular revocation must be based on an actual finding that the individual is ineligible for the visa.

b. **(U)** Under no circumstances should you revoke a visa when the individual is in the United States, or after the individual has commenced an uninterrupted journey to the United States, other than a revocation based on driving under the influence (DUI). Outside of the DUI exception, revocations of individuals in, or en route to, the United States may only be done by the Department's Visa Office of Screening, Analysis, and Coordination (CA/VO/SAC).

# 9 FAM 403.11-4 (U) REVOCATION PROCEDURES

## 9 FAM 403.11-4(A) (U) Visa Revocations by Consular Officers

*(CT:VISA-2088; 10-02-2024)*

**(U)** Although the decision to revoke a visa is a discretionary one, you should not use this authority arbitrarily. When practicable:

(1) **(U)** Notify the individual of the intention to revoke the visa;

(2) **(U)** Allow the individual the opportunity to show why the visa should not be revoked; and

(3) **(U)** Request the individual to present the travel document in which the visa was issued.

### 9 FAM 403.11-4(A)(1) (U) Required Procedures

*(CT:VISA-2088; 10-02-2024)*

a. **(U) Informing Individual of Intent to Revoke Visa:**

(1) **(U)** Notify the individual of the intent to revoke a visa if such notification is practicable. The notice of intent to revoke a visa affords the individual the opportunity to demonstrate why the visa should not be revoked. An after-the-fact notice that the visa has already been revoked is not sufficient unless prior notice of intent to revoke was not practicable.

(2) **(U)** A prior notification of intent to revoke a visa would not be practicable if, for instance, you do not know the whereabouts of the individual, or if the individual's departure is believed to be imminent. In cases where the individual can be contacted and travel is not imminent, prior notice of intent to revoke the visa is normally required, unless you have reason to believe that a notice of this type would prompt the individual to attempt immediate travel to the United States.

b. **(U) Physical Cancellation of Visa:** If a decision to revoke the visa is reached after the case has been reviewed, print or stamp the word "REVOKED" in large block letters across the face of the visa. Also date and sign this action. If you are at a post other than the one where the visa was issued, the title and location of your post should be written below the signature.

c. **(U) If the Individual Possesses Another Valid U.S. Visa:** When you have taken action to revoke a visa, you should determine whether the individual holds another current U.S. visa in the same or another passport. You should revoke that visa as well, if the grounds for revoking the first visa apply to any other visa the individual may hold, or if independent grounds for revocation apply. In the latter case, if practicable, give the individual an opportunity to rebut or overcome that ground(s) of ineligibility.

d. **Unavailable**

e. **Unavailable**

## 9 FAM 403.11-4(A)(2) (U) When to Notify Department Regarding Revocation

*(CT:VISA-1948; 03-07-2024)*

a. **(U)** If a visa is physically cancelled before the individual's departure to the United States, then there is no need to report the revocation to the Department, except in cases involving A, G, C-2, C-3, or NATO visas.

b. **(U)** L/CA, the Diplomatic Liaison Division (CA/VO/DO/DL), the Chief of Protocol (S/CPR), and the appropriate country desk should be promptly notified whenever any diplomatic or official visa, or any visa in the A, G, C-2, C-3, or NATO classification is revoked.

c. **(U)** See 9 FAM 403.11-4(C)(1) below for more information about notifying the Department of visa revocations that may have political, public relations, or law enforcement consequences.

# 9 FAM 403.11-4(B) Unavailable

*(CT:VISA-2088; 10-02-2024)*

a. **Unavailable**

b. **Unavailable**

c. **(U)** See 9 FAM 402.8-8, Procedures to be Followed When Derogatory Information Received.

# 9 FAM 403.11-4(C) (U) Revoking Visas in Sensitive Cases

## 9 FAM 403.11-4(C)(1) (U) Keeping Department Informed in High Profile Cases

*(CT:VISA-1948; 03-07-2024)*

a. **(U)** You should be alert to the political, public relations, and law enforcement consequences that can follow a visa revocation and should work with the Department to ensure that all legally available options are fully and properly assessed. The revocation of the visa of a public official or prominent local or international person can have immediate and long-term repercussions on our political relationships with foreign powers and on our public diplomacy goals in a foreign state. The visa laws must be applied to such persons like any others, recognizing that certain visa categories, particularly A’s and G's, are not subject to the same standards of ineligibility as others. Hasty action, however, must be avoided in such high-profile visa cases and you should seek the Department’s guidance before any visa revocation unless unusual and exigent circumstances prevent such a consultation. Consultation both within the mission and with the Department may result in a decision that the Department, rather than the consular officer, should undertake the revocation, since Department revocations pursuant to the Secretary's revocation authority provide more flexibility in managing the relevant issues.

b. **(U) When to Consult with the Department:**

(1) **(U)** You are responsible for keeping the Department (CA/VO/SAC, CA/VO/F, L/CA, and the appropriate country desk) informed of visa actions that may affect our relations with foreign states or our public diplomacy, or that may affect or impede ongoing or potential investigations and prosecutions by U.S. and other cooperating foreign law enforcement agencies.

(2) **(U)** This is particularly true when you use the power granted under INA 221(i) as implemented in 22 CFR 41.122 and this section, to revoke the visas of officials of foreign governments, prominent public figures, and subjects or potential subjects of U.S. and foreign criminal investigations.

(3) **(U)** In such cases, you should seek the Department's guidance before any visa revocation unless unusual and exigent circumstances prevent such a consultation. In the rare cases in which advance consultation is not possible, you should inform the Department immediately after the revocation.

c. **Unavailable**

## 9 FAM 403.11-4(C)(2) (U) Diplomatic and Official Visas

*(CT:VISA-1650; 11-21-2022)*

**(U)** You must keep in mind that most A, G, C-2, C-3, and North Atlantic Treaty Organization (NATO) visa categories are exempt from most INA 212(a) ineligibility provisions per 22 CFR 41.21(d). Precipitant action must be avoided in cases involving foreign government officials and other prominent public figures. Consultations at post and with the Department might result in the decision that the Department, rather than the consular officer, should undertake the revocation. The Department's revocation authority provides more flexibility in managing relevant issues. For example, Department revocations may be undertaken prudentially, rather than based on a specific finding of ineligibility and are not subject to the 22 CFR 41.122 requirement with respect to notification to the individual.

## 9 FAM 403.11-4(C)(3) (U) When Revocation Subject is Subject of Criminal Investigation

*(CT:VISA-2088; 10-02-2024)*

a. **(U)** In cases in which the individual whose visa is revocable is also the subject of a criminal investigation involving U.S. law enforcement agencies, action without prior Department consultation and coordination could:

(1) **(U)** Jeopardize an ongoing investigation;

(2) **(U)** Prejudice an intended prosecution;

(3) **(U)** Preclude apprehension of the subject in the United States;

(4) **(U)** Put informants at risk; or

(5) **(U)** Damage cooperative law enforcement relationships with foreign police agencies.

b. **Unavailable**

c. **(U)** In deciding what cases to report in advance to the Department, err on the side of prudence. It is always better to report cases requiring no Department action rather than having to inform the Department after the fact in a case that has adverse consequences for U.S. law enforcement or diplomatic interests. Contact CA/VO/SAC and other functional bureaus, as appropriate.

Case: 25-6906, 11/20/2025, DktEntry: 16.15, Page 84 of 300

# 9 FAM 403.11-5 (U) REVOCATION OF VISAS BY THE DEPARTMENT

*(CT:VISA-1948; 03-07-2024)*

a. **(U)** When the Department revokes a visa, when possible, a revocation notice will be sent to the consular section by email furnishing a point of contact in the Visa Office. You must follow the instructions in the revocation notice.

b. **(U)** Although the Department is not required to notify an individual of a revocation done pursuant to the Secretary's discretionary authority, you should do so unless instructed otherwise, especially in cases where the revoked visa was issued to a government official.

## 9 FAM 403.11-5(A) (U) Notice to Department of Presence in United States

*(CT:VISA-2150; 04-29-2025)*

a. **Unavailable**

b. **(U)** Upon receipt of your report, the Department will decide whether the visa should be revoked. Alternatively, the Department may inform DHS of the data submitted and give DHS an opportunity to initiate proceedings under the pertinent provisions of INA 237. If the latter course is followed, the Department will request that DHS advise the Department of the individual's date of departure and destination, so the individual's *visa may be physically canceled after their* departure from the United States.

## 9 FAM 403.11-5(B) (U) Prudential Revocations

*(CT:VISA-2150; 04-29-2025)*

a. **(U)** Although you usually may revoke a visa only if the individual is ineligible under INA 212(a), or INA 214(b), or is no longer entitled to the visa classification, the Department may revoke a visa if an ineligibility or lack of entitlement is suspected, when an individual would not meet requirements for admission, or in other situations where warranted. This is known as a "prudential revocation." In addition to the conditions described in 9 FAM 403.11-5(A) above, the Department may revoke a visa when it receives derogatory information directly from another U.S. Government agency, including a member of the intelligence or law enforcement community. These requests are reviewed by CA/VO/SAC/RC, which forwards an electronic memo requesting revocation to a duly authorized official in the Visa Office, along with a summary of the available intelligence and/or background information and any other relevant documentation. When prudential revocation is approved, the subject's name is entered into CLASS, the visa case status is updated to "Revoke", and the revocation is communicated within the Department and to other agencies by the following means:

(1) **Unavailable**

(2) **Unavailable**

(3) **Unavailable**

b. **Unavailable**

c. **(U) Prudential Revocation for Driving Under the Influence:** Either the consular section or the Department has the authority to prudentially revoke a visa based on a potential INA 212(a)(1)(A) ineligibility when an IDENT Watchlist Record appears in System Messages for a CJIS Search of US-VISIT or a CJIS Search of OBIM record. Before doing so, re-send the fingerprints to NGI to obtain a RAP sheet for an arrest or conviction of driving under the influence, driving while intoxicated, or similar arrests/convictions (DUI) that occurred within the previous five years. This does not apply when the arrest has already been addressed within the context of a visa application; i.e., the individual has been through the panel physician's assessment due to the arrest. This does not apply to other alcohol related arrests such as public intoxication that do not involve the operation of a vehicle. Unlike other prudential revocations, you do not need to refer the case to the Department but can prudentially revoke on your own authority. Process the revocation from the Spoil tab NIV and add P1A3 and VRVK lookouts from the Refusal window.

### *9 FAM 403.11-5(C) Unavailable*

*(CT:VISA-2150; 04-29-2025)*

*a.* ***Unavailable***

*b.* ***Unavailable***

*c.* ***Unavailable***

*(1)* ***Unavailable***

*(2)* ***Unavailable***

*(3)* ***Unavailable***

*d.* ***Unavailable***

*e.* ***Unavailable***

## 9 FAM 403.11-6 (U) RECONSIDERATION OF REVOCATIONS

## 9 FAM 403.11-6(A) (U) Reinstatement Following Revocation

*(CT:VISA-2088; 10-02-2024)*

**Unavailable**

(1) **Unavailable**

(2) **(U) If Visa Has Been Revoked and Physically Canceled:** If a visa has been revoked and the revoked visa physically canceled, the individual may apply for a new visa; however, they may not travel on the physically cancelled visa.

(3) **Unavailable**

(4) **Unavailable**

# 9 FAM 403.11-7 (U) ACTIONS BY DHS

## 9 FAM 403.11-7(A) (U) Cancellation of Visas by Immigration Officers Under 22 CFR 41.122(e)

*(CT:VISA-2088; 10-02-2024)*

a. **(U) When a visa is canceled by a DHS officer, one of the following notations will normally be entered in the individual's passport:**

(1) **(U)** Canceled. Adjusted;

(2) **(U)** Canceled. Excluded. DHS (Office) (Date);

(3) **(U)** Canceled. Application withdrawn. DHS (Office) (Date);

(4) **(U)** Canceled. Final order of deportation/voluntary departure entered DHS (Office) (Date) Canceled. Departure required. DHS (Office) (Date);

(5) **(U)** Canceled. Waiver revoked. DHS (Office) (Date); and

(6) **(U)** Canceled. Presented by impostor. DHS (Office) (Date).

b. **(U)** Except when a visa is canceled after the individual's status has been adjusted to that of a permanent resident, DHS will inform the consular section that issued the visa of the cancellation action. The I-275, Withdrawal of Application/Consular Notification form, will be used to inform consular officers at the issuing office of the cancellation action. The I-275 form and any other attached forms should not be released to individuals or their representatives.

## 9 FAM 403.11-7(B) (U) Voidance of Counterfeit Visas

*(CT:VISA-1275; 05-10-2021)*

**(U)** When DHS has determined through examination that a visa has been altered or is counterfeit, it will void the visa by entering one of the following notations on the visa page, together with the action officer's signature, title, and office location:

(1) **(U)** Counterfeit visa per testimony of individual (file number); or

(2) **(U)** Counterfeit visa per telecon, letter, e-mail from U.S. Embassy (U.S. Consul).

**UNCLASSIFIED (U)**

# EXHIBIT 2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

No. 1:25-cv-10685-WGY
Volume 2, Pages 72 - 132

AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
Plaintiffs

vs.

MARCO RUBIO, in his official capacity as
Secretary of State, et al,
Defendants

********

BENCH TRIAL DAY 4

BEFORE THE HONORABLE WILLIAM G. YOUNG
UNITED STATES DISTRICT JUDGE

United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
July 10, 2025

********

Court Reporter: Kelly Mortellite, RPR, RMR, CRR
Official Court Reporter
United States District Court
One Courthouse Way
Boston, Massachusetts 02210
mortellite@gmail.com

A P P E A R A N C E S

RAMYA KRISHNAN
XIANGNONG WANG
Knight First Amendment Institute at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
Carrie.decell@knightcolumbia.org
and
COURTNEY GANS
NOAM BIALE
ALEXANDRA CONLON
Sher Tremonte LLP
90 Broad Street, 23rd Floor
New York, NY 10004
(212) 540-0675
Cgans@shertremonte.com
For Plaintiffs

ETHAN B. KANTER
WILLIAM KANELLIS
VICTORIA M. SANTORA
JESSICA A. STROKUS
DOJ-Civ
P.O. 878
Ben Franklin Station
Washington, DC 20044
(202) 616-9123
Ethan.kanter@usdoj.gov
and
SHAWNA YEN
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, MA 02210
Shawna.yen@usdoj.gov
(617) 748-3100
For Defendants

Case: 26-6906, 11/20/2026, DktEntry: 16.15, Page 91 of 300


INDEX


| WITNESS | PAGE |
|---|---|
| PETER HATCH | |
| Direct Examination By Ms. Conlon (continued) | 75 |
| Cross-Examination By Ms. Santora | 90 |
| Redirect Examination By Ms. Conlon | 107 |
| AMY GREER | |
| Direct Examination By Mr. Biale | 113 |
| Cross-Examination By Mr. Kanellis | 125 |


E X H I B I T S

| Exhibit No. | Received |
|---|---|
| 237 | 124 |

P R O C E E D I N G S

(Resumed, 11:19 a.m.)

THE COURT: The witness may resume the stand.

MS. CONLON: Ms. Conlon, you may continue.

BY MS. CONLON:

Q. So we've spoken quite a bit about Canary Mission, that source of names, and the court alluded earlier with you to the fact that names came from elsewhere. I just want to turn to the "elsewhere" part of that for a moment.

11:19 You had previously testified that the names came through Derek Gordon, correct?

A. Yes, they came through ICE leadership, HSI leadership.

Q. And they came on multiple occasions, right? It wasn't one delivery?

A. Right, there were multiple.

Q. And certain -- well, you'll tell me if it's for all or some, but in certain instances you received more than just the name of a person to look at, right?

A. We would get the name, occasionally we would get what 11:19 protest they were alleged to have attended, maybe where they were a student, some basic information. The lead usually contained some basic information.

Q. When you say "the lead," you mean like the verbal information Mr. Gordon gave you about the person?

A. Yes.

Q. And when you say that in certain instances Mr. Gordon gave you the name of a student and which protest they had attended, you mean like the date and place and time of a particular protest, correct?

A. I believe so.

Q. And he didn't just give you their name and the protest they went to and the school they went to but also their suspected nationality, correct?

A. No. I don't -- again, these are -- as I said before in my deposition, the leads didn't go through me. Most of the leads went to the team lead or through my deputy.

But as I recall, when hearing the information, I don't know if I could say that they -- I don't know the details of each lead other than they usually had a name, they definitely had a name, that they were a protester and then it may have included what school they were from. I don't recall hearing anything about nationality.

Q. Mr. Hatch, I'm going to be referring to the transcript of your deposition. For the benefit of the court and the government, I'm thinking about pages 213 to 214 of Mr. Hatch's deposition, and I want to make sure you have a copy.

Actually, can we put it up on the screen because it's just one page. 213. We just need a moment. I just want you to be able to see it.

I'm going to draw your attention to the bottom half of the

page, and you can let me know if it refreshes your recollection because I'm assuming that you simply forgot.

Line 16, you were asked: "Do analysts get anything more than the name of a student protester when they're asked to research that individual?"

Answer: "Yes."

"What information besides the name do they get?"

We're going to start -- Ms. Safavi objected. Starting at line 24, Answer: "As I recall, they could get what protest

11:22 they were at," and then continuing on to the next page, which may take us technically a moment.

A. Is it possible I can see the whole page? That's better. I can read this.

Q. Okay. "They could get the suspected nationality." Do you see that there?

A. Yes, they could get it. I don't recall but it's possible the nationality could have been part of the lead. I just don't recall it.

Q. So to the best of your recollection -- you can take that

11:23 down.

To the best of your recollection having reviewed your deposition testimony, they could get the student name, where they were a student, the protests they attended and their suspected nationality, among other things; is that right?

A. They could get it, yes.

Q. Now, Mr. Gordon would convey that information to them separate from the directive to look at the Canary Mission website. That was a separate source of information; is that correct?
A. Yes, we had multiple sources of information. Canary Mission was not the only one.
Q. And about the quarter of the people identified came through alternate sources other than Canary Mission, right?
A. I guess up to.
11:23 Q. I'm sorry?
A. Up to a quarter.
Q. Up to a quarter?
A. I don't know the exact numbers of the leads we got. Sorry.
Q. Sorry, no.
You testified a bit in your deposition about the process, to the extent to which the process involves the front office, which I assume is the front office of HSI, in terms of identifying leads. And I want to ask you about that.
11:24 The leads, the list of leads usually goes through the front office, the leadership of HSI, isn't that correct?
A. Could you show the deposition?
Q. Sure. Do you not recall? Because we don't ordinarily just show people their depositions unless they don't remember. If you don't remember, we can if you want to.

THE COURT: He's asked and that's your answer, you're not going to show it to him.

MS. CONLON: I mean, I just -- you're right, not unless you don't recall.

THE COURT: It's not whether I'm right. This is your case to try, but that strikes me that when a witness asks -- well, it's your case to try. Show it to him or not.

A. You referenced the deposition, so I'd like to see the deposition.

11:25 Q. Sure. Can we please turn to page 177 of the deposition transcript. Actually, I guess it's page 178. I apologize. Page 178, please.

If you look at lines one through five, you indicated that -- you made a clarification about the list you received. You testified that, "They usually go through the front office, so the leadership of HSI, but they come from Office of Border Czar, Office of the Secretary."

Do you see that there?

A. I see that.

11:25 Q. So we can take that down.

So when you say, "They go through the front office," that means who exactly?

A. So the front office are the people we mentioned before. It could go through Mr. Gordon, Mr. Hammer. Again, that's the HSI top leadership.

Q. And when you say, "They go through the leadership of HSI, but they come from the Office of the Border Czar," you're speaking of the Office of the Border Czar, which is housed, as I understand it, outside of the Department of Homeland Security, right?
A. So when I said that, I was giving you possible examples of where the leads came from. I don't -- as I had said earlier, I don't know exactly, because I'm not familiar with that process and I was not privy to that, I don't know how they got the -- I
11:26 don't know how HSI got the leads. I don't know how it was sent to them, and I don't know who sent it to them. And at that point I was speculating who it came from.
I think I mentioned they came from possibly the Border Czar, possibly DHS, possibly other partners, even the public. So those leads can come from all directions.
Q. So I hear you saying you don't know for certain where the particular student protester names given to the tiger team came from but that the regular process -- and I'm literally reading your words here, "The clarification would be those lists
11:27 usually go through the front office so the leadership of HSI but they come from Office of Border Czar, Office of the Secretary." That is the ordinary process, correct?
A. No, it is not. The ordinary process for leads or the ordinary process for the protesters?
Q. The ordinary process for lists. You said, "Lists usually

go through the front office, so the leadership of HSI, but they come from Office of Border Czar, Office of the Secretary."
A. The leads go through -- in this case, the leads went through the front office and could have come from those locations.
As I said before, for example, with the Canary Mission list, I don't know how that was presented to us. I don't know who sent that, notified us of the website. I don't know of any leads, any particular leads coming from any place outside of HSI. I can't tell you where each lead came from.
Q. So I am clear here, when you made a reference in your deposition in response to a question about the leads to the Office of the Border Czar, you were referring to the Border Czar who is appointed by the President outside of the Department of Homeland Security; is that correct?
A. When I said "Border Czar," I was referring to the Border Czar.
Q. The Border Czar being Tom Homan. We can talk about him by name, right?
A. That's correct.
Q. Tom Homan was -- withdrawn. Tom Homan does not work for DHS, right?
A. I think -- I don't know who the Border Czar works for, if he works for DHS --
Q. He's not part of HSI's leadership; is that fair to say?

A. He's not part of HSI leadership.
Q. When you said that ordinarily -- or I'm not sure what you're saying about it now, but when you said in your deposition that, "Lists go through the front office but come from the Office of Border Czar or Office of the Secretary," "Office of the Secretary" was a reference to the Secretary of Homeland Security, correct?
A. Yes. And what I meant was their offices. So obviously the Secretary of Homeland Security is not sending us leads personally.
Q. The executive office?
A. Yes, her office, her staff, as well as Border Czar. And for clarification, as I said before in the deposition and now, I don't know where each particular lead came from. I don't know where each particular list came from. So I can't say for certain, but I was giving you general where they may have come from. I could not cite, for example, a specific lead that came from any particular source if you were to ask me.
Q. Yeah, I understand that you don't know the specific origin of these leads. I'm asking you how it normally works since you don't know the specifics of this source of leads. So that's what I wanted to clarify.
A. To answer your question on how it normally works is I get the lead from the chain of command. That's the normal process. How the chain of command gets it is something beyond my

visibility.
Q. Okay. Well, just to be very clear, the question you were asked was about how leadership gets it, and the answer you gave was that the lists go through the front office. Was that untrue? Is that incorrect?
A. The list goes through the front office -- in this case, the lists and leads were coming from the front office, the HSI front office.
Q. And literally in your deposition you said, quote, "But 11:31 they come from Office of Border Czar, Office of the Secretary." Was that incorrect?
A. They could come from --
Q. That isn't what you said. Do you want to see it?
MS. SANTORA: Objection.
THE COURT: The objection is sustained. I've looked at the deposition. He said what he said. You've read it. It's part of the record. He's given his testimony here today. Let's move on.
Q. Okay. We can move on to -- I only have a few questions 11:31 remaining.
So we spoke about the ROAs for five particular people, and you looked at them with me. You've mentioned that there were approximately 200, as best you know, ROAs generated by the tiger team, right?
A. Approximately, yes. I don't recall the numbers. I was

not keeping stats of what I read.
Q. I understand. Now, most of the ROAs, so far as you know, mentioned Israel or Palestine, correct?
A. Yes, as you saw the way they were mentioned in the five we reviewed earlier.
Q. In other words, whether a person -- references to what the person had said concerning Israel or Palestine?
A. Could be.
Q. Many of them mentioned specifically the war in Gaza, right?
11:32
A. I don't know.
Q. Do you recall seeing any that mentioned the war in Gaza?
A. I recall, yes.
Q. Is that a yes?
A. Yes. Some mentioned Gaza, I believe.
Q. Some mentioned pro-Palestinian protests, right?
A. I think so.
Q. More than just the one we saw today, correct?
A. Yes, I think so.
11:32
Q. Some used the term "pro-Hamas," correct?
A. I believe so.
Q. Some, like the ones we saw today, mentioned a student protester's public writing, correct?
A. If you mean a post as public writing, then yes.
Q. I don't only mean a post. Articles in newspapers, for

example?
A. That's possible as well.
Q. To be clear, I'm not asking you to just summarize what you and I looked at in those five, but I'm asking the broader body of ones --
A. I understand.
Q. Okay. Some mentioned a student protester's social media, right?
A. That's correct.
11:33 Q. Some of the ROAs mentioned public statements by protesters, not from social media, not from, say, an article, right?
A. Yes, some mentioned public statements.
Q. Some mentioned a student protester's chants at a student protest, right?
A. I believe some did.
THE COURT: Some of them mentioned criminal activity.
THE WITNESS: Yes, sir.
Q. Well, the question is about the ones we haven't seen, so I
11:33 guess the question for you, to build on what Your Honor has asked, Mr. Hatch, approximately how many of them mentioned criminal activity?
A. I don't recall those numbers.
Q. Today we looked at five, only one of which made a reference to a person having been arrested. Is that a

representative sample?
A. I think there were two with.
Q. I'm sorry?
A. I think that I read two today -- two of those five had criminal activity. One had the ones you mentioned about the New York cases, but another had an LSD possession charge.
Q. I am talking about recent criminal activity at a protest. You're talking about something else. I understand the distinction, so let me be clear.
Of the population of reports of analysis that you reviewed, approximately how many included allegations of recent criminal conduct in connection with a protest?
A. I don't know.
Q. Did any of the reports of analysis you reviewed mention that a person had been convicted of a crime?
A. I don't remember.
Q. Hmm. Some of the ROAs that you reviewed, not just the ones in this courtroom, specifically mentioned a protester's membership in a student group, right?
A. That's possible.
Q. That's possible or that is what you recall?
A. I believe there were some.
Q. Some specifically mentioned a student's membership in the group Students For Justice in Palestine, right?
A. I think that was one.

