**No. 26-6906**

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

**STANFORD PUBLISHING CORPORATION, *et al.*,**

*Plaintiffs-Appellees,*

**v.**

**MARCO RUBIO, *et al.*,**

*Defendants-Appellants.*

**Appeal from a Judgment Issued by the U.S. District Court for the Northern District of California (Civil Action No. 5:25-cv-06618-NW)**

# DEFENDANTS-APPELLANTS' EXCERPTS OF RECORD VOLUME 15 of 15

**JONATHAN D. GUYNN**
**Acting Assistant Attorney General**
**Civil Division**

**DREW C. ENSIGN**
**Deputy Assistant Attorney General**

**AUGUST E. FLENTJE**
**Special Counsel for Immigration Litigation**

**SAMUEL P. GO**
**Assistant Director**

**JAMES A. HURLEY**
**Trial Attorney**
**Office of Immigration Litigation**
**U.S. Department of Justice Civil Division**
**P.O. Box 878, Ben Franklin Station**
**Washington, D.C. 20044**
**T: (202) 305-1889**
**F: (202) 305-2509**
**james.hurley@usdoj.gov**

**JAIME DURR**
**DOMINIC WEISS**
**Trial Attorneys**

**Date: November 20, 2026**

**Attorneys for Respondent**

MR. KANELLIS: Your Honor, we tender the witness.

Oh, your Honor, actually -- my apologies. We move into evidence the Exhibits HH and, um, the first exhibit?

THE COURT: HJ.

MR. KANELLIS: Yes, sir.

MR. BIALE: Your Honor --

THE COURT: I'll reserve until I've heard cross-examination.

Mr. Biale, go ahead.

MR. BIALE: Okay. And very briefly.

CROSS-EXAMINATION BY MR. BIALE:

Q. You said that these are related to the National Day of Action, right?

A. Yes, sir.

Q. And the National Day of Action is an event that, um, has, um, relates to topics -- a variety of topics that AAUP and MESA have an interest in, right?

A. Correct.

Q. And in fact, in the source data you provided, the very first event description is "Indiana Graduate Workers Coalition went on Strike at Indiana University," right?

A. That's correct, that's what I provided.

Q. Okay. You don't know -- you have no idea whether that strike had anything to do with Israel or Palestine, right?

A. On the website it claims that these were, um, looking for opportunities to combat, um -- to provide opportunities for free speech to include Palestine and divestment issues, according to the Day of Action website.

Q. What website are you talking about? You keep mentioning a website.

A. The Day of Action website where I obtained this information from.

Q. Okay. And what is the URL for the Day of Action website?

A. I can retrieve it. It's a "Coalition for Higher Ed.org."

Q. Okay. And a "Coalition for Higher Ed," that's a different organization from AAUP, right?

A. It's sponsored by AAUP on the website.

Q. "Yes" or "No." Is the Coalition for Higher Education the same as AAUP?

A. It is not.

Q. Is the Coalition for Higher Education the same as MESA?

A. It is not.

Q. Okay. Now looking at these charts that you show. Assuming, just for the sake of argument, that these are in fact political activities engaged in by these organizations between 2024 and 2025, what this shows, right, is that the organizations have engaged in much more political activity in 2025, correct?
A. That is what is shown, correct.
Q. Okay. So whatever resources that they were deploying to other things in 2024, in 2025, they've deployed those resources much more to political activity, right?
MR. KANELLIS: Objection, your Honor, vague.
THE COURT: No, overruled.
A. Can you repeat the question, please?
Q. I said whatever resources they had to direct to other activities in 2024, they have directed more of those resources to political activities to 2025, "Yes" or "No"?
A. I'm not sure I -- I cannot answer that. I don't know what the resources were in 2024 versus 2025.
Q. Well presumably it took some resources of the organization to plan these events, right?
MR. KANELLIS: Objection, calls for speculation.
THE COURT: Well, on this foundation, I have to sustain it.

MR. BIALE: All right. If I could have one moment?

(Pause.)

Q. Now with respect to HJ, sir, you testified that these were public events, right?

A. That is correct, from the AAUP website under the events tab.

Q. Okay. And when you said "public," you meant that there was public information available about them on the website, correct?

A. That is correct.

Q. You don't know whether these events were attended by members of the public, right?

A. I am not aware of that. I just know what I was able to pull from the website.

Q. Okay. And that website, again, doesn't have any information about whether these were public events in the sense that everyone from the public was invited, right?

A. All this is showing is the number of events over time and what was displayed on the AAUP website. Whether they were public or private? I don't know.

Q. You don't know. Okay.

(Pause.)

Q. And all you know is they were advertised, you

don't actually know if these events occurred, right?
A. I do not know if they occurred, but I know they're advertised by AAUP.
MR. BIALE: Nothing further.
THE COURT: I will admit both Exhibits HH as Exhibit 240 and HJ as Exhibit 241.
(Exhibits 240 and 241, marked.)
THE COURT: You have nothing else for this witness, do you, Mr. Kanellis?
MR. KANELLIS: No, sir.
THE COURT: All right, you may step down.
Call your next witness.
MR. KANELLIS: Your Honor, the United States -- the government defendants call Assistant Director Andre Watson.
MS. CONLON: Your Honor --
THE COURT: Now wait a minute.
MS. CONLON: I just want an exhibit number.
THE COURT: Ms. Conlon, I have no direction from the Court of Appeals. Now my understanding is that Mr. Watson is familiar with documents that to which the stay undoubtedly applies, so I don't know what we're doing.
I -- in other words, I am not going to -- I recognize that when the stay went into effect, we, um,

had heard the direct examination of Mr. Armstrong, and we had one question or two on the cross-examination, and then the stay went into effect.

Now I suppose I could take his direct examination, um, but we're not going to get anywhere on cross-examination in light of the stay. Though I'm not going to consider the direct of either Armstrong or Watson if somehow I am precluded from considering the documents as to which the stay presently applies.

So with that said, I'm not clear what we're doing. And I'll start with you.

MR. KANELLIS: Well, your Honor, it was our understanding, and perhaps it was an misimpression, that certainly we are delaying Mr. Armstrong's cross, or the remainder of it, until we hear from the First Circuit. But it was our understanding we could proceed with Mr. Watson today with direct and cross on the --

THE COURT: But they can't cross on the documents that are, um -- I mean I'm not going to permit it, because I have to obey the stay. Even if you told me, "Well we'll waive it," I must obey it. And so of course I will.

So, I'm sorry, this is part of the problem of a stay in the midst of trial proceeding. But, um, I just don't think it will be as coherent as if we did it all

at once.

So --

MS. KRISHNAN: Your Honor, may I be heard on the issue of documents?

THE COURT: Yes. Why don't you, once again, introduce yourself.

MS. KRISHNAN: Yes. Good morning, your Honor, my name is Ms. Krishnan.

THE COURT: Yes.

MS. KRISHNAN: So I'll start by saying that the only documents that are part of the core documents that we plan to cross-examination Mr. Watson on are the letters that he authored that went to the State Department, and our understanding is that the First Circuit stay doesn't reach those documents because those documents are ones over which the government only claims the law enforcement privilege, and we had understood your Honor to have overruled the assertion of that privilege.

THE COURT: And your understanding is correct. Your understanding of what I've done is correct. But I read the order of the Court of Appeals -- and I'm not at all clear that their understanding is the same as mine.

So unless the government agrees with you and has no problem with -- I certainly accept your

representation that there's no problem allowing cross-examination as to those transmittal letters, then I'd be fine.

But Mr. Kanellis?

MR. KANELLIS: That's fine with us, your Honor.

THE COURT: Oh, it is?

MR. KANELLIS: Yes.

THE COURT: All right.

MR. KANELLIS: That is the --

THE COURT: No, no, I'll hold her to it. I mean she's an officer of the court.

He made be called.

(Pause.)

THE COURT: And while he's coming, are we clear then that the only thing that remains for the evidentiary presentation is the cross-examination of Mr. Armstrong, if you press to have Armstrong as a witness, is that right?

MS. KRISHNAN: Yes, in addition to, um, one of plaintiffs' witnesses, Professor Veena Dubal, who is the General Counsel of AAUP.

THE COURT: Yeah, when are we going to hear her?

MS. KRISHNAN: Friday.

THE COURT: Okay, thank you.

(ANDRE WATSON, sworn.)

THE CLERK: And please state your full name and spell your last name for the record.

THE WITNESS: Yes, ma'am. Andre Watson. My last name is spelled W-A-T-S-O-N.

THE CLERK: Thank you.

************

ANDRE WATSON

************

DIRECT EXAMINATION BY MR. KANELLIS:

Q. Good morning, Mr. Watson. I'm going to call you "AD Watson," because your title is "Assistant Director." Is that all right with you?

A. Yes, sir.

Q. AD Watson, who do you work for?

A. U.S. Immigrations and Customs Enforcement.

Q. And what is your current position?

A. The Assistant Director of the National Security Division.

Q. And for how long have you held the position of the Assistant Director for the National Security Division?

A. Since July of 2020.

Q. Let's talk briefly about your background. Where did you grow up?

A. I grew up in the Tidewater Region of Virginia, sir.
Q. And did you go to college?
A. Yes, sir.
Q. Where did you go to college?
A. Ultimately the Old Dominion University in Norfolk Virginia.
Q. After you graduated from college, um, what year was that actually?
A. In 1993, sir.
Q. And what did you do after you graduated from Old Dominion University in 1993?
A. I accepted an appointment to the position of Special Agent with the United States Customs Service.
Q. Briefly describe for the Court your responsibilities as a Special Agent for the Customs Service?
A. Conducting criminal investigations as to violations of customs and federal law, in addition to revenue collection investigations in furtherance of customs duties.
Q. Was that your first employment with the federal government?
A. Yes, sir, it was.
Q. May I ask you why did you want to work for the

federal government?
A. I grew up in a house that had military backgrounds with my father and I always saw a career either in the military or in law enforcement.
Q. How long did you remain as a Special Agent for the U.S. Customs Service?
A. Until the creation of the Department of Homeland Security.
Q. And when was that?
A. March of 2003, sir.
Q. Do you have an understanding, based upon your experience, of why the Department of Homeland Security was formed in 2003?
A. Yes, sir, I do.
MS. KRISHNAN: Objection.
Q. What is your understanding?
A. It was created in response to the terrorist attacks that occurred on 9/11.
Q. And what -- can you describe generally the changes that occurred with respect to the U.S. Customs Service in 2003?
MS. KRISHNAN: Objection, relevance.
THE COURT: No, no, he may do it. Generally.
How did things change?
A. For Special Agents assigned to the U.S. Customs

Service, we were merged with Special Agents from the Immigration and Naturalization Service, and for uniformed personnel with U.S. Customs Service, they were merged with uniformed personnel from the Immigration and Naturalization Service, and two agencies were created therein, being one, um, Immigration and Customs Enforcement, and the other being U.S. Customs and Border Protection.

THE COURT: Just so I'm clear, prior to this merger, the first agency was in what Cabinet Secretary?

THE WITNESS: For U.S. Customs Service, that was within the Department of Treasury, your Honor.

THE COURT: And --

THE WITNESS: And the Immigration and Naturalization Service was within the Department of Justice.

THE COURT: Understood. Thank you.

THE WITNESS: Yes, sir.

Q. So since 2003, you said the Department of Homeland Security was created. Was the Department of Homeland Security Investigations also created at that time?

A. Um, ICE was.

Q. Uh-huh. And what about -- can you explain to the Court the difference between ICE and HSI, if there is one?

A. Yes, sir. Homeland Security Investigations is a program office within U.S. Immigrations and Customs Enforcement.

Q. Okay. Now since 2003, you've worked for HSI, correct?

A. Yes, sir.

Q. And has HSI's mission changed or stayed the same since 2003?

A. It has stayed the same.

Q. Have priorities changed with different administrations since your -- since its inauguration in 2003?

A. Yes, sir.

Q. Can you give some examples of priorities changing with different Presidential administrations?

A. Yes, sir. I can begin with during the Obama administration that our priorities realigned to organized crime and firearms trafficking, to include firearms smuggling from the United States into the Republic of Mexico.

Q. Okay. And were there any other changes after the Obama administration left office?

A. Yes, sir, with the first Trump administration.

Q. Okay. Now you're aware that this case centers around HSI's enforcement of its Title VIII mission,

right?

A. Yes, sir.

Q. Can you explain to the Court briefly what your understanding of the Title VIII mission is?

A. The Title VIII mission for HSI focuses on opportunities to conduct criminal investigations as it relates to violations of United States Code. That sometimes goes into the space of Title VIII in areas such as Alien smuggling and so forth.

Q. Does Title VIII also include civil law violations?

A. It can.

Q. And in 2003, was HSI's mission, did it include the ability to enforce civil immigration laws?

A. Yes, sir.

Q. And just to be clear, were HSI's authorities, in 2003, different than they are now?

A. No, sir.

Q. You've talked about, um -- strike that.

Has the emphasis on Title VIII enforcement changed over time?

A. Yes, sir, it has.

Q. Well can you describe how it's changed?

A. It has changed in areas like investigations -- criminal investigations, in furtherance of worksite enforcement, labor trafficking. So there have been

times where HSI Special Agents have leveraged opportunities to conduct criminal investigations into those activities and allegations.

Q. And has the emphasis on Title VIII enforcement changed with different administrations?

A. Yes, sir.

Q. Does the -- do these changes impact the way HSI does business, in your experience?

A. No, sir.

Q. Can you explain to the Court why, if the priorities regarding Title VIII are different, your responsibilities remain the same?

A. Pursuant to our statutory authority, by way of the Homeland Security Act of 2003, as well as DHS delegation Order 7030.2, we've always had that authority to conduct criminal investigations to include enforcement of the Immigration and Nationality Act. So if we encounter a scenario where we're conducting a criminal investigation and we in turn identify an undocumented alien or a foreign student that is present without inspection or out of status or here otherwise contrary to law, we can, in coordination with the principal legal advisor and/or Enforcement and Removal Operations, take action.

Q. Let's take a step back to your background for a moment after you began working at HSI in 2003.

Can you briefly describe for the Court your professional background and promotions?

A. Um, yes. So again, beginning with my employment as a Special Agent with the U.S. Customs Service, I began in Atlanta, Georgia and served there for just under 8 years. And prior to that I took a reassignment to the U.S. Customs Service post in Vancouver or British Columbia as a Customs representative. And from that location I promoted out and became a Supervisory Special Agent in the Wayne Washington field office. At the time we merged and became DHS and then ICE. And then I took reassignment to ICE headquarters serving as a Section Chief and Unit Chief within the National Security Division.

And then on to an Assistant Special Agent in Charge in our Houston, Texas field office. Then back to headquarters to serve at the Department of Justice International Organized Crime Intelligence Operations Center. And then a reassignment to the Office of the Director to serve as the Chief of Staff to the Deputy Director. And then as a Deputy Special Agent In Charge in the Washington, D.C. field office. Then Special Agent in Charge in the Baltimore, Maryland field office. Before a detail assignment to DHS headquarters to serve as the Principal Deputy Assistant Secretary for the

Countering of Weapons of Mass Destruction field office.
Q. And what do you do now, again?
A. The Assistant Director for the National Security Division.
Q. How many people work for the National Security Division approximately?
A. Up to 400 employees, sir.
Q. What is the mission of the National Security Division?
A. Our mission is to leverage Customs and Immigration Authorities through programmatic support for HSI Special Agents that are assigned to the FBI's Joint Terrorism Task Force, as well as the Counterintelligence Task Force, to HSI Special Agents that are assigned to our Human Rights Violators and War Crimes Center -- as well as Unit, and also to our Special Agents that are working in the Counterintelligence Development Unit. And finally, with regards to the Student and Exchange Visitor Program compliance and oversight functions for just over 7,000 certified schools and universities in a student population of just under 1.3 million.
Q. The Student and Exchange Visitors Program, I think I mixed up that. Can you describe that a little bit?
A. Yes, sir. So that has primacy for oversight and compliance functions as it relates to colleges and

universities that are SEVP certified. So you're looking at a population of just under 7,000 schools. But you also have designated school officials, just under 40,000, that are certified by SEVP, to coordinate the functions of schools and universities in compliance with the code of federal regulations. And again, the student population is just under 1.3 million currently in the United States.

Q. How does the enforcement of immigration laws under Title VIII touch on issues of national security?

A. With regards to Title VIII, um, we are talking about non-immigration Visa holders and overstays, alien overstays, but also foreign students that are studying in the United States. So by way of the movement of people comes the opportunity for the United States government to screen and vet those persons that are coming into the United States.

So through our lines of effort and through partnerships across the agencies, we work hand and glove with the Department of Justice and the Department of State to identify risk and innate vulnerabilities as it relates to individuals that are presenting themselves for inspection or entry into the United States. But also while they're here in the United States, to ensure that they are in compliance with the laws thereto. If

there are threats or concerns that are raised, we coordinate with the inner agency to take action as appropriate.

Q. Why do these threats or concerns cause -- or how does that cause you, in the NSD, to take action?

A. With threats and concerns, we look to activities, associations, and/or conduct, and if there is linkage to foreign terrorist organizations or there are other national security or public safety concerns, those are indicators of opportunities whereby further analysis and review is required to determine if that person's presence is contrary to law.

Q. Since your work in 2003 with HSI, are you aware of historical events where immigration concerns have overlapped with the National Security Division's mandate?

A. Yes, sir.

Q. And can you provide examples of those?

A. Most recently, um, we've had instances of foreign students that have made threats at colleges and universities, and based on reports that came to the attention of law enforcement either by way of local law-enforcement representatives assigned to the Joint Terrorism Task Forces or to the school officials. HSI was brought in to conduct criminal investigations in

coordination with the JTTF in the case of one school, and in the case of another, after the fact, successfully taking action by one, issuing NTAs, in the case of one school, for individuals that were arrested on state charges, and in the instance of the other, issuing an NTA pursuant to a threat made by a student against a university Professor.

THE COURT: What's an "NTA"?

THE WITNESS: A "Notice to Appear," your Honor.

THE COURT: Thank you.

Q. And are there other historical events where the National Security Division has investigated matters relating to immigration?

A. Yes, sir, there is a continuous requirement in that space where the National Security Division has supported our Special Agents that are assigned to the Joint Terrorism Task Forces, and I have the privilege of seeing that information by way of reporting from my personnel at FBI headquarters, sir.

Q. Okay. Was the Boston Marathon Bombing, was that an example of such an immigration-related national security concern?

A. Yes, sir.

Q. And how about the San Bernadino attack?

A. Yes, sir.

Q. Okay, let's be clear about something. Does HSI make evaluations about whether someone may or may not receive a Visa?
A. Yes, sir.
Q. You make the evaluations or -- or how do you make those evaluations?
A. We contribute to that process.
Q. I see. And has that always been the case since HSI was formed in 2003?
A. To the best of my knowledge.
Q. Does HSI make decisions to revoke a visitor's Visa?
A. No, sir.
Q. What agency do you understand makes that decision?
A. The Department of State, sir.
Q. You were aware of the charges in the complaint, um, filed by the American Association of University Professors and other organizations, right?
A. Yes, sir.
Q. I'm going to refer to that organization as AAUP.
Are you familiar with the allegations that the government is targeting certain foreign Visa and green card holders for protesting?
A. Yes, sir.
Q. So that we can address them, describe your

understanding of what those allegations are?
A. That we are looking to, um, foreign students and/or potential faculty members and targeting them based on their speech alone.
Q. Does the U.S. government target individuals for removal from the U.S. based solely on participating in public protests?
A. No, sir.
MS. KRISHNAN: Objection.
THE COURT: The objection's overruled. The answer may stand.
Q. In the last couple of years, have you been aware of incidents relating to public safety at public protests?
A. Yes, sir.
Q. And, um, how are you aware of that?
A. Through reporting, um, to my division by way of personnel assigned to the Joint Terrorism Task Forces.
Q. Okay. And I believe earlier you discussed threats at school offices, right, is that what you're referring to here?
A. Yes, sir.
Q. Has HSI turned its attention to what is happening at certain on-campus protests?
A. HSI is aware of those activities based on

referrals that come to our agency, sir.
Q. AD Watson, people have the right to protest in this country, don't they?
A. Yes, sir.
MS. KRISHNAN: Objection.
Q. And people have the right to --
THE COURT: Overruled in that form and the answer may stand.
Q. People have the right to peaceably assemble in this country, correct?
A. Yes, sir.
Q. Then why is HSI aware or -- of what's happening at protests around the country?
A. Upon receipt of referrals and/or information to our Office of Intelligence, sir.
Q. And how does that trigger HSI's statutory authority?
A. The first opportunity comes from the allegation, and then it is to, one, identify either associations or activity, or conduct by persons that are identified in the referral.
Q. Why doesn't HSI just wait until an action or a violence has happened to act?
MS. KRISHNAN: Objection.
THE COURT: Well I think that's too general.

Let's come to this case.
Q. How many different Presidential administrations have you worked under?
A. At least 4 to 5, sir.
Q. With the 4 to 5 administrations you've worked under, have HSI's statutory authorities changed in any material respect?
A. No, sir.
Q. A different question.
With any of these 4 to 5 administrations, has HIS's priorities executing its statutory mission changed?
A. Yes, sir.
Q. When the Trump administration was voted in in November, did that alter in any respect HSI's statutory mission?
A. No, sir.
Q. Since the beginning of President Trump's second term, have the protocols or standards for HSI's enforcement of its statutory mission changed in any respect?
MS. KRISHNAN: Objection, lack of foundation.
THE COURT: Well to the extent of his authority and knowledge, I'm going to let him answer.
Has it within your purview?

THE WITNESS: No, sir.
THE COURT: All right, that may stand.
Q. Are you familiar with what an "Executive Order" is?
A. Yes, sir.
Q. Can you describe for the Court your understanding of what is an Executive Order?
A. An Executive Order is what I will frame as the Commander's intent, by way of the President of the United States, and direction for the Executive Office, and the agencies and department therein, to action accordingly pursuant to the laws that they have available.
Q. In your career, have you had occasion to be part of HSI's response when implementing the objectives of an Executive Order?
A. Yes, sir.
Q. And based on that experience, describe for the Court how HSI responds to Presidential executive orders?
A. Upon more recently notification of an Executive Order from the Trump administration, we look to identify existing lines of effort in program divisions that can complement the requirements or the desired in-state. So we're already looking at our lines of effort to include tactics and procedures that could prove helpful in

fulfilling the requirements therein.

THE COURT: Let me tell you what I heard you say.

In the current administration, upon receipt of Executive Orders, you align your resources and priorities, within the statutory framework or regulatory framework, best to accomplish those goals, is that fair?

THE WITNESS: Yes, your Honor.

THE COURT: All right.

Q. AD Watson, this year you referenced an Executive Order, um, issued by the Trump administration. Was this Executive Order relating to national security?

A. Yes, sir.

MR. KANELLIS: Your Honor, may I approach?

THE COURT: You may.

MR. KANELLIS: Let the record reflect I am presenting the witness what has been marked and admitted into evidence as Exhibit 70.

Your Honor, I have a copy for you, if you would like.

(Hands up.)

MR. KANELLIS: 70.

(On screen.)

Q. Mr. Watson, have you had an opportunity to -- AD Watson, have you had an opportunity to look over this document?

A. Yes, sir.
Q. Are you familiar with this document?
A. Yes, sir.
Q. Briefly describe for the Court what is this document?
A. "Protecting the United States Against Foreign Terrorists and other National Security and Public Safety Threats."
Q. And when did you, um, see this document for the first time?
A. The latter part of January 2025, sir.
Q. And this came from President Trump's office, correct?
A. Yes, sir.
Q. And what was your understanding of what this order related to?
A. Screening and vetting of, um, foreign nationals and aliens.
Q. When you received this Executive Order, did HSI already conduct screening and vetting of foreign aliens?
A. Yes, sir.
Q. What did you do with respect to your responsibilities in your office in response to this, um, upon receipt of this Executive Order?
A. Ensured that my subordinate staff, one, was aware,

and to executing operations accordingly.
Q. What do you mean by "executing operations accordingly"?
A. Existing screening and vetting operations, sir.
Q. And can you elaborate a little bit about what that means in terms of what the National Security Division actually did?
A. Yes, sir. So through process on an annual basis, the National Security Division receives just under 1.3 million records from the U.S. Customs and Border Protection arrival and departure information system. In addition to that, we also receive records from the Student Exchange Visitor Information System, and we also receive records from the Department of State Bureau of Consular Affairs as it relates to potential overstays that are believed to be within the Continental United States.
Q. Did you understand this Executive Order, when you reviewed it and received it, to change HSI's authorities in any way?
A. No, sir.
Q. Did you understand this Executive Order to change HSI's protocols for arrest or investigation?
A. No, sir.
Q. Did it change or alter the tools HSI already had

available with respect to conducting investigations?
A. No, sir.
Q. Did you -- did HSI, in response to this Executive Order, and your office in particular, develop a plan of action to implement the objectives of this Executive Order?
A. Yes.
Q. And can you describe, um, generally to the Court what did that plan entail?
A. That plan entailed a unit within the Office of Intelligence to process referrals, um, from a variety of sources, um, to complement the Executive Order and our existing lines of effort.
Q. Did that, um, initiative that you've just described involve coordination with the Department of State?
A. Yes, sir.
Q. And can you describe for the Court, um -- well, strike that.
Had -- prior to this Executive Order, had HSI in the past coordinated with the Department of State to implement national security interests?
A. Yes, sir.
Q. And describe how you've done so, you, HSI and NSD, have done so in the past?