Q. Some specifically mentioned a student protester's statements or views on Israel, correct?

A. I believe so.

Q. Fair to say that the vast majority of the ROAs you reviewed said nothing about criminal activity whatsoever?

A. I don't know.

Q. You don't know whether the vast majority --

A. I don't recall the details of those ROAs.

Q. Now, this whole effort, tiger team effort, began sometime 11:36 in March, right?

A. I believe so, yes.

Q. And it was responsive to two executive orders issued by the President, one of which we've spent some time discussing, and those would be Executive Order 14161 and 14188, correct?

A. As I said before, the tiger team was formed because of the large number of individuals in the lists. The tiger team was formed to look at protesters.

Q. Okay. And the reason that you were looking at protesters was because of the executive orders, correct?

11:37 A. The reason I was looking at protesters is because I was directed to from HSI leadership. Whether or not they did it in response to the executive orders was not something I was privy to.

Do the protesters' activities relate to an executive order? Possibly. I guess it could be characterized that way.

But you're asking me if I characterized it that way, and I did not.

Q. Well, Mr. Hatch, I really don't want to have to go back to your deposition transcript, but I will if you don't recall saying this.

You've previously testified that Mr. Gordon gave you guidance or instructions about the executive orders to produce reports of analysis on student protesters. You linked those things, isn't that correct?

11:37 A. I think it's fair to say that yes, but that's not my -- I did link those things, but my direction to the team was not execute the executive order. My direction to the team was look at protesters.

Q. I don't want to argue with you. I'm not asking about your direction to your team. I'm asking about what you received, the directions you got. And the directions you got were to create these reports of analysis on student protesters as part of HSI's response to Executive Orders 14161 and 14188, isn't that right?

11:38 A. I don't know if -- I'm just trying to answer the question as best I can, Your Honor. I don't characterize it that way. I know that the executive orders, I know one of those executive orders existed. As I said in my deposition, that was the first time I had read one of them. So the context of everything we were doing is obviously from the executive orders, but in this

particular effort, my direction to the team and as I received it, my characterization of it is we were looking at protesters.
Q. Can we please put page 149 of the deposition transcript on the screen. Please take a look.
Line 11, Question: "Well, you -- you agreed -- you answered in the affirmative to whether you have received guidance or instructions about the executive orders and you named as one person who has provided that guidance, Mr. Gordon. My question is what was that guidance?"
11:39 Ms. Safavi objects. You answered, "Produce reports of analysis on individuals involved in protests as it relates to Title 8."
That's what you said, right?
A. Yes, I think that's what I just said a minute ago. The job was to produce reports of analysis on individuals involved in protests as it relates to Title 8 and violations of law.
Q. I'm not sure why you're so resistant to answer this here.
THE COURT: Don't characterize the witness's answers. I'm listening.
11:40 MS. CONLON: Okay. We can take down the transcript.
Q. Now, these protests that we're talking about, the student protests, they began in October of 2023, right?
A. Yes, I believe so.
Q. Okay. This urgent effort by HSI to identify these student protesters didn't start in 2023 when the protests began. It

started after these executive orders in the spring of 2025, right?

A. It started in the spring of 2025.

MS. CONLON: Okay. Nothing further.

THE COURT: Ms. Santora, do you wish to examine this witness?

MS. SANTORA: Yes, I do, Your Honor.

CROSS-EXAMINATION BY MS. SANTORA:

Q. Good morning. I want to ask you a few questions.

11:41 During your direct testimony yesterday you testified about your role with the Office of Intelligence, correct?

A. Yes, I did.

Q. And you are the highest-ranking official in the Office of Intelligence?

A. I am.

Q. And are you responsible as leadership in the Office of Intelligence for providing guidance to your analysts?

A. Yes, I do.

Q. Are you responsible for providing training to your

11:41 analysts?

A. Yes, training, policy, procedures, equipment and allocation of analysts.

Q. So would it be fair to say that if there were changes to policies and procedures in your office, you would know about those?

A. Yes, if they related to the analysts, yes.

Q. And you would provide training to your analysts on those?

A. That's correct.

Q. Would it be possible for a new policy or procedure to exist in your office without you knowing about it?

A. In my office, no.

Q. And since the beginning of 2025, have there been any changes to the policies and procedures in your office?

A. No. We've been doing our analysis the same way since I started in 2019, 2020, and developed the way we do analysis. We haven't changed the way we do subject profiles at any time in say -- during that time we've always done subject profiles this way. We conduct our analysis the same way. And for that matter, we've been looking at the same violations of law during that time as well.

Q. So you haven't changed the content of your reports of analysis?

A. We have not.

Q. So it's always included biographical information?

A. It has.

Q. Information about criminal activity?

A. Yes.

Q. Information about potential violations of law, including Title 8?

A. Yes.

Q. And I just mentioned reports of analysis. Can you, for the benefit of everyone, define what is a report of analysis?
A. It's the way the analyst documents their work product, and it is specifically designed for analyzing criminals, criminal networks, criminal conspiracies, and subject profile is just one ROA type that we use.
Q. You mentioned that your office receives leads or tips that can generate the creation of a report of analysis, correct?
A. That's correct.
11:43 Q. And from where does the Office of Intelligence receive tips or leads?
A. In general terms, beyond the scope of a protest, we receive them from all different kinds of directions. They can come from an agent's contacts. They can come from interagency partners. They can even come from the tip line, which is a public-facing mechanism for the public to provide tips. They even can be mailed to the office, hard copies.
Q. And with respect to the protesters, did your office receive leads in a different way?
11:44 A. I think we were getting the leads from all directions. I don't know in particular where we were getting the leads from.
Q. Okay. When your office receives a lead, generally speaking, what does it do with it?
A. Usually it's provided to an analyst to do exactly what you saw with these ROAs, to look for information, as I said before,

that's a violation, potential violation of law, with our specialty being immigration and customs laws. But it's also, as we're building that, it's also to get the context of the individual, which is why the biographical information and the car information like I mentioned is in there.

Q. And is a lead ever insufficient for your office to do anything with it?

A. Yes. There are times when a lead just has incomplete information, a nonspecific name, no identifying information to help us identify or narrow down who it was.

Q. And in that case what does your office do?

A. We would just file the lead. We'd move on.

THE COURT: Well, that question interests me. I've had cases where someone's identified as LNU or FNU LNU, first name unknown, last name unknown, and I wondered what we're talking about in my case. And your answer jogged that memory.

When you don't have enough to do anything, do you report that in any way, or you just don't do anything because you haven't got enough to work on?

THE WITNESS: It's mostly the latter, sir.

THE COURT: The latter, all right. Ms. Santora, go ahead.

Q. Assuming that there's sufficient information in the lead, what does -- I guess I'll ask this. Does your office do -- you said you would create a report of analysis; is that correct?

A. That's correct.
Q. And in creating that report of analysis, you testified earlier that you do independent research?
A. Yes.
Q. So you look into the information in the lead and independently confirm?
A. Try to, yes.
Q. And that's the information that goes into the report of analysis?
11:46 A. Yes.
Q. So to be clear, the report of analysis is a fact-based document?
A. Yes, we try, as you saw with those, we try to just report the facts or what the analyst finds and properly source it so anyone reading it knows where this that came from.
Q. Does a report of analysis make any recommendations?
A. It does not.
Q. Does it include any opinions?
A. Does not.
11:47 Q. Does it make any referrals?
A. No.
Q. Or any judgments?
A. No.
Q. How do you know that reports of analysis don't include those things I just referred to, recommendations, opinions,

referrals and judgments?
A. It's in our policy.
Q. You spoke during your direct examination about a tiger team, correct?
A. That's correct.
Q. Generally speaking, what is a tiger team?
A. A tiger team is a term of art we use for an ad hoc, temporary standup of analysts or a combination of analysts that get assigned to a project, usually when it's a large workload, and we use it when we have to bring analysts in from other parts so a specific group or section doesn't have the capacity to handle, so we'll bring in others to help.
And it's a way of differentiating between whether someone's doing their normal job or whether they're doing this additional duty or whether they have been reassigned to this duty.
THE COURT: So tiger team, you've had Tiger Teams more than once on different subjects?
THE WITNESS: Yes, Your Honor. We've used a tiger team maybe half a dozen times since I've been at HSI for all different types of things. It's just a term of art.
THE COURT: Thank you.
BY MS. SANTORA:
Q. So why is the term tiger team used, if you know?
A. I think, I mean we got it from business, military I think

uses the term as a way to focus analysts. I didn't make up the term tiger team. If I go back to my Coast Guard days, we would set up a tiger team to fix an engine problem when you needed an electrician or mechanic. It's kind of always been in existence.

Q. So you've heard the term back to your Coast Guard days?

A. I have, yes.

Q. So it's a term that's used in government jargon?

A. Yes, and I believe in business, too.

11:49 Q. And it sounds a bit intimidating. Is it meant to intimidate?

MS. CONLON: Objection.

THE COURT: Sustained. He said it's a term of art.

Q. Is it meant to intimidate?

MS. CONLON: Objection.

THE COURT: Why don't you ask him whether he means it to intimidate.

Q. Do you mean it to intimidate?

A. No, not at all. It's an internal term.

11:49 THE COURT: The sense I get, so we're clear on what I'm hearing, is you mobilize a Tiger Team because you need to do the work assigned, correct?

THE WITNESS: Yes, Your Honor.

THE COURT: And calling it a tiger team conveys to me some sense of urgency and importance in that work.

THE WITNESS: Yes, sir.
THE COURT: Is that right?
THE WITNESS: That's correct. And we're analysts, so we're nerds. We're the nerds. We're a law enforcement and we're analysts. We're nerds. We're not ferocious.
THE COURT: It's not like painting decals on fighter planes.
THE WITNESS: No, sir.
THE COURT: Go ahead.
11:50 BY MS. SANTORA:
Q. I want to talk to you about the tiger team that was created in March of 2025. What topic was that Tiger Team created to address?
A. That was protesters and we had gotten a lot of leads.
Q. Were you asked specifically or was that tiger team asked specifically to look into student protesters?
A. All protesters.
Q. All protesters, okay.
And ultimately how many people did the tiger team look 11:51 into?
A. Over 5,000, more than 5,000. I don't know the exact number.
Q. And in looking into those people, did the Office of Intelligence analyze any differently than it normally does?
A. A little bit. Normally we do an ROA on everybody, no

matter what. And that's why you'll see the variation as we saw from the five today where one was two pages and one was longer.

But in this instance, because we had so many names, I told the analysts if you don't find anything beyond the biographic information -- we were looking at violations of law and as it relates to protests. So some of the names, for example, were said to be at a protest, but we never found that they were at a protest. We never found anything. We didn't find any conduct. We didn't find anything related to the individual. So it would have been a one-page ROA. And so I told the team for the sake of expediency to get through this long list to just not do the ROAs on those individuals.

Q. Okay. You talked about the fact that you received information from Canary Mission with respect to these lists, correct?

A. Yes.

Q. To be clear, does your office work with Canary Mission?

A. No. Like I said before, we have no association with Canary Mission. Canary Mission is not associated with HSI at all. I don't know who posts on that website. I don't know who runs that website. I don't know anybody in that organization. I don't have any connection with anybody in that organization.

Q. Does the office treat Canary Mission information differently than it treats other information?

A. We treat it just like any other lead.

Q. Was the office asked to look at Canary Mission information differently than other information?
A. No, we were not asked to look at it differently. We were not asked to change the ROA process or our process of criminal analysis.
Q. Would it be relevant to a report of analysis that someone had been charged with a crime but not convicted?
A. As long as the charge was factual, it could be included in the ROA, so yes.
11:53 THE COURT: I don't understand a charge that wasn't factual.
THE WITNESS: I guess you're right. A charge would be included in that section you saw, the criminal history.
BY MS. SANTORA:
Q. And how would that be relevant to the analysis, a charge that was not a conviction?
THE COURT: That's pretty hypothetical. I don't know what to do with that. This is a law enforcement operation or part of a law enforcement operation. Of course you include
11:54 charges because you might want to -- or someone, some enforcer might want to follow up on that. I just don't understand.
MS. SANTORA: Okay. We'll move on. Thank you, Your Honor.
THE COURT: All right.
MS. SANTORA: Preserving the government's objection to

these documents being entered into evidence based on privilege, in case our objection is ultimately overruled -- the overruling objection is upheld, I do want to ask questions about the documents that opposing counsel --

THE COURT: You don't waive the objection properly preserved by exercising your opportunity during the trial to ask about such documents.

MS. SANTORA: Thank you, Your Honor.

I want to ask you about a document you looked at 11:55 earlier. I believe it was, it was in the packet we received. It was Exhibit K related to Mr. Mahdawi. I don't know what letter it's been marked.

MS. CONLON: It was marked as a number, and it's 235.

MS. SANTORA: 235, okay. Are you able to show the witness?

THE COURT: I'm an equal opportunity helper.

MS. SANTORA: Thank you, Your Honor.

THE COURT: Here's the documents that have now been marked, and thank you, Ms. Conlon, Exhibit 235 in evidence.

11:55 BY MS. SANTORA:

Q. Do you see subject profile for Mohsen Mahdawi?

THE COURT:

A. I'm looking at the one for Suri.

THE COURT: You said K.

MS. SANTORA: Sorry. That was K. I don't know what

letter this was.

THE COURT: You want Mahdawi?

MS. SANTORA: Mahdawi, yes.

THE COURT: All right. In the packet as it was delivered to the court, it's Exhibit E. And so our record is complete, someone will help me, Exhibit E has become --

MS. CONLON: 235.

THE WITNESS: Are you going to ask me about --

THE COURT: Since I have now become a document custodian. Go ahead.

11:56

BY MS. SANTORA:

Q. I believe when you were being questioned earlier --

THE WITNESS: Sir, this is Khalil.

THE COURT: It is, and that's my mistake. I'm not much of a document custodian. Yes.

MS. SANTORA: I can give the witness my copy --

THE COURT: No. I have it right here. Now I've got the right one. Having nothing to do with this exhibit, but it reminds me, the government has made an ex-parte submission, properly. The court has reviewed it, and pertaining to one of these exhibits, and that's something potentially should be redacted or withdrawn. I want to know precisely what it is with the brackets as you've done it in time for our conference at 3:00. You can hand it up to the clerk so I know what we're talking about. Go ahead.

11:57

BY MS. SANTORA:
Q. Mr. Hatch, you are looking at the subject profile now of Mohsen Mahdawi, correct?
A. Yes, I am.
Q. And do you remember when opposing counsel was questioning you and they said that in this report of analysis it included only biographical information, correct?
A. Yes.
Q. And do you see the last bullet under Analysis and 11:58 Findings?
A. Yes, I do.
Q. That relates to possession of various drugs, correct?
A. It does.
Q. Would you describe that as biographical information?
MS. CONLON: Objection, Your Honor.
THE COURT: No. She may have that question in that form.
A. I don't know.
Q. Would you describe the drug charges as biographical 11:59 information?
MS. CONLON: Objection. It doesn't even say "charges."
Q. Would you describe that bullet relating to this individual being in possession of drugs as biographical information?
A. I'd more likely say it was criminal history.

Q. Thank you.
And that bullet appears in the analysis and findings section, correct?
A. It did, it also appears in criminal history.
Q. Okay. Thank you. I want to ask you about another one of the documents opposing counsel asked you about. These are the documents related to Rumeysa Ozturk.
THE COURT: In the packet of documents given to the court, these appear as Exhibit C. And they are now in evidence as what? Ms. Conlon.
MS. CONLON: Sorry. Ms. Ozturk, 232.
THE COURT: 232.
THE WITNESS: Do you want this one back, sir?
THE COURT: Yes.
THE WITNESS: Okay.
BY MS. SANTORA:
Q. Opposing counsel asked you earlier about the first bullet under analysis and findings, and they mentioned the coauthoring of an op-ed. Do you remember that exchange?
12:01 A. Yes.
Q. And if you look at the rest of that bullet, it says that she wrote the op-ed with Tufts Students for Justice in Palestine, which was suspended for calls for Student Intifada.
Would that part of the bullet factor into the office's analysis?

12:02
12:03

A. Yes, I mean it is part of it.
Q. Moving on, I would like to ask you, I want to ask you some questions about the executive orders that you referenced in your testimony.
A. Okay.
Q. How did your office respond to Executive Order 14161 and Executive Order 14188, if at all?
A. Can you give me the titles? I don't know them by the numbers.
Q. Executive Order 14161 is protecting -- I'm sorry, I don't have the title in front of me. 14188 has to do with antisemitism. You mentioned that you had not seen that executive order until your deposition, correct?
A. That's correct.
Q. So we can put that to one aside. With respect to the other executive order that you --
A. Okay. I'm familiar with that.
Q. -- yesterday and today, how did your office respond to that executive order?
A. I recall when I read that executive order, I saw that just about everything related to that executive order and us were things we were already doing. They all related to existing Title 8 issues. So it did not task my office with doing anything different.
Q. And so your office didn't change the way it analyzed

information in response to the executive orders?
A. No. And especially in that executive order, it didn't change anything. It all related to Title 8. It emphasized things in Title 8, but nothing was new to us.
Q. So the executive order essentially directed your office to follow Title 8?
A. That's how I interpreted it for the most part.
Q. And your office does follow Title 8?
A. We have been since I've been there and, I mean, since HSI has existed.
Q. And how long has HSI existed?
A. HSI, and in its previous form, Customs' Office of Investigations, has been around since the 1950s, and I believe Title 8 has been since the 1950s.
Q. I want to go back for a second to the ROAs about the protesters. You said that your office looked into 5,000 leads related to that, correct?
A. Over 5,000, yes.
Q. And because of the bulk of work in that particular situation, ROAs were not created in every circumstance, correct?
A. That's correct.
Q. Do you know in what percentage of cases ROAs were created?
A. I don't know the exact numbers, but I would estimate, I think I said 200, so less than -- I'm not good at public math.

Less than 5 percent.
Q. Less than 5 percent. And so 95 percent did not result in the creation of an ROA?
A. That would seem to be true.
Q. What happened with those 95 percent of the 5,000 cases?
A. If we didn't do an ROA, we just moved on to the next person on the list or the next lead. We didn't do anything with them.
Q. Okay. So in 95 percent of those 5,000 cases regarding
12:05 protesters, your office did nothing?
A. We moved on to the next lead, yes.
MS. SANTORA: Thank you.
THE COURT: Ms. Conlon, anything further?
MS. CONLON: Yes, Your Honor.
THE COURT: You may.
MS. CONLON: Is it okay with Your Honor if I examine from here?
THE COURT: Of course it is. So you all understand, I understand that by passing the bar, you have the right to be
12:06 within the bar enclosure denominated by the rug in deeper blue. It's not an instruction that you have to stay on that rug, but I learned you could move around in the bar enclosure as a lawyer. Go ahead, Ms. Conlon.

MS. CONLON: Okay.

REDIRECT EXAMINATION BY MS. CONLON:

Q. So you were just asked about the percentage of ROAs that were generated as a result of this line of effort, and you have estimated -- and don't worry, this won't be an equation. But you've estimated about 5 percent; is that right?

A. Yes.

Q. And your estimate is based on the notion knowing that there were over 5,000 names at least on Canary Mission, and you

12:06

saw maybe 200 reports; is that right?

A. As I recall, yes, I think that's what I said.

Q. Now, you have said before you didn't look at all the reports generated by the tiger team, right?

A. That's correct.

Q. You happened to have seen about 200, correct?

A. Somewhere in there. I don't know the exact numbers.

Q. Right?

A. I'm giving you an estimate. That's all I'm doing.

Q. No, no. I appreciate that you have seen 5 percent of --

12:07

if we're sticking with percentages, I appreciate that what you can tell us is that you've seen 200 and you know that at least more than 5,000 people were looked at. But I understood you to be saying earlier you can't tell us how many ROAs were actually created. Am I mistaken?

A. I'm estimating that somewhere under 200 or around 200 ROAs

were produced. In my testimony I believe I said, as you mentioned earlier, dozens, I had read -- you asked me how many I had read. I said dozens. And then you brought up my deposition and said, "You said here 100," and I had said earlier 20.

So I would estimate I've read between 20 and 100, but I know the team produced more, and I'm estimating they produced less than 200 in total.

Q. And what is that based on? What is your estimate of what the team produced, I mean, based on?

A. Just my recollection of the effort described to me by the team lead. I'm giving you my best estimate.

Q. I appreciate that. Fair to say you don't actually recall the total number that were created by the tiger team?

A. I do not recall the total number.

Q. Fair to say you are in a position to speak about the total number as an estimate only that you personally reviewed?

A. That's correct.

Q. Now, that 5,000-person list which resulted in -- for many folks resulted in no ROAs, one of the reasons it resulted in no ROAs for so many people is because that list included a lot of U.S. citizens, right?

A. That's correct.

Q. And it's not within the purview of the Office of Intelligence to write reports of analysis about U.S. citizens,

correct?
A. We absolutely are.
Q. Oh, you wrote them about U.S. citizens?
A. HSI intelligence is authorized to write ROAs about U.S. persons. That's the question you asked me, right?
Q. Yes, that is the question I'm asking.
A. Now, are you asking me if any of the protesters that were U.S. citizens had ROAs written on them?
Q. Well, I guess that's a good question.
12:09 A. I don't know. I don't recall, I don't recall reading an ROA on a U.S. person.
Q. Now, the circumstance in which you could write an ROA about a U.S. person, that would not be for a violation of Title 8 immigration offense, right, for example, being out of status or any number of things?
A. We are authorized to write ROAs on U.S. persons for any violation of U.S. law, potential violation of U.S. law, suspicion of violating U.S. law, information related to violations of U.S. law, as I've said before.
12:10 Q. Sorry. So going back to the question I think you tried to ask if I was asking just a moment ago, the tiger team did not, to your knowledge, create ROAs on U.S. citizen protesters; is that correct?
A. I don't recall reading any ROAs on U.S. citizen protesters.

Q. And you did not understand the project at hand to be one that included looking at U.S. citizen student protesters, correct?
A. I didn't interpret the focus to be U.S. persons.
Q. Now, you've said that ROAs were only generated for some small number out of the overall group. And one reason that could happen is if you couldn't sufficiently identify a person; is that correct?
A. That's correct. That's one reason.
12:11 Q. Another reason that could happen was if you couldn't confirm that a student had actually attended a protest; is that right?
A. That's correct, that's one reason. It's a possible reason, yes.
Q. In other words, the student protester initiative of the tiger team was meant really to capture people who protested, is that correct, who had attended protests?
A. I would not use the word "capture."
Q. Well, we can pick a different word.
12:11 THE COURT: Focus on is the sense of her question. Do you accept that?
A. That was the focus, yes.
Q. So if no protest, no ROA; is that right?
A. Yeah. If we found no activity, we would move on to the next one.

Q. I'm a little confused because "activity" -- I'm asking specifically about protest activity. If you did not find evidence of protest activity, the person did not receive an ROA; is that correct?
A. That is correct.
Q. Now, the ROAs were not limited to persons who attended protests who had potentially committed a criminal offense, correct?
A. When we start out with the leads, we don't know what we have to begin with, so we look, as you saw in the ROAs, we focus on the individual.
Q. And ROAs were generated for students who attended protests who were not suspected of having committed a crime, isn't that right?
A. That is correct, yes.
MS. CONLON: Just a moment.
Q. You said that you weren't directed to look at the Canary Mission list any differently from how you look at other information. Did I hear that correctly?
A. The Canary Mission list, it was one source of leads we get. We were not directed to look at Canary Mission any differently than we would another lead on a protester.
Q. You didn't receive a directive to look at any other collection of people from any other single source in the way that you did for the Canary Mission website, correct?

A. I think it's fair to say that Canary Mission was unique.
Q. It was unique because it was the focal point of this effort, wasn't it?
A. It was unique because it was a large amount of leads, large amount of information on protesters.
MS. CONLON: Just a moment.
Q. I think you testified earlier, but tell me if I'm wrong, that you as the director of the office are familiar with training given to analysts about how to do these reports of
12:14 analysis, right?
THE COURT: This is redirect. That's beyond the scope.
MS. CONLON: Your Honor, I'm sorry, I thought that just came up in the government's questioning.
THE COURT: I didn't.
MS. CONLON: You didn't hear that?
THE COURT: That may not be the same.
MS. CONLON: Can I have just one second to see? I'm sorry.
12:15 I think that's it. Thank you so much. Thank you for your time.
THE COURT: Nothing more, Ms. Santora?
You may step down. Thank you. This witness is excused. Call your next witness.
MR. BIALE: Thank you, Your Honor. Noam Biale for the

plaintiffs. Plaintiffs call Amy Grier.

THE COURT: She may be called.

AMY GREER, Sworn

COURTROOM CLERK: Can you please state your name and spell your last name for the record.

THE WITNESS: Sure. My name is Amy Greer, G-r-e-e-r.

MR. BIALE: May I proceed, Your Honor?

THE COURT: You may.

DIRECT EXAMINATION BY MR. BIALE:

12:16 Q. Good afternoon, Ms. Greer.