A. So in the past, with regards to coordination from the Department of State, we've had that through our Human Rights Violators and War Crimes Center, we've had the pleasure of a virtual and/or part-time representative from the Department of State supporting that initiative in the space of human rights violators and war criminals.

Conversely, we've also leveraged that Department of State asset through our Counterthreat Lead Development Unit, as it relates to international military students that are in the United States, that sometimes go absent without leave. And upon receiving notifications from the Department of Defense of that declaration, we then in turn coordinate with the Department of State to make sure that they are aware of that status issue, and then take appropriate action as deemed necessary.

Q. With respect to the Executive Order that is contained in Exhibit 7, you indicated you coordinated with State. Well how did you -- what steps did you take to coordinate with State?

THE COURT: Actually I'm going to interrupt.

Your testimony is that following the Executive Order, you developed a plan of action concerning these matters.

Is that written down anywhere?

THE WITNESS: Not to my knowledge, sir.

THE COURT: All right. Describe it, as best you can, what's the plan now?

THE WITNESS: The plan was -- a team, based within the Office of Intelligence, that would conduct analysis on referrals from a variety of sources and prepare Reports Of Analysis for review and consideration and potential referral to the Department of State.

THE COURT: And these Reports of Analysis, I've heard them referred to as "ROAs," is that correct?

THE WITNESS: Yes, your Honor.

THE COURT: And that's -- in essence, that's the plan?

THE WITNESS: Yes, your Honor.

THE COURT: Go ahead, Mr. Kanellis.

MR. KANELLIS: Your Honor, you anticipated my next line of questions.

THE COURT: Well go ahead.

Q. Which is, um, AD Watson, for purposes of this trial, have you reviewed a visual depiction of the collaborative process between DHS and State?

A. Yes, sir.

Q. And would this chart help you to explain to the Court in understanding how that process worked?

A. Yes, sir.

(Interruption.)

THE COURT: He hasn't shown it to you yet. You're assuming it will help you. I assume he's going to show you what we have marked as HN.

Is that right?

MR. KANELLIS: HO?

THE COURT: Well maybe this is something else. All right.

MR. KANELLIS: I'm not sure about HO. I have the exhibit here, your Honor, and we will --

(On screen.)

MR. KANELLIS: Your Honor, may I approach?

THE COURT: You may.

(Hands to witness and judge.)

Q. AD Watson, we have on the screen here a visual PowerPoint presentation to assist in your testimony to the Court.

Can you describe to the Court, in a little more detail, how this initiative between State and DHS works with respect to DHS's response to the Executive Order?

A. Yeah. So as I understand it, the HSI Office of Intelligence was the "process owner," if you will, by way of their employees being criminal analysts to conduct analyses of referrals of information from a

variety of sources. Those analysts in turn, um, upon receipt of those referrals, would conduct open-source analysis and various checks to, one, validate the availability of information and/or the referral, and they would put together what's called a Report of Analysis. That Report of Analysis was prepared and reviewed and ultimately submitted for approval within the Office of Intelligence leadership framework, and then from there, um, with a letterhead memorandum prepared, in coordination with the Office of the Principal Legal Advisor as well as HSI's Special Agents assigned to the Office of Intelligence on detail, a package for referral to me as the Assistant Director.

Q. Okay. And so here we have, on the screen, depicting the HSI Director for National Security -- the Assistant Director for National Security Division, and that's you?

A. Yes, sir.

Q. Now what did you do when you received this packet?

A. Upon receipt of the approved packet, um, I then reviewed the letterhead, um, memorandum -- the letterhead memorandum letter, as well as the ROA, and with approval signed it, meaning I'm approving the submission package together, and providing a digital signature, and then referred it to the Department of

State.

THE COURT: I just want to -- your testimony was you reviewed it, and with approval, signed it, those were the words that you used. But I understand that to mean you reviewed it, and if you approved it, you signed it?

THE WITNESS: Yes, your Honor.

THE COURT: All right. I understand.

Q. And with respect to the State Department, did you participate in the internal processes of the State Department regarding this referral you sent to them?

A. No, sir.

Q. Did you hear back from the State Department at any point in time?

A. Sometimes.

Q. Sometimes. Not all the time?

A. Correct.

Q. Okay. Well let's pick up again from when you heard back from the State Department.

What happened then?

A. Thank you. We, on occasion, would receive notification from the Department of State that an action letter is forthcoming by way of transmission from the Department of State's Executive Secretary to the ICE Executive Secretary.

Q. And what happened next?
A. Upon receipt of that correspondence, we would then transfer it to the HSI Office of Domestic Operations and then from there to the appropriate HSI field office for action as deemed appropriate.
THE COURT: Just so as I understand this chart. Back it comes with the notation, "Action Letter," but it's parallel, it runs through you and through the ICE Executive Secretary, have I got that correct?
THE WITNESS: Yes, your Honor.
THE COURT: So who, um -- but once that action letter comes out, I don't see any place where action stops, it -- in any event you're notified, the Secretary is notified, and the action letter moves on, because this is a letter for action, to the HSI Domestic Operations Division.
Have I got that right?
THE WITNESS: Yes, your Honor.
THE COURT: So you're notified, but you're not asked to do anything else. Now comes the action from the Department of State?
THE WITNESS: Yes, your Honor.
THE COURT: Okay.
THE WITNESS: And I would further add to that, that in the beginning, some went to me directly, and the

others flowed through the Executive Secretary. So that's the reason why you have two arrows. There were, um, variations in who it went to. But those were the two recipients, either myself or the ICE Executive Secretary.

THE COURT: Or both?

THE WITNESS: Yes, sir.

Q. So then it went to the HSI SAC office, right?

A. Yes, sir.

Q. And in the SAC office, these are regional offices that would be in the place where the individual and his targeting is supposedly located, is that a fair statement?

A. Yes, sir.

Q. Okay. And then were arrests, um, made at that point?

A. Yes, sir.

Q. And what if somebody had left the country, were arrests made?

A. No, sir.

Q. Okay.

THE COURT: Well he's given an example that would justify these red boxes that say "No action." But other than having left the country already, where there other grounds at that stage for no action? Does my question

make sense?

THE WITNESS: It does, your Honor.

For the purpose of this, um, matter, um, no. But in other contexts the answer can be no action. Because if someone does leave by way of a voluntary departure, then there's no action, they left on their own accord.

THE COURT: All right.

THE WITNESS: So that's the reason why you would have that box there.

THE COURT: Thank you.

MR. KANELLIS: Your Honor, we, pursuant to Rule 107, we move into evidence, as a pedagogical exhibit, um, the exhibit, um, you have in your hand.

MS. KRISHNAN: Objection, this is a chalk, it doesn't need to be in evidence.

MR. KANELLIS: Your Honor, you --

THE COURT: Wait a minute. I'm a little unclear here, I guess. I'm perfectly willing to take this as a chalk as I took HN. Isn't that satisfactory?

MR. KANELLIS: Yes, your Honor, it's just a device to aid the Court.

THE COURT: It is, and it is as I understand it.

Q. AD Watson, as HSI's Assistant Director for National Security, do you have some familiarity with the volume of protests that have occurred in the United

States after the attacks of October 7th, 2023?
A. Yes, sir.
Q. And, um, how would you describe the number of protests based on your personal knowledge?
A. It increased.
Q. Have these protests occurred around the country?
A. Yes, sir.
Q. And to your knowledge have any of these protests included speech against the State of Israel or in support of Palestine?
A. Yes, sir.
Q. With respect to the volume of leads that the National Security Division has reviewed, through this process you've just described, has the volume of leads increased by HSI -- received by HSI increased over the last 6 months?
A. Yes, sir.
Q. How much would you say?
A. Um, I'd give it a modest increase, sir.
Q. And have you received leads regarding individuals who have been associated with protests?
A. Yes, sir.
Q. And with respect to the leads you received regarding individuals associated with these protests, about how many total have you reviewed?

A. At least 20. But I don't believe more than 30, sir.
Q. So between the thousands of protests, you've reviewed 20 or 30 referrals, is that a fair statement?
A. Yes, sir.
MS. KRISHNAN: Objection, misstates testimony.
THE COURT: No, he just adopted it. I'm going to let that stand.
Q. I'm going to ask you about five individuals who passed through this referral process you've just described?
Are you familiar with the name "Rumeysa Ozturk"?
A. Yes, sir.
Q. Is Ms. Ozturk one of the individuals referred in the vetting process between DHS and State that you just described?
A. Yes, sir.
Q. Was Ms. Ozturk's referral processed through the vetting procedures you've outlined above?
A. Yes, sir.
Q. And was Ms. Ozturk arrested?
A. Yes, sir.
Q. Was Ms. Ozturk arrested because she engaged in political speech?
MS. KRISHNAN: Objection.

THE COURT: Well I'm going to sustain that. You are leading this witness. You called him.

MR. KANELLIS: All right, that's fine.

Q. Are you familiar with the name "Badar Khan Suri"?

A. Yes, sir.

Q. Is Mr. Suri one of the individuals referred in the vetting process between DHS and State described above?

A. Yes, sir.

Q. And was Mr. Suri's referral given the same multilevel vetting review you've described before?

A. Yes, sir.

Q. Was Mr. Suri arrested?

A. Yes, sir.

Q. Was Mr. Suri arrested because of his political speech?

MS. KRISHNAN: Objection, your Honor.

THE COURT: Sustained.

MR. KANELLIS: Your Honor, what is the basis for the --

THE COURT: You're leading the witness.

Q. Do you know why Mr. Suri was arrested?

A. Yes, sir.

Q. Why was he arrested?

A. Because the State Department took action on his immigration status, sir.

Q. Are you familiar with the name "Mohsen Mahdawi"?
A. Yes, sir.
Q. Is Mr. Mahdawi one of the individuals referred in the vetting process between DHS and State that you described to the Court?
A. Yes, sir.
Q. Did Mr. Mahdawi receive a full vetting for the multiple levels of review you described?
A. Yes, sir.
Q. And was Mr. Mahdawi arrested?
A. Yes, sir.
Q. And why was Mr. Mahdawi arrested?
A. A change by the Department of State in his immigration status.
Q. Are you familiar with the name, um, "Mahmoud Khalil"?
A. Yes, sir.
Q. Is Mr. Khalil one of the individuals referred to in the -- that's referred in the vetting process between the Department of Homeland Security and State that you've described to the Court?
A. Yes, sir.
Q. Did Mr. Khalil's case receive a full vetting through the process you've described to the Court?
A. Yes, sir.

Q. Was Mr. Khalil arrested?
A. Yes, sir.
Q. And why was Mr. Khalil arrested?
A. Action by the Department of State against his immigration status.
Q. Are you familiar with the name "Yunseo Chung"?
A. Yes, sir.
Q. Is Ms. Chung one of the individuals referred in the process you've described regarding the State and DHS collaboration you've described to the Court?
A. Yes, sir.
Q. And did Ms. Chung's case receive a full multilevel review, the same multilevel review you've described to the Court?
A. Yes, sir.
Q. In your career, AD Watson, going back more than 20 years to 2003, have you ever heard of a policy instituted by the U.S. government to target people for deportation based upon engaging in political speech?
MS. KRISHNAN: Objection.
THE COURT: Overruled.
A. No, sir.
Q. In the last year, have you heard about any Visa revocation decisions or removal decisions made by anyone in the U.S. government that remains solely because

someone engaged in political speech?

MS. KRISHNAN: Objection.

THE COURT: Sustained.

Q. Are you aware, in the last year, of any decisions made by anyone in the U.S. government regarding removing a person from the United States for political speech?

MS. KRISHNAN: Objection.

THE COURT: Overruled.

A. No, sir.

MR. KANELLIS: We tender the witness.

THE COURT: Ms. Krishnan.

CROSS-EXAMINATION BY MS. KRISHNAN:

Q. Good morning, Mr. Watson.

A. Good morning.

Q. You were the Assistant Director at the National Security Division, correct?

A. I am.

Q. In HSI?

A. Correct.

Q. That makes you the senior-most official in the National Security Division?

A. Correct.

Q. You report to Acting Deputy Executive Associate Director William Russo?

A. Today, yes.
Q. And you've been in your current role since July 2020?
A. Correct.
Q. And you've worked at DHS since its inception?
A. Correct.
Q. In 2003?
A. Correct.
Q. The President has issued several Executive Orders that relate to HIS's work, right?
A. There are overlaps in the Executive Orders and HSI's investigative authorities, yes.
Q. You need to be familiar with these Executive Orders to do your job?
A. I'm sorry, I'm not following the question, Madam.
Q. Well the Executive Orders that you say overlap with HSI's work, you have to be familiar with those Executive Orders to do your job, correct?
A. We have to be familiar with our authority by way of statute and that training comes from the Federal Law Enforcement Training Center in Brunswick, Georgia. So those are the authorities that give us the ability to conduct investigations. So I would reference the Homeland Security Act of 2003 as well as DHS Delegation Order 7030.2, it is those authorities that give HSI the

ability to conduct criminal investigations.
Q. So your testimony is that you don't need to be familiar with Executive Orders that touch on HSI's work?
MR. KANELLIS: Objection, mischaracterizes --
THE COURT: Sustained, that wasn't his testimony.
Q. Do you need to be familiar with Executive Orders to do your job?
A. (Pause.) Do I need to have situational awareness of Executive Orders? It's helpful.
Q. Did you tell Mr. Kanellis that you were familiar with Executive Order 14161?
A. May I see it again to make sure I'm speaking to the correct one.
THE WITNESS: (From Judge.) Thank you, sir.
A. (Looks.) Yes.
Q. This Executive Order is titled "Protecting the United States from Foreign Terrorists and other National Security and Public Safety Threats"?
A. Yes, ma'am.
Q. Okay. And you are also familiar with Executive Order 14188?
A. By way of this matter, yes.
Q. And it's titled, "Additional Measures" --
THE COURT: Your answer then, that, um -- here's what I hear.

Once this case came up and you were preparing to testify and the like, you became more familiar with that Executive Order, is that accurate what you were saying to me?

THE WITNESS: Yes, your Honor.

THE COURT: And before that you may have known that it existed, but at least in terms of touching on what you say "situational awareness," doing your job, you didn't have any particular, um, awareness of that?

THE WITNESS: Yes, your Honor.

THE COURT: Are my statements fair? I don't want to put anything in your mouth.

THE WITNESS: Your statements are fair. Yes, your Honor.

THE COURT: All right.

Go ahead.

Q. ICE is enforcing Executive Order 14188, is that correct?

A. I'm sorry, state that again. Someone was coughing.

Q. ICE is enforcing Executive Order 14188, isn't it?

A. "Enforcing" the Executive Order?

Q. Yes.

A. May I see it, please?

Q. You'd like to see the Executive Order?

A. Yes, ma'am. I don't have it in front of me.
Q. It's being pulled up on the screen.
A. Okay. (Looks.)
Q. All right. I'm going to ask you again.
Is ICE enforcing the Executive Order 14188?
A. So, Counselor, I only see Page 1 in front of me, and this Executive Order speaks to specific lines of effort and gives primacy to various departments. So I'll reference in Section 3, um, Section C, that the attorney in general is encouraged to employ appropriate civil rights enforcement authorities. ICE is a component within the Department of Homeland Security and not within that framework. So since I can only see the first page, I don't think it's wise to speak beyond that under oath.
Q. And, Mr. Watson, you were deposed in this case, correct?
A. Yes.
Q. You were deposed just over a month ago on June 11th?
A. The month of June, yes. The date I don't remember.
Q. And you understood that you were then under oath?
A. Yes.
Q. And you had an attorney present with you at that

deposition?
A. Yes.
Q. You were asked this question and gave this answer at that deposition.
Question: "So as you indicated in your declaration, ICE enforces the Executive Order 14188, correct?" And your answer was "Yes, ma'am"?
MR. KANELLIS: Objection, your Honor. Can the witness and can I see the transcript so we can --
THE COURT: Well she's read it, and in these circumstances, she's entitled to read it. If she wants to question him, then she should show it to him. But that's what he said on his deposition and I'm allowed to pair it with his testimony at trial, and I do.
Go ahead. Go ahead, Ms. Krishnan.
MS. KRISHNAN: Thank you.
Q. HSI is implementing the two Executive Orders we've discussed?
MR. KANELLIS: I'm going to object again, your Honor, what she said mischaracterizes --
THE COURT: Wait a minute. When I need your argument, I'll ask for it. The objection is sustained.
See he hasn't said it.
MS. KRISHNAN: I was reading from the data, but I believe we've now got the deposition transcript up on

the screen. And this starts at the bottom of Page 11, um, 111, my apologies, and it runs on to the top of 112.

(On screen.)

Q. So it says: "So as you indicated in your declaration, ICE enforces this Executive Order 14188, correct?" And the answer states, "Yes, ma'am."

You said that, right?

A. It's captured in the transcript, Counselor.

Q. Okay, thank you.

And HSI is implementing --

A. I'm sorry, the screen just went dark. I apologize. I can't see it anymore.

Q. Understood. I'm not asking -- this question isn't about your deposition transcript.

HSI is implementing EO 14161 and EO 14188, is that right?

A. (Looks.) HSI has participated in support of Enforcement and Removal Operations as it relates to Title VIII initiatives. So by virtue of that support that HSI, as a program office, has provided to ERO, that that can apply on a large macro scale. But I can't speak to individual instances as I do not have oversight of every operation or investigation that is being conducted in the United States.

Q. HSI has implemented the Executive Orders we've

discussed by initiating a new program, right?
A. That's fair.
Q. Uh-huh. And you learned of this program through an executive briefing in March?
A. That's correct.
Q. Attended by senior HSI leaders?
A. That's correct.
Q. Including Acting Deputy Executive Associate Director Derrick Gordon?
A. Gordon, yes.
Q. And then Acting Executive Associate Director Robert Hammer?
A. That's correct.
Q. Assistant Director of the Office of Intelligence Peter Hatch was also present?
A. That's correct.
Q. As was your deputy, Bradley Etter?
A. That's correct. Well not my deputy, Mr. Etter is the deputy of Assistant Director Peter Hatch. Mr. Etter works within the Office of Intelligence. He's not my deputy.
Q. Understood. And the purpose of this program, what you called the Plan of Action letter, it was to identify protesters whose actions violated the Executive Orders?
A. (Pause.) The plan of action was to address the

referrals of information, um, as it relates to it. So I can't say, as you stated, that is the plan of action, that's not what I recall specifically.

Q. But you became aware of activities at student protests from the Reports of Analysis, that was your testimony?

A. Me personally, yes.

Q. Okay. And the program we'd been discussing, it led to a new process, right?

A. I don't know that it's a new process, because I can't speak to the lines of effort that the Office of Intelligence already has in place.

Q. Well I'm going to return to the deposition transcript. (Pause.) All right, well before I get to the transcript.

This process was new in your time at HSI, is that right?

A. It's new in my role as the Assistant Director where we, by way of the National Security Division, are providing a resource in support thereof.

Q. Were you aware of this process before you assumed your current role as Assistant Director in the National Security Division?

A. Not to my knowledge, no.

Q. Okay. And the process we're discussing, that

involved collaboration between the Office of Intelligence, the National Security Division, and the State Department, right?

A. If you're referencing the meeting between Mr. Hammer, Mr. Gordon, Mr. Hatch, Mr. Etter, and myself? Yes.

Q. And pursuant to this process, the Office of Intelligence creates Reports of Analysis?

A. The Office of Intelligence creates Reports of Analysis by way of a mission-essential function, that's what they do regardless.

Q. "Yes" or "No," the Office of Intelligence creates Reports of Analysis?

MR. KANELLIS: Objection, asked and answered.

THE COURT: It was. But just so I'm clear.

You've always been providing Reports of Analysis, is that correct?

THE WITNESS: Yes, your Honor.

THE COURT: All right. But then you have this meeting -- here's what I'm getting from this.

So you have this meeting, and so your focus in doing what you've always done, that does change about the emphasis on a certain aspect of things.

Isn't that right?

THE WITNESS: Yes, your Honor.

THE COURT: All right.
Q. And at this briefing, you discussed Reports of Analysis on activities contrary to the Executive Orders, those were the specific Reports of Analysis you discussed at this meeting?
MR. KANELLIS: Objection, your Honor.
THE COURT: Sustained, on the deliberative process privileged, what they discussed.
MS. KRISHNAN: This concerns an instruction that was provided at the briefing.
THE COURT: Well you're cross-examining, you may frame it that way, you were instructed thus and so.
MS. KRISHNAN: Okay.
Q. Was the Office of Intelligence instructed to create Reports of Analysis on activities contrary to the Executive Orders?
A. I don't recall that instruction being given or hearing it. I don't recall.
Q. Well as part of the process that we're describing, the Office of Intelligence producing Reports of Analysis on activities contrary to the Executive Orders?
THE COURT: I guess I'm not following. In other words, among the duties that he was expected to see implemented, was Reports of Analysis of activity that ran contrary to the Executive Orders?

MS. KRISHNAN: That's correct.

THE COURT: All right. I follow that.

Is that what you were told? Is that what you were expected to emphasize or focus on, Reports of Analysis of conduct that, among other things, ran contrary to the President's Executive Orders?

THE WITNESS: That was a deliverable that would be produced upon completion of analysis. So it's an output, your Honor, that could result from their efforts to review information received from various sources.

THE COURT: Right, I follow that. So let me put it to you another way.

One of the things you were directed to do was look at your leads and see if, having done your professional work, there's conduct contrary to the Executive Orders?

THE WITNESS: Yes, sir, your Honor.

THE COURT: All right.

Go ahead, Ms. Krishnan.

MS. KRISHNAN: Thank you.

Q. And these reports were then sent to the National Security Division?

A. If they were approved.

Q. Approved by the Office of Intelligence?

A. That's correct.

Q. Uh-huh. And upon receipt of these reports, the

National Security Division reviews them?
A. That's correct.
Q. And if the National Security Division determines that an ROA should be referred to the State Department for potential action, it refers that Report of Analysis to the State Department?
A. In coordination with the Office of the Principal Legal Advisor.
Q. Senior leaders at HSI have been continually updated about the new program, correct?
A. I don't understand the question in terms of "continually updated"?
Q. Well have senior leaders received updates about the new program?
A. They have received briefings and updates on the work and progress thereto.
Q. This program has been discussed in numerous meetings since the executive briefing, right?
A. (Pause.) It has come up on several occasions from its inception, but I can't say when those briefings ceased.
Q. Well it has been discussed on at least a weekly basis, right?
A. At its inception, yes.
Q. And in these meetings, senior HSI leaders were

present?
A. Yes.
Q. I want to talk more about your role in the process we've been discussing.
You received instructions in connection with the process, right?
A. Yes.
Q. From senior HSI leaders?
A. Yes.
Q. Including Derrick Gordon?
A. Yes.
Q. And Robert Hammer?
A. Yes.
Q. You were instructed to make referrals to the State Department?
A. Yes, when deemed appropriate.
Q. Uh-huh. These referrals included the Report of Analysis?
A. Yes.
Q. And an accompanying letter?
A. Yes.
Q. That was signed by you?
A. Yes.
THE COURT: I just want to get the names right. From Derrick Gordon and Robert --

THE WITNESS: Hammer.

THE COURT: Hammer. Yes. Thank you.

Q. And when deemed appropriate, you sent these referrals directly to John Armstrong?

A. He was one recipient, yes.

Q. He's the head of the State Department's Bureau of Consular Affairs?

A. That is my last understanding.

Q. HSI couldn't act on these referrals alone?

A. Correct.

Q. HSI needed Secretary of State Marco Rubio or Senior Bureau Official John Armstrong to decide whether it was appropriate for HSI to act or not?

A. (Pause.) Their decision is pursuant to their authorities, not ours.

THE COURT: Well I think what she's asking is you understood that, um, when she says you "needed them" under the law to take it any further, it was a decision that resided by law in the Secretary of State or in some instances Mr. Armstrong, is that what you thought?

THE WITNESS: Yes, your Honor.

THE COURT: All right.