A. Good afternoon.

Q. Where do you work?

A. At Dratel & Lewis as an associate attorney.

Q. And what is Dratel & Louis?

A. It is a small criminal defense firm.

Q. Where is it based?

A. In Manhattan.

Q. And how long have you been a licensed attorney?

A. Since September 18, 2020.

12:16 Q. Okay. Good memory for the date.

A. It was the day RGB died.

Q. I see.

A. It was not a celebratory day.

Q. I see. And you're admitted to the New York bar?

A. Yes.

Q. Any other states?
A. Actually that 2020 date I was admitted to the State Bar of Alaska. And since then I've been admitted to the District of New Jersey, the District of New York, and the District of the District of Columbia.
Q. Do you know an individual by the name of Mahmoud Khalil?
A. Yes.
Q. How do you know him?
A. He is my client.
12:17 Q. When did you begin representing Mr. Khalil?
A. In or around November of 2024.
Q. And since you began representing him in November of 2024, have you met with Mr. Khalil in person?
A. I have.
Q. Approximately how many times?
A. Approximately two to three times.
Q. In addition to the two to three times you met with Mr. Khalil in person, have you ever met with him in a videoconference or on FaceTime or something like that?
12:18 A. Yes. I have met with him numerous times by videoconference, Signal, et cetera.
Q. You said "numerous times." Can you estimate for us how many times you met with Mr. Khalil by videoconference?
A. Sure. Between November and March, probably weekly, so however that adds up to. And then after his detention, I met

with him nearly daily by videoconference.
Q. Okay. So fair to say you've met with Mr. Khalil, at least by videoconference, dozens, maybe even over 100 times?
A. Yes.
Q. Are you familiar with Mr. Khalil's wife?
A. Yes.
Q. What is her name?
A. Dr. Noor Abdalla.
Q. And have you met Dr. Abdalla in person?
12:18 A. Yes.
Q. Approximately how many times?
A. Probably five or six times.
Q. Have you also met with Dr. Abdalla on videoconference?
A. Yes, numerous times.
Q. Numerous. Can you give us a ballpark estimate?
A. I was one of the primary contacts for Dr. Abdalla throughout the course of this case. So it's hard to estimate, but probably a few times a week, so at least dozens, if not more.
12:19 Q. And just so we're clear, when you say "this case," you're referring --
A. Sorry. The habeas and immigration case post-detention.
THE COURT: Case in which you represent him as his attorney?
THE WITNESS: One of them, yes, sir.

MR. BIALE: Thank you.
Q. Are you familiar with Dr. Abdalla's voice?
A. Yes.
Q. Okay. Have you ever been to the building where Mr. Khalil and Dr. Abdalla live?
A. Yes.
Q. Approximately how many times have you been there?
A. Approximately twice.
Q. Are you familiar with the lobby of that building?
A. Yes.
Q. Okay. I'd like to direct your attention to March 8, 2025. What do you recall happened that day?
A. In the evening of March 8, 2025, I received a phone call from Mahmoud.
Q. Okay. Do you remember approximately what time?
A. I remember exactly what time. It was 8:26 p.m.
Q. And without telling me what -- when you say "Mahmoud," we're talking about Mr. Khalil?
A. Sorry. Mr. Khalil, yes.
Q. Without telling me what Mr. Khalil told you in that phone call, can you tell us about anything that he did in that phone call?
A. I am not sure if he handed the phone to the agent from immigration or if the agent took the phone, but the phone was given to one of the agents.

Case: 25-6906, 11/20/2025, DktEntry: 16.15, Page 134 of 300


Q. And when you say, "one of the agents," can you clarify what you mean?
A. Sure. Mr. Khalil called me because agents had entered, and I know this because I spoke with the agent on the telephone, and so that agent introduced himself to me over the telephone.
Q. Okay. And did the agent identify what agency he was from?
A. He said he was from Department of Homeland Security, HSI.
Q. Okay. And you understood based on the way the phone call went that this agent was physically present with Mr. Khalil at the time?
A. Yes.
Q. Now, were you physically present with Mr. Khalil and with this agent at the time?
A. No.
Q. Okay. Could you hear anything in the background of the phone call?
A. With Mr. Khalil?
Q. Yes.
A. I could hear him speaking, Mr. Khalil speaking, and I was obviously hearing the agent speaking to me. And then I heard other voices, ambient voices in the background.
Q. Okay. And then what happened next after you received this phone call?
A. Well, I spoke to the agent and he hung up on me.

Q. Okay. And what happened after that?
A. Well, I freaked out a little, to be completely candid, and I called the partners at my law firm. And then while I was on the phone with one of them, I received another phone call.
Q. And who was the second phone call -- who did the second phone call come from?
A. The second phone call came from Dr. Noor Abdalla.
Q. And Dr. Abdalla call you from her phone or from somebody else's phone?
12:22
A. She called me from Mr. Khalil's phone.
Q. Okay. And approximately when did Dr. Abdalla call you from Mr. Khalil's phone?
A. It was at 8:34, so eight minutes later.
Q. And when Dr. Abdalla called you, were you able to hear her voice over the phone?
A. Yes.
Q. Did you hear any other sounds over the phone?
A. Yes. I could hear Mahmoud, or Mr. Khalil, speaking in the background, and I heard other ambient male voices.
12:23
Q. Okay. I'd like to show you what's been marked for identification as Exhibit A1.
Mr. Kumar, if you can pull that up and just pause on the first frame.
Do you see that in front of you, Ms. Greer?
A. Yes.

Q. Just looking at the image in the middle, do you see the location?
A. On the bottom left there, or do you mean the actual --
THE COURT: No. Do you recognize the location?
A. Yes, I do.
MR. BIALE: Thank you, Your Honor.
Q. Where do you recognize that -- what do you recognize that location to be?
A. That is the lobby of Mr. Khalil and Dr. Abdalla's
12:24 apartment building.
Q. And how do you recognize that location to be the lobby of their apartment building?
A. Because I've been there and because I actually noticed the tiling on the floor when I visited, it's kind of an odd linoleum tile.
MR. BIALE: Okay. Mr. Kumar, I'd like you to play -- and I'm hoping that we have sound -- play the video to 7 seconds.
THE COURT: Well, you're calling her to authenticate
12:24 this video?
MR. BIALE: Yes, Your Honor.
THE COURT: And what do you -- let me ask this preliminary question. What do you understand this to be? Yes, what do you think this is, this video?
THE WITNESS: From what I know of this video, this is

the video of when Mahmoud, Mr. Khalil, was arrested.
THE COURT: And how did you come to know that?
THE WITNESS: I know that because I received it from Dr. Abdalla on the evening that Mr. Khalil was arrested.
THE COURT: All right. And who do you think took it?
THE WITNESS: Dr. Abdalla.
THE COURT: Thank you. All right. Mr. Kanellis.
MR. KANELLIS: I'll reserve my objection, Your Honor.
THE COURT: Reserved, okay. You may proceed.
12:25 MR. BIALE: Could you play it to seven seconds, Mr. Kumar, and with sound.
(Video played.)
BY MR. BIALE:
Q. Okay. You just heard some voices on that video, and you heard at the end it sounded like a woman's voice say, "He's not resisting."
A. Mm-hmm.
Q. Do you recognize that person's voice?
A. Yes.
12:25 Q. Who is that?
A. Dr. Abdalla.
MR. BIALE: Now, Mr. Kumar, if you can play a few more seconds to ten seconds.
(Video played.)
MR. BIALE: Stop.

Q. Now I'm going to ask you, who do you recognize in the video?
A. The person facing the camera is Mr. Khalil.
MR. BIALE: Okay. And now, with the court's indulgence, I'll ask to play another 20 seconds of the video, if we can do that.
THE COURT: Proceed.
(Video played.)
Q. Okay. You just heard some additional parts of the video, 12:26 and you heard Dr. Abdalla say "Hi Amy."
A. Mm-hmm.
Q. Do you know who she is referring to?
A. Yes.
Q. Who is she referring to?
A. Me.
Q. And how do you know that?
A. Because I was on the phone with her. I answered the telephone when she called.
Q. Okay. Can you just tell us about what you remember about 12:27 that conversation.
A. Sure. I was on the phone with Dr. Abdalla and one of the partners at my law firm, and together we were advising Dr. Abdalla, I was saying to her --
MR. KANELLIS: Objection, Your Honor. Two bases.
THE COURT: I'll hear you.

MR. KANELLIS: First is, if she's going to discuss these communications, she may be waiving her privilege. Second, calls for hearsay.

THE COURT: Well, the first is, I suppose she knows that, and she may make her own determinations.

The second is, what she says is hardly -- well, I'm not so sure it's even hearsay. If she was advising her, it's not for the truth. That's the advice, act in this way. Any response from Mr. Khalil's wife I would think under the

12:28 circumstances is an excited utterance.

So subject to your motion to strike, you may answer the question. What did you say and -- did the partner speak, before we go any further?

THE WITNESS: We were both speaking, but I was primarily the one speaking.

THE COURT: And what's the name of the partner?

THE WITNESS: Lindsay Lewis.

THE COURT: All right. And tell us what each person said as best you can recall.

12:28 THE WITNESS: Okay. When we first got on the phone, we were attempting to calm Dr. Abdalla down. "It's going to be okay. Can you stay with us? Let's talk through this." And that was both Lindsay and myself, Ms. Lewis and myself. I was asking Dr. Abdalla, "How many people do you see? What's happening now? Can you ask them where they're taking him? Can

you ask them if they will show you a warrant? Will one of them identify themselves to you? Can you get a name? Again, where are they taking him?"

And I honestly do not recall, because this was obviously a rapidly unfolding situation, whether it was myself or Lindsay who asked if we could speak with one of the agents again and to see if Dr. Abdalla could hand one of them the phone.

MR. BIALE: Okay. So Your Honor, at this time I would play the rest of the video, given what you've heard about Ms. Greer's memory of what was said on that phone call, but I don't want to take up the time if the court would be prepared to receive the video in evidence now.

THE COURT: Well, I have this problem, but perhaps Mr. Kanellis wouldn't object on this ground. That's not the original video because the visages of the agents are obscured. Someone has done that. If he has no problem with that, I am prepared to receive the video as a video of whatever it records. So we'll ask him.

MR. KANELLIS: Your Honor, obscuring the faces is not the issue. The issue is it hasn't been properly authenticated. If Ms. Abdalla wants to come and lay the foundation, no issue with that.

THE COURT: I think it's been adequately identified, and that objection is overruled, and A1 is admitted as an

exhibit, now it will be Exhibit 237. 237. But I'll review it, so we need not play it.

(Exhibit 237 admitted into evidence.)

MR. BIALE: That's fine, Your Honor.

BY MR. BIALE:

Q. Let me just ask so the court understands because it's a good point. The court pointed out that the faces are obscured in the video. And I think you testified before that you received the video from Dr. Abdalla shortly after it was taken; is that right?

12:31

A. Yes, approximately two hours later.

Q. In the version that you received from Dr. Abdalla, were the agents' faces obscured?

A. No.

Q. Okay. How did, if you know, how did the faces of the agents come to be obscured in the video?

A. We, as a legal team, knew that there has been a respectful protocol when videos are shown publicly to blur out the faces of other people besides, you know, the person agreeing to make the video public. So as a team, we decided to blur out the

12:32

video -- excuse me, blur out the faces. And I was privy to part of those conversations, and then one of the legal team members undertook that, the blurring.

Q. Just to be clear, that was to protect the identities of the agents who were involved in the arrest, right?

A. Right, to protect the identities of any person who appeared in the video who was not Mahmoud.
Q. Okay. Now, you've seen this version of the video before? And by "this version," I mean the exhibit that was just admitted into court.
A. The Associated Press version, yes, I have seen it.
Q. And you have also seen the version that Dr. Abdalla sent you two hours after this incident?
A. Correct.
12:32 Q. Other than the obscured faces of agents, is there any difference between those two videos, or are they identical?
A. They appear identical to me, yes.
MR. BIALE: No further questions.
THE COURT: Mr. Kanellis.
MR. KANELLIS: Very short, Your Honor.
CROSS-EXAMINATION BY MR. KANELLIS:
Q. Ms. Greer, is it?
A. Yes.
Q. Let's keep that video up. Have you had -- you are a
12:33 criminal defense attorney?
A. Yes, sir.
Q. And you represent criminal clients who have been accused of breaking the law. Fair statement?
A. I represent people who have been accused of breaking the law.

Q. And have a few of your clients ever been arrested?
A. Sure.
Q. And when they were arrested, have a few of your clients ever been handcuffed?
A. Yes.
MR. BIALE: Objection. Your Honor.
THE COURT: No. Overruled, overruled. This is certainly something that is appropriate. I don't know how far we'll go, but he may proceed with it.
12:33 MR. KANELLIS: I've made that point, Your Honor. I'm going to move on to another one.
THE COURT: All right.
MR. KANELLIS:
Q. Do you remember in the video that hanging from the chests of the two -- and we can play it back if you need your memory refreshed, but hanging from the chests of the two agents were identification badges, correct?
A. I recall seeing at least one.
Q. At least one?
12:34 A. Yeah, I mean, just from memory.
Q. From memory. Do you want, we can play the video back.
THE COURT: It's in evidence. I'm going to have to look at it.
Q. All right. So there was no -- no one was concealing the fact that these were law enforcement officers, right?

A. No.

MR. KANELLIS: Okay. No more questions, Your Honor.

THE COURT: Nothing further for this witness, Mr. Biale?

MR. BIALE: No, Your Honor.

THE COURT: You may step down. So call your next witness.

MR. BIALE: Your Honor, at this time plaintiffs have called all our witnesses who we have not previously identified as being called out of order, and so, except with respect to those witnesses, plaintiffs rest.

12:34

THE COURT: All right. And who is left, just so we know?

MR. BIALE: Sure. Sorry. One second.

So here is what it includes. So we have Jeff Reger, who is scheduled to testify on Monday. He's the executive director of MESA.

On Tuesday, the government is going to be calling the agents who were involved in four of the relevant arrests, and we have agreed with the government that, because both sides wanted to call those witnesses, we have agreed that the cross-examinations could go beyond the scope of the direct so that we don't have to call them separately.

12:35

And then on Friday, we will have Veena Dubal, who is the head of --

THE COURT: Friday of this week?

MR. BIALE: No. Friday of next week. I'm sorry, would you like to know the whole schedule? I was just telling you plaintiffs' witnesses.

THE COURT: No, no. Keep going.

MR. BIALE: So Friday of next week we will have plaintiffs' additional witnesses. These are the ones who are out of the country this week. Veena Dubal, who is the general counsel of AAUP, and Cinzia Arruzza, who is a professor at Boston University.

THE COURT: All that's fine.

MR. BIALE: And we may -- sorry, just to be complete, we may call one very brief summary witness to talk about evidence that's already been admitted or will be admitted, but that's still to be determined.

THE COURT: All right. So the government may call a witness.

MR. KANELLIS: Your Honor, we have operated under the understanding it was going to last -- our first witness would be available tomorrow.

THE COURT: Fine. We'll charge you with the time, but that's fine. Well, actually, we'll charge you with the time, but we'll stop the clock now. There were matters that I was going to see you on at 3:00, once I've handled the proceeding I have on for 3:00. I'm happy to handle it now.

Where I'd like to start, if anyone could help me, and I'm looking to the government, is the ex-parte submission in the red folder, I want to see what document, to what document does that relate. And in that document -- you don't have to reveal it to them, but in that document to what words or sentence, if you can point it out. It doesn't have to be done -- oh, Ms. Santora is ready to do it.

MS. SANTORA: I was going to confer with our agent.

THE COURT: You go right ahead.

12:37 MR. BIALE: Your Honor, sorry. Before we get there, I of course forgot about one witness. We have also indicated to the government that we wished to call Stuart Wilson, who is a government official. We have served a trial subpoena for him on the government. The government so far has not accepted service of that subpoena but has told me that he will be available to come to testify either next Monday or next Friday.

MR. KANELLIS: That's not accurate.

MR. BIALE: Which part of it is not accurate?

MS. SANTORA: I can explain. I think I know what

12:38 you're talking about. So we had indicated based on -- or I had indicated, and I'm sorry if this was confusing, that based on the trial schedule as the parties had currently set, it seemed like the only days where there would be available trial time is Monday and Friday. And I had tried to indicate that we were inquiring with our witness as to his availability on those

days, not that he was available.

MR. BIALE: That's fine.

MR. KANELLIS: I apologize for multiple people speaking, Your Honor. One point of clarification, we have I think cooperated very well with respect to sharing time and figuring out how to fill out these two weeks. Mr. Wilson was not identified on their witness list. We had no idea --

THE COURT: Well, I deal with cases in controversy. So far I don't have controversy. Assuming we can get him and fit him in, that's fine.

12:39

All right. Have we got the document we're concerned about or the portion of it?

MS. SANTORA: Yes. Let us just confer for one minute. I want to make sure we have the accurate information, Your Honor.

THE COURT: Well, we've got a whole team here. What was the matter, the housekeeping or other matter that we were going to have to talk about at 3:00? Let's talk about it.

MR. KANELLIS: Your Honor, I would ask that we do that at sidebar. It contains sensitive information.

12:39

THE COURT: Sidebar on the record I will do it.

MR. KANELLIS: Yes, sir.

THE COURT: Very well.

(Sealed sidebar excised from transcript.)

THE COURT: One minute while I total up the time.

MR. BIALE: Your Honor, can I ask one clarifying question?

THE COURT: Of course.

MR. BIALE: This relates to what we were just discussing, but the question can be asked on the public record.

THE COURT: Yes.

MR. BIALE: With respect to the ROAs that were admitted into evidence today, other than the particular one that we just handed back --

12:46 THE COURT: That we're dealing with.

MR. BIALE: I just want to get clarification. Are those part of the public record?

THE COURT: They are not.

MR. BIALE: Those are sealed?

THE COURT: They're sealed. But all -- for instance, though I take it the last video has been on TV and the like, all the exhibits in this case are for the court. This court's protocol is not to share those during the trial or until the court is done with its decision.

12:47 The court in its decision will make reference to those things upon which the court has relied. I've always taken the position that those things, unless classified, and I've dealt with cases that had classified data, are then public so the decision may be thoroughly reviewed by obviously higher courts but anyone who wants to analyze the court's reasoning.

Case: 25-6906, 11/20/2025, DktEntry: 16.15, Page 149 of 300



Now, there are various protective orders into which the attorneys have voluntarily entered, and those continue, and you are all subject to those.

MR. BIALE: Thank you for that helpful clarification, Your Honor.

THE COURT: Total elapsed time for the plaintiffs is two days, two hours, 45 minutes. Defense, three hours, 15 minutes. We'll resume tomorrow promptly at 9:00 a.m. Thank you.

(Recess, 12:47 p.m.)

* * * * *

CERTIFICATE OF OFFICIAL REPORTER

I, Kelly Mortellite, Registered Professional Reporter, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing transcript is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter to the best of my skill and ability.

Dated this 10th day of July, 2025.

/s/ Kelly Mortellite

______________________________

Kelly Mortellite, RPR, RMR, CRR

Official Court Reporter

# EXHIBIT 3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

No. 1:25-cv-10685-WGY
Volume 1, Pages 1 - 65

AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
Plaintiffs

vs.

MARCO RUBIO, in his official capacity as
Secretary of State, et al,
Defendants

********

BENCH TRIAL DAY 5

BEFORE THE HONORABLE WILLIAM G. YOUNG
UNITED STATES DISTRICT JUDGE

United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
July 11, 2025

********

Court Reporter: Kelly Mortellite, RPR, RMR, CRR
Official Court Reporter
United States District Court
One Courthouse Way
Boston, Massachusetts 02210
mortellite@gmail.com

A P P E A R A N C E S

RAMYA KRISHNAN
SCOTT WILKENS
Knight First Amendment Institute at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
Carrie.decell@knightcolumbia.org
and
COURTNEY GANS
NOAM BIALE
ALEXANDRA CONLON
Sher Tremonte LLP
90 Broad Street, 23rd Floor
New York, NY 10004
(212) 540-0675
Cgans@shertremonte.com
For Plaintiffs

ETHAN B. KANTER
WILLIAM KANELLIS
VICTORIA M. SANTORA
JESSICA A. STROKUS
DOJ-Civ
P.O. 878
Ben Franklin Station
Washington, DC 20044
(202) 616-9123
Ethan.kanter@usdoj.gov
and
SHAWNA YEN
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, MA 02210
Shawna.yen@usdoj.gov
(617) 748-3100
For Defendants

INDEX

| WITNESS | PAGE |
|---|---|
| MAUREEN SMITH | |
| Direct Examination By Ms. Strokus | 8 |
| Cross-Examination By Mr. Wilkens | 20 |

E X H I B I T S

None

P R O C E E D I N G S

(Begins, 9:02 a.m.)

THE COURT: Let me say, as I have each day I've authorized Internet access to these proceedings and, therefore, if you are accessing these proceedings via the Internet, have in mind that the rules of court remain in full force and effect. That means there's no taping, streaming, rebroadcasts or screenshots or other transcription of these proceedings. You must keep your microphone muted at all times. If you do not, I shall cut you off from access.

With that said, the government may call its first witness.

MR. BIALE: Can we just briefly raise, before the government calls --

THE COURT: Well, I see some things that perhaps need attending to. I plan to do it during the break this morning. I'd like to take evidence.

MR. BIALE: That's fine, Your Honor. I just want to say I think timing will work out fine. We need to address it and get clarity before the second witness testifies, but it's fine to --

THE COURT: Well, before the second witness, very well.

MR. BIALE: Thank you, Your Honor.

THE COURT: Call the first witness, Ms. Santora.

Case: 25-6906, 11/20/2026, DktEntry: 16.15, Page 155 of 300



MS. SANTORA: The government calls Maureen Smith. Ms. Smith is testifying remotely, and I do understand she is having some trouble logging in, so it might take a second for her to get logged in.

THE COURT: Well, all right, and that's fine. And I don't know if she can hear me, but I apologize for not starting early with her, but I appreciate her presence.

And since we're waiting, but as soon as she's ready, do you have someone to signal when she's ready?

MS. SANTORA: Yes. I think if we could just pull up the Zoom link, we should see if she's been able to log in. We have an attorney with her who will be questioning her.

THE COURT: Very well. Then we can talk about other matters in the interim is what I'm saying.

So, two matters that I think need addressing and I was going to address during the break. First of all, with respect to Exhibit A, and I see Mr. Kanter here, the document as to which the government has asserted the Presidential communications privilege. I have that matter under advisement.

MR. KANTER: Yes.

THE COURT: In view now of the coordinate proceedings in the Court of Appeals, I state that document is not going to be used, disclosed, at all until the court, if ever, until the court has concluded its analysis of the government's assertion of that privilege.

Case: 25-6906, 11/20/2025, DktEntry: 16.15, Page 156 of 300


Yes, I have looked at it in order to make that determination, and I am considering it. But you understand that's as far as it's going in these proceedings, unless I were otherwise to order, and I will make the order just as soon as I can. If I decide that the privilege applies, as I understand the governing law, I should return the document physically, and I will, to government counsel, and it's certainly not part of the record and that's an end of it.

MR. KANTER: And if Your Honor decides that the privilege does not apply, the result would be --

THE COURT: Well, look, I think since the matter is in limbo, I'm going to be very cautious what I say, but I'll say this.

MR. KANTER: It's still under advisement.

THE COURT: It looks to me like the document is, as to these proceedings, of very peripheral relevance. So let's say that I decide that the privilege does not apply. I note it is to be construed narrowly, but let's say I decide it's not to apply. I don't have any present intention of making any disclosure of it, but I may consider it part of the record.

Does that answer your question?

MR. KANTER: Thank you, Your Honor.

THE COURT: Yeah. All right. The second thing is about these witnesses and service and the like. And I had hoped all this could be worked out. But let me -- and I'm not

going to entertain argument on this. Let me tell you two lines that I'm following.

One, we're not going to be adding witnesses to this case and so we're limited to the witnesses disclosed in the pretrial order.

Two, the government isn't going to put on, given the fact that the weekend is coming up and witnesses, we're going to have to go through next week and Wednesday we're not going to sit, the government is not going to put on a witness now without making that witness available for deposition if they want, the plaintiffs want to take the deposition.

All right. Are we ready with Ms. Smith?

COURTROOM CLERK: Yes, she's on the Zoom.

THE COURT: Let's go.

MR. BIALE: Your Honor --

THE COURT: Let's go with Ms. Smith.

MR. BIALE: Yes, Your Honor.

THE COURT: We'll take a break and I'll hear you.

MR. BIALE: I'll raise it then.

THE COURT: Do I understand, Ms. Santora, that we're going to have an on camera lawyer interrogate her?

MS. SANTORA: Yes, I think you can see her on camera now.

THE COURT: I can. All right. Let's start by swearing the witness.

MAUREEN SMITH, Sworn

COURTROOM CLERK: Can you please state your full name and spell your last name for the record.

THE WITNESS: Maureen Amanda Smith.

THE COURT: Thank you. You don't have to keep your hand up.

THE WITNESS: Okay.

THE COURT: And counsel is with you, if she could introduce herself.

MS. STROKUS: Good morning, Your Honor. Jessica Strokus on behalf of defendants. And Your Honor, I have one request. As we are appearing via Zoom, may I remain seated during examination and objections on cross-examination?

THE COURT: Of course you may. Of course you may.

MS. STROKUS: Thank you, Your Honor.

THE COURT: Let me say this, Ms. Smith. I know it would have been more convenient to you if I started early. All I can say is I have plenty to do, and I appreciate you starting at our usual time. Very well. Ms. Gursky, you may inquire.