Q. And some of these referrals sought the Secretary of State's assessment whether a noncitizen's activities in the U.S. would compromise a compelling U.S. foreign

policy interest, right?
A. Correct.
Q. In some of these referrals, it was the State Department's assessment whether to revoke a Visa, correct?
A. Correct.
Q. You had conversations with the State Department about these referrals?
A. Only to inform that they are coming.
Q. Okay. The first time you had one of these conversations was in March?
A. That seems accurate.
Q. You made the referral in Mahmoud Khalil's case?
A. I signed the letter, yes.
Q. And in Yunseo Chung's case?
A. I signed that letter too.
Q. In Rumeysa Ozturk's case?
A. I signed that letter.
Q. In Mohsen Mahdawi's case?
A. I signed that letter.
Q. In Badar Khan Suri's case?
A. I signed that letter.
Q. And these referrals I just mentioned, they were part of any process we've been discussing?
A. Yes.

Q. All of these referrals went through you?
A. Yes.
Q. And you've made other referrals through this process?
A. Yes.
Q. And as part of this new process, you've seen Reports of Analysis that discuss a person's pro-Palestinian views?
A. (Pause.) Some could have contained that information, but I can't speak to every one without the benefit of the document in front of me.
Q. Some did in fact contain that information, correct?
THE COURT: Well he just answered that.
MS. KRISHNAN: He said "could have."
THE COURT: Okay, I stand corrected. You are right.
Are you able to testify that some did?
THE WITNESS: I would respectfully ask your Honor, since I'm under oath, to have the benefit of a review.
THE COURT: All right.
Q. At your deposition you were asked, "Since this new program began in March, have you seen any ROAs that discussed someone's pro-Palestinian views?" And your answer was "Yes."

Do you recall saying that?
A. I do.
Q. And you have seen ROAs that discuss a person's anti-Israel view?
A. I have seen those, yes.
Q. You've also seen ROAs that discuss a person's alleged pro-Hamas advocacy?
A. Yes.
Q. You've seen ROAs that discuss a person's alleged antisemitic activities?
A. Yes.
Q. And your best recollection is that the number of referrals that you have made since March is between 10 and 50?
A. I do recall giving that answer, yes.
Q. Uh-huh. This was as of June, when we had the deposition?
A. Yes.
Q. In deciding to make referrals as part of this process, you have relied only on information contained in the Reports of Analysis that you received, right?
A. Yes.
Q. In other words, the basis for referral in each case was the Report of Analysis?
A. Yes.

Q. You read the ROAs you received before deciding whether to refer them to the State Department?
A. I review them, yes.
Q. And you review them to determine whether they are complete?
A. Yes.
Q. In other words, you review them to make sure that they're readable?
A. That's fair.
Q. And to make sure the ROA contains what it says it contains?
A. That's fair.
Q. And if they are complete, you send them to the State Department?
A. Yes.
Q. In fact in every case you have received a Report of Analysis as part of the new program we've been discussing, you've referred it to the State Department?
A. (Pause.) Yes.
Q. Because the question whether a Visa should be revoked or whether a removability determination should be made, that's a determination for the State Department to make?
A. Yes.
Q. I'd like for us to look at one of the letters that

you wrote. I will show you a document that has been premarked as D by the government.

MS. KRISHNAN: Your Honor, may I approach?

THE COURT: This is not yet in evidence?

MS. KRISHNAN: It's not in evidence, your Honor.

THE COURT: You may.

(Hands.)

MR. KANELLIS: Your Honor, I'm going to object to the extent that this document is attorneys-eyes only.

THE COURT: For that reason we're not going to put it on the public screen, but we may use it.

MR. KANELLIS: Thank you, your Honor.

A. (Reads.)

Q. This is a true and accurate copy of the referral letter that you sent in Mr. Khalil's case?

A. It appears to be the case. But for clarification, you said earlier a letter I "wrote," and there's a difference between you writing a letter and signing a letter. So I want to be clear that in the questions you've asked me up to this point, signing is applicable.

Q. Okay, so this is a true and accurate copy of the referral letter that you sent in Mr. Khalil's case?

A. That I signed and that I sent.

Q. Thank you.

MS. KRISHNAN: I'd like to offer this as an

exhibit, um, Number 242.

MR. KANELLIS: Objection, your Honor, no foundation for a hearsay exception.

THE COURT: Overruled. It's admitted as Exhibit 242 in evidence.

(Exhibit 242, marked.)

Q. Now you testified at your deposition -- you testified at your deposition that you don't --

THE COURT: Well I think I should simply say for everyone's guidance that my receiving it in evidence means only that it is part of the record in this case and, um, it does not lose its attorneys-eyes only designation. I think I've made that clear with respect to documents given to plaintiffs and the like. Where it's agreed they're attorneys-eyes only, that restriction remains until further order of the Court.

But go ahead, it is in evidence, and it's part of the record upon which I will review and base my decision.

Go ahead.

MS. KRISHNAN: Thank you, your Honor.

May I just clarify that, um, what you just said means that I can't, um, quote anything from the document?

THE COURT: No, you can.

MS. KRISHNAN: Oh, I can quote. Thank you.
Q. Now you testified at your deposition that you don't determine whether an activity is antisemitic in your work, correct?
A. Ma'am, I don't have my testimony in front of me to confirm that, so it would be helpful, if that's available, to see it.
MS. KRISHNAN: Let me show it to you.
(On screen.)
Q. Could you read lines -- this is on Page 135, Lines 4 to 10.
A. (Reads.)
Q. And please tell me when you're done reading.
A. Yes, I see that. Yes, ma'am.
Q. Thank you.
So you testified at your deposition that you don't determine whether an activity is antisemitic, correct?
A. Yes.
Q. And you testified that you don't know how someone else at HSI determines whether an activity is antisemitic?
A. Correct.
Q. Now if you look at, um, 242, in the first sentence here you state: "I am writing to provide a summary of the actions by Mahmoud Khalil that violate President

Trump's Executive Orders on antisemitic"?
A. Uh-huh.
Q. So you don't know how HSI determines activities are antisemitic?
A. I don't because I didn't.
Q. Okay. And so you don't know -- but you say here, um, that Mr. Khalil's actions violate President Trump's Executive Orders on antisemitism?
A. I signed the letter, yes.
THE COURT: Who -- these letters, they may differ in detail of course, but who would prepare such a letter for your signature?
THE WITNESS: The letters that --
THE COURT: And I don't mean that disparagingly, people prepare letters for my signature.
Go ahead.
THE WITNESS: Thank you, your Honor.
So the letters accompany the ROA. I don't know who prepared it within the Office of Intelligence --
THE COURT: But within the team that put the packet together -- you get a packet?
THE WITNESS: Yes, sir.
THE COURT: And you testified -- and I don't mean to delay it, but you've testified to your review of the packet, and having reviewed it and read the letter, you

have signed it.
Is that a proper characterization of your involvement in these letters?
THE WITNESS: Yes, your Honor.
THE COURT: Go ahead.
Q. When you signed this letter, did you adopt its contents?
THE COURT: Well I think that's what "signing" means and that's the inference I'm going to draw.
MS. KRISHNAN: Thank you, your Honor.
Q. And just to be clear, the Executive Orders referred to in this first sentence, they are EO 14161 and EO 14188, correct?
A. That's fair.
Q. Now during your deposition you testified that you don't know how HSI assesses whether a person's presence or activities in the U.S. could have adverse foreign policy consequences?
MR. KANELLIS: Objection, your Honor, what he testified to in his deposition is irrelevant, she can just ask him the question.
THE COURT: Well I'll make that determination. But he's present and so I think your use of the deposition should be confined to impeaching him. And I'll sustain the objection on that ground.

Q. You don't know how HSI assesses whether a person's presence or activities in the U.S. could have adverse foreign policy consequences?
A. Can you repeat that question again, please?
THE COURT: You don't know whether a person's presence or activities in the United States could have adverse foreign policy consequences?
THE WITNESS: Correct.
Q. And you don't know who at HSI makes that determination?
A. Correct.
Q. So turning to -- back to the first sentence of the first paragraph of Exhibit 242.
It states that Mr. Khalil's actions, quote, "may be sufficient for the Secretary of State to determine there are compelling adverse foreign policy consequences to the U.S. from Mr. Khalil's presence here," right?
A. (Looks.) I'm sorry, when you're reading that sentence, did you say the first sentence in the first paragraph?
Q. Yes.
A. (Reads.) Okay. "May be sufficient for the Secretary of State to determine" -- yes.
Q. So you don't know how HSI made that assessment?
A. (Pause.) I don't, but I would defer to the Report

of Analysis that was completed by the Office of Intelligence and the intelligence professionals that were responsible for it.

Q. Is your testimony that the Report of Analysis created by the Office of Intelligence included that assessment?

A. When you say "included that assessment," what do you mean?

Q. Well the assessment we've been talking about is the Secretary -- that it may be sufficient for the Secretary of State to determine that there are compelling adverse foreign policy consequences to the U.S. from Mr. Khalil's presence in the United States?

A. The Report of Analysis that's done by the Office of Intelligence professionals is materials that they have found through their research, those materials are what is provided in that determination for the benefit thereof.

Q. "Yes" or "No." The Report of Analysis created by the Office of Intelligence included the assessment that I just described, that it may be sufficient for the Secretary of State to determine that there are compelling adverse foreign policy consequences for the U.S.?

MR. KANELLIS: Objection.

THE COURT: No, she may have the question in that form. Overruled.

You may answer.

A. By including the Report of Analysis as part of the package? I think that's fair.

Q. And I'm asking about the contents of the Report of Analysis?

A. I understand, but I don't have that in front of me.

THE COURT: He answered your question that he thought it was fair.

MS. KRISHNAN: Okay, well the ROA will speak for itself.

Q. And the agency has not decided what activities contrary to the EO means?

A. I'm sorry, which agency?

Q. ICE. ICE has not decided what activities are contrary to EO 14161 and EO 14188, correct?

A. This letter is coming from HSI, so I can't speak for ICE. I can only speak to the program office on the letter.

Q. All right. Let me ask about HSI then.

Has HSI -- withdrawn.

HSI has not decided what activity is contrary to the Executive Order means?

A. I'm sorry, is that a question for me?
Q. That is a question for you.
A. By way of the Report of Analysis being submitted with the letterhead referral, it's for that consideration. Hence the word "may."
Q. "Yes" or "No," Mr. Watson. Has HSI decided what activities are contrary to the Executive Orders?
THE COURT: I guess really I don't understand the question. He's got before him a Report of Analysis. He signs the letter which was intended to move the thing along to the Secretary of State, or to Mr. Armstrong anyway, and I infer that he adopts what he signed after reviewing the Report of Analysis. So the logical inference from that, given the language here, is that the appropriate individuals who did the investigation came to that conclusion. But if you're asking whether there was a separate, um, standard, "This conduct fits," "This conduct does not," that's a different question. That's my confusion.
MS. KRISHNAN: Your Honor, that's precisely why I want to ask this question, because in his deposition testimony he stated that HSI had not decided what activities are contrary to --
THE COURT: Well I haven't heard any evidence to suggest that HSI has, as a general matter, decided it,

and -- but again, I say that to help.

About how much more have you got for this witness? Or phrased another way, do you want to take the morning recess?

MS. KRISHNAN: Yes, thank you.

THE COURT: All right. We'll take the morning recess for one half hour till 11:15. We'll stand in recess.

(Recess, 10:45 a.m.)

(Resumed, 11:15 a.m.)

THE COURT: Ms. Krishnan, you may continue.

Q. Mr. Watson, just to finish the topic we were on before the break.

HSI has not adopted standards for deciding what activities violate the two EOs we have been discussing, correct?

A. Not to my knowledge.

Q. And just returning to the letter, Exhibit 242. The first sentence of the third paragraph states that: "Mr. Khalil's involvement in the March 6th, 2025 protest at Barnhard College aligns with the Executive Orders focused on deporting Hamas sympathizers."

Do you see that?

MR. KANELLIS: Objection, she misreads it.

THE COURT: Well it's not exactly what it says,

but, um --

Do you see that sentence, sir?

THE WITNESS: Yes, your Honor.

THE COURT: That was her question. So focus on that sentence.

Now your question?

(Pause.)

Q. So your testimony is that HSI has not adopted, um, a standard for deciding what activities --

THE COURT: He just testified to that. Let's move on.

MS. KRISHNAN: All right.

Q. You don't know whether EO 14188 indicates that it is the foreign policy of the U.S. to combat antisemitism, correct?

A. I'm sorry, ask that question again, please?

Q. You don't know whether EO 14188 indicates that it is the foreign policy of the U.S. to combat antisemitism, correct?

A. I don't have that EO in front of me. So maybe that could be helpful, considering that I'm under oath.

Q. I don't -- the question is whether you know or you don't know?

A. I don't know.

Q. Okay. And you haven't been told whether the U.S.

has a policy of combating antisemitism domestically or abroad?
A. I'm sorry, I haven't been told. I'm trying to understand the question. There's an Executive Order.
Q. The question is, you haven't been told that the U.S. has a policy of combating antisemitism in America and abroad?
A. I don't recall being told, no.
Q. In your letter, um, at the second line of the last paragraph on the first page, you state that: "HSI is concerned that Mahmoud Khalil's protest activities, quote, 'may undermine U.S. foreign policy.'" Correct?
A. Correct.
Q. "May undermine U.S. foreign policy by creating a hostile environment to Jewish students," right?
A. That is one part of the sentence, yes.
Q. You testified earlier, during your direct examination, that your job at HSI is to protect national security and public safety, right?
A. Yes.
Q. That is HSI's mandate?
A. One of them, yes.
Q. And you don't know whether antisemitic activity falls within HSI's national security and public safety mandate?

THE COURT: Ask it again? I didn't understand the question.

Q. You don't know whether antisemitic activity falls within HSI's national security and public safety mandate?

MR. KANELLIS: Objection, foundation.

THE COURT: Well to me it's too vague, because it could. It's so vague.

MS. KRISHNAN: Okay.

Q. Does antisemitic activity fall within HSI's national security mandate?

THE COURT: Again, I don't know what you mean by "antisemitic activity." Two of the witnesses you have called have defined "antisemitism." When we -- if we have any time this morning, it's sort of sensitive, I think -- we're not going to have a bifurcated trial argument, but now that we're pretty much done with evidence, I was going to make some observations sort of to tee up what I'm thinking going into final arguments and to define certain things. One of the things I'm going to define is "antisemitism." And now that I started talking -- and I'm going to define it in the way plaintiffs' witnesses defined it, that is "hostility based upon one's faith or ethnicity to the group." That's what "antisemitism" is.

Now antisemitic activity can range from pure speech to -- and we've seen it, horrific violence. So I don't know what that means.

The objection is sustained.

MS. KRISHNAN: Understood, your Honor. My question is about antisemitic activity as that term is used in Mr. Watson's letter.

THE COURT: Well then can we ask him, to what did you think that phrase meant? What did you think that phrase meant, "antisemitic activity," when you saw you letter?

THE WITNESS: Well there's more to that phrase, and what's left out in the sentence you read was the part about indicating support for a designated terrorist organization, that is where HSI would be concerned pursuant to, as you referenced, our posture and mission as it relates to national security and public safety, and by way of our participation on the Joint Terrorism Task Forces.

Q. So HSI is concerned about antisemitic activity only insofar as it is tied to support for a designated foreign terrorist organization?

A. In this instance it's captured in the letter, each is a case-by-case determination.

Q. Well I'm asking generally, in the context of the

program that we've been talking about, is HSI concerned about antisemitic activities only so far as it demonstrates support for a designated foreign terrorist organization?
A. That could be a trigger in reference thereto, yes.
Q. So is HSI -- so HSI is concerned about antisemitic activity outside of that circumstance?
A. I don't understand the question?
THE COURT: No, no, that question makes sense because your answer was "It could be a trigger."
THE WITNESS: Yes.
THE COURT: And as I listen to that, that suggests that there's other forms of antisemitic activity that also could be a trigger.
Is that what you meant to say?
THE WITNESS: Yes.
THE COURT: Tell me what they are?
THE WITNESS: Other triggers could relate to associations, activities, or conduct that violates the Immigration and Nationality Act or U.S. law.
THE COURT: Well do associations violate the Act? You used the word "associations" and then you went to conduct.
THE WITNESS: Not necessarily, it's a case-by-case determination. Associations would warrant a further

investigation.

THE COURT: For instance, as to one of these individuals, it turned out that the wife of one of these individuals, her father, was an alleged Hamas leader. Now a law-enforcement agency, one imagines, would be interested in that fact. The fact itself might not be useful, but that's certainly an interesting fact. Whatever she's trying to get at, that's what I'm --

What else is there?

THE WITNESS: So --

THE COURT: Something like that? That's an association.

THE WITNESS: The association could be relevant as to a determination of admissibility. So if that factor is known by --

THE COURT: Well my duty here is people we've already admitted they're lawfully in here and the issue the plaintiffs claim is that the way they were -- their Visas were taken away or their status was taken away, they challenge that, that's the issue. So they're lawfully here.

And we'll let you ask the next question.

(Pause.)

Q. And so to be clear, HSI is concerned about associations that demonstrate antisemitic activity

whether or not it's linked with terrorist activity?
A. Foreign terrorist activity can be a cornerstone and it can expand. I would defer to the investigation and the analysis to determine if this is something that should be referred for consideration in coordination with the Office of the Principal Legal Advisor.
Q. Does antisemitic activity, as that term is used in your letter, fall within either the national security or public safety mandates of HSI?
A. It can based upon conduct.
Q. Okay. At your deposition you were asked, quote, you said that "HSI's topics in areas of interest include national security and public safety." My question is "Whether antisemitism falls within either national security or public safety for HSI?" And your answer was "I don't know."
A. I recall that, yes.
Q. And you don't know whether pro-Palestinian advocacy falls within HSI's national security and public safety mandates?
A. I don't know. But if an allegation is received or information is referred, an investigation or inquiry can be conducted to determine if the activity or conduct is contrary to law.
Q. Contrary to law?

A. Uh-huh.
Q. Not contrary to the Executive Orders?
A. Contrary to law, as I stated.
Q. Well does "contrary to law" include the two Executive Orders we've been discussing?
A. It could if the conduct aligns within that framework.
THE COURT: No, no, she's trying to get at whether, in your view, the Executive Orders, standing alone, are another source of action?
THE WITNESS: No, sir, not alone.
THE COURT: Okay.
Q. You have written other letters like the ones we've been discussing relating to Mahmoud Khalil, correct?
A. Yes.
Q. I'd like to show you a document that has been premarked as B by the government.
THE WITNESS: And, your Honor, if I may?
A. Once again, you're saying the word that I've "written" other letters. I've clarified it earlier in my testimony that I've signed them.
Q. My apologies. You've signed other letters like this one?
A. Yes.
MS. KRISHNAN: May I approach, your Honor?

THE COURT: Of course.

(Hands to witness.)

Q. This is a true and accurate copy of the referral letter that you sent in Ms. Chung's case?

A. (Looks.) Yes.

MS. KRISHNAN: I offer this as Exhibit 243.

THE COURT: Any objection?

MR. KANELLIS: Um, no, your Honor. But it is attorney-eyes only. I'll just make that --

THE COURT: And I've spoken to that. It's admitted in evidence, Exhibit 243. We understand it's attorneys-eyes only.

(Exhibit 243, marked.)

Q. I'd now like to show you a document that's been premarked as Exhibit F by the government.

A. (Looks.)

Q. Is this a true and accurate copy of the referral letter that you sent in Mr. Mahdawi's case?

A. (Looks.) It appears to be.

MS. KRISHNAN: I offer this as Exhibit 244.

MR. KANELLIS: No objection subject to the attorneys-eyes only designation, your Honor.

THE COURT: And I understand that it is. It's Exhibit 244 in evidence.

(Exhibit 244, marked.)

Q. I'd now like to show you a document which has been premarked as Exhibit H by the government.
A. (Looks.)
Q. Is this a true and accurate copy of the referral letter that you sent in Ms. Ozturk's case?
A. It is one that I digitally signed, but the reproduction uses off-key terminology in the header on Page 2.
THE COURT: I guess I -- I appreciate your patience, Mr. Watson, but looking back at Exhibit 244 and its second page, it reads, um, on the second page, "Homeland Security Investigations RE," and then the individuals, and in that case it was Mahdawi, um, and Page 2. Here what's left off, as I compare them, is "Homeland Security," and the second line is hard to make out, but it appears to be "Rumeysa Ozturk, Page 2."
Have I compared them correctly?
THE WITNESS: Affirmative, your Honor.
THE COURT: Very well.
Go ahead.
MS. KRISHNAN: I'd like to offer it as Exhibit 245.
MR. KANELLIS: No objection subject to the --
THE COURT: No objection, it's Exhibit 245 in evidence.

(Exhibit 245, marked.)
Q. I have one more letter that I would like to show you. This document has been premarked as Exhibit I by the government.
A. (Reads.)
Q. Is this a true and accurate copy of the referral letter that you sent in Mr. Suri's case?
A. Yes, ma'am.
MS. KRISHNAN: I'm offering this as Exhibit 246.
MR. KANELLIS: No objection, subject to the attorneys-eyes only restriction, your Honor.
THE COURT: Noted, and it is, but it's admitted as Exhibit 246 -- not but it's admitted, and it's admitted.
(Exhibit 246, marked.)
Q. Just so we're clear. Before an official determination is made by the State Department after receiving a referral letter, a notice goes from the State Department to HSI about the State Department's forthcoming action?
A. I'm not following on that question, ma'am?
THE COURT: Nor am I, Ms. Krishnan.
(Pause.)
MS. KRISHNAN: I'll clarify.
Q. Before an official determination is made by the State Department, there are sometimes informal

communications between the State Department and HSI, correct?

MR. KANELLIS: Objection, foundation.

THE COURT: Well that's pretty general. But in letters of this sort where the basis is the concern about a Title VIII violation, um, limited to that, and limited to, um, subsequent to January 20th in the Trump administration, is that correct?

THE WITNESS: It can happen.

THE COURT: Well do you -- and I've been given this chalk and the next arrow on the chalk is the arrow that says "Action Letter."

Now she properly asks, between your transmittal letter in and an action letter out, with the limitations that I've just posed, do you recall interaction with State Department officials? Do you recall? You don't have to be the one interacting, but do you recall such interactions?

THE WITNESS: I don't recall them.

THE COURT: You don't. All right.

THE WITNESS: With the referral going over in between?

THE COURT: Right.

THE WITNESS: I don't recall it.

THE COURT: Once they got it.

THE WITNESS: Right. I don't recall that.

THE COURT: All right, that's his answer.

Q. A change in a person's immigration status doesn't have to result in arrest, correct?

THE COURT: Well there's been this whole -- it's not a matter of this case, but I can take judicial notice of proceedings in other cases.

There was this whole business where apparently tapping into the FBI's database, a whole raft of student Visas were cancelled. I had 9 in one case, 2 in another. And about 50 temporary restraining orders resulted. The reason being that the FBI's database, for perfectly logical reasons, has arrests in it. It isn't just limited to convictions. So action allegedly was being taken that these people had committed crimes. It is still the fact in the United States that a person is innocent until convicted. And, um, my understanding, as far as I've spoken, I think I'm on sound ground.

My understanding is that they -- but I'm not clear who "they" is, has revised that policy and now is scrutinizing things in a different way. I don't see what that has to do with this case?

But go ahead, Ms. Krishnan.

MS. KRISHNAN: Thank you.

Q. You said, in your direct examination, that people

were arrested because of a change in their immigration legal status, correct?
A. Correct.
Q. A change that was affected by a determination by the State Department?
A. Correct.
Q. And that change in a person's immigration status, that doesn't have to result in arrest, correct?
A. (Silence.)
THE COURT: Well, again if we're talking about this case --
MS. KRISHNAN: We are.
THE COURT: All right.
My belief is that, um, for instance, taking away someone's student Visa does not automatically unleash the enforcement and removal officers of Homeland Security. I'm talking about something else.
So is the question you're asking, um, once an action letter is received, an action letter from the Department of State is, um -- I'll ask this question.
An action letter from the Department of State, that does trigger an arrest, it triggers action. That's the action that it triggers, isn't it?
THE WITNESS: It can, yes.
THE COURT: It can. But it need not, is that

right?

THE WITNESS: When you receive the action letter from the Department of State saying that the Visa has been revoked or the status has changed, it, one, can trigger a redetermination. So with that notice, that goes to Domestic Operations and it goes to the HSI field office. That HSI field office works in coordination with the Principal Legal Advisor in, one, crafting and preparing a notice to a peer for the person in question before an immigration judge, pursuant to the action from the Department of State.

THE COURT: I see. I see. And you've already gone over the -- which we needn't go over again. If you can't find the person, it turns out they've left the United States, then that action letter, no further action is necessary?

THE WITNESS: Yes, your Honor.

THE COURT: But your answer to me is back comes the action letter, out goes -- in the usual course, a notice to appear --

THE WITNESS: Yes, sir.

THE COURT: -- and proceedings follow?

THE WITNESS: Yes, sir.

THE COURT: Thank you.