DIRECT EXAMINATION BY MS. STROKUS:

Q. Good morning, Ms. Smith.

Where do you currently work?

A. I work at the U.S. Department of State.

Q. And how long have you been employed with the State Department?

A. I have been employed since September of 1999.

Q. What was your first position with the State Department?

A. My first position with the State Department was at the United States Consulate General in Guadalajara, Mexico.

Q. And can you please briefly walk us through the duty stations and positions that you've held.

A. Yes. After that I went back to D.C. and I had an orientation class for foreign service generalists. Then I was given language training in Portuguese. I went to Recif, Brazil where I was the sole consular officer and deputy principal officer.

After Recif I went to Merida, Mexico as an entry level officer and after that Santo Domingo, Dominican Republic as the immigrant visa unit chief; after that back to Merida, Mexico as the consular section chief and deputy principal officer; then to Mexico City as American citizen services chief; then back to D.C. for French and Haitian Creole language training. I went to Port-au-Prince for two years as deputy consul general. Then after that I went to Guadalajara, Mexico as the nonimmigrant visa unit chief, and after that to Kingston, Jamaica as deputy consul general, which is where I am now.

Q. Ms. Smith, have you had a change in your employment since February of this year?

A. Yes. As of the beginning of February of this year, I went to Washington, D.C. on long-term temporary duty, TDY, until

now. And I'm in Kingston, packing up to report to a one-year position up in D.C.

So thank you for indulging me in doing the testimony from here virtually, everyone there in the court.

Q. And what was your temporary duty station that's now going to be your permanent station for the next year?

A. I am a senior adviser in the Bureau of Consular Affairs front office.

Q. And are there any roles at the Bureau of Consular Affairs immediately superior to your role?

A. Yes. My direct supervisor is Mr. John Armstrong, the senior bureau official for consular affairs.

Q. Ms. Smith, are you familiar with how decisions at the State Department have historically been made?

A. Yes, I am familiar with how decisions are made historically.

Q. And has the State Department's policy evolved in the time that you've been employed?

A. Yes, it has evolved.

Q. Has the State Department created an exhibit that would assist you in presenting your testimony today?

A. Yes.

MS. STROKUS: Your Honor, I'd like to mark --

MR. WILKENS: Objection.

THE COURT: Wait a minute. Well, she's leading, but

it's background. I'll let that stand.

MS. STROKUS: Your Honor, I'd like to mark for identification Exhibit HM.

THE COURT: Have I got this?

MS. STROKUS: I believe you do, Your Honor.

THE COURT: HM for identification.

BY MS. STROKUS:

Q. And Ms. Smith, are you familiar with this exhibit?

A. Yes, I am familiar with it.

Q. Will it help present the evidence to which you are testifying and assist in comprehension today?

A. Yes, it will assist.

MS. STROKUS: Your Honor, pursuant to 107(a) and 611, I move Exhibit HM into evidence.

MR. WILKENS: Objection. Your Honor, I'd like to voir dire about the how the exhibit was prepared because it hasn't been established.

THE COURT: Forgive me, but I'll ask you to state your name.

MR. WILKENS: Scott Wilkens, Your Honor, for the plaintiffs.

THE COURT: Mr. Wilkens, you're of course welcome, but no voir dire. I don't understand what the relevance of this is and Ms. Gursky, tell me why you think this is relevant.

MR. WILKENS: Your Honor, we don't have a copy.

THE COURT: Well, the government will provide you one forthwith. I have one. But Ms. Gurksy, tell me why this is relevant.

MS. STROKUS: Your Honor, I'm Ms. Strokus, just to clarify.

THE COURT: Ms. Strokus, yes. And you must forgive me. I recognize you. I just hadn't got your name down yet. Forgive me that. Ms. Strokus. And you've gotten a trip now as part of this case. Tell me why it's relevant.

MS. STROKUS: Your Honor, plaintiffs have alleged a new policy which they have termed an ideological deportation policy that they assert that the State Department and the Department of Homeland Security are employing.

THE COURT: I understand that.

MS. STROKUS: This witness is going to testify that the State Department's policies and practices, the way it implements law and regulation have been in place for, in some instances, up to 70 years. And the purpose of this exhibit is to aid, to assist her in presenting her testimony based on her knowledge and aid in the court's comprehension, simply because of the large volume of years to cover for what is currently being implemented today.

THE COURT: But this goes way back before she was employed there, so she doesn't have personal knowledge, for instance, of what was going on in 2004, and certainly she

doesn't have -- though I can take judicial notice of the Immigration Act of 1924, and she doesn't have personal knowledge of the visa security measures in 1941.

I can take judicial notice of the events, the World Trade Center bombing, September 11 terrorist attacks, one imagines they changed their policies.

MS. STROKUS: Your Honor --

THE COURT: Let's proceed this way. You go ahead and ask her your questions. I understand that central to this case is an alleged policy, and the government denies that there's any such policy. But it's pretty clear the government has procedures, and I'm interested to know what she has to say about those procedures. Let's proceed that way.

I've looked at this. It's hardly conclusive on anything, but I'll defer ruling. So go ahead and ask your questions.

MS. STROKUS: Your Honor, just to clarify, Ms. Smith did just testify that she joined the State Department in 1999. And if I could make a brief offer of proof for all of the testimony that would come before --

THE COURT: No. I stand corrected as to when she joined, and I'm appreciative of that, but I don't need an offer of proof at this time. Go ahead, ask questions.

MS. STROKUS: Thank you, Your Honor.

BY MS. STROKUS:

Q. Ms. Smith, when with did the State Department's visa issuance policy originate?

THE COURT: Which policy? Excuse me, I didn't hear the type of policy.

MS. STROKUS: Visa issuance policy.

THE COURT: Again, forgive me. Say it again.

MS. STROKUS: Sure. My question, Your Honor, was when did today's -- when did the State Department's visa issuance policy originate.

MR. WILKENS: Objection.

THE COURT: Overruled. You may answer.

A. Thank you, Your Honor.

With the Immigration Act of 1924.

Q. And Ms. Smith, what did that Immigration Act of 1924 do?

MR. WILKENS: Objection.

A. It laid out some basic --

THE COURT: I'm going to sustain that. I can look at the Act. We're back in 1924. That's over a century ago. Let's come to this case.

MS. STROKUS: Yes, Your Honor. Certainly, Your Honor.

BY MS. STROKUS:

Q. So skipping over some questions that I intended to ask Ms. Smith, Ms. Smith, after World War II, what was the next major development in immigration law?

MR. WILKENS: Objection.

THE COURT: No. Overruled. She may tell us.
A. After World War II, the major milestone was the Immigration and Nationality Act in 1952 which laid out rules and regulations on visas and established ineligibilities and what DHS would call inadmissiblities, as well as rules around visa revocation.
Q. And is the INA still the governing law today?
A. Yes, it is still the governing law.
MR. WILKENS: Objection.
THE COURT: Well, overruled. I'm the judge of the law, but I'm going to let that stand. Go ahead. That's the act that's in effect today. Go ahead. Go ahead, counsel.
MS. STROKUS: Yes.
BY MS. STROKUS:
Q. Have there been any amendments that have been relevant to the State Department visa security policy in the years following 1952?
A. Yes. One in particular stands out in my mind that came into effect right before I started with the State Department, which was in 1996, which established the ineligibilities for illegal presence 212(a)(9)(i) and 212(a)(9)(ii).
Q. And you started at the State Department when again?
A. In September of 1999, and I got to my first post in November of 1999.
Q. What was the next major event that impacted the State

Department's visa security policy?

A. If I may back up just a little bit because something that impacted the State Department was in 1993, the first World Trade Center bombing when it --

MR. WILKENS: Objection.

THE COURT: What's the ground of the objection?

MR. WILKENS: I mean, she testified that she joined the department in 1999. Now she's going to back to before she joined, Your Honor.

THE COURT: Yes, but she has training and the like. To tell you the truth, so far I haven't heard anything that is particularly relevant, but I'd like to move on. If she doesn't get to something relevant pretty soon, I'll issue a direction. But this is all background and perhaps it's helpful.

Go ahead. After the World Trade Center bombing, what happened so far as you know?

THE WITNESS: Yes, Your Honor.

A. So after the first World Trade Center terrorist bombing, there was a push within Consular Affairs for some system automation as well as limited biometric collection. And if we fast forward, I started in '99, then the September 11, 2001 terrorist attacks happened. And that was a major wake-up call for the State Department for Consular Affairs and for the whole U.S. Government in terms of our failure to properly vet visa applicants, since at least a couple of them were in the U.S. on

student visas. At least one had attended flight school in the United States.

So in the immediate years following the September 11 terrorist attacks, there were several laws that came into effect and major changes in the Bureau of Consular Affairs in terms of full biometric collection. And, for example, the INS became DHS with all of its different components, HSI, ICE, also consular officers having access to entry and departure data for all aliens.

Another major shift was that before 9/11 foreigners could transit the U.S. without a visa. And starting in 2002, foreigners needed to obtain a visa in order to even switch planes in the United States.

Also the visa security program was created, which is where HSI has agents co-located in consular sections abroad that conduct additional vetting on visa applicants. And also in the few years following 9/11 it was mandated that U.S. Government agencies needed to share in a very fulsome way derogatory information on visa applicants. And also there was sharing of biometric data especially between DHS and Consular Affairs.

Q. Ms. Smith, was there anything specific to student visa applicants that occurred following 9/11?

A. Yes. Specific to student visa applicants the SEVIS system was created, also referred to as SEVP, Student and Exchange Visitor Program. And that was literally a database that was

created by ICE to track students from the moment that they are issued their I-20 or DS-2019 form in order to apply for a visa abroad. And it tracks when they report to class in the United States. If they were to flunk out of school, their status would change.

ICE certifies designated school officials at every school that is accredited to issue the I-20 or DS-2019, and the DSO, as they're called, is supposed to update in SEVIS, in the SEVP any and all student movements, including if someone is, for example, adversely terminated at the school.

Q. Ms. Smith, all of these changes and evolutions that you've mentioned after the September 11 terrorist attacks, are they still being implemented today by the State Department?

A. Yes, they are still in effect today.

Q. After the implementation and all of this evolution in response to the September 11 terrorist attacks, was there anything else that occurred that created additional evolution in the State Department's visa security policy?

A. So for example, in 2013, there was the Boston Marathon bombing that was carried out by a naturalized U.S. citizen and a legal permanent resident. And that brought to the forefront once again for Consular Affairs the need to properly vet all applicants because of serious national and public security concerns.

The next big event was in 2015, the San Bernardino

shooting that was carried out by a Pakistani national who obtained a K-1 fiance visa in order to enter the U.S. to marry a U.S. citizen. And he had posted on his social media, I think it was the day before or the day of the shooting, he had posted what he was going to do. And then a review of social media revealed afterwards that he had pro-ISIS postings on his social media. So this was when the Bureau of Consular Affairs first started to take a really hard look at how to vet social media.

Q. And for how long has the State Department required visa applicants to provide social media handles for the purpose of visa vetting?

A. So to mention that in 2016, so about a year after the San Bernardino shootings, FDNS, the Forensic Document National Security director within USCIS started social media vetting of certain subsets of applicants.

And in the State Department, in, it was 2019 or 2020, started to require that all visa applicants, whether nonimmigrant or immigrant visa applicants, were obliged to report their social media handles on their DS-160 or DS-260 electronic application forms.

Q. And Ms. Smith, following after, say, 2020, has there been additional development in the State Department's visa security policy?

A. Yes. There have been further developments in terms of interagency and biometric checks. Also there have been some

innovations, for example, for a while there was a predictive analytic software that was run as a pilot at some posts on visa applicants based on their biographic and other information. Sort of a first foray into an AI type system on visa applicants.

And another is a focus on data-driven decisions and metrics. So everything on refusal rates, productivity, there have been different innovations over the years since around 2019, 2020, leading up until today and continuing.

Q. Ms. Smith, is the State Department, to your knowledge, continuing to implement the same statutes and regulations today as it has since the passage of the Immigration and Nationality Act in 1952?

A. Yes. The State Department and specifically Consular Affairs continues to uphold everything that is in the INA.

MS. STROKUS: Your Honor, I have nothing further for this witness and tender the witness to the court.

THE COURT: Yes. Thank you.

Mr. Wilkens, do you wish to inquire of this witness?

MR. WILKENS: Yes, I do, Your Honor.

THE COURT: You may.

CROSS-EXAMINATION BY MR. WILKENS:

Q. Ms. Smith, you've talked about, I think you called them everything from sort of major changes to changes over the years to innovations.

And am I correct that when those types of changes have happened, the Department of State and in particular the Bureau of Consular Affairs has regularly issued policy guidance to all posts on how those changes should be implemented?
A. Yes, that is correct. One way that the State Department or Consular Affairs issues guidance to the field is via cables, yes.
Q. And while we're on that topic, in addition to cables, how else does the Department provide policy guidance to visa officers around the world and in Washington?
A. Another way that the State Department provides guidance is via FAM updates, the Foreign Affairs Manual, 9 FAM in particular, which is everything about how consular officers need to apply the INA abroad, sort of operational instructions.
Another way besides cables and FAM updates, sometimes emails are released until a cable can get fully cleared because any cable that is released from the State Department has numerous layers of clearances both within Consular Affairs as well as throughout the State Department building, many different offices.
And another way that guidance is released to the field is, depending on the topic, Consular Affairs may hold a webinar in order to give information and receive questions from the field.
Q. And in addition to taking account of the various types of changes that you spoke about earlier, this type of policy

guidance is also issued to implement executive orders no matter what the Presidential administration, correct?

MS. STROKUS: Objection, Your Honor.

THE COURT: What's the ground?

MS. STROKUS: Scope of her prior testimony.

THE COURT: Overruled. He may have it. Is that the practice?

THE WITNESS: Counsel, can you please repeat the question? I want to make sure I understand.

THE COURT: Yes. His question is, does like policy guidance get issued to consular offices when it's necessary to implement a President's executive orders.

THE WITNESS: Thank you, Your Honor.

The Consular Affairs would release cables or webinar or hold webinars if an executive order is relevant to visa work or let's say U.S. passport adjudications. So it really depends on the topic. We don't hold a webinar or release a cable based on every executive order. It really depends on what the topic of the executive order is.

Q. And under this administration, isn't it correct that the bureau has issued policy guidance with respect to executive orders issued by the President?

MS. STROKUS: Objection, Your Honor.

THE COURT: I'm not getting into how they've changed the visa applications, if at all and on what basis. In my

mind, all of those things implicate national security, and that's the line I'm following. So that question I'm sustaining on that ground.

Q. So I will come back to a related area in a moment. Let me just step back for a second about your position, Ms. Smith, which you talked about earlier as special adviser. You've been in that role since February, right?

A. That is correct, I've been in that role since February.

Q. And that is the first role that you've had sort of in the head office, the front office in Washington, D.C. since you joined the Department in 1999, correct?

A. Yes, that is correct. That's the first role I've had in the Consular Affairs front office since I joined.

Q. You've, so to speak, been in the field up until taking that role; is that fair?

A. Yes, that's correct. Other than language training, I've been in the field.

Q. Okay. And so would it be fair to say that you've been on the receiving end of the policy guidance we've talked about under various cables that are sent or the Foreign Affairs Manual, the emails that you mentioned that are sent prior to some cables being issued; is that right?

A. Yes, I've been on the receiving end of guidance from D.C.

Q. And in your current role since February, you've been on the, let's say the generating end, the creation end of the

policy guidance that goes out to consular posts around the world and to the visa office in D.C., correct?

MS. STROKUS: Objection, Your Honor.

THE COURT: No. He may have that. Is that a proper characterization, ma'am?

THE WITNESS: I guess what I'd do is I'd caveat it a little bit, because I am one of many people within the Bureau of Consular Affairs who are attempting to faithfully carry out what the President is releasing via executive orders.

BY MR. WILKENS:

Q. And would it be fair to say that one of the principal responsibilities of your role is to help implement President Trump's executive orders, and in particular, let me refer to a couple of them in particular, Executive Active order 14161, which is titled Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats, and Executive Order 14188, titled, Additional Measures to Combat Antisemitism; is that right?

MS. STROKUS: Objection, Your Honor, scope.

THE COURT: No. Overruled. He may have it.

A. Yes, that is correct. As part of my job in D.C. is to help the Bureau of Consular Affairs implement executive orders out of the White House, including the EOs that you mentioned, EO 14161 and the EO on antisemitism.

Q. And in your role as special adviser since February, you

have in fact undertaken a number of tasks to implement those two executive orders, isn't that right?

MS. STROKUS: Objection, Your Honor, scope.

THE COURT: Overruled.

A. Can you please ask the question again? I think it's two questions. So would you mind separating the questions, please.

THE COURT: Follow that direction.

MR. WILKENS: I'm trying to remember the question, Your Honor.

THE COURT: I'll break it down. He asked about two executive orders. So since you've had this duty in February, have you worked on the executive order relative to measures to combat terrorism and the like, the first one he mentioned?

THE WITNESS: Yes, Your Honor. So EO 14161, I have been a member of the team to help implement that executive order, which basically directed the State Department to find ways to better vet visa applicants abroad. And so it was left to the State Department and specifically the Bureau of Consular Affairs to envision and implement what that entailed, what that means.

THE COURT: And his second question was, the executive order dealing with antisemitism.

THE WITNESS: Yes, Your Honor. Although I've been less involved with that executive order specifically, I have had some dealings with it but not as much as EO 14161.

BY MR. WILKENS:
Q. Turning you specifically to the antisemitism EO, what guidance are you aware of that has been issued to visa officers, to consular officers to implement the antisemitism EO?
MS. STROKUS: Objection, Your Honor, scope.
THE COURT: Sustained. But this is not on scope. We're not getting into the vetting of visa applicants.
MR. WILKENS: Your Honor, let me mark an exhibit to sort of make it clear that some of this material is before the court and has been marked as exhibits that deals with this question.
THE COURT: Maybe it is. So we'll have to work out from there, but that's the line I'm following.
MR. WILKENS: Yes.
Could we pull up Exhibit 64, please. Terrorists.
THE COURT: I have it.
THE WITNESS: I'm viewing it as well.
THE COURT: Thank you.
BY MR. WILKENS:
Q. Ms. Smith, please take a moment to look at that, if you need to.
MS. STROKUS: Your Honor, I'm going to object to the introduction of this exhibit to this witness.
THE COURT: Wait a minute. It's a little too late.

This document is in evidence under the pretrial order. So we've got a document in evidence, it's redacted, and I'm not changing that.

MS. STROKUS: I understand, Your Honor. My objection is under Rule 611(b), the scope of cross-examination.

THE COURT: Well, that's within the court -- I see, it's scope. And I overrule the objection. But yes, maybe -- well, no, she's adverse. He may inquire. The matter is within my discretion. He may inquire, but I'm not getting into changes in practice for vetting visa applicants. But hope springs eternal, Mr. Wilkens, so go ahead.

MR. WILKENS: Yes.

BY MR. WILKENS:

Q. And have you seen this cable before, Ms. Smith?

A. Yes, I have seen this cable before.

Q. And is this cable one of the types of policy guidance that's been issued to implement the executive orders we spoke about a moment ago, including the antisemitism executive order?

MS. STROKUS: Objection, Your Honor.

THE COURT: Overruled.

A. Yes, this is one example of how executive orders are implemented.

Q. Okay. And just with respect to cables more generally but including this cable, am I correct that cables don't just apply to visa officers located in diplomatic posts around the world

but also can provide policy guidance to the visa officers working here in D.C., isn't that correct? Well --

THE WITNESS: Were you going to say something, Your Honor.

THE COURT: No.

THE WITNESS: Sorry.

MR. WILKENS: Sorry. That was me. Let me withdraw that.

THE COURT: Withdrawn.

BY MR. WILKENS:

Q. I'll ask you, so the cables -- yeah. This cable applies not just to visa applicants who are applying for visas through posts abroad but also applies to visa holders who are present in the United States, isn't that right?

A. So the question is whether the cable guidance would apply to visa holders in the United States as well?

Q. Yes.

A. I think it's a little bit of a broad question to try and answer because if a student has been admitted to the United States, they are admitted by Customs and Border Protection, S, Ms and Js are categories that are submitted, duration of status. And so there's certain aspects of their presence here that are -- well, actually, most aspects of their presence in the United States are sort of governed by the Department of Homeland Security and not the State Department.

Q. The State Department, though, is the agency with the statutory authority to revoke visas, correct?
A. That is correct, the State Department has the authority to revoke visas.
Q. And that includes student visas, correct?
A. That is correct, that includes student visas that the State Department has the authority to revoke.
Q. And could I ask you to turn to paragraph 11 of this cable, which is on page five of six?
A. Yes. Could I have a moment to read it, please.
Okay.
Q. Okay. So with respect to paragraph 11, does that make it clear that the cable, the guidance provided by this cable is applicable not just to students applying for visas from abroad at consular posts but also the students in the United States and the possibility that the State Department will revoke their visas?
MS. STROKUS: Objection.
THE COURT: Well, the document speaks for itself. The objection is overruled. No. The objection is sustained. The document speaks for itself. That's what it says.
MR. WILKENS: Okay, Your Honor.
BY MR. WILKENS:
Q. Just to be clear, the questions that I will be asking with respect to policy guidance, I intend to ask those questions

about policy guidance with regard to visa holders in the U.S., not visa applicants abroad who are applying through U.S. diplomatic posts. I just want to be clear about that, that that's what I want to focus on.

So am I correct that in the bureau in which you are a senior adviser that there is a visa office that handles the revocation of visas for students who are already in the United States, student visa holders?

A. Yes, that is correct, there is the visa office in D.C. that would handle the revocation of visas there; yes, that is correct.

Q. And we spoke a moment ago about different types of guidance, policy guidance that is provided by the Department of State and the bureau, which you mentioned, for example, includes the Foreign Affairs Manual, cables, emails in advance of cables being issued and webinars.

And do those types of guidance -- don't those types of guidance also apply to visa officers in Washington who are working on visa revocations?

MS. STROKUS: Objection.

THE COURT: Overruled.

A. So I think what you're asking is whether the same standards would apply abroad or domestically in the United States on whether there are grounds to revoke a visa.

So there are certainly rules as it does briefly mention in

paragraph 11 of the cable in Exhibit 64, there is brief mention of that. And so for example, it mentions how in driving under the influence, a consular officer abroad is able to revoke a visa, even if the person is in the United States. But most times it needs to be the visa office in the U.S. that would perform the prudential revocation.

Q. And could you just briefly explain what the term "prudential revocation" means for the court.

A. Yes, a prudential revocation is when a visa is revoked but it actually does not take effect until the person departs the United States.

Q. Okay. And I just want to just back up for one second just to be clear. So the types of guidance we talked about, the Foreign Affairs Manual, cables, emails, webinars, all of that, those types of policy guidance with regard to the two EOs we spoke about apply to students, student visa holders, the revocation of student visas for students who are already present in the United States, correct?

MS. STROKUS: Objection.

THE COURT: No. Overruled.

A. A consular officer, whether they're abroad or in the United States, would need to look at the totality of the circumstances of an applicant's situation, would need to look at all facts their case, any and all criminal history, any aspect of the applicant in order to determine if there are

grounds for revocation or prudential revocation.
Q. And I want to focus on the question of where the guidance that the consular officer, particularly located in D.C., is relying on.
And what I'm asking is, they also rely on the various types of policy guidance that you mentioned, which includes the Foreign Affairs Manual, cables, emails, webinars, isn't that correct?
A. Yes, an officer in D.C. would also rely on the Foreign Affairs Manual, cables, webinars. We are all held to the same standard.
Q. And I think you mentioned a moment ago that with the exception of sort of DUIs, for example, most visa revocations for visa holders in the United States, student visa holders in the U.S. are handled out of visa officers -- are handled by visa officers located in Washington, isn't that right?
A. That is correct.
Q. Okay.
A. The majority of visa revocations are performed from D.C.
Q. If we can just turn back to the first page of this exhibit, 64, and I'm going to direct you to the latter couple of sentences of paragraph two, the summary paragraph.
Do you see where it's quoting from Secretary Rubio there?
A. Yes, I do see the quote from Secretary Rubio.
Q. And that quote from Secretary Rubio is guidance to visa

officers, including those who are handling the revocation of visas of students who are in the U.S., right?

MS. STROKUS: Objection, hearsay.

THE COURT: No. The document is in evidence. It's not hearsay, but I'm sustaining the objection. The document speaks for itself. That's what it says.

MR. WILKENS: Okay, Your Honor.

THE COURT: Except the identity of who said it is unclear. So we'll let Mr. Wilkens have that.

You understand that the quoted portion in that paragraph, ma'am, comes from the present Secretary of State, Marco Rubio?

THE WITNESS: Yes, Your Honor. That comes from Secretary Rubio.

THE COURT: Thank you.

By MR. WILKENS:

Q. And just to be clear, that's part of the guidance, right?

THE COURT: Well, the document speaks for itself.

MS. STROKUS: Objection.

THE COURT: The objection is sustained. I can read.

BY MR. WILKENS:

Q. Let me move off of this exhibit, Ms. Smith.

Just briefly, to go back to your role as special adviser, you mentioned that you report to Mr. Armstrong, right?