Go ahead, Ms. Krishnan.

Q. You don't know what inquiry the State Department does once it receives a referral letter from you, correct?
A. Correct.
Q. Mr. Khalil was arrested on March 8th of this year. Do you know the date of his letter from his case?
A. (Looks.) March 7th is the date stamp.
Q. Thank you.
MS. KRISHNAN: No further questions.
THE COURT: Nothing further for this witness?
MR. KANELLIS: No, sir.
THE COURT: Very well. You may step down. Thank you.
(Steps down.)
THE COURT: Is that all the -- as I hear it, that's all the witnesses we have for today?
(Silence.)
THE COURT: All right. Let me stop the clock then.
(Pause.)
THE COURT: The total elapsed time is the plaintiffs, 3 days, 2 hours, 45 minutes. The defense, 2 days, 40 minutes.
There are motions for the Court that I should act upon and I am going to at this time.

There is a motion to seal the, um -- a certain motion, a discovery motion. That motion is -- the motion to seal is allowed. The motion to compel is denied as wholly untimely.

The matter of an adverse inference is premature. We're not going to -- I'm not going to consider adverse inferences until I come to consider the whole case.

So that takes care of ECF documents. I just ruled on Document 214. The motion to seal was Document 215.

I also have Document 211, a motion to compel additional documents. This appears to be the list to which reference has been made in the course of the trial.

The -- I think these documents are within the scope of the stay. The request asks for documents within the scope of the stay. So I'm not going to rule on it. But because it might be helpful, um, if I were permitted to rule on it, I can give an indicative ruling. My indicative ruling is that I would deny it as to the first bullet point on the first page as overbroad, and the last bullet point on the second page, because it's imprecise.

As to all the other documents, I would allow the motion, and if those documents are in the possession of the Court, and I believe certain action memos are, I

would, um -- and having reflected on it, I would deny -- excuse me, I would overrule the, um, asserted privileges and, um, turn them over to the defense, at least to subject them to cross-examination. They'll be before the Court in any event, but I will turn them over to the defense, um, and they might be used during the cross-examination of Mr. Armstrong, if ever I'm permitted to cross-examine Mr. Armstrong.

Now let's talk about what we're going to do here.

MR. KANTER: Your Honor, may I pose a question?

THE COURT: Yes.

MR. KANTER: Your reference, if I am permitted to allow the cross-examination of Mr. Armstrong. The question pertains to your Honor's deliberative process ruling privilege on Monday regarding the Armstrong action memos in which you denied the deliberative process privilege claimed on the merits except as to certain interlineations which you found were.

THE COURT: Right.

MR. KANTER: It is our understanding that the mandamus petition concerns privilege rulings that either have not yet been made or were made solely based on waiver. Therefore it is our understanding that your ruling regarding the action memos on the merits permits those action memos to be, um, the subject of cross-

examination of Mr. Armstrong, which, um, there's no objection from the government on, um, allowing that, they are subject to attorneys-eyes only, which occurred today regarding Mr. Watson.

Therefore, as it relates to action memos, um, that is not, in our understanding, as an impediment to the cross-examination of Mr. Armstrong, which we'd like to put on tomorrow morning.

THE COURT: And you've answered me.

What do you say to that?

MR. BIALE: I'd say that we agree, your Honor.

THE COURT: Wonderful.

MR. BIALE: Except insofar as the other action memos have not been disclosed, I think those should follow within the same rubric.

THE COURT: But we're going to.

MR. BIALE: I'm sorry, I should let Ms. Conlon address this.

THE COURT: I said what I would do. The other action memos in the possession of the Court will be disclosed forthwith, subject to attorneys-eyes only, and we will make copies just as soon as I get off the bench. And the copies, the government will have copies of what we may copy, so they know exactly what it is. Now I find that very helpful.

Case: 26-0906, 11/20/2026, DktEntry: 16.16, Page 92 of 158



And that being so, and I think it will be clear that we will finish the evidence tomorrow, now let's talk about what will happen.

MR. KANTER: And one -- I'm sorry to interrupt.

THE COURT: But please don't be. The one time I didn't want to be interrupted, I was quick to say so. But other than that --

Go ahead.

MR. KANTER: Okay.

Mr. Armstrong, although he appeared in person for direct is unable to appear in person for cross-examination tomorrow. If he can appear by --

THE COURT: So long as you can arrange it, that will be fine with the Court, I'm eager to get it concluded.

MS. CONLON: Your Honor, I understand the Court is willing, but I want the record to be clear that we object, because he testified here in person and the Court had the benefit of seeing his demeanor and everything else, and we don't think it's fair that we don't get the benefit of having him back here. So I appreciate the ruling is moot, but I just want to lodge our objection.

THE COURT: And you have, but I adhere to my ruling. I've tried entire civil cases remotely. I can

see his demeanor sufficiently.

All right, now let's talk about what's going to happen.

45 minutes for argument. The plaintiffs will argue last. The defense will argue first. When shall we do it? Shall we do it on Monday or do you want to put it off further?

MR. KANTER: Um --

THE COURT: What's the government's position?

(Pause.)

MR. KANELLIS: Your Honor --

THE COURT: You were ready Friday.

MR. KANELLIS: We can do it tomorrow or -- I would defer to the Court. I think you are in a better position to guide us as to what you want.

THE COURT: Well I'm going to make the determination.

MS. KRISHNAN: Your Honor, if the Court would be amenable, Monday would be preferable to the plaintiffs.

THE COURT: Monday. We'll do it Monday -- well I work for Ms. Belmont, but I believe we are able to do it.

45 minutes a side is an hour and a half. I know I'll have questions. And, um, shall we start at 10:00, will that be more convenient? You're all here ready to

start at 9:00. I'll be ready to start at 9:00. I'm asking if it would be more convenient to start at 10:00?

MS. KRISHNAN: 10:00 is fine.

THE COURT: Very well.

MS. CONLON: Your Honor, we have another question concerning closing arguments, if that's okay?

THE COURT: Of course it's okay.

MS. CONLON: If plaintiffs wish to split the closing argument between two attorneys is that permissible?

THE COURT: That's fine for this case.

MS. CONLON: Okay.

And with respect to time, if plaintiffs have less than 45 minutes remaining of trial time, we presume plaintiffs just have less than 45 minutes for argument. But we just want to confirm our understanding.

THE COURT: Your understanding is correct.

MS. CONLON: Okay.

THE COURT: Now before I move off that, but recognizing that, um, we're going to have final arguments on Monday, um, I think it's appropriate to say a few words about -- I think they're words in a definitional sense, and I'm going to mention words as I did with antisemitism. And all I'm stating, and I just state it to be helpful, is how I think these words

figure in this first amendment case.

I do it with some diffidence because, um, I recognize that, um, a quick definition that I give here necessarily may lead or apply in a somewhat different guise in the totality of the circumstances as presented by the facts. But I really do think that it would be helpful if my operating definitions were known to the parties. That does not make them right. And it's open to the parties to simply say that they are wrong and support it with both factual support in the case and, um, legal support, if I'm wrong.

So let me just start, because these words are used in the documents before the Court, and this is the meaning to which, as I approach final argument, I ascribe to them. I've already spoken to antisemitism.

"Antisemitism" is that feeling of hostility to a person or a group on account of faith or certain ethnicity. I consider that it is a fit subject of the United States government to discourage antisemitism and, um, just as it would and should discourage Islamophobia, any sort of anticlericalism, and indeed hostility to atheists, sectarian hostility, it's not part of the America cannon. And it is a fit object of government to discourage it and encourage inclusiveness and, um, our ability to live together as citizens and lawful

visitors.

Antisemitism or antisemitic speech, standing alone, is not illegal. It may be repulsive, but it's not illegal. It is protected under the First Amendment.

Now let me jump to a word, a very broad-brush word on foreign policy, because it is not within the purview of this Court's authority to comment on the foreign policy of the United States, that, quite clearly, perhaps more than anything else in our separation of powers, is committed to the Executive. But because events that figure in this case are significant, um, and truly trying to stay away from any commentary, I think I go into final argument thinking this.

That Hamas, in October 2023, initiated a horrific, I'll use that normative word, against the State of Israel and its people. Israel responded with its full military force and the struggle between the two continues to this day. The foreign policy of the Biden administration was strongly to allie itself and support the State of Israel. That foreign policy has been followed by the Trump administration and if anything made more supportive.

And I mean nothing normative by this, but it appears that at least with respect to the conduct of the State of Israel in its war -- and I will call it "war,"

against Hamas, the foreign policy of the United States is to allie virtually, 100 percent with the foreign policy of the State of Israel.

Now to get back to definitions. Criticisms of the State of Israel are not antisemitism, they're political speech, protected speech. Even strong, violent criticism speech -- well violence is not acceptable, and that use of the word was probably wrong. But I meant vile criticisms of the State of Israel and its policies are protected speech. I think I can be this specific saying that, um, the conduct of the State of Israel is -- involves war crimes, it involves genocide, um, those matters are protected speech. Anyone is allowed -- well put aside the "anyone," but it's protected speech under the First Amendment to our Constitution.

What else? (Pause.) I think that's probably sufficient. Well a couple of legal questions.

The, um -- I take it we're agreed that Executive Orders do not have the force of law. But feel free to challenge the Court on this.

I have asked the question at the beginning, um, and I'm not sure of the answer, but I asked whether a person not a citizen of the United States, but lawfully here in the United States, has the same First Amendment rights as a citizen? As I have worked on this case

during the course of the case, and my own research, leads me to think that probably they do. The answer is in the affirmative. Again we're talking about pure speech, we're not talking about conduct that puts someone in fear or even more than that is, um, a threat of violence against a person.

Oh, there is one other definition. Criticism of the State of Israel, the use of the words that I mentioned, does not -- it's political speech, it does not constitute pro-Hamas, um, support. Pro-Hamas support has to be something more than, um, that.

And I think that's the -- I think that's where I'll stop. I'm not going to entertain questions on this. When you get to arguing, I will pull hypotheticals and we can go back and forth. Please feel free to challenge anything the Court has said, I've said it just to help.

The Court is authorized to take judicial notice at any time in a proceeding so long as I give notice that I am taking judicial notice. I think -- and I don't know how this plays at all, honestly, and everything I say to you is honest, but I am prepared to take judicial notice that Steven Miller is the President's prime advisor on immigration matters. That's all. I mean nothing normative by that.

Now one other matter we should raise, and I think it's ripe now, but we can raise it on Monday. How long do you want after final argument, where you will heard my hypotheticals and where I push back and where I don't, how long would you like for the filing of requested findings and rulings?

MR. KANELLIS: Your Honor, we ask for two weeks, if that's not too long.

MR. BIALE: And, your Honor, we would ask to submit it next Friday.

THE COURT: No, I'm going to give the two weeks. I'm not insensitive to how this case started, but the matter is complex.

So two weeks from, um, next Monday will be -- well Monday is the 21st, so that is Monday the 4th of August.

Now the matter, as I indicated when I spoke the other day, the matter then will be under advisement. I'll move with all speed to address the matter.

The only other loose end is, um, these orders are how we will proceed and conclude unless the Court of Appeals enters some affirmative order that requires action by this Court, and if it does, I will obey.

Are there any questions? Though I'm not going to get into any discussion, definitions, or legal issues.

Any questions on the part of the plaintiffs?

MS. KRISHNAN: No, your Honor.

THE COURT: The defense?

MR. KANELLIS: No, your Honor.

THE COURT: Again, thank you all. 9:00 tomorrow morning.

We'll recess.

(Ends, 12:10 p.m.)

Case: 25-6906, 11/20/2025, DktEntry: 16.16, Page 101 of 158



C E R T I F I C A T E

I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do hereby certify that the forgoing transcript of the record is a true and accurate transcription of my stenographic notes, before Judge William G. Young, on Thursday, July 17, 2025, to the best of my skill and ability.

/s/ Richard H. Romanow 07-17-25
________________________
RICHARD H. ROMANOW Date

CRAIG H. MISSAKIAN (CABN 125202)
Acting United States Attorney
PAMELA T. JOHANN (CABN 145558)
Chief, Civil Division
KELSEY J. HELLAND (CABN 298888)
Assistant United States Attorney

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-6488
FAX: (415) 436-6748
kelsey.helland@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| STANFORD DAILY PUBLISHING CORP., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>RUBIO, *et al.*,<br><br>Defendants. | Case No. 5:25-cv-06618-NW<br><br>**[PROPOSED] ORDER GRANTING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>Date: November 19, 2025<br>Time: 9:00 a.m.<br>Place: Courtroom 3, 5th Floor<br><br>The Honorable Noël Wise |

## [PROPOSED] ORDER

Defendants' Cross-Motion for Summary Judgment is hereby GRANTED. Plaintiffs' Motion for Summary Judgment is DENIED. The Clerk shall close the file.

DATED:

______________________________________
HON. NOËL WISE
United States District Judge

Marc Van Der Hout (Cal. Bar #80778)
Johnny Sinodis (Cal. Bar #290402)
Oona Cahill (Cal. Bar #354525)
**VAN DER HOUT LLP**
360 Post Street, Suite 800
San Francisco, CA 94108
Telephone: (415) 981-3000
Facsimile: (415) 981-3003
Email: ndca@vblaw.com

Conor T. Fitzpatrick (Mich. Bar #P78981)*
Daniel A. Zahn (D.C. Bar #90027403)*
**FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION (FIRE)**
700 Pennsylvania Avenue SE, Suite 340
Washington, DC 20003
Telephone: (215) 717-3473
Email: conor.fitzpatrick@thefire.org
Email: daniel.zahn@thefire.org

Colin P. McDonell (Cal. Bar #289099)
**FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION (FIRE)**
510 Walnut Street, Suite 900
Philadelphia, PA 19106
Telephone: (215) 717-3473
Email: colin.mcdonell@thefire.org

*Pro hac vice application forthcoming

*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

THE STANFORD DAILY PUBLISHING CORPORATION, JANE DOE, and JOHN DOE,

*Plaintiffs*,

v.

MARCO RUBIO, in his official capacity as Secretary of State, and

KRISTI NOEM, in her official capacity as Secretary of Homeland Security,

*Defendants*.

Case No. 5:25-cv-06618

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

15-ER 4078

> "We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty, and the pursuit of Happiness."

## INTRODUCTION

1. In the United States of America, no one should fear a midnight knock on the door for voicing the wrong opinion. That is because America's founding principle, core to who and what we are as a Nation, is that liberty comes not from the benevolent hand of a king, but is an inherent right of every man, woman, and child. American liberty enshrines in the First Amendment the "inalienable human rights" to "think as you will and to speak as you think." *303 Creative LLC v. Elenis*, 600 U.S. 570, 584 (2023) (internal quotation marks omitted).

2. But Secretary of State Marco Rubio and the Trump administration are trying to turn the inalienable human right of free speech into a privilege contingent upon the whims of a federal bureaucrat, triggering deportation proceedings against noncitizens residing lawfully in this country for their protected political speech regarding American and Israeli foreign policy. The Secretary of State and the President claim to possess unreviewable statutory authority to deport any lawfully present noncitizen for speech the government deems anti-American or anti-Israel.

3. They are wrong. The Federalists tried the same gambit 227 years ago with the Alien Friends Act, which allowed President Adams to deport any noncitizen he deemed dangerous to "peace and safety." An Act Concerning Aliens, ch. 58, § 1, 1 Stat. 570, 571 (1789) (expired Mar. 3, 1801). It was "one of the most notorious laws in our country's history," "widely condemned as unconstitutional," and "may have cost the Federalist Party its existence." *Sessions v. Dimaya*, 584 U.S. 148, 185 (2018) (Gorsuch, J., concurring in part and in judgment).

4. 225 years after the Alien Friends Act expired, the danger of nighttime raids on noncitizens for perceived thoughtcrime is reality once more. Secretary Rubio and the Trump administration's war against noncitizens' freedom of speech is intended to send an unmistakable message: Watch what you say, or you could be next.

5. Message received. At Plaintiff Stanford Daily, the independent, student-run newspaper at Stanford University, writers present on student visas are declining assignments related to the conflict in the Middle East, worried that even reporting on the conflict will endanger their

lawful immigration status. And Plaintiffs Jane Doe and John Doe, lawfully present noncitizens with no criminal history, have likewise self-censored because of their rational concern about the ongoing danger of deportation for expression Secretary Rubio deems anti-American or anti-Israel.

6. This pall of fear is incompatible with American liberty. Our First Amendment stands as a bulwark against the government infringing the inalienable human right to think and speak for yourself. That is why the Supreme Court held over 80 years ago that "[f]reedom of speech and of press is accorded aliens residing in this country." *Bridges v. Wixon*, 326 U.S. 135, 148 (1945). Our First Amendment does not "acknowledge[] any distinction between citizens and resident aliens." *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 n.5 (1953) (internal quotation marks omitted).

7. Secretary Rubio and the administration rely on two provisions of the Immigration and Nationality Act ("INA") for their supposed power to censor lawfully present noncitizens. The first allows the Secretary of State to render a noncitizen deportable if he "personally determines" their *lawful* "beliefs, statements, or associations" "compromise a compelling United States foreign policy interest." 8 U.S.C. §§ 1182(a)(3)(C)(iii), 1227(a)(4)(C)(i) (the "Deportation Provision"). The second allows the Secretary to "at any time, in his discretion, revoke" a "visa or other documentation." *Id.* § 1201(i) (the "Revocation Provision").

8. Both provisions are unconstitutional as applied to protected speech. The First Amendment cements America's promise that the government may not subject a speaker to disfavored treatment because those in power do not like his or her message. And when a federal statute collides with First Amendment rights, the Constitution prevails. U.S. Const. amend. I ("Congress shall make no law … abridging the freedom of speech …."); *see also, e.g.*, *United States v. Robel*, 389 U.S. 258, 268 n.20 (1967) (rejecting "balancing" First Amendment rights against "interests of national security").

9. Secretary Rubio and the Trump administration claim (as all censors do) that this time is different, that the supposed repulsiveness of anti-American and anti-Israel views mean the government should get a free pass for censorship. But "[i]f there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414

Case: 26-6906, 11/20/2026, DktEntry: 18.16, (107 of 158)

(1989) (holding the First Amendment protects burning the American flag in protest). Plaintiffs, who are affected by this censorship, bring this case to restore freedom of speech in the United States.

**JURISDICTION AND VENUE**

10. This action arises under the First and Fifth Amendments to the United States Constitution.

11. The Court has jurisdiction under 28 U.S.C. § 1331 and the First and Fifth Amendments to the U.S. Constitution.

12. The Court has authority to issue the requested relief under the Declaratory Relief Act at 28 U.S.C. §§ 2201–2202, Rules 57 and 65 of the Federal Rules of Civil Procedure, and the Court's inherent equitable powers. The Court has authority to award costs and attorneys' fees under 28 U.S.C. § 2412.

13. Venue in this action against officers and employees of the United States is proper in this district under 28 U.S.C. § 1391(e)(1)(B) because a substantial part of the events or omissions giving rise to these claims occurred in this district and additionally under 28 U.S.C. § 1391(e)(1)(C) because Plaintiff Stanford Daily resides in this district.

**DIVISION**

14. This action should be assigned to the San Jose Division because a substantial part of the events giving rise to these claims occurred in the county of Santa Clara, where Plaintiff Stanford Daily resides. Civil L.R. 3-2(c), (e).

**THE PARTIES**

***Plaintiffs***

15. Plaintiff Stanford Daily Publishing Corporation ("Stanford Daily") is a California nonprofit corporation based in Stanford, California. Its primary holding is *The Stanford Daily*, which is the independent, student-run newspaper of Stanford University.

16. *The Stanford Daily* covers news related to Stanford University, publishing short- and long-form articles along with editorials. Since the October 7, 2023, attack, *The Stanford Daily* has included coverage of student opinions and campus protests related to the conflict in Gaza. Since March 2025, fearing Secretary Rubio will revoke their visas under the Revocation Provision or

render them deportable under the Deportation Provision, many of the paper's noncitizen writers who are lawfully present in the United States have self-censored by declining to cover pro-Palestinian student protests at Stanford, refraining from covering topics related to the conflict in Gaza, and seeking removal of their previous articles about it.

17. Plaintiff Jane Doe[1] is a noncitizen lawfully present in the United States in valid nonimmigrant status, having entered lawfully pursuant to an F-1 student visa. Jane Doe has published pro-Palestinian/anti-Israel commentary online. Jane Doe has not been accused of violating any university rules nor has she been charged with or convicted of any crime. Yet she is listed on the Canary Mission website, which compiles profiles on individuals the organization views as having "anti-Israel" opinions. A Trump administration official testified that "most of the names" of individuals targeted for deportation based on pro-Palestinian advocacy come from Canary Mission. Since March 2025, fearing Secretary Rubio will revoke her visa under the Revocation Provision or render her deportable under the Deportation Provision, Jane Doe has refrained from publishing and voicing her true opinions regarding Palestine and Israel.

18. Plaintiff John Doe is a noncitizen lawfully present in the United States in valid nonimmigrant status, having entered lawfully pursuant to an F-1 student visa. After the October 7, 2023, attack, John Doe peacefully attended pro-Palestinian protests at his university and elsewhere and published pro-Palestinian/anti-Israel commentary online. John Doe has not been accused of violating any university rules nor has he been charged with or convicted of any crime. Beginning in March 2025 and continuing into April 2025, John Doe feared that Secretary Rubio would revoke his visa under the Revocation Provision or render him deportable under the Deportation Provision based on his published works and pro-Palestinian stance. John Doe therefore refrained, for example, from publishing a study related to Gaza. He has since resumed his journalism and pro-Palestinian advocacy, placing him at risk of visa revocation and deportation.

[1] Jane Doe and John Doe are pseudonyms that two lawfully present noncitizens plaintiffs are using because they fear government retaliation for their protected expression. The Doe Plaintiffs are contemporaneously filing a Motion to Proceed Pseudonymously.

***Defendants***

19. Defendant Marco Rubio is the Secretary of State and has authority over the operations of the State Department. In that capacity and through his agents, Defendant Rubio has broad authority over the operation and enforcement of the immigration laws. Relevant here, the Revocation Provision provides Secretary Rubio unilateral discretion to "revoke" "visa[s] or other documentation," and the Deportation Provision provides Secretary Rubio unilateral discretion to render noncitizens deportable for protected speech if he "personally determines" the noncitizen's speech "compromise[s] a compelling United States foreign policy interest." Plaintiffs sue Secretary Rubio in his official capacity.

20. Defendant Kristi Noem is the Secretary of Homeland Security and has ultimate authority over the Department of Homeland Security ("DHS"), which includes various component agencies including U.S. Immigration Customs and Enforcement ("ICE"). In that capacity and through her agents, Defendant Noem has broad authority over the operation and enforcement of the immigration laws, including authority to initiate removal proceedings in immigration court and arrest and detain noncitizens while removal proceedings are pending, and therefore leads a mechanism by which Secretary Rubio's revocation and deportation proclamations are executed. Plaintiffs sue Secretary Noem in her official capacity.

## FACTUAL ALLEGATIONS

### I. The October 7 Attacks and Ensuing Protests and Other Speech

21. On October 7, 2023, Hamas and other Palestinian militant groups launched a coordinated attack in southern Israel, leading Israel to launch a counterattack and ground invasion of Gaza.

22. At American universities, some students and faculty viewed Israel's response as disproportionate. Planned and spontaneous protests erupted across the country, variously calling for a ceasefire, increased humanitarian aid to Palestinians, and university divestment of financial portfolios from Israel.

23. Some protests featured calls for a "free Palestine" and included chants such as "from the river to the sea, Palestine will be free" and "intifada revolution."

24. Other events featured pro-Palestinian advocates handing out flyers.

25. Some protesters engaged in violence, property damage, and blockades of pro-Israel students attending classes. Many protests, however, remained peaceful.

26. Apart from protests, others on and off campus voiced their viewpoints on the conflict through social media, in news interviews and editorials, and in other forums.

**II. During the 2024 Campaign and After the Election, Trump Makes Clear His Administration Will Target Noncitizens Based on Speech.**

27. President Donald J. Trump was the Republican Party's 2024 nominee for President of the United States.

28. The 2024 platform of the Republican Party expressed support for "revoking Visas of Foreign Nationals who support terrorism and jihadism."

29. Mr. Trump's campaign website linked to the Republican Party platform.

30. Mr. Trump's campaign website separately promised to "Deport pro-Hamas radicals and make our college campuses safe and patriotic again."

31. At campaign rally on October 16, 2023, Mr. Trump promised to revoke the visas of foreign students deemed "radical, anti-American, and anti-Semitic" and to "aggressively deport" resident aliens with "jihadist sympathies."

32. At an event on October 28, 2023, Mr. Trump committed, "I will cancel the student visas of Hamas sympathizers on college campuses. The college campuses are being taken over, and all of the resident aliens who joined in the pro-jihadist protest this month—nobody's ever seen anything like it—come 2025 we will find you and we will deport you. We will deport you."