A. Yes, that is correct, I report to Mr. John Armstrong.

Q. And you also work closely with the Office of the Counselor to Secretary Rubio, correct?
A. Yes, I do work with the office of the counselor.
Q. And the Office of the Counselor -- well, could you explain just briefly the Department of State sort of organizational structure?
A. Yes, I can explain. So the Office of the Counselor -- the consular reports directly to the Secretary of State, and they are responsible for providing guidance, and also they can take on special projects for the Secretary's office.
Q. And the Office of the Counselor which reports directly to the Secretary has provided you with various tasks related to the implementation of the two executive orders we've discussed, correct?
MS. STROKUS: Objection.
THE COURT: Overruled.
A. I do sometimes receive instruction from the office of the consular, but most times it is through the senior bureau official in consular affairs.
Q. I just want to be clear, in addition to reporting to Mr. Armstrong, you also have this working relationship with the office of the consular, which reports directly to Secretary Rubio, right?
A. Yes, I do have a working relationship with the Office of the Counselor.

Q. And you've received tasks regarding the implementation of the two executive orders from Mr. Armstrong and the Bureau of Consular Affairs and also from the office of the consular to Secretary Rubio, correct?

MS. STROKUS: Objection.

THE COURT: Overruled.

A. Can you clarify which executive orders, please.

Q. Yes. The two we were speaking about earlier.

A. Yes, I have received guidance or instructions for EO 141617 and EO 14188.

Q. You spoke earlier about the connections, the work between the Department of Homeland Security and the Department of State and how that has changed or increased over time, correct?

A. Yes, I spoke earlier about how that has evolved over time, become a much closer relationship, starting really with the 1992 World Trade Center bombing and especially after the 9/11 terrorist attacks, in terms of biometric and information sharing.

Q. And in your role as special adviser, you have worked with the Department of Homeland Security, correct?

MS. STROKUS: Objection.

THE COURT: Overruled.

A. Yes, in my role as senior adviser, I have worked with the Department of Homeland Security.

Q. And I want to just focus on two aspects of that,

Ms. Smith. You have participated in what is referred to as a student visa working group, right?

MS. STROKUS: Objection.

THE COURT: I'm not clear can where that falls on the line I'm following, so I'm going to sustain it but without prejudice to you following it up.

Q. Okay. Since you became special adviser, some of your work has involved the revocation of visas of students who have engaged in student protests, correct?

MS. STROKUS: Objection.

THE COURT: Overruled.

A. Can you repeat the question, please.

Q. Yes. In your role as special adviser, you have worked on issues related to the revocation of student visas for students who engaged in student protests, correct?

A. Yes, in my role as senior adviser, I have worked on matters related to the revocation of student visas and also frankly revocation of visas for anyone, whether or not they're a student, who has been arrested or otherwise broken our laws in the United States.

Q. But you have worked, in your role as special adviser, you have worked on the revocation of student visas for students engaged in protests only since February of 2025, right?

MS. STROKUS: Objection.

THE COURT: Overruled.

A. In my role as senior adviser since February of 2025, I have worked on cases where applicants have derogatory information in our system.

THE COURT: Wait. Excuse me for interrupting, but I'm going to pretty strictly follow my line. His questions, I understood, don't deal with applicants. They only deal with people who are here lawfully on visas that have issues. And I've understood your testimony about revocation of visas to apply to such persons.

This last question, as I heard it, is only this. You first began working on the revocation of visas of the student protesters after the assumption of your role in February 2025. Is that true?

THE WITNESS: So to answer your question more directly, Your Honor, since arriving in February of 2025, my work has included not only student visa holders. So you're asking, sir, about any visa holder in the United States, including students. And yes, my work has included that.

THE COURT: But you're making the point that your work is much broader than that, at least in the revocation of visa area?

THE WITNESS: Yes, Your Honor, my work, yes.

THE COURT: Yes, I understand. Mr. Wilkens.

BY MR. WILKENS:

Q. Let me focus on two different ways, as I understand it, in

which your work has concerned the revocation of student visas involving student protesters.

One way has been referrals coming from the Department of Homeland Security to the Bureau of Consular Affairs and Mr. Armstrong that recommend -- that have recommended the revocation of the visas of certain students who were engaged in student protests, isn't that right?

MS. STROKUS: Objection.

THE COURT: Overruled.

A. Would you mind repeating the question, please.

THE COURT: He says, his question is that one way you've been involved in the revocation of visa-holding student protesters is when a recommendation comes from the Department of Homeland Security advising that such visa should be revoked; is that correct?

THE WITNESS: Thank you for repeating the question, Your Honor. That is correct.

We, as I stated during my deposition, we sometimes get information from the Department of Homeland Security about student visa holders or other types of visa holders who are in the United States and there is some sort of derogatory information.

And as I stated during my deposition, my role has been fairly limited with regard to specific visa cases, occasionally checking in our system whether the person has a valid

nonimmigrant visa, if it is an expired nonimmigrant visa, if they are a legal permanent resident, checking if someone is a U.S. citizen. So it's a little bit more verifying the actual status of the person in the United States.

BY MR. WILKENS:

Q. And Ms. Smith, with respect to that limited role, you dealt with, in that way, the case of Mahmoud Khalil, correct?

MS. STROKUS: Objection.

THE COURT: Overruled.

A. Yes, I do recognize the name Khalil Mahmoud.

Q. You were asked by the Office of the Counselor to Secretary Rubio to check in the system whether Mr. Khalil was a visa holder or a lawful permanent resident, correct?

A. I am not sure if it was from the Office of the Counselor or from the Department of Homeland Security, but yes, I did check if Khalil was a visa holder or a legal permanent resident.

Q. And did you have that sort of involvement in the cases involving Rumeysa Ozturk or Badar Khan Suri or Yunseo Chung?

MS. STROKUS: Objection.

THE COURT: Overruled.

A. As I stated during my deposition, I thought I recognized the name Suri, but I thought it was a female, and during the deposition I saw it was a male. So if I worked on it, it would have been just to verify the visa status or an LPR.

Did you say the other name was Chung?
Q. Yes.
A. I do not recognize that name. And can you repeat the name of the other applicant, please?
Q. Mohsen Mahdawi. Sorry, go ahead.
A. Sorry. I do recognize the name Mahdawi, but I thought -- I think it's a he --
Q. Yes.
A. I thought he was from a different country. And when I saw it during the deposition, it was a different country than I had remembered. The name does sound familiar. But again, my role would have been limited to checking if the person was a valid visa holder or a legal permanent resident, visa status.
Q. Thanks. I'll ask about one more name, Rumeysa Ozturk. Were you involved in her case in any way?
A. I do not remember working on her case, no.
MR. WILKENS: Okay. Thank you. And Your Honor, I just wanted to raise one thing. It looked to me like Ms. Strokus maybe had been speaking with someone else in the room. And if there's someone else in the room, I'd like them to be identified.
MS. STROKUS: That's fine, Your Honor. We have agency counsel here. We just have a limited screen.
THE COURT: I appreciate that.
MR. ANDERSON: Carl Anderson, with the State

Department.

THE COURT: And Mr. Anderson, thank you for identifying yourself.

Is that it for this witness?

MR. ANDERSON: Thank you, Your Honor.

MR. WILKENS: Not it for my questions, Your Honor, but yes, thank you for clarifying that.

THE COURT: And Mr. Anderson, you are certainly welcome.

BY MR. WILKENS:

Q. I want to -- so you've just spoken about one way in which the Bureau of Consular Affairs has worked with the Department of Homeland Security on revoking the visas of student protesters, and I want to -- I just want to talk about one other way, as I understand it, that the two agencies have addressed or discussed the issue of visa revocations for student protesters.

And you were part of a student working group with DHS in which the issue of the revocation of student visas for students who are engaged in protests was discussed, correct?

MS. STROKUS: Objection.

THE COURT: Well, I think that may run afoul of the deliberative privilege. Sustained.

I'll ask the question. As part of your job, ma'am, at some time in the period we're talking about, you were part of a

working group within DHS, the Department of Homeland Security, that concerned itself with student protesters. Is that true?

THE WITNESS: Your Honor, in my role as senior adviser in Consular Affairs, I did participate in a group with the Department of Homeland Security about student visa protesters and other matters, yes.

THE COURT: Thank you.

BY MR. WILKENS:

Q. And I want to ask about what you referred to in your deposition as the Homeland Security Council. Do you remember talking about that?

MS. STROKUS: Objection.

THE COURT: Well, since I don't know -- I don't have the deposition before me, I'll allow her to answer yes or no.

Do you remember mentioning that individual or office in your deposition, ma'am?

THE WITNESS: Yes, Your Honor, I did mention in my deposition that the Homeland Security Council calls meetings, and I have attended several of those meetings.

BY MR. WILKENS:

Q. And in those meetings, the attendees, the meetings that you attended, the issue of student protesters and the revocation of their visas came up, didn't it?

MS. STROKUS: Objection, Your Honor. Presidential communications privilege.

THE COURT: What? Presidential? Is that --

MS. STROKUS: Yes, Your Honor.

THE COURT: -- the privilege you're asserting?

MS. STROKUS: Homeland Security Council is a direct advisory to the President, Your Honor.

THE COURT: So let me be very clear now. You're asserting the executive privilege of the President of the United States with respect to these meetings?

MS. STROKUS: Yes, Your Honor, the Homeland Security Council is part of the executive, it is part of the White House.

THE COURT: You're all part of the executive, aren't you? You're part the executive.

MS. STROKUS: I am, Your Honor. I mean specifically that this council advises directly to the President. It is part of the Executive Office of the President.

THE COURT: This council we're talking about is part of the Executive Office of the President. What's his or her name?

MS. STROKUS: Yes. Your Honor, it is a council of people who have been collected to advise on Homeland Security. It is termed the Homeland Security Council, and it is part of the Executive Office of the President.

THE COURT: Okay. I appreciate your help. So there's an informal council on Homeland Security.

MS. STROKUS: No, Your Honor. It is a formal council. It is a formal council that is part of the Executive Office of the President.

THE COURT: And its name is --

MS. STROKUS: The Homeland Security Council.

THE COURT: Thank you. And it's comprised of whom?

MS. STROKUS: Your Honor, that is part of the Presidential communications privilege.

THE COURT: So it's a secret council?

MS. STROKUS: The existence of the council is not a secret, Your Honor.

THE COURT: But its membership is secret?

MS. STROKUS: They are staff members of the Executive Office of the President, Your Honor.

THE COURT: And its membership is secret?

MS. STROKUS: I would not say that it is secret, Your Honor. I would say that it is privileged.

THE COURT: And it's privileged from this court? I may not know who these people are? I mean, you tell me that. Is that what you're saying?

MS. STROKUS: Given the ongoing issues with privilege in this court, Your Honor, I will maintain that this is the Presidential communications privilege and the identities of the individuals on the Homeland Security Council are privileged. The discussions that are had within the Homeland Security

Council and agencies are privileged under the Presidential communications privilege because this council is part of the Executive Office of the President and provides direct recommendations, direct advice for the President to take action in his duty under the Constitution.

THE COURT: Your position is clear. Let me ask you this, because this pertains to my research on Exhibit A as to which this -- and Mr. Kanter may respond to this as well. And really it does not come up in the context that counsel has now raised it where at least the name of this secret entity is Homeland Security, which the natural inference is it involves national security.

MR. KANTER: Homeland Security Council, not secret.

THE COURT: The name is not secret, no. But now its members are apparently secret.

MR. KANTER: Privilege.

THE COURT: Privilege, you say. So she takes that position, and I'm not in a position to overrule it, and I'm not going to, at least now.

But go back to Exhibit A. If I rule that Exhibit A is privileged, my review of that exhibit is, that has nothing to do with or the claim that -- if any claim were raised that it has to do with national security is so peripheral that, to be almost evanescent. Be that as it may, if it did have to do with national security and the executive privilege of the

President of the United States is invoked, the decided cases indicate that no adverse inference may be drawn from that. And those are higher courts, and I respect that. But if it didn't have to do with national security, I'm wondering when such privilege is invoked, whether, as you'll find if you were here in Massachusetts dealing with the attorney-client privilege, under the common law of Massachusetts, where I started and still reside, if you invoke the attorney-client privilege, the factfinder is entitled to draw an adverse inference that the attorney-client privilege is invoked, but you're hiding something.

I wonder whether when national security is not at play, as it appears to be as your co-counsel has invoked it, but with respect to Exhibit A where it appears it doesn't, what's the law on that?

I'm not asking now. It's a matter that could be briefed if we even get that far because I haven't ruled whether the privilege applies or not, but it's appropriate to raise it now.

Sorry for the detour, Ms. Smith. We'll let Mr. Wilkens get back to work.

MR. WILKENS: Thank you, Your Honor.

BY MR. WILKENS:

Q. So Ms. Strokus and Ms. Smith, I want to return for a moment to the Homeland Security Council with respect to what is

public about it. And a great deal has been made public by White Houses over time. And so in particular, the Homeland Security adviser is Stephen Miller, isn't that correct? That's on the White House website; isn't that right?

A. Yes, the Homeland Security security adviser is Stephen Miller.

Q. And can you name the agencies -- I'm not asking for the names of the people but the agencies and agency heads who are as a matter of public record part of the council?

MS. STROKUS: Your Honor, objection again.

THE COURT: Same grounds? Same grounds?

MS. STROKUS: Yes, Your Honor.

MR. WILKENS: Your Honor, I'd like to pull up a White House web page that shows the information that I'm trying to ask about to show that it's public.

THE COURT: Well, you may, but then why don't you pull it up and show it to the witness or read it to the witness --

MR. WILKENS: Yes, Your Honor.

THE COURT: -- because you have it, and let's see what she says about it.

MR. WILKENS: Yes, Your Honor. We'll pull it up now.

MS. STROKUS: Your Honor, I'm going to object to this. This was not produced to the defendants in discovery.

THE COURT: True. But I'm going to allow him to do it if it's on the White House website. Now, a privilege has been

invoked. I think I might want to take a look at it, and it would be helpful, can you people print things out? Why don't you take a screenshot of it and print it out? I'm swimming in paper here.

MS. CONLON: I know. Unfortunately, we have no printer access in the courthouse, but we'll put it on the screen in a second.

THE COURT: All right. Let's put it on the screen.

MR. WILKENS: Pre-marked as EP.

THE COURT: Okay. Now, EP, this is one of your newer documents. So this is EP.

MS. STROKUS: Your Honor, may we have a quick recess so that we can determine what is public and what is not? We have not seen this before, and my understanding --

THE COURT: I don't see the need for a recess. It's sufficiently public that they can get their hands on it. And it's represented to the court that this is the White House's own website. I'm reading it, it says Homeland Security Council.

MS. STROKUS: Your Honor, I would just point out that at the top of the page it says, "Under President George W. Bush," and that this is frozen in time, it is not current.

THE COURT: All right. That's fine. And therefore, the way we'll proceed is you're going to have to move on, Mr. Wilkens, because she says that this is not the current

council. When you can get to a printer, print that out, and let me have it.

BY MR. WILKENS:

Q. Can I ask you, Ms. Smith, if you read that --

THE COURT: She can't read it.

MS. STROKUS: Objection on.

THE COURT: Wait a minute. He hasn't asked his question yet. Let him ask the question.

BY MR. WILKENS:

Q. What I want to ask is, is the description of the Homeland Security Council and its agency members an accurate description of the current Homeland Security Council?

THE COURT: She doesn't have the document before her. She does? She has it before her.

MS. STROKUS: Objection, speculation, foundation. This has not been produced in discovery. It's a historical document.

THE COURT: Yes, he knows that. And so what he's asking her is, is the historical document, is the composition the same today? You object to that, asserting the same privilege, I take it?

MS. STROKUS: Yes, Your Honor, under the privilege and also because it's speculative.

THE COURT: Look. I've heard you. I understand the grounds of the objection.

Now, I'm in the middle of the trial. I need to sort this out. So without sustaining this objection in any way, I'm going to direct you to move on, because if the assertion of privilege is correct, the question you ask, since you can only come up with one from a prior administration and that's some time ago, calls for her divulging matters as to which such a claim has been made, an interesting claim. Anything else?

MR. WILKENS: Yes, Your Honor.

BY MR. WILKENS:

Q. I'd like to just briefly focus on a few cables of the type that you testified about earlier, cables that the Bureau of Consular Affairs issued as part of its implementation of the two executive orders that we spoke about.

MR. WILKENS: And I will go through them as quickly as I can, Your Honor.

Q. Let me direct you to, if we can pull up Exhibit 51, please.

MS. STROKUS: Your Honor, I'm going to object to this, make a scope objection.

THE COURT: Your objection is scope. Overruled.

A. Okay. I see Exhibit 51. I would appreciate a minute or two to read through it, please.

Okay, I am ready, sir.

Q. Okay. Thank you. Do you recognize this cable?

A. Yes, I do recognize this cable.

Q. Is it one of the cables that you were referring to earlier with respect to providing policy guidance about the implementation of the executive orders?
A. As we can see in the summary paragraph on page one, it does mention EO 14161, and the cable, to summarize it in a sentence or two, directs visa hosts abroad to catch up on their backlog of what are called system messages.
System messages are derogatory information that appears in our systems abroad when there's a visa holder. So it's someone who already has a visa, and then it's derogatory information that pops into our system once they've been arrested, or other derogatory information.
Q. If I could ask you just briefly, based on your understanding -- well, sorry. Strike that.
If you could turn to paragraph three, please, on page two of seven.
A. Okay, I see it. Can I just have a minute to read through it, please?
Q. Sure.
A. Okay.
Q. Okay. I want to direct your attention to most of the way down the paragraph where the sentence begins, "Visa holders who overstay their admission period." And in that sentence, I just want to focus on the phrase -- well, it says, "engage in conduct that poses a threat to U.S. national security or

otherwise misuse their visas should have their visas revoked under INA 221(i)." Do you see that?
A. Yes, I do see that.
Q. This is not a statutory exam, but could you briefly describe your understanding of INA 221(i)?
A. I have not read INA 221(i). I'm not an expert on that, I apologize.
Q. Okay. So with respect to the phrase "or otherwise misuse their visas," where can a visa officer in Washington who is looking at the revocation of student visas, where could they go to determine what it means to misuse a visa?
A. Well, my first look as a consular officer would be to the 9 Foreign Affairs Manual which has all of the rules about how to implement visa law and to, as I've said before and as I said during my deposition, to look at the facts for each and every case. Each and every case is analyzed individually. As a consular officer, my job is to took at the totality of circumstances and all of the facts for each and every visa applicant or each and every visa holder.
Q. Okay. Let me direct you to paragraph 11 on page five which is under a heading, "Revocation if the alien is still in the United States."
A. Yes, I see that paragraph.
Q. Okay. Obviously you see that most of it is redacted for law enforcement, but I just want to ask about the unredacted

part.

What do you understand it to mean, that requests for revocation of visas when the individuals in the U.S. have to be sent to what's called here the revocation team?

A. So it's exactly what it says there, that hosts abroad need to refer to the team in D.C. when they think that a visa merits revocation.

THE COURT: What do the initials mean, since I'm unfamiliar with your organization, VO, I assume means visa office. SAC means what?

THE WITNESS: I believe that SAC is security advisory and clearances, and I am not sure what RC stands for. But you are correct, Your Honor, it's a team within the visa office.

THE COURT: Yes. And that's the visa office in Washington?

THE WITNESS: That is correct, sir, it is the visa office in Washington.

THE COURT: Thank you.

BY MR. WILKENS:

Q. A moment ago you spoke about a visa officer, including you, looking at the totality of the circumstances in deciding whether a visa should be revoked, right?

A. Yes. Each case would be looked at individually to gather all of the facts in order to make a decision on a visa revocation.

Q. And under the two executive orders we've been talking about and the policy guidance with regard to how they should be implemented, the facts, the totality of the circumstances include a student engaging in a student protest, correct?

MS. STROKUS: Objection.

THE COURT: If I understand, your question is a hypothetical. Ask it again.

MR. WILKENS: Sorry, Your Honor.

BY MR. WILKENS:

Q. Since -- when you are considering the totality of circumstances, is engaging in a campus protest inconsistent with a student's visa status?

MS. STROKUS: Objection.

THE COURT: Overruled. She may give us her opinion.

A. Well, I think it's a bit of a hypothetical question, but we would need to look at all of the facts of the case. I mean, I don't want to veer off into, you know, if this, then that. But, you know, if it were someone, a visa holder who engages in violent activity, whether it's during a protest or not, if they were arrested for that violent activity, then that is something that we would consider for possible visa revocation.

Q. So I'm not -- so putting aside student visa holders who engage in some kind of violence or have been arrested, putting that to one side, isn't it accurate to say that engaging in a campus protest -- sorry. Isn't it accurate to say that when

you are looking at the totality of the circumstances, engaging in a campus protest is inconsistent with a student's visa status?

MS. STROKUS: Objection, asked and answered.

THE COURT: Well, she hasn't answered it, but he stated it the other way. He's asking --

THE WITNESS: Can you repeat the question, please, counsel.

THE COURT: Well, the information ultimately is coming to me, and I guess what he's trying to get at is, do you think that engaging in a student protest, nonviolent and standing alone, is inconsistent with a student's visa status -- I'll state it differently -- is grounds for revoking his visa status? Do you think that?

THE WITNESS: I think it's a difficult question to answer. If it's a nonviolent protest and it's not a protest that is supporting terrorism, then I'm not sure that that would be a problem. I think that we would probably see it in a negative light if the person were protesting in a way that supports terrorism, even if it's a nonviolent protest.

THE COURT: Thank you.

THE WITNESS: Again, I think we'd have to look at the totality of the circumstances for the individual applicants.

MR. WILKENS: Just one moment, Your Honor.

THE COURT: Of course.

While we're waiting, I've waffled on the document, HM for identification, which was proffered by the defendants as admissible evidence under 611. Reviewing it and on reflection, it's not. It doesn't meet the criteria of 611, but the court receives it as a chalk or demonstrative aid, illustrative of the witness's testimony.

MS. STROKUS: Your Honor, just to clarify, it was also offered under 107(a).

THE COURT: And I am excluding it. Thank you for your precision. Your rights are saved.

Is that it for this witness?

MS. CONLON: No.

MR. WILKENS: Your Honor, we're trying to pull up a document. We're going to return for a moment, but it will be brief, to the Homeland Security Council and a current White House document that describes, it's a Presidential memorandum from President Trump issued since he entered office that describes the National Security Council and also describes when that becomes the Homeland Security Council through the change of agency heads who are part of the Homeland Security Council but not the National Security Council.

THE COURT: Well, you know, where does it come from?

MR. WILKENS: The Whitehouse.gov. It's an executive -- it's in the same part of the Whitehouse.gov website that has the executive orders that we've been talking

about.

THE COURT: If it does, I mean, I suppose it's something of which I could take judicial notice. I mean, you proffered something that was not current, so the objection was very well taken. But if you have something current, I don't know what this witness can add to it because, at least for presiding here in the midst of trial, I'm not going to take it upon myself to overrule the objection that's been stated as to Presidential communications. I am going to reflect on it.

MR. WILKENS: Yes, Your Honor. We would like to just offer it. It's EQ for identification.

THE COURT: Where is it physically?

MR. WILKENS: It's coming up.

MS. STROKUS: Your Honor, I object.

MR. WILKENS: It will come up on screen.

MS. STROKUS: Objection.

THE COURT: Yes. And your objection is sustained because that's too evanescent for this old guy, a ruling not found in the Federal Rules of Evidence.

Look, when you get me a paper copy, life goes on, then I'll take a look at it.

MR. WILKENS: Yes, Your Honor. We'll do that over the break.

THE COURT: And it seems to me that it's a type of thing as to which I can take judicial notice. It doesn't have

to be marked as an exhibit, unless of course there's some dispute that that is in fact what the White House website itself is putting out.

BY MR. WILKENS:

Q. So Ms. Smith, just returning to the issue of student -- a student protest and a student visa holder who is present at a student protest, when that is inconsistent with the student visa status, which we spoke about a couple of minutes ago, I want to ask you, so a nonviolent protest but a protest that can be considered pro-Hamas, that is consistent with a student's visa status, correct?

MS. STROKUS: Objection.

THE COURT: Sustained. These questions are argumentative. The language is what it is. She's an employee of the agency, and therefore you may argue that's a statement of the agency, but these matters are all subject to argument here.

No. Sustained. And I've allowed her to give her answer, not on your specific question, but as to how she would go about it.

MR. WILKENS: Thank you, Your Honor. Let me just quickly go --

THE COURT: How much more have you for her?

MR. WILKENS: Just, I think, Your Honor, we're going to break soon. I think I just need ten, ten more minutes.

THE COURT: I think I can go ten more minutes. Go ahead.

MR. WILKENS: Thank you, Your Honor.

BY MR. WILKENS:

Q. So if we could turn to Exhibit 50 and pull that up, please.

A. Okay. I have Exhibit 50 open. The subject is "Caught and revoked."

Q. Okay.

A. Could I have a minute to read through it, please?

Q. Oh, yes. Please go ahead.

A. Okay, I'm ready.

Q. Okay. And do you recognize this cable?

A. Yes, I recognize this cable.

Q. And is it one of the cables that we referred to earlier that was put in place as policy guidance to implement the executive orders?

MS. STROKUS: Objection, scope.

THE COURT: Overruled.

A. Yes, it is related to EO 14161 as it mentions in the opening line of the cable.

Q. Okay. And one thing we didn't do when we looked at Exhibit 51, and maybe we can do this without turning to it, but that exhibit, the cable is titled "Catch and Revoke, National Security Through Timely Processing of Visa Systems Messages."

This one, as you mentioned, is titled "Caught and Revoked, Updated Guidance."

Is it fair to say that this cable here is an update, updated guidance to the cable that we were speaking about earlier, Exhibit 51, "Catch and Revoke"?