33. At a campaign rally on November 8, 2023, Mr. Trump promised, "I will also quickly cancel the student visas of all Hamas sympathizers on college campuses which have been infested with radicalism like never before."

34. At the same rally, Mr. Trump said, "If you hate America, if you want to abolish Israel, if you sympathize with jihadists, then we don't want you in our country …. To all the resident aliens who joined in the pro-jihadist protests … we put you on notice: Come 2025, we will find you and we will deport you."

35. On May 14, 2024, Mr. Trump said at a campaign event, "One thing I do is, any student that protests, I throw them out of the country. You know, there are a lot of foreign students. As soon as they hear that, they're going to behave."

36. On January 20, 2025, President Trump issued an executive order stating that the government would ensure that noncitizens present in the United States "do not bear hostile attitudes" toward the United States government and do not "advocate for" or "support" "foreign terrorists and other threats to our national security." Exec. Order No. 14,161, 90 Fed. Reg. 8451, 8451 (Jan. 20, 2025).

37. The U.S. Senate unanimously confirmed Mr. Rubio as Secretary of State, and he took office on January 21, 2025. The Secretary of State serves at the pleasure of the President.

38. On January 30, 2025, the White House issued a fact sheet promising to revoke the visas of and deport "Hamas Sympathizers," stating, "To all the resident aliens who joined in the pro-jihadist protests, we put you on notice: come 2025, we will find you, and we will deport you. I will also quickly cancel the student visas of all Hamas sympathizers on college campuses, which have been infested with radicalism like never before." *Fact Sheet: President Donald J. Trump Takes Forceful and Unprecedented Steps to Combat Anti-Semitism*, The White House (Jan. 30, 2025), https://perma.cc/GY4H-7ASR.

39. The administration considers "From the river to the sea, Palestine will be free" to express support for Hamas, capable of justifying action under the Revocation or Deportation Provisions. Trial Tr. vol. 1, 32–35, *Am. Ass'n of Univ. Professors v. Rubio*, No. 25-cv-10685 (D. Mass. July 18, 2025), https://perma.cc/S854-PXXK. Likewise, calling Israel "an apartheid state," "calling for an arms embargo on Israel," or "criticizing Israel's actions in Gaza" might be sufficient to invoke the Revocation or Deportation Provisions. *Id.*

## III. The Trump Administration Arrests, Detains, and Attempts to Deport Noncitizens for Protected Speech.

40. Trump and his administration made good on their promises, aggressively targeting lawfully present noncitizens for protected speech, particularly at universities.

41. Mahmoud Khalil was a graduate student at Columbia University and a lawful permanent resident (green card holder).

42. Mr. Khalil had been an active participant at Columbia in demonstrations and advocacy against Israel's actions following the October 7, 2023, attack. Mr. Khalil repeatedly criticized Israel's military operations in Gaza and what he viewed as Columbia's financing and facilitation of those activities.

43. Late in the evening on March 8, 2025, agents from DHS arrested Mr. Khalil with no prior notice at his apartment, transferred him to a Louisiana immigration jail, and initiated proceedings to deport him from the United States.

44. The DHS document initiating removal proceedings against Mr. Khalil cited his protected speech as the sole basis for his deportation under the Deportation Provision. DHS later explained Secretary Rubio had "personally determined" Mr. Khalil's continued presence "would have potentially severe adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest" because of Mr. Khalil's "participation" in "antisemitic protests and disruptive activities, which fosters a hostile environment for Jewish students in the United States." *Khalil v. Trump*, No. 25-cv-01963, 2025 WL 1514713, at *7 (D.N.J. May 28, 2025), *appeal docketed sub nom.*, *Khalil v. President United States of America*, No. 25-2162 (3d Cir. June 23, 2025).

45. On March 9, 2025, reacting on social media to Mr. Khalil's arrest, Secretary Rubio wrote, "We will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported." Marco Rubio (@marcorubio), X (Mar. 9, 2025, at 6:10 PM), https://perma.cc/726Z-VT4Z.



46. On March 10, 2025, reacting to Mr. Khalil's arrest, President Trump warned that additional students involved in "pro-terrorist, anti-Semitic, anti-American activity" will be found and deported, vowing that "the Trump administration will not tolerate it" and that Mr. Khalil's arrest was the "first" of "many to come." Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 10, 2025, at 1:05 PM), https://perma.cc/6VPC-AESU.

47. On March 11, 2025, White House Press Secretary Karoline Leavitt told reporters that Mr. Khalil faced deportation because he "sid[ed] with terrorists, Hamas terrorists, who have killed innocent men, women, and children." Ms. Leavitt also asserted Mr. Khalil "distributed pro-Hamas propaganda flyers with the logo of Hamas" on Columbia's campus, though the government never offered evidence to substantiate this statement. She emphasized, "This administration is not going to tolerate individuals … studying in our country and then siding with pro-terrorist organizations."

48. Mr. Khalil remained in a Louisiana immigration jail until June 20, 2025, when a federal court ordered his release on constitutional grounds. *Khalil v. Trump*, No. 25-cv-01963 (D.N.J. June 20, 2025), ECF No. 316, *appeal docketed sub nom.*, *Khalil v. President United States of America*, No. 25-2162 (3d Cir. June 23, 2025).

49. On March 13, 2025, in an interview with NPR, Deputy Homeland Security Secretary Troy Edgar conceded that Mr. Khalil's deportable "offense" was participating in protests.

50. Rümeysa Öztürk is a PhD student at Tufts University in Boston, Massachusetts. She is a citizen of Turkey and studies in the United States on an F-1 student visa.

51. Ms. Öztürk coauthored an op-ed in the Tufts student newspaper, *The Tufts Daily*, in March 2024. The article criticized the University's refusal to adopt several resolutions approved by the undergraduate student senate urging the University to, among other things, recognize a genocide in Gaza and divest from Israeli companies.

52. On March 25, 2025, six plain-clothes federal officers surrounded Ms. Öztürk on the street outside her home in Somerville, Massachusetts. The officers detained her and quickly transported her to a Louisiana immigration jail.

53. Four days before Ms. Öztürk's arrest, Secretary Rubio, relying solely on her protected expression, had revoked Ms. Öztürk's visa under the Revocation Provision. A DHS

spokesperson justified the revocation by asserting Öztürk's editorial "[g]lorif[ied] and support[ed] terrorists."

54. Ms. Öztürk remained in a Louisiana immigration jail until May 9, 2025, when a federal court ordered her release on constitutional grounds. *Ozturk v. Trump*, No. 25-cv-374, 2025 WL 1355667 (D. Vt. May 9, 2025).

55. Mohsen Mahdawi is an undergraduate student at Columbia University and a legal permanent resident (green card holder) in the United States.

56. As a student at Columbia, Mr. Mahdawi was an outspoken critic of Israel's military campaign in Gaza. He appeared on televised news interviews, in print news articles, and spoke at protests.

57. Upon information and belief, on April 14, 2025, after Mr. Mahdawi completed the citizenship test to become a United States citizen, masked DHS agents entered the interview room and arrested him, after which the Trump administration began proceedings to deport him from the United States.

58. Secretary Rubio relied upon the Deportation Provision to attempt Mr. Mahdawi's removal, claiming his protests and rhetoric undermined the U.S. foreign policy goal of promoting peace in the Middle East. Resp. in Opp'n to Mot. for Release Ex. A, at 2, *Mahdawi v. Trump*, No. 25-cv-00389, 2025 WL 1243135 (D. Vt. Apr. 30, 2025), ECF No. 42-1, *appeal docketed*, No. 25-1113 (2d Cir. May 1, 2025).

59. Mr. Mahdawi remained in a Vermont immigration jail until May 9, 2025, when a federal court ordered his release on constitutional grounds. *Mahdawi*, 2025 WL 1243135.

60. Since March 2025, the Trump administration has continued revoking the visas of and arresting, detaining, and attempting to deport lawfully present noncitizens under the Deportation and Revocation Provisions based on protected expression and has reiterated its intention in public statements to continue doing so.

61. On May 8, 2025, Department of Homeland Security Assistant Secretary for Public Affairs Tricia McLaughlin posted on X that noncitizens "pushing Hamas propaganda," "glorifying terrorists," or otherwise engaging in "anti-American" conduct "can expect your visa will be

revoked." Tricia McLaughlin (@TriciaOhio), X (May 8, 2025, at 10:26 AM), https://perma.cc/5ZJ3-4VUU.

62. At a May 21, 2025, congressional hearing, Secretary Rubio, responding to a question about the revocation of Öztürk's visa based on her speech, said he "proudly" revoked her visa, that he revokes visas every day, and that he would continue revoking visas.

63. On July 18, 2025, John Armstrong, Senior Bureau Official in the Bureau of Consular Affairs, testified in the United States District Court for the District of Massachusetts that mere criticism of Israel, such as calling for an arms embargo or calling Israel an "apartheid state" are, per the Trump administration, legitimate grounds to revoke a visa. Trial Tr. vol. 1, 32–35, *Am. Ass'n of Univ. Professors v. Rubio*, No. 25-cv-10685 (D. Mass. July 18, 2025), https://perma.cc/S854-PXXK.

64. On July 29, 2025, White House Deputy Chief of Staff and Homeland Security Advisor Stephen Miller posted on X that administration officials are "working continuously" to revoke visas from noncitizens "who espouse hatred for American or its people"—not just noncitizens who criticize Israel. Stephen Miller (@StephenM), X (July 29, 2025, at 9:08 PM), https://perma.cc/U9JN-FQK7.


Stephen Miller
@StephenM

This is just patently false. We have officials working continuously to identity, revoke or deny foreigners' visas who espouse hatred for America or its people. This is a top priority. College students who witness such conduct can use the ICE tip line. Also: there is no "speech code" of any kind in the Columbia deal. There is an ironclad requirement — with enforcement mechanisms — to admit students based on actual merit and not illegal racial quotas, set asides or preferences.

Glenn Greenwald @ggreenwald · 19h
Exactly. No foreign students are being deported by the Trump State Department and ICE for criticizing the US - only for criticizing Israel.

Just like the "hate speech" codes Trump demanded US colleges adopt allows students to call the US a "racist endeavor" but not Israel. ...

9:08 PM · Jul 29, 2025 · 540.6K Views

**IV. Stanford Daily's Noncitizen Staff Self-Censors, Fearing Immigration Consequences for Protected Speech.**

65. Stanford Daily operates and publishes *The Stanford Daily*, the student-run newspaper of Stanford University.

66. Stanford Daily is a voluntary membership organization. Everyone who wants to join Stanford Daily is guaranteed a spot, and any Stanford student who *The Stanford Daily* publishes becomes a member of Stanford Daily.

67. Stanford Daily has over 150 members.

68. Stanford Daily "strives to serve the Stanford community with relevant, unbiased journalism and provides its editorial, tech, and business staffs with unparalleled educational opportunities."

69. Since its founding as *The Daily Palo Alto* in 1892, Stanford Daily has sought to cover all relevant campus activities in an unbiased fashion and provide an outlet for Stanford community members to publish opinions.

70. In line with Stanford Daily's mission and core business activities, *The Stanford Daily* has endeavored to provide the Stanford community with relevant and unbiased journalism about campus events or issues related to Hamas's October 7, 2023, attack on Israel and Israel's war in Gaza.

71. Also in line with Stanford Daily's mission and operations, the newspaper provides a platform for Stanford community members to voice their opinions on the Israeli-Palestinian conflict and other foreign policy issues.

72. But since the Trump administration began targeting lawfully present noncitizens for deportation based on protected speech in March 2025, lawfully present noncitizen students working at and contributing to Stanford Daily have self-censored expression for fear of visa revocation, arrest, detention, and deportation.

73. For example, in March 2025, a lawfully present noncitizen editor on staff decided to quit Stanford Daily because of the student's nonimmigrant visa status. Fearing visa revocation,

arrest, and deportation for association with articles about Israel or Palestine, the student decided to leave the newspaper.

74. But for the threat of visa revocation under the Revocation Provision and of deportation under the Deportation Provision, the student would continue being a member of Stanford Daily.

75. As another example, one lawfully present noncitizen student on staff signed up to cover a story about a vigil that brought together Jewish and Palestinian families to honor those who died in the conflict in Gaza. The student attended, took notes, and interviewed sources. But because of the student's nonimmigrant visa status, and fear that they may face adverse immigration consequences if they published the article, the student decided against publishing the article.

76. But for the threat of visa revocation under the Revocation Provision and of deportation under the Deportation Provision, the student would publish the article.

77. Similarly, a lawfully present noncitizen editor on staff, fearing adverse immigration consequences, asked Stanford Daily to remove articles they had previously written about pro-Palestinian campus activism and related issues and to no longer assign them to edit stories involving Israel or Palestine.

78. But for the threat of visa revocation under the Revocation Provision and of deportation under the Deportation Provision, the editor would republish the article they had taken down and would edit stories involving Israel and Palestine.

79. Another lawfully present noncitizen Stanford Daily staff writer, who had written about Israeli and Palestinian officials, as well other foreign affairs topics, asked Stanford Daily to remove all her articles from Stanford Daily's website, fearing adverse immigration consequences.

80. But for the threat of visa revocation under the Revocation Provision and of deportation under the Deportation Provision, the staff writer would not have asked Stanford Daily to remove the articles.

81. Additionally, a lawfully present noncitizen Stanford Daily editorial board member asked for an article about the Israeli Defense Forces to be removed from the website, fearing adverse immigration consequences.

82. But for the threat of visa revocation under the Revocation Provision and of deportation under the Deportation Provision, the editorial board member would not have asked to remove the article.

83. Secretary Rubio's use of the Deportation Provision and Revocation Provision to target protected expression has hindered Stanford Daily's journalism in other ways, too. Since the Trump administration began targeting lawfully present noncitizens for deportation based on protected speech in March 2025, Stanford Daily has received numerous requests from lawfully present noncitizens who either wrote or were quoted or pictured in articles to remove their name, image, or article for fear of adverse immigration action based on their speech.

84. Since the Trump administration began targeting lawfully present noncitizens for deportation based on protected speech in March 2025, international students have also largely stopped talking to Stanford Daily journalists and, when they do speak, often refuse to speak on the record, particularly when it comes to discussing topics like Israel and Palestine.

85. But for the threat of visa revocation under the Revocation Provision and the threat of deportation under the Deportation Provision, international students would resume speaking freely with Stanford Daily.

86. Since Secretary Rubio starting using the Deportation Provision and Revocation Provision against protected speech, Stanford Daily has received other requests from current and former writers, asking it to remove opinion editorials they published, quotes they provided, or their names in bylines or articles.

87. But for the threat of visa revocation under the Revocation Provision and of deportation under the Deportation Provision, the current and former writers would not seek to have their pieces, quotes, or identities removed from the newspaper.

88. But for the threat of visa revocation under the Revocation Provision and deportation under the Deportation provision, Stanford Daily noncitizen contributors would resume contributing articles to Stanford Daily.

## V. Plaintiff Jane Doe Fears Deportation Due to Her Pro-Palestinian Speech.

89. Plaintiff Jane Doe is a noncitizen lawfully present in the United States pursuant to a lawful admission on an F-1 student visa.

90. Jane Doe is a former student at a United States university.

91. Jane Doe was a member of the pro-Palestinian student group Students for Justice in Palestine (SJP) at her university.

92. Jane Doe has published pro-Palestinian/anti-Israel commentary online, including commentary accusing Israel of committing "genocide" and perpetuating "apartheid." She has also used the slogan, "from the river to the sea, Palestine will be free."

93. Jane Doe has publicly criticized American foreign policy, particularly its relationship with Israel.

94. Due to her advocacy, Jane Doe appeared in a profile on the Canary Mission website.

95. Canary Mission is an anonymously run website that publishes the personal information of students, professors, and organizations it deems "anti-Israel."

96. On July 9, 2025, during a trial in the United States District Court for the District of Massachusetts, Peter Hatch, a senior official in ICE's Homeland Security Investigations unit, testified that Derek Gordon, Deputy Special Agent in Charge of Homeland Security Investigations at DHS, asked Hatch to instruct Hatch's team to generate "reports" on individuals identified on Canary Mission's website. Trial Tr. vol. 2, 108–10, *Am. Ass'n of Univ. Professors v. Rubio*, No. 25-cv-10685 (D. Mass. July 9, 2025), https://perma.cc/PCL4-6YTQ.

97. The "reports" Mr. Hatch's team prepares are for the State Department, which uses them to make decisions regarding, among other things, "[v]isa revocations." *Id.* at 101.

98. Mr. Hatch testified that "most" of the names of student protestors that DHS asked ICE to investigate "came from" Canary Mission's website. *Id.* vol. 1, 44.

99. Prior to their detentions and attempted deportations, Canary Mission published profiles of Mahmoud Khalil, Rümeysa Öztürk, and Mohsen Mahdawi.

100. Since March 2025, fearing that Secretary Rubio will revoke her visa under the Revocation Provision or render her deportable under the Deportation Provision, Jane Doe has

Case: 26-6906, 11/20/2026, DktEntry: 16.6, Page 120 of 158

refrained from publishing and voicing her true opinions regarding Palestine and Israel and has deleted a social media account to guard against retaliation for past expression.

101. But for the threat of visa revocation under the Revocation Provision and deportation under the Deportation Provision, Jane Doe would resume publishing and voicing her true opinions regarding Palestine and Israel and would reactivate her social media account containing her past expression.

**VI. John Doe Fears Adverse Immigration Action for His Protected Speech.**

102. Plaintiff John Doe is a noncitizen lawfully present in the United States pursuant to a lawful admission on an F-1 student visa.

103. John Doe is a former student at a United States university.

104. After the October 7, 2023, attack, John Doe attended pro-Palestinian protests and published pro-Palestinian/anti-Israel commentary online.

105. At protests, John Doe participated in chants including, "From the river to the sea, Palestine will be free," as well as chants accusing Israel of committing "genocide."

106. After the Trump administration began targeting other lawfully present noncitizen students for deportation based on protected speech, the professor for whom John Doe served as a teaching assistant advised John Doe to reconsider engaging in protected advocacy related to Israel and Palestine due to potential danger to his immigration status.

107. After March 2025, fearing Secretary Rubio would revoke his visa under the Revocation Provision or render him deportable under the Deportation Provision following the administration's actions against other noncitizens, John Doe refrained from publishing a study containing criticism of Israel's actions in Gaza, which John Doe views as a genocide backed by the United States' foreign policy.

108. But for the threat of visa revocation under the Revocation Provision and deportation under the Deportation Provision, John Doe would have published and voiced his true opinions regarding Palestine and Israel without delay or fear of arrest, detention, or deportation for his protected speech.

Case: 26-6906, 11/20/2026, DktEntry: 16.6, Page 121 of 158

109. John Doe has resumed engaging in protected pro-Palestinian/anti-Israel commentary, including accusing Israel of committing genocide, as well as commentary critical of American foreign policy towards Israel and Palestine. His continuing expression places him in danger of visa revocation under the Revocation Provision and deportation under the Deportation Provision.

**INJURIES TO PLAINTIFFS**

110. Secretary Rubio and Secretary Noem violate Plaintiffs' First Amendment rights by enforcing the Deportation Provision and Revocation Provision based on protected expression, the threatened enforcement of which chills Plaintiffs and/or their lawfully present noncitizen members from engaging in protected expression like attending protests, using certain slogans, and publicly voicing their true views about American foreign policy, Israel, and Palestine.

111. The chill is amplified because Secretary Rubio and Secretary Noem's enforcement of the Deportation Provision and Revocation Provision has entailed ambush arrests by masked agents accompanied by prolonged detention in ICE holding facilities thousands of miles from detainees' homes.

112. Secretary Rubio and Secretary Noem have enforced the Deportation Provision and Revocation Provision based on protected expression and will continue to do so absent declaratory and injunctive relief prohibiting enforcement of these statutes based on protected expression.

113. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality op.)).

114. Plaintiffs have suffered and continue to suffer irreparable harm due to the Deportation Provision's and Revocation Provision's enforcements based on protected expression, which will continue absent declaratory and prospective injunctive relief.

115. Because Plaintiffs and their lawfully present noncitizen members have engaged and wish to continue engaging in expression which Secretary Rubio might consider anti-American, anti-Israel, or detrimental to American foreign policy, they face an ongoing and credible threat of continued enforcement of the Deportation Provision and Revocation Provision.

116. Secretary Rubio and Secretary Noem's ongoing threat to the protected expression of Plaintiffs and their members presents an actual controversy within this Court's jurisdiction.

**FIRST CLAIM**

**First Amendment**

**Deportation Provision**

**(Declaratory Relief)**

117. Plaintiffs reallege and incorporate by reference the preceding paragraphs as though fully set forth herein.

118. The First Amendment provides "Congress shall make no law … abridging the freedom of speech, or of the press; or of the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I.

119. America's First Amendment reflects "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

120. Political protests are an exercise of "basic constitutional rights in their most pristine and classic form." *Edwards v. South Carolina*, 372 U.S. 229, 235 (1963).

121. The "advocacy of a politically controversial viewpoint is the essence of First Amendment expression," and "no form of speech is entitled to greater constitutional protection." *McCullen v. Coakley*, 573 U.S. 464, 488–89 (2014) (cleaned up).

122. A free press "serves and was designed to serve as a powerful antidote to any abuses of power by government officials and as a constitutionally chosen means for keeping officials elected by the people responsible to all the people whom they were selected to serve." *Mills v. Alabama*, 384 U.S. 214, 219 (1966).

123. To that end, "[s]uppression of the right of the press to praise or criticize government agents and to clamor and contend for or against change … muzzles one of the very agencies the Framers of our Constitution thoughtfully and deliberately selected to improve our society and keep it free." *Id.*

Case: 26-6906, 11/20/2026, DktEntry: 16.6, (123 of 158)

124. A press/communication platform's own rights are infringed when its contributors are chilled. *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 121–23 (1991).

125. The Supreme Court has made clear that "freedom of speech and of press is accorded aliens residing in this country." *Wixon*, 326 U.S. at 148.

126. "It has long been recognized that resident aliens enjoy the protections of the First Amendment." *Price v. U.S. INS*, 962 F.2d 836, 841 (9th Cir. 1991).

127. The INA allows the Secretary of State to render deportable noncitizens "whose … activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States." 8 U.S.C. § 1227(a)(4)(C)(i).

128. That deportation authority is subject to "[t]he exceptions" to the Secretary of State's authority to exclude noncitizens from the United States on foreign policy grounds. *Id.* § 1227(a)(4)(C)(ii) (incorporating *id.* § 1182(a)(3)(C)(ii)–(iii)).

129. Those exceptions include that a noncitizen "shall not be excludable [for protected speech], unless the Secretary of State personally determines that the alien's admission would compromise a compelling United States foreign policy interest." *Id.* § 1182(a)(3)(C)(iii).

130. The Deportation Provision, therefore, allows the Secretary of State to render lawfully present noncitizens deportable for protected speech if he "personally determines" that the noncitizen's activities "compromise a compelling United States foreign policy interest." *Id.* §§ 1182(a)(3)(C)(iii), 1227(a)(4)(C)(i).

131. When the government determines that a noncitizen is no longer lawfully in the United States through operation of the Deportation Provision, immigration officers may obtain a warrant to arrest and detain the noncitizen pending completing of removal proceedings. *See id.* § 1226(a); 8 C.F.R. § 287.8(c).

132. Detention and/or deportation would deter a person of ordinary firmness from engaging in protected activity.

133. As a result of the Deportation Provision, lawfully present noncitizens must either forego protected expression or risk detention and deportation.

134. As applied to protected speech, the Deportation Provision is facially viewpoint based and content based because it applies solely to speech the government believes adversely affects its foreign policy.

135. The government "may not discriminate against speech based on the ideas or opinions it conveys." *Iancu v. Brunetti*, 588 U.S. 388, 393 (2019).

136. "Viewpoint discrimination is thus an egregious form of content discrimination" because "[t]he government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

137. The Deportation Provision is facially viewpoint discriminatory as applied to protected speech for two reasons. First, it affords the Secretary of State unbounded discretion to render lawfully present noncitizens deportable on the basis of protected speech. Second, opinions the Secretary deems in his sole discretion adverse to America's foreign policy subject noncitizens to potential deportation, while those he views as aligning with or praising American foreign policy do not.

138. Secretary Rubio and the Trump administration's enforcement of the Deportation Provision demonstrates the Deportation Provision's viewpoint discriminatory nature as applied to protected speech.

139. For example, Secretary Rubio's determination that Mr. Khalil's protected expression regarding Israel and Palestine triggered the Deportation Provision is that Mr. Rubio believed Mr. Khalil's opinions and expression "undermine[d] U.S. policy to combat anti-Semitism around the world and in the United States."