A. I'd just like to check Exhibit 51 to make sure that we're referring to the other one.

Q. Sure.

A. Just a moment. Yes, Exhibit 51 is "Catch and Revoke" and Exhibit 50 is, "Caught and Revoked." So yes, that is correct that it is a follow-up cable to Exhibit 51.

Q. Thank you.

Let me just quickly address two more cables. If we can turn to Exhibit 53, please.

A. Okay, I see Exhibit 53. Let me just open it and review it, please.

Q. Sure.

A. Okay, I'm ready.

Q. Thank you. Do you recognize this cable as well, Ms. Smith?

A. Yes, I do recognize this cable.

Q. Okay. And just quickly to confirm, this is also one of the cables that provides policy guidance on the implementation of the two executive orders we've been talking about, correct?

MS. STROKUS: Objection to scope.

THE COURT: Well, I've been overruling scope objections, and of course this is an agreed-upon exhibit, but this one seems directed entirely to visa applicants, so I'm just not going to permit it, because of the implications for national security. Sustained.

MR. WILKENS: Objection.

BY MR. WILKENS:

Q. If I could pull up Exhibit CG, which is another cable.

A. Okay. I am clicking on it now. I'm going to look at it. I need a minute to read through.

Q. Yes.

MS. STROKUS: Your Honor, I'm going to object to this exhibit. It doesn't appear that -- it has been pointed out to me by the witness that there's something in this document that is incorrect.

THE COURT: Well, it can be corrected then, if it's necessary. The document has been marked for identification. She can be inquired of.

MS. STROKUS: Your Honor, it has been pointed out to me that this exhibit is marked by the plaintiffs. It appears to be a leaked cable. It was not produced by the defendants in discovery, and therefore we cannot verify the accuracy of this exhibit.

THE COURT: Well, that may be. He may inquire about it. You're saying it may not be authentic. I can follow that.

BY MR. WILKENS:
Q. Ms. Smith, you have seen this cable before, correct?
A. Let me -- so the other documents that are produced here in AgileLaw have a REF number at the bottom, and this one does not. This one has a number in the bottom right-hand side. And there are some -- it looks, as Jessica said, it looks to be a leaked cable because someone provided it from their email I can see. So I really can't attest to the veracity of the document.
There's also some, I can see, like, for example, on the bottom of page one and the top of page two, there appear to be some sort of like black fuzzy markings. So I'm not sure I feel comfortable attesting to the veracity of this document.
THE COURT: Well, I take your testimony, ma'am, and I appreciate it. But his question was have you seen this cable? Do you recognize it?
THE WITNESS: Let me just take a minute to look at it, please. Okay. Yes, Your Honor, this cable does look familiar.
BY MR. WILKENS:
Q. All right. And when you say it looks familiar, you recall seeing this cable with the subject line "Action Request Expanding Screening and Vetting For FMJ Applicants," correct?
THE COURT: I don't see anything here that goes to people who are valid visa holders in the United States. This concerns itself with increased scrutiny of the issuance of visas. And so I'm going to sustain it, consistent with my

other rulings, though it appears to be an authentic document, albeit perhaps leaked.

MR. WILKENS: Your Honor, this cable states at paragraph two, the bottom of paragraph two it states that it -- "This guidance supersedes REF B." And if you look at page one of the cable, where it says "Reference," REF B is a cable that we earlier, the witness earlier talked about and put into evidence, which is 25 State 26168. That's Exhibit 64, which applies to the revocation of visas. So this cable that the witness has just --

THE COURT: But it doesn't talk about that.

MR. WILKENS: So the specific relevance of what's in this cable to revocation of visa holders is that it addresses activities that are inconsistent with holding a visa.

THE COURT: Where? Where does it do that?

MR. WILKENS: Let me -- it's -- maybe, let me just come at this it a different way, Your Honor.

THE COURT: All right.

BY MR. WILKENS:

Q. Ms. Smith, am I correct that -- am I correct that one ground for revoking a visa of someone present in the U.S. is if the visa officer considers that they would not have been granted a visa in the first instance?

A. Okay. So just to clarify, are we moving on from Exhibit CG? Because I thought we were talking about Exhibit CG.

THE COURT: We are. I'm moving on from it. We'll see where we go. He's over ten minutes now. Final few questions, Mr. Wilkens?

But you can answer that. Is it a valid ground to revoke a visa that never should have been issued in the first place?

THE WITNESS: Yes, that is a valid ground. If we see that a consular officer should not have issued a visa in the first place, that there are facts to support that, yes, that would be grounds to revoke a visa.

THE COURT: All right.

MR. WILKENS: Your Honor, could we -- I may have just very few questions. If we could take a break now, I will quickly determine whether --

THE COURT: Very few questions? You told me ten minutes. You're at 13 by my counting.

MR. WILKENS: I apologize, Your Honor.

THE COURT: We'll take the recess for one half hour.

MR. WILKENS: Thank you, Your Honor.

THE COURT: Understand, we are not getting into the application for visas. That's an inventive strategy, I follow that. I'm not going to let her answer questions now because they could now, under their heightened scrutiny, use it to revoke a presently existing visa. So far in this case I haven't seen that ground asserted at all, but the very few I

take it, and you will represent to the court, will not exceed five minutes, right, not exceed five minutes?

MR. WILKENS: I'll do my best, Your Honor -- yes.

THE COURT: I hear the answer yes. We'll recess until 25 minutes after 11:00. We'll recess.

(Recess, 10:56 a.m.)

* * * * *

CERTIFICATE OF OFFICIAL REPORTER

I, Kelly Mortellite, Registered Professional Reporter, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing transcript is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter to the best of my skill and ability.

Dated this 11th day of July, 2025.

/s/ Kelly Mortellite

________________________________

Kelly Mortellite, RPR, RMR, CRR

Official Court Reporter

# EXHIBIT 4

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS (Boston)

No. 1:25-cv-10685-WGY
Volume 2, Page 66 to 131

AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
Plaintiffs

vs.

MARCO RUBIO, in his official capacity as
Secretary of State, et al,
Defendants

*********

For Bench Trial Before:
Judge William G. Young

United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
Friday, July 11, 2025

********

REPORTER: RICHARD H. ROMANOW, RPR
Official Court Reporter
United States District Court
One Courthouse Way, Room 5510, Boston, MA 02210
rhr3tubas@aol.com

A P P E A R A N C E S

RAMYA KRISHNAN, ESQ.
CAROLINE DeCELL, ESQ.
ALEXANDER ABDO, ESQ.
SCOTT B. WILKENS, ESQ.
ALEXANDRA CONLON, ESQ.
Knight First Amendment Institute at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
E-mail: Ramya.krishnan@knightcolumbia.org
and
COURTNEY GANS, ESQ.
NOAM BIALE, ESQ.
Sher Tremonte LLP
90 Broad Street, 23rd Floor
New York, NY 10004
(212) 540-0675
Email: Cgans@shertremonte.com
For Plaintiffs

ETHAN B. KANTER, ESQ.
WILLIAM KANELLIS, ESQ.
VICTORIA M. SANTORA, ESQ.
JESSICA STROKUS, ESQ.
DOJ-Civ
P.O. 878
Ben Franklin Station
Washington, DC 20044
(202) 616-9123
Email: Ethan.kanter@usdoj.gov
and
SHAWNA YEN, ESQ.
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, MA 02210
Email: Shawna.yen@usdoj.gov
For Defendants

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| MAUREEN SMITH (By Zoom, continued.) | | | | |
| By Ms. Strokus | | | | |
| By Mr. Wilkens | | 69 | | |
| JOHN ARMSTRONG | | | | |
| By Ms. Santora | 78 | | | |
| By Ms. Conlon | | 124 | | |

E X H I B I T S

EXHIBIT 238.............................. 72
EXHIBIT 239.............................. 76

P R O C E E D I N G S

(Resumed, 11:30 a.m.)

THE COURT: Mr. Wilkens, go ahead, for your 5 minutes. I have been given a document, the heading is the "White House Organization of the National Security Council and Subcommittees," January 20th, 2025.

Go ahead.

MR. WILKENS: Yes, your Honor, and I will come back to that in a little while. I want to focus --

THE COURT: In your 5 minutes?

MR. WILKENS: Yes. I want to focus my 5 minutes on Visa revocations, not applications for Visas. But with respect to Visa revocations, why the cable that we were talking about, marked as CG, is relevant to Visa revocations.

CROSS-EXAMINATION BY MR. WILKENS: (By Zoom, Continued.)

Q. So you earlier, several times today, have spoken about the Foreign Affairs Manual. Do you remember that?

A. Yes, I have referred several times to the Foreign Affairs Manual today.

Q. Okay.

MR. WILKENS: And if we can pull up Exhibit CK, please.

(On screen.)

A. Okay, I see the document. I'm going to open it and review it. I just need a minute or two.
Q. Sure. And I'm going to only ask you about one specific provision, but -- on Page 6.
A. Oh, okay.
Q. And I can tell you which number.
MS. STROKUS: Your Honor, I'm going to object again on the same grounds as the prior document.
THE COURT: I haven't got it yet. I haven't got it.
It's on Page 6?
MS. STROKUS: This document was not produced by the government in discovery, and we therefore cannot attest to its authenticity. It appears to be a leaked version.
THE COURT: Yeah, once again this is allegedly a "leaked version" of a government document.
All right, um, so you're going to have to prove authenticity, and that's fine. Go ahead.
MR. WILKENS: Your Honor, if I could? In the bottom left this shows that it's the public version of the FAM. There is a nonpublic version, but this is from the state.gov website, that's where it comes from. And it was produced by the plaintiffs in this case.
THE COURT: Yeah, all right.

MS. STROKUS: I'll withdraw my objection that it is, um -- that it is leaked. However, I continue to state that the government did not produce this document.

THE COURT: It isn't even offered yet, so let's see his question. But we'll take it as authentic.

Q. Ms. Smith, do you recognize this document?

A. Yes, this appears to be a section of 9 FAM.

Q. Okay. And you're aware that portions of the 9 FAM are publicly available, correct?

A. Yes, that is correct. There is one version online for the public that has some sections that are labeled unavailable, um, and we have the full version internally in Consular Affairs.

A. Okay. And you'll see the heading here, that this 9 FAM 403.11 deals with or covers Visa revocations, correct?

A. That is correct, 9 FAM 403.11 does cover Visa revocations.

Q. Okay. And let me ask you to turn to -- oh, um, let me first move this into evidence.
What exhibit number?

MS. STROKUS: Objection, your Honor, proper foundation. Foundation and authenticity. Again, it was not produced by the government in discovery.

THE COURT: Understood. But I thought you waived

the foundation when you agreed that it was part of the public manual, the Foreign Affairs Manual?

MS. STROKUS: Your Honor, it was not stipulated to as part of the exhibit list.

THE COURT: Isn't it marked as one of the, um, unagreed-to exhibits?

MS. STROKUS: It is not agreed to.

THE COURT: I know it's not agreed to, but it was marked for identification as a nonagreed-to exhibit, isn't that correct?

MS. STROKUS: Yes, your Honor.

THE COURT: Overruled. It may be admitted and it will be Exhibit 200 and --

MR. WILKENS: 238, your Honor.

THE COURT: 238. Thank you.

(Exhibit 238, marked.)

Q. If I could direct you, Ms. Smith, to Page 6 of Exhibit 238, and to the provision at the bottom, which is titled 9 FAM 403.11-5(b), "Prudential Revocations." Do you see that?

A. I do. I would like a minute to read through that paragraph, since you're focusing on that one.

Q. Sure.

A. (Reads.) Okay.

Q. Okay. And just looking at this paragraph, um, if

you go down to the third line, after that first word classification, there's a comma, it says, "The Department may revoke a Visa if an ineligibility or lack of entitlement is suspected when an individual would not meet requirements for admission or in other situations where warranted."

Do you see that?

A. Yes, I do see that text.

Q. Okay. And so based on that text, isn't it correct that the bases for eligibility or for admission and the reasons for ineligibility for admission are relevant to the prudential revocation of a Visa?

MS. STROKUS: Objection.

THE COURT: Overruled.

A. So, um, I'm not qualified to talk about admission because that is a Customs and Border Protection decision, they deal with inadmissibility. So would you mind repeating the question, um, focusing on what you would like me to answer, please?

Q. Yes. So with respect to the granting of Visas, um, isn't this passage indicating that with respect to the revocation of Visas, the factors that a Visa officer can look at for the, um, eligibility of a person for the granting of a Visa are relevant to Visa revocations?

MS. STROKUS: Objection.

THE COURT: No, overruled. I'll let him have that question and one more.

A. Well I think it's a complicated question to answer because Visa eligibility is covered in other sections of the FAM. This citation that you're noting on Page 6 of Exhibit CK is related to, um, revoking a Visa, and as it, you know, pretty simply states in the text, if, um -- the Department can revoke a Visa if ineligibility is um, you know, identified, um, or if an -- if the person is believed to no longer be entitled to their Visa. And so, um, I hope that answers the question.

THE COURT: All right. One more.

MR. WILKENS: Yes, your Honor.

Q. If we could turn to Exhibit CG, the cable that we were speaking about earlier, please. Oh, sorry. Yes, CG.

A. Yes, I'm bringing that up now. Just a moment. Okay. I am ready.

Q. Okay. And if we turn to a Page 6 of that exhibit, and, um, the paragraphs, um -- well beginning with 20, that describe, um, factors that can be taken into account for the eligibility or ineligibility for the granting of a Visa.

A. Okay, I'll read through Paragraphs 20 and 21. Just a moment, please.

Q. Yeah.
A. (Reads.) Okay.
Q. Am I right that these factors, identified here in this cable, can be taken into account in revoking a Visa?
MS. STROKUS: Objection, your Honor.
THE COURT: Overruled.
A. Yes, the information contained in Paragraphs 20 and 21 of Exhibit CG can be taken into account when a decision is made to revoke a Visa. Paragraphs 20 and 21 talk about if an applicant is not credible, um, if their activities are inconsistent with, um, their Visa class, um, if there are inconsistencies or derogatory information that is discovered during vetting, and so all of these factors could be relevant to a Visa revocation. And as I've stated prior, a Consular officer always looks at the totality of circumstances, um, and all facts for every case, um, before making, um, a decision to revoke a Visa.
Q. Okay.
MR. WILKENS: Your Honor, I would move this exhibit into evidence.
THE COURT: Do you object?
MS. STROKUS: Objection, your Honor.
THE COURT: Overruled. It may be admitted,

Exhibit 239.

(Exhibit 239, marked.)

THE COURT: Now do you have any further questions for this witness?

MR. WILKENS: I do not, your Honor.

THE COURT: I take it you do not.

(Laughter.)

THE COURT: And counsel for the government, any further questions for the witness?

MS. STROKUS: No, your Honor, and cognizant of the Court's time.

THE COURT: Thank you. And thank you, Ms. Smith.

Very well. Call your next witness.

MS. SANTORA: Your Honor, the government calls John Armstrong.

MR. BIALE: And, your Honor, before this witness comes in, and this is just the issue I raised at the beginning --

THE COURT: Yes, and I'll hear you.

MR. BIALE: With respect to -- you know we have a dispute about what documents can be used. Our plan is to cross-examine this witness, Ms. Conlon will cross-examine this witness using some of the documents that were initially produced in-camera --

THE COURT: I understand. I'm not surprised.

MR. BIALE: I just want to make that clear, so we don't have a fight about it in the middle of the testimony.

THE COURT: Well they can object, but I intend, having given the documents to you, if they pertain to his cross-examination, they may use them.

MR. BIALE: Thank you, Judge.

THE COURT: Mr. Armstrong may be called.

(Witness takes the stand.)

(JOHN ARMSTRONG, sworn.)

THE CLERK: And please state your full name, spelling your last name for the record.

THE WITNESS: John Armstrong, A-R-M-S-T-R-O-N-G.

THE COURT: And if I may start, um, welcome. I had originally thought we were going to hear your testimony remotely because you were or are on your way to the United Kingdom?

THE WITNESS: Um, no, that is not me, sir. I just run things in Washington. Although we do have official travel from time to time.

THE COURT: Okay, I am mistaken. But you are welcome.

THE WITNESS: Thank you, sir.

THE COURT: Ms. Santora, go right ahead.

MS. SANTORA: Thank you, your Honor.

**************

JOHN ARMSTRONG

**************

DIRECT EXAMINATION BY MS. SANTORA:

Q. Hello, Mr. Armstrong, thank you for being here today.

Can you tell us your current role at the State Department?

A. My current position is Senior Bureau Official in the Bureau of Consular Affairs.

Q. And how long have you been in that role?

A. I assumed it on the 27th of February of this year.

Q. How long have you worked for the State Department?

A. It's, um, over 30 years. It will be 31 in October.

Q. So when did you first start working for the State Department, in what year?

A. 1994, in October, I believe. It was October 14th.

Q. And in what capacity?

A. When I began, I started as a Foreign Service Officer. I continue to be one today.

Q. Can you briefly tell the Court about your assignments starting with your first and going up

through your current role?

A. I'd be happy to. Initially when I came in in October of 1994, I was assigned, um, following basic training, to take consular training, and then Rumanian language, and then sent to Rumania for 2 years as a Vice Consul where I ran the nonimmigrant Visa section and the fraud prevention section.

After Rumania, I went to Warsaw Poland where I served as the trade officer on -- working on trade issues for two years.

And then from there, I went back to Washington D.C. where I served as the Belarus desk officer in the Office of Western Slavic and Moldovan Affairs.

Following that position -- just a moment, I have to think. I went back to Warsaw for four years, where I was a political officer and I was also the labor officer.

Following that time in Warsaw, I went to the Russia desk, the Office of Russia Affairs, where I was a Senior Political Officer for two years.

After that I studied Ukrainian for a year and then went to Kyiv Ukraine to our embassy where I was the Deputy Consul General.

Following Kyiv, I went to -- my next posting was in the Bahamas, at Embassy Nassau, where I was the

Consular Section Chief, which I did for a year, and then I was Acting Deputy Chief Admission, the Number 2 position, for two years.

Following that, I returned to Washington D.C. where I was the Director of the Washington Passport Agency for three years.

After that, I went to Embassy Warsaw in Poland where I was the Economic Counselor running the Economics Section for three years.

After that, in 2020, during covid, I returned to Washington and was the Director of the Office of Eastern European Affairs which deals with Ukraine, Belarus, and Molodova.

Following that position, where I was for two years, I was a Senior Advisor in the Office of Sanction Coordination, also at the main building of the State Department.

Following that, I studied Spanish and went to Lima, Peru, where I was Consul General, and I served until returning to Washington in the middle of February of this year, and I was briefly the Deputy Assistant Secretary for Overseas Citizen Services.

And then I assumed my current position on February 27th of this year.

Q. And are you -- is there anyone senior -- can you

remind the Court of what is your current position?

A. My current position is Senior Bureau Official in the Bureau of Consular Affairs. I'm the top official in the Bureau of Consular Affairs.

Q. And who is senior to you at the State Department?

A. The Undersecretary for Management.

Q. Anyone else senior to you at the State Department?

A. Um, yes. Well there's the two Deputy Secretaries, the Deputy Secretary, and then the Deputy Secretary for Management and Resources. And above them is the Secretary of State.

Q. What does the Bureau of Consular Affairs do?

A. Basically we have three missions. First of all, we're responsible for passport issuance throughout the United States at 29 passport bureaus and centers. It's approximately 25 million passport products a year.

Secondly, we are in charge of, um, processing Visas at Foreign Missions -- our Foreign Missions abroad or diplomatic posts, that's over 200 of them, and there's approximately 14 million applications a year.

And then finally, we are responsible for the welfare of American citizens abroad and providing them services they need. If they're in need, we try to help them. Overall we have a staff of approximately 13,000 and a budget of $5.5 billion.

Q. What are your responsibilities as a Senior Official in the Bureau of Consular Affairs?
A. I am responsible for the operations of the Bureau. The buck stops with me.
Q. And that includes being responsible for the Visa section that you mentioned?
A. Yes, ma'am.
Q. Are you aware of the policies applicable to Visas?
A. Yes.
Q. Would you say that you're aware of all policies applicable to Visas?
A. In general, yes, I would say that.
Q. Would you say it would be possible for a policy related to Visas to exist without you knowing about it?
MS. CONLON: Objection, your Honor.
THE COURT: She may have it in that form.
A. I would be very surprised if there was such a policy. I have a good hand on the pulse of what's done by the Visa office, your Honor.
Q. Does the Bureau of Consular Affairs get involved in issuance of Visas, is that correct?
A. Could you repeat the question please?
Q. Is the Bureau of Consular Affairs involved in the issuance of Visas?
A. Yes, it is, we are responsible for that overseas.

Q. And are there different types of Visas?
A. Yes, there are. There are two basic types, or the nonimmigrant Visa and the immigrant Visa.
Q. What is a nonimmigrant Visa?
A. Nonimmigrant Visas are for people who are coming for temporary purposes in the United States and will be leaving and returning -- leaving the United States for another destination, students, tourists, um, people coming to work, um, journalists.
Q. And how is an immigrant Visa different from that?
A. Immigrant Visas are for people who are coming to remain in the United States, permanently.
Q. Are you familiar with the allegations in this case?
A. I have some knowledge, but I haven't ever seen all of them.
Q. Is it fair to say, based on your knowledge, that this case does not involve immigrant Visa holders?
A. Yes.
Q. So when I ask you questions about Visa holders, if I don't specify, I'm referring to nonimmigrant Visa holders. Okay?
A. I understand.
Q. I believe you mentioned this, but what type of Visa, nonimmigrant or immigrant, is a student Visa?

A. Student Visas are nonimmigrant Visas, they're Fs, Ms, and they can be Exchange Visitors, which are Js.

Q. What standards apply to the issuance of nonimmigrant Visas?

A. Could you clarify the question?

Q. What legal authorities apply to the issuance of nonimmigrant Visas?

A. The applicant for the Visa has to, um, show that they are qualified for that Visa. In some cases they need a petition. In others they need forms, like students will need a form from an accredited university. Students also, as do tourists, have to overcome Section 214(b) of the Immigration and Nationality Act, which is an intending immigrant. They have to show that they do not intend to remain in the United States to the satisfaction of a Consul Officer at an interview. The law, which we all follow very strictly, places the burden of proof on the applicant, on the alien. If our Consul Officer is not convinced, the Consul Officer -- of that, they must refuse that application.

Q. Does the Bureau of Consular Affairs deal with the revocations of nonimmigrant Visas?

A. Yes, we do. Yes. And it has for years. It's in the Immigration and Nationality Act, I believe it's Section 221(i).

Q. And what standards apply -- I believe you just mentioned one, what legal authorities apply to Visa revocations?

A. The key legal authority for a revocation is Section 221(i) of the Immigration and Nationality Act, which if I remember correctly, your Honor, gives the Secretary of State and any Consular Officer the ability to revoke a Visa at any time for any reason. We treat this seriously. And of course some sort of evidence is needed. We don't go do this on a whim. We review each case individually and carefully.

Q. Does the Bureau of Consular Affairs make removability determinations?

A. I'm sorry?

THE COURT: I didn't catch it either. Would you ask the question again.

MS. SANTORA: Sure, I'll rephrase it a little bit.

Q. Does the State Department make removability determinations?

THE COURT: Removability determinations.

A. Yes, the Secretary of State can make those determinations, I believe it's, um -- it's also in the INA. We call it 4(c) is the section. But it's a longer section citation.

Q. Would that be INA Section 237(a)(4)(c)?

A. I believe that's it, yes.
Q. Okay. Are you familiar with the State Department's process and protocols for, um, the revocations of Visas, which we talked about a few questions ago?
A. Yes, I am.
Q. And are you familiar with the State Department's process and protocols for making determinations under 237(a)(4)(c), the statute you just referenced?
A. Yes, ma'am, I am.
Q. How are you familiar with those, um, processes and protocols?
A. It's part of my job. I have to know about these things in order to lead the Bureau of Consular Affairs.
Q. Have you prepared a chart to assist the Court with explaining how the process and protocol works?
A. My staff and I have reviewed the chart, yes.
Q. Okay.
MS. SANTORA: Your Honor, I would like to identify Exhibit H, or mark for identification Exhibit HN. This is the chart that Mr. Armstrong referred to.
THE COURT: Um, do I have it?
MS. SANTORA: It should be in a binder.
THE COURT: Yes, well I have -- yes, I do have it. Yes. HN. And I will permit this chalk to be used as --

I will permit this chart to be used as a chalk.

Go ahead.

MS. SANTORA: Thank you.

Q. Mr. Armstrong, I think we're going to pull the chart up on the screen.

(Technical difficulties.)

MS. SANTORA: Your Honor, may I approach? I can also give him a paper copy.

THE COURT: He can use mine. But of course you may.

THE WITNESS: I'll take this one, sir, so you can also see it.

THE COURT: Thank you.

(Hands up.)

THE COURT: A question I have, and I've seen these initials come up. I'm roughly familiar with this chart. But do you see, um, the Bureau of Consular Affairs is there roughly in the center. And then to the right, there's two little boxes, "NIV" and "LPR." What do those initials stand for?

THE WITNESS: Your Honor, "NIV" is "Nonimmigrant Visa," and "LPR" is "Legal Permanent Residence."

THE COURT: Yes, understood.

Proceed.

THE WITNESS: No problem.

Q. Okay, it looks like we might not be able to pull the chart up on the screen, so, um -- um, okay.

Mr. Armstrong, is this the chart that you were just referring to when I asked if you had prepared a chart?

A. Yes, it is.

Q. Okay. Based on your experience at the Bureau of Consular Affairs, does the chart accurately represent the State Department's process and protocol for Visa revocations and foreign policy determinations under INA Section 237(a)(4)(c)?