140. Secretary Rubio's determination that Mr. Mahdawi's protected speech regarding Israel and Palestine triggered the Deportation Provision is that Mr. Rubio believed Mr. Mahdawi's opinions and expression undermined the government's position regarding the Middle East peace process.

141. Laws discriminating based on viewpoint are per se unconstitutional. *See Iancu*, 588 U.S. at 399 ("The Court's finding of viewpoint bias ended the matter.")

142. In the alternative, viewpoint discriminatory laws are subject to strict scrutiny.

143. The First Amendment also generally forbids government actions that discriminate based on the content of the speaker's expression. "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* Content-discriminatory laws are subject to strict scrutiny. *Id.* at 163–64.

144. The Deportation Provision is not narrowly tailored to achieve a compelling government interest with respect to deportations based on protected speech.

145. Restricting speech to tilt public debate and opinion in the government's preferred direction "is not [a] valid, let alone substantial" government interest. *Moody v. NetChoice, LLC*, 603 U.S. 707, 740 (2024).

146. Nor is the Deportation Provision's allowance for deportation based on protected speech narrowly tailored. It vests the Secretary of State with unbounded, unbridled, and unconstrained discretion to deem any noncitizen's protected speech a foreign policy threat and to banish the speaker from the United States on that basis.

147. The Deportation Provision's allowance for deportation based on protected speech is not the least restrictive means of advancing the government's foreign policy objectives because, at minimum, the government can counter the noncitizen's speech with its own speech.

148. The "First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech." *Lozman v. Riviera Beach*, 585 U.S. 87, 90 (2018).

149. By allowing the Secretary of State to render lawfully present noncitizens deportable for protected speech about America's foreign policy, the Deportation Provision also blatantly discriminates based on viewpoint by codifying the ability of the government to take adverse action against protected speech by targeting its foreign policy critics with deportation.

Case: 26-6906, 11/20/2026, DktEntry: 16.16, (126 of 158)

150. Deporting someone for protected speech would deter and is deterring people of ordinary firmness from engaging in protected speech.

151. Plaintiffs are entitled to a declaration under 28 U.S.C. § 2201 that the Deportation Provision is viewpoint and content based when applied to protected speech and that the First Amendment prohibits deporting Plaintiffs and/or their noncitizen members under it for engaging in protected speech.

**SECOND CLAIM**

**First Amendment**

**Deportation Provision**

**(Injunctive Relief)**

152. Plaintiffs re-allege and re-incorporate the preceding paragraphs as though fully set forth herein.

153. The Deportation Provision violates the First Amendment for the reasons stated in Claim I.

154. Plaintiffs are entitled to injunctive relief preventing Secretary Rubio from rendering Plaintiffs and/or their noncitizen members deportable under the Deportation Provision for engaging in protected speech. *See Bell v. Hood*, 327 U.S. 678, 684 (1946) ("[I]t is established practice for this Court to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution."); *see also Ex parte Young*, 209 U.S. 123 (1908).

155. Plaintiffs are entitled to injunctive relief preventing Secretary Noem from initiating deportation proceedings against or otherwise invoking the Deportation Provision against Plaintiffs and/or their noncitizen members based on protected speech. *See Bell*, 327 U.S. at 684; *Ex parte Young*, 209 U.S. 123.

156. Plaintiffs have no adequate legal, administrative, or other remedy by which to prevent or minimize the continuing irreparable harm to their First Amendment rights. Without injunctive relief against the Deportation Provision as applied to protected speech, Secretary Rubio's suppression and chill of Plaintiffs' First Amendment rights will continue, and Plaintiffs will suffer per se irreparable harm indefinitely.

157. The balance of equities and the public interest favors permanent injunctive relief because "it is always in the public interest to prevent the violation of a party's constitutional rights." *X Corp. v. Bonta*, 116 F.4th 888, 904 (9th Cir. 2024) (internal quotation marks omitted).

158. Plaintiffs acknowledge that, under 8 U.S.C. § 1252(f)(1), only the Supreme Court has jurisdiction to "enjoin or restrain the operation" of the Deportation Provision. Plaintiffs therefore plead the request for injunctive relief so it is contained in the operative pleading and may be raised to the Supreme Court in later proceedings.

**THIRD CLAIM**

**Fifth Amendment (Vagueness)**

**Deportation Provision**

**(Declaratory Relief)**

159. Plaintiffs re-allege and re-incorporate the preceding paragraphs as though fully set forth herein.

160. The Due Process Clause of the Fifth Amendment to the U.S. Constitution prohibits laws, including immigration statutes, that are impermissibly vague. *Sessions*, 584 U.S. at 174–75 (majority op.).

161. A law is unconstitutionally vague when it "fails to provide a person of ordinary intelligence fair notice of what is prohibited" or "is so standardless that it authorizes or encourages seriously discriminatory enforcement." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)).

162. Because deportation is a "drastic measure, often amounting to lifelong banishment or exile," the "most exacting vagueness standard" applicable to criminal laws also applies to immigration laws. *Sessions*, 584 U.S. at 156–57 (plurality op.) (cleaned up).

163. Moreover, when a regulation "is capable of reaching expression sheltered by the First Amendment," the vagueness doctrine "demands a greater degree of specificity than in other contexts." *Smith v. Goguen*, 415 U.S. 566, 573 (1974).

164. The Deportation Provision is vague on its face as applied to protected speech because it provides no guidance to noncitizens regarding when a person's expression would "compromise a compelling United States foreign policy interest." 8 U.S.C. § 1182(a)(3)(C)(iii).

165. The Deportation Provision is also vague on its face as applied to protected speech because it provides standardless, limitless discretion to government officials charged with its enforcement regarding when a person's expression would "compromise a compelling United States foreign policy interest."

166. The Deportation Provision is also vague on its face as applied to protected speech because it authorizes arbitrary and discriminatory enforcement, granting the Secretary of State unfettered and unreviewable discretion to arbitrarily enforce the Deportation Provision based on his own subjective determination of what will compromise or adversely affect foreign policy.

167. The Deportation Provision is also vague on its face as applied to protected speech because the United States' foreign policy interests are vast, ever-changing, and often kept confidential from the public. *See Massieu v. Reno*, 915 F. Supp. 681, 700–03 (D.N.J.) (concluding 8 U.S.C. § 1227(a)(4)(C)(i) is void for vagueness), *rev'd on other grounds*, 91 F.3d 416 (3d Cir. 1996).

168. Plaintiffs are entitled to a declaration under 28 U.S.C. § 2201 that the Deportation Provision is void for vagueness under the Fifth Amendment as applied to deportations based on protected speech and that the Fifth Amendment prohibits deporting Plaintiffs and/or their noncitizen members under the Deportation Provision for engaging in protected speech.

**FOURTH CLAIM**

**Fifth Amendment (Vagueness)**

**Deportation Provision**

**(Injunctive Relief)**

169. Plaintiffs re-allege and re-incorporate the preceding paragraphs as though fully set forth herein.

170. The Deportation Provision is unconstitutionally void for vagueness under the Fifth Amendment as applied to deportations based on protected speech for the reasons stated in Claim III.

171. Plaintiffs are entitled to injunctive relief preventing Secretary Rubio from rendering Plaintiffs and/or their noncitizen members deportable under the Deportation Provision based on protected speech. *See Bell*, 327 U.S. at 684; *Ex parte Young*, 209 U.S. 123.

172. Plaintiffs are entitled to injunctive relief preventing Secretary Noem from initiating deportation proceedings against or otherwise invoking the Deportation Provision against Plaintiffs and/or their noncitizen members based on protected speech. *See Bell*, 327 U.S. at 684; *Ex parte Young*, 209 U.S. 123.

173. Plaintiffs have no adequate legal, administrative, or other remedy by which to prevent or minimize the continuing irreparable harm to their First and Fifth Amendment rights. Without injunctive relief against the Deportation Provision as applied to protected speech, Secretary Rubio's suppression and chill of Plaintiffs' First Amendment rights will continue, and Plaintiffs will suffer per se irreparable harm indefinitely.

174. The balance of equities and the public interest favors permanent injunctive relief because "it is always in the public interest to prevent the violation of a party's constitutional rights." *X Corp.*, 116 F.4th at 904 (internal quotation marks omitted).

175. Plaintiffs acknowledge that, under 8 U.S.C. § 1252(f)(1), only the Supreme Court has jurisdiction to "enjoin or restrain the operation" of the Deportation Provision. Plaintiffs therefore plead the request for injunctive relief so it is contained in the operative pleading and may be raised to the Supreme Court in later proceedings.

**FIFTH CLAIM**

**First Amendment**

**Revocation Provision**

**(Declaratory Relief)**

176. Plaintiffs re-allege and re-incorporate the preceding paragraphs as though fully set forth herein.

177. Subjecting noncitizens to adverse immigration action for protected speech violates the First Amendment for the reasons stated in Claim I.

178. The Revocation Provision, 8 U.S.C. § 1201(i), provides that "[a]fter the issuance of a visa or other documentation to any alien, the … Secretary of State may at any time, in his discretion, revoke such visa or other documentation."

179. The Revocation Provision allows the Secretary of State to revoke a "visa or other documentation" based on protected speech.

180. For example, Secretary Rubio used the Revocation Provision to revoke Rümeysa Öztürk's visa based on her protected speech of coauthoring an article for *The Tufts Daily* newspaper and he committed to revoking visas of other lawfully present noncitizens in the future based on protected speech.

181. The "First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech." *Lozman*, 585 U.S. at 90.

182. Revoking the visa or other documentation of a noncitizen would deter and is deterring people of ordinary firmness from engaging in protected speech.

183. Revocations of visas and other documents for protected speech necessarily rely on viewpoint or content discrimination, because the Secretary of State is singling out particular expression for disfavored treatment, making the Revocation Provision subject to strict scrutiny as applied to protected speech.

184. Restricting speech to tilt public debate and opinion about American foreign policy and silence views contrary to the current government's foreign policy "is not [a] valid, let alone substantial" government interest. *Moody*, 603 U.S at 740.

185. The Revocation Provision, as applied to protected speech, is not narrowly tailored because it vests the Secretary of State with unbounded, unbridled, and unconstrained discretion to revoke visas and other documentation based on protected speech for whatever reason the Secretary personally deems sufficient.

186. The Revocation Provision, as applied to protected speech, is not the least restrictive means of advancing the government's objectives because, at minimum, the government can counter the noncitizen's speech with its own speech.

187. Plaintiffs are entitled to a declaration under 28 U.S.C. § 2201 that the First Amendment prohibits revoking the visa or other documentation of Plaintiffs or their noncitizen members under the Revocation Provision based on protected speech.

**SIXTH CLAIM**

**First Amendment**

**Revocation Provision**

**(Injunctive Relief)**

188. Plaintiffs re-allege and re-incorporate the preceding paragraphs as though fully set forth herein.

189. Revoking noncitizens' visas or other documentation based on protected speech violates the First Amendment for the reasons stated in Claim V.

190. Plaintiffs are entitled to injunctive relief preventing Secretary Rubio from revoking the visas or other documentation of Plaintiffs and/or their noncitizen members under the Revocation Provision based on protected speech. *See Bell*, 327 U.S. at 684; *Ex parte Young*, 209 U.S. 123.

191. Plaintiffs are entitled to injunctive relief preventing Secretary Noem from initiating deportation proceedings against Plaintiffs and/or their noncitizen members based on visas revoked under the Revocation Provision for engaging in protected speech. *See Bell*, 327 U.S. at 684; *Ex parte Young*, 209 U.S. 123.

192. Plaintiffs have no adequate legal, administrative, or other remedy by which to prevent or minimize the continuing irreparable harm to their First Amendment rights. Without injunctive relief against the Revocation Provision as applied to protected speech, Secretary Rubio's suppression and chill of Plaintiffs' First Amendment rights will continue, and Plaintiffs will suffer per se irreparable harm indefinitely.

193. The balance of equities and the public interest favors permanent injunctive relief because "it is always in the public interest to prevent the violation of a party's constitutional rights." *X Corp.*, 116 F.4th at 904 (internal quotation marks omitted).

194. The Revocation Provision is not subject to Section 1252(f)'s bar on injunctive relief because it falls outside "the provisions of part IV of this subchapter [8 U.S.C. §§ 1221–1232]." 8 U.S.C. 1252(f)(1).

**SEVENTH CLAIM**

**Fifth Amendment (Vagueness)**

**Revocation Provision**

**(Declaratory Relief)**

195. Plaintiffs re-allege and re-incorporate the preceding paragraphs as though fully set forth herein.

196. For the reasons stated in Claim III, the Fifth Amendment prohibits vague laws that fail to give the public notice of what is required or lack standards to prevent arbitrary or discriminatory enforcement.

197. The Revocation Provision is unconstitutionally vague as applied to protected speech because it provides noncitizens no notice of what protected expression could trigger the revocation of their visa or other documentation.

198. The Revocation Provision is also vague on its face as applied to protected speech, because it provides limitless discretion to government officials charged with its enforcement regarding when a noncitizen's protected speech provides a basis revoke a visa or other documentation.

199. The Revocation Provision is also unconstitutionally vague as applied to protected speech because it provides no guidance to government officials charged with its enforcement regarding when a noncitizen's expression should trigger revocation of a visa or other documentation.

200. The Revocation Provision is also unconstitutionally vague as applied to protected speech because it authorizes arbitrary and discriminatory enforcement by granting the Secretary of State and subordinate officials unfettered and unreviewable authority to revoke a visa "at any time, in his discretion." 8 U.S.C. § 1201(i).

201. Plaintiffs are entitled to a declaration under 28 U.S.C. § 2201 that the Fifth Amendment prohibits revoking the visa or other documentation of Plaintiffs or their noncitizen members under the Revocation Provision based on protected speech.

**EIGHTH CLAIM**

**Fifth Amendment**

**Discretionary Revocation Provision**

**(Injunctive Relief)**

202. Plaintiffs re-allege and re-incorporate the preceding paragraphs as though fully set forth herein.

203. The Revocation Provision is unconstitutionally void for vagueness under the Fifth Amendment as applied to revocations of visas or other documentation based on protected speech for the reasons stated in Claim VII.

204. Plaintiffs are entitled to injunctive relief preventing Secretary Rubio from revoking visas or other documentation of Plaintiffs and/or their noncitizen members under the Revocation Provision based on protected speech. *See Bell*, 327 U.S. at 684; *Ex parte Young*, 209 U.S. 123.

205. Plaintiffs are entitled to injunctive relief preventing Secretary Noem from initiating deportation proceedings against Plaintiffs and/or their noncitizen members based on visas revoked under the Revocation Provision for engaging in protected speech. *See Bell*, 327 U.S. at 684; *Ex parte Young*, 209 U.S. 123.

206. Plaintiffs have no adequate legal, administrative, or other remedy by which to prevent or minimize the continuing irreparable harm to their First Amendment rights. Without injunctive relief against the Revocation Provision as applied to protected speech, Secretary Rubio's suppression and chill of Plaintiffs' First Amendment rights will continue, and Plaintiffs will suffer per se irreparable harm indefinitely.

207. The balance of equities and the public interest favors permanent injunctive relief because "it is always in the public interest to prevent the violation of a party's constitutional rights." *X Corp.*, 116 F.4th at 904 (internal quotation marks omitted).

208. The Revocation Provision is not subject to Section 1252(f)'s bar on injunctive relief because it falls outside "the provisions of part IV of this subchapter [8 U.S.C. §§ 1221–1232]." 8 U.S.C. 1252(f)(1).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment against Defendants in their official capacities and issue the following relief:

A. Declare that the First Amendment prohibits deporting Plaintiffs and/or their noncitizen members under the Deportation Provision[2] for engaging in protected speech;[3]

B. Declare that, as to Plaintiffs and/or their noncitizen members, the Deportation Provision is void for vagueness under the Fifth Amendment as applied to deportations based on protected speech;

C. A preliminary and permanent injunction prohibiting Secretary Rubio from rendering Plaintiffs and/or their noncitizen members deportable under the Deportation Provision based on protected speech;[4]

D. A preliminary and permanent injunction prohibiting Secretary Noem from initiating deportation proceedings or otherwise invoking the Deportation Provision against Plaintiffs and/or their noncitizen members based on protected speech;

---

[2] As used in the Prayer for Relief, "Deportation Provision" has the same meaning as in Paragraph Seven above.

[3] To be clear, Plaintiffs' lawsuit does not challenge the Secretary's separate exclusion authority under 8 U.S.C. § 1182(a)(3)(C)(iii). Plaintiffs' challenge is solely to 8 U.S.C. § 1227(a)(4)(C)(i) as applied to the initiation of deportation proceedings based on protected speech.

[4] Plaintiffs acknowledge that, under 8 U.S.C. § 1252(f), only the Supreme Court has jurisdiction to "enjoin or restrain the operation" of the Deportation Provision. Plaintiffs therefore plead the request for injunctive relief so it is contained in the operative pleading and may be raised to the Supreme Court in later proceedings. Section 1252(f) does not, however, constrain this Court's ability to enjoin the Revocation Provision or render declaratory relief regarding the constitutionality of the Deportation Provision as to Plaintiffs and their noncitizen members. *See Biden v. Texas*, 597 U.S. 785, 800–01 (2022).

E. Declare that the First Amendment prohibits revoking the visas or other documentation of Plaintiffs and/or their noncitizen members under the Revocation Provision[5] based on protected speech;

F. Declare that as to Plaintiffs and/or their noncitizen members, the Revocation Provision is void for vagueness under the Fifth Amendment as applied to revocations of visas or other documentation based on protected speech;

G. A preliminary and permanent injunction prohibiting Secretary Rubio from revoking the visas or other documentation of Plaintiffs and/or their noncitizens members under the Revocation Provision for engaging in protected speech;[6]

H. A preliminary and permanent injunction prohibiting Secretary Noem from initiating deportation proceedings against Plaintiffs and/or their noncitizen members based on visas revoked under the Revocation Provision for engaging in protected speech;

I. Award reasonable attorneys' fees and costs under 28 U.S.C. § 2412(b) and any other applicable law; and

J. Award such other relief as the Court may deem just and proper.

Dated: August 6, 2025

Respectfully Submitted,

/s/ *Marc Van Der Hout*
Marc Van Der Hout (Cal. Bar #80778)
Johnny Sinodis (Cal. Bar #290402)
Oona Cahill (Cal. Bar #354525)
**VAN DER HOUT LLP**
360 Post Street, Suite 800
San Francisco, CA 94108
Telephone: (415) 981-3000
Facsimile: (415) 981-3003
Email: ndca@vblaw.com

/s/ *Conor T. Fitzpatrick*
Conor T. Fitzpatrick (Mich. Bar #P78981)*
Daniel A. Zahn (D.C. Bar #90027403)*
**FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION (FIRE)**
700 Pennsylvania Avenue SE, Suite 340
Washington, DC 20003
Telephone: (215) 717-3473
Email: conor.fitzpatrick@thefire.org
Email: daniel.zahn@thefire.org

---

[5] As used in the Prayer for Relief, "Revocation Provision" has the same meaning as in Paragraph Seven above.

[6] The Revocation Provision is not subject to Section 1252(f)'s bar on injunctive relief because it falls outside "the provisions of part IV of this subchapter [8 U.S.C. §§ 1221–1232]." 8 U.S.C. 1252(f)(1).

Colin P. McDonell (Cal. Bar #289099)
**FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION (FIRE)**
510 Walnut Street, Suite 900
Philadelphia, PA 19106
Telephone: (215) 717-3473
Email: colin.mcdonell@thefire.org

*Pro hac vice application forthcoming

*Counsel for Plaintiffs*

Case: 26-6906, 11/20/2026, DktEntry: 16.16, (137 of 158)

**VERIFICATION OF GRETA REICH**

Under 28 U.S.C. § 1746, I, Greta Reich, declare as follows:

1. I am the president of The Stanford Daily Publishing Corporation ("Stanford Daily") and editor-in-chief of *The Stanford Daily*.

2. I am an officer of Stanford Daily and am authorized by the corporation to act on its behalf.

3. I have read the foregoing Verified Complaint for Declaratory and Injunctive Relief.

4. I have personal knowledge of the factual allegations in paragraphs 15–16 and 65–88 of the Verified Complaint and know them to be true.

5. I verify under penalty of perjury that the foregoing is true and correct.

Executed on August 5, 2025.

[signature]

Greta Reich

Case: 26-6906, 11/20/2026, DktEntry: 16.16, (138 of 158)

## VERIFICATION OF JANE DOE

Under 28 U.S.C. § 1746, I, Jane Doe, declare as follows:

1. I am a Plaintiff in the present case.

2. I have read the foregoing Verified Complaint for Declaratory and Injunctive Relief.

3. I have personal knowledge of the factual allegations in paragraphs 17 (as to the allegations concerning my immigration status, my speech, and the impact of the challenged provisions on my speech), 89-94, and 100-101 of the Verified Complaint and know them to be true.

4. I verify under penalty of perjury that the foregoing is true and correct.

Executed on August 5th, 2025.

Jane Doe

Case: 26-6906, 11/20/2026, DktEntry: 16.16, (139 of 158)

## VERIFICATION OF JOHN DOE

Under 28 U.S.C. § 1746, I, John Doe, declare as follows:

1. I am a Plaintiff in the present case.

2. I have read the foregoing Verified Complaint for Declaratory and Injunctive Relief.

3. I have personal knowledge of the factual allegations in paragraphs 18 and 102–109 of the Verified Complaint and know them to be true.

4. I verify under penalty of perjury that the foregoing is true and correct.

Executed on August 5th, 2025.

John Doe

John Doe

CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney
KENNETH BRAKEBILL (CABN 196696)
Chief, Civil Division
KELSEY J. HELLAND (CABN 298888)
Assistant United States Attorney

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-6488
FAX: (415) 436-6748
kelsey.helland@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| STANFORD DAILY PUBLISHING CORP., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>RUBIO, *et al.*,<br><br>Defendants. | Case No. 5:25-cv-06618-NW<br><br>**NOTICE OF APPEAL**<br><br>The Honorable Noël Wise |

PLEASE TAKE NOTICE that Defendants hereby appeal to the United States Court of Appeals for the Ninth Circuit from the Court's August 28, 2026 Memorandum of Decision (Dkt. No. 108) and Judgment (Dkt. No. 109).

Date: October 14, 2026

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

*/s/ Kelsey J. Helland*
KELSEY J. HELLAND
Assistant United States Attorney

Attorneys for Defendants

ADRMOP,APPEAL,CLOSED,REFDIS

# U.S. District Court
# California Northern District (San Jose)
# CIVIL DOCKET FOR CASE #: 5:25-cv-06618-NW

Stanford Daily Publishing Corporation et al v. Rubio et al
Assigned to: District Judge Noel Wise
Referred to: Magistrate Judge Virginia K. DeMarchi
Case in other court: Ninth Circuit, 26-06906
Cause: 28:1331 Fed. Question

Date Filed: 08/06/2025
Date Terminated: 08/28/2026
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**Stanford Daily Publishing Corporation** represented by

**Conor T. Fitzpatrick**
Foundation for Individual Rights and Expression
700 Pennsylvania Avenue SE
Suite 340
Washington, DC 20003
215-717-3473
Email: conor.fitzpatrick@fire.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Colin Patrick McDonell**
Foundation for Individual Rights and Expression
510 Walnut Street
Suite 900
19106
Philadelphia, PA 19106
215-717-3473
Email: colin.mcdonell@fire.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel A. Zahn**
Foundation for Individual Rights and Expression
700 Pennsylvania Ave. SE
Ste. 340
Washington, DC 20003
215-717-3473
Email: daniel.zahn@thefire.org
*TERMINATED: 05/15/2026*
*PRO HAC VICE*

**John Nicholas Sinodis**
Van Der Hout, LLP
360 Post St.
Ste 800

San Francisco, CA 94104
415-821-8820
Fax: 415-981-3003
Email: ndca@vblaw.com
*ATTORNEY TO BE NOTICED*

**Oona Cahill**
Van Der Hout LLP
360 Post St.
Suite 800
San Francisco, CA 94108
415-981-3000
Email: ocah@vblaw.com
*ATTORNEY TO BE NOTICED*

**Marc Van Der Hout**
Van Der Hout, LLP
360 Post St.
Ste 800
San Francisco, CA 94108
415-981-3000
Fax: 415-981-3003
Email: ndca@vblaw.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jane Doe** represented by

**Conor T. Fitzpatrick**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Colin Patrick McDonell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel A. Zahn**
(See above for address)
*TERMINATED: 05/15/2026*
*PRO HAC VICE*

**John Nicholas Sinodis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Oona Cahill**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marc Van Der Hout**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **John Doe** | represented by | **Conor T. Fitzpatrick**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED*<br><br>**Colin Patrick McDonell**<br>(See above for address)<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED*<br><br>**Daniel A. Zahn**<br>(See above for address)<br>*TERMINATED: 05/15/2026*<br>*PRO HAC VICE*<br><br>**John Nicholas Sinodis**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br><br>**Oona Cahill**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br><br>**Marc Van Der Hout**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

V.