A. It accurately represents that in the case of referrals from the Department of Homeland Security.

Q. Okay. So does the State Department rely on information when it is revoking a nonimmigrant Visa or making a foreign policy determination under INA Section 237(a)(4)(c)?

A. I'm sorry, I don't understand the question. Do we rely on information? From various sources. We do rely on information from various sources, including it may come from the Department of Homeland Security, it may come from sources that we have, it may come from law enforcement, diplomatic sources abroad, the media. So a variety of sources. Yes, we do actually look at information.

Q. Okay, let's focus on information that you received from, you mentioned, the Department of Homeland Security. Do you see them referenced in the chart?
A. Yes, on the left-hand side, the big blue box.
Q. Okay. And how does information come, if it does, to the Bureau of Consular Affairs from the Department of Homeland Security?
A. From my experience it comes in the form of an e-mail, which serves as a cover letter, and then an attachment with additional information about the case.
Q. And is that attachment referred to as a "referral"?
A. Yes.
Q. And when the Bureau of Consular Affairs receives the information, um, what do they first determine about the individual?
A. Well the first thing they do is confirm receipt to DHS, that we have actually received this, your Honor, and that we are acting on it. After that, um, the -- as related to your Honor's question, the question is whether it's a nonimmigrant Visa or whether it's a legal permanent resident. Nonimmigrant Visas go for processing and review to the Visa office. The legal permanent residents take a different track and go up to the Secretary of State if we find that the evidence is

sufficient to take action.
Q. Okay, let's stick with the nonimmigrant Visas first. You said they go to the Visa office. What does the Visa office then do with the referral after they receive it?
A. The Visa office examines the information, seeing if it's serious enough to enact a revocation. It will also consult with, um, lawyers at the State Department who work for the Legal Advisor, they don't work for Consul Affairs directly, but there are lawyers assigned to look at it from a legal point of view.
After that, if the Visa office finds it's sufficient, they'll discuss it with whoever received the, um, referral from DHS, and if that person agrees, then it will go into the revocation process and the Visa will be revoked. If not, um, then -- well actually in either case, whether it's revoked or whether it's not, there'll be a communication back to DHS telling DHS what was done in that case. Or there's one other possibility. If I may?
Q. Sure.
A. There may be a request for more information.
Q. And who would they request more information from?
A. They would write back to whoever in DHS had sent the referral.

Q. Okay. Let's talk now about the other part of the chart, relating to this "LPR" on the chart. That's a "Lawful Permanent Resident"?

A. Yes.

Q. And how is a lawful permanent resident different from a nonimmigrant Visa?

A. Um, first of all, we cannot revoke the status of a lawful permanent resident. Um, the Secretary of State can have a finding that that person is removable, but we cannot do that in the -- in the Bureau of Consular Affairs. So what happens in that case, after an analysis of information -- and this is done in each case individually, an action memo, um, sometimes called a "decision memo," is sent to the Secretary of State, and the Secretary of State will have a choice then, and from my experience in most cases there are three choices. One, agree and find the person removable, usually under, um, 4(c), as we talked about. Um, disagree and find the person not removable. Or discuss, in other words ask for more information.

Q. And in the event that the Secretary of State finds the person removable, um, what happens after that?

A. Um, the, um, Department of Homeland Security is informed of this, and this usually take two routes. There will be an informal notification back to the

person who sent the original referral, as a courtesy, but the official notification goes from the Secretary of State to, um, the DHS secretary, because the DHS secretary is his interlocutor.

Q. And I believe you also mentioned that it's possible for the Secretary of State to determine that the person is not removable, correct?

A. That's correct. And in which case the Bureau of Consular Affairs would contact the person in DHS who made the referral and say the Secretary has found -- has disagreed and does not fine the person removable.

Q. Okay, I want to go back to --

THE COURT: Just to get a feel for this.

THE WITNESS: Yes, sir.

THE COURT: With respect to, um, legal permanent residence.

THE WITNESS: Yes, sir.

THE COURT: Under the statute, this is a determination that is, um, by statute, given to the Secretary, that officer in the government, that cabinet Secretary himself or herself?

THE WITNESS: Yes.

THE COURT: And then as I'm listening to you, pretty much as a matter of courtesy, since it's a Cabinet Secretary who's made that determination, the

communication as to the result, goes to the Cabinet Secretary in the Department of Homeland Security, and in today's world, she, then takes action, because action falls within the Department of Homeland Security.

Is that right?

THE WITNESS: That is correct, sir. The actual formal -- Homeland Security will not take action in those cases until they receive the official notification Secretary to Secretary. What we would send to Consular Affairs is a courtesy that, yes, the Secretary has made this finding. Then the official notification will go from Executive Secretary to Executive Secretary.

THE COURT: Thank you.

THE WITNESS: Certainly.

Q. I want to go back, for a second, to nonimmigrant Visas.

Does the Visa office independently analyze the referral that it received from DHS?

A. Yes, most definitely, that's our job. We're not a rubber stamp for DHS.

Q. Do all referrals of nonimmigrant Visa holders from DHS that go to the Visa office result in Visa revocations?

A. No.

Q. Do you have any idea of the percentage that does

result in Visa revocations?
A. Based on my time in my current position, I would say approximately 25 to 30 percent are sent back without action be taken, either to ask for more information or we just find the information not significant enough to take action.
Q. Okay. And you've been in your position since February of 2025, correct?
A. Yes, ma'am.
Q. And has the Bureau of Consular Affairs handled DHS referrals consistently with this chart that we've been discussing since that time?
A. Yes, and it's my understanding even before. We do not create any policy or procedure here.
MS. CONLON: Objection, move to strike as nonresponsive.
THE COURT: Overruled. That may stand.
Q. Does this chart depict how the Bureau of Consular Affairs handles all referrals from DHS?
A. Yes.
Q. Does it accurately depict how the Bureau of Consular Affairs would handle a DHS referral involving protesters?
A. Yes, all referrals from DHS.
Q. Okay. So the chart focuses on a referral from

DHS, but you mentioned that the State Department, in revoking Visas and, um, making removability determinations, can rely on information from other sources, correct?

A. That is correct.

Q. And, um, what are those other sources?

A. For example, the media. There can be derogatory information that comes up after a Visa was issued, some action the Visa holder took or is planning to take, and if it's significant enough, that could lead to a, um, revocation of the Visa. Information received from law enforcement. Information that happens that is, um, sent by the public. Poison pen letters.

I, in fact, know of a case like this, when I was in Ukraine, of a security guard who worked at the embassy, who supposedly was going as a tourist, but one of his colleagues revealed his true intention, which was to remain in the United States. And we revoked that Visa and fired him.

Q. And so would you say that some of the information, um, is internal information to the State Department?

A. It can be, yes.

Q. And in the case of information that it not based on a referral, um, say we're talking about a nonimmigrant Visa holder, so it goes to the Visa office

and the Visa office determines that the Visa should not be revoked. In those circumstances, again where there's no referral, does the Visa office tell DHS about the Visa revocation?

A. No, DHS is not involved in this.

Q. Okay.

(Pause.)

MS. SANTORA: Your Honor, I move to introduce into evidence this chart.

MS. CONLON: Your Honor, we understand it doesn't aid or assist with testimony, so we object for it coming in for sort of its truth, but to the extent that it's a demonstrative aid, I don't even know that it needs to be admitted.

THE COURT: I think that's a proper characterization. If he says this is accurate and it's been accurate throughout his tenure, as I understand it, it will be part of the record, but as HN, a chalk. And the difference is, as factfinder, I have to decide whether to believe, disbelieve, or believe in part any witness's testimony.

Here the chart depends on my belief of this witness's testimony, it doesn't stand alone. They created it for this trial. And I accept it in that fashion. I mean no disrespect, that's just my

responsibility. Actually I find this helpful and I will be referring to it. But it was created for the witness, for his testimony, and so what he has to say about it really governs.

Go ahead.

MS. SANTORA: Thank you, your Honor.

Q. Mr. Armstrong, I'm going to show you a document that is an exhibit in this case, this is Exhibit 70.

MS. SANTORA: Your Honor, may I approach to hand this document to the witness?

THE COURT: Of course.

(Hands to witness.)

THE WITNESS: Thank you.

May I familiarize myself with it?

THE COURT: Of course.

THE WITNESS: Thank you, sir.

A. (Reads.) I have finished my review.

Q. Okay, thank you. Have you seen this document before?

A. Yes.

Q. And what is it?

A. It's an Executive Order from the President.

Q. What is the title?

A. "Protecting the United States from Foreign Terrorists and other National Security and Public Safety

Threats."

Q. In what capacity have you seen it?

A. In my official capacity as the top official in the Bureau of Consular Affairs.

Q. What is the purpose of the document?

A. The purpose is to protect the United States and the American people from foreign threats.

Q. Have you relied on this document to do your job?

A. Yes, we have referred to this document in doing my job, as have other people in the Bureau of Consular Affairs, and not only.

Q. How would you use it with respect to doing your job?

A. Well I think the key thing is, um, to summarize this document, is it instructs all of us to use existing procedures to maximize the security of the American people.

Q. Does it require anything of the State Department?

A. It requires quite a few things of the State Department. They're enumerated. Again, to summarize, it's increasing our vigilance and to make sure we're using all existing mechanisms, procedures, and policies that we have to ensure the security of the American people.

Q. Did it create new legal authorities related to the

State Department's work?
A. To my knowledge, no.
Q. Did the State Department do anything in response to the Executive Order?
A. Yes, we take our orders from the President, whoever that is, and we increase our use of the -- it reviewed actually what we were doing, and that review is actually ongoing.
Q. And can you explain what exactly, if anything, the State Department did in response to this Executive Order?
A. Well one thing I can actually say, and it's -- it's a bit of "Inside Baseball," your Honor, if I may? Um, there's -- in our nonimmigrant Visa system, there are messages that come when derogatory information appears, and a lot of our posts are very -- have a lot of work to do, a lot of people to interview, they have backlogs, and they don't always review those messages in a timely manner and act upon them. We noted this and we emphasized to our diplomats overseas that they need to review this information, and when justified, to revoke Visas, not to let it build up. It needs to be kept up. Because people -- if there is negative information and they have a Visa and it should be revoked, we need to do that, and not delay. I think this was talked about,

some people have called it the "Catch and Revoke Policy."

Q. I'd like to show you -- okay, I'd like to show you the document, um, you just referred to.

MS. SANTORA: Your Honor, may I approach?

THE COURT: You may.

MS. SANTORA: This is Exhibit 21 for the record, and I'm going to show it to the witness.

(Hands to witness.)

THE WITNESS: Thank you.

THE WITNESS: May I review it?

THE COURT: Of course.

THE WITNESS: Thank you.

A. (Reads.) I've completed my review.

Q. Okay. Is this the document you were referring to?

A. Yes.

Q. And can you explain what it is?

A. This is an instruction, a guidance to our diplomatic posts abroad, over 200 posts. In particular you can see that because it says "All diplomatic and consular posts collective," it's known as an "all-back." It was sent out talking about this very thing I spoke about, about the need to review systems messages on a regular timely basis, and to take action where warranted.

Q. Okay. And is this document implementing the Executive Order we were just talking about, Executive Order 14161?

A. Yes, it even refers to it in the second paragraph.

Q. And how does it implement the Executive Order?

A. By increasing the emphasis on and the vigilance in reviewing systems messages which carry -- can carry significant negative information about Visa holders, and then when justified, revoking these Visas, which is done at the diplomatic posts.

Q. Does it provide new legal authority for revoking Visas?

A. No, not -- no, it's using the 221(i).

Q. So in revoking Visas under this guidance, the State Department is relying on existing legal authority, correct?

A. Yes, I believe so. I believe 221(i) has been in the INA since the beginning, 70 years ago.

Q. Okay. Are you aware of anything else that the State Department has done in response to Executive Order 14161?

A. We've issued guidance to the field, again emphasizing the importance of security and the importance of reviews, for example the importance of 214(b) has been an issue that we've raised with the

field. Again, these are using existing policies and authorities, it's nothing new in that regard.
Q. I'd like to show you another document.
MS. SANTORA: This has been entered into evidence as Exhibit 53 in this case, your Honor.
THE COURT: Say again the document number?
MS. SANTORA: Exhibit 53.
THE COURT: 53.
MS. SANTORA: No, I'm sorry, your Honor, it actually is Exhibit 64.
THE COURT: 64.
MS. SANTORA: May I approach to give a copy of this document --
THE COURT: You may.
(Hands to witness.)
THE WITNESS: Thank you.
May I review it, your Honor?
THE COURT: Of course.
THE WITNESS: Thank you, sir.
A. (Reads.) I've completed my review.
Q. Okay. Do you recognize that document?
A. Could you repeat the question please?
Q. Do you recognize that document?
A. I do recognize this document.
Q. What is it?

A. It is a guidance to the field. As discussed previously, it is an all-back, it's sent out to all our posts abroad.
Q. And, um, what is the guidance related to?
A. It's related to, um, social media and online screening of students and exchange visitors, the F, M, and J Visa classes.
Q. And is it guidance that was issued in response to the Executive Order we were just talking about?
A. Yes.
Q. And how does it implement that Executive Order?
A. It increases the vetting of, um, a class of Visa applicants.
Q. Why does it do that?
A. In order to improve the security of the United States.
Q. What class of Visa applicants does it increase vetting to?
A. Students and exchange visitors.
Q. And that's social media vetting, correct?
A. Yes.
Q. And why does it focus on students and exchange visitors?
A. Well I can think of a couple of reasons. First of all, the social media is -- when the INA was written --

and in the past this hasn't been considered, it didn't exist, but it's a gold mine of information. And also, um, people who are younger, students, and most students and exchange visitors are -- I'm 60 and I don't use social media much, but they do use social media a lot. So they're a group that uses all that information and those tools. And so it makes it available to us.

Q. Does it create new legal authority, um, for vetting through social media chats?

MS. CONLON: Objection, your Honor, these questions about legal authority seem to call for a legal conclusion.

THE COURT: No, I want to hear his view.

You may answer, sir.

THE WITNESS: Thank you, your Honor.

A. No, it doesn't. It talks about Section 214(b) of the Immigration and Nationality Act, and also, um, Section 212(a)(3)(b), which is, um, support for terrorist organizations. These are not new.

Q. And how do those sections that you just referred to relate to vetting?

A. In the vetting one could find information that would lead to a 214(b) refusal under an intending immigrant, for example, if someone talks about their previous unauthorized work in the United States. Or it

could lead to a finding on support for a terrorist organization, someone brags about how they've given money to Hamas.

Q. And both of those would bear on someone's eligibility for a Visa?

A. Most definitely.

Q. Are you aware of anything else that, um, the Department of State did in response to Executive Order 14161?

A. There were, um -- there was a review, um, at least a partial review of 3(c) policies, and, um, that's a foreign policy ground for refusal under the INA, um, and there were some that the Secretary authorized to be added. One, for example, for, um, government officials who assist in a legal migration to the United States.

Q. You said 3(c) policies. Are you referring to a section of the INA when you say that?

A. Yes, ma'am.

Q. What section is that?

A. I don't know the whole number, we call it "3(c)." It's the foreign policy section. Ineligibility on foreign policy grounds.

Q. Okay.

(Pause.)

MS. SANTORA: Your Honor, I'd like to mark for

identification Exhibit JJ, the statute that the witness just referred to.

THE COURT: The statute?

MS. SANTORA: Yes.

THE COURT: I see no reason for adding statutes in.

MS. SANTORA: Okay.

THE COURT: A citation to them is sufficient.

MS. SANTORA: Okay. May I approach to show the witness a copy of the statute to refresh his recollection?

THE COURT: Of course.

(Approaches, hands document to witness.)

THE WITNESS: Thank you.

May I review it, your Honor?

THE COURT: Well it's pretty thick, I don't even know what she's going to ask here. But of course take a look at it.

THE WITNESS: May I ask which part you're referring to? It is rather thick.

MS. SANTORA: Yes, I was referring to the section you referenced, which I believe is Section (a)3(c), it's INA 312 of 1182, the statute.

A. (Looks.) Is this, ma'am, the section that says "See foreign policy"?

Q. Yes.
A. Yes, I believe that is it.
Q. Okay. Can you take a moment to review it.
A. (Looks.) I've reviewed it.
MS. SANTORA: If you don't mind, may I approach also to get it back?
(Approaches witness to get document back.)
Q. So the statute you just reviewed, Mr. Armstrong, was that the statute you were referring to when you referred to "3(c) policies"?
A. Yes.
Q. And do 3(c) policies apply to, um, Visa holders or to Visa applicants?
A. It could be both actually, um, if a Visa holder was outside the United States. But also an applicant could be found ineligible under 3(c).
Q. Okay. So 3(c) policies do not apply to Visa holders in the United States?
A. No. That's my understanding.
Q. Okay. I'd like to show you another document.
MS. SANTORA: If I could approach? This has been marked as Exhibit 71 in this case.
(Approaches witness with document.)
THE WITNESS: Thank you.
A. (Looks.) I'm familiar with this document.

Q. Okay, what is the document?
A. It's an Executive Order from the President of the United States.
Q. And what is it titled?
A. "Additional Measures to Combat Antisemitism."
Q. And how are you familiar with that document? In what capacity have you seen that document before?
A. In carrying out my job.
Q. And how have you relied on it to do your job?
A. It makes clear that the official policy of the United States is to combat antisemitism both at home and abroad.
Q. Did the State Department rely on this document to revoke Visas?
A. We would rely on the Immigration and Nationality Act. It doesn't give us any authority here, it instructs us and emphasizes. It's a document that informs what we're doing, yes, but not as a part of the law that we would use to revoke a Visa.
Q. Okay. Did the document change the State Department's authority to revoke Visas?
A. It's my understanding it didn't.
Q. Did the document change the State Department's process and protocols for revoking Visas?
A. No.

Q. Did the document change the State Department's authority to make removability determinations?
A. No.
Q. Did the document change the State Department's process and protocols for making removability determinations?
A. No.
Q. I'd like to show you a few more documents.
MS. SANTORA: Your Honor, the documents that I'm intending to show the witness are not privileged but have been marked as confidential, um, based on the protective order signed between the parties. We would ask that the courtroom be cleared of the public for the purposes of putting on this document.
THE COURT: I'm not going to clear the courtroom unless I see what the documents are.
MS. CONLON: What documents are we talking about?
MS. SANTORA: So they are -- the documents will be Exhibits 8, 12, 16, 19, and --
THE COURT: 8.
MS. SANTORA: 8. 12.
THE COURT: Wait a minute.
MS. CONLON: Sorry, are these the documents from the certified administrative record in this case, are those all from that record?

MS. SANTORA: They're from the sealed version of the administrative record.

MS. CONLON: I see. So 8, 12 --

MS. SANTORA: So 16, 19, and 21.

THE COURT: Well I'm not disposed to clear the courtroom, there's a constitutional right --

MS. CONLON: And we would object to that.

THE COURT: -- to have a public courtroom for public trials. So, um -- and these have been marked in evidence in this case, which means they are documents upon which I may, and I may be required, to make my decision. So that request is denied. You see -- I'm not doing it.

MS. SANTORA: Thank you, your Honor.

Q. Mr. Armstrong, I would like to show you a document, I'll show you one at a time.

MS. SANTORA: If I may approach?

Q. The first has been marked as Exhibit 8 in this case.

(Approaches witness, hands document.)

THE WITNESS: Thank you.

May I review it?

MS. SANTORA: Sure.

THE WITNESS: Thank you.

A. (Reads.) I've completed my review.

Q. Okay. Do you recognize this document?
A. I do.
Q. What is it?
A. It's a memorandum from Secretary Rubio to the Secretary of Homeland Security.
Q. And in what capacity have you seen this document?
A. In doing my job, my official duties at the State Department.
Q. What does the memorandum relate to?
A. The memorandum informs, um, the Secretary of Homeland Security of Secretary Rubio's finding in a case of a particular alien, finding the person, um, removable under 273(a)(4)(c) of the Immigration and Nationality Act. Actually two people, one is blacked out.
Q. Okay. Who is the person whose name is not redacted?
A. Mahmoud Khalil.
Q. And can you summarize what the document finds with respect to Mr. Khalil?
A. That section of the INA deals with foreign policy grounds for finding removability, which the Secretary of State does, or if given a different document. It informs of it here and then talks about Mr. Khalil's antisemitic -- role in antisemitic protests and disruptive activities that foster a hostile environment

for students in the United States.

Q. And it provides that as the basis for finding Mr. Khalil removable?

A. Yes, it describes it on the back, on the second page.

Q. What does it say about Mr. Khalil's activities?

THE COURT: Well in view of your objection, remember it's in evidence. I've read it.

MS. SANTORA: Okay, thank you, your Honor, we can move on.

Q. Mr. Armstrong, I'd like to show you another document.

MS. SANTORA: If I may approach? This has been marked as Exhibit 12 in this case.

(Approaches witness, hands document.)

THE WITNESS: Thank you, your Honor. May I review it?

THE COURT: Of course.

THE WITNESS: Thank you.

A. (Reads.) I've completed my review.

Q. Do you recognize this document?

A. I do.

Q. Have you seen it before?

A. I have, in performance of my official duties in leading the Bureau of Consular Affairs.

Q. Okay. And what is the document?
A. The document's similar to the previous one, it's a memorandum from the Secretary of State informing the Secretary of Homeland Security of a decision made regarding the removability of an alien.
Q. What alien does it refer to?
A. It refers to Mohsen Mahdawi.
Q. And what does it find with respect to Mr. Mahdawi?
A. Oh, sorry I pronounced it wrong. The Secretary of State informs us that he found Mr. Mahdawi removable under Section 237(a)(4)(c)(1) of the Immigration and Nationality Act.
Q. And does the document provide the Secretary's rationale for that finding?
A. It does, on the second page. That rationale was Mr. Mahdawi's involvement and leadership of disruptive protests at Columbia University, and that included antisemitic conduct and calling for the destruction of Israel. The Secretary also noted that this is clearly against U.S. policy to counter antisemitism. And Mr. Mahdawi's activities undermine the peace process in the Middle East, including coming to a peaceful resolution of the ongoing conflict in Gaza.
Q. Thank you. I'd like to show you another document.
MS. SANTORA: If I can approach? This is Exhibit

Number 19.

THE COURT: Say again the number?

MS. SANTORA: 19.

THE COURT: Thank you.

(Approaches, hands to witness.)

THE WITNESS: Thank you.

May I review it, your Honor?

THE COURT: Of course.

THE WITNESS: Thank you.

A. (Reads.) I've completed my review.

Q. Do you recognize this document?

A. I do.

Q. Have you seen it before?

A. I have, in performance of my duties as the senior Bureau official of the Bureau of Consular Affairs at the State Department.

A. What is the document?

A. The document is a communication, a memorandum from Secretary Rubio to the Secretary of Homeland Security.

Q. And what is the memo about?

A. The memo informs Secretary Noem that Secretary Rubio has found two aliens, um, one is Yunseo Chung, and the other one is blacked out, so I don't know who the person is, um, to be removable under the foreign policy section of the INA, Section 237(a)(4)(c)(1).

Q. And does the document provide the Secretary's rationale for this determination?
A. Yes, it does. It found that Ms. Chung and the other unnamed person were involved in, um, participation and apparently leadership roles in antisemitic protests and disruptive activities. It created a hostile environment for Jewish students in the United States.
Q. Thank you. I'd like to show you another document.
MS. SANTORA: If I could approach. This is labeled as Exhibit 21 in this case.
(Approaches, hands witness document.)
THE WITNESS: Thank you.
Your Honor, may I review it?
THE COURT: Yes.
THE WITNESS: Thank you.
A. (Reads.) I've completed my review.
Q. Do you recognize this document?
A. I do.
Q. And have you seen it before?
A. Yes, I have, as in my leadership role of the Bureau of Consular Affairs at the Department of State.
Q. What is the document?
A. The document is a memorandum from Secretary Rubio informing Secretary Noem, the Secretary of Homeland Security, of Secretary Rubio's decision to find Badar

Khan Suri deportable under INA Section 273(a)(4)(c)(1), which is the foreign policy section.

Q. And does the memo provide the rationale for the Secretary's determination?

A. Yes, it does, it cites Mr. Suri's direct connection to Hamas leadership as well as his involvement in antisemitic activities that created a hostile environment for Jewish students in the United States.

Q. Okay, I have one more document to show you.

MS. SANTORA: If I could approach? This is Exhibit 16.

(Approaches, hands to witness.)

THE WITNESS: Thank you.

Your Honor, I'd like to review?

THE COURT: Sure.

THE WITNESS: Thank you.

A. (Reads.) I've completed my review.

Q. Do you recognize the document?

A. I most certainly do.

Q. What is it?

A. It's a communication, um, a memorandum from me to Andre Watson, who's the Assistant Director of the National Security Division of ICE, at DHS.

Q. And you wrote that in your official capacity as

the Senior Bureau Official at the Bureau of Consular Affairs, correct?

A. I did not write it, I signed it. Other people drafted the document.

Q. Okay. But you have reviewed what the memo said, correct?

A. I did, before signing it, yes.

Q. And, um, what is the purpose of the memorandum?

A. The purpose is to inform Mr. Watson of the decision made to, um, revoke, um, Rumeysa Ozturk's Visa due to her activities in the United States, and it was revoked under Section 221(i) of the Immigration and Nationality Act.

Q. And --

A. And I signed it on the back. That's me.

Q. Thank you.

What was the basis for your determination?

THE COURT: His determination?