**Defendant**

| | | |
|---|---|---|
| **Marco Rubio**<br>*in his official capacity as Secretary of State* | represented by | **Kelsey John Helland**<br>United States Attorney's Office<br>450 Golden Gate Avenue, Box 36055<br>San Francisco, CA 94102<br>(415) 436-6488<br>Email: kelsey.helland@usdoj.gov<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **Kristi Noem**<br>*in her official capacity as Secretary of Homeland Security* | represented by | **Kelsey John Helland**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **The Reporters Committee for Freedom of the Press** | represented by | **Gabriel Rottman**<br>Reporters Committee for Freedom of the Press<br>1156 15th St. NW<br>Ste 1020 |

Washington, DC 20005
202-795-9316
Email: gabe.rottman@gmail.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Immigration Lawyers, Law Professors, and Scholars**

**Defendant**

**Markwayne Mullin** represented by **Kelsey John Helland**
United States Attorney's Office
Department of Justice, Civil Division
450 Golden Gate Avenue, Box 36055
San Francisco, CA 94102
(415) 436-6488
Email: kelsey.helland@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**State of Washington** represented by **Cristina Sepe**
Washington State Office of the Attorney General
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
360-753-7085
Email: cristina.sepe@atg.wa.gov
*ATTORNEY TO BE NOTICED*

**Amicus**

**Reporters Committee for Freedom of the Press** represented by **Daniel A. Laidman**
Davis Wright Tremaine LLP
350 South Grand Avenue
Ste 2700
Los Angeles, CA 90071
213-633-6800
Email: danlaidman@dwt.com
*ATTORNEY TO BE NOTICED*

**Amicus**

**Committee to Protect Journalists** represented by **Daniel A. Laidman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**The Cato Institute** represented by **EmilyRose Naomi Johns**
The Law Office of EmilyRose Johns
1950 Franklin Street, Suite 1700
Oakland, CA 94612
(510) 985-4434

Email: emilyrose@erjohnslaw.com
*ATTORNEY TO BE NOTICED*

**Amicus**

**The National Coalition Against Censorship** represented by **EmilyRose Naomi Johns**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**The Rutherford Institute** represented by **EmilyRose Naomi Johns**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**American Civil Liberties Union of Northern California** represented by **Frances Cheston Thacher**
ACLU of Northern California
39 Drumm Street
San Francisco, CA 94111
415-391-5400
Fax: 415-397-7188
Email: cthacher@aclunc.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**First Amendment Coalition** represented by **Frances Cheston Thacher**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**PEN American Center** represented by **Frances Cheston Thacher**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Freedom of the Press Foundation** represented by **Frances Cheston Thacher**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**American Association of Colleges and Universities** represented by **Frances Cheston Thacher**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Blaine Bookey**
*Immigration Lawyers, Law Professors, and Scholars*

**Amicus**

**Immigration Lawyers, Law Professors, and Scholars** represented by **Blaine Meredith Bookey**
The Center for Gender and Refugee Studies
UC Hastings College of the Law
200 McAllister Street
San Francisco, CA 94102
(415) 703-8202
Fax: (415) 581-8824
Email: bookeybl@uclawsf.edu
*ATTORNEY TO BE NOTICED*

**Amicus**

**Student Press Law Center** represented by **Matthew Stephen Lee Cate**
Law Office of Matthew S.L. Cate
101 Montgomery Street, Suite 900
San Francisco, CA 94104
(415) 964-4400
Fax: (415) 964-4400
Email: matt@matthewcatelaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Associated Collegiate Press** represented by **Matthew Stephen Lee Cate**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**College Media Association** represented by **Matthew Stephen Lee Cate**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Fifty-five Student Media Outlets and Newsroom Leaders** represented by **Matthew Stephen Lee Cate**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/06/2025 | 1 | COMPLAINT *FOR DECLARATORY AND INJUNCTIVE RELIEF* against Kristi Noem, Marco Rubio ( Filing fee $ 405, receipt number ACANDC-20976625.).<br><br>Injunction against the US government/official or APA vacatur requested. Filed by Stanford Daily Publishing Corporation, John Doe, Jane Doe. (Van Der Hout, Marc) (Filed on 8/6/2025) (Entered: 08/06/2025) |
| 08/06/2025 | 2 | ADMINISTRATIVE MOTION TO PROCEED PSEUDONYMOUSLY filed by Jane Doe, John Doe. Responses due by 8/11/2025. (Attachments: # 1 Proposed Order)(Van Der Hout, Marc) (Filed on 8/6/2025) (Entered: 08/06/2025) |

| | | |
|---|---|---|
| 08/06/2025 | 3 | Proposed Summons. (Van Der Hout, Marc) (Filed on 8/6/2025) (Entered: 08/06/2025) |
| 08/06/2025 | 4 | Proposed Summons. (Van Der Hout, Marc) (Filed on 8/6/2025) (Entered: 08/06/2025) |
| 08/06/2025 | 5 | Certificate of Interested Entities by Stanford Daily Publishing Corporation (Van Der Hout, Marc) (Filed on 8/6/2025) (Entered: 08/06/2025) |
| 08/06/2025 | 6 | Certificate of Interested Entities by Jane Doe (Van Der Hout, Marc) (Filed on 8/6/2025) (Entered: 08/06/2025) |
| 08/06/2025 | 7 | Certificate of Interested Entities by John Doe (Van Der Hout, Marc) (Filed on 8/6/2025) (Entered: 08/06/2025) |
| 08/06/2025 | 8 | NOTICE of Appearance filed by Colin Patrick McDonell on behalf of Stanford Daily Publishing Corporation, Jane Doe, John Doe (McDonell, Colin) (Filed on 8/6/2025) (Entered: 08/06/2025) |
| 08/06/2025 | 9 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 328, receipt number ACANDC-20976659.) filed by Stanford Daily Publishing Corporation, Jane Doe, John Doe. (Fitzpatrick, Conor) (Filed on 8/6/2025) (Entered: 08/06/2025) |
| 08/06/2025 | 10 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 328, receipt number ACANDC-20976661.) filed by Stanford Daily Publishing Corporation, Jane Doe, John Doe. (Zahn, Daniel) (Filed on 8/6/2025) (Entered: 08/06/2025) |
| 08/06/2025 | 11 | MOTION for Preliminary Injunction *and Preliminary Factual Findings and Legal Conclusions* filed by Stanford Daily Publishing Corporation, Jane Doe, John Doe. Responses due by 8/20/2025. Replies due by 8/27/2025. (Attachments: # 1 Proposed Order)(Van Der Hout, Marc) (Filed on 8/6/2025) (Entered: 08/06/2025) |
| 08/06/2025 | 12 | Declaration in Support of 11 MOTION for Preliminary Injunction *and Preliminary Factual Findings and Legal Conclusions* filed byStanford Daily Publishing Corporation, Jane Doe, John Doe. (Related document(s) 11 ) (Van Der Hout, Marc) (Filed on 8/6/2025) (Entered: 08/06/2025) |
| 08/06/2025 | 13 | EXHIBITS re 12 Declaration in Support, *Exhibits A-I* filed byStanford Daily Publishing Corporation, Jane Doe, John Doe. (Related document(s) 12 ) (Van Der Hout, Marc) (Filed on 8/6/2025) (Entered: 08/06/2025) |
| 08/06/2025 | 14 | EXHIBITS re 12 Declaration in Support, *Exhibits J-O* filed byStanford Daily Publishing Corporation, Jane Doe, John Doe. (Related document(s) 12 ) (Van Der Hout, Marc) (Filed on 8/6/2025) (Entered: 08/06/2025) |
| 08/06/2025 | 15 | Case assigned to District Judge Noel Wise.<br><br>Counsel for plaintiff or the removing party is responsible for serving the Complaint or Notice of Removal, Summons and the assigned judge's standing orders and all other new case documents upon the opposing parties. For information, visit *E-Filing A New Civil Case* at http://cand.uscourts.gov/ecf/caseopening.<br><br>Standing orders can be downloaded from the court's web page at www.cand.uscourts.gov/judges. Upon receipt, the summons will be issued and returned electronically. A scheduling order will be sent by Notice of Electronic Filing (NEF) within two business days. (ark, COURT STAFF) (Filed on 8/6/2025) (Entered: 08/06/2025) |
| 08/06/2025 | | CASE REFERRED to Magistrate Judge Virginia K. DeMarchi for Discovery. (smc, COURT STAFF) (Filed on 8/6/2025) (Entered: 08/06/2025) |

| | | |
|---|---|---|
| 08/06/2025 | 16 | **ORDER granting 10 Motion for Pro Hac Vice re attorney Daniel Zahn** *by Judge Noel Wise.* (akw, COURT STAFF) (Filed on 8/6/2025) (Entered: 08/06/2025) |
| 08/06/2025 | 17 | **ORDER granting 9 Motion for Pro Hac Vice attorney Conor Fitzpatrick** *by Judge Noel Wise.* (akw, COURT STAFF) (Filed on 8/6/2025) (Entered: 08/06/2025) |
| 08/06/2025 | 18 | **Initial Case Management Scheduling Order with ADR Deadlines: Case Management Statement due by 10/28/2025. Initial Case Management Conference set for 11/4/2025 09:00 AM in San Jose, Courtroom 3, 5th Floor. (hdj, COURT STAFF) (Filed on 8/6/2025) (Entered: 08/06/2025)** |
| 08/06/2025 | 19 | Summons Issued as to Kristi Noem, Marco Rubio, (Attachments: # 1 Summons)(hdj, COURT STAFF) (Filed on 8/6/2025) (Entered: 08/06/2025) |
| 08/11/2025 | 20 | SUMMONS Returned Executed by Stanford Daily Publishing Corporation, John Doe, Jane Doe. Marco Rubio served on 8/8/2025, answer due 8/29/2025. (Fitzpatrick, Conor) (Filed on 8/11/2025) (Entered: 08/11/2025) |
| 08/11/2025 | 21 | SUMMONS Returned Executed by Stanford Daily Publishing Corporation, John Doe, Jane Doe. Kristi Noem served on 8/8/2025, answer due 8/29/2025. (Fitzpatrick, Conor) (Filed on 8/11/2025) (Entered: 08/11/2025) |
| 08/11/2025 | 22 | CERTIFICATE OF SERVICE by Stanford Daily Publishing Corporation, Jane Doe, John Doe re 12 Declaration in Support, 18 Initial Case Management Scheduling Order with ADR Deadlines, 17 Order on Motion for Pro Hac Vice, 2 ADMINISTRATIVE MOTION TO PROCEED PSEUDONYMOUSLY , 4 Proposed Summons, 5 Certificate of Interested Entities, Case Referred to Magistrate Judge for Discovery, 14 Exhibits, 8 Notice of Appearance/Substitution/Withdrawal of Attorney, 15 Case Assigned by Intake,, 13 Exhibits, 6 Certificate of Interested Entities, 7 Certificate of Interested Entities, 16 Order on Motion for Pro Hac Vice, 3 Proposed Summons, 11 MOTION for Preliminary Injunction *and Preliminary Factual Findings and Legal Conclusions* (Fitzpatrick, Conor) (Filed on 8/11/2025) (Entered: 08/11/2025) |
| 08/11/2025 | 23 | NOTICE by Stanford Daily Publishing Corporation, Jane Doe, John Doe re 11 MOTION for Preliminary Injunction *and Preliminary Factual Findings and Legal Conclusions* (Attachments: # 1 Declaration of Garry Kasparov, # 2 Declaration of Uriel Epshtein) (Fitzpatrick, Conor) (Filed on 8/11/2025) (Entered: 08/11/2025) |
| 08/18/2025 | 24 | STIPULATION WITH PROPOSED ORDER re 11 MOTION for Preliminary Injunction *and Preliminary Factual Findings and Legal Conclusions* filed by Stanford Daily Publishing Corporation, Jane Doe, John Doe. (Fitzpatrick, Conor) (Filed on 8/18/2025) (Entered: 08/18/2025) |
| 08/18/2025 | 25 | **ORDER DENYING 24 Stipulation to Extend Time and Set Briefing Schedule for Plaintiffs' Motion for Preliminary Injunction and Preliminary Factual Findings and Legal Conclusions** *signed by Judge Noel Wise.* (akw, COURT STAFF) (Filed on 8/18/2025) (Entered: 08/18/2025) |
| 08/19/2025 | 26 | STIPULATION WITH PROPOSED ORDER re 11 MOTION for Preliminary Injunction *and Preliminary Factual Findings and Legal Conclusions* filed by Stanford Daily Publishing Corporation, Jane Doe, John Doe. (Fitzpatrick, Conor) (Filed on 8/19/2025) (Entered: 08/19/2025) |
| 08/20/2025 | 27 | **ORDER GRANTING 26 STIPULATION TO EXTEND TIME AND SET BRIEFING SCHEDULE FOR PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND PRELIMINARY FACTUAL FINDINGS AND LEGAL CONCLUSIONS** *signed by Judge Noel Wise on 8/20/2025.*<br>Preliminary Injunction Hearing reset for 10/1/2025 at 09:00 AM in San Jose, Courtroom |

| | | |
|---|---|---|
| | | 3, 5th Floor before District Judge Noel Wise. (akw, COURT STAFF) (Filed on 8/20/2025) (Entered: 08/20/2025) |
| 08/27/2025 | 28 | STIPULATION WITH PROPOSED ORDER re 11 MOTION for Preliminary Injunction *and Preliminary Factual Findings and Legal Conclusions* filed by Stanford Daily Publishing Corporation, Jane Doe, John Doe. (Fitzpatrick, Conor) (Filed on 8/27/2025) (Entered: 08/27/2025) |
| 08/27/2025 | 29 | NOTICE of Appearance filed by Kelsey John Helland on behalf of Marco Rubio, Kristi Noem (Helland, Kelsey) (Filed on 8/27/2025) (Entered: 08/27/2025) |
| 08/28/2025 | 30 | **ORDER GRANTING 28 STIPULATION FOR EXPEDITED SUMMARY JUDGMENT BRIEFING** *signed by Judge Noel Wise on 8/28/2025.*<br><br>Motion for Summary Judgement Hearing set for 11/19/2025 at 09:00 AM in San Jose, Courtroom 3, 5th Floor before District Judge Noel Wise.<br><br>**Plaintiff is directed to re-notice the Motion for Preliminary Injunction as a Motion for Summary Judgment pursuant to the stipulation by September 3, 2025. The hearing on both the Parties cross-motions for summary judgment shall be set for Wednesday, November 19, 2025, at 9:00 a.m. (akw, COURT STAFF) (Filed on 8/28/2025) (Entered: 08/28/2025)** |
| 08/28/2025 | 31 | **CLERK'S NOTICE RESETTING CASE MANAGEMENT CONFERENCE DEADLINES.**<br>November 4, 2025 Case Management Conference reset to November 19,2025 to be heard concurrently with motion hearings.<br>Case Management Statement due by 11/4/2025. Initial Case Management Conference set for 11/19/2025 at 09:00 AM in San Jose, Courtroom 3, 5th Floor.<br>*(This is a text-only entry generated by the court. There is no document associated with this entry.)* (akw, COURT STAFF) (Filed on 8/28/2025) (Entered: 08/28/2025) |
| 08/29/2025 | 32 | MOTION for Summary Judgment filed by Stanford Daily Publishing Corporation, Jane Doe, John Doe. Motion for Summary Judgment Hearing set for 11/19/2025 09:00 AM in San Jose, Courtroom 3, 5th Floor before District Judge Noel Wise. Responses due by 9/24/2025. Replies due by 10/20/2025. (Attachments: # 1 Motion for Preliminary Injunction and Preliminary Factual Findings and Legal Conclusions)(Fitzpatrick, Conor) (Filed on 8/29/2025) (Entered: 08/29/2025) |
| 09/24/2025 | 33 | Cross MOTION for Summary Judgment *and Opposition to Plaintiffs' Motion for Summary Judgment* filed by Marco Rubio, Kristi Noem. Motion for Summary Judgment Hearing set for 11/19/2025 09:00 AM in San Jose, Courtroom 3, 5th Floor before District Judge Noel Wise. Responses due by 10/20/2025. Replies due by 11/3/2025. (Attachments: # 1 Declaration of Kelsey J. Helland, # 2 Proposed Order)(Helland, Kelsey) (Filed on 9/24/2025) (Entered: 09/24/2025) |
| 10/14/2025 | 34 | ADMINISTRATIVE MOTION to Stay Defendants' Briefing Deadlines and Continue Summary Judgment Hearing Pending Government Shutdown filed by Marco Rubio, Kristi Noem. Responses due by 10/20/2025. (Attachments: # 1 Declaration of Kelsey J. Helland)(Helland, Kelsey) (Filed on 10/14/2025) (Entered: 10/14/2025) |
| 10/14/2025 | 35 | ADR Certification (ADR L.R. 3-5 b) of discussion of ADR options (Fitzpatrick, Conor) (Filed on 10/14/2025) (Entered: 10/14/2025) |
| 10/15/2025 | 36 | ***filed in error*** MOTION for leave to appear in Pro Hac Vice *for proposed amicus the Reporters Committee for Freedom of the Press* ( Filing fee $ 328, receipt number ACANDC-21239426.) filed by The Reporters Committee for Freedom of the Press. |

| | | |
|---|---|---|
| | | (Rottman, Gabriel) (Filed on 10/15/2025) Modified on 10/15/2025 (hdj, COURT STAFF). (Entered: 10/15/2025) |
| 10/15/2025 | 37 | MOTION to File Amicus Curiae Brief filed by State of Washington. Responses due by 10/29/2025. Replies due by 11/5/2025. (Attachments: # 1 Exhibit Proposed Amicus Brief) (Sepe, Cristina) (Filed on 10/15/2025) (Entered: 10/15/2025) |
| 10/15/2025 | 38 | Consent MOTION for Leave to File *Amici Curiae Brief In Support Of Plaintiffs Motion For Summary Judgment* filed by Reporters Committee for Freedom of the Press, Committee to Protect Journalists. (Attachments: # 1 Brief of Proposed Amici Curiae In Support of Plaintitffs' Motion for Summary Judgment, # 2 Proposed Order)(Laidman, Daniel) (Filed on 10/15/2025) (Entered: 10/15/2025) |
| 10/15/2025 | 39 | MOTION for Leave to File *Amicus Curiae Brief* filed by The Cato Institute, The National Coalition Against Censorship, The Rutherford Institute. (Johns, EmilyRose) (Filed on 10/15/2025) (Entered: 10/15/2025) |
| 10/15/2025 | 40 | ADMINISTRATIVE MOTION Leave to File Amicus Brief filed by American Civil Liberties Union of Northern California, First Amendment Coalition, PEN American Center, Freedom of the Press Foundation, American Association of Colleges and Universities. Responses due by 10/20/2025. (Attachments: # 1 Proposed Amicus Brief, # 2 Proposed Order Proposed Order)(Thacher, Frances Cheston) (Filed on 10/15/2025) (Entered: 10/15/2025) |
| 10/15/2025 | 41 | MOTION to File Amicus Curiae Brief filed by Blaine Bookey, Immigration Lawyers, Law Professors, and Scholars. Responses due by 10/29/2025. (Attachments: # 1 Appendix)(Bookey, Blaine) (Filed on 10/15/2025) (Entered: 10/15/2025) |
| 10/15/2025 | 42 | Consent MOTION for Leave to File *as Amici Curiae in Support of Plaintiffs' Motion for Summary Judgment* filed by Student Press Law Center, Associated Collegiate Press, College Media Association, Fifty-five Student Media Outlets and Newsroom Leaders. (Attachments: # 1 Proposed Brief of Student Press Amici, # 2 Proposed Order)(Cate, Matthew) (Filed on 10/15/2025) (Entered: 10/15/2025) |
| 10/16/2025 | 43 | OPPOSITION/RESPONSE (re 34 ADMINISTRATIVE MOTION to Stay Defendants' Briefing Deadlines and Continue Summary Judgment Hearing Pending Government Shutdown ) filed byStanford Daily Publishing Corporation, Jane Doe, John Doe. (Attachments: # 1 Proposed Order Denying Defendants' Administrative Motion for a Stay)(Fitzpatrick, Conor) (Filed on 10/16/2025) (Entered: 10/16/2025) |
| 10/20/2025 | 44 | OPPOSITION/RESPONSE (re 33 Cross MOTION for Summary Judgment *and Opposition to Plaintiffs' Motion for Summary Judgment*, 32 MOTION for Summary Judgment ) *Plaintiffs Combined Response to Defendants Cross-Motion for Summary Judgment and Reply in Support of Motion for Summary Judgment* filed byStanford Daily Publishing Corporation, Jane Doe, John Doe. (Attachments: # 1 Declaration of Conor Fitzpatrick in Support of Plaintiffs Motion for Summary Judgment, # 2 Proposed Order Granting Plaintiffs' Motion for Summary Judgment and Denying Defendants' Motion for Summary Judgment)(Fitzpatrick, Conor) (Filed on 10/20/2025) (Entered: 10/20/2025) |
| 10/20/2025 | 45 | **ORDER FOR SUPPLEMENTAL BRIEFING** *signed by Judge Noel Wise on 10/20/2025.*<br>Defendants shall file a supplemental brief of no more than 3 pages by Wednesday, October 22, 2025, at 5:00p.m. (akw, COURT STAFF) (Filed on 10/20/2025) (Entered: 10/20/2025) |
| 10/22/2025 | 46 | Supplemental Brief re 34 ADMINISTRATIVE MOTION to Stay Defendants' Briefing Deadlines and Continue Summary Judgment Hearing Pending Government Shutdown |

| | | |
|---|---|---|
| | | filed byMarco Rubio, Kristi Noem. (Attachments: # 1 DOJ Contingency Plan)(Related document(s) 34 ) (Helland, Kelsey) (Filed on 10/22/2025) (Entered: 10/22/2025) |
| 10/23/2025 | 47 | **ORDER DENYING 34 ADMINISTRATIVE MOTION FOR A STAY** *signed by Judge Noel Wise on 10/23/2025.* (akw, COURT STAFF) (Filed on 10/23/2025) (Entered: 10/23/2025) |
| 11/03/2025 | 48 | REPLY (re 33 Cross MOTION for Summary Judgment *and Opposition to Plaintiffs' Motion for Summary Judgment* ) filed byKristi Noem, Marco Rubio. (Attachments: # 1 Declaration (Supplemental) of Kelsey J. Helland)(Helland, Kelsey) (Filed on 11/3/2025) (Entered: 11/03/2025) |
| 11/13/2025 | 49 | **ORDER. For good cause shown, the Court GRANTS the various unopposed Motions for Leave to File as Amici Curiae, ECF Nos. 37, 38, 39, 40, 41, and 42. The proposed briefs previously filed as attachments to the respective motions for leave are deemed filed. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (nwlc2, COURT STAFF) (Filed on 11/13/2025) (Entered: 11/13/2025)** |
| 11/13/2025 | 50 | CLERK'S NOTICE REGARDING MOTION HEARING<br><br>At the November 19, 2025 motion hearing, Plaintiffs, Defendants, and Amici will be allowed to speak during the hearing. If Amici elect to speak, Amici will each be allotted 5 minutes. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (nwlc2, COURT STAFF) (Filed on 11/13/2025) (Entered: 11/13/2025) |
| 11/13/2025 | 51 | **Order by District Judge Noel Wise granting 2 Administrative Motion to Proceed Pseudonymously. (nwlc2, COURT STAFF) (Filed on 11/13/2025) (Entered: 11/13/2025)** |
| 11/17/2025 | 52 | **ORDER REGARDING QUESTIONS FOR NOVEMBER 19, 2025 HEARING** *signed by Judge Noel Wise on 11/17/2025.* (akw, COURT STAFF) (Filed on 11/17/2025) (Entered: 11/17/2025) |
| 11/17/2025 | 53 | NOTICE by Kristi Noem, Marco Rubio re 52 Order *Regarding Plaintiffs' Standing* (Helland, Kelsey) (Filed on 11/17/2025) (Entered: 11/17/2025) |
| 11/18/2025 | 54 | NOTICE by Reporters Committee for Freedom of the Press *to Protect Journalists Regarding Oral Argument* (Laidman, Daniel) (Filed on 11/18/2025) (Entered: 11/18/2025) |
| 11/18/2025 | 55 | NOTICE by Immigration Lawyers, Law Professors, and Scholars *Regarding Oral Argument* (Bookey, Blaine) (Filed on 11/18/2025) (Entered: 11/18/2025) |
| 11/19/2025 | 56 | NOTICE by Associated Collegiate Press, College Media Association, Fifty-five Student Media Outlets and Newsroom Leaders, Student Press Law Center (Cate, Matthew) (Filed on 11/19/2025) (Entered: 11/19/2025) |
| 11/19/2025 | 57 | NOTICE of Appearance filed by John Nicholas Sinodis on behalf of Jane Doe, John Doe, Stanford Daily Publishing Corporation (Sinodis, John) (Filed on 11/19/2025) (Entered: 11/19/2025) |
| 11/19/2025 | 58 | NOTICE of Appearance filed by Oona Cahill on behalf of Jane Doe, John Doe, Stanford Daily Publishing Corporation (Cahill, Oona) (Filed on 11/19/2025) (Entered: 11/19/2025) |
| 11/19/2025 | 59 | NOTICE of Appearance filed by Marc Van Der Hout on behalf of Jane Doe, John Doe, Stanford Daily Publishing Corporation (Van Der Hout, Marc) (Filed on 11/19/2025) (Entered: 11/19/2025) |