Q. What was basis for your determination that the Visa should be revoked?

THE COURT: He may answer.

THE WITNESS: Thank you, your Honor.

A. The basis was her antisemitic activities in the U.S., as detailed. It talks about creating a hostile environment for Jewish students, and indicating support

for a designated terrorist organization. I believe it was Hamas, but it might have been Hezbollah. I don't remember exactly.

Q. I want to direct your attention to the last line, the last line of the first paragraph of the memorandum. It says, "Due to ongoing ICE operations, security of this revocation will be silent. The Department of State will not notify the subject of the revocation."

Does the Department of State, when it revokes nonimmigrant Visas, typically inform the Visa holder that their Visa has been revoked?

A. Yes, we usually do.

Q. And in this case you did not?

A. That is correct. And judging from the context, ICE had made a request that we not inform so that they could take action to remove Ms. Ozturk from the United States.

THE COURT: Let me ask you a couple of questions here, but I'm going back to the other four that you've been shown, and I'm talking about the chart.

You know about the Secretary's actions because, as I understand it, your involvement here, as the Director of the Bureau of Consular Affairs, you're the one who causes the memo or in fact sends the memo to the Secretary of State saying "Agree," "Disagree,"

"Discuss"?

THE WITNESS: Yes, I'm the last one who looks at it, yes.

THE COURT: All right. So, um, my question is broader than the, um, what you've been shown.

But since you've been there, in your official capacity, can you estimate how many such memos involve student protests, protesters, and concerns about antisemitism, limit it as to that. About how many such memos have you sent to the Secretary of State?

THE WITNESS: I would estimate the number of such memos would be between 15 to 20.

THE COURT: All right. And of those 15 to 20, if you can break down how many were agreed and executed, how many were disagreed, how many were discussed?

THE WITNESS: In my recollection, almost all were agreed. There may have been one that was not. I'm the not sure. And there may have been another one that was discussed and later agreed to.

THE COURT: Yeah, just asking for your best recollection.

Go ahead, Ms. Santora.

Q. And related to those memos that your Honor was just discussing, um, the -- your office, before sending an action memo to the Secretary, independently analyzes

the information in referrals, correct?

A. That is correct, we analyze it. The Visa office, along with legal counsel, analyze it, um, independently of DHS, the information.

Q. And then makes a recommendation on removability to the Secretary, correct?

A. That is correct. And the recommendation is reviewed by many people. And then I -- or whoever is sitting in the position I am currently in, makes the final determination of whether it goes forward to the Secretary or not. My practice is to read the whole memo.

Q. And the Secretary, um, makes the ultimate determination on removability, correct?

A. That is correct, the Secretary of State, Marco Rubio.

Q. You said before that you were familiar with the allegations in this complaint, correct?

A. I have some knowledge of them, I have not read the complaint.

Q. Are you familiar with the fact that the plaintiffs in this case allege that the government is implementing an ideological deportation policy?

A. I have heard that --

MS. CONLON: Objection, your Honor.

THE COURT: No, she may so characterize it. And she may ask the question. And his answer may stand.

A. I have heard that accusation. I believe it's groundless.

Q. So is there an ideological deportation policy?

A. No.

Q. How do you know?

A. I run the Bureau of Consular Affairs. I'm responsible for everything those 13,000 people do. At the end of the day, the buck stops with me. I would know if there was an ideological deportation policy going on that involved the Bureau of Consular Affairs or the State Department for that matter. It's silly to suggest that there's such a policy that I didn't know about.

Q. Does the State Department have any policy to revoke Visas based on protected speech?

A. No.

Q. Does the State Department have any policy to find people removable based on protected speech?

A. No.

Q. Does the State Department have any policy to revoke Visas based on political viewpoints?

A. Um, if you're supporting a terrorist organization, yes, in that case. And it's been made clear by the

statements of Marco Rubio and, um -- this is not something that we started with Marco Rubio. If you support terrorism, you can have your Visa revoked.

Q. And is that a provision of the law?

A. It's in the law. There's the ineligibility, the 3(b) that we talked about. And actually that example you gave me, right before 3(c), they have 3(b) that goes into several pages of discussion of this. These officers abroad are required to put in a security advisory opinion on any case that they think that there's any indication of support for terrorism. We treat this very seriously.

Q. Has anyone ever told you to revoke the Visas on the basis of protected speech?

A. No.

Q. As anyone ever told you to find someone removable on the basis of their protected speech?

A. I can't find anyone removable, but no one has instructed me to prepare the materials for the Secretary to make that finding.

Q. Could the State Department be deploying an ideological deportation policy in secret without your knowledge?

MS. CONLON: Objection.

THE COURT: Based upon the entire record, I'm

going to sustain that.

(Pause.)

Q. To be clear, it's your testimony that it would not be possible for an ideological deportation policy to be implemented at the State Department without your knowledge, correct?

A. That is my --

MS. CONLON: Objection.

THE COURT: No, no, he can -- and I sustained the earlier objection because the whole gravamen of the case is that it is an avowedly public operation supported by the statements of the -- here the defendant public officials. And I'll let his testimony stand.

Anything else for this witness?

MS. SANTORA: No, that's it. Thank you, your Honor.

THE COURT: All right.

Ms. Conlon?

MS. CONLON: Yes, may I, um, go to the podium?

THE COURT: You may.

THE WITNESS: Your Honor, may I stand up for a minute?

THE COURT: Of course you can.

THE WITNESS: Thank you, sir.

(Stands.)

(Then Sits.)

CROSS-EXAMINATION BY MS. CONLON:

Q. Good afternoon, Mr. Armstrong.

A. Good afternoon.

Q. Okay. So you were asked --

THE COURT: Wait. Wait a minute. Wait a minute. I have, at this moment, received an order from the Court of Appeals, so let me read it.

(Reads.)

THE COURT: Here's how we're going to proceed. Let me read this in open court and you'll all have copies. This is entered and I received it as you hear it, and this is the order of the Court of Appeals in the First Circuit.

"The government has filed a mandamus petition and accompanying request for interim relief. Plaintiffs have opposed. After initial review of the parties' submissions and relevant portions of the record, we grant the government's request for a stay of any further disclosure of documents for which the government says it has claimed privilege and where waiver is the only basis stated for rejecting the claim of privilege. Plaintiffs may file a more fulsome answer to the petition by Monday, July 14, 2025, at 5:00 p.m.

The District Court is invited to address the petition by Tuesday, July 15, 2025 at 5:00 p.m. The Court's response should identify what the reason was for the in-camera review and detail the rationale for its waiver rulings on the government's assertion of certain privileges. The motion for administrative stay is denied as moot. The Court will rule promptly on the petition."

In light of the order of the First Circuit, and because it's 5 minutes to 1:00, I think we'll suspend proceedings at this time.

Ms. Conlon?

MS. CONLON: Could I begin my examination, with the 5 minutes remaining, without anything that will affect the order from the First Circuit just so we can get started?

THE COURT: Well I'm deferential to their order. I've got to reflect on what it reaches. But for my review of this order, it reaches everything that has been -- that this Court has disclosed to you as to which the government has objected.

And you've got 5 minutes.

MS. CONLON: 5 minutes to argue it or 5 minutes to --

THE COURT: No, no, 5 minutes to question him.

MS. CONLON: Okay. Just for the clarity for the Court and the record, our understanding, I think, is different in terms of the group of documents that we understood the government to be filing the petition about, um, but I am certainly able to start examining this witness without using any documents at all. So I just wanted to be clear, because I hear the Court saying that the Court thinks that the documents that I might use in this examination, which is to say the ones we received from the Court yesterday, are implicated by the government's petition, and I want to be clear that our understanding is that they are not, and that that relates to documents that have yet to be disclosed to us. But I understand the Court needs to review the document that's in front of you more thoroughly. So if I may begin the examination --

THE COURT: It's not a document, it's an order.

MS. CONLON: Correct, the binding order. So I will not -- I have no intention, in this remaining minute --

THE COURT: Right. You have 4 minutes. Go ahead.

MS. CONLON: Thank you, your Honor.

(Pause.)

Q. Mr. Armstrong, you testified on direct examination about certain noncitizens, um, by name, that the

government asked you about. To be clear, um, you had personal involvement in the decisions with respect to all of them, is that right?

A. That's my recollection, because in the case of the ones that went to the Secretary of State for decision, the action memo would have gone through me before it went up. And in the one remaining case, I -- as I recall, the action memo actually went to me from one of the Deputy Assistant Secretaries. So, yes, I was involved, in my professional duties, in these cases.

Q. And when you say that it went to you before it went up to Secretary Rubio, it's the case that you actually had to clear the document to go to Secretary Rubio, is that right?

A. That's correct. I'm the -- for the action memo, before it can leave the Bureau of Consular Affairs, it comes from -- it's actually from me, um, the decision -- the action memo is from me. And as I stated, it's my practice to read, um, the documents before they go up. I treat it seriously, I treat my duties seriously to read it in full. And make corrections, if needed, I may add.

Q. And when you say "corrections," what kind of corrections?

A. Um, there's any number. It's part of the

clearance or the approval process. It's serious business. For example, sometimes, despite best efforts, there's simple grammatical errors or punctuation errors. I can't send something to the Secretary with not enough commas or a semicolon in the wrong place. Sometimes it's more serious, there are what I believe, in my position, I judge to be something that is not phrased in the clearest way to get across our point or, for example, not the best evidence is used to make our point. Sometimes I disagree completely and send the document back to the drafter and I say, "This can't stand, you have to fix this."

Q. You're describing a sort of searching review before it goes to the Secretary, is that right?

A. That's correct, much of my time is spent doing such activities.

Q. With respect to the five individuals whose documents you just reviewed with the government, you didn't make any corrections about those, right?

A. I -- I'm trying to be helpful, but I review in a week, you know, sometimes 10, 15, or more action memos that go to other parts of the State Department, and I can't recall what I did on a memo that was, you know, several months ago.

Q. You don't have an independent recollection of the

back and forth on these memos that the government showed you, is that right?
A. I do not. But my general practice is that I review things thoroughly and judiciously before I sign them. I have to sign off on it, and that's my responsibility, even if it's someone else's fault.
Q. And if you disagreed with a memo that came to you that was intended for the Secretary, you could stop it from going to him, right, by not clearing it?
A. That's correct, I could send it back.
Q. You didn't do that for any --
THE COURT: I think that's a good place to stop.
MS. CONLON: Okay.
THE COURT: We'll stop taking testimony today. We'll start promptly at 9:00 a.m. on Monday next week.
The total elapsed time is, um, for the plaintiffs, 3 days, 55 minutes. For the defense, 1 day, 1 hour, um, 35 minutes.
Understand you've only got four days -- four and a half days for the plaintiffs, and I thought that that included -- I intend that that include closing arguments. So assuming you want some cross-examination here, um, time is of the essence.
Now have a good weekend.
MR. KANELLIS: Your Honor, I apologize.

Case: 25-6906, 11/20/2025, DktEntry: 16.15, Page 281 of 300



THE COURT: Well now the apology is properly sought. I said we're stopping at 1:00. We're stopping.

We'll recess.

(Adjourned, 1:00 p.m.)

C E R T I F I C A T E

I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do hereby certify that the forgoing transcript of the record is a true and accurate transcription of my stenographic notes, before Judge William G. Young, on Friday, July 11, 2025, to the best of my skill and ability.

/s/ Richard H. Romanow 07-11-25
________________________
RICHARD H. ROMANOW Date

# EXHIBIT 5

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS (Boston)

No. 1:25-cv-10685-WGY

AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
Plaintiffs

vs.

MARCO RUBIO, in his official capacity as
Secretary of State, et al,
Defendants

*********

For Bench Trial Before:
Judge William G. Young

United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
Thursday, July 17, 2025

********

REPORTER: RICHARD H. ROMANOW, RPR
Official Court Reporter
United States District Court
One Courthouse Way, Room 5510, Boston, MA 02210
rhr3tubas@aol.com

A P P E A R A N C E S

RAMYA KRISHNAN, ESQ.
CAROLINE DeCELL, ESQ.
ALEXANDER ABDO, ESQ.
SCOTT B. WILKENS, ESQ.
ALEXANDRA CONLON, ESQ.
Knight First Amendment Institute at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
E-mail: Ramya.krishnan@knightcolumbia.org
and
COURTNEY GANS, ESQ.
NOAM BIALE, ESQ.
Sher Tremonte LLP
90 Broad Street, 23rd Floor
New York, NY 10004
(212) 540-0675
Email: Cgans@shertremonte.com
For Plaintiffs

ETHAN B. KANTER, ESQ.
WILLIAM KANELLIS, ESQ.
VICTORIA M. SANTORA, ESQ.
JESSICA STROKUS, ESQ.
DOJ-Civ
P.O. 878
Ben Franklin Station
Washington, DC 20044
(202) 616-9123
Email: Ethan.kanter@usdoj.gov
and
SHAWNA YEN, ESQ.
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, MA 02210
Email: Shawna.yen@usdoj.gov
For Defendants

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| MOHAMED MAKLAD | | | | |
| By Mr. Kanellis | 5 | | | |
| By Mr. Biale | | 18 | | |
| ANDRE WATSON | | | | |
| By Mr. Kanellis | 26 | | | |
| By Ms. Krishnan | | 60 | | |

E X H I B I T S

EXHIBIT 240............................... 22
EXHIBIT 241............................... 22
EXHIBIT 242............................... 80
EXHIBIT 243............................... 97
EXHIBIT 244............................... 98
EXHIBIT 245............................... 99
EXHIBIT 246............................... 99

P R O C E E D I N G S

(Begins, 9:00 a.m.)

THE COURT: Because I have authorized internet access to these proceedings, it's appropriate to say that if you are attending these proceeding via internet, you must remember that the rules of court remain in full and effect, and that means there is no taping, streaming, rebroadcast, screen shots, or other transcription of these proceedings.

Also, you must keep your microphone muted. That's very important. And if you do not, I shall have to cut you off.

Very well. The plaintiffs are calling two witnesses. You may call your first witness.

MR. KANELLIS: Your Honor, today the government will be calling two witnesses.

THE COURT: I misspoke. And, Mr. Kanellis, you may call the first of the two.

MR. KANELLIS: Your Honor, the U.S. government calls Mohamed Maklad.

THE COURT: He may be called.

(MOHAMED MAKLAD, sworn.)

THE CLERK: Can you please state your full name and spell your last name for the record.

THE WITNESS: My name is Mohamed Maklad, and my

last name is M-A-K-L-A-D.

THE COURT: Mr. Kanellis, you may proceed.

**************

MOHAMED MAKLAD

**************

DIRECT EXAMINATION BY MR. KANELLIS:

Q. Mr. Maklad, where do you work?

A. I work at Homeland security Investigations.

Q. And that's a part of the Department of Homeland Security?

A. That is correct.

Q. And what is your job at Homeland Security Investigations?

A. I'm a Supervisory Analyst.

Q. And what do you do as a Supervisory Analyst?

A. I conduct research and analysis in support of our agency's needs.

Q. As a Supervisory Analyst, have you had any experience retrieving data and information from public sources?

A. I have.

Q. And in that role have you had any experience analyzing and summarizing data from public sources?

A. I have.
Q. Why are you here to testify today?
A. I'm here to provide summary exhibits on public events and publications by AAUP and MESA.
Q. You said by AAUP and MESA?
A. Yes, correct.
Q. And those are two of the plaintiffs in this case, correct?
A. Yes, sir.
Q. And then you said, um -- did you say "public events"?
A. Yes, I did.
Q. What do you mean by "public events"?
A. Events that we're able to access through publicly-available information that occurred of some kind of gathering.
Q. You also mentioned, I think, "publications," is that right?
A. I did, sir.
Q. What do you mean by "publications"?
A. Anything that would be associated with the plaintiffs.
Q. Okay. Can you describe for the Court the volume of public events and publications you've retrieved when searching for the information that underline these

charts?
A. For all of --
MR. BIALE: Objection.
THE COURT: Well the chart's not yet before the Court, but this is where he's going. Overruled. He may have it.
A. Thousands, sir. Over a thousand of volumes that we got to make these exhibits.
Q. And have you compiled these thousands of references to the summary charts?
A. I have.
Q. Did you compile the sources for the work underlying these summary charts?
A. I have.
Q. And how did you do so?
A. I did so on an EXCEL spreadsheet, sir.
Q. Did you say an EXCEL spreadsheet?
A. EXCEL spreadsheets.
Q. Can you move the microphone a little bit closer to you?
A. (Moves mic.)
Q. Yes, thank you.
Was the spreadsheet with the sources for the data you compiled provided to plaintiffs in this case?
A. It was.

MR. BIALE: Objection.
THE COURT: Well do you know that?
THE WITNESS: I provided it to the defense.
THE COURT: Well my question is to you, do you know that it was provided? And you started to answer. You provided them?
THE WITNESS: I provided it to the defense team.
THE COURT: Okay. And when did you do that?
THE WITNESS: I did that on July 3rd, sir.
THE COURT: Thank you.
Go ahead.
MR. KANELLIS: Your Honor, may I approach?
THE COURT: You may.
MR. KANELLIS: Let the record reflect I'm handing you, the witness, three exhibits marked for identification.
THE COURT: And which are they?
MR. KANELLIS: Sir, they are HJ, HL, and HH.
THE COURT: All right.
(Hands to witness and judge.)
THE COURT: Proceed.
Q. Are these exhibits that you prepared for this litigation, sir?
A. They are.
MR. KANELLIS: Let's pull up Exhibit HJ, labeled

"Comparison AAUP Public Events 2022 through 2025."
(On screen.)
Q. Can you explain to the Court what information you're attempting to summarize with this exhibit?
A. This is a summary of the total number of events listed on AAUP's websites, between 2022 and 2025.
Q. And does it include the entire year of 2025?
A. It includes just the first 6 months of 2025.
Q. And what do you mean by "public events"?
A. These were events listed on the AAUP websites, um, various webinars, gatherings, and things that would bring people together over a certain cause.
Q. And how were you able to determine that these public events were sponsored or promoted by the plaintiff, AAUP?
A. I determined that by pulling it from their website directly.
Q. And how do you know you were looking at AAUP's website?
A. Based on the AOR, sir, the AAUP network.
Q. Now with respect to looking at AAUP's website, is it possible, in your mind, that AAUP sponsored more events than are listed on this website?
MR. BIALE: Objection.
THE COURT: Well I'm going to sustain that, "Is it

possible?" Let's get to the guts of it.

What's the difference between blue and red here?

THE WITNESS: Your Honor, blue represents the overall events and red is events that have been identified as being related to Palestine and Israel.

Q. And how many events total did you see promoted on AAUP's website?

THE COURT: Well the document speaks for itself. What's the relevance of this?

MR. KANELLIS: Your Honor, this shows AAUP's political activity after 2025. After the ideological deportation policy was in place, it increased, it did not decrease. It was unaffected by AAUP's --

THE COURT: Yes, I understand your point.

Yes?

MR. BIALE: Your Honor, if I may?

THE COURT: Yes.

MR. BIALE: No one is claiming, in this case, that the organization's speech has been chilled. The organization's --

THE COURT: That's understood. I've limited it.

MR. BIALE: Yes.

THE COURT: But it's peripherally relevant, and so I'll admit it.

HJ is admitted.

MR. BIALE: Your Honor, I'm sorry, I have a further objection to this document.

THE COURT: Yes?

MR. BIALE: We don't know anything about the methodology that this witness used to determine what is a Palestine/Israel-associated event.

THE COURT: He's here for cross-examination. I'll reconsider it.

MS. CONLON: He stated --

THE COURT: I said it's "peripherally relevant." It's a line in their closing argument, I suppose.

MR. BIALE: And, your Honor, the data about these events is also not in evidence. He's saying he pulled it from the website.

THE COURT: But it's available to you?

MR. BIALE: But we don't know what he looked at, your Honor.

THE COURT: Oh, wait a minute. Wait a minute. Well that slows me down.

And so Mr. Kanellis can address that?

MR. KANELLIS: Your Honor, we made the witness available, then we produced --

THE COURT: No. No.

MR. KANELLIS: They elected not to question him.

THE COURT: No, the data has got to be produced.

MR. KANELLIS: We produced it.

THE COURT: Is this all you gave them is this?

THE WITNESS: And the source data, your Honor.

THE COURT: And the source data?

THE WITNESS: Yes, your Honor.

THE COURT: And what does the source data look like?

THE WITNESS: It's an EXCEL spreadsheet, your Honor, that contains all of the --

THE COURT: Okay.

Is that one here?

MR. KANELLIS: Um, yes, your Honor.

THE COURT: Can I see it?

MR. KANELLIS: We can pull that. It's on --

Your Honor, we -- we don't have the --

(Discussion.)

MR. KANELLIS: We don't have a physical copy, your Honor, with us.

(Pause.)

MR. KANELLIS: The source data, your Honor, was sent to plaintiffs.

THE COURT: No one's impugning that, he so testified.

MR. BIALE: Well, your Honor --

THE COURT: I mean can I see what it looked like?

MR. KANELLIS: Yes, your Honor, we will -- but we're going to have to print that out.

THE COURT: All right, then we'll reserve on admitting it.

MR. BIALE: For clearing the record, your Honor, I believe he testified that he sent the source data to defendants. Now we received spreadsheets, but I don't know what this data relates to.

THE COURT: Well all right. I need help on this, so I'll vacate the admission of this, but he can go on.

Let's find out about these other ones, quickly.

MR. KANELLIS: Um --

THE COURT: You said 10 minutes, Mr. Kanellis.

MR. KANELLIS: Yes, I did.

THE COURT: Go ahead.

Q. How many events are listed by AAUP in Exhibit --

THE COURT: Well the document speaks for itself. If you get it in evidence, the numbers will be there. Let's look at the evidence.

(Pause.)

MR. KANELLIS: Let's go to "Hotel Lima," Exhibit HL.

(On screen.)

Q. And what's the purpose of this chart?

A. The purpose of this chart is to show, um, what the

witness has identified, to testify in this case, um, their searches or their associations related to Palestine or Israel in Google Overtime in 2024 and '25.

THE COURT: Forgive me for interrupting.

THE WITNESS: Yes, sir?

THE COURT: I don't know what that means, "associations relative to Palestine"?

THE WITNESS: Yes, your Honor.

THE COURT: Tell us what you mean by that?

THE WITNESS: So basically, sir, what we've done is we've taken all the names on the bottom on the, um -- in random, in Google, and identified whether their name, and "Israel" and "Palestine," has come with a result in Google in 2024 and 2025, showing an association between that name and some kind of publication on Israel and Palestine.

THE COURT: I see. I see. And blue is 24 and red is 25?

THE WITNESS: Yes, your Honor.

MR. BIALE: Your Honor --

THE COURT: Wait a minute. Wait a minute.

How is this relevant?

MR. KANELLIS: Your Honor, the plaintiffs have claimed that -- the individual witnesses have claimed that they were active and associated with issues with

Palestine and Israel prior to the implementation of the ideological deportation policy in 2025. This shows that if there was any public association with those witnesses and the issue of Palestine and Israel, it increased after -- for most of these witnesses, after the implementation of the ideological deportation --

THE COURT: If I understand though, this is some Google search where -- and we'll take Professor Nickel as an example, where his name and "Palestine" is in the same reference.

Is that correct?

THE WITNESS: That's correct, your Honor.

THE COURT: Yeah, that's too remote. It's excluded. Let's look at the, um --

MR. KANELLIS: Let's go to the final exhibit.

THE COURT: Yes.

MR. KANELLIS: "Hotel Hotel."

(On screen.)

Q. And, Mr. Maklad, what does Exhibit "Hotel Hotel" depict?

A. Exhibit "Hotel Hotel" depicts a single -- the number of events in a single day in 2024 and 2025 sponsored by AAUP under the Day of action for Higher Education.

Q. What is your understanding of the Day of Action

For Higher Education?

MR. BIALE: Objection, foundation.

MR. KANELLIS: I'm laying a foundation.

THE COURT: And you may.

A. My understanding of the Day of Action for Higher Education is it is sponsored by AAUP and others to engage in free speech activities across college campuses.

Q. And how do you know this was sponsored by AAUP, this National Day of Action for Higher Education?

A. AAUP was quoted saying that they spearheaded this action in 2024, and in 2025, their logo and on their website, "A Day of Action," indicates that they've sponsored these events.

MR. BIALE: Objection, move to strike. Quoted from where? We have no idea where he's getting this information, your Honor.

THE COURT: Well you can inquire.

All right.

Q. And what does this chart show about, um, the, um, political activity of AAUP and MESA from April 17th, 2024 compared to the same day, April 17th, 2025?

MR. BIALE: Objection. There was no testimony that this is activity of MESA. He stated that this was activity of MESA.

THE COURT: Correct.

MR. BIALE: Although the exhibit says "MESA," and I'm not sure where that comes, your Honor.

MR. KANELLIS: Oh, I can give you that foundation, your Honor, I can explain.

Q. Why do you include "MESA" on the title page of this exhibit?

A. MESA was also included as a sponsor on their website, "Day of Action."

Q. And how do you know that?

A. I saw the emblem on the website where I pulled the information from.

MR. BIALE: Objection.

Q. And then what did the exhibit show about the political activity of MESA and AAUP comparing 2024 and 2025?

A. In 2024, there were approximately 9 events that occurred, um, according to the website where I pulled this information. And in 2025, there were approximately 191 events that occurred, according to this --

Q. What is the increase percentage-wise in events sponsored by AAUP and MESA from 2024 to 2025?

A. Approximately 2000 percent.

Q. 2000 percent?

A. Yes, sir.