| | | |
|---|---|---|
| 11/19/2025 | 60 | **ORDER DENYING CROSS-MOTIONS FOR SUMMARY JUDGMENT WITHOUT PREJUDICE. (nwlc2, COURT STAFF) (Filed on 11/19/2025) (Entered: 11/19/2025)** |
| 11/19/2025 | 61 | **Minute Entry for proceedings held before *District Judge Noel Wise:*** <br><br> Motions for Summary Judgment Hearing and Initial Case Management Conference held on 11/19/2025. <br> Argument presented by counsel for both parties. The Court denied the parties' Cross-Motions for Summary Judgment without prejudice. The Court set the following briefing schedule. Defendant to file motion to dismiss no later than December 3, 2025. Opposition due by December 10, 2025. Any reply ordered filed by December 17, 2025. Case Management Conference continued to January 6, 2025. <br><br> Digital Recording Time: 9:01 - 9:41 Liberty. <br> **Transcriber Velvet Quill Communications, Email: info@velvetquill.com** <br><br> Plaintiff Attorney: Conor Fitzpatrick, Colin McDonell, Daniel Zahn, Marc Van Der Hout. <br> Defendant Attorney: Kelsey Helland. <br> *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (akw, COURT STAFF) (Date Filed: 11/19/2025) Modified on 10/26/2026 (lmh, COURT STAFF). (Entered: 11/20/2025) |
| 11/20/2025 | 62 | **CLERK'S NOTICE SETTING FURTHER CASE MANAGEMENT CONFERNECE.** <br> Case Management Statement due by 12/23/2025. Further Case Management Conference set for 1/6/2026 at 09:00 AM in San Jose, - Videoconference Only. This proceeding will be held via a Zoom Meeting. <br><br> **Meeting Access:** All counsel may access the meeting information at https://www.cand.uscourts.gov/judges/wise-noel-nw/ <br><br> **Court Appearances:** Advanced notice is required of counsel or parties who wish to be identified by the court as making an appearance or will be participating in the argument at the hearing. A list of names and emails must be sent to the CRD at nwcrd@cand.uscourts.gov no later than January 2, 2026, at 5:00pm. <br><br> **Civ LR 77-3(d).** Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited. <br><br> **Zoom Guidance and Setup:** https://www.cand.uscourts.gov/zoom/. <br><br> Case Management Statement due by 12/23/2025. Further Case Management Conference set for 1/6/2026 at 09:00 AM in San Jose, - Videoconference Only. <br> *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (akw, COURT STAFF) (Filed on 11/20/2025) (Entered: 11/20/2025) |
| 12/01/2025 | 63 | STIPULATION WITH PROPOSED ORDER re 61 Motion Hearing,,,, Case Management Conference - Initial,,,, Terminate Hearings,,, 60 Order on Motion for Summary Judgment, filed by Jane Doe, John Doe, Stanford Daily Publishing Corporation. (Attachments: # 1 Proposed Order)(McDonell, Colin) (Filed on 12/1/2025) (Entered: 12/01/2025) |
| 12/01/2025 | 64 | **ORDER GRANTING AS MODIFIED 63 STIPULATION FOR AMENDED SCHEDULING ORDER** *signed by Judge Noel Wise on 12/1/2025.* |

| | | |
|---|---|---|
| | | January 6, 2026 Case Management Conference vacated.<br>Motion to Dismiss Hearing set for 1/8/2026 at 09:00 AM in San Jose, Courtroom 3, 5th Floor before District Judge Noel Wise. (akw, COURT STAFF) (Filed on 12/1/2025) (Entered: 12/01/2025) |
| 12/04/2025 | 65 | AMENDED COMPLAINT *for Declaratory and Injunctive Relief - Verified* against Kristi Noem, Marco Rubio. Filed by Jane Doe, Stanford Daily Publishing Corporation, John Doe. (Attachments: # 1 Redline - Verified Amended Complaint for Declaratory and Injunctive Relief)(Fitzpatrick, Conor) (Filed on 12/4/2025) (Entered: 12/04/2025) |
| 12/12/2025 | 66 | MOTION to Dismiss for Lack of Jurisdiction filed by Kristi Noem, Marco Rubio. Motion Hearing set for 1/8/2026 09:00 AM in San Jose, Courtroom 3, 5th Floor before District Judge Noel Wise. Responses due by 12/19/2025. Replies due by 12/29/2025. (Attachments: # 1 Proposed Order)(Helland, Kelsey) (Filed on 12/12/2025) (Entered: 12/12/2025) |
| 12/19/2025 | 67 | OPPOSITION/RESPONSE (re 66 MOTION to Dismiss for Lack of Jurisdiction ) filed byJane Doe, John Doe, Stanford Daily Publishing Corporation. (Fitzpatrick, Conor) (Filed on 12/19/2025) (Entered: 12/19/2025) |
| 12/29/2025 | 68 | REPLY (re 66 MOTION to Dismiss for Lack of Jurisdiction ) filed byKristi Noem, Marco Rubio. (Helland, Kelsey) (Filed on 12/29/2025) (Entered: 12/29/2025) |
| 12/29/2025 | 69 | MOTION for Summary Judgment *Re-Noticed Motion per Court's December 1, 2025, Order* filed by Jane Doe, John Doe, Stanford Daily Publishing Corporation. Motion for Summary Judgment Hearing set for 5/6/2026 09:00 AM in San Jose, Courtroom 3, 5th Floor before District Judge Noel Wise. Responses due by 1/12/2026. Replies due by 1/20/2026. (Attachments: # 1 Motion for Preliminary Injunction and Preliminary Factual Findings and Legal Conclusions, # 2 Combined Response to Defendants Cross-Motion for Summary Judgment and Reply in Support of Motion for Summary Judgment) (Fitzpatrick, Conor) (Filed on 12/29/2025) Modified on 8/26/2026 (akw, COURT STAFF). (Entered: 12/29/2025) |
| 12/29/2025 | 70 | Renotice motion hearing re 33 Cross MOTION for Summary Judgment *and Opposition to Plaintiffs' Motion for Summary Judgment* filed byKristi Noem, Marco Rubio. (Related document(s) 33 ) (Helland, Kelsey) (Filed on 12/29/2025) (Entered: 12/29/2025) |
| 12/29/2025 | 71 | **CLERK'S NOTICE ADVANICNG MOTION HEARINGS**<br><br>Motion to Dismiss Hearings 64 66 **advanced from January 8, 2026 to January 6, 2026 at 09:00 AM** in San Jose, Courtroom 3, 5th Floor before District Judge Noel Wise. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (akw, COURT STAFF) (Filed on 12/29/2025) (Entered: 12/29/2025) |
| 01/06/2026 | 72 | **Minute Entry for proceedings held before District Judge Noel Wise:**<br>Motions Hearing held on 1/6/2026. Argument presented by Counsel. The Court took the motions under submission. Order shall issue.<br><br>Total Time in Court: 2:03.<br>Court Reporter: Summer Fisher.<br><br>Plaintiff Attorney: Conor Fitzpatrick, Daniel Zahn, Marc Van Der Hout.<br>Defendant Attorney: Kelsey Helland.<br>*(This is a text-only entry generated by the court. There is no document associated with this entry.)* (akw, COURT STAFF) (Date Filed: 1/6/2026) (Entered: 01/06/2026) |
| 01/07/2026 | 73 | TRANSCRIPT ORDER for proceedings held on 01/06/2026 before District Judge Noel Wise by Jane Doe, John Doe, Stanford Daily Publishing Corporation, for Court Reporter |

| | | |
|---|---|---|
| | | Summer Fisher. (Fitzpatrick, Conor) (Filed on 1/7/2026) (Entered: 01/07/2026) |
| 01/12/2026 | 74 | Transcript of Proceedings held on 01/06/2026, before Judge Noel Wise. Court Reporter/Transcriber Summer Fisher, telephone number summer_fisher@cand.uscourts.gov 408-763-0563. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re 73 Transcript Order ) Redaction Request due 2/2/2026. Redacted Transcript Deadline set for 2/12/2026. Release of Transcript Restriction set for 4/13/2026. (Related documents(s) 73 ) (Fisher, Summer) (Filed on 1/12/2026) (Entered: 01/12/2026) |
| 01/16/2026 | 75 | **ORDER DENYING 66 MOTION TO DISMISS** *signed by Judge Noel Wise on 1/16/2026.* (akw, COURT STAFF) (Filed on 1/16/2026) (Entered: 01/16/2026) |
| 02/13/2026 | 76 | ANSWER to Amended Complaint by Kristi Noem, Marco Rubio. (Helland, Kelsey) (Filed on 2/13/2026) (Entered: 02/13/2026) |
| 03/06/2026 | 77 | STIPULATION WITH PROPOSED ORDER *for Amended Scheduling Order* filed by Kristi Noem, Marco Rubio. (Attachments: # 1 Proposed Order)(Helland, Kelsey) (Filed on 3/6/2026) (Entered: 03/06/2026) |
| 03/13/2026 | 78 | **ORDER GRANTING 77 STIPULATION RE SCHEDULING** *signed by Judge Noel Wise on 3/13/2026.*<br><br>May 6, 2026 Motion for Summary Judgment 69 Hearing converted to a Bench Trial and reset for May 14, 2026 at 09:00 AM in Courtroom 3, 5th Floor, before District Judge Noel Wise. (akw, COURT STAFF) (Filed on 3/13/2026) (Entered: 03/13/2026) |
| 03/27/2026 | 79 | Renotice motion hearing re 69 MOTION for Summary Judgment *Re-Noticed Motion per Court's December 1, 2025, Order per Court's March 13, 2026, Order* filed byJane Doe, John Doe, Stanford Daily Publishing Corporation. (Related document(s) 69 ) (Fitzpatrick, Conor) (Filed on 3/27/2026) (Entered: 03/27/2026) |
| 03/27/2026 | 80 | Renotice motion hearing re 33 Cross MOTION for Summary Judgment *and Opposition to Plaintiffs' Motion for Summary Judgment Converted to Trial on the Papers per 78* filed byMarco Rubio, Markwayne Mullin. (Related document(s) 33 ) (Helland, Kelsey) (Filed on 3/27/2026) (Entered: 03/27/2026) |
| 03/27/2026 | 81 | EXHIBITS re 78 Order,, Terminate Motions,, Set Hearings,, Terminate Hearings, *and DECLARATION and MANUAL FILING NOTIFICATION* filed byJane Doe, John Doe, Stanford Daily Publishing Corporation. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit)(Related document(s) 78 ) (Zahn, Daniel) (Filed on 3/27/2026) (Entered: 03/27/2026) |
| 03/27/2026 | 82 | EXHIBITS re 78 Order,, Terminate Motions,, Set Hearings,, Terminate Hearings, filed byJane Doe, John Doe, Stanford Daily Publishing Corporation. (Attachments: # 1 AAUP Trial Transcript July 7, # 2 AAUP Trial Transcript July 8, # 3 AAUP Trial Transcript July 9, # 4 AAUP Trial Transcript July 10, # 5 AAUP Trial Transcript July 11, # 6 AAUP Trial Transcript July 14, # 7 AAUP Trial Transcript July 15, # 8 AAUP Trial Transcript July 17, # 9 AAUP Trial Transcript July 18, # 10 AAUP Trial Transcript July 21)(Related document(s) 78 ) (Zahn, Daniel) (Filed on 3/27/2026) (Entered: 03/27/2026) |
| 04/08/2026 | 83 | **ORDER. Ahead of the parties upcoming bench trial on the papers, the Court orders the parties to file a short statement, of no more than 3 pages, with an estimate of how much time (in hours) they will need to present their case. The parties shall** |

| | | |
|---|---|---|
| | | **include the time requested per side as well as the total time estimated. The parties may file a joint statement or separate statements. The parties shall file by April 15, 2026. Signed by Judge Noel Wise on April 8, 2026. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (nwlc2, COURT STAFF) (Filed on 4/8/2026) (Entered: 04/08/2026)** |
| 04/09/2026 | 84 | Supplemental Brief filed byMarkwayne Mullin, Marco Rubio. (Helland, Kelsey) (Filed on 4/9/2026) (Entered: 04/09/2026) |
| 04/09/2026 | 85 | Statement re 78 Order,, Terminate Motions,, Set Hearings,, Terminate Hearings, *Joint Statement of Undisputed Facts* by Jane Doe, John Doe, Stanford Daily Publishing Corporation. (Fitzpatrick, Conor) (Filed on 4/9/2026) (Entered: 04/09/2026) |
| 04/09/2026 | 86 | Statement re 78 Order,, Terminate Motions,, Set Hearings,, Terminate Hearings, *Plaintiffs' Unilateral Statement of Disputed Facts* by Jane Doe, John Doe, Stanford Daily Publishing Corporation. (Fitzpatrick, Conor) (Filed on 4/9/2026) (Entered: 04/09/2026) |
| 04/09/2026 | 87 | Supplemental Brief re 79 Renotice motion hearing, *Supplemental Brief in Support of Judgment* filed byJane Doe, John Doe, Stanford Daily Publishing Corporation. (Related document(s) 79 ) (Fitzpatrick, Conor) (Filed on 4/9/2026) (Entered: 04/09/2026) |
| 04/14/2026 | 88 | Statement *(Joint)* re 83 Order,, by Jane Doe, John Doe, Stanford Daily Publishing Corporation. (Fitzpatrick, Conor) (Filed on 4/14/2026) Modified on 4/15/2026 (kam2, COURT STAFF). (Entered: 04/14/2026) |
| 04/23/2026 | 89 | RESPONSE re 84 Supplemental Brief by Jane Doe, John Doe, Stanford Daily Publishing Corporation. (Fitzpatrick, Conor) (Filed on 4/23/2026) (Entered: 04/23/2026) |
| 04/23/2026 | 90 | RESPONSE re 87 Supplemental Brief by Markwayne Mullin, Marco Rubio. (Helland, Kelsey) (Filed on 4/23/2026) (Entered: 04/23/2026) |
| 04/23/2026 | 91 | RESPONSE re 86 Statement, *of Disputed Facts* by Markwayne Mullin, Marco Rubio. (Helland, Kelsey) (Filed on 4/23/2026) (Entered: 04/23/2026) |
| 05/08/2026 | 92 | **CLERK'S NOTICE RESETTING BENCH TRIAL**<br><br>May 14, 2026 Bench Trial reset to 5/27/2026 at 09:00 AM in San Jose, Courtroom 3, 5th floor before District Judge Noel Wise.<br>*(This is a text-only entry generated by the court. There is no document associated with this entry.)* (akw, COURT STAFF) (Filed on 5/8/2026) (Entered: 05/08/2026) |
| 05/12/2026 | 93 | **ORDER. Ahead of the parties upcoming bench trial, the Court orders the parties to file a Joint Pretrial Statement by May 20, 2026, with the following information:**<br><br>**(1) A brief description of the parties, the substance of claims and defenses that remain to be decided, and the operative pleadings;**<br><br>**(2) A statement of all requested relief, including an itemization of all elements of damages claimed;**<br><br>**(3) A statement of requested proposed amendments to pleadings, and the causes of action or affirmative defenses to be dismissed or withdrawn prior to trial;**<br><br>**(4) A concise statement of each disputed point of law concerning liability or relief, citing supporting statutes and decisions;**<br><br>**(5) A brief summary of the status of settlement negotiations (without indicating specific dollar amounts or other proposed settlement terms), and an indication of whether further negotiations are likely to be productive; and** |

15-ER 4129

| | | |
|---|---|---|
| | | **(6) Any other matters that will facilitate the just, speedy, and efficient resolution of the action.**<br><br>**Signed by Judge Noel Wise on May 12, 2026. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (nwlc2, COURT STAFF) (Filed on 5/12/2026) (Entered: 05/12/2026)** |
| 05/15/2026 | 94 | NOTICE of Withdrawal filed by Daniel A. Zahn, no longer appearing on behalf of Jane Doe, John Doe, Stanford Daily Publishing Corporation in this case (Zahn, Daniel) (Filed on 5/15/2026) (Entered: 05/15/2026) |
| 05/20/2026 | 95 | Statement *(Joint)* re 93 Order by Jane Doe, John Doe, Stanford Daily Publishing Corporation. (Fitzpatrick, Conor) (Filed on 5/20/2026) Modified on 5/21/2026 (kam2, COURT STAFF). (Entered: 05/20/2026) |
| 05/27/2026 | 98 | **Minute Entry for proceedings held before District Judge Noel Wise:**<br>Bench Trial held on 5/27/2026. Argument presented by counsel for both parties. The Court took the matter under submission. Further Case Management Conference set for July 28, 2026 at 9:00 AM - via videoconference.<br><br>Total Time in Court: 6:18.<br>Court Reporter: Tiffany Salinas-Harwell.<br><br>Plaintiff Attorney: Conor Fitzpatrick, Colin McDonell, John Sinodis, Oona Cahil, Marc Van Der Hout.<br>Defendant Attorney: Kelsey Helland.<br>*(This is a text-only entry generated by the court. There is no document associated with this entry.)* (akw, COURT STAFF) (Date Filed: 5/27/2026) (Entered: 05/28/2026) |
| 05/28/2026 | 96 | **ORDER. The Court held a bench trial on May 27, 2026. The Court ordered the parties to file, by no later than June 26, 2026, the following:**<br><br>**1.Proposed Findings of Fact. The parties shall jointly file proposed findings of fact, formatted in a manner that the Court could incorporate them into an order. To the extent the parties disagree on a fact, each party shall include their proposal and a brief explanation of support for that proposed finding and an explanation of why they disagree.**<br><br>**2.Proposed Order. Each party shall separately file a proposed order. The parties shall be concise but address all respective requested relief. The parties shall send Word versions (as well as file on the docket) to the Court's proposed order email address (nwpo@cand.uscourts.gov). This is not briefing; the parties shall not file responsive briefing to each other's proposed orders.**<br><br>**3.Demonstratives. The parties shall lodge on the docket any demonstratives used during the bench trial that have not already been filed.**<br><br>**Signed by Judge Noel Wise on May 28, 2026. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (nwlc2, COURT STAFF) (Filed on 5/28/2026) (Entered: 05/28/2026)** |
| 05/28/2026 | 97 | EXHIBITS re 96 Order,,,, *Plaintiffs' Demonstratives* filed byJane Doe, John Doe, Stanford Daily Publishing Corporation. (Related document(s) 96 ) (Fitzpatrick, Conor) (Filed on 5/28/2026) (Entered: 05/28/2026) |

15-ER 4130

| | | |
|---|---|---|
| 05/29/2026 | 99 | TRANSCRIPT ORDER for proceedings held on 5/27/2026 before District Judge Noel Wise by Jane Doe, John Doe, Stanford Daily Publishing Corporation, for Court Reporter Tiffany Salinas-Harwell. (Fitzpatrick, Conor) (Filed on 5/29/2026) (Entered: 05/29/2026) |
| 06/08/2026 | 100 | Transcript of Proceedings held on May 27, 2026, before Judge Noel Wise. Court Reporter: Tiffany Salinas-Harwell, E-Mail Address: Tiffany_Salinas-Harwell@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re 99 Transcript Order). Redaction Request due 6/29/2026. Redacted Transcript Deadline set for 7/9/2026. Release of Transcript Restriction set for 9/8/2026. (tsh, COURT STAFF) (Filed on 6/8/2026) (Entered: 06/08/2026) |
| 06/26/2026 | 101 | Proposed Findings of Fact by Jane Doe, John Doe, Stanford Daily Publishing Corporation *Joint Proposed Findings of Fact*. (Fitzpatrick, Conor) (Filed on 6/26/2026) (Entered: 06/26/2026) |
| 06/26/2026 | 102 | Proposed Order re 96 Order,,,, *Defendants' Proposed Post-Trial Order* by Markwayne Mullin, Marco Rubio. (Helland, Kelsey) (Filed on 6/26/2026) (Entered: 06/26/2026) |
| 06/26/2026 | 103 | Proposed Order re 96 Order,,,, *Plaintiffs' Proposed Post-Trial Order* by Jane Doe, John Doe, Stanford Daily Publishing Corporation. (Fitzpatrick, Conor) (Filed on 6/26/2026) (Entered: 06/26/2026) |
| 07/22/2026 | 104 | **CLERK'S NOTICE SETTING CASE MANAGEMENT CONFERENCE.**<br><br>Case Management Statement due by 8/10/2026. Initial Case Management Conference set for 8/27/2026 at 09:00 AM in San Jose, - Videoconference Only. This proceeding will be held via a Zoom Meeting.<br><br>**Meeting Access:** All counsel may access the meeting information at https://www.cand.uscourts.gov/judges/wise-noel-nw/<br><br>**Court Appearances:** Advanced notice is required of counsel or parties who wish to be identified by the court as making an appearance or will be participating in the argument at the hearing. A list of names and emails must be sent to the CRD at nwcrd@cand.uscourts.gov no later than August 24, 2026 at 5:00pm.<br><br>**Civ LR 77-3(d).** Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited.<br><br>**Zoom Guidance and Setup:** https://cand.uscourts.gov/zoom.<br><br>Case Management Statement due by 8/10/2026. Initial Case Management Conference set for 8/27/2026 at 09:00 AM in San Jose, - Videoconference Only.<br>*(This is a text-only entry generated by the court. There is no document associated with this entry.)* (akw, COURT STAFF) (Filed on 7/22/2026) (Entered: 07/22/2026) |
| 07/27/2026 | 105 | STIPULATION *FOR DISMISSAL OF PLAINTIFF JOHN DOE* filed by John Doe. (Fitzpatrick, Conor) (Filed on 7/27/2026) (Entered: 07/27/2026) |
| 08/10/2026 | 106 | CASE MANAGEMENT STATEMENT *(JOINT)* filed by Jane Doe, Stanford Daily Publishing Corporation. (Fitzpatrick, Conor) (Filed on 8/10/2026) (Entered: 08/10/2026) |

| | | |
|---|---|---|
| 08/26/2026 | 107 | **ORDER by Judge Noel Wise on August 26, 2026. The Court's Memorandum of Decision following the bench trial will issue soon. Accordingly, the Court VACATES the Case Management Conference set for August 27, 2026. The Court will reset the Case Management Conference as needed.** ***(This is a text-only entry generated by the court. There is no document associated with this entry.)*** **(nwlc1, COURT STAFF) (Filed on 8/26/2026) (Entered: 08/26/2026)** |
| 08/28/2026 | 108 | **MEMORANDUM OF DECISION PURSUANT TO FED. R. CIV. P. 52(A)(1)** *signed by Judge Noël Wise on 8/28/2026.* (akw, COURT STAFF) (Filed on 8/28/2026) (Entered: 08/28/2026) |
| 08/28/2026 | 109 | **JUDGMENT** *signed by Judge Noël Wise on 8/28/2026.* (akw, COURT STAFF) (Filed on 8/28/2026) (Entered: 08/28/2026) |
| 08/28/2026 | | ***Civil Case Terminated pursuant to 108 and 109 . (akw, COURT STAFF) (Filed on 8/28/2026) (Entered: 08/28/2026) |
| 10/14/2026 | 110 | NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by Markwayne Mullin, Marco Rubio. (Appeal fee FEE WAIVED.) (Helland, Kelsey) (Filed on 10/14/2026) (Entered: 10/14/2026) |
| 10/20/2026 | 111 | USCA Case Number 26-6906 Ninth Circuit for 110 Notice of Appeal to the Ninth Circuit filed by Markwayne Mullin, Marco Rubio. (dhm, COURT STAFF) (Filed on 10/20/2026) (Entered: 10/21/2026) |
| 10/26/2026 | 112 | TRANSCRIPT ORDER for proceedings held on 11/19/2025 before District Judge Noel Wise by Markwayne Mullin, Marco Rubio, for Recorded Proceeding - San Jose. (Helland, Kelsey) (Filed on 10/26/2026) **Transcriber Velvet Quill Communications, Email: info@velvetquill.com** Modified on 10/26/2026 (lmh, COURT STAFF). (Entered: 10/26/2026) |


| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 10/27/2026 06:44:27 | | | |
| **PACER Login:** | jahurley1181 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 5:25-cv-06618-NW |
| **Billable Pages:** | 16 | **Cost:** | 1.60 